

Figure 5-45: Overview Map of Location Specific Option LS-13





**Figure 5-46: Detail of Location Specific Option LS-13**





## 5.1.14  Location Specific Option 14 (LS-14)

**Section 4(f) Property Avoided: Andrews Manor Park**

### A.    Description

The Proposed Action would widen I-495 on existing alignment at this location. The improvements would result in impacts to Andrews Manor Park as described in **Section 2.1.41**. Option LS-14 would involve shifting the I-495 mainline approximately 85 feet north to avoid the Section 4(f) use of the park (**Figure 5-47** through **Figure 5-49**). The stormwater management facility would be relocated to the existing alignment of I-495 that would be vacated under the design of Option LS-14. No additional Section 4(f) property would experience a use from Option LS-14.

### B.    Analysis

In consideration of Least Overall Harm Factor 6, Option LS-14 would cause severe impacts to community resources, potentially resulting in the relocation of 41 properties. The Proposed Action would not result in any relocations along this portion of the Study. In consideration of Least Overall Harm Factor 7, Option LS-14 would cost approximately $193 million or $25 million more than the Proposed Action along this portion of the project. Owing to the severe impacts to community resources and substantial difference in cost, Option LS-14 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the use of Andrews Manor Park when compared to the Proposed Action Option LS-14 would have greater ability to mitigate adverse impacts to Section 4(f) property. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-14 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Option LS-14 would avoid the use of Andrews Manor Park. There are no additional Section 4(f) properties in the vicinity.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-14 would meet the Purpose and Need to a degree that is comparable to the Proposed Action.

00038838

00038839

**Figure 5-47: Overview Map of Location Specific Option LS-14**

DRAFT SECTION 4(f) EVALUATION



**Figure 5-48: Detail of Location Specific Option LS-14 (Map 1 of 2)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

| Location Specific Options | Legend | | |
|---|---|---|---|
| Option LS-14 | Centerline of Proposed Action | Map Match Line | |
| | Historic Property | | |
| | Park Property | | |

**Location Specific Options Map**

Map 7.2.1

0    150    300 Feet

00038841

DRAFT SECTION 4(f) EVALUATION



**Figure 5-49: Detail of Location Specific Option LS-14 (Map 2 of 2)**



00038843

### 5.1.15 Location Specific Option 15 (LS-15)

**Section 4(f) Properties Avoided: Cabin John Regional Park, Tilden Woods Stream Valley Park, Old Farm Neighborhood Conservation Area, and Cabin John Stream Valley Park, Unit 6.**

A.    **Description**

The Proposed Action would widen I-270 on alignment at this location. The widening would result in impacts to Cabin John Regional Park as described in **Section 2.2.2**, Tilden Woods Stream Valley Park (**Section 2.2.3**), Old Farm Neighborhood Conservation Area (**Section 2.2.4**) and Unit 6 of Cabin John Stream Valley Park (**Section 2.2.5**).

Option LS-15 would relocate the west spur of I-270 up to 1.6 miles to the west, avoiding the four Section 4(f) properties (**Figure 5-50** through **Figure 5-56**). The wide westerly shift is necessary because Cabin John Regional Park is a contiguous resource that extends over a mile to the west of I-270. The arc of Option LS-15 was designed to avoid Section 4(f) property, minimize property relocations, and connect to I-495 near the existing interchange. Existing I-270 would be removed from service between the west spur interchange with I-495 and the Montrose Road interchange.

B.    **Analysis**

In consideration of Least Overall Harm Factor 6, Option LS-15 would cause severe impacts to community resources, potentially resulting in the relocation of 700 properties. Option LS-15 would also impact the roadway infrastructure of several existing communities, potentially cutting off access to these areas. In consideration of Least Overall Harm Factor 7, Option LS-15 would cost an estimated $2.5 billion or $1.6 billion more than the Proposed Action along this portion of the project. Owing to the severe impacts to community resources and substantial difference in cost, Option LS-15 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the Section 4(f) use of the four properties listed in **Table 5-16**, when compared to the Proposed Action Option LS-15 would have greater ability to mitigate adverse impacts to Section 4(f) property. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-15 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) property for protection. In consideration of Least Overall Harm Factor 3, Cabin John Regional Park is a large, heavily used, multi-function recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County in a location where no comparable facilities exist. It is the most significant Section 4(f) property along this portion of the Study.

**Table 5-16: Properties Avoided by Option LS-15**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Cabin John Regional Park | 5.7 |
| Tilden Woods Stream Valley Park | 0.2 |
| Old Farm Neighborhood Conservation Area | 0.1 |
| Cabin John Stream Valley Park, Unit 6 | 0.4 |
| **Total Section 4(f) Property Avoided** | **6.4** |

00038844



In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-15 would maintain the same typical section as the Proposed Action, but owing to the length and significant disruption to established communities would meet the Purpose and Need of the Study to a lesser degree than the Proposed Action.

00038845



**Figure 5-50: Overview Map of Location Specific Option LS-15**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**
- Option LS-15
- Option LS-16
- Option LS-17

**Legend**
- Centerline of Proposed Action
- Historic Property
- Park Property
- Map Match Line

**Location Specific Options Overview Map**

Map 8.1.0

0   750   1,500 Feet

00038846



**Figure 5-51: Detail of Location Specific Option LS-15 (Map 1 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

00038847

DRAFT SECTION 4(f) EVALUATION



**Figure 5-52: Detail of Location Specific Option LS-15 (Map 2 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Cabin John Regional Park

| Location Specific Options | Legend |
|---|---|
| Option LS-15 | Centerline of Proposed Action |
| | Historic Property |
| | Park Property |
| | Map Match Line |

Location Specific Options Map

Map 8.1.2

0   150   300
Feet

00038848

**DRAFT SECTION 4(f) EVALUATION**



**Figure 5-53: Detail of Location Specific Option LS-15 (Map 3 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Location Specific Options

Legend

Option LS-15

Centerline of Proposed Action

Map Match Line

Historic Property

Park Property

Location Specific Options Map

Map 8.1.3

0    150    300 Feet

00038849



**Figure 5-54: Detail of Location Specific Option LS-15 (Map 4 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

Option LS-15

**Legend**

Centerline of Proposed Action

Map Match Line

Historic Property

Park Property

**Location Specific Options Map**

Map 8.1.4

0   150   300 Feet

00038850

DRAFT SECTION 4(f) EVALUATION



**Figure 5-55: Detail of Location Specific Option LS-15 (Map 5 of 6)**



00038851



**Figure 5-56: Detail of Location Specific Option LS-15 (Map 6 of 6)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

Cabin John Regional Park

**Location Specific Options**
- Option LS-15
- Option LS-16
- Option LS-17

**Legend**
- Centerline of Proposed Action
- Map Match Line
- Historic Property
- Park Property

**Location Specific Options Map**

Map 8.1.6

0    150    300 Feet

00038852

00038853



### 5.1.16  Location Specific Option 16 (LS-16)

**Section 4(f) Property Avoided: Cabin John Regional Park**

A.    **Description**

The Proposed Action would widen I-270 on existing alignment at this location. The widening would result in impacts to Cabin John Regional Park as described in **Section 2.2.2**. Option LS-16 would shift the I-270 mainline approximately 160 feet to the east while maintaining the same typical section as the Proposed Action (**Figure 5-57** through **Figure 5-61**). The design of Option LS-16 would realign the I-270 split into the east and west spurs.

B.    **Analysis**

In consideration of Least Overall Harm Factor 6, Option LS-16 would cause severe impacts to community resources, potentially resulting in the relocation of 60 properties. In consideration of Least Overall Harm Factor 7, Option LS-16 would cost an estimated $920 million or $270 million more than the Proposed Action along this portion of the project. Owing to the severe impacts to community resources and substantial difference in cost, Option LS-16 would result in more harm than the Proposed Action.

**Table 5-17: Property Avoided by Option LS-16**

| Section 4(f) Property | Section 4(f) Avoidance (in Acres) |
|---|---|
| Cabin John Regional Park | 5.7 |
| **Total Section 4(f) Property Avoided** | **5.7** |

**Table 5-18: Properties Experiencing an Increase in Section 4(f) Use by Option LS-16**

| Section 4(f) Property | Increase in Section 4(f) Use (in Acres) |
|---|---|
| Tilden Woods Stream Valley Park | 0.9 |
| Old Farm Neighborhood Conservation Area | 0.6 |
| Cabin John Stream Valley Park, Unit 6 | 2.4 |
| **Total Section 4(f) Property Avoided** | **3.9** |

In consideration of Least Overall Harm Factor 1, Option LS-16 would avoid the use of Cabin John Regional Park (**Table 5-17**) and increase the Section 4(f) use of the four properties listed in **Table 5-18**. The net result is when compared to the Proposed Action, Option LS-16 would reduce use of Section 4(f) properties by 1.8 acres. When compared to the Proposed Action Option LS-16 would have greater ability to mitigate adverse impacts to Section 4(f) property. However, the Proposed Action would primarily result in impacts to the edges and boundaries of the Section 4(f) properties where they meet the existing transportation facility. By comparison, Option LS-16 would result in significant impacts to the protected activities, attributes and features of the Section 4(f) properties listed in **Table 5-18**. Therefore, in consideration of Least Overall Harm Factor 2, Option LS-16 would result in greater harm to Section 4(f) properties than the Proposed Action.

00038854

In consideration of Least Overall Harm Factor 3, Cabin John Regional Park is a large, heavily used, multi-function recreational facility that provides opportunities to a wide segment of densely populated lower Montgomery County in a location where no comparable facilities exist. It is the most significant Section 4(f) property along this portion of the Study. In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 5, Option LS-16 would maintain the same typical section as the Proposed Action and would meet the Purpose and Need of the Study to a degree comparable to the Proposed Action.

### 5.1.17  Location Specific Option 17 (LS-17)

**Section 4(f) Property Avoided: Cabin John Stream Valley Park (Rockville)**

#### A.    Description

The Proposed Action would widen I-270 on-alignment. The widening would result in impacts to Cabin John Stream Valley Park (Rockville) as a result of the construction of a stormwater management facility as described in **Section 2.2.6**. Option LS-17 would similarly widen I-270 on alignment, but would avoid the use of Cabin John Regional Park (Rockville) by eliminating the proposed stormwater management facility (**Figure 5-57** and **Figure 5-61**).

#### B.    Analysis

In consideration of Least Overall Harm Factor 6, Option LS-17 would reduce impacts to forest resources by approximately 2 acres. However it would also eliminate a stormwater management facility and result in a quantity treatment deficit that would affect the ability of the project to secure a state permit. A stormwater management facility is required at this location to address a quantity treatment deficit along this portion of the project. Engineering studies determined no additional suitable locations for stormwater treatment are along this portion of the project. As a result, in consideration of Least Overall Harm Factor 5, Option LS-17 would meet the Purpose and Need to a lesser degree than the Proposed Action because MDOT SHA would not be able to deliver the project in an environmentally responsible manner. Owing the compromised ability to meet the Purpose and Need and adverse impacts to the treatment of stormwater runoff, Option LS-17 would result in more harm than the Proposed Action.

In consideration of Least Overall Harm Factor 1, because it avoids the Section 4(f) use of Cabin John Stream Valley Park (Rockville), Option LS-17 would have greater ability than the Proposed Action to mitigate adverse impacts. Additionally, in consideration of Least Overall Harm Factor 2, Option LS-17 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, Option LS-17 would avoid the use Cabin John Stream Valley Park (Rockville). The use of additional Section 4(f) properties in the vicinity would not change. In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of this Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 7, Option LS-17 would cost $35 million, approximately $3 million less than the Proposed Action.

00038855



**Figure 5-57: Overview Map of Location Specific Options LS-16 and LS-17**



DRAFT SECTION 4(f) EVALUATION



**Figure 5-58: Detail of Location Specific Option LS-16 (Map 1 of 4)**



Location Specific Options are not designed to the same level of detail as the Proposed Action. Detailed limits of disturbance are not defined. For analysis purposes a standard width of 200 feet was applied to allow estimation of environmental impacts.

**Location Specific Options**

Option LS-16

**Legend**

Centerline of Proposed Action

Historic Property

Park Property

Map Match Line

**Location Specific Options Map**

Map 8.2.1

0    150    300 Feet

00038857

Figure 5-59: Detail of Location Specific Option LS-16 (Map 2 of 4)



Figure 5-60: Detail of Location Specific Option LS-16 (Map 3 of 4)



00038859



**Figure 5-61: Detail of Location Specific Option LS-16 (Map 4 of 4) and Location Specific Option LS-17**



00038861



## 5.2    Other Minimization Alternatives Considered

### 5.2.1    Alternative 5: 1-Lane, High-Occupancy Toll Managed Lane Network

#### A.    Description

This alternative consists of adding one HOT managed lane in each direction on I-495. On I-270, Alternative 5 would convert the one existing HOV lane in each direction to an HOT managed lane (**Figure 5-62**). Buses would be permitted to use the managed lanes.

#### B.    Analysis

In consideration of Least Overall Harm Factor 5, Alternative 5 would not meet the Purpose and Need of the Study owing to deficiencies in addressing the existing traffic and long-term traffic growth and trip reliability. Detailed analysis, including a full comparison of impacts and financial information in relation to the other Proposed Action, is found in the **Chapter 2** of the DEIS and the *Alternatives Technical Report* attached as **Appendix B** of the DEIS. Alternative 5 would perform the worst for most metrics used to evaluate existing traffic and long-term traffic growth and trip reliability and would perform the worst amongst the Screened Alternatives in system-wide delay, corridor travel time, density/level of service and travel time (GP lanes). For this reason, Alternative 5 would result in more harm than the Proposed Action.

**Table 5-19: Difference in Use of Section 4(f) Properties among the Proposed Action and Alternative 5**

| Section 4(f) Property | Section 4(f) Use from Alt 5 (Acres) | Section 4(f) Use from Proposed Action (Acres) | | | | | |
|---|---|---|---|---|---|---|---|
| | | Alt 8 | Alt 9 | Alt 9M | Alt 10 | Alt 13B | Alt 13C |
| BARC | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Montgomery Blair High School Athletic Fields | 1.1 | 1.4 | 1.4 | 1.1 | 1.4 | 1.4 | 1.4 |
| Blair Local Park | 0.3 | 0.4 | 0.4 | 0.3 | 0.4 | 0.4 | 0.4 |
| Burning Tree Club | 0.5 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Cabin John Regional Park | 4.4 | 5.7 | 5.7 | 5.7 | 7.2 | 4.5 | 5.2 |
| Forest Glen Historic District | 0.1 | 0.2 | 0.2 | 0.1 | 0.2 | 0.2 | 0.2 |
| Glenarden Historic District | 0.6 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 | 0.8 |
| Indian Spring Club Estates Historic District | 1.1 | 1.2 | 1.2 | 1.1 | 1.2 | 1.2 | 1.2 |
| C&O Canal NHP | 14.8 | 15.4 | 15.4 | 15.4 | 15.4 | 15.4 | 15.4 |
| George Washington Memorial Parkway | 12.1 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 | 12.2 |
| Greenbelt Park | 0.3 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 | 0.6 |
| Henry P. Johnson Park | 0.0 (*Avoided*) | < 0.1 | < 0.1 | < 0.1 | < 0.1 | < 0.1 | < 0.1 |
| Locust Hill Neighborhood Park | 0.2 | 0.3 | 0.3 | 0.2 | 0.3 | 0.3 | 0.3 |
| Manchester Estates Park | 0.4 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Rock Creek Stream Valley Park, Unit 2 | 0.2 | 0.4 | 0.4 | 0.2 | 0.4 | 0.4 | 0.4 |
| Rock Creek Stream Valley Park, Unit 3 | 2.5 | 3.3 | 3.3 | 2.5 | 3.3 | 3.3 | 3.3 |
| Sligo Creek Parkway | 3.3 | 4.1 | 4.1 | 3.3 | 4.1 | 4.1 | 4.1 |
| **Impacts to Section 4(f) Properties (Ac)** | **42.4** | **47.9** | **47.9** | **45.4** | **49.4** | **46.7** | **47.4** |

00038862



When compared to the Proposed Action, Alternative 5 would result in less use to the 16 Section 4(f) properties listed in **Table 5-19**. Alternative 5 would also impact one fewer Section 4(f) property than the Proposed Action: Henry P. Johnson Park. For the remaining Section 4(f) properties that would experience a use, there is no difference in the area of impacts between the Proposed Action and Alternative 5. In consideration of Least Overall Harm Factor 1, because Alternative 5 would result in less use of Section 4(f) property through the length of the Study, there would be greater ability to mitigate adverse impacts when compared to the Proposed Action. Additionally in consideration of Least Overall Harm Factor 2, Option LS-1 would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 5 would result in less Section 4(f) use of each of these properties, save Baltimore Washington Parkway.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 6, owing to a narrower typical section, when compared to Proposed Action, Alternative 5 would result in fewer impacts to wetlands, waterways, and forest resources. It would also result in fewer relocations. In consideration of Least Overall Harm Factor 7, Alternative 5 would cost between $ 7.7 billion and $8.6 billion, which compares to between $8.2 Billion and $9.9 Billion for the Proposed Action.

**Figure 5-62: Alternative 5 Typical Sections**



00038863



### 5.2.2  MD 200 Diversion Alternative

Through the agency coordination process supporting the development of the DEIS, a few cooperating and participating agencies requested that MDOT SHA evaluate an alternative that would provide an alternate route for travelers to use MD 200 (Intercounty Connector) instead of the top side of I-495 between I-270 and I-95. The alternative was born out of a desire of the agencies to avoid or reduce impacts to significant, regulated resources and residential displacements.

### A.    Description

From a traffic standpoint, the MD 200 Diversion Alternative would provide an alternative route by directing travelers to use MD 200 instead of the top side of I-495 between I-270 and I-95 (**Figure 5-63**). MD 200 Diversion Alternative would consist of the following elements:

- No widening or capacity improvements along I-495 between the I-270 West Spur and I-95.
- Consideration of TSM/TDM improvements along I-495 between the I-270 East Spur and I-95.
- Two managed lanes added in each direction on I-495 between the Study limits south of George Washington Parkway, at the Virginia Department of Transportation HOT lane extension south of the American Legion Bridge, and the I-270 West Spur.
- Two managed lanes added in each direction on I-495 between I-95 and the Study limits west of MD 5.
- Conversion of the one existing HOV lane in each direction to a HOT managed lane on I-270 and the addition of one HOT managed lane in each direction on I-270, resulting in a two-lane managed lanes network on I-270.
- Two managed lanes added in each direction of I-95 between the MD 200 and I-495.

In general, the MD 200 Diversion Alternative would result in fewer environmental impacts than the Proposed Action. This is the result of no widening or capacity improvements for approximately 10.5 miles along the top side of I-495. Under the MD 200 Diversion Alternative because there are no impacts along the top side of I-495, 13 Section 4(f) properties would be avoided with this alternative compared to the Proposed Action. Specifically, this alternative would avoid four Section 4(f) properties under the authority of the Capper-Cramton Act: Units 2 and 3 of Rock Creek Stream Valley Park, Sligo Creek Parkway, and Unit 3 of Northwest Branch Stream Valley Park. No new Section 4(f) properties along I-95 would be impacted by the MD 200 Alternative.

00038864

**Figure 5-63: MD 200 Diversion Alternative**



## B.    Analysis

In consideration of Least Overall Harm Factor 5, the MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. MD 200 will not have adequate capacity to accommodate the projected traffic by design year 2040 and the viable TSM/TDM solutions would not provide adequate congestion relief on I-495. The MD 200 Diversion Alternative Analysis Results Paper is included as an attachment to the *Alternatives Technical Report* enclosed as **Appendix B**. As the MD 200 Diversion Alternative would not meet the Purpose and Need of the Study, it would cause more harm than the Proposed Actions.

00038865

In consideration of Least Overall Harm Factor 1, when compared to the Proposed Action, the MD 200 Diversion Alternative avoids the Section 4(f) use (between 14.9 and 17.9 acres) of the 15 properties listed in **Table 5-19**. Because of this avoidance, the MD 200 Diversion Alternative would have greater ability to mitigate adverse impacts than the Proposed Action. Additionally, inconsideration of Least Overall Harm Factor 2, the MD 200 Diversion Alternative would result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

**Table 5-20: Section 4(f) Properties Avoided by MD 200 Diversion Alternative**

| Section 4(f) Property | Avoided Potential Use under MD 200 Diversion Alternative from the Proposed Action |
|---|---|
| Fleming Local Park | 0.1 Acre |
| Grosvenor Estate | 0.1 Acre to 0.2 Acre (Alt 10) |
| Rock Creek Stream Valley Park, Unit 3 | 2.5 Acres (Alts 5 and 9M) to 3.3 Acres |
| Rock Creek Stream Valley Park, Unit 2 | 0.2 Acre (Alts 5 and 9M) to 0.4 Acre |
| Locust Hill Neighborhood Park | 0.2 Acre (Alts 5 and 9M) to 0.4 Acre |
| Metropolitan Branch, B&O Railroad | 8.8 Acres |
| National Park Seminary Historic District/ Forest Glen | 1.2 Acres |
| Forest Glen Historic District | 0.1 Acre (Alts 5 and 9M) to 0.2 Acre |
| Forest Glen Neighborhood Park | 0.2 Acre (Alts 5 and 9M) to 0.3 Acre |
| Sligo Creek Parkway | 3.3 Acres (Alts 5 and 9M) to 4.1 Acres |
| South Four Corners Neighborhood Park | < 0.1 Acre (Alts 5 and 9M) to 0.1 Acre |
| Indian Spring Club Estates | 1.1 Acres (Alts 5 and 9M) to 1.2 Acres |
| Indian Springs Terrace Local Park | 1.2 Acres (Alts 5 and 9M) to 1.4 Acres |
| Montgomery Blair High School Athletic Fields | 1.1 Acres (Alts 5 and 9M) to 1.4 Acres |
| Blair Local Park | 0.3 Acres (Alts 5 and 9M) to 0.4 Acre |
| Northwest Branch Stream Valley Park | 3.2 Acres |

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 0**). When compared to the Proposed Action, the MD 200 Diversion Alternative would result in less Section 4(f) use of Units 2 and 3 of Rock Creek Stream Valley Park and Sligo Creek Parkway.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation.

In consideration of Least Overall Harm Factor 6, owing to a narrower typical section along I-495 between the I-270 east spur and the I-95 interchange, when compared to Proposed Action, the MD 200 Diversion Alternative would result in fewer impacts to wetlands, waterways, and forest resources. It would also

00038866



result in fewer relocations. In consideration of Least Overall Harm Factor 7, the MD 200 Diversion Alternative would cost between $6.7 billion and $8.1 billion, which compares to between $8.2 Billion and $9.9 Billion for the Proposed Action. However, the MD 200 Diversion Alternative would require a subsidy of public funding, which means that even with toll revenue, the State would have to pay approximately $310 million over the life of the project.

## 5.3    Proposed Action

There are six Build Alternatives that are being retained for detailed study in the DEIS. These alternatives include managed lanes that differ in the manner in which the proposed travel lanes would be designated and configured. The six Build Alternatives were summarized in **Section 1.4.3** of this document and are described in detail in the DEIS. The total impacts to Section 4(f) property are listed in **Table 5-21**. Because the No Build would not result in the use of any Section 4(f) property, it is evaluated as an avoidance alternative in **Section 3.1.1.**

<p align="center">**Table 5-21: Total Potential Impacts to Section 4(f) properties by Build Alternative**</p>

| Alternative | Potential Impact in Acres to Section 4(f) Properties |
|---|---|
| 8 | 146.8 |
| 9 | 146.8 |
| 9M | 144.7 |
| 10 | 149.0 |
| 13B | 145.5 |
| 13C | 146.7 |

### 5.3.1    Alternative 8: Two-Lane, ETL Managed Lane Network on I-495 and One-Lane ETL and One-Lane HOV Managed Lane Network on I-270

#### A.    Description

This alternative consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane in each direction on I-270, and adding one ETL managed lane in each direction on I-270 (**Figure 5-64**). Buses would be permitted to use the managed lanes.

#### B.    Analysis

In consideration of Least Overall Harm Factor 5, Alternative 8 would meet the Purpose and Need of the Study to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 8 provides the least benefit compared to the other Build Alternatives in several metrics used to evaluate each alternative's ability to accommodate existing and long-term traffic growth, including average speed in the GP lanes, overall network delay during the AM peak period, and average annual travel time savings per commuter. Additionally, because Alternative 8 only provides a single ETL along I-270, slow-moving vehicles can reduce trip reliability in the managed lanes under Alternative 8 compared to the other Build Alternatives, which all provide two-lane systems. Owing to the compromised ability to meet the Purpose and Need, Alternative 8 would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 8 would result in 146.8 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Alternative 9 would result in the same area of impact to Section 4(f) properties. Each of the Build

00038867



Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 8 and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 8 would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 8 would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 8 would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost of Alternative 8 is approximately $8.7 Billion to $9.6 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 8 cashflow estimates indicate a more positive financial self-sufficient position (requiring no public subsidy) than several other Build Alternatives. Results for the baseline scenario indicated net payments to the state of approximately $833 million over the lifetime of the concessionaire's stake in the roadway. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,627 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the state may be required to provide a subsidy of approximately $584 million.

00038868



**Figure 5-64: Alternative 8 Typical Sections**





### 5.3.2  Alternative 9: Two Lane, High-Occupancy Toll Managed Lanes Network

#### A.  Description

Alternative 9 consists of adding two HOT managed lanes in each direction on I-495, converting the one existing HOV lane in each direction on I-270 to a HOT managed lane, and adding one HOT managed lane in each direction on I-270, resulting in a two-lane, managed lane network on both highways (**Figure 5-65**). Buses would be permitted to use the managed lanes.

#### B.  Analysis

In consideration of Least Overall Harm Factor 5, Alternative 9 would meet the Purpose and Need of the Study to a greater degree than the other Build Alternatives that comprise the Proposed Action. Alternative 9 performs consistently well when evaluating traffic metrics to accommodate existing and long-term traffic growth. It also performs the best among the Build Alternatives when evaluating average speed and corridor travel times on I-495 and I-270 within the limits of the Study. Alternative 9 would provide a reliable trip in the managed lanes and enhance reliability of the trip in the GP lanes.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost of Alternative 9 is approximately $8.7 Billion to $9.6 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 9 cashflow estimates indicate that it would be the most likely to be financially self-sufficient (requiring no public subsidy), representing a substantial difference in the cost among the alternatives. In the baseline scenario, positive excess cashflows would be approximately $960 million over the lifetime of the concessionaire's stake in the roadway. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,762 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the State may be required to provide a subsidy of approximately $482 million (lowest of the potential subsidies estimated from the financial analysis). Owing to meeting the Purpose and Need of the Study to a greater degree and for having the most financially self-sufficient outlook, Alternative 9 results in less harm than the other Build Alternatives in the Proposed Action.

00038869

In consideration of Least Overall Harm Factor 1, Alternative 9 would result in 146.8 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Alternative 8 would result in the same area of impact to Section 4(f) properties. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 9 and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 9 would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 9 would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 9 would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

**Figure 5-65: Alternative 9 Typical Sections**



00038870



### 5.3.3   Alternative 9 Modified

#### A.   Description

Overall, Alternative 9M would be a blend of Alternatives 5 and 9 with the primary difference on the top side of I-495 between I-270 and I-95 being the addition of one HOT lane instead of two HOT lanes in each direction:

- Two HOT managed lanes added in each direction on I-495 on the west side – between the Study limits south of the George Washington Memorial Parkway and the I-270 West Spur, including the American Legion Bridge.

- Conversion of the one existing HOV lane in each direction to a HOT managed lane on I-270 and the West Spur, and the addition of one HOT managed lane in each direction on I-270 and the West Spur, resulting in a two-lane managed lanes network. (Similar to Alternative 9, **Figure 5-65**).

- Conversion of the one existing HOV lane in each direction to a HOT managed lane on the I-270 East Spur. (Similar to Alternative 5, **Figure 5-62**.

- One HOT managed lane in each direction on I-495 between the I-270 West Spur and I-95. (Similar to Alternative 5).

- Two HOT managed lanes added in each direction on I-495 on the east side – between I-95 and the Study limits west of MD 5. (Similar to Alternative 9).

#### B.   Analysis

In consideration of Least Overall Harm Factor 5, Alternative 9M would meet the Purpose and Need of the Study to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 9M provides less benefit than all of the other Build Alternatives, save Alternative 8, owing to deficiencies in addressing the existing traffic and long-term traffic growth and trip reliability. Because Alternative 9M only provides a single HOT lane in each direction of I-495 between the I-270 west spur and I-95 interchange, slow-moving vehicles can reduce trip reliability in the managed lanes compared to the other Build Alternatives, which all provide two-lane systems.

In consideration of Least Overall Harm Factor 7, Alternative 9M would cost approximately $8.2 to $9.1 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 9M cashflow estimates indicate that it would may be financially self-sufficient. In the baseline scenario, positive excess cashflows would be approximately $459 over the lifetime of the concessionaire's stake in the roadway. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,190 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the State may be required to provide a subsidy of approximately $827 million. Owing to the compromised ability to meet Purpose and Need and a financial outlook that is less than Alternatives 9 and 10, Alternative 9M would result in greater harm than the other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 9M would result in 144.7 acres of impacts to Section 4(f) properties, the least among the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and

00038871

edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 9M and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 9M would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 9M would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 9M would result in less impact to Units 2 (0.2 acre less) and 3 (0.8 acre) of Rock Creek Stream Valley Park and Sligo Creek Parkway (0.8 acre) than the other Build Alternatives.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6,owing to a narrower typical section no I-495 between the I-270 west spur and I-95, when compared to the Proposed Action, Alternative 9M would result in fewer impacts to wetlands, waterways, and forest resources. It would also result in fewer relocations. Detailed mapping of Alternative 9M can be found in **Appendix D** of the DEIS.

### 5.3.4    Alternative 10: Two ETL Managed Lanes Network on I-495

#### A.    **Description**

Alternative 10 consists of adding two ETL managed lanes in each direction on I-495, retaining one existing HOV lane per direction on I-270, and adding two ETL managed lanes in each direction on I-270 (**Figure 5-66**). Buses would be permitted to use the managed lanes.

#### B.    **Analysis**

In consideration of Least Overall Harm Factor 5, Alternative 10 would meet the Purpose and Need of the Study to a degree similar to Alternative 9, and greater than the other Build Alternatives that comprise the Proposed Action. Alternative 10 would perform well for metrics used to measure the criteria of existing traffic and long-term traffic growth, but not as strongly as Alternative 9. Owing to the compromised ability to meet the Purpose and Need, Alternative 8 would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 10 would result in 149.0 acres of impacts to Section 4(f) properties, the largest when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries

00038872



and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 10 and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 10 would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 10 would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 10 would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, while Alternative 10 has the widest typical section, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost to Build Alternative 10 is $9 Billion to $9.9 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 10 cashflow estimates indicate a more positive financial self-sufficient position (requiring no public subsidy) than Alternatives 8, 9M, 13B, and 13C. Results for the baseline scenario indicated positive excess cashflows of approximately $866 million. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $2,711 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the state may be required to provide a subsidy of approximately $604 million.

00038873



**Figure 5-66: Alternative 10 Typical Sections**



### 5.3.5   Alternative 13B: HOT Managed Reversible Lanes on I-495 and Two, Managed Lanes on I-270

A.   **Description**

This alternative consists of adding two HOT managed lanes in each direction on I-495 and converting the existing HOV lanes in both directions to two HOT managed, reversible lanes on I-270 (**Figure 5-67**). Buses would be permitted to use the managed lanes.

B.   **Analysis**

In consideration of Least Overall Harm Factor 5, Alternative 13B would meet the Purpose and Need of the Study to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 13B would better accommodate existing and long-term traffic growth on I-495. However, on I-270, Alternative 13B would only provide better trip reliability and accommodate existing and long-term traffic grown in the peak direction of travel during peak periods. While the reversible HOT lanes on I-270 could accommodate the peak traffic demand, it would have negative impacts to travel along I-495 during the AM peak period. During this time, no northbound HOT lanes would be available along I-270, which would preclude any travelers along I-495 from using the HOT lanes if they were also destined for travel along northbound I-270. This would reduce the potential demand for the HOT lanes along both directions of I-495 approaching I-270 and increase the demand for the already over-capacity adjacent GP lanes. Owing to the compromised ability to meet the Purpose and Need, Alternative 13B would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 13B would result in 145.5 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 13B and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 13B would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when

00038874

compared to the Build Alternatives that comprise the Proposed Action, Alternative 13B would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section 2.2.2**). When compared to the Proposed Action, Alternative 13B would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost to build Alternative 13B is $8.7 Billion to $9.6 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 13B cashflow estimates indicate that it would be the least likely to be financially self-sufficient among the Build Alternatives. Results for the baseline scenario indicated positive excess cashflows of approximately $196 million. Under a lower construction price and lower interest rate scenario, the positive cashflows would be estimated at $1,907 million. Conversely, a higher construction cost and higher interest rate scenario would result in a negative cashflow estimate where the state may be required to provide a subsidy of approximately $1,088.

### Figure 5-67: Alternative 13B Typical Sections



00038875



### 5.3.6   Alternative 13C: ETL Managed Reversible Lanes and one HOV Managed Lane Network on I-270

#### A.   Description

This alternative consists of adding two ETL managed lanes in each direction on I-495 and retaining the existing HOV lanes in both directions and adding two ETL managed, reversible lanes on I-270 (**Figure 5-68**). Alternative 13C would maintain the existing roadway network on I-270 with HOV lanes to allow for free HOV travel while adding two managed, reversible lanes. Buses would be permitted to use the managed lanes.

#### B.   Analysis

In consideration of Least Overall Harm Factor 5, Alternative 13C meets the Purpose and Need to a lesser degree than the other Build Alternatives that comprise the Proposed Action. Alternative 13C would slightly outperform Alternative 13B – while still falling shy of Alternatives 9 and 10 – for the network delay metric because one HOV lane would be maintained in the non-peak direction under this alternative. Under Alternative 13C reversible HOT lanes on I-270 could accommodate the peak traffic demand, but the alternative would have negative impacts to travel along I-495 during the AM peak period and reversible lanes can only be operated in one direction at a time. Owing to the compromised ability to meet the Purpose and Need, Alternative 13C would result in more harm than other Build Alternatives in the Proposed Action.

In consideration of Least Overall Harm Factor 1, Alternative 13C would result in 146.7 acres of impacts to Section 4(f) properties when compared to the range of impacts for the other Build Alternatives – 144.7 to 149.0. Each of the Build Alternatives in the Proposed Action would impact the same number of Section 4(f) properties. Differences between the Build Alternatives are limited to areas at the boundaries and edges of Section 4(f) properties, where they meet the existing transportation facility. Despite the minor difference in the acreage of Section 4(f) use between Alternative 13C and the other Build Alternatives, the quality and features of the impacted lands for all Build Alternatives would be very similar. The ability to mitigate adverse impacts caused by Alternative 13C would be substantially equal to the other Build Alternatives that comprise the Proposed Action. In consideration of Least Overall Harm Factor 2, when compared to the Build Alternatives that comprise the Proposed Action, Alternative 13C would result in substantially equal harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection.

In consideration of Least Overall Harm Factor 3, the most significant Section 4(f) property along the length of the Study is Greenbelt Historic District, owing to its status as a National Historic Landmark. Additional Section 4(f) properties of elevated significance are scattered along the length of the Study, and include: George Washington Memorial Parkway (**Section 2.1.1**), Chesapeake and Ohio NHP (**2.1.2**), Clara Barton Parkway (**Section 2.1.3**), both units of Rock Creek Stream Valley Park (**Sections 2.1.9** and **2.1.11**), Sligo Creek Parkway (**Section 2.1.17**), Greenbelt Park (**Section 2.1.30**), Baltimore Washington Parkway (**Section 2.1.31**), Glenarden Historic District (**Section 2.1.35**), Suitland Parkway (**Section 2.1.39**), and Cabin John Regional Park (**Section** In consideration of Least Overall Harm Factor 1, because it avoids the use of three Section 4(f) properties – despite the increased use of the Section 4(f) properties listed in **Table 5-14** – when compared to the Proposed Action Option LS-10 would result in greater ability to mitigate adverse impacts to Section 4(f) property. In consideration of Least Overall Harm Factor 2, Option LS-10 would also

00038876

result in less remaining harm to the protected activities, attributes, and features that qualify Section 4(f) properties for protection. When compared to the Proposed Action, Alternative 13C would result in substantially equal use of these Section 4(f) properties.

In consideration of Least Overall Harm Factor 4, the OWJ have not provided views regarding the least overall harm alternatives. The opportunity to comment will occur during review of the Draft Section 4(f) Evaluation. In consideration of Least Overall Harm Factor 6, the number of potential relocations as well as impacts to wetlands, waterways and forest resources are substantially equal across all Build Alternatives.

In consideration of Least Overall Harm Factor 7, the anticipated construction and right-of-way cost to build Alternative 13C is $8.8 Billion to $9.7 Billion, which compares to the other Build Alternatives which range from $8.2 Billion to $9.9 Billion. Alternative 13C cashflow estimates would be less likely to be financially self-sufficient than Alternatives 8, 9, and 10. In the base case scenario, positive excess cashflows would be approximately $328 million. Under a lower construction price and lower interest rate scenario, the positive excess cashflows would be estimated at $2,065 million, compared to the result for a higher construction price and higher interest rate scenario which indicate negative cashflows where the State may be required to provide a subsidy of approximately $998 million.

### Figure 5-68: Alternative 13C Typical Section



## 5.4    Results of Least Overall Harm Analysis

The location specific options, other minimization alternatives, and the Build Alternatives set forth in the DEIS were each evaluated above in terms of the seven Least Overall Harm factors defined in 23 CFR 774.3(c)(1). The following preliminary analysis, as summarized in **Table 5-22**, considers how each alternative compare to the others based on the seven Least Overall Harm factors to ultimately identify the alternative that would result in the least overall harm.

The nature of the build alternatives being considered in this case, the proposed expansion of two major existing highway facilities, influences greatly how the Least Overall Harm factors are applied to the Section 4(f) analysis. Many of the resources described above have already been impacted by the development and subsequent expansions of I-495 and I-270. Other resources have been developed and/or managed in recognition of the presence of these crucial regional transportation facilities. Moreover, the constrained



built environmental surrounding I-495 and I-270 in light of the large amount of commercial and residential development in proximity to the limits of the Study means that there are only minimal differences between each alternative in the Section 4(f) properties impacted and harm resulting from the use of those properties.

Therefore, certain of the least overall harm factors are weighted more heavily in this draft analysis than others because the potential harm or benefit associated with some factors is greater than with others. For instance, the ability to mitigate adverse impacts (Factor 1) is weighted less heavily because it is anticipated that acceptable mitigation for all identified Section 4(f) uses will be similar for all Build Alternatives. Similarly, the relative severity of the remaining harm to Section 4(f) properties and the relative significance of Section 4(f) properties (Factors 2 and 3) are also weighted less heavily because there is little variation among the alternatives considered in this evaluation in terms of the remaining harm to Section 4(f) properties and the array of Section 4(f) properties impacted.

For this preliminary analysis, the views of the OWJ (Factor 4) are not yet considered because discussions with the OWJ are ongoing and will not be available until the Final Section 4(f) Evaluation. By contrast, the views of the OWJ will be weighted more heavily than Factors 1,2, and 3 as it is anticipated that their comments will provide beneficial diversity to the analysis of least overall harm.

By contrast, the magnitude of any adverse impacts to resources not protected by Section 4(f) (Factor 6) is relatively more important because many substantial non-Section 4(f) resources such as well-developed residential communities, streams, wetlands, and forests are commonly located adjacent to the existing highways and are highly valued in this project area. Substantial differences in costs among the alternatives (Factor 7) is also weighted more heavily than Factors 1, 2, and 3 because many of the differences in cost described above are extremely high. Beyond the numerical differences in basic construction, condemnation, and other costs, because this project will be delivered through a Public-Private Partnership, MDOT/SHA must also consider the long-term financial viability of each alternative. This factor is weighted more heavily in this analysis because differences in cost, especially for alternatives that are predicted to require state subsidies, could result in substantial harm to the financial viability of the P3 program for this project. Finally, the degree to which each alternative meets the Purpose and Need for the project (Factor 5) is weighted more heavily in this analysis because alternatives that hinder or prevent the project's ability to accommodate existing traffic and long-term traffic growth would likely result in economic, environmental and quality of life harm to Maryland and the entire Greater Washington region.

The preliminary Least Overall Harm analysis is presented in **Table 5-22** below. The final results will be presented in the Final Section 4(f) evaluation.

00038878

00038879



Table 5-22: Summary of the Least Overall Harm Analysis of Alternatives

| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Build Alternatives within the Proposed Action** | | | | | | | | |
| Alternative 8 | Substantially equal ability to mitigate adverse impacts to each Section 4(f) property | Substantially equal relative harm given the physical footprint among the Build Alternatives. Harm would occur to properties as described in Section 2 | All build alternatives would impact the same number of Section 4(f) properties | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation. Views of OWJs will be considered and | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Would meet the Purpose and Need to a lesser degree than other Build Alternatives. Would create traffic problems that would reduce trip reliability in the managed lanes. |
| Alternative 9 | | | | | Meets Purpose and Need to Greater Degree | | Total Cost of Alternative would be between $8.7 and $9.6 Billion | Meets Purpose and Need; impacts to properties protected by Section 4(f) are minimized; appropriate mitigation measures for use of Section 4(f) property to minimize harm. |
| Alternative 9 Modified | | | | | Meets Purpose and Need to a Lesser Degree | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $8.5 and $9.3 Billion. Not financially viable owing to lower revenue. | Would meet the Purpose and Need to a lesser degree than other Build Alternatives because it does not successfully address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| Alternative 10 | | | | | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than other Build Alternatives | Total Cost of Alternative would be between $9.0 and $9.9 Billion | Would have greater impacts to Section 4(f) Properties, natural resources, and property relocations as well as greater cost, but would provide no additional benefit in meeting Purpose and Need. |
| Alternative 13B | | | | | Meets Purpose and Need to a Lesser Degree | Substantially equal magnitude of adverse impacts to properties not protected by Section 4(f) | Total Cost of Alternative would be between $8.7 and $9.6 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree than the other Build Alternatives. Would only accommodate traffic growth in the peak direction during peak period. Would not be financially self-sufficient. |
| Alternative 13C | | | | | Meets Purpose and Need to a Lesser Degree | | Total Cost of Alternative would be between $8.8 and $9.7 Billion. Not financially viable owing to lower revenue | Would meet the Purpose and Need to a lesser degree. Would have negative impacts to travel along I-495 during the AM peak period as reversible lanes can only be operated in one direction at a time. Would not be financially self-sufficient. |

00038880

DRAFT SECTION 4(f) EVALUATION



| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| **Other Alternatives Considered** | | | | | | | | |
| **MD 200 Diversion Alternative** | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $7.0 and $8.1 Billion. Not financially viable owing to lower revenue. | The MD 200 Diversion Alternative would not address the Study's Purpose and Need of accommodating long-term traffic growth, enhancing trip reliability or improving the movement of goods and services. Would not be financially self-sufficient. |
| **Alternative 5** | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Does not meet Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Cost of Alternative would be between $7.8 and $8.5 Billion. Not financially viable owing to lower revenue. | Alternative 5 does not meet the Study's Purpose and Need because it does not address existing traffic and long-term traffic growth or enhance trip reliability, and it is not financially viable. |
| **Location Specific Options** | | | | | | | | |
| **LS-1** | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Meets Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-1 would meet the Purpose and Need of the project, it would cost $600 million more to construct than the Build Alternatives along this portion of the project. |
| **LS-2** | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives Not financially viable owing to lower revenue | Option LS-2 would adequately meet the Purpose and Need of the project, it would cost in excess of $1 billion more than the Build Alternatives along this portion of the project. |
| **LS-3** | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-3 would result in 10.4 acres of additional impacts to Section 4(f) properties, which would create additional mitigation along this portion of the project when compared to the Build Alternatives. Would cost in excess of $1.7 billion more than the Build Alternatives along this portion of the project. |
| **LS-4** | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | When compared to the Build Alternatives, Option LS-4 would result in 11 acres of additional impacts to Section 4(f) properties and cost nearly $700 million more. |

00038881

DRAFT SECTION 4(f) EVALUATION



| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-5 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-5 would result in 3.8 acres of additional impacts to Section 4(f) properties and cost $27 million more than the Build Alternatives along this portion of the Study. |
| LS-6 | Great Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-6 would cost $25 million more than the Build Alternatives along this portion of the Study. |
| LS-7 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Meets Purpose and Need | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-7 would result in an increase of 12 acres of impact to Section 4(f) properties, result in 547 additional relocations, and cost approximately $1.2 billion more than the Build Alternatives along this portion of the Study. |
| LS-8 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-8 would result in 0.9 acre of additional impacts to Section 4(f) properties and cost $250 million more than the Build Alternatives along this portion of the Study. |
| LS-9 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternative | Greater Cost than Build Alternatives | Option LS-9 would cost approximately $200 million more than the Build Alternatives along this portion of the Study. |
| LS-10 | Less Ability to Mitigate than Build Alternatives | Greater Harm than Build Alternatives | Greater Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | When compared to the Build Alternatives, Option LS-10 would result in 6.1 acres of additional impacts to one Section 4(f) property: BARC. Option LS-10 would cost approximately $88 million more than the Build Alternatives along this portion of the project. |
| LS-11 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-11 would cost approximately $500 million more than the Build Alternatives along this portion of the project. |

00038882



| Alternative | i. The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property | ii. The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection | iii. The relative significance of each Section 4(f) property | iv. The views of the official(s) with jurisdiction over each Section 4(f) property | v. The degree to which each alternative meets the purpose and need for the project | vi. After reasonable mitigation, the magnitude of any adverse impacts to properties not protected by Section 4(f) | vii. Substantial differences in costs among the alternatives | Preliminary Summary |
|---|---|---|---|---|---|---|---|---|
| LS-12 | Greater Ability to Mitigate than Build Alternatives | Substantially Equal | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Less cost than Build Alternatives | Option LS-12 would cost approximately $1 million less than the Build Alternatives. However, Option LS-12 would result in two displacements versus none by the Build Alternatives. |
| LS-13 | Substantially Equal | Substantially Equal | Substantially Equal | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-13 would cause severe impacts to community resources, potentially resulting in the relocation of 166 properties and cost approximately $400 million more than the build alternatives. |
| LS-14 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | OWJs to provide views during the review period of the DEIS and Draft Section 4(f) Evaluation | Meets Purpose and Need | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-14 would cause additional impacts to wetlands and forest resources and cost approximately $125 million more than the Build Alternatives. |
| LS-15 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Lesser Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-15 would cost approximately $25 million more than the Build Alternatives along this portion of the Study. |
| LS-16 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-16 would cost approximately $1.6 billion more than the Build Alternatives along this portion of the project. |
| LS-17 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Greater Cost than Build Alternatives | Option LS-17 would cost approximately $270 million more than the Build Alternatives along this portion of the project. |
| LS-18 | Greater Ability to Mitigate than Build Alternatives | Less Harm than Build Alternatives | Less Harm than Build Alternatives | | | Greater Magnitude of Adverse Impacts than Build Alternatives | Less Cost than Build Alternatives | Option LS-18 would be more difficult to permit than the Build Alternatives. |

# 6

# 6    COORDINATION

A summary of relevant coordination with the agencies and OWJ listed below is provided in **APPENDIX A.**

## 6.1    Department of Interior

This Draft Section 4(f) Evaluation will be provided to for coordination and comment to the Department of Interior.

## 6.2    Officials with Jurisdiction over Public Parks

There are eight OWJ over parkland in the Study: NPS; M-NCPPC, Montgomery County; M-NCPPC, Prince George's County; Montgomery County Public Schools Board of Education; City of Gaithersburg; City of Greenbelt; City of New Carrollton; and City of Rockville. This Draft Evaluation will be circulated to the OWJ. Preliminary Coordination has also occurred with the following:

### 6.2.1    National Park Service (NPS)

The NPS is the official with jurisdiction over NPS property and is also the agency within the Department of Interior with responsibility for consultation related to Section 4(f). NPS agreed to become a Cooperating Agency in the development of the Environmental Impact Statement (EIS) in March 2018 and coordination has continued throughout the Study including calls, emails, in-person meetings and other written correspondence. As a Cooperating Agency, NPS provided concurrence on major project milestones including the Purpose and Need, Agency Coordination Plan, and the ARDS. Aside from numerous large agency coordination meetings, individual meetings and conference calls with NPS were held on fourteen occasions between June 2018 and February 2020 to discuss key topics related to Section 4(f) properties including permitting, property access, Section 106, impacts, mitigation, minimization, avoidance, technical studies, and other issues related to the overall Study and specific properties. Additional correspondence was conducted via email and extensive sharing of project documents with NPS. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.2    Maryland-National Capital Park and Planning, Montgomery County

M-NCPPC, Montgomery County is the official with jurisdiction over county-owned public parks and recreation facilities in Montgomery County. M-NCPPC, Montgomery County is a Cooperating Agency, and coordination has occurred throughout the MLS process including calls, emails, in-person meetings and other written correspondence. Aside from numerous large agency coordination meetings, over 20 individual meetings and conference calls were held between June 2018 and February 2020. Topics for

00038884



coordination with M-NCPPC included property access, mitigation, mapping, avoidance, minimization, and impacts to each M-NCPPC park properties. MDOT SHA presented to the full M-NCPPC Commission twice to discuss the Study's Purpose and Need, preliminary range of alternatives, results of the MD 200 (Intercounty Connector [ICC]) Diversion Alternative and the ARDS. Additional correspondence via email and extensive sharing of project documents has occurred throughout the Study. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.3   Maryland-National Capital Park and Planning, Prince George's County

M-NCPPC, Prince George's County is the official with jurisdiction over county-owned public parks and recreation facilities in Prince George's County. M-NCPPC , Prince George's County is a Cooperating Agency in the development of the Environmental Impact Statement, and coordination has occurred throughout the Study including meetings and written correspondence. Aside from numerous large agency meetings, over 15 individual meetings and conference calls were held between June 2018 and February 2020. Topics for coordination with M-NCPPC included anticipated impacts to Section 4(f) properties, mitigation, avoidance, minimization, and the Study process and progress. MDOT SHA presented to the full M-NCPPC Commission twice to discuss the Study's Purpose and Need, preliminary range of alternatives, results of the MD 200 (ICC) Diversion Alternative and the ARDS. Additional correspondence via email and extensive sharing of project documents has occurred throughout the Study. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.4   Montgomery County Public Schools Board of Education

The Montgomery County Public Schools Board of Education is the official with jurisdiction over playgrounds and athletic fields on school property in Montgomery County, specifically Montgomery Blair High School athletic fields. On February 4, 2020, MDOT SHA sent a letter to Montgomery County Public Schools Board of Education requesting information on the athletic fields associated with Montgomery Blair High School. Specifically, the letter requested confirmation that the fields are under the agency's jurisdiction, the property was accurately depicted in the Study's mapping, the data related to the size and amenities was accurate, whether any planned or programmed facilities have been identified, and whether special funding was used, such as POS, to purchase the property. In addition, the letter requested the agency's determination of significance under Section 4(f). The Board of Education responded in both a call and in an email on February 27, 2020 to MDOT SHA affirming the request and determination of significance. Coordination with Montgomery County Public Schools Board of Education will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.5   City of Gaithersburg

The City of Gaithersburg is the official with jurisdiction over local park property within the city limits. Meetings with the City of Gaithersburg were conducted April, May, and August 2018. Additional coordination with the City of Gaithersburg has occurred via written correspondence, covering topics such as property access for City-owned land, and the scope of work for the project. The City of Gaithersburg is a Section 106 Consulting Party. On February 4, 2020, MDOT SHA sent a letter to the City of Gaithersburg requesting information on the local parks within the city limits. Specifically, the letter requested confirmation that the parks are under the city's jurisdiction, the property was accurately depicted in the Study's mapping, the data related to the size and amenities was accurate, whether any planned or programmed facilities have been identified, and whether special funding was used, such as POS, to

00038885



purchase the property. In addition, the letter requested the city's determination of significance under Section 4(f). Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.6   City of Greenbelt

The City of Greenbelt is the official with jurisdiction over local park property within the city limits. Meetings with the City of Greenbelt were held in November 2018, and January and June 2019. These meetings covered topics such as the Purpose and Need of the project, alternatives, impacts, and impacts to historic properties. The City of Greenbelt is a Section 106 Consulting Party. On February 5]4, 2020, MDOT SHA sent a letter to the City of Greenbelt requesting information on the local parks within the city limits. Specifically, the letter requested confirmation that the parks are under the city's jurisdiction, the property was accurately depicted in the Study's mapping, the data related to the size and amenities was accurate, whether any planned or programmed facilities have been identified, and whether special funding was used, such as POS, to purchase the property. In addition, the letter requested the city's determination of significance under Section 4(f). MDOT SHA followed up on March 10, 2020 with additional information that was requested by the City via phone call. The City of Greenbelt provided additional information in a May 1, 2020 letter and confirming the significance of all parks under the city's jurisdiction. Coordination with the City of Greenbelt will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.7   City of New Carrollton

The City of New Carrollton is the official with jurisdiction over local park property within the city limits. Coordination with the City of New Carrolton took place in January 2019. Topics of discussion include the Purpose and Need of the project, alternatives, and impacts. On February 4, 2020, MDOT SHA sent a letter to the City of New Carrollton requesting information on the local parks within the city limits. Specifically, the letter requested confirmation that the parks are under the city's jurisdiction, the property was accurately depicted in the Study's mapping, the data related to the size and amenities was accurate, whether any planned or programmed facilities have been identified, and whether special funding was used, such as POS, to purchase the property. In addition, the letter requested the city's determination of significance under Section 4(f). Coordination with the City of New Carrollton will continue with the review of the Draft Section 4(f) Evaluation.

### 6.2.8   City of Rockville

The City of Rockville is the official with jurisdiction over local park property within the city limits. Individual meetings have taken place with the City of Rockville a few times between May 2018 and February 2020. On February 4, 2020, MDOT SHA sent a letter to the City of Rockville requesting information on the local parks within the city limits. Specifically, the letter requested confirmation that the parks are under the city's jurisdiction, the property was accurately depicted in the Study's mapping, the data related to the size and amenities was accurate, whether any planned or programmed facilities have been identified, and whether special funding was used, such as POS, to purchase the property. In addition, the letter requested the city's determination of significance under Section 4(f). In late February 2020, MDOT SHA met with the City of Rockville and presented the potential impacts to each Section 4(f) resource within the City's jurisdiction. MDOT SHA described the need for the impact and the avoidance and minimization efforts incorporated into the design to-date. The City of Rockville is a Section 106 Consulting Party. Coordination with the City of Rockville will continue with the review of the Draft Section 4(f) Evaluation.

00038886

## 6.3    Officials with Jurisdiction of Historic Sites

There are four OWJ over historic sites in the Study corridor: Advisory Council on Historic Preservation; Maryland Historical Trust; NPS; and Virginia Department of Historic Resources.

Three meetings with Section 106 consulting parties have taken place, on May 3 and November 13, 2018, and June 17, 2019, all attended by FHWA and the Maryland Historical Trust. The first meeting provided overviews of the Study and the Section 106 process for this undertaking. A draft schedule of activities was also presented. The second meeting provided general Study updates, an update on Section 106 efforts, and outlined the development of the proposed PA. The third meeting included general Study updates, historic properties status updates, a preliminary list of adversely affected properties, and the PA development outline. A fourth consulting parties meeting is anticipated in spring 2020.

Coordination with OWJ over historic sites will continue as the Study moves forward, and the agencies with jurisdiction will have opportunity to comment on the Draft EIS and Draft Section 4(f) Evaluation.

### 6.3.1    Advisory Council on Historic Preservation

The Advisory Council on Historic Preservation is an official with jurisdiction because it is involved in consultation under Section 106 of the National Historic Preservation Act. FHWA notified the Advisory Council on Historic Preservation (ACHP) on March 26, 2018 of the Study. ACHP chose to participate in consultation in a letter dated May 22, 2018. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.3.2    Maryland Historical Trust

The Maryland Historical Trust is the Maryland SHPO. MHT agreed in a response form on April 2018 to be a Participating Agency for the MLS. MDOT SHA, on behalf of and in coordination with FHWA, initiated the Section 106 process and presented the Study by letter to MHT, the Virginia Department of Historic Resources (DHR) and other consulting parties on April 12, 2018. A coordination meeting with MHT was held in April 2018 covering the MLS Study Section 106 approach, and numerous rounds of email and letter correspondence between May 2018 and early 2020. This has included sharing of Study materials DOE forms and a six volume Cultural Resources Technical Report. On March 12, 2020, MHT concurred with the eligibility and Section 106 effects finding for the Study. Section 106 consultation is ongoing. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.3.3    National Park Service

MDOT SHA and FHWA recognize the importance of the NPS properties that would be impacted by the Build Alternatives. Since initiation of the study, NPS has actively participated as a cooperating agency in the NEPA process and as a consulting party in the Section 106 consultation. MDOT SHA and FHWA have met with NPS staff on a regular basis and this coordination will continue through the project development, design and construction stages of the project. The following discussions summarize the avoidance and minimization efforts made to-date by MDOT SHA and FHWA towards NPS properties. The effort to avoid, minimize and mitigate impacts will continue with NPS staff. One of the challenges with this consultation has been in locating and interpreting the various formal and informal agreements for the use of the NPS properties for vehicular use, some of which are over 50 years old.

00038887

NPS agreed to become a Cooperating Agency in development of the Environmental Impact Statement in March 2018 and coordination has continued throughout the MLS process including meetings and written correspondence. As a Cooperating Agency, NPS provided concurrence on major project milestones including the Purpose and Need, Agency Coordination Plan, and the ARDS. Aside from numerous large agency coordination meetings, individual meetings and conference calls with NPS were held on fourteen occasions between June 2018 and February 2020 to discuss key topics related to Section 4(f) properties including permitting, property access, Section 106, impacts, mitigation, minimization, avoidance, MLS technical studies, and other issues related to the overall Study and specific properties. Additional correspondence was conducted via email and extensive sharing of project documents with NPS. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.3.4 Virginia Department of Historic Resources

The Virginia Department of Historic Resources is the Virginia SHPO. MDOT SHA, on behalf of and in coordination with FHWA, initiated the Section 106 process and presented the Study by letter to MHT, the Virginia Department of Historic Resources (DHR) and other consulting parties on April 12, 2018. In a letter dated February 14, 2020, VDHR did not concur with characterizing archaeological resources as the proposed Dead Run Archaeological District and instead recommended Sites 44FX0374, 44FX0379, 44FX0381 and 44FX0389 individually eligible for listing on the NRHP. Section 106 consultation is ongoing. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

## 6.4 Coordination with Other Agencies

### 6.4.1 Department of Housing and Urban Development (HUD)

Section 4(f) requires coordination with HUD when the agency has an interest in a Section 4(f) property. MDOT SHA will notify HUD via letter of the availability of the Draft Section 4(f) Evaluation for the MLS. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

### 6.4.2 United States Department of Agriculture (USDA)

Section 4(f) requires coordination with the USDA when national forests under the jurisdiction of the U.S. Forest Service may experience a Section 4(f) Use. The MLS will not use any land of a national forest and as such the USDA has no role as an official with jurisdiction under Section 4(f). However, the USDA is a Participating Agency under NEPA and is involved in Section 106 consultation as a consulting party. USDA owns the Beltsville Agricultural Research Center (BARC), an historic site under Section 4(f) and historic property under Section 106. The official with jurisdiction over BARC is the Maryland Historical Trust. Coordination will continue with the review of the Draft Section 4(f) Evaluation.

## 6.5 Public

The public will have an opportunity to review and comment on the Draft Section 4(f) Evaluation concurrently with the DEIS. For parks, recreation areas, or wildlife and waterfowl refuges, the OWJ over Section 4(f) property must be informed of the intent to make a *de minimis* impact determination, after which an opportunity for public review and comment must be provided. For historic sites, FHWA and MDOT SHA will consult with the parties participating in the Section 106 process, but is not required to provide additional public notice or provide additional opportunity for review and comment of *de minimis* impact findings. Comments from the public related to the Section 4(f) analysis will be addressed in the Final Section 4(f) Evaluation.

00038888

00038889

7

# 7    CONCLUSION

This Draft Section 4(f) Evaluation has been prepared in accordance with 23 CFR Part 774; FHWA's Section 4(f) Policy Paper (2012); and 23 U.S.C. 138 and 49 U.S.C. 303. Following a 45-day review period, the preceding alternatives evaluation along with any comments received would be considered as a basis for FHWA's final determination on whether feasible and prudent avoidance alternatives exist, and whether the Proposed Action includes all possible planning to minimize harm to Section 4(f) properties.

00038890

00038891

# APPENDIX A

## Summary of Correspondence with Agencies and Officials with Jurisdiction

00038892

00038893



## Table A-1: Relevant Correspondence with Agencies and Officials with Jurisdiction over Section 4(f) Properties

| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| From | NPS | 05/01/2018 | Letter | NPS Scoping Comments | • Chesapeake & Ohio Canal National Historical Park<br>• Baltimore Washington and Suitland Parkways |
| From | NPS | 05/03/2018 | Email | Coordination Phone Call Follow-up | • NPS will coordinate schedules for the appropriate NPS staff<br>• Laurel Hammig and Tammy Stidham will be points of contact for Special Use Permit |
| From | NPS | 05/17/2018 | Email | Section 106 | • Laurel Hammig and Tammy Stidham will be points of contact for Section 106 |
| N/A | NPS | 06/11/2018 | Conference Call | | Caryn Brookman and Tammy Stidham:<br>• ARPA Permit required to conduct Phase 1B archaeological investigations on NPS property, to be submitted by 6/15/18 with 60-day turnaround<br>• NPS requires multi-park Special Use Permit for all other studies requiring access to NPS property<br>• Sean McCabe will coordinate with individual NPS park to ensure needs appropriately addressed |
| N/A | NPS | 06/12/2018 | Conference Call | NPS Coordination Meeting | • Permitting<br>• Staffing Agreement<br>• NPS Adoption of EIS<br>• Section 106 Programmatic Agreement<br>• Impacts and Mitigation |

00038894



| To/<br>From | Agency | Date | Coordination<br>Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| N/A | NPS | 10/25/2018 | Meeting | NPS Coordination Meeting | • Study Updates<br>• Update on Property Access and Special Use Permit<br>• American Legion Bridge – Design Current Thinking<br>• American Legion Bridge – Total Avoidance Options<br>• American Legion Bridge – Minimization Options<br>• Construction<br>• Mitigation<br>• NEPA<br>• Next Steps |
| N/A | NPS | 12/10/2018 | Meeting | NPS Coordination Meeting | • Property Access and Special Use Permit<br>• ROW Information<br>• Suitland Parkway<br>• Baltimore-Washington Parkway/Greenbelt Park<br>• Mitigation<br>• NEPA |
| From | NPS | 01/07/2019 | Document | DEIS Outline | • NPS comments on DEIS outline |
| From | NPS | 02/04/2019 | Document | NPS Comments - American Legion Bridge | • General Project Comments<br>• Potential Mitigation Projects |
| From | NPS | 02/26/2019 | Email | Section 106 Determinations of Eligibility | • Comments on Determinations of Eligibility Batch 4 |
| From | NPS | 03/26/2019 | Email | Section 106 Determination of Eligibility | • Comments on Determinations of Eligibility for Greenbelt Park |

00038895

**DRAFT SECTION 4(f) EVALUATION**



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| N/A | NPS | 04/17/2019 | Meeting | NPS Coordination Meeting | • Study Updates<br>• Update on Property Access and Special Use Permit<br>• Discussion of LOD/Impacts<br>• Discussion of Mitigation<br>• Additional Topics<br>• Next Steps |
| To | NPS | 04/24/2019 | Email | Greenbelt Park NR Eligibility | • MDOT SHA not able to support a NR-eligible determination for Greenbelt Park |
| N/A | NPS | 05/29/2019 | Meeting | NPS Coordination Meeting | • General Project Updates<br>• Action Items from Previous Meeting<br>• Direct Access/Traffic Analysis<br>• Limits of Disturbance<br>• Greenbelt Park Determination of Eligibility<br>• Mitigation Discussion<br>• Action Items/Next Steps |
| N/A | NPS | 08/21/2019 | Meeting | Assessment of Conditions - GW Memorial Parkway | • Update on MDOT project<br>• Update on VDOT project<br>• Traffic Assessment of Direct Access Options<br>• Signing Options<br>• Other Options |
| N/A | NPS | 08/22/2019 | Meeting | NPS Coordination Meeting | • Direct Access/Traffic Analysis<br>• Action Items/Next Steps |
| From | NPS | 10/28/2019 | Concurrence Form | ARDS | • NPS re-concurrence on ARDS |
| N/A | NPS | 11/4/2019 | Meeting | NPS Coordination Meeting | • MDOT SHA presented update on traffic studies<br>• MDOT SHA presented options for BWP interchange |
| N/A | NPS | 11/18/2019 | Meeting | NPS ROW Coordination Meeting | • Discussion of MDOT SHA ROW information |

00038896



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| | | | | | • Walk through NPS Units<br>• General ROW questions from MDOT SHA<br>• Path forward for potential property transfers |
| N/A | MNCPPC | 6/4/2018 | Meeting | General coordination with MNCPPC | • Current Activities Update<br>• Staffing Agreement<br>• Purpose and Need<br>• Property Access for Field Work<br>• Mitigation |
| To | MNCPPC | 6/7/2018 | Letter | Right-of-Entry Request | • Request for right-of-entry onto MNCPPC-PG properties |
| From | MNCPPC | 7/10/2018 | Letter | Right of Entry | • Right of entry agreement from MNCPPC |

00038897



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| N/A | MNCPPC | 7/18/2018 | Presentation | Commission Briefing | • Update on Study Status and Schedule<br>• Summary of Purpose and Need<br>• Preliminary Range of Alternatives<br>• Screening Criteria to evaluate alternatives |
| N/A | MNCPPC | 7/19/2018 | Meeting | General coordination with MNCPPC | • Current Activities and Schedule<br>• Discussion of M-NCPPC Coordination Process<br>• Purpose and Need – Status of Comments<br>• Staffing Agreement<br>• Property Access Update<br>• Mitigation<br>• Section 4(f) Update |
| From | MNCPPC | 7/24/2018 | Letter | Right of Entry | • Right of entry agreement from MNCPPC |
| From | MNCPPC | 8/2/2018 | Letter | Right of Entry | • Right of entry agreement from MNCPPC |
| To | MNCPPC | 8/15/2018 | Letter | MDOT SHA Request for Right of Entry onto MNCPPC - PG Property | • MDOT SHA Request for Right of Entry onto MNCPPC - PG Property for mitigation site search |
| N/A | MNCPPC | 9/25/2018 | Meeting | Issue Resolution | • Understanding the NEPA Process<br>• Roles, responsibilities and expectations of the Lead Agency, Sponsoring Agency, Cooperating Agencies and Participating Agencies<br>• Maryland's Streamlined NEPA/Section 404 Process<br>• Executive Order 13807 and Study Schedule<br>• Understanding M-NCPPC organization and roles |
| From | MNCPPC | 10/22/2018 | Letter | Right of Entry | • MNCPPC Prince George's Parks provides permission to access properties owned by MNCPPC Prince George's Parks for wetland and waterway delineations and phase 1 archaeological investigations |

00038898

**DRAFT SECTION 4(f) EVALUATION**



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| From | MNCPPC | 12/4/2018 | Email | Executive Meeting | • MNCPPC comments on agenda for Executive Meeting |
| N/A | MNCPPC | 12/7/2018 | Meeting | Executive Level Coordination | • Introductions<br>• Roles and Responsibilities<br>• Summary of Coordination To-Date<br>• Schedule/Critical Touch Points<br>• Mitigation |
| To | MNCPPC | 1/10/2019 | Letter | Alternative Staff Funding | • MDOT SHA Response to MNCPPC request for financial assistance with staffing needs on the I-495 & I-270 Managed Lanes Study |
| N/A | MNCPPC | 3/20/2019 | Meeting | Potential stream and wetland mitigation sites | • Introductions, Project Overview, and Status<br>• Mitigation Opportunities |
| From | MNCPPC | 5/1/2019 | Letter | ARDS | • MNCPPC comments on Draft ARDS paper |
| From | MNCPPC | 5/31/2019 | Email | NCPC Staff+1 Meeting | • Email from MNCPPC regarding attendance at the NCPC Staff +1 meeting |
| N/A | MNCPPC | 6/20/2019 | Meeting | Mitigation in Prince George's County | • Project Overview and Status<br>• Mitigation Overview and Site Opportunities<br>• Additional Mitigation Opportunities |
| To | MNCPPC | 8/13/2019 | Email | MD 200 Alternative & Direct Access Locations | • MDOT SHA response to MNCPPC questions on what information regarding the MD 200 Alternative and additional direct access locations can be shared with the City of Rockville |
| N/A | MNCPPC | 9/16/2019 | Meeting | MNCPPC Coordination Meeting | • Current Activities and Schedule<br>• Avoidance and Minimization Process<br>• Potential Mitigation |

00038899

**DRAFT SECTION 4(f) EVALUATION**



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| N/A | MNCPPC | 10/7/2019 | Meeting | MNCPPC Coordination Meeting | • Discussion of Current ROW Near Resources<br>• Avoidance and Minimization Process<br>• Potential Mitigation |
| N/A | MNCPPC | 10/28/2019 | Meeting | MNCPPC Coordination Meeting | • Right-of-Way<br>• Other Ongoing Items<br>• Detailed Mapping<br>• Bridge over Northwest Branch - Construction<br>• Cabin John Resources<br>• Upcoming Meetings |
| N/A | MNCPPC | 10/30/2019 | Meeting | MNCPPC Prince George's Coordination Meeting | • Current Activities<br>• Avoidance/Minimization Process<br>• Anticipated Park Impacts<br>• Potential Mitigation |
| N/A | MNCPPC | 11/4/2019 | Meeting | MNCPPC Coordination Meeting | • Discussion of Forest Conservation Easements (FCE)<br>• Planting Opportunities for Reforestation Law Compliance<br>• Discussion of Other Park Impacts and Avoidance/Minimization Efforts |
| From | MNCPPC | 12/6/2019 | Email | Pedestrian and Bike Considerations | • Follow-up from 11/15/19 meeting<br>• Asks that project include bike/ped access at each crossing |
| From | MNCPPC | 12/23/2019 | Email | DEIS Review Schedule and Mandatory Referral | • Email from MNCPPC concurring with MDOT SHA proposal to provide MNCPPC with Administrative Draft of DEIS but seek MNCPPC concurrence on the RPA under after DEIS is published |
| N/A | MNCPPC | 1/6/2020 | Meeting | Potential Mitigation Opportunities in PG | • Discussion of news articles on revisions to MLS<br>• Discussion of park impacts |
| To | MNCPPC | 1/7/2020 | Email | MNCPPC Non-Concurrence on Revised ARDS | • MDOT SHA response to M-NCPPC non-concurrence on ARDS |

00038900

**DRAFT SECTION 4(f) EVALUATION**



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| From | MNCPPC | 2/28/2020 | Email | PG County MCE Impacts and Planting Opportunities | • PG Parks response to email regarding process for mitigating direct impacts to existing FCEs and planting opportunities |
| From | M-NCPPC | 3/16/202 | Letter | Section 106 Comments, Volumes 1-6 | • Comments on Section 106 technical report |
| To | Gaithersburg | 4/27/2018 | Letter | Response to Comments | • MDOT SHA response to comments from City of Gaithersburg |
| To | Gaithersburg | 8/23/2018 | Letter | Right of Entry | • MDOT SHA request for right-of-entry onto properties owned by the City of Gaithersburg |
| To | Gaithersburg | 2/4/2020 | Letter | Section 4(f) Park Inventory | • Request for information about local park properties<br>• Requesting confirmation of park ownership, location, boundaries, amenities<br>• Request ID of planned or programmed activities<br>• Request confirmation of whether parks have used LWCF or POS funds |
| From | Greenbelt | 6/26/2019 | Letter | Historic Properties | • Comments on Preliminary List of Adversely and Potentially Adversely Affected Historic Properties |
| To | Greenbelt | 2/4/2020 | Letter | Section 4(f) Park Inventory | • Request for information about local park properties<br>• Requesting confirmation of park ownership, location, boundaries, amenities<br>• Request ID of planned or programmed activities<br>• Request confirmation of whether parks have used LWCF or POS funds |
| From | Greenbelt | 5/1/2020 | Letter | Response to MDOT SHA Letter | • City of Greenbelt provides response to request for park information |
| To | New Carrollton | 2/4/2020 | Letter | Section 4(f) Park Inventory | • Request for information about local park properties<br>• Requesting confirmation of park ownership, location, boundaries, amenities |

00038901



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| | | | | | • Request ID of planned or programmed activities<br>Request confirmation of whether parks have used LWCF or POS funds |
| To | New Carrollton | 2/14/2020 | Email | Curbside Tree Plantings | • Curbside tree plantings do not meet the reforestation criterion |
| To | Rockville | 2/4/2020 | Letter | Section 4(f) Park Inventory | • Request for information about local park properties<br>• Requesting confirmation of park ownership, location, boundaries, amenities<br>• Request ID of planned or programmed activities<br>Request confirmation of whether parks have used LWCF or POS funds |
| N/A | Rockville | 2/14/2020 | Meeting | Park Impacts | • MDOT SHA provided update on project<br>• MDOT SHA provided walkthrough of project impacts through Rockville<br>• City of Rockville requested that buffer of trees be kept by dry SWM facility in Cabin John SVP |
| From | ACHP | 5/22/2018 | Letter | ACHP Participation | • ACHP will participate in Section 106 consultation |
| From | ACHP | 5/23/2018 | Email | participating Agency | • ACHP will not be a participating Agency because they will be participating in the Section 106 process |
| To | MHT | 4/12/2018 | Letter | Project Initiation Letter | • Inform MHT of project<br>• Preliminary Area of Potential Effects<br>• Funding<br>• Identification Methods and Results<br>• Review Request |
| N/A | MHT | 4/18/2018 | Meeting | I-495 MLS Study Section 106 Approach | • I-495 MLS Study Section 106 Approach |
| To | MHT | 8/28/2018 | Email | Greenbelt Park DOE | • Greenbelt DOE |

00038902

**DRAFT SECTION 4(f) EVALUATION**



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| To | MHT | 10/19/2018 | Letter | Historic Context and Batch 1 of DOEs | • Transmit Historic Context and Batch 1 of DOEs |
| To | MHT | 12/7/2018 | Letter | Batch 2 of DOEs | • Transmit Batch 2 of DOEs |
| From | MHT | 12/21/2018 | Letter | Historic Context and Batch 1 of DOEs | • MHT comments on Historic Context and Batch 1 of DOEs |
| To | MHT | 1/7/2019 | Letter | Batch 3 of DOEs | • Transmit Batch 3 of DOEs |
| To | MHT | 2/7/2019 | Letter | Batch 4 of DOEs | • Transmit Batch 4 of DOEs |
| From | MHT | 2/22/2019 | Letter | Batch 2 of DOEs | • MHT comments on Batch 2 of DOEs |
| From | MHT | 2/22/2019 | Letter | Batch 3 of DOEs | • MHT comments on Batch 3 of DOEs |
| To | MHT | 3/8/2019 | Letter | Batch 5 of DOEs | • Transmit Batch 5 of DOEs |
| From | MHT | 3/26/2019 | Letter | Batch 4 of DOEs | • MHT comments on Batch 4 of DOEs |
| To | MHT | 4/8/2019 | Letter | Batch 6 of DOEs | • Transmit Batch 6 of DOEs |
| From | MHT | 4/17/2019 | Letter | Batch 5 of DOEs | • MHT comments on Batch 5 of DOEs |
| To | MHT | 5/8/2019 | Letter | Batch 7 of DOEs | • Transmit Batch 7 of DOEs |
| From | MHT | 5/30/2019 | Letter | Batch 6 of DOEs | • MHT comments on Batch 6 of DOEs |
| To | MHT | 6/7/2019 | Letter | Batch 8 of DOEs | • Transmit Batch 8 of DOEs |

00038903



| To/ From | Agency | Date | Coordination Type | Topic / Subject | Agenda Items / Discussion Topics |
|---|---|---|---|---|---|
| From | MHT | 6/13/2019 | Concurrence Form | MHT APE Concurrence | • MHT concurrence with revised APE |
| To | MHT | 7/8/2019 | Letter | Batch 9 of DOEs | • Transmit Batch 9 of DOEs |
| From | MHT | 3/12/2020 | Letter | MHT Comments on Section 106 Technical Report | MHT concurrence on eligibility and effect findings |
| To | Virginia DHR | 3/23/2018 | Letter | Participating Agency | • Invitation to become a participating agency |
| From | Virginia DHR | 4/17/2018 | Response Form | Participating Agency | • Virginia DHR response agreeing to become a participating agency |
| To | Virginia DHR | 5/28/2019 | Letter | Archaeological investigations in Virginia | • Scope of archaeological investigations in Virginia |
| From | Virginia DHR | 6/10/2019 | Letter | Revised APE | • Expanded APE may be necessary |

| N/A | USDA | 2/27/2019 | Meeting | BARC Mitigation | • Project Overview and Status<br>• Paint Branch Fish Passage Mitigation Site<br>• Potential Stream Mitigation – Site PG 00120A/B<br>• Field Walk – Site PG 00120A/B |
|---|---|---|---|---|---|
| From | USDA | 3/28/2019 | Email | BARC Mitigation | • BARC Stream & Wetland Mitigation Sites |
| To | USDA | 8/22/2019 | Email | BARC Mitigation | • Request for potential reforestation opportunities |
| To | USDA | 1/7/200 | Email | BARC Impacts | • MDOT SHA provides mapping showing potential Impacts to BARC property |

00038904



00038905

# APPENDIX B

## Documentation of Easement Agreements and Permits

Chesapeake and Ohio Canal National Historical Park

**Property Owner: Federal Government (Administered by NPS)**

**Type of Agreement: Letter Permit consisting of correspondence from 1959 to 1964 between State Roads Commission and National Parks Service**

Rock Creek Stream Valley Park

**Property Owner: M-NCPPC**

**Type of Agreement: Easement**

> **Liber 3199, Folios 507-509 (1964) in Montgomery County Land Records**

> **Liber 4512, Folios 407-410 (1974) in Montgomery County Land Records**

Sligo Creek Stream Valley Park

**Property Owner: M-NCPPC**

**Type of Agreement: Easement**

> **Liber 2696, Folios 11-13 (1959) in Montgomery County Land Records**

Northwest Branch Stream Valley Park, Unit 3

**Property Owner: M-NCPPC**

**Type of Agreement: Easement**

> **Liber 3098, Folios 574-578 (1963) in Montgomery County Land Records**

Beltsville Agricultural Research Center

**Property Owner: Federal Government (administered by USDA)**

**Type of Agreement: Easement**

> **Liber 4053, Folios 130-155 (1972) in Prince George County Land Records**

Greenbelt Park and Baltimore Washington Parkway

**Property Owner: Federal Government (administered by NPS)**

**Type of Agreement: Permit**

> **Referenced on State Highway Plats 27061, 13582, NPS Land Record No. 593**

00038906



Suitland Parkway

**Property Owner: Federal Government (administered by NPS)**

**Type of Agreement: Permit**

    **State Highway Plats 26648, 26649, 26640**

    **Special Use Permit No. NCR NACE 6000 1903**

00038907



UNITED STATES
DEPARTMENT OF THE INTERIOR
NATIONAL PARK SERVICE
NATIONAL CAPITAL PARKS
WASHINGTON 25, D. C.

*46735*

FEB 13 1961

Mr. James D. Felter
Special Assistant Right-of-Way Engineer
Maryland State Roads Commission
300 West Preston Street
Baltimore 1, Maryland

Dear Mr. Felter:

We have received your letter of January 25 with two paste-up copies
of your construction drawings for the Capital Beltway Interchange
with the George Washington Memorial Parkway, Maryland, showing the
limits of construction required to build this interchange. This
drawing has been assigned our Map File No. NCP 117.2-427.

The construction limits shown in red on this plan are in accordance
with the agreement made at our meeting of January 17 and are approved
by this Office. Although the limits of construction in some areas
are in the center of a drainage ditch these limits will be extended
to the top of slope.

This will authorize you to proceed with the construction of this
interchange on Federal land subject to the following conditions:

1.  The State of Maryland hereby agrees to be fully responsible
for the management, protection, use and safety within the park area
involved in this authorization until the work is completed, inspected,
and the park areas are accepted, in writing, ~~and the entire project~~
~~within Federal limits is complete~~. The State of Maryland shall require
its contractor to accept responsibility and assume liability for
any and all claims arising through tort actions which result from
incidents directly or indirectly connected with the work performed
and to agree to indemnify the United States against any loss, damage
or liability arising from the work permitted or performed, and
further to provide evidence of adequate public liability and property
damage insurance in a form to protect the interests of the United
States.

2.  That you will make every effort to preserve trees on park land
within the work area, and your staff will consult with representa-
tives of this Office on any situation concerning the preservation
of these trees.

00038908

3. That your staff will consult with representatives of this Office concerning field decisions involving finished grades and fine grading.

4. That you will use seed and fertilizer mixtures which will conform with those used on adjacent parkway sections.

5. That any felled trees, stumps, brush, large stones or debris of any kind resulting from construction of the interchange will be removed from park land before final acceptance of the interchange.

6. It is assumed that access to the outfall construction area below Rock Run Culvert will be staked on the ground and reviewed with representatives of this Office before any clearing or excavation is started.

7. That all storm drainage on park land will be carried in concrete pipe where ditches have to be constructed more than 3' deep, as stated in Section 11 of our letter of November 23, 1960.

8. That the use of the towpath for other than pedestrian traffic is prohibited with the exception of the existing access road crossing constructed by the bridge contractor. The State of Maryland shall arrange to have subsequent contractors requiring access to the river side of the C & O Canal use this same access across the canal. When construction access is no longer required to the river side of the canal for this project the State shall arrange to have the fill and culvert removed from the canal and have it restored as closely as possible to its original condition, according to instructions from representatives of this Office.

9. That you will fully cooperate with other contractors and Government employees and you will not commit or permit any act which will interfere with the performance of their work.

10. That every precaution will be taken to protect park property and preserve the landscape features.

11. That the areas disturbed shall be restored to the satisfaction of this Office.

12. That you will abide by any further instructions of the U. S. Park Police or other representatives of this Office during the course of the work.

2

13.   Upon the acceptance of the conditions contained in this letter, indicated by the approval of the State Roads Commission acting for the State of Maryland in the space provided and the return of one executed copy to the Office of National Capital Parks, this letter becomes a permit for the construction of the facility described.

We are returning one signed print as requested in your letter.

Unless sooner revoked or extended in writing, permission to perform this work will expire December 31, 1962.

Sincerely yours,

(Sgd.) Robert C. Horne

Robert C. Horne
Chief, Division of
Design and Construction

Enclosure 2

Approved for the State of Maryland
by the State Roads Commission

By: _James B. Potter_

Chief
Bureau of Government and
Public Utility Right of Way
Acquisition

00038910

STATE OF MARYLAND
STATE ROADS COMMISSION

March 7, 1961

Contract: M 512-50-320
I 495-2(75)40
Capital Beltway - Potomac River
To Seven Locks Road
Re: National Park Service Property
File No.: 46715

Mr. Robert C. Horne, Chief
Division of Design and Construction
U. S. Department of the Interior
National Park Service
National Capital Parks
Washington 25, D. C.

Dear Mr. Horne:

Reference is made to your letter of February 13, my reply of March 2 and your
recent letter of March 3; all regarding authorization for construction of the
Capital Beltway and the Capital Beltway interchange at George Washington Memorial
Parkway over land owned by National Park Service.

Your suggestion in the third paragraph of your letter of March 3 is entirely
acceptable. The first sentence of the first condition in your letter of February 13
should be modified to read, "The State of Maryland hereby agrees to be fully
responsible for the management, protection, use and safety within the park area
involved in this authorization until the work is completed, inspected, and the park
area are accepted, in writing, and thereafter so long as this facility (underpass
of the east and west bound lanes of the George Washington Memorial Parkway) is in
place."

Thank you for your cooperation in this matter.

Very truly yours,

cc: Mr. LeRoy G. Moser
    Mr. Cordt A. Goldeisen
    Mr. G. Bates Chairas
    Mr. Malcolm D. Philpot
    Mr. J. Francis Curran
    Mr. William L. Shook

Haines B. Feiter
Chief
Bureau of Government and Public Utility
Right of Way Acquisition

March 3, 1961


Mr. Raleigh B. Felter, Chief
Bureau of Government and Public Utility
   Right of Way Acquisition
Maryland State Roads Commission
300 W. Preston Street
Baltimore 1, Maryland

Dear Mr. Felter:

You returned a copy of our letter of February 13 authorizing the
construction of the Capital Beltway Interchange with the George
Washington Memorial Parkway, Maryland, with your letter of
March 2.

The deletion of the words "and thereafter so long as this facil-
ity is in place" in condition No. 1 is not satisfactory to this
Office since we do not propose to take over the management and
operation of the Capital Beltway and we do not believe this is
your intention either. We would expect you to be the responsible
party. We are, however, agreeable to eliminating any inference
that this phrase relates to the east and westbound lanes of the
George Washington Memorial Parkway which we will maintain.

We would be perfectly agreeable, if you so desire, to accept a
letter from you reinserting a modified phrase such as "and
thereafter so long as this facility (exclusive of the east and
westbound lanes of the George Washington Memorial Parkway) is in
place." If this is satisfactory to you and your legal division.
Upon the receipt of a letter from you indicating that the Maryland
State Roads Commission is agreeable to this modification, we will
consider such a letter a part of the authorization of February 13
and make that authorization effective.

Copy to:  Files (2)                   Sincerely yours,
        Div. of Maint. (2)
        Park Police (2)
        Construction
        Mr. Horne                   Robert C. Horne
        Mr. Andrews               Chief, Division of
        Bu. of Public Roads       Design and Construction

RCHorne:hbj

00038912

FEB 13 1961

Mr. Haines D. Felter
Special Assistant Right-of-Way Engineer
Maryland State Roads Commission
300 West Preston Street
Baltimore 1, Maryland

Dear Mr. Felter:

We have received your letter of January 25 with two paste-up copies
of your construction drawings for the Capital Beltway Interchange
with the George Washington Memorial Parkway, Maryland, showing the
limits of construction required to build this interchange.  This
drawing has been assigned our Map File No. NCP 117.2-427.

The construction limits shown in red on this plan are in accordance
with the agreement made at our meeting of January 17 and are approved
by this Office.  Although the limits of construction in some areas
are in the center of a drainage ditch these limits will be extended
to the top of slope.

This will authorize you to proceed with the construction of this
interchange on Federal land subject to the following conditions:

1.  The State of Maryland hereby agrees to be fully responsible
for the management, protection, use and safety within the park area
involved in this authorization until the work is completed, inspected,
and the park areas are accepted, in writing, and thereafter as long
as this facility is in place.  The State of Maryland shall require
its contractor to accept responsibility and assume liability for
any and all claims arising through tort actions which result from
incidents directly or indirectly connected with the work performed
and to agree to indemnify the United States against any loss, damage
or liability arising from the work permitted or performed, and
further to provide evidence of adequate public liability and property
damage insurance in a form to protect the interests of the United
States.

2.  That you will make every effort to preserve trees on park land
within the work area, and your staff will consult with representa-
tives of this Office on any situation concerning the preservation
of these trees.

3.  That your staff will consult with representatives of this Office concerning field decisions involving finished grades and fine grading.

4.  That you will use seed and fertilizer mixtures which will conform with those used on adjacent parkway sections.

5.  That any felled trees, stumps, brush, large stones or debris of any kind resulting from construction of the interchange will be removed from park land before final acceptance of the interchange.

6.  It is assumed that access to the outfall construction area below Rock Run Culvert will be staked on the ground and reviewed with representatives of this Office before any clearing or excavation is started.

7.  That all storm drainage on park land will be carried in concrete pipe where ditches have to be constructed more than 3' deep, as stated in Section 11 of our letter of November 23, 1960.

8.  That the use of the towpath for other than pedestrian traffic is prohibited with the exception of the existing access road crossing constructed by the bridge contractor.  The State of Maryland shall arrange to have subsequent contractors requiring access to the river side of the C & O Canal use this same access across the canal.  When construction access is no longer required to the river side of the canal for this project the State shall arrange to have the fill and culvert removed from the canal and have it restored as closely as possible to its original condition, according to instructions from representatives of this Office.

9.  That you will fully cooperate with other contractors and Government employees and you will not commit or permit any act which will interfere with the performance of their work.

10.  That every precaution will be taken to protect park property and preserve the landscape features.

11.  That the areas disturbed shall be restored to the satisfaction of this Office.

12.  That you will abide by any further instructions of the U. S. Park Police or other representatives of this Office during the course of the work.

00038914

13.  Upon the acceptance of the conditions contained in this letter, indicated by the approval of the State Roads Commission acting for the State of Maryland in the space provided and the return of one executed copy to the Office of National Capital Parks, this letter becomes a permit for the construction of the facility described.

We are returning one signed print as requested in your letter.

Unless sooner revoked or extended in writing, permission to perform this work will expire December 31, 1962.

                              Sincerely yours,


                              Robert C. Horne
                              Chief, Division of
                              Design and Construction


Enclosures 2

Approved for the State of Maryland
by the State Roads Commission

By:_____

Copy to:  Files (2)
          Div. of Maint. (2)
          Park Police (2)
          Construction
          Horne
          Andrews
          Bur. of Public Roads

EERensch:mgw  2/8/61

NATIONAL CAPITAL PARKS

Mar 3  10 25 AM '61

RECEIVED
3

NOV 3  1960

Mr. Haines B. Felter, Chief
Bureau of Government and Public Utility
  Right of Way Acquisition
Maryland State Roads Commission
300 West Preston Street
Baltimore 1, Maryland

Dear Mr. Felter:

Your letter of October 21, File No. 46735 requested this office to
issue you a permit for construction of the Capital Beltway and its
interchange with the George Washington Memorial Parkway at Carderock,
on the basis of the metes and bounds plat submitted with your letter
of September 7. This plat has been assigned our Map File No. NCP
117.2-405.

From a review of the above plat it would appear advisable, before
the issuance of a construction permit, to modify the actual land
areas that you would require from those indicated. We suggest you
submit to us a marked print of the construction drawings on which
is indicated the extent of cut and fill sections along the south
side of that section of the parkway roadway paralleling the canal,
together with the same thing for the north side of that portion of the
outbound parkway roadway falling within the northeast quadrant of
the interchange. It would be our intention to make any of the land
between the parkway roadways that are now in Federal ownership and
coming within the interchange area, available for your use. This
drawing should also indicate the area required adjacent and contiguous
to the present bridge permit issued to you by our letter of February
23, 1960, together with the area required for the relocation of Rock
Run. Following receipt of the above-mentioned plan, we shall be
pleased to issue you the necessary permit.

Copy to:   Files (2)                    Sincerely yours,
           Horne
           Weeden
           O'Brien
           Andrews

RWAndrews:ew                            William M. Haussmann
                                        Acting Chief, Division of
                                        Design and Construction

MAIL   2 11 PM '60   NATIONAL CAPITAL PARKS

OCT 2 1 1960

Mr. Haines B. Felter, Chief
Bureau of Government and Public Utility
  Right of Way Acquisition
Maryland State Roads Commission
300 West Preston Street
Baltimore 1, Maryland

Dear Mr. Felter:

At a meeting held October 19 with Mr. Hamilton, we discussed
your letter of September 7 in reference to the question of
an easement across park property for the construction of the
Capital Beltway Interchange at Carderock. The drawings ac-
companying your September 7 letter were assigned our Map File
No. MCP 117.2-425.

Mr. Hamilton agreed that perhaps the construction at this
interchange could be handled on a permit basis, similar to the
permit you now have for the construction of the Potomac River
Bridge. We also discussed the possibility of working out an
agreement covering the matter of maintenance and operation of
the various roadways within the interchange. We understand that
Mr. Hamilton will work out a tentative draft of such an agreement
for our later review.

                         Sincerely yours,



                         William M. Haussmann
                         Acting Chief, Division of
                         Design and Construction

Copy to:   Files (2)
           Weeden
           Horne
           O'Brien
           Andrews

181

*40?M I*

*Work Completed pub*

D24-NCR(RU)

D.. 1 1 1964

Mr. John B. Funk
Chairman-Director, State Roads
  Commission
State of Maryland
P.O. Box 717
Baltimore, Maryland  21203

Dear Mr. Funk:

Permission has been requested by letter of November 18 from Mr. Charles R.
Anderson, Chief, Landscape Section, to perform landscape planting on the
land of the George Washington Memorial Parkway, U. S. Reservation 404m,
at the intersection of the Parkway and the Capital Beltway and also in
the vicinity of Cabin John Parkway.

The proposed work is shown on prints of sheets 10, 6 and 7 of Interstate
Planting Contract M-512-117-320 submitted with the letter and assigned
our Map File Nos. NCR 117.2-610-1, 2 and 3 respectively.

It is understood that all planting under this contract will be maintained
and guaranteed by the permittee for one year and that upon completion of
the care and replacement phase, maintenance will be performed by the
National Park Service.

The use of parkland for the work described is subject to ~~resecution at the~~
~~discretion of the Regional Director, National Capital Region, National Park~~
~~Service, and~~ the conditions contained herein.

1.  The State of Maryland hereby agrees to be fully responsible for the
management, protection, use and safety within the park area involved in
this authorization until the work is completed, inspected, and the park
areas are accepted, in writing.  The State of Maryland shall require its
contractors to accept responsibility and assume liability for any and all
claims arising through tort actions which result from incidents directly or
indirectly connected with the work performed and to agree to indemnify
the United States against any loss, damage, or liability arising from
the work permitted or performed, and further to provide evidence of
adequate public liability and property damage insurance in a form to
protect the interests of the United States.

1553

00038918

2. In the work described the State of Maryland will require its employees and contractors to exercise all normal and reasonable safety precautions.

3. All reasonable precautions shall be exercised to protect park property.

4. All disturbed areas and park facilities damaged by this work shall be restored to the satisfaction of the Regional Director, National Capital Region, National Park Service.

5. Permittee shall comply with all instructions issued by the U. S. Park Police and other official representatives of this Office.

6. In the use of the land covered by this permit the permittee agrees to comply with the nondiscrimination provisions prescribed by Section 301 of Executive Order 10925, dated March 6, 1961 (26 F.R. 1977), as amended and modified by Section 201 of Executive Order No. 11114 of June 20, 1963 (28 F.R. 6436, 6487), establishing the President's Committee on Equal Employment Opportunity which are incorporated herein by reference and made a part hereof, and as used therein the "Contractor" means the permittee.

7. Necessary barricades and suitable signs, flares, lanterns, and other signal devices shall be provided and used at locations where desirable for public safety.

8. Permittee shall remove any trash or debris left at site by workmen.

9. Any underground utility line damaged as a result of this work shall be promptly repaired.

10. This permit does not provide for any additional parking or storage areas on parkland. Work areas are limited to the area at the site of the actual planting.

11. The permittee shall notify this Service before starting work and when the work is completed and ready for inspection. (Telephone 301-7296.)

12. Upon the acceptance of the conditions contained in this letter, indicated by the approval of the State of Maryland in the space provided and the return of the executed copy to this Office, this letter becomes a permit for the work described. The work is not to be started until the concerned Department has verified that the acceptance by the State of Maryland has been received by this Office. (Receipt can be verified by telephoning 301-7296.)

2

Unless sooner revoked or extended in writing, permission to perform this work will expire ~~April 30, 1965~~. *December 10, 1966*

Sincerely yours,

*L. A. Powell*

*for* Raymond L. Freeman
Assistant Regional Director,
Resource Planning

Accepted and agreed to this
*22* day of *Mar*, ~~196~~. *1965 as amended*

STATE OF MARYLAND, STATE ROADS COMMISSION

By: _____

Title: _____

cc:
NCR Files (2)
Mr. Haughwout
Mr. Bartel (2)
Park Police (2)
Mr. Rensch, NCRC

FHaughwout:pcs 12/7/64

Dec 11  2 24 PM '64
NATIONAL CAPITAL REGION
N P S

MAIL

00038920

00038921

Market 4

Md. State Ada Comma — 312 W. Preston St. Bethesda C. R. Pinse

4-22-64

LIBER **3199** FOLIO **506**

Recorded March 24th, 1964-at-2:40 P.M.

THIS DEED OF EASEMENT made this /3th day of March, 1964,
by and between THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING
COMMISSION, party of the first part, Grantor, and STATE OF
MARYLAND to the use of the STATE ROADS COMMISSION OF MARYLAND,
party of the second part, Grantee.

WITNESSETH:

THAT for and in consideration of the sum of SEVEN
HUNDRED THOUSAND DOLLARS ($700,000.00), and other good and
valuable considerations, paid by the party of the second part unto
the party of the first part, receipt whereof is hereby acknowledg-
ed, the party of the first part does hereby give, grant, bargain
and sell, release, convey and confirm unto the party of the
second part, its successors and assigns, an easement in perpetuity
for all and every highway purpose over the hereinafter described
land:

ALL the land lying between the outermost lines designated
"Right of Way Line", as shown and/or indicated on State Roads
Commission of Maryland Plats Nos. 29263, 29262, 29009, 29010,
29011, 29012, 29013, 29014, 29015, 29016, 29018, 29022, 29034,
29037, 29038, 29359, 29030, 29031, 29032 and 29035 attached here-
to and made a part hereof.

And the Grantor does further grant unto the State of
Maryland, to the use of the State Roads Commission of Maryland,
its successors and assigns, the right to create, use and maintain
on the area of the land shown hatched thus ▨ on the above
designated plats, such slopes as are necessary to retain and
support the highway and/or adjacent property; it being agreed
between the parties hereto, however, that at such time as the
contour of the land over which this slope easement is granted
is changed so that the easement required for slopes is no longer
necessary to retain, support or protect the highway construction
within the area conveyed, then said easement for slopes shall
cease to exist.

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 3199, p. 0506, MSA_CE63_3157. Date available 04/08/2008. Printed 12/15/2019.

LIBER 3199 FOLIO 507

And the Grantor does further grant unto the State of Maryland, to the use of the State Roads Commission of Maryland, its successors and assigns, the perpetual right to create, use and maintain on the area of the land shown cross-hatched thus ⬚ on the above designated plats, such stream changes, side ditches, inlet ditches, outlet ditches, pipes, culverts and all other drainage facilities as are necessary in the opinion of the State Roads Commission to adequately drain the highway or adjacent property and/or control the flow of water through those drainage structures to be built to protect said highway.

And the Grantor does further grant unto the State of Maryland, to the use of the State Roads Commission of Maryland, its successors and assigns, the perpetual right to discharge the flow of water from such stream changes, side ditches, inlet ditches, outlet ditches, pipes, culverts and all other drainage facilities as are necessary in the opinion of the State Roads Commission to adequately drain the highway or adjacent property and/or control the flow of water through those drainage structures to be built to protect said highway within the areas shown cross-hatched thus ⬚ into existing waterways or natural drainage courses, as indicated by the symbol ●→ and/or upon the existing ground, as indicated by the symbol ●⤙ , at the outlet end of the drainage facilities so created by the Commission, all of which are shown graphically and indicated by appropriate symbols and explanatory notations on the aforesaid plats.

And the Grantor does further grant unto the State of Maryland, to the use of the State Roads Commission of Maryland, its successors and assigns, any and all right whatsoever of the Grantor, its successors and assigns, of any means whatsoever of ingress or egress between the through highway and their remaining property across the lines which are designated "Right of Way Line of Through Highway," to the end that there never will

- 2 -

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 3199, p. 0507, MSA_CE63_3157. Date available 04/08/2008. Printed 12/15/2019.

00038923

LIBER **3199** FOLIO **508**

be any vehicular, pedestrian and/or animal access to or from
said Through Highway and their remaining property across those
lines which are so marked on the above mentioned plats, except
by means of such public road connections as the Grantees may
construct, or permit to be constructed.

And the Grantor herein does hereby covenant and agree,
on behalf of itself, its successors and assigns, to abide by
and respect each and every control or restriction set forth in
this instrument of writing, it being the intention of this con-
veyance to perpetuate all the rights and privileges granted to
the State of Maryland, to the use of the State Roads Commission,
by this deed. It is expressly understood and agreed that these
covenants shall run with and bind the Grantor, its successors
and assigns, forever.

It being further covenanted and agreed between the
parties that no roadways connecting the Capital Beltway with
the East-West Highway at Beach Drive shall ever be constructed
by the party of the second part.

It being further convenanted and agreed between the
parties that the Capital Beltway through the easement area here-
by conveyed shall have a maximum of six (6) lanes, and wherever
possible existing roadways in the area shall not be relocated
and any additional lanes of the Capital Beltway shall be con-
structed in the median.

The foregoing covenants to run with the land and be
binding upon the Grantees, their successors and assigns, forever.

TO HAVE AND TO HOLD the hereinbefore described easement
unto the State of Maryland to the use of the State Roads Commis-
sion of Maryland, its successors and assigns, in perpetuity.

IN TESTIMONY WHEREOF the Maryland-National Capital Park
and Planning Commission has caused these presents to be executed

- 3 -

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 3199, p. 0508, MSA_CE63_3157. Date available 04/08/2008. Printed 12/15/2019.

00038924

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 3199, p. 0509, MSA_CE63_3157. Date available 04/08/2008. Printed 12/15/2019.

**LIBER 3199 FOLIO 509**

by William J. Stevens, its Chairman, and attested to by Jesse F. Nicholson, its Secretary-Treasurer, and affixed its corporate seal hereto; and the State Roads Commission of Maryland has caused these presents to be executed by John B. Funk, its Chairman, and attested to by C. R. Pease, its Secretary and affixed its corporate seal hereto.

ATTEST:                              THE MARYLAND-NATIONAL CAPITAL PARK
                                     AND PLANNING COMMISSION

Jesse F. Nicholson,           By    William J. Stevens
Secretary-Treasurer                 William J. Stevens,
                                    Chairman


                                     STATE ROADS COMMISSION OF MARYLAND


C. R. Pease,                  By    John B. Funk
Secretary                           John B. Funk,
                                    Chairman

STATE OF MARYLAND, MONTGOMERY COUNTY, to wit:

    I HEREBY CERTIFY that on this 13th day of March, 1964, before me the subscriber, a Notary Public of the State of Maryland in and for the County aforesaid, personally appeared William J. Stevens, Chairman of the Maryland-National Capital Park and Planning Commission and acknowledged the foregoing instrument to be the act and deed of said Commission and at the same time made oath in due form of law that he is fully authorized to execute and acknowledge same.

    WITNESS my hand and Notarial Seal.

                              Delcine T. White
                              DELCINE T. WHITE    Notary Public

                    My commission expires May 3, 1965

                              - 4 -

00038925

LIBER 4 5 1 2 FOLIO 4 0 7

| FORM RW 25 (Revised 7/1/71)<br>LEGAL DEPARTMENT<br>300 West Preston Street<br>Baltimore, Maryland 21201<br><br>Mail Address – P. O. Box 717<br>Baltimore, Maryland 21203 | **DEED**<br>TO<br>THE STATE OF MARYLAND<br>TO THE USE OF<br>THE STATE HIGHWAY ADMINISTRATION<br>OF THE<br>DEPARTMENT OF TRANSPORTATION | PAGE 1<br>Right of Way Item No. ___ 40167 A MD.<br><br>State Highway Administration<br>Project No. M 512-22-320 |

**This Deed,** Made this ___ /0 ___ day of ___ *april* ___ in the year 1974

(A) WHEREAS, the State Highway Administration of the Department of Transportation, acting for and on behalf of the State of Maryland, finds it necessary to acquire the land, easements, rights and/or controls, shown and/or indicated on State Highway Administration's Plats Numbered ___ 29989, 30265, 41184

APR-11-74  PAID 8 6 2 0   CLK.C.T.H.C.   NSC --- BCK   12.0C

which are duly recorded, or intended to be recorded, among the Land Records of

___ Montgomery ___ County ~~City~~ in the State of Maryland in order to lay out, open, establish, construct, extend, widen, straighten, grade and improve as a part of the State Roads System of Maryland, a highway and/or bridge, together with the appurtenances thereto belonging, under its Contract Number ___ M 512-22-320 and known as the ___ Capital Beltway - Georgia Avenue to Rock Creek Park

and to thereafter use, maintain and/or further improve said highway and/or bridge, as a part of the Maryland State Roads System.

(B) NOW, THEREFORE, THIS DEED AND RELEASE WITNESSETH: That for and in consideration of the above premises, One Dollar ($1.00) and other good and valuable considerations, the receipt whereof is hereby acknowledged, we do hereby grant and convey unto the STATE OF MARYLAND, TO THE USE OF THE STATE HIGHWAY ADMINISTRATION OF THE DEPARTMENT OF TRANSPORTATION, its successors and assigns, ~~in fee simple and forever~~, all our right, title and interest, free and clear of all liens and encumbrances, in and to ___ Perpetual Easement

(C) ALL THE LAND, together with the appurtenances thereto belonging, or in anywise appertaining, lying between the outermost lines designated "Right of Way Line," as shown and/or indicated on the hereinbefore mentioned plats, all of which plats are made a part hereof, so far as our property and/or our rights may be affected by the said proposed highway and/or bridge, and the appurtenances thereto belonging, or in anywise appertaining.

(D) ~~AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, the right to create, use and maintain on the area of the land shown hatched thus~~ [hatched symbol] ~~on the above designated plats, such slopes as are necessary to retain and support the highway and/or adjacent property; it being agreed between the parties hereto, however, that at such time as the contour of the land over which this slope easement is granted is changed so that the easement required for slopes is no longer necessary to retain, support or protect the highway construction within the area conveyed in fee simple, then said easement for slopes shall cease to exist.~~

(E) AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, the perpetual right to create, use and maintain on the area of the land shown cross-hatched thus [cross-hatched symbol] on the above designated plats, such stream changes, side ditches, inlet ditches, outlet ditches, pipes, culverts and all other drainage facilities as are necessary in the opinion of the State Highway Administration to adequately drain the highway or adjacent property and/or control the flow of water through those drainage structures to be built to protect said highway.

(F) AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, the perpetual right to discharge the flow of water from such stream changes, side ditches, inlet ditches, outlet ditches, pipes, culverts and all other drainage facilities as are necessary in the opinion of the State Highway Administration to adequately drain the highway or adjacent property and/or control the flow of water through those drainage structures to be built to protect said highway (either within the areas shown cross-hatched thus [symbol] ~~or within the limits of the areas hereinbefore conveyed in the fee simple) into existing waterways or natural drainage courses, as indicated by the symbol~~ [arrow symbol] and/or upon the existing ground, as indicated by the symbol [symbol] , at the outlet end of the drainage facilities so created by the State Highway Administration, all of which are shown graphically and indicated by appropriate symbols and explanatory notations on the aforesaid plats.

(G) AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, ANY AND ALL RIGHT WHATSOEVER OF THE GRANTORS, their heirs, successors and assigns, of any means whatsoever of ingress or egress between the THROUGH HIGHWAY and their remaining property across the lines which are designated "Right of Way Line of Through Highway," to the end that there never will be any vehicular, pedestrian and/or animal access to or from said Through Highway and their remaining property across those lines which are so marked on the above mentioned plats, except by means of such public road connections as ~~are shown thereon, unless~~ the State Highway Administration may construct or permit to be constructed.

(H) ~~AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, ANY AND ALL RIGHT WHATSOEVER of the GRANTORS, their heirs, successors and assigns, of vehicular ingress or egress between their remaining property and the highway across those portions of the right of way lines which are marked "THROUGHOUT THIS PORTION OF THE RIGHT OF WAY LINE ALL VEHICULAR ACCESS IS DENIED," to the end that there never will be any vehicular access to or from said highway and their remaining property across those portions of the said right of way lines which are so marked on the above mentioned plats.~~

CONTINUED ON PAGE 2

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) HMS 4512, p. 0407, MSA_CE63_4470. Date available 08/31/2005. Printed 12/5/20

00038926

LIBER 4512 FOLIO 408

FORM RW 25 (Revised 7/1/71)                    CONTINUED FROM PAGE 1                              PAGE 2

(I) AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns, the perpetual right to erect and maintain between October 1st and April 1st of each year, snow fences within 100 feet of the land hereby granted in fee simple, provided that said snow fences shall not interfere with the construction and use of buildings now erected or hereafter erected or with growing crops.

(J) AND THE GRANTORS HEREIN do hereby covenant and agree, on behalf of themselves, their heirs, successors and assigns, to abide by and respect each and every control or restriction set forth in this instrument of writing, it being the intention of this conveyance to perpetuate all the rights and privileges granted to the State of Maryland, to the use of the State Highway Administration, by this deed. It is expressly understood and agreed that these covenants shall run with and bind upon the GRANTORS, their heirs, successors and assigns, forever.

(K)

   In addition to the highway right of way being conveyed, this

instrument also conveys a perpetual easement over 0.34 acre, more or

less, of extra land as indicated on State Highway Administration Extra

Land Plat No. 41184

CONTINUED ON PAGE 3

BINDING MARGIN
DO NOT WRITE IN THIS SPACE

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) HMS 4512, p. 0408, MSA_CE63_4470. Date available 08/31/2005. Printed 12/15/20

00038927

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) HMS 4512, p. 0409, MSA_CE63_4470. Date available 08/31/2005. Printed 12/25/20

BINDING MARGIN
DO NOT WRITE IN THIS SPACE    LIBER 4 5 1 2 FOLIO 4 0 9

FORM RW 25 (Revised 7/1/71)    CONTINUED FROM PAGE 2    PAGE 3

(V) TOGETHER with the buildings and improvements thereupon erected, made or being and all and every the rights, roads, alleys, ways, waters, privileges, appurtenances and advantages, to the same belonging, or anywise appertaining.

(W) IT IS UNDERSTOOD AND AGREED that the State Highway Administration shall have no further obligation or liability for the results of construction, reconstruction, maintenance or further construction of said highway and/or bridge.

(X) TO HAVE AND TO HOLD the land and premises above described and mentioned and hereby intended to be conveyed unto the proper use and benefit of the State of Maryland, to the use of the State Highway Administration of the Department of Transportation, its successors and assigns forever in ✗✗✗✗✗✗, together with the rights, easements, privileges and controls hereinbefore mentioned. This instrument conveys a perpetual easement over 3 parcels consisting of 1,218± acres.
(Y) AND the grantors covenant that they have neither done, nor suffered to be done, anything to encumber the property, easements and/or rights, etc., hereby conveyed, and that they will execute such other and further assurance of same as may be requisite.

(Z) AND ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
join in this conveyance for the purpose of releasing the land, easements and/or rights herein conveyed from the operation and effect and any mortgage and/or lien which they hold upon the property of the grantors, retaining their rights as mortgagees and/or lienors in and to the remainder of the land of the grantor not affected by this conveyance.

IN WITNESS WHEREOF we have hereunto set our hands and seals.    MARYLAND-NATIONAL CAPITAL PARK
AND PLANNING COMMISSION

WITNESS  _A. Edward Navarre_    By _John F. Downs, Jr._  (SEAL)
         A. Edward Navarre        John F. Downs, Jr.

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

WITNESS  _____    _____ (SEAL)

SEE PAGE 4 FOR ACKNOWLEDGMENTS

00038928

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) HMS 4512, p. 0410, MSA_CE63_4470. Date available 08/31/2005. Printed 12/5/20

LIBER 4 5 1 2 FOLIO 4 1 0

STATE OF MARYLAND - COUNTY OF. *Montgomery* ............          PAGE 4-FORM RW-25

I hereby certify that, before me, the subscriber, a NOTARY PUBLIC of the STATE OF MARYLAND, in and for

..... *Montgomery* ......County, personally appeared.. *John F. Dorr, Jr.* ...

and each severally acknowledged the aforegoing deed and release to be *his *her *their respective
act, or *to be the act of the said body corporate. (NOTE: strike out the words not applicable.)

AS WITNESS MY HAND AND NOTARIAL SEAL, this. /st...day of... *April* .......... in the year. *1974*.

    NOTARY SEAL           *Evelyn R. Baldwin* NOTARY PUBLIC.

             My Commission expires
             My Commission expires July 1, 1974

---

STATE OF MARYLAND - COUNTY OF................................

I hereby certify that, before me, the subscriber, a NOTARY PUBLIC of the STATE OF MARYLAND, in and for

................................County, personally appeared............................

and each severally acknowledged the aforegoing deed and release to be *his *her or *their respective
act, or *to be the act of the said body corporate. (NOTE: strike out the words not applicable.)

AS WITNESS MY HAND AND NOTARIAL SEAL, this.........day of........................ in the year........

    NOTARY SEAL          ........................ NOTARY PUBLIC.
             My Commission expires

---

STATE OF MARYLAND - COUNTY OF................................

I hereby certify that, before me, the subscriber, a NOTARY PUBLIC of the STATE OF MARYLAND, in and for

................................County, personally appeared............................

and each severally acknowledged the aforegoing deed and release to be *his *her or *their respective
act, or *to be the act of the said body corporate. (NOTE: strike out the words not applicable.)

AS WITNESS MY HAND AND NOTARIAL SEAL, this.........day of........................ in the year........

    NOTARY SEAL          ........................ NOTARY PUBLIC.
             My Commission expires

---

# DEED

FROM

MARYLAND-NATIONAL CAPITAL
PARK AND PLANNING COMMISSION
TO
THE STATE OF MARYLAND
TO THE USE OF
THE STATE HIGHWAY ADMINISTRATION
OF THE
DEPARTMENT OF TRANSPORTATION

Received for Record............,19....
at......o'clock......M.  Same day recorded
in Liber...... No.........Folio......  Kc.,
one of the Land Records of .......... County,
and examined per ........................ Clerk.

Cost of Record $..........................

---

To - State Highway Administration -
this conveyance has been recorded in
the Right of Way Division Ledger.

No Extra property was acquired by deed

Extra property has been acquired and
entered in property record - Form RW-91

INDEXED IN LEDGER ........ DATE ........

By:-...............
Ledger Clerk.

OFF CONVEYANCES MADE.

I HEREBY CERTIFY that the
instrument has been prepared
under my supervision, an
attorney admitted to the
Court of Appeals of Maryland.

................
Special Attorney
State Roads Commission

mailed to -
Md. State Rds. commission — 300 W. Preston st. Balt. 2b. 20760

**LIBER 2696 FOLIO 11**
**Recorded Jan. 18th, 1960-at-3:52 P. M.**

THIS DEED OF EASEMENT, made this 25th day of November,
1959, by and between the MARYLAND NATIONAL CAPITAL PARK AND PLANNING
COMMISSION, part of the first part, and the STATE OF MARYLAND, to the use
of THE STATE ROADS COMMISSION of Maryland, party of the second part.

WITNESSETH:

That for and in consideration of the sum of Ten ($10.00) Dollars,
and other good and valuable considerations paid by the party of the second
part unto the party of the first part, receipt whereof is hereby
acknowledged, the party of the first part does hereby give, grant, bargain,
sell and release convey and confirm unto the party of the second part, its
successors and assigns, an easement in perpetuity for highway purposes
over all of the lands lying between the outermost line designated Right of
Way Line or Right of Way Line of Through Highway, as shown and/or indi-
cated on State Roads Commission of Maryland Plats Nos. 19567 and 19568,
attached hereto and made a part hereof.

And the Grantor does further grant unto the State of Maryland, to the
use of the State Roads Commission of Maryland, its successors and assigns,
the right to create, use and maintain on the land shown hatched thus
/ / / / on the above mentioned plats, such drainage structures, stream
changes and facilities as are necessary in the opinion of the State Roads
Commission to adequately drain the roadway and/or adjacent property and
such slopes as are necessary to retain the highway and/or adjacent property;
it being agreed between the parties hereto, however, that at such time as
the contour of the land over which this easement is granted is changed so
that this easement required for slopes is no longer necessary to support
or protect the property lying between Right of Way Lines or Right of Way
Lines of Through Highway, then said easement for slopes shall cease to be
effective.

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 2696, p. 0011, MSA_CE83_2654. Date available 03/25/2008. Printed 03/15/2019.

00038930

LIBER **2696** FOLIO **12**

And the Grantor does further grant unto the State of Maryland, to the use of the State Roads Commission of Maryland, its successors and assigns, the right to create, use and maintain on or across the adjacent land of the Grantors such waterways and/or inlets and outlets as are necessary in the opinion of the State Roads Commission for the drainage structures indicated in the legend shown in the left hand corner of the above mentioned plats.

AND THE GRANTORS DO FURTHER GRANT unto the State of Maryland, to the use of the State Roads Commission of Maryland, its successors and assigns, any and all right whatsoever of the GRANTORS, their heirs, successors and assigns, of any means whatsoever of ingress or egress between the THROUGH HIGHWAY and their remaining property across the lines which are designated "Right of Way Line of Through Highway," to the end that there never will be any vehicular, pedestrian and/or animal access to or from said through highway and their remaining property across those lines which are so marked on the above mentioned plats, except by means of such public road connections to EXPRESSWAYS or by means of such public and/or private road connections to CONTROLLED ACCESS ARTERIAL HIGHWAYS, as the "COMMISSION" may construct, or permit to be constructed.

To have and to hold said easements unto the State of Maryland, to the use of the State Roads Commission of Maryland, its successors and assigns, in perpetuity, subject to and in accordance with the provisions of Sub-section 1(a) of Public Act No. 284, 71st Congress, as amended, and Section 28 Sub-title "Park and Planning Commission", of Article 16 of the Code of Public Local Laws of Maryland Title "Montgomery County" as enacted by Chapter 780 of the Laws of Maryland of 1959.

In testimony whereof, witness the name and seal of the Grantor.

MARYLAND NATIONAL CAPITAL PARK
AND PLANNING COMMISSION

By _____ (SEAL)
its Chairman

Attest:

_____
Secretary-Treasurer

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 2696, p. 0012, MSA_CE63_2654. Date available 03/25/2008. Printed 03/15/2019.

LIBER **2696** FOLIO **13**

STATE OF MARYLAND

MONTGOMERY COUNTY, to wit:

I hereby certify that on this *25ᵗʰ* day of *November* ,
19*59*, before me the subscriber, a Notary Public in and for Montgomery
County, personally appeared *Herbert W. Wells* , Chairman of
the Maryland National Capital Park and Planning Commission, and acknowledged
the foregoing instrument to be the act and deed of said Commission and at
the same time made oath in due form of law that he is fully authorized by
proper resolution to execute and acknowledge same.

Witness my hand and Notarial Seal.

*Carl E. Gud...*
Notary Public

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 2696, p. 0013, MSA_CE63_2654. Date available 03/25/2008. Printed 03/15/2019.

00038932

mailet 6 –                                                    7-22-63
St. ad. Comm. 300 W. Preston St rm. 402 Balto md

# LIBER **3098** FOLIO **577**
### Recorded June 21st, 1963-at-2:14 P. M.

THIS DEED OF EASEMENT, made this 15th day of   May

1962, by and between Maryland National Capital Park and Planning

Commission, party of the first part, and the State of Maryland, to the use of

the State Roads Commission of Maryland, party of the second part.

WITNESSETH:

THAT for and in consideration of the sum of One Dollar and other good

and valuable considerations paid to the party of the first part by the party of

the second part; receipt whereof is hereby acknowledged, the party of the

first part does hereby give, grant and convey unto the party of the second

part and its successors, a perpetual easement for normal highway purposes

over, across and through all of the lands shown colored in red and yellow on

State Roads Commission of Maryland Plats No. 15420 and 17847, attached

hereto and made a part hereof.

TO HAVE AND TO HOLD the same unto the State of Maryland, to the

use of the State Roads Commission of Maryland and its successors, in

perpetuity, except that at any time said area shall be abandoned and not used

for highway purposes, then in that event, said easement shall cease and

determine, and subject to and in accordance with the provisions of Subsection

1(a) of Public Act No. 284, 71st Congress, as amended, and Section 28

Sub-title "Park and Planning Commission", of Article 16 of the Code of

Public Local Laws of Maryland Title "Montgomery County" as enacted by

Chapter 780 of the Laws of Maryland of 1959.

WITNESS, the Maryland-National Capital Park and Planning

Commission.

MARYLAND NATIONAL CAPITAL PARK
AND PLANNING COMMISSION

William J. Stevens
its Chairman
William J. Stevens

Attest:

Secretary - Treasurer
Jesse F. Nicholson

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 3098, p. 0577, MSA_CE63_3056. Date available 04/10/2008. Printed 09/18/2019.

00038933

MONTGOMERY COUNTY CIRCUIT COURT (Land Records) CKW 3098, p. 0578, MSA_CE63_3056. Date available 04/10/2008. Printed 09/18/2019.

LIBER **3098** FOLIO **578**

State of Maryland )

County of Montgomery )

On this *15th* day of *May*, 196~7~3, before me, a Notary Public of the State of Maryland, in and for Montgomery County, personally appeared ~~Herbert W. Wells~~ *WILLIAM J. STEVENS*, Chairman of the Maryland National Capital Park and Planning Commission, and acknowledged the foregoing and annexed deed to be the act and deed of the Maryland National Capital Park and Planning Commission.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.

*Carl E. Gudikunst*

Notary Public, State of Maryland

MY COMMISSION EXPIRES MAY **3**, 19~45~65

Carl E. Gudikunst

00038934

4053    150    -16-

parcel  E,    as shown on State Roads Commission's plat number 37636,

the three (3) following courses and distances, VIZ.:  (1) S 68° 28' 44" E

50.25 feet;  (2) S 65° 03' 32" E  50.04 feet;  (3)  S 54° 47' 55" E  50.49 feet

to intersect the northerly right of way line of the Capitol Beltway, said

intersection being situated 150.00 feet, measured perpendicularly, from

station 281+50.00 of the base line of right of way of the Capitol Beltway,

thence binding along the northerly right of way line  of the Capitol Beltway

N 62° 46' 06" W  150.00 feet to the place of beginning.

Containing 0.01 acres more or less.

PARCEL  F

BEGINNING for the same at a point on the northerly right of way line of

the Capitol Beltway, said point being situated 150.00 feet, measured perpen-

dicularly from station 281+50.00 of the base line of right of way of the

Capitol Beltway, as said base line is delineated on State Roads Commission's

plat number 37636 attached hereto and made a part hereof, running thence and

binding along the outline of the perpetual easement area marked parcel

F , as shown on State Roads Commission's plat number 37636, the four (4)

following courses and distances; VIZ.:  (1) N 44° 49' 27" E  215.06 feet;

(2) N 76° 02' 45" E  159.45 feet;  (3)  S 62° 46' 06" E  65.00 feet;  (4)

S 27° 13' 54" W  310.00 feet to intersect the northerly right of way line of

the Capitol Beltway, said intersection being situated 150.00 feet, measured

perpendicularly, from station 284+00.00 of the base line of right of way of the

Capitol Beltway, thence binding along the northerly right of way line of the

Capitol Beltway  N 62° 46' 06" W  250.00 feet to the place of beginning.

Containing  1.32 acres more or less.

PARCEL   G

BEGINNING for the same at a point on the southerly right of way line of

the Capitol Beltway, said point being situated 150.00 feet, measured per-

pendicularly, from station 281+50.00 of the base line of right of way of the

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0150, MSA_CE64_4134. Date available 06/07/2006  Printed 12/15/2019.

Case 8:22-cv-02597-DKC    Document 65-6    Filed 10/30/23    Page 101 of 140

## 4053  151

Capitol Beltway, as said base line is delineated on State Roads Commission's
plat no. 37636, attached hereto and made a part hereof; running thence and
binding along said southerly right of way line of the Capitol Beltway S 62° 46'
06" E  115.00 feet to a point situated 150.00 feet, measured perpendicularly,
from station 282+65.00 of the base line of right of way of the Capitol Beltway,
thence leaving the southerly right of way line of the Capitol Beltway and bind-
ing along the outline of the perpetual easement area marked parcel G, as shown
on State Roads Commission's plat no. 37636, the four (4) following courses and
distances; VIZ.:  (1) S 27° 13' 54" W  325.000 feet;  (2) N 62°46'06" W 85.00
feet;  (3) N 17° 30' 15" E  177.55 feet;  (4) N 27° 13' 54" E 150.00 feet to
the place of beginning.

Containing 0.80 Acres more or less.

PARCEL H

BEGINNING for the same at a point on the southerly right of way line of
the Capitol Beltway, said point being situated 150.00 feet, measured radially,
from station equality 284+61.63 back equals 284+91.07 ahead of the base line
of right of way of the Capitol Beltway as said base line is delineated on State
Roads Commission's plat number 37636, attached hereto and made a part hereof,
running thence and binding along said southerly right of way line of Capitol
Beltway by a curve to the left having a radius of 5061.07 feet for a distance
of 382.14 feet, said curve being subtended by a chord S 64° 55' 53" E 382.05
feet to intersect the right of way line of ramp A, said intersection being
situated 150.00 feet, measured radially, from station 288+61.88 of the base
line of right of way of the Capitol Beltway, said intersection also being
situated 50.00 feet, measured radially, from station 2+22.59 of the base line
of right of way of Ramp A, as said base line is delineated on State Roads Com-
mission's plat number 37636, thence binding along the right of way line of ramp
A by a curve to the right having a radius of 10277.61 feet for a distance of
117.70 feet, said curve being subtended by a chord S 57° 12' 20" E 117.69 feet
to intersect the easterly line of division of the U.S. Department

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0151, MSA_CE64_4134. Date available 06/07/2006  Printed 12/15/2019.

00038936

**4053  152**

of Agriculture, thence binding thereon  S 32° 47' 50" W  27.00 feet to the

southeastern extremity of the perpetual easement area marked parcel

H , as shown on State Roads Commission's plat number 37636,  thence binding

along the outline of said easement area the eight (8) following courses and

distances; VIZ.:    (1)  N 61° 12' 29" W  40.81 feet; (2)  N 63° 12' 32" W

83.24 feet;   (3)  N 57° 53' 43" W  52.48 feet;  (4) N 58° 05' 10" W 104.44

feet;  (5)  N 57° 11' 43" W 52.12 feet; (6)  N 62° 06' 40" W  51.64 feet;

(7) N 63° 44' 51" W  51.59 feet; (8) N 57° 28'  23" W  61.06 feet to the

place of beginning.

Containing  0.22 Acres more or less.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0152, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

00038937

4053   153

The following are perpetual easement areas for stream change:

PARCEL I

BEGINNING for the same at a point on the southerly right of way line of the Capitol Beltway, said point being situated 111.00 feet, measured perpendicularly, from station 244+65.00 of the base line of right of way of the Capitol Beltway, as said base line is delineated on State Roads Commission's Plat Number 36603, attached hereto and made a part hereof, running thence and binding along the outline of the perpetual easement area, as shown on State Roads Commission's plat number 36603, the three (3) following courses and distances, VIZ" (1) S 00° 52' 46" E  171.82 feet; (2) S 86° 44' 36" W 71.70 feet; (3) N 15° 56' 53" W  159.53 feet to intersect the aforementioned southerly right of way line of the Capitol Beltway, said intersection being situated 111.00 feet, measured perpendicularly, from station 243.50.00 of the base line of right of way of the Capitol Beltway, thence binding along said southerly right of way line  N 78° 43' 34" E 115.00 feet to the place of beginning.

Containing 0.35 acres more or less.

PARCEL J

BEGINNING for the same at a point on the right of way line of the south bound lane of Interstate Route 95, hereinafter called I-95, said point being situated 175.00 feet, measured radially, from station 591+50.00 of the base line of right of way of I-95, as said base line is delineated on State Roads Commission's plat number 36604, attached hereto and made a part hereof, running thence and binding along the outline of the perpetual easement area, as shown on State Roads Commission's plat number 36604, the three (3) following courses and distances; VIZ: (1) S 61° 53' 20" W 90.81 feet; (2) N 26° 55' 15" E 45.67 feet; (3) N 53° 46' 25" E 92.54 feet to intersect the aforementioned right of way line of the south bound lane of I-95, said intersection being situated 191.00 feet, measured radially, from station 592+00.00

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0153, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

00038938

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0154, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

-20-

**4053   154**

of the base line of right of way of I-95, thence binding along said right of

way line S 16° 08' 27" W  54.78 feet to the place of beginning.

Containing 0.06 acres more or less.

00038939

PRINCE GEORGE's COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0155, MSA_CE64_4134. Date available 08/07/2006. Printed 12/15/2019.

4053    155

REC...
Federal Highway,
OCT 18 1971
Region 2
Maryland Division

STATE ROADS COMMISSION
P. Box #99
upper marlboro, MD.

(EMS)

Taxes levied and on record
as of this date
JAN 7 1972
have been paid
DIRECTOR OF FINANCE
PRINCE GEORGES COUNTY, MD.

Received for record on the..............
Day of.........MARCH..........AD. 1972
and the same day recorded in Liber
No. 4053....at Folio 130.&c
one of the LAND Records
of Prince George's County, Maryland
W. Mandy Webb
_____
Clerk of the Circuit Court

00038940

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0130, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

4053   130

THIS DEED, made this _4th_ day of _October_,
1971, by and between the UNITED STATES OF AMERICA, acting by and
through the DEPARTMENT OF TRANSPORTATION, FEDERAL HIGHWAY ADMINISTRATION,
hereinafter referred to as the DEPARTMENT, and the STATE OF MARYLAND,
STATE HIGHWAY ADMINISTRATION, hereinafter referred to as the STATE.

W I T N E S S E T H :

WHEREAS, the STATE has filed application under the provisions
of the Act of Congress approved August 27, 1958 (Title 23, United
States Code, Section 107(d), 72 Stat. 893) for the conveyance to the
STATE certain easements in, over and across lands hereinafter
described being located in Prince Georges County, Maryland, and
a part of Agricultural Research Center, Department of Agriculture;
and

WHEREAS, the Federal Highway Administrator pursuant to delegation
of authority from the Secretary of Transportation, has determined
that the interests in lands requested by the STATE are reasonably
necessary in connection with the construction of Interstate
Projects I-495-2(74)26 and I-95-3(5)5; and

WHEREAS, this conveyance is further authorized under the provisions
of the Act of Congress approved October 15, 1966 (Section 6(a)(1)(A),
80 Stat. 931, 937); and

WHEREAS, the Deputy Administrator of the Agricultural Research
Service, Department of Agriculture, has authorized the DEPARTMENT
to convey the easements in, over and across the hereinafter
described lands to the STATE.

NOW, THEREFORE, the DEPARTMENT as authorized by law, does hereby
appropriate, remise, release, quitclaim and convey unto the State
of Maryland the following easements:

00038941

4053  131

1. A perpetual and assignable easement to locate, construct, reconstruct, repair, operate, and maintain a right-of-way and appurtenances thereto in, on, through and across Parcels Nos. 1, 2, 3 as described in Exhibit "A" and shown on Plat Nos. 21563, 21562, 37635, 37636 in Exhibit "B", both attached hereto and made parts hereof, including all existing, future, or potential common law or statutory abutters' rights or easements of access to, from and between the right-of-way of Interstate Project I-495-2(74)26 and the adjoining property of the United States of America; and

2. Perpetual and assignable easements and rights-of-way to locate, construct, operate, maintain, repair and patrol drainage facilities in, upon, over and across Parcels Nos. A, B, C, D, E, H as described in Exhibit "A" and shown on Plats Nos. 21563, 21562, 37635, 37636 in Exhibit "B"; and

3. A perpetual and assignable easement to relocate, construct, reconstruct and maintain the Little Paint Branch, a stream, in, on, through and across Parcels Nos. F and G as described in Exhibit "A" and shown on Plat No. 37636 in Exhibit "B"; and

4. A perpetual and assignable easement to locate, construct, reconstruct, repair, operate and maintain a right-of-way and appurtenances thereto in, on, through and across Parcels Nos. 4, 5 and 6 as described in Exhibit "A" and shown on Plats Nos. 36603, 36604 and 36605 in Exhibit "B", both attached hereto and made parts hereof, including all existing, future, or potential common law or statutory abutters' rights or easements of access to, from and between the right-of-way of Interstate Project I-95-3(5)5 and the adjoining property of the United States of America; and

5. A perpetual and assignable easement to relocate, construct, reconstruct and maintain a stream in, on, through and across Parcel No. I as described in Exhibit "A" and shown on Plat No. 36603; and

6. A perpetual and assignable easement and right-of-way in, over and across Parcel J, as described in Exhibit "A" and shown on Plat No. 36604 in Exhibit "B", to construct, maintain, repair, operate, patrol an outlet ditch.

TO HAVE AND TO HOLD, the above-mentioned lands and interests in lands unto the State of Maryland, for so long a time as such are needed for highway purposes upon the express condition that if, at any time, the need for highway purposes shall no longer exist, notice of the fact shall be given by the STATE to the DEPARTMENT and such lands and interests in lands shall immediately revert to the United States of

- 2 -

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0131, MSA_CE64_4134, Date available 08/07/2006, Printed 12/15/2019.

00038942

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0132, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

4053   132

America and to the control of the Department of Agriculture as such control existed prior to this instrument; and subject to the following covenants and regulations, which shall be binding on the State, its successors and assigns:

1.   The State in consideration of the conveyance of said lands and interests in lands does hereby covenant and agree as a covenant running with the land for itself, its successors and assigns that it will comply with the provisions of Title VI of the Civil Rights Act of 1964, (78 Stat. 252; 42 U.S.C., Sections 2000d-2000d-4) and the regulations set forth in Title 49—Transportation, Subtitle A, Part 21, Code of Federal Regulations (49 CFR 21.1-21.23) (1970), specif- ically that (a) no members of the traveling public and business users of the Federally-assisted highway shall, on the ground of race, color, or national origin be excluded from participating in, be denied the benefits  of, or be otherwise subject to discrimination in their access to and use of said highway or their access to and use of the facilities and services provided for public accommodations (such as eating, sleeping, rest, recreation and vehicle servicing) constructed on, over, or under the right-of-way of the said highway, (b) that the State shall use the lands and interests in lands so conveyed, in compliance with all other requirements imposed pursuant to said Title 49, Subtitle A, Code of Federal Regulations, Part 21.

2.   In the event of breach of the above-mentioned nondiscrimination covenants, the DEPARTMENT reserves the right to declare the term of this grant terminated in whole or in part and to revest title in the United States of America and to the control of the Department of Agriculture as such control existed prior to this instrument.

- 3 -

00038943

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0133, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

4053   133

IN WITNESS WHEREOF, I, Edwin J. Reis, Assistant Chief Counsel,
pursuant to delegations of authority from the Secretary of Transportation,
the Federal Highway Administrator, and the Chief Counsel, Federal
Highway Administration, by virtue of authority in me vested by law,
have hereunto subscribed my name as of the day and year first
above written.

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
FEDERAL HIGHWAY ADMINISTRATION

IN PRESENCE OF:

_June L Creel_              BY _Edwin J. Reis_
_Ethel M Bell_                  Edwin J. Reis
                                Assistant Chief Counsel


UNITED STATES OF AMERICA)
                        )
DISTRICT OF COLUMBIA    )

I, _James A Bloom_, a Notary Public in and for
the District of Columbia, do hereby certify that on this the _4th_
day of _October_, 1971, before me personally
appeared Edwin J. Reis, Assistant Chief Counsel, Federal Highway
Administration and acknowledged that the foregoing instrument having
date of _October 4_, 1971, was executed
by him in his official capacity and by authority in him vested by
law, for the purposes and intents in said instrument described and
set forth, and acknowledged the same to be his free act and deed as
Assistant Chief Counsel, Federal Highway Administration.

Witness my hand and seal this _4th_ day of _October_,
1971.

_James A Bloom_
                                            Notary Public

(SEAL)


My Commission Expires _December 31, 1973_

- 4 -

00038944

4053    134

In compliance with the conditions set forth in the foregoing
deed, the STATE OF MARYLAND, STATE HIGHWAY ADMINISTRATION, certifies
and, by the acceptance of this deed, accepts the right-of-way over certain
lands herein described and agrees for itself, its successors and
assigns forever to abide by the conditions set forth in said deed.

STATE OF MARYLAND
STATE HIGHWAY ADMINISTRATION

Approved as to form
and legal sufficiency
11/4/71    19
Eli Baer
Special _____ Attorney _____

BY _David H. Fisher_
STATE HIGHWAY ADMINISTRATOR

STATE OF MARYLAND                              )
                                              )
COUNTY OF _Baltimore_                          )

I, _____, a Notary Public in and
for the State of Maryland, hereby certify that _David H. Fisher_
whose name as _State Highway Administrator_ is signed to the
foregoing conveyance and who is known to me, acknowledged before me on
this day that, being informed of the contents of the conveyance, he
in his capacity as such _Administrator_
executed the same voluntarily on this day.

Given under my hand and seal of office this _13th_ day of
_December_, 1971.

_Frank J. Paskowski_
Notary Public

(SEAL)

My Commission Expires _July 1, 1974_

- 5 -

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0134, MSA_CE64_4134, Date available 06/07/2006 Printed 12/15/2019.

00038945

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0135, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

4053 · 135                                                    -1-

Property to be Conveyed to the State Roads
Commission of Maryland by the U. S. Government
(U.S. Agricultural Department)
Capitol Beltway
Contract No. 722-3-320
722-8-320
File No: 39747

Parcel No. I:  Beginning at the intersection of the Northerly Right of Way

line of the Capitol Beltway with the 15th or South 73° 45' 01" East 498.6

foot line of Lot 4, 186.28 feet from the beginning thereof of a deed from the

State of Maryland to the United States of America dated October 2, 1937 and

recorded among the Land Records of Prince George's County, Maryland, in

Liber 485 at Folio 116, said point of intersection being 150.00 feet measured

radially from Station 370+09.72 of the base line of Right of Way of the

Capitol Beltway as said base line of Right of Way is delineated on State Roads

Commission Plat No. 21563 attached hereto and made a part hereof, thence

binding along the title line of the United States of America the two follow-

ing courses and distances vis: North 73° 46' 01" West 186.28 feet, South

64° 07' 02" West 238.14 feet to intersect the Southerly Right of Way line of

the Capitol Beltway, said point of intersection being 150.00 feet measured

radially from Station 367+50.45 of the aforementioned base line of Right of

Way, thence binding along the Southerly Right of Way line of the Capitol

Beltway, North 48° 21' 13" West 1007.67 feet to intersect the title line of

the Baltimore & Ohio Railroad as shown on the Baltimore & Ohio Railroad

Valuation Map No. V-18.1-10, said point of intersection being 150.00 feet

measured radially from Station 357+42.78 of the aforementioned base line of

Right of Way, thence binding along the aforementioned title line of the Balti-

more & Ohio Railroad 320.70 feet along the arc of a curve deflecting to the

left having a radius of 5762.58 feet and a long chord bearing of North 20°

58' 00"East 320.66 feet to intersect the aforementioned Northerly Right of Way

line of the Capitol Beltway, said point of intersection being 150.00 feet

measured radially from Station 356+29.53 of the aforementioned base line of

right of way, thence binding along the aforementioned Right of Way line of the

Capitol Beltway South 48° 21' 13" East 1380.19 feet to the place of beginning.

Containing 7.87± Acres.

The above described tracts of land being subject to the drainage rights

as indicated on State Roads Commission's Plats Nos. 21562 and 21563 attached

hereto and made a part hereof.

Exhibit "A"

00038946

PRINCE GEORGES COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0136, MSA_CE64_4134. Date available 08/07/2006. Printed 12/15/2019.

4053   136

-2-

. . . . . . . . . . . . . .

Parcel No. 2:  Beginning for the same at a point of intersection of the Norther-

ly Right of Way line of the Capitol Beltway and the tenth or South 00° 48' 02"

East 1351 9/10 foot line 131.66 feet from the beginning thereof of a deed from

the State of Maryland to the United States of America dated October 2, 1937 and

recorded  among the Land Records of Prince George's County, Maryland, in Liber

485 at Folio 116, said point of intersection being 150.00 feet measured radially

from Station 342+21.54 of the base line of Right of Way of Capitol Beltway as

said base line of Right of Way is delineated on State Roads Commission Plat No.

21562 attached hereto and made a part hereof, thence binding along said

Northerly Right of Way line the two following courses and distances vis:

1068.08 feet along the arc of a curve deflecting to the right having a radius of

3969.72 feet and a long chord bearing of South 56° 03' 42" East 1064.86 feet,

South 48° 21' 13" East 308.89 feet to intersect the title line of the Baltimore

& Ohio Railroad as shown on Baltimore & Ohio Railroad Valuation Map No. V-18.1-10,

said point of intersection being 150.00 feet measured radially from Station

355+58.15 of the aforementioned base line of Right of Way as said base line of

Right of Way is delineated on State Roads Commission Plat No. 21563 attached

hereto and made a part hereof, thence binding along the aforementioned title

line of the Baltimore and Ohio Railroad, 321.25 feet along the arc of a curve

deflecting to the right having a radius of 5696.58 feet and a long chord bear-

ing of South 20° 42' 56" West 321.21 feet to intersect the Southerly Right of

Way line of the Capitol Beltway, said point of intersection being 150.00 feet

measured radially from Station 356+72.89 of the aforementioned base line of

Right of Way, thence binding along the Southerly Right of Way of the Capitol

Beltway the two following courses and distances vis:  North 48° 21' 13" West

423.63 feet, 831.99 feet along the arc of a curve deflecting to the left having

a radius of 3669.72 feet and a long chord bearing of North 54° 59' 55" West

830.21 feet to intersect the aforementioned tenth or South 00° 48' 02" East 1351

9/10 foot line, said point of intersection being  150.00 feet measured radially

from Station 343+89.26 of the aforementioned base line of Right of Way, thence

running with said title line North 00° 53' 20" West 340.75 feet to the place

of beginning.

Containing 9.08± Acres.

00038947

Contract No. P-722-3-320  -3-
Project:  Capital Beltway - New Hampshire
Avenue to Rhode Island Avenue.
Property:  U. S. Department of Agriculture
Item No.:  39747

Property to be conveyed to the State Roads Commission of Maryland by
the United State Government Agricultural Department.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
PARCEL NO. 3

BEGINNING for the same at the point of intersection of the Northerly Right
of Way Line of the Capital Beltway and the second or S 39° 24' W 1535.7 foot
line 388.42 feet from the beginning  thereof of a deed from Joseph E. Gatti
and Josephine A. Gatti, his wife, to the United States of America dated
December 20, 1940, and are recorded among the land records of Prince Georges
County, Maryland, in Liber 591 at Folio 283, said point of intersection being
150 feet measured radially  from station 290+39.67 of the base line of Right
of Way of the Capital Beltway as said base line of Right of Way is delineated
on State Roads Commission's Plat No. 37636, attached hereto and made a part
hereof;  thence binding along the aforementioned title line  S 32° 47' 50" W
153.23 feet to intersect the base line of Right of Way of the aforesaid Capital
Beltway at station 290+07.90; thence continuing along the aforementioned
title line the two following courses and distances; VIZ.:   S 32° 47' 50" W
124.98 feet, and S 32° 47' 50" W  50.00 feet to intersect the Southerly Right
of Way Line of the Capital Beltway;  thence leaving the aforementioned title
line and binding along said Southerly Right of Way Line of the Capital Beltway
the four following courses and distances; VIZ.:  (1) by a curve to the left
117.69 feet, said curve being subtended by a chord N 57° 12' 19" W  117.68 feet,
said curve having a radius of 10,277.61 feet; (2) by a curve to the right having
a radius of 5,061.07 feet for a distance of 382.06 feet, said curve being sub-
tended by a chord  N 64° 55' 53" W  382.05 feet; (3)  N 62° 46' 06" W  493.75
feet; (4) by a curve to the left having a radius of 4,472.66 feet for a dis-
tance of 1,571.40 feet, said curve being subtended by a chord N 72° 50' 00" W
1,563.33 feet to intersect the easterly existing Right of Way Line of Cherry
Hill Road, said point being situated at a distance of 111 feet measured
radially from station 262+38.31 of the base line of Right of Way of the east-

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0137, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

4053  137

00038948

-4-

4053  138

bound lane of the Capital Beltway, as said base line of Right of Way is delineated on State Roads Commission's Plat No. 37635, attached hereto and made a part hereof; thence leaving the southern Right of Way Line of the Capital Beltway and binding along the easterly existing Right of Way Line of Cherry Hill Road the five following courses and distances; VIZ: (1) N 09° 10' 26" W 115.52 feet; (2) N 09° 10' 26" W 42.34 feet; (3) by a curve to the right having a radius of 1,402.39 feet for a distance of 107.70 feet, said curve being subtended by a chord N 06° 58' 24" W 107.68 feet; (4) N 04° 46' 26" W 132.57 feet; (5) N 04° 46' 26" W 180.13 feet to intersect the aforementioned northerly Right of Way Line of the Capital Beltway; thence leaving the easterly existing Right of Way Line of Cherry Hill Road and binding along the northerly Right of Way Line of the Capital Beltway the four following courses and distances; VIZ.: (1) S 65° 54' 30" E 130.63 feet; (2) by a curve to the right having a radius of 4,733.66 feet for a distance of 897.32 feet, said curve being subtended by a chord S 68° 11' 56" E 895.98 feet; (3) S 62° 46' 06" E 1,330.58 feet; (4) by a curve to the left having a radius of 4,761.07 feet for a distance of 531.84 feet, said curve being subtended by a chord S 65° 58' 06" E 531.57 feet to the place of beginning.

Containing 22.44 Acres more or less.

The above described parcels being subject to provisions stated in the expressway note as shown on State Roads Commission's Plat Nos. 37635 and 37636 attached hereto and made a part hereof.

The above described parcels also being subject to all easement and drainage notes as shown on State Roads Commission's Plat Nos. 37635 and 37636, attached hereto and made a part hereof.

This description is a replacement for the description previously written for State Roads Commission's Plat Nos. 21560 and 21561 whose Contract No. was P-722-3-320 and which was written in February 1959.

PRINCE GEORGES COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0138, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

Contract No.    F-799-3-3112
Proje   : Interstate Route 95.                                    -5-
        From Powder Mill Road to Capital Beltway
.Property:  U.S. Department of Agriculture
. Item.No.   39747

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

PARCEL NO. 4:

BEGINNING for the same at the intersection of the easterly property line
of the U. S. Department of Agriculture with the southerly right of way line of
the eastbound lane of the Capital Beltway, said point of beginning being
situated 111.00 feet distant, measured radially, from station 251+99.38 of the
base line of right of way of the eastbound lane of the Capital Beltway, as
said base line is delineated on State Roads Commission's plat number 36603,
attached hereto and made a part hereof, said point of beginning also being
N 41° 07' 53" W 257.14 feet from a point designated as the beginning of the
N 36° 36' W 460.32 feet line of the deed dated 4/29/41, from Anita E. McCoy
to the United States of America, Liber 609, folio 18; thence leaving said
point of beginning and running along the southerly right of way line of the
eastbound lane of the Capital Beltway by a curve to the left having a radius
of 4472.66 feet for a distance of 420.24 feet, said curve being subtended by
a chord S 81° 25' 04" W 420.08 feet; thence continuing along said southerly
right of way line S 78° 43' 34" W 727.32 feet to intersect the right of way
line of Ramp "D", said ramp "D" being located in the southeast quadrant of the
interchange of the Capital Beltway and Interstate Route 95; thence leaving the
southerly right of way line of the eastbound lane of the Capital Beltway and
running along the right of way line of Ramp "D" the six (6) following courses
and distances, VIZ:  (1) by a curve to the right having a radius of 686.00 feet
for a distance of 503.97 feet, said curve being subtended by a chord S 12° 09'
43" W 492.71 feet;  (2) S 49° 06' 35" W 169.78 feet;  (3) by a curve to the
right having a radius of 660.00 feet for a distance of 259.33 feet, said curve
being subtended by a chord S 58° 47' 18" W 257.66 feet;  (4) S 70° 02' 41" W
164.25 feet;  (5) S 43° 28' 48" W 55.90 feet;  (6) S 68° 38' 53" W 18.63 feet
to intersect the westerly property line of the U. S. Dept. of Agriculture;
thence leaving the right of way line of Ramp "D" and running along the westerly
property line of the U. S. Dept. of Agriculture N 27° 04' 17" E 125.36 feet
to intersect the base line of right of way of the aforementioned Ramp "D" at
station 7+23.10 as said base line is delineated on State Roads Commission's
Plat No. 36603, attached hereto and made a part hereof; thence continuing

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWV 4053, p. 0139, MSA_CE64_4134. Date available 08/07/2006. Printed 12/15/2019.

4053  139

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053; p. 0140, MSA_CE64_4134. Date available 08/07/2006. Printed 12/15/2019.

4053  140
-6-

along said westerly property line N 27° 04' 17" E 888.48 feet to intersect
the aforementioned base line of right of way of the eastbound lane of the
Capital Beltway at station 238+37.27; thence continuing along said westerly
property line N 27° 04' 17" E 153.28 feet to intersect the northerly property
line of the U. S. Dept. of Agriculture; thence leaving the westerly property
line of the U. S. Dept. of Agriculture and running along the northerly property
line of the U. S. Dept. of Agriculture the six (6) following courses and
distances, VIZ:  (1)  N 71° 05' 14" E 502.10 feet;  (2)  N 81° 11' 17" E 62.55
feet;  (3) N 01° 39' 43" W 15.00 feet;  (4) N 85° 20' 17" E 14.00 feet;  (5)
N 88° 31' 26" E 360.40 feet;  (6)  N 39° 36' 25" E 162.43 feet to intersect
the aforementioned easterly property line of the U. S. Dept. of Agriculture;
thence leaving the northerly property line of the U. S. Dept. of Agriculture
and running along the easterly property line of the U. S. Dept. of Agriculture
S 32° 47' 24" E 207.59 feet; thence continuing along said easterly property
line S 41° 07' 53" E 68.08 feet to intersect the aforementioned base line
of right of way of the eastbound lane of the Capital Beltway at station 251+21
.42; thence continuing along said easterly property line S 41° 07' 53" E
135.10 feet to the place of beginning.

Containing 13.26 acres more or less.

00038951

PRINCE GEORGES COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0141, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

-7-

**4053  141**

PARCEL NO. 5

BEGINNING for the same at the intersection of the southerly property line of the U. S. Dept. of Agriculture with the easterly right of way line of the northbound lane of Interstate Route 95, said point of beginning being situated 162.93 feet distant, measured radially, from station 594+37.34 of the base line of right of way of the northbound lane of Interstate Route 95, as said base line is delineated on State Roads Commission's Plat Nos. 36604 and 36605, attached hereto and made a part hereof, said point of beginning also being N 79° 48' 36" W 964.04 feet from a concrete monument, said monument being located at the end of the N 75° 57' W 551.00 feet line of the deed dated 10/2/33, from Theodore A. Sellman to the United States of America, Liber 401, Folio 96; thence leaving said point of beginning and running with said southerly property line of the U. S. Dept. of Agriculture the five (5) following courses and distance, VIZ:  (1)  N 79° 48' 36" W 117.91 feet; (2) S 02° 30' 49" E 93.62 feet; (3) S 81° 44' 24" W 102.53 feet to intersect the aforementioned base line of right of way of the northbound lane of Interstate Route 95 at station 592+69.45; (4) S 81° 44' 24" W 605.35 feet to intersect the southbound lane of Interstate Route 95 at station 590.63.18, as said base line is delineated on State Roads Commission's Plat Nos. 36604 and 36605, attached hereto and made a part hereof; (5) S 81° 44' 24" W 253.93 feet to intersect the westerly right of way line of the southbound lane of Interstate Route 95; thence leaving the southerly property line of the U. S. Dept. of Agriculture and running along the westerly right of way line of the southbound lane of Interstate Route 95 the twenty (20) following courses and distances, VIZ.:  (1) N 37° 20' 15" E 96.48 feet;  (2) N 65° 27' 51" E 63.41 feet;  (3) by a curve to the right having a radius of 3969.72 feet for a distance of 51.97 feet, said curve being subtended by a chord N 31° 37' 21" E 51.96 feet;  (4) N 06° 45' 03" E 57.81 feet;  (5) N 16° 08' 27" E 54.78 feet;  (6)  N 39° 31' 14" E 262.52 feet;  (7) N 33° 38' 23" E 157.54 feet;  (8) N 47° 29' 03" E 52.84 feet;  (9) N 56° 01' 28" E 107.98 feet; (10) by a curve to the right having a radius of 3969.72 feet for a distance of 415.71 feet, said curve being subtended by a chord N 44° 44' 50" E 415.52 feet; (11) N 24° 44' 43" E 114.20 feet; (12)  N 37° 10' 33" E 108.14 feet; (13) N 50° 24' 52" E 105.80 feet;  (14) N 65° 10' 33" E 213.57 feet;  (15) N 31° 05' 59" E 57.82 feet;  (16) N 41° 32' 09" E 54.68 feet;  (17) N 60° 37' 04" E 88.30

00038952

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0142, MSA_CE64_4134. Date available 08/07/2006. Printed 12/15/2019.

4053  142

-8-

feet; (18) N 56° 16' 43" E 166.77 feet; (19) N 62° 08' 01" E 166.35 feet;
(20) N 44° 47' 08" E 33.66 feet to intersect the southerly existing right of
way line of Sellman Road; thence leaving the westerly right of way line of the
southbound lane of Interstate Route 95 and running along the southerly existing
right of way line of Sellman Road N 66° 27' 30" E 547.59 feet to intersect the
westerly existing right of way line of Cherry Hill Road; thence leaving the
southerly existing right of way line of Sellman Road and running along the west-
erly existing right of way line of Cherry Hill Road S 20°46' 58" E 115.69 feet
to intersect the base line of right of way of Interstate Route 95 at station
617+18.67; thence continuing along the westerly existing right of way line of
Cherry Hill Road S 20° 46' 58" E 609.65 feet to intersect the westerly right of
way line of Cherry Hill Road; thence leaving the westerly existing right of way
line of Cherry Hill Road and running along the westerly right of way line of
Cherry Hill Road the three following courses and distances, VIZ.: (1) N 38°
21' 54" W 26.29 feet; (2) N 20° 22' 52" W 268.25 feet; (3) S 71° 58' 02" W
6.17 feet to intersect the easterly right of way line of Interstate Route 95;
thence leaving the westerly right of way line of Cherry Hill Road and running
along the easterly right of way line of Interstate Route 95 the ten (10)
following courses and distance, VIZ.: (1) S 60° 53' 28" W 397.27 feet; (2)
S 17° 41' 23" W 112.23 feet; (3) S 35° 36' 31" W 140.25 feet; (4) S 59° 35'
39" W 378.65 feet; (5) S 42° 47' 00" W 140.23 feet; (6) S 45° 07' 25" W 142.29
feet; (7) by a curve to the left having a radius of 2815.35 feet for a dis-
tance of 94.18 feet, said curve being subtended by a chord S 34° 14' 36" W
94.17 feet; (8) S 37° 38' 01" W 238.20 feet; (9) S 19° 08' 32" W 95.91 feet
(10) S 23° 56' 14" W 106.61 feet to the place of beginning.

Containing 33.12 acres more or less.


PARCEL NO. 6

BEGINNING for the same at the intersection of the easterly existing
right of way line of Cherry Hill Road with the southerly existing right of
way line of Sellman Road, said intersection being situated 115.38 feet distant,
measured radially, from station 617+96.90 of the base line of right of way of
Interstate Route 95, as said base line is delineated on State Roads Commission's

00038953

## 4053   143

Plat No. 36605, attached hereto and made a part hereof; thence leaving said point of beginning and running along the southerly existing right of way line of Sellman Road N 79° 57' 56" E 235.60 feet to intersect the aforementioned base line of right of way of Interstate Route 95 at station 620+04.43; thence continuing along said southerly existing right of way line N 79° 57' 56" E 428.54 feet to intersect the easterly right of way line of Interstate Route 95; thence leaving the southerly existing right of way line of Sellman Road and running along the easterly right of way line of Interstate Route 95 S 31° 45' 28" W 70.48 feet to intersect the northerly right of way line of Relocated Sellman Road; thence leaving the easterly right of way line of Interstate Route 95 and running along the northerly right of way line of Relocated Sellman Road by a curve to the right having a radius of 994.93 feet for a distance of 132.84 feet, said curve being subtended by a chord N 56° 38' 49" E 132.74 feet to intersect the aforementioned southerly existing right of way line of Sellman Road; thence leaving the northerly right of way line of Relocated Sellman Road and running along the southerly existing right of way line of Sellman Road N 79° 57' 56" E 152.46 feet to intersect the base line of right of way of Relocated Sellman Road at station 9+26.76, as said base line is delineated on State Roads Commission's plat number 36605, attached hereto and made a part hereof; thence continuing along said southerly existing right of way line N 79° 57' 56" E 255.32 feet to intersect the southerly right of way line of Relocated Sellman Road; thence leaving the southerly existing right of way line of Sellman Road and running along the southerly right of way line of Relocated Sellman Road the six (6) following courses and distances, VIZ.: (1) S 51° 43' 46" W 48.64 feet; (2) S 80° 02' 54" W 31.59 feet; (3) by a curve to the left having a radius of 914.93 feet for a distance of 490.19 feet, said curve being subtended by a chord S 64° 41' 58" W 484.35 feet; (4) S 49° 21' 04" W 437.86 feet; (5) by a curve to the right having a radius of 676.62 feet for a distance of 89.59 feet, said curve being subtended by a chord S 53° 08' 40" W 89.52 feet; (6) S 15° 47' 49" W 85.70 feet to intersect the easterly right of way line of Cherry Hill Road; thence leaving the southerly right of way

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0143, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

00038954

4053  144

line of Relocated Sellman Road and running along the easterly right of way line
of Cherry Hill Road the two following courses and distances, VIZ.:  (1) S 20°
22' 52" E 215.00 feet;   (2)  S 12° 02' 42" W 29.62 feet to intersect the afore-
mentioned easterly existing right of way line of Cherry Hill Road; thence
leaving the easterly right of way line of Cherry Hill Road and running along
the easterly existing right of way line of Cherry Hill Road N 20° 46' 58" W
622.13 feet to intersect the aforementioned base line of right of way of Inter-
state Route 95 at station 617+60.49;  thence continuing along said easterly
existing right of way line N 20° 46' 58" W 120.87 feet to the place of begin-
ning.

Containing 4.87 acres more or less.

The above described parcels numbered 5 and 6 being a part of the Agricul-
tural Research Center's Tract No. 021 formerly known as the Sellman Brothers
Tract, said tract being surveyed for the U. S. Government July - September,
1933.

The above described parcels being subject to the provisions stated in the
"Expressway" note as shown on State Roads Commission's Plat Nos. 36603, 36604
and 36605, attached hereto and made a part hereof.

The above described parcels also being subject to all easement and drain-
age notes as shown on State Roads Commission's Plat Nos. 36603, 36604, and
36605, attached hereto and made a part hereof.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0144, MSA_CE64_4134. Date available 08/07/2006. Printed 12/15/2019.

00038955

CAPITOL BELTWAY.
Contract No.: F-722-B-.

**4053  145**   -11-

Easement Areas to be acquired by the State of Maryland to the use
of the State Roads Commission of Maryland from the U. S. Department of Agriculture.

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

PARCEL NO. A

BEGINNING FOR the same at a point in the northerly right of way line
and right of way line of Through Highway of the Capitol Beltway, said point
being 150 feet distant, measured radially in a northerly direction from
station 347+50 of the base line of Right of Way of the Capitol Beltway as
said base line is delineated on State Roads Commission's Plats Nos. 21562
and 21563 attached hereto and made a part hereof, running thence and binding
along the northerly extremities of said easement area the nineteen (19) following courses and distances; VIZ:

| | | | |
|---|---|---|---|
| (1) | S 58° 46' 14" E | 52.07 | feet; |
| (2) | S 54° 43' 06" E | 52.00 | feet; |
| (3) | S 53° 58' 01" E | 52.00 | feet; |
| (4) | S 56° 31' 03" E | 52.11 | feet; |
| (5) | S 53° 34' 07" E | 52.06 | feet; |
| (6) | S 52° 49' 02" E | 52.07 | feet; |
| (7) | S 54° 15' 50" E | 52.17 | feet; |
| (8) | S 50° 13' 05" E | 52.11 | feet; |
| (9) | S 48° 22' 01" E | 52.11 | feet; |
| (10) | S 48° 43' 36" E | 50.94 | feet; |
| (11) | S 53° 56' 30" E | 51.35 | feet; |
| (12) | S 43° 46' 43" E | 50.16 | feet; |
| (13) | S 46° 03' 03" E | 50.04 | feet; |
| (14) | S 47° 12' 26" E | 50.01 | feet; |
| (15) | S 41° 30' 40" E | 25.18 | feet; |
| (16) | S 48° 21' 17" E | 25.00 | feet; |
| (17) | S 87° 01' 01" E | 32.01 | feet; |
| (18) | S 48° 53' 15" E | 23.51 | feet; |
| (19) | S 20° 42' 59" W | 27.00 | feet; |

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0145, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

00038956

4053 · 146

to intersect the aforesaid northerly right of way line of the Capitol Beltway,
thence binding thereon  (20) N 48° 21' 13" W   308.89 feet;  (21) by a curve
to the left, having a radius of 3969.72 feet for a distance of 519.36 feet,
said curve being subtended by a chord, N 52° 06' 03" W  518.11 feet to the
place of beginning.

Containing 0.16 ± Acre.

PARCEL NO. B

BEGINNING FOR the same at a point in the northerly right of way line and
right of way line of Through Highway of the Capitol Beltway, said point being
situated 150 feet distant, measured at right angles, from station 356+ 29.53
of the Base line of right of way of the Capitol Beltway as said base line is
delineated on State Roads Commission's Plat Nos. 21562 & 21563 attached
hereto and made a part hereof, running thence and binding along the northerly
extremities of the aforesaid easement area the seventeen (17) following
courses and distances; VIZ:

| | | |
|---|---|---|
| (1) | N 20° 57' 59" E | 27.00 feet; |
| (2) | S 61° 23' 40" E | 56.46 feet; |
| (3) | S 48° 21' 06" E | 25.00 feet; |
| (4) | S 46° 03' 44" E | 50.04 feet; |
| (5) | S 46° 03' 47" E | 50.04 feet; |
| (6) | S 47° 12' 26" E | 50.01 feet; |
| (7) | S 44° 55' 12" E | 50.09 feet; |
| (8) | S 41° 30' 34" E | 50.36 feet; |
| (9) | S 44° 55' 15" E | 50.09 feet; |
| (10) | S 47° 12' 23" E | 50.01 feet; |
| (11) | S 44° 55' 12" E | 50.09 feet; |
| (12) | S 42° 38' 33" E | 50.25 feet; |
| (13) | S 43° 46' 46" E | 50.16 feet; |
| (14) | S 48° 21' 12" E | 50.00 feet; |

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0146, MSA_CE64_4134, Date available 06/07/2006  Printed 12/15/2019.

00038957

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0147, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

4053   147                                    -13-

(15).  S 46° 03' 47" E      50.04  feet;

(16)   S 44° 55' 09" E      50.09  feet;

(17)   S 44° 55' 12" E      50.09  feet;

to intersect the aforesaid northerly right of way line and right of way line

of Through Highway, thence binding thereon  (18)  N 48° 21' 13" W  770.47 feet

to the place of beginning.

    Containing 0.37 ± Acre.

00038958

4053  148                    -14-

The following are perpetual easement areas for drainage facility:

PARCEL  C

Beginning for the same at a point on the easterly right of way line of Cherry Hill Road, said point being situated 30.00 feet, measured perpendicularly, from station 14+50.00 of the base line of right of way of Cherry Hill Road, as said base line is delineated on State Roads Commission's plat number 37635, attached hereto and made a part hereof; running thence and binding along the outline of the perpetual easement area marked parcel  C,      as shown on State Roads Commission's plat number 37635, the ten (10) following courses and distances; VIZ.:  (1) S 29° 07' 37" E 52.81 feet;  (2)  S 08° 03' 30" E 50.04 feet;  (3)  S 05° 42' 57" E  37.14 feet;  (4)  S 05° 45' 17" E  13.53 feet;  (5)  S 09° 21' 42" E  52.00 feet;  (6) S 05° 49' 46" E  39.93 feet;  (7)  S 00° 08' 41" W  11.66 feet;  (8) S 02° 29' 00" E  25.02 feet;  (9) S 04° 46' 26" E  75.00 feet;  (10)  S 01° 17' 51" E  35.02 feet to intersect the right of way line of the west bound lane of the Capitol Beltway, thence binding along said right of way line  N 65° 54' 30" W  9.00 feet to intersect the easterly right of way line of Cherry Hill Road, said intersection being situated 169.31 feet, measured radially, from station 261+36.15 of the base line of right of way of the west bound lane of the Capitol Beltway, as said base line is delineated on State Roads Commission's plat number 37635, thence leaving the right of way line of the west bound lane of the Capitol Beltway and binding along the easterly right of way line of Cherry Hill Road the three (3) following courses and distances, VIZ.:     (1) N 04° 46' 26" W 142.23 feet to a point situated 30.00 feet, measured radially, from station 16+82.38 of the base line of right of way of Cherry Hill Road;  (2) by a curve to the left with a radius of 1071.74 feet for a distance of 104.28 feet, said curve being subtended by a chord N 07° 33' 41" W  104.24 feet to a point situated 30.00 feet, measured radially, from station 15+87.02 of the base line of right of way of Cherry Hill Road; (3)  N 10° 20' 56" W  137.02 feet to the place of beginning.

Containing 0.10 Acres more or less.

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0148, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

00038959

-15-

PARCEL  D                        4053   149

BEGINNING for the same at the intersection of the easterly right of way line of Cherry Hill Road with the right of way line of the east bound lane of the Capitol Beltway, said intersection being situated 111.00 feet, measured radially, from station 262+38.31 of the base line of right of way of the east bound lane of the Capitol Beltway, as said base line is delineated on State Roads Commission's plat number 37635, attached hereto and made a part hereof; running thence along the right of way line of the east bound lane of the Capitol Beltway by a curve to the right with a radius of 4472.66 feet for a distance of 11.00 feet, said curve being subtended by a chord S 82° 49' 41" E 10.99 feet, thence leaving the right of way line of the east bound lane of the Capitol Beltway, and binding along the outline of the perpetual easement area marked parcel  D,          as shown on State Roads Commission's plat number 37635 the six (6) following courses and distances; VIZ.:  (1) S 03° 58' 24" E 42.91 feet;  (2) S 09° 10' 26" E  49.94 feet;  (3) S 12° 57' 12" E  59.38 feet;  (4) S 13° 54' 23" E  50.16 feet;  (5) S 15° 02' 35" E 50.25 feet;  (6) S 14° 25' 01" W  54.63 feet to intersect the easterly right of way line of Cherry Hill Road, said intersection being situated 16.00 feet, measured perpendicularly, from station 13+00.00 of the base line of right of way of Cherry Hill Road, as said base line is delineated on State Roads Commission's plat number 37635, thence binding along the easterly right of way line of Cherry Hill Road  N 08° 47' 51" W 305.05 feet to the place of beginning.

Containing 0.08 acres more or less.

PARCEL  E

BEGINNING for the same at a point on the northerly right of way line of the Capitol Beltway, said point being situated 150.00 feet measured perpendicularly, from station 280+00.00 of the base  line of right of way of the Capitol Beltway, as said base line is delineated on State Roads Commission's plat number 37636, attached hereto and made a part hereof, running thence and binding along the outline of the perpetual easement area marked

PRINCE GEORGE'S COUNTY CIRCUIT COURT (Land Records) WWW 4053, p. 0149, MSA_CE64_4134. Date available 06/07/2006. Printed 12/15/2019.

00038960

00038961

National Park Service
NATIONAL CAPITAL REGION

LAND RECORD NO. 593

May 13, 1968

Baltimore-Washington Parkway
Reservation No. 688
Prince Georges County, Maryland

1. On May 13, 1968, the following DISPOSAL was recorded in the Land Records of National Capital Region.

Part of Greenbelt Park transferred to the State Roads Commission of Maryland.

MARYLAND STATE ROADS COMMISSION has filed application under the provisions of the Act of Congress of August 27, 1958 (Title 23, United States Code, Section 317, 72 Stat. 916), for the transfer of land and interests in land hereinafter described, situate in Prince Georges County, Maryland and being a part of the land known as Greenbelt Park under the jurisdiction and control of the Department of the Interior: National Park Service, this transfer is further authorized under the provisions of the Act of Congress approved October 15, 1966, (Section 6(a) (1) (A), 80 Stat. 931, 937); and

The Director, Bureau of Public Roads has determined that the land and interests in lands covered by the application are reasonably necessary for the Edmonston Road Relocation designated as Federal-Aid Secondary Route 397; and

The National Park Service, Department of the Interior, by letter of May 11, 1967, has authorized the transfer of the land and interests in land to the Maryland State Roads Commission. Subject, however, to the following condition:

00038962

That there be reserved to the United States of America the right of access between Greenbelt Park and Edmonston Road, as indicated on Plat 17086, between survey station 66+00 and station 67+00.

Deed to the State of Maryland Recorded April 3, 1967,

Land Records of Prince Georges County, Book 3579, Page 200.

Plats assigned map file No. NCR 123-469-1 to 4.

2. This land was transferred to the State of Maryland by deed dated December 12, 1967.

3. Drawing is on page 3.

Fred W. Binnewies

Assistant Regional Director, Operations

00038963



RESERVATION Nº 688

BALTIMORE WASH. PKY.

AREA OCCUPIED BY CAPITAL BELTWAY IS UNDER PERMIT TO STATE OF MARYLAND

GLENDALE RD.

JAEGGER TRACT

GREENBELT PARK

BALT-WASH. PKY.

GREENBELT PARK

EDMONSTON RD.

PRIVATE

TO BALT.

GOODLUCK RD

AREA TRANSFERRED TO STATE OF MARYLAND
AREA PREVIOUSLY ACQUIRED

LAND RECORD Nº 593

00038965

LEGEND FOR DRAINAGE STRUCTURES
DRAINAGE STRUCTURES CALLED FOR IN THE DEED OR DEEDS TO THE STATE OF MARYLAND TO THE USE OF THE STATE ROADS COMMISSION ARE PLANNED AT APPROXIMATELY THE FOLLOWING STATION LOCATIONS. HOWEVER, THE COMMISSION RESERVES THE RIGHT TO LOCATE OR LATER MOVE SAID DRAINAGE STRUCTURES NOT MORE THAN TWENTY-FIVE (25) FEET, PLUS OR MINUS, FROM SAID DESIGNATED STATIONS.

THIS IS AN EXPRESSWAY, AND NO ACCESS EITHER VEHICULAR, PEDESTRIAN AND/OR ANIMAL WILL BE PERMITTED ACROSS THE LINES DESIGNATED "RIGHT OF WAY LINE OF THROUGH HIGHWAY" EXCEPT BY MEANS OF SUCH PUBLIC ROAD CONNECTIONS AS THE COMMISSION MAY CONSTRUCT OR PERMIT TO BE CONSTRUCTED.

WASHINGTON CIRCUMFERENTIAL HIGHWAY

Superseded by metes and bounds plat Nº 27042

NATIONAL PARK SERVICE PROP. 37836

NATIONAL PARK SERVICE PROP. 37836

BALTIMORE WASHINGTON PARKWAY

Proposed Pipe Culvert
Proposed Pipe Culverts
Proposed Pipe Culverts

Ramp A
Δ=40°59'47"
D=7°00'
R=818.51
T=302.07
L=578.16
E=53.96

W.C.H.
Δ=4°58'30" Lt.
D=0°50'
R=11459.16
T=497.81
L=995.00
E=10.81

PRC 109+18.36 RAMP'Z
POC 574+93.25 S.B.L.

Ramp A
Δ=33°00'38"
D=7°00'
R=818.51
T=242.54
L=471.58
E=35.18

B-W Pkwy.
N. B. L.
Δ=14°54'25"
D=0°45'
R=7699.44
T=743.59
L=1418.92
E=62.20

B-W Pkwy.
S. B. L.
Δ=11°57'19"
D=0°50'08"
R=11039.75
T=1173.56
L=2239.29
E=51.02

Baltimore Washington Pkwy.

| | South Bound Lane | North Bound Lane |
|---|---|---|
| Δ | 8°08'22" | 14°47'21" |
| D | 0°45' | 0°60' |
| R | 7699.44 | 5729.58 |
| T | 549.55 | 743.59 |
| L | 1085.27 | 1418.92 |
| E | 19.31 | 48.05 |

Ramp H
Δ=96°28'23"
D=6°00'
R=954.93
T=1069.40
L=1607.88
E=478.77

Ramp H
Δ=5°50'10" Lt.
D=0°50'
R=11459.16
T=502.54
L=1004.44
E=11.01

Ramp H
Δ=14°57'01"
D=7°00'
R=818.51
T=121.97
L=242.17
E=9.04

W.C.H.
Δ=5°34'14'15"E

Drainage Legend.
Rt. Sta. 464+25 W.C.H.
Rt. Sta. 464+25 to 467+10 W.C.H.
Sta. 468+10 W.C.H.
Sta. 108+85 Ramp Z
Sta. 806+50 Ramp H
Sta. 810+25 Ramp H
Sta. 810+50 Ramp H

LOCATED IN   PRINCE GEORGES   COUNTY

PREPARED BY
MICHAEL BAKER, JR., INC.

Michael Baker, Jr.
PROJECT ENGINEER

REVISIONS
March 3, 1959

I 495  STATE ROADS COMMISSION
OF MARYLAND
WASHINGTON CIRCUMFERENTIAL HIGHWAY
U.S. ROUTE 1 TO BALTIMORE – WASHINGTON PARKWAY.
CONTRACT No.  P 722-8-320

SCALE  1" = 100'

RIGHT OF WAY ENGINEER

PLAT No. 13582

VOID

NAMES OF REPORTED PROPERTY OWNERS AS SHOWN ON THIS PLAT ARE THOSE OF ORIGINAL GRANTORS TO THE COMMISSION. THE APPROXIMATE PROPERTY LINES SHOWN WERE NOT ESTABLISHED BY ACTUAL SURVEY, BUT ARE INTENDED FOR AN APPROXIMATE GUIDE ONLY.

To Washington, D.C.
Match Line

STATE HIGHWAY ADMINISTRATION (State Road Plats) P-722-008-320 Plat 13582_MSA_S1624_13582. Date available 12/16/1960. Printed 03/26/2019.

Maryland State Archives

USA S1624-13582

00038966



Case 8:22-cv-02597-DKC    Document 65-6    Filed 10/30/23    Page 132 of 140

LEGEND FOR DRAINAGE STRUCTURES

DRAINAGE STRUCTURES CALLED FOR IN THE DEED OR DEEDS TO THE STATE OF MARYLAND TO THE USE OF THE STATE ROADS COMMISSION ARE PLANNED AT APPROXIMATELY THE FOLLOWING STATION LOCATIONS; HOWEVER, THE COMMISSION RESERVES THE RIGHT TO LOCATE OR LATER MOVE SAID DRAINAGE STRUCTURES NOT MORE THAN TWENTY-FIVE (25) FEET, PLUS OR MINUS, FROM SAID DESIGNATED STATIONS.

THIS IS AN EXPRESSWAY, AND NO ACCESS EITHER VEHICULAR, PEDESTRIAN AND/OR ANIMAL WILL BE PERMITTED ACROSS THE LINES DESIGNATED "RIGHT OF WAY LINE OF THROUGH HIGHWAY" EXCEPT BY MEANS OF SUCH PUBLIC ROAD CONNECTIONS AS THE COMMISSION MAY CONSTRUCT OR PERMIT TO BE CONSTRUCTED.

CONDEMNATION CASE
3/11/1963
Trial Date
3-11-63

To Baltimore

To Washington, D.C.

Base Line of Right of Way

Baltimore-Washington Parkway - S.R.I.

Fee Simple Area 1.10± Acres Shown Thus ☐

NAMES OF REPORTED PROPERTY OWNERS AS SHOWN ON THIS PLAT ARE THOSE OF ORIGINAL GRANTORS TO THE COMMISSION. THIS APPROXIMATE PROPERTY LINES SHOWN WERE NOT ESTABLISHED BY ACTUAL SURVEY, BUT ARE INTENDED FOR AN APPROXIMATE GUIDE ONLY.

LOCATED IN   PRINCE GEORGES   COUNTY

PREPARED BY   Bureau of Design

Henry T. Oheim
Chief of Condemnation Section

| | BOOKS | REVISIONS |
|---|---|---|
| APPROVED BY THE STATE ROADS COMMISSION PURSUANT TO CHAPTER 30, ACTS OF THE GENERAL ASSEMBLY OF MARYLAND, 1943 | 13586, 14424, 14261, 14019, 14262 | |
| DATE | | CHAIRMAN |

STATE ROADS COMMISSION
OF MARYLAND

Capitol Beltway

CONTRACT No. P722-18-320

SCALE: 1"=100'

ISSUED January 21, 1962

Geo. C. Hisser
Right of Way Engineer

PLAT No. 27061

MSA 31624 - 27061

00038967



LEGEND FOR DRAINAGE STRUCTURES

DRAINAGE STRUCTURES CALLED FOR IN THE DEED OR DEEDS TO THE STATE OF MARYLAND TO THE USE OF THE STATE ROADS COMMISSION ARE PLANNED AT APPROXIMATELY THE FOLLOWING STATION LOCATIONS; HOWEVER, THE COMMISSION RESERVES THE RIGHT TO LOCATE OR LATER MOVE SAID DRAINAGE STRUCTURES NOT MORE THAN TWENTY-FIVE (25) FEET, PLUS OR MINUS, FROM SAID DESIGNATED STATIONS.

Sta. 510+50

THIS IS AN EXPRESSWAY    AND NO ACCESS EITHER VEHICULAR, PEDESTRIAN AND/OR ANIMAL, WILL BE PERMITTED ACROSS THE LINES DESIGNATED "RIGHT OF WAY LINE OF THROUGH HIGHWAY" EXCEPT BY MEANS OF SUCH PUBLIC ROAD CONNECTIONS AS THE COMMISSION MAY CONSTRUCT OR PERMIT TO BE CONSTRUCTED.

Now SHA R/w
Sec'y # 40211
2804/75
Recorded - 4-5-63

MAXWELL  CHRISTOPHER
49120

To Marlboro Pike

Sec'y # 40733
Now SHA R/w  2857/219
Recorded 8-22-63
JOHN H. BURTON
49118

Easement Area
for Relocated
Stream

To BRANCH AVENUE

WALL SUITLAND PARKWAY

Right of Way Line

Right of Way Line of Through Highway

Proposed
Culvert

511+78.63
278+06.16

Base Line of Right of Way

Existing Right
of Way Line

PT 511+35.48 Bk
511+36.90 Ahd

Right of Way Line of Through Highway

Right of Way Line

Easement Area for
Relocated Stream

For Conv. See
Plat No. 42583

LOCATED IN PRINCE GEORGES COUNTY

R/w checked 10-16-87

Now SHA R/w
RAYMOND  BENTE ET AL
49115
Sec'y # 40925
2887/560
Recorded - 10-25-63

JOHN H. BURTON
49118
Sec'y # 40733
2857/219
Recorded - 8-22-63

Curve Data
Base Line of Right of Way
Δ = 20°-19'-15"
D = 1°-00'-00"
R = 5729.58'
T = 1026.83'
L = 2032.08'
E = 91.28'
Superelevate 0.03:1'

PREPARED BY
BUREAU OF DESIGN

Frederic A. Heins  2/5/62
ASST. ENGR. OF ROAD DESIGN

REVISIONS
June 25, 1962

STATE ROADS COMMISSION
OF MARYLAND

CAPITOL BELTWAY-NORTH OF MD.4 TO EAST OF MD.5

SCALE
1" = 50'
ISSUED  March 2, 1962

LeRoy C. Moser
CHIEF, RIGHT OF WAY DIVISION

CONTRACT NO. P-722-29-320

PLAT NO. 26648

NAMES OF REPORTED PROPERTY OWNERS AS SHOWN ON THIS PLAT ARE THOSE OF ORIGINAL GRANTORS TO THE COMMISSION. THE APPROXIMATE PROPERTY LINES SHOWN WERE NOT ESTABLISHED BY ACTUAL SURVEY, BUT ARE INTENDED FOR AN APPROXIMATE GUIDE ONLY.

Maryland State Archives

1  2  3  4  5  6

00038968



LEGEND FOR DRAINAGE STRUCTURES

DRAINAGE STRUCTURES CALLED FOR IN THE DEED OR DEEDS TO THE STATE OF MARYLAND TO THE USE OF THE STATE ROADS COMMISSION ARE PLANNED AT APPROXIMATELY THE FOLLOWING STATION LOCATIONS; HOWEVER, THE COMMISSION RESERVES THE RIGHT TO LOCATE OR LATER MOVE SAID DRAINAGE STRUCTURES NOT MORE THAN TWENTY-FIVE (25) FEET, PLUS OR MINUS, FROM SAID DESIGNATED STATIONS.

320+80

THIS IS AN EXPRESSWAY, AND NO ACCESS EITHER VEHICULAR, PEDESTRIAN AND/OR ANIMAL, WILL BE PERMITTED ACROSS THE LINES DESIGNATED "RIGHT OF WAY LINE OF THROUGH HIGHWAY" EXCEPT BY MEANS OF SUCH PUBLIC ROAD CONNECTIONS AS THE COMMISSION MAY CONSTRUCT OR PERMIT TO BE CONSTRUCTED.

Now SHA R/w
Secty # 55591
4315/513
Recorded -10-12-73

MARION E.
WEST
45401

Now SHA R/w
Secty# 39913
2779/167
Recorded-1-25-63

MARIE S. LABAT  Jerry Wolman
43938

GEORGE B.
PADGETT
45830
Now SHA R/w
See plat 27255

To Marlboro Pike

To Branch Avenue

Right of Way Line
Easement Area
Right of Way Line of Through Highway
Proposed Pipe Culvert

Match Plat 26650

LOCATED IN PRINCE GEORGES COUNTY

S 49°-27'-41"W

Jerry Wolman
MARIE S. LABAT
43938
Now SHA R/w
Secty # 39913
2779/167
Recorded 1-25-63

CURVE DATA
BASE LINE OF RIGHT OF WAY
Δ= 20°-19'-15"
D= 1°-00'-00"
R= 5729.58'
T= 1026.83'
L= 2032.08'
E= 91.28'
SUPERELEVATE 0.03":1'

R/W Checked 10-16-87

PREPARED BY
BUREAU OF DESIGN

REVISIONS

Frederic A. Hering 2/27/62
ASST. ENGR. OF ROAD DESIGN

STATE ROADS COMMISSION
OF MARYLAND
CAPITOL BELTWAY- NORTH OF MD.4 TO EAST OF MD.5.

SCALE 1"= 50'        CONTRACT No. P-722-29-320
ISSUED March 5, 1962

CHIEF, RIGHT OF WAY DIVISION

PLAT No. 26649

NAMES OF REPORTED PROPERTY OWNERS AS SHOWN ON THIS PLAT ARE THOSE OF ORIGINAL GRANTORS TO THE COMMISSION. THE APPROXIMATE PROPERTY LINES SHOWN WERE NOT ESTABLISHED BY ACTUAL SURVEY, BUT ARE INTENDED FOR AN APPROXIMATE GUIDE ONLY.

Maryland State Archives

MSA S1624-26649

00038969



Case 8:22-cv-02597-DKC   Document 63-3   Filed 10/30/23   Page 135 of 140

## LEGEND FOR DRAINAGE STRUCTURES
DRAINAGE STRUCTURES CALLED FOR IN THE DEED OR DEEDS TO THE STATE OF MARYLAND TO THE USE OF THE STATE ROADS COMMISSION ARE PLANNED AT APPROXIMATELY THE FOLLOWING STATION LOCATIONS; HOWEVER, THE COMMISSION RESERVES THE RIGHT TO LOCATE OR LATER MOVE SAID DRAINAGE STRUCTURES NOT MORE THAN TWENTY-FIVE (25) FEET, PLUS OR MINUS, FROM SAID DESIGNATED STATIONS.

Sta. 320+80

THIS IS AN EXPRESSWAY AND NO ACCESS EITHER VEHICULAR, PEDESTRIAN AND/OR ANIMAL WILL BE PERMITTED ACROSS THE LINES DESIGNATED "RIGHT OF WAY LINE OF THROUGH HIGHWAY" EXCEPT BY MEANS OF SUCH PUBLIC ROAD CONNECTIONS AS THE COMMISSION MAY CONSTRUCT OR PERMIT TO BE CONSTRUCTED.

MATTIE S. LEGATT  Jerry Wolman
43938
Recorded 1-25-63
2779/167

To Branch Avenue

GEORGE B. PADGETT
45830
Now SHA R/W
See plat 27255

To Marlboro Pike

Now SHA R/w
MATTIE S. LEGATT  Jerry Wolman
43938
Secy # 39913
2779/167  Recorded 1-25-63

### CURVE DATA
Base Line of Right of Way
Δ · 20° 19' 15"
D · 1° 00' 00"
R · 5729.58'
T · 1026.83'
L · 2032.08'
E · 91.28'
Superelevate 0.03' : 1'

LOCATED IN  PRINCE GEORGES  COUNTY  R/w checked 10-16-87

PREPARED BY
BUREAU OF DESIGN.
ASST. ENGR. OF ROAD DESIGN

REVISIONS

## STATE ROADS COMMISSION OF MARYLAND
CAPITOL BELTWAY-NORTH OF MD. 4 TO EAST OF MD. 5
CONTRACT No. P-722-29-320
SCALE 1" = 50'
ISSUED March  1962

PLAT No. 26650

NAMES OF REPORTED PROPERTY OWNERS AS SHOWN ON THIS PLAT ARE THOSE OF ORIGINAL GRANTORS TO THE COMMISSION. THE APPROXIMATE PROPERTY LINES SHOWN WERE NOT ESTABLISHED BY ACTUAL SURVEY, BUT ARE INTENDED FOR AN APPROXIMATE GUIDE ONLY.

STATE HIGHWAY ADMINISTRATION (State Road Plats) P-722-029-320 Plat 26650_MSA_S1624_26650. Date available 12/8/1963. Printed 01/18/2018.

MSA S1624-26650

00038970

00038971

NPS Form 10-114 (Rev. 01/2017)
National Park Service



## SPECIAL USE PERMIT

**National Capital Parks-East**
1900 Anacostia Drive, S.E.
Washington, D.C., 20020
(202) 690-5185



| Name | | | |
|---|---|---|---|
| Mr. Daniel Beck | | | |
| **Company/Organization** | | | |
| Maryland Department of Transportation State Highway Administration Office of Structures | | | |
| **Street Address** | | | |
| 707 North Calvert Street | | | |
| **City** | **State** | **Zip Code** | **Country** |
| Baltimore | Md | 21202 | |
| **Telephone Number** | **Cell Phone Number** | | |
| 410-545-8317 | 410-545-8317 | | |
| **Fax Number** | | | |
| 410-209-5002 | | | |
| **Email Address** | | | |
| DBeck@sha.state.md.us | | | |

Park Alpha Code
NACE
Type of Use
Long Term
Permit #
NCR NACE 6000 1903

Is hereby authorized to use the following described land or facilities in [U.S. Reservation 675, Suitland Parkway]:
I-95/495 (Capital Beltway) in Prince Georg's County, Maryland.

The area must be restored to its original condition at the end of the permit.

The permit begins at 7:30 ☒ am / ☐ pm on 04/08/2019 (mm/dd/yyyy).      The permit expires at 4:30 ☐ am / ☒ pm on 03/08/2024 (mm/dd/yyyy).

SUMMARY OF PERMITTED ACTIVITY: (see attached sheets for additional information and conditions)

To perform structural removal and replacement and widening of the I-95/495-overpass dual bridges within median over the Parkway by Maryland Department of Transportation State Highway Administration (MDOT-SHA) in accordance with submitted plans.

Person on site responsible for adherence to the terms and conditions of the permit (include contact information)
Mohammed Oumer,  MDOT-SHA District 3 Construction, Office Phone: 240-563-1306, Cell Phone: 443-569-1061

Authorizing legislation or other authority
Director's Order # 53: Special Use Permits - PEPC #58370

| | | | |
|---|---|---|---|
| **APPLICATION FEE** | ☒ Received | Amount | |
| | ☐ Not Required | $ 250.00 | |
| **PERFORMANCE BOND** | ☐ Required | Amount | |
| | ☒ Not Required | $ | |
| **LIABILITY INSURANCE** | ☒ Required | Amount | |
| | ☐ Not Required | $ | |
| **COST RECOVERY** | ☐ Required | Amount | |
| | ☒ Not Required | $ | |
| **LOCATION FEE** | ☐ Required | Amount | |
| | ☒ Not Required | $ | |

ISSUANCE of this permit is subject to the attached conditions. The undersigned hereby accepts this permit subject to the terms, covenants, obligations, and reservations, expressed or implied herein.

_____
PERMITTEE Signature

Title: PROJECT MANAGER
OFFICE oF STRUCTURES
MDOT-SHA

Date: 5 APR 19

_____
Authorizing NPS Official

for

Title: Superintendent

Date: APR  5 2019

_____
Authorizing NPS Official (additional, if required)

Title:

Date:

00038972

## CONDITIONS OF THIS PERMIT

Failure to comply with any of the terms and conditions of this permit may result in the immediate suspension or revocation of the permit. [36 CFR 1.6(h)]

1. The permittee is prohibited from giving false information; to do so will be considered a breach of conditions and be grounds for revocation: [36 CFR 2.32(a)(3)].

2. This permit may not be transferred or assigned without the prior written consent of the Superintendent.

3. The permittee shall exercise this privilege subject to the supervision of the Superintendent or designee, and shall comply with all applicable Federal, State, county and municipal laws, ordinances, regulations, codes, and the terms and conditions of this permit. Failure to do so may result in the immediate suspension of the permitted activity or the revocation of the permit. All costs associated with clean up or damage repairs in conjunction with a revoked permit will be the responsibility of the permittee.

4. The permittee is responsible for making all necessary contacts and arrangements with other Federal, State, and local agencies to secure required inspections, permits, licenses, etc.

5. The park area associated with this permit will remain open and available to the public during park visiting hours. This permit does not guarantee exclusive use of an area. Permit activities will not unduly interfere with other park visitors' use and enjoyment of the area.

6. This permit may be revoked at the discretion of the Superintendent upon 24 hours notice.

7. This permit may be revoked without notice if damage to resources or facilities occurs or is threatened, notwithstanding any other term or condition of the permit to the contrary.

8. This permit is made upon the express condition that the United States, its agents and employees shall be free from all liabilities and claims for damages and/or suits for or by reason of any injury, injuries, or death to any person or persons or property of any kind whatsoever, whether to the person or property of the Permittee, its agents or employees, or third parties, from any cause or causes whatsoever while in or upon said premises or any part thereof during the term of this permit or occasioned by any occupancy or use of said premises or any activity carried on by the Permittee in connection herewith, and the Permittee hereby covenants and agrees to indemnify, defend, save and hold harmless the United States, its agents, and employees from all liabilities, charges, expenses and costs on account of or by reason of any such injuries, deaths, liabilities, claims, suits or losses however occurring or damages growing out of the same.

9. Permittee agrees to carry general liability insurance against claims occasioned by the action or omissions of the permittee, its agents and employees in carrying out the activities and operations authorized by this permit. The policy shall be in the amount of $ 1 million per Occurrence, $ 3 million Aggregate and underwritten by a United States company naming the United States of America as additional insured. The permittee agrees to provide the Superintendent with a Certificate of Insurance with the proper endorsements prior to the effective date of the permit.

10. Permittee agrees to deposit with the park a bond in the amount of $ N/A from an authorized bonding company or in the form of cash or cash equivalent, to guarantee that all financial obligations to the park will be met.

11. Costs incurred by the park as a result of accepting and processing the application and managing and monitoring the permitted activity will be reimbursed by the permittee. Administrative costs and estimated costs for activities on site must be paid when the permit is approved. If any additional costs are incurred by the park, the permittee will be billed at the conclusion of the permit. Should the estimated costs paid exceed the actual costs incurred; the difference will be returned to the permittee.

12. The person(s) named on the permit as in charge of the permitted activity on-site must have full authority to make any decisions about the activity and must remain available at all times. He/she shall be responsible for all individuals, groups, vendors, etc. involved with the permit

13. Nothing herein contained shall be construed as binding the Service to expend in any one fiscal year any sum in excess of appropriations made by Congress or administratively allocated for the purpose of this permit for the fiscal year, or to involve the Service in any contract or other obligation for the further expenditure of money in excess of such appropriations or allocations.

14. If any provision of this permit shall be found to be invalid or unenforceable, the remainder of this permit shall not be affected and the other provisions of this permit shall be valid and be enforced to the fullest extent permitted by law.

### Add additional park specific conditions sequentially

15. The permitted work shall be in accordance with the Special Use Permit Application submitted by Maryland Department of Transportation State Highway Administration (MDOT-SHA), to access to the underside of the bridge to install traffic barriers and make repairs on the existing I-95/I-495 bridges, to remove portions of the existing bridge in the median area of I-95/I-495, and to commence the construction of the bridge abutments in the median of the existing beltway (to include excavation, pile driving and placing concrete for the abutments), dated January 30, 2019. Any other alterations to the document must be reviewed and approved by the Superintendent in writing.

16. The Permittee will provide the NPS POC with digital photographs of the project area(s) prior to and at the completion of the permitted activity with orientation references, clearly depicting the present conditions of all parkland that will be disturbed under this Permit. The NPS POC Jamese Hemsley can be reached at (202) 690-5163 or nace_special_permits@nps.gov.

17. The Permittee shall provide NPS with weekly email updates on project status for the duration of the approved work. Updates should be sent to NPS POC Jamese Hemsley at nace_special_permits@nps.gov. Failure to provide weekly updates may result in suspension or termination of this permit by the Superintendent.

18. Permitted activities must be coordinated through the Parkway Supervisor (15) fifteen days in advance at (301) 763-4912.

19. Should the Permittee encounter any human remains, previously unidentified archeological sites or materials, excavations will stop and immediately notify the U.S. Park Police (USPP) at (202) 610-7500, National Capital Parks-East Superintendent at (202) 690-5127 and Chief of Resource Management at (202) 494-6905. The Park Superintendent, in consultation with the USPP, Chief of Resource Management, shall determine the appropriate course of action.

20. The Permittee shall report all emergencies (i.e. injuries, accidents) that occur on park property during permitted work to the U.S. Park Police (USPP) at (202) 610-7500 and to the Superintendent of National Capital Parks-East (202) 690-5127 immediately.

21. Permitted work hour is weekdays only, 7:30 a.m. to 4:30 p.m., and Federal holidays excluded. Schedule work shall not interfere with daily rush hours. Mornings 6:00 a.m. to 9:00 a.m. and evenings 3:00 p.m. to 7:00 p.m. The Permittee may request changes to those work hours as needed throughout the project, but requests must be in writing and submitted to the park Superintendent at least 15) fifteen calendar days before the proposed work date/time change. No work may occur outside of the hours established here unless the Superintendent has provided written authorization to proceed.

22. The Permittee and/or any sub-permittees or contractors performing the permitted activity must have a signed copy of the permit, along with the enclosed conditions, in their possession and available for inspection at all times when working on park property.

23. The Permittee or its contractors will submit a Traffic Control Plan and a Safety Plan to NPS at least fifteen (15) calendar days before the proposed start of work. Site work may not begin until these two plans have been submitted to and approved by the NPS. In the event that NPS is unable to complete its review and provide approval of the plans within fifteen (15) calendar days, NPS will notify the Permittee in writing to negotiate additional review time with MDOT-SHA. Traffic management & safety: All traffic management activities shall be done in accordance with MUTCD, and shall be coordinated through the USPP within fifteen (15) calendar days in advance. Please coordinate directly with Sergeant Norlith Roberts of the USPP District 5. Sergeant Roberts can be reached at (202) 610-8724 or at norlith_roberts@nps.gov.

24. The Permittee or its contractors will submit a detailed work proposal to NPS at least fifteen (15) calendar days before the proposed start of work. The work proposal must include a clear timeline of permitted activities. Site work may not begin until the work proposal has been submitted to and approved by the NPS. In the event that NPS is unable to complete its review and provide approval of the work proposal within fifteen (15) calendar days, NPS will notify the Permittee in writing to negotiate additional review time with MDOT-SHA.

25. The Permittee or its contractors will submit an Erosion Control Plan to NPS at least fifteen (15) calendar days before the proposed start of work. Site work may not begin until this plan has been submitted to and approved by the NPS. In the event that NPS is unable to complete its review and provide approval of the plan within fifteen (15) calendar days, NPS will notify the Permittee in writing.

26. The Permittee shall implement all necessary measures to prevent air, noise, and water pollution by any material and/or equipment used during this permitted activity.

27. Only the Permittee shall negotiate requests, correspondence, and meetings desired with the NPS. All contractors, subcontractors or consultants must channel their requests through the recognized representative of the Permittee who, in turn, will contact the NPS.

28. All access roads and the areas adjacent to the work site shall be kept free of trash, mud and construction debris. The work zone shall be kept free of trash and construction debris to the extent possible. Parking for all vehicles associated with construction is limited to areas within the limits of disturbance or paved parking lots on MDOT-SHA property.

29. No contaminated water, material or chemical residue shall be discharged or expelled into park-owned land or into adjacent lands or waterways.

30. The Permittee shall consider all reasonable steps to ensure that no spillage of contaminants, fuels, chemicals or other potentially hazardous substances, or damage from vehicles or equipment occurs.

31. The Permittee shall be responsible for the cost and repairs to any structures, facilities, installations, sod, soils, or landscape vegetation on park property damaged by the work authorized under this permit and shall, at the direction of the NPS, submit detailed plans for the repair, restoration, and/or replacement of such. The Permittee agrees to pay the NPS for any damage resulting from this permit that would not reasonably be inherent in the use that the Permittee is authorized to make of the land. The NPS will give the Permittee written notice of such damage and the Permittee shall either take corrective action or pay the indicated amount as agreed upon and approved by the Superintendent (or delegate).

32. On its construction documents, the Permittee will clearly indicate the LOD represents the limit of tree clearing. The Permittee will also assure the LOD is clearly marked in the field and apparent to all MDOT-SHA and sub-contractor crews. The Permittee will provide physical "hard" protection at the limit of the LOD to minimize damage or destruction of vegetation, especially trees of five (5) inches Diameter at breast height (DBH) or greater that have not been identified for removal and wildlife habitat. The Permittee must seek the Superintendent's approval for all vegetation clearing activities.

33. The Permittee shall conduct a tree survey of all trees identified to be removed with a five (5) inch diameter at breast height and greater. This survey will require NPS approval at least fifteen (15) calendar days before the proposed start of work. Site work may not begin until this plan(s) has been submitted to and approved by the NPS. In the event that NPS is unable to complete its review and provide approval of the invasive species control plan within fifteen (15) calendar days, NPS will notify the Permittee in writing to negotiate additional review time with MDOT-SHA.

34. The Permittee will develop a 5-year invasive species control plan to manage the impacted forested area(s). This plan will need NPS approval at least fifteen (15) calendar days before the proposed start of work. Site work may not begin until this plan(s) has been submitted to and approved by the NPS. In the event that NPS is unable to complete its review and provide approval of the invasive species control plan within fifteen (15) calendar days, NPS will notify the Permittee in writing to negotiate additional review time with MDOT-SHA.

35. The Permittee will protect soil from compaction by using geotextile and rock blankets in the construction work area(s) whenever possible.

36. The Permittee or its contractors shall ensure all vehicular traffic is confined to the permitted work area only and environmentally sensitive areas immediately adjacent to the work zone are avoided and protected.

37. The Permittee or its contractors shall be responsible for identifying staging areas for equipment and materials. However, no staging areas will be located in regulated areas like floodplains, streams, wetlands, wetland buffers, or NPS property.

38. The Permittee shall require its contractor to submit all public notices and communication for road closures, detours, or other aspects of this project to the Public Affairs Specialist Jonathan Shafer at least fifteen (15) business days in prior to being released. Mr. Shafer can be reached at (202) 619-7186 or at jonathan_shafer@nps.gov.

39. The Permittee shall contact the NPS point of contact to schedule an onsite field meeting prior to the start of work on NPS property. Also, within seven calendar days prior to the expiration date of the work on parklands, a joint walk-through of the project area with the Permittee and NPS POC (point of contact) shall be conducted. The walk-through will be conducted in all areas to restore. The NPS POC Jamese Hemsley can be reached at (202) 690-5163 or nace_special_permits@nps.gov.

40. The Permittee has been approved to remove up to 26 trees (total 162.9" DBH) within the limit of Disturbance (LOD) to perform structural removal, replacement and widening of the I-95/495 overpass dual bridges over the Parkway. The Permittee is required to mitigate for the loss of trees (based on a 1:1 DBH) on property owned by the NPS. The Superintendent must approve, in writing, any additional trees for removal.

41. For the loss of trees (based on a 1:1 DBH), the Permittee will replant 65 – 2.5" DBH trees. The Permittee will work with the NPS POC to identify locations along Suitland Parkway to replant trees. The Permittee will maintain the trees for 5 years, which includes removing tree staking materials after 1 year. The NPS POC Jamese Hemsley can be reached at (202) 690-5163 or nace_special_permits@nps.gov.

42. The Permittee or its contractors shall comply with all applicable Federal, State, county and municipal laws, ordinances, regulations, codes, and the terms and conditions of this permit. This includes but is not limited to Resource Conservation Recovery Act, The Clean Water Act, The National Historic Preservation Act, The Clean Air Act, The Oil Pollution Act, and The National Oil and Hazardous Substance Pollution Contingency Plan. The Permittee also shall comply with all applicable Occupational Safety and Hazard Administration requirements. Failure to do so may result in the immediate suspension of the permitted activity or the termination of the permit. The Permittee shall require its contractor to reimburse NPS for cleanup or repair of damages required to be made by NPS staff or contractor in conjunction with the termination of this permit.