

**DEPARTMENT OF THE ARMY**
BALTIMORE DISTRICT, CORPS OF ENGINEERS
ATTN: REGULATORY BRANCH
2 HOPKINS PLAZA
BALTIMORE, MD 21201-2930
**December 3, 2020**

Operations Division

Ms. Caryn Brookman
Environmental Program Manager
I-495 & I-270 P3 Office
707 North Calvert Street, P-601
Baltimore, Maryland 21202

Dear Ms. Brookman:

This is in reference to your application **CENAB-OPR-MN (MDOT SHA/I-495 I-270 Managed Lane Study) 2018-02152-M15** for the I-495 & I-270 Managed Lanes NEPA Study to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the project limits and enhances existing and planned multimodal mobility.

Due to the volume of comments received this letter provides only a partial summary of the comments received in response to the U.S. Army Corps of Engineers (Corps) and Maryland Department of the Environment (MDE) joint public notice (PN 20-42) and joint virtual Corps/MDE Public Hearing held on August 25, 2020. The Corps has also reviewed the testimony of the other three virtual and two in-person public hearings. Further, this letter sets forth the Corps request for additional information concerning the project.

**Background**

The I-495 & I-270 Managed Lanes Study (MLS) National Environmental Policy Act (NEPA) is being conducted under the One Federal Decision process which requires cooperating Federal agencies to provide any permit decisions within 90 days of the final NEPA decision document. Based on the proposed impacts of the six build alternatives under consideration in the Draft Environmental Impact Statement (DEIS), the MLS is being evaluated under DA Individual Permit (IP) procedures. The Corps' evaluation of a Section 404 permit application is a two-part test, which involves determining whether the project complies with the Clean Water Act Section 404(b)(1) Guidelines (Guidelines) and the Corps public interest review.

The fundamental precept of the Guidelines is that dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in

combination with known and/or probable impacts of other activities affecting the ecosystem of concern [40 CFR 230.1(c)]. In addition, one of the primary requirements of the Guidelines is that no discharge can be permitted if there is a practicable alternative with less adverse impact on the aquatic environment provided the alternative does not have other significant adverse environmental consequences [40 CFR 230.10(a)]. The alternatives test is applied more rigorously (i.e., alternatives are presumed to exist) for projects that are proposed to be located in special aquatic sites when the project is not water dependent.  Under Section 404, only the least environmentally damaging practicable alternative (LEDPA) can receive DA authorization. Note that an alternative is practicable if it is available and capable of being done after taking into consideration cost, logistics, and existing technology in light of overall project purposes.

The decision whether to issue a DA permit is also based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended uses on the public interest. This is known as the public interest review [See 33 CFR Part 320.4.] The evaluation of the probable impacts which the proposed activity may have on the public interest requires a careful weighing and balancing of the benefits which reasonably expected to accrue from the project, balanced against the reasonably foreseeable detriments. Among the factors that must be evaluated as part of the public interest review include: conservation, economics, aesthetics, general environmental concerns, wetlands and streams, historic and cultural resources, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, energy needs, safety, food and fiber production, mineral needs, water quality, consideration of property ownership, and in general, the needs and welfare of the people. The Corps evaluates all comments received in the public interest review. All comments are evaluated for their merit and provided to the applicant for response.  Please consider and fully address the public interest review factors and the Corps requirements of a LEDPA in your response to these comments.

The Corps has determined that your basic project purpose of proving transportation improvements along I-495 and I-270 corridors is non-water dependent (i.e., the project does not require siting within a special aquatic site to fulfill the <u>basic</u> purpose of the project). Therefore, upland alternatives to improve water quality, which do not involve impacts to special aquatic sites, are presumed to exist unless clearly demonstrated otherwise.

## Public Notice Comments

In response to the Corps/MDE joint public notice for the Joint Permit Application (JPA) and the MLS DEIS (including the appendices and supporting documentation), this office received letters and e-mails from the public, nonprofit organizations, businesses, and Federal, State, and local agencies.  In addition, MDE has already provide comments directly to you in their November 9, 2020 letter.

00141257

In general, public comments received were predominantly against the proposed build alternatives and supporting the no build alternative. The public comments supporting a build alternative were split between support for Alternative 9, 9M, and 10. A small portion of public comments supported further exploring the use of MD 200 as an alternative to construction on the northern portion of I-495 (though most did not support extending the managed lanes on I-95 north of the I-495). Some commenters supported reversible lanes on I-270. Support for upgrading the American Legion Bridge was somewhat unique in that it was supported by both commenters in favor of the build alternatives and a small set of commenters against the overall build alternatives. Commenters also wanted the American Legion Bridge design to include a transit option. Some commenters supported the western phase of the MLS and extending work up I-270 to I-70 in Frederick County. Most commenters opposed to the build alternatives expressed a desire to see transit options evaluated and/or the process take a more holistic approach to address transportation needs in the study area. Many of these commenters also felt that transportation demand management should be further evaluated.

Those in opposition to the build alternatives expressed a wide range of concerns. Recurring issues/concerns raised were increases air pollution, impacts to natural resources (streams, wetlands, forest cover), noise, cost/funding and public-private partnership approach, traffic, transparency in the process, impacts to private residences and property values, environmental justice, and cultural resources.

Air pollution comments were common and focused on multiple area of concerns including potential increases of small particulates near homes, recreational areas, and schools to increases in greenhouse gas emission and climate change. Multiple commenters questioned how the project aligned with Maryland's commitment to reduce greenhouse gas emissions and questioned the claims of emission reduction based on fuel efficiency standards (no longer in place) and (potentially unrealized) increase travel speeds. Some commenter tied air quality issues to environmental justice factors expressing concerns that increased air pollution could disproportionally affect low income populations. Overall commenters felt the analysis of potential air quality impacts was insufficient to assess the proposed alternatives.

Impacts to natural resources was another broad category concern. Commenters opposed to the build alternatives were concerned about possible impacts to resources like streams and wetlands, forest, and parklands. Commenters expressed concern that impacts for the build alternatives were not detailed enough including stormwater impacts and compensatory mitigation options to offset impacts. Commenters were also concerned about individual resources and/or areas like Rock Creek or the Henson Creek Trail. As stated above, impacts to open space and parklands were also a major concern. One additional specific concern raised was the potential impacts to Plummers Island, a unique natural resource located in the Potomac River immediately downstream of the American Legion Bridge. Plummers Island, now located on U.S. National Park Service land, has been the subject of numerous studies and surveys.

00141258

Overall commenters felt the analysis of potential natural resource impacts was insufficient to assess the proposed alternatives.

Noise abatement concerns were expressed for both during construction and post construction.  These concerns are tied into concerns of quality of life and property values.  Multiple commenters expressed concerns about noise barriers, noise increases associated with new flyover ramps and/or loss of existing tree screening, and increases in noise affecting their properties and/or public spaces including schools and parks.

Many of the commenters opposed to the build alternatives felt that, especially considering the on-going Purple Line P3 process and the State's contribution to that project, that this proposed project would be partially funded by Maryland and the taxpayers.  Commenters also expressed concern that if this were the case (i.e., a proposed project subsidized in part by State funding) then the elimination of some other alternatives from further evaluation was premature.  Commenters also expressed concern that the true cost of the proposed project was inaccurate considering the Purple Line P3 experience.  Commenters also expressed concern that a P3 approach primarily benefits the private entity/concessionaire and there is little financial incentive for the selected concessionaire of the managed lanes to address general purpose lane traffic congestion.  Commenters also questioned the variable tolling amounts and if such a practice prices out commuters less able to pay.

For traffic, a major concern expressed by commenters is the assertion that the traffic analysis is flawed and may not support the elimination of alternatives under the NEPA Purpose and Need.  Latent and induced demand, both for the proposed project roadways and the local and arterials roadways, should be better addressed in the model and analysis write-up.  Commenters also expressed concerns over VMT, traffic spreading, and roadway capacity estimates and their impact on the traffic model's predictions including the proposed project's NEPA Purpose and Need and benefits analysis.  Another major subset of concerns over the traffic analysis was the inherent unknowns of the COVID-19 outbreak and its potential changes to all forms of commuting patterns in the proposed project area.  Increased telework opportunities and social distancing concerns have resulting in changes to both mass transit use and driving.  Some commenters asserted that a percentage of workers and businesses will continue to allow increased telework opportunities and this potential change in commuting patterns should be analyzed to understand how it may affect the proposed project stated NEPA Purpose and Need.  In addition, the ability to utilize telework opportunities is limited to a portion of the workforce.  Many workers, including those deemed essential during the pandemic, would continue to commute to work.  It is unclear how many of these commuters rely on mass transit options and/or driving.  A few commenters acknowledged that mass transit use may also be affected the pandemic.  Overall, commenters opposed to the build alternatives expressed a desire for more time to study the impacts of the pandemic and its impacts on commuting patterns in the region.  They expressed concern that with so many unknowns it would be premature to make a decision to proceed with a build alternative.

00141259

Multiple commenters expressed concerns about the proposed project's process and transparency. Several commenters raised issues related to the full availability of the DEIS appendices and comment period. Interestingly, many commenters requested more information and analysis in the NEPA process while others indicted the analysis was already too large. As stated above, comparisons to the Purple Line P3 project were numerous, particularly concerning the true project cost; the likelihood of litigation and cost overruns; the limits of Disturbance (LOD), impacts, design, and benefits. In addition, commenters expressed concerns over the lack of information regarding the potential relocation of utilities, upgrade of bridges, and delays/impacts to local roadways and residences associated with construction and operation of the build alternatives. The WSSC water and sewer line relocations was mentioned by name in many comments. Commenters asserting that the billions of dollars to relocate the utilities would be passed on to rate payers.

Comments received concerning environmental justice covered several issues. Some commenters felt the analysis was flawed and/or not comprehensive enough based on the analysis in the DEIS. Commenters also expressed concern the NEPA process had not done enough to engage minority populations, citing turn out at the hearings as one example. As stated above, some commenters were concerned that health-related impacts had the potential to disproportionately affect minority communities. There were also concerns that the for-profit nature of the P3 managed lane approach itself has potential to impact a portion of the public less able to pay to use the managed lanes and therefore subject them to increase traffic congestion in the general purpose lanes (i.e., do managed lanes shift traffic congestion to the portion of the public least able to pay?).

The Corps received numerous public comments concerning direct and indirect impacts to individual properties including residence, businesses, hospitals, public spaces, and community centers (e.g., the local YMCA).

Comments received concerning cultural resources also raised a variety of issues including potential impacts to historic districts and resources including archeological sites. Some commenters felt the lack of detail regarding some of these resources made it difficult to provide meaningful comments.

In addition to comments from the general public, the Corps also received comments from several non-profit organizations and public entities including the City of Greenbelt and the Sierra Club. Comments provided by the City of Greenbelt comments mirror many of the concerns raised in opposition of the project including Maryland National Capital Park and Planning Commission (MNCPPC). The City raises concerns about the project LOD, Section 4(f) evaluation and park impacts, and the traffic analysis. The Sierra Club provided extensive comments on behalf of numerous nonprofit organizations and their members. The Corps will not try to summarize the Sierra Club comments except to say the comments provide additional substance to many of the public opposition comments received by the Corps. Along with the City of Greenbelt

comments and MNCPPC comments (summarized below at the end of the agency comments) these comments deserve careful consideration and a detailed response in the NEPA documentation.

The following agencies also provided comments:

U.S. Environmental Protection Agency (EPA)

EPA commented that an evaluation of a full range of available or practicable alternatives was lacking in the permit support documentation. EPA recommends that the applicant thoroughly evaluate the project plans to identify upland alternatives and onsite design modifications that will avoid and minimize impacts to aquatic resources to the maximum extent practicable.  EPA expressed further concern over stormwater management and culvert evaluations in the documentation and stressed the need for further avoidance and minimization efforts to avoid impacts to aquatic resources including fostering aquatic organism passage through crossings.  EPA recommends a thorough evaluation of the project's potential to cause or contribute to significant degradation of the aquatic ecosystem and ensure that measures are undertaken to avoid and minimize the potential of secondary and cumulative impacts.  EPA provides specific recommendations for consideration of several types of sensitive aquatic resource area, Plummers Island, culvert crossings, and cumulative impact analysis. EPA also commented the environmental information provided in the permit application lacks a full resource characterization of the onsite resources proposed to be impacted. EPA stated the baseline information is important in not only assessing the impacted resources but also in identifying avoidance and minimization opportunities, assessing secondary and cumulative impacts, and evaluating appropriate mitigation for unavoidable impacts.  EPA also makes several recommendations concerning the compensatory mitigation for the proposed project.  The EPA comments and specific recommendations will be included as an attachment to this letter.

U.S. Fish and Wildlife (FWS)

FWS provided general comments concerning on-going Section 7 consultation and compensatory mitigation site review along with specific mitigation site comments.  The FWS comments and specific recommendations will be included as an attachment to this letter.

National Marine Fisheries Service (NMFS)

NMFS provided several recommendations pursuant to the Fish and Wildlife Coordination Act due to concerns about potential impacts to migratory fish, including a recommendation that consultation with us be reinitiated during the design phase. NMFS primary concern is related to impacts to areas where the existing roadways cross perennial streams that provide spawning habitat and/or migration corridors for anadromous fish. Specifically, perennial streams and rivers provide important habitat for anadromous fish such as alewife *(Alosa pseudoharengus),* blueback herring *(A. aestivalis)* and American shad *(A. sapidissima),* which use the river including the areas in and around the proposed project site as migratory, spawning, nursery, resting, and foraging habitat.  Specific design of each of these crossings has yet to be determined,

but a suite of avoidance/minimization approaches have been identified to offset impacts to migratory fish. These include avoiding in-water work during the period in which migratory fish are likely to be present (March 1 – June 15), maintaining adequate passage zones for aquatic life, and examining potential impacts to fish passage where the corridor crosses streams with relatively large (i.e., drainage area upstream of crossing ≥ 132 acres) streams. While these approaches do largely address NMFS concerns, they offered additional information/guidance to further ensure that impacts to these species are minimized to the extent practicable. The specific NMFS information will be included as an attachment to this letter.

Commonwealth of Virginia Department of Conservation and Recreation (DCR)
    DCR letter provided comments for the Division of Planning and Recreation Resources, the Division of Natural Heritage, and the Division of Dam Safety and Floodplain Management.  The comments address potential impacts to protected lands, species, and the floodplain.  Specific comments in the letter will be included as an attachment to this letter.

Maryland Department of Natural Resources (DNR)
    DNR reviewed the Draft Environmental Impact Statement and Draft Section 4(f) Evaluation and provided comments. DNR has also reviewed the Joint Federal/ State Application for the Alteration of any Floodplain, Waterway, Tidal or Nontidal Wetland in Maryland and provided comments on June 2, 2020; July 10, 2020; November 4, 2020; November 6, 2020 to MDE on the proposed project impacts and the stream and wetland mitigation sites.  Copies of this correspondence will be included with this letter. DNR has provided comments for all stream restoration and mitigation projects to the MLS team and provided copies to the Corps and MDE. For those projects, DNR's stream restoration policy (Principles and Protocols to Guide the Department of Natural Resources' Actions Regarding Stream Restoration Projects in Maryland, Policy Number 2015:01) states that "it is the overarching policy of DNR to protect riparian forests and tree cover and avoid tree clearing associated with stream restoration or other proposed stream 'improvement' activities…. Impacts to existing forest cover or trees must be avoided or minimized to the maximum extent possible with ample justification in order for a stream restoration, rehabilitation, stabilization, reclamation, enhancement or engineering project to be supported by DNR." DNR encourages replanting riparian buffers at all sites, but especially Use III and Use IV watersheds. All mitigation projects should be designed to maintain or enhance fish passage through the project area, particularly during low flow periods. DNR also provides specific comments for the various proposed compensatory mitigation sites.  DNR comments and specific recommendations will be included as an attachment to this letter.

Maryland Historical Trust (MHT)
    MHT commented that the proposed build alternatives have the potential to affect historic resources and MHT will continue to consult with Federal Highway Administration (FHWA) and SHA to complete the project historic properties review pursuant to Section 106.

Maryland National Capitol Park and Planning Commission

   MNCPPC provided extensive comments on the proposed project. The Corps will not try to summarize the entire 200+ page comment letter (plus attachments). Instead, we will highlight some major concerns raised. MNCPPC expressed a desire for additional consideration of the MD 200 Diversion. As part of that analysis, MNCPPC requested a better explanation for why improvements to I-95 were including in the initial MD 200 analysis. MNCPPC also provided comments concerning the Capper-Crampton Act and potential impacts for parklands administered by MNCPPC. MNCPPC, and many other commenters, questioned if the proposed project LOD may be revised (i.e., increased) in the design stages and result in larger impacts than disclosed in the DEIS and JPA. MNCPPC commented that the effects of the decision to remove the collector-distributor system along I-270 were not evaluated independently of the other aspects of the build alternatives. MNCPPC provide many questions and comments on the traffic analysis including the report disputing much of the modeling approach.

## Corps Comments

   The Corps has reviewed MDE's comment request letter and for the sake of brevity will not repeat many of comments already provide by MDE. The Corps would request both permitting agencies be including in any discussion covering comments. Also please include both agencies in any response to those comments independent of the NEPA and JPA process. The Corps provides the following general and specific comments on the DEIS:

General DEIS Comments
- Please update the FEIS, as appropriate, in sections where information and coordination are listed in the DEIS as pending or ongoing.

- Please update all relevant sections of the FEIS and attachments to discuss the effect that COVID-19 has on the proposed MLS project, including any potential impact to the proposed project's NEPA Purpose and Need.

- Please include details regarding revised traffic studies, and address public comments concerning traffic modeling deficiencies, potential increases in latent and induced demand, changes in commuting due to COVID-19, and any potential impact to the proposed project's NEPA Purpose and Need.

- Please provide more details on constructability throughout the FEIS and relevant attachments.

- Please ensure all impact totals and required mitigation totals match throughout the FEIS and attachments.

- Please address the effects that will result from utility relocation throughout the FEIS and attachments, particularly related to impacts to resources and costs associated with relocations. Please address how the relocations will be paid.

- Please provide additional information regarding how the project will be phased, the timing of those phases, and how that relates to the current JPA.

- Please provide additional details on how the P3 process may be revised based on lessons learned from the Purple Line project. For example, would the proposed project need to provide financial assurances to a selected P3 concessionaire?

- Please update the information regarding the WQC process in Maryland and Virginia.

- Analysis for the American Legion Bridge should include a transit option (at a minimum like the design for Woodrow Wilson Bridge for future transit use), avoidance and minimization of impacts to Plummers Island, and discuss how impact to the National Park Service C&O Canal will be handled.

<u>Specific DEIS Comments</u>
- Executive Summary. Under the definition of Limits of Disturbance (LOD) on Page ES-5, please consider adding language regarding a continued commitment to avoidance and minimization.
- Chapter 2. Section 2.3. page 7. Please define Fiscally Constrained.
- Section 2.5.2. page 14. The Purple Line information needs to be updated including the new completion date

- Section 2.5.3. page 18-19 The last paragraph in this section was not vetted by the Corps prior to inclusion in the DEIS and as written belongs in the Corps permit decision section not here. The applicant is free to make a statement about the financial viability of the project but should not infer the Corps has made a final determination of practicability based on financial considerations.

- Section 2.7.2. pages 37-38. Please update the culvert section in the FEIS to reflect any agreed upon changes in approach.

- Section 2.7.5. page 44. Please update the tolling information, as appropriate, with the results of toll range setting process.

- Section 2.7.5.d. page 44. states that dynamic tolling will minimize environmental impacts. Generally, separated toll lanes require a larger roadway footprint than similar general purpose lanes (e.g., for independent access/exit and separation barriers). Please provide an explanation regarding how dynamic tolling minimizes environmental impacts, including which environmental impacts are minimized.

- Section 2.7.6. page 45. Is there any analysis of how much transit would be required to meet the proposed project's NEPA Purpose and Need (i.e., to provide

the provide traffic relief similar to the build alternatives)? Also, is there any data on the utilization of bus rapid transit (BRT)?

- Section 2.7.6 page 45. Please clarify which barriers could be addressed and if this also supports any of the proposed project's NEPA Purpose and Need (e.g., improved trip reliability for bus transit).

- Section 2.7.8. page g 47 Phase I of the P3 should be defined to avoid confusion between Phase I of the MLS and the Public Works Board approval/awarding of Phase I for the overall P3 program.

- Chapter 3. Section 3. Please explain why Active Traffic Management (ATM) is no longer included in this section.

- Chapter 4. Section 4.12 page 82. Please provide an update on the status of mitigation coordination and planning for the additional mitigation required on National Park Service land.

- Section 4.13 Page 87. Please update Section 4.13 to include stormwater locations. Also, please update the Watershed and Surface Water Quality to discuss how proposed stormwater management will mitigate water quality impacts.

- Appendix B. The analysis for MD 200 has several inconsistences from the other build alternatives that should be explained. For example, it is not explained why the two-lane alternative for I-495 would begin at the West spur from I-270 rather than the East Spur. The area between spurs is also congested and any improvements would result in minimal impacts to parkland or residences. Also, the Interchange Reconfigurations bullet indicates that TSM/TDM were not considered due to potential environmental and property impacts, despite these impacts being included in the other retained alternatives.

- Appendix D. The traffic analysis should be revised to address the various comments received especially the traffic analysis and comments provided by Mr. Norman Marshall of Smart Mobility.

- Appendix E. The Environmental Justice analysis should be revised to address the various comments received during the public comment period.

- Appendix L. Natural Resources Technical Report Appendix A. The impact tables should include all the build alternative evaluated.

00141265

Other information Needs
As previously stated in our November 5, 2020 letter, the Corps ability to evaluate and authorize a proposed project is contingent upon receiving information on all project impacts to waters of the U.S.  The Corps can evaluate the entire 48-mile transportation project.  However, fundamental to permitting the entire project, the Corps requires basic information on impacts to all waters of the U.S., including jurisdictional wetlands, for the complete project. The information required for each impact area includes the location, limit of disturbance, estimated quantity of impacts (areal extent in square feet/linear feet), and type of impact (e.g., fill, culvert, stormwater management pond, stream restoration or stabilization, etc.).  This information must be including in a revised JPA submittal.  Please note that this additional information may trigger an additional public and/or agency coordination period with a subsequent comment response/information request.  The revised JPA submittal must also include Phase II compensatory mitigation plans for the proposed permanent impacts to waters of the U.S., including jurisdictional wetlands.  Also, any DA authorization is contingent upon the applicant receiving all other applicable approvals including Section 401 Water Quality Certification (WQC). Please be aware of the time requirements for 401 WQC process and any final permit decision making requirements under the One Federal Decision process.

**Summary and Additional Information Requirements**

   The Corps is concerned that several of the broad comments and issues raised during the comment period may affect the MLS's NEPA Purpose and Need and the screening criteria used to evaluate alternatives (e.g., traffic analysis and environmental justice).  While all public comments are important and need to be addressed in your comment response and NEPA documentation, it is essential that there is in-depth analysis to support any selected preferred alternative for the proposed project and the elimination of other alternatives.  Therefore, considering these comments and concerns, the Corps is requesting you address the enclosed comments and our additional information request.  Also, please copy furnish the Corps in your response to MDE's comment letter, including their additional information request, and provide MDE a copy of your response to our comments.

   In accordance with DA regulations, this office provides applicants with the opportunity to furnish proposed resolutions or rebuttals to all objections and comments received. In order for us to more fully consider the responses we received, and to enable us to assess the total impacts of the project and continue with our evaluation, a response regarding each comment, concern, or recommendation is requested along with a preferred alternative recommendation and ultimately a revised JPA and revised NEPA document. **Please provide this office with your response to the the enclosed comments and this letter, by March 15, 2021**. If additional time is necessary, please advise this office.  Please send your electronic response to john.j.dinne@usace.army.mil and copy furnish MDE (steve.hurt1@maryland.gov). The information requested is to fulfill the requirements of Corps regulations, the Clean

00141266

Water Act Section 404(b)(1) Guidelines, and the Corps public interest review process. This information will be used to render a final Corps permit decision.

We look forward to coordinating with you as the review process proceeds and we work to make a permit decision under the One Federal Decision process. Should you have any questions concerning this matter, please contact me at (410) 962-6005 or john.j.dinne@usace.army.mil.

Sincerely,

*Jack Dinne 12/3/2020*

Jack Dinne
Biologist, Maryland North Section

Enclosures

Cc (via email): Mr. Steve Hurt, MDE (steve.hurt1@maryland.gov)
Ms. Jeanette Mar, FHWA (jeanette.mar@dot.gov)



**Interagency Working Group**

January 27, 2021

**Interagency Working Group (IAWG) Meeting No. 13**
**I-495 & I-270 Managed Lanes Study**
**Microsoft Teams**
**January 27, 2021 @ 10:00 AM**

**Meeting handout**: Agenda, Presentation (provided following the meeting)

**Meeting Goals:**
- Provide an update on the MLS Study:
  - Discuss proposed solutions to concerns raised
  - Outline phased delivery approach
  - Present the MDOT SHA's Recommended Preferred Alternative (RPA)
  - Introduce commitments and enhancements
  - Introduce the agency and stakeholder collaboration process
- Discuss next steps

**Highlights**
- The Maryland Department of Transportation State Highway Administration (MDOT SHA) presented on the I-495 and I-270 Managed Lanes Study (MLS) via PowerPoint with Andrew Bing acting as the Meeting Facilitator. The meeting started with introductions followed by a review of the agenda and meeting goals.
- The Federal Highway Administration (FHWA) provided an update on One Federal Decision (OFD). FHWA noted that President Biden has revoked Executive Order 13807- OFD. FHWA indicated that no official guidance has been provided yet. This project will continue to follow federal regulations including Council on Environmental Quality (CEQ) National Environmental Policy Act (NEPA) regulations and Title 23 U.S.C. 139.
  - The Maryland-National Capital Park and Planning Commission (M-NCPPC) questioned how the MLS can move forward with OFD being revoked. M-NCPPC also mentioned that OFD removes timeline requirements for the Project.
    - FHWA noted that the project is still held to federal regulations and will continue to follow the streamlining procedures under 23 U.S.C. 139. FHWA will provide updates or information on any new applicable executive orders as they can but the project will continue to follow applicable federal regulations and streamlining procedures.
  - M-NCPPC raised concerns with the announcement of the MDOT SHA Recommended Preferred Alternative (RPA).
    - FHWA noted that the CEQ and federal regulations are clear about the requirement for the lead agencies to identify a preferred alternative. The OFD Executive Order was policy, not regulation.
- **COVID-19 Considerations:**
  - MDOT SHA provided an update on how the MLS is considering the COVID-19 pandemic. MDOT SHA noted that the MLS considerations include monitoring, research, and sensitivity analysis. As the MLS progresses, these considerations will be updated regularly. The results will be published in the Final Environmental Impact Statement (FEIS).
- **MLS Study Update:**
  - MDOT SHA provided an update on the MLS schedule. The schedule included:

00141810

**Interagency Working Group**
January 27, 2021

- **NOV 2020:** DEIS Comment Period Ends
- **JAN 2021:** Present MDOT RPA
- **MAR 2021:** Request Concurrence on RPA
- **MAR-JUN 2021:** Refinement of Engineering & Environmental in Response to DEIS Comments and Final Mitigation
- **JUL 2021:** FHWA/Cooperating Agency Review Draft FEIS #1
- **AUG-SEP 2021:** FHWA Legal Sufficiency Review Draft FEIS #2
- **OCT 2021:** Publish FEIS
- **OCT-NOV 2021:** Notice of Availability (NOA)
- **NOV 2021:** Publish Record of Decision (ROD)
- **2022:** Permits for Phase 1 South

o MDOT SHA provided a recap of the Draft Environmental Impact Statement (DEIS) and Public and Stakeholder Engagement efforts.
o MDOT SHA noted that approximately 2,895 comments were received from agencies, elected officials, community organizations, and individuals during the 123-day DEIS Comment Period, between July 10 and November 9, 2020.
- MDOT SHA and FHWA are reviewing all DEIS comments, completing additional analyses as needed and will be responding to all substantive comments received as part of the FEIS.
- MDOT SHA noted that 257 comments were received in support for one or more specific Build Alternatives with Alternative 9 receiving the most support tallying approximately 245 comments.
o M-NCPPC indicated that it is confusing that the MDOT SHA announced the RPA and is asking for agency concurrence prior to MDOT SHA responding to agency comments on the DEIS.
- MDOT SHA indicated that there are several factors that come with selecting a RPA including its ability to meet the purpose and need and MDOT SHA is continuing to address agency comments through individual agency meetings to discuss comments and proposed responses.
- M-NCPPC noted that their concurrence on the RPA would come via the mandatory referral process and would involve presenting to their Commission. Further discussion is needed on this process.
o The National Capital Planning Commission (NCPC) indicated that the total amount of comments on the MLS seems low and asked how comments are being counted.
- MDOT SHA noted that a comment is one piece of mail and there can be several topics within one comment. All individual comments will be reviewed, and substantive comments will receive responses. Additionally, a large number of comments were received as a form letter format.
o Prince George's County Department of Public Works & Transportation (PG DPW&T) questioned the phasing of the MLS.
- MDOT SHA deferred to the upcoming slides to address phasing of the project.
o Montgomery County Department of Transportation (MC DOT) noted that 83% of the comments supports the No Build Alternative and asked how those comments will be considered.
- MDOT SHA noted that the No Build Alternative does not meet the Purpose and Need of the MLS and it is common to hear support for the No Build


MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00141811

Alternative (opposition to the project). It was reiterated that the Purpose and Need was established through a collaborative effort and includes accommodating existing traffic and long-term traffic growth.

- o The National Park Service (NPS) noted that the RPA is being announced publicly before the agencies are commenting and concurring to the RPA and asked how it will be messaged to the public.
  - MDOT SHA noted the RPA is the *MDOT SHA recommended* preferred alternative and is being messaged to the public this way.
  - NPS asked why MDOT SHA is not waiting until all comments have been reviewed and responded to prior to selecting an RPA.
  - MDOT SHA noted that no comments indicating support or concern from the agencies were received on the alternatives retained for detailed study and the majority of comments received were on elements that were common among all Build Alternatives. MDOT SHA stated that selecting an RPA at this point in the process allows MDOT SHA to further refine design on a single alternative in an effort to further avoid and minimize impacts to address specific comments.
- o M-NCPPC noted that the No Build alternative is on the table and must be considered as a part of NEPA.
  - MDOT SHA indicated that the No Build Alternative does not meet the Purpose and Need for the project but that it continues to be on the table.
  - FHWA noted that this is a MDOT SHA RPA and an RPA has to be selected to advance the MLS. Selecting an RPA allows for details including mitigation and commitments to be further developed.

- **Phased Delivery Approach:**
  - o MDOT SHA presented the MLS phased delivery approach and detailed the following:
    - Immediate focus is on delivering Phase 1 South to address the regionally significant congestion bottleneck at the American Legion Bridge.
    - Current P3 Solicitation is for partner (Phase Developer) to collaborate on preliminary design/predevelopment work with MDOT, agency partners and other stakeholders to further avoid and minimize impacts to environmental resources, communities, properties and other features.
    - Environmental impacts associated with the Preferred Alternative, measures to avoid, minimize and mitigate unavoidable impacts will continue to be addressed for the 48-mile study area and will be covered by one FHWA FEIS and ROD.
    - The identification of a Preferred Alternative and its associated impacts for the entire project in the FEIS is consistent with the FHWA's objective of analyzing and selecting transportation solutions on broad scale to provide meaningful analysis and avoid segmentation.
    - It is the intent of MDOT SHA and FHWA to work toward implementation of the Preferred Alternative through a phased delivery approach with the first delivery phase identified as the most significantly congested area in the PM peak within the study limits, the American Legion Bridge

- MDOT SHA will proceed with a phased delivery approach as noted in the DEIS. The FEIS will include a chapter detailing this phased delivery approach.
- Until additional environmental review is complete, involving further agency coordination and engagement with stakeholders and the public, MDOT SHA will not:
  - Request permits or authorizations outside of Phase 1 South.
  - Seek transfer or acquisition of public property or pursue. involuntary relocations or acquisition of private property adjacent to the existing interstate corridors needed for widening outside of Phase 1 South.
  - Additional opportunities for further avoidance, minimization and mitigation will be available for subsequent phases as final design advances on those phases.
  - Environmental mitigation identified in the ROD will be implemented consistent with the phased delivery approach, unless there is opportunity to provide advanced mitigation that is mutually agreeable to all parties, is feasible to advance, and is identified as priority.
- MDOT SHA noted that the phased delivery approach was described in the DEIS and will be fully detailed in the FEIS.
- M-NCPPC asked how the phased delivery process will work and be implemented as the future phases are unclear.
  - MDOT SHA noted that impacts associated with the RPA over the entire 48-miles of the MLS will continue to be evaluated and included in the FEIS along with mitigation and commitments which will be part of the ROD.
  - Additionally, once future phases are identified, MDOT SHA is committed to performing further environmental review and agency and public coordination.
- NPS asked if the ROD will be for the entire 48 miles.
  - MDOT SHA stated that the ROD will be for the entire 48-mile MLS.
- M-NCPPC asked why the FEIS and ROD cannot be phased along with the permits.
  - FHWA noted that the study is being conducted on the full 48 miles to evaluate environmental impacts on a broad scale consist with FHWA guidance on independent utility and logical termini. FHWA does not issue phased or multiple RODs and has no established policy on issuing multiple RODs. FHWA noted that the phased delivery approach is used on most major projects like the MLS and has been used on Maryland projects, including the InterCounty Connector.
- The Maryland Department of Planning (MDP) questioned how transit will be included in Phase 1 South along with COVID-19 effects on transit use.
  - MDOT SHA indicated transit elements are incorporated into the RPA as outlined in the DEIS but that specific transit commitments will be discussed later in the presentation.
- The Maryland Department of Natural Resources (DNR) asked how MDOT SHA would address Phase 1 South improvements meeting the purpose and need if it were moved forward separately and how that will be detailed the FEIS.

00141813

- MDOT SHA noted that a full traffic analysis will be completed on phasing the project to prove operational independence of phases in support of Interstate Access Point Approval (IAPA) required by FHWA and will be detailed in the FEIS.
  - o NCPC asked if the commitment for further environmental review considers a supplemental EIS/ROD.
    - MDOT SHA responded that they will complete environmental documentation required by FHWA at a minimum.
    - FHWA also responded that additional NEPA documentation will be required for future phases but it cannot predict if a supplemental EIS will be required until more information is known based on design and additional analyses and coordination.

- **MDOT SHA's RPA:**
  - o MDOT SHA presented MDOT SHA's RPA. After thorough review, MDOT SHA recommends that Alternative 9 be identified as the Preferred Alternative in the FEIS.
  - o Alternative 9 includes adding two High Occupancy Toll (HOT) managed lanes in each direction on I-495 and convert one existing HOV lane to a HOT managed lane and add one HOT managed lane in each direction on I-270.
  - o Alternative 9 performs the best of the Build Alternatives studied for three key traffic metrics:
    - Average Speed
    - Level of Service (LOS)
    - Effect on Local Network
  - o In addition to strong performance to address recurring congestion during peak periods, Alternative 9 also improves reliability and accommodates incidents, special events, bus transit, and homeland security by providing a continuous two-lane managed lane system.
  - o MDOT SHA reviewed a table of the MLS Summary of Effects from the DEIS highlighting the effects of Alternative 9.
  - o Benefits of Alternative 9 include allowing HOV 3+ vehicles to travel free, providing for a more reliable trip in managed lanes, which will reduce dependence on single occupancy vehicles (SOVs). The HOT lanes will provide new equitable opportunities because the option for free travel on the managed lanes extends to HOV 3+ car/van pools and bus transit. General purpose lanes will remain free with less congestion.
  - o Transit benefits of Alternative 9 include the greatest increased travel speed for buses, HOT lane connections to existing transit service on the local arterials, and connections that support existing and future transit service to underserved transit markets.
  - o M-NCPPC asked if the traffic analysis in the FEIS will include HOV usages and managed lane forecasting demand.

00141814

- ▪ MDOT SHA noted that the traffic analysis will include the HOV usages and demand forecasting. The COG and VISSIM traffic models will be used to complete the traffic analysis in the FEIS.
  - o M-NCPPC asked if the loss of non-peak hour general-purpose traffic usage of the HOV lane on I-270 is being considered as there is congestion on I-270 now.
    - ▪ MDOT SHA noted that the traffic analysis does include the loss of a HOV lane usage in the non-peak hours for general-purpose traffic and shows Alternative 9 preforms the best.
    - ▪ The VISSIM model using dynamic assignment to consider what types of vehicles will be using the managed lanes.

- **Commitments and Enhancements:**
  - o MDOT SHA presented specific commitments with the identification of MDOT SHA's RPA as Alternative 9 based on recommendations, comments, and feedback we received from local governments, resource and regulatory agencies, stakeholder groups, elected officials and the public. Commitments include but are not limited to: bicycle and pedestrian connections in Montgomery and Prince George's Counties, regional transit improvements throughout the MLS corridor, and environmental enhancements above and beyond mitigation. Specific commitments can be found in the presentation.
  - o The Maryland Department of the Environment (MDE) asked if the commitments and environmental enhancements will be included in the FEIS and Limits of Disturbance (LOD).
    - ▪ MDOT SHA noted that the commitments are above and beyond mitigation for direct impacts and that they will be incorporated as commitments in the ROD. Some of the commitments are better defined than others and can be incorporated into the LOD and some may include a commitment for further study once they are better defined after the ROD.
  - o MDP asked how the transit enhancements will be a part of the ROD and how will they be implemented.
    - ▪ MDOT SHA indicated that the commitments will be included in the ROD and will be implemented based on the identified phasing.
  - o PG DPW&T asked how the commitments will be implemented.
    - ▪ MDOT SHA noted the commitments will be implemented by identified phase unless there is agreement to advance a commitment outside of Phase 1 South forward.

- **Agency and Stakeholder Collaboration Process:**
  - o MDOT SHA introduced the Collaborative Leadership Summit (CLS) and Executive Steering Committee (ESC). The CLS's purpose is to increase leadership participation representing all agency partners to build agreement between agency executives on a strategic consensus building approach to advance critical study elements. The ESC will focus on building consensus on critical study elements and will include the

00141815

same level of representatives from lead, cooperating, and participating agencies as those that attend the CLS. Specific topics of concern, critical to each agency, identified from this Summit, will be used as the basis for monthly, or as-needed, ESC Meetings.

- o MDOT SHA detailed the continuation of IAWG meetings and stakeholder engagement.
- o NCPC asked if an agenda or detailed issues will be provided prior to the CLS.
  - ▪ MDOT SHA noted that the agenda and Statement of Principles will be sent today.
- o PG DPW&T asked if the PowerPoint presentation will be distributed to attendees.
  - ▪ MDOT SHA indicated it will be sent following the meeting.

- **Summary:**
  - o MDOT SHA provided a summary of the presentation, reviewed next steps, and asked for any other questions.
  - o MDOT SHA reiterated that the MDOT SHA RPA was identified at this time to allow MDOT SHA and FHWA to address specific comments, continue with design efforts to avoid and minimize impacts on a single alternative, and finalize mitigation for unavoidable impacts.
  - o The FEIS and ROD will include impacts and mitigation associated with the Preferred Alternative along the 48-mile corridor, however, the project will be delivered in phases. This approach is typical for large corridor projects and has been used in Maryland before.
  - o At a minimum, MDOT SHA will be required to complete a NEPA reevaluation which will determine whether supplemental documentation will be needed. Additional agency and public collaboration will occur as a key element of this approach. This will be a commitment in the ROD with FHWA.
  - o The commitments and enhancements described were identified through extensive agency coordination and, through that coordination, were determined to be priorities. These commitments and enhancements are above and beyond mitigation for direct impacts.

**Next Steps**
- o Continue conducting additional analyses, further development avoidance and minimization design changes, finalize mitigation and refine the limits of disturbance in coordination with agencies: **Ongoing**
- o Conduct Individual agency meetings on DEIS Comments and Mitigation: **January - April 2021**
- o Collaborative Leadership Summit and Executive Steering Committee Kick-off: **February 2021**
- o Agency Concurrence on RPA: **March 2021**
- o DEIS comment responses development: **November 2020 - April 2021**
- o FEIS and ROD development: **January - November 2021**
- o Submit revised Section 404/401 of CWA JPA Package: **September 2021**

00141816

Attendance

| Name | Agency | Email |
|------|--------|-------|
| Mandy Ranslow | ACHP | mranslow@achp.gov |
| Christine Mazzarella | EPA | Mazzarella.Christine@epa.gov |
| Stepan Nevshehirlian | EPA | Nevshehirlian.stepan@epa.gov |
| Angus Welch | EPA | welch.angus@epa.gov |
| Megan Cogburn | FHWA | megan.cogburn@dot.gov |
| James Gavin | FHWA | james.gavin@dot.gov |
| Jeanette Mar | FHWA | Jeanette.Mar@dot.gov |
| Diane Mobley | FHWA | Diane.Mobley@dot.gov |
| Jitesh Parikh | FHWA | Jitesh.Parikh@dot.gov |
| Keilyn Perez | FHWA | Keilyn.Perez@dot.gov |
| Lavinia Thomas | FHWA | Lavinia.Thomas@dot.gov |
| Sharon Vaughn-Fair | FHWA | Sharon.Vaughn-Fair@dot.gov |
| Ray Li | FWS | Ray_Li@fws.gov |
| Dan Dozier | Lawfirm of Press, Dozier, & Hamelburg | DDozier@pressdozierlaw.com |
| Amanda Sigillito | MDE | amanda.sigillito@maryland.gov |
| Steve Hurt | MDE | steve.hurt1@maryland.gov |
| Emily Dolbin | MDE | emily.dolbin@maryland.gov |
| Jennifer Smith | MDE | jenniferm.smith@maryland.gov |
| Gwen Gibson | MDNR | gwendolyn.gibson@maryland.gov |
| Lauren Molesworth | MDOT MTA | LMolesworth@mdot.maryland.gov |
| Eric Almquist | MDOT SHA | ealmquist@rkk.com |
| Steve Archer | MDOT SHA | SArcher@mdot.maryland.gov |
| Eric Beightel | MDOT SHA | EBeightel.consultant@mdot.maryland.gov |
| Andrew Bing | MDOT SHA | abing@kramerassociates.net |
| Caryn Brookman | MDOT SHA | CBrookman.consultant@mdot.maryland.gov |
| Michael Drummond | MDOT SHA | Michael.Drummond@wsp.com |
| Jeff Folden | MDOT SHA | JFolden1@mdot.maryland.gov |
| Karen Kahl | MDOT SHA | kkahl@rkk.com |
| Beth Kreider | MDOT SHA | ekreider@wrallp.com |
| Bob Maimone | MDOT SHA | bob@blackwaterenvironmentalgroup.com |
| Rich Parsons | MDOT SHA | RParsons1.consultant@mdot.maryland.gov |
| Erron Ramsey | MDOT SHA | eramsey@rkk.com |
| Catherine Robbins | MDOT SHA | CRobbins.consultant@mdot.maryland.gov |
| Matt Snare | MDOT SHA | msnare@rkk.com |
| Christine Sutkowski | MDOT SHA | csutkowski@rkk.com |
| David Thomas | MDOT SHA | DThomas6.consultant@mdot.maryland.gov |
| Stacy Talmadge | MDOT SHA | STalmadge.consultant@mdot.maryland.gov |
| John Williams | MDOT SHA | jwilliams@rkk.com |
| Bihui Xu | MDP | bihui.xu@maryland.gov |
| Carl Chamberlin | MDTA | cchamberlin@mdta.state.md.us |
| Beth Cole | MHT | beth.cole@maryland.gov |
| Tim Tamburrino | MHT | tim.tamburrino@maryland.gov |
| Jennifer Hannum | M-NCPPC | Jennifer.Hannum@pgparks.com |

| Name | Agency | Email |
|---|---|---|
| Erin McArdle | M-NCPPC | Erin.McArdle@montgomeryparks.org |
| Debra Borden | M-NCPPC | Debra.Borden@mncppc.org |
| Matthew Harper | M-NCPPC | matthew.harper@montgomeryparks.org |
| Jacqueline Hoban | M-NCPPC | jacqueline.hoban@montgomeryparks.org |
| Maria Martin | M-NCPPC | Maria.Martin@ppd.mncppc.org |
| Carol Rubin | M-NCPPC | carol.rubin@montgomeryplanning.org |
| Crystal Saunders-Hancock | M-NCPPC | crystal.hancock@ppd.mncppc.org |
| Douglas Stephens | M-NCPPC | Douglas.Stephens@montgomeryparks.org |
| Ashby Strassburger | M-NCPPC | ashby.strassburger@montgomeryparks.org |
| Andrew Bossi | Montgomery County DOT | andrew.bossi@montgomerycountymd.gov |
| Hannah Henn | Montgomery County DOT | hannah.henn@montgomerycountymd.gov |
| Stephen Aldrich | Montgomery County Planning | Stephen.Aldrich@montgomeryplanning.org |
| Nazneen Ferdous | MWCOG | nferdous@mwcog.org |
| Dusan Vuksan | MWCOG | dvuksan@mwcog.org |
| Karrie Freeman | Navy | karrie.reckley@navy.mil |
| Michael Weil | NCPC | michael.weil@ncpc.gov |
| Anne Schuyler | NCPC | anne.schuyler@ncpc.gov |
| Diane Sullivan | NCPC | Diane.sullivan@ncpc.gov |
| Phillip Neuberg | NIST | phillip.neuberg@nist.gov |
| Laurel Hammig | NPS | laurel_hammig@nps.gov |
| Tammy Stidham | NPS | tammy_stidham@nps.gov |
| Victor Weissberg | Prince George's County DPW&T | vweissberg@co.pg.md.us |
| Jack Dinne | USACE | john.j.dinne@usace.army.mil |
| Joseph DaVia | USACE | joseph.davia@usace.army.mil |
| Davon Collins | USPS | Davon.M.Collins@usps.gov |
| Robert Iosco | VDOT | robert.iosco@vdot.virginia.gov |
| Susan Shaw | VDOT | susan.shaw@vdot.virginia.gov |

Message
_____

**From:**      Steve Archer [SArcher@mdot.maryland.gov]
**Sent:**      4/22/2021 4:20:35 PM
**To:**        L. Paige Whitley [lpwhitley@me.com]
**CC:**        Richard Ervin [RErvin@mdot.maryland.gov]; Julie Schablitsky [JSchablitsky@mdot.maryland.gov]; Matt Manning
               (Consultant) [MManning.consultant@mdot.maryland.gov]
**Subject:**   RE: Maguire Funeral Home 1964 payout with condemned land abutting Morningstar Tabernacle No. 88 Cemetery &
               Hall


Thank you Paige!  I appreciate you sharing the file.  Let us take a look into it and see if it opens up any more leads for records or information we may have at SHA.

Steve

Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Phone 410-545-8508
sarcher@mdot.maryland.gov


**From:** L. Paige Whitley <lpwhitley@me.com>
**Sent:** Thursday, April 22, 2021 3:58 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Charlotte Troup Leighton <troupleighton@gmail.com>; Ballo, Rebeccah
<rebeccah.ballo@montgomeryplanning.org>; Charles Hall <charles.hall@maryland.gov>; Crane, Brian
<brian.crane@montgomeryplanning.org>; Diane Baxter <baxterd9@aol.com>; Dr. Alexandra Jones
<ajones@archaeologyincommunity.com>; Eileen McGuckian <phileen3@verizon.net>; Elizabeth Hughes -MDP-
<elizabeth.hughes@maryland.gov>; Julie Schablitsky <JSchablitsky@mdot.maryland.gov>; Matt Manning (Consultant)
<MManning.consultant@mdot.maryland.gov>; Montgomery Crawford <mceye.photo@gmail.com>; Richard Ervin
<RErvin@mdot.maryland.gov>
**Subject:** Re: Maguire Funeral Home 1964 payout with condemned land abutting Morningstar Tabernacle No. 88
Cemetery & Hall


Steve, I am happy to break with the norms of current circumstances and quickly and freely share the document.  I know what it's like to wait… and wait…

Please find it attached; digital page 5 of 175 pages lists "First and Final Account" and #5 on the list is McGuire Funeral Services, Inc. (Note:  Correct name is "Maguire").   Materials you recently shared with us mention the condemnation of this property and the one next to it (Legal Nos. 10749 and 10748, respectively).   In fact, your docs also share the following tidbit from SRC Louis Yost in 1958 suggesting that perhaps Morningstar was once also considered for condemnation (italics mine):

> "I wish to call attention that this third deed [1933] refers to the Board of Trustees of the Morningstar Tabernacle No. 88 as being Incorporated, and it is my understanding that *we cannot condemn an incorporated cemetery*.  However, I would advise you to discuss this point with Mr. Moser to get his verification."


Paige Whitley

On Apr 22, 2021, at 3:04 PM, Steve Archer <SArcher@mdot.maryland.gov> wrote:

We are requesting this document from the archives, but if you already have a copy you are able to share that would be appreciated so we can respond/look into it more promptly.  It has taken some time for us to receive document requests, particularly under current circumstances.

Steve

---

**From:** Charlotte Troup Leighton <troupleighton@gmail.com>
**Sent:** Thursday, April 22, 2021 2:56 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Ballo, Rebeccah <rebeccah.ballo@montgomeryplanning.org>; Charles Hall <charles.hall@maryland.gov>; Crane, Brian <brian.crane@montgomeryplanning.org>; Diane Baxter <baxterd9@aol.com>; Dr. Alexandra Jones <ajones@archaeologyincommunity.com>; Eileen McGuckian <phileen3@verizon.net>; Elizabeth Hughes -MDP-<elizabeth.hughes@maryland.gov>; Julie Schablitsky <JSchablitsky@mdot.maryland.gov>; L.Paige Whitley <lpwhitley@me.com>; Matt Manning (Consultant) <MManning.consultant@mdot.maryland.gov>; Montgomery Crawford <mceye.photo@gmail.com>; Richard Ervin <RErvin@mdot.maryland.gov>
**Subject:** Re: Maguire Funeral Home 1964 payout with condemned land abutting Morningstar Tabernacle No. 88 Cemetery & Hall

# See State Roads Commission vs. Andrew Mickens et al Condemnation legal case #10749, page 5.

On Thu, Apr 22, 2021 at 2:52 PM Steve Archer <SArcher@mdot.maryland.gov> wrote:

Hi Paige,

We'd be happy to work with you on that, can you share the document you reference so we might try and do some more investigation?  Our inference that burials were not relocated at Morningstar comes primarily from the as-built plats that show where graves were marked with a boundary and avoided and the ROW acquisition from Morningstar that specifically noted that the cemetery and hall were outside the right-of-way acquisition for the beltway construction.  Moreover, in situations where relocations *have* occurred there has been a more robust record (such as at the Poor Farm), which we do not have here.  It is an "absence of evidence" argument to some extent, but we are always willing to look at new information and ensure we have it right.

It is possible that we are overlooking something from another property that was not part of the Morningstar/Moses Hall cemetery where a relocation might have occurred - it sounds like this is a distinct property that was never part of the Morningstar cemetery? - the farmstead to the North?  Since our efforts to date have been concerned with the current proposed impacts we have not done a deep dive on this issue for the entirety of the original beltway construction.

We'd be happy to look at the documents and/or meet to discuss further.

Steve

**From:** L.Paige Whitley <lpwhitley@me.com>
**Sent:** Thursday, April 22, 2021 1:45 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Cc:** Julie Schablitsky <JSchablitsky@mdot.maryland.gov>; Richard Ervin <RErvin@mdot.maryland.gov>; Matt Manning
(Consultant) <MManning.consultant@mdot.maryland.gov>; Eileen McGuckian <phileen3@verizon.net>; Dr. Alexandra
Jones <ajones@archaeologyincommunity.com>; Diane Baxter <baxterd9@aol.com>; Charlotte Troup Leighton
<troupleighton@gmail.com>; Montgomery Crawford <mceye.photo@gmail.com>; Elizabeth Hughes -MDP-
<elizabeth.hughes@maryland.gov>; Charles Hall <charles.hall@maryland.gov>; Crane, Brian
<brian.crane@montgomeryplanning.org>; Ballo, Rebeccah <rebeccah.ballo@montgomeryplanning.org>
**Subject:** Maguire Funeral Home 1964 payout with condemned land abutting Morningstar Tabernacle No. 88 Cemetery
& Hall

Dear Mr. Archer,

As the researcher assisting Friends of Moses Hall (FMH) in identifying burials and providing background
history of the community, I am writing to ask for clarification and assistance.

While FMH members were on the cemetery site with Julie Schlablitsky this past Friday, you confidently
declared that no burials were relocated to clear the ROW for the original I-495 construction. Notwithstanding
physical evidence of graves within the current ROW, you indicated that state ROW records do not identify any
burials as left behind in the ROW abutting the site. Our efforts to obtain the ROW files, first from the Maryland
State Archives and more recently from MDOT SHA, are an effort to confirm MDOT SHA's findings before the
FEIS is issued.

We are concerned because a public document obtained from the MD State Archives (MSA) indicates that
McGuire [sic: should read Maguire] Funeral Service, Inc. of the District of Columbia was on the list of payouts
filed January 1964 along with heirs of Peter and Dorcas Ann Jones.* This condemned property area includes
the current ROW area SHA and FMH believe may contain burials; the majority of the Jones' property is under
I-495. Our request for ROW files aims to confirm MDOT SHA's findings and to reassure descendants by
putting to rest the idea that bodies were left behind during 1960s highway construction.

As you know, we have experienced some hurdles in obtaining the files we need from MSA, which has delayed
our research (missing records/passing the buck, etc.). We appreciate that you recently supplied us with some
of the files and records we need and we are still examining them. However, as we work to fill in the gaps we
remain concerned that MDOT SHA's research may have overlooked something.

Please, could you or a colleague please state upon what evidence you base your assertion that no burials
were found or relocated within the state ROW for original I-495 construction?

Thank you for your assistance.

Sincerely,

Paige Whitley
Friends of Moses Hall

*See State Roads Commission vs. Andrew Mickens et al Condemnation legal case #10749, page 5.

Message

---

**From:**   Cogburn, Megan (FHWA) [megan.cogburn@dot.gov]
**Sent:**   5/17/2021 5:54:25 PM
**To:**   Perritt, Karen (FHWA) [karen.perritt@dot.gov]; gabrilovich, lev (fhwa)
**Subject:**   RE_ Air Quality Conformity question(3).pdf

From:
To:
Cogburn, Megan (FHWA)
Subject:
Date:
Perritt, Karen (FHWA); Gabrilovich, Lev (FHWA)
RE: Air Quality Conformity question
Monday, May 17, 2021 4:54:25 PM
If either of you have any questions, I'm happy to meet prior to the call tomorrow morning. Since my
e-mail below, the State made the announcement public as of last Wednesday. For reference, the
announcement is here: https://495-270-p3.com/environmental/alternatives/rpa/

From: Perritt, Karen (FHWA)
Sent: Monday, May 17, 2021 4:44 PM
To: Gabrilovich, Lev (FHWA) <lev.gabrilovich@dot.gov>
Cc: Cogburn, Megan (FHWA) <megan.cogburn@dot.gov>
Subject: FW: Air Quality Conformity question


From: Cogburn, Megan (FHWA)
Sent: Tuesday, May 4, 2021 8:58 AM
To: Perritt, Karen (FHWA) <Karen.Perritt@dot.gov>
Subject: RE: Air Quality Conformity question

Hi Karen,

I'm glad you are able to join today's call. Unfortunately I will not be on due to a conflict, but I
wanted
to provide a little more context for you since Jeanette failed to mention this in her e-mail. I know you
are somewhat familiar with the project from your time in HEPE; however, there have been major
changes in recent weeks (which have not been made public yet). The State released a DEIS last July
on the whole 48 mile corridor but they are now pivoting and preparing a supplemental DEIS for
Phase 1 only. Phase 1 includes 495 from the American Legion Bridge over the Potomac River up to
270 with the terminus at 370. Phases 2 and 3 which include the topside and eastern portion of 495
will be no build. The intent is to announce this new alternative and select it as the preferred
alternative in the SDEIS, and then we would issue a combined FEIS/ROD for the preferred
alternative.

Given this new path forward, the State is now seeking our guidance on what to include in the limited
scope SDEIS and then the FEIS/ROD. The question now is whether selecting no build for Phases 2 and
3 would necessitate updates to the TIP (though it looks like they are planning to anyway to account
for HOT Lanes rather than ETL) and determining project level conformity prior to the FEIS/ROD in
May 2022. What is currently in the TIP and conforming plan includes the entire P3 program which is
worst-case scenario with the entire build out. It sounds like timing wise the amended CLRP will not
be approved until June 2022, so we just need to understand whether there are any
flexibilities/actions we can take sooner to meet the ROD in May 2022 or if the project schedule
would need to be bumped out until the amended CLRP is approved in June (which of course is
problematic for the State). I'm also wondering if there is the possibility of not updating the TIP since

00145782

it encompasses the entire project and the design hasn't changed, but we are just opting not to build Phases 2 and 3 at this point in time.

Hopefully this provides a little more context and helps for the conversation this afternoon. Thanks!

Megan

From: Perritt, Karen (FHWA)
Sent: Tuesday, May 4, 2021 7:43 AM
To: Ho, Cecilia (FHWA) <Cecilia.Ho@dot.gov>; Mar, Jeanette (FHWA) <Jeanette.Mar@dot.gov>; Martinez, Victoria (FHWA) <Victoria.Martinez@dot.gov>
Cc: Cogburn, Megan (FHWA) <megan.cogburn@dot.gov>; Parikh, Jitesh (FHWA) <Jitesh.Parikh@dot.gov>
Subject: RE: Air Quality Conformity question

Hi. I would be available to call into the meeting from 2-3pm.
Karen

From: Ho, Cecilia (FHWA)
Sent: Monday, May 3, 2021 5:11 PM
To: Mar, Jeanette (FHWA) <Jeanette.Mar@dot.gov>; Martinez, Victoria (FHWA) <Victoria.Martinez@dot.gov>
Cc: Cogburn, Megan (FHWA) <megan.cogburn@dot.gov>; Parikh, Jitesh (FHWA) <Jitesh.Parikh@dot.gov>; Perritt, Karen (FHWA) <Karen.Perritt@dot.gov>
Subject: RE: Air Quality Conformity question

Hi, Jeanette-Hope you are doing well!

Unfortunately I am not available from 2-4 tomorrow afternoon and I am fully booked on Wed. I am copying Karen to see if she can attend the meeting tomorrow. But I can meet Thursday between 11:30 and 1pm or on Friday between 11 am and 4 pm if we need to discuss after your meeting.

Here are my thoughts based on the information provided below. In order for FHWA to make a project level conformity determination, all the related conformity requirements must be met. One of the requirements is that the project must come from a conforming plan and TIP and the requirements are in 40 CFR 93.115. 40 CFR 93.115 (b)(1) stated that to satisfy the requirement of a project coming from a conforming plan, "the project is specifically included in the conforming transportation plan and the project's design concept and scope have not changed significantly from those which were described in the transportation plan, or in a manner which would significantly impact use of the facility"; a similar requirement can be found in 40 CFR 93.115(c)(1) for project coming from a conforming TIP.

So here is the question: Is the change in the project is significantly different in design concept and scope than those included in the plan and TIP? If yes, then the plan and TIP must be amended first

to incorporate these changes and found to conform before we can make a project level conformity determination. The project level conformity must be made before the completion of the NEPA process.

Hope this helps.
Cecilia


From: Mar, Jeanette (FHWA)
Sent: Monday, May 03, 2021 11:51 AM
To: Ho, Cecilia (FHWA) <Cecilia.Ho@dot.gov>; Martinez, Victoria (FHWA)
<Victoria.Martinez@dot.gov>
Cc: Cogburn, Megan (FHWA) <megan.cogburn@dot.gov>; Parikh, Jitesh (FHWA)
<Jitesh.Parikh@dot.gov>
Subject: Air Quality Conformity question

Cecilia:

We have regular meetings with MDOT SHA to discuss the I-495/I-270 MLS project. The next project meeting will be on Tuesday, 5/4/2021 from 2:00 PM – 4:00 PM. Would you be available to call in that day to answer questions on their air quality conformity? Or we can set up another time to discuss?

Below is a preview of what MDOT SHA will be asking FHWA at the meeting.
Air Quality Conformity:
The current CLRP includes the full P3 Program limits, ~70 miles, and includes adding four Express Toll Lanes. MDOT is currently proposing revisions to the inputs which are up for TPB approval in June 2021 to change ETL to HOT and change the completion dates in areas outside of the MLS from 2025 to 2030. With the limits of actual build improvements being reduced for the current NEPA study, we assume it's acceptable to continue including the entire Program for conformity purposes as this would be the worst case. The amended CLRP with the updated inputs is going to be approved in June 2022 and our ROD is anticipated in April/May 2022. Will FHWA approve the FEIS/ROD if the new amended CLRP with the updated inputs is not approved yet? Again, we assume the answer would be yes as the modifications were minor (ETL to HOT) and the conformity analysis would be on the full P3 Program. If FHWA anticipates any concerns, we would like to discuss as soon as possible. Please let me know if you have any questions. Also, please let me know your thoughts in responding back to MDOT SHA's question

Thanks!
Jeanette

Jeanette Mar
Environmental Program Manager

FHWA - Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
phone (410) 779-7152
fax (410) 962-4054

00145785

Message

| | |
|---|---|
| **From**: | Parikh, Jitesh (FHWA) [jitesh.parikh@dot.gov] |
| **Sent**: | 5/19/2021 4:05:29 PM |
| **To**: | Mobley, Diane (FHWA) [diane.mobley@dot.gov]; gabrilovich, lev (fhwa) |
| **Subject**: | MLS AQ Conformity Internal Meeting Information.pdf |
| **Attachments**: | 05192021_-_Item_5_UPDATED_-_MDOT_RPA_letter.pdf; Visualize 2045 Update Schedule.docx |

```
From:
To:
Parikh, Jitesh (FHWA)
Mobley, Diane (FHWA); Gabrilovich, Lev (FHWA); Ho, Cecilia (FHWA); Perritt, Karen (FHWA); Jackson, Sandra
(FHWA); Arhin, Kwame (FHWA); Cogburn, Megan (FHWA); Mar, Jeanette (FHWA); Perez, Keilyn (FHWA);
Hansen, Christopher (FHWA)
Subject:
Date:
Attachments:
All,
In preparation for our internal meeting (to be scheduled) on AQ Conformity related to the Managed
Lanes Study (MLS), I am providing following background so everyone is on the same page and we are
able to utilize meeting time efficiently. Please feel free to weigh in/clarify if missed anything.
Facts:
· Visualize 2045 (CLRP) includes construction of I-270 Managed Lanes and construction of I-495
I-95 Managed Lanes. (70 miles)
· The 2021-2024 TIP includes planning activities in support of the Traffic Relief Plan (TRP) Phase
1, which will implement express toll lanes along I-270, between I495 and I-70, and I-495,
between the American Legion and Woodrow Wilson bridges. (70 miles)
Managed Lanes Study:
· The MLS limits are I-495 from GWMP to MD 5 and I-270 from spurs to I-370 for a total of 48
miles.
· The MDOT SHA recommended preferred alternative (RPA) is a 14 miles from GWMP to spurs
and I-270 from spurs to I-370.
With above background, FHWA Is assessing whether we have a significant change in design concept
and scope (for RPA) within the meaning of the conformity regulations that would require
amendment to the CLRP and TIP including AQ conformity.
MDOT has submitted changes to their traffic relief plan to bring them in line with RPA and for future
studies (see attached pdf). FHWA approval of updated Visualize 2045 is anticipated in Fall 2022 (see
attached Word document). This schedule does not work for the MLS, as MDOT SHA is seeking a ROD
in April 2022.
At yesterday's meeting with MDOT SHA, we had discussed if MLS's design concept and scope has
changed significantly (from what is in the plan and program) within the meaning of conformity
regulations that would require amendments. We discussed following options:
1. Cecilia will check in with EPA for any flexibility
2. Assuming there is no flexibility found, the SHA and its consultants would talk to TPB about a)
whether to include the 14 mile new RPA in the 2022 TIP update (scheduled to start today and finish
in June which could delay the ROD); or b) do a simultaneous TIP amendment with the 2022 TIP
update (described yesterday as a difficult, confusing, and expensive option).
Option 1: Cecilia spoke with EPA and their interpretation is same as FHWA. They are planning to
meeting internally to see if there is any flexibility.
Option 2a): Attached letter suggest that MDOT SHA has requested to include 14 mile new RPA in
2045 Visualize and 2022 TIP (I think) updates. This option does not address MLS ROD schedule.
Option 2b): See below. To be discussed with Sandra.
Other questions:
· TRP is in 2021-24 TIP for planning only. Was TRP included in AQ conformity of Visualize 2045?
· Was TRP project included in AQ conformity of 2021-24 TIP?
MLS AQ Conformity Internal Meeting Information
Wednesday, May 19, 2021 3:05:29 PM
05192021_-_Item_5_UPDATED_-_MDOT_RPA_letter.pdf
Visualize 2045 Update Schedule.docx
```

· Even if the TRP was part of AQ conformity of Visualize 2045 and 2021-24 TIP, would regulation require to amend the TIP & Visualize 2045 and re-do conformity for 14 mile RPA?
· If yes, would TPB consider doing amendments to current TIP & Visualize 2045 simultaneously with the updates?
· What are other options considering MDOT SHA is seeking a ROD in April 2022.
Jitesh

00146295

Message

---

**From**: Alan Whittemore [atwhittemore@gmail.com]
**Sent**: 5/26/2021 7:54:12 PM
**To**: amoss@dovetailcrg.com; Matt Manning (Consultant) [MManning.consultant@mdot.maryland.gov];
mtawney@dovetailcrg.com; gewatson3d@aol.com; reckerlin@nvcc.edu; srsheffield@comcast.net;
lwadams4@gmail.com; Dove, Carla [DOVEC@si.edu]; Dorr, Laurence [dorrl@si.edu]; pgilleve@gmu.edu;
alma.solis@usda.gov; Wagner, Warren [wagnerw@si.edu]; WOODMANN@si.edu; jlawrey@gmu.edu; Rod Simmons
[rod.simmons@alexandriava.gov]; Robert Soreng [sorengrj@gmail.com]
**Subject**: Plummer's Island history
**Attachments**: Plummers Island lichens Science 1971.pdf

Dear Adriana et al.,

Rob has given you some recent studies of lichens and air pollution, but I believe that the attached paper, published in the journal Science in 1971, is the one that played a key role in convincing Congress to pass the 1973 legislation phasing out tetraethyl lead as a gasoline additive.

I just sent an email with a zip attachment. If that doesn't reach you, please let me know.


Yours truly,
Alan Whittemore
atwhittemore@gmail.com

# Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution

Abstract. *Growth rates were significantly suppressed in juvenile thalli (less than 0.1 square millimeter in initial size) of the saxicolous lichen* Pseudoparmelia baltimorensis *from a Potomac River island with high atmospheric lead burden as compared to the case for a similar island with a lower lead burden. However, larger thalli showed no significant changes in growth response as a result of atmospheric pollution stress. Disruptions in lichen growth thus appear to affect life stages when growth is most rapid and food reserves are low. Once a minimum thallus size is attained, the stress tolerance of the lichen increases.*

The competitive ability of a lichen population in any habitat is related to the establishment and growth rates inherent in the individual lichen population and to the level of tolerance exhibited by the population to various kinds of disturbances. Because many species of lichens are long-lived and exhibit a wide range of tolerances to natural and man-caused environmental stresses, they are often used as indicators of environmental quality.

We report here the results of a 5-month study of the growth of thalli of the saxicolous foliose lichen *Pseudoparmelia baltimorensis* (Gyel. & For.) Hale on two Potomac River islands which exhibit significant differences in the atmospheric pollution burden. We found that juvenile thalli exhibited significant reductions in growth and mature thalli exhibited no growth changes due to pollution stress. These results suggest that stress tolerance commonly associated with lichen populations is a characteristic only of slow-growing mature lichen thalli.

The study areas were two Potomac River islands, Bear Island and Plummers Island, Maryland. Plummers Island is located immediately below the Cabin John Bridge which supports the Capital Beltway (Interstate 495) between Maryland and Virginia. Bear Island is located approximately 6 km upstream of the bridge, remote from surrounding highways.

Because of the close proximity of the two islands and the fact that the habitat conditions are the same on both, we have assumed that the islands are similar in every detail except for the effects of automobile exhaust. In the time since the Cabin John Bridge was built (1965), the annual mean number of vehicles crossing the bridge has steadily increased (*1*). Because there are no nearby industrial sites or coal-fired power plants to contribute pollutants, the two habitats constitute an experimental system which can be used to study responses of lichens to pollutants in automobile exhaust.

Thalli of *P. baltimorensis* were photographed at monthly intervals at Bear and Plummers islands from April to September 1978. Details of the photographic procedure used are presented elsewhere (*2*). A total of 85 lichen thalli were photographed each month. Most of these thalli were initially 1 mm² or less in surface area.

Increases in thallus surface area were expressed as the percentage of the increase (based on the initial surface area). Using these methods, we were able to compare lichen growth for the two habitats and for different initial thallus sizes (*3*).

Table 1 shows the mean thallus increases observed for thalli of three size classes from Plummers and Bear islands. A significant (P < .05) increase in the mean thallus size was observed for thalli from Bear Island < 0.1 mm² when compared with thalli of the same size class from Plummers Island. No significant differences in growth response from the two habitats were observed for thalli larger than 0.1 mm².

The relationship between the initial



Fig. 1. Thallus increase (in percent) for *Pseudoparmelia baltimorensis* from Plummers Island (□) and Bear Island (●). The regression line indicates the linear relationship between thallus increase and transformed (natural logarithm) initial size data for lichen thalli from unstressed habitats (Bear Island) only. No significant relationship was found for pollution-stressed thalli from Plummers Island.

thallus size and the thallus increase (Fig. 1) is generally a negative exponential one, and natural logarithmic transformations of initial thallus size data exhibit the best fit to regression lines of initial size versus area increase. Thalli from Bear Island exhibit good fit to the regression line calculated. However, thalli from Plummers Island consistently fall below the regression line, an indication that thalli of small size tend to exhibit deviations in growth response as a result of pollution stress. No significant linear relationship between thallus size and thallus growth could be found for the pollution-stressed thalli, an indication that stress effects may influence juvenile thalli to various degrees.

Although Bear Island and Plummers Island are relatively close together, their atmospheric lead burdens are significantly different. Table 2 illustrates the degree to which atmospheric lead has affected *P. baltimorensis* relative to other habitats (*4*). Thalli of *P. baltimorensis* from Plummers Island contain significantly higher (P < .05) concentrations of lead than thalli from Bear Island or Skyline Drive in western Virginia. A comparison of lead concentrations from herbarium samples of *P. baltimorensis* and from recently collected thalli also demonstrates that the lead content has increased since the Cabin John Bridge was built. Background concentrations of lead appear to be relatively high (approximately 200 μg per gram of thallus) in the United States by comparison with lead concentrations in Panama (*5*).

Increased automobile exhaust fallout from the Cabin John Bridge is thus associated with significant increases in the lead content of *P. baltimorensis* thalli from Plummers Island. Thalli from Bear Island are affected only by the normal background fallout.

Lead is an easily measured component of automobile exhaust fallout, and it is used in this study as an indicator of total pollution burden for environmental comparisons of the two island habitats. The growth responses exhibited by *P. baltimorensis* thalli to changes in the pollution burden thus may be due to the effects of a wide variety of pollutants on lichen growth, not only lead. Indeed, lead tolerance in lichens has been shown to be related to the nature of the binding characteristics of lead on lichen cell walls (*6*).

A review of some of the effects of air pollution on lichen growth (*7*) suggests a relationship between lichen growth and air pollution which can be used for bio-

Downloaded from http://science.sciencemag.org/ on April 25, 2021

00146617

Table 1. Increase in the thallus area during a 5-month growth interval for *Pseudoparmelia balti-morensis* thalli from Plummers Island and Bear Island, Maryland.

| Initial thallus size (mm²) | Percent increase* | |
|---|---|---|
| | Plummers Island | Bear Island |
| < 0.1 | 44.9 ± 22.7 (11) | 141.3 ± 30.7 (16) |
| 0.1 to 1.0 | 42.9 ± 8.8 (20) | 47.9 ± 15.8 (18) |
| > 1.0 | 35.7 ± 14.7 (10) | 34.7 ± 8.6 (10) |

*Mean percent increase in the area ± 95 percent confidence intervals. The sample size is given in parentheses.

Table 2. Elemental lead contents observed for thalli of *Pseudoparmelia baltimorensis* collected from various locations.

| Location | Collection date | Lead* (µg/g) |
|---|---|---|
| Plummers Island, Maryland | 1974–1978 | 1131.0 ± 179.3 |
| Plummers Island, Maryland | 1938 | 106.0 |
| Bear Island, Maryland | 1974–1978 | 273.0 ± 50.6 |
| Skyline Drive, Virginia | 1974–1978 | 218.5 ± 100.9 |
| Litchfield County, Connecticut | 1971 | 198.0 |
| Barro Colorado Island, Panama | 1975 | 7.0 |

*Elemental values of the lead mean ± 95 percent confidence intervals (sample size, five). Values without confidence limits are single observations.

logical monitoring of atmospheric quality. Lichens near roads and densely populated areas accumulate lead and other metals (8).

Our study demonstrates in addition that lichens of varying age and size classes exhibit differences in growth responses to environmental stress. Newly established thalli appear to exhibit the greatest sensitivity to environmental disturbances, and experiments designed to study only large thalli may not be as useful as those designed to examine a wide range of thallus sizes.

The relationship between the initial thallus size and the growth rate has been discussed in recent reviews (9). Thallus growth rate has been thought to consist of three phases: (i) a juvenile "prelinear" phase characterized by rapid exponential growth, (ii) a "linear" phase characterized by constant growth, and (iii) a "postlinear" phase during thallus senescence. Proctor (10) has developed a simple model of lichen growth based on the assumption that the relative growth rate is proportional to the area of a thallus in an annulus of constant width within the growth margin. This model predicts that the relative growth rate will be constant after a certain minimum size is achieved.

Our data generally fit this model, inasmuch as *P. baltimorensis* thalli from Bear Island exhibit exponential relative growth rates and juvenile thalli (< 0.1 mm²) exhibit significantly greater increases in relative growth than larger thalli. A comparison of the thallus growth of all thallus size classes from Plummers Island, however, shows no difference in growth between juvenile thalli and all other size classes. Thus, the growth behavior of juvenile (prelinear) thalli of *P. baltimorensis* from Plummers Island suggests that prelinear growth may be suppressed in suboptimal environmental conditions. This would ultimately affect the lichen age-class distribution and the colonization potential in disturbed habitats.

Grime (11) has recently considered evidence for the existence of three primary strategies in plants that are associated with the degree to which competition, stress, and disturbance influence plant fitness. Of these three strategies, stress tolerance was thought to be most characteristic of lichens. Characteristics of lichens that are associated with stress tolerance are slow growth rates, long periods of physiological inactivity, longevity, and opportunism. These characteristics make it possible for lichens to maintain themselves for prolonged periods of time under adverse conditions and to resume activity rapidly when conditions improve.

*Pseudoparmelia baltimorensis* thalli exhibited growth under both high and low lead conditions. Juvenile thalli from high lead habitats exhibited obvious reductions in growth compared to those from low lead habitats. However, only one thallus was found to exhibit measurable growth in both habitats. After thalli achieved a minimum size (approximately 1 mm²), the relative growth rates of thalli from both habitats were not significantly different. These results suggest that the slow thallus growth of *P. baltimorensis* affords mature thalli a certain degree of stress tolerance. Slow growth rates in mature thalli would be dependent upon the accumulation of a minimum food reserve and thus a minimum size. Juvenile thalli, however, exhibited reduced growth rates at a life stage when growth is normally rapid and food reserves are low. These thalli are thus less tolerant of stress and would be expected to exhibit a greater degree of instability in environmentally stressed conditions.

JAMES D. LAWREY

*Biology Department,*
*George Mason University,*
*Fairfax, Virginia 22030*

MASON E. HALE, JR.

*Department of Botany,*
*Museum of Natural History,*
*Smithsonian Institution,*
*Washington, D.C. 20560*

**References and Notes**

1. The annual mean number of vehicles crossing the Cabin John Bridge ranged from 40,000 in 1965 to nearly 100,000 in 1977 (data are from the Maryland Department of Transportation).
2. M. E. Hale, Jr., *Bryologist* 73, 72 (1970); J. D. Lawrey and M. E. Hale, Jr., *Proc. Biol. Soc. Wash.* 90, 698 (1977).
3. We removed much of the subjectivity associated with studies of lichen growth by expressing lichen growth in terms of area increases rather than radial increases. We also expressed growth in terms of the biomass available to sustain growth during the measurement interval. Thus, area increases (in percent) reflect the amount of lichen growth relative to the initial surface area. We determined the differences in growth rate statistically, using a one-way analysis of variance and Duncan's multiple range test.
4. Samples were digested in acid; lead concentrations were determined for all lichen samples by atomic absorption spectrophotometry.
5. The highest reported lead concentrations in lichen thalli (12,045 parts per million, dry weight) were obtained for *Cornicularia muricata* from mine spoil material in the Pennines, Derbyshire, England [D. W. Shimwell and A. E. Laurie, *Environ. Pollut.* 3, 291 (1972)]. Background lead concentrations in England are perhaps lower than those in the United States. Background lead concentrations of approximately 50 to 100 ppm (dry weight) were reported for lichens collected from a rural area in North Yorkshire by M. R. D. Seward [*Lichenologist* 6, 158 (1974)].
6. D. H. Brown and D. R. Slingsby, *New Phytol.* 71, 297 (1972).
7. O. L. Gilbert, in *The Lichens*, V. Ahmadjian and M. E. Hale, Eds. (Academic Press, New York, 1973), p. 443; B. W. Ferry, M. S. Baddeley, D. L. Hawksworth, *Air Pollution and Lichens* (Athlone, London, 1973).
8. M. Saeki, K. Kunii, T. Suzuki, *Bull. Environ. Contam. Toxicol.* 14, 726 (1975); K. Laaksovirta, H. Olkkonen, P. Alakuijala, *Environ. Pollut.* 11, 247 (1976).
9. M. E. Hale, Jr., in *The Lichens*, V. Ahmadjian and M. E. Hale, Eds. (Academic Press, New York, 1973), p. 473; R. A. Armstrong, in *Lichenology: Progress and Problems*, D. H. Brown, D. L. Hawksworth, R. H. Bailey, Eds. (Academic Press, London, 1976), p. 309; P. B. Topham, in *Lichen Ecology*, M. R. D. Seward, Ed. (Academic Press, London, 1977), p. 31.
10. M. C. F. Proctor, *New Phytol.* 79, 659 (1977).
11. J. P. Grime, *Am. Nat.* 111, 1169 (1977).
12. Financial support was provided by the Washington Biologist's Field Club.

21 December 1978; revised 2 February 1979

Downloaded from http://science.sciencemag.org/ on April 25, 2021

00146618



**Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution**

JAMES D. LAWREY and MASON E. HALE JR.

*Science* **204** (4391), 423-424.
DOI: 10.1126/science.204.4391.423

| | |
|---|---|
| **ARTICLE TOOLS** | http://science.sciencemag.org/content/204/4391/423 |
| **REFERENCES** | This article cites 9 articles, 0 of which you can access for free<br>http://science.sciencemag.org/content/204/4391/423#BIBL |
| **PERMISSIONS** | http://www.sciencemag.org/help/reprints-and-permissions |

Downloaded from http://science.sciencemag.org/ on April 25, 2021

Use of this article is subject to the Terms of Service

*Science* (print ISSN 0036-8075; online ISSN 1095-9203) is published by the American Association for the Advancement of
Science, 1200 New York Avenue NW, Washington, DC 20005. The title *Science* is a registered trademark of AAAS.

1979 by the American Association for the Advancement of Science

Message

---

**From:**     Julie Schablitsky [JSchablitsky@mdot.maryland.gov]
**Sent:**     6/15/2021 12:22:14 PM
**To:**       Steve Archer [SArcher@mdot.maryland.gov]
**Subject:**  Re: FHWA input on MLS/Morningstar Cemetery effect determination

Agreed.....if we don't touch cemetery property, avoid all graves, and just chew up some space in our ROW, we are golden..

**JULIE SCHABLITSKY, PHD**
*Chief Archaeologist*
Maryland Department of Transportation
State Highway Administration
Cultural Resources Section
707 N. Calvert St.
Baltimore, MD 21202
410-545-8870 (office)
443-930-2127 (cell/text)

---

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Tuesday, June 15, 2021 12:17 PM
**To:** Julie Schablitsky <JSchablitsky@mdot.maryland.gov>; Caryn Brookman (Consultant)
<CBrookman.consultant@mdot.maryland.gov>; Matt Manning (Consultant)
<MManning.consultant@mdot.maryland.gov>; Richard Ervin <RErvin@mdot.maryland.gov>; Karen Hutchins-Keim
<khutchins-keim@rkk.com>
**Subject:** RE: FHWA input on MLS/Morningstar Cemetery effect determination

Yes, thanks for the clarification.  We specifically discussed that scenario and would have that ability to reassess the
effect and make it adverse if there were remains in the ROW that needed to be relocated.  This all assumes we can
tweak LOD to avoid that suspicious depression, and our commitment to investigate impacted ROW is "clear" once we
get there.

Steve

---

**From:** Julie Schablitsky <JSchablitsky@mdot.maryland.gov>
**Sent:** Tuesday, June 15, 2021 12:11 PM
**To:** Steve Archer <SArcher@mdot.maryland.gov>; Caryn Brookman (Consultant)
<CBrookman.consultant@mdot.maryland.gov>; Matt Manning (Consultant)
<MManning.consultant@mdot.maryland.gov>; Richard Ervin <RErvin@mdot.maryland.gov>; Karen Hutchins-Keim
<khutchins-keim@rkk.com>
**Subject:** Re: FHWA input on MLS/Morningstar Cemetery effect determination

What happens if there are burials from the cemetery in our right of way, and we have to move them to construct
our project?  Historic cemeteries with intact burials (features), from my perspective, contain archaeological
data...Criterion D. The removal and loss of one person's story from what they leave behind (DNA,
skeletal/biological data, burial container/practice, and material goods [clothing, personal effects])is enough to
warrant an adverse effect, I would argue.

I also want to better understand what you all propose to provide the Gibson Grove Cemetry with and without an
adverse effect.  How would it look different?

00147665

This will also need to be approved and understood by Tim Smith/Greg Slater.

Thanks for thorough details, Steve.

Julie

**JULIE SCHABLITSKY, PHD**
*Chief Archaeologist*
Maryland Department of Transportation
State Highway Administration
Cultural Resources Section
707 N. Calvert St.
Baltimore, MD 21202
410-545-8870 (office)
443-930-2127 (cell/text)

---

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Tuesday, June 15, 2021 10:47 AM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>; Matt Manning (Consultant) <MManning.consultant@mdot.maryland.gov>; Richard Ervin <RErvin@mdot.maryland.gov>; Karen Hutchins-Keim <khutchins-keim@rkk.com>
**Cc:** Julie Schablitsky <JSchablitsky@mdot.maryland.gov>
**Subject:** FHWA input on MLS/Morningstar Cemetery effect determination

All,

I discussed with David Clarke the "fork in the road" we are at with the Morningstar cemetery property and where we go with the effect determination, and the risks/benefits/timing that I've discussed with you all. Here's a quick summary:

• David is feeling like this is a NAE to this property based on the minimization/avoidance efforts, and how we have characterized effects to other properties. Building a noise wall next to a historic property with minor take of noncontributing elements is not adverse.

• The PA needs a clear process to deal with the potential for ROW investigation and remains (as we've always assumed) but that is not enough to tip to AE

• FHWA supports the project design elements we have been calling "context sensitive" including the ped path between church and cemetery, and things like potential treatment of the new noise wall on the cemetery facing side, but if we are "not adverse", the 106 mitigation laundry list goes away.

• David felt like some of the issues raised with the property (social justice, etc) are best addressed through NEPA rather than 106 (heads up Caryn, probably need more clarity on that and if it is shared elsewhere in FHWA)

• I passed along that MHT was hesitant about revising the determination and requested the signatories meet and discuss the potential revision to NAE prior to that happening, David agreed that should happen.

• Two possible arguments against a NAE: 1. would be that we need to change the boundary of the property to include both Gibson Grove and Morningstar and look at it more holistically. MHT has already said they should be documented as separate resources, and given that the "church community" and "cemetery community" are not seeing eye-to-eye on things, that seems unlikely to be a consideration. The second was the ongoing invocation of cumulative effects; while guidance on this is not perfectly clear, FHWA looks at it case by case and believes the cumulative impact is more appropriate for resources that see multiple "nibbles" over a shorter period, rather than impacts that occurred prior to NHPA and NEPA being a strong consideration in cumulative assessment.

• Timing wise, we agreed that it would be better for any effect determination revision to come with second draft of the PA rather than our immediate next anticipated step of updated LOD/APE. That will give us time to have the GPR

results, discuss with signatories, etc.  So we will let the AE finding ride for a little while longer to allow things to play out and coordination to occur/continue.

- We talked at some length on the fact that this decision has both regulatory and political implications (lest I be accused of having 106 blinders on), and that a NAE is going to have some strong pushback.  FHWA felt at the end of the day we need to go by the book on 106, be consistent with how we are treating other properties, and continue the dialogue with the cemetery stakeholders about past impacts and "good neighbor" obligations through other venues and means as we have been doing.

- Slightly aside, David said the FHWA attendees needed for the PA comment review meeting with them would be himself, Megan Cogburn, Jeanette, and Diane Mobley as optional, so I'll be getting a schedule poll out on that.  Caryn, I think you should attend but anyone else from the NEPA side we should include from yesterday?

Thanks everyone, that's all the news that's fit to print for the moment.

Steve



**FRIENDS OF MOSES HALL MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**

**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**https://www.friendsofmoseshall.org/**

June 28, 2021

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
**Maryland Department of Transportation State Highway Administration Environmental Planning Division**
707 North Calvert Street
Baltimore, MD 21202

Re:    CRTR – Archaeological Report No. 560 – Comments from Friends of Moses Hall Consulting Party for Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Cabin John, MD

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the supplemental Cultural Resources and Technical Report documentation and archaeological monitoring for the I-495 & I-270 Managed Lanes Study for Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212) dated May 2021 (Archaeological Report No. 560).

Friends of Moses Hall first wish to thank MDOT SHA for your report and efforts to date, including suggested plantings to help curb erosion caused by stormwater runoff and the temporary gate at the Seven Locks entrance that was installed the week of June 21. We also appreciate that MDOT SHA has acknowledged that there is evidence of at least one grave within the existing state right-of-way (Feature 98), warranting additional field investigations, including ground penetrating radar, that are scheduled for completion in early July.

**We share the following comments:**

1. We are honored to announce that the **National Trust for Historic Preservation** has named the Morningstar Tabernacle No. 88 Order of Moses Cemetery and Hall site one of **America's 11 Most Endangered Historic Places of 2021**. It is our hope that this recognition will help call

00148221

national attention to past racial injustice caused by transportation infrastructure projects, and further support our efforts to protect and preserve this important resource.

2. It is our understanding that the planned GPR survey will be limited to the area within the state right-of-way around Feature 98; however, it is also our expectation that this survey will seek to identify the natural boundaries of the cemetery and therefore could also shed light on Feature 96, a clear depression at the fence line between the cemetery parcel and the MDOT SHA ROW. Considering that the cemetery boundaries were identified only by visual inspection for the original I-495 construction and that many graves are unmarked, the discovery of graves within the current state right-of-way is not surprising. Completing GPR for this cemetery represents a minimum standard of care under current archaeological practice to identify burials within the right-of-way.

3. We request information on immediate action that MDOT SHA plans to implement in order to protect potential burials in the state right-of-way. Until further studies are conducted to fully understand the character of Feature 98, the potential impacts to this burial due to mowing, fence repair, or other maintenance activities would be in violation of Section 106 without further documentation and consultation.

4. We wish to reiterate that any impact to the cemetery is unacceptable, including portions of the cemetery already impacted by I-495 (e.g. Feature 98). We note that MDOT crews removed bamboo within the state right-of-way on Sunday, June 27 with no apparent archaeological monitor on site. Further, we point out that ground truthing should remain a methodology of last resort after GPR reports have been reviewed by all parties.

5. Another significant concern relates to erosion at the site. The report states that the soils present in this area are classified as "severe erosion hazard." We note that the report acknowledges erosion caused by clearing of forest cover but does not acknowledge such from I-495 runoff. Why? We have seen first-hand that water runoff from I-495 contributes to the erosion. Further, it is clear that any stormwater measures taken during the 1992 widening of I-495 were insufficient to address erosion caused by highway runoff. We look forward to continued discussions with MDOT SHA regarding actions the state can take to mitigate for past damage and to ensure that erosion does not further compromise the site.

6. A.D. Marble's staff found a casket handle at the site during their fieldwork, which we understood was photographed and catalogued before being handed over to Friends of Moses Hall. We do not see the casket handle mentioned as one of the artifacts found at the site.

7. A. D. Marble did an admirable job reviewing the past history of the site. However, there is a small error when discussing the history of the Gibson Grove AME Zion Church. In Para. 3 on digital page 59 of 313 of the report is the statement: "The Gibson Grove AME Zion Church began in New York City in 1796…." In fact, we believe the authors meant the branch of Methodism called the African Methodist Episcopal Zion church, not the specific church on Seven Locks Road. The statement should read "The *African Methodist Zion Church* began in New York City in 1796….". The same error in church reference occurs in the next sentence.

00148222

8. In addition to the planned GPR survey, MDOT SHA has indicated that a metes-and-bounds or ALTA survey has been completed for the three cemetery parcels. We look forward to reviewing the surveys and any accompanying reports as soon as they are available.

We appreciate your consideration of these comments and look forward to our continued engagement related to the Section 106 process for this project.

Sincerely,

FRIENDS OF MOSES HALL

**Alexandra Jones, PhD, RPA**
Executive Director and Founder, Archaeology in the Community
Trustee, Morningstar Tabernacle Number 88, Incorporated

**Austin E. White**
Descendant
Trustee, Morningstar Tabernacle Number 88, Incorporated

**Eileen McGuckian**
Historian and President, Montgomery Preservation
Trustee, Morningstar Tabernacle Number 88, Incorporated

**Diane E. Baxter**
Descendant

**Montgomery Crawford**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Charlotte Troup Leighton**
Vice President of Advocacy, CJCA

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

**L. Paige Whitley**
Independent Researcher

00148223

cc:     Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.maryalnd.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Carol Rubin, M-NCPPC – carol.rubin@montgomeryplanning.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Natali Fani-Gonzalez, Vice-Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00148224

**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

# Morningstar Cemetery Communications Strategy

## Purpose

- The purpose of this document is to outline a proactive strategy for stakeholder and media engagement around the disclosure of new developments at Morningstar Cemetery. The new developments could attract national media attention and represent a major win for the community, stakeholders and MDOT SHA. After years of collaboration and engagement with the Friends of Moses Hall, the community and other stakeholders, MDOT can announce that the New American Legion Bridge I-270 Traffic Relief Plan (the "Project") will completely avoid the historic cemetery. MDOT SHA will work with the community on preferences and options for protecting, investigating or treating possible interments within state ROW that will not be impacted by the proposed improvements.

## Background

Morningstar Tabernacle No. 88, Moses Hall and Cemetery (Morningstar Cemetery) is a historic site consisting of an African American cemetery and remnants of a community building that was associated with the fraternal organization, Ancient United Order, Sons and Daughters, Brothers and Sisters of Moses (The Moses Order). The Moses Order was a social institution for African American communities during the late 19th and early 20th centuries, an era where services like insurance and education were not equitably available to the black community. One chapter of the Order, Morningstar Tabernacle No. 88, was located in Cabin John, Maryland, an area known as Gibson Grove. The Moses Hall building only exists today as a foundation. Many members of the organization were buried on the property upon their passing. The Order, including this local chapter, cared for its membership by providing burial services and plots, among other services. Many were also members of the historic Gibson Grove African Methodist Episcopal Church (Gibson Grove Church), founded around the same time. The church building is located nearby across present-day I-495.

Today, the Gibson Grove Church is known as the First Agape African Methodist Episcopal (AME) Zion Church at Gibson Grove. Both resources have strong, vibrant advocate/descendant communities who want to preserve this significant portion of Maryland's history and avoid impacts from the highway improvements. The Maryland Department of Transportation State Highway Administration (MDOT SHA) has been working closely with these key stakeholders to address concerns about the Project, and MDOT shares their interest in finding solutions that respect these properties as historic resources and the Morningstar Cemetery as a revered resting place.

[ PAGE  \* MERGEFORMAT ]

00153086



**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

## Key Messaging Overview

- Since early 2020, MDOT SHA has continually met and worked with stakeholders and consulting parties to help Morningstar Cemetery and Gibson Grove Church be identified on the National Register of Historic Places and to avoid potential impacts of possible highway improvements identified in the Managed Lanes Study (MLS) on the cemetery and church in compliance with the National Environmental Policy Act and Section 106 of the National Historic Preservation Act.

> Commented [PJ(1)]: Should this be changed to "...and FHWA has ...."
>
> Commented [CD(2R1)]: Yes add us in

- In July 2021 to further determine how best to avoid impacting these historic and hallowed sites, MDOT SHA had high-resolution ground-penetrating radar (GPR) surveys conducted to detect and map both marked and unmarked graves.
- The surveys identified possible existing burials within and extending outside of the current cemetery property boundary into the MDOT SHA ROW to the north of the cemetery boundary.
- With respect and sensitivity regarding the location of potential unmarked burial sites, MDOT SHA is sharing the results of the survey and possible locations with descendants, other cemetery and church stakeholders and consulting parties.
- In the meantime, the Preferred Alternative -- Alternative 9 - Phase 1 South-- will avoid all impacts to the cemetery due to design refinements that will be detailed in the Supplemental Draft Environmental Impact Study (SDEIS) planned to be published in Fall 2021.
- MDOT SHA will work with the community on preferences and options for protecting, investigating or treating possible interments within state ROW that will  not be impacted by the proposed improvements.
- MDOT SHA will work with the community on preferences and options for protecting, investigating or treating possible interments within state ROW that will not be impacted by the proposed improvements.

## Stakeholder and Communications Outreach Efforts

### Immediate Stakeholder Outreach

- MDOT SHA will share the GPR report and results about the cemetery with representatives from the First Agape African American Methodist Episcopal Zion Church and the Friends of Moses Hall at an in person meeting the week of September 6.
- The same day, MDOT SHA will share the GPR report with the Federal Highway Administration, the Maryland Historical Trust and all other consulting parties.

> Commented [PJ(3)]: Should the GPR report be shared with us prior to sharing it with representatives from First Agape African American Methodist Episcopal Zion Church and the Friends of Moses Hall?
>
> Commented [CD(4R3)]: Nope it's fine we can all get it at the same time

### Media Strategy

- Schedule embargoed interview with Katie Shaver (Washington Post) with Sec. Slater and Julie Schablitsky for Sept. 2 or 3. Story embargoed until the day after the meetings with the stakeholder group and after submission of the report to consulting parties.
- Have approved statements ready to be issued should media or other stakeholders inquire about the GPR results or MDOT SHA's progress on avoiding impacts to the cemetery
- Update website with fact sheet and approved statement

[ PAGE  \* MERGEFORMAT ]



**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

- Additional proactive media outreach could include a press release, social media posts, eblasts.

## MDOT SHA P3 Statement

Throughout the I-495 & I-270 Managed Lanes Study (MLS) MDOT SHA has coordinated and consulted with interested stakeholders on potential impacts to the Morningstar Cemetery in compliance with the National Environmental Policy Act and Section 106 of the National Historic Preservation Act. MDOT SHA's goal has always been to avoid impacts to the Morningstar Cemetery as the agency worked to address some of the nation's worst traffic congestion in the National Capitol Region.

That collaboration led to the cemetery being formally identified as eligible for the National Register of Historic Places. Additionally, MDOT SHA worked with the Friends of Moses Hall and other stakeholders on measures the property in an effort to address invasive vegetation, drainage, access and aesthetics.

~~MDOT SHA can now announce that the New American Legion Bridge I-270 Traffic Relief Plan will have no adverse effect on the cemetery property and avoids potential graves within MDOT SHA right-of-way.~~

As part of MDOT SHA's commitment to due diligence and sensitivity regarding the location of potential unmarked burial sites, In July 2021 high-resolution ground-penetrating radar (GPR) survey was conducted to detect and map both marked and unmarked graves. The survey identified possible burials within and extending outside of the current cemetery property boundary into the MDOT SHA ROW.

MDOT SHA will work with the community on preferences and options for protecting, investigating or treating possible interments within state ROW that will not be impacted by the proposed improvements.

MDOT SHA will continue working with the P3 Phase Developer to further reduce and avoid impacts around the cemetery property during the predevelopment work stage.

## Tough Q & A

### What have MDOT SHA and FHWA done to avoid harm to the Morningstar Cemetery and Gibson Grove Church?

MDOT SHA has held multiple meetings with the affiliated communities in 2020 and 2021 to understand their concerns, priorities, and overall preservation goals for these resources.  As part of our consultation under Section 106 of the National Historic Preservation Act, some of the MDOT SHA efforts taken include:

- Preparing a determination-of-eligibility for the National Register of Historic Places (NRHP) (this step ensures the property must be considered for any federal action that might affect it) for the Morningstar Cemetery.  The Gibson Grove Church had already been through this documentation and determination prior to initiation of the MLS and is eligible for the NRHP.

[ PAGE  \* MERGEFORMAT ]

00153088

**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

- Continued development of a *programmatic agreement*, part of the process of compliance with Section 106 of the National Historic Preservation Act, to resolve adverse effects through consultation among the Federal Highway Administration, MDOT SHA, the Maryland Historical Trust, and the Advisory Council on Historic Preservation, the National Park Service, and numerous other consulting parties, including those affiliated with the cemetery and church.
- Refining the Preferred Alternative design to avoid impacts to the Morningstar Cemetery property that will be detailed in the Supplemental Draft Environmental Impact Statement (SDEIS).
- Working through an extensive legal and fieldwork process to cut down invasive bamboo that had taken over much of the northern part of the cemetery and continuing to coordinate bamboo treatment in MDOT SHA right-of-way with the new Morningstar Tabernacle trustees' efforts to control regrowth.
- Developing detailed physical mapping of visible graves, markers, and other features both within and outside the project area to assist both the MLS planning effort and long-term stewardship of the cemetery.
- Conducting detailed historical research on both properties as part of the same effort.
- Working with stakeholders and other entities such as Montgomery County on pedestrian and other access enhancements for the Preferred Alternative design to help reconnect the Gibson Grove Church and Morningstar Cemetery.
- Assisting the Morningstar Tabernacle Trustees with trash removal, erosion stabilization, and providing a gate to limit undesired access to the cemetery property.
- Commissioning an additional ground penetrating radar survey to identify additional unmarked burials within the cemetery, and the adjacent right-of-way (property which MDOT SHA owns bordering the actual I-495 pavement). The survey also included the Gibson Grove Church property in an effort to help them identify the location of graves (possible grave locations at the church property are not threatened and far removed from any potential MLS impacts).

## What do the results of ground penetrating radar survey mean?

- MDOT SHA is aware that most graves are **unmarked** at the Morningstar Cemetery or had markers that were not permanent and have been moved or lost over time. They are sometimes discernible only as depressions, or not visible at all. Early, unmarked graves from the late 19th century may not have been visible, marked, or remembered by the 1960s. Archaeological studies were not required or common at that time.
- GPR is a remote sensing method used to identify cultural features below the ground such as buried building foundations, artifact concentrations, and human burials.   Within cemeteries, GPR searches for differences in soil compaction and changes, as well as voids created from coffins and caskets.  Since natural features such as tree roots and recent disturbances can cause similar changes in the soil, archaeologists would need to "ground truth" or excavate the soil to investigate in order to confirm any burials.
- The GPR identified a pattern of features that may indicate potential graves exist within a grassy area outside the cemetery property and highway pavement area but within a portion of MDOT

[ PAGE  \\* MERGEFORMAT ]

SHA-owned property. While excavation would be needed to verify the graves, MDOT SHA needs to work with the community on the details, timing, and, importantly, extent of this work.

- With this new information, MDOT SHA will focus its work on engineering and design to avoid the area now identified as containing potential burials. As demonstrated by the project team's collaboration and work to date, it is MDOT SHA's intention to avoid disturbance of human remains to the greatest extent possible. If there are suspected human remains within MDOT SHA's property outside the existing cemetery property, we will work with the community on options for their treatment and stewardship, regardless of whether that property is needed for or impacted by the project

## Will the proposed highway improvements destroy/impact the Morningstar Cemetery?

MDOT SHA identified the need for further research and evaluation of the property in a Section 106 (cultural resources) Technical Report in January 2020. The Draft Environmental Impact Statement (DEIS), published in July 2020 showed approximately 0.3 acre of impact to the current cemetery property. While minimization efforts were incorporated into the six Build Alternatives detailed in the DEIS, additional research efforts to further define the limits of the property and extent of burials were conducted after the DEIS. In response to these efforts and public comments received on the DEIS, MDOT SHA developed an option as part of the Preferred Alternative that completely avoids ground disturbance within the cemetery property boundary and reduced the temporary impact to the cemetery's property to approximately 14 square feet. This option has been shared with the affected communities through consultation.

**Commented [PJ(5]:** I thought elsewhere it said now we are totally avoiding the cemetery. Does this contradict earlier statement?

**Commented [CD(6R5]:** Yes this is problematic as they can't at this time make a commitment for total avoidance until we get farther in design and actually ground truth the archaeology

## Will the proposed highway improvements destroy/impact the Gibson Grove Church building?

No. The historic Gibson Grove Church building will not be affected, although some of the Gibson Grove Church property will likely be needed for temporary construction use and restored after construction. MDOT SHA has been working with First Agape AME Zion Church, its present congregation, to include improvements to the drainage and property that complement and support their ongoing church restoration efforts as potential mitigation for the temporary use of a portion of the Gibson Grove Church property.

## Were there impacts to the Morningstar Cemetery when I-495 was built in the 1960s?

MDOT SHA has looked at right-of-way acquisition, historical photographs, and other state archival files from the late 1950s and early 1960s as I-495 was being designed and constructed. That documentation shows that MDOT SHA took into consideration the location of the cemetery as the original Beltway project was developed. MDOT SHA (at that time the Maryland State Roads Commission [MSRC]) acquired a sliver (0.077-acre, 3,354 square feet) of the Morningstar Tabernacle No. 88 property from its

[ PAGE  \* MERGEFORMAT ]



**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

Trustees for I-495 construction in 1962. In documentation for the transaction, MSRC specifically documented that no graves were believed to be in the area of acquisition. Historic aerial photos show most of the area sold to MDOT SHA (MSRC) by the Morningstar Tabernacle No. 88 Trustees was an access road, north of the lodge building, which would not be expected to be a place for burials. The acquisition documentation, including plats and plans, specifically show the boundaries for the cemetery area as they were understood at that time. MDOT SHA has found no documentation or evidence that MDOT SHA or its contractors disturbed any graves at Morningstar Cemetery during the construction of I-495.

After construction of I-495, the Morningstar Cemetery property was intermittently used for some burials, but the Morningstar Tabernacle No. 88 chapter eventually faded without a sustaining membership. The social landscape and demographics changed and the services it provided were available through other means, and the original community area was divided by the new highway. The Morningstar Tabernacle property ownership also lapsed over time, without passing to successors. The local community made occasional informal efforts to maintain access to the property and provide limited upkeep over the years, but there was no formal successor in ownership. In 2020, the Friends of Moses Hall was organized, and in 2021 new Trustees for the property were constituted.

## Were there impacts to the Gibson Grove Church in the 1960s from I-495?

The Gibson Grove Church building was not directly affected by the construction of I-495, although stormwater drainage features installed for the original Beltway have been an ongoing concern at the Gibson Grove Church property. MDOT SHA is continuing to work with First Agape AME Zion Church to improve the drainage as part of the Preferred Alternative design. While the Gibson Grove Church building was not directly affected, the Gibson Grove community and other similar disenfranchised communities along its path were disrupted by the Interstate that took family farm and home properties, and eventually ran between two of its key community resources, the Morningstar Cemetery and Gibson Grove Church. In part, impacts like these nationwide led to the passage of the National Environmental Policy Act and the National Historic Preservation Act in the late 1960s and early 1970s. These laws now require that federal projects take environmental and historic resources into account in their planning.

Currently, the Gibson Grove Church is in a state of disrepair as a result of a fire in the early 2000s, and First Agape AME Zion Church has been successfully planning and fundraising to restore and rehabilitate the Gibson Grove Church building.

- .

## What are the next steps?

- MDOT SHA and the Federal Highway Administration continue to work with many additional parties on the Section 106 programmatic agreement that will memorialize treatment and consultation for all historic properties adversely affected by the project. This programmatic agreement will be completed before the federal agencies can issue a Record of Decision and, thereby, authorize the project for construction. This is a legally binding document that obligates

[ PAGE  \* MERGEFORMAT ]

00153091



**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional



FHWA and MDOT SHA to complete commitments in the agreement as a condition of project authorization.

- The programmatic agreement will contain detailed commitments on further investigations and treatment of any potential cemetery features, or areas where there may be human remains that might be affected by the Project. These commitments are subject to consultation with the community.
- Once the commitments (investigation and treatment plan) are finalized, MDOT SHA will complete all required steps of the plan prior to any construction impacts occurring. Under no circumstances will MDOT SHA affect graves without full investigation and treatment determined in consultation with the community.

[ PAGE  \* MERGEFORMAT ]



**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

## Appendix: Morningstar Cemetery
## Timeline of Coordination and Efforts

Late 1880s – Morningstar Tabernacle No. 88, a chapter of the Ancient United Order, Sons and Daughters, Brothers and Sisters of Moses is founded. It shares strong community ties with the Gibson Grove African Methodist Episcopal Church. The membership of both organizations is strong through the 1940s but begins to change with post World War II suburbanization and other societal changes

| | |
|---|---|
| 1960s | • MSRC initiates planning and construction of I-495<br>• As part of this, Maryland State Roads Commission (MSRC) purchases property from Morningstar Tabernacle, north of the building and outside the understood cemetery boundary<br>• National Historic Preservation Act of 1966 enacted to preserve historic and archaeological sites in the United States and established the National Register of Historic Places<br>• National Environmental Policy Act of 1969 enacted to promote the enhancement of the environment and established the President's Council on Environmental Quality<br>• Lodge building at Morningstar Tabernacle No. 88 is no longer used, but stands for some time after I-495 construction. Its exact destruction time is not clear. |
| 1970s | • Last known/recorded burials at Morningstar Cemetery |
| 2018 | • Notice of Intent for the Managed Lanes Study Environmental Impact Statement to be prepared in accordance with the National Historic Preservation Act and National Environmental Policy Act<br>• MDOT SHA initiated Consulting Parties coordination in accordance with Section 106 of the National Historic Preservation Act of 1966. |
| 2019 | • On-going design refinements to minimize and avoid impacts to the Gibson Grove Church and Morningstar Cemetery |
| 2020 | • January 2020, MDOT SHA issues a Section 106 technical report identifying Morningstar Cemetery as a resource requiring further evaluation<br>• MDOT SHA in-person meeting with Gibson Grove church leadership in February 2020 |

[ PAGE  \* MERGEFORMAT ]



**Proactive Engagement and P3 Communications Strategy**
Draft–Confidential–Pre-Decisional

| | |
|---|---|
| | • Committed to and began non-invasive field investigations at Morningstar Cemetery in March 2020<br>• Draft EIS published in July 2020 identifying 0.3 acres of impact to Morningstar Cemetery<br>• MDOT SHA conducted on-site drainage and erosion investigations of drainage issues in July 2020<br>• Morningstar Tabernacle No. 88 Moses Hall and Cemetery deemed eligible for National Register of Historic Places by MDOT SHA in August 2020<br>• Virtual Meeting with FHWA, Friends of Moses Hall, and the Maryland Historical Trust in September 2020 |
| 2021 | • MDOT SHA completed vegetation removal (bamboo) in the vicinity of the Morningstar Cemetery and completed historic and archaeological documentation of the cemetery<br>• May 2021, Report documenting the mapped cemetery features and historical information shared with consulting parties<br>• Continued Avoidance and Minimization design efforts<br>• MDOT SHA voluntarily performed Ground Penetrating Radar investigation in the Morningstar Cemetery area to determine the likely presence / absence of burials<br>• MDOT SHA preparing Supplemental EIS |
| *2022* | • *MDOT SHA to publish Final EIS and Record of Decision* |

[ PAGE  \* MERGEFORMAT ]

00153094

**Cooperating Agency SDEIS Comment Review Meeting**
**I-495 & I-270 Managed Lanes Study**
**Microsoft Teams**
**September 1, 2021 @ 2:00 PM**

**Meeting handout**: Agenda

**Agenda:**
- Introductions
- Comments and Response Approach
- Common Cooperating Agency SDEIS Comments
- Next Steps
- Schedule

- **Introductions**
  The Maryland Department of Transportation State Highway Administration (MDOT SHA) provided a brief introduction and overview of the I-495 & I-270 Managed Lanes Study (MLS) items to be discussed during the meeting. MDOT SHA provided a PowerPoint presentation for the discussion and thanked everyone for attending the meeting.

- **Comments and Response Approach**
  MDOT SHA thanked the cooperating agencies for their comments on the Supplemental Draft Environmental Impact Statement (SDEIS). MDOT SHA also explained the purpose of the SDEIS, stating that the SDEIS is intended to consider new information relative to the Preferred Alternative, Alternative 9 - Phase 1 South. Building off the analysis in the existing DEIS, the SDEIS discloses new information relevant to the Preferred Alternative focusing on new information while referencing the DEIS for information that remains valid. MDOT SHA clarified that the SDEIS is not meant to be the final environmental document, and that additional analyses and information on mitigation need to be finalized and will be included in the combined Final Environmental Impact Statement (FEIS) / Record of Decision (ROD). The Maryland-National Capital Park and Planning Commission (M-NCPPC) asked MDOT SHA to provide comment numbers on the errata responses to better align the response with the comment. MDOT SHA agreed to correspond the response to the original comment number.

- **Common Cooperating Agency SDEIS Comments**

  o **Preferred Alternative**
    MDOT SHA reviewed two SDEIS comments as an example of common comments on the Preferred Alternative. The EPA's SDEIS comment detailed that the SDEIS does not sufficiently elaborate on traffic benefits from the preferred alternative of the MLS. MDOT SHA noted that they will be adding additional text on traffic benefits to Chapter 2 of the revised SDEIS. M-NCPPC's SDEIS comment detailed concerns that the Preferred Alternative's limits as described in the SDEIS are not clear enough. M-NCPPC's comment stated that it

00154634

is not clear that improvements on I-495 east of Old Georgetown Road will not be a part of the project. MDOT SHA reiterated that no action will be taken on areas outside of the Preferred Alternative limits (Alternative 9 Phase 1 South), and any such improvements would advance separately, and would be subject to additional environmental studies, analysis, and collaboration with the public, stakeholders, and local agencies. The Federal Highway Administration (FHWA) affirmed MDOT SHA's statement, also stating that a new environmental study would need to be undertaken for improvements outside of the Preferred Alternative limits. M-NCPPC then asked about transit funding commitments that were made as part of the P3 Agreement and whether they would be part of the Preferred Alternative. MDOT SHA stated that these were commitments for funding, not specific projects, and were made separately outside of the National Environmental Policy Act (NEPA) through the P3 agreement.

o **Use of "avoidance" outside of Phase 1 – South**
The EPA, Maryland Department of Environment (MDE) and M-NCPPC provided similar SDEIS comments sharing concerns that counting areas outside of the limits of Phase 1 – South as "avoidance" is not an appropriate use of the term. MDOT SHA stated the MLS study limits have not changed, they remain the full 48 miles from the DEIS: I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including replacement of the American Legion Bridge over the Potomac River, to west of MD 5 and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs, in Montgomery and Prince George's Counties, Maryland. The Preferred Alternative, Alternative 9 - Phase 1 South, includes build improvements within the limits of Phase 1 South only. There is no action or no improvements included at this time on I-495 east of the I-270 east spur to MD 5. Therefore, it is appropriate to state that the Preferred Alternative avoids resources on I-495 east of the I-270 east spur to MD 5. The EPA thanked MDOT SHA for the clarification and noted that they will get back to MDOT SHA with any further questions on this topic. MDE stated that other parts of the SDEIS referenced future improvements would be needed outside of Phase 1 – South and that they will brief leadership on the clarification. FHWA noted that if MDOT SHA decides to move forward with future improvements referenced in the SDEIS, they would be analyzed in a separate environmental study.

o **Environmental Justice Analysis**
The EPA's SDEIS comment on Environmental Justice recognized that MDOT SHA discussed utilizing EJSCREEN data during a previous Environmental Justice Working Group meeting. The EPA comment clarified, however, that they would like to see the SDEIS include EJSCREEN-related information to identify and/or clarify potential population vulnerabilities. MDOT SHA affirmed that the revised SDEIS will include additional information regarding existing conditions data from EJSCREEN and that a separate Appendix with both EPA's and Maryland's EJSCREEN will be included. M-NCPPC's SDEIS comment stated that they believe the SDEIS Environmental Justice analysis is inadequate. MDOT SHA stated that the revised SDEIS will include an analysis of EJ impacts from the Preferred

00154635

Alternative but that the disproportionately high and adverse effect finding and any mitigation will be captured in the FEIS/ROD.   The National Capital Planning Commission's (NCPC) SDEIS comment recommended that the SDEIS be updated with the latest 2020 Census information and MDOT SHA stated that this would be incorporated into the FEIS/ROD.

o **Visual Impact Analysis (VIA)**
NCPC and NPS had similar SDEIS comments stating that the SDEIS lacked analysis regarding visual impacts. NCPC specifically requested that the SDEIS include detailed photo renderings to allow NCPC a better understanding of potential visual impacts. MDOT SHA stated that the revised SDEIS will include additional text on the VIA, and that text is being worked on now under the guidance of FHWA, including completing FHWA's VIA questionnaire. The SDEIS will include this VIA scoping questionnaire as an appendix and will include the results in Chapter 4. MDOT SHA acknowledged that visual renderings and the full VIA, plus mitigation, will be included in the combined FEIS / ROD.

o **Effects of COVID**
NCPC's SDEIS comment related to the effects of COVID recommends that MDOT SHA should continue to monitor traffic throughout the remainder of the MLS as COVID rates are on the rise again and there could be a permanent travel behavior change, as more people change how they live and work.  MDOT SHA reaffirmed that traffic behavior has been and will be monitored throughout the MLS. MDOT SHA pointed out that it will be especially interesting to see how traffic behavior changes in September 2021 as kids return to school and cases of COVID begin to rise again. MDOT SHA also confirmed that revisiting travel demand will be part of any future environmental study.

M-NCPPC's SDEIS comment recommends that a trendline be included on the COVID Traffic Impacts graph to indicate what traffic may have looked like without a public health crisis. MDOT SHA acknowledged that they could add a line to the graph but elaborated that the data may appear insignificant as traffic changes happen very gradually on a year-to-year basis on I-495 and I-270 within the study area because there is little spare capacity for growth (change in traffic from 2019 to 2020 to 2021 without COVID may look quite similar).

The EPA's SDEIS comment recommends clarifying how the alternatives analysis will be potentially updated, considering the results of the "COVID-19 Travel Analysis and Monitoring Plan."  MDOT SHA clarified that the sensitivity analysis conducted as part of the COVID plan will supplement (rather than replace) the results of the analysis completed using pre-pandemic forecasts. The sensitivity results will confirm that the project would still be needed if demand is less than forecasted and demonstrate that the project would still provide operational benefits under that scenario.

MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00154636

o  **Traffic Analysis**
USACE's SDEIS comment about traffic analysis asked why proposed improvements to I-270 beyond I-370 were not included in the traffic analysis model. MDOT SHA answered that the I-270 Pre-NEPA project is an adjacent project covering those limits that will evaluate traffic independently as part of their own NEPA studies. M-NCPPC's SDEIS comment had concerns that "relieving" congestion at the American Legion Bridge (ALB) will not eliminate congestion in total but rather shift it to bottlenecks at the termini of Phase 1 – South. MDOT SHA recognizes that bottleneck shifts may take place but pointed out that there will be a net benefit to the region in the general-purpose lanes, the high-occupancy toll lanes, and the surrounding local roadway network. M-NCPPC stated that MDOT SHA should make changes to signage to direct more people to take the Intercounty Connector (ICC). MDOT SHA stated they are responsive to that feedback, and they have already begun discussions about utilizing dynamic messaging signs to direct more people to the ICC. M-NCPPC also recommended that MDOT SHA continue to look at traffic mitigation measures within the area of Phase 1 South as part of this project.

o  **Compensatory Stormwater Management (SWM)**
M-NCPPC's SDEIS comment on SWM stated they do not feel that suitable potential SWM opportunities should be eliminated due to their location on parkland. MDOT SHA acknowledged that they appreciate M-NCPPC's willingness to host SWM on their parkland, but SWM is considered a Section 4(f) use under regulation when it is part of a transportation project. A use cannot occur unless there are no feasible or prudent avoidance alternatives and MDOT SHA has identified suitable off-site SWM that does not impact parkland. It was noted that stream restoration for water quality credit included in the plan does impact parkland, but this could be considered an enhancement to the Parkland and therefore may qualify as an exemption under Section 4(f). M-NCPPC wanted a larger commitment to SWM in the vicinity of the project and noted any SWM near or on parkland would be a benefit to them. FHWA noted that since M-NCPPC, as the official with jurisdiction, believes that SWM benefits the park, then FHWA is willing to discuss the policy issue with their Section 4(f) experts. M-NCPPC reiterated that SWM on parkland along the project corridor would be a benefit. MDE stated that they would support as many sites as possible along the project corridor.

MDE also recommended that MDOT SHA include an explanation in the SDEIS on how SWM sites are dropped from consideration. MDOT SHA said they will incorporate that, but ultimately SWM sites will be selected based on final design and permitting considerations and would follow the three step SWM approval process as described in the MDE 2000 SWM Manual. MDOT SHA explained that the SWM included in the SDEIS is all preliminary and additional sites are being investigated closer to the project corridor and may be added in the FEIS.

MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00154637

o **Mitigation**

M-NCPPC's SDEIS comment about mitigation stated they feel that the SDEIS does not have enough specificity for Section 4(f) requirements for M-NCPPC to review or comment on a "mitigation plan." MDOT SHA noted that the SDEIS had more detail on mitigation than the DEIS but the SDEIS was not meant to detail the full mitigation plan, as it is a supplement to the DEIS. MDOT SHA further stated that there are many components that make up mitigation that are each in different stages. Historic properties and parkland are still in consultation phases. M-NCPPC recognized that the process is not easy and is time consuming, but that opportunities to mitigate for resources are not abundant so they want to make great use of this opportunity. MDOT SHA acknowledged this and stated that the mitigation process requires feedback on the previously proposed mitigation summary and extensive coordination through the upcoming bi-weekly mitigation meetings. M-NCPPC acknowledged that they owe MDOT SHA feedback on the mitigation summary and that they will provide it shortly.

NPS's SDEIS comment asked MDOT SHA to be clearer in the revised SDEIS that MDOT SHA has the responsibility for mitigation. MDOT SHA noted that the combined FEIS / ROD will serve as MDOT SHA's commitment to mitigation measures.

NCPC noted that they been researching ownership of Capper-Cramton Act parks and will let MDOT SHA know when they have completed the effort. MDOT SHA thanked NCPC for their work and asked them to let MDOT SHA know the results of their research. FHWA also thanked NCPC for the research and asked NCPC to setup a meeting with counsels once they have the results.

• **Next Steps**

MDOT SHA noted they are working to address all comments on the SDEIS and intend to have the final version of the SDEIS sent to FHWA by September 10th for prior concurrence from the FHWA headquarters office. The SDEIS, including the errata table of comments with responses, is anticipated to go out to cooperating agencies on September 27th. The final SDEIS will be published October 1st and have a 45-day comment period. One virtual public hearing will take place on November 1st, broken up into two sessions. The hearings will be livestreamed. Additionally, comments will be accepted via email, comment form, letter, and voicemail.

• **MLS Schedule**

MDOT SHA detailed the upcoming dates of the MLS. From October through December MDOT SHA will finalize analyses, limits of disturbance and mitigation. The Draft FEIS / ROD is anticipated to completed in early 2022, which will be sent to FHWA and cooperating agencies for initial review. M-NCPPC added that sometime during this timeline the project is required to go through M-NCPPC's mandatory referral process over the Preferred Alternative. MDOT SHA said they will take cue from M-NCPPC on how to coordinate and initiate that process.

00154638



- **Other Questions/Comments**
  NCPC stated they will need to coordinate with MDOT SHA about project submission to NCPC as well. M-NCPPC stated that Carol Rubin will be retiring effective October 1, 2021 and that Debra Borden will be assisting with Montgomery County coordination. Steve Aldrich and Matt Harper should be copied on all correspondence until a replacement is named.

MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

00154639



### Attendance

| Name | Agency | Email |
|------|--------|-------|
| Angus Welch | EPA | Welch.angus@epa.gov |
| Timothy Witman | EPA | Witman.timothy@epa.gov |
| Megan Cogburn | FHWA | megan.cogburn@dot.gov |
| Christopher Hansen | FHWA | christopher.hansen@dot.gov |
| Jeanette Mar | FHWA | jeanette.mar@dot.gov |
| Jitesh Parikh | FHWA | jitesh.parikh@dot.gov |
| Andrew Bossi | MCDOT | Andrew.bossi@montgomerycountymd.gov |
| Steve Hurt | MDE | Steve.hurt1@maryland.gov |
| Andrew Bing | MDOT SHA | abing@kramerassociates.net |
| Caryn Brookman | MDOT SHA | CBrookman.consultant@mdot.maryland.gov |
| Jeffrey Folden | MDOT SHA | Jfolden1@mdot.maryland.gov |
| Emily Hill | MDOT SHA | ehill@nmpengineering.com |
| Karen Kahl | MDOT SHA | kkahl@rkk.com |
| Neil Leary | MDOT SHA | nleary@wrallp.com |
| Michael Lynch | MDOT SHA | mlynch@nmpengineering.com |
| Erron Ramsey | MDOT SHA | eramsey@rkk.com |
| Jeff Roberta | MDOT SHA | jroberta@rkk.com |
| Tyler Ruth | MDOT SHA | tyler@blackwaterenvironmentalgroup.com |
| Matt Snare | MDOT SHA | msnare@rkk.com |
| Stacy Talmadge | MDOT SHA | stalmadge.consultant@mdot.maryland.gov |
| David Thomas | MDOT SHA | dthomas6.consultant@mdot.maryland.gov |
| Stephen Aldrich | M-NCPPC | Stephen.aldrich@montgomeryplanning.org |
| Rebeccah Ballo | M-NCPPC | rebeccah.ballo@montgomeryplanning.org |
| Jordan Baucum-Colbert | M-NCPPC | Jordan.baucumcolbert@mncppc.org |
| Debra Borden | M-NCPPC | Debra.borden@mncppc.org |
| Matthew Harper | M-NCPPC | Matthew.harper@montgomeryparks.org |
| Jacqueline Hoban | M-NCPPC | Jacqueline.hoban@montgomeryparks.org |
| Erin McArdle | M-NCPPC | erin.mcardle@montgomeryparks.org |
| Carol Rubin | M-NCPPC | Carol.rubin@montgomeryplanning.org |
| Douglas Stephens | M-NCPPC | Douglas.stephens@montgomeryparks.org |
| Anne Schuyler | NCPC | anne.schuyler@ncpc.gov |
| Diane Sullivan | NCPC | Diane.sullivan@ncpc.gov |
| Michael Weil | NCPC | Michael.weil@ncpc.gov |
| Laurel Hammig | NPS | Laurel_hammig@nps.gov |
| Joe DaVia | USACE | joseph.davia@usace.army.mil |
| Jack Dinne | USACE | john.j.dinne@usace.army.mil |
| Abraham Lerner | VDOT | Abraham.lerner@vdot.virginia.gov |

 

# I-495 EXPRESS LANES
# NORTHERN EXTENSION (495 NEXT)

 
### STATE HIGHWAY ADMINISTRATION

## NEW AMERICAN LEGION BRIDGE
## I-270 TO I-70 TRAFFIC RELIEF PLAN

**Fairfax County Board of Supervisors
Transportation Committee Meeting**

September 28, 2021

# Meeting Agenda

- **VDOT 495 NEXT Project**
  - Environmental and Agency Approvals
  - Stormwater Management and Stream Restoration Commitments
  - Design Refinements
- **MDOT New American Legion Bridge I-270 to I-70 Traffic Relief Plan**
  - Project Overview
  - Phase 1 Predevelopment
  - Project Elements in Virginia
- **Coordination between Maryland and Virginia**
- **Transit Components and Benefits**
- **Next Steps**





 Virginia Department of Transportation     2     

00155110

# Environmental and Agency Approvals

### Federal Highway Administration

- Environmental Assessment / Feb. 24, 2020
- Revised Environmental Assessment Published May 2021*
- Interchange Justification Report June 14, 2021*
- Finding of No Significant Impact June 29, 2021*

### National Park Service

- Section 106 No Adverse Effect Concurrence April 29, 2020
- Section 4(f) Temporary Occupancy and *De Minimis* Impact Determination Concurrence May 6, 2021*

- Section 4(f) Temporary Occupancy and *De Minimis* Impact Determination Concurrence May 12, 2021*

- HOT Lanes Designation / April 20, 2021*

### Virginia Department of Environmental Quality

- Approval for Virginia Stormwater Management Program regulations / Jan. 28, 2019

*Approvals have occurred since October 2020 Public Hearing

  Virginia Department of Transportation

3



# Stormwater Management and Stream Restoration Commitments



- Improve quality and quantity of water leaving the 495 NEXT project area

- Improve plunge pools at four outfalls along Scotts Run stream

- Transurban to provide $1.387M to Fairfax County for restoring approximately 3,000 linear feet of Scotts Run

- Stabilize stream banks at two locations along Scotts Run to improve conditions



 Virginia Department of Transportation  4 

00155112

# Design Refinements
## Georgetown Pike Interchange

**Revised Georgetown Pike interchange ramps configuration:**

1. Channelized free-flow right-turn from westbound Georgetown Pike to northbound I-495

2. Acceleration and merge lane with increased merge distance on northbound I-495 on-ramp

**Revised Georgetown Pike overpass typical section:**

3. Wider bridge with six-foot-wide sidewalk on north side of bridge

4. Trail connection to Scotts Run Nature Preserve



VDOT | Virginia Department of Transportation    5    495 ExpressLanes NORTHERN EXTENSION

00155113

# Design Refinements
## Lewinsville Road Bridge and Timberly South Area

- Additional rectangular rapid flashing beacon and high-visibility crosswalk across Lewinsville Road at Timberly Lane intersection

- Revised trail terminus alignment and additional improvements to sidewalk on Lewinsville Road Bridge and along Lewinsville Road between Snow Meadow Lane and I-495





 Virginia Department of Transportation

6



00155114





Jeff

Construction will start at the ALB and move up I-270 in sections.
MDOT SHA is not currently pursuing any permits or procurement on the rest of the beltway east of I-270 at this time.

Phase 1 is the immediate focus of the P3 program.

 MDOT MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

## Challenges Phase 1 Will Solve

- Need for a new American Legion Bridge
  - ○ Replacing bridge deck/structural repairs or full bridge replacement is needed in the next decade
  - ○ Construction/traffic impacts will be similar for replacing the deck or full bridge replacement
- Need for new travel options on the most congested and unreliable freeways in Maryland - Wider bridge alone does not relieve congestion or provide options for carpools
- Lack of Transit Opportunities and Connections - No opportunities for reliable suburban transit services due to congested interstates
- Barriers to Bicycle and Pedestrian Connections
  - ○ No connection across American Legion Bridge linking trails in Virginia and Maryland
  - ○ Barriers created by interstates – missing important connections across the highways



   

9



MDOT MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

## Benefits of HOT Lanes

- All Travelers on the Highway and Local Road Network Benefit from HOT Lanes
  - ○ HOT lanes improve highway operations and provide the driving public, as well as transit riders and carpoolers, with reduced congestion, trip reliability and improved safety.
- Transit Users will receive Benefits of increased Reliability and Congestion Free Trips.
  - ○ HOT lanes can significantly improve transit travel times and transit system reliability that have limited regional express-bus services utilizing the congested general-purpose lanes.
- Carpoolers of three of more can also use HOT lanes for free (HOV 3+)
  - ○ Others with fewer occupants in the vehicle that choose to use HOT lanes will pay a dynamic toll to use HOT lanes for reliable trips with reduced travel time.
- The General-Purpose Lanes will Remain Free
  - ○ Only those who choose to pay a toll for a speedier trip in the HOT lanes will pay the toll.

10



MDOT MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

# Preferred Alternative (PA)

- Announced in January 2021, *Alternative 9 was identified as the PA* based on results of traffic, engineering, financial and environmental analyses and public comment

- After several months of further coordination with and listening to our agencies and stakeholders on Alternative 9 as the PA, MDOT is *now aligning the MLS to be consistent with the phased delivery and permitting approach*

- MDOT and FHWA have identified a *new PA*, <u>Alternative 9 – Phase 1 South</u> to include the same two new HOT managed lanes in each direction as described in Alternative 9 included within the Phase 1 South limits only

- No action at this time on I-495, east of the I-270 east spur

11

Pre-decisional & Deliberative



Caryn-

Read from slide

00155120



Caryn-

MDOT selected this HOT lanes alternative for further analysis because it will incentivize people not cars by providing the option for free-flow travel of bus transit, carpools, and those who choose to pay a toll.

At the same time, all existing general-purpose lanes would remain free as they are today for everyone to use but those lanes will be moving faster

Also, the proposed improvements will benefit local roads.  Our analysis estimates a 5% decrease in vehicle hours of delay on the local roads in Montgomery County.

HOT lanes would also boost ridesharing since vanpools and cars with three or more people could use the HOT lanes for free. This new travel option will reduce dependence on single occupancy vehicles.

Our analysis has found that sections of the highway will increase person throughout during peak hours by up to 50 percent.

Across the river in Virginia, HOT lanes work to manage growth and change behavior:

Carpooling on I-495 has increased 550 percent from opening year to FY 2020.
I-95 Express Lanes move more than twice as many people per lane than the general-purpose lanes.

Here in Maryland, our HOT lanes would provide new opportunities for faster, more reliable suburban transit by providing a fixed guideway in both directions.

This includes transit connections across the American Legion Bridge between Maryland and Virginia and up I-270 that aren't possible today because of the severe congestion, such as Fredrick to Shady Grove, Germantown to Tysons, and Bethesda to Tysons.

We also will be looking at a number of capital improvements during the predevelopment phase that would add station capacity, new bus bays, and park & ride capacity at the key transit centers in the corridor.

Ramp connections are planned to transit and activity centers to improve access to transit hubs, housing and jobs.

The HOT lanes will also be operationally compatible with the Express Lanes on I-495 and I-95 in Virginia – creating a seamless regional network for express travel.

This all will be further detailed in a Supplemental Draft Environmental Impact Statement we are preparing to issue this September, which also will involve a 45-day public comment period and public hearing.

As we advance toward publishing a Final Environmental Impact Statement (FEIS) and seek a Record of Decision (ROD) in Spring/Summer 2022, the predevelopment work we are asking you to approve today will allow us to further reduce impacts on communities, resources and utilities, possibly identify further enhancements and continue to plan and design a better project.



Caryn-

Read from slide



Caryn-

Read from slide

00155124



Jeff

00155125



MDOT MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

# Phase 1 Solicitation: Selected Developer

**Accelerate Maryland Partners, LLC**

- Strong understanding of the project and well-thought-out approaches to manage and mitigate project risks including solutions to further reduce property impacts, reduce potential utility conflicts, and provide environmental stewardship

- Delivery of Phase 1 South (GWMP to I-370) with No Maryland Funding

- Proposed Commitments: Transit Improvements, Community Grant program, Vision Zero Investments, No-Interest Loan Program for Local Fleet Conversions, and Water Quality enhancements*

- Offered: $145m Development Rights Payment; Estimated $5m for Vision Zero during Phase 1 South and estimated at least $300m in transit services for Phase 1 South, $50m in community grants, and $25m for emerging technologies over the operating term*

- Comprehensive Approach to Local Workforce Development including Small, Disadvantaged, and Veteran Owned Businesses; Union and Local Contractor involvement; Engagement with Local Community Organizations and Educational Institutions

*The exact investments would be determined as part of the Section P3 Agreement along with other components to advance final design, construction, financing, operations, and maintenance for 50 years.

17

Jeff



Jeff



Jeff

To access the HOT lanes, we currently anticipate an addition of ramps to access the HOT lanes at I-370, Gude Dr, and Wootton Parkway.
The new Westlake Terrace will only be HOT lanes access, no general purpose lanes access.

00155128





00155130



00155131

# Maryland and Virginia Coordination

Maryland Governor Hogan and Virginia
Governor Northam announced historic **Capital
Beltway Accord** in November 2019.

**Key Elements:**

- Provide a new American Legion Bridge and new
  bicycle and pedestrian access to connect trails on
  both sides of Potomac River.
- Final agreement will define how Maryland and
  Virginia projects will "interface" including:
    - Design and construction requirements
    - Operations and maintenance roles
    - Seamless regional dynamic toll lane network
      with each state operating its system
      independently



 

23



## Transit Components and Benefits

Virginia's 495 NEXT Project and Maryland's New American Legion Bridge I-270 to I-70 Traffic Relief Plan:

Support shared vision for multimodal transportation solutions.

Create new opportunities and greater incentives for buses, carpools, and other transit use through express lanes.

Incorporate transit recommendations from joint I-495 American Legion Bridge Transit/TDM Study supporting bus service between Fairfax and Montgomery Counties.

VDOT | 495 ExpressLanes NORTHERN EXTENSION    24    MDOT MARYLAND DEPARTMENT OF TRANSPORTATION STATE HIGHWAY ADMINISTRATION



Caryn

In addition to the congestion benefits of Alternative 9-Phase 1 South, we have also been looking at how a HOT managed lane system would connect people to transit through improved access to Metro, MARC, and bus stations and provide new opportunities for transit between suburbs

Over the last two years, MDOT has been collaborating with local transit service providers to find existing or new opportunities for bus transit service on the managed lanes system.

Through this collaboration, 11 new potential transit services were identified that would be supported by the HOT managed lanes infrastructure.

This includes multiple routes on I-495 and I-270 within the Phase 1 limits such as Fredrick to Shady Grove, Germantown to Tysons, and Bethesda to Tysons.

A number of capital improvements would also need to be made to add station capacity, new bus bays, and park & ride capacity at the key transit centers in the corridor, some of which are noted on the slide.

The Transit Coordination Report which goes into much more detail is available for review on the P3 website, and projects an estimated 10,000 new daily transit riders on this system.

00155134

## Virginia's Transit Commitment

- VDOT committed to providing project funding for transit in the I-495 corridor
- Implement the Tyson's / Montgomery County routes proposed in joint I-495 American Legion Bridge Transit/TDM Study:
  - $2.2 million per year for bus service operations
  - $5.2 million for initial purchases of buses
- Working with transit providers and jurisdictions to identify what the options are for providing services across the two counties and for timing of implementation

 Virginia Department of Transportation

26





00155136

# Next Steps

**Continue coordination with Virginia and Maryland**

**Virtual Public Information Meeting – September 29, 2021 (6:30-8:30 p.m.)**

## Virginia - 495 NEXT Project

- Refine design
- Reach financial close with concessionaire
- Conduct right-of-way acquisition and begin construction in 2022

## Maryland New American Legion Bridge I-270 to I-70 Traffic Relief Plan

- Publish Supplemental Draft Environmental Impact Statement / October 1, 2021 (45-day comment period closes November 15, 2021)
- Hold Public Hearing / November 1, 2021
- Publish Final Environmental Impact Statement and Record of Decision / Spring 2022
- Complete predevelopment work and finalize Section P3 Agreement / Summer 2022

  28  



**I-495 EXPRESS LANES**
**NORTHERN EXTENSION (495 NEXT)**
495northernextension.org

**NEW AMERICAN LEGION BRIDGE**
**I-270 TO I-70 TRAFFIC RELIEF PLAN**
495-270-p3.com

00155138

Gibson Grove Gone But Not Forgotten: The Archaeology of an African American Church

By

Alexandra Jones

A dissertation submitted in partial satisfaction of the

requirements for the degree of

Doctor of Philosophy

in

Anthropology

in the

Graduate Division

of the

University of California, Berkeley

Committee in charge:

Dr. Laurie Wilkie
Dr. Rosemary Joyce
Dr. Ula Taylor

Spring 2010

00155831

00155832

Abstract

Gibson Grove Gone But Not Forgotten: The Archaeology of an African American Church

By

Alexandra Jones

Doctor of Philosophy in Anthropology

University of California, Berkeley

Professor Laurie Wilkie, Chair

The history of the African American community in Cabin John, Maryland has never been fully explored until the community's oldest church burned down. From the ashes, came the story of a resilient community which began in the 1880's and still exists today. Gibson Grove A.M.E. Zion Church Archaeological Project began as project to help a church rebuild its structure after a terrible fire. Utilizing a collaborative approach the project became a community archaeology project. This resulted in integrating various segments of a community that had previously limited contact with each other.

The archaeology did not yield the initial research goal results, but the information which was revealed was far more informative. The information lead to new research queries which in turn changed the direction of the project.  The information obtained also gave a voice to the previously silenced African American community in Cabin John, thus illuminating their contributions to the development of Cabin John.

# TABLE OF CONTENTS

List of Tables ……………………………………………………………… ii
List of Figures………………………………………………………………… iii
Chapters
   1. Introduction………………………………………………………… 1
   2. Regional Context…………………………………………………….5
   3. Archaeological Investigations at Gibson Grove…………………………….17
   4. Public Archaeology and Gibson Grove…………………………………...32
   5. Silences Revealed Cabin John's African American Community……………….42
Epilogue………………………………………………………………………55
Bibliography…………………………………………………………………..57
Appendices
   Appendix A.  Level and Feature Descriptions……………………………...64
   Appendix B.  Shovel Test Pit Records……………………………………...67
   Appendix C.  Master Artifact Catalogue…………………………………....72

00155834

## LIST OF TABLES

**3.1**  Phosphorus Test Results
**3.2**  Artifact Distribution

# LIST OF FIGURES

**2.1**  1913 Map of Cabin John
**2.2**  Cabin John Hotel
**2.3**  Cabin John Park Brochure
**3.1**  Map of Gibson Grove Church property
**3.2**  Elevation Map of Gibson Grove Archaeological Site
**3.3**  Map of Gibson Grove Archaeological Site
**3.4**  Current Picture of the site
**3.5**  Picture of the tree and root system on north side of the church
**4.1**  Cemetery Clean Up
**4.2**  Community Archaeology Day
**5.1**  Circular Process of Information Gathering
**5.2**  Map of Seven Locks Road 1931
**5.3**  Map of Seven Locks Road 1959
**5.4**  Marion and Sadie Crawford
**5.5**  Financial Card of Grand United Order of Brothers and Sisters, Sons and Daughters of Moses

# Chapter 1: Introduction

The building of black communities and neighborhoods is often forgotten in the histories of cities or towns.  The material traces of the actions of individuals seeking better lives, purchasing land, making homes, founding churches, participating in fraternal associations and creating community are present in everyday landscapes.  Yet, segregation shaped the stories told about post-emancipation life; often silencing African American voices and shaping the ways places are remembered and forgotten.  In Cabin John, Maryland, a thriving African American community grew from the purchase of small plots of land, involvement with the Morningstar Tabernacle #88 (a fraternal association), and the establishment of the Gibson Grove A.M.E. Zion Church. My dissertation explores how the practice of collaborative archaeology uncovered the history of Cabin John's African American community, brought together a once segregated community and in the process, helped the African American members of this community find their voice, which had previously been marginally recognized in the history of Cabin John.

Historical archaeology has long prided itself as a progressive discipline which studies under-documented groups. Deetz (1988:363) writes, "Archaeology's prime value to history lies in its promise to take into account large numbers of people in the past who were either not included in written record, or if they were, were included in either a biased or minimal way". Historical archaeology has been coined as the "field that gives people without a history a voice" (Little 1994:6, Orser and Fagan 1995:37-38).  As LuAnn DeCunzo (1996:3) notes: "Historical archaeologists are combining sophisticated ethnographic analysis of documentary and oral historical data with their anthropologically sensitive excavation and material culture research to produce highly contextualized and nuanced studies of historical sites, neighborhood, and communities." Historical archaeology is the blend of history, science, archaeology, and anthropology interwoven to create a comprehensive view of the material culture being studied. This holistic approach allows historical archaeology to play a unique role in illuminating past events.

There is a "growing awareness on how histories are manipulated for social political ends in the form of invented traditions," (Stahl 2004:52), and as a result, archaeologists "must engage in an ethnography of historical production, tracking power and the production of both silences and mentions in the historical narrative" (Stahl 2004:52). When engaging in community archaeology, critical theorists archaeologists, reflect on what their motivation is for conducting the project and how their personal experiences influence their knowledge base and how it reflects in their interpretations of a site (Leone 1986, Leone et al. 1987, Potter 1994; Wilkie & Bartoy 2000, Palus et al. 2006). Critical archaeologists are keenly aware that "all knowledge serves interests" (Potter 1994:36). In understanding this basic principle, archaeologists acknowledge the social factors that were governing the past and have influence on the present.

The practice of archaeology has moved from "making archaeology meaningful to the public" (Judge, 1989:4) and public benefits (Little 2002) to working directly with communities (e.g., Derry and Malloy 2003, Little and Shackel 2007, Marshall 2002, McDavid and Babson 1997, Shackel and Chambers 2004, Singleton and Orser 2003). This follows a movement in which archaeologists are working to make their research relevant beyond the confines of academia.  Randall McGuire (1994:182) stated, "If we recognize that the pasts we study are the pasts of living communities, then we must also recognize an obligation to serve the interests of these communities."  Thereby archaeologists are addressing issues, such as racism, segregation,

and discrimination (e.g., McDavid and Babson 1997, Mullins 2003); issues that are relevant to communities impacted by the research.

This research began as a result of a fire in the First Agape A.M.E. Zion Church at Gibson Grove.  In 2004, on Ash Wednesday, a fire broke out in the church building (Soladay 2004).  Although the interior of the building was completely destroyed, the exterior survived.  In 2008, the church raised money to renovate the church structure.  However, renovation plans were halted after one of the members of the Gibson Grove A.M.E. Zion Church, a descendant of the White and Crawford families, mentioned that her family had been buried on the church property years earlier. The fact that people might be buried on the church property presented a problem for the new congregation. In order to continue with their renovation plans, the church had to have an archaeological survey conducted on the property. The Gibson Grove A.M.E. Zion Church reached out to local archaeology entities, but they didn't account for archaeological excavations in their renovation budget.  In an effort to meet their needs, I took on the project.

For this project, community refers to the biological descendants of the people who once occupied the sites, as well as present day communities who are interested in or impacted by the research (e.g., Singleton and Orser 2003).   For practical purposes, community archaeology at Cabin John includes three distinct groups: (1) the current Cabin John residents who are African American and European American; (2) the members of the Gibson Grove A.M.E. Zion Church and their descendants, and (3) the members of the First Agape A.M.E. Zion Church.  Each group had a stake in the community's history and each has its own agenda.  The current Cabin Johners are interested in the history of their neighborhood.  The descendants of the Cabin John African American community and the previous members of Gibson Grove A.M.E. Zion Church were interested in the history of the church and their families.  The First Agape A.M.E. Zion Church wanted to gain more knowledge about the land they now occupy and the people, particularly the African Americans, who once lived and worshiped on that land.

I met with the First Agape A.M.E Zion Church community frequently to discuss the project's development and to ask for their input on how it should proceed. I met not only with the church leaders but also with the church body in order to gain an accurate understanding of everyone's desires for the project.  I used their concerns and ideas as guidelines for the development of the research design. Due to the unusual circumstance of the ownership of the property, I wanted the current church congregation to be left with a feeling of pride in the legacy of their new property. Though the church community was the one to reach out for archeological help, they were not the only community members with whom we, the field crew and I, were going to have to collaborate. The White family, whom were descendants of the Crawford family and White family felt moving the skeletal remains of her relatives was of highest priority.  An invitation was extended to the family to visit and/or come out and volunteer with the project any time they wanted. We wanted the members of the White family to feel comfortable with the archaeologists and the work they we were conducting.   In every stage of this research, components were continually added to involve the various communities in the interpretation and outcome of the project. By conducting community archaeology, the communities are no longer the "research subjects" but partners in research process.

Community archaeology at Cabin John consisted of outreach, collaboration, excavations, and public interpretation. Collaboration is a key factor, since archaeologists have an obligation to the archaeological record as well as the communities the research represents. Chip Colwell-Chanthaphonh and T.J. Ferguson (2008:1) state, "Collaboration in practice exists on a

continuum, from merely communicating research to descendant communities to a genuine synergy where the contributions of the community members and scholars create a positive result that could not be achieved without joining efforts  (Ferguson and Colwell-Chanthaphonh 2008:1).  Community archaeology created an opportunity to ask questions which would not have been considered without the input of the communities in the archaeological investigations.

Silence was a key factor in every aspect of the archaeological investigations at Gibson Grove. As a Historical Archaeologist, I expected to find silences in the documentary record and I assumed archaeology would fill the voids. Yet, in the cases of Gibson Grove there were archaeological silences also. The lack of material culture was not the result of poor preservation, decomposition or destruction by human activity. In turn the lack of material culture gave information about how the space and landscape was utilized. The archaeological silence yielded informal and the social life in the past and dispelled presumed assumption of how church landscapes were used in the past. The archaeological silence led to a different set of inquiries around Gibson Grove A.M.E. Zion Church and its role in the social lives of Cabin John's African American community. The inquires transitioned from the normal dialogue of explaining the burials and artifacts to explain the absences of burials and artifacts.

Gibson Grove A. M. E. Zion Church Archaeological Project objective was to recover the bodies of two children that had been buried on the Church property pre-1912. After extensive shovel- test pits and excavations units, no burials were uncovered, but to my amazement the only material culture recovered was nails, glass, siding and concrete. It is believed that the black church served as the center of social life for African Americans communities (Gatewood 2000, Skocpol et al. 2006); however, in the case of Gibson Grove A.M.E. Zion Church, the lack of material culture revealed the church was not the center of the social life. By engaging in an open dialogue with the descendants of Cabin John's African American community, I was able to confirm what the archaeology already revealed the church was not the center of social life. Through conducting the oral interviews, I uncovered the story of Moses Hall and the social history of Cabin John.

My dissertation chronicles the archaeological excavations of Gibson Grove A.M.E. Zion Church Project. Each chapter covers a different phase of the project as it happened. Chapter 2 explores the regional history of Cabin John based on archival documentation. It begins with a brief history of the establishment of the state of Maryland and then focuses on Montgomery County. The chapter explores African American life in post-bellum southern Maryland and how race played a role in the development of Cabin John's African American community.

Chapter 3 addresses the excavations of Gibson Grove A.M.E. Zion church property. The archaeological excavations for the project lasted approximately two months in the summer of 2008. In order to ensure an accurate survey of the church property was conducted, Phase I, Phase II, and Phase III investigations were performed and the investigations yielded no burials. During the excavation information was obtained revealing the burials would have been located in the adjacent property. The neighbor's property was part of the original church property, but was sold some years earlier.

In Chapter 4, I discuss the development of the field of Public Archaeology and how this field influenced the work conducted at Gibson Grove A.M.E. Zion Church Archaeological. Upon the completion of excavations, the public archaeology component of the project began and continued for a year past the excavations. The public archaeology component for the site was carried out in a number of ways: public interpretation, archaeology education, and outreach.

00155839

4

Public archaeology was the medium through which the archaeologists and the community were able to work with each other and collaborate.

In Chapter 5, I reconstruct the history of the ten original African American families based on archives, oral history, and the archaeological investigations. This chapter is a compilation of months of intense research. I weaved together the information to produce the rich history of this community's social, religious and economic past. Their story is that of a resilient group of people who created their own institutions. Living in the segregation town of Cabin John, they had to build, established and maintained their own school, church, and fraternal association (which paid for doctor's visits and burials) in order to thrive and advance themselves and their children.

## Chapter 2: Regional Context

In order to understand the history of Gibson Grove A.M.E Zion Church and the role it played in Cabin John's African American community, the regional context of the site needs to be examined. This chapter will explore the development of Cabin John out of the colony of Maryland, as well as will discuss the politics of race relations in Maryland post-bellum. The chapter will further explain how geography and economics played a role in the development of Cabin John's African American community.

All of the information contained in this chapter was obtained from archival sources. The majority of documents utilized for this chapter came from Montgomery County Historical Society collections. The documents were pamphlets, booklets, or articles written by members of the Cabin John community. The other documentary sources utilized were books which explored the history of Maryland and the District of Columbia.

<u>Location of Cabin John</u>

Cabin John is currently located along the Potomac River within the Bethesda section of Montgomery County, Maryland. It is physically confined by the National Capital Beltway, Cabin John Parkway, and the Potomac River. The area spans about 550 acres and is roughly about four miles up-stream from Washington, DC.

The early settlers of Cabin John were farmers tied to the land and later to the commerce of the Chesapeake and Ohio canal. In the 19th and early 20th century, Cabin John turned into a summer resort area (Wells 2008). The area was established as a suburb to the District of Columbia and a place where people could build their summer homes. It also gave residents the benefit of living close to the city without the hustle and bustle of city life. Cabin John was connected to the District of Columbia by a trolley line which went shuttled between Cabin John and Georgetown (Welles 2008).

<u>Regional History</u>

George and Cecilius Calvert were the visionaries and founders of the colony of Maryland. George Calvert known as Baron or Lord Baltimore, had served the English Crown for several years in various offices. When he converted from the Anglican religion to Catholicism, he stepped down from his position as Secretary of State and requested to retire to private life. Despite his religious conversion, King James I held him in high regard and insisted that he take a position on the Privy Council and gave him the title Baron Baltimore of Baltimore in the County of Longford in Ireland (Russell 1907).

Lord Baltimore observed the practice of establishing British colonies in the Caribbean Island and the colony Virginia and longed to establish his own colony. He wrote a letter to King Charles I requesting a grant for the colony of Maryland in the New World. Lord Baltimore was granted the request; however he died on April 15, 1632 before the charter passed the Great Seal (Russell 1907, Andrews 1933). Cecilius Calvert, being the eldest son of Lord Baltimore and his heir became as the second Lord Baltimore. The charter for Maryland was granted on June 20, 1632 to the second Lord Baltimore and the founder of Maryland.

Before the Europeans migrated to Maryland, the area now known as Cabin John was inhabited by the Native American groups: Susquehannah, Piscataway and Seneca. The first group of European settlers landed in March of 1634 and established St. Mary's City. The settlers

to Maryland were families and single men driven by the purpose of establishing wealth. The settlers were also from various religious backgrounds such as Catholic, Episcopalian, Presbyterian, Quaker and Jewish; making Maryland the first British colony to practice religious tolerance. (Russell 1907).

Father Andrew, a Catholic priest appointed by the Calvert family to accompany the first settlers, became very instrumental in Maryland's negotiations with the Native Americans in Maryland. Father Andrew learned various Native American languages in order to communicate with the inhabitants of the cities established by Maryland settlers. Father White developed a close relationship with the head chief of the Piscataway Native Americans, Kittamaquuad and also established good working relationships with other Native American groups in that region. In 1742, the Maryland Legislature paid 300 pounds to the Native American confederacy; and in return the Native Americans relinquished their claims to their territories within the Maryland boundaries (Armstrong 1947).

The settlement slowly grew into other villages and towns. Maryland's economy was based on the growth and export of tobacco. Maryland was it was not subject to the restrictions and export taxes placed by the King on the others colonies because it was a proprietary colony of Lord Baltimore. Thus, Maryland was able to trade freely with whomever it pleased, which added to its economic development. Most of the colonists lived on tobacco plantations and the colony had very little urban growth (Russell 1907).

As the population of Maryland grew, the province had to be subdivided into counties. In 1695, the Maryland Assembly created its tenth county known as Prince George County. Prince George County comprised of all the land along the upper Potomac River. Moreover, a new county, Fredrick County was created covered the northern portion of Prince George County. In 1776, Montgomery County was also created which formed the southernmost portion of Fredrick County (Armstrong 1947). The newly formed towns of Cabin John and Georgetown were located in the territory of the Montgomery County.

Maryland in relation to the other states, occupied a unique position as a boarder state because it was geographically located in the middle of the northern states and the southern states. As the United States developed from dependent colonies into a unified country economic differences between the agrarian south and the industrial north began to divide the newly formed country. Maryland was a slave holding state that depended on enslaved people's labor to work the farms and plantations in the south and eastern shore; however a considerable number of industries existed in the northern portion of the state that used very limited slave labor.

Maryland, as a slave state, had the second largest free African American population in 1790 and the largest in 1840. Maryland had 62,136 free African Americans residing in the state in 1840 which equaled about 41% of the African American population (Fields 1985). Being that Maryland had such a large free population for numerous decades European Americans had sufficient time to develop their relationships with free African Americans. When African Americans in Maryland were freed on November 1, 1864 the pre-emancipation attitudes that European Americans carried about free African Americans was intensified. "For among the many difficulties black Marylanders confronted was whites' long-accustomed familiarity with and professed contempt for a large and subservient free black population" (Fuke 1999:xix).

Georgetown

In the early 1700's, several planters owned property in the southeastern portion of Fredrick County which later became known as Montgomery County. Tobacco was the staple crop for this area and many land owners earned their living from tobacco sales and export. The large amount of tobacco being grown in the region led George Gordon to petition the Maryland Assembly for a building to store harvested tobacco in 1744. He erected his warehouse the following year and three years later Maryland declared his warehouse as the location for official tobacco inspection station. This area grew naturally as a commercial location and in 1751 George Gordon and George Beall (another large land owner) petitioned to have the area created into a town. On June 8, 1751, the Maryland Assembly purchased sixty acres of land from both men and created 80 lots which became Georgetown, Maryland (Lesko et al. 1991, MacMaster 1966/1968, Robinson and Associates1993, Crane et al. 2006).

When Congress was trying to decide whether to add the land along the Potomac River within the Federal City boarders, "Georgetowners" lobbied for the idea with the understand that this decision would bring Georgetown in Federal City. By 1802, Georgetown was added to Federal City; however they were a independent municipal government with no representation in Congress. In 1871, Congress revoked Georgetown's charter and formally incorporated it to the rest of the District of Columbia, known as Federal City (Beauchamp 1998, Lesko et al. 1991).

The town of Georgetown grew as a result of the lucrative tobacco market and its proximity to the Potomac River. Georgetown functioned as the main port for Fredrick County and Federal City. It also served as the place of transshipment and export for the region beyond the Patuxent and Anacostia. The port received imports from Britain, Europe, and the West Indies and in turn exported tobacco to the same areas (Beauchamp 1998, Ellis 1966/1968).

Georgetown, though its main export was tobacco also developed a reputation around the 1760s for slave trade. Mr. John Beattie established a business on the 3200 block of O Street where he engaged in selling enslaved persons. According to the 1800 Montgomery County census the city of Georgetown had 1,449 enslaved persons and 277 free African Americans out of a total population of 5,120 residents. Slave trading remained a lucrative business until this horrific practice was outlawed by a Congressional Act in 1850. (Lesko et al. 1991).

As a bustling town, Georgetown form of slavery typified other towns of its time period in border states. Many of the enslaved persons had trades and skills and were able to "hire out" their time. The wages paid to them were given to their enslavers. Sometimes, the enslavers gave small allowances for their work. These allowances were sometimes used to buy their freedom and some gained their freedom by manumission (Lesko et al. 1991).

By 1810, the population of Georgetown's African American had grown to 1,161 enslaved persons and 551 free African Americans who lived as part of the town's total population of 4,948 (Lesko et al. 1991). The free population of Georgetown had almost doubled from the 1800 census report. Also the first school for African American children in Georgetown was established by Mrs. Mary Billings in 1810. In 1816, the first church established was called the Meeting House which later changed to Mount Zion United Methodist Church (the oldest African American congregation in the District of Columbia). Between the 1820's and the 1830's, the free African American population grew from 894 to 1,204 dropping and the enslaved population by nearly a third (Lesko et al. 1991).

During the early 1800's Georgetown experienced an economic slump as the shipping business which made it a vibrant port town had diminished. Over the years silt had begun to

build up in the area of the Potomac Channel closest to Georgetown making it impossible to navigate boats through the water. This resulted in minimal activity and trade in Georgetown, and diversion to ports in Alexandria, Virginia or northern Maryland (Crane et al. 2006).

In July of 1828, the Chesapeake and Ohio (C&O) Canal Company began construction work on the canal the same day that the Baltimore and Ohio (B&O) Railroad began railroad. By 1834, a portion of the canal was opened which included lock 7-10 extending to the Cabin John area and continuing through Maryland just short of Cumberland. However, the railroad became the main form of transportation through western Maryland in 1835 because it was able to complete its system quicker than the C&O Canal Company (Robinson and Associates 1993).

By 1860, free African Americans became a thriving part of Georgetown's social setting. The number of free African Americans was in partly because tobacco was becoming less important in this region, resulting in many land owners manumitting their enslaved persons (Robinson and Associates 1993). A large population of African Americas resided in the eastern part of Georgetown known as "Herring Hill", which was home to over 200 African American families (Lesko et al. 1991). Herring Hill represented a small cross section of Georgetown's larger African American community.

On April 16, 1862, the institution of enslavement was abolished in the District of Columbia. This decision was compounded by the large influx of refugees from the Civil War which greatly increased the African American population. Between the years of 1860-1870, Georgetown's African American population increased from 1,935 to over 3,271 (Lesko et al. 1991). This steady population growth also came with an increase in schools and churches. By 1872, there were about 254 schools for African Americans located in the District of Columbia and five African American churches were founded and built in Georgetown by 1897.

Georgetown became a place where African Americans that came out of the ashes of oppression built schools, churches, businesses, and homes. It was a place in the South where African Americans in the early 1900s experienced a community renaissance. The community was thriving and people belonged to social, fraternal and benevolent organizations. They patronized each other's local African American businesses as a community and had their own health care providers; things they did not have access to just 30 years earlier ((Lesko et al. 1991).

Churches and fraternal activities were the center of African American social life (Gatewood 2000:202, Skocpol, et al. 2006). DuBois (1995 [1898]) noted that secret and beneficial organizations were next to churches in importance in African American life. According to Dubois (1995 [1898]:233),

> Their real function is to provide a fund for relief in case of sickness and for funeral expenses. The burden which would otherwise fall on one person or family is, by small, regular contributions, made to fall on the group. This business feature is then made attractive by a ritual, ceremonies, officers, often a regalia, and various social features.

Fraternal organizations collected dues that funded a rich range of social activities, as well as essential services such as medical care, burials, loans, and support for deceased widows (cf., Brackett 1890: 48). National insurance companies systematically discriminated against black people in their policies until the mid-1900s, yet other means of obtaining both life and burial insurance became available to African Americans through fraternal organizations. Paul Mullins (1999) discusses the role of African American fraternal organizations, such as the Masons, in

Annapolis, Maryland.  The Maryland Republic and State Capital Advertiser noted in 1875 that "Nearly every colored man in the south belongs to at least one secret society" ("A Negro Funeral" 1875 quoted in Mullins 1999:86).

According to Gatewood (2000) the number of secret and fraternal societies in the black community multiplied rapidly in the late 19th century.  Being a member of a fraternal organization signified status and position in the African American community (Gatewood 2000). Rivaling churches as community institutions, many black fraternal federations became active in struggles for equal civil rights (Skocpol and Oser 2004). But by the 1920s, fraternal societies and other mutual aid institutions had entered a period of decline from which they never recovered. The many possible reasons for this decline included the rise of the welfare state, restrictive state insurance regulation, and competition from private insurers (Beito 1990).

Cabin John's Origins:  Early Landownership

From the early 1700's until the mid 1800's, only a few families settled in Cabin John and all were large land owners of European descent. In 1715, Captain Thomas Fletchall owned 65 acres on the east side of Captain Johns Run. Later he acquired a parcel of land twice the size on the western portion of the Run and all land became known as "Fletchalls Garden". In 1735, John Read also purchased 100 acres which he named "Reads Delight" and sold it to Joseph White in1784.

Joseph White bought as additional 35 acres adjacent to Reed Delight and named the property "Bite the Bitter". In June of 1973, Thomas Beall acquired a land grant of 25 ½ acres between Fletchalls Garden and Bite the Bitter; the land parcel was referred to as Hallifax. Furthermore, Robert Peter acquired land located next to the aforementioned properties in 1802 and his property was called Carderrock (Armstrong 1947, Offutt 1995).  Consequently, Cabin John developed out of Fletchalls Garden, Carderrock, Bite the Bitter, and Hallifax.

The White family in turn bought the majority of properties from the land owners until they owned almost all of the land in Cabin John.  In 1844, Joseph White inherited the families' properties from his mother and another relative. By 1845 the Whites owned all of the land that later became the main area of Cabin John and Cabin John Park development (Wells 2008).

Post Civil War

By 1864, Mr. White began to sell some of his properties. The properties were mainly sold to three individuals: Thomas Dowling, Joseph Bobinger and Thomas Tuohey.  This resulted in three families determining the future of Cabin John.  Thomas Dowling bought one tract from Mr. White which included a "house and numerous outbuildings" (Wells 2008). Thomas's brother, William Dowling, also bought a piece of land in 1866 for a farm which was later named Graceland. In 1876, Thomas Dowling purchased more land and signed the deeds over to his wife Amanda Dowling (Armstrong 1947). Amanda Dowling acquired her brother-in-law's property and bought other parcels of land until she owned a large majority of the White's properties.

Joseph Bobinger and his wife Rosa moved to Cabin John in 1860. Joseph became the first postmaster for Cabin John; his wife operated a refreshment stand out of their home. She sold cigars, tobacco, candies and other food items to the men that worked on the bridge. She also developed quite a reputation for cakes and chicken dinners.

In 1870, the Bobinger purchased 100 acres of the White's property on the south side of Conduit Road west of Cabin John Bridge stretching from the bridge to the river (Offutt 1995).



Figure 2.1 Map of Cabin John (J.S. Tomlinson 1913: From the collection of Richard Cook)



Figure 2.2  Cabin John Hotel (Tomlinson 1913)

They built a hotel which started as a 25 room structure and quickly spread to a larger building. They bought additional property to expand the business to two large banquet halls, private dining rooms, two lunch rooms, two parlors, a billiard room, a music room, a barber shop, and several bars. The family lived on the top floor and guests were not allowed to stay overnight under any circumstances. As they developed the landscape, they added an elaborate garden in the rear of the hotel so that guests could walk through and gaze upon the river. In 1900, an amusement park was added as well as a merry-go-round and a scenic railway. Joseph soon died leaving Rosa and her two sons to run the hotel. Rosa was known for hiring African Americans to work for the hotel as laundry staff, cooks, and servers. However, the hotel did not serve African Americans (Offutt 1995, Armstrong 1947).

   In 1876, Thomas Tuohey bought 26 ½ acres west of the Bobinger property and south of the aqueduct. Thomas's son, Dennis Tuohey also moved into the area purchasing a section of the Carderrock property and building a home which also housed their family store (Offutt 1995).

00155847

> Only one room was the store, the rest was house. The big steps out the front that went into the lunch room at the beer joint that was the entrance to the store. Now, that one big lunch room was divided up into three rooms. The store was out front; then the dining room; then the kitchen. It was a very small store, but he had a lot stuff packed in there. Where the beer joint had its bar that was considered the parlor. Which was never used. (Offutt 1995:119)

In addition to running the local store and beer joint, the Tuohey family also founded the Cabin John Fire Department (Wells 2008).

In 1880, the bulk of Mrs. Dowling's Carderrock property was sold to J.D.W. Moore. Moore owned all the land east of her 600 acre property. Where he operated a large farm and quarry for which he employed a number of African Americans.

Cabin John's African American Community

Robert and Sarah Gibson were the first African American family to purchase land in Cabin John. The Gibsons were enslaved in Rappahana, Virginia on a plantation about 10 miles from Bull Run Creek. Sarah worked as a seamstress, while her husband worked as wagon driver. The couple worked in the field when they were done with their other jobs (Gibson Grove A.M.E. Zion Church [GGC] n.d.: a, Young n.d.). The Gibsons escaped enslavement when the Union soldiers rode through plantations at the end of the Civil War ordering enslaved persons to leave. Sarah is quoted saying on that day her family left the plantation, "slaves feared these soldiers on their rearing bucking horses, as much as they feared their master…human beings were running helter skelter, not knowing whether to obey the soldiers or run to their master" (Young n.d.:1). In the frenzy, her husband, experience the same situation on the other side of the plantation, was unable to reach Sara and the children before they left the plantation. Robert was left not knowing where to search for his family (Young n.d.).

Sarah and her children walked for miles heading north towards Washington City. By night fall, they found themselves at Bull Run Creek surrounded by other people in the same situation all scared to cross the creek (Young n.d, GGC n.d.:b). Sarah is quoted saying, "the creek was running red with blood from those that lost their lives in the battles" (Young n.d.:1). Mrs. Gibson had always looked to God for guidance and according to her, "This was the time for a little talk with Jesus" (Young n.d.:1). She asked for strength to carry on and make it over the creek safely. Holding one child in each arm for balance she crossed the creek reaching the other side safely (Young, n.d.)[1].

There was an African American church located in DC called Shiloh Baptist Church located on 18th and L street N.W. Shiloh Baptist Church did not just serve as a place of worship for African Americans; it was also a place to find their family and friends who were separated during enslavement. The Gibsons were able to reunite after ten years of time apart at the church (Young n.d., GGC n.d.:a). The Gibson family moved to Maryland to work and hired themselves out to Frank Dallon who lived on Cinnamon Tree Road not far from Potomac, Maryland. During

---

[1] The story of the Gibson's escape from slavery was a written account of an oral account told to Thelma Young by her aunt Sarah Gibson.

the sixteen years of working for Mr. Dallon they saved their money in order to buy a property in Cabin John.

In 1880, Mr. and Mrs. Gibson entered into an agreement with Mrs. Amada Dowling to purchase her portion of Carderrock (Montgomery County Circuit Court [MCCC] 1880). However, Ms. Dowling pulled out of their agreement and sold that same property to J.D.W. Moore during that same year (MCCC 1880).Though  in 1881, Mr. Moore entered into a mortgage agreement with the Gibsons to purchase the Carderrock property from him (MCCC 1881).

It was believed that Mr. Moore created the first subdivision in Cabin John in 1885 by selling plots on Seven Locks Road (Conroy Road) to ten African American families worked for him on his farm (Armstrong 1947, Offutt 1995).  Although Mr. Moore offered five acre of land many did not purchase up to five acres because each plot varied in size and price. For example, Lloyd Jackson bought his two- and- quarter acres for $56 (MCCC 1885: a) and George and Sarilla Scott bought four-and-half acres for $114 (MCCC 1885: b). All of the African American families' properties bordered Seven Locks Road (Conroy Road).

Another family, Charles and Christina Brown, purchased their property from J.D.W. Moore on Dec 21 of 1885 for the $101 (MCCC 1885).  Charles and Christina lived on their property along with their adopted daughter Lena Brown. The Browns operated a small truck farm off of the property.  Mr. Henry Brown would take the vegetables and fruits they grew on their property and sell them at the markets in Georgetown. (Kytle 1976).  Christina Brown passed away in the late 1890's and Charles Brown died in 1912 leaving Lena to manage the farm by herself. Lena being unable to maintain the farm by herself let some people stay on the property.

Ms. Lena Brown sought employment in the city to sustain herself and her property by working as a cook for a family and a boarding house in Washington, D.C. (Kytle 1976). However, as her financial situation worsened, she fell behind on her taxes and had many interested buyers tried to but her land for the amount of her back taxes. Eventually she sold the property to the Federal Government in the late 1930s. In the early 1940's, the Federal Government built two subdivisions: one for their European American employees and another for their African American employees of the David Taylor Model Basin.

The African American subdivision of 20 homes was developed on the acquired Brown property. This development brought the second wave of African Americans into the Cabin John community. It further intensified the community's segregated living dynamics as the subdivision was adjacent to the other African Americans homes on Seven Locks Road. This new community was commonly referred to as Carver Road, because of a newly created road that went in a semicircle around the subdivision from one end of Seven Locks Road to other end of Seven Locks Road. The new road was called Carver.

History of Gibson Grove A.M.E. Zion Church

In 1898, Sarah Gibson decided to donate a section of her four and half acres of land in Cabin John, Maryland to the community to build a church. Under the guidance of Reverend Wright, Gibson Grove AME Zion Church was founded by African Americans residents of Cabin John the same year Mrs. Gibson donated the land (Young n.d.).

The church was located on Conroy Road (which is known today as Seven Locks Road) and a log cabin served as the church structure. The cabin was constructed from logs harvested

00155849

from the trees located on Sarah Gibson's property. In honor of her generosity, the church was named after her, Gibson Grove A.M.E. Zion Church. Services were held in this structure until 1923 (GGC n.d.: a).

The church served as the community's place of worship, and a place where wedding and funeral ceremonies were held. Church baptisms were performed in Cabin John creek, located about one-half miles southeast of the church, while winter baptism took place in a smaller creek that ran alongside the Gibson home (Gibson Grove 2006). A section of the property surrounding the church was also used as a cemetery; the last person was buried in 1912 (GGC n.d.:b). It was believed that two or three people were buried there.

In the early 1920's, the congregation decided to build a new church.. The church began to save money and started the building process in 1922. Sarah Gibson's grandson and a few other young men in the church formed a group who were responsible for the church maintenance and the new building project. The pastor was responsible for keeping the money saved towards the church's building project. Sarah Gibson recounted to Thelma Young,

> On the big day, the boy's club hired Mr. Frank Emery and his team to meet them at the lumber yard. The pastor did not show up with the money they had entrusted to him. The hired team waited all day, the pastor has deserted them. Mr. Emery, being a white man, had no pity for them. He charged them for his days service. (n.d.:p. 2)

The money matter was a setback. However, the church recovered from it and completed the new church building in 1923. Revered N.C Stevenson served as the new pastor. It was a modest one room block with an off-center belfry located southwest of the old log cabin. (Cavicchi 2001) The new structure was built into a hill giving it more prominence and stature than the previous log cabin. It became known as the "little white church on the hill" (Gibson Grove 2006). In January of 1929, Mrs. Sarah Gibson the visionary of the church passed away. She was laid to rest in Moses Hall cemetery located adjacent to the church property (GGC n.d.:c).

Under the leadership of Reverend Robert White the congregation took on a $30,000.00 mortgage to modernize the church in 1974. The remodeling updates included: installing central air conditioning and heat, adding indoor restrooms, and built an addition which included a kitchen and dining area. In 1986, Reverend Joseph A. Davis became the new pastor. As one of his top goals he planned to have the mortgage paid off by July 1, 1990. In 1989, an anonymous person offered to pay the remaining balance of $12,000.00 provided their identity remained confidential. The church board voted on accepting the donation and the mortgage was paid off shortly after (GGC 1989).

In 1998, the church celebrated its centennial anniversary and was added to the list of Montgomery County's historical sites. However, the congregation had dwindled to only a few faithful members as they had problems maintaining their membership. Due to gentrification, property tax values rose greatly, thus making it hard for the congregation members to continue living in Cabin John. In 2002, Gibson Grove had its closing ceremony. During the same year, the A.M.E. Zion Church allowed a new congregation to take over the building once occupied by the Gibson Grove A.M.E. Zion Church. The new congregation became the First Agape A.M.E. Zion Church at Gibson Grove. A few members of the former congregation joined the new church after the building renovations were completed and the church was opened for service. On Ash Wednesday of 2004, a fire broke out in the church building (Soladay 2004). Although the

interior of the building was completely destroyed, the exterior was preserved. Ever since, the members of the congregation worshipped at other temporary locations in Cabin John.

Though the African American community in Cabin John remained autonomous, the ten miles proximity to Georgetown helped them maintain a close network and support system with the African American community in Georgetown.

American Land Company

In 1912, J.S. Tomlinson, CEO of the American Land Company, approached Mrs. Dowling about her Cabin John property holding. He offered $50,000 for her property and she sold the majority of her property to the company for them to create the Cabin John Park development (Wells 2008). Tomlinson's vision was to replace the farm land with 600 new homes. In his 1913 sales brochure, Tomlinson advertised the development as, "Conveniently located and especially suited for country homes for business men, Government officials and retired capitalists" (64).

In an effort to attract the "right" people to Cabin John and maintain a community in which others would want to eventually live, Tomlinson had to be very selective about to his potential buyers. As part of his adverting brochure he noted, "To make and maintain a desirable standard for a new community means careful discrimination in many ways. That we may accomplish this is necessary to prescribe certain restrictions in connection with different features of this home building. One of these rules is that a deed or contract will not be made to a colored person" (Tomlinson 1913:42-43). By the time the Cabin John Park was being developed, the African American community in Cabin John was already well established.  Tomlinson would have viewed this section of Cabin John as a threat to his effort to attract the "right" kind of people to Cabin John Park. Thus, the statement quoted in his brochure was to reassure his potential buyers that the risk identified had been mitigated.

Mr. Moore single handedly, intentionally or unintentionally created the first African American community in Cabin John. There are no records which indicate that any of the other large or small land owners in Cabin John sold any property to African Americans.  In 1912, Mr. Tomlinson ensured that no more African Americans moved into the Cabin John area. Due to the European American's resentment of African Americans, the African American community remained segregated and autonomous from the rest of the Cabin John community. The Cabin John African American community never grew beyond the original property bounds sold to them originally in 1885 until 1970.



Figure 2.3 Cabin John Park Brochure (Tomlinson 1913)

00155852

## Chapter 3: Archaeological Investigation at Gibson Grove

In 2008, after being displaced for four years, the church raised enough money to have the church structure renovated.  However, renovation plans had to be halted because Mrs. Dove, one of the former members of the Gibson Grove A.M.E. Zion Church, a descendant of the White and Crawford families; mentioned that her family had been buried on the church property years earlier. The fact that people might be buried on the church property presented a problem for the new congregation. They reached out to several state officials to discuss what steps needed to be taken in order for them to continue with their plans for renovation.  The resolution for this dilemma would prove to be archaeology.

In March of 2008, I was contacted by a District of Columbia archaeologist and asked if I would be interested in assisting with the church project. I agreed to meet with the church leaders to assess the issues and discuss what needed to be accomplished.  I met with the church leaders the following month on April 16th to discuss the work expectations. I conducted a preliminary of survey of the church property and was also taken to the location of the cemetery. The church expressed they had no funds in their budget to hire a CRM firm to conduct the work and they were reaching out to the archaeology community to see if someone would perform the work for them gratis. The only other request was that they needed the work completed by the end of the summer, enabling them to stay on schedule with their renovation plans.

The following week, a grant was secured from the University of California, Berkeley to conduct the archaeological research, and the church was informed that I would conduct the archaeological investigations for the church.

The Case Study

Gibson Grove A.M.E. Zion Church was built in 1889 and then rebuilt in 1923 at the same location (Mower and Cole 1937: Church Records Form, para. 6). The church gave me a copy of a map of the property (Figure 3.1) the map notes three graves on the church property (Page and Huff 1962).  During the initial walking survey of the church property, the First Agape A.M.E. Zion Church liaison mentioned that she had been informed, of two burials were located at the back of the church near a structure which she referred to as a "privy". After I agreed to the project, I was informed that the descendant family of the remains requested they be repatriated into the Moses Lodge cemetery.

In order to conduct archaeological excavations on the site legal permission had to be obtained from the State of Maryland. Since the church is located on private property the State did not have jurisdiction over the excavations, however, I contacted the Montgomery County archaeologist as a common courtesy to inform her of the excavations. In order to exhume remains, permission from the State's Attorney for Montgomery County had to be granted. According to state law, any remains interred longer than 80 years could be recovered by an archaeologist without the assistance of the State's Medical Examiner.

The State's Attorney requested that a letter be placed in the local newspaper notifying the public of the disinterment and a letter noting  the cemetery had agreed to re-inter the remains on their property.  The church placed the ad in the local newspaper, The Gazette; the ad ran for 15 days. First Agape A.M.E. Zion Church and I drafted a letter to the State's Attorney notifying him that we had fulfilled his requirements. The church which was in negotiations to obtain the cemetery property from the descendants of Moses Lodge who also noted that as the cemetery's

representatives, the remains would be buried on the cemetery's property. The State's Attorney for Montgomery County granted us approval to disinter the remains of those buried on the church property in May of 2008.



Figure 3.1 Map of Gibson Grove Church property (Park and Huff 1962)

Phase I

Before excavations were conducted, I went to the Maryland State Archives to obtain and verify background information on Gibson Grove A.M.E. Zion Church. During my archival search, I utilized my limited knowledge of the church, its owners, and Moses Hall to try and locate any information on all three topics. I verified Sarah Gibson lived and died in Cabin John, and her family lived in Cabin John. The census records, however showed that she had a number of children which conflicted with the original oral report and I was given by the Church liaison and written accounts in the church bulletin (GGC n.d.: b). While researching information on the church, I located The Federal Writers' Project of the Works Progress Administration (WPA), 1937 the church series. This work was part of a series of interviews conducted to gather information on the state's African American churches. This series included a section on Gibson Grove A.M.E. Zion Church. In the section of the questionnaire asking about the pervious building it stated, "Previous building stood on the same site as present" (Mower and Cole 1937: Church Records Form, para. 6). In addition, I located information on the Moses Lodge cemetery in the Directory of Maryland Burial Grounds (Genealogical Council of Maryland 1996). The entry on the cemetery identified its location as Cabin John, Maryland and noted the first burial was conducted in 1921. After researching the site and confirming much of the site's history, I set the first week of June as the start date of the archaeological investigations.

During the first week of June, the site was surveyed using a total station (Sokkia SET510) to record and map the site. A comprehensive walking survey of the church and cemetery properties was also conducted. The walking survey of the church property revealed the structure previously mentioned as a privy was simply an old shed. However, there was one cement post protruding out of the ground which indicated another structure preceding the shed, possibly a privy. Upon surveying the church, structure it was uncovered that the church was built on top of the hill and the foundation of the church is propped up on cement posts. None of the structural posts extended into the ground, rather wood siding was built around the cement posts to give the illusion that the building rested upon the ground. It is unclear if the addition of the church was built in the same manner. The south side of the church has a slope of about 70% making it impossible to survey. The state had built Interstate 495 on the property adjacent to the church, under the claim of eminent domain. During the construction of the interstate the land to the south of the church was graded to create a drain ditch. The hill was graded so steep that over time the south side of the church property had eroded leaving very little area to walk.

During the survey, two stones were identified as being of possible interest. The two stones were placed on each side of a large tree in the back of the church. The stones were similar to the head stones observed in the cemetery. This location was noted as a possible location for the burials. The tree would have been a small sapping and it was a much desirable location to bury people than next to a privy (which was the suggested location by the informant).

During this first week, I extended an invitation to Montgomery County's High School Archaeology Club to come out and assist with the survey. For the following two weeks I had a county archaeologist and two high school students at the site assisting with the surveying. A grid was set up across the whole site in a 2 meter by 2 meter pattern. We utilized the total station to record the site and the cross points of the site grid, which would later serve as the shovel test pit locations. Though the site is very small in scale, the process of surveying took two weeks because the students were being trained during the process on how to set up a manual grid with measuring tapes and how to use a total station.

After the site was surveyed the information was brought back and entered into the computer in order to create maps of the site. Figure 3.2 illustrates elevations in the landscape which intended use was to give clues as to where the land may have slight elevations abnormal to the rest of the landscape. Figure 3.3 illustrates the locations of shovel test pits in relation to the church structure. Due to the site's location, small scale, and potentially small grave shafts I made a decision early to conduct non-probabilistic sampling based on .5 meter squares placed every two meters across the entire site. Upon reviewing the elevation map (Figure3.2) there was no anomalies which stood out on the landscape map and the walking survey yielded only one clue as to the location of the burials. Hence, I chose to move forward with Phase II investigations.

Phase II

During phase II numerous methods were utilized to aid the locating of the grave shafts. The process began by exploring non-invasive methods (metal detection and ground penetrating radar) of locating the grave shafts; then slowly utilized more invasive methods (soil sampling and shovel test pits) of testing based on the results of the previous test.

Oral accounts indicated two children had been interred and the map stated three persons had been interred on the church property. There was no documentation stating sex or age of the persons buried; in addition there was no information on how the persons were interred. Without knowing if the bodies were buried in coffins or shrouds; the main objective was to locate the burials in a non-invasive method. Metal detection was a technique utilized to accomplish this goal. If the children were buried in coffins, the detector would pick up any coffin ware used in the construction or decoration of the coffins.

A White's 3900/D Pro Plus metal detector was utilized to survey the site. All of the land surrounding the church was surveyed with the exception of the south side of the church due to the slope of the land. The detector picked up 36 locations where metal was present; those locations were marked with flags. There were numerous metal detections around the shed and along the parameter of the church on the north side.

The metal detection hits did not yield any insightful information or aid in locating the grave shafts. It did backup the information that the church had suffered a fire incident in 2008. The detections around the church were probably mostly nails from the roof shingles that the firefighters removed during the fire (hypothesis proven through later excavations). The shed detections might lead to shafts; however, there was evidence that the shed structure was rebuilt over a previous structure. Thus the detection could also have been as a result of construction debris.

The metal detection did not yield as positive results as presumed. Testing was halted for a week, in order to allow an external University that was interested in using ground penetrating radar (GPR) on burial sites to come and survey the site and the cemetery. Testing stopped on Thursday in order to focus on the cemetery and bring it to a state where GPR could be conducted[2].

---

[2] During my tour of the cemetery with another archaeologist, we noticed approximately 50 graves which we could identify. As we conducted the walking survey there were other graves identified that were hidden under bush and brush. In addition there were newer graves placed on top of older graves. We realized that in order to re-bury the skeletal remains, we would have to identify the burials that were already located in the cemetery. Thus, we arranged a weekend during which volunteers and archaeologists cleaned the cemetery to a state where GPR could be



Figure 3.2 3-D view of Gibson Grove Archaeological Site [3]

conducted. The following week, GPR was supposed to be utilized to delineate the burials in the cemetery. Refer to Chapter 4 for more detail on clean up.

[3]   The map illustrates elevations in the landscape which intended use was to give clues as to where the land may have slight elevations abnormal to the rest of the landscape. The church structure was located in the lower left portion of the map. The x represents the locations of the shovel test pit units around the church structure.

00155857



Figure 3.3 Site Map featuring the shovel test pits

00155858



Figure 3.4 Current Picture of Site

00155859

Yet, the GPR survey never took place due to scheduling conflicts. At that point, I proceeded to the next form of testing (soil sampling) in an attempt to yield the locations of the grave shafts.

The procedure of using phosphate soil testing to detect burials has been utilized by some forensic anthropologists and archaeologists with some success (Daly 1994, Tibbett and Carter 2008, Haecker and Mack 1997). This procedure was utilized by Charles Haecker and Jeffery Mauck to locate burials at the archaeological site of the Battle of Palo Alto (1997). The theory behind the procedure is that when skeletal remains decompose it releases calcium which bounds with the naturally occurring phosphorus into the soil. Once the calcium phosphate is formed within the soil, it resides in the soil for an extended period of time even after skeletal remains have been removed from the soil. Hence, soil samples are collected from the site and the phosphate levels in the soil are tested to see if the soil yields high levels of phosphate.

Since the site was divided into a 2 meter by 2 meter grid, a soil sample was extracted with an auger at every cross section point. The auger was washed before extracting each soil sample. Upon extraction, the samples were placed in a bag immediately and labeled for the lab. In addition to the samples collected from the site, a control sample was extracted from an area of the church property where the burials were known not to be located.

Before the soil could be tested, it had to be processed into a testable state. The soil samples had to be dried and all debris such as rocks, leaves, and sticks had to be removed. Once this process was completed, the soil was ready to undergo phosphate testing.

A 30 mL test tube was filled with distilled water and two Floc-Ex tablets were added to the tube. Once the tablets were completely dissolved, one teaspoon of the prepared soil sample was added to the solution. The tube was shaken for the duration of one minute. After the minute passed the tube was placed in a holder allowing for the soil to settle. The clear solution which separated from the soil was then extracted and placed into another 30 mL test tube to test the phosphate levels.

Using a pipet, 25 drops of the clear solution was transferred to a clean test tube and distilled water was added to the solution. A phosphorus tablet was added to the solution and a top was placed on the tube. The tablet dissolved in the solution and then was allowed to sit for five minutes giving the new chemicals time to mix and react. After the five minute period, the new solution was compared to a color chart to determine the phosphate levels.

The results were measured using a color chart to determine the level: a low phosphate level was light blue, a medium phosphate level was aqua blue and a high phosphate level was deep blue. Table 3.1 illustrates the results of the phosphorus test. The control sample yielded a low phosphate level result in addition to all of the samples except for two which also yielded a low phosphate. Samples line 7 point 47 and point 48 yielded medium results. These two samples were extracted from the middle of the yard space located behind the church structure. The phosphate levels for these points were higher than the rest of the site, yet they were not high enough to indicate a burial, but were noted for further investigation.

Upon reviewing the results of the metal detection and the soil tests, there were no signs or indications of the location of the grave shafts. With no new knowledge, I proceeded to conducting shovel test pit (STP) excavations. Since the grid was already established and I wanted to gain the best sample of the site, a STP was placed at every 2 meter by 2 meter cross-section. A few more shovel test pits were conducted in the yard beyond the front of the church structure to ensure the property was completely surveyed and tested. Each test pit was to be dug

a meter in depth. All soil collected was screened through ¼ inch mesh screens. Upon the completion of each test pit, the pit was backfilled.

A total of 51 shovel test pits were excavated (Refer to Appendix B for details on each shovel test pit). The shovel test pits gave an even more interesting picture of the church site. Out of the 51 shovel test pits, only 25 had artifacts. All of the artifacts were construction materials: nails, glass, siding and concrete all located in close proximity to the church consistent with artifacts one would find at a site that experienced a fire. The rest of the test units were sterile. Even more baffling was the lack of artifacts on a property, which has been in constant use for over 100 years and had no evidence of the landscape ever being utilized.

Black Churches since the early 1800's have played an important role in Black peoples' lives. Black churches helped establish schools (elementary, high school and college), were instrumental in the development of benevolent societies/mutual aid societies, and advocated for the political right of blacks (Frazier 1974, Lincoln and Mamiya 1990). "The church is regarded as the center of the black community since it not only offered religious services and instruction, but provided recreational, educational, and social services that were not available elsewhere" (Cabak et al. 1995:56).

Gibson Grove A.M.E. Zion Church as a member of the African Methodist Episcopal Zion denomination had certain obligations to the church community as mandated by the church. The A.M.E. Zion and the A.M.E. Church share similar beliefs being they were formed out of the same break from the Methodist Episcopal Church. According to the churches doctrine,

> Each local church…shall be engaged in carrying out the spirit of the original Free African Society out of which the A.M.E. Church evolved, that is to seek out and save the lost and serve the needy through a continuing program of: (1) preaching the gospel, (2) feeding the hungry, (3) clothing the naked, (4) housing the homeless, (5) cheering the fallen, (6) providing job for the jobless, (7) administering to the needs of those in prison, hospitals, nursing homes, asylums and mental institutions, senior citizen's homes, caring for the sick, the shut-in, the mentally and socially disturbed, and (8) encouraging thrift and economic advancement.  (Lincoln and Mamiya 1990)

Based on the doctrines of the church there should have been continuous activity on the Gibson Grove A.M.E. Zion Church property.

Prior to the excavations at Gibson Grove, two previous excavations of African American church sites had been conducted by other archaeologists.  The excavations at Wayman A.M.E. Church site and the Boston African Meeting House site both yielded artifacts, which showed the churches' involvement in the community's social welfare (Cabak et al. 1995, Bower and Rushing 1980). Based on these excavations I expected to find artifacts during the shovel test unit phase which would also showed Gibson Grove A.M.E. Zion's participation in the Cabin John community's lives; be it political, social, medical or educational. However, there was no material culture to support any of these activities were taking place on the property.

**Table  3. 1 Phosphorus Test Results**

| Location | Result |
|---|---|
| Control | Low |
| Line 1 Point 1 | Low |
| Line 1 Point 2 | Low |
| Line 1 Point 3 | Low |
| Line 1 Point 4 | Low |
| Line 1 Point 5 | Low |
| Line 2 Point 6 | Low |
| Line 2 Point 6 | Low |
| Line 2 Point 7 | Low |
| Line 2 Point 8 | Low |
| Line 2 Point 9 | Low |
| Line 2 Point 10 | Low |
| Line 2 Point 11 | Low |
| Line 3 Point 12 | Low |
| Line 3 Point 13 | Low |
| Line 3 Point 14 | Low |
| Line 3 Point 15 | Low |
| Line 3 Point 16 | Low |
| Line 3 Point 17 | Low |
| Line 3 Point 18 | Low |
| Line 3 Point 19 | Low |
| Line 3 Point 20 | Low |
| Line 4 Point 21 | Low |
| Line 4 Point 22 | Low |
| Line 4 Point 23 | Low |
| Line 4 Point 24 | Low |
| Line 4 Point 25 | Low |
| Line 4 Point 26 | Low |
| Line 4 Point 27 | Low |
| Line 4 Point 28 | Low |
| Line 4 Point 29 | Low |
| Line 4 Point 30 | Low |
| Line 4 Point 31 | Low |

| Location | Result |
|---|---|
| Line 5 Point 32 | Low |
| Line 5 Point 33 | Low |
| Line 5 Point 34 | Low |
| Line 5 Point 35 | Low |
| Line 5 Point 36 | Low |
| Line 5 Point 37 | Low |
| Line 5 Point 38 | Low |
| Line 5 Point 39 | Low |
| Line 5 Point 40 | Low |
| Line 6 Point 41 | Low |
| Line 6 Point 42 | Low |
| Line 6 Point 43 | Low |
| Line 6 Point 44 | Low |
| Line 6 Point 45 | Low |
| Line 6 Point 46 | Low |
| Line 7 Point 47 | Medium |
| Line 7 Point 48 | Medium |
| Line 7 Point 49 | Low |
| Line 7 Point 50 | Low |
| Line 8 Point 51 | Low |
| Line 8 Point 52 | Low |
| Line 8 Point 53 | Low |
| Line 8 Point 54 | Low |
| Line 8 Point 55 | Low |
| Line 9 Point 56 | Low |

The STP excavations revealed the soil texture and color for the site was consistent with very little variation throughout the site. The soil ranged from 10YR 4/6 silt to 10YR 5/6 silt with about 30% - 50% of the soil being small rocks. The church is located about 2 miles west of a quarry that has been in operation since the mid 1800's. Hence, the finding seemed to be consistent with the general geography of the area. Yet, what I found usual was for a site with constant occupation and 2 or 3 burials located on the property the soil did not look disturbed.

There was one material, tree root, which consistently appeared throughout all of the test pits and prove to be an even bigger problem later. There were about seven large oak trees roughly about 80 to 100 years old located on the property. The tree roots hold the hill which the church sits upon in place. They extend under the structure of the church (Figure 3.5) and the roots continue into both neighbors' yards. Many of the shovel test pits did not extend to the desired depth due to massive roots or massive root systems.

Upon completion of all the Phase II testing, I reviewed the data and it did not reveal any information indicating that people had been buried on this site. A community archaeology day was hosted at the site and the discoveries of that day further supported the Phase II findings.

Community Archaeology Day

The "Community Archaeology Day" was a day when the public was invited to come out and learn about the archaeology being conducted at the Gibson Grove site. An ad was placed in the Cabin John Newsletter "Village News" informing everyone in the immediate community of the activities. In addition, press releases were sent to all the major newspapers in the area informing them of the upcoming event. Special invites were sent to the District of Columbia Office of Preservation, Montgomery County's Parks and Planning, Archaeology Division, and the Reginald F. Lewis Museum of Maryland African American History and Culture.

There was a full day of activities planned all around the theme of archaeology and the Gibson Grove A.M.E. Zion site. There was a small test pit left open (behind a rope) where people could see how an excavation unit looked. Tours of the site were conducted during the tour I explained the purpose of the excavations and described some of the artifacts which had been uncovered during the shovel test pit excavations. However, I was very careful not to give any interpretations of the artifacts and its significance. By leaving the door open for the visitors to interpret, each group of people would almost instinctively begin to tell me what they knew about the church and its property and their interpretations of the artifacts. The community day resulted in me gaining knowledge about the history of Cabin John that has not been written in books.

There was one piece of information that came out of the day that was of direct significance to the archaeological investigations. One visitor mentioned the original Gibson Grove A.M.E. Zion church structure (the log cabin) was located on the current neighbor's property. This account was confirmed by three other visitors who also lived in Cabin John. Based on this information, the logical hypothesis is that the remains were also buried on that portion of the church's property which now belonged to their neighbor. Although the Phase II findings and  new oral reports made a strong case that there were no burial shafts on the property,  I proceeded to Phase III excavations for due diligence.



Figure 3.5 Picture of the tree and roots on the north side of the church

Phase III

The strategy for the phase III excavations was created around the hypothesis that the burials may not be located on this property, based on prior knowledge from the first two phases and the oral reports given by the community visitors. Non-probabilistic sampling was utilized to select where the test units would be placed. A total of six 1.5 meters by 1.5 meters units were excavated on the property. The locations of the units were selected based on the results of earlier testing and areas which would give an accurate sample of the site.

Unit 1 was placed in the northwest corner of the church's back yard located directly in front of the shed. The northern side of the unit runs along the property line. The west side was adjacent to the shed. The unit was cover sparsely with grass and leaves. Level A consisted of top soil sparsely covered with grass. The top soil 10 YR 3/2 very dark grayish brown ended about 2.5 centimeters and the soil turned 10YR 5/6 yellowish brown silt. The artifacts located in this

level consisted of nails. Level B is 10YR 5/6 yellowish brown silt, this level was about 12 centimeters in depth, and  nails and piece of painted wood were the artifacts recovered from this level. Level C was 10YR 5/ 6 yellowish brown silt. No artifacts were recovered from this level it was sterile. The unit stopped due to massive tree roots bisecting the unit and it was cored to a depth of 30 centimeters.

Unit 2 was located in the western most portion of the church's backyard 2 meters to the south of Unit 1. The unit is adjacent to the large tree which lines the property line. The unit was covered with bare top soil and no vegetation. Level A was covered with top soil 10YR 3/2 very dark grayish brown. The top soil was about 2.5 centimeters in depth and just under the top soil was 10YR 5/4 yellowish brown silt loam which contained 10% rock. Artifacts recovered include coal, brick, nails, and pieces of iron. Level B continued the 10YR 5/4 yellowish brown silt. However, the rock content went up to 15% and coal was the artifact recovered from this level. Level C consisted of 10 YR 5/4 yellowish brown sandy silt loam with about 30% rock.  There were no artifacts recovered from this level. The unit stopped at about 31 centimeters due to roots from the adjacent trees and large rocks in southwest corner.

Unit 3 was located 4 meters north of the side of the church and about 4 meters south of the property line and the neighbor's fence. The unit is in the middle of the walk area from the front of the church leading to the back of the church. The unit is located on a 15% slope, covered sparsely with grass. Level A was covered with very little top soil 10 YR 4/2 dark grayish brown and it was about 1 centimeter in depth. The remained of the level was 10YR 5/4 yellowish brown silt. Window glass, coal, brick, concrete and nails were excavated from this level.  Level B continued with 10YR 5/4 yellowish brown silt. A piece of window glass was the only artifact in this level. The unit was excavated to 23 centimeters in depth.

Unit 4 was located adjacent to north side wall of the addition on the church. The unit's south side faced the window in the north wall. The unit located about 1.5 meters from the base of the north wall. It was covered with glass from the blown out window. Level A was covered with glass and ash. The ash seemed to be a combination of roof shingles and wood left from the church fire. Level A consisted of silt loam 2.5Y 5/4 light olive brown and schist with 10% rock inclusions. The artifacts recovered from this level were nails, wire, and coal. An iron pipe was found in the middle of the south wall of the unit which continued into the next level. The soil in level B consisted of 10 YR 5/6 yellowish brown silt loam with 20% rock. At 16 centimeters, the soil texture changed from silt loam to hard clay. One screw and a piece of window glass were recovered from this level. The iron pipe continued into level B and went deeper. The unit was stopped at 23 centimeters due to the soil texture turning to hard clay. Feature 1 (the iron pipe) appeared about 7 centimeters into level A. It continued through level B and into what would have been level C.

Unit 5 was located on the eastern portion of the church property. It was located between a tree and old corner stone block and 9 meters north of the front stairs of the church. The unit was on a 15% slope located closer to the front of the church than unit 3. The unit was covered sparsely with grass. Level A was covered with top soil 10 YR 4/2 dark grayish brown and a little grass. The soil changed 3 centimeters in depth to 10 YR 5/4 yellowish brown silt loam. Numerous artifacts were recovered from this level nails, animal bone, glass, brick, coal, and cap of a flask. In level B, the soil continued with the 10YR 5/4 yellowish brown silt loam.  The artifacts found in this level were coal, glass, nails, wood, wire, and President Wilson button. Level C contained 10 YR 5/4 yellowish brown silt loam. The artifacts in the level were a nail,

glass, coal and brick fragments all found within the first 3 centimeters of the level. The remainder of the level was sterile. The unit was cored to 40 centimeters.

**Table 3.2 Artifact Distribution**



Artifact Distrubition, Gibson Grove A.M.E. Zion Church

      Unit 1    Unit 2    Unit 3    Unit 4    Unit 5

Unit 6 (trench) was placed in southern portion of the church's back yard. There are two rocks located parallel to each other on both sides of the tree. The unit was placed in front of these rock markers so that it would bisect both areas in front of the markers.  The south wall of the unit is on a 10% incline. Level A was covered with a thin 2 centimeters layer of top soil 10YR3/2 very dark grayish brown. The remainder of the level was 10YR 5/6 yellowish brown silt loam. In the southern portion of the unit, bottle glass was recovered and two pieces of bottle glass were located in the northern portion of the unit as well. In level B, the soil color and texture remained the same, 10 YR 5/6 yellowish brown silt loam. The northern and middle section of the unit came to a halt due to a root floor at about 25 centimeters. The south portion continued. There were no artifacts recovered from this level. Level C was located beneath level B on the south portion of the unit only. The soil is 10YR 5/6 yellowish brown silt loam with about 30% rock and large roots. No artifacts were recovered.  Level D was located below level C on the southern portion of the unit. The soil has maintained its same consistence of 10YR 5/6 yellowish silt loam. No artifacts were recovered. In level E, the soil was 10YR 5/6 yellowish brown silt loam with 30% rock. The roots are continuing through this portion of the unit; the area became smaller due to the roots. No artifacts recovered. Level F located beneath level E yielded the same soil color and texture 10YR 5/6 yellowish brown silt loam with 30% rock inclusions. No artifacts recovered. The unit was cored to 95 centimeters in the southern portion of the unit.

Upon completion of the excavations two assertions became apparent. First if there were any grave shafts on the property the tree roots would have disturbed the graves so severely that they would not be detectable. The second assertion based on the types of artifacts recovered and the limited amount of artifacts, suggested there was limited use of the back portion of the church property. If the church community had utilized the property in the rear of the church, materials remains symbolizing foodways, clothing or personal effects might have been recovered. Based on my observations of the cemetery, I would expect to have found some remnants of objects placed on or around the burials site. The absences of archaeological information led me to believe that the remains had not been buried on the current church's property. Yet there was more to the story of Gibson Grove A.M.E. Zion Church than was being told by the archaeology. Hence, I chose to conduct further investigations into the history of the site by assessing the knowledge of the community.

00155867

Chapter 4: Public Archaeology and Gibson Grove

This chapter focuses on the development of field of Public Archaeology and how this field influenced the archaeological work conducted at Gibson Grove A.M.E. Zion Church Site. Public archaeology is not a new field it has been around since the 1960's with the introduction of Cultural Resource Management (CRM) (Jameson 2004, Merriman 2004). The field has grown and development subfields. One of the subfields is community archaeology which encompasses the same components of public archaeology (just they are conducted collaboratively with member of the community). Gibson Grove A.M.E. Zion Church Site started as a CRM site where a church needed skeletal remains moved for construction purposes and evolved into a community archaeology project, where communities were brought together and a segment of the community's history has been uncovered.

Public archaeology functions in different modalities depending on the archaeologist. For the excavations at Gibson Grove I utilized an umbrella approach for public archaeology. Though the site was in essences a CRM site, public interpretation, archaeology education and outreach where all major components in how the site was excavated and interpreted. This chapter will explore the development of public archaeology and how various archaeologists utilize the phrase to mean CRM, public interpretation, and archaeology education. It will also discuss how these concepts were put into practice at the Gibson Grove.

<u>Public Archaeology</u>

Public archaeology has become increasingly important over the past few years. There is no concise understanding of public archaeology or what it entails; the reason for this is that the meaning of public archaeology and its usage as changed over its existence (Merriman 2004, Jameson 1997, 2004; Little 2002, Potter 1994). John Jameson views public archaeology as a field, which is comprised of cultural resource management, public interpretation (focus on methods of conveying archaeological information to the lay public) and educational archaeology (formal classroom and less formal educational settings (2004). Jameson's description is one which has taken all of the various uses of the phrase public archaeology and compiled them into a broad general understand of the practice. Though Jameson uses public archaeology to mean all three components, there are many archaeologists that use the term to mean CRM, public interpretation, or archaeology education; but not all three together.

Cultural Resource Management (CRM) is viewed as public archaeology in that "the public element of this archaeology came to consist of archaeologist managing cultural resources on the behalf of the public, rather than entailing a great deal of direct public involvement in the work itself" (Merriman  2004:3). It was believed in the early stages of CRM that by recording, documenting and preserving the knowledge of our shared past archaeologists are essentially 'doing the will of the people'.  "Public interest is generally thought to be served through the preservation of cultural resources" (Merriman 2004:3). CRM work does go further than just doing archaeology because it is preserved as what is best for the public. Laws which govern CRM work extend to public and federal owned land; however, they don't apply to privately-owned property. Yet, there are individuals who view the preservation of our cultural resources as important.  These individuals concerned with preserving the past hire and work with archaeologist on their private property. Beyond the cases of individuals and their private property, CRM in the past few years has expanded to include more involvement from the public

00155868

(Blakey 1998, LaRoche 2007, Balsom 1999, Crisler  Mitchell and Gleichman 1999).  Part of this involvement includes public interpretation of the sites.

Public interpretation of archaeology is conveying archaeological information to the lay public. This work can be accomplished through books, websites, tours of sites, museums, lectures, etc. Though archaeologists convey the archaeological information; does not mean that the archaeologist is the authority on the interpretations of the sites history. Many archaeologists have come up with creative ways of allowing the public to take an active role in the interpretation of the material culture and how it contributes to the history of site (McDavid 2002, 2004; LaRoche 2007; LaRoche and Blakey 1997, Derry 1997, Potter 1994, Leone 2005).For example at archaeologist at President's House constructed a viewing platform. Everyday any archaeologist would be on the platform with the public discussing what is taking place archaeologically. While archaeologist would discuss the excavations the general public would have dialogues with the archaeologists and amongst themselves about the meaning of excavations and the artifacts recovered. This form of interpretation contributed to how the archaeologist interpreted the site (LaRoche 2007).

Though public interpretation is a simple concept, it is very difficult in practice. Archaeologists gained information from their excavations and in this way we (the archaeologists) are the authorities on the material culture and the context in which it was found. We then that this knowledge to the public and present it to them. Though we are the experts on when, where, and how artifacts were excavated and as scientists we can tell through analysis its function, we are not always the experts on how it functioned in the social context of where it was found. Copeland suggested a constructivist approach for letting the public participate in the interpretive process (2004). He argues that a constructivist approach is valuable in that it considers the prior knowledge and values of the viewer (public viewing the excavated artifacts). According to Copeland, the archaeologist gains knowledge from the artifact, the information is then presented to the public (in a manner which the public can give feedback), the public then takes the information and processes it based on their prior knowledge and presents their constructions or interpretations of the artifacts (Copeland 2004).

Critical theory archaeologists have discussed the process of public interpretation and its role in archaeology in great length and have argued about the benefits of this approach (Leone 1986, Leone Potter and Shackel 1987, Potter 1994, Wilkie and Bartoy 2000, Palus Leone and Cochran 2006, Wylie 1985).  While some of the same ideas of the constructivist approach are used critical theorists of archaeology take it one step further in that they argue that archaeologists should be  self-reflexive (Hodder 1997/ 2003) and critical of the social constructs which governed the past they are studying. Critical archaeologists take into account that they are people as well and how their personal experiences influence one's knowledge base. In addition, they reflect critically on what their motivation is for conducting the project and how it reflects in their interpretations of a site. Critical archaeologists are keenly aware that "all knowledge serves interests" (Potter 1994:36). In understanding that basic principle, archaeologists acknowledge the social ideologies that were governing the past and influence the present. Those ideologies silenced many key players in the past, yet through archaeology those key players are revealed. Through allowing their descendants to share in the process of interpreting their pasts those who where once void from history's pages are given an opportunity to tell their life stories.

With the public's growing involvement in the interpretation of archaeological sites, new and innovative educational methods can be pioneered. By education, I mean how students of

archaeology are learning to conduct public archaeology as well as educational methods used for the public. In curriculum-associated education, students of archaeology are taught through an institution how to become an archaeologist. There are large number of universities and colleges that have anthropology departments; however not all of them have archaeology divisions, and even those that do don't all teach public archaeology courses.  Since public archaeology has been growing there are universities that offer courses in Public archaeology such as George Washington University and there are other universities that have established internship programs to give their students hands-on experience in working with the public like Sonoma State University. As more students join this growing field of public archaeology, traditional means of class room teaching are not enough to prepare these budding archaeologists. Field schools, which have always been a way for students to gain experience out of the class, are also taking on the task of teaching students the importance of public collaboration (Potter 1994, Cressey and Anderson 2006, Dorset 2008). Archaeology education does not just start with undergraduates; it has been extended to high school students who want to pursue careers in archaeology. For example in Maryland the Montgomery County Parks and Planning, Archaeology Division  and Archaeology in the Community, Inc., both run programs for high school students interested in learning how to become archaeologists. As students are taught how to work with the public, there is a new group of students entering archaeology with innovative ways of dealing with public education.

Public Education comes in a variety of forms from traditional methods, such as books, museums, DVDs, and site tours, to non-traditional methods, such as the internet, interactive booths at archaeological sites, and volunteer excavation days. As public archaeologists attempt to include the public into the interpretive process, they create a more collaborative basis for the development of the site's history. The results of this collaborative work are products which are reflexive, multivocal, and contextual (McDavid 2002/2004). This method of interpretation creates a holistic view of the past and gives the public an opportunity to understand how the past is relevant to our present. The collaborative process is executed in a number of ways. One way of practicing this method is site tours. Site tours are traditionally given by a tour guide who is a historian trained on what to highlight and what information to give the public.  At an archaeological site in Quseir, Egypt, the archaeologist took the idea and decided to work closely with the descendants and local public in order to figure out what aspects of the history are important to the public and should be highlighted in the display of the material culture from the site (Moser et al. 2002).  This particular method gave the public the authority to decide what they wanted to know and tell about their past versus the archaeologist deciding for the public.

In addition to collaborative education in the forms of working together on interpretation, one other way the archaeologist educates the public is on the field of archaeology. Some archaeologists have incorporated an outreach program as a component of the archaeological project (Palus Leone and Cochran 2006, LaRoche 2007, Gadsby and Chidester 2005). Outreach is a way for archaeologists to educate the general public about the field of archaeology and how archaeology is conducted. Outreach can vary from one day "public archaeology day" to an extended children's camp. A one-day program may consist of inviting people to the site observe archaeology being conducted, while an archaeologist explains the process. Longer programs depending on the design teach the attendees the basics of archaeology and give them some level of experience working with artifacts. This form of education helps the public gain an

understanding for the importance of archaeology to the development and creation of our histories.

## Community Archaeology

Community archaeology is an effort by archaeologists to take the advancements made in public archaeology and progress further. Community archaeology seeks to incorporate local people in all aspects of the archaeological enterprise (Moser et al. 2002, Marshall 2002). In order to truly understand what community archaeology entails; we need to understand what we mean by community. Terms like public and local people are very broad terms yet community represents a more intimate group of people. A community is a social group of varied size who share common characteristics and is perceived to belong to a distinct segment of society. Though a community is one unit, an archaeological site generally has more than one community which can lay historical claims to it. This is what makes community archaeology a challenging experience.

As an archaeologist seeking to incorporate the community in all aspects of the project one must address and recognize all of the communities involved. Identifying the various communities sometimes may be as easy as working with the local town members and leaders; however, in most cases it is very complicated and requires some research into the history of the site before any formal research designs are created. The initial historical research gives insight into which communities may need to be contacted about involvement in the archaeology project. One caveat is that not all communities want to be involved in bringing up their past; however, as long as an honest effort is put forth by the archaeologists to involve all communities, the archaeologists have fulfilled their responsibilities. An archaeologist has to be open to the challenges he/she will face while trying be truly collaborative.

Because of the emphasis on collaboration, community archaeology is deeply frustrating, extremely time consuming, humbling, and challenging in unanticipated ways (Marshall 2002), but the end product is extremely rewarding. This form of archaeology creates an opportunity to ask questions of the past which would not have been considered if it were not for the archaeological investigations. It creates an avenue for communities to ask questions of the past that are relevant to their present, questions which empower silenced communities (Stahl 2004).

## Community Archaeology at Gibson Grove

Collaboration

Most archaeologists give reports on community archaeology projects that had great outcomes, wonderful yet rocky community partnerships, and a wealth of material culture to help inform the community of its rich history. Gibson Grove was not that type of site. We did develop wonderful community relationships, and the project has produced some wonderful outcomes. However, it was the lack of material culture that produced this outcome.

The Gibson Grove A.M.E. Zion Church archaeological project began as a project where the community was reaching out to archaeologists asking for help. In an effort to meet their needs I took on their project; however, I met with the First Agape A.M.E Zion Church community frequently to discuss the project's development and ask for their input on how it should proceed. I met not only with the church leaders but also with the church body in order to gain an accurate understanding of everyone's desires for the project. I used their concerns and

00155871

ideas as guidelines for the development of the project design. Due to the unusual circumstance of the ownership of the property, I wanted the current church congregation to be left with a feeling of pride in taking on the legacy of their new property.

Though the church community was the one to reach out for archeological help, they were not the only community members with whom we the archaeologists, were going to have to collaborate. The White family's desires were our highest concern, considering they were the relatives of the skeletal remains we were asked to move. The representative, with whom I worked Mrs. Dove, she gave us permission to "do what needs to be done" (Dove personal communication 2008). I extended an invitation to her and her family to visit and/or come out and volunteer with the project any time they wanted.

I digress for a moment to point out that I knew as a young African American woman who has no ties to this community, every one's concern was: why was I doing this and what was I gaining from this project? My honest answer was two things: 1) it needed to be done in order to help the church community; and 2) I thought the story of Cabin John's African American church needed to be told. It is hard as an outsider to gain others' trust. I realized that by being honest and genuine worked best for me. Many of the community members referred to me as "young lady" or "baby" sometimes to my face and others times in conversations with others. However, through working hard with them and for them, they soon began to respect me and value my role in their lives.

The church and the White family wanted the skeletal remains to be placed in Moses Lodge cemetery. A week before the excavation was supposed to start, I toured Moses Lodge cemetery. At that time, I was under the impression that this was a historic cemetery that was receiving proper care and maintenance. After a half mile uphill hike, I walked into a mini forest overgrown with plants, bushes, poison ivy and bamboo. I immediately called the church liaison and inquired about the entity responsible for the land's maintenance. The cemetery was privately owned by the Moses Lodge, and the last living member was also the older woman whose family members were buried on the church property. Basically, no one was taking responsibility for the maintenance of the land.

While surveying the seven head stones were noticeable. These headstones were professional crafted headstones with inscriptions. Yet as we walked deeper into the brush, rows of headstones made from quarry rocks were noticeable. It seemed to be about 50 or more grave markers, each in rows which extended the length of the burial ground. At one of the graves, someone had placed a decorative fence around the burial and planted a small rose bush, which has since grown wild from lack of pruning over the years. It was soon realized that in order to re-bury the skeletal remains we would have to identify the burials that we already located in the cemetery. The first step would require the cemetery to be cleaned. We looked at this task as a way to have the different communities come out and interact while also working together for a common good.

The following week I began my campaign to involve the community. I called a few of the old congregation members and an older member of the Moses Lodge in order to inform them of the archaeology project being conducted. I also asked for permission to clean and clear the cemetery for repatriation purposes. All parties agreed, and I asked them to inform some of their younger family members in case anyone wanted to volunteer to clean their older family members' graves. I went to Sunday service at the church to speak with the church congregation

about what the archaeologists would be doing on the cemetery property. An invitation was extended for the entire congregation to come out and assist with cleaning up the cemetery.

As this project increased in size so did the community size. Now that we would be conducting a cleaning project in about 15 homeowners' backyards (literally), I thought the community should be notified of what was going on. Flyers were printed and placed in 100 mailboxes of the neighbors that lived closest to the church and Moses Lodge Cemetery,



Figure 4.1 Cemetery Clean Up

00155873

informing them of the archaeologists' presence and inviting them to observe or assist with the cleanup. In addition, Montgomery County Parks and Planning Archaeology Division was contacted and asked to send out an email to all their archaeology volunteers to assist with the cleaning project.

The second weekend in June was our "clean up day." This was a chance for me to meet the community at large and ask them questions about the Cabin John area. The archaeologists and Montgomery County volunteers showed up for the cleanup.  There was one home owner who came out and helped for about an hour. I was able to speak with a few of the residents through their gates. The few who talked to me through the gate informed me that they had nothing to do with the trash it was other people who trashed the cemetery. The blame for the state of the cemetery lay solely with other people. Nevertheless, no one in the community came out to assist but the one homeowner. We, the archeologists, went out the following day and cleared more of the cemetery. The church leaders and the archaeologists met to talk about the progress. In two days' time the cemetery was half cleared. The church decided to pay a company to clear the remainder of the cemetery. By the Tuesday, the cemetery was cleared. We went for a walk and were able to identify more graves and headstones.

The same week I received an email from the Cabin John Homeowners Association inquiring about the work done at the cemetery. I corresponded with the community liaison and the president and informed them about the project. They expressed concern over the cemetery being cleaned and whether or not this would encourage people to disturb the cemetery more.  I explained to them that in order for us to determine where we can rebury the skeletal remains it had to be done, and we had permission from the last living owners of the property. Once they heard this, they were more at ease; it seemed they thought we were doing this without consulting the owners.

Though our main communities in which we consulted with were the church and the White family, I learned very quickly that the greater Cabin John community was also concerned with what was taking place.

Education

Through the course of the project educational components were implemented in order to further incorporate the public in the project. These educational components came in the form of a "Community Archaeology Day" and an internship program.

The "Community Archaeology Day" was a day where all the public was invited to come out and learn about the archaeology being conducted at the Gibson Grove site. As mentioned in Chapter 3, the local community and greater Maryland community were all invited to come and partake in the planned activities of the day. Community day was a success not only because it gave the community an opportunity to interact with the archaeologists, but because I the archaeologist was able to gain knowledge from the community.

The information about the original site of the Gibson Grove A.M.E. Zion's log cabin proved to be very helpful in the last phase of archaeological investigations. We as archaeologists can benefit from the use of what Italian theorist Antonio Gramsci (1992) calls "organic intellectuals." These are people from the community who, without formal education, are just as philosophical as traditional scholars and are valuable to anyone studying a site. The information I was given when I started the project was based on oral reports given to the church liaison by other persons. The information I had received was by people who had lived here when they

where children or whose parents had told them about the church. These same people gave names and contacts for old residents of the area to whom we could reach out and gain more information.

Upon digging a little deeper into the few historical documents I was able to find some evidence hinting to the fact that the log cabin was located next to the new church. This one piece of information changed the purpose of the project. The project's original goal was to exhume the skeletal remains and repatriate them to Moses Lodge cemetery. If there were no skeletal remains then there was no need for archaeological excavations except to prove this information true. The project slowly turned from exhuming the skeletal remains to ensuring there were none on the property. This day showed how collaborating with community can and will have an impact on all those involved.

The second educational component was an archaeological internship. Montgomery County Parks and Planning, Archaeology division has an archaeology club for high school students. Working together we were able to have three high school students come and work on the site. The students had already been trained on basic archaeological procedures that were part of being in the archaeology club. They spent two weeks out in the field working. They learned how to use the total station and how to set up a grid. Two of the students were seniors going off to college to major in anthropology. The third was a junior in high school who aspires of going to college for anthropology.

Having interns at the site was important for numerous reasons. The students who came to work at the site were local students. Discussing the history of Montgomery County and the site made the students understand that what they were working on was a part of their history. Through everyday conversation the students also realized all of the archeologists working on the site were from the area, and we each gave them a different perspective on working in the field of archaeology in the Chesapeake region. The interns gained not only valuable experience in the field, they learned as they discovered part of their own heritage, and through all of our experiences they gained mentors who offered to help them navigate through the field of archaeology.

Interpretation

In the beginning the main focus of the project was to locate the burials of the past church members and repatriate them in Moses Lodge cemetery. As an archaeologist who thinks critically about a site and its potential relevance to its community, I felt that in order to accurately interpret the site I had to reach out to the different communities which all had an interest in the interpretation.

By reaching out to the various communities that made up Cabin John's history, I uncovered a huge part of their history that has for the most part gone untold. McGuire stated, "If we recognize that the pasts we study are the pasts of living communities, then we must also recognize an obligation to serve the interests of these communities" (1994:182). The history of Cabin John that I uncovered told the story of the African American community.

I had constant contact with the church community that asked for work to be conducted on the church, and we worked together on all decisions. I engaged with the Cabin John Community Association and members of the current Cabin John community via outreach and email. On the

00155875



Figure 4.2 Community Archaeology Day (A community member talking to a volunteer)

"Community Archaeology Day," the people touring the site were told the brief history of the church and were shown some of the artifacts from the site, yet they were not given interpretations of the materials. Many of the individuals (viewers) provided their prior knowledge of the site and thus created their own interpretations. By utilizing all of the information given, I was able to construct some bits of the Cabin John African American Community past.

In all of my conversations, everyone would mention I needed to talk various to people whose families owned the property. I reached out to Mrs. Dove and asked if I could come to talk to her. In the course of our conversation she gave me the names and numbers of as many African American Cabin Johners as she had. In the weeks that passed I went from trying to gain information on the church and Moses Lodge to learning about a thriving community which was in many ways autonomous from the rest of Cabin John. With each interview I would present the finds of the excavation and then ask questions about what was found or not found in order for

00155876

them to give me their interpretation of the site. I conducted six interviews with representatives of four families, all of whom where members of Gibson Grove A.M.E. Zion church.

Ferguson and Colwell-Chanthaphonh state, "Collaboration in practice exists on a continuum, from merely communicating research to descendant communities to a genuine synergy where the contributions of the community members and scholars create a positive result that could not be achieved without joining efforts" (2008). They go on to say, "Collaboration, then, is not a uniform idea or practice but a range of strategies that seek to link the archaeological enterprise with different publics by working together" (2008). I wanted my work to be relevant, relevant to the community requesting the work, relevant to the descendant community, and relevant to the greater Cabin John community. In every stage of my research, I continually tried to add components where the various communities were involved and felt like they had a role in the interpretation and outcome of the project.

Interpreting the Gibson Grove A.M.E. Zion archaeological site is a continual process. A process which has exceeded the original goal of cultural resource management and has grown into a project which is giving voice to a community which has long been silenced.

Integrating Cabin John

Before the introduction of archaeology, the greater Cabin John community had been segregated. The current Cabin Johners recognized there was an African American community that was once in the area, but outside of the Gibsons, none of the other families were ever discussed. Everyone knew of Moses Lodge but it was always talked about in context of the cemetery and the few meetings that were held on the property. Gibson Grove A.M.E. Zion Church was the most recognized fixture of the once-present African American community, yet it is no longer in existence. In its place is First Agape A.M.E. Zion Church which has no ties to the community at large.

Through collaborating with all members of the community, dialogues were opened between the three segments (current Cabin Johners, past African American community of Cabin John, and First Agape A.M.E. Zion Church), which until the archaeological excavations, had very little to do with one another. Yet, by me taking a genuine interest in all the groups and working with each one of them and listening to their concerns and questions, I was able to help bridge the gaps between the groups.

Every archaeologist should share their data with the community so that everyone can gain insight from the findings, keeping in mind Maria Franklin's (1997) assertion that "…most of us has not given black society much reason to feel that archaeology should be important to them"(43). Archaeological data is essential to African American history, and as scholars working with such sites, we need to share the value of our work. There are responsibilities that come with understanding the importance of material culture studies, and how they help fill in the gaps of the written record.

00155877

## Chapter 5: Silences revealed Cabin John's African American Community

Community archaeology helped reveal silences in Cabin John's history. It uncovered the voices of Cabin John's African American community that were silenced during Jim Crow and segregation. Silences in African American history shape the way neighborhoods are remembered and forgotten. In order to understand the role silence plays in history, the process of historical production has to be explored. Trouillot (1995) believed that there are four crucial moments when silence can enter the historical production process at the moment of fact creation, the moment of fact assembly, the moment of fact retrieval, and the moment of retrospective significance.

Archaeology is science created around a set of practice which serves to recover information about a given space in time. During the excavation of Gibson Grove, the archaeology revealed information about the use or lack of use of a particular space. The information gained from the excavations created a different set of oral history and archival inquires. As a participant in, and an observer of the historical production process for Cabin John, the silences became obvious. There were different absences in information between the documentary, oral historical and archaeological archives. By playing the three sources of data against on another, tacking back and forth between them (Wylie 1985), the past of Cabin John's African American communities began to emerge.

Archives are used as repositories for stored knowledge and information; they are places where documents are assembled into narrative. The assembly of data into fact is a significant factor in historical production (Trouillot 1995). Archives are institutions set up to house various bodies of knowledge depending on their focus. These institutions select bodies of information which they consider important to preserve and maintain. The selection of data which should be preserved can result in forms of silence, particularly if the documents maintained are only relevant to particular people or events.

For example, Gibson Grove A.M.E. Zion Church was originally built during the end of the reconstruction period. The Federal Writers' Project of the Works Progress Administration (WPA) was hired to interview surviving ex-slaves during the 1930s. The purpose of these interviews was to learn about African Americans and their lives. In 1937, a series of interviews were conducted to find out about African American churches in Maryland. Gibson Grove A.M.E. Zion Church was among the churches covered in this survey. The interviewers were only able to answer eight questions of the two pages of queries on the church. The standard document asked a range of basic information questions about the churches such as; Name of the church, Denomination, Date of laps, Date organized, Architecture, etc. In the process of answering the survey, the question on previous building location was answered incorrectly. It stated, "Previous building stood on the same site as present." (Mower and Cole 1937: Church Records Form, para. 6). The original church built in 1898 was located west of the current church that was built in 1923. This document was the only official document that could be retrieved on the church.

Montgomery County Historical Society serves as the local archives for information pertaining to Cabin John. The historical society has a section on Cabin John. The bulk of information contained in the Cabin John section is newspaper clippings on various events that have taken place in Cabin John. In this section, newspaper articles can be found discussing Gibson Grove A.M.E. Zion Church nomination for historical status and the Church receiving historical status (Soladay 2004). The Historical Society has a collection of pamphlets and

booklets produced by Cabin John Association; in one pamphlet a short article was written on the Colored Schools in Cabin John and in one of the booklets two of past residents of Cabin John's African American community were interviewed (Kyle 1976, Clarke and McKinney 1976).

In 1976, Cabin John Association in celebration of the bicentennial wanted to produce a pamphlet about Cabin John. Ms. Elizabeth Kytle conducted 18 interviews of current and past Cabin John residents and turned the interviews into the book, *Time Was, A Cabin John Memory Book.* The book contains two interviews with African American residents, which is the only written text with detail information about Cabin John's early African American community. However, the texts are limited in that though the focus was suppose to be memories of Cabin John, the interviews developed more into accounts of the older women's personal lives.

The general lack of information on the African American families and the establishment of the Gibson Grove A.M.E. Zion Church in Cabin John can be interpreted as a silence in history. The historical archives are great resources in recounting the stories of the past. However, archaeology can fill the voids left by the historical record. Archaeology differs from the archives in that archaeology focuses on the lives of people through their material culture. For archaeologists knowledge is constructed at the trowels edge (Hodder 2003). By utilizing a critical approach around the excavation of site, knowledge of the past groups (gender, ethic, and class) will be obtained.

Yet there are also silences in the archaeological record. If knowledge is at the trowels edge (Hodder 2003), what happens if there is nothing at the edge of the trowel? There are unique situations where a site is excavated and there is no material culture to be found. This form of silence tells a different story often contrary to what we as archaeologists learned prior to the excavations. On occasions the knowledge gained at the trowels edge is no knowledge and it's this type of silence, which speaks loudest about what was taking place in the past at a given time and place. The lack of material culture opened a new window of dialogue between the archaeologist and the various communities. The archaeological finding suggested that very little activity took place on the church property. This line of evidence created new conversations between the archaeologists and the communities around the use of the property. The results also created questions about the historical record and its validity.

It is known that historical records contain bias based on the social context in which they are constructed. Critical archaeology utilizes an approach, which recognizes these biases and moves beyond them to create a revisionist past, which tells a more inclusive account of the past (Leone Potter and Shackel 1987, Potter 1994, Wilkie and Bartoy 2000). Archaeologists working in partnerships with communities can take the silence of archaeology and use diverging lines of evidence to further explain their finds. Oral history becomes a great tool when partnering with communities, their interpretations and knowledge can often provide insight to the archaeological record.

In order to move beyond the silence of the archaeological record; oral history can be used as a tool to help break the silence. Oral histories are viewed by many as a way of obtaining information about an historical event through one individual's personal account. Oral histories contribute to the historical production process of fact creation (Trouillot 1995). The people recounting the historical event or events are recalling information based on their memory of an occurrence. "Memory [is]…by definition a personal activity, subject to the biases, quirks, and rhythms of the individual's mind. If a remembered event is expressed verbally, the remembrance is of course slanted by the teller's choice of words and by his or her sense of how to shape a tale"

(Fabre and O'Meally 1994: 5). In addition, to account for the unconscious silences in a person's recounting of an historical event, one also has to account for the conscious silences in a person's narrative. As the person/ narrator is recounting their story of the past, they are choosing what information to tell and what information to omit based on their own biases of what is important. These oral accounts with their built in silences whether conscious or unconscious are the foundations of history making.

The accounts from the oral histories I conducted included discussions of individual African American families but very little was known about the community as a whole. The absence of information from the immediate community prompted me to seek out the descendant community of Cabin John's African American community. I began by interviewing members of the White family and as I interviewed them I asked for contact information of other families that also lived in Cabin John. With each new interview, I would ask the interviewee if they had any contact information on any of the other families. And I continued until I felt like I had a large enough sample of all the families. The interviews provided great insight to how the church property was utilized and information about the church and its congregation. With each person I interviewed, I inquired about Moses Hall and the cemetery. Yet no one was able to tell me any more than a few facts about organization. No one referred to the lodge by it name Morningstar Tabernacle #88 Grand United Order Brothers and Sisters, Sons and Daughters of Moses, they only called it Moses Hall. Everyone stated meetings and dances were held in the hall. After several conversations, I was sure it was a small mutual aid society that the community had created. Yet in a conversation with a member she said she was initiated in the District of Columbia (S. Harris personal communication 2008).

This small piece of information hinted that Moses Hall was more than a mutual aid society and larger than Cabin John. Through weeks of research, I learned that Moses Hall was one of numerous lodges belonging to a secret African American fraternal organization. The fact that it was a secret organization explains why there was limited information on the lodge and why those who were interviewed knew little more than the name Moses Hall. The persons interviewed were all children during the time of the lodges operation (except one person). It was the forgetting or the absence of mention to the children about lodge business, which resulted in the silences now about the organization.

Through recognizing silences and using them as curves in a circular process I was able to reconstruct the Cabin John's forgotten history. Each time I encountered a void I used it as directional to go to another form of knowledge and would continue revisiting knowledge bases in a circular pattern until I discovered the missing links. Then in turn taking the newly acquired information and continuing in the cycle until the community's history was uncovered.

The information gained from the archaeology was vital in the reconstruction of the African American past of Cabin John. It would have been ideal to excavate the church and recover artifacts which would have given the story of the space and how people utilized the church space. The excavations did prove that community archaeology can be a fruitful endeavor for revealing the hidden histories, even when the archaeological practice reveals no material culture. Though the archaeology revealed the lack of social activities at the church and the oral history revealed Morningstar Tabernacles #88's role in the social lives of community; this project demands we turn an archaeological gaze to these kinds sites and further study the role of secret societies, in the lives of African Americans.

00155880



Figure 5.1 Circular Process of Information Gathering

Cabin John's African American Community

By applying the above mentioned approach I was able to revise the history of the African American community of Cabin John. All of the information obtained in the remainder of this chapter was information I obtained as a result of my archaeological excavations at Gibson Grove.

Though the Gibson family was an important part of the Cabin John's African American community, there were many other families in the area as well. The neighborhood included the Harris, the Crawford, the White, the Jones, the Scott, the Carter, the Brown, the Bowles, and the

00155881

Jackson families; the families Mr. Moore sold plots of land on Seven Locks Road (Armstrong 1947, Offutt 1995). All of the property was purchased from J.D.W Moore, during this time he was the only land owner willing to sell property to African Americans.

The African American community of Cabin John was self-sufficient; they grew their own food; built their own school and homes; and some individuals ran their own small businesses. The community was located adjacent to Cabin John Creek which was utilized as the main source of water. There were a few families which had the privilege of having wells on their property, thus relieving them of the arduous task of hauling water from the creek. In addition to the creek water, everyone had rain barrels which aided in the water collection process (P. Black personal communication 2008, S. Harris personal communication 2008). The first African Americans to move into this section of Cabin John seem to have bought their land around the early 1880's. In those early years, they began the process of community building.

The Brown Family

Charles Henry Brown purchased land from J. W. Moore and his wife Sarah Moore on April 27th 1885. Mr. Brown purchased four and a half acres of land for the sum of one hundred one dollars and fifty cents (MCCC 1885). Mr. Brown, along with his wife Christina Brown and their adopted daughter Lena Brown, resided on the on the property.

Mr. Brown operated a small truck farm on the property that his daughter Lena helped him operate. The crops grown on the farm would be sold at the markets in Washington, D.C. - Center Market, Georgetown Market, P Street Market, and K Street Market. The Browns had a diversified range of crops; cabbage, potatoes, tomatoes, broccoli, sweet potatoes, corn, peppers, watermelon, and cantaloupes. In addition to growing food, they also maintained livestock; chickens, turkeys and ducks (Kytle 1976).

The Browns, in addition to running a farm, were also active in the community. The Browns attended Gibson Grove A.M.E. Zion church and at various points in their lives, served on a committee. Mr. Brown served as a trustee for the Cabin John Elementary School and also a member of Morningstar Tabernacle #88 (Kytle 1976, Clarke and McKinney 1976, Morningstar Lodge 1904).

In 1912 Mr. Brown passed away and his wife had died some years later leaving Lena to manage the property on her own. Ms. Lena Brown worked for the Cabin John Bridge Hotel as a laundress for a period of time. She then sought work in Washington, D.C. not wanting to stay in her parents' house alone anymore. She acquired a job as a cook in a private family's home and also worked at a boarding house as a dishwasher. During this time she had people staying on her Cabin John property and they "ruined" the property (Kytle 1976).

In the late 1930's Ms. Brown was going through a rough financial period. She was unable to pay the taxes on her property and attempts had been made to take the property from her (Kytle 1976). In 1940 the Federal Government decided they wanted to buy her property to build a housing development for its workers at the David Taylor Model Basin. The property was developed into a segregated community consisting of 20 houses for their African American employees (Armstrong 1947, Offutt 1995).

Ms. Lena Brown later moved back to Cabin John as an older woman and lived with the Hughes family until she died.

The Bowles Family

Jasper and Matilda Bowles purchased land from J.D.W. Moore. Jasper and Matilda had one son (Roland) and two daughters (Adeline and Alice). Mrs. Bowels worked for the Cabin John Bridge Hotel for about 18years. She worked in the ice cream parlor, dipping the ice cream for the patricians of the hotel. In addition to working in the ice cream parlor, she was also one of the hotel's laundresses. She would load the dirty laundry in a wheelbarrow and take it to a location some distance from the main hotel building where she would wash the clothes. In some cases, if the clothes were too heavy, the laundry man would come and carry the clothes for her. She would be assisted by little girls who would wash the handkerchiefs, while she washed everything else (Kytle, 1976).There is very little known about the Bowles beyond their occupation.

Jones Family

The first members of the Jones family to buy property in Cabin John were Robert and Emma Jones. Emma and Robert were married in 1882 and they had nine children they raised in Cabin John.  They had five daughters - Georgiana, Emma, Odelia, Daisy, and Ada and four sons - Edward, Robert, Clarence, and Rodney.

The Jones family was quite active in the community. Emma Jones was the local midwife and is reported having delivered almost everyone in the Cabin John African American community.  She retired from this profession and past the skill on to her daughter Odelia. (S. Harris, personal communication, 2008). Robert Jones was a trustee of the local school alongside his son Edward Jones (Clarke and McKinney 1976). In addition to their work and civic duty the Jones were very active in Gibson Grove A.M.E. Zion church (Kytle 1976).

Their oldest son, Edward, married Irene Jones and they lived on his parents' property for the early years of their marriage. In 1919, they purchased property directly down the road from his parents.  Irene worked from home as a laundress and Edward ran the family farm with the help of Irene. Irene's clientele was located in Glen Echo quite a distance from Cabin John. She would travel by horse and wagon to pick up her clients laundry. The clothes would be washed and ironed at her home and then she would return the laundry to her clients.

According to Irene's accounts, her and her husband had a fairly large farm. The farm was worked by both of them. They grew many of the same vegetables and fruit as their neighbors and they also raised livestock for consumption and labor purposes. She stated they, "had to buy some things, but we made preserves and jellies and things like that and that helped out a whole lot in the winter" (Kytle 1976:42). Most of the food the Jones family consumed was raised or grown on the property.

Though Ms. Jones was busy running her laundry business and tending to her family farm, the bulk of her free time was spent resting and volunteering at the church. She was a member of the stewardess board, a member of the choir, and a Sunday school teacher. When she became too old to attend church anymore, she became a member of the church's missionary society and continued to do the work of the church from home (Kytle 1976). Irene and Edward were the oldest living Jones family members which remained in Cabin John.



Figure 5.2 Map of Seven Locks Road 1931 (Klinge 1931)

00155884



Figure 5.3 Map of Seven Locks Road 1959 (Klinge 1949)

Scott Family

George Scott purchased four and half acres from J.D.W. Moore for the sum of one hundred and fourteen dollars on June 16th of 1885 (MCCC 1885). Mr. Scott lived on this property with his with Cyrilda and their two grandchildren Snowden Dove and Ida Dove. There is not a lot of information known about Scott family other than they were members of Morningstar Tabernacle #88 and Gibson Grove A.M.E. Zion Church (Morningstar Lodge 1904).

Carter Family

Henry Carter purchased on May 4th of 1885 two and a quarter acres for fifty six dollars and twenty five cents from J.D. W. Moore (MCCC 1885). He resided on this property with his wife Mary Delia Carter and their three children Robert, Laia, and Hester Carter. Mr. Carter was an active member of Morningstar Tabernacle #88 (Morningstar Lodge 1904). It is unknown if his wife or children were members of the lodge also.

Jackson Family

Philip Jackson also purchased two and a quarter acres of land on May 4th of 1885 from J.D.W. Moore (MCCC 1885). He moved on to the property his wife and four year old son; they had been married four years when they made the decision to buy property. Mr. and Mrs. Jackson raised two sons Fredrick and Philip Jackson and a niece Eva Jackson, while living on their Cabin John property (Census 1900). Philip Jackson and Eva Jackson were active members of Morningstar Tabernacle #88 (Morningstar Lodge 1904). It is not clear if the parents were also members of the lodge. No references have been located to state were the Jackson family were members of Gibson Grove A.M.E. Zion Church, however it is plausible considering the proximity of their home to the church.

Crawford Family

The Crawford family was one of the largest family groups in Cabin John. James and Ella Crawford purchased land from J.D.W. Moore. The Crawford's had seven children; John, Mary, Virginia, James, Viola, Jennie, and Robert Crawford. James worked as a laborer while Ella and their oldest daughter Viola worked as cooks. However it is unknown who employed their services (Census 1910). In addition to working outside the home, the family also had a garden which they grew their own food.

The Crawford family was quite involved in the Cabin John community. The Crawford family members help build Gibson Grove A.M.E. Zion Church. They served on various church committees over the years; Church trustee board, Sunday school teachers, Deaconess Board and choir (Clarke 1983, Gibson Grove 1976, Gibson Grove 1989). In addition to their involvement with the church, Ella Crawford was a member of Morningstar Tabernacle #88. In 1904, she was conferred as a 4th degree within the organization's hierarchy (Morningstar Lodge 1904).

Though there is limited information on the Crawford children, what is known is Robert Crawford was a golfer. He won the Colored Open Championship which was held in Washington, DC. An article on him was featured in the Washington Post (n.d.).

The Crawford family being one of the largest families in the Cain John's African American community it was inevitable that they would intermarry with the other Cabin John families. Mary "Peaches" Crawford married Rodney White. Sadie Crawford married Marion



Figure 5.4  Marion and Sadie Crawford

Harris. Also, Hester Carter married George Harris. These three marriages made the bond between neighbors stronger by elevating it to the status of family. This larger family represented about one third of the African American community of Cabin John community.

White Family

The White family in Cabin John seems to begin with Rodney White. He was born in Maryland. However it is unknown when he moved into the Cabin John area or if he was raised in one of the communities surrounding Cabin John. Rodney and Mary White purchased land from Mr. P. Jones. Their new plot of land was located about 2 miles from the Crawford property. The Whites were married in 1923 after having their first son Rodney White Jr. The White had a total of eleven children Bernice, Jane, Nathaniel, Lucille, Aloise, Lorraine, Robert, Preston, Allen, Charles, and Rodney White. In addition to her children with Rodney, Mary had a child before her marriage named George Crawford (B. Dove personal communication 2008).

Rodney White worked as a day laborer and Mary cleaned other people homes part-time. When not working for other people, Mary devoted her time to raising her family. Rodney and Mary both spent a great deal of time taking care of their single family home and gardens. Being related to many of their neighbors meant that the White family were involved any many of the same activities as their other relatives. They attended Gibson Grove A.M.E. Zion Church and

were activity members of Morningstar Tabernacle #88. In the case of the White family many of the children belonged to the Juvenile Division of Morningstar Tabernacle #88 (B. Dove personal communication 2008).

Harris Family

The Harris family in Cabin John begins with Mary and Charles Harris. They married in 1880 and soon after started their family. They had five children 4 sons; Elijah, Louis, George, and Marion Harris and one daughter Jessie Harris. The Harris family owned land in Cabin John however it is unclear whether they purchased land from one of the other families or if they purchased land from J.D.W Moore. It is know that the land Moses Hall was built on belonged to the Harris family, Mary Harris's home was located walking distance from Moses Hall (E. Harris personal communication 2008).

Their son, George Harris, married Hester Carter in 1917; they purchased land from P. Jones another African American land owner. Their brother Marion married Sadie Crawford which had seven children Ernest, Sadie, Raymond, Herbert, Leroy, Montgomery, and Hazel Harris. Marion and Sadie lived in Rock Spring, Maryland. Marion's mother convinced them to move back to Cabin John and build their home behind their family home (S. Harris personal communication 2008). It is unknown if their other two brother and sister ever married.

Elijah Harris is credited with running Morningstar Tabernacle #88. He served as President and Secretary of the lodge for a period of time (Morningstar Lodge 1904, E. Harris personal communication 2008). The history of Morningstar Tabernacle #88 is unclear but it is known that the Harris, White and Crawford families were all members and personal insured the upkeep of Moses Hall (the building built for the business of the lodge). All of Marion and Sadie's children belonged to the juvenile division of the lodge; Sadie their daughter mentioned she was initiated as a young adult into the adult division of the fraternal organization (S. Harris personal communication 2008). She seemed to be the only child old enough to make the transition before the organization disbanded.

Grand United Order of Brothers and Sisters, Sons and Daughters of Moses

All the heads of the families belonged to Grand United Order Brothers and Sisters, Sons and Daughters of Moses, a secret black fraternal organization stared in 1867 by Peter Paul Brown in Morristown, PA (Widely Known Secret Society 1909). The objectives of the order were "the maintenance and education of the orphan children of deceased members, the burial of its dead, and the care and oversight of its sick and destitute" members (Walker 1880:52). Little is known about the workings of the organization, but the group started the Morningstar Tabernacle #88 in Cabin John.

The lodge was prominent consisting of Moses Hall[4] and a cemetery. Moses Hall in Cabin John was run by Elijah Harris and the Harris, White, and Crawford families all played a large role in the upkeep of the building and the property (S. Harris personal communication 2008, A. White personal communication 2009). Moses Hall was a two level building that hosted lodge

---

[4] It was common in the organization that once a lodge acquired a facility it was named Moses Hall.



Figure 5.5 Financial Card of Grand United Order of Brothers and Sisters, Sons and Daughters of Moses

meetings twice a month on Wednesday evenings. The lodge also hosted all of the social events, dances, and dinners (S. Harris personal communication 2008).

Everyone in the African American Cabin John community was a member of Morningstar Tabernacle #88. Each member paid dues and according to the 1904 ledger the members paid a portion of their dues every time they came to the meetings. Members of the lodge were afforded the privilege of being buried in Moses Hall cemetery, which was used from 1912 to 1970. It was not until about the 1930's when the younger generation started to move away that membership became stagnant.

In the late 1960's Moses Hall was destroyed due to fire. A neighborhood youth of European American decent, under the influence of alcohol, set the place on fire. The building was completely destroyed only a few bricks and a cemetery mark the location of the once present Hall.

Education in Cabin John

On June 12, 1880 the first school for African Americans in Cabin John was built. The school was named Moore's School (probably named after J.D.W. Moore), it was a 16 by 24 feet single room building located on Conroy Road. The original half acre site was bought for $10. On

February 12, 1883, Montgomery County Board of Education bought another quarter of an acre for $32.50 from J.D.W. Moore to expand the school site (Clarke and McKinney 1976).

    Twenty-Eight years later a decision was made to move the school. On March 28 of 1911, the Montgomery County School Board began renting put Gibson Grove A.M.E. Zion Church and moved the school to the church. The School Board agreed to pay the trustees of Gibson Grove $7.72 for use of the space as a school. Once the school was moved to its new location the name changed to Cabin John Elementary School (Clarke and McKinney 1976).

    The school's trustee board was made up of members of the Cabin John African American community; Edward Jones, Robert Jones, Charles Jones, Ida Dove, C.H. Brown, William Harper, James Crawford, Phillip Jackson, Robert Carter, Lloyd Jackson, and Toliver Wallace. Cabin John Elementary School was only open for 11 years and during that time, it had a number of teachers that taught at the school; Jennie Peters, Florence Johnson, William Luckett, William Ferguson, Rebecca Underwood, Estelle Brooks, and Margaret Wood. The school was shut down on January 22 of 1922 by the county superintendent.  Edwin Broome, County Superintendent, went before the Montgomery County School Board and recommended the closure of the school due to low attendance. For five years following the closure, 24 children within the community of Cabin John had no school they could attend (Clarke and McKinney 1976).

    Outraged and upset by the actions taken by the County School Board and realizing nothing was being done to solve the education problem, a group of enraged parents of Cabin John children went before Montgomery County School Board on February 14, 1926. During that meeting, the parents were told a new site would be purchased for a school. Yet, months passed and no new school was built. In its stead the School Board decided to rent Moses Hall out for $5 a month rent.

    The children began attending school at Moses Hall. While in attendance, they were taught by Ms. Margaret Woods. The school was only open for five years before the School Board ordered the school closed and the children moved to River Road School (S. Harris personal communication 2008). The last school to be located in Cabin John for African Americans officially closed its doors on September 8, 1931(Clarke and McKinney 1976).

Epilogue

I have spent the greater part of the past two years researching the African Americans that lived and still live in Cabin John. During the course of my research I uncovered the rich story of ordinary people who in the face of adversity built a community.  I embarked on my research expecting to help a church rebuild after a fire and to exhume and repatriate the skeletal remains of two past community members. I was able to accomplish one of these tasks.

Upon completion of the excavations, it was uncovered that the skeletal remains were not present on the current church property. In addition to that revelation, I realized, with the limited amount of information obtained from the archaeological record, there was not much I could add to the story of African Americans in Cabin John.  Through making the choice to pursue the history of Gibson Grove A.M.E. Zion church beyond tradition archaeological methods, that choice led to new information and queries.

Being an African American woman, I have been raised in a family which always stressed the importance of church in our community and throughout my career as an academic I was taught that the black church played an important role in the African American community. Armed with my beliefs I expected to find that the church played this same role in the Cabin John community. When the archaeology proved otherwise, I pursued other lines of evidence to provide a more detailed explanation for what the archaeological record had already revealed.  In talking with community members, what became apparent was that the institution which bonded the community was a secret fraternal society.

The fraternal society (Morningstar Tabernacle #88, Grand United Order Brothers and Sisters, Sons and Daughters of Moses) provided many of the services that the community needed at the time, but could not obtain anywhere else. The society provided medical and certain aspects of financial security which were denied to African American in post-bellum Maryland. It also served as the main social outlet for the Cabin John community.  Morningstar Tabernacle #88 even dabbed in the religion department, through having guest ministers speaking at their events. The larger organization owned property in Cabin John and many towns throughout Maryland. Hence, being a member of this organization created a sense of security for their members and a sense of pride that they belonged to an organization owned and operated by African Americans for their advancement.

Cabin John community thrived as a result of Morningstar Tabernacle #88.  In an effort to report a complete an accurate picture of Cabin John's African American community, upon discovering the society's role in the community, I tried to locate as much information as I could on the organization. The focus of my dissertation was Gibson Grove A.M.E. Zion Church and I conducted full archaeological and historical investigations on the property. However, Gibson Grove has led me to Morningstar Tabernacle #88, Grand United Order Brothers and Sisters, Sons and Daughters of Moses.

I want to conduct further investigations into this fraternal society and explore the role fraternal and benevolent societies played in the lives of post-bellum African Americans in Maryland. Archaeologically, I would like to go the property in Cabin John owned by the society and use a total station to recreate the building footprint of Moses Hall. This would give an accurate picture of the size of structure, which hosted all of the community's social events. In addition, I want to conduct phase I and phase II survey on the area adjacent to the old structure.

In the past few months, I located two other lodges located in Maryland (the lodge in Baltimore also had a building -Moses Hall).  If the Baltimore property is still vacant, I would like to reconstruct the building footprint also and possibly conduct phase I survey on this property.

I would like to explore the archives and see if I can locate official correspondence from the organization. I have knowledge that there is documentation on the organization; however some of the correspondence on the organization and produced by the organization is housed in a private collector's collection which is not available to the public. In pursuing the history behind the organization; I would like to conduct ethnographic interviews with any living past members of the society. What remains of the organization's membership seems to be dying away with each day that passes, by collecting their stories it gives a deeper understanding of the role the society played in their lives and their community.

To date nothing has ever been published on Grand United Order Brothers and Sisters, Sons and Daughters of Moses they have managed to remain a secret society for all of these years. I feel it is time their secret was shared with the world.

## **Bibliography**

Armstrong, Edith. (1947). *Cabin John Community*. Cabin John, Maryland.

Balsom, Janet. (1999). Staying Upright. *CRM*, 3, 23-26.

Beauchamp, Tanya. (1998). *The Georgetown Historic District*. Washington, D.C.: The
    Georgetown Heritage Trust.

Beito, David. (1990). Mutual Aid for Social Welfare: The Case of American Fraternal Societies.
    *Critical Review* 4(4),709-736.

Blakey, Michael. (1998). The New York African Burial Ground Project: An Examination of
    Enslaved Lives, a Construction of Ancestral Ties. *Transforming Anthropology*, 7(1), 53-
    58.

Bower, Anne and Byron Rushing. (1980) The African American Meeting House : The Center for
    the 19th Century Afro-American Community in Boston. In R. Schuyler (Ed.),
    *Archaeological Perspectives on Ethnicity in America: Afro-American and Asian
    American Culture History* (pp.69-75). New York: Baywood Publishing.

Brackett, Jeffrey. (1890). *Notes on the Progress of the Colored People in Maryland Since the
    War*. Maryland: Books for Libraries Press.

Cabak, Melanie, Mark Groover, and Scott Wages. (1995). Health Care and the Wayman A.M.E.
    Church. *Historical Archaeology* 29(2), 55-76.

Cavicchi, Claire. (2001). *M-NCPPC, Places from the Past: The Tradition of Gardez Bien in
    Montgomery County*. Silver Spring: M-NCPPC.

Clarke, Nina. (1983). *History of the Nineteenth-Century Black Churches in Maryland and
    Washington, D.C.* New York: Vantage Press.

Clarke, Nina and Frank McKinney. (1976). *The Bicentennial Cabin Jo*hn. Unpublished
    Manuscript on file Montgomery County Historical Society.

Cressey, Pamela and Margaret Anderson. (2006). *Alexandria, Virginia*. New York: Oxford
    University Press.

Crane, B., Auman, C., Crowell, E., Pappas, M., Horn, J., et al. (2006). *The Archaeology of an
    Urban Landscape, The Whitehurst Freeway Archaeological Project Volume II:
    Historical Site*. Unpublished Manuscript on file, DC SHPO Office, Washington, D.C.

Crisler, Jane, Kris Mitchell, and Carol Gleichman. (1999). Working Together for Better
    Solutions. *CRM*, 3, 3-5.

Colwell-Chanthaphonh, Chip and T.J. Ferguson. (2008). *Collaboration in Archaeological Practice*. Lanham: Rowman & Littlefield Publishers, Inc.

Copeland, Tim. (2004). Presenting Archaeology to the Public. In N. Merriman (Ed.), *Public Archaeology (*pp.132-144). New York: Routledge.

Daly, Julia. (1994). A Phosphate Analysis of the Soils from Four Archaeological Sites in Northern Greece.  In Henry Woodward (Ed.), 7Th Keck Symposium Volume (pp 148-151). Pennsylvania: Keck Geology Consortium.

DeCunzo, Luann and Bernard Herman (Eds.). (1996). *Historical Archaeology and the Study of American Culture*. University of Tennessee: Tennessee.

Deets, Edward and Charles J. Maddox. (1917). *A Real Estate Atlas of the part of Montgomery County, Maryland*. Maryland: Edward Deets and Charles J. Maddox Civil Engineers.

Deetz, James. 1988. American Historical Archaeology: Methods and Results. *Science* 239 (4838): 362-367.

Derry, Linda. (1997). Pre-Emancipation Archaeology: Does It Play in Selma, Alabama. *Historical Archaeology,* 31(3), 18-26.

Derry, Linda and Maureen Malloy, eds. (2003). *Archaeologists and Local Communities: Partners in Exploring the Past*. Washington, DC: Society for American Archaeology.

Dorset, Elaine. (2008). Fort Vancouver National Historic Site Hudson's Bay Company Gardens. *SHA Newsletter*, 41(1), 38.

DuBois, W.E.B. (1995[1898]). The Negro of Farmville Virginia.  In Lewis, David (Ed.), *W.E.B. DuBois a Reader.* New York: Henry Holt and Company, LLC.

Fields, Barbara Jeanne. (1985). Slavery *and Freedom on the Middle Ground*. New Haven: Yale University Press.

Franklin, Marie. (1997). Power to the People Sociopolitics and the Archaeology of Black Americans. *Historical Archaeology,* 31(3), 36-50.

Frazier, Franklin. (1974). *The Negro Church in America*. New York: Schocken Books.

Fuke, Richard Paul. (1999*). Imperfect Equality: African American and the Confines of White Racial Attitudes in Post-Emancipation Maryland*. New York: Fordham University Press.

Gadsby, David and Robert Chidester. (2005) *History from the bottom Up: A Research Design*

*for Participatory Archaeology in Hampden-Woodberry, Baltimore, MD.* Baltimore: Center for Heritage Resource Studies.

Gatewood, W.B. (2000). *Aristocrats of Color: The Black Elite, 1880-1920.* Fayetteville, Arkansas: University of Arkansas Press.

Genealogical Council of Maryland. (1996). *Directory of Maryland Burial Grounds.* Maryland: Heritage Books.

Gibson Grove A.M.E. Zion Church. (n.d., a). *History of Gibson Grove A.M.E. Zion Church 1898-1989.* Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

Gibson Grove A.M.E. Zion Church. (n.d., b). *History of Gibson Grove.* Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

Gibson Grove A.M.E. Zion Church. (n.d., c). *Gibson Grove A.M.E. Zion Church an Historic Witness in Montgomery County.* Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

Gibson Grove A.M.E. Zion Church. (1976). *Bicentennial edition Founder's day Celebration.* Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

Gibson Grove A.M.E. Zion Church. (1989). *A Souvenir Program of the Mortgage Burning of Gibson Grove A.M.E. Zion Church.* Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

Gibson Grove A.M.E. Zion Church. (2006). *Gibson Grove A.M.E. Zion Church Founded 1898 Church, School, and Cemetery.* Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

Gramsci, Antonio. (1992). *Prison Notebook.* New York: Columbia University Press.

Haecker, Charles and Jeffrey Mauck. (1997). *On the Prairie of Palo Alto: Historical Archaeology of the U.S.- Mexican War Battlefield.* Texas: Texas A &M University Press.

Hodder, Ian. (1997). Always Momentary, Fluid and Flexible: Towards a Reflexive Excavation Methodology. *Antiquity,* 71, 691-700

Hodder, Ian. (2003). "Archaeological Reflexivity and the "Local" Voice." *Anthropological Quarterly*, 76 (1), 55-69.

Jameson, John. (1997). What this Book is About. In J. Jameson (Ed.), *Presenting Archaeology to the Public: Digging for Truths* (pp 11-20). Walnut Creek: Altamira Press.

Jameson, John. (2004). Public Archaeology in the United States. In N. Merriman (Ed.), *Public Archaeology (*pp.21-58). New York: Routledge.

Klinge, F.H.M. (1931). *Property Atlas of Volume 1 Montgomery County, Maryland*. Lansdale: Frank H.M. Klinge Engineers and Publishers.

Klinge, F.H.M. (1949). *Atlas of Montgomery County Maryland Volume* 2. Lansdale: Frank H.M. Klinge Engineers and Publishers.

LaRoche, Cheryl. (2007). Public History at Sites of Protest: Citizenship on the President's House Viewing Platform. *Cross Ties*, 2 (3), 1-3.

LaRoche, Cherly and Michael Blakey. (1997). Seizing Intellectual Power: The Dialogue at the New York African Burial Ground. *Historical Archaeology, 31*(3), 84-106.

Leone, M.P. (1986). Symbolic, Structural, and Critical Archaeology. In D. Meltzer, D. Fowler, and J. Sabloff (Eds.), *American Archaeology Past and Future: A Celebration of Society for American Archaeology, 1935-1985*. Washington, DC: Smithsonian Institution Press.

Leone, M.P. (2005). *The Archaeology of Liberty in an American Capital*. Berkeley: University of California Press.

Leone, M.P., Parker Potter, and Paul Shackel. (1987). Towards a critical Archaeology. *Current Anthropology,* 28(3), 283-302.

Lesko, Kathleen, Valerie Babb and Carroll Gibbs. (1991). *Black Georgetown Remembered: A History of its Black Community From Founding of the "The Town of George" in 1751 to the Present Day*. Washington, D.C.: Georgetown University Press.

Lincoln, C. Eric and Lawrence Mamiya. (1990). *The Black Church in The African American Experience*. Durham: Duke University Press.

Little, Barbara. (1994). Journal of Archeological Method and Theory 1(1): 5-40.

Little, Barbara. (2002). Archaeology as a Shared Vision. In B. Little (Ed.), *Public Benefits of Archaeology*. (pp.3-19). Gainesville: University Press of Florida.

Little, Barbara and Paul Shackel. (2007). *Archaeology as a Tool of Civic Engagement*. Maryland: AltaMira Press.

MacMaster, Richard. (1966/1968). Georgetown and Tobacco Trade, 1751-1783. *Records of the Columbia Historical Society*, 66/68, 1-33.

Marshall, Yvonne. (2002). What is community archaeology. *World Archaeology*, 34(2), 211-219.

McDavid, Carol. (2002). Archaeologies that Hurt; Descendants that matter: a pragmatic approach to collaboration in the public interpretation of African American Archaeology. *World Archaeology*, 34(2), 303-314.

McDavid, Carol. (2004).Towards a More Democratic Archaeology.  In N. Merriman (Ed.), *Public Archaeology (*pp.159-187). New York: Routledge.

McDavid, Carol and David Babson. (1997) In the Realm of Politics: Prospects for Public Participation in African American Archaeology. *Historical Archaeology*, 31(3).

McGuire, Randall. (1994). Do the Right Thing. In T. Bray (Ed.), Reckoning *with the Dead* (pp.180-184). Washington, DC: Smithsonian Institution Press.

Merriman, Nick. (2004). Diversity and Dissonance in Public Archaeology.  In N. Merriman (Ed.), *Public Archaeology* (pp.1-17). New York: Routledge.

Montgomery County Circuit Court. (1923). Land Records. Maryland.

------.  (1881). Land Records. Maryland.

------.  (1880). Land Records. Maryland.

------.  (1885). Land Records. Maryland.

------.  (1885). Land Records. Maryland.

------.  (1885). Land Records. Maryland.

Morningstar Tabernacle #88. (1904). Unpublished Manuscript on file Montgomery County Historical Society.

Moser, Stephanie et al. (2002) Transforming archaeology through practice: Strategies for Collaborative Archaeology and the Community Archaeology Project at Quseir, Egypt. *World Archaeology*, 34(2), 220-248.

Mower, J. and R. Cole (1937). *WPA Survey of State and Land Historical Records: Maryland Historical Records Survey Church Records*. MD: Works Projects Administration.

Mullins, Paul. (2003). *Race and Affluence: An Archaeology of African American and Consumer Culture, 1850-1930*.  New York: Plenum Press.

Offutt, William. (1995). *Bethesda: A Social History of the Area through WWII*. Maryland: The Innovation Game.

00155897

Orser, Charles E. Jr. and Brain M. Fagan. 1995. Historical Archaeology 37-38.

Park, R. and Francis Huff.  (1962). *Map of Seven Locks Road*. Maryland: State Highway Administration.

Palus, Matthew, Mark Leone, and Matthew Cochran. (2006) Critical Archaeology: Politics Past and Present. In M. Hall and S. Silliman (Eds.).  *Historical Archaeology*, (pp.84-101). New York: Black well Publishing.

Potter, Parker. (1994). *Public Archaeology in Annapolis: A Critical Approach to History in Maryland's Ancient City*. Washington: Smithsonian Institution Press.

Robinson and Associates. (1993). *The Georgetown Historical District Project: A Cultural Resources Survey*. Unpublished Manuscript on File , DC SHPO Office, Washington, D.C.

Shackel, Paul and Erve Chambers (Eds.).  (2004). *Places in Mind: Archaeology as Applied Anthropology*. New York: Routledge.

Singleton, Theresa and Charles Orser. (2003). Descendant Communities: Linking People in the Present with the Past. In L. Zimmerman , K. Vitelli, and J. Hollowell-Zimmer (Eds.) *Ethical Issues in Archaeology*, (pp.143-152). California: AltaMira Press.

Skocpol, Theda, Ariane Liazos, and Marshall Ganz. (2006). *What a Might Power We Can Be: African American Fraternal Groups and the Struggle for Racial Equality*. Princeton: Princeton University Press.

Skocpol,Theda and Oser, Jennifer. (2004). Organization Despite Adversity: The Origins and Development of African American Fraternal Associations. *Social Science History*,28(3), 367-437.

Soladay, M. (2004). Fire Destroys Historic Church. *The Gazette*. March 3, pp. 3-4.

Stahl, Ann. (2004). Making History in Banda: Reflections on the Construction of Africa's Past. *Historical Archaeology,* 38(1), 50-65.

Tibbett, Mark and David Carter, eds. (2008). *Soil Analysis in Forensic Taphonomy: Chemical and Biological Effects of Buried Human Remains*. Boca Raton: CRC Press.

Tomlinson, J.S. (1913). *Cabin John Park: 7 miles from the White House*. Washington, DC: American Land Company.

Trouillot, M. (1995). *Silencing the Past: Power and the Production of History*. Boston: Beacon Press.

U.S. Census Bureau. (1900). *Statistical abstract of the United States*. Washington, DC: Government Printing Office.

U.S. Census Bureau. (1910). *Statistical abstract of the United States*. Washington, DC: Government Printing Office.

Walker, R.F. (1880). *Acts and Joint Resolutions Passed by The General Assembly of the State of Virginia During the Session of 1879-1880*. Richmond: Superintendent Public Printing.

Wells, Judith. (2008). *Cabin John: Legends and Life of an Uncommon Place*. Maryland: Cabin John Association.

Widely Known Secret Society. (1909). *Afro-American.* February 13, pp. 6.

Wilkie, Laurie and Kevin Bartoy. *(2000).* A Critical Archaeology Revisited*. Current Anthropology*, 41(5), 747-777.

William, Ellis. (1966/1968). Home Rule in Action: Georgetown, 1789 to 1871. *Records of the Columbia Historical Society*, 66/68, 47-56.

Wylie, Alice. (1985). Putting Shakertown Back Together: Critical Theory in Archaeology. *Journal of Anthropological Archaeology*, 4, 133-147.

Young, T. (n.d). *The History of Gibson Grove Methodist Church and In Memory of Sarah Gibson, Founder and Donor*. Unpublished Manuscript on file, First Agape A.M.E. Zion Church, Cabin John, MD.

# APPENDIX A

## Level and Feature Descriptions

**Unit 1**

This was a 1.5m x1.5 m unit placed in the northwest corner of the church's back yard located directly in front of the shed. The northern side of the unit runs along the property line. The west side was adjacent to the shed. The unit was cover sparsely with grass and leaves.

**Level A** – Level A consisted of top soil sparsely covered with grass. The top soil 10 YR 3/2 very dark grayish brown ended about 2.5 cm and the soil turned 10YR 5/6 yellowish brown silt. The artifacts located in this level were nails.

**Level B** - Level B was located beneath level A, this layer is 10YR 5/6 yellowish brown silt. This level was about 12cm in depth. Nails and piece of painted wood were the artifacts recovered from this level.

**Level C** – Level C was beneath Level B. It is 10YR 5/ 6 yellowish brown silt. No artifacts were recovered from this level it was sterile. The unit stopped due to massive tree roots bisecting the unit. The unit was cored to a depth of 30 cm.

**Unit 2**

The unit was a 1.5m x 1.5m located in the western most portion of the church's backyard 2 m to the south of Unit 1. The unit is adjacent to the large tree which lines the property line. The unit was covered with bare top soil, no vegetation.

**Level A** – Level A was covered with top soil 10YR 3/2 very dark grayish brown. The top soil was about 2.5 cm in depth. Just under the top soil was 10YR 5/4 yellowish brown silt loam which contained 10% rock. Artifacts recovered include coal, brick, nails, and pieces of iron.

**Level B** – Level B located just under Level A continued the 10YR 5/4 yellowish brown silt. However the rock content went up to 15%. Coal was the artifact recovered from this unit.

**Level C** – Level C consisted of 10 YR 5/4 yellowish brown sandy silt loam with about 30% rock. There were no artifacts recovered from this level. The unit stopped at about 31cm due to roots from the adjacent trees and large rocks in southwest corner.

**Unit 3**

Unit 3 was a 1.5m x1.5m unit located 4 m north of the side of the church and about 4 m south of the property line and the neighbor's fence. The unit is in the middle of the walk area from the front of the church leading to the back of the church. The unit is located on a 15% slope. The unit is covered sparsely with grass.

**Level A** – Level A was covered with very little top soil 10 YR 4/2 dark grayish brown, it was about 1 cm in depth. The remained of the level was 10YR 5/4 yellowish brown silt. Window glass, coal, brick, concrete and nails were the artifacts recovered from this level.

**Level B** – Level B continued with 10YR 5/4 yellowish brown silt. A piece of window glass was the only artifact in this level. The unit was excavated to 23 cm in depth; the unit was stopped due to the level becoming sterile after the first 2cm of the level.

## Unit 4

The unit was 1.5m x 1.5 m, it was located adjacent to north side wall of the addition on the church. The unit's south side faced the window in the north wall. The unit located about 1.5m from the base of the north wall. It was covered with glass from the blown out window.

**Level A** – The unit was covered with glass and ash. The ash seemed to be a combination of roof shingles and wood. Level A consisted of silt loam 2.5Y 5/4 light olive brown and schist with 10% rock inclusions. The artifacts recovered from this level were nails, wire, and coal. In the middle of the south wall of the unit a iron pipe was found. It continued into the next level.

**Level B** – The soil in level B consisted of 10 YR 5/6 yellowish brown silt loam with 20% rock. At 16 cm the soil texture changed from silt loam to hard clay. One screw and a piece of window glass were recovered from this level. The iron pipe continued into level B and went deeper. The unit was stopped at 23 cm due to the soil texture turning to hard clay.

**Feature 1** – The iron pipe appeared about 7 cm into level A. It continued through level B and into what would have been level C.

## Unit 5

Unit 5 is 1.5m x1.5m located on the eastern portion of the church property. It is located between a tree and old corner stone block and 9 m north of the front stairs of the church. The unit was on a 15% slope located closer to the front of the church than unit 3. The unit was covered sparely with grass.

**Level A** – The level was covered with top soil 10 YR 4/2 dark grayish brown and a little grass. The soil changed 3cm in depth to 10 YR 5/4 yellowish brown silt loam. Numerous artifacts were recovered from this level nails, animal bone, glass, brick, coal, and cap of a flask.

**Level B** – Level B is beneath level A, the soil continued with the 10YR 5/4 yellowish brown silt loam.  The artifacts found in this level were coal, glass, nails, wood, wire, and President Wilson button.

**Level C** – The level contained 10 YR 5/4 yellowish brown silt loam. The artifacts found in the unit were a nail, glass, coal and brick fragments all found in the first 3 centimeters of the level. The remained of the level was sterile. The unit was cored to 40cm.

## Trench

The trench is a 1.5m x.5m unit, located in southern portion of the church's back yard. There are two rocks located parallel to each other on both sides of the tree. The unit was placed in front of these rock markers, so that it would bisect both areas in front of the markers. The south wall of the unit is on a 10% incline.

**Level A** – Level A was covered with a thin 2cm layer of top soil 10YR3/2 very dark grayish brown. The remainder of the level was 10YR 5/6 yellowish brown silt loam. In the southern portion of the unit bottle glass was recovered and two pieces were located in the northern portion of the unit.

**Level B** - Level B the soil color and texture remained the same, 10 YR 5/6 yellowish brown silt loam. The northern and middle section of the unit came to a halt due to a root floor at about 25cm. The south portion continued. There were no artifacts recovered from this level.

**Level C** - Level C is located beneath level B on the south portion of the unit only. The soil is 10YR 5/6 yellowish brown silt loam with about 30% rock and large roots. No artifacts were recovered.

**Level D** – Level D located below level C on the southern portion of the unit. The soil has maintained its same consistence of 10YR 5/6 yellowish silt loam. No artifacts.

**Level E** – Level E soil is 10YR 5/6 yellowish brown silt loam with 30% rock. The roots are continuing through this portion of the unit. The area became smaller due to the roots. No artifacts recovered.

**Level F**- Level F located beneath level E  same soil color and texture 10YR 5/6 yellowish brown silt loam with 30% rock inclusions. No artifacts recovered. The unit was cored to 95 cm in the south portion of the unit.

# APPENDIX B

## Shovel Test Pit Records

**Line 1**
**STP No: 1**
Location: 1.4m E of N999.2 E999.4 Z1000.7
Depth of Unit: 35 cm
Artifacts: nail and wood
Description:
1) 10YR 5/4 yellowish brown loose loam
2) 10YR 5/4 compact loam

**STP No: 2**
Location: 1m E of STP 1
Depth of Unit: 34 cm
Artifacts: nail and concrete
Description:
1) 10YR 5/4 loam 30% rock
2) 10YR 5/6 sandy loam

**STP No: 3**
Location: W of N998.6 E1002.9 Z999.6
Depth of Unit: 19 cm
Artifacts: none
Description:
1) 10YR 5/4 loam 40% rock
2) Stopped due to rock

**Line 2**
**STP No: 4**
Location: E of N997 E998.8 Z1000.3
Depth of Unit: 30 cm
Artifacts: nail
Description:
1) 10 YR 4/6 silt
2) 10YR 4/6 silt 30% rock
3) Large root going through STP
4) Stopped due to large roots

**STP No: 5**
Location: E of N996.8 E 998.8 Z1000.35
Depth of Unit: 31 cm
Artifacts: none
Description:

1) 10 YR 4/6 silt
2) 10YR 4/6 silt
3) Stopped due to roots

**STP No: 6**
Location: E of N999.7 E 1002.8 Z999.9
Depth of Unit: 28 cm
Artifacts: none
Description:
1) 10YR 4/6 silt
2) 10YR silt large root with 50% rocks
3) Stopped due to rock and root

**Line 3**
**STP No: 7**
Location: E of N994.9 E998.7 Z1000.5
Depth of Unit: 25 cm
Artifacts: none
Description:
1) 10YR 5/3 silt loam 45% rock
2) Stopped due to roots

**STP No: 8**
Location: E of N994.8 E 1000.7 Z1000.3
Depth of Unit: 26 cm
Artifacts: nails
Description:
1) 10YR 4/6 mottled w/ chalky rock sandy
loam
2) 10 YR 6/6 sandy loam
3) 10YR 6/6 sandy loam 70% rock

**STP No: 9**
Location: E of N994.6 E1002.7 Z 1000.1
Depth of Unit: 20 cm
Artifacts: none
Description:
1) 10YR 6/6 mottled w/ chalky rock
2) Stopped due to roots

**STP No: 10**
Location: E of N999.4 E1006.7 Z999.6
Depth of Unit: 29 cm
Artifacts: concrete
Description:
1) 10YR 4/6 sandy silt loam 15% rock

**STP No: 11**
Location: E of N 994.2 E 1008.9 Z993.3
Depth of Unit: 24 cm
Artifacts: none
Description:
1) 2.5 Y 6/4 sandy loam w/ 50% rock

**STP No: 12**
Location: E of N994.2 E1008.7 Z999.3
Depth of Unit: 20 cm
Artifacts: none
Description:
1) 10YR 4/6 sandy silt loam
2) 10YR 4/5 mottled with chalky rock silt
3) Stopped due to roots and rock

**STP No: 13**
Location: E of N994.1 Z 998.9 E1010.6
Depth of Unit: 31 cm
Artifacts: nail and glass
Description:
1) 10 YR 4/6 sandy loam rock inclusions
10% rock
2) Stopped due to roots at the base

**STP No: 14**
Location: N/A
Depth of Unit: N/A
Artifacts: none
Description:
1) Cable wire

**<u>Line 4</u>**
**STP No: 15**
Location: E of .7m N993 E996.7 Z1000.9
Depth of Unit: 30 cm
Artifacts: nut
Description:

1) 10YR 4/6 sandy/silt

**STP No: 16**
Location: E of .8m N993 E 998.7 Z1000.7
Depth of Unit: 33cm
Artifacts: none
Description:
1) 10YR 4/6 sandy/silt loam

**STP No: 17**
Location: E .8m of N992.8 E1000.7
Depth of Unit: 36cm
Artifacts: nail found on surface
Description:
1) 10YR 5/6 silt 25% pebble
2) A layer of rock 8cm down white and
chalky
3) 10YR 5/6 silt

**STP No: 18**
Location: E of .8m N992.7 E1002.7 Z1000.3
Depth of Unit: 37 cm
Artifacts: none
Description:
1) 10YR 4/3 silt
2) 10YR 4/6 silt 40% rock

**STP No: 19**
Location: E of .9m N992.6 E 1004.6 Z999.5
Depth of Unit: 32cm
Artifacts: none
Description:
1) 10 YR 3 /4  silt
2) 10YR 4/6 silt 25% pebbles
3) Stopped unit due to roots

**STP No: 20**
Location: E .9m of N992.4 E1006.6
Depth of Unit: 34 cm
Artifacts: none
Description:
1) 10YR 5/6 silt 20% pebbles and  mica
schist

00155904

**STP No: 21**
Location: E of N992.3 E 1008.6 z999.6
Depth of Unit: 33 cm
Artifacts: wire nail
Description:
1) 10YR 5/6 silt 30% rock
2) 2.5 Y 5/4 hard clay loam

**STP No: 22**
Location: E of N992.1 E1010.5 Z999.1
Depth of Unit: 30 cm
Artifacts: none
Description:
1) 10 YR 4/6 silt 20% rock
2) Stopped due to rocks and roots

**STP No: 23**
Location: E of N991.9 E1012.55 Z998.7
Depth of Unit: 40 cm
Artifacts: none
Description:
1) 10 YR 4/6 silt 40% rock
2) Stopped due to rocks

**STP No: 24**
Location: E of N991.7 E1014.5 Z998.3
Depth of Unit: 45 cm
Artifacts: wire nail, window glass, button
Description:
1) 10 YR 4/6 silt 50% rock large cobbles

**Line 5**
**STP No: 25**
Location: W of N991 E998.6 Z1000.8
Depth of Unit: 39 cm
Artifacts: none
Description:
1) 10YR 5/6 silt 30% rock
2) 10YR 5/6 silt  30 cm and below

**STP No: 26**
Location: E of N991 E998.6 Z1000.8
Depth of Unit: 42 cm
Artifacts: concrete
Description:

1) 10YR 5/6 silt

**STP No: 27**
Location: E of .7m N990.7 E1002.7 Z1000.4
Depth of Unit: 38 cm
Artifacts: none
Description:
1) 10YR 5/6 silt
2) 10YR 5/6 silt 30% rock

**STP No: 28**
Location: E of.7m N990.7 E1002.7 Z1000.6
Depth of Unit: 36 cm
Artifacts: none
Description:
1)  10YR 5/6 silt
2)  10YR 5/6 silt 30%rock

**STP No:  29**
Location: E of N900.65 E1000.6 Z1000.6
Depth of Unit: 31 cm
Artifacts: glass
Description:
1) 2.5Y 4/4 silt 11 cm 40% rock
2) 10YR 5/6 silt/sandy 30% rock

**STP No: 30**
Location: E of N989.8 E1014.4
Depth of Unit: 36 cm
Artifacts: brick
Description:
1) 10YR 4/6 silt
2) Located adjacent to chimney

**STP No: 31**
Location: E of N989.7 E1016.3
Depth of Unit: 39 cm
Artifacts: cut nails
Description:
1) 10YR 4/6 silt 30% rock

**STP No:  32**
Location: W of N990.01 E1012.4
Depth of Unit: 21.7 cm

Artifacts: cut nails
Description:
1) 10YR 4/6 silt loose soil

## Line 6
**STP No: 33**
Location: E of 1.2m N989.2 E994.6 Z1000.9
Depth of Unit: 30 cm
Artifacts: none
Description:
1) 10YR 4/6 silt
2) Stopped unit due to roots

**STP No: 34**
Location: E of.8m N989.1 E996.6 Z1000.9
Depth of Unit: 37 cm
Artifacts: none
Description:
1) 10YR 4/6 silt

**STP No:  35**
Location: E of N989.01 E998.64 Z 1000.97
Depth of Unit: 37 cm
Artifacts: None
Description:
1) 1 YR 5/6 sandy/silt
2) 10YR 5/6 10% rock silt
3) 10YR 5/6 10% rock hard dry compact
soil
4) Massive tree roots on south end

**STP No: 36**
Location: E of N988.8 E1000.6 Z1000.9
Depth of Unit: 27 cm
Artifacts:  crystal
Description:
1) 10YR 5/6 sandy silt
2)10YR 5/6 sandy/silt
3) Roots stopped unit

**STP No: 37**
Location: E of N988.7 E 1000.6 Z 1000.7
Depth of Unit: 30cm
Artifacts: siding
Description:

1) 5YR 3/2 silt mica 30-40%
2) 10YR 5/6 sandy/silt 30% rock
3) Located adjacent to tree
4) Roots stopped unit

## Line 7
**STP No: 39**
Location: E of N987 E998.5 Z1000.9
Depth of Unit: 27 cm
Artifacts: none
Description:
1) 10YR 3 /4 silt/sand and 10% mica
2) Root stopped unit

**STP No: 40**
Location: E of N986 E1002.6 Z1000
Depth of Unit: 49cm
Artifacts: concrete, siding
Description:
1) 10YR 3/ 4 silt with 20% pebbles

## Line 8
**STP No: 41**
Location: E of N985.2 E994.5 Z1000.4
Depth of Unit: 40 cm
Artifacts: coal, glass, and drywall
Description:
1) 10YR 5/4 silt 20% pebbles
2) Stopped due to rocks

**STP No: 42**
Location: E of N985.1 E996.5 Z1000.6
Depth of Unit: 40 cm
Artifacts: brick
Description:
1) 10 YR 5/4 silt 20% rocks
2) Stopped due to rocks

**STP No:  43**
Location: E of N985 E998.5 Z1000.8
Depth of Unit: 42c m
Artifacts: nail
Description:
1) 10 YR 5/4 silt 20 % Pebbles

**STP No: 44**
Location: E of N984.9 E 1000.3 Z1000.8
Depth of Unit: 23 cm
Artifacts: none
Description:
1) 10 YR 5/4 silt 70% rock
2) Stopped by rocks

**Line 9**
**STP No: 45**
Location: E of N 983.04 E998.5 W1000.4
Depth of Unit: 37 cm
Artifacts: none
Description: 10 YR 4/6  and  30% rocks

**STP No: 46**
Location: W of N983 E998.5 Z1000.4
Depth of Unit: 28cm
Artifacts: concrete
Description:
1) 10 YR 4/6 and mica schist and 30% rock

**Line 10**
**STP No: 48**
Location: E of tree 2m (bottom of hill)
Depth of Unit: 31 cm
Artifacts: siding
Description:
1) 10 YR 4/4 silt
2) Stopped by roots

**STP No: 49**
Location: 2m S of STP 48
Depth of Unit: 20 cm
Artifacts: coal and glass
Description:
1) 10YR 6/4 silt
2) Stopped by roots and rock

**STP No: 50**
Location: 4m S of STP 48
Depth of Unit: 35 cm
Artifacts: nails and coal
Description:

1) 10 YR 5/3 sandy loam
2) 12 cm layer of sand rock loam 2.5Y 6/2
3) 13 cm 10YR 5/3 sandy loam
4) 15 cm isolated pockets of 10YR 6/4
5) 34 cm 10YR 4/3 silt loam
6) Stopped due to roots

**STP No:  51**
Location: 5m S of STP 48
Depth of Unit: 57 cm
Artifacts: nails
Description:
1) 10YR 3/3 silt
2) 30 cm coal layer
3) 32 cm 10 YR 5/4 silt

**Trench**
**STP No: 38   (line 7)**
Location: S 1.5m of tree N989.14 E996.64
Depth of Unit: N/A
Artifacts: none
Description:
1) Sterile Unit
2) Opened trench

**STP No: 47**
Location: N 968.8 E 1000.5
Depth of Unit: N/A
Artifacts: glass
Description:
1) 10YR 3 /4 sandy silt 4cm
2) 10YR 4/ 4 30-40% mica
3) 10 YR 4/6 silt and below
4) Opened trench

# APPENDIX C

## Master Artifact Catalogue

| Bag # | STP | Line | Unit | Level | Feature | Item | Material | Form | Count | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 1 | | | | 1 | Nail, cut | | 1 | |
| 1 | 1 | 1 | | | | 2 | Synthetic/ Recent Material | roof shingle | 3 | black with white dots |
| 1 | 1 | 1 | | | | 3 | Wood, building related | | 1 | white paint on one side |
| 2 | 2 | 1 | | | | 1 | Synthetic/ Recent Material | | 10 | concrete frags |
| 2 | 2 | 1 | | | | 2 | Nail, wire | | 1 | |
| 3 | 4 | 2 | | | | 1 | Nail, general | | 1 | |
| 4 | 8 | 3 | | | | 1 | Nail, cut | | 2 | |
| 5 | 13 | 3 | | | | 1 | Glass, window | | 1 | |
| 5 | 13 | 3 | | | | 2 | Nail, wrought | | 1 | |
| 5 | 13 | 3 | | | | 3 | Metal, other | | 1 | AL frag |
| 5 | 13 | 3 | | | | 4 | Synthetic/ Recent Material | | 1 | concrete frags |
| 6 | 15 | 4 | | | | 1 | Plant Remains, Seeds, and Nuts | | 1 | |
| 7 | 17 | 4 | | | | 1 | Nail, cut | | 1 | |
| 8 | 21 | 4 | | | | 1 | Nail, cut | | 1 | |
| 9 | 24 | 4 | | | | 1 | Glass, window | | 2 | |
| 9 | 24 | 4 | | | | 2 | Nail, cut | | 1 | |
| 9 | 24 | 4 | | | | 3 | Synthetic/ Recent Material | | 1 | WHT 2 whole button |
| 10 | 26 | 5 | | | | 1 | Synthetic/ Recent Material | | 2 | concrete frags |
| 11 | 29 | 5 | | | | 1 | Glass, window | | 2 | |
| 12 | 30 | 5 | | | | 1 | Brick | | 4 | |
| 12 | 30 | 5 | | | | 2 | Metal, other | | 1 | ring |
| 12 | 30 | 5 | | | | 3 | Glass, window | | 3 | |
| 12 | 30 | 5 | | | | 4 | Glass, safety | | 2 | |
| 12 | 30 | 5 | | | | 5 | Nail, wire | | 3 | roof tack |
| 12 | 30 | 5 | | | | 6 | Nail, wrought | | 1 | |
| 12 | 30 | 5 | | | | 7 | Nail, other | | 1 | frag |
| 13 | 31 | 5 | | | | 1 | Brick | | 1 | |
| 13 | 31 | 5 | | | | 2 | Glass, window | | 2 | |
| 13 | 31 | 5 | | | | 3 | Nail, cut | | 1 | |

| Bag # | STP | Line | Unit | Level | Feature | Item | Material | Form | Count | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 13 | 31 | 5 | | | | 4 | Nail, wire | | 2 | |
| 13 | 31 | 5 | | | | 5 | Glass, bottle | | 2 | |
| 14 | 32 | 5 | | | | 1 | Nail, wrought | | 1 | |
| 14 | 32 | 5 | | | | 2 | Nail, wrought | | 1 | frag |
| 14 | 32 | 5 | | | | 3 | Glass, other | | 3 | frosted |
| 14 | 32 | 5 | | | | 4 | Nail, wire | | 1 | roof tack |
| 14 | 32 | 5 | | | | 5 | Glass, bottle | | 2 | |
| 15 | 36 | 6 | | | | 1 | Stone | | 1 | crystal |
| 16 | 37 | 6 | | | | 1 | Synthetic/ Recent Material | | 2 | siding |
| 17 | 40 | 7 | | | | 1 | Synthetic/ Recent Material | | 2 | siding |
| 17 | 40 | 7 | | | | 2 | Synthetic/ Recent Material | | 31 | concrete frags |
| 18 | 41 | 8 | | | | 1 | Synthetic/ Recent Material | | 4 | drywall |
| 18 | 41 | 8 | | | | 2 | Glass, window | | 2 | |
| 18 | 41 | 8 | | | | 3 | Coal | | 5 | |
| 18 | 41 | 8 | | | | 4 | Synthetic/ Recent Material | | 1 | dry paint from a wall |
| 19 | 42 | 8 | | | | 1 | Brick | | 1 | |
| 20 | 43 | 8 | | | | 1 | Nail, wire | | 1 | |
| 21 | 46 | 9 | | | | 1 | Synthetic/ Recent Material | | 1 | concrete frags |
| 22 | 48 | 10 | | | | 1 | Synthetic/ Recent Material | | 1 | siding |
| 23 | 49 | 10 | | | | 1 | Coal | | 4 | |
| 23 | 49 | 10 | | | | 2 | Brick | | 6 | |
| 23 | 49 | 10 | | | | 3 | Glass, window | | 5 | |
| 24 | 50 | 10 | | | | 1 | Coal | | 25 | |
| 24 | 50 | 10 | | | | 2 | Glass, window | | 6 | |
| 24 | 50 | 10 | | | | 3 | Synthetic/ Recent Material | | 1 | siding |
| 24 | 50 | 10 | | | | 4 | Synthetic/ Recent Material | | 1 | concrete frags |
| 24 | 50 | 10 | | | | 5 | Nail, wire | | 4 | |
| 25 | 51 | 10 | | | | 1 | Coal | | 65 | |
| 25 | 51 | 10 | | | | 2 | Glass, window | | 3 | |
| 25 | 51 | 10 | | | | 3 | Nail, cut | | 3 | |
| 25 | 51 | 10 | | | | 4 | Metal, other | door | 1 | catch for a door |

| Bag # | STP | Line | Unit | Level | Feature | Item | Material | Form | Count | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 25 | 51 | 10 | | | | 5 | Nail, other | | 2 | frag |
| 25 | 51 | 10 | | | | 6 | Mortar | | 1 | |
| 26 | | 3 | 1 | A | | 1 | Nail, wrought | | 3 | |
| 26 | | 3 | 1 | A | | 2 | Nail, cut | | 2 | |
| 26 | | 3 | 1 | A | | 3 | Nail, wire | | 3 | |
| 26 | | 3 | 1 | A | | 4 | Nail, other | | 2 | frags |
| 26 | | 3 | 1 | A | | 5 | Metal, other | fastener | 1 | clothes fastener |
| 27 | | 3 | 1 | B | | 1 | Wood, other | | 1 | burnt |
| 27 | | 3 | 1 | B | | 2 | Nail, cut | | 1 | |
| 27 | | 3 | 1 | B | | 3 | Nail, wrought | | 1 | |
| 27 | | 3 | 1 | B | | 4 | Metal, other | | 1 | rust ball of iron |
| 28 | | 5 | 2 | A | | 1 | Coal | | 13 | |
| 28 | | 5 | 2 | A | | 2 | Brick | | 1 | |
| 28 | | 5 | 2 | A | | 3 | Nail, wrought | | 6 | |
| 28 | | 5 | 2 | A | | 4 | Nail, cut | | 1 | |
| 28 | | 5 | 2 | A | | 5 | Nail, wire | | 3 | |
| 28 | | 5 | 2 | A | | 6 | Nail, other | | 5 | frags |
| 28 | | 5 | 2 | A | | 7 | Metal, iron | | 1 | flat rusted piece of iron |
| 29 | | 5 | 2 | B | | 1 | Coal | | 19 | |
| 30 | | 4 | 3 | A | | 1 | Glass, window | | 20 | |
| 30 | | 4 | 3 | A | | 2 | Glass, other | | 2 | frosted on one side |
| 30 | | 4 | 3 | A | | 3 | Brick | | 3 | |
| 30 | | 4 | 3 | A | | 4 | Synthetic/ Recent Material | | 7 | |
| 30 | | 4 | 3 | A | | 5 | Stone, slate | | 1 | |
| 30 | | 4 | 3 | A | | 6 | Nail, cut | | 11 | |
| 30 | | 4 | 3 | A | | 7 | Nail, wrought | | 17 | |
| 30 | | 4 | 3 | A | | 8 | Nail, wire | | 36 | |
| 30 | | 4 | 3 | A | | 9 | Nail, other | | 11 | frags |
| 30 | | 4 | 3 | A | | 10 | Metal, other | | 1 | flat rusted piece of iron |
| 30 | | 4 | 3 | A | | 11 | Screw | | 1 | |
| 31 | | 4 | 3 | B | | 1 | Glass, window | | 1 | |
| 32 | | 8 | 4 | A | | 1 | Coal | | 10 | |
| | | | | | | | | | | |

00155910

| Bag # | STP | Line | Unit | Level | Feature | Item | Material | Form | Count | Comments |
|-------|-----|------|------|-------|---------|------|----------|------|-------|----------|
| 32 | | 8 | 4 | A | | 2 | Nail, wire | | 7 | |
| 32 | | 8 | 4 | A | | 3 | Glass, window | | 3 | |
| 33 | | 8 | 4 | B | | 1 | Synthetic/ Recent Material | | 2 | roof shingle |
| 33 | | 8 | 4 | B | | 2 | Glass, window | | 1 | |
| 34 | | 10 | 5 | A | | 1 | Coal | | 160 | |
| 34 | | 10 | 5 | A | | 2 | Coal | | 100 | |
| 34 | | 10 | 5 | A | | 3 | Brick | | 1 | |
| 35 | | 10 | 5 | A | | 1 | Metal, other | | 1 | cover for electrical wire |
| 35 | | 10 | 5 | A | | 2 | Glass, bottle | | 1 | rim and part neck |
| 35 | | 10 | 5 | A | | 3 | Brick | | 11 | |
| 35 | | 10 | 5 | A | | 4 | Bone, Fragment, Mammal | | 2 | |
| 35 | | 10 | 5 | A | | 5 | Plant Remains, Seeds, and Nuts | | 1 | nut |
| 35 | | 10 | 5 | A | | 6 | Synthetic/ Recent Material | | 1 | concrete frag |
| 35 | | 10 | 5 | A | | 7 | Synthetic/ Recent Material | | 1 | siding |
| 35 | | 10 | 5 | A | | 8 | Glass, window | | 10 | |
| 35 | | 10 | 5 | A | | 9 | Glass, bottle | | 19 | WHT |
| 35 | | 10 | 5 | A | | 10 | Glass, bottle | | 8 | embossed / BRW glass |
| 35 | | 10 | 5 | A | | 11 | Metal, other | cap | 1 | cap to flask |
| 35 | | 10 | 5 | A | | 12 | Nail, wrought | | 4 | |
| 35 | | 10 | 5 | A | | 13 | Nail, cut | | 5 | |
| 35 | | 10 | 5 | A | | 14 | Nail, wire | | 9 | roofing tacks |
| 35 | | 10 | 5 | A | | 15 | Nail, oter | | 3 | frags |
| 35 | | 10 | 5 | A | | 15 | Porcelain | | 1 | sm frag |
| 35 | | 10 | 5 | A | | 16 | Earthernware, Glazed | | 1 | glazed inside and out |
| 36 | | 10 | 5 | B | | 1 | Synthetic/ Recent Material | | 1 | Wilson button |
| 36 | | 10 | 5 | B | | 2 | Brick | | 12 | |
| 36 | | 10 | 5 | B | | 3 | Wood, other | | 3 | burnt |
| 36 | | 10 | 5 | B | | 4 | Metal, other | | 1 | iron nut |
| 36 | | 10 | 5 | B | | 5 | Synthetic/ Recent Material | | 3 | shingles |
| | | | | | | | | | | |

00155911

| Bag # | STP | Line | Unit | Level | Feature | Item | Material | Form | Count | Comments |
|---|---|---|---|---|---|---|---|---|---|---|
| 36 | | 10 | 5 | B | | 6 | Metal, other | | 5 | wire |
| 36 | | 10 | 5 | B | | 7 | Glass, bottle | | 16 | |
| 36 | | 10 | 5 | B | | 8 | Glass, bottle | | 1 | BRW glass |
| 36 | | 10 | 5 | B | | 9 | Metal, other | bottle cap | 2 | whole cap |
| 36 | | 10 | 5 | B | | 10 | Metal, other | | 2 | iron frags |
| 36 | | 10 | 5 | B | | 11 | Nail, other | | 2 | frags |
| 36 | | 10 | 5 | B | | 12 | Nail, cut | | 2 | |
| 36 | | 10 | 5 | B | | 13 | Coal | | 24 | |
| 37 | | 10 | 5 | B | | 1 | Brick | | 1 | whole |
| 38 | | 10 | 5 | C | | 1 | Nail, wrought | | 1 | |
| 38 | | 10 | 5 | C | | 2 | Brick | | 8 | |
| 38 | | 10 | 5 | C | | 3 | Coal | | 26 | |
| 38 | | 10 | 5 | C | | 4 | Stone, slate | | 4 | |
| 38 | | 10 | 5 | C | | 5 | Glass, bottle | | 5 | |
| 38 | | 10 | 5 | C | | 6 | Glass, window | | 2 | |
| 39 | | 10 | 5 | C | | 1 | Brick | | 3 | |
| 40 | | 8 | 4 | A-B | 1 | 1 | Metal, other | pipe | 1 | iron pipe |
| 41 | | | Trench | A | | 1 | Glass, bottle | | 11 | |



**FRIENDS OF MOSES HALL**
The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated
7550 Seven Locks Road
Cabin John, MD 20818
morningstarmosescj@gmail.com
https://www.friendsofmoseshall.org/

October 8, 2021

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
**Maryland Department of Transportation State Highway Administration Environmental Planning Division**
707 North Calvert Street
Baltimore, MD 21202

**Re:    Report on Geophysical Surveys and GPR Presentation**

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the Report on Geophysical Surveys and the GPR presentation developed by MDOT SHA. Friends of Moses Hall wish to again thank MDOT SHA for your reports and efforts to date.

Friends of Moses Hall particularly appreciates the GPR survey that was conducted, which sheds important light on the conditions at the cemetery. However, there are a number of concerns that we have with 1) the work completed and 2) SHA's resulting conclusion that burials have been "completely avoided." **We share the following comments:**

**The GPR effort conducted does not appear to be complete.** The tremendous volume of positive results should have resulted in a more thorough investigation of the area. We understand that incomplete bamboo removal and other physical obstacles prevented further GPR investigation in some locations; however, these problems can be undoubtedly addressed to allow for a more thorough investigation. It is appropriate practice in a GPR survey to cast a wider buffer than is apparent from this work. The investigation should have continued northward up to the edge of the highway, as well as extending further east and west. The fact that the investigation did not continue further northward precludes any determination that the graves have been "completely avoided." SHA simply did not give a hard or wide

00156115

enough look to prove that was the case. SHA's own study concludes that there is a notable possibility that graves were not captured by the GPR work thus far (pg. 13). These graves could be in highly sensitive areas quite close to the existing and potential future highway.

Therefore, on the basis of an incomplete GPR study, **it is imprudent for SHA to determine that the Preferred Alternative alignment completely avoids the cemetery**. In fact, the realization that SHA's understanding of this site has moved rapidly – from not incorporating it as a resource until Friends of Moses Hall's involvement, to identifying one potential burial in the ROW, to now identifying many – should give us substantial pause before declaring avoidance complete.

As a result, more GPR work should be done north, west, and east of the completed study limits, providing an appropriate buffer to what has been found to-date and deeply examining the most critical areas near the highway.

**Additionally, the location of the limits of disturbance (LOD) in relation to the *known* burial sites raises substantial questions about physical avoidance.** The updated LOD still appears to be immediately adjacent to a grave. As SHA's report acknowledges, GPR is imperfect. The entirely of the grave feature may not exactly correspond with the GPR findings. This risk is usually addressed by establishing a buffer, which does not appear to have been done for this LOD. Therefore, we remain concerned about physical impacts to burials.

To address this deficiency, **we strongly recommend that SHA establish both a buffer between graves and the LOD, as well as archaeological monitoring during construction**. In particular, we are extremely concerned about the impacts to graves that have already been affected by the establishment of ROW within the burial ground, and the Friends of Moses Hall needs to understand what will be done to protect these resources during construction.

As the previous point makes clear, the lack of any clear information about construction techniques also precludes any determination regarding physical avoidance. The sensitive nature of the site would require both an approach to construction itself and to monitoring that would ensure no physical impacts would occur. **SHA has not provided enough information about construction for the agency to claim physical avoidance nor for FMH to opine on the level of physical avoidance**.

With these comments, we request that SHA provide information on how they will address these meaningful limitations in the existing analysis. **This information is a prerequisite to any suggestion that physical effects to the site have been avoided.**

We appreciate your consideration of these comments.

Sincerely,

FRIENDS OF MOSES HALL
The Board of Trustees of
Morningstar Tabernacle Number 88, Incorporated

**Diane E. Baxter**
**President, Morningstar Tabernacle Number 88, Incorporated**
Descendant

00156116

**Dr. Charles W. Harris**
**Vice President, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Eileen McGuckian**
**Secretary, Morningstar Tabernacle Number 88, Incorporated**
Historian and President, Montgomery Preservation

**Montgomery Crawford**
**Treasurer, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Alexandra Jones, PhD, RPA**
**Trustee, Morningstar Tabernacle Number 88, Incorporated**
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
**Trustee, Morningstar Tabernacle Number 88, Incorporated**
Descendant

**Charlotte Troup Leighton**
**Trustee and Chair, Friends of Moses Hall Committee, Morningstar Tabernacle Number 88, Incorporated**
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
**Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated**
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

00156117

cc:     Governor Lawrence J. Hogan – governor.mail@maryland.gov
        Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
        Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
        Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
        Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
        Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
        Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
        Richard Ervin, MDOT SHA – rervin@mdot.maryalnd.gov
        Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
        Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
        Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
        Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
        John Simkins, FHWA Virginia Division - john.simkins@dot.gov
        Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
        Debra Borden, M-NCPPC – debra.borden@mncppc.org
        Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
        Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
        Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
        Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
        Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
        Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
        Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
        Sara Love, Maryland State Delegate – sara.love@house.state.md.us
        Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
        Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
        Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
        Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
        Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
        Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
        Gabe Albornoz, Montgomery County Councilmember - councilmember.albornoz@montgomerycountymd.gov
        Andrew Friedson, Montgomery County Councilmember - councilmember.friedson@montgomerycountymd.gov
        Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
        Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
        Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
        Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
        Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
        Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
        Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00156118

| | |
|---|---|
| **From**: | Christine Sutkowski [csutkowski@rkk.com] |
| **Sent**: | 10/12/2021 9:13:40 AM |
| **To**: | Guinther, James [jguinther@wrallp.com]; Bryan Townsend (Consultant) |
| | [BTownsend3.consultant@mdot.maryland.gov]; Carlos Brown [carlos.brown@wsp.com] |
| **CC**: | Jeff Roberta [jroberta@rkk.com]; Bauer, Kenneth [kbauer@wrallp.com]; Catherine Robbins (Consultant) |
| | [CRobbins.consultant@mdot.maryland.gov] |
| **Subject**: | RE: VDOT SDEIS comment - Live Oak Drive |

Thanks, Bryan and Jim. That seems reasonable and I will keep the LOD as is. I'll share the suggestion for the commitment with Caryn and Karen.

———————————————————————

**CHRISTINE M. SUTKOWSKI, PE**
(she/her/hers)
Senior Project Engineer

410.728.2900 P | 410.462.9193 D | 301.602.1079 C

**From:** Guinther, James <jguinther@wrallp.com>
**Sent:** Monday, October 11, 2021 4:53 PM
**To:** Bryan Townsend (Consultant) <BTownsend3.consultant@mdot.maryland.gov>; Christine Sutkowski <csutkowski@rkk.com>; Carlos Brown <carlos.brown@wsp.com>
**Cc:** Jeff Roberta <jroberta@rkk.com>; Bauer, Kenneth <kbauer@wrallp.com>; Catherine Robbins (Consultant) <CRobbins.consultant@mdot.maryland.gov>
**Subject:** RE: VDOT SDEIS comment - Live Oak Drive

Correct, keeping LOD to ROW line gives the designer room for the design of the tiebacks. I would just put a commitment in the SDEIS for no surface disturbance or construction along Live Oak.

**From:** Bryan Townsend (Consultant) <BTownsend3.consultant@mdot.maryland.gov>
**Sent:** Monday, October 11, 2021 4:47 PM
**To:** Christine Sutkowski <csutkowski@rkk.com>; Carlos Brown <carlos.brown@wsp.com>
**Cc:** Jeff Roberta <jroberta@rkk.com>; Bauer, Kenneth <kbauer@wrallp.com>; Catherine Robbins (Consultant) <CRobbins.consultant@mdot.maryland.gov>; Guinther, James <jguinther@wrallp.com>
**Subject:** Re: VDOT SDEIS comment - Live Oak Drive

Hi Christine,

I'm looping Jim in since I know one of the concerns was potentially the length of tie-backs from the massive retaining wall. I don't know if we know how far back those might go at this point, but we may need to be cautious about pulling the LOD in based on the subsurface needs.

That said, maybe there is some nuance we can introduce re: surface disturbance along Live Oak...

Thanks,

Bryan

00156196

**From:** Christine Sutkowski <csutkowski@rkk.com>
**Sent:** Monday, October 11, 2021 4:40 PM
**To:** Bryan Townsend (Consultant) <BTownsend3.consultant@mdot.maryland.gov>; Carlos Brown <carlos.brown@wsp.com>
**Cc:** Jeff Roberta <jroberta@rkk.com>; Bauer, Kenneth <kbauer@wrallp.com>; Catherine Robbins (Consultant) <CRobbins.consultant@mdot.maryland.gov>
**Subject:** VDOT SDEIS comment - Live Oak Drive

Hi Bryan and Carlos,

We received the following comment from VDOT on the Administrative Draft SDEIS mapping at the GWMP interchange: "Concerned that the limits of disturbance include all of Live Oak Drive. If there is some way to clarify that no work is anticipated on Live Oak Drive, or otherwise caveat the LOD in this area."

Now that we have incorporated the latest interchange design, is a change in the LOD to exclude Live Oak Drive warranted? The LOD is set along existing right-of-way along the I-495 outer loop in this area so we would not be reducing property impacts. The design does not show MDOT work along Live Oak Drive so perhaps that alone is enough to clarify that no work is anticipated. Please let me know your thoughts on modifying the LOD.

Including Ken and Catherine in case the latest noise barrier analysis/design does necessitate LOD along Live Oak Drive.

Thanks,
Christine

_____

**CHRISTINE M. SUTKOWSKI, PE**
(she/her/hers)
Senior Project Engineer

700 East Pratt Street, Suite 500
Baltimore, MD 21202

410.728.2900 P | 410.462.9193 D | 301.602.1079 C
www.rkk.com

**Responsive People | Creative Solutions**

"RK&K" and "RK&K Engineers" are registered trade names of Rummel, Klepper & Kahl, LLP, a Maryland limited liability partnership. This message contains confidential information intended only for the person or persons named above. If you have received this message in error, please immediately notify the sender by return email and delete the message. Thank you.

RK&K is an equal opportunity employer that values diversity at all levels. RK&K does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, parental status, military and veteran status, and any other characteristic protected by applicable law. Consistent with the requirements of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, we also note that RK&K does not discriminate in its selection or retention of subcontractors on the grounds of race, color, or national origin. We also note that RK&K will ensure that Minorities will be afforded full opportunity to submit proposals and not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

The information supplied in this message may be privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, the sender does not intend delivery to you to waive any privilege or right pertaining to this message. You have no right to retain, disseminate, copy or disclose the material contained herein. If you have received this message in error, please immediately notify the sender by return e-mail, and delete the errant message. Thank you.

Whitman, Requardt & Associates, LLP (WRA) is an equal opportunity employer that values and fosters diversity at all levels. WRA does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy), national origin, political affiliation, sexual orientation, gender identity, marital status, disability, genetic information, age, parental status, military and veteran status, and any other characteristic protected by applicable law. Consistent with the requirements of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, we also note that WRA does not discriminate in its selection or retention of subcontractors on the grounds of race, color, or national origin. WRA will ensure that individuals and minority business enterprises will be afforded full opportunity to submit proposals and not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

WRA_Disclaimer_v20210609

00156197

Message

_____

**From**: Steve Archer [sarcher@mdot.maryland.gov]
**Sent**: 11/2/2021 4:35:54 PM
**To**: Clarke, David (FHWA) [david.clarke@dot.gov]
**Subject**: RE_ Section 106 Comments on the I-495 & I-270 M....pdf


From:
To:
Steve Archer
Clarke, David (FHWA)
Subject:
Date:
RE: Section 106 Comments on the I-495 & I-270 Managed Lane Study, 10/8/2021
Tuesday, November 02, 2021 3:35:54 PM
CAUTION: This email originated from outside of the Department of Transportation (DOT). Do not click on links or
open attachments unless you recognize the sender and know the content is safe.
Yes, correct, we did not revise the effect finding on the property in the last letter, to give time to see
the new LOD, etc. So we have not asked for concurrence; we discussed this strategy with FHWA. I
think we will have plenty of safeguards to strongly disincentivize the developer from barging into the
cemetery (including a requirement already in place that they have CR staff).
Their project would be snarled forever if they wanted to do that, but strange constructability things
do happen (like a tunnel boring machine getting stuck for a year under Seattle ), so contractually it is
difficult to say "you will never touch", but rather say "you own all the schedule and cost
consequences if you do need to touch" the property in question.
We'll get the language drafted up soon to run by you. I will want to circle back with you and division
folks on the proposed meeting with the consulting party prior to the updated finding of effect going
out, if FHWA wants to attend that discussion.
Thanks,
Steve
Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202
Phone 410-545-8508
sarcher@mdot.maryland.gov
From: Clarke, David (FHWA) <david.clarke@dot.gov>
Sent: Tuesday, November 2, 2021 3:27 PM
To: Steve Archer <SArcher@mdot.maryland.gov>
Subject: FW: Section 106 Comments on the I-495 & I-270 Managed Lane Study, 10/8/2021
Sorry Steve, I was thinking about these letters where consulting parties don't agree with a no
adverse effect, not the SHPO, yet…
One issue I'm dealing with elsewhere is after a contract is awarded the contractor goes
through value engineering and then "cuts things out / makes changes" and don't know or did
not check in with the 106 folks where there are mitigation commitments.
AKA the noise wall here, we need to make sure they don't value engineer it out of the project
etc.
I'm feeling better after seeing more of the engineering
David S. Clarke
Federal Preservation Officer
Federal Highway Administration
1200 New Jersey Avenue, SE

Washington, DC 20590
(202) 366-2060
david.clarke@dot.gov
From: Paula Posas <paula.posas@mdsierra.org>
Sent: Tuesday, October 12, 2021 9:39 AM
To: Paula Posas <paula.posas@mdsierra.org>
Subject: Section 106 Comments on the I-495 & I-270 Managed Lane Study, 10/8/2021
CAUTION: This email originated from outside of the Department of Transportation (DOT). Do not click on links or
open attachments unless you recognize the sender and know the content is safe.
To whom it may concern:
Attached are the October 8, 2021 Section 106 Comments of Sierra Club Maryland Chapter. Also
attached are the comments of the Washington Biologists' Field Club and Friends of Moses Hall.
Sierra Club's Section 106 comments mention supporting their requests. There are many serious
issues raised in these comments, which should be of interest to Maryland's elected leadership and
staff of multiple federal agencies, including the Department of Interior, Environmental Protection
Agency, Army Corps of Engineers, and Federal Highway Administration.
Maryland Sierra Club has also joined 44 other organizations in calling for an extension of the
comment period on the I-495 & I-270 Managed Lanes Study Supplemental Draft Environmental
Impact Statement (SDEIS).
Sincerely,
Paula
-photo
Paula
Posas
Deputy Director
Maryland Sierra Club
PO Box 278
Riverdale, MD 20738
paula.posas@mdsierra.org
(301) 432-0652
sierraclub.org/maryland
Giving people opportunities to explore, enjoy, and protect the planet
Working toward zero waste, renewable energy, and cleaner transportation
Follow us on Facebook, Instagram, and Twitter.
Donate to the Maryland Chapter today!



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION III**
**1650 Arch Street**
**Philadelphia, Pennsylvania  19103-2029**

November 30, 2021

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201

Mr. Jeffrey T. Folden, P.E., DBIA
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Office
707 North Calvert Street
Mail Stop P-601
Baltimore, Maryland 21201

**Subject:** I-495 & I-270 Managed Lanes Study, Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation CEQ# 20210149

Dear Mr. Parikh and Mr. Folden:

The U.S. Environmental Protection Agency has reviewed the Supplemental Draft Environmental Impact Statement (SDEIS) dated October 2021 for the I-495 & I-270 Managed Lanes Study (MLS), Montgomery and Prince George's Counties, Maryland & Fairfax County, Virginia (CEQ# 20210149) pursuant to Section 309 of the Clean Air Act and Section 102(2)(C) of the National Environmental Policy Act (NEPA).

The Maryland Department of Transportation State Highway Administration (MDOT SHA), in association with the Federal Highway Administration (FHWA), prepared this SDEIS to consider new information relative to the newly identified Preferred Alternative, Alternative 9 - Phase 1 South.  The Study's purpose is to develop a travel demand management solution(s) that address congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

The SDEIS focuses on new information since the July 10, 2020 DEIS and describes the background and context in which Alternative 9 – Phase 1 South was identified.  The DEIS originally identified eight alternatives with Alternative 9 announced as the MDOT SHA Recommended Preferred Alternative.  After several months of coordination, the new Preferred Alternative, Alternative - Phase 1 South, includes a two-lane High Occupancy Toll (HOT) managed lanes network on I-495 and I-270 within the limits of Phase 1 South only.  On I-495 the Preferred Alternative consists of adding two, new HOT managed lanes in each direction from the George Washington Memorial Parkway to east of MD 187.

On I-270, the Preferred Alternative consists of converting the one existing HOV lane in each direction to a HOT managed lane and adding one new HOT managed lane in each direction on I-270 from I-495 to north of I-370 and on the I-270 east west spurs. There are no actions or improvements currently proposed on I-495 east of the I-270 spur to MD 5.

As noted in the SDEIS avoidance and minimization opportunities have resulted in avoiding over 100 acres of parkland, and hundreds of wetland and stream features. In addition, MDOT and FHWA established an Environmental Justice (EJ) Working Group (EJWG) that collaborated to refine the EJ analysis and improve community outreach. The efforts to avoid, minimize, and mitigate impacts will continue through ongoing and future coordination with the applicable regulatory and resource agencies. The final avoidance, minimization and mitigation will be documented in the Final EIS.

EPA has worked closely with the agencies throughout the planning process and appreciates the coordination efforts that have occurred. We have reviewed and provided comments for previous components of the EIS, as part of the cooperating agency agreement with FHWA. The DSEIS includes supplemental information that adequately addresses and/or responds to our previous comments. We expect that additional avoidance and minimization of adverse impacts can be achieved in more advanced design phases. EPA looks forward to reviewing project details that were deferred to the Final EIS and seeing development of mitigation to offset unavoidable impacts. Please consider the enclosed technical comments, based on the SDEIS information. EPA appreciates the opportunity to remain involved in the project design, review, planning, and construction process.

If you have any questions regarding our comments, please feel free to contact Timothy Witman, at (215) 814-2775 or by email at Witman.Timothy@epa.gov.

Sincerely,

STEPAN NEVSHEHIRLIAN

Digitally signed by
STEPAN NEVSHEHIRLIAN
Date: 2021.11.30
14:55:16 -05'00'

Stepan Nevshehirlian
Environmental Assessment Branch Chief
Office of Communities, Tribes and
Environmental Assessment

Enclosure

00158546

**Enclosure**
**Technical Comments**
I-495 & I-270 MLS, SDEIS

**Air Quality**

Section 4.8.3 states that "All Build Alternatives are projected to slightly increase annual tailpipe GHG emissions by an average of 1.4 percent compared to the No Build Alternative in 2040." In addition, to the tailpipe emission, GHG emissions will also be generated during the construction of this large infrastructure project. EPA recommends considering practicable mitigation strategies to reduce emissions. These could include implementing dust suppression techniques noted in section 4.8.4 of the SDEIS as well as other best practices described in the documents referenced below.

For additional guidance on reducing construction emissions and improving energy efficiency during construction, we recommend accessing the resources provided by EPA's Diesel Emissions Reduction Act program, available at: https://www.epa.gov/dera/reducing-diesel-emissions-construction-and-agriculture, and employing the operational and equipment strategies detailed in the EPA publication, "Cleaner Diesels: Low Cost Ways to Reduce Emissions from Construction Equipment," available at https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P1009QEO.pdf. These strategies include equipment idle reduction, engine preventive maintenance, equipment operator training, and various fuel strategies, such as retrofit technologies, engine upgrades, and electrification.

**Environmental Justice**

EPA appreciates the lead agencies' planning and coordination of the Environmental Justice Working Group (EJWG). EPA encourages the continued scheduling of regular EJWG meetings to discuss and address EJ-related topics and potential concerns. EPA recommends keeping the EJWG apprised of EJ-related analyses, outreach efforts, and mitigation progress to support a transparent NEPA process and avoid adverse or disproportionate impacts to vulnerable communities.

EPA notes that the next steps for the EJ analysis, to be documented in the final EIS, include consideration of mitigation and enhancement measures if unavoidable adverse effects may occur under the Preferred Alternative. An additional and potentially valuable step will be the continued use of a communication strategy to convey findings. It may be beneficial to engage communities to address the significance of changes in land use and construction-related effects.

Table 4-45 indicates that block groups which the project characterizes as EJ and Non-EJ may face similar environmental consequences from certain hazards (e.g., air pollution). EPA notes that certain populations (e.g., low-income and/or people of color populations) may face elevated susceptibility to impacts that may affect other populations less severely. Therefore, EPA encourages the project to address the potential for adverse impacts in areas of potential EJ concern even if less vulnerable areas may face similar conditions. EPA emphasizes the importance of mitigating natural resource impacts within underserved communities to preserve the benefits of those resources for local populations.

**Stormwater**

EPA recognizes the effort that the DEIS and SDEIS placed on addressing stormwater requirements. EPA discourages the use of existing wetlands, streams, and other existing aquatic resources to treat and manage stormwater as it may result in degradation of those resources. EPA recommends continued coordination with agencies to ensure stormwater mitigation on and/or off site is appropriate. EPA also recommends that any proposed stormwater mitigation that includes stream restoration also focus on managing stormwater from adjacent upland areas and surrounding developed sites prior to entering the proposed stream restoration site and not rely only on restoration as mitigation. Incorporating this additional consideration may alleviate recent stream degradation that occurred from increased development and create a more flood resilient stream, which is an important consideration of climate adaptation.


**Aquatic Resources - Wetlands and Waters of the United States**

All action alternatives include substantial permanent, indirect, and cumulative impacts to aquatic resources. EPA recommends the Final EIS fully evaluate the preferred alternative and include any new details regarding onsite designs that will avoid and minimize impacts to aquatic resources to the maximum extent practicable. EPA also recommends that the FHWA and MDOT SHA continue to coordinate with EPA, the United States Army Corps of Engineers, Maryland Department of the Environment, and other cooperating agencies throughout the design build process to verify and permit impacts to aquatic resources, ensure avoidance and minimization to the maximum extent practical, and determine appropriate mitigation and compensatory mitigation.