November 30, 2021

Mr. Jeff Folden, I-495 & I-270 P3 Program Deputy Director
I-495 & I-270 P3 Office
707 North Calvert Street, Mail Stop P-60
Baltimore Maryland, 21202
MLS-NEPA-P3@mdot.maryland.gov

Mr. Jitesh Parikh
Federal Highway Administration
George H. Fallon Building
31 Hopkins Plaza, Suite 1520
Baltimore, Maryland 21201
jitesh.parikh@dot.gov

**Re: Comments on I-495 & I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation**

On July 10, 2020, the Federal Highway Administration and the Maryland Department of Transportation State Highway Administration (the "Agencies") issued a draft environmental impact statement ("DEIS") for the I-495 and I-270 Expansion Project ("Project"). The Agencies then created and selected a new alternative, Alternative 9 Phase 1 South, as the preferred alternative for the Project. Subsequently, on October 1, 2021, the Agencies issued a supplemental draft environmental impact statement ("SDEIS") to consider the preferred alternative's environmental impacts.

The undersigned Organizations and City oppose the preferred alternative put forth in the SDEIS and support the no build alternative. The SDEIS (including its appendices) presents incomplete and inadequate analyses of environmental impacts and fails to achieve the fundamental objectives of the National Environmental Policy Act ("NEPA"). Even the inadequate information presented shows that the Project will harm Maryland citizens and their environment and cannot be justified.

The comments provided below refer specifically to the SDEIS, and do not repeat the comments on the DEIS that were provided to the Agencies on November 9, 2020, by the Maryland Chapter of the Sierra Club and other organizations. Unfortunately, the SDEIS disregards all the technical and procedural issues raised in the November 9 comments and does not present any information that would alter any of those comments or cause any to be removed from consideration. The comments on the DEIS therefore remain valid, and both they and the comments below on the SDEIS must be satisfactorily addressed.

These comments identify the Organizations' key concerns regarding the SDEIS, including but not limited to the following, and discuss them in detail in the body of this document:

- The SDEIS fails to disclose the preferred alternative's cost breakdown in any meaningful way. The SDEIS fails to disclose the significant financial costs the preferred alternative would impose on the state and its citizens, including a direct subsidy to a private developer, costs of relocation of utilities, decreases in property values, shortfall payments, and other significant financial risks associated with the Public Private Partnership ("P3") Program. Those risks are recognized by Maryland Department of Transportation ("MDOT") in signed contracts with the developer but not disclosed to the public in the SDEIS. Evaluating the entire Project's costs in the NEPA process is particularly important given that MDOT and Maryland's governor misled the public regarding the Project's costs.

00158557

- The reasons for dismissing non-private-toll lane alternatives from consideration (such as those alternatives not providing congestion reduction and not capable of being funded) no longer exist. The SDEIS needed to consider and meaningfully evaluate other viable, less costly, and less harmful alternatives that would relieve congestion, including public transit, multi-modal options, transportation demand management, and transportation system management. This must be done before the NEPA process can proceed to a final environmental impact statement ("FEIS").

- There are serious flaws in the traffic analysis. Moreover, even with these flaws, the information presented in the SDEIS shows that the preferred alternative will be only marginally effective at reducing congestion on the Beltway and I-270, will create new and larger traffic problems at key interchanges and merge areas, and will irreparably harm Maryland's irreplaceable natural, historical, and environmental resources. The limited benefits of the toll lanes, available only to those who can afford them, cannot justify the magnitude of harm they will cause.

- The SDEIS does not adequately analyze air emissions and ignores the harms the preferred alternative's construction and operation will cause from particulate matter, greenhouse gas, and carbon monoxide emissions locally, regionally, and nationally. In doing so, the SDEIS presents the decisionmakers and public with a one-sided view of the preferred alternative's costs and benefits.

- The SDEIS ignores the negative impacts of the preferred alternative on safety on the toll lanes, general purpose ("GP") lanes, and arterial roads. These environmental and human health impacts must be evaluated and presented for public review and comment.

- The SDEIS fails to adequately address the preferred alternative's significant adverse effects on historic and cultural resources, which include both direct and constructive uses of historic properties.

- The SDEIS fails to take the required hard look at environmental justice ("EJ") issues. The SDEIS fails to perform any meaningful analysis of impacts on EJ populations, let alone disproportionate impacts. The SDEIS ignores the harms that EJ communities will suffer during construction and operation of the preferred alternative, including air quality impacts from newly created bottlenecks and impacts from the loss of an otherwise free lane on I-270. The SDEIS also ignores that EJ communities are unlikely to experience the benefits of the high-priced toll lanes and that the preferred alternative will exacerbate cumulative disproportionate impacts borne by environmental justice communities from highway construction.

- Like the DEIS process, the SDEIS process has also violated NEPA. Seven of numbers in the SDEIS Executive Summary quantifying the impacts of the preferred alternative were incorrect for over 40 of the 60 days of the comment period, in contravention of NEPA regulations requiring accuracy in the summary. For those who relied on non-English versions of the Executive Summary, the Agencies left the incorrect documents online for at least seven more days before changing the links to a new file, giving those individuals fewer than 13 days to comment on the accurate SDEIS information. With all versions, the Agencies quietly changed the SDEIS without alerting the public they had been reviewing and commenting on an incorrect version.

- The Project has fundamentally changed so many times (including its footprint, phasing, and procurement type from fixed price to progressive predevelopment public-private partnership) that the public cannot understand what is going on, let alone which description is accurate. The SDEIS does little to clarify such issues and if anything muddles them even more by trying to

00158558

simultaneously exclude and include I-495 east of the eastern spur from the preferred alternative plan. The purpose of the NEPA process is to disclose information so the public and other agencies can make informed comments and decisions. This awkward and hastily prepared add-on to the DEIS does not achieve those ends.

- The SDEIS fails to perform significant analyses regarding nearly every single adverse impact of the preferred alternative, and instead postpones those analyses until either an FEIS is issued, or construction has begun. Contrary to promoting public participation and informed decision-making as required by NEPA, the SDEIS hinders the public's understanding of the preferred alternative and will lead to less informed decision-making.

- The SDEIS, in referencing the DEIS, continues to rely on documents and data that the Agencies have refused to release to the public, despite numerous requests from the public, in violation of NEPA.

The SDEIS appears designed to reach a pre-determined result—expand I-495 and I-270 with privately owned toll lanes—without meaningfully involving the public, considering viable alternatives, or considering the preferred alternative's environmental impacts. It also appears that the Federal Highway Administration ("FHWA"), despite its obligations and recent statements committing to environmental justice and climate justice, is not acting independently or properly evaluating the best available information, but merely serving as a rubber stamp for MDOT's biased preference to expand the highways.

The Organizations request that the Agencies select the no build option. Alternatively, the Agencies must not move forward with the preferred alternative or any of the DEIS's fundamentally flawed build alternatives without formulating a revised purpose and need statement; consideration of additional, less harmful and costly alternatives that address the real needs for transportation improvements in the region; conducting the many analyses that have been ignored or improperly deferred; and providing the public with a new DEIS that addresses the failures identified in these comments and comments on the DEIS and accords the public a meaningful opportunity to review and comment.

Sincerely,

Sierra Club Maryland Chapter[1]

350MoCo

Audubon Naturalist Society

Audubon Society of Central Maryland (Howard, Frederick, Carroll Counties)

Bikemore

Carderock Springs Citizens Association

---

[1] The Organizations would like to acknowledge Jill Grant & Associates, LLC, Norm Marshall (Smart Mobility, Inc.), and John Zamurs, PhD (Zamurs and Associates, LLC), for assisting the groups in drafting these comments. We would also like to thank the many organizations and volunteers who dedicated their time and expertise to these comments: Chesapeake Bay Foundation; Citizens Against Beltway Expansion; DontWiden270.org; Friends of Moses Hall; National Parks Conservation Association; Arthur Katz, PhD, Retired Scientist; Byron Bloch, National Vehicle and Traffic Safety Expert; Ole Varmer, Sr., Fellow, The Ocean Foundation; Sarah Lesher, PhD.

00158559

Cedar Lane Unitarian Universalist Environmental Justice Ministry

Central Maryland Transportation Alliance

Chesapeake Bay Foundation

Citizens Against Beltway Expansion

City of Rockville

Coalition for Smarter Growth

Conservation Montgomery

DontWiden270.org

DoTheMostGood

Downtown Residents Advocacy Network (Baltimore)

Friends of Lower Beaverdam Creek

Friends of Moses Hall/The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated

Friends of Sligo Creek

Glen Echo Heights Mobilization

Greater Farmland Civic Association

Greater Greater Washington

Green Team of St. Vincent de Paul Church

Greenbelt Climate Action Network

Howard County Climate Action

Indivisible Howard County MD

Interfaith Power & Light (DC.MD.NoVA)

League of Women Voters of Maryland

Maryland Conservation Council

Maryland Legislative Coalition

Maryland PIRG

NAACP Maryland State Conference, Environmental and Climate Justice Committee

National Parks Conservation Association

Neighbors of the Northwest Branch of the Anacostia River

Northern Virginia Citizens Association

Our Revolution Maryland

00158560

Our Revolution Montgomery County

Policy Foundation of MD / Voices Maryland

Save Our Seminary at Forest Glen Inc.

Sligo Creek Golf Association

Strong Future Maryland

Sunrise Movement Howard County

Takoma Park Mobilization Environment Committee

The Ocean Foundation

Transit Choices

Unitarian Universalist Legislative Ministry of Maryland

Washington Area Bicyclist Association

Washington Biologists' Field Club

West Montgomery County Citizens Association

Woodside Forest Civic Association

Wyngate Citizens Association

00158561

TABLE OF CONTENTS

I.    The SDEIS Violates NEPA's Requirements ........................................................... 1

   A.    NEPA Standards .......................................................................................... 1

   B.    The SDEIS's 60-Day Public Comment Period Is Insufficient to Satisfy the Agencies' NEPA Obligations .............................................................. 2

   C.    The SDEIS Unlawfully Omits Analyses of the Preferred Alternative's Environmental Effects ................................................................................. 3

   D.    The SDEIS Retains the DEIS's Narrow Purpose and Need Statement, which Unreasonably Restricts the Alternatives that Must be Evaluated ....................................... 4

   E.    The SDEIS Fails to Consider All Reasonable Alternatives ......................... 7

   F.    The SDEIS Considers an Unlawfully Segmented Part of the Overall Planned Highway Expansion ...................................................... 8

   G.    The SDEIS's Claims of Reduced Impacts Are Invalid Given That the Removed Segment Remains a Reasonably Foreseeable "Future Phase" .......... 9

   H.    The SDEIS's Executive Summary is Inaccurate ...................................... 17

II.   The SDEIS Relies on Flawed Traffic Modeling that Overstates the Preferred Alternative's Benefits and Understates and, in Some Cases, Entirely Overlooks Multiple Adverse Effects ......................................................................................... 18

   A.    Summary .................................................................................................. 18

   B.    Flaws in the MWCOG and VISSIM Models Used in the I-495 and I-270 SDEIS .......... 21

   C.    Toll Issues ................................................................................................ 39

   D.    Foreseeable Impacts of Building I-495 and I-270 Managed Lanes .......... 44

   E.    Appendix A: Traffic Forecasts ................................................................ 50

   F.    Appendix B: The SDEIS Wrongly Claims that Over-Capacity Assignments Indicate Latent Demand .......................................................... 52

   G.    Appendix C: The Virginia Express Lanes Caused the Worst Bottleneck on I-495 .......... 55

   H.    Other Traffic Issues ................................................................................. 60

   I.    The Toll Rate Setting is Unfair ............................................................... 85

III.  The SDEIS's Water Quality Discussion Violates NEPA ..................................... 97

   A.    The SDEIS Insufficiently Analyzes How Stormwater Runoff Would Affect Surface Water Quality ............................................................ 97

   B.    The SDEIS Fails to Analyze Indirect Effects on Surface Water Quality as Well as the Impact of Climate Change ............................................ 99

   C.    The SDEIS Does Not Sufficiently Consider Alternatives or Onsite Mitigation Options for Wetlands ........................................................ 100

   D.    The SDEIS Fails to Provide Basic Information About Impacts on Floodplains and Corresponding Mitigation Efforts ........................................ 101

00158562

IV.    The SDEIS's Minimal Air Quality Discussion, which Lacks Any Analysis of Air Emissions and Their Impacts, Violates NEPA ........................................................................ 102

    A.    The SDEIS Does Not Evaluate the Preferred Alternative's Greenhouse Gas Emissions .................................................................................................................. 102

    B.    The SDEIS Does Not Evaluate the Preferred Alternative's Criteria Pollutant and Other Pollutant Emissions ....................................................................................... 105

    C.    The SDEIS Fails to Address Air Quality Concerns in Environmental Justice Communities ............................................................................................................ 113

    D.    The SDEIS Fails to Analyze Emissions from Newly Created Bottlenecks and Additional Traffic Congestion .............................................................................. 114

    E.    The SDEIS Fails to Quantify Harms from Air Emissions Despite Available Scientifically Sound Methods ............................................................................... 115

    F.    Information in the SDEIS Reveals Numerous Additional Air Quality-Related Concerns that the SDEIS Fails to Analyze ......................................................... 116

V.    The SDEIS's Land Use and Species Impacts Discussion Violates NEPA ............................... 117

    A.    The SDEIS Does Not Adequately Identify and Analyze Impacts to Aquatic Biota ....... 117

    B.    The SDEIS Fails to Adequately Identify and Analyze Impacts to Forests .................... 117

    C.    The SDEIS's Analysis of Potential Impacts to the Northern Long-Eared Bat Relies Too Heavily on an Outdated Endangered Species Act § 4(d) Rule ............................... 118

    D.    The SDEIS Does Not Sufficiently Explain How Impacts to Rare and Threatened Plants Will be Mitigated ..................................................................................... 119

    E.    The SDEIS Does Not Sufficiently Explain its LOD Determination, Including the Impact of the Preferred Alternative on Plummers Island ................................................. 119

VI.    The SDEIS Fails to Meet the Agencies' Environmental Justice Obligations ............................ 119

    A.    Relevant Federal Laws and Guidance on Environmental Justice Obligations .............. 119

    B.    The SDEIS Improperly Delays Important Environmental Justice Analysis Until the FEIS, which Hinders Meaningful Review and Comment ............................................... 122

    C.    The SDEIS's Limited Discussion of EJ Impacts Relies on Misleading and Conclusory Statements and Fails to Take a Hard Look at Those Impacts or Consider Possible Mitigation ............................................................................................................... 123

    D.    The SDEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative .............. 124

    E.    The SDEIS Does Not Adequately Consider and Avoid Impacts to the Morningstar Tabernacle No. 88 Moses Cemetery and Hall and Gibson Grove A.M.E. Zion Church ................................................................................................................. 125

    F.    The SDEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes ................................................................................................ 126

    G.    FHWA Should Not Move Forward with the FEIS and Preferred Alternative Before Completing a Thorough Investigation of the Civil Rights Complaint Filed Against MDOT .................................................................................................................. 128

00158563

VII.    The Hazardous Waste Standards Used in the SDEIS Are Not Adequate for Projecting Hazardous Waste Impacts.................................................................................. 129

VIII.   The SDEIS Does Not Sufficiently Evaluate the Preferred Alternative's Indirect and Cumulative Effects.................................................................................................. 133

IX.     The SDEIS Violates NHPA/Department of Transportation Act Section 4(f) Requirements ..... 136

        A.    The SDEIS Discloses Increased Adverse Effects on Section 106 and Section 4(f)-Protected Sites...................................................................................................... 137

        B.    The SDEIS's 4(f) Chapter Provides More than Simply "Additional Analysis"............. 138

        C.    The Agencies' Deferral of the Federally Required Assessment of Impacts Impermissibly Forecloses Opportunities to Avoid, Minimize, and Mitigate Impacts to Historic Properties .................................................................................... 138

        D.    Lack of an Appropriate Alternatives Analysis in the SDEIS for the American Legion Bridge Impairs Legally Required Avoidance, Minimization, and Mitigation Decisions about Historical Properties ................................................................ 139

        E.    The SDEIS Continues to Neglect Other Issues That Require Attention and Were Described in Section 106 Comments and Comments on the DEIS ............................... 142

        F.    The SDEIS Improperly Excludes "Future Phase" Section 106 Historical and 4(f) Impacts from the Project's Impacts ......................................................................... 142

        G.    The Mismatch and Overlap of Multiple Short I-495 & I-270 Review Periods Hindered Meaningful Review and Comment Both by the Public and Section 106 Consulting Parties ..................................................................................................... 143

        H.    The SDEIS Is Outdated Compared to the Section 106 Process Findings....................... 143

        I.    The SDEIS Contains an Incomplete and Inadequate Assessment of Impacts on Plummers Island, Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Gibson Grove A.M.E. Zion Church, Cedar Lane Unitarian Universalist Church, and Native American Site(s) near the American Legion Bridge........................................................ 144

        B.    Without Full Accounting of Harms to Historic and 4(f) Sites, the Agencies Cannot Reasonably Select a Preferred Alternative or Identify an Alternative that Avoids 4(f) Properties as Required by Section 4(f) ........................................................................ 153

X.      Miscellaneous Defects in the SDEIS ...................................................................................... 153

        A.    The SDEIS's Statements on the American Legion Bridge's Potential Reconstruction are Inconsistent and Confusing....................................................................................... 153

        B.    The SDEIS's Lack of Disclosure and Deceptive Language Denies the Public a Fair Opportunity to Comment on the Issue of Possible Rail Alignment on the American Legion Bridge ................................................................................................................ 154

        C.    The Preferred Alternative's Reduction of Free Lanes Violates Federal Requirements.. 155

        D.    The SDEIS Does Not Disclose Taxpayer Costs ............................................................. 157

        E.    The NEPA Alternatives Selection Process Has Been Window Dressing; For MDOT Adding Four Toll Lanes is Not an Option but a Requirement and Foregone Conclusion ...................................................................................................................... 162

00158564

F.    Extensive Tree Canopy Loss from the Preferred Alternative is Not Justifiable in a Climate Crisis............................................................................................................. 164

G.    The SDEIS Does Not Disclose the Larger Agenda of the P3 Toll Lane Deal................ 165

H.    Climate Change and COVID-19 Have Changed Everything ......................................... 168

I.    The SDEIS's Public Involvement and Agency Coordination Section Is Inaccurate and Misleading.................................................................................................................... 170

J.    The Agencies Have Withheld from the Public Documents That Were Considered in Drafting the DEIS and SDEIS .................................................................................... 171

XI.    Conclusion ........................................................................................................................... 172

00158565

I.      **The SDEIS Violates NEPA's Requirements**

A.      **NEPA Standards**

An Environmental Impact Statement ("EIS") has "twin functions": preparation of the EIS is designed to require agencies to take a hard look at the consequences of their proposed actions, and distribution of the EIS is designed to provide important information about the proposed action to the public for notice and comment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 356 (1989). The NEPA process relies on public scrutiny. *See* 40 C.F.R. § 1500.1(b) (2019). An EIS therefore must "detail the environmental and economic effects of proposed federal action 'to enable those who did not have a part in its compilation to understand and consider meaningfully the factors involved,' and to compel the decisionmaker to give serious weight to environmental factors in making discretionary choices." *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir. 1975) (citations omitted).

An EIS must "provide full and fair discussion of significant environmental impacts" arising from the proposed action and describe reasonable alternatives "that would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1 (2019).[2] Agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives[.]" *Id.* § 1502.14(a) (2019). Agencies must consider the direct, indirect, and cumulative impacts of proposed actions, including health impacts. *Id.* § 1508.8 (2019); *see also id.* § 1508.7 (2019). General statements about possible effects and risks do not constitute the hard look required by NEPA without a justification for why the agency could not supply more definitive information. *Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019). Conclusory statements that the effects will be minimal or are inevitable are also insufficient under NEPA. *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *Defs. of Wildlife v. N. C. Dep't of Transp.*, 762 F.3d 374, 394 (4th Cir. 2014); *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, 677 F.3d 596, 602 (4th Cir. 2012). Moreover, "an agency may not rely on incorrect assumptions or data in an EIS." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005).

NEPA requires that an EIS contain high-quality information and accurate analysis. *See* 40 C.F.R. § 1500.1(b) (2019). If an agency relies on incomplete data, or if data relevant to the proposed project is unavailable, the EIS must disclose this shortcoming. *See Lands Council v. Powell*, 395 F.3d 1019, 1032 (9th Cir. 2005). Further, the use of inaccurate data to support the need for a proposed project is a violation of NEPA. *N.C. All. for Transp. Reform v. DOT*, 151 F. Supp. 2d 661, 688 (M.D.N.C. 2001) (DOT violated NEPA by premising the need for a transportation project on overstated traffic projection estimates).

An EIS must contain a detailed discussion of possible mitigation measures. *Protect Our Communities Found. v. Jewell*, 825 F.3d 571, 581-82 (9th Cir. 2016). "Without such a discussion,

---

[2] These comments cite to the Council on Environmental Quality's ("CEQ's") NEPA regulations in effect at the time the Agencies announced their intent to prepare an EIS and when the DEIS was released. Although new regulations were finalized on July 16, 2020, 85 Fed. Reg. 43,304, CEQ has begun a series of rulemakings to reconsider and revise those new regulations, *see* 86 Fed. Reg. 55,757 (Oct. 7, 2021). At all events, the comments on, and flaws identified in, the SDEIS apply no matter which CEQ regulations are considered.

1

neither the agency nor other interested groups and individuals can properly evaluate the severity of the adverse effects." *Methow Valley Citizens Council*, 490 U.S. at 352.

Agencies may not "postpone analysis of an environmental consequence to the last possible moment"; they must consider impacts "as soon as it can reasonably be done." *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002). NEPA requires consideration of the potential impacts of an action *before* the action takes place. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998). Because the need to engage in reasonable forecasting and speculation is implicit in NEPA, agencies may not shirk their responsibilities by labeling discussions of future environmental effects as "crystal ball" inquiries. *Del. Riverkeeper Network*, 753 F.3d at 1310; *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1079 (9th Cir. 2011).

NEPA's EIS requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (quoting *Methow Valley Citizens Council*, 490 U.S. at 349). NEPA regulations explain that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b) (2019) Federal agencies shall to the fullest extent possible "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." *Id.* § 1500.2(d) (2019); *see also Center for Biological Diversity v. Gould*, 150 F. Supp. 3d 1170, 1182 (E.D. Cal. 2015) (agency's failure to include environmental information that it relied upon in its decision precluded plaintiffs from submitting more complete comments and thus violated NEPA).

An adequate EIS is essential to the informed agency decision-making and informed public participation required by NEPA. *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 725 (9th Cir. 2009). To implement the latter requirement, any referenced material must be made available within the time allowed for comment. *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582, 598 (4th Cir. 2018) (citing 40 C.F.R. §§ 1502.9(a), 1502.21).[3] When the information in the EIS is so incomplete or misleading that the decisionmaker and the public cannot make an informed comparison of the alternatives, revision of an EIS may be necessary to provide "a reasonable, good faith, and objective presentation of the subjects required by NEPA." *Animal Def. Council v. Hodel*, 840 F.2d 1432, 1439 (9th Cir. 1988), *amended*, 867 F.2d 1244 (9th Cir. 1989); 40 C.F.R. § 1502.9(a), (c) (2019). A "draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements in section 102(2)(C) of the Act." 40 C.F.R. § 1502.9(a) (2019). "If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and circulate a revised draft of the appropriate portion." *Id.*

**B.    The SDEIS's 60-Day Public Comment Period Is Insufficient to Satisfy the Agencies' NEPA Obligations**

On October 1, 2021, the Agencies released the SDEIS to the public with a 45-day deadline for review and comment. Many of the undersigned organizations requested an extension of that deadline. Others, including the City of Rockville, Montgomery County Council, Members of U.S.

---

[3] *See also Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, Council on Env't Quality, 46 Fed. Reg. 18,025 at # 25b (Mar. 23, 1981 as amended 1986), https://www.energy.gov/sites/default/files/2018/06/f53/G-CEQ-40Questions.pdf.

00158567

Congress Anthony Brown and Jamie Raskin, and U.S. Senators Benjamin Cardin and Chis Van Hollen also asked for extensions. Among other things, those letters explained that 45 days was insufficient because:

- The preferred alternative is a substantial project going through many communities and environmentally and culturally significant areas.
- There are serious questions about the validity of the traffic modeling performed in the SDEIS, requiring independent analysis which takes time.
- The SDEIS together with its appendices is over 8,000 pages; even reviewing the document on a full-time basis, assuming that were possible, would take longer than 45-days.
- The SDEIS continually references the DEIS and its appendices, which amount to over 19,000 pages; meaningful review of the SDEIS and its references would take well over 45 days.
- The SDEIS's public comment period overlapped with the toll rate range setting public comment period and the National Historic Preservation Act Section 106 comment period.
- COVID-19 creates additional challenges for the public to review materials.

The Agencies did not respond to these requests. However, three days before the comment deadline, the Agencies announced that the comment period was being extended by 15 days, to November 30, 2021. The Agencies did not explain why, nor did the Agencies respond to the issues identified that justified a need for a longer comment period, such as the deficiencies in the traffic analysis. This 15-day extension over the Thanksgiving holiday period, which occurred after the public hearing and after many commenters had already submitted rushed comments, violates the Agencies' NEPA obligations to encourage and facilitate public involvement and informed public participation, including public participation from environmental justice communities.

C.    **The SDEIS Unlawfully Omits Analyses of the Preferred Alternative's Environmental Effects**

The SDEIS unlawfully omits many important discussions and analyses of the preferred alternative's environmental effects, stating that the Agencies will present that information to the public when the FEIS is released. For example, the SDEIS does not provide the following information and says it will be presented for the first time in the FEIS:

- A sensitivity analysis that will confirm the need for the preferred alternative and verify that the preferred alternative would provide benefits even if future demand for toll lanes is less than projected. SDEIS at ES-4. This statement not only indicates that the required analysis will be delayed but also shows that the Agencies have predetermined the results of that analysis, in violation of NEPA.

- An updated traffic analysis to determine the worst-case intersections and interchanges throughout the corridors of the preferred alternative and to provide for updated carbon monoxide air quality modeling. *Id.* at 4-43.

- An updated mobile source air toxics analysis. *Id.*

3

- An updated greenhouse gas ("GHG") emissions analysis. *Id.* at 4-44

- An analysis of construction related GHG emissions. *Id.*

- A determination of whether the preferred alternative has disproportionately high and adverse impacts to environmental justice populations. *Id.* at 4-104.

The SDEIS does not justify the delay for any of these analyses. Withholding analyses of environmental effects from the public until the FEIS is issued violates both the letter and spirit of NEPA.[4] Before moving forward with the preferred alternative, the Agencies must present their analyses of its environmental impacts for public review and comment, adjust any future NEPA documents based on those comments, and respond to all substantive comments.

**D.  The SDEIS Retains the DEIS's Narrow Purpose and Need Statement, which Unreasonably Restricts the Alternatives that Must be Evaluated**

An EIS must "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives." 40 C.F.R. § 1502.13 (2019). Agencies may not define a project's "objectives in unreasonably narrow terms." *City of Carmel-By-The-Sea v. U.S. Dept. of Transp.*, 123 F.3d 1142, 1155 (9th Cir. 1997). A purpose and need statement must allow an EIS to be more than a "foreordained formality." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991). An agency "may not circumvent the proscription" against defining its objectives in unreasonably narrow terms "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives." *Nat'l Parks Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). Further, a purpose and need statement premised on false or inaccurate information fails to provide a basis for "informed evaluation or a reasoned decision," and therefore does not satisfy NEPA's requirements. *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983).

Our previous comments explained the numerous flaws with the purpose and need statement, including that it is unreasonably narrow, unlawfully constrains the range of considered alternatives, and is based on inaccurate traffic and financial assumptions.

Unfortunately, the SDEIS retains that flawed purpose and need without change:

The Study's purpose is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the Study limits, and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:

---

[4] The SDEIS states that "FHWA does not intend to issue a combined FEIS/ROD," SDEIS at PDF p.1, however other sources suggest FHWA still intends to do so, *see* Environmental, I-495 & I-270 Managed Lanes Study, Study Timeline, https://oplanesmd.com/environmental/, visited Nov. 3, 2021 ("Fall 2021 - Spring 2022" "Development of Combined Final Environmental Impact Statement / Record of Decision"). A combined FEIS/ROD would further prevent public review and comment on significant environmental effects prior to a final decision on the preferred alternative.

4

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Accommodate Homeland Security
- Improve Movement of Goods and Services

Two goals for the Study were also identified in addition to the purpose and needs:
(1) the use of alternative funding approaches for financial viability and
(2) environmental responsibility.

SDEIS at ES-2, 1-2.

As explained in our DEIS comments, the purpose and need statement that the Agencies carried over to the SDEIS eliminates any alternative that does not involve managed lanes and does not attract highway toll concessionaires. By including "additional roadway travel choices" in the purpose and need statement, the Agencies foreclosed the possibility of meeting the broader Project goals by other reasonable means, such as transportation system management, transportation demand management, mass transit, or multimodal strategies. The purpose and need statement improperly limits alternatives to travel demand solutions that are financially profitable to a private sector investor and thereby unlawfully adopts the private interests of potential P3 investors and excludes alternatives that do not meet their specific private objectives. The Notice of Intent to prepare the EIS illustrates this problem by stating that "[m]anaged lanes are needed," and "[a]dditional roadway management options are needed."[5] Based on the purpose and need statement, the build alternatives studied as part of the traffic analysis for the DEIS and SDEIS included managed lanes to the exclusion of other alternatives. SDEIS at 3-4. This result did not allow a full and fair consideration of all reasonable alternatives and made the NEPA process merely a foreordained formality.

Our prior comments provided a reworded purpose and need statement that meets NEPA's requirements and would allow a reasonable comparison of alternatives:

The Purpose of the Study is to develop infrastructure and policy solutions that will improve accessibility and mobility in the Northwest and Beltway corridors while reducing vehicle miles traveled, supporting sustainable land use and economic development, and promoting social, environmental, and economic equity.

This broader purpose and need statement reflects the broader objectives used in some past Maryland studies. For example, the 2004/2005 Capital Beltway Study purpose and need included objectives like: improve regional mobility; provide enhanced safety; maximize travel operational efficiencies; provide cost-effective transportation infrastructure; and support the area's economic

---

[5] Notice of Intent to Prepare Environmental Impact Statement, I-495 & I-270 Managed Lanes Study, 83 Fed. Reg. 11,812, 11,812 (March 16, 2018).

00158570

growth and the environment.[6] The Agencies should start the process over based on this or a similar purpose and need statement.

Relatedly, like in the DEIS, the purpose and need statement in the SDEIS is based on inaccurate traffic information. Instead of analyzing whether the purpose and need statement remained valid in light of current traffic, it appears the SDEIS asked only whether the purpose and need statement validated the preferred alternative. SDEIS at ES-2 to ES-3. This approach is backwards. The SDEIS does not evaluate the purpose and need statement in light of COVID-19, increased telework, or the results and projected results of the implementation of the I-270 Innovative Congestion Management Project ("ICMP").[7] The SDEIS and our comments in Section II below demonstrate that the Agencies are not performing an unbiased traffic analysis but rather seeking confirmation to support the preferred alternative. *See, e.g.*, SDEIS at ES-4.

The financial assumptions that underlie the preferred alternative's purpose and need are also inaccurate. The SDEIS repeats the DEIS's claim that a P3 is needed because Maryland "does not have the funds to construct improvements of this magnitude with an estimated cost of approximately $3 to $3.5 billion," nor does the state "have the bonding capacity to take out loans to pay for the Improvements." SDEIS at ES-10. MDOT has also previously justified eliminating other alternatives based on these claims. The SDEIS does not provide any support for these claims; in fact, they are contradicted by statements made by MDOT State Highway Administration ("SHA") indicating that the state can indeed issue new bonds backed by transit revenue streams, like tolls or transit fares, and can seek low-interest federal loans similar to those which concessionaires have access to.[8] Moreover, the Agencies must consider federal funding support, including the recently passed infrastructure bill.[9]

---

[6] MDOT SHA, Capital Beltway Study Public Display Boards (May 6, 2004), https://web.archive.org/web/20170202174503/http://apps.roads.maryland.gov/WebProjectLifeCycle/AW518_11/HTDOCS/Documents/Informational_Public_Workshop/AW518%20Display%20Boards.FINAL.5-6-04a.pdf.

[7] *See, e.g.*, Bob Barnard, *Traffic Lights to I-270 Entrance Ramps Activated in Frederick, Montgomery Counties*, FOX5 (Sept. 15, 2021), https://www.fox5dc.com/news/traffic-lights-to-i-270-entrance-ramps-activated-in-frederick-montgomery-counties; Steve Bohnel, *Ramp Metering, for Traffic Control, Begins Along I-270*, Bethesda Magazine (Aug. 17, 2021), https://bethesdamagazine.com/bethesda-beat/traffic/ramp-metering-for-traffic-control-begins-along-i-270/; Sonia Demiray, *Opinion: Pricey Toll Lane Plan Won't Solve Regional Traffic Issues*, Maryland Matters (Nov. 1, 2021), https://www.marylandmatters.org/2021/11/01/opinion-pricey-toll-lane-plan-wont-solve-regional-traffic-issues/.

[8] Bruce DePuyt, *Purple Line Will be Delayed as MDOT Seeks Management Solution*, WTOPnews (Sept. 23, 2020), https://wtop.com/maryland/2020/09/purple-line-will-be-delayed-as-mdot-seeks-management-solution/; Katherine Shaver, *Maryland Would Have to Divert Money from Other Projects if Purple Line Builders Quit, State Transit Chief Tells Court*, Washington Post (Sept. 8, 2020), https://www.washingtonpost.com/local/trafficandcommuting/maryland-would-have-to-divert-money-from-other-projects-if-purple-line-builders-quit-state-transit-chief-tells-court/2020/09/08/85dd149a-ee22-11ea-99a1-71343d03bc29_story.html.

[9] *See Maryland Lawmakers, Bay Advocates React to Late-Night Passage of $1.2 Trillion US Infrastructure Bill*, Maryland Matters (Nov. 6, 2021), https://wtop.com/maryland/2021/11/maryland-lawmakers-bay-advocates-react-to-late-night-passage-of-1-2-trillion-us-infrastructure-bill/ Kevin Kinnally, *Here's What the Infrastructure Bill Means for Maryland*, Maryland Association of Counties (Nov. 8, 2021), https://conduitstreet.mdcounties.org/2021/11/08/heres-what-the-infrastructure-bill-means-for-maryland/.

00158571

### E.    The SDEIS Fails to Consider All Reasonable Alternatives

The alternatives analysis is the "heart" of an EIS. 40 C.F.R. § 1502.14 (2019). NEPA requires that an agency "[r]igorously explore and objectively evaluate *all* reasonable alternatives" to the proposed action. *Id.* § 1502.14(a) (2019) (emphasis added). An agency must consider a range of alternatives "sufficient to permit a reasoned choice among the options." *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1243 (10th Cir. 2011) (quoting *Ass'ns Working for Aurora's Residential Env't v. Colo. Dep't of Transp.*, 153 F.3d 1122, 1130 (10th Cir. 1998)); *see also Sierra Club v. Watkins*, 808 F. Supp. 852, 872 (D.D.C. 1991) (agency is required to "consider a range of alternatives that covers the full spectrum of possibilities"). Also, NEPA does not allow an agency to eliminate alternatives "merely because they do not offer a complete solution" to the purpose and need of the proposed project. *Nat. Res. Def. Council v. Morton*, 458 F.2d 827, 836 (D.C. Cir. 1972).

The SDEIS fails to consider many reasonable alternatives to the preferred alternative, including multi-modal alternatives such as the multi-modal alternative presented in our comments on the DEIS, and is therefore inadequate. *Citizens for a Better Henderson v. Hodel*, 768 F.2d 1051, 1057 (9th Cir. 1985) ("[T]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate."). The SDEIS analyzes only one alternative that proposes to add two high occupancy toll lanes in each direction on parts of I-495 and I-270. The SDEIS does not analyze any transit and other non-highway expansion alternatives but perpetuates the DEIS's failure to consider the full spectrum of possibilities. The SDEIS also does not analyze transportation demand management, transportation system management, or reversable lanes. Our prior comments presented a viable multimodal alternative for consideration, System Management/Accessibility/Rapid Transit (SMART), which the SDEIS continues to ignore. The SDEIS's proposal to allow bus use of the preferred alternative's toll lanes is not sufficient consideration of all reasonable alternatives.[10]

Additionally, the SDEIS provides an improper evaluation of alternatives. The SDEIS's preferred alternative adds toll lanes to shorter parts of I-495 and I-270 than were considered in the DEIS. Yet the SDEIS compares the preferred alternative to managed lane alternatives that involve a significantly larger portion of the two highways. *See, e.g.*, SDEIS at 5-56. Whatever the consequences of this mismatch, it does not allow a meaningful evaluation to be conducted. Further, the SDEIS's preferred alternative does not compare its environmental effects to alternatives such as public transit, transportation systems/demand management, contraflow lanes, and reversible lanes, which were eliminated from further study prior to the DEIS. If the Agencies wish to evaluate and approve the preferred alternative with its smaller scope, the Agencies must evaluate a full range of reasonable alternatives, including multimodal alternatives, with a similar scope.

---

[10] Moreover, the SDEIS does not consider any increases in actual transit routes, times, or frequency. If the transit planning preceded this DEIS/SDEIS focused on addressing the best mode to ease the transportation deficiency, perhaps the need for the extra lanes could be avoided and highway expansion could have been less of a foregone conclusion. The SDEIS discusses $360M in "transit improvements" throughout Montgomery County, but that seems more to placate local transit advocates to fund backlogged improvements rather than specific transit improvements addressing congestion in the corridor.

00158572

**F.    The SDEIS Considers an Unlawfully Segmented Part of the Overall Planned Highway Expansion**

The SDEIS evaluates an unreasonably segmented portion of the overall planned highway expansion, thereby omitting analysis of other reasonable alternatives and reasonably foreseeable environmental impacts.

Agencies are required to discuss connected and cumulative actions in the same EIS. 40 C.F.R. § 1508.25(a)(1), (2) (2019). This requirement prevents agencies from engaging in segmentation, that is, circumventing NEPA by not studying the cumulative impacts of a single project. "This rule against segmentation was developed to prevent the piecemeal environmental analysis of interrelated projects, which could give an inaccurate impression of overall environmental effects." *N.C. All. for Transp. Reform*, 151 F. Supp. 2d at 680.

Courts consider three factors to determine if separate project segments are in fact cumulative actions that should be discussed in the same impact statement: (1) whether they are part of a single project; (2) whether they were announced simultaneously; and (3) whether construction of both portions was reasonably foreseeable. *N.C. All. for Transp. Reform*, 151 F. Supp. 2d at 684-85 (citing *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214-15 (9th Cir. 1998)). There is no doubt that the overall I-495 and I-270 P3 managed lane expansion meets all of these criteria: The SDEIS limits its evaluation of alternatives and environmental effects to this segment despite acknowledging at various points that the preferred alternative is only the first phase of the Project and that the P3 agreement that Maryland has already entered into with a private party goes beyond the segment of the preferred alternative. *See, e.g.*, SDEIS at ES-16. The impacts of all segments should therefore be evaluated in one NEPA document.

In addition, under DOT regulations, three criteria must be met by any transportation action reviewed under an individual EIS. First, the action being reviewed must "[c]onnect logical termini and be of sufficient length to address environmental matters on a broad scope." 23 C.F.R. § 771.111(f)(1). Second, the action is required to "[h]ave independent utility or independent significance, *i.e.*, be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made." *Id.* § 771.111(f)(2). Lastly, the action must not "restrict consideration of alternatives for other reasonably foreseeable transportation improvements." *Id.* § 771.111(f)(3).

The SDEIS violates the regulations because the segment it addresses does not connect logical termini; it would create bottlenecks and worsen traffic at its endpoints if it were the only segment constructed. The SDEIS also violates the independent utility requirement because none of the segments would take place in the other's absence. *Defs. of Wildlife*, 762 F.3d at 395; *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012). Finally, by limiting the scope of the SDEIS to a segment that is only part of the overall P3 Program, the SDEIS restricts consideration of partial or full public transportation options (such as expanding the Maryland Area Regional Commuter line) that would be viable if evaluated based on the entire P3 Program. Going forward with this segmentation will also prevent similar public transit options from being considered when the other two segments go through the NEPA process and will make approval of additional managed lanes a mere formality.

00158573

Further, the segmentation was implemented purposefully to ignore impacts of widening Upper I-270 until a later date, which already is part of the P3 agreement, while trying to get the first part of the larger Project approved and underway. Not addressing Upper I-270 issues in this SDEIS precludes an adequate evaluation of preferred alternative's direct impacts, indirect impacts, and cumulative effects and foreseeable Project risks (such as the private developer not being willing to complete Upper I-270 in light of the political risks, Section 4(f) risks, and the fact that that portion would not meet the narrow purpose and need for the Project or be profitable without state subsidy).[11] Former Transportation Secretary Pete Rahn disclosed during an October 2019 interview that I-270 was divided into two phases because of issues with the Monocacy Battlefield:

> the governor's direction was that I-270 be our first phase. And he didn't say 370 to the Beltway. He said 270. So we now have Phase 1A and 1B — 1B being north of 370. And what we're having to deal with there is a uniqueness to I-270, particularly impacted by the Monocacy battlefield. That's why 270 has been separated into two. We currently have [taken] the initial steps of the NEPA [National Environmental Policy Act] process for that section north. So we're not ignoring it.[12]

Monocacy National Battlefield, which directly touches the current Upper I-270, is on the National Register of Historic Places. Any attempts at expanding that highway would create significant environmental and Section 4(f) impacts. Attempting to avoid analysis of a section of the roadway because it contains a historic National Battlefield is not a valid reason to segment a proposal's NEPA review. End points may not be created simply to avoid proper analysis of environmental impacts.

No action on Lower I-270 should proceed without completing a NEPA-compliant evaluation of impacts arising from widening Upper I-270 and studying the cumulative impacts of this full plan.

### G.    The SDEIS's Claims of Reduced Impacts Are Invalid Given That the Removed Segment Remains a Reasonably Foreseeable "Future Phase"

The case has not been made that the footprint of the Project is actually smaller to justify this partially focused SDEIS and argument of reduced impacts. In fact, the Project is not smaller, it is just differently phased. The second phase is a reasonably foreseeable future action whose cumulative impact must be evaluated in the SDEIS.

By designating the future phase of I-495 east of the eastern I-270 spur as "no action at this time" rather than "no build," that segment is essentially no different than upper I-270 which is also

---

[11] "From the very beginning, our statement of goal has been net zero cost to the state. The word 'net' is important here, because we know there are areas like 270 north that will have a cost that is going to exceed our projections for revenue generated by that section. That by itself would equal a subsidy or 'gap funding.'" *A Transportation Q&A: Rahn Talks I-270, Partnerships, Growth and More*, Bethesda Magazine (Oct. 24, 2019), https://bethesdamagazine.com/bethesda-beat/traffic/a-transportation-qa-rahn-talks-i-270-partnerships-growth-and-more/.

[12] *Id.* (alterations in original).

00158574

in essence "no action at this time" yet is still part of the plan as a reasonably foreseeable "future phase."

The "no action at this time" appears to be an attempt to dodge accepted NEPA terminology of "no build," which has a clear legal meaning. No action at this time appears to be an attempt to illegally segment the Project to receive clearances while biasing the rest of the Project in favor of toll lanes.

The essence of illegal segmentation is the intentional piecemealing of a single project to avoid compliance with federal and historic preservation environmental laws *See Md. Conservation Council v. Gilchrist*, 808 F.2d 1039, 1041 (4th Cir. 1986). Both the upper I-270 and eastern I-495 segments traverse environmentally sensitive areas and it was clear that the inclusion of these segments would potentially jeopardize approval of the Project as a whole.[13] By deferring review of the upper I-270 and eastern I-495 segments, MDOT has set up a bifurcated decision-making structure whereby the less environmentally controversial section is approved, and then construction of the other segments will be presented as necessary to the success of the Project as a whole.

Former Maryland Transportation Secretary Pete Rahn admitted in 2019 that I-270 was divided into two phases because of issues with the Monocacy Battlefield (see Section I.F for more).[14] He also stated: "I-270 does not work without the American Legion Bridge. The American Legion Bridge does not work without [Interstate] 495 over to 95. We have to be approaching this as a system."[15]

Governor Hogan, Comptroller Peter Franchot, MDOT, and Transurban have admitted there were likely to be or are problems moving forward with eastern I-495. Transurban North America President Jennifer Aument said in April 2019 that the Project had a "complex political and economic path ahead."[16] The pre-vote discussion at the Board of Public Works ("BPW") between Comptroller Franchot, Transportation Secretary Slater, and Governor Hogan displayed great frustration with the opposition and changes to the Project.[17] MDOT's description in the November

---

[13] BPW Meeting Agenda, at 57-58 (Nov. 3, 2021), https://bpw.maryland.gov/MeetingDocs/2021-Nov-3-Agenda.pdf.

[14] *A Transportation Q&A: Rahn Talks I-270, Partnerships, Growth and More*, Bethesda Magazine (Oct. 24, 2019), https://bethesdamagazine.com/bethesda-beat/traffic/a-transportation-qa-rahn-talks-i-270-partnerships-growth-and-more/.

[15] Robert McCartney, Luz Lazo and Katherine Shaver, *Maryland and Virginia to rebuild and widen the American Legion Bridge, Governors Say*, Washington Post (Nov. 12, 2019), https://www.washingtonpost.com/local/trafficandcommuting/maryland-and-virginia-to-rebuild-and-widen-the-american-legion-bridge-governors-say/2019/11/12/6531d8fe-04c9-11ea-ac12-3325d49eacaa_story.html.

[16] Bruce DePuyt, *Transportation Management Giant Reverses Course, Eyes Bid for Md. Highway Project*, Maryland Matters (Dec 19, 2019), https://www.marylandmatters.org/2019/12/19/transportation-management-giant-reverses-course-eyes-bid-for-md-highway-project/.

[17] DontWiden270.org Newsletter, (Nov. 7, 2021), https://mailchi.mp/54329663960d/write-mdot-by-1115-another-45m-grab (Referencing pre-vote discussion at Nov 3, 2021 Board of Public Works meeting, Comptroller Franchot: "And I often say to the Governor who is the author of this project, I think we really need to do this initial part. And should you be happy with that? Give me the other two-thirds back, because that's what he wanted to do originally. And I can see that. So he's not happy, the Treasurer is not happy . . .").

00158575

3, 2021 BPW agenda of the tortuous, up and down path the Project faced indicates the depth and extent of problems with parts of the plan, particularly the eastern segment.[18]

Comptroller Franchot said in a podcast interview on May 10, 2021, that:

[E]ast of 270 on 495 [would be considered in] five or six years [because it's] very controversial that requires some parkland and some residences and eminent domain, and there's a big hue and cry and uproar over there. . . . And, you know [by doing the American Legion Bridge to I-370], we'll be able to without completely turning the area on its head, we're going to be able to test a properly drafted P3, and we'll see how it goes.[19]

It seems that MDOT only dropped I-495 east of the I-270 eastern spur when it became clear that including that segment would stall or end the entire Project because it might or would not be able to receive agency concurrence from several cooperating agencies including M-NCPPC,[20] NCPC,[21] and the National Park Service.[22] It likely also would not have been able to receive concurrence from the U.S. Navy[23] as noted in our comments on the DEIS. The more extensive Project would have had major impacts on land and property owned by these agencies, and thus they pushed back.

I-495 to the east would have massive environmental and human impacts, including those listed in the right-most column in the table below:

---

[18] Board of Public Works Agenda, at 57-58 (Nov 3, 2021), https://bpw.maryland.gov/MeetingDocs/2021-Nov-3-Agenda.pdf. Page 58 states: "The limits, type, and other aspects of the solicitation changed during the development of the Phase 1, requiring a greater magnitude of early services than originally anticipated. The project limits of the phases and type of P3 solicitation changed several times due to varying factors. . . ."

[19] https://web.archive.org/web/20210329030942/https://s168.podbean.com/pb/fbfd15bd19f93abbcb0452fb6fa86d5b/60614351/data2/fs110/2708898/uploads/Everyday_Law_Peter_Franchot9jl3b.mp3?pbss=643a3775-6a6e-5302-8006-be00f401ef0c.

[20] Letter from Elizabeth M. Hewlett and Casey B. Anderson to Jeanette Mar and Time Smith re I-495/I-270 Managed Lanes Study – Notice of Non-Concurrence with Selection of Alternative 9 as the Recommended Preferred Alternative, (April 21, 2021), https://montgomeryplanningboard.org/wp-content/uploads/2021/04/Notice-of-Non-Concurrence_signed.pdf.

[21] NCPC Information Presentation: I-495 and I-270 Managed Lanes Study, at 3 (Oct 7, 2021), https://www.ncpc.gov/docs/actions/2021October/7984_I-495_and_I-270_Managed_Lanes_Study__Information_Sheet_Oct2021.pdf ("NCPC staff do not concur with the current State-preferred alternative based on 1) M-NCPPC's continuing non-concurrence with the study and 2) staff remain unclear about how the use of Capper-Cramton property (for managed lanes expansion) would benefit each park over and above potential impact mitigation measures as required by the Capper-Cramton Act. Current SEIS and draft EIS materials do not describe potential impacts nor applied mitigation/benefits in enough detail . . .").

[22] National Capital Planning Commission (USA) Meeting, Oct. 7, 2021, https://youtu.be/h7ItQFmbfwU?t=5754, Commissioner May comments, regarding NPS.

[23] Bruce DePuyt, *U.S. Navy Strongly Opposed To Capital Beltway Widening Project*, Maryland Matters (Nov. 20, 2020), https://www.marylandmatters.org/2020/11/20/u-s-navy-strongly-opposed-to-capital-beltway-widening-project/.

00158576

**Table: Comparison of Impacts MLS DEIS, Phase 1 South SDEIS, 495 East (calculated)**

|   |   | DEIS/Alt 9 | Phase 1 South | 495 East |
|---|---|---|---|---|
| 1 | Total Potential Impacts to Park Properties (acres) | 133.1 *(page 4-3)* | 36.1 | 97 |
| 2 | Total Right-of-Way Required2 (acres) | 323.5 | 115.9 | 207.6 |
| 3 | Number of Properties Directly Affected (count) | 1,475 | 501 | 974 |
| 4 | Number of Residential Relocations (count) | 34 | 0 | 34 |
| 5 | Number of Business Relocations (count) | 4 | 0 | 4 |
| 6 | Number of Historic Properties with Adverse Effects | 13[7] [effect cannot be determined] | 11 | 2? |
| 7 | Noise Sensitive Areas Impacted (count) | 133 *(page 4-138; 37 on I-270)* | 49 | 84 |
| 8 | Hazardous Materials Sites of Concern (count) | 501 *(page 4-3, 4-73)* | 255 | 246 |
| 9 | Wetlands of Special State Concern | 0 | 0 | 0 |
| 10 | Wetlands° (acres) | 16.3 | 4.3 | 12 |
| 11 | Wetland 25-foot Buffer4 (acres) | 53.1 | 7.1 | 46 |
| 12 | Waterways° (square feet) | 1,909,586 *(page 4-81)* | 1,017,702 | 891,884 |
| 13 | Waterways4 (linear feet) | 155,922 *(page 4-81)* | 46,553 | 109,369 |
| 14 | Tier II Catchments (acres) | 55.3 | 0 | 55.3 |
| 15 | 100-Year Floodplain (acres) | 119.5 | 48.8 | 70.7 |
| 16 | Forest Canopy (acres) | 1,497 | 500.1 | 996.9 |
| 17 | Rare, Threatened and Endangered Species Habitat (acres) | No information in DEIS | 56.4 | ?? |
| 18 | Sensitive Species Project Review Area (acres) | 155 *(page 4-3)* | 44.5 | 110.5 |
| 19 | Unique and Sensitive Areas (acres) | 408.2 *(page 4-3)* | 168.5 | 239.7 |
| 20 | Width pavement on I-495 | 194-198 (DEIS page 4-3, but not included in SDEIS) | | |
| 21 | Width of pavement on I-270 | 218-222 (DEIS page 4-3, but not included in SDEIS) | | |

The May 12, 2021, announcement strongly inferred that the eastern part of I-495 had been dropped and this apparent decision was applauded by agency cooperating parties and the public.

Headlines on that day proclaimed:

1. *Maryland Scales Back Most Controversial Part of Beltway Toll Lanes Plan East of I-270: State Officials Say They Will Take 'No Action' on Further Studying How to Widen the Beltway East of I-270.*[24]

---

[24] Katherine Shaver, *Maryland Scales Back Most Controversial Part of Beltway Toll Lanes Plan East of I-270*, Washington Post (May 12, 2021), https://www.washingtonpost.com/transportation/2021/05/12/maryland-toll-lanes-plan/.

00158577

2.   *Maryland's Controversial Highway Widening Proposal Scaled Back.*[25]
3.   *Large Portion of Capital Beltway Removed from Highway Widening Plan, Leaving I-270.*[26]
4.   *MDOT Removes Large Stretch of Capital Beltway from Toll-Lane Plan.*[27]
5.   *Maryland Gov. Larry Hogan Scaling Back Plans For I-270 Widening.*[28]
6.   *Capital Beltway Project Eliminates 30 Miles of Proposed Toll Roads.*[29]
7.   *MDOT Cancels Plans to Widen Beltway East of I-270.*[30]

The terms used to describe the change are scale back, remove, eliminate, shrink, and cancel. From no outlet did the public receive any indication that review, and approval of the segment was merely deferred and that MDOT had simply changed the Project phasing.

Even the Project contracting language changed temporarily. For a time and during the period of contract review by the legislature, treasurer, and comptroller, the contract referred to "Phase South" and "Phase North" instead of Phase 1 with qualifiers as had been done before and has been done since.[31] This further implied that other phases had been dropped from the plan.

Elected officials and decision makers of every level bought in to the public narrative that MDOT had changed course and made a better, less damaging decision in order to allow the Project to progress. This narrative influenced subsequent decisions made by a portion of the Montgomery County Council, the Transportation Planning Board, the BPW, and Maryland Transportation Authority ("MDTA") to advance the Project.[32]

---

[25] James Brasuell, *Maryland's Controversial Highway Widening Proposal Scaled Back*, Planetizen (May 13, 2021), https://www.planetizen.com/news/2021/05/113310-marylands-controversial-highway-widening-proposal-scaled-back.

[26] Briana Adhikusuma, *UPDATED: Large portion of Capital Beltway removed from highway widening plan, leaving I-270*, Bethesda Beat (May 12, 2021), https://bethesdamagazine.com/bethesda-beat/transportation/capital-beltway-removed-from-plan-to-widen-i-270/.

[27] Bruce DePuyt, *MDOT Removes Large Stretch of Capital Beltway From Toll-Lane Plan*, Maryland Matters (May 12, 2021), https://www.marylandmatters.org/2021/05/12/mdot-removes-large-stretch-of-capital-beltway-from-toll-lane-plan/.

[28] Lauren DeMarco, *Maryland Gov. Larry Hogan Scaling Back Plans for Capital Beltway and I-270 Widening*, Fox 5 DC (May 13, 2021), https://www.fox5dc.com/news/maryland-gov-larry-hogan-scaling-back-plans-for-capital-beltway-and-i-270-widening.

[29] Tyson Fisher, *Capital Beltway Project Eliminates 30 Miles of Proposed Toll Roads*, Landline (May 14, 2021), https://landline.media/capital-beltway-project-eliminates-30-miles-of-proposed-toll-roads/.

[30] Patrick Herron, *MDOT Cancels Plans to Widen Beltway East of I-270*, The Moco Show (May 12, 2021), https://mocoshow.com/blog/mdot-cancels-plans-to-widen-beltway-east-of-i-270/.

[31] Phase Public-Private Partnership Agreement for the I-495 and I-270 P3 Program, (June 2021), https://www.oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement.pdf.

[32] Josh Tulkin, *Opinion: Toll Lanes on I-495 East of I-270 Were Put on Hold, But Remain in Overall Plan*, Bethesda Magazine (Nov 1, 2021), https://bethesdamagazine.com/bethesda-beat/opinion/opinion-toll-lanes-on-i-495-east-of-i-270-were-put-on-hold-but-remain-in-overall-plan/.

13

Yet, elsewhere, the contrary reality was evident. Governor Hogan on the same day disavowed the smaller footprint, saying it all needed to be done.[33] MDOT in its statement plainly stated:

> This RPA does not suggest that improvements will not be needed on the top side and east side of I-495. If the new RPA is selected at the conclusion of the MLS, consideration of improvements to remaining parts of the interstate system would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and agency partners.[34]

Even after the May 2021 decision to reduce the Project scope, the selected Transurban-led consortium Accelerate Maryland Partners still showed in its marketing materials the rest of I-495 as "future phases."[35] A September 11 article in *The Australian* states: "Transurban's Charlton says . . . delivering the first section of the road also sets his company up to win future stages of the project, valued at another $US9 billion to $US11 billion over the next decade or so. That would give Transurban a continuous network of roads through Maryland and Virginia that encircle Washington DC."[36]

In September 2021, MDOT rebranded its P3 toll lane website: the new home page showcases a map that labels I-495 east of the I-270 eastern spur as "future phases."

---

[33] Coleen Grablick, *Maryland Shrinks Plan To Add More Lanes To The Beltway*, DCist (May 12, 2021), https://dcist.com/story/21/05/12/maryland-reduces-beltway-expansion-plan-to-focus-on-northern-region/. .

[34] *New Recommended Preferred Alternative to Deliver Phase 1 South: American Legion Bridge I-270 to I-370*, (May 12, 2021) https://web.archive.org/web/20210512170303/https:/495-270-p3.com/environmental/alternatives/rpa/.

[35] Aileen Cho, *Maryland's $11B P3 Road Project Moves Forward With Outreach*, Engineering News-Record (June 14, 2021), https://www.enr.com/articles/51919-marylands-11b-p3-road-project-moves-forward-with-outreach.

[36] Patrick Hatch, *Roads to Riches: Transurban, Super Funds Vie for Bigger Slice of America's Pie*, The Age (Sept. 11, 2021), https://www.theage.com.au/business/companies/roads-to-riches-transurban-super-funds-vie-for-bigger-slice-of-america-s-pie-20210902-p58o5e.html.

00158579



Source: https://oplanesmd.com/, last accessed Nov. 27, 2021.

And, according to the contract signed in August,[37] Transurban will have the right of first refusal or "development rights" for future phases.

The press, however, acknowledged the self-fulfilling reality of the situation. The Washington Post, a toll lane booster, issued several editorials lamenting the smaller footprint but arguing the rest had to be done. The first one, dated May 30, 2021, said:

> By shrinking the plan . . . , while scrapping most of the Beltway widening, the governor has bowed to local political opposition. . . . Perhaps it will take some future Democratic governor, one with thick skin and a firm grasp of demographic and traffic forecasts, to convince recalcitrant local Democrats and get the job done.[38]

A July 6, 2021 *Washington Post* Editorial Board opinion talked of approval of only Phase 1 South of the Project as a threat to "downscale it to the point where it would be ineffective at

---

[37] Bruce DePuyt, *In Split Vote, Board of Public Works Approves Highway Design Contract*, Maryland Matters (Aug. 11, 2021), https://www.marylandmatters.org/2021/08/11/bulletin-in-split-vote-board-of-public-works-approves-highway-design-contract/.

[38] Editorial Board, *Opinion | Hogan is Backing Off His Plan to Widen the Beltway. Expect More Traffic.*, Washington Post (May 30, 2021), https://www.washingtonpost.com/opinions/hogan-is-backing-off-his-plan-to-widen-the-beltway-expect-more-traffic/2021/05/28/0ab489a4-bcb4-11eb-83e3-0ca705a96ba4_story.html.

00158580

blunting gridlock."[39] In a July 29, 2021, the Editorial Board remarked, "Mr. Hogan, who had already scaled back his ambitious public-private partnership to widen Interstate 270 and the Capital Beltway in the Washington suburbs by adding toll lanes and rebuilding the American Legion Bridge linking Montgomery and Fairfax counties over the Potomac, deployed carrots and sticks to revive his plan."[40]

On November 20, 2021, the Washington Post Editorial Board said:

If those suburban toll lanes are not built — not just the first phase segments but along the entire length of the Beltway and farther north on I-270 — it's a sure bet that today's terrible traffic will become tomorrow's mind-bending gridlock. . . . Mr. Hogan was already forced to pare back his toll road plan to accommodate local opposition. That was followed by a state report suggesting[[41]] that the downsized project — covering just segments of the Beltway and I-270 — wouldn't do much for evening rush-hour traffic by 2045. . . . In fact, it should serve as a warning: Without a more farsighted project that would add capacity to Maryland's full length of the Beltway and I-270 to Frederick, everyone will suffer.[42]

The Transurban 2021 Corporate Report lists for North America in the next five years current projects as "Maryland Express Lanes Project Phase 1" and "Capital Beltway Accord."[43] It lists potential opportunities in the next five years as "Express Lanes enhancements and/or extensions" and "Future traditional toll road and Express Lanes acquisition opportunities."[44] For the 5+ years horizon, it lists potential opportunities as "Maryland Express Lanes Project future phases" and "Future traditional toll road and Express Lanes acquisition opportunities."[45]

Moreover, the Agencies violated NEPA by failing to include the upper I-270 portion of the Project in the NEPA process for the I-495 & I-270 Managed Lanes Study, and yet Transurban was given a right of first refusal to build the upper I-270 part of the Project in the August 2021 contract

---

[39] Editorial Board, *Opinion | There Are Only Losers in Maryland's Dysfunction Over Highway Expansion*, Washington Post (July 6, 2021), https://www.washingtonpost.com/opinions/2021/07/06/there-are-only-losers-marylands-dysfunction-over-highway-expansion/.

[40] Editorial Board, *Opinion | A Washington-Region Traffic Armageddon Has Been Averted. For Now.*, Washington Post (July 29, 2021), https://www.washingtonpost.com/opinions/2021/07/29/maryland-highway-plan-larry-hogan/.

[41] Katherine Shaver, *Maryland Toll Lanes: Beltway, I-270 Lanes Wouldn't Improve Worst Evening Traffic in Regular Lanes, Study Says*, Washington Post (Oct. 1, 2021), https://www.washingtonpost.com/transportation/2021/10/01/maryland-toll-lanes-traffic/.

[42] Editorial Board, *Opinion | No One Welcomes Tolls on Maryland Highways, But the Alternative Would be Worse*, Washington Post (Nov. 20, 2021), https://www.washingtonpost.com/opinions/2021/11/20/no-one-welcomes-tolls-maryland-highways-alternative-would-be-worse/.

[43] Transurban 2021 Corporate Report, at 1 (Aug. 9, 2021), https://www.transurban.com/content/dam/investor-centre/04/2021-Corporate-Report.pdf.

[44] *Id.*

[45] *Id.*

00158581

with MDOT.[46] Now it is equally inappropriate and illegal to temporarily exclude I-495 east of the spur from the SDEIS to give the misleading appearance of reduced environmental impacts. Even if not widened with toll lanes immediately, that widening of the rest of I-495 remains a reasonably foreseeable future event and therefore must be counted as a cumulative effect of the MLS. The impacts of upper I-270 must also be quantified and disclosed to the public as part of the current NEPA process.

All of the public and all agencies should continue to regard the plan in that light. To do any less would be to close one's eyes to all the information coming in about the postponement and to be tricked out of an opportunity to respond to the facts on the ground. This entire SDEIS focused only on Alternative 9 Phase 1 South is essentially a decoy to distract from the overall plan. Segmenting the Project in this fashion appears calculated to de-fuse the opposition long enough to sneak this first phase through to construction and thereby obligate the other segments due to the new and worsened bottlenecks at the toll lane end points.

### H.    The SDEIS's Executive Summary is Inaccurate

"Each environmental impact statement *shall* contain a summary that *adequately and accurately* summarizes the statement." 40 C.F.R. § 1502.12 (emphasis added). This requirement is essential as members of the public do not have time to read and comment on thousands of pages in 45 days and must be able to rely on the Agencies' summary of that information. However, the SDEIS's executive summary incorrectly lists the environmental impacts of the preferred alternative. *Compare* SDEIS Table ES-1 at ES-13, *with id.* Table 4-1 at 4-3. The SDEIS's executive summary incorrectly states that the impacts to forest canopy from the preferred alternative will be over ten times less than the estimate in the body of the SDEIS: only 48.8 acres in the executive summary versus 500.1 acres in chapter 4. Similarly, the executive summary states that only 44.5 acres of unique and sensitive areas acreage will be impacted when chapter 4 estimates that number to be 168.5 acres. These gross inaccuracies, which downplay important environmental impacts, mislead the public and preclude meaningful review and comment.

At some point less than a week before the original written comment deadline, well after the public hearing, and fewer than three weeks before the extended comment deadline, FHWA or MDOT posted a new version of the English SDEIS that corrected these inaccuracies on the website: https://oplanesmd.com/sdeis/. Many commenters had downloaded the SDEIS already, had already completed their review, and even had already submitted their comments. The only way any of them would have known about these corrections is if they would have gone back to the website https://oplanesmd.com/sdeis/, and saw the text that says, "NOTICE of Revision on 11/10/2021: Table ES-1 Adjusted in Executive Summary." The Agencies provided no notice of these changes, either by email or other method. Further, despite making these changes and uploading a new English SDEIS containing them, the Agencies did not change the SDEIS Executive Summaries in Amharic, Chinese, French, Korean, and Spanish, leaving non-English speakers with inaccurate (and downplayed) environmental impacts to review and comment on.[47]

---

[46] The Agencies have begun "pre-NEPA planning activities," but no analysis of environmental effects have been considered or presented to the public.

[47]    *See*    https://oplanesmd.com/wp-content/uploads/2021/10/SDEIS_00_Executive_Summary_AMHARIC.pdf; https://oplanesmd.com/wp-content/uploads/2021/10/SDEIS_00_Executive_Summary_CHINESE.pdf;

00158582

This omission violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Executive Order 13166, "Improving Access to Services with Persons with Limited English Proficiency," 65 Fed. Reg. 50,121 (Aug. 16, 2000), which require that project sponsors be certain that Limited English Proficiency populations have meaningful access to review and comment on agency plans.

Moreover, the SDEIS posted on the U.S. Environmental Protection Agency's ("EPA's") website also remained inaccurate.[48] The new SDEIS, despite including these changes, still stated that it was signed and approved September 23, 2021, which is impossible since it was revised on November 10, 2021.

At a minimum the Agencies should withdraw the SDEIS and reissue one with an accurate executive summary for all of the public, including non-English speakers, to review and comment.

## II.    The SDEIS Relies on Flawed Traffic Modeling that Overstates the Preferred Alternative's Benefits and Understates and, in Some Cases, Entirely Overlooks Multiple Adverse Effects[49]

### A.    Summary

The SDEIS tells a simplistic traffic story. It claims that if the preferred alternative is not constructed, corridor traffic volumes will grow significantly, and delays will grow exponentially.

---

https://oplanesmd.com/wp-content/uploads/2021/10/SDEIS_00_Executive_Summary_FRENCH.pdf;
https://oplanesmd.com/wp-content/uploads/2021/10/SDEIS_00_Executive_Summary_KOREAN.pdf;
https://oplanesmd.com/wp-content/uploads/2021/10/SDEIS_00_Executive_Summary_SPANISH.pdf. Some time on or after November 17, 2021, fewer than 13 days from the public comment deadline, MDOT and/or FHWA silently posted new Amharic, Chinese, French, Korean, and Spanish Executive Summaries that corrected the inaccuracies. Members of the public who relied on these translated versions and somehow became aware of the corrections therefore had a very limited time in which to comment. Again, no notice was provided of this change, so most people reviewing and commenting were unaware and commented on the original erroneous SDEIS. *Compare* https://web.archive.org/web/20211117153534/https://oplanesmd.com/sdeis (capture of SDEIS website from 3:35 PM on November 17 with links to old and incorrect Executive Summaries), *with* https://oplanesmd.com/sdeis/ (current SDEIS website with links to new Executive Summaries that include "FINAL_UPDATED-11_16_2021" in file name titles). It is disappointing that the Agencies would make changes to the SDEIS Executive Summaries so late in the public comment period and not even alert the public to these changes. It is also disappointing that the Agencies would provide an accurate SDEIS Executive Summary to the public with less than the minimum 45-day public comment period required under NEPA. *See* 40 C.F.R. §§ 1502.9(c)(4), 1506.10(c); 23 C.F.R. §§ 771.123(k), 771.130(d). And it is further disappointing that the Agencies would knowingly provide English readers and non-English readers with different amounts of time to review and comment on the correct SDEIS Executive Summaries, fewer than 13 days for non-English readers. FHWA should immediately stop the process from moving forward until this discrimination is investigated and fully remedied.

[48] U.S. EPA, Environmental Impact Statement (EIS) Database (Nov. 16, 2021), https://cdxapps.epa.gov/cdx-enepa-II/public/action/eis/details?eisId=345361.

[49] This section is based on the review of Norman Marshall, President, Smart Mobility, Inc. Mr. Marshall received a B.S. in Mathematics from Worcester Polytechnic Institute (1977) and an M.S. in Engineering Sciences from Dartmouth College (1982). Mr. Marshall's studies at Dartmouth College included graduate courses in transportation modeling. Mr. Marshall has 33 years of professional experience in transportation modeling and transportation planning including 14 years at RSG Inc. (1987-2001) and nearly 20 years at Smart Mobility Inc. (2001-now). Mr. Marshall's primary professional focus is regional travel demand modeling and related transportation planning. Mr. Marshall is a nationally known expert in this field and has completed projects in over 30 states including work for the U.S. government, state Departments of Transportation, Metropolitan Planning Organizations, cities, and non-profit

00158583

It claims that the preferred alternative will reduce congestion on the general-purpose lanes relative to traffic conditions today. It claims that the preferred alternative will alleviate congestion on other roads.

This simple story is wrong. The same promises were made in the Virginia I-495 Express Lanes FEIS, and the results were completely different. During the peak traffic periods, the Express Toll lanes created what is the worst bottleneck on I-495 today, at the northern terminus of the lanes. The FEIS either did not disclose this impact or it was not anticipated. As a result, the Virginia Department of Transportation ("VDOT") had to quickly open a shoulder lane to partially mitigate this bottleneck.

(Pre-COVID-19) travel times in the Virginia I-495 general-purpose lanes are <u>higher</u> today than they were before the Express Lanes opened and much higher than forecasted in the FEIS. The FEIS got this wrong. Otherwise in the peak periods, the effects of the Express Lanes are complex, causing both increases in traffic on some roads and decreases on others. The FEIS wrongly claimed only benefits to other roads.

Part of why things didn't turn out as anticipated is reliance on flawed modeling. Flaws in the Metropolitan Washington Council of Governments ("MWCOG") model include that it: (1) does not constrain traffic flow to capacity; (2) does not properly feed congested travel times back to non-work trip destinations; (3) assumes no increased traffic from road expansion; (4) fails to accurately forecast bottlenecks; (5) cannot calculate net congestion tradeoffs; and (6) cannot accurately model peak period conditions. It then takes these flawed "demand" estimates and inputs them into a capacity constrained VISSIM model that is overwhelmed and produces erroneous output. This "garbage" output from the VISSIM model is the basis for most of the SDEIS traffic metrics and is invalid.

The claims made in the Maryland SDEIS are the same as those made in the Virginia FEIS. The underlying modeling approach is the same.

Based on empirical data from Virginia and Maryland, understanding of model flaws, and data analysis, the reasonably foreseeable impacts of constructing managed lanes on I-495 and I-270 follow.

1) Expanding I-495 and I-270 will shift traffic from the shoulder hours into the peak hours and create and/or exacerbate bottlenecks. The flawed models employed in the SDEIS analyses are incapable of forecasting this type of problem. As bottlenecks are most likely at the terminus of the managed lanes, phasing is critically important as well as the final extent of the Project.

2) An improvement in general-purpose lane speed is unlikely because constructing the managed lanes will shift traffic from the shoulder hours into the peak hours, and the

_____

organizations. One of his particularly notable projects is a $250,000 project with the California Air Resources Board where he led a team including the University of California in reviewing the state's regional travel demand models. Mr. Marshall has many peer-reviewed publications and conference presentations, including presentations at national Transportation Research Board conferences in 2017, 2018, and 2019. Mr. Marshall is an Associate Member of the Transportation Research Board. Mr. Marshall's resume is attached to these comments.

00158584

general-purpose lanes will be just as congested during the peak hours as they would have been otherwise. The foundational premise of this Project is that extreme congestion in the general-purpose lanes is needed to justify the high tolls that will be required to fund the preferred alternative.

3) Constructing the I-495 and I-270 managed lanes is likely to make arterial congestion worse. No trip begins or ends on a limited access highway, and traffic does not magically switch between limited access highways and arterials as is presented in the SDEIS. Any shifts between these roadway classes causes traffic increases on some arterials and traffic decreases on others. As managed lanes concentrate traffic in the peak hour, arterial roads at I-495 and I-270 interchanges will be severely impacted, and these impacts are likely to outweigh the congestion benefits of traffic diversion from other arterials. The SDEIS models are incapable of calculating these tradeoffs.

4) If the managed lanes are constructed, it is likely that there will be significant traffic growth (induced travel) and induced land use impacts.

5) Managed lane proponents stress "choice." In fact, the choice is between two bad options: extreme congestion vs. extremely high tolls. Only about 1/6 of the daily traffic is carried by the Virginia I-495 Express Lanes despite the Express Lanes having 1/3 of the roadway capacity. This is an inefficient use of infrastructure. The other 5/6 of traffic is carried by the general-purpose lanes. The estimates in the SDEIS are consistent with those ratios. The toll lanes are "chosen" primarily by high-income travelers and/or travelers who are having the tolls reimbursed. This elite group will remain small because increases in demand by other users will prompt the tolls to increase further, becoming even less affordable.

6) The managed lanes would benefit only the few who are able to outbid the majority of travelers. There would be no benefits for non-users of the toll lanes. Non-users of the toll lanes (most travelers) would face continued high congestion in the general-purpose lanes and increased congestion on arterial roadways accessing I-495 and I-270 interchanges. Nevertheless, a portion of their taxes likely would go toward subsidizing the private toll lanes as has occurred in Virginia.

7) The MDTA toll setting exercise was theater to mollify a skeptical public. The rates are set so high that the private operator will be able to maximize revenue through algorithms that cynically have been labeled "jam and harvest." These algorithms intentionally increase congestion in the general-purpose lanes prior to traffic peaking and then to charge higher tolls. It's the public that gets "jammed" as their money gets "harvested."

In conclusion, the flawed traffic models used in the SDEIS overestimate future congestion to justify the preferred alternative. The SDEIS then fails to acknowledge that the preferred alternative depends on peak period general-purpose lane congestion while also causing additional connecting arterial congestion and large bottlenecks where the toll lanes end. The proposed managed lanes in Maryland would make congestion worse for the majority of peak period drivers and push drivers to choose between extreme congestion and extremely high tolls to make the lanes profitable. The promised benefits for non-users of the toll lanes will not materialize, and taxpayers will likely have to subsidize the preferred alternative.

00158585

B.      **Flaws in the MWCOG and VISSIM Models Used in the I-495 and I-270 SDEIS**

The SDEIS justifies the preferred alternative by comparing computer model outputs between the Alternative 9G Phase 1 alternative and the no build alternative. These SDEIS outputs are an example of the well-known expression "garbage in, garbage out."

The SDEIS employs a sequence of two computer models: 1) the MWCOG regional travel demand model, and 2) a VISSIM microsimulation model. As documented in Section II.B.2, the MWCOG model fails to constrain traffic flow to capacity and produces impossibly high traffic forecasts which the SDEIS calls "demand." Then these impossibly high traffic forecasts are input to a capacity constrained VISSIM model ("garbage in"). The VISSIM model is overwhelmed by the high inputs and produces meaningless ("garbage out") throughput numbers.

As documented in Appendix B, "demand" as presented in the SDEIS is an artificial model output represents nothing in the real world. Both the ridiculously high demand numbers and the ridiculously low throughput numbers in the SDEIS are not valid performance metrics; they are conclusive evidence of serious modeling errors.

The other traffic metrics presented in the SDEIS are similarly invalid. SDEIS model speed, delay and travel time are interrelated outputs of the VISSIM model. All the VISSIM metrics – including speed, delay and level of service – are interrelated with the throughput metrics. All the metrics are wrong. The only other traffic metrics used in the SDEIS, "effect on the local network." are from the MWCOG and do not properly represent capacity constraints. All the SDEIS traffic metrics are invalid

1.      **The Throughput Model Outputs Used to Justify the Preferred Alternative are Obviously Wrong**

The most congested I-495 segment today is northbound in the inner loop in the afternoon peak hour, where the managed lanes end (documented in Appendix C). If the managed lanes are extended into Maryland, the most critical section similarly will be northbound in the afternoon peak hour upstream of end of the managed lanes. Severe bottlenecks will be created by the proposed preferred alternative where managed lane traffic will have to merge with the general-purpose lane traffic. The SDEIS acknowledges the presence of these bottlenecks, stating: "Congestion would be present during the PM peak period on the I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits . . ." SDEIS at 2-6.

The SDEIS fails to acknowledge that that preferred alternative would greatly worsen these bottlenecks but illustrates the bottleneck in the throughput metric. The SDEIS states: "Throughput represents the number of vehicles that pass by a given point in the roadway network in a set amount of time. SDEIS at 3-13. The throughput numbers presented in the SDEIS indicate that throughput in this section in the afternoon peak period in 2045 would be much lower than today whether the preferred alternative is constructed or not.

Figures 1 and 2 show throughput numbers for 5-6 p.m. and 6-7 p.m., respectively. The 2017 existing volumes are from the DEIS Appendix C and the 2045 no build and Alternative 9G numbers are from SDEIS Appendix A.

00158586

*Figure 1: Northbound Inner Loop Throughput 5-6 p.m. – 2017 from DEIS, 2045 from SDEIS*



*Figure 2: Northbound Inner Loop Throughput 6-7 p.m. – 2017 from DEIS, 2045 from SDEIS*



There is no real-world rationale for future throughput being significantly lower than today. Without widening, throughput will be very similar to today because the road is already congested. With widening, throughput also will be very similar to today because traffic flow will be metered by the downstream bottlenecks. The SDEIS compares two sets of wrong 2045 throughput numbers and presents the difference between them as a performance metric. This is invalid.

00158587

In the DEIS, the Inner Loop afternoon peak hour volume (5-6 p.m.) on the American Legion Bridge is reported to be 8,760 vehicles per hour. This segment has 5 travel lanes today, so the average volume is 1752 vehicles per lane per hour. In the SDEIS future Build model, 2 managed lanes are added so there would be a total of 7 lanes. The SDEIS reports the throughput as only 3,430 vehicles in the 6-7 p.m. hour, i.e., less than 500 vehicles per lane per hour – less than the traffic volumes on city streets interrupted by traffic signals. This is obviously wrong.

Although the throughput numbers are wrong, they are illustrative of a fatal flaw in the preferred alternative design. For the express toll lanes to operate effectively, the traffic in them must be able to merge back into the general-purpose lanes at the northern terminus. The very low throughput volumes shown in Figures 1 and 2 show that the VISSIM model is suggesting that this is impossible, and furthermore, that the merge point will cause traffic to spill back for miles in both the general-purpose lanes and the managed lanes.

The VISSIM model is overwhelmed by the "garbage in" "demand" and translates it into unrealistically- low throughput. The SDEIS calls the difference between "demand" and "throughput" "demand unserved." During the afternoon peak period (3 -7 p.m.) in the inner loop there is unserved demand in each of the four hours, and the VISSIM model queue becomes longer and longer through 7 p.m. This queue of cumulative unserved demand is not reported in the SDEIS but is easily calculated from the demand and throughput numbers. Figure 3 shows demand, throughput, and cumulative unserved demand.

*Figure 3: Preferred Alternative 2045 Inner Loop American Legion Bridge Demand, Throughput and Cumulative Unserved Demand (Queue) in the Afternoon Peak Period*



Assuming that there is no traffic backed up at the beginning of the simulation (3 p.m.), the traffic backup (queue) grows exponentially over the 4 hours of the afternoon simulation to over 16,000 vehicles at 7 p.m. Clearing this accumulated queue in VISSIM would require many hours of additional simulation

23

Figure 4 illustrates what the VISSIM model might show if the simulation were extended far enough to eliminate the queue. As long as "demand" exceeds throughput the queue increases. In this illustration, the maximum queue is not reached until 10 p.m. Only after 10 p.m. does throughput exceed "demand" allowing the queue length to shorten and finally be eliminated after 3 a.m.

*Figure 4: Preferred Alternative 2045 Inner Loop American Legion Bridge Demand, Throughput and Cumulative Unserved Demand (Queue) in the Afternoon Peak Period Illustrative Extension of VISSIM Simulation*



This illustration is not realistic or the real world but is representative of what the VISSIM model would do if the simulation were extended overnight. Therefore, ending the simulation at 7 p.m. is arbitrary and greatly underreports the congestion problems in the VISSIM model.

For example, the SDEIS reports that the speed in the inner loop from G.W. Parkway to the I-270 West Spur in the afternoon peak period for the preferred alternative is 7 mph in the general-purpose lanes and 23 mph in the managed lanes. SDEIS Table 3-5 at 3-9. This really means is that the speed in the general-purpose lanes is much higher than 7 mph at the beginning of the simulation and much lower than 7 mph at the end of the simulation period (7 p.m.), and similarly that the speed in the managed lanes is much higher than 23 mph and much lower than 23 mph. at the end of the simulation period (7 p.m.). However, if the simulation were extended later, e.g., until midnight, the average VISSIM speeds reported midnight would be even lower than those reported in the SDEIS. 7 p.m. is an appropriate time to end the simulation relative to the real world, but it is not an appropriate time to end the deeply flawed VISSIM simulation.

The VISSIM model outputs are wrong. However, if MDOT insists that the model outputs are valid, the proposed preferred alternative fails to meet the purpose and need. The 23-mph managed lane speed in the most critical road segment is too low to meet the purpose of the Project.

24

Furthermore, if the simulation period were properly extended until the queue cleared, the calculated managed lane speed would be even lower than 23 mph.

**2.      MWCOG Model "Demand" Does Not Constrain Traffic Flow to Capacity**

This section documents capacity constraint problems in the DEIS modeling because SDEIS modeling files were not made available. However, the same problems certainly are present in the SDEIS modeling.

The MWCOG model includes an hourly capacity value for each roadway segment. Modeling best practice is to use "ultimate capacity", i.e., the "maximum volume that should be assigned to a link by the forecasting model."[50] The MWCOG model sets freeway capacity at 2000 vehicles per lane per hour in lower-density areas and 1900 per-lane per hour in higher-density areas. As shown in Figure 5 reproduced from the DEIS, the maximum traffic volumes mostly max out around 8000 for the four-lane sections (not including segments with more lanes including the American Legion Bridge, the split south of the I-270 spur, the I-95 interchange area, and the approach to the Woodrow Wilson Bridge).

The MWCOG model capacity is, as is stated in the modeling reference the "maximum volume that should be assigned to a link by the forecasting model." Assigned volumes that exceed capacity are errors and assigned volumes that greatly exceed capacity are serious model errors. Alan Horowitz, one of the most respected experts in travel demand modeling wrote:

> *I am quite familiar with alternatives that assign traffic well beyond a volume-to-capacity ratios (v/c) of 1, and I cannot fathom why anybody would take any of this seriously, either as a realistic representation of the future or as a strawman case study . . .*
>
> *. . . do not publish any alternative/scenarios with facilities loaded beyond a v/c ratio of 1.1.*[51] *(Horowitz 2019)*

In the DEIS, many segments of I-495, I-270 and other roads are loaded with v/c greater than 1.1 (Figure 6). Horowitz admonishes that the DEIS modeling should not be published with v/c > 1.1. Therefore, these model results should not be used for planning purposes. The DEIS not only does publish these modeling results and uses them for planning, but even goes so far as to represent these over-capacity assignments as a performance measure. This claim is false and is rebutted in the Appendix B of this report section (Section II.F).

The MWCOG model relies on 40-year-old Static Assignment Algorithm (STA) that was adopted 40 years ago when computers were less powerful that today's smart phones. STA treats every road segment as independent of other road segments. In peak periods, traffic on I-495 and

---

[50] Cambridge Systematics, Vanasse Hangen Brustlin, Gallop, Bhat, C.R., Shapiro Transportation Consulting and Martin/Alexious/Bryson, *Travel Demand Forecasting: Parameters and Techniques*, National Cooperative Highway Research Program Report 716, 2012.

[51] Horowitz, Alan. Posting on the Travel Model Improvement Program (TMIP) listserv, March 2019.

00158590

I-270 is characterized by queues behind bottlenecks. In STA there are no queues behind bottlenecks, and the MWCOG models cannot capture backups at the merges on I-270/I-495 or accurately model conditions during the peak of rush hour traffic

In my peer-reviewed journal article: *Forecasting the Impossible: The status quo of estimating traffic flows with static traffic assignment and the future of dynamic traffic assignment*,[52] I document that STA always produces impossibly high freeway traffic volumes in congested networks and cannot be relied on for planning. The only solution is to replace STA with a more modern Dynamic Traffic Assignment (DTA) algorithm. MWCOG has a long-term plan to replace STA with DTA. Alan Horowitz also wrote: "*Choose DTA over STA whenever possible.*"[53]

---

[52] Marshall, Norman. Forecasting the impossible: The status quo of estimating traffic flows with static traffic assignment and the future of dynamic traffic assignment, *Research in Transportation Business & Management*, Volume 29, 2018, 85-92. https://www.sciencedirect.com/science/article/pii/S2210539517301232?via%3Dihub

[53] Horowitz, Alan. Posting on the Travel Model Improvement Program (TMIP) listserv, March 2019.

00158591

*Figure 5: 2017 I-495 Inner and Outer Loop Peak Period Hourly Volumes*





Source: DEIS, 2020.

00158592

*Figure 6: Impossible Traffic Forecasts in MWCOG 2040 No Build Afternoon Peak Period (Segments with Volume/Capacity Greater than 1.1 Shown in Red)[54]*



Source: I mapped from MWCOG model link in DEIS.

All the model traffic forecasts for roadway segments shown in red have volume-to-capacity ratios greater than 1.1. As Horowitz advises, these results should not be published – or used in planning. The AM peak period map is similar.

---

[54] Loaded network file downloaded from ftp://dtpcog:cog.dtp@ftp.mwcog.org/MD_SHA_TRP_Study_2040_Alt1_Model_Files.zip referenced in DEIS Appendix C, at 841.

00158593

### 3.    MWCOG Model Does Not Properly Feed Congested Travel Times Back to Non-Work Trip Destinations

All good travel demand models employ a feedback process so that the destinations chosen are sensitive to congested travel time. The MWCOG model feeds back congested travel time from the morning peak period, but only for work trips. The destination choices for the other trip types are based on off-peak travel times. This is inadequate. As I commented about the MWCOG model in 2002:

> The TPB DCV2 model does include distribution feedback. However, the feedback mechanism is only applied to home-based work trips. Specifically, AM congested times are used to distribute HBW trips while off-peak uncongested times are used to distribute HBS, HBO, and NHB trips.[55] The underlying assumption by TPB staff is that congestion does not influence non-work trip making…
>
> In a publication by the Travel Model Improvement Program (TMIP) – a program sponsored by the EPA and U.S. DOT – entitled *Incorporating Feedback in Travel Forecasting: Methods, Pitfalls, and Common Concerns* dated March 1996, the authors provide technical guidance on incorporating feedback in the traditional four-step model. Some of the findings published in the report … [include] … Feedback should be implemented for the work-related trips at a minimum, and the other purposes should be examined for their percentage of peak travel.[56]

In my 2002 review, I found that in the forecast year, modeled congestion on the Potomac River crossings was severe. The MWCOG model assumed that non-work travelers, including those making shopping trips, would cross the river regardless of congestion, because peak period congestion did not affect their destination choices in the model. Perversely, these non-work travelers crowded out work trips from the Potomac River bridges in the model during peak times. It appears that these problems remain in the MWCOG model today and are especially relevant to modeling the American Legion Bridge. The MWCOG model over-assigns non-work trips to all the bridges during peak periods because the model is not representing travel times for these trips properly.

In the DEIS 2040 no build model, MWCOG morning and afternoon peak period traffic volumes for all Potomac River bridge crossings are ridiculously high (Figure 7). All greatly exceed the 1.1 volume-to-capacity ratio threshold, and range as high as 2.75, i.e., the bridge traffic volume is 275% of the highest possible volume.

---

[55] HBS - Home-based Shop; HBO - Home-Based Other, NHB - Non Home-Based.

[56] Letter concerning "Effects of Proposed Potomac River Crossings on Land Use and Traffic and Identification of Serious Deficiencies in TPB Version 2 Transportation Model." November 4, 2002. http://www1.mwcog.org/uploads/committee-documents/pF1eWV020040726152612.pdf.

29

00158594

*Figure 7: Wildly Impossible Potomac Bridge Traffic Forecasts in MWCOG 2040 No Build Morning and Afternoon Peak Periods*



| | Point of Rocks | American Legion | Chain | Francis Scott Key | Theodore Roosevelt | Arlington Memorial | I-395 | Woodrow Wilson |
|---|---|---|---|---|---|---|---|---|
| ■ AM | 2.75 | 1.36 | 2.48 | 1.63 | 1.42 | 1.67 | 1.44 | 1.37 |
| ■ PM | 2.50 | 1.27 | 2.33 | 1.67 | 1.40 | 1.59 | 1.30 | 1.29 |

Source: I extracted data from MWCOG model link in DEIS.

**4.      MWCOG Model Assumes No Increased Traffic from Road Expansion**

In general, freeway expansion causes induced travel. A review of the induced travel research by Handy and Boarnet (2014) concluded that induced travel is real, and that the magnitude is enough to prevent capacity expansion from reducing congestion:

> *Thus, the best estimate for the long-run effect of highway capacity on VMT [vehicle miles traveled] is an elasticity close to 1.0, implying that in congested metropolitan areas, adding new capacity to the existing system of limited-access highways is unlikely to reduce congestion or associated GHG [greenhouse gas] in the long-run.[57]*

The DEIS rejected Alternative 6 adding only general-purpose lanes because of the induced travel impacts:

> *The results of the Alternative 6 modeling indicated that latent demand, meaning trips from other routes, times and modes, would be expected to fill the GP lanes by 2040, resulting in worse traffic operations than all of the Screened Alternatives in several metrics, including network-wide delay and average travel time.*

---

[57] Handy, Susan and Marlon G. Boarnet. Impact of Highway Capacity and Induced Travel on Passenger Vehicle Use and Greenhouse Gas Emissions: Policy Brief prepared for California Air Resources Board, September 30, 2014.

00158595

DEIS at 2-12.[58] Induced travel represents the difference between Build Vehicle Miles Traveled (VMT) and no build VMT. The SDEIS models cannot accurately account for induced travel because the MWCOG model overestimates traffic growth in the no build alternative.

In the long-term induced land use is an important cause of induced travel. Widening I-270 in the late 1980s is a classic case study.

> *In the five years before construction began, officials endorsed 1,745 new homes in the area stretching from Rockville to Clarksburg. During the next five years, 13,642 won approval.*[59]

By 1997, I-270 was routinely overrunning its designed capacity, and peak-hour traffic volumes on some segments had surpassed levels forecasted for 2010.

A primary cause of the inaccurate traffic forecasts was inaccurate land use forecasts which were assumed to be the same for both no build and build analyses. The total number of households forecast for the Washington region for the year 2000 was only off by 2 percent. However, the forecasts were completely wrong about the distribution of the households. [60] Growth was much lower in the region's core than forecast, and much higher in western suburban areas, especially in the I-270 corridor.

Figure 8 compares the 2000 forecast made before the I-270 widening with actual 2000 numbers. The largest forecasting error was for Montgomery County in the I-270 corridor, where the actual number of households in 2000 exceeded the forecast by 27 percent. Widening I-270 was a primary cause.

---

[58] See Appendix B of this report for a discussion of latent demand, induced travel and generated traffic.

[59] Sipress, Alan, *Md.'s Lesson: Widen the Roads, Drivers Will Come*, Washington Post, January 4, 1999. https://www.washingtonpost.com/wp-srv/digest/traffic4.htm.

[60] Data from National Capital Region Transportation Planning Board, MWCOG, "Comparison of 1984 Study Forecasts with Most Recent Data: I-270 Corridor, June 18, 2001.

00158596

*Figure 8: Washington DC Region: Suburban Freeway Projects Shifted Households to Suburbs from Core[61]*



Source: Data from National Capital Region Transportation Planning Board and MWCOG.

When the I-270 widening project was planned, forecast housing and employment growth in the corridor was moderate, and growth in the region's core was expected to be much stronger.[62] The forecasts were completely wrong about the distribution of the households. Growth was much lower in the region's core than forecast, and much higher in western suburban areas, especially in the I-270 corridor.

The other areas where growth exceeded the forecast are suburban Virginia areas where freeway capacity also was expanded. Projects in these areas include construction of the Dulles Greenway, the Route 234 Bypass and widening I-66.

The suburban increases were balanced by declines and slower growth in the core of the region, including D.C., Arlington, Prince George's County, and Alexandria.

The I-495 and I-270 DEIS states on page 144, "As the land use assumptions do not vary between Alternative 1/No Build and the Build Screened Alternatives, all the trip generators are equal among scenarios: there will not be new housing developments or new places of employment." Such assumptions are clearly debatable. Widening I-270 and I-495 likely will cause induced land use and induced travel. Induced travel causes increased energy use and air pollution, including greenhouse gas emissions.

The DEIS also asserts:

---

[61] National Capital Region Transportation Planning Board and MWCOG, *Induced Travel: Definition, Forecasting Process, and a Case Study in the Metropolitan Washington Region*, September 19, 2001.

[62] Data from National Capital Region Transportation Planning Board, MWCOG, "Comparison of 1984 Study Forecasts with Most Recent Data: I-270 Corridor, June 18, 2001.

00158597

Induced demand represents new trips. While the project may generate some new trips, MWCOG modeling shows that the amount of induced demand caused directly by the project would be less than 1% of the total VMT in the region.

DEIS App'x C, at 144. Despite this assertion, due to its deficiencies, the MWCOG model cannot accurately account for induced travel. *See* Appendix B below, Section II.F.

### 5.    MWCOG Model Fails to Accurately Forecast Bottlenecks

Figures 9 and 10 show the traffic increases in peak hour traffic on Virginia I-495 following the opening of the Express Lanes ("EL") and General-Purpose Lanes ("GPL"). The increases are calculated as the average of post-construction 2013-2019 to pre-construction 2005-2007. Appendix C provides details of how these numbers were estimated.

*Figure 9: Change in <u>Outer</u> Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening (change per segment comparing 2013-2019 to 2005-2007 traffic volumes)*



00158598

*Figure 10. Change in <u>Inner</u> Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening (change per segment comparing 2013-2019 to 2005-2007 traffic volumes)*



Source: Virginia Department of Transportation traffic count reports.

In general, the before and after decreases in peak hour GPL traffic volumes are small, on the order of 200-300 per hour, or less than 5% of the total GPL peak hour traffic volume. The one outlier shown in Figure 9 for the Outer Loop southbound between SR 193 to the Dulles Toll Road is not an exception but is just a quirk in the data. The Express Lanes begin in this section, and the VDOT traffic count is after the split. If the count were upstream of the split, no such large reduction would be shown.

What is most striking in the data is that the higher peak hour volumes carried in 6 lanes (4 GPL + 2 EL) also extend into the 4-lane GPL sections north and south of the endpoints of the Express Lanes. There is little, if any, congestion relief where the Express Lanes are parallel to the general-purpose lanes, but much worse congestion upstream and downstream. This large increase in peak hour traffic was caused by the opening of the Express Lanes and has resulted in the worst bottleneck on I-495 in the afternoon on the Inner Loop where the Express Lanes must merge back into the general-purpose lanes. (See Appendix C for more details.)

The Express Lanes opened in November 2012. This bottleneck problem was not anticipated or disclosed in the planning process. Only a few months later in June 2013, VDOT announced a plan to partially address these problems by opening a shoulder lane on the left side of the Inner Beltway to increase the effective width to five general-purpose lanes at the merge.

Expanding I-495 and I-270 in Maryland likely will result in similar unintended negative congestion impacts, creating and/or exacerbating bottlenecks. The Virginia modeling was not up to the task of forecasting these types of problems and the SDEIS modeling is not either.

00158599

### 6.    MWCOG Model Cannot Calculate Net Congestion Tradeoffs

The MWCOG model treats daily traffic as a composite of four time periods[63] including a 3-hour morning peak period (6-9 a.m.) and a 4-hour afternoon peak period (3-7 p.m.). The time shifts that resulted from the opening of the Express Lanes in Virginia is mostly within these peak periods, i.e., it shifts traffic from what planners call the "shoulder" hours into the peak hour. The MWCOG model does not have any way of considering time shifts within the peak periods and cannot calculate the congestion changes related to such shifts.

Instead, it calculates vehicle hours of delay (VHD) as if traffic volumes are constant throughout the 3-hour morning peak period and 4-hour afternoon peak period. The calculated VHD grows exponentially as a function of the volume-to-capacity ratio (V/C) – especially when modeled V/C exceeds 1.0. As discussed above, V/C greater than 1.0 is impossible and represents model errors. Figure 11 shows MWCOG model arterial delay in minutes per mile as a function of V/C.

*Figure 11: MWCOG Model Vehicle Minutes of Delay Per Mile for 40 mph Arterial[64]*



Source: MWCOG model documentation.

In the figure, a road segment with calculated V/C = 1.0 has 1.5 minutes of delay per mile, and modeled delay grows exponentially with an impossible V/C > 1.0. V/C in the MWCOG model is not capped at 1.2, and there are higher V/C road segments in the model, including the value of 2.75 for the Point of Rocks Bridge shown in Figure 3. Beyond the V/C point shown in the Figure

---

[63] Four time periods: morning peak, midday, afternoon peak, and overnight.

[64] Calculated from MWCOG. Calibration Report for the TPB Travel Forecasting Model, Version 2.3, on the 3,722-Zone Area System: Final Report, January 20, 2012.

00158600

7, MWCOG model VHD continues to increase exponentially – 6.6 minutes per mile at V/C = 1.3, 8.6 minutes per mile at V/C = 1.4, and so forth with MWCOG model table values as high as V/C = 3.0.

As shown in Figure 12, most (81%) of regional afternoon peak period VHD in the 2040 no build modeling is from impossible assignments with volume-to-capacity ratio exceeding 1.0. The exponential increases in modeled delay as a function of V/C makes MWCOG model VHD more of a metric of model errors than a metric of real-world performance.

*Figure 12: 2040 No Build Regional Afternoon Peak Period VHD – Road Segments with Possible v/c ≤ 1.0 vs. Impossible v/c > 1.0*



Source: I extracted data from MWCOG model link in DEIS and calculated totals.

The DEIS VHD calculations are invalid. However, even if they were valid, they do not provide a compelling case for the proposed managed lanes Project. Figure 13 takes the DEIS VHD numbers for a combination of Montgomery and Prince George's Counties and divides by current and 2040 population so the alternatives can be compared on a per capita basis.

36

*Figure 13: DEIS Vehicle Minutes of Delay Per Capita for Montgomery and Prince George's Counties*[65]



Source: DEIS, 2020.

The DEIS and SDEIS modeling indicates that congestion is going to get much worse in the future, but that I-495/I-270 managed lanes will make it somewhat less bad. In fact, the real story the VHD outputs tell us is that the MWCOG model overestimates future traffic volumes and translates relatively small increases in VMT into larger increases in VHD. For example, for an arterial roadway in the model where the volume has reached capacity in the peak period, a 1% increase in traffic volume in the MWCOG model translates into a 10% increase in VHD per vehicle. This amplification of small VMT changes into large VHD numbers is just a way of making impacts look larger.

### 7.    SDEIS Models Cannot Accurately Model Peak Period Conditions

As documented above, the peak period traffic volumes outputs from the MWCOG model are not capacity constrained. The model forecasts impossibly high volumes for many roadway segments including segments of I-495 and I-270 that are the focus of the SDEIS.

The SDEIS analysis takes these over-capacity assignments and uses them as inputs to a VISSIM microsimulation model that is capacity constrained. This is a useless exercise because the VISSIM model can only report that the inputs are impossible. The SDEIS tries to represent what are essentially VISSIM error messages as measure of latent demand. This claim is false and is rebutted in the Appendix B of this report.

This is an example of an old computer adage – "garbage in – garbage out." The two-model process is analogous to money laundering. Bad forecasts from the MWCOG model are filtered through the VISSIM model and come out as very detailed precise-looking numbers. However, the underlying MWCOG model forecasts are invalid, and the VISSIM outputs also are invalid.

---

[65] Numbers from DEIS Table 1-1 at 1-5 and DEIS Appendix C, Table 5-23 at 149.

00158602

The SDEIS framing of "demand" vs. "throughput" is fundamentally wrong. Demand is not a point, as anyone who has taken Economics 101 has had hammered into them repeatedly; demand is a curve with more demand when the price is lower and less demand when the price is higher. For un-tolled roads, this "price" is primarily based on the value of travel time. The generalized price for toll roads includes both cost and time. As shown in this illustration from the Federal Highway administration, there is a market equilibrium balance between demand and price/supply (Figure 14).

*Figure 14: Market Equilibrium User Costs and Traffic Volumes (FHWA)[66]*



**Exhibit 4.** Equilibrium user costs and traffic volumes.
P = price. V = volume.

Source: Federal Highway Administration, 2017.

The narrative accompanying the figure reproduced above states:

> When supply and demand are in balance, a market is said to be in *equilibrium*. This is often represented as the intersection of a supply curve and a demand curve, which determines the market-clearing price and quantity (see Exhibit 4). At this point, everyone who purchases the good is willing to (collectively) buy that amount at that price, and producers are willing to supply that quantity at that price. If either the supply or demand curves shift, the market price and quantity will also change.

> For highway travel, demand is determined as described above. The "supply" curve, however, is essentially represented by the generalized cost curve. The intersection of these two curves determines how high traffic volumes will be and what the associated average highway-user costs will be at that volume level. When the level of demand is low relative to the capacity of the road, it will be uncongested, and prices will be relatively constant even as volumes increase (the "flat" part of the user cost curve in Exhibit 4). However, when demand levels are high and the road

---

[66] Federal Highway Administration. Economics: Pricing, Demand, and Economic Efficiency – A Primer. 2017. https://ops.fhwa.dot.gov/publications/fhwahop08041/cp_prim4_03.htm.

38

is congested, both user costs and traffic volumes will be higher, potentially rising sharply as demand continues to increase.

The dichotomy put forward in the SDEIS of "demand" vs "throughput" does not exist. There are only traffic volumes at the equilibrium point. The volume $V_0$ represents the point on the demand curve where the cost equals $P_0$. The "throughput" should equal this equilibrium traffic volume.

### C.    Toll Issues

#### 1.    The Preferred Alternative Creates Bad "Choice" Between Extreme Congestion and Extremely High Tolls

One of the SDEIS needs for the preferred alternative is: "Provide Additional Roadway Travel Choices." SDEIS at ES-2. This "need" has been carried over from the DEIS which states:

> Travelers on I-495 and I-270 do not have enough options for efficient travel during extensive periods of congestion. Additional Roadway management options are needed to improve travel choices, while retaining the general-purpose lanes.

DEIS App'x A at 13.

This is one of the reasons cited for rejecting a Transportation System Management/Transportation Demand Management (TSM/TDM) alternative. SDEIS at 5-49. Supplementing the general-purpose lanes with managed lanes for the monied few is not a valid project "need" because it is just a restatement of the preferred alternative.

The proposed "choice" is between extremely high tolls and extreme congestion. Most travelers will end up choosing congestion over extremely high tolls. The Virginia I-495 Express toll lanes only carry about 1/6 of the daily traffic volume on the sections with Express Lanes despite being 1/3 of roadway capacity (Figures 15 and 16). The other 5/6 of traffic is carried in the general-purpose lanes. This is an inefficient use of infrastructure.

00158604

*Figure 15: 2019 Daily Virginia Outer Loop Average Daily Traffic Volumes*[67]



Source: Virginia Department of Transportation traffic count data, 2019.

*Figure 16: 2019 Daily Virginia Inner Loop Average Daily Traffic Volumes*



Source: Virginia Department of Transportation traffic count data, 2019.

---

[67] Commonwealth of Virginia Department of Transportation Average Daily Traffic Volumes with Vehicle Classification Data on Interstate, Arterial and Primary Route 2019. https://www.virginiadot.org/info/resources/Traffic_2019/AADT_PrimaryInterstate_2019.pdf.

00158605

The DEIS forecasts managed lane usage for Alternative 9 ranging from 10% to 31% during the 7-8 a.m. peak hour and from 12% to 35% during the 4-5 p.m. peak hour (DEIS, Appendix C, Figures 5-19 – 5-22, p. 99-100). These numbers are consistent with the estimate of 1/6 of daily traffic for Virginia because the managed lanes will attract a larger share of traffic during the peak hour. Only about 1/6 of the Maryland I-495 and I-270 traffic will be carried by the managed lanes despite being 1/3 of roadway capacity.

Notably, the SDEIS fails to provide any information about how much of the traffic will be carried by the managed lanes. This information is in redacted portions of the *Final I-495 and I-270 Phase 1 Priced Managed Lanes Comprehensive Traffic and Revenue Study* prepared for the MDOT and dated November 4, 2019.[68] However, this information is redacted. About 20 pages in the concluding Chapters 6 and 7 of this report are partly or completely blacked out. The public has the right to see this information which has been paid for by the public and is necessary to make an informed decision about the merits of the proposed preferred alternative.

## 2. Dynamic Tolls Will Be Set to Maximize Revenue – Not for Roadway Efficiency

The SDEIS states that the P3 approach "is designed to . . . provide more-efficient pricing." SDEIS at 2-30. This statement means nothing. How is the pricing "more efficient"? What is it more efficient than? The SDEIS pretends that dynamic pricing is a benevolent "invisible hand" that serves the public. It states:

> Rather than solely focusing on revenue, the Preferred Alternative will be designed to maintain speeds of 45 mph or greater in the HOT lanes. The goal of the HOT lanes is to maintain free-flowing traffic and to use pricing factors to influence traffic flow. As such, the toll rate range will be set to ensure the HOT lanes operate to established operational metrics, which applies, the economic principles of supply and demand to influence the utilization of the HOT lanes.

SDEIS at ES-11. The 45-mph threshold is significant in that the private operator can charge tolls higher than the "soft cap" when speeds decline below 45 mph. In general, however, tolls will be set to maximize revenue and profit rather than for any public purpose. Algorithms to maximize managed lane toll revenue have been extensively studied and applied in real-world toll roads. Figure 17 shows a slide from a presentation by Robert Phillips

---

[68] MDOT, *Final I-495 and I-270 Phase 1 Priced Managed Lanes Comprehensive Traffic and Revenue Study* (Nov. 4, 2019), https://mdta.maryland.gov/sites/default/files/Files/ALB270/191104_Final_495270_Managed_Lanes_Traffic_Revenue_Study_Redacted_ADA.pdf.

00158606

*Figure 17: Robert Phillips: Revenue-Maximizing Dynamic Tolls[69]*



The revenue-maximizing dynamic tolling strategy – which has been applied in toll roads in Texas and likely elsewhere – is to increase congestion in the general-purpose lanes prior to traffic peaking and then to charge higher tolls. Phillips calls this economically rational but socially perverse strategy "Jam and Harvest." It's the public that gets "jammed" as their money gets "harvested."

---

[69] Phillips, Robert, Director of Pricing Research at Amazon, Presented at the University of California, Berkeley ITS Transportation Seminar, February 28, 2020. Video at: https://its.berkeley.edu/news/revenue-maximizing-dynamic-tolls.

00158607

*Figure 18: Robert Phillips: Revenue-Maximizing Dynamic Tolls[70]*



For the private operator:

**More congestion = More revenue**

The interests of the private operator are not aligned with the public interest. True efficiency would be achieved by minimizing total delay across all travelers. This would be accomplished by setting the tolls only high enough to maintain 45 mph or higher flow in the managed lanes, i.e., a maximum of 1600 vehicles per lane per hour in the managed lanes. These most-efficient tolls would be significantly lower than the revenue-maximizing "jam and harvest" tolls.

The lengthy toll-rate range setting process conducted by the MDTA is just theater to mollify the public. The toll rate schedule is too high to protect the public. The caps are so high that most of the time the tolls will be set to maximize revenues as described. The private operator is free to "jam and harvest."

---

[70] *Id.*

00158608

### D.    Foreseeable Impacts of Building I-495 and I-270 Managed Lanes

####     1.    Managed Lanes Are Unlikely to Reduce Congestion on the General-Purpose Lanes

The small reductions in Virginia I-495 general-purpose lane volumes shown in Figures 9 and 10 have not improved general-purpose lane travel times. As shown In Figure 20, The Express Lanes operator, Transurban, reports reliably fast travel times in the southbound Express Lanes and large average time savings compared to the general-purpose lanes.

*Figure 20: Transurban Travel Time Data[71]*



Source: Transurban, 2019.

Figure 20 shows average general-purpose lane travel times of about 60 minutes. Assuming that this is for the entire 14-mile length, this represents a speed of about 15 mph. However, Figure 20 could represent a shorter distance because the average time shown for the Express Lanes of about 10 minutes is impossible for the entire 14-mile length (because it would require an average speed of 84 mph). If the segment underlying the data is shorter than the full 14 miles, the actual general-purpose lane speeds may have been even lower than 15 mph.

Researchers at the University of Virginia found that in March 2018, average morning and peak hour travel times in the general-purpose lanes were typically 20-30 mph.[72] March 2018 was

---

[71] Bell, Elisa, Transurban. 495 and 95 Express lanes: Customer choice regional benefit. Presented as part of the Transportation Research Board's Webinar on Ensuring Equity with Priced Managed Lanes in April 2019. http://onlinepubs.trb.org/onlinepubs/webinars/190429.pdf.

[72] Babiceanu, Simona and Donna Chen, Empirical Evidence for Estimating the Value of Travel Time on Express Lanes: Northern Virginia Regional Case Study, 2018.

00158609

one of the better months in the Transurban data. However, the discrepancy between the two sets of data is unexplained. An estimate of 20 mph is used in the figure below.

The Virginia I-495 Express Lanes FEIS reported pre-construction "Existing" speeds for the Outer Loop of 46 mph in the AM peak hour and 39 mph in the PM peak hour, i.e., twice the speeds reported for today by Transurban. This suggests that peak hour general-purpose lane speeds have declined significantly since opening the Express Lanes. As shown in Figure 21, current general-purpose lane speeds are generally much lower than was forecast in the FEIS.

*Figure 21: I-495 General-Purpose Speed – Historical, FEIS Forecast, and Estimated Actual[73]*



Source: Virginia Express Lanes 2006 FEIS and current data.

The DEIS general-purpose lane travel time forecasts are invalid because (as discussed above):

- The models overestimate no build traffic volumes.
- The models fail to account for the shift to the peak hours that would follow managed lanes construction.

These two factors cause the models to overestimate general-purpose lane congestion in the no build alternative and underestimate general-purpose-lane congestion in the build alternative.

---

[73] Virginia Department of Transportation (VDOT), Capital Beltway Study: Final Environmental Impact Statement and Section 4(f) Evaluation, Table 2-9, at 45, (April 2006), http://www.virginiadot.org/VDOT/Projects/Northern_Virginia/asset_upload_file77_72985.pdf.

00158610

The Virginia experience suggests that constructing similar managed lanes in Maryland would do little or nothing to reduce congestion on the general-purpose lanes. In fact, as discussed in a subsequent section of this report, the entire premise of this Project is that extreme congestion is needed to justify the extremely high tolls required to pay for the Project.

### 2.    Managed Lanes Are Likely to Make Arterial Congestion Worse

The SDEIS puts forward a simplistic and incorrect framing of diversion from arterial roadways to I-495/I-270. It pretends that traffic magically is subtracted from one class of roadway and added to the other. In fact, no trip begins and ends on a limited access roadway and a traffic shift from arterials to I-495/I-270 necessarily adds traffic to some arterials as it reduces traffic on others. Figure 22 shows a typical example from Google Maps comparing routes between Bethesda and Silver Spring.

*Figure 22: Google Maps Recommended Route from Bethesda to Silver Spring*



Source: Google Maps, 2020.

Google Maps recommends a route using I-495 over an arterial route even though the I-495 route is more than 50% longer in miles (8.2 miles vs. 5.4 miles) because it is 2 minutes faster (16 minutes vs. 18 minutes). The I-495 route reduces the traffic volume on Jones Bridge Road and East-West Highway, but it adds traffic to MD 355 and US 29. Whether this represents a net congestion benefit depends on the congestion levels on all these roads.

The DEIS assumes trips like this should be on I-495 and that the non-freeway route represents undesirable diversion. However, circuitous routing that adds vehicle miles traveled (VMT) and air pollution including greenhouse gas emissions is undesirable. Adding express toll lanes also is likely to make arterial congestion worse because it counteracts peak spreading and will increase peak hour arterial traffic in the areas around I-495 and I-270 interchanges. The increased peak hour traffic congestion in these areas is likely to outweigh the congestion benefits on other roads.

Here is real world example. As discussed above, the opening of the Express Lanes in Virginia in November 2012 caused the worst I-495 bottleneck. Several months later in June 2013, VDOT announced a plan to partially address these problems by opening a shoulder lane on the left side of the Inner Beltway to increase the effective width to five general-purpose lanes at the merge.

46

The public relations handout developed at this time stated that there would be "no impact to nearby bridges and neighborhoods.[74]

This change was implemented in 2015. Residents of McLean have complained that this seemingly minor change has had a large impact on their community as it shifts the bottleneck farther north and adds significant congestion to Georgetown Pike and other intersecting local streets.[75] Figure 23 shows traffic congestion at one of the key intersections where McLean residents are concerned about I-495 congestion spreading to local streets.

*Figure 23: Georgetown Pike Westbound at I-495*



Source: Google Maps, 2020.

As a response to these complaints, in 2018 VDOT analyzed returning to the original configuration. It found that such a return would improve operations at the SR 193 intersection [contradicting their 2013 public relations handout]: "as a result of the merge area for the Express Lanes moving back to the Old Dominion Drive area, which meters the traffic and provides a more consistent flow to the mainline near Route 193."[76] However, it also found that the closure of the shoulder lane would increase delay on the I-495 Express Lanes. The change was not made because Express Lanes traffic was prioritized over McLean traffic. Nevertheless, even with the use of the shoulder lane, this merge area remains the worst bottleneck on I-495.

The VDOT quote uses the word "meters." Traffic metering is an underappreciated congestion control measure. Peak period traffic bottlenecks are inevitable but can be used as a management tool by choosing the bottleneck locations, metering traffic there, and providing peak

---

[74] *VDOT 495 North Traffic Congestion to Get Better With New VDOT Shoulder-Use Lane Project*, Express Lanes (June 28, 2013), https://www.expresslanes.com/uploads/1000/382-Shoulder_use_Lane_Project_121013.pdf.

[75] Brian Trompeter, *Residents Fume Over I-495 Shoulder Lane in McLean*, InsideNova (Jan. 16, 2018), https://www.insidenova.com/news/arlington/residents-fume-over-i-495-shoulder-lane-in-mclean/article_da2f87a2-f871-11e7-8a7b-a7b93e288cea.html.

[76] VDOT. I-495 Auxiliary Lane Study, May 9, 2018.

00158612

period protection to other roadways. Constructing managed lanes focuses more traffic in the peak hours and undermines peak spreading and traffic metering.

### 3.        Taxpayers May Not Be Off the Hook for Managed Lane Costs

This choice between extreme congestion and extremely high tolls is fundamental to making the managed lanes attractive to private operators. They need high peak hour tolls to pay off bonds. They need extreme congestion to justify high tolls. Most toll roads including the Virginia I-495 Express Lanes lose money in the early years and count on increasing congestion in the future to allow them to raise tolls to the point that the investment finally pays off.

Overestimating future toll road traffic and revenue is an international problem. The Wall Street Journal reported that traffic counts were roughly 77% of what had been forecast.[77] Furthermore, this research predates the effects of COVID-19. The article quotes Gregory Erhardt, an author of a National Academies review: "There is some incentive for forecasts to be high if they make [a project] more likely to get built."

Figure 24 shows Transurban's Virginia I-495 losses by year since the project was opened.

*Figure 24: Transurban's I-495 Express Lanes Losses[78]*



Source: I created graph using information from Transurban financial reports.

The Virginia I-495 Express Lanes have never been profitable, and cumulative losses now are $498 million. The 2020 and 2021 fiscal years ending June 30th includes COVID-19impacts, but it doesn't appear the road was on its way to profitability even before this. If the Virginia I-495 Express Lanes are ever to break even, the worst toll rates are yet to come.

The I-95 Express Lanes (also managed by Transurban) were profitable pre- COVID-19 – but were not in FY 2020 or FY2021. It appears that a radial commuting route like I-95 is a better

---

[77] David Harrison, *Billons Spent on Roads and Transit Project s Are Often Based on Optimistic Forecasts*, Wall Street Journal (Sept. 21, 2021), https://www.wsj.com/articles/transportation-projects-often-rely-on-optimistic-forecasts-11632216602.

[78] Reporting Suite, Transurban. https://www.transurban.com/investor-centre/reporting-suite.

00158613

market than a circumferential highway like I-495. It is likely that the private operators are hoping to duplicate the I-95 success by extending the I-495 Express Lanes into Maryland to emphasize a radial north-south I-270/I-495 commuter route Maryland into Virginia. The larger I-495 segment likely was dropped, in part, because it was not as financially viable as the remaining "Phase 1" segment.

The SDEIS promises a free lunch where the entire preferred alternative is paid for by private funding. As shown in Figure 25, this is not what happened in Virginia. The Virginia I-495 Express Lanes were constructed at a cost of over $2 billion with private equity and private bonds providing less than half the total. The larger share (over $1 billion) came from a government Transportation Infrastructure Finance and Innovation (TIFIA loan) and $495 million from the Virginia Department of Transportation.

The VDOT $495 million contribution was, pre- COVID-19, supporting just 46,000 transactions per day for the VA I-495 Express Lanes.

Virginia did not plan to contribute to the Express Lanes but was pushed into it to make a deal that was acceptable to the private entities. Maryland likely will be in an even weaker bargaining position. The poor I-495 Express Lanes finances likely would have killed the east-west I-495 sections in Maryland, even without all of the other problems with that proposal.

*Figure 25: Virginia I-495 Express Lanes Construction Cost[79]*



Source: Federal Highway Administration project profile.

If the Maryland toll lane traffic volumes fall short of the forecasts, revenue will be insufficient to cover bond payments. The private operators have mechanisms in place to upend the toll rate schedule if this happens through a P3 Master Trust Agreement that requires Maryland to make payments and/or revise the toll rates to address the shortfall.

---

[79] Federal Highway Administration. Project Profile: Capital Beltway High Occupancy Toll (HOT) Lanes (I-495). https://www.fhwa.dot.gov/ipd/project_profiles/va_capital_beltway.aspx.

00158614

The P3 Master Trust Agreement includes a rate covenant. If there is projected to be a Rate Covenant Shortfall (meaning the P3 Program revenues (including video surcharges, late payment fees, etc.) expected to be collected will be insufficient to cover the payments due to all Section Developers from the Operating Reserve Account and all principal and interest due on all MDTA Notes) in six or more consecutive months during the next 24 months, MDTA shall either (i) make administrative or operational changes that will eliminate the Rate Covenant Shortfall or (ii) if there are not administrative or operational changes that will eliminate the Rate Covenant Shortfall, then MDTA shall notify MDOT. Following such notification MDOT shall either (a) instruct MDTA to take no further action on the basis that MDOT elects to make supplemental payments at the time of the projected shortfall so that, if such supplemental payments were included as additional P3 Program Revenues in the calculation of the Rate Covenant calculation then no shortfall would exist or (b) instruct MDTA staff to present to the MDTA Board a toll proposal to commence the toll rate setting process intended to fix, revise, charge, and collect the tolls, fees or other charges in the P3 Program so that the Rate Covenant Shortfall is eliminated. Upon the conclusion of the toll setting process the MDTA Board may approve, adjust or reject the toll proposal.[80]

## E.    Appendix A: Traffic Forecasts

Figure A1 shows SDEIS daily traffic data and forecasts for I-495 and I-270. The SDEIS forecasts significant traffic growth in the 2045 no build alternative and only slightly higher growth for the build alternative.

---

[80]    Maryland    Transportation    Authority    Board    Meeting,    August    26,    2021. https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

00158615

*Figure A1: Maryland DEIS Daily Traffic Data and Forecasts (Tables 3-1 and 3-2)*



Source: SDEIS, Tables 3-2 and 3-2, p. 3-7 and 3-8.

In fact, traffic can be expected to grow little in the preferred alternative corridor if the roadway is not widened, but likely will grow significantly if it is widened.

Figure A2 shows the traffic data and forecasts from the 1998 FEIS for the Virginia Express Lanes, along with 2019 actual Average Annual Weekday Traffic (AAWDT).

Officials offered a similar forecast of significant growth in the 1998 FEIS for the Virginia Express Lanes (Figure A2), but total daily I-495 traffic has changed little in 21 years and is much lower today than what was forecast in the FEIS no build scenario. Presumably, the 1998 FEIS modeling forecast even higher traffic volume for the build alternative, but those numbers are not reported in the FEIS and therefore are not shown in Figure A2.

*Figure A2: Virginia FEIS Daily Traffic Data and Forecasts (from FEIS Tables 3-1 and 3-2)*



Source: Virginia Express Lanes FEIS, 2006.

00158616

**F.    Appendix B: The SDEIS Wrongly Claims that Over-Capacity Assignments Indicate Latent Demand**

Generated traffic is a critical concept that is explained by Litman in Box B1.

*Box B1. Excerpt from Generated Traffic and Induced Travel: Implications for Transport Planning*

Todd Litman, Victoria Transport Policy Institute, July 1, 2020 https://www.vtpi.org/gentraf.pdf

Traffic engineers often compare traffic to a fluid, assuming that a certain volume must flow through the road system, but it is more appropriate to compare urban traffic to a gas that expands to fill available space (Jacobsen 1997). Traffic congestion tends to maintain equilibrium: traffic volumes increase to the point that congestion delays discourage additional peak-period vehicle trips. Expanding congested roads attracts *latent demand*, trips from other routes, times and modes, and encourage longer and more frequent travel. This is called *generated traffic*, referring to additional peak-period vehicle traffic on a particular road. This consists in part of *induced travel*, which refers to absolute increases in vehicle miles travel (VMT) compared with what would otherwise occur (Hills 1996; Schneider 2018).

This is not to suggest that increasing road capacity provides no benefits, but generated traffic affects the nature of these benefits. It means that road capacity expansion benefits consist more of increased peak-period mobility and less of reduced traffic congestion. Accurate transport planning and project appraisal must consider these three impacts:

1. Generated traffic reduces the predicted congestion reduction benefits of road capacity expansion (a type of rebound effect).
2. Induced travel imposes costs, including downstream congestion, accidents, parking costs, pollution, and other environmental impacts.
3. The additional travel that is generated provides relatively modest user benefits, since it consists of marginal value trips (travel that consumers are most willing to forego).

Ignoring these factors distorts planning decisions . . .

Litman makes an important distinction between latent demand and induced travel, with generated traffic encompassing both.

- *Latent demand: Additional trips that would be made if travel conditions improved (less congested, higher design speeds, lower vehicle costs or tolls).*
- *Induced travel: An increase in total vehicle mileage due to roadway improvements that increase vehicle trip frequency and distance, but exclude travel shifted from other times and routes.*
- *Generated traffic: Additional peak-period vehicle trips on a particular roadway that occur when capacity is increased. This may consist of shifts in travel time, route, mode, destination and frequency.[81]*

---

[81] Litman, 2020, at 3.

00158617

The MWCOG Model Assignments Are Not Intended to Include Any Latent Travel

The SDEIS uses the phrase latent demand in the same way Litman does: ". . . latent demand refers to people who want to use I-495 or I-270 during the peak hours, but do not because of the congestion." DEIS App'x C at 76. The SDEIS then mistakenly assumes that over-capacity MWCOG model forecasts can be used to quantify latent demand. This assumption is not supported by MWCOG model documentation or by the professional travel demand modeling literature in general.

The DEIS used MWCOG Version 2.3.71 and the SDEIS used Version 2.3.75. The MWCOG website includes travel demand model documentation on the versions 2.3.70, 2.3.75 and 2.3.78. including:

- The TPB Version 2.3 Travel Model, Build 70, also known as the Version 2.3.70 Travel Mode became the adopted travel model on October 18, 2017.
  - o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.70 (Volume 1)
  - o Highway and Transit Networks from the VDOT and MDOT Off-Cycle Amendment to the 2016 CLRP (TPB Version 2.3.70 Travel Model)
- The TPB Version 2.3 Travel Model, Build 75, also known as the Version 2.3.75 Travel Mode became the adopted travel model on October 17, 2018.
  - o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.75: Volume 1 of 2: Main Report and Appendix A (Flowcharts)
  - o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.75: Volume 2 of 2: Appendices B (Batch Files), C (Cube Voyager Scripts), and D (AEMS Fortran Control Files)
  - o Highway and Transit Networks for the TPB Ver. 2.3.75 Travel Model and Air Quality Conformity Analysis of Visualize 2045 and the FY 2019-2024 TIP
- The user's guide and the highway and transit networks documentation for the current model, Ver.2.3.78, were released April 14, 2020.
  - o User's Guide for the COG/TPB Travel Demand Forecasting Model, Version 2.3.78. Metropolitan Washington Council of Governments, National Capital Region Transportation Planning Board, April 14, 2020.
  - o Highway and Transit Networks used in the Air Quality Conformity Analysis of the 2020 Amendment to Visualize 2045 and the FY 2021-2024 TIP (Ver. 2.3.78 Travel Model). Metropolitan Washington Council of Governments, National Capital Region Transportation Planning Board, April 14, 2020.
- Validation reports:
  - o Calibration Report for the TPB Travel Forecasting Model, Version 2.3, on the 3,722-Zone Area System. Final Report. Washington, D.C.: National Capital Region Transportation Planning Board, January 20, 2012.
  - o In 2013, the Version 2.3 Travel Model was validated to year-2010 conditions. Updates to the model resulting from this validation work were part of Ver.2.3.52. The model validation effort was documented in the following memo: Milone, Ronald. Memorandum to Files. "2010 Validation of the Version 2.3 Travel Demand Model." Memorandum, June 30, 2013.

53

o  In 2019, TPB staff conducted a re-validation of Version 2.3.75 to year-2014 conditions. The work was documented in the following memo: Feng Xie to Dusan Vuksan and Mark Moran, "Year-2014 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, March 12, 2019.

The version 2.3.75 documentation and validation report match the version used in the SDEIS.

None of the ten model documents on the MWCOG website make any reference to "latent", "induced" or "generated" demand, The MWCOG model's traffic volume outputs are intended to represent actual traffic volumes - either for the base year or for a forecast year. This is apparent in the latest validation report (2019). It compares traffic volumes assigned by the model to traffic counts – both for an entire day (Figure B1) and for each of the four model time periods (Figure B2). In each case, the target is an exact match.

*Figure B1: MWCOG Model Daily Model Traffic Volumes vs. Counts[82]*

**Table A3-1. Estimated and Observed 2014 Daily VMT by Facility Type\***

| Facility Type | Links w/ Counts | Observed ("O") | Estimated ("E") | Ratio (E/O) | Standard † Acceptable | Standard † Preferable |
|---|---|---|---|---|---|---|
| Freeway | 517 | 29,419,832 | 31,618,131 | 1.07 | ±7% | ±6% |
| Major Arterial | 1,867 | 14,795,795 | 15,845,341 | 1.07 | ±15% | ±10% |
| Minor Arterial | 2,939 | 10,897,071 | 12,343,027 | 1.13 | ±15% | ±10% |
| Collector | 1,144 | 2,311,056 | 1,718,105 | 0.74 | ±25% | ±20% |
| Expressway | 224 | 5,063,294 | 4,826,940 | 0.95 | ±15% | ±10% |
| Ramp | 2 | 30,176 | 26,161 | 0.87 | N/A | N/A |
| *Total:* | *6,693* | *62,517,224* | *66,377,704* | *1.06* | *±5%* | *±2%* |

Source: MWCOG, 2019.

*Figure B2: MWCOG Model Daily Model Traffic Volumes vs. Counts[83]*

**Table A4. 2014 VMT Estimated to Observed Ratio (E/O) by Time Period and Facility Type\***

| | Links w/ Counts | AM Peak | Mid-day | PM Peak | Night | *Daily* |
|---|---|---|---|---|---|---|
| Freeway | 125 | 1.12 | 1.40 | 0.93 | 1.12 | *1.13* |
| Major Arterial | 543 | 1.05 | 1.08 | 0.87 | 1.15 | *1.02* |
| Minor Arterial | 596 | 1.33 | 1.12 | 1.17 | 1.37 | *1.22* |
| Collector | 319 | 0.81 | 0.68 | 0.71 | 0.72 | *0.72* |
| Expressway | 93 | 0.91 | 1.07 | 0.82 | 0.98 | *0.94* |
| *Total:* | *1,676* | *1.09* | *1.20* | *0.92* | *1.12* | *1.07* |

Note: * Based on 1,676 directional links with hourly traffic counts ( none of them are ramps)

Source: MWCOG, 2019.

---

[82] Xie, Feng. "Year-2014 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, March 12, 2019.

[83] Xie, Feng. "Year-2014 Validation of TPB's Version 2.3 Travel Demand Model," Memorandum, March 12, 2019.

00158619

The model outputs summarized in the tables above include both overestimated and underestimated traffic volumes relative to counts. Some of the overestimated volumes are impossibly high because they exceed roadway capacity, but these errors are not an estimate of latent demand, they are just errors.

G.    **Appendix C: The Virginia Express Lanes Caused the Worst Bottleneck on I-495**

Peak hour traffic volumes increased sharply after the Express Lanes opened. Peak hour traffic numbers were extracted from VDOT traffic reports by multiplying Annual Average Daily Traffic ("AADT") by the estimate of the portion traveling during the peak hour or design hour (K Factor).

The VDOT reports do not include AADT for the Express Lanes except for a 2019 value of 15,000 at the southern exit. This 15,000 per direction number is used as an estimate. The VDOT traffic reports include K factors for the Express Lanes at the southern end in both directions. In 2019, these K factors were 0.1756 for the Outer Loop and 0.2053 for the Inner Loop. As shown in Figure C1, these are over two times the average K factors for parallel general-purpose lane (GPL) segment. This is logical because there is much less incentive to use the Express Lanes during off-peak periods, even given lower toll rates.

*Figure C1: I-495 K Factors Showing Concentration of Express Lanes Traffic in Peak Hour[84]*



Source: Virginia Department of Transportation traffic count reports, 2019.

The K-factors in Figure C1 show that traffic on the general-purpose lanes is spread widely across the day. This is an efficient use of the roadway capacity. "Peak spreading" is an underappreciated congestion management strategy. In sharp contrast, a large proportion of traffic

---

[84] From VDOT traffic data report. General-purpose-lanes K Factor is average of segments parallel to Express Lanes.

00158620

on the Express Lanes is during the peak hours. This undermines the congestion relief that otherwise would result from peak spreading and causes unintended negative consequences.

Figures 5 and 6 earlier in this report (reinserted for convenience as Figures C2 and C3 show the estimated change in peak hour traffic volume[85] for the Outer and Inner Loop GPL before and after construction. The "Before" numbers are averages from 2005-2007. The "After" numbers are averages from 2013-2019. The period 2008-2012 is omitted due to the extended construction period.

*C2: Change in <u>Outer</u> Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening*



Source: Virginia Department of Transportation traffic count reports.

---

[85] Calculated as AADT x K Factor.

00158621

*C3: Change in Inner Loop GPL Peak Hour Traffic in Virginia After Express Lanes Opening*



The I-495 Inner Loop often is severely congested for several miles both north and south of the Potomac River in the afternoon. Therefore, the American Legion Bridge is often considered a primary bottleneck in the system. However, a close examination of speed data shows that the worst bottleneck is the first mile north of the end of the Express Lanes north of the Dulles Toll Road.

Figure C4 shows Inner Loop speeds for 15-minute intervals from 7 a.m. to 10 a.m. Speeds for 11 Inner Loop segments are shown – from the Route 123 interchange at the bottom/south to the Cabin John Parkway interchange at the top/north. The gray dashed line above the GW Parkway interchange line represents the state line. The northbound speeds at the Georgetown Pike interchange just north of the Express Lane merge are 20 mph or less for a 2-hour period, but the speeds at the American Legion Bridge (above the gray dashed line) never fall below 35 mph. The bridge is not the primary bottleneck in the morning peak period.

57

00158622

*Figure C4: Inner Loop Morning Peak Period Speed Data (INRIX)[86]*



Source: Virginia Department of Transportation, 2018.
Legend: Purple box peak hour for core study area; white box longer study period.

The afternoon picture is murkier because queues behind bottlenecks spill back into upstream bottlenecks. Nevertheless, Figure C5 shows that the worst afternoon bottleneck in the system is also north of the Express Lanes merge. Compared to the American Legion Bridge, the Express Lanes merge area:

- becomes severely congested (red) about an hour earlier,
- is severely congested for about two hours longer, and
- has lower minimum speeds (8 mph vs 15 mph).

---

[86] Extracted from VDOT, I-495 Express Lanes Northern Extension Environmental Assessment Scoping Framework Document (November 15, 2018), Figure 7, p. 22. The purple box highlights the peak hour, and the white box is for the peak period.

00158623

Figure C5: Inner Loop Afternoon Peak Period Speed Data (INRIX[87]



Source: Virginia Department of Transportation, 2018.
Legend: Purple box peak hour for core study area; white box longer study period.

Finally, Figure C6 shows Inner Loop peak hour traffic for the segment from Georgetown Pike (SR 193) to the George Washington Parkway (the first segment with VDOT data after the Express Lanes merge).

---

[87] Extracted from VDOT, I-495 Express Lanes Northern Extension Environmental Assessment Scoping Framework Document (November 15, 2018), Figure 7, p. 22. The purple box highlights the peak hour, and the white box is for the peak period.

00158624

*Figure C6: I-495 Inner Loop from SR 193 to George Washington Parkway Peak Hour Traffic Volume (Vehicles) by Year[88]*



Source: Virginia Department of Transportation traffic count reports.
Note: 2008-2012 omitted because of construction during this period.

Figure C6 shows that there was adequate capacity for the pre-Express Lanes traffic volume on four general purpose lanes (less than 8000 vehicles per hour) but not enough for the post-Express Lanes traffic volume. After the Express Lanes opened, the peak hour volume immediately shot up to about 9200 vehicles per hour and has stayed constant at that level from 2013 through 2019. This constant value indicates that this is the maximum capacity for this roadway segment, even with the use of the shoulder lane. The extreme delay results from the queue that spills back behind this bottleneck, a bottleneck that was caused by the Express Lanes project and the worst bottleneck on I-495 in Virginia.

H.    **Other Traffic Issues**[89]

1.    **The Agencies Have Admitted and Demonstrated That There Are Feasible Alternatives that Would Effectively Reduce Roadway Traffic Congestion**

As noted in Section I, the Agencies violated NEPA by failing to study reasonable alternatives that would avoid or reduce harmful impacts of the preferred alternative. Yet, the Agencies acknowledge in SDEIS Appendix B that other measures would effectively address

---

[88] Estimated from VDOT annual Daily Traffic Volume Estimates reports.

[89] Norm Marshall, national traffic modeling expert, has reviewed the Other Traffic Issues section and concurs on the traffic-related observations contained in the section. The data collected by the "Independent Traffic Recorder" was collected under the guidance of retired scientist Dr. Arthur Katz.

00158625

congestion. As noted below, the Agencies and MWCOG specify that flexible work schedules and ridesharing, including express bus service, would be effective alternatives to dynamic pricing:

> As may be seen from the compiled data, speed increases have been of a greater magnitude than the magnitude of traffic volumes. While traffic volumes regionally recently have been about 20% below pre-pandemic levels, peak period speed data remain near free-flow. Traffic flow theory and longstanding empirical data have established that when demand exceeds capacity and traffic operations are in unstable or saturated conditions, a small reduction in demand results in a disproportionate improvement in speeds. As such, strategies to marginally reduce single occupant vehicle (SOV) demand during peak demand via flexible work schedules, pricing or ridesharing (including express bus service) are effective ways to address peak period congestion, conserve energy and reduce emissions.

SDEIS App'x B at 146.

These and other traffic demand strategies have been studied and found to be effective by state and regional policy experts. In a 2017 report,[90] the regional Transportation Planning Board found that traffic demand management, including significant telework, would be more effective at reducing congestion than adding express toll lanes to local highways, including I-495 and I-270. In August 2020, the Maryland Transportation Institute testified[91] that a 5 percent increase in telework would reduce congestion by 32 to 58 percent. As for traffic systems management, even MDOT predicts[92] that its Innovative Congestion Management program, including restriping to add lanes at certain locations, ramp entrance and exit adjustments and ramp meters on I-270, will improve driving time by as much as 30 minutes between Frederick and I-495.

Previous studies by MDOT and FHWA have given prominence to Transportation System/Transportation Demand Management (TSM/TDM)."[93]

By contrast, the SDEIS mentions TSM/TDM on only one page (5-49) as an alternative within the Section 4(f) alternatives under consideration and rejects it. SDEIS at 5-49.[94] Traffic

---

[90] *An Assessment of Regional Initiatives for the National Capital Region: Technical Report on Phase II of the TPB Long-Range Plan Task Force*, Transportation Planning Board (Dec. 2017), https://f0d3dd92-98e8-4a26-bc62-0ccf9ff9f227.filesusr.com/ugd/ecd536_28937c781136436ebf432adc5af39494.pdf.

[91] Bruce DePuyt, *Analysts: More Telework, Change in Habits Could Dramatically Ease Congestion*, Maryland Matters (Aug. 14, 2020), https://www.marylandmatters.org/2020/08/14/analysts-more-telework-change-in-habits-could-dramatically-ease-congestion/.

[92] I-270 Innovative Congestion Management Project, MDOT SHA, https://mdot-sha-i270-i70-to-i495-inno-cong-mgmt-mo0695172-maryland.hub.arcgis.com/.

[93] Capital Beltway Study Display Boards, at 7 (May 6, 2004), https://web.archive.org/web/20170202174503/http:/apps.roads.maryland.gov/WebProjectLifeCycle/AW518_11/HTDOCS/Documents/Informational_Public_Workshop/AW518 Display Boards.FINAL.5-6-04a.pdf.

[94] On that page, the SDEIS incorrectly argues that TSM/TDM would not enhance trip reliability, improve the movement of goods and services, or enhance multimodal connectivity. Clearly it would do these three things and could meet the project purpose and need except for being revenue generating. The proposed I-495 & I-270 toll lane Project will only be revenue generating for the private sector and will still have to be subsidized by taxpayers.

demand management strategies, including flexible work schedules, express buses, and telework, and transportation systems management strategies, such as ramp meters, lane and ramp adjustments, and queue-jumper lanes giving buses and trucks preference at ramp meters, would have less harmful impacts than the preferred alternative. They must be studied to fulfill NEPA's requirement that reasonable alternatives that avoid or minimize adverse impacts be reviewed and made available for public scrutiny and engagement.

> **2.** **The No Build has Faster Trips than the GP Lanes of the Toll Road for Round Trips and Afternoon Return Trips between I-370 and exits at River Road, Clara Barton and GW Parkway[95]**

The SDEIS makes this conclusory statement that is unsupported by the study findings: "Overall, the Preferred Alternative provides tangible operational benefits that would be significantly better than the No Build." SDEIS at ES-12. This is not accurate in multiple different respects, from safety (*see* Sections II.H.7 to 13) to travel time.

In fact, MDOT's own traffic data in the SDEIS Appendix A demonstrates that the no build has faster trips than the GP lanes of the toll road for round trips and afternoon return trips between I-370 and exits at River Road, Clara Barton and GW Parkway. This is also true if you start from Montrose Road.

The tables below show travel times advantage in minutes saved from data in the SDEIS Appendix A. SDEIS App'x A. For example, a round trip between I-370 and River Road has the no build 5 minutes faster (travel time is shortened by 5 minutes). The PM trips is faster by 6.4 minutes. The reason the no build afternoon travel time has a larger time advantage than the round trip is because the GP lanes in the morning trip are 1 to 2 minutes faster. But the evening travel time is so large it overwhelms the small morning advantage.

Travel Time Difference Between No Build (NB) and GP Alternative (GP), Starting from I-370

| I-370 to | Round Trip (minutes) | PM trip from Exit to 370 |
|---|---|---|
| River Road | 5 | 6.4 |
| Clara Barton | 8.6 | 11.3 |
| GW Parkway | 7.3 | 9.9 |

Travel Time Difference Between No Build (NB) and GP Alternative (GP), Starting from Montrose Rd

| Montrose to | Round Trip (minutes) | PM trip from exit to 370 |
|---|---|---|
| River Road | 5.3 | 6.6 |
| Clara Barton | 8.5 | 11.1 |
| GW Parkway | 7.6 | 10 |

---

[95] This analysis was done by retired scientist Dr. Arthur Katz.

00158627

The reason for the time advantage for the no build in the afternoon is the chokepoint from ending the Beltway toll lanes between the I-270 spurs. That can be seen in examining the trip time for the no build and GP lanes.

The afternoon trip from River Road to Democracy Boulevard, the first northbound exit on the I-270 west spur after River Road, is 6.3 minutes slower in the GP lanes than under the no build. This reflects the fact that the planned end point of the toll lanes on the Beltway between the east and west spurs and the reduction in the number of GP lanes on that portion of the west spur—from the current three lanes to two—has created so much congestion that it backs up traffic into the I-270/I-495 split and beyond, causing major slowdowns for the drivers in the GP lanes eastbound on the Beltway and northbound on I-270. The impact of the toll lanes can be seen in the fact that the DEIS 2040 projections for travel times for the no build and GP lanes to Democracy from the River Road exit were almost identical.

Comparison Between Travel Times from River Road in 2040 vs. 2045

| River Road to | | 2040 | 2045 |
|---|---|---|---|
| Democracy Exit, Spur | No Build | 6.6 | 10.4 |
| | Toll | 7.4 | 16.7 |
| Difference | | 0.8 | 6.3 |

### 3. The Need for the Project is Undercut by the Success of I-270 Innovative Congestion Management in Virtually Eliminating Congestion on I-270 below I-370 and The Increasing Trend Toward Teleworking

The traffic modeling in the SDEIS relies on outdated traffic data for I-270 from 2018. That data preceded the enormous move to teleworking and the completion of the SHA's $132,000,000 Innovative Congestion Management Project ("ICMP") improvements on I-270, which have added lanes and substantially reduced travel time on I-270 south of I-370, where the proposed toll road would be built.[96]

The new traffic management system on I-270 has solved many of the traffic issues on lower I-270 without new construction. The data in the SDEIS shows that southbound AM trips in 2045 from the beginning of the toll road expansion on I-270 at I-370 to destinations such as River Road, Clara Barton Parkway and GW Parkway will be 40-50% faster for the no build alternative than pre-pandemic trips. In other words, this is occurring now with traffic management, even without added lanes, much less toll lanes.

---

[96] According to DEIS App'x C at 16, "The I-270 Innovative Congestion Management (ICM) initiative is a Progressive Design-Build project to construct improvements along I-270 between I-70 and I-495, including the East and West Spurs. This project was announced in April 2017 as a series of targeted improvements with the goal of reducing congestion at key locations, with a scheduled completion in 2021. The project includes fourteen roadway improvements that increase capacity and vehicle throughput and address safety concerns and bottlenecks. The project also includes innovative technologies and techniques, including adaptive ramp metering and active traffic management strategies, including dynamic message signs and dynamic speed limits."

00158628

For example, as a result of these changes, the trip from I-370 to River Road on the Beltway will take half the time it took pre-pandemic (13 minutes vs. the pre-pandemic 26.2 minutes, average speed for the trip 46 mph vs. 21 mph pre-pandemic). *See* SDEIS App'x A, Table 2. The same dramatic improvement was also seen in the results of the DEIS for 2040. The no build improvement is happening today, in 2021, and will continue at least to 2045. This raises questions about why toll lane construction is being proposed.

An independent daily recording of traffic speeds on I-270 between July 2021 and November 2021 gave further evidence that the ICM has already been successful. With guidance from an expert traffic engineer, an independent traffic recorder took daily screenshots of the traffic overlay on the Google Traffic App at 7:30, 8:00 and 9:00 in the morning and at 4:00, 5:00 and 6:00 in the afternoon. Screen shots were taken of 1) The whole metro area, from Frederick in the north to Fredericksburg in the south, to show all the places that had congestion 2) the entire length of I-270, from Frederick to the split at Democracy Blvd. and 3) just Lower I-270 from I-370 to the split at Democracy Blvd., which is where the proposed toll road would be.

The speed of the traffic is color-coded: green indicating at or above the speed limit, orange indicating moderate speed reduction and red indicating severe speed reduction.

The independent traffic recorder then noted that from late July to late November, while much of the metropolitan area highways consistently experienced red or orange, Lower I-270 was nearly always green. When Lower I-270 was orange or red, the cause of slowdowns was identified, first by looking for an accident icon. If found, an extra screenshot of it was taken. If not found, the independent traffic recorder checked the weather radar at the exact times. If a weather disturbance was found, the independent traffic recorder took a screenshot of the radar, noting the existence of a heavy thunderstorm or other disturbance. Typical screenshots are shown in the figures below:

64

Representative screenshots of Google Map with Traffic Overlay



Key: Green = Free-flowing,  Orange = Moderate slow-down,  Red = Extreme slow-down

00158630

Storm-related slow-down and ICMP visual

| Whole Area | Entire I-270 | Lower I-270* |
|---|---|---|
|  |  |  |
| Lower I-270 slows moderately | Radar show a thunderstorm | ICM I-270 Overview** |

Key: Green = Free-flowing,  Orange = Moderate slow-down,  Red = Extreme slow-down
*Where Phase 1 South toll lanes would be built
** Large circle shows 8 lanes

The independent traffic recorder summarized that traffic speeds during peak travel times on Lower I-270 were normally free-flowing at or above the speed limit. This could not be said about I-495 or I-95 south in Virginia, where managed lanes have recently been built. The independent traffic recorder noted that those roads were frequently orange and red.

The independent traffic recorder observed that the traffic between Democracy Blvd and I-370 is currently *not* congested, even during rush hours, and noted that imposing toll lanes would likely create congestion because it would reduce the number of existing free lanes; the five years of construction would also create congestion. The recorder further noted that if traffic issues on the upper portion of I-270 were addressed through investments including transit,[97] more cars would be removed from both I-270 and the Beltway, helping further reduce congestion on both highways. The need to recognize that the I-270 ICMP has already addressed congestion on lower I-270 has been pointed out in various editorial pieces.[98]

---

[97] Transit options could include increasing MARC service via a third track and all-day service, extending the Metro Red Line, or a dedicated bus lane on I-270.

[98] Arthur Katz, *Opinion: The Myths Surrounding the I-495/I-270 Highway Expansion*, Maryland Matters (Aug. 21, 2020), https://www.marylandmatters.org/2020/08/21/opinion-the-myths-surrounding-the-i-495-i-270-highway-expansion/; Sonia Demiray, *Opinion: Pricey Toll Lane Plan Won't Solve Regional Traffic Issues*, Maryland Matters

00158631

The success of the I-270 ICMP was confirmed on November 10, 2021, by MDOT Secretary Greg Slater at the MDOT Consolidated Transportation Plan Tour ("Road Show") in Montgomery County. When asked about having "successfully fixed the problem from 370 to 495 [on I-270]", he said: "The transportation systems and management operations strategies that we've put out on 270 are absolutely working. They have been an effective strategy. They've been able to manage the traffic as they can in those kind of areas."[99]

MDOT's ICMP website, in the General Concrete, Inc. Contract (page 20) relates that the ICM improvements will relieve congestion on lower I-270 through 2040.[100] The findings of the DEIS confirm that there is no advantage of toll lanes on lower I-270 over the no build alternative through 2040. DEIS App'x C at 123-124. Data in the two tables on page 123 are explained with an asterisk: "Improved travel times along I-270 in Alternative 1/No Build are a result of the I-270 ICM initiative." In the northbound PM peak direction on I-270, the toll lanes might go three minutes faster than 2017 in 2040. In the southbound direction, building toll lanes would offer no travel time advantage over 2017 times.

The DEIS also says of the I-270 PM peak period:

- Conditions are generally projected to be acceptable under Alternative 1/No Build in the northbound and southbound directions due to the Financially Constrained Long-Range Transportation Plan (CLRP) programmed improvements, including the Innovative Congestion Management (ICM) initiative, except for congestion along the I-270 Southbound East Spur due to spillback from I-495

---

(Nov. 1, 2021), https://www.marylandmatters.org/2021/11/01/opinion-pricey-toll-lane-plan-wont-solve-regional-traffic-issues/.

[99] MDOT Consolidated Transportation Program Presentation (Nov. 10, 2021), https://www.youtube.com/watch?v=0rFAps6rNpo&t=4460s.

[100] Technical Proposal Progressive Design-Build (PDB) IS 270 – Innovative Congestion Management Contract, at 20 (Jan. 19, 2017), https://ago-item-storage.s3.us-east-1.amazonaws.com/0e429362abe24844beeef29a92d50959/I-270_Innovative_Congestion_Management_Tech_Proposal_and_Analysis.pdf?X-Amz-Security-Token=IQoJb3JpZ2luX2VjECUaCXVzLWVhc3QtMSJGMEQCIDddFBFtpeF0ii%2F8IaQA9jD9I62Ip7CzKtA%2FmamkgFHbAiAusIXx0MrfMTmTju6zNf3YnGuaIIJkZxpv9Z5t3KxLn8SqDBAjt%2F%2F%2F%2F%2F%2F%2F%2F%2F%2F8BEAAaDDYwNDc1ODEwMjY2NSIM0I6jCzjcQhtmnPnaKtcDqrG0II8ZBOML4mNkY2f07YfSiNTILIoEZgXvnDZbBm97et%2FEfL993DnbTY2i9TtKmLscF5GV6j5zY6Ai6BmS%2Bsig%2BSgyc33cjMwq5%2Fktc25C70yycix4KMma6DUExJxvhswuD75c9%2BYpRqGm2GkLeu1%2Fds55Kmay5NKPfzLx7Fc07tqmCCfbEiSajUKnj9euN6A%2FZi7wSNrLQdWUNnw96Ijb%2BU20Z9MRBWzXIH5koHroUBWr3vc8D6dAFIkPpFz9b6io7sPKBq2SZfWEGQgWuToExgzC9TNp%2BGqJnK0I4U1kkR3g%2F73an%2FmNKQJcvE5y9JMRYnPRyvGORlc3iVMzr%2F53CO49X4Lyleb3fX18nGpsJTVZY%2B9zV8NWAgMBCZTaGNNXkJcb32OiBwQWhEmiUHup8AvzQaTXeBexiwmJ%2B8s2xpMXQZkRsxAIESoReG5O63DWwpVNV440gSSf%2F1bTg98%2FaOtWI0xcoUOAsgUHA0oP0C9IzkckWQej1sX3Gm23%2BgZXgtX7LLNfusxvidczQDKJero7XqMkpHFcuUmCTuVp8hn46unLLEVxpvtqGmoKafpqCfIPFeJtq1d%2Bbb1vo15d1IZDB9wpBBPnwMbT6WVp6IPmj9f4JMLisml0GOqYBoEPVFH54yQwJWyrVxSIN79yfAMYIVoJte4IMZ1UBbZA%2Bq%2FpOrwH9FlpTLfqjwpntGL4UpRp0aCo%2By-nyIIClg%2FpCsmaVjRzWHpmk3ipQaPyd%2BpvuUHmv7%2BMCf09upFXIvmOUysCvOEUpmW%2BlJd5bSgVXKcdfxuEwueZnTHYd%2FUSuUpyVRG5pVgjiGa7tmL4KW3cPzPfwe3a1GoatgRLqIbN3gqs5X%2F5g%3D%3D&X-Amz-Algorithm=AWS4-HMAC-SHA256&X-Amz-Date=20211130T130236Z&X-Amz-SignedHeaders=host&X-Amz-Expires=300&X-Amz-Credential=ASIAYZTTEKKE6XNNRSU2%2F20211130%2Fus-east-1%2Fs3%2Faws4_request&X-Amz-Signature=b865201572e77bfa4806ae4d1e663db53e93f5b629e1b801458d96694b5d5eba.

00158632

- In some cases, the Build Screened Alternatives are projected to operate worse than Alternative 1/No Build along I-270 due to increased volumes in the system and/or reduced capacity in the off-peak direction from the removal of the HOV lanes.

DEIS App'x C at 124-125.

The SDEIS shows the preferred alternative will not lessen the worst evening traffic.[101] The clearly unfavorable outcomes of toll lanes on lower I-270 as spelled out in the DEIS and SDEIS raise questions about why toll lanes are even being considered for I-270 from I-495 to I-370. Governor Hogan himself said of the current plan to go from the ALB to I-370 is "not going to do much to solve the traffic."[102]

Accordingly, the I-270 portion of the proposed expansion should be removed from further consideration. The toll road has no discernable transportation benefits in relation to the no build alternative. The GP lanes using MDOT's own numbers show no significant transportation improvement over the no build southbound in the AM or northbound in the PM. This is also true of the toll lanes. The toll lanes have a small, 2- or 3-minute advantage over the no build for the trips between I-370 and I-495 in the morning and evening peaks, but that is not significant enough to justify the community and traffic impacts elsewhere, the contractual liabilities in the likely event that the Project does not generate the expected revenue for the private multinational company, and the multibillion-dollar cost of all the interchanges that will need to be rebuilt in the project area.

### 4.    Innovative Congestion Management Initiatives Have a Demonstrated Ability to Address Congestion and Must Be Considered as or Part of a Project Build Alternative

As the foregoing demonstrates, the effectiveness of the ICMP proves that there are alternatives to the proposed build option that would adequately address the purpose and need of the Project while avoiding or significantly reducing adverse environmental impacts, including impacts on environmental justice populations and Section 4(f)-protected resources.

The demonstrated effectiveness of the ICMP requires a reconsideration of alternatives that were eliminated from consideration under NEPA. Even a very limited package of improvements is sufficient to partially address the purpose and need of the Project in terms of accommodating current traffic levels and relieving current traffic congestion. A fuller package of improvements that included additional investments in transit and more, would fully address the purpose and need for the Project. Implementing ICMP and similar strategies on the Capital Beltway would be a prudent and feasible alternative that would avoid the serious section 4(f) impacts we have identified. Such an alternative must be considered under NEPA, and Section 4(f) requires its selection.

---

[101] Katherine Shaver, *Toll Lanes on Beltway, I-270 in Maryland Wouldn't Lessen Worst Evening Traffic Without Other Improvements, Study Says*, Washington Post (Oct. 1, 2021), https://www.washingtonpost.com/transportation/2021/10/01/maryland-toll-lanes-traffic/.

[102] Colleen Grablick, *Maryland Shrinks Plan To Add More Lanes To The Beltway*, DCist (May 12, 2021), https://dcist.com/story/21/05/12/maryland-reduces-beltway-expansion-plan-to-focus-on-northern-region/.

00158633

5.        **MDOT Selected Misleading Traffic Endpoints that Obscure the Seriousness of the Traffic Failures Produced by the New I-270/I-495 Toll Lanes**

In collecting/analyzing traffic data, MDOT in SDEIS Appendix A selected misleading traffic endpoints that obscure the seriousness of the traffic failures produced by the new I-270/I-495 toll lanes. To give an example, SDEIS Appendix A uses the VA 193 exit as the starting point on several trips, which is not even controlled by MDOT. If the GW Parkway is chosen as the starting point, the no build trip is 10 minutes faster than the Build GP trip.

As shown earlier, if trips beginning at the GW Parkway, the American Legion Bridge, Clara Barton Parkway, or River Road to I-370 were shown, they would reveal the Build GP lanes are significantly slower than the no build—6.5 to 11 minutes—for those trips. These trips represent the essence of this construction plan.

The point above is demonstrated by data from Virginia.[103] The 495 NEXT Revised Environmental Assessment (May 2021) included this paragraph regarding Build GP lanes.

Screenshot from the 495 Next Environmental Assessment

**PM Peak Period: General Purpose Lanes**—Under 2045 Build conditions, travel times along the northbound I-495 GP lanes between Route 123 and the ALMB decrease by approximately five minutes when compared to 2045 No Build conditions. Travel times along southbound I-495 GP lanes between the ALMB and Route 123 remain generally consistent compared to 2045 No Build Conditions.

_____

*Revised Environmental Assessment*                                                    May 2021

2-9

This data demonstrates that the travel time reduction in the general-purpose lanes comes from the travel time improvements in Virginia rather than from building toll lanes in Maryland.

6.        **Further Traffic Model Issues: The Traffic Model Used in the SDEIS Gives Results that Defy Logic**

Multiple expert members of several groups concluded that the output of the SDEIS's traffic model is contrary to common sense, logic, and accepted traffic forecasting methodologies.[104] The traffic model results also contradicted results by MDOT itself, before Maryland suddenly changed its preferred alternative in May 2021. The SDEIS traffic model fails at the merge at Wisconsin Avenue and several other notable locations, predicting traffic increases or decreases that do not

---

[103] I-495 Express Lanes Northern Extension Revised Environmental Assessment, at 2-9 (May 2021), www.495northernextension.org/documents/studies/070121/i-495_next_revised_ea_-_may_2021.pdf.

[104] See more here: Letter from MTOC, CABE, and DontWiden270 to Acting FWHA Administrator Stephanie Pollack, (Oct. 18, 2021), https://transitformaryland.org/sites/default/files/pollackletter.pdf.

00158634

make sense and are not credible.[105] For illogical results to come from a model, they must be explained. The SDEIS does not explain the surprising and logic-defying model results.

As a result, the SDEIS provides no basis for determining whether the preferred alternative satisfies the Project's purpose and need, what the air pollution and noise impacts will be, and whether it will disproportionately harm environmental justice populations.

The expert comments demonstrate that the projections for areas many miles away from the toll roads are incorrect. The SDEIS estimates that for trips going east during the peak afternoon period that pass through the Old Georgetown Road to the 355 Beltway segment represent half the volume in the next segment 355 to Connecticut Avenue. "We then have a dramatic change of doubling traffic in that short distance. And we are supposed to know what that means 30 miles later."

The peak afternoon travel volumes for each hour from 3 to 7 PM for the road segments – 355 to Connecticut Avenue and Connecticut Avenue to Georgia Avenue. The difference in the volume between the no build and GP lanes is 1.5 to 2.5 percent, except in the 4 to 5 PM hour, where it is slightly higher. Nevertheless, the projected travel times show a 30% travel time advantage for the GP in the segment from 355 to Connecticut Avenue and a 40% travel time advantage in the Connecticut Avenue to Georgia Avenue segment. It is difficult to see how that is possible.

The SDEIS Appendix A incorrectly shows that the travel time is faster for the build GP lanes than for the no build until it reaches the I-270/I-495 Beltway split. Elsewhere, MDOT's own numbers show that by the time you reach the Clara Barton Parkway the GP lanes are slower than the no build. The SDEIS also incorrectly shows the no build and build GP lane travel times are essentially the same, 50 minutes for the no build and 51 for the build GP lanes. However, MDOT's own numbers for the PM trip from GW Parkway at the American Legion Bridge to I-370 shows the no build is 10 minutes faster: 42 minutes for the no build and 52.1 for the build GP lanes. SDEIS App'x A Attachment E Table "Commute from the American Legion Bridge to ICC (PM)," at PDF p. 142.

It does not appear that the Agencies performed any routine checks to examine whether the traffic model needed updating or fixes to be adequate. This is contrary to accepted practice, as set forth in the AASHTO *Practitioner's Handbook #3: Managing the NEPA Process for Toll Lanes and Toll Roads*,[106] which discusses "Traffic Forecasting for Tolled Alternatives" as a key technical document, and the first question on the checklist is: "Are improvements to the model needed before the NEPA forecasts are developed?"

Comparison of alternatives, the fundamental purpose of an EIS, is impossible when the traffic model lacks credibility. Moreover, the public cannot intelligently comment on key aspects of the environmental analysis, among them whether the preferred alternative satisfies the purpose

---

[105] See more here: Letter from MTOC, CABE, and DontWiden270 to Acting FWHA Administrator Stephanie Pollack, Oct. 18, 2021, https://transitformaryland.org/sites/default/files/pollackletter.pdf.

[106] *Practitioner's Handbook #3: Managing the NEPA Process for Toll Lanes and Toll Roads,* AASHTO (Aug. 2016), https://environment.transportation.org/wp-content/uploads/2021/05/ph03-2-1.pdf.

00158635

and need, and the extent of air and noise pollution, and the extent to which the preferred alternative will impact environmental justice populations. The traffic model presented in the SDEIS is not credible and needs to be replaced in a future environmental impact statement with one that is corrected and uses a thoroughly validated traffic model. The traffic modeling done for this SDEIS cannot be a basis for advancing a project of this scale adjacent to the nation's capital.

7.      **Improving Safety Is Not Part of the Purpose and Need of this Project and Is Largely Unanalyzed and Unaddressed in the DEIS and SDEIS**[107]

As will be discussed further in subsequent sections, the Maryland toll-lane plan would make the general purpose less safe than they are today.

Unlike some past highway projects, improving safety is not a part of this Project's purpose. This Project's purpose and need as stated in the SDEIS is:

The purpose of the Study is to develop a travel demand management solution(s) that addresses congestion, improves trip reliability on I-495 and I-270 within the study limits and enhances existing and planned multimodal mobility and connectivity.

The needs for the Study are:

- Accommodate Existing Traffic and Long-Term Traffic Growth
- Enhance Trip Reliability
- Provide Additional Roadway Travel Choices
- Improve Movement of Goods and Services
- Accommodate Homeland Security.

Two goals for the Study were identified in addition to the needs: (1) the use of alternative funding approaches for financial viability and (2) environmental responsibility.

SDEIS at 1-2 to 1-3.

This contrasts for example with a previously considered project purpose for managed lanes on the Maryland Capital Beltway, which was

To determine the most feasible and effective means to:

- Improve regional mobility
- Provide enhanced safety
- Maximize travel operational efficiencies
- Provide cost-effective transportation infrastructure

---

[107] This section was reviewed and refined under the guidance of Byron Bloch, a national vehicle safety and crashworthiness expert. Mr. Bloch is a national court-qualified vehicle safety expert, has testified at U.S. Congressional hearings on vehicle and traffic safety, and was awarded the Lifetime Achievement Award at the 2001 World Traffic Safety Symposium in New York.

00158636

- Address current and forecasted travel demand in the Capital Beltway corridor
- Support the area's economic growth and the environment.[108]

This is a serious omission, particularly given that the overall mission of FHWA is "to enable and empower the strengthening of a world-class highway system that *promotes safety,* mobility, and economic growth, while enhancing the quality of life of all Americans."[109] It is therefore wholly unacceptable that the SDEIS fails to disclose serious safety impacts and impermissibly defers their identification and analysis, saying:

> The FEIS and Interstate Access Point Approval (IAPA), which is an FHWA approval to ensure safety, operations, and engineering acceptability on the interstate system, will include a more detailed assessment of the future mainline and localized operational impacts of the Preferred Alternative. Opportunities to further address safety and operations will be evaluated on the Selected Alternative after the conclusion of NEPA and during final design.

SDEIS at ES-12.

The SDEIS includes a statistical review of historic crash data along I-270 and I-495 to help identify potential safety impacts of the Managed Lane Study. However, the SDEIS fails to include any suggestions or insights about how to mitigate or prevent the continuation of such crashes. In the five-year study period of 2012-2016, there were a total of 2,918 crashes along 1-270. There was no breakdown of the types of injuries, nor their severity, nor was there information about how many were crashes of large trucks and tractor- with passenger vehicles (cars, minivans, SUVs).

### 8.    The SDEIS Fails to Disclose the Project's Serious Adverse Safety Impacts for Users of the Post-Project General Purpose Lanes[110]

The SDEIS and project materials suggest as a general matter, improvements in safety on tolled lanes,[111] but fail to disclose the reductions in safety of future post-toll lane general purpose lanes compared to today for general purpose lane travelers.

Under the preferred alternative, the GP lanes would become less safe due to additional traffic and congestion; new and worsened bottlenecks with end merge-point congestion; loss of the left lane shoulder; a higher concentration of 18-wheelers due to avoidance of high tolls and the post-COVID-19 boost in trucking; and removal of an existing non-tolled lane in each direction of

---

[108]    Capital    Beltway    Study    Display    Boards,    at    6    (May    6,    2004), https://web.archive.org/web/20170202174503/http://apps.roads.maryland.gov/WebProjectLifeCycle/AW518_11/HTDOCS/Documents/Informational_Public_Workshop/AW518 Display Boards.FINAL.5-6-04a.pdf.

[109]    About, U.S. Department of Transportation Federal Highway Administration (Sept. 17, 2012), https://www.fhwa.dot.gov/about/ (emphasis added).

[110]    This section was reviewed and refined under the guidance of Byron Bloch, a national vehicle safety and crashworthiness expert.

[111]    http://495northernextension.org/documents/pim092021/2021-09-29_495_next_pim_presentation_final.pdf, at 15; https://mdta.maryland.gov/sites/default/files/Files/ALB270/201118_Letter_AMP_to_MDTA_Toll_Rates_ADA.pdf, at 2.

00158637

I-270, squeezing more traffic into fewer free lanes. Each of these changes to the GP lanes as a result of the preferred alternative is associated with an increase in crashes and decrease in safety.

As a result of policy and other decisions made for the preferred alternative, the GP lanes would not see improved traffic flow in many places during peak travel and would in fact become more, not less, congested. As one news article put it, "Toll Lanes Won't Help Regular Lane Drivers at Evening Peak."[112] Only a small fraction of drivers, those paying the high tolls,[113] would experience a relatively small reduction in evening congestion in the peak direction.[114] Some drivers would face worse congestion due to worsened traffic bottlenecks.

Early toll-lane promotional information in Virginia advertised the express lanes as a "safer ride" because of the absence of trucks and because—for those who pay the toll—express lanes "reduce congestion, the greatest cause of Beltway accidents." In other words, the private partners in Virginia have publicly acknowledged that only users of the toll lanes would experience improvements in safety.

In Maryland, unaffordable tolls for truckers[115] would discourage them from using the toll lanes and keep trucks on the GP lanes, where an increased concentration of trucks and increased congestion would be expected to cause more accidents. Heavy trucks and tractor- trailers need much greater stopping distances than do cars. If the cars ahead need to suddenly slow or stop, the large trucks may be unable to avoid the crash.

Furthermore, truck concentration on highways has increased in most of the country post-COVID-19.[116] Truck traffic is up 13% in Maryland compared to 2019.[117] Truck accidents in Maryland have also increased post-COVID-19[118] and the safety of first responders has been under

[112] Colleen Martin, *Toll Lanes Won't Help Regular Lane Drivers at Evening Peak: Study*, Patch (Oct. 1, 2021) https://patch.com/maryland/silverspring/toll-lanes-wont-help-regular-lane-drivers-evening-peak-study.

[113] *TOLLS: Drivers Could Pay $50 for a Trip Around The Beltway*, WNCT9 (July 14, 2021), https://www.wnct.com/news/national/tolls-drivers-could-pay-50-for-a-trip-around-the-beltway/.

[114] Katherine Shaver, *Maryland Toll Lanes: Beltway, I-270 Lanes Wouldn't Improve Worst Evening Traffic in Regular Lanes, Study Says*, Washington Post (Oct. 1, 2021), https://www.washingtonpost.com/transportation/2021/10/01/maryland-toll-lanes-traffic/.

[115] Tyson Fisher, *Capital Beltway Toll Rates Draw Scrutiny From Residents and Elected Officials*, Land Line (July 15, 2021), https://landline.media/capital-beltway-toll-rates-draw-scrutiny-from-residents-and-elected-officials/.

[116] Michael Sivak, *States with the Highest and Lowest Truck Traffic on Interstate Highways*, Green Car Congress (March 16, 2021), https://www.greencarcongress.com/2021/03/20210316-sivak.html ("During the week of March 1 through March 7, 2021 (the latest available data), truck traffic on all interstates increased by 12% compared with the corresponding week in 2019, while passenger-vehicle traffic decreased by 9%.").

[117] Alex Argiris, *Environmental Lessons for Maryland in Wake of COVID-19*, Baltimore Fishbowl (Nov. 18, 2021), https://baltimorefishbowl.com/stories/environmental-lessons-for-maryland-in-wake-of-covid-19/.

[118] Bruce Leshan, *36 Truck Crashes on Beltway's 'Big Curve' and Crews Can't Figure Out How to Make it Stop*, WUSA9 (Sept. 15, 2020), https://www.wusa9.com/article/traffic/three-dozen-truck-crashes-on-beltways-big-curve-highway-officials-cant-stop-it/65-a45b0402-c344-465d-a9e1-91a5f0984684.

00158638

greater threat.[119] Members of the Bethesda-Chevy Chase Rescue Squad report, "Since March [2020] we've had an increase in calls involving tractor-trailers—so much so the state has started to pay attention. Rain almost guarantees running a jackknifed big rig . . ."

Under the proposed Maryland toll-lane plan, the GP lanes would become less safe due to additional traffic and congestion; new and worsened bottlenecks with end merge-point congestion; loss of the left lane shoulder; a higher concentration of 18-wheelers due to avoidance of high tolls and the post-COVID-19 boost in trucking; and removal of an existing non-tolled lane in each direction of I-270, squeezing more traffic into fewer free lanes.

Each of these changes to the GP lanes as a result of the preferred alternative is associated with an increase in crashes and decrease in safety.

The HOT lanes in Virginia in pre-COVID-19 times carry about one-sixth[120] of the vehicles while the GP lanes carry five-sixths or 85%. That is despite the fact that the HOT lanes would take up about one third of the space. At present, the Virginia HOT lanes are transporting far less than one sixth of the vehicles on I-495.

In short, while the proposed toll lane scheme may have some benefits for an affluent minority, it places the lives of some 85% of travelers at greater risk than before.

The new configuration puts not only drivers and passengers at greater risk but first responders. Safety has not been considered at all, let alone considered as a criterion for making choices in the SDEIS.

This is a serious deficiency for a road project adding 42 new lane miles; it shows a lack of engagement with the public welfare and public safety and must be addressed thoroughly and transparently for the public prior to a FEIS which becomes the basis for making final decisions.

Consider what happened to the general-purpose lanes in Virginia after the toll lanes were added. The Infrastructure Justification Report[121] for I-495 NEXT project in Virginia reported that for the northbound I-495 general purpose lanes: "The crash rate for northbound I-495 GP lanes from Route 7 to the ALMB [American Legion Memorial Bridge] is approximately 100 percent higher than the statewide crash rate. The injury crash rate is 25 percent higher than the statewide injury crash rate. … The northbound section includes the current northern terminus of the I-495 Express Lanes, 5 merges, 4 diverges, and a dynamic shoulder use lane."

---

[119] Jacob Sorensen, *Less Traffic, More Trouble: Truck Crashes Spike During COVID-19*, EMS World (Sept. 2020) https://www.hmpgloballearningnetwork.com/site/emsworld/article/1224774/less-traffic-more-trouble-truck-crashes-spike-during-covid-19.

[120] Norm Marshall, Review of Maryland I-495 & I-270 Managed Lanes Project Draft Environmental Impact Statement and Draft Section 4(f) Evaluation, Oct. 2020. https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/MD%20Managed%20Lanes%20DEIS%20Traffic%20Review%2010-29-2020.pdf.

[121] I-495 Express Lanes Northern Extension (NEXT) Interchange Justification Report, VDOT (Apr. 2021), https://495northernextension.org/documents/studies/070121/i-495_next_ijr_report_and_exhibits_combined_2021-04-26_with_all_signatures_ne.pdf.

00158639

Given the known decrease in safety for the post-build GP lanes and 85% of road users, and the example of what occurred in Virginia, much more care needs to be given to safety considerations for post-toll lane general purpose lanes and new merge-point bottlenecks at the ends of the toll lanes. Deferring consideration of such impacts to a time when the public is unable to review is not appropriate and threatens public safety.

**9.    End Merge Point Congestion Safety Risks and Associated Environmental Justice Impacts Were Not Disclosed**

The Virginia Express Lanes opened in 2012. End merge point congestion quickly became a major problem that was not adequately foreseen or recognized in impact statements. The 2014 VDOT report entitled "I-495 Northern Section Shoulder Use Project Traffic Forecasting and Analysis Report" explains the decision to use a shoulder lane to alleviate merge point congestion and safety issues near the northern terminus of the toll lanes. The report (page 86) says the decision to use the shoulder lane from 7–11 AM and 2–8 PM was to "allow VDOT to optimize the performance of the existing I-495 roadway infrastructure, enhance its traffic carrying capability, and *improve the safety of the merge between the general purpose lanes and Express Lanes* [italics added] without substantial widening of I-495 and other impacts."

Seven years later, the problem of merge point congestion is intended to be addressed by Virginia's 495 NEXT project with Transurban. 495 NEXT is described by VDOT as a "2.5-mile extension of the 495 Express Lanes north to the American Legion Bridge to reduce congestion" that would "[help] address one of the worst bottlenecks in the region and reduce cut-through traffic in local McLean neighborhoods."[122] And yet, Virginia's decision to do this extension before Maryland finalizes its plans and clears the NEPA process could cause more of the same merge point congestion in Virginia, unless the merge point congestion is moved to Maryland:.

[Supervisor John] Foust, who represents the McLean area which is most impacted by congestion caused by the merge of the current toll lanes into the main lanes approaching the American Legion Bridge, said moving forward without a commitment from Maryland to widen or replace the American Legion Bridge "is exposing us to permanent impacts that worsen the situation."

"For many years, I have supported widening or replacing the American Legion Bridge because I know it is important to our residents and it's important to our economy," said Foust. "But I honestly believe that until Maryland replaces the bridge and widens its side of the Beltway, 495NEXT provides those who can afford to pay the tolls a way to cut in line and arrive a few minutes sooner to the congestion at the bridge while adversely impacting everyone else."[123]

---

[122] *Virginia and Transurban Sign Agreements to Invest More Than $1 Billion in Northern Virginia Transportation*, VDOT Newsroom (Jan. 29, 2019), https://www.virginiadot.org/newsroom/northern-virginia/2019/virginia-and-transurban-sign-agreements-to-invest-more-than-1-billion-in-northern-virginia-transportation1-29-2019.asp.

[123] Ken Moore, *Pressure Mounts, Opposition Remains; Virginia Predicts Maryland Will Have Additional Toll Lanes Running Across the American Legion Bridge by 2027*, Connection Newspapers (April 21, 2021), http://www.connectionnewspapers.com/news/2021/apr/21/pressure-mounts-opposition-remains/.

00158640

This will similarly be the case with the merge point congestion and new larger bottlenecks at the termini of the toll lanes in Maryland around the Wisconsin Avenue merge on 495 and around Shady Grove on I-270.

In Maryland, the I-270 end point of the toll lanes is in a location high in environmental justice populations. Therefore, the congestion, air quality and safety impacts will disproportionately impact environmental justice populations. This was not considered in the SDEIS. Also, environmental justice populations in eastern Montgomery County and Prince George's County who work in the more job-rich western part of the region would also have to endure a large traffic bottleneck where the toll lanes end on their commutes home. This was also not considered in the SDEIS.

> **10.** **The SDEIS Failed to Disclose Reduction in Safety on General Purpose Lanes Due to Preferred Alternative's Removal of General Purpose Inside Shoulder Lanes**

The SDEIS failed to disclose that the preferred alternative's new configuration with the HOT lanes will remove inside shoulder lanes from the Maryland general purpose lanes, thereby reducing the safety of the GP purposes. The 2014 VDOT "I-495 Northern Section Shoulder Use Project Traffic Forecasting and Analysis Report" acknowledges that important safety function performed by the inside shoulder lanes when it considered shoulder lane use to alleviate merge point congestion and safety issues near the northern terminus of the toll lanes. That report also says (p. 83) that during off peak times the shoulder lane "will not be open to traffic in order *to provide the safety and operational benefits of an inside shoulder including providing access for emergency vehicles and a location for motorists to stop in an emergency situation*." (emphasis added). The SDEIS failed to disclose the safety issues posed by removing the inside shoulder lanes from the Maryland general purpose lanes in the new configuration with the HOT lanes.

76

00158641



**Figure ES-1: Alternative 9 – Phase 1 South Typical Sections (HOT Managed Lanes Shown in Yellow)**

Proposed configuration for HOT lanes in Maryland, SDEIS page ES-8

### 11. The SDEIS Failed to Estimate the Impacts of Toll Lanes on Accident Rate

Knowing the safety issues discussed above and the likelihood of increased accidents on the regular lanes due to the new configuration of the general-purpose lanes after building toll lanes, the accident rate for the preferred alternative needs to be estimated and disaggregated to show the accident rate by lane type (toll or GP). Since there will be a significant increase in exit and entrance ramps needed for the toll lanes, that needs to be a major factor in the estimates as well. The public needs to see a clear presentation of baseline numbers for accidents and fatalities on the two highways as well as the post-project estimates.

### 12. Slip Lanes Create Known Safety Hazards Yet the SDEIS Failed to Disclose or Address Them

The SDEIS (pages 3-4) says that there will be:

00158642

A Set of Exchange Ramps, including one (1) slip ramp per direction: [on the] Outer loop exchange ramp from Maryland high-occupancy toll (HOT) managed lanes to Virginia GP lanes south of the ALB [and on the] Inner loop exchange ramp from Virginia GP lanes to Maryland HOT managed lanes north of Clara Barton Parkway.

SDEIS at 3-4. Yet the SDEIS says nothing of the safety issues associated with using slip ramps.

Left entrance slip lanes are dangerous and lead to increased accidents. This was admitted in a VDOT December 15, 2020 Technical Memorandum entitled "I-495 Express Lanes Northern Extension (NEXT) Project Left-side Express Lane Entry/Exit Slip Ramps."[124] It specifically identifies "the increase in frequency and severity of crashes and operational issues as a result of speed differentials and six-lane weaving maneuvers required" as reason not to do them and as reason to subsequently replace slip ramps with interchanges.

It states:

Left-side entry/exit slip ramps have a number of constraints and challenges which make their use challenging and typically undesirable. VDOT and Transurban have been removing these types of ramps where possible along the I-95 Express Lanes corridor due to safety and operational issues observed in the field and confirmed with analysis data.[125]

It continues:

As demonstrated by the previously mentioned issues identified along the I-95 corridor, notable safety and operational issues are associated with a configuration where faster flowing traffic from the ELs must merge suddenly with congested and slower-moving traffic in the GP lanes in a short distance, with little or no storage area. This configuration increases the potential for, and frequency / severity of, the following problems:

- Sideswipe and rear-end crashes due to speed differentials between ELs traffic attempting to merge and congested GP lanes traffic;

- Queuing on the proposed transition ramp area that spills back from the GP lanes due to merging traffic, and that potentially causes dangerous back-ups onto the through lanes of the mainline ELs;

- "Hot-spot" speed reductions on both the ELs or the GP lanes that occur suddenly and are driver expectancy issue."[126]

---

[124] VDOT, I-495 Express Lanes Northern Extension (NEXT) Project Left-side Express Lane Entry/Exit Slip Ramps, PDF pp. 21-25, https://495northernextension.org/documents/pim092021/2021-09-29_495_next_pim_meeting_notes.pdf.

[125] *Id.* at 21.

[126] *Id.* at 25.

00158643

In response to a question posed at an informational meeting on September 29, 2021,[127] VDOT further explained: "At-grade entrances require vehicles in the general purpose lanes to maneuver from the right side to the left side to access the slip lanes. This causes major weaving issues immediately downstream of interchange on-ramps for vehicles trying to access the Express Lanes – causing congestion hot spots and safety issues."

The 2020 DEIS mentions additional uses of slip lanes on the eastern part of I-495 – "At-grade slip ramps along I-495 between the Baltimore-Washington Parkway and MD 450" (page 2-34) and "At-grade slip ramps along I-495 between MD 214 and Ritchie Marlboro Road" (page 2-35). The traffic analysis (Appendix C) says: "slip ramps would not be needed except at termination points. These termination points are: • The northern end of I-270 • The southern end of I-495 east of the Woodrow Wilson Memorial Bridge • Near the American Legion Bridge in Maryland and the Dulles Toll Road in Virginia." It is interesting that the DEIS is talking about slip ramps well outside of the study area east of the Woodrow Wilson Memorial Bridge.

Slip ramps to the managed lanes are clearly a part of the proposed plan in Maryland yet neither the main document nor appendices of DEIS or SDEIS mention the safety issues and undesirability of slip ramps.

Furthermore, the location for the preferred alternative's slip ramps is around the junction where the trucks allowed on Maryland's HOT lanes will have to merge into Virginia's general-purpose lanes (because big rigs are banned from Virginia's HOT lanes), further raising risk of rapid truck lane changes in the area surrounding the American Legion Bridge. Likewise, and also increasing peril for drivers, on the Inner Loop in the northbound direction, tractor trailer trucks would be making quick movements to merge to enter the Maryland HOT lanes via slip lanes.

The I-495 & I-270 MLS SDEIS says nothing about the safety issues with slip ramps. The word "slip" does not occur in the SDEIS traffic appendix (Appendix A) and occurs only a single time in the SDEIS to mention the use of slip ramps on pages 3-4. Once again, the SDEIS has failed to mention an important safety issue requiring attention, discussion, and mitigation.

### 13.    The SDEIS Fails to Disclose Safety Risks of Narrowed Lanes Width During Construction of the Toll Lanes

The 2014 VDOT "I-495 Northern Section Shoulder Use Project Traffic Forecasting and Analysis Report" about shoulder lane use to alleviate merge point congestion and safety issues near the northern terminus of the toll lanes also talks about measures "intended to offset any negative impacts on safety from the reduction in lane and shoulder widths required to implement the shoulder use lane." During construction of HOT lanes in Virginia, the lanes were narrowed from the nationally accepted 12 feet to 11 feet. Construction in many places lasts years, often up to five years. Lanes narrower than 12 feet are associated with more accidents. Clearly, reductions in lane width present an increased safety risk for lane users.[128] The potential safety risks to lane

---

[127] I-495 NEXT September 29, 2021 Project Information Meeting – Summary of Questions and Answers, https://495northernextension.org/documents/pim092021/2021-09-29_495_next_pim_meeting_notes.pdf.

[128]    Mitigation    Strategies    for    Design    Exceptions    -    Safety,    FHWA    (Oct.    15,    2014), https://safety.fhwa.dot.gov/geometric/pubs/mitigationstrategies/chapter3/3_lanewidth.cfm.

00158644

users during construction in Maryland due to narrowed lane widths is not raised or addressed in the SDEIS.

During the 3 to 5 years (or more) of the de-construction and then construction phase for the I-270 and I-495 segment, plus all the bridges and sound-walls, the local traffic will have to be re-routed to the surrounding local streets, which will greatly increase travel times and distances. Emergency response may be delayed during this time period. For a preview of the disruption and congestion resulting from construction, simply drive on Virginia's I-66 which is under construction for toll lanes right now. The SDEIS's failure to clearly disclose these serious traffic and safety issues is misleading and deprives the public and decision-makers of correct and complete information about the Project's impacts.

14.    **Public Health Hazard of Toxic Silica Construction Dust Is Not Disclosed in SDEIS[129]**

In the 3 to 5 years of I-270 and I-495 road widening and re-building, the road and bridges deconstruction processes will create massive amounts of toxic crystalline silica construction dust.[130] Such toxic air pollution (especially for those closer to the highways) is known to cause respiratory diseases, including asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer. This is an urgent public health issue that is neither fully disclosed nor addressed in the SDEIS.

According to the National Cancer Institute and OSHA, and various other U.S. and British sources, workers in such environments must wear respiratory protection masks, and other precautions are also required. As the 1-270 and I-495 road and bridge construction persists, with the continuous generation of harmful silica dust, precautions (i.e., staying indoors, keeping all windows closed, and wearing of facemasks to go outside) may be needed to protect schools (Julius West Middle School, Farmland Elementary, Carderock Springs Elementary, and Walter Johnson High) and other sensitive sites close to the highways.

The massive and continuous generation of toxic silica dust will require major mitigation measures such as vacuum systems and watering by tanker trucks, which are only marginally effective; disposal issues; and environmental impacts. Mitigation measures will require more equipment and workers and will generate more traffic and pollution (and costs) during the deconstruction phase. Yet, none of this is covered in the SDEIS.

The SDEIS superficially states that "State and local regulations regarding dust control and other air quality emission reduction controls would be followed." SDEIS at 4-103. Then the SDEIS lists some examples of practices that "may" be followed. *Id.* The failure to mention federal regulations suggests that OSHA and other federal regulations on "dust control and other air quality emission reduction controls" would not be required to be followed. Yet, workers on federal

---

[129] This paragraph was reviewed and refined under the guidance of Byron Bloch, a national vehicle safety and crashworthiness expert.

[130] David J. Valiante, MS, CHI, Donald P. Schill, MS, Kenneth D. Rosenman, MD, and Edward Socie, MS, *Highway Repair: A New Silicosis Threat*, Am J Public Health. 2004 May; 94(5): 876–880, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448352/.

00158645

construction projects must comply with OSHA. This issue of silica construction dust must be addressed as a project impact requiring attention and mitigation.[131] Furthermore, these are not just issues of occupational safety with fugitive dust but of particle drift, as has been noted in past Maryland environmental assessments.[132]

The health risks of toxic silica dust generated by construction were raised in DEIS comments, and are known in the road and construction industry, and known to Transurban. Examples of mitigation plans in large infrastructure projects show these risks are known and real.[133] Yet the SDEIS makes no mention of toxic respirable crystalline silica construction dust.

### 15.    Health Risks of Widened Highways Are Minimized and Ignored in the SDEIS

During public hearings on the toll lanes and in the media, doctors and health experts have repeatedly weighted in on this proposed project. They repeatedly support the no build option and point out that there are other, better alternatives[134] to this plan. In the most recent article, a physician and board member of the Chesapeake Physicians for Social Responsibility stated: "Prioritization of highway expansion in Maryland is not only willfully dismissive of the scientific consensus on climate change, but ultimately of limited and transient benefit to reducing traffic in our metro area."[135] The links between the climate crisis and human health risks are becoming increasingly clear. Climate change is an impact multiplier, including in the area of risks to human health.

According to the SDEIS, there would be 154.7 acres of new impervious surface (Table 4-33 on page 4-71) as a result of the proposed Phase 1 South.

As a result of the preferred alternative, 17.7 acres (770,788 square feet) of new impervious surface would impact the Potomac River/Rock Run watershed. Some 98.2 acres (4,276,484 square feet) of new impervious surface would impact the Cabin John Creek watershed. Meanwhile, the preferred alternative would destroy 500 acres of forest canopy. Alone or combined, this amount of new impervious surface and forest canopy loss would represent an astonishing impact to these

---

[131] Anh-Tai Vuong, *OSHA Silica Regulations One Year In: The Latest Developments and How Businesses Can Remain Compliant*, Occupational Health & Safety (Feb. 1, 2020), https://ohsonline.com/Articles/2020/02/01/OSHA-Silica-Regulations-One-Year-In-The-Latest-Developments-and-How-Businesses-Can-Remain-Compliant.aspx.

[132] *I-270/US 15 Multi-Modal Corridor Study Frederick and Montgomery Counties, Maryland Alternatives Analysis/Environmental Assessment*, MDOT & FHWA, at IV-91 (May 2009), https://www.oplanesmd.com/wp-content/uploads/2019/07/AA_EA_for_I-270_US-15_Multi-Modal_Corridor_Study_2009.pdf.

[133] MetroTunnel Environmental Management Framework (Dec. 2019), at 32-33, https://web.archive.org/web/20210317004101/https://metrotunnel.vic.gov.au/__data/assets/pdf_file/0006/96135/Environment-Management-Framework-updated-December-2019.pdf.

[134] For example, *see* Barbara Coufal, *Opinion: Maryland's Toll Plan Won't Reduce Congestion*, Washington Post (Nov. 25, 2021), https://www.washingtonpost.com/opinions/letters-to-the-editor/marylands-toll-plan-wont-reduce-congestion/2021/11/24/11f18be0-4bc0-11ec-a7b8-9ed28bf23929_story.html.

[135] Dr. Nishanth Khanna, *Opinion: State Should Prioritize Climate-Conscious Policies*, Fund Mass Transit (May 11, 2021), https://www.marylandmatters.org/2020/05/11/opinion-state-should-prioritize-climate-conscious-policies-fund-mass-transit/.

81

00158646

watersheds. The forest canopy loss amplifies and accelerates the negative impacts already associated with the new impervious surface.

Just in the area of harm to water quality, the SDEIS says this:

Initial roadway construction would result in is the removal of trees and other riparian buffer vegetation. The removal of riparian vegetation, including forest and tree cover, greatly reduces the buffering of nutrients and other runoff materials and allows unfiltered water to directly enter a stream channel (Trombulak and Frissell, 2001). Tree removal during the construction process can reduce the amount of shade provided to a stream and raise the water temperature of the affected stream. In addition to tree removal, stormwater discharges also have the potential to increase surface water temperatures in nearby waterways. The effects of the temperature change depend on stream size, existing temperature regime, volume and temperature of stream baseflow, and the degree of shading.

Impacts associated with the use of the road after construction are mainly based on the potential for contamination of surface waters and related drinking water supplies by runoff from new impervious roadway surfaces. Potential contaminants to surface waters include heavy metals, deicing compounds, organic pollutants, contaminants of emerging concern, hazardous chemical spills, pathogens, and sediment.

The most common heavy metal contaminants are lead, aluminum, iron, cadmium, copper, manganese, titanium, nickel, zinc, and boron. Most of these contaminants are related to gasoline additives and regular highway maintenance. Other sources of metals include mobilization by excavation, vehicle wear, combustion of petroleum products, historical fuel additives, and catalytic-converter emissions. Generally, heavy metals from highways found in streams are not at concentrations high enough to cause acute toxicity (CWP, 2003).

SDEIS at 4-69 to 4-70.

The assertion that heavy metal contaminants from highways generally are not in concentrations high enough to cause acute toxicity is pure distraction that deflects from these serious issues. The SDEIS fails to acknowledge that these contaminants (heavy metals, hazardous chemicals, persistent organic pollutants and more) would not just be flowing into streams, which is alarming, but directly untreated[136] into a channel next to a biodiversity hotspot/endangered species island studied by eminent scientists, and into the region's drinking water supply. The surface area the new influx of contaminants would come from 17.7 acres (770,788 square feet) of new impervious surface for the Potomac River/Rock Run watershed.

---

[136] See SDEIS at ES-10. The SDEIS states: "For the Preferred Alternative, the water quantity management requirement will be met within each drainage segment, except one: the ALB drainage segment. Based on typical practice, a quantity waiver could be granted for the ALB due to the direct discharge to the Potomac River, a major waterway." The American Legion Bridge drainage segment will not meet water quality management requirements but is intended to be addressed with a waiver of the water quality management requirements.

00158647

No specific efforts are mentioned to mitigate such risks. Efforts and specific techniques to keep these toxins from polluting these sensitive water resources ("Rock Run Culvert, also called Plummers Channel, and the Potomac River), if any, need to be disclosed so they can be commented on by the public. Passing references to mitigation doesn't fulfill the purpose of NEPA for these kinds of impacts and for stormwater management as well. Mitigation needs to be specified. Plummers Island is a sensitive receptor, and such pollutants or a hazardous chemical spill could destroy their long-term research plots (refer to Plummers Island discussion in 4(f) section of these comments).

Unmentioned in the SDEIS are risks to human health from flash flooding associated with these massive land transformations. Air quality and the association of polluted air with worse COVID-19 health outcomes are also not mentioned. The risks to construction workers and adjacent populations of crystalline respirable silica construction dust are not mentioned. Federal laws have been enacted, implemented, and enforced in relation to this toxic dust; it can no longer be omitted from consideration in discussion of health impacts and safety measures.[137]

Consider these three comments made by Marylanders during the DEIS public hearings.[138] The points they make remain fully relevant and are unaddressed in the SDEIS. The first speaker is a fourteen-year-old Montgomery County Public School student. The second is an experienced public health professional. The third is the mayor of what would be the Project's most impacted jurisdiction.

> **MCPS student:** "I oppose expanding Highway I-270. I was a student at Julius West Middle School last year and from researching over 700 studies done by the Health Effects Institute, they learned that if you live 300 to 500 meters away from a highway, you are at a higher risk of getting asthma as a child, and if you have asthma, it may increase asthma attacks. Also, it causes impaired lung function, premature death, and deaths from cardiovascular diseases. Julius West Field is only 35 meters away from I-270. Before Corona, the students were required to run the track lap before PE. The school building is only 253 meters away from the highway. It is already too close. I believe that we should do air quality tests that are done outside, not just inside. Currently, they only do indoor air quality tests. Despite the lack of testing, they're telling us it is safe [inaudible] to increased cars on the highway. This can only make air quality worse. This is a problem, especially since they are planning on expanding it and turning it into a for profit highway that benefits an Australian corporation at the expense of American children and American families that live right next to the highway. Don't ruin the lives of children for the sake of profit."

> **Ron Bialek:** "I am a public health professional more than 35 years of experience, including 10 years on the faculty of Johns Hopkins School of Public Health and 25

---

[137] Anh-Tai Vuong, *OSHA Silica Regulations One Year In: The Latest Developments and How Businesses Can Remain Compliant*, Occupational Health & Safety (Feb. 1, 2020), https://ohsonline.com/Articles/2020/02/01/OSHA-Silica-Regulations-One-Year-In-The-Latest-Developments-and-How-Businesses-Can-Remain-Compliant.aspx.

[138] MDOT SHA & FHWA November 1, 2021 Virtual Public Hearing Materials, https://oplanesmd.com/your-participation/past-public-outreach/.

00158648

years as CEO of the Public Health Foundation. Well, we've helped more than 500 organizations around the country in their efforts to achieve healthier communities.

I support the no build option. Moving forward with any of the alternatives retained and evaluated in this EIS will impact my health, my family's health and the health of individuals and communities in and around the study area and areas not studied, such as roads to and from the Beltway and 270. By law and reinforced by the CDC, an EIS must consider human health. Simply stating in the EIS, quote, human health has been considered end quote, with no backup facts, no data, data sources being provided does not meet the legal requirements for considering human health. The study must be redone using facts and data, respected valid and reliable data sources and modeling of impacts of human health.

I know what it means to consider human health in a study and how agencies can skirt the issue when they don't want damaging information exposed. The study is either negligent in not adequately considering human health or a decision was made to hide the facts.

One of the most grievous examples of how human health was not adequately considered is found in Chapter 4 in Appendix 8, both addressing environmental justice and the impact on minority communities. The study notes that there are 199 block groups within the Environmental Justice Analysis area and 107 have minority populations equal to or greater than 50 percent. Unfortunately, the health impacts of minority communities have been excluded from the document. Chapter 4 in Appendix E states that excess emissions may be reduced. Even in the unlikely event this is true, those emissions will be closer where people live and play with many fewer trees to filter the pollutants. And what about emissions increases on the roads to and from the Beltway to 270? In Chapter 4 dash 61 the following statement is made: Information is currently incomplete or unavailable to credibly predict the study's specific health impacts. This is an inaccurate statement. Valid and reliable data exist and science exists to model and predict the health impacts. Unfortunately, none of these are addressed in the study.

And looking at the study team of over 70 individuals, I was unable to find a single individual with an MPH or degree in epidemiology with the expertise to analyze the data and human health impacts. The absence of facts, data, and data sources about the impacts on human health and no evidence sound public health science has been used in developing the DEIS is unacceptable, and it's an embarrassment to the state and to the citizens. In the event that any of the build alternatives continue to be considered, this DEIS must be redone. That is a legal requirement. Thank you."

**Rockville Mayor Bridget Donnell Newton**: On behalf of the Council and our community [70,000 individuals] – I appreciate the commitment of Director Choplin in her letter of July 15, 2020 that "no homes, businesses, or community facilities will need to be relocated within Rockville." Additionally she writes: "Furthermore, the MDOT SHA is committed to avoiding and minimizing any property needed and

00158649

impacts to environmental features such as greenspace and mitigating for noise where possible."

With all due respect – what exactly does this mean? What does "where possible" mean when you are talking about someone's home? Play space for children and enjoyment of a conversation in your own back yard? A track and field space for students at Julius West Middle School? A peaceful night's sleep for residents of The Rockville Nursing Home?

What does "mitigating for noise where possible mean" when residents of Rockville's West End neighborhood have been striving for over 20 years to get a sound wall built after the widening of 1-270 25 years ago made being outside untenable?

. . . I am here to tell you again – as the 9th most livable city in America – the City of Rockville is equally committed to protecting and supporting our residents, our environment and our quality of life. Let's ensure that MDOT/SHA leads the way on the values that all Marylanders hold dear. Make the fiscally, environmentally and socially responsible decision. The No Build Alternative is the only truthful and defensible alternative in compliance with the National Environmental Policy Act.[139]

## I.    The Toll Rate Setting is Unfair

### 1.    The Estimated Toll Costs Were Not Disclosed in the SDEIS

The SDEIS does not include a presentation or discussion of any specific toll rates or toll numbers. The toll rates represent an impact in terms of the preferred alternative's viability, purpose and need, and environmental justice impacts and should have been presented with more than just a process explanation.

The dynamic tolling structure contemplated by this Project is not easily understood without explanation and illustration and specific examples and numbers. It took 87 pages just to explain it to even those whose profession relates to road tolling.[140] The numbers of people responding to toll rate range setting was a fraction of the number responding to the DEIS and SDEIS. The NEPA documents are where most people look to for Project information and the toll information should have been in the NEPA document. Between the first and second toll rate range setting, only one

---

[139] Full remarks here: https://dontwiden270.org/s/495-I-270-Testimony-09102020.docx.

[140] Bruce DePuyt, What Will it Cost to Use New I-495/I-270 Toll Lanes? That Depends, *Maryland Matters* (May 21, 2021),       https://www.marylandmatters.org/2021/05/21/what-will-it-cost-to-use-new-i-495-i-270-toll-lanes-that-depends/ ("Maryland residents will have nearly two months — until mid-August — to offer their thoughts on a set of proposed tolls for the 'managed lanes' that the Hogan administration wants to build along portions of the Capital Beltway and Interstate 270. It may take the public that long to decipher the Maryland Transportation Authority's 87-page 'dynamic-pricing' scheme. . . . Board member W. Lee Gaines Jr. suggested the public will grasp the system 'maybe       eventually.'").       The       87-page       document       can       be       viewed       here: https://mdta.maryland.gov/sites/default/files/Files/2021_0514%20Board%20Book_final.pdf. It was made available online at the MDTA website for the toll rate range setting, https://mdta.maryland.gov/ALB270TollSetting.

00158650

change was made (a 3-cent reduction in the minimum toll). The toll rates are a huge element of the preferred alternative and of high concern to Maryland residents. The toll rate details could and should have been disclosed in the SDEIS.

### 2. The Toll Rate Pricing Scheme Is Highly Inequitable with High Tolls, High Social Costs, and Public Interest Concerns

The proposed tolls for the preferred alternative are excessively high, with high social costs, and will serve to deepen inequities in Maryland while failing to serve the public interest.[141]

High Tolls: Amid all the permutations in the proposed dynamic toll pricing for 63 different scenarios, there are some things that particularly stand out. In 2026, when the toll lanes would open, the maximum toll for a passenger car to drive from the George Washington Parkway to the I-270/I-370 interchange would be $50 in 2021 dollars. During evening rush hour 4–7 p.m. the tolls for that trip will match or exceed the soft cap nine (9) weekdays out of ten (10) (see image below at right). The maximum toll rate for a big rig trucker with no transponder or other payment plan is $42.33 per mile, or $296 for a 7-mile trip. Those toll rates—from passenger car to big rig—will be far too high for average drivers on a daily basis. They are exclusive, inequitable, and discriminatory. It bears mentioning that even these exceedingly high toll rates and escalations now under discussion will not satisfy Transurban, which is seeking even higher rates.[142]



Table IV-5: Estimated Frequency Soft Rate Cap is Exceeded and Prevented from Increasing (I

---

[141] Maryland Sierra Club Toll Rate Setting Testimony, (July 12, 2021), https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-TollRateSettingTestimony-2021July12_0.pdf.

[142] A November 18, 2020 letter from Transurban-led Accelerate Maryland Partners to MDTA's Deb Sharpless requests various revenue-increasing alterations to the numbers and escalations for the toll lanes, https://mdta.maryland.gov/sites/default/files/Files/ALB270/201118_Letter_AMP_to_MDTA_Toll_Rates_ADA.pdf.

00158651

High Social Costs: The Hogan Administration and MDOT claim this private toll lanes plan comes at virtually no cost to taxpayers. That is not true.[143] The people who will pay the tolls are mostly Maryland taxpayers. Further, building P3 toll lanes will have significant costs that will have to borne by the state and impacted jurisdictions (*see* Section X.D). Maryland taxpayers and likely ratepayers will also be forced to absorb the cost of billions in utility relocations.[144]

The costs of the highway expansion will also be paid by individuals, school children, and communities harmed by significantly increased greenhouse gas and other health-damaging air pollution, significantly increased stormwater runoff, and the loss of property value, historic places, wildlife habitat, parkland, and tree canopy.

To see the many additional costs the preferred alternative will have for generations, view Maryland Sierra Club's June 29, 2021, testimony.[145] It explains the strong argument that a FEIS is necessary to know the impacts and costs of the preferred alternative and must be completed before making toll rate or other commitments, including signing a contract with a developer.[146]

The private toll operators have no incentive to reduce congestion on the free lanes since congestion on the GP lanes will further drive traffic to the toll lanes. But since the toll lanes are unaffordable to the majority of travelers, they will experience congestion the same or worse than before, particularly since an existing lane on I-270 will become a toll lane, squeezing more drivers onto fewer general-purpose lanes.

This toll lane proposal and the high tolls will further deepen the regional east-west racial and economic divide and societal inequities.[147] This plan turns public land over to private investors for the benefit of the affluent. Those who can afford to take the HOT or Express lanes will experience a faster, safer commute while everyone else experiences high congestion. The SDEIS

---

[143] Jeremy Mohler, *Opinion: The True Cost of Maryland's Toll-Road Plan*, Washington Post (Nov. 12, 2021), https://www.washingtonpost.com/opinions/2021/11/12/true-cost-marylands-toll-road-plan/; Josh Tulkin and Klaus Philipsen, *Maryland Needs More Info on Toll Lane Contract; Vote Must be Delayed*, Baltimore Sun (Aug. 9, 2021), https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0810-hogan-toll-lanes-20210809-qtety5ezcncdrkt4ewaqpuaz4q-story.html.

[144] Bruce DePuyt, *Labyrinth of Pipelines and Cables Could Face Major Disruption by Highway Plan -- And Who Would Foot the Bill?*, Maryland Matters (Oct. 28, 2020), https://www.marylandmatters.org/2020/10/28/labyrinth-of-pipelines-and-cables-could-face-major-disruption-by-highway-plan-and-who-would-foot-the-bill/.

[145] Maryland Sierra Club Testimony on Phase 1 P3 Agreement, (June 29, 2021) https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/Testimony-495-270ReliefPlan-P3Agreement-2021June29.pdf.

[146] *See also* Josh Tulkin and Klaus Philipsen, *Maryland Needs More Info on Toll Lane Contract; Vote Must be Delayed*, Baltimore Sun (Aug. 9, 2021), https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0810-hogan-toll-lanes-20210809-qtety5ezcncdrkt4ewaqpuaz4q-story.html.

[147] *See* Stewart Schwartz, Hogan's Transportation Priorities Reflect His Bias, Baltimore Sun (July 9, 2021), https://www.baltimoresun.com/opinion/readers-respond/bs-ed-rr-hogan-beltway-widening-letter-20210709-qiwy5hycanagfangmiha5q42du-story.html.

00158652

concedes at that "the travel speed and trip reliability benefits offered by the tolled lanes could be a less feasible choice for EJ populations due to cost burden." SDEIS at 4-102.

The tolls will not be accessible to working class families. Articles and statements from neighboring Virginia show this. A November 15, 2021 article in *Virginia Business* reports that Virginia and the private sector partner (which includes Macquarie, the other private partner with Transurban on the Maryland toll lane proposal) have partnered to expand a toll relief program.[148] Virginia Governor Northam states: "This will make it significantly more affordable for working people to use the tunnels in Hampton Roads."[149] The private sector partner says: "This is our commitment to easing the financial burden that we know our tolls have on income-restrained residents."[150] The 2022 toll relief program is open to Portsmouth and Norfolk residents who earn less than $30,000 a year. Regarding trying to expand relief to even more people going forward, Northam said, "This is a start. We know that we have more work to do."[151]

In effect, the State of Virginia is subsidizing a multinational corporation with Virginia taxpayer dollars so Virginia commuters can afford a toll facility that is built on a public asset that Virginia turned over to the multinational until 2070. This subsidy is needed so that the everyday person can afford to get to work. These toll lane deals seldom stop at the initial agreement, they require deal upon deal upon deal to make the toll lanes work or keep working. MDOT is not at present contemplating a similar subsidy to remedy this injustice.

The Maryland toll lanes, due to the spacing between the access points, are designed to serve longer distance and pass-through traffic rather than locals. Thus, Maryland residents are not necessarily the beneficiaries these lanes. An additional matter is what the tolls would cost to cross the American Legion Bridge generally and during peak congestion. According to the Regulation of Tolling provision of the Surface Transportation and Uniform Relocation Assistance Act of 1987 (P.L. 100-17), bridge tolls "shall be just and reasonable."[152]

The plans for the toll lanes evidence a heavy anti-transit bias and it remains a problem that the Project would primarily benefit the affluent at the expense of the broader public and not be affordable for economically disadvantaged environmental justice populations. These issues and many more were raised by community members and elected officials during public testimony on the toll rate range setting.[153] These issues were not addressed in the DEIS or SDEIS with any

---

[148] Katherine Schulte, Va. expands Elizabeth River Tunnels toll relief program, *Virginia Business* (Nov. 15, 2021), https://www.virginiabusiness.com/article/va-expands-elizabeth-river-tunnels-toll-relief-program/.

[149] *Id.*

[150] *Id.*

[151] Nathan Crawford et al., Eligible Drivers to Save up to $650 a Year at Downtown, Midtown Tunnels as Toll Relief Program Expands, *WAVY* (Nov. 15, 2021), https://www.wavy.com/news/local-news/portsmouth/northam-announces-toll-reductions-in-portsmouth/.

[152] *See* Tolling U.S. Highways and Bridges, *EveryCRSReport* (Aug. 4, 2017), https://www.everycrsreport.com/reports/R44910.html.

[153] *Locals at Beltway/I-270 Toll Rate Hearings Target High Tolls, Inequity, and Climate*, Maryland Sierra Club (July 20, 2021), https://www.sierraclub.org/maryland/blog/2021/07/locals-beltway-i-270-toll-rate-hearings-target-high-tolls-inequity-and-climate.

00158653

mitigation measures or programs specifically designed to make the toll lanes affordable for low income and environmental justice populations. The lanes are knowingly designed for the affluent. MDOT SHA and MDTA did not make any apparent attempt to negotiate or lower the soft rate cap or toll maximums; they accepted what the developer (who demanded a higher rate of return than other bidders) wanted.

Public Interest Concerns: We must also reiterate our concern that this deal is not in the public interest.[154] Privatizing roadways can lead to significant control of regional transportation by private companies accountable to their shareholders rather than the public. The monopoly power Transurban would have in our region would also allow toll markups[155] exploiting their monopoly power as well as give Transurban inordinate influence on our politics and planning.[156] There is simply a misalignment between the goals of good government and the goals of P3 toll lane companies such as Transurban. Transurban is on record saying its goal in our region is to "maximize the tolls" and admitted that: "An increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, . . . and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll roads and therefore reduce our earnings."[157] Thus, improvements that would be good for and desired by Marylanders and sensible in the midst of a climate crisis are undesirable for Transurban and shareholders.

This toll lane proposal sets up a perverse incentive for a private company and Maryland's own government to lock in car-dependency and act against the public interest for generations. The contract is also set up so that Maryland pays the Transurban-led developer in Maryland if there is a breach by the Transurban-led developer in Virginia or VDOT of "certain defined interface obligations set forth in the Section P3 Agreement."[158]

---

[154] Many other researchers and national entities have found these kinds of deals not to be in the public interest. Examples of such findings include: https://jubileedebt.org.uk/wp-content/uploads/2017/02/The-UKs-PPPs-disaster_Final-version_02.17.pdf; https://www.pwc.com.au/legal/assets/reimagining-ppps-oct17.pdf; https://www.cbo.gov/system/files/2020-01/56003-CBO-PPP.pdf; http://www.ncsl.org/Portals/1/Documents/transportation/P3_State_Statutes.pdf; https://canada.constructconnect.com/dcn/news/government/2019/11/study-finds-p3s-to-be-more-expensive-in-the-long-term; https://www.smh.com.au/national/nsw/westconnex-the-toll-road-that-ate-sydney-20210323-p57d9y.html; http://www.thenewspaper.com/news/24/2458.asp.

[155] Ian Parry, *Green Tax Design in the Real (Second-Best) World*, 3 Encyclopedia of Energy, Natural Resource, and Environmental Economics, at 161-168, (2013), https://www.sciencedirect.com/science/article/pii/B9780123750679000310.

[156] There are already concerning indications of this in the toll lanes solicitation process. Benjamin Ross, Testimony on Toll Lane P3 Contract (June 29, 2021), https://f0d3dd92-98e8-4a26-bc62-0ccf9ff9f227.filesusr.com/ugd/9cb12f_498e67c0295a4f218ea005ae8a9e2e78.pdf.

[157] Transurban Prospectus at 13 (Sept. 16, 2020), https://links.sgx.com/FileOpen/Transurban%20Finance%20Company%20Pty%20Ltd_Secured%20Euro%20MTN%20Programme%20OC.ashx?App=Prospectus&FileID=46449.

[158] *See* Maryland Sierra Club Testimony on Phase 1 P3 Agreement, (June 29, 2021) https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/Testimony-495-270ReliefPlan-P3Agreement-2021June29.pdf.

89

00158654

3.       **Key Details of Toll Pricing Scheme Were Hidden from Public by Being Contained in Agreements Not Listed Among the Review Materials[159]**

The proposed and now approved[160] toll scheme is even more inequitable and costly for would be toll lane users than what was proposed during the first toll rate range setting.

The August 26, 2021 "First Amended and Restated I-495 & I-270 Public-Private Partnership Program (P3) Interagency Agreement (IAA) between Maryland Department of Transportation (MDOT) State Highway Administration (SHA), MDOT and MDTA" reads:

> If there is projected to be a Rate Covenant Shortfall (meaning the P3 Program revenues (including video surcharges, late payment fees, etc.) expected to be collected will be insufficient to cover the payments due to all Section Developers from the Operating Reserve Account and all principal and interest due on all MDTA Notes) in six or more consecutive months during the next 24 months, MDTA shall either
>
> (i)   make administrative or operational changes that will eliminate the Rate Covenant Shortfall or
> (ii)  if there are not administrative or operational changes that will eliminate the Rate Covenant Shortfall, then MDTA shall notify MDOT. Following such notification MDOT shall either
> (a)   instruct MDTA to take no further action on the basis that MDOT elects to make supplemental payments at the time of the projected shortfall so that, if such supplemental payments were included as additional P3 Program Revenues in the calculation of the Rate Covenant calculation then no shortfall would exist or
> (b)   instruct MDTA staff to present to the MDTA Board a toll proposal to commence the toll rate setting process intended to fix, revise, charge, and collect the tolls, fees or other charges in the P3 Program so that the Rate Covenant Shortfall is eliminated. Upon the conclusion of the toll setting process the MDTA Board may approve, adjust or reject the toll proposal.[161]

This appears to mean that Maryland taxpayers and especially toll road users or would-be users will be penalized in the event MDOT's traffic projections are incorrect and for other agency errors. It appears to mean quality of service (in the form of "administrative or operational changes") provided by MDTA, a state agency, can be decreased in the interest of paying the developer (Australian toll lane giant Transurban) its promised profit, which it is owed even if the

---

[159] Also available at Maryland Sierra Club Testimony on Toll Rate Range Setting Process #2, Phase 1 South: American Legion Bridge I-270 to I-370 (Oct. 28, 2021), https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/MDSierraClub-TollRateSettingTestimony-2021Oct28.pdf.

[160] Katherine Shaver, *Maryland Board Approves Final Rates for Toll Lanes Planned on Part of Beltway*, Washington Post (Nov 18, 2021), https://www.washingtonpost.com/transportation/2021/11/18/maryland-beltway-270-toll-rates/.

[161] MDTA Board Meeting (Aug. 26, 2021), https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

00158655

toll lanes are not well utilized. This scheme and contract appear strongly biased in favor of the private sector at the expense of Maryland residents.

In addition to the shortfall payments being a potential trigger for a new toll rate range setting process, the interagency agreement explicitly requires that MDTA not make any changes that could reduce P3 program revenues, saying: "MDTA agrees that it shall not (unless compelled to by law), reduce the civil penalty for late payment of tolls, citation fees, or enforcement fees applicable to the P3 Program, or take other rate setting action that causes P3 Program revenues to decrease."

It is imperative that the public be told that this is just the first of the potential P3 toll rate range settings and that the only direction these tolls, fees, and escalations can go is up.

The information in the Interagency Agreement pertaining to the I-495 & I-270 toll lane contract is in direct contradiction to what is being presented publicly. As of November 21, 2021, MDTA reported on its webpage that "The approved toll rate ranges are intended for the duration of the Phase 1 South agreement."[162] One would reasonably think these are the toll rates and escalations for the duration of the concession. But instead of saying "will apply," the misleading wording is "are intended for." So, the public is being told that these toll rate ranges with escalations are intended for the term of the concession. But in reality, the Interagency Agreement says the toll rate ranges and escalations can be changed as needed going forward to keep the Project sufficiently profitable for the developer. Full public disclosure of this hidden escalation clause as part of the SDEIS is imperative, particularly since the public will be paying for the tolls and for hidden taxpayer costs of the toll lanes

These strings-attached agreements, which are not subject to public comment, some of which were or will be executed after the reviews required by the P3 law and after the BPW vote, undermine public trust in agency processes, agency authority, and transparency. Some of these arrangements will be made without any further opportunity for the public to comment or even be aware of future changes regarding the tolls.

The Governor and MDOT have made repeated representations that the Project risk would be transferred to the private sector. That it would cost taxpayers nothing or virtually nothing.[163]

---

[162] Toll Rate Range Public Comment Period Opens for Phase 1 South American Legion Bridge I-270 to I-370, MDTA (May 20, 2021), https://mdta.maryland.gov/blog-category/mdta-news-releases/toll-rate-range-public-comment-period-opens-phase-1-south-american. The full statement is: "*Escalation Factors:* The approved toll rate ranges are intended for the duration of the Phase 1 South agreement (anticipated to be 50 years). For the toll rates to effectively manage demand and ensure reliability for users of the HOT lanes into the future, the maximum toll rate range, soft rate cap and unregistered video surcharge will escalate over time to account for inflation, population employment, and income growth."

[163] Robert McCartney, Luz Lazo, and Katherine Shaver, *Maryland and Virginia to Rebuild and Widen the American Legion Bridge, Governors Say*, Washington Post (Nov. 12, 2019), https://www.washingtonpost.com/local/trafficandcommuting/maryland-and-virginia-to-rebuild-and-widen-the-american-legion-bridge-governors-say/2019/11/12/6531d8fe-04c9-11ea-ac12-3325d49eacaa_story.html ("'In any case, toll payers and not taxpayers will pick up the entire tab, officials said. 'As a taxpayer, there will be no cost,' Rahn said. 'It will be a cost to someone as a driver if they choose to use the express toll lanes.'"); Jordan Pascale, *Regional Transportation Board Vote May Quash Hopes For Maryland Toll Lane Project On I-495/I-270*, DCist (June16, 2021), https://dcist.com/story/21/06/16/regional-board-vote-may-quash-hopes-for-maryland-toll-lane-

00158656

Yet, at each step, it is clear that the state is taking on more risk, including by changes made *after* the August 11, 2021, BPW vote. (*E.g.*, "In connection with financial close of each Section, MDTA will issue bonds or notes to fund certain costs in which the State is best equipped to manage and reduce the overall risk," August 26, 2021, Interagency Agreement.)

The August 2021 P3 contract[164] and August 26, 2021, interagency agreement[165] have many examples of the state assumption of this financial risk. Still more than the state itself, it appears that the taxpaying public will be on the hook for dozens of compensation and relief events, toll road subsidies, monopoly markups, billions in utility relocations, and then even shortfall payments for mistakes made by MDOT, MDOT SHA, MDTA, and Transurban. The toll payers themselves will surely pay for those mistakes.

Every day there are articles about the high tolls and woes Transurban is causing in Australia. Look at these articles as a cautionary tale that should send a strong warning sign that the same will occur here, to the extreme detriment of Maryland and the transportation system serving our nation's capital.

1. NRMA Calls for Toll Price Transparency (riverineherald.com.au),[166]

2. 'Cost Outweighs Benefit': Trucking Giant's Toll Message to Drivers (theage.com.au),[167]

3. WestConnex: The Toll Road That Ate Sydney (smh.com.au).[168]

Under the interagency agreement, it seems that MDTA designates MDOT SHA as its agent. Then the contract stipulates: "No Party shall interfere with or impede any other Party's performance of its obligations under this Agreement or any P3 Agreement." In other words, following execution of the tolling agreement, MDTA will have no real say in future rate increases and escalations, with its role confined to rubberstamping MDOT SHA requests. And all individuals in the parties are indemnified, so no individual who participated in this agreement can be held

---

project/ ("The project is using a public-private partnership, though, which Hogan says will not cost taxpayers and won't need federal funding."); *see also* Jeremy Mohler, *Opinion: The True Cost of Maryland's Toll-Road Plan*, Washington Post (Nov. 12, 2021), https://www.washingtonpost.com/opinions/2021/11/12/true-cost-marylands-toll-road-plan/.

[164] Phase Public-Private Partnership Agreement for the I-495 and I-270 P3 Program, (June 2021), https://www.oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement.pdf.

[165]    MDTA    Board    Meeting    (Aug.    26,    2021), https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

[166] AAP Newswire, NRMA calls for toll price transparency, Riverine Herald (Oct. 25, 2021), https://www.riverineherald.com.au/national/2021/10/25/5511055/nrma-calls-for-toll-price-transparency.

[167] Tom Rabe, *'Cost Outweighs Benefit': Trucking Giant's Toll Message to Drivers*, The Age (Sept. 28, 2021), https://www.theage.com.au/national/nsw/cost-outweighs-benefit-trucking-giant-s-toll-message-to-drivers-20210928-p58vi1.html.

[168] Deborah Snow & Matt O'Sullivan, *WestConnex: The Toll Road That Ate Sydney*, Sydney Morning Herald (March 26, 2021), https://www.smh.com.au/national/nsw/westconnex-the-toll-road-that-ate-sydney-20210323-p57d9y.html.

00158657

accountable. Again, it is toll road users and Maryland residents who will pay the price for the errors that are virtually certain to occur.

In a November 18, 2020 letter, the developer told MDTA that even the exorbitant tolls being put forth during the rate settings are not high enough.[169] That developer letter casts doubt on the currently-identified toll rate ranges, and the information about the interagency agreement further raises questions about just how fast the tolls might rise and when and how the conditions for exceeding the toll soft cap may change.

On October 13, 2021, the Metropolitan Washington Council of Governments approved two resolutions that would "prioritize equity in transportation, housing and funding."[170] Equity is a regional value, and it is violated by $50 toll lanes benefitting only the most affluent residents of the most affluent part of the region. MDOT has said that those driving on the toll lanes will have increased trip reliability and increased safety.[171] That sets up a two-class system that people in Maryland don't want and don't buy into. On lanes right next to each other, only those who can afford the private lanes get a safer commute, with the general-purpose lanes available to those who can't afford the toll lanes made less safe and even more congested than before.

### 4.     Local Concerns Were Dismissed in the MDTA Toll Rate Range Setting but Remain Valid

Although 67% of commenters were opposed to the toll rates in the first toll setting comment period during the summer[172] and 75% opposed the toll rates and escalations during the second toll setting[173] (which had no in person public hearing), local voices[174] giving testimony have not had much attention in this ongoing controversy over Governor Hogan's proposed toll lane expansion.[175] Neither has State Treasurer Nancy Kopp, who most recently voiced concerns[176] about the toll rates in her comments on the predevelopment contract. The issues raised in the

---

[169]     Letter     from     Aaron     Singer     to     Deborah     Sharpless     (Nov.     18,     2020), https://mdta.maryland.gov/sites/default/files/Files/ALB270/201118_Letter_AMP_to_MDTA_Toll_Rates_ADA.pdf.

[170] Katherine Shaver, *D.C.-Area Leaders Prioritize Equity in Transportation, Housing and Funding Decisions*, Washington Post (Oct. 13, 2021), https://www.washingtonpost.com/transportation/2021/10/13/racial-equity-planning-dc-region/.

[171] Public Information Meeting (Sept. 29, 2021), http://495northernextension.org/documents/pim092021/2021-09-29_495_next_pim_presentation_final.pdf.

[172] Katherine Shaver. *Maryland Toll Lanes: Authority Recommends Lowering Minimum Rates for Beltway, I-270*, Washington Post (Sept. 30, 2021), https://www.washingtonpost.com/transportation/2021/09/30/maryland-beltway-270-toll-rates/.

[173] Tyson Fisher, *I-270/I-495 Toll Rates in Maryland Will be Slightly Cheaper*, Land Line (Nov. 23, 2021), https://landline.media/i-270-i-495-toll-rates-in-maryland-will-be-slightly-cheaper/.

[174] Locals at Beltway/I-270 Toll Rate Hearings Target High Tolls, Inequity, and Climate, Sierra Club Maryland Chapter (July 20, 2021), https://www.sierraclub.org/maryland/blog/2021/07/locals-beltway-i-270-toll-rate-hearings-target-high-tolls-inequity-and-climate.

[175]     Public     comments     on     the     toll     rate     range     setting     can     be     found     at https://mdta.maryland.gov/ALB270TollSetting/PublicParticipation.

[176] Office of the State Treasurer: Review of Proposed Public-Private Partnership, July 9, 2021, http://www.treasurer.state.md.us/media/151465/20210709_sto_p3_agreement_report_final.pdf.

00158658

testimony are serious and merit consideration so excerpts from the first toll rate range setting in-person hearing are reprinted below:

> Thank you for the opportunity to once again – share the unanimous agreement of the Rockville City Council and our Staff that this hearing is an example of a government burying its head in the sand – refusing to turn away from 20 year old ideas - and a complete denial of climate change and social justice. ... I've long believed that government is there to provide that which an individual alone cannot do. Well – members of MDTA – why are you all not providing safe and equitable transportation services for the public in Montgomery County? Why should we be forced to accept a toll road when the governor stated that tolls in other parts of Maryland were regressive? - Rockville Mayor Bridget Newton

> These tolls are just plain too high. The maximum toll from the G W Parkway to Shady Grove starts at $50 when the highway opens, and it keeps going up. It hits $141 – that's right, $141 – by the time Transurban's contract runs out. And these numbers go up even higher with inflation. But these sky-high tolls aren't enough for Transurban. Its demands are revealed in a November letter that MDTA waited months to release and then buried in fine print on its website. In that letter, the profit-hungry company told the state what it really wants. The tolls need to go up even faster than the Hogan administration proposes. ... This is what you get when you turn our highways over to a company that, in its own country, gets called "an untouchable, blood-sucking monopoly." That's from Joe Aston in the Australian Financial Review – hardly a left-wing paper. This proposal is a betrayal of the public interest. These tolls and the contract behind it must be rejected. - Ben Ross, Maryland Transit Opportunities Coalition

> Transurban, the Australian company MDOT selected for this project, needs congestion to make money. For about ten years they prevented the Virginia Department of Transportation from building an additional southbound lane on I-95 at the Occoquan River crossing because it would relieve congestion. Yes, that is right. They blocked it because it would relieve congestion. Embedded in the fine print of their contracts are "non-compete clauses" that block efforts to relieve congestion. Anything the local government wants to do to relieve congestion either incurs a huge payment to Transurban or is completely blocked. ... This P3 is a soul-crushing plan. It is soul-crushing to think anyone would want to unleash it on us. It is NOT "traffic relief" and NOT FREE! It's an unconscionable regressive tax. A wolf in sheep's clothing. We absolutely must not let Marylanders fall victim to it. - Sally Stolz

> Privatizing roadways can lead to significant control of regional transportation by private companies accountable to their shareholders rather than the public. Transurban is on record saying its goal in our region is to 'maximize the tolls'. Road and mass transit improvements that would be good for our climate and desired by Marylanders are considered undesirable by Transurban and its shareholders. This toll lane proposal sets up a perverse incentive for a private company and our own government to lock in car-dependency and act against the public interest for

00158659

generations. . . . We strongly disagree with the high tolls that are proposed that surely will substantially increase over time, with the high cost the project will have on our health, environment and pocketbooks, and the way this toll lane proposal will deepen inequities in Maryland and fail to serve the public interest. - Brian Ditzler, Sierra Club Maryland Chapter

This is a public private partnership. A corporation's mission is to bring in more MONEY. Their goal is NOT bring us less congestion, NOT to worry about what working families can afford, and NOT to worry about the environment. These FOR-PROFIT HOT lanes have a REVERSE incentive. If there is MORE traffic on the rest of the highway, they can CHARGE MORE for their toll lanes. And don't forget, LESS TRAFFIC IS what we were trying to achieve. The tolls revenue will go to a private company and not to the government or to fund other transportation options. I do not support any plan that allows wealthier people to bypass traffic, while low wealth people are subjected to more traffic. This is a short sighted plan and a tax on the poor and middle class, for not being able to afford to live close to their jobs or public transit. - Patrice Davis

Here's an example of how the needs of middle- and lower-income people were discounted in the toll-setting process from the beginning. Among the documents released by MDTA is the study used to determine how much people are willing to pay to take the toll lanes. Problem is, only certain sorts of people were invited to take part in the study. Of the 2,383 participants, 54% were male, the median age was 55-64, and 43% lived in 2-person households. Fewer than 12% had a household income under $75,000. The median income was between $125,000 and $150,000. A whopping 23% earned $200,000 or more. Where are the majority of working families in this study? They aren't there because MDOT and MDTA never intended the toll lanes for them. But that doesn't mean lower-income and middle-income people don't have a designated role in this toll-lane scheme. They – we – are the congestion fodder. We are the people who fill up the reduced number of free lanes until congestion is so intolerable that the few who can afford it pay the sky-high tolls to escape. It's been baked in from the beginning. - Janet Gallant, DontWiden270.org

There's been inadequate conversations about mass transit and the opportunities that those options offer. We have got to be careful as we do this, because I can tell you there are constituents of mine who might happily pay $67 to ride in a fancy toll lane; I assure you that as you go further north into Gaithersburg, into Germantown, those folks for the most part are not going to be able to afford the tolls. Yet they are the ones who'll be driving more miles and paying higher tolls. - Senator Cheryl Kagan

Although public payments are made through the MDTA which is a subsidiary of MDOT, the pre-agreement contract guarantees a profit margin for the private partner. This has the effect of the State of Maryland enforcing a conditional burden on Maryland residents to the benefit of a non-elected partner of the governing body. There may be little legal redress that can be sought by the citizens of Maryland once

00158660

the contract is put into effect. Lower and middle class citizens may find better opportunity out of the State, particularly if saddled with deprivation during economic downturns in the future. If this condition is realized, it could have obvious consequences on Maryland's tax base. - Ollie Ellison

Under MDOT's design, if you are on a toll lane when you cross the American Legion Bridge and plan to drive all the way up to I-370, you can transition directly to the general lanes only at the Clara Barton Parkway. For the rest of the trip up to I-370, the only way to exit the toll lanes is to exit the highway altogether and drive on local roads until you get to the next entrance ramp for the general lanes. This kooky design not only creates havoc on local roads, it will lock some people into the toll lanes and force them to give more of their hard-earned dollars to Transurban. - Barbara Coufal, Citizens Against Beltway Expansion

The most important thing I can tell you is that no one will drive in these toll lanes unless the public lanes are crowded. And the higher the tolls go, the more crowded those public lanes will be. So the toll lanes will fail, because the only way they will raise substantial amounts of money is if the public lanes are so congested that people feel forced to pay through the nose to get out of them. - Ellen Ryan

My fear is that under the P3 model, the private concessionaire will have every incentive to push Maryland and MDTA to perpetuate or expand harmful and predatory tolling policies that hurt consumers but fatten their bottom line. - Delegate Al Carr

This is a very risky project for Maryland taxpayers and setting tolls without a tally of the physical and environmental costs is flawed and shows poor stewardship and lack of restraint. - Elliot Levine

This P3 is not an acceptable deal for Maryland and its taxpayers. Good government demands that full fiscal, environmental, and social impacts of this project be determined before locking into a long-term exclusive contract. No contract should be voted on, much less approved, until the environmental impact statement has been finalized. It is premature to develop toll rate ranges at this time. - Linda Rosendorf, DontWiden270.org

The scheme to widen 270 rather than focus on public transit would escalate the climate crisis. Climate change is causing extreme weather catastrophes throughout the world. Temps in the pacific NW and parts of CA are higher than they have ever been in history. People are dying because of climate change right now. - Becky Batt

Virtual Information Room . . . has small print that says: 'Toll rates are for illustrative purposes only,' and 'Actual toll rates will be set in the future by the Phase 1 South Section Developer.' How does this support an informed decision? The October 20, 2020 Preliminary Due Diligence document states . . . 'the rate can be set to maximize throughput or revenue. In order to achieve the P3 program goals, the rate must be set to maximize revenue . . .' What are the actual P3 program goals,

00158661