and how does maximizing revenue serve the public interest? Last, the March 12, 2021 Preliminary Due Diligence Report . . . mentions the Capital Beltway Accord. But no version of this document has ever been made available to the public. Finally, I want to comment on the behavior of some of the supporters of the P3 Project. It does not help when the Governor accuses those with legitimate issues of being 'far-left, pro-traffic activists.' And it does not help when an MDOT Deputy Secretary threatens jurisdictions with loss of funding if they oppose the P3 project. - Andrew Gallant

Each of you has been handed a dilemma: How can I fulfill my fiduciary responsibility to the people of Maryland, Montgomery and Prince George's counties when I have no final information from the EIS [environmental impact statement] to weight the pros and cons, benefits and costs of this project? - Arthur Katz

### III.    The SDEIS's Water Quality Discussion Violates NEPA

#### A.    The SDEIS Insufficiently Analyzes How Stormwater Runoff Would Affect Surface Water Quality

Like the DEIS, the SDEIS does not sufficiently analyze how stormwater runoff from construction would affect surface water quality and fails to identify stormwater volume and pollutant loads. *See Methow Valley Citizens Council*, 490 U.S at 349 (agencies must "carefully consider[] detailed information concerning significant environmental impacts" and make the public aware of those environmental effects before a proposed action is chosen). It is well-recognized that stormwater can degrade water quality, particularly in urban settings.[177] In fact, Maryland has already faced such degradation,[178] and that degradation will continue with the preferred alternative.

The SDEIS shows that the preferred alternative will further degrade local water quality and make it harder for Montgomery County, Prince George's County, and Fairfax County to meet their requirements under the Chesapeake Bay Total Maximum Daily Loads ("TMDLs"). The SDEIS does not explain how TMDLs will be met. Rather, the SDEIS simply assures the public that stormwater management and TMDL compliance "will be accounted for in the stormwater design and water quality monitoring," SDEIS at 4-71, which have not yet taken place and so are not available for comment. Similarly, the Agencies have not yet determined whether there will be rare, threatened, or endangered ("RTE") species in the areas set aside for compensatory stormwater management, SDEIS App'x C Part 1 at 9, and, if such species exist, how risks to them will be mitigated. The Agencies may need to reopen the consultation process when "new information

---

[177] *See, e.g.*, National Academies of Science, Committee on Reducing Stormwater Discharge Contributions to Water Pollution, Urban Stormwater Management in the United States (2009), https://www.nap.edu/read/12465/chapter/1; *see also* Hallie Miller, *Report Faults Maryland for Failings in Chesapeake Bay Pollution*, Washington Post (Aug. 18, 2020),    https://www.washingtonpost.com/local/report-faults-maryland-for-failings-in-chesapeake-bay-pollution/2020/08/18/8c4421f2-e193-11ea-b69b-64f7b0477ed4_story.html.

[178] Hallie Miller, *Report Faults Maryland for Failings in Chesapeake Bay Pollution*, Washington Post (Aug. 18, 2020), https://www.washingtonpost.com/local/report-faults-maryland-for-failings-in-chesapeake-bay-pollution/2020/08/18/8c4421f2-e193-11ea-b69b-64f7b0477ed4_story.html.

00158662

reveals effects of the action that may affect listed species or critical habitat." 50 C.F.R. § 402.16(a)(2).

The Agencies continue to rely on water trading credits for stormwater management and do not sufficiently analyze how relying on compensatory stormwater management, rather than onsite pollution reduction, will impact local waterways. As we noted in our comments on the DEIS, the Agencies acknowledge that any amount of stormwater that cannot be managed and treated by a stormwater management facility within the limits of disturbance ("LOD") will not be addressed onsite for the American Legion Bridge ("ALB") drainage segment. SDEIS at 2-11. The offsite compensation needs are substantial: the SDEIS estimates that 351 acres of impervious areas offsite will require treatment. SDEIS App'x C Part 1 at 5.

The Agencies are delaying too many elements of stormwater management until after a FEIS is issued. Instead of including any compensatory stormwater design in the NEPA process so that the public has an opportunity to review and comment on it, the Agencies ask the public to wait for final design, noting only that "[d]etailed stormwater management design, to be performed during final design, and/or use of innovative technologies may reduce the compensatory stormwater management requirements." SDEIS at 2-11. The "anticipated" compensatory mitigation measures are "a variety of means including, but not limited to, new SWM [stormwater management] facilities to provide water quality treatment for untreated existing impervious surfaces, stream restoration, outfall stabilization, existing SWM facility retrofits, pavement removal, or generation of water quality credits as provided in applicable sections of the [Sediment and Stormwater Guidelines and Procedures]." *Id*. In our previous comments, we asked why the Agencies were not considering additional methods of onsite storage, including whether underground storage or stormwater swales could be used to manage stormwater, and we continue to ask why those options are not being considered.

The lack of detail on stormwater treatment and impacts is less surprising when one considers that the SDEIS does not even identify with precision the level of construction and reconstruction that would take place. The amount and type of stormwater management required under the Maryland Stormwater Management Act of 2007 is dictated in part by the amount of impervious surface area created and reconstructed by the preferred alternative. Md. Code Ann., Env't §§ 4-201.1, 4-203 (2014). The SDEIS bases its stormwater management requirements on an unsupported assumption that only the road shoulders and one to two of the existing lanes would need to be reconstructed, without having to reconstruct the other existing lanes. The SDEIS, moreover, is even vaguer than the DEIS in this regard. The DEIS, for its part, identified that 25% of the lanes would need to be reconstructed. We critiqued that estimate as unsupported, but the SDEIS is even vaguer because the amount of reconstruction would vary considerably based on whether one or two lanes are reconstructed. [179]

---

[179] There appears to be little basis for arriving at the 25% figure, particularly in light of a statement by former Maryland Secretary of Transportation Pete Rahn that "the Washington Beltway [] can no longer be expanded and it needs to be reconstructed because we have mush underneath it and the system frankly has got to be taken right down to the dirt and brought back up." Sean Slone, *Transportation Policy Academy 2015 – DC – Maryland Secretary of Transportation Pete Rahn*, The Council of State Governments (May 19, 2015), https://web.archive.org/web/20200906121216/https://knowledgecenter.csg.org/kc/content/transportation-policy-academy-2015-%E2%80%93-dc-%E2%80%93-maryland-secretary-transportation-pete-rahn.

00158663

The ambiguous nature of the SDEIS goes beyond just how many lanes will be reconstructed: the Stormwater Appendix indicates that the Agencies intend to construct more than just the preferred alternative. The appendix explains that the first alternative is only the first "phase" of the Beltway Expansion Project:

> The MLS [Managed Lanes Study] Phase 1 South JPA is being submitted for approval first. The Draft EIS covers the entire MLS while the Supplemental DEIS covers Phase 1 South; therefore, this document will cover requirements for the entire MLS, with a breakdown of Phase 1 South requirements versus potential future phases. In this document, MLS Phases will refer to Phase 1 South and potential future phases along I-495 outside Phase 1.

SDEIS App'x C Part 1 at 1. Throughout the SDEIS, the Agencies cite the limited impact of the preferred alternative, *see, e.g.*, SDEIS at 4–57, 4-60, 4-106, but if the Agencies are planning to construct beyond this "phase," they cannot tout the limited impacts of this one phase. If additional construction is selected beyond the preferred alternative, then a new NEPA process must occur to allow the public to participate in the review process. Moreover, the SDEIS must analyze reasonably foreseeable future actions, 40 C.F.R. §§ 1508.7, 1508.25, and if the Agencies are already planning for further construction, they must address the impacts.

### B.    The SDEIS Fails to Analyze Indirect Effects on Surface Water Quality as Well as the Impact of Climate Change

Climate change is not addressed, despite it being well accepted that climate change can increase stormwater and therefore increase impacts on surface water quality. Both the U.S. EPA[180] and the Maryland Department of Environment ("MDE")[181] have concluded that climate change will increase flooding, and MDE further notes that this impact will be exacerbated by "increases in impervious surface attendant with development," as would occur with the preferred alternative. Nor are other potential temperature changes—such as those from tree removal—sufficiently analyzed. SDEIS at 4-69. Once again, the public is asked to take on faith that proper mitigation will be conducted.

Relatedly, indirect impacts are insufficiently analyzed; for example, the SDEIS states only that indirect impacts to wetlands and waterways "could result" and that a "detailed assessment of hydrologic effects will occur once final limits of cut and fill are determined in the final phase of engineering design." SDEIS at 4-57. The Agencies must analyze all environmental impacts, including indirect ones. 40 C.F.R. § 1502.16. Deferring such an important consideration to final design is unacceptable because it prevents public participation on the issue. *See* 40 C.F.R.

---

[180] EPA has said that "climate changes, such as the amount, timing, and intensity of rain events, in combination with land development, can significantly affect the amount of stormwater runoff that needs to be managed." EPA, Stormwater Management In Response To Climate Change Impacts: Lessons From The Chesapeake Bay And Great Lakes Regions (Final Report), EPA/600/R-15/087F (Mar. 2016), at 1, https://cfpub.epa.gov/si/si_public_file_download.cfm?p_download_id=536300&Lab=NCEA.

[181] MDE, University of Maryland, Maryland Department of Natural Resources, Comprehensive Assessment of Climate Change Impacts in Maryland, Chapter Two (July 2018), at 2, https://mde.state.md.us/programs/Air/ClimateChange/Documents/FINAL-Chapt%202%20Impacts_web.pdf.

00158664

§§ 1500.1(b) ("public scrutiny [is] essential"), 1500.2(d) (the agency must "encourage and facilitate public involvement").

### C.    The SDEIS Does Not Sufficiently Consider Alternatives or Onsite Mitigation Options for Wetlands

The SDEIS does not demonstrate that there is no practicable alternative that will have less extensive impacts to wetlands and streams than the preferred alternative, though the Agencies were required to do so. Exec. Order 11990, 42 Fed. Reg. 26,961 (May 24, 1977). This failure is something we criticized in our comments on the DEIS, but the Agencies still have not evaluated anything beyond the alternatives that they already identified in the DEIS, apart from explaining different ALB bridge reconstruction locations. SDEIS App'x G at 36-37. Thus, the SDEIS's assertion that impacts to wetlands were avoided where practicable is unsupported. *See Id.* at 31. Moreover, this assertion does not satisfy NEPA because it does not consider whether the overall Project—including the selection of lanes to be constructed—can be done in a way that is less impactful on wetlands.

Further, as is true throughout the SDEIS, far too much meaningful analysis, including a detailed assessment of hydrologic effects, is delayed until the "final phase of the engineering design." SDEIS at 57. It appears this "final phase" and analysis will not even occur until after a FEIS and ROD is released and the NEPA process is complete. This delay contravenes the underlying purpose of the NEPA process: an EIS shall provide "a full and fair discussion of [the project's] significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Referenced material must be made available within the time allowed for comment. *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d at 598 (citing 40 C.F.R. §§ 1502.9(a), 1502.21). The EIS must again be supplemented so that the public can review and comment on these issues related to the full scale of wetlands impacts. *Animal Def. Council v. Hodel*, 840 F.2d at 1439, *amended*, 867 F.2d 1244; 40 C.F.R. § 1502.9(a), (c).

The Floodplain and Wetland Statement of Findings included with the SDEIS also does not discuss onsite mitigation. This omission seems to stem at least in part from the SDEIS's assumption that many impacts to wetlands and waterways would be self-mitigating, but the SDEIS does not explain how it reached that determination. *See* SDEIS at 2-12; SDEIS App'x C Part 1 at 7. (From the SDEIS: "Self-mitigating sites are sites where the potential design would improve the function of the environmental resources and would not require impacts to be mitigated." SDEIS at 2-12 to 13.) In fact, to the extent that the SDEIS assumes any stream restoration site impacts would be self-mitigating, stream restoration projects throughout the area have resulted in long-term tree canopy loss, are associated with uncontrolled growth of impervious surfaces upstream, and a general lack of nutrient and sediment removal efficiency as compared to modeled predictions.[182]

---

[182] *See, e.g.*, Antonio Olivo, *Polluted, Damaged Streams in Chesapeake Region at Center of Debate over Cleanup*, Washington       Post       (Jan.       25,       2020), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=t%26e&clip=TAE_6_29_2021_meeting_1 &ys=2021rs; Timothy B. Wheeler, *Stream Restoration Techniques Draw Pushback*, Bay Journal (Oct. 7, 2020),

00158665

The 43,000+ acre impact to Tier 2 catchments in the DEIS is now zero in the SDEIS. SDEIS at 4-68. The SDEIS does not explain the difference in these impacts. Maryland's anti-degradation policy requires a specific review of Tier 2 stream impacts with a public checklist and Social and Environmental Justification for reducing water quality. COMAR 26.08.02.04-1. According to the SDEIS, the public will only know of the outcome of those negotiations from the FEIS.

Finally, we emphasize that the Agencies are bound by several federal and state regulations that are not discussed in any detail here. For example, the Army Corps of Engineers ("Corps") regulations at 33 C.F.R. § 320.4(b)(5) require the Corps to consider Maryland's wetland protection laws, including the state's goal to achieve "no net overall loss in nontidal wetland acreage and function, and to strive for a net resource gain in nontidal wetlands." Md. Code Regs. 26.23.04.03. Yet this regulation appears nowhere in the SDEIS.

D.    **The SDEIS Fails to Provide Basic Information About Impacts on Floodplains and Corresponding Mitigation Efforts**

Despite devoting a section of the SDEIS—and part of the Floodplain and Wetland Statement of Findings—to floodplains, the SDEIS nevertheless fails to provide basic information about the impacts the construction will have on floodplains. *See* SDEIS at 4-74 to 76. The SDEIS does not analyze how the construction and footprint of the preferred alternative would increase flood risks by changing the hydraulic function and elevation of floodplains. This failure occurs despite an acknowledgement that 48.8 acres of floodplain will be impacted (this figure combines permanent and temporary impacts). SDEIS at 4-75.[183] Instead, the analysis of the effect stormwater will have on floodplains continues to be delayed until the "final design," presumably after completion of the NEPA process, providing no way for the public to judge whether any yet-to-be proposed mitigation will be effective. SDEIS at 4-75. As we explained in our discussion on wetlands impacts, this outcome is unacceptable. The public must be given an opportunity to review and comment on floodplains impacts once they are known.

The Agencies have not yet determined existing storm discharge, floodplain impacts, whether mitigation is required, and what mitigation would be implemented. Without this information, the preferred alternative should not be authorized: the Corps is required to avoid authorizing floodplain development whenever practicable alternatives exist outside the floodplain because they "possess significant natural values and carry out numerous functions important to the public interest." 33 C.F.R. § 320.4(l)(1). The Agencies must conduct a floodplain impact analysis that looks at direct and cumulative effects in the SDEIS and the public must be afforded the opportunity to comment on the Agencies' findings.

---

https://www.bayjournal.com/news/pollution/stream-restoration-techniques-draw-pushback/article_ffc96960-0895-11eb-b36f-efa466158524.html.

[183] It is difficult to determine what changes were made resulting in the different accounting of impacts between the DEIS and SDEIS. For example, floodplain impacts were zero in the DEIS, but are now more than 48 acres. What was the specific design change that resulted in this increased impact?

00158666

IV.    **The SDEIS's Minimal Air Quality Discussion, which Lacks Any Analysis of Air Emissions and Their Impacts, Violates NEPA**

The comments provided below are supplemental to the comments provided on November 9, 2020, by the Maryland Chapter of the Sierra Club and other organizations. The SDEIS did not address previous air quality and greenhouse gas emissions comments. The SDEIS did not present any information that would alter any of these comments or cause any to be removed from consideration. They remain valid, address issues of concern in the DEIS and must be satisfactorily addressed. Unfortunately, the SDEIS seems to disregard all the technical and procedural issues initially raised in the November 9 comments.

The SDEIS contains no analysis of the preferred alternative's air quality effects, precluding meaningful review and comment from the public and violating NEPA. The lack of analysis of the air emissions caused by the preferred alternative and the human health and environmental harms from those emissions also prevents proper evaluation of mitigation. The SDEIS air quality discussion therefore does not meet the NEPA requirement to describe the impacts of a proposed action so that the agency may take a hard look at its consequences, nor does this discussion provide full and accurate information to the public for its review and comment. For these reasons alone, a new SDEIS must be prepared. Moreover, it is clear from the DEIS and well-established highway expansion modeling techniques that any expansion of the Beltway and I-270 will increase emissions of harmful air pollutants, including greenhouse gases, and cause significant human health and environmental harms; a thorough review of this information would show that the no build alternative is the only justifiable selection.

A.    **The SDEIS Does Not Evaluate the Preferred Alternative's Greenhouse Gas Emissions**

Federal courts consistently have held that NEPA requires agencies to disclose and consider climate impacts in their reviews.[184] The Council on Environmental Quality ("CEQ") explains that "[c]limate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview."[185] The CEQ further explains that "when addressing climate change agencies should consider: (1) The potential effects of a proposed action on climate change as indicated by assessing GHG emissions (e.g., to include, where applicable, carbon sequestration); and, (2) The effects of climate change on a proposed action and its environmental impacts."[186] The SDEIS fails at both.

The SDEIS does not provide any evaluation of the GHG emissions of the preferred alternative, either from construction or operation. The SDEIS merely references the insufficient operational phase GHG emission discussion presented in the DEIS regarding proposed build alternatives that in any event are substantially different from the preferred alternative discussed in the SDEIS. SDEIS at 4-43 to 44. The SDEIS also provides no analysis of construction related

---

[184] *See, e.g., Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172 (9th Cir. 2008); *WildEarth Guardians v. BLM*, 8 F. Supp. 3d 17 (D.D.C. 2014).

[185] Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, 81 Fed. Reg. 51,866 (Aug. 5, 2016))

[186] *Id.* (footnote omitted).

00158667

GHG emissions. *Id.* at 4-44. The SDEIS claims that these analyses will be presented in the FEIS. There is no justification for withholding this important information and preventing the public from reviewing and commenting on it.

Moreover, the SDEIS's discussion of the DEIS's GHG analysis is inaccurate, further violating NEPA. The SDEIS states:

> [R]ecognizing the importance of GHG emissions, and consistent with CEQ's 2016 Final Guidance for Federal Departments and Agencies on Consideration of Greenhouse Gas Emissions and the Effects of Climate Change in National Environmental Policy Act Reviews, MDOT SHA utilized the best available data and EPA approved emissions model available at the time of development of the DEIS air quality analysis to estimate GHG emissions associated with the Build Alternatives.

SDEIS at 4-43 to 44. It is incorrect to claim that the DEIS was consistent with CEQ's 2016 Guidance. The DEIS does not once mention that Guidance and in fact the DEIS, and by extension the SDEIS, conflict with it in numerous ways. For example, contrary to the Guidance, neither the DEIS nor the SDEIS:

- Attempts to fully quantify any alternative's GHG emissions or explain why they could not be quantified. The DEIS avoided quantifying the build alternatives' construction GHG emissions and the SDEIS avoided quantifying the preferred alternative's construction and operation GHG emissions entirely.

- Attempts to assess potential climate change human health and environmental effects of the projected GHG emissions.

- Discusses methods to appropriately analyze reasonably foreseeable direct, indirect, and cumulative GHG emissions and climate effects. Neither the DEIS nor the SDEIS considers the effects of connected actions, such as the construction of additional segments of the highway expansion.

- Considers the ways in which a changing climate may impact the build alternatives or preferred alternative.

- Considers environmentally differentiated alternatives or mitigation measures to reduce GHG emissions.

The SDEIS also violates the February 2021 National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions, which directs agencies to "consider all available tools and resources in assessing GHG emissions and climate change effects of their proposed actions, including, as appropriate and relevant, the 2016 GHG Guidance."[187] On the contrary, there

---

[187] 86 Fed. Reg. 10,252 (Feb. 19, 2021) (citing 81 Fed. Reg. 51,866 (Aug. 5, 2016)).

00158668

is a complete lack of analysis of these issues in the SDEIS, despite the availability of numerous well-established tools for performing such an analysis.

Relatedly, the SDEIS claims that: "Statewide analyses do not indicate that the HOT lanes will impede Maryland's ability to meet our GHG emission reduction goals. In fact, the Greenhouse Gas Reduction Act Plan documents Maryland's existing and future emissions reductions under several scenarios, all of which include this project." SDEIS at 4-44. It is not clear what information the SDEIS is relying on to reach this conclusion and it does not cite to any sources or analyses to support its conclusion, precluding meaningful review and comment. Since the SDEIS acknowledges that the Agencies have not yet performed a GHG emissions analysis for the preferred alternative, how can the SDEIS say whether the expansion will impede Maryland's ability to meet its GHG emission reduction goals? Moreover, Maryland's Final Greenhouse Gas Emissions Reduction Act Plan makes no mention of the proposed expansion, any of the build alternatives considered in the DEIS, or the preferred alternative.[188] That Plan does not appear to include the GHG emissions increase from the preferred alternative.[189]

Finally, the SDEIS contains no discussion of the human health and environmental effects of the increased greenhouse gas emissions, in direct violation of NEPA.

It is deeply disappointing to read in the SDEIS that the project sponsor is dismissing the NEPA process by not providing greenhouse gas emission estimates of the new alternative, Alternative 9-Phase 1 South, and calling it the "preferred" alternative without any comparison to the other alternatives. Alternative 9-Phase 1 South is a new alternative, different than the other alternatives studied in the DEIS, yet it is impossible for the public and decision makers to evaluate this alternative among the others for many important issues, including greenhouse gas emissions which may be the most critical issue going forward.

The public will not be able to evaluate:

- how this alternative compares to other alternatives with respect to future greenhouse gas emissions and weigh in on the selection of a "preferred" alternative, given its impact on greenhouse gas emissions

---

[188] *See* The Greenhouse Gas Emissions Act 2030 GGRA Plan, Maryland Dept. of the Environment (Feb. 19, 2021), https://mde.maryland.gov/programs/Air/ClimateChange/Documents/2030%20GGRA%20Plan/THE%202030%20G GRA%20PLAN.pdf; Appendix J 2020 MDOT Greenhouse Gas Reduction Act Plan, https://mde.maryland.gov/programs/Air/ClimateChange/Documents/2030%20GGRA%20Plan/Appendices/Appendi x%20J%20-%20MD%20Department%20of%20Transportation%20Plan.pdf.

[189] The Final Plan departs significantly from the Draft Plan, which claimed that the addition of toll lanes on I-270 and I-495 would reduce GHG emissions, a claim MDOT-SHA has repeated publicly to gain support for the expansion. That claim was contradicted by the DEIS which showed the operations of the build alternatives would increase GHG emissions (without even considering GHG emissions caused by construction of the build alternatives). An important purpose of NEPA is to provide the public with accurate information for its consideration and comment and it is even more essential for the SDEIS to clearly present the GHG impacts when the project sponsor has been misleading the public on those impacts elsewhere.

00158669

- what the construction and maintenance greenhouse emissions will be from this alternative, or from any other alternative

- how the completion and operation of this alternative will impact the State of Maryland's ability to meet legislative and Climate Action Plan requirements and goals.

Further, climate change is real and is occurring and its effects will continue into the future. Yet neither the SDEIS or the DEIS address the issue of the effects of climate change on the preferred alternative area and the preferred alternative itself. The project sponsor should conduct a vulnerability assessment of the preferred alternative area and use that assessment to determine which parts of the preferred alternative area may be vulnerable to the various impacts of climate change (e.g., sea level rise, flooding from extreme rainfall, extreme temperatures, etc.). Having such an assessment will allow the project sponsor to consider location and/or design changes that may be necessary to accommodate or mitigate the impacts of climate change. Significant changes to location and design of the preferred alternative as currently shown in the various alternatives in the DEIS and SDEIS may also trigger a re-do of the NEPA process. Consideration of the impacts of climate change may also allow the project sponsor to avoid costly last-minute design or location changes or more frequent reconstruction and repair of the roadway further into the future. It would be in the project sponsor's and the public's best interest to consider and evaluate climate change effects and impacts at this stage of the project development and NEPA process.

### B.    The SDEIS Does Not Evaluate the Preferred Alternative's Criteria Pollutant and Other Pollutant Emissions

#### 1.    Particulate Matter and Nitrogen Dioxide

The SDEIS incorrectly states that "transportation conformity requirements pertaining to $PM_{2.5}$ do not apply for this Project and no further analysis of $PM_{2.5}$ was required." SDEIS at 4-43.[190] First, as prior comments pointed out in detail, the preferred alternative is a new non-exempt project in an "orphan area," an area designated as maintenance for the 1997 $PM_{2.5}$ National Ambient Air Quality Standards ("NAAQS") at the time that NAAQS was revoked, and therefore transportation conformity requirements apply before approval.[191]

Second, regardless of conformity requirements, further $PM_{2.5}$ analysis, such as a localized hot-spot analysis, is required by NEPA. $PM_{10}$ and $PM_{2.5}$ are both transportation-related pollutants that have been shown to have short-term negative impacts in areas proximate to their release. The NAAQS attainment status of the region is not representative of the $PM_{10}$ and $PM_{2.5}$ concentrations near the preferred alternative, as none of the monitoring sites are located near the preferred alternative. Regardless of the NAAQS status, the preferred alternative will increase local emissions

---

[190] $PM_{2.5}$ refers to particulate matter measuring 2.5 micrometers or smaller. Likewise, $PM_{10}$ refers to particulate matter measuring 10 micrometers or smaller.

[191] *See South Coast Air Quality Management District v. E.P.A. (South Coast II)*, 882 F.3d 1138 (D.C. Cir. 2018); Transportation Conformity Guidance for the *South Coast II* Court Decision, U.S. EPA, EPA-420-B-18-050 (Nov. 2018), https://nepis.epa.gov/Exe/ZyPDF.cgi?Dockey=P100VQME.pdf.

00158670

of $PM_{2.5}$ and $PM_{10}$ experienced by nearby populations, which will affect human health and the environment. The SDEIS unlawfully ignores these effects.

Further, it is well established that there are human health harms from increases in $PM_{2.5}$ concentrations even below the annual and 24-hour NAAQS. Prior comments document some of this evidence. EPA staff recently explained "we reach the conclusion that the available scientific evidence, air quality analyses, and the risk assessment . . . can reasonably be viewed as calling into question the adequacy of the public health protection afforded by the combination of the current annual and 24-hour primary $PM_{2.5}$ standards."[192] EPA staff explained that the current annual "primary" limit of 12 micrograms per cubic meter ($\mu g/m^3$) is inadequate to protect public health and advocated tightening the standard to a stricter level between 8 $\mu g/m^3$ and 12 $\mu g/m^3$.[193] $PM_{2.5}$ is associated with increased mortality and cardiovascular problems in populations with exposure to the particles at levels below that of the current NAAQS. There is no evidence of a safe threshold for $PM_{2.5}$, and the risk/exposure relationship appears "linear" down to levels as low as 5 $\mu g/m^3$.[194] The SDEIS ignores the latest science regarding $PM_{2.5}$ human health harms and presents the public with a misleading picture that the preferred alternative will cause no particulate matter-related harms. Given the latest evidence, it is likely that EPA will lower $PM_{2.5}$ NAAQS standards, which the SDEIS also fails to consider.

To comply with NEPA and make a decision on the preferred alternative with a true understanding of its impacts, we request that the Agencies conduct $PM_{2.5}$ and $PM_{10}$ monitoring near I-495 and I-270; analyze the current concentrations and model increases that would be caused by the preferred alternative (and other reasonably foreseeable highway expansion segments); and study the health impacts of the likely $PM_{2.5}$ increases.

Nitrogen Dioxide ("$NO_2$") can irritate airways in the human respiratory system which in turn can aggravate respiratory diseases, particularly asthma, as evidenced by respiratory symptoms (such as coughing, wheezing or difficulty breathing), and lead to hospital admissions and visits to emergency rooms. Regardless of regional attainment status, increased $NO_2$ concentrations near highway expansion projects are guaranteed.[195] The SDEIS improperly ignores the increased $NO_2$ emissions and health effects that the preferred alternative will cause.

---

[192] Policy Assessment for the Reconsideration of the National Ambient Air Quality Standards for Particulate Matter, External Review Draft, U.S. EPA, EPA-452/P-21-001, at 3-188 (Oct. 2021), https://www.epa.gov/system/files/documents/2021-10/draft-policy-assessment-for-the-reconsideration-of-the-pm-naaqs_october-2021_0.pdf.

[193] Id. at 3-188. ("Compared to the current annual standard, meeting a revised annual standard with a lower level is estimated to reduce $PM_{2.5}$-associated health risks in the 30 annually-controlled study areas by about 7-9% for a level of 11.0 $\mu g/m^3$, 15-19% for a level of 10.0 $\mu g/m^3$, 22-28% for a level of 9.0 $\mu g/m^3$, and 30-37% for a level of 8.0 $\mu g/m^3$").

[194] Id. at 3-24 ("Studies evaluated in the 2019 [Integrated Science Assessment] and draft [Integrated Science Assessment] Supplement examine this issue, and continue to provide evidence of linear, no-threshold relationships between long-term $PM_{2.5}$ exposures and all-cause and cause-specific mortality.").

[195] See, e.g., Anna Font, et al., Degradation in Urban Air Quality from Construction Activity and Increased Traffic Arising from a Road Widening Scheme, Science of the Total Environment 497–498, at 123-32 (Aug. 14, 2014), https://www.sciencedirect.com/science/article/pii/S0048969714010900.

00158671

In addition to the sources and studies cited in the November 9 comments, ongoing and current research continue to discover the detrimental effects of exposure to traffic-generated emissions, and resulting concentrations, of particulate matter and $NO_2$. For example:

*The Global Burden of Transportation Tailpipe Emissions on Air Pollution-Related Mortality in 2010 and 2015.*[196] This study estimates 385,000 deaths globally in 2015 from transportation related emissions. One of highest areas of transportation attributable fraction of PM deaths was the NAFTA corridor, which include the US and the preferred alternative area. Of these, on-road diesel emissions contributed the most to the health impacts, pointing out the need to estimate the concentrations of both $PM_{10}$ and $PM_{2.5}$ with and without the preferred alternative.

*Health Effects of $PM_{2.5}$ Emissions from On-Road Vehicles During Weekdays and Weekends in Beijing, China.*[197] This study considered $PM_{2.5}$ exposure in an urban area. It found 4435 premature deaths from $PM_{2.5}$ exposure under weekday exposure conditions with the greatest impact attributable to the AM rush hour period. The air quality studies for this preferred alternative must find the locations with increases in traffic for the rush hour periods and estimate PM concentrations for those locations with the greatest increase in traffic and congestion.

*Impacts of Transportation Emissions on the Risk of Mortality: Findings from the Literature and Policy Implications.*[198] This study found that mortality rates increase by 5% per 10 µg/m³ increase in $NO_2$ concentration, 2% per unit of traffic intensity on the road, and 7% per unit of distance closer to the road. The findings of this study describe the importance of estimating the $NO_2$ concentrations that residents of, and visitors to, the project area will be exposed to because of the preferred alternative. It is especially important to identify those locations where the source (highway lanes) – receptor distance is reduced.

*Evaluating the Cumulative Impacts of a Long Range Regional Transportation Plan: Particulate Matter Exposure, Greenhouse Gas Emissions, and Transportation System Performance.*[199] This study found that health effects of exposure to high levels of toxic vehicle emissions cannot be reversed by future reductions in emission levels. The authors also found that in the largest activity centers, more population and employment, and correspondingly greater traffic congestion and air pollutant concentrations, than by the modeling method used by most MPOs and state DOTs. The implications for this Project's study are twofold; 1) that it is critically

---

[196] Susan C Anenberg et al., *The Global Burden of Transportation Tailpipe Emissions on Air Pollution-Related Mortality in 2010 and 2015*, 2019 Environ. Res. Lett. 14 094012 (Sept. 6, 2019), https://iopscience.iop.org/article/10.1088/1748-9326/ab35fc/pdf.

[197] Ruipeng Tong et al., *Health Effects of $PM_{2.5}$ Emissions From On-Road Vehicles During Weekdays and Weekends in Beijing, China*, 223 Atmospheric Environment 117258 (Feb. 15, 2020), https://www.sciencedirect.com/science/abs/pii/S1352231019308969.

[198] Razieh Nadafianshahamabadi et al., *Impacts of Transportation Emissions on the Risk of Mortality: Findings from the Literature and Policy Implications*, European Society of Medicine (Aug. 11, 2021), https://esmed.org/MRA/mra/article/view/2502.

[199] Mohammad Tayarani et al., *Evaluating the Cumulative Impacts of a Long Range Regional Transportation Plan: Particulate Matter Exposure, Greenhouse Gas Emissions, and Transportation System Performance*, Transportation Research Part D: Transport and Environment (Aug. 2018), https://www.sciencedirect.com/science/article/abs/pii/S136192091730706X.

00158672

important to determine the exposure to traffic-related pollution at the opening year of the preferred alternative because the health impacts cannot be reversed; and 2) that the traffic levels for the outyears (2040 and 2045) of the preferred alternative are likely to be underestimated leading to higher pollution levels and population exposures than that described in the SDEIS. This again highlights the need for an understanding of the concentration levels for these pollutants.

*The Health Impacts of Weekday Traffic: A Health Risk Assessment of $PM_{2.5}$ Emissions During Congested Periods.*[200] This study found traffic congestion in the greater Toronto/Hamilton area has a substantial impact on human health and the economy, especially at the most congested periods. Results showed an impact of 206 deaths per year with an economic impact of approximately $1.3 billion. This study points out again the importance of an accurate assessment of both species of PM and of $NO_2$ for the preferred alternative.

*Air Pollution and Health Risks Due to Vehicle Traffic.*[201] This study focused on $NO_2$ concentrations and looked at both freeway and arterial scenarios which are present in the project area. The results showed an approximately ten-fold increase in health effects (doctor visits/hospital admissions) and mortality as traffic volumes increased from 1000 vehicles per hour (vph) to 10000 vph in the freeway scenario and from 1000 vph to 4000 vph in the arterial scenario. These levels of traffic volumes are present in the project area in many locations at both the freeway and arterial facilities. Increases in traffic volumes from the preferred alternative will occur, reaching levels beyond that considered in the NIH study. Therefore, the air quality analyses for this preferred alternative must look at $NO_2$ concentrations in the project area and understand how they will change as a result of the completion of the preferred alternative and what the health effects will be.

*Mortality-Based Damages Per Ton Due to the On-Road Mobile Sector in the Northeastern and Mid-Atlantic U.S. by Region, Vehicle Class and Precursor.*[202] This study looked at emissions from 5 vehicle classes for 12 states and DC. Found that, light duty trucks ("LDT") are responsible for the most $PM_{2.5}$-attributable premature mortalities with 46% of those mortalities from directly emitted primary particulate matter. In the District of Columbia metro area, LDT trucks accounted for 1.71 million miles of travel in 2016.[203] Depending on the inclusion of sport utility vehicles (the

---

[200] Weeberb J. Requia et al., *The Health Impacts of Weekday Traffic: A Health Risk Assessment of $PM_{2.5}$ Emissions During Congested Periods*, Environment International (Feb. 2018), https://www.sciencedirect.com/science/article/pii/S0160412017318263.

[201] Zhang and Batterman, *Air Pollution and Health Risks Due to Vehicle Traffic*, Sci. Total Environment (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4243514/.

[202] Calvin A. Arter, *Mortality-Based Damages Per Ton Due to the On-Road Mobile Sector in the Northeastern and MidAtlantic U.S. by Region, Vehicle Class and Precursor*, 2021 Env. Res. Lett. 16 065008 (Jun. 8, 2021), https://iopscience.iop.org/article/10.1088/1748-9326/abf60b/pdf.

[203] Air Quality Conformity Analysis of the 2020 Amendment to Visualize 2045: Full Report, MWCOG (March 18, 2020), https://www.mwcog.org/file.aspx?D=y1L01XsWB%2fML7NuRhyH0FPC9fk07eX9zabki%2fGWjG9l%3d&A=rrf YR9JzOYNizTRfbVg0KKBcrd%2fxu4VMJKhU9156M%2fM%3d.

00158673

classification of LDT is based on vehicle weight), LDTs account for 42% of the vehicle fleet in the DC metro area.[204] This study again highlights the importance of a microscale PM analysis.

Notwithstanding DEIS comment 1a of Section H regarding particulate matter conformity and PM maintenance orphan areas, NEPA would also require an analysis of PM and $NO_2$ impacts from the preferred alternative. Under NEPA, project sponsors must take a "hard look" at the potential impact to the natural and human environment, including human health. The science behind the numerous studies cited in the November 9 comments and additional studies cited above clearly demonstrate the potential impact of these transportation-related pollutants upon public health. USEPA recognized this by setting short-term National Ambient Air Quality Standards for these pollutants (1-hour for $NO_2$ and 24-hours for both $PM_{10}$ and $PM_{2.5}$). Yet despite the overwhelming evidence of the potential impact and harm elevated levels of these pollutants could have on the residents and visitors to the project area, the SDEIS and the DEIS rely on the excuse that an analysis of these pollutants is not needed because the project area is in attainment for these pollutants.

Further, although the study area may not currently be in nonattainment for the $PM_{2.5}$ air quality standards, the traffic conditions associated with this preferred alternative are very close to meeting the conditions for requiring a project-level hot-spot under the transportation conformity regulations and guidance. USEPA's guidance identifies the following project types (among others) as requiring a project level PM hot-spot air quality analysis:

- A project on a new highway or expressway that serves a significant volume of diesel truck traffic, such as facilities with greater than 125,000 annual average daily traffic and 8% or more of such AADT is diesel truck traffic;

- New exit ramps and other highway facility improvements to connect a highway or expressway to a major freight, bus, or intermodal terminal;

- Expansion of an existing highway or other facility that affects a congested intersection (operated at Level-of-Service D, E, or F) that has a significant increase in the number of diesel trucks.[205]

Tables 3-1 through 3-3 show that the Average Daily Traffic on I-270 and I-495 clearly exceed the AADT in EPA's guidance, ranging from 135,000 ADT to 317,000 ADT for 2045 for the preferred alternative. The SDEIS and the Air Quality chapter in the DEIS (Appendix I), for some reason, do not identify the percentage of diesel trucks in the project area. Other sources indicate that 6% of VMT on Maryland's Interstate system is truck traffic.[206] The volume threshold is met for

---

[204] *Vehicle Census Shows What's on Our Region's Roads*, MWCOG TPB News (March 13, 2019), https://www.mwcog.org/newsroom/2018/03/13/vehicle-census-shows-whats-on-our-regions-roads-fleet-mix-electric-vehicles-visualize-2045/.

[205] PM Hot-spot Guidance Transportation Conformity Guidance for Quantitative Hot-spot Analyses in $PM_{2.5}$ and $PM_{10}$ Nonattainment and Maintenance Areas, EPA-420-B-21-037 October 2021.

[206] TRIP, *Restoring Maryland's Interstate Highway System: Meeting Maryland's Transportation Needs with a Reliable, Safe & Well-Maintained National Highway Network* (Aug. 2020), https://tripnet.org/wp-content/uploads/2020/08/TRIP_Maryland_Interstate_Report_August_2020.pdf.

00158674

performing a PM hot-spot analysis and the percentage diesel truck traffic is very close to the threshold and may well exceed it on I-270, I-495, or local arterials, if this information was available. Again, notwithstanding DEIS comment 1a of Section H regarding particulate matter conformity and PM maintenance orphan areas, if the project area were in a nonattainment or maintenance area for PM, an analysis would likely have been done. The residents of and visitors to the project area deserve the same level of protection from elevated levels of PM as do residents and visitors in nonattainment and maintenance areas. The proximity of the preferred alternative traffic conditions to the triggers for a PM hot-spot analysis under USEPA guidance, strongly argues for a PM hot-spot analysis for this Project. The status of nonattainment/maintenance should not matter.

In addition, examination of recent air quality monitoring data highlights the urgency of the need for an analysis of these additional pollutants. Monitoring data from 2020 shows:

- DC monitor at 420 34th St, NE – maximum $PM_{2.5}$ value of 62.2 micrograms/meter$^3$

- DC monitor at 3600 Benning Rd, NE – maximum $PM_{2.5}$ value of 83.7 micrograms/meter$^3$

Although technically not a violation of the $PM_{2.5}$ air quality standard (98th percentile exceeding 35 micrograms/meter$^3$), these values do demonstrate that high levels of $PM_{2.5}$ do occur in the study area, exposing residents and visitors to unhealthful levels of $PM_{2.5}$. It is incumbent upon the project sponsor to demonstrate that the preferred alternative will not exacerbate exposure to this pollutant, as well as to $PM_{10}$ and $NO_2$.

Regardless of the attainment/nonattainment status of the project area, the project sponsor must address these pollutants in a quantitative manner. The traffic analysis for the preferred alternative indicates traffic levels will increase and the air quality analysis shows that carbon monoxide, mobiles source air toxics, and greenhouse gas emissions will all increase as a result of the preferred alternative. It is clear that PM and $NO_2$ levels will also increase due to the preferred alternative. It is incumbent upon the project sponsor to document whether those increases will rise to the level of inflicting negative health outcomes within the project area.

### 2.    Carbon Monoxide

The SDEIS provides no carbon monoxide ("CO") analysis but instead merely references the DEIS's discussion of the pollutant, which was based on a different proposed project. SDEIS at 4-43. The SDEIS states:

> An updated traffic analysis to determine the worst-case intersections and interchanges on Preferred Alternative throughout the corridors will be performed. If the result of this updated analysis changes the ranking of the worst-case intersections and interchanges, updated CO air quality modeling will be performed on the Preferred Alternative using the updated intersection and interchange data. The results of the traffic analysis and CO modeling, if performed, will be presented in the FEIS.

*Id.* The Agencies should have performed this updated analysis prior to releasing the SDEIS and presented its results for public review and comment. There is no justification for delaying this

important information and it only serves to hinder meaningful public review and comment.[207] The Agencies' failure to analyze this information also results in a failure to analyze the corresponding human health and environmental harms from the increased carbon monoxide concentrations that the preferred alternative will cause.

Comment 5 in the November 9 comments pointed out technical flaws in the carbon monoxide hot-spot analysis. In addition to those flaws, the analysis may have omitted a large number of sites that should have undergone a carbon monoxide hot-spot analysis (as well as a hot-spot analysis for $PM_{10}$, $PM_{2.5}$ and $NO_2$, as indicated above and in the November 9 comments). The Air Quality Report (Appendix I of the DEIS) indicates that interchanges chosen to undergo an air quality analysis were based solely on volume and delay and intersections chosen to undergo an air quality analysis were based solely on traffic volumes and level-of-service (LOS). Reductions in the source-receptor distance do not appear to have been considered. As shown in the Figure in DEIS Section H, comment 1 of the November 9 comments and discussed in the Environmental Justice comment below, even a small reduction in the source receptor distance can have a large increase in air pollutant concentrations. Reductions in source-receptor distance are commonly used as an indicator for a possible hot-spot analysis site. By not including this factor into the analysis site selection is incomplete. As a result, the air quality discussion in the SDEIS and the analysis in the DEIS is fundamentally flawed for not considering Project changes resulting in moving roadways closer to the public and potentially causing negative air quality and public health impacts.

An additional error in CO air quality analysis is the misapplication of the persistence factor. The persistence factor is a parameter to account for the variability in traffic and meteorological conditions from the 1-hour modeled CO concentration to a derived 8-hour CO concentration for comparison to the 8-hour CO NAAQS. The air quality analysis used a persistence factor of 0.7 (Appendix I, page 74). USEPA guidance allows for the use of 0.7 as a default persistence factor when no more appropriate or project-specific data is available.[208] However, for this project more representative data is available. Table 2-3 of Appendix I of the DEIS shows CO monitoring data for 8 CO monitors in the study area. Only 1 monitor is in the study area in Maryland, monitor 240330030 in Prince George's County. Calculating a persistence factor for 2018 (the latest year of available data in the Table) from the 2nd maximum 1-hour CO concentration to the 2nd maximum 8-hour concentration (the NAAQS CO 8-hour standard is based on the 2nd maximum CO concentration) yields a persistence factor of 0.88. Therefore, the 8-hour projected CO concentrations should be recalculated using a persistence factor of 0.88. This will result in substantially higher 8-hour CO concentrations and may, considering all the other technical errors and omissions described in the November 9 comments, show an exceedance of the 8-hour CO NAAQS and a negative air quality impact.

---

[207] The SDEIS references the CO analysis presented in the DEIS. However, that presentation involved a different project scope with different CO impacts. And prior comments explained that the DEIS presentation incorrectly applied EPA's CO Hot-Spot modeling guidance, resulting in an incorrect and artificially low prediction of CO concentrations from the build alternatives at issue. Regardless of these errors, the DEIS predicted increased CO concentrations at every site analyzed.

[208] Guideline for Modeling Carbon Monoxide From Roadway Intersections , EPA-454/R-92-005 (Nov. 1992), https://tripnet.org/wp-content/uploads/2020/08/TRIP_Maryland_Interstate_Report_August_2020.pdf.

00158676

### 3.      Mobile Source Air Toxics

Mobile Source Air Toxics ("MSATs") are associated with elevated cancer risks and other major health concerns. The construction and operation of the preferred alternative would be expected to increase exposure to these pollutants and increase the health harms they cause. However, that information, including the levels of increased exposure and health harms, is not mentioned in the SDEIS. The SDEIS merely states: "The results of an updated MSAT analysis using traffic data derived from this affected network will be presented in the FEIS." SDEIS at 4-43. Once again there is no justification for this delay, and it violates NEPA; this delay appears designed to minimize discussion and the public's understanding of negative consequences of the preferred alternative. The Agencies must redo the SDEIS and provide the public with information on the increased MSAT emissions and resulting expected health impacts from the preferred alternative for review and comment.

Further, the SDEIS states without support in its environmental justice section that "the Preferred Alternative is not predicted to increase emission burdens for Mobile Source Air Toxics." SDEIS at 4-102. It is not clear how the SDEIS reached this conclusion without having performed the analysis. The SDEIS could not even refer to the DEIS to support its conclusion, given that the DEIS showed substantial increases ranging from 4.1% to 13.3% in emissions of MSAT directly attributable to the build alternatives it evaluated. At best, the SDEIS's statement downplays and misleads the public on the MSATs harms from the preferred alternative.

Examination of the 2020 air quality monitoring data for the Maryland/District of Columbia area demonstrates that ambient levels of mobile source air toxics can be elevated and could exceed the various screening criteria, as shown in the Table in Comment 4. The ambient air quality monitor at 2500 First Street, NW in the District measures various air toxics, among other pollutants and parameters. The 2020 data for this monitor shows that the maximum 8-hour formaldehyde concentration at this monitor was 7.6 parts per billion (or micrograms per cubic meter) while the screening value is 6.3 parts per billion. Although this monitor is nearly 6 miles from the project area, it does demonstrate that mobile source air toxics concentrations can be elevated in the project area and can exceed screening levels.

This finding highlights the issues raised in the November 9 comment, namely:

- correct the emissions calculations,

- determine appropriate concentration levels for each MSAT for each appropriate time scale (1-hour, 8-hour, daily, annual, etc.),

- compare against appropriate screening level(s),

- perform a health risk assessment to indicate increased cancer and other disease risks, and

- determine if this acceptable to continue with the Project.

The need for a health risk assessment becomes even more critical when considering the environmental burdens already placed on environmental justice communities (see below comment

00158677

regarding deficiencies in the Environmental Justice discussion). The construction of the preferred alternative should not disproportionately adversely impact them more.

### 4.    Parking Lots

The impact of parking lots on air quality, as indicated by Comment 2, was not addressed in the SDEIS. Yet, the SDEIS indicates an expansion of parking lots due to the preferred alternative. The SDEIS indicates that the Westfield Montgomery Mall park and ride lot will have increased parking capacity. The project sponsor must report how many additional vehicles will be using the lot and if an air quality analysis is needed to discover any potential air quality impacts.

### C.    The SDEIS Fails to Address Air Quality Concerns in Environmental Justice Communities

After examining Appendix K of the SDEIS it becomes clear how inadequate the Environmental Justice analysis and discussion in the DEIS (Appendix E) is. The EJSCREEN of Appendix K of the SDEIS shows that one area is more disproportionally affected by environmental concerns. Of the 11 Environmental Indicators in Figures 1 through 11 in Appendix K, Gaithersburg, Maryland is shown to be most negatively affected in all but one of those indicators. Yet a thorough and complete air quality analysis for the preferred alternative is required to provide needed information to more accurately describe the potential impacts of the project on most, if not all, of the environmental concerns most negatively affecting Gaithersburg, as shown in the Environmental Indicators in the EJSCREEN. More specifically (in the order of the figures in Appendix K):

- Hazardous Waste Proximity – emissions from hazardous waste generators and sites as contributors to background levels for a health risk assessment for the preferred alternative (see the discussion in Section H, comment 4 of the November 9 comments).
- Lead Paint Indicator – lead paint on highway bridges in soils from flaking and in the air during lead paint removal from bridges as contributors for background levels for a PM analysis and health risk assessment for the preferred alternative (see the discussion in Section H, comments 1, 2 and 4 of the November 9 comments).
- Air Toxics Cancer Risk – emissions from air toxics emitters as contributors to background levels for performing a health risk assessment for the preferred alternative to identify levels and risks from mobile source air toxics (see the discussion in Section H, comment 4) of the November 9 comments).
- Diesel Particulate Matter – perform a $PM_{10}$ and $PM_{2.5}$ project-level air quality analysis (see the discussion in Section H, comments 1 and 2 of the November 9 comments).
- Respiratory Hazard – perform a $PM_{10}$, $PM_{2.5}$ and $NO_2$ project-level analysis, perform a health risk assessment and correct the CO analysis (see the discussion in Section H, comments 1,2, 3, 4, 5, 9, 11, 12 and 13).
- Ozone Index – perform a regional ozone precursor emissions analysis (see the discussion in Section H, comment 3).
- Particulate Matter ($PM_{2.5}$) Index - perform a $PM_{2.5}$ project-level air quality analysis (see the discussion in Section H, comments 1 and 2 of the November 9 comments).

113

- Superfund Proximity Index - emissions from Superfund sites as contributors to background levels for a health risk assessment for the preferred alternative (see the discussion in Section H, comment 4 of the November 9 comments).
- Risk Management Plan Facilities Proximity Index - emissions from chemical plants as contributors to background levels for a health risk assessment for the preferred alternative (see the discussion in Section H, comment 4 of the November 9 comments).
- Traffic Proximity and Volume Index - perform a $PM_{10}$, $PM_{2.5}$ and $NO_2$ project-level analysis, perform a health risk assessment and correct the CO analysis (see the discussion in Section H, all comments).

The Air Quality Report in Appendix I of the DEIS identifies 34 sites for carbon monoxide analysis. Yet of all these sites only two are in or near the Gaithersburg area (I-270/I-370 interchange and I-270 interchange with Shady Grove Road and its ramp intersections). The Air Quality Report does not present any results for the I-270/Shady Grove interchange (Table 3-30). Table 3-29 shows that one-hour carbon monoxide levels in the I-270/I-370 area will increase from 3.80 parts per million (ppm) to 6.10 ppm as a result of this Project in 2025, adding to the environmental burden in this area. Given the environmental concerns in this area, two analysis locations are not sufficient.

The Gaithersburg CEA analysis in Appendix E (page 70) of the DEIS indicates that "noise generators (travel lanes) are moved closer to receptors." Because the roadway is moved closer to receptors, air quality may also deteriorate at these locations. These locations should be evaluated as sites for an air quality analysis.

Section H, comment 5 of the November 9 comments discusses the requirement to look at air quality impacts on the affected network, not just the immediate project area as was done for the air quality analysis for the DEIS, because of traffic volume increases on those roadways and the potential for exceedances of the relevant health-based air quality standards. In the Gaithersburg area, this is especially important because of the disproportionate environmental load impacting its residents and visitors. The project sponsor should examine the traffic and source-receptor distance changes in the affected network in the Gaithersburg area and perform an air quality analyses at those roadways undergoing the most substantial changes in traffic levels, speeds or source-receptor distance as a result of the preferred alternative.

### D.    The SDEIS Fails to Analyze Emissions from Newly Created Bottlenecks and Additional Traffic Congestion

The SDEIS recognizes that the preferred alternative would create bottlenecks outside the preferred alternative limits. SDEIS at ES-12, 2-6. As explained above, the SDEIS does not accurately analyze these bottlenecks nor the arterial congestion that the preferred alternative would cause at the terminus of the managed lanes. *See* Section II (Traffic Impacts). These bottlenecks and additional congestion will create additional air quality impacts in the areas where they occur, which the SDEIS shows are likely to be in environmental justice communities. *See* SDEIS at 4-96, 4-99. The SDEIS entirely fails to evaluate these air quality impacts and their associated human health and environmental harms.

114

00158679

E.    **The SDEIS Fails to Quantify Harms from Air Emissions Despite Available Scientifically Sound Methods**

It is improper for an agency to place its thumb on the scale by inflating the benefits of a proposed action while minimizing its impacts. *See, e.g.*, *WildEarth Guardians v. Zinke*, No. CV 17-80-BLG-SPW-TJC, 2019 WL 2404860, at *11 (D. Mont. Feb. 11, 2019) ("Because OSM quantified the benefits of the proposed action, it must also quantify the associated costs or offer non-arbitrary reasons for its decision not to."), *report and recommendation adopted sub nom. WildEarth Guardians v. Bernhardt*, No. CV 17-80-BLG-SPW, 2021 WL 363955 (D. Mont. Feb. 3, 2021). As explained above, the SDEIS does not attempt to quantify or even discuss the significant human health harms that the preferred alternative would cause. In the SDEIS, the Agencies quantify the purported investment and job growth benefits of the preferred alternative, SDEIS at 4-112. Further, the SDEIS discusses potential benefits of dollars proposed for transit investment. *Id.* at ES-9. However, the Agencies do not quantify the dollar value of the human health and environmental harms that the preferred alternative, and in particular its air emissions, would cause. Nor does the SDEIS provide non-arbitrary reasons for not quantifying the value of these harms, although doing so would provide the public and decisionmakers with a more useful understanding and comparison. There are well-established scientifically sound methods to perform this quantification, which the SDEIS improperly ignores.[209]

For example, using the RMI SHIFT Calculator State Highway Induced Frequency of Travel to estimate emissions impacts from FHWA data,[210] and inputting the 42 lane miles that the preferred alternative would add in the DC-VA-MD-WV Metropolitan Statistical Area,[211] results in an estimated range of an additional 1.1 Million Metric Tons of Carbon Dioxide Equivalent (MMT $CO_2e$) to 3.4 MMT $CO_2e$ through 2050 from induced travel from the preferred alternative. The estimated range varies whether evaluating direct or lifecycle emissions and whether under a business-as-usual scenario or a scenario designed to meet the U.S. target of reducing greenhouse gas emissions 50-52 percent from 2005 levels by 2030. Looking at the lower end of the range, the preferred alternative would result in over $100 million in climate impacts. And that value does not even include the impacts from construction emissions, particulate matter emissions (which can reasonably be calculated), emissions from other air pollutants, or emissions from the other highway expansion segments.

The USDOT recently released a Climate Action Plan, in which it recognized "the Department has the opportunity and obligation to accelerate reductions in greenhouse gas

---

[209] *See, e.g.*, Technical Support Document: Social Cost of Carbon, Methane, and Nitrous Oxide Interim Estimates under Executive Order 13990 (Feb. 2021), at 4-5; Benefit-Cost Analysis Guidance for Discretionary Grant Programs, U.S. Dep't of Transp., at 34 (Feb. 2021) (recommending using a value of $61 per metric ton of $CO_2$ in 2030 and $78 per metric ton in 2045, in 2019 dollars, $852,700 per metric ton of $PM_{2.5}$).

[210] SHIFT Calculator State Highway Induced Frequency of Travel, RMI, https://shift.rmi.org/ (visited Nov. 11, 2021); SHIFT (STATE HIGHWAY INDUCED FREQUENCE OF TRAVEL) CALCULATOR, About the Methodology, RMI, https://rmi.org/wp-content/uploads/2021/10/rmi_shift_calculator_methodology.pdf (visited Nov. 11, 2021).

[211] American Legion Bridge I-270 to I-70 Relief Plan – Phase South, Accelerate Maryland Partners, at 6 (June 16, 2021) https://uploads-ssl.webflow.com/60a42101147b2d88a026d66b/60ca5e5015e1231d68f88e5c_AM%20Partners-Industry%20Day%20Presentation-FINAL.pdf (describing addition of 26 new lane miles of highway on I-495 and I-270 in Phase South A and 16 new lane-miles of highway on I-270 on Phase South B).

00158680

emissions from the transportation sector and make our transportation infrastructure more climate change resilient now and in the future.[212] The USDOT pledged to "ensure that Federally supported transportation infrastructure, and DOT programs, policies, and operations, both consider climate change impacts and incorporate adaptation and resilience solutions whenever possible."[213] Had the SDEIS used best available science to consider and quantify the climate change and other air quality impacts of the preferred alternative, the FHWA would have seen that the preferred alternative should not move forward. Regardless, at a minimum, the FHWA must consider and quantify these impacts using the best available science and present that information to the public for review and comment.

### F.    Information in the SDEIS Reveals Numerous Additional Air Quality-Related Concerns that the SDEIS Fails to Analyze

1) The SDEIS discusses direct and indirect connections to transit stations (page 2-22). What are they? Are there any traffic or ridership changes as a result? If yes, could the traffic changes cause an air quality impact?

2) The discussion regarding Interstate Access Point Approval (page ES-12) in the Executive Summary of the SDEIS foreshadows changes to the preferred alternative with accompanying environmental impacts. Yet it seems this approval will take place after the completion of the NEPA process. Unless this approval results in only the most minor of changes to the preferred alternative, the Interstate Access Point Approval should be subject to NEPA or lead to a re-opening of the NEPA process for this Project.

3) Examination of Table 5 of Appendix A shows several locations where the vehicle throughput is nearly the same for the Build and No-Build cases and even shows locations where 2045 vehicle throughput levels are less than the existing throughput levels. This information raises the question of whether the preferred alternative is really necessary.

It is concerning that the project sponsor may be taking shortcuts in the environmental review in general, and the air quality and climate change aspects of the environmental review in particular. Examination of the presentation by Accelerate Maryland Partners (American Legion Bridge I-270 to I-70 Relief Plan – Phase South, Industry Day, June 16, 2021) emphasizes the intent to accelerate project delivery (see slide 4). In addition, having separate contracts for tolling technology and Operations and Maintenance with Accelerate Maryland Partners, rather than with government agencies (MDOT or FHWA), reduces oversight by the project sponsor and facilitates project acceleration (i.e., shortcuts). In accelerating project delivery, the first aspect that is "accelerated" is environmental protection. Based on the environmental documentation for this Project to date and the urgency displayed to "accelerate" the Project, it is likely that one of the shortcuts to be implemented will be minimizing the protection of residents and visitors from harmful air emissions.

---

[212] Climate Action Plan Revitalizing Efforts to Bolster Adaptation & Increase Resilience, USDOT Office of the Secretary of Transportation, at i (Aug. 2021) https://www.sustainability.gov/pdfs/dot-2021-cap.pdf.

[213] *Id.*

00158681

The SDEIS states: "The measured ambient air concentrations closest to the study area were all well below the corresponding NAAQS, except for the exceedance of the 2015 8-hour ozone standard recorded at all the monitor locations." SDEIS at 4-42. The SDEIS does not include these measured ambient air concentrations or cite to where that information can be found. As pointed out in comments on the DEIS, the Agencies should perform air quality monitoring near I-495 and I-270; monitors located miles away are likely not representative of near-road pollutant concentrations. Moreover, the Agencies should explain what "well below" means and whether there are human health or environmental harms at such concentrations and at predicted concentration increases from the preferred alternative. The only scientifically justifiable answer to both those questions is yes, but the SDEIS ignores these impacts. Finally, the SDEIS improperly minimizes the exceedance of the 2015 8-hour ozone standard, which has significant human health and environmental impacts that the SDEIS does not address.

The SDEIS also entirely ignores reasonably foreseeable indirect and cumulative air quality impacts from the preferred alternative, including increased emissions caused by induced demand and increased emissions caused by other segments of the highway expansion that the Agencies are already planning to build and are more likely to be built if the preferred alternative is selected.

## V.    The SDEIS's Land Use and Species Impacts Discussion Violates NEPA

### A.    The SDEIS Does Not Adequately Identify and Analyze Impacts to Aquatic Biota

The SDEIS fails to adequately identify and analyze impacts on aquatic species, aquatic habitats, and fisheries, relying instead on watershed data. Even with the reduced scope of the preferred alternative, waterways are still being substantially impacted, and the SDEIS acknowledges that the preferred alternative could impact aquatic biota by changing the "mortality of aquatic organisms" and through habitat loss. SDEIS at 4-83. But, once again, the SDEIS fails to quantify those impacts: the mitigation section is nearly identical to the corresponding section in the DEIS and has the same deficiencies. The Agencies state that "all required precautions will be taken to avoid and minimize impacts to the stream and its aquatic biota," and note that MDOT is coordinating a mussel survey, SDEIS at 4-83, but this information must be included as part of the NEPA process. 40 C.F.R. § 1502.1. The SDEIS must be further supplemented with sufficient data to analyze direct and indirect effects on aquatic resources and provide a detailed description of proposed mitigation of those impacts.

### B.    The SDEIS Fails to Adequately Identify and Analyze Impacts to Forests

The SDEIS acknowledges that over 500 acres of tree canopy, including 14.7 acres of Forest Conservation Easements, will be affected and that this will result in substantial impacts in many areas, *see* SDEIS at 4-3 and 4-69, but the SDEIS does not quantify those impacts or explain how tree canopy impacts were factored into other impact quantifications. For example, in discussing the preferred alternative's impact on watersheds, the SDEIS notes that "[t]ree removal during the construction process can reduce the amount of shade provided to a stream and raise the water temperature of the affected stream." SDEIS at 4-69. Tree removal can also affect water quality by reducing the buffering of runoff materials and allowing runoff to enter streams directly.

00158682

In addition to failing to adequately analyze the impacts to forests, the SDEIS does not provide sufficient information on tree mitigation, indicating instead that the mitigation plan will not be assembled until the "final design at each compensatory SWM [stormwater management] site." SDEIS App'x C Part 1 at 13. In the stormwater appendix, the Agencies concede that they have still have not determined forest impacts, obtained approval under the Maryland Reforestation Law, or determined whether and to what extent mitigation can be achieved onsite. *Id.* And, when forest impacts cannot be mitigated onsite, the SDEIS contains the vague assurance that "the P3 Developer can refer to the MLS Maryland Reforestation Law Mitigation Site Search Report to identify potential mitigation opportunities according to the Maryland Reforestation Law Mitigation hierarchy." *Id.* These empty reassurances run afoul of NEPA. The EIS must again be supplemented so that the public can review and comment on to the full scope of forest impacts.

### C.    The SDEIS's Analysis of Potential Impacts to the Northern Long-Eared Bat Relies Too Heavily on an Outdated Endangered Species Act § 4(d) Rule

The SDEIS relies on the Final 4(d) Rule for the Northern Long-Eared Bat to permit forest clearing within the bat's known habitat. USFWS 2016 Programmatic Biological Opinion. The SDEIS ignores, however, that the bat will likely be listed as an endangered species, based on a court order. *Center for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020). In that case, the court determined that the Fish and Wildlife Service "failed to articulate a rational connection between its own analysis and its determination" that the Northern Long-Eared Bat should be designated as threatened rather than endangered. *Id.* at 82-83. The take exemptions listed in the 4(d) Rule are allowed only as long as the Northern Long-Eared Bat is listed as threatened and not endangered. 16 U.S.C. § 1538(a)(1)(B) (prohibiting takes of endangered species).

During an acoustic survey, three sites within the corridor study boundary—and therefore likely impacted by the preferred alternative—had Northern Long-Eared Bat calls, SDEIS at 4-86, and the DEIS appendix, referenced throughout the SDEIS, notes that construction could affect summer roosting and maternity habitat for the Northern Long-Eared Bat, DEIS App'x L at 154. The SDEIS waives off this risk by referring to a letter, dated January 13, 2021, determining that the preferred alternative was "not likely to adversely affect" the Northern Long-Eared Bat. SDEIS at 4-90. But that letter was written before a federal court ordered the Fish and Wildlife Service to issue a new listing determination within eighteen months of completion of a "Special Status Assessment." *Center for Biological Diversity v. Everson*, No. 15-477 (EGS) (D.D.C. Mar. 1, 2021). And, as the letter itself reveals, the determination relied on a nebulous distinction between "known" maternity roost trees or hibernacula—which the USFWS reports not to have found—and what the DEIS appendix (which the SDEIS continues to rely on) observes: that construction could indeed affect these types of habitats. The letter mentions a voluntary restriction of construction during the summer, which seems to acknowledge the potential of the preferred alternative for habitat modification.

That habitat modification could constitute a take under the Endangered Species Act. *Babbitt v. Sweet Home Chapt. Comms. for Ore.*, 515 U.S. 687 (1995). The SDEIS must analyze reasonably foreseeable future actions, 40 C.F.R. §§ 1508.7, 1508.25, and therefore must consider how a new classification would affect construction. Moreover, even assuming the Northern Long-Eared Bat's current threatened status remains in place, the SDEIS is inadequate because it does

00158683

not analyze the reasonably foreseeable harm to the Northern Long-Eared Bat. 40 C.F.R. § 1502.22. As noted above, that harm could include the destruction of the bat's habitat.

### D.    The SDEIS Does Not Sufficiently Explain How Impacts to Rare and Threatened Plants Will be Mitigated

Significant impacts to state rare and threatened plants species are identified. *See* SDEIS at 4-77, 4-78. Mitigation plans, however, are vague, focus on minimization and transplanting which has variable success.

### E.    The SDEIS Does Not Sufficiently Explain its LOD Determination, Including the Impact of the Preferred Alternative on Plummers Island

The SDEIS indicates that a "Base Option" was determined that would reduce the Plummers Island LODs by 1.7 acres, SDEIS at 5-15, but does not explain how that figure was arrived at nor whether any alternatives with less impact were evaluated. The SDEIS also does not sufficiently consider visual and noise impacts to Plummers Island. *See* SDEIS at 4-109, 4-111 (discussing visual and noise impacts but making no mention of Plummers Island).

Furthermore, the SDEIS appears to underestimate the LODs. In discussing how LODs were determined for stream restoration sites, the SDEIS notes that the sites would "have impacts to private properties and environmental resources" but that "impacts to wetlands and waterways at these sites are generally considered self-mitigating." SDEIS at 2-12. The SDEIS does not explain how it reached its conclusion regarding self-mitigation, nor does it spell out exactly how that conclusion affected the LOD determinations. *See* SDEIS at 2-12, SDEIS App'x C Part 1 at 7. (From the SDEIS: "Self-mitigating sites are sites where the potential design would improve the function of the environmental resources and would not require impacts to be mitigated." SDEIS at 2-12–13.) In light of the lack of support for this conclusion, the Agencies should instead evaluate impacts based on more realistic LODs.

## VI.    The SDEIS Fails to Meet the Agencies' Environmental Justice Obligations

### A.    Relevant Federal Laws and Guidance on Environmental Justice Obligations

EPA explains that:

Environmental justice is the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income, with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies. This goal will be achieved when everyone enjoys:

- The same degree of protection from environmental and health hazards, and

- Equal access to the decision-making process to have a healthy environment in which to live, learn, and work.[214]

---

[214] U.S. Envtl. Prot. Agency, Environmental Justice, (Oct. 29, 2021), https://www.epa.gov/environmentaljustice.

00158684

Title VI of the 1964 Civil Rights Act prohibits discrimination in programs and activities receiving federal financial assistance, stating "no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

Executive Order 12,898, Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations (Feb. 11, 1994), requires each federal agency to "make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations[.]"

The CEQ has issued guidance on considering environmental justice impacts under NEPA, directing that "[a]gencies should consider the composition of the affected area, to determine whether minority populations, low-income populations, or Indian tribes are present in the area affected by the proposed action, and if so whether there may be disproportionately high and adverse human health or environmental effects on minority populations, low-income populations, or Indian tribes."[215] The analysis requires examination of qualitative as well as quantitative factors:

> Agencies should recognize the interrelated cultural, social, occupational, historical, or economic factors that may amplify the natural and physical environmental effects of the proposed agency action. These factors should include the physical sensitivity of the community or population to particular impacts; the effect of any disruption on the community structure associated with the proposed action; and the nature and degree of impact on the physical and social structure of the community.[216]

The purpose of an environmental justice analysis under NEPA is to determine whether the proposed federal action will have a "disproportionately adverse effect on minority and low-income populations." *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003). An EIS must compare impacts on populations to determine whether the environmental justice impacts "appreciably exceed" impacts to the general population.[217] Not only should the comparison be quantitative, but the distinct culture and structure of environmental justice communities means the comparison should include qualitative analysis as well.[218] As with all NEPA requirements, agencies must "take a 'hard look' at environmental justice issues." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

The Office of the Secretary of Department of Transportation ("USDOT") issued Updated Environmental Justice Order 5610.2(a), which states the USDOT's commitment to consider environmental justice principles in all USDOT programs, policies, and activities; describes how the objectives of environmental justice will be integrated into planning and programming; and sets

---

[215] Environmental Justice Guidance Under the National Environmental Policy Act, at 9 (Dec. 10, 1997).

[216] *Id.* at 6.

[217] CEQ Guidance at 26-27.

[218] *See id.* at 14.

00158685

forth policies to prevent disproportionately high and adverse environmental effects to minority or low-income populations. Order 5610.2(a) highlights the importance of avoiding disproportionately high and adverse environmental justice effects in programs, policies, and activities, and includes as its aim the identification of potential effects, alternatives, and mitigation measures.[219] *Id.* § 6. The Order adopts a goal to "avoid[], minimize[] or mitigate[]" disproportionate effects. *Id.*; *see also id.* § 7(c)(2).

In order to comply with USDOT Order 5610.2(a), Executive Order 12,898, and Title VI, USDOT officials must ensure that any of their programs, policies, or activities that will have a disproportionately high and adverse effect on minority populations or low-income populations "will only be carried out if further mitigation measures or alternatives that would avoid or reduce the disproportionately high and adverse effect are not practicable." Order 5610.2(a) § 8(c). Activities that will have a high and adverse effect on populations protected by Title VI can only be carried out if (1) a substantial need for the program, policy, or activity exists; and (2) alternatives that would have fewer adverse effects on protected populations, either (a) would have other adverse social, economic, environmental or human health impacts that are severe or (b) would involve increased costs of extraordinary magnitude. *Id.* § 8(d).

Moreover, FHWA issued Order 6640.23A, FHWA Actions to Address Environmental Justice in Minority Populations and Low-Income Populations. Among other things, the Order requires FHWA managers and staff to comply with NEPA and Title VI in a manner that "identif[ies] the risk of discrimination early in the development . . . so that positive corrective action can be taken." *Id.* § 8(c). "Any relevant finding identified during the implementation of this directive must be included in the planning or NEPA documentation that is prepared for the appropriate program, policy, or activity." *Id.* § 8(h). The Order commits FHWA to "identify and prevent discriminatory effects . . . to ensure that social impacts to communities and people are recognized early and continually throughout the transportation decision-making process—from early planning through implementation." *Id.* § 6(a).

Recently, President Biden expanded on the federal government's commitment to environmental justice and issued an Executive Order On Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, explaining the goal to prioritize environmental justice and that "the Federal Government should pursue a comprehensive approach to advancing equity for all, including people of color and others who have been historically underserved, marginalized, and adversely affected by persistent poverty and inequality."[220] "The order formalizes President Biden's commitment to make environmental justice a part of the mission of every agency by directing federal agencies to develop programs, policies, and activities

---

[219] The Order defines disproportionately high and adverse effect as an adverse effect that:

(1) is predominately borne by a minority population and/or a low-income population, or

(2) will be suffered by the minority population and/or low-income population and is appreciably more severe or greater in magnitude than the adverse effect that will be suffered by the non-minority population and/or non-low-income population.

Order 5610.2(a), App. § 1(g).

[220] Exec. Order No. 13,990 of Jan. 20, 2021, 86 Fed. Reg. 7,037 (Jan. 25, 2021).

121

to address the disproportionate health, environmental, economic, and climate impacts on disadvantaged communities."[221]

**B.    The SDEIS Improperly Delays Important Environmental Justice Analysis Until the FEIS, which Hinders Meaningful Review and Comment**

The SDEIS says:

> A final comparison of environmental resource impacts in EJ block groups and non-EJ block groups will be presented in the FEIS. The determination of disproportionately high and adverse impacts to EJ populations will be made on the Preferred Alternative and will be disclosed in the FEIS.

SDEIS at 4-104. Further, the SDEIS says that measures to mitigate any disproportionately high and adverse impacts will be determined and documented in the FEIS and ROD. *Id.* at 4-104. The SDEIS does not provide justification for postponing these required analyses.[222]

By delaying an analysis of EJ impacts until the FEIS, the SDEIS prevents full and fair participation by all potentially affected communities in transportation decision-making processes and violates NEPA, Title VI, Executive Order 12,898, USDOT Order 5610.2(a), and FHWA Order 6640.23A. The Agencies should have performed the analysis already, so that a determination on EJ impacts could be made and the public and EJ communities in particular could meaningfully review and comment on it before the Agencies finalize their evaluation of the preferred alternative.

Even though the FRA has deferred the assessment required by USDOT Order 5610.2(a), the Agencies have not shown that: 1) there is a substantial need for the Project, *see* USDOT Order 5610.2(a) § 8(d)(1); and 2) there are no build alternatives that would address the claimed need with fewer adverse effects on minority and low-income communities and at lower cost, or at least without increasing costs by an extraordinary magnitude, *id.* § 8(d)(2). First, nothing in the SDEIS shows that this purported need is present given the increased prevalence of teleworking following the COVID-19 pandemic and accounting for implementation of the I-270 Innovative Congestion Management Project. Further, even if there were a need, nothing in the SDEIS shows that the preferred alternative is the only way to address this need. The Agencies improperly limited their evaluation to only one alternative that adds two toll lanes in each direction. In doing so, the Agencies ignored numerous reasonable alternatives that would better take environmental justice

---

[221] The White House Briefing Room, FACT SHEET: President Biden Takes Executive Actions to Tackle the Climate Crisis at Home and Abroad, Create Jobs, and Restore Scientific Integrity Across Federal Government (Jan. 27, 2021), https://www.whitehouse.gov/briefing-room/statements-releases/2021/01/27/fact-sheet-president-biden-takes-executive-actions-to-tackle-the-climate-crisis-at-home-and-abroad-create-jobs-and-restore-scientific-integrity-across-federal-government/.

[222] Our previous comments also explained that census block group information is not specific enough, from an environmental justice standpoint, to understand and properly address the unique needs of different socio-economic and community-based groups. Census data is deficient because it excludes "pockets of minority or low-income communities, including those that may be experiencing disproportionately high and adverse effects." EPA, Final Guidance for Incorporating Environmental Justice Concerns in EPA's NEPA Compliance Analyses, at 2.1.1 (1998). Further, as the Federal Highway Administration has found, census data cannot reveal the intricate communal networks that could exacerbate negative impacts on environmental justice populations. *See* FHWA, U.S. DOT, Environmental Justice Reference Guide, at 15 (2015).

00158687

concerns into account and cause less harm. *See* Section I.E. When considering build alternatives under USDOT Order 5610.2(a), the FHWA must consider these other alternatives, including the proposed multi-modal SMART alternative. The SDEIS does not explain why none of these alternatives were evaluated, and in any event, they must be evaluated under NEPA and USDOT Order 5610.2(a).

**C.    The SDEIS's Limited Discussion of EJ Impacts Relies on Misleading and Conclusory Statements and Fails to Take a Hard Look at Those Impacts or Consider Possible Mitigation**

In its limited discussion of environmental justice, the SDEIS makes several conclusory statements regarding potential impacts, but these passing remarks are insufficient to discharge the Agencies' duty to take a hard look at environmental justice issues. *See Del. Riverkeeper Network*, 753 F.3d at 1313 ("[s]imple, conclusory statements of 'no impact' are not enough to fulfill an agency's duty under NEPA") (alteration in original) (quoting *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 154 (D.C. Cir. 1985)).

The SDEIS states that "the Preferred Alternative is not predicted to increase emission burdens for Mobile Source Air Toxics." SDEIS at 4-102. The SDEIS provides no explanation or support for this assertion, however, which is called into question by the fact that the DEIS showed substantial increases ranging from 4.1% to 13.3% in emissions of MSAT directly attributable to the build alternatives it evaluated.

As another, example, the SDEIS says:

Air quality impacts associated with construction would not differ between EJ block groups and non-EJ block groups. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours.

SDEIS at 4-103.

Once again, the SDEIS cites no data—neither quantitative nor qualitative—to support this conclusion. Given that the SDEIS disclaims having performed any construction air quality assessment, *see* SDEIS at 4-110, let alone a health assessment, it appears there is no basis for this conclusion. We disagree that air quality impacts associated with construction would not disproportionately burden the air quality and health of environmental justice communities, which are more likely to be located along the highway. The SDEIS's statement about mitigation efforts, without even knowing the impacts, is too vague to be meaningful and does not come close to addressing the suite of adverse impacts the preferred alternative would cause to environmental justice communities. The SDEIS also provides no evidence that the Agencies evaluated the realm of options available to mitigate the disproportionate impacts to minority and low-income communities, despite their obligation to do so—and to make the information available to the public for review and comment—under NEPA and USDOT Order 5610.2(a) before moving forward with the preferred alternative.

Additionally, the SDEIS fails to evaluate the impacts of the preferred alternative in conjunction with the already high environmental burdens experienced by environmental justice

123

communities. Highway building, particularly at the expense of public transit that environmental justice communities rely on, has historically created and increased discorporate harms on environmental justice communities in Maryland and throughout the country.[223] The SDEIS fails to consider these cumulative impacts. Environmental justice communities already experience higher levels of particulate matter, ozone precursors, MSAT, carbon monoxide, and other harmful air pollutants, as well as other harmful environmental stressors, which will be increased by the preferred alternatives, but the SDEIS does not evaluate any of these existing or increased burdens. Proper analysis of air quality is especially important in the environmental justice context. Research has connected localized air pollutants to adverse health outcomes, including pulmonary and cardiovascular disease, neurological effects, and cancer.[224] These effects are compounded in environmental justice populations who are disproportionately exposed to harmful air pollution from nearly all major emission categories.[225] Statements like the following, "Air quality impacts associated with construction would not differ between EJ block groups and non-EJ block groups," SDEIS at 4-103, are meaningless without a full analysis of those impacts and health effects. Increased pollutant loads can cause more harm to environmental justice communities that are already experiencing high pollutant levels from past and present actions.

Without taking a hard look at environmental impacts, including cumulative impacts from past, present, and future actions, the SDEIS cannot foster the "informed public participation" that is central to NEPA. *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). An informed evaluation of the project's impacts on environmental justice populations is critical to "effective community participation."[226] The Agencies fail to disclose in the SDEIS the environmental justice impacts of the preferred alternative in combination with existing impacts from past actions and potential mitigation options, and therefore "preclude meaningful evaluation of the effectiveness of the agency's proposed action." *Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 227 (D.D.C. 2003).

> **D.    The SDEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative**

As explained in Sections II and IV.D , the SDEIS recognizes that the preferred alternative would create bottlenecks outside the preferred alternative limits, SDEIS at ES-12, 2-6, but the SDEIS does not accurately analyze these bottlenecks nor the arterial congestion that the preferred alternative would cause at the terminus of the managed lanes. These bottlenecks and additional

---

[223] *See, e.g.*, Liam Dillon and Ben Poston, *Freeways Force Out Residents in Communities of Color — Again*, LA Times, (Nov. 11, 2021), https://www.latimes.com/projects/us-freeway-highway-expansion-black-latino-communities/; Katie McKenna, *Opinion: How the Beltway Widening Project Is Excluding Low-Income Communities*, Maryland Matters (Nov. 30, 2021), https://www.marylandmatters.org/2021/11/30/opinion-how-the-beltway-widening-project-is-excluding-low-income-communities/ ("Why are we not investing in making alternative modes of transportation more accessible, efficient, and affordable?").

[224] *See, e.g.*, 83 Fed. Reg. 42,986 (Aug. 24, 2018).

[225] *Id.*; Christopher W. Tessum, et al., *PM₂.₅ Polluters Disproportionately and Systemically Affect People of Color in the United States*, Science Advances, Apr. 2021, https://advances.sciencemag.org/content/advances/7/18/eabf4491.full.pdf.

[226] CEQ Guidance at 4.

00158689

congestion will create additional air quality impacts in the areas where they occur, which the SDEIS shows are likely to be in environmental justice communities, including around the endpoints of the preferred alternative. *See* SDEIS at 4-96, 99. The SDEIS entirely fails to evaluate these air quality impacts and their associated human health and environmental harms.

**E.    The SDEIS Does Not Adequately Consider and Avoid Impacts to the Morningstar Tabernacle No. 88 Moses Cemetery and Hall and Gibson Grove A.M.E. Zion Church**

Morningstar Tabernacle No. 88 Order of Moses Cemetery and Hall ("Morningstar Moses Cemetery and Hall") were established around 1885 alongside Gibson Grove, a post-Emancipation Black settlement.[227] Residents, including some who had formerly been enslaved, established a benevolent society to care for the sick and destitute, bury deceased, and provide overall support to the local Black community.[228] Morningstar Moses Cemetery and Hall were named one of America's 11 Most Endangered Historic Places in 2021 by the National Trust for Historic Preservation.[229] Prior construction of the Beltway through the Gibson Grove community already went through and took a portion of the site. The SDEIS fails to consider the additional and cumulative impacts to the site and community that would be caused by the preferred alternative.

After completing a geophysical survey that identified additional burials, the Agencies claimed that "complete avoidance of the Morningstar Cemetery property has now been achieved." SDEIS at ES-14. This statement does not acknowledge or recognize prior impacts from Beltway construction. Second, the cemetery boundary and locations of graves remain unknown. As the Friends of Moses Hall explained, additional non-invasive archeological investigations are needed to determine whether additional graves are located to the north of the Moses Hall foundations, including the portions of the adjacent state right-of-way that were not surveyed.[230] Investigation needs to occur up to the edge of the highway and further east and west. Third, the SDEIS does not sufficiently consider other impacts to the property, including noise, visual, and water impacts. The Agencies must ensure that their analysis is exhaustive prior to approving any further development in this historically and culturally significant area that already faced significant disruption in the past.

Moreover, the preferred alternative moves the disturbed area from the Morningstar Moses Cemetery and Hall but increases impacts to the adjacent historic African American First Agape AME Zion Church (formerly Gibson Grove AME Zion Church). The church is more than 100 years old and held the second oldest congregation in the Cabin John community. It is named after Sarah Gibson, a former slave from Virginia who migrated to the area shortly after the Civil War and donated the land. The Gibson Grove Church property has suffered cumulative impacts from

---

[227] Discover America's 11 Most Endangered Historic Places for 2021 , National Trust for Historic Preservation (June 3, 2021), https://savingplaces.org/stories/11-most-endangered-historic-places-2021#.YYvqBPnMKUk.

[228] *Id.*

[229] *Id.*

[230] Press Release: Statement in Response to Report of Geophysical Survey for Morningstar Tabernacle No. 88 Moses Hall and Cemetery Released by MDOT SHA With I-495 and I-270 Section 106 Materials on September 8, 2021, Friends of Moses Hall (Sept. 10, 2021), https://www.friendsofmoseshall.org/press-releases.

125

00158690

stormwater damage over many years due to the original I-495 Beltway construction, which the SDEIS does not consider. The Agencies should not increase the damage by further disturbing the property with an expanded highway and impervious concrete, noise, light, and other pollution. The SDEIS does not show that the Agencies have considered alternatives or actions that would eliminate or reduce the impacts to the Gibson Grove Church.

These impacts might be avoidable, or at least mitigated, if the Agencies carried out their obligations to consider other reasonable alternatives, such as the SMART alternative or other multimodal options that would have a smaller footprint and less impact on these properties. Before moving forward, the Agencies must conduct this evaluation, which may lead the Agencies to select an alternative with fewer disproportionate impacts on these important sites.

**F.     The SDEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes**

With respect to traffic in the environmental justice section, the SDEIS states:

The Preferred Alternative is projected to provide operational benefits to the proposed managed lanes as well as general purpose lanes on the I-495 and I-270 interstate system, plus operational benefits to the surrounding local arterial network. The Preferred Alternative would significantly increase vehicle throughput across the American Legion Bridge and on the southern section of 1-270 while reducing congestion. It would also increase speeds, improve reliability, and reduce travel times and delays along the majority of I-495, I-270, and the surrounding roadway network compared to the No Build Alternative. Populations in both EJ block groups and non-EJ block groups would have the opportunity to experience these operational benefits.

SDEIS at 4-102. Later, under tolling considerations, the SDEIS states:

While the travel speed and trip reliability benefits offered by the tolled lanes could be a less feasible choice for EJ populations due to cost burden, under the Preferred Alternative, all existing GP lanes would remain toll-free and would undergo travel time improvements that would benefit all road users. Additionally, under the Preferred Alternative, toll-free travel for bus transit and High Occupancy Vehicles with three or more passengers (HOV 3+) in the managed lanes, including carpools and vanpools, would be provided. Toll rate caps would be set through a public process by the Maryland Transportation Authority, and public notice of toll schedule revisions would be required.

*Id.* at 4-104.

These two paragraphs do not provide a sufficiently detailed or accurate picture of the costs and benefits of the preferred alternative on EJ communities. First, even under the SDEIS's flawed traffic discussion, *see* Section II, the SDEIS shows that traffic and travel times in the general lanes

00158691

would not improve, at least during certain times and directions.[231] Additionally, neither these statements nor the rest of the SDEIS environmental justice discussion consider the disruptions that would be caused by the years of construction needed for the preferred alternative. Second, the SDEIS does not adequately describe the likely tolls for the managed lanes, which in 2026, when the toll lanes would open, are proposed to be up to $50 for a passenger car to drive from the George Washington Parkway to the I-270/I-370 interchange.[232] Such high tolls are exclusive, inequitable, and discriminatory. The preferred alternative sets up a two-class system: on lanes right next to each other, only those who can afford the private lanes get a faster and safer commute, with everyone else relegated to the more congested and therefore less safe general-purpose lanes. The SDEIS fails to analyze this issue and consider who would benefit from the toll lanes but instead waives it away, saying merely that the toll lanes "could be a less feasible choice for EJ populations due to cost burden," and claiming disingenuously that "EJ block groups and non-EJ block groups would have the opportunity to experience these operational benefits." The opportunity to benefit from the preferred alternative is meaningless if those benefits would not actually be realized.

Further, the SDEIS does not address the environmental justice implications of turning the existing I-270 part-time high occupancy vehicle ("HOV") lanes, one in each direction, currently available to vehicles with two or more passengers, into one of the full-time high occupancy toll ("HOT") lanes, which could only be used for free if traveling with three or more. Currently, the HOV lanes on I-270 act as general lanes outside of a 3-hour peak window each day, and so are available to everyone, and even during that window they may be used for free by vehicles with at least two passengers.[233] Under the preferred alternative, people who travel with two people during rush hour, or even one-person vehicles during other times of the day, will no longer have access to those lanes unless they can afford to pay for them. The SDEIS presents the option under the preferred alternative for vehicles with three or more passengers to travel for free on the toll lanes as a benefit to environmental justice communities, but it completely ignores the loss of this lane to those who cannot or would not pay the high tolls. Environmental justice populations disproportionately work evening and night shifts, or day shifts that start and end before or after the peak commuting hours and are therefore disproportionately harmed by loss of the general-purpose lane outside of rush hours and resulting congestion and safety issues.

Many EJ communities will not gain in travel time, due to driving through new bottlenecks over the American Legion Bridge. A large proportion of the region's EJ populations live in eastern Montgomery County and Prince George's County. To access jobs in western Montgomery County and Virginia, they would have to pass through new and worsened bottlenecks around the end points of the toll lanes (at Wisconsin Avenue). These bottlenecks would therefore disproportionately

---

[231] *See* Dan Schere, *Projections in New Study Show More Traffic with Toll Lanes on Beltway, I-270*, Bethesda Magazine (Oct. 1, 2021), https://bethesdamagazine.com/bethesda-beat/transportation/projections-in-new-study-show-more-traffic-with-toll-lanes-on-beltway-i-270/; Katherine Shaver, *Toll Lanes on Beltway, I-270 in Maryland Wouldn't Lessen Worst Evening Traffic Without Other Improvements, Study Says*, Washington Post (Oct. 1, 2021), https://www.washingtonpost.com/transportation/2021/10/01/maryland-toll-lanes-traffic/.

[232] *See* Sierra Club Maryland Chapter, Testimony on Toll Rate Range Setting Process, Phase 1 South: American Legion Bridge I-270 to I-370 (July 12, 2021), https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-TollRateSettingTestimony-2021July12_0.pdf.

[233] MDOT, High Occupancy Vehicle (HOV) Lanes Frequently Asked Questions https://roads.maryland.gov/mdotsha/pages/Index.aspx?PageId=249 (visited Nov. 10, 2021).

00158692

harm environmental justice populations living beyond the limits of the toll lanes, which the SDEIS fails to evaluate. The same would occur for the environmental justice populations living around the northern terminus of the toll lanes and north of where I-270 intersects with I-370. On the afternoon return home, they will face a bigger traffic bottleneck (and associated reductions in safety/increased accidents and more delay) under the Project build alternative than under the no-build alternative.

Lower income environmental justice populations who cannot afford the toll lanes will disproportionately rely on the free general-purpose lanes. However, the general purpose lanes as configured after building toll lanes would become less safe relative to today due to: additional traffic and congestion; new and worsened bottlenecks with end merge-point congestion; loss of the inside shoulder lane; a higher concentration of 18-wheelers that are kept off the toll lanes by unaffordable tolls and whose numbers are increasing following the COVID-19 pandemic; removal of an existing non-tolled lane in each direction of I-270, squeezing more traffic into fewer general purpose lanes; inferior maintenance of the free lanes compared to the toll lanes and poorer safety during emergencies and slower access to emergency response owing to space constraints and loss of the inside shoulder lane. *See* Sections II.H.7 to 15.

### G.   FHWA Should Not Move Forward with the FEIS and Preferred Alternative Before Completing a Thorough Investigation of the Civil Rights Complaint Filed Against MDOT

In December of 2015, the NAACP Legal Defense and Educational Fund, Inc., on behalf of the Baltimore Regional Initiative Developing Genuine Equality, Inc. and African-American residents of Baltimore, filed a complaint pursuant to Title VI with the USDOT, challenging Maryland's decision to cancel plans for the "Red Line" rail system for Baltimore City and redirect all state funding for it to a newly-created Highways, Bridges, and Roads Initiative, which focuses on road projects in rural and suburban parts of the state.[234] Among other things, the complaint argued that because the cancellation and redirection of funds had a disparate impact on African-American citizens, it violated Title VI. According to the complaint, "A transportation economist, using Maryland's own travel model, found that whites will receive 228 percent of the net benefit from the decision, while African Americans will receive -124 percent."[235] One of the most expensive projects in the Highways Plan involved I-270.[236] The complaint alleged that Maryland has discriminated against African Americans in highway construction since the 1930s.[237]

An initial investigation conducted by the FHWA Office of Civil Rights could not determine whether the state's decision included efforts to comply with Title VI, but it found that MDOT administrated their programs and services in a manner that calls into question whether MDOT

---

[234] Complaint Pursuant to Title VI of the Civil Rights Act of 1964, *Baltimore Regional Initiative Developing Genuine Equality, Inc. v. State of Maryland*, Federal Highway Administration Office of Civil Rights (Dec. 18, 2015), https://www.naacpldf.org/wp-content/uploads/Baltimore-Red-Line-Complaint.pdf.

[235] *Id.* at 2.

[236] *Id.* at 11 n.52.

[237] *Id.* at 13-14.

00158693

violated the USDOT's regulations governing Title VI.[238] The USDOT stated it would conduct a comprehensive compliance review and continue investigating the complaint to determine whether the state's decision violated Title VI.[239] However, less than six months later, under the Trump Administration, USDOT without explanation administratively closed the complaint, without any findings.[240] It is not clear if anything has come from the promised comprehensive compliance review.

Because the preferred alternative is a product of the state's decision to redirect resources to highway programs,[241] because MDOT has evaluated only highway expansion and no public transit or multimodal alternatives that could provide more benefits and less harms to environmental justice communities, and because of President Biden's renewed commitment to environmental justice, the FHWA should not move forward with the preferred alternative until a full evaluation and decision is reached on the complaint and Maryland's and MDOT's compliance with Title VI.

## VII.   The Hazardous Waste Standards Used in the SDEIS Are Not Adequate for Projecting Hazardous Waste Impacts

The SDEIS Appendix I: Hazardous Materials Report: Limited Phase 1 Environmental Site Assessment Phase 1 South assumes the following:

> The purpose of this Phase I ESA was to identify soil, groundwater, soil vapor, or debris-impacted sites in the project corridor that have potentially impacted the area within the limit of disturbance (LOD). The Phase I ESA was conducted in modified/limited accordance with EPA Standards and Practices for All Appropriate Inquiries (AAI) as required under Section 101(35)(B) of CERCLA as specified in Title 40 Code of Federal Regulations (CFR), Part 312; the ASTM International Standard E 1527-13, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (ASTM E 1527-13).

---

[238] Letter from Yvette Rivera to Governor Hogan and Secretary Rahn (Jan. 19, 2017), https://www.naacpldf.org/files/about-us/Redline_Compliance_Review_Letter.pdf.

[239] *Id.*

[240] Letter from Charles E. James Sr. to Secretary Rahn (July 13, 2017), https://www.naacpldf.org/files/about-us/USDOT-letter.pdf; LDF Statement on U.S. Transportation Department's Decision to Close Red Line Inquiry (July 13, 2017), https://www.naacpldf.org/press-release/ldf-statement-on-u-s-transportation-departments-decision-to-close-red-line-inquiry/; Emily Sullivan, *Buttigieg on Red Line: "We're Very Excited to Fund Good Transit Projects"*, WYPR News (Nov. 23, 2021), https://www.wypr.org/wypr-news/2021-11-23/buttigieg-on-red-line-were-very-excited-to-fund-good-transit-projects ("The NAACP and Black transit activists filed a civil rights complaint with the U.S. DOT after the Red Line's cancellation, noting that Hogan shifted more than $730 million of the project's state money to roads in predominantly white counties. . . . When asked whether he would reopen the complaint, Buttigieg said he can't speak to any specific cases. 'What I can say is we're going to take civil rights very seriously moving forward,' he said. 'When I arrived, we found that the department's Office of Civil Rights was not exactly staffed up or empowered.'")

[241] The state has already spent millions of dollars the preferred alternative that otherwise could have been used in a nondiscriminatory manner. *See, e.g.*, Katherine Shaver, *Maryland Board Approves $45 Million More for Consultant on Beltway, I-270 Toll Lanes Project*, Washington Post (Nov. 3, 2021), https://www.washingtonpost.com/transportation/2021/11/03/bpw-toll-lanes-consultant-contract/.

00158694

SDEIS App'x I at 13.

The fundamental problem lies in both the "modified/limited accordance" qualifier above and the many qualifying clauses in the ASTM International Standard E 1527-13, Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process (ASTM E 1527-13), specifically paragraphs:

- 4.5.1 *Uncertainty Not Eliminated*—No *environmental site assessment* can wholly eliminate uncertainty regarding the potential for *recognized environmental conditions* in connection with a *property*.

- 4.5.2 *Not Exhaustive*—*All appropriate inquiries* does not mean an exhaustive assessment of a *property*.

- 4.5.3 *Level of Inquiry is Variable*—Not every *property* will warrant the same level of assessment.

These clauses hide a great number of well-recognized risks that the entity performing the assessment chooses not to recognize.

In particular, the SDEIS Appendix I fails to address how climate change has greatly increased and will continue to increase the amount of flash flooding, especially since highway expansion will increase the amount of impermeable surface that collects toxic substances from rain and vehicles and reduces the amount of permeable soil and vegetation that can process rain.[242]

Hydrology and percolation of hazardous waste are seriously impacted by these changes:

- Increased impermeable surface increases flash flooding risk, and by displacing trees, other vegetation, and permeable soil it reduces the ability of the ecosystem to handle flooding.

- Increased rain in a changing climate saturates soil, which also reduces the ability of the ecosystem to handle flooding.

- Compacted soil, which will happen in staging areas, also loses its ability to percolate.

Soils are not just three-dimensional sieves: whatever passes through soil also has chemical interactions with individual soil particles. In healthy soil, complex ecosystems of mineral substructure surrounded by communities of microorganisms affect the hydrology and percolation of hazardous waste.

---

[242] Colman, Z., *The Toxic Waste Threat That Climate Change is Making Worse*, Politico (August 26, 2019), https://www.politico.com/story/2019/08/26/toxic-waste-climate-change-worse-1672998.

00158695

Research on this began several decades ago.[243] The 2019 severe flooding of midwestern farmland prompted studies of hydration and percolation in flooded and saturated soils, including chemicals applied as fertilizer, herbicides, and pesticides. Related issues have been studied elsewhere.[244]

With flash flooding over already saturated or compacted soils lacking vegetation the flooding scours the soil, Hazardous waste can be carried along physically for long distances over land.[245]

On PDF pages 138–145, there are eight hazardous waste sites of high concern that interface with the preferred alternative's limits of disturbance. There are many more sites of moderate and low concern that touch or overlap with the preferred alternative's limits of disturbance

If the waste disturbed at these sites is even slightly soluble in flood water, or in the organic chemicals released elsewhere by flood waters—themselves hazardous—hazardous waste can be transported in solution into storm water catchments or directly into rivers and streams, and thence into the Chesapeake Bay and the Atlantic Ocean, poisoning economically valuable ecosystems.[246] These economic costs are externalities, costs borne by fisherman and others whose livelihoods are affected, and taxpayers paying to clean up the Bay.

Storm water catchments become ever more contaminated with hazardous waste transported during storms or even non-storm rains as impermeable surface covers more land surface.[247]

---

[243] *See* Pitt, R., Clarke, S., and R. Field, *Groundwater Contamination Potential from Stormwater Infiltration Practices*, Urban Water, 1(3), 217-236 (Sept. 1999), https://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.593.4721&rep=rep1&type=pdf.

[244] Bergvall, M., Grip, H., Sjöström, J. and H. Laudon, *Modeling Subsurface Transport in Extensive Glaciofluvial and Littoral Sediments to Remediate a Municipal Drinking Water Aquifer*, Hydrol. Earth Syst. Sci., 15, 2229–2244, (July 18, 2011), https://hess.copernicus.org/articles/15/2229/2011/hess-15-2229-2011.pdf; Brown, C. D., Hollis, J. M., Bettinson, R. J. & Walker, A, *Leaching of Pesticides and a Bromide Tracer Through Lysimeters From Five Contrasting Soils*, Pest Manag. Sci. 56, 83–93 (2000); De-Campos et al., *Short-Term Reducing Conditions Decrease Soil Aggregation*, Soil Science Society of America Journal, 2009; 73 (2), 550, https://www.ars.usda.gov/ARSUserFiles/30200525/WindErosionPublications/Short-TermReducingConditionsDecreaseSoilAggregation.pdf; Eggleston, J. R. and Rojstaczer, S. A., *Can We Predict Subsurface Mass Transport?*, Environ. Sci. Technol., 34, 4010–4017, 2000; Erickson, B. E., *Analyzing the Ignored Environmental Contaminants*, Environ. Sci. Technol., 36, 140A–145A, 2002; Khullar, J. S., *Floods in Polluted Rivers Can Pollute Groundwater Too. Floods Have the Potential to Impact the Microbial Quality of Groundwater in Affected Areas*, (Nov. 3, 2017) https://www.downtoearth.org.in/news/science-technology/floods-in-polluted-rivers-can-pollute-groundwater-too-59007; Pitt, R. *Potential Groundwater Contamination Associated with Stormwater Infiltration and Recommended Practices*, (2009), http://unix.eng.ua.edu/~rpitt/Presentations/Regional_Conferences/Groundwater_SW_Issues_Bend_ACWA_2009.pdf.

[245] World Health Organization, *Chemical Releases Associated with Floods*, WHO/CED/PHE/EPE/18.02 (2008), https://apps.who.int/iris/rest/bitstreams/1135970/retrieve.

[246] *See* Frazin, R. Hundreds of Hazardous Waste Sites Could Face Flooding in Next 20 Years: Report (July 28, 2020), https://thehill.com/policy/energy-environment/509587-hundreds-of-hazardous-waste-sites-could-face-floods-over-20-years.

[247] Young S, Balluz L, and Malilay J., *Natural and Technologic Hazardous Material Releases During and After Natural Disasters: A Review*, Science of the Total Environment, 322(1–3):3–20 (2004)

00158696

Decontaminating storm water catchments is difficult, expensive, unlikely to succeed, and is another external cost not assumed by private contractors and imposed on taxpayers.

Much attention has been paid to the dangers of flooding for Superfund sites, but the same mechanisms also make even small deposits of hazardous substances dangerous.[248]

The majority of hazardous wastes mobilized by floods will contaminate the waterways the floods drain into. But in the Maryland Piedmont, in soils that are not compacted, saturated, or destroyed by contamination, water percolates from the surface downward through the soil and rock until it reaches the water table, the saturated zone called an aquifer. I-270 and I-495 west of route 650 (exits 28 AB) lie in the Piedmont.[249]

Most aquifers in the Piedmont have no natural overlying impermeable layer to protect them from contamination by substances released on or near the surface, including leaking hazardous waste sites and runoff from impermeable surfaces.[250]

In the Coastal Plain, East of Exits 28 AB, the hydrogeology makes aquifers even more susceptible to surface contamination. These aquifers feed into surface waterways through springs and are the source of well water.

Current regulations for evaluating the risk of release of hazardous chemicals from existing waste sites do not take all these critical factors into account.

Hence the SDEIS does not adequately address the real consequences and costs of adding impermeable surface that will increase flash flooding in an area much larger that the stated LOD, increasing the risk of flushing hazardous waste into storm water catchment basins, streams, rivers, the Chesapeake Bay, the Atlantic Ocean, with many external costs to those whose livelihoods and health are affected and to taxpayers.[251] These external costs are not assumed by the private contractor who builds the project and collects the tolls. Costs associated with hazardous waste will

---

http://dx.doi.org/10.1016/S0048-9697(03)00446-7.

[248] See Carter, J. and C. Kalman, A Toxic Relationship: Extreme Coastal Flooding and Superfund Sites, Union of Concerned Scientists Report (July 28, 2020), https://www.ucsusa.org/resources/toxic-relationship; Erikson, T.B., Brooks, J., Niles, E.J., Pham, P.N., and Vinck, P., Environmental Health Effects Attributed to Toxic and Infectious Agents Following Hurricanes, Cyclones, Flash Floods and Major Hydrometeorological Events, Review, J Toxicol Environ Health B Crit Rev. 22(5-6):157-171 (Aug. 22, 2019); Euripidou E, and Murray V., Public Health Impacts of Floods and Chemical Contamination, Journal of Public Health 26(4):376–83 (2004) http://jpubhealth.oxfordjournals.org/content/26/4/376.full.pdf; Hasemyer, D., and Olsen, L., Climate Change Poses a Growing Threat to Hundreds of Hazardous Waste Superfund Sites, NBC News (Sept. 24, 2020), https://www.nbcnews.com/specials/superfund-sites-climate-change/.

[249] Maryland Department of Natural Resources, Ground Water and Wells in the Maryland Piedmont, Fact Sheet 19, DNR Publication No: 12-3112013-630: April 2013, http://www.mgs.md.gov.

[250] Maryland Geological Survey, Coastal Plain Aquifers in Maryland (2020), http://www.mgs.md.gov/groundwater/coastal_plain_aquifers_mobile.html.

[251] See also EEA – European Environment Agency, Groundwater Quality and Quantity in Europe, Environmental Assessment Report No. 3, Copenhagen, Denmark, at 123 (1999); Flesher, J., Flood Raises Fears of Pollution At Michigan Toxic Waste Site, AP News (May 21, 2020), https://apnews.com/article/us-news-ap-top-news-traverse-city-mi-state-wire-michigan-b223d2e6fea6f2c8d82d60981708e7c6

00158697

be borne by the impacted areas and by the state. In the event of "the discovery of any Unknown Hazardous Environmental Conditions during the carrying out of the Construction Work;" the state, using money from taxpayers, will be required to make compensation payment(s) to the developer.[252]

## VIII.   The SDEIS Does Not Sufficiently Evaluate the Preferred Alternative's Indirect and Cumulative Effects

An indirect effect is "caused by the action and [is] later in time or farther removed in distance, but [is] still reasonably foreseeable." 40 C.F.R. § 1508.7 (b) (2019). It "may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems" *Id.* A cumulative effect is the "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7 (2019). As part of its EIS, the Agencies must measure the direct, indirect, and cumulative environmental effects of its proposed action. *Id.* §§ 1502.16, 1508.7, 1508.8 (2019); *N.C. Wildlife Fed'n*, 677 F.3d at 602.

"Conclusory statements that the indirect and cumulative effects will be minimal or that such effects are inevitable are insufficient under NEPA." *N.C. Wildlife Fed'n*, 677 F.3d at 602. Instead, an EIS must include a "useful analysis of the cumulative impacts of past, present and future projects." *Carmel-by-the Sea*, 123 F.3d at 1160; *accord Ocean Advocs. v. U.S. Army Corps of Engineers*, 402 F.3d 846, 868 (9th Cir. 2005) ("an agency must provide 'some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided.'") (quoting *Neighbors of Cuddy Mountain*, 137 F.3d at 1379-80). "It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006).

"A meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network*, 753 F.3d at 1319 (quoting *Grand Canyon Trust v. FAA*, 290 F.3d 339, 345 (D.C. Cir. 2002)). Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects without any quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*,

---

[252] *See* Maryland Sierra Club Testimony on the 495-270 Relief Plan P3 Agreement, at 7 (June 29, 2021), https://www.sierraclub.org/sites/sierraclub.org/files/sce-authors/u25361/Testimony-495-270ReliefPlan-P3Agreement-2021June29.pdf; *see also* EPA—Environmental Protection Agency, Sensitive Environments and the Siting of Hazardous Waste Management Facilities (1997), https://archive.epa.gov/wastes/wyl/web/pdf/sites.pdf.

00158698

958 F.3d 865, 872-73 (9th Cir. 2020); *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 994 (9th Cir. 2004).

Despite these clear obligations, the SDEIS's one-page discussion of indirect effects and one-page discussion of cumulative effects contains no meaningful analysis, even when considered with the sparse discussion in the DEIS, and it is so inadequate that it precludes meaningful public review and comment.

Regarding indirect effects, the SDEIS merely says:

The Preferred Alternative could change travel patterns by providing increased capacity along existing facilities. More rural, less-developed portions of the ICE [Indirect and Cumulative Effects] Analysis Area and other locations where undeveloped land exists would be most likely to experience pressure for new development from improved access along the I-270 and I-495 corridors. Noise impacts could occur to communities from greater traffic volumes on connecting roadways. Indirect impacts would be minimized by adherence to existing master plans and zoning regulations pertaining to new development.

Indirect impacts to wetlands, wetland buffers and waterways from the Preferred Alternative could result from roadway runoff, sedimentation, changes to hydrology, and facility-related run-off quality and quantity associated with the conversion of land from rural to urban and suburban uses, as well as changes in drainage patterns and imperviousness. Indirect downstream impacts to surface water would be minimized through the development and application of approved erosion and sediment control plans and stormwater-related best management practices (BMPs).

SDEIS at 4-108. With respect to cumulative impacts, the SDEIS merely says:

The proposed action, along with other future transportation projects would cause noise impacts, with potential cumulative effects on communities in the vicinity of improved and new roadways. Cumulative impacts to water quality could occur from stream loss and the incremental increase of impervious surfaces that may increase runoff from past, present, and future development projects. These would be minimized through the use of BMPs during construction and use of SWM [stormwater management] facilities. The incremental effect would be minimized by the required permitting process, which would identify avoidance, minimization, and mitigation as needed to offset wetland losses.

SDEIS at 4-109.

These are precisely the types of conclusory, general statements, with no quantification or details, that courts have repeatedly found insufficient under NEPA. The SDEIS does not meaningfully evaluate either the indirect or cumulative impacts from various aspects of the preferred alternative on traffic conditions, water, air, health, environmental justice, historic and cultural properties, greenspace, and utilities. Nor does it evaluate other impacts of the preferred alternative when combined with other past, present, and reasonably foreseeable future projects, including the reasonably foreseeable impacts of the other highway expansion segments that are

134

more likely to occur if the preferred alternative is built. There is nothing in the SDEIS that constitutes the "quantified or detailed information" about the indirect and cumulative effects of the preferred alternative that is necessary for informed decision-making. *Ocean Advocates*, 402 F.3d at 868; *Bark*, 958 F.3d at 872-73. Some specific deficiencies include:

The SDEIS also ignores the consequences of the proposed four to five years of construction of the preferred alternative and the traffic, environmental, health, economic, and other effects this construction will cause. Further, the SDEIS ignores the cumulative construction effects of the preferred alternative along with reasonably foreseeable other projects in the region, including the other P3 highway expansion segments.

Our comments on the DEIS explained that the Agencies improperly ignored the costs of relocation of water and sewer infrastructure[253] and other types of utilities (electricity, gas, internet, and cable television),[254] as well as who would bear those costs. The SDEIS also does not address this issue, despite the fact that Maryland citizens and environmental justice communities may be forced to pay billions of extra dollars as a result.

The SDEIS also fails to consider the cumulative impacts from the preferred alternative's construction and operation GHG emissions, which are necessarily cumulative in nature. The Agencies must reasonably quantify GHG emissions from the construction and operation of the preferred alternative, evaluate them together with GHG emissions from reasonably foreseeable projects in the region, place those emissions in the context of local, regional, national, and international climate change and human health impacts, and present that information for public review and comment. *See WildEarth Guardians v. Bernhardt*, No. CV 16-1724 (RC), 2020 WL 6701317, at *7-9 (D.D.C. Nov. 13, 2020); *accord Del. Riverkeeper Network*, 753 F.3d at 1319.

Even if the Agencies do not evaluate the other proposed P3 highway expansion segments in the same environmental impact statement, despite their obligation to do so, *see* Section I.F, the SDEIS still must evaluate the indirect and cumulative impacts of those and other reasonably foreseeable projects in the NEPA process. The failure of the SDEIS to do so is particularly

---

[253] Letter from Montgomery County Council to Gregory Slater (May 14, 2020), https://static1.squarespace.com/static/5b72c6a8da02bc640472bf8c/t/5ec01b95ac35107c14b15b29/1589648277828/WSSC-MDOT-Letter.pdf; Memorandum to Prince George's County Council and Montgomery County Council re Agenda Item #1: Briefing: Possible Impacts of the I-270 and I-495 Road Widening P3 Project on WSSCWATER Infrastructure (March 12, 2020), https://www.montgomerycountymd.gov/council/Resources/Files/agenda/cm/2020/20200312/20200312_TETIEE1-2.pdf; Dominique Maria Bonessi, *Water Bills In Maryland Could Nearly Triple Under Beltway And I-270 Expansion Plan*, WAMU (March 16, 2020), https://wamu.org/story/20/03/16/water-bills-in-maryland-could-nearly-triple-under-beltway-and-i-270-expansion-plan/; Bruce DePuyt, *Express Toll Lanes Could Raise Water Bills in Montgomery and Prince George's*, Maryland Matters (March 13, 2020), https://www.marylandmatters.org/2020/03/13/express-toll-lanes-could-raise-water-bills-in-montgomery-and-prince-georges/.

[254] Bruce DePuyt, *Pipes, Cables Could Face Major Disruption by Plan to Widen Beltway and I-270*, WTOPnews (Oct. 28, 2020), https://wtop.com/dc-transit/2020/10/pipes-cables-could-face-major-disruption-by-plan-to-widen-beltway-and-i-270/; Bruce DePuyt, *Labyrinth of Pipelines and Cables Could Face Major Disruption by Highway Plan — And Who Would Foot the Bill?*, Maryland Matters (Oct. 28, 2020), https://www.marylandmatters.org/2020/10/28/labyrinth-of-pipelines-and-cables-could-face-major-disruption-by-highway-plan-and-who-would-foot-the-bill/.

00158700

egregious here, where completion of the preferred alternative makes completion of the other connecting P3 highway expansion segments more likely.

As explained in Section II.B.4, the SDEIS does not properly consider the induced land use and travel caused by the preferred alternative, along with corresponding increases in energy use, air pollution, and GHG emissions. Nor does it consider the induced land use and travel from the other segments of the highway expansion.

The SDEIS also lacks the cumulative analysis necessary to identify regional effects to impacted aquifers and regional hydrology during construction and operation of the preferred alternative and other reasonably foreseeable projects. This information must be made available to the public so that replication of the results can be tested and an understanding of the quality of the outputs can be determined.

## IX.  The SDEIS Violates NHPA/Department of Transportation Act Section 4(f) Requirements

The I-495 & I-270 Project, including its Phase I South, has the potential to cause irreparable damage to historic and cultural resources in the pathway of the proposed interstate expansion plans. Section 4(f) of the Department of Transportation Act bars the FHWA from approving any transportation project that "requires the use of . . . any land from an historic site of national, State, or local significance as so determined by such officials *unless* (1) *there is no feasible and prudent alternative* to the use of such land, and (2) such program includes all possible planning to minimize harm to such . . . historic site resulting from such use." 23 U.S.C. § 138(a); 49 U.S.C. § 303(c) (emphasis added).

In addition, both NEPA and Section 106 of the National Historic Preservation Act require the Agencies to take a "hard look" at the Project's effects on historic and cultural resources based on complete and accurate information. Notwithstanding the importance of these resources to the American public and Maryland residents, the SDEIS still understates and fails to adequately consider the preferred alternative's effects on historic and cultural resources, including those identified in the SDEIS as 4(f)-protected properties. Indeed, the SDEIS proposes that these determinations be deferred until after the FEIS is issued, and instead addressed after-the-fact through the execution of a Programmatic Agreement ("PA"). SDEIS at 4-40. As a result, the draft Section 4(f) evaluation contained in the SDEIS is based on flawed and incomplete information, which invalidates many of its ultimate conclusions about the extent to which the Project will use Section 4(f)-protected historic properties. Additionally, in preparing the SDEIS Section 4(f) analysis, the Agencies have still failed to consider alternatives that would have emerged if they had used all possible planning to avoid use of historic properties and parks, among other resources, by exploring feasible and prudent alternatives. Therefore, the SDEIS violates the letter and intent of federal historic preservation laws that the Agencies are required by Congress to follow. The public must still be provided an opportunity to review and comment on an accurate document that corrects these defects.

00158701

Below are comments on the SDEIS that supplement the comments already made on historical and cultural resources in the DEIS.[255]

**A.    The SDEIS Discloses Increased Adverse Effects on Section 106 and Section 4(f)-Protected Sites**

The SDEIS states on page 5-1:

Section 4(f) of the US Department of Transportation (USDOT) Act of 1966 as amended (49 USC. 303(c)) is a Federal law that protects significant publicly-owned parks, recreation areas, wildlife and/or waterfowl refuges, or any significant public or private historic sites. Section 4(f) applies to all transportation projects that require funding or other approvals by the USDOT. As a USDOT agency, FHWA must comply with Section 4(f) and its implementing regulations at 23 CFR 774.

Overall, most historic sites that are within the Project's LOD had increased impacts in the SDEIS relative to the DEIS, and impacts are being significantly underestimated with reference to several known historical sites. In "Table 5-1: Summary of Section 4(f) Property Use," SDEIS at 5-6, of the 21 sites listed, impacts increased for 16 of those sites while 3 had no change, and for two sites, impacts were reduced due to a change in land designation accounting NPS seemingly agreed to allow.

The Morningstar Cemetery is not included in the table, though its exclusion is premature and unsupported: The SDEIS claims "complete avoidance of the Morningstar Cemetery property has now been achieved," SDEIS at ES-14, but it is not yet possible to determine if impacts will be avoided since the ground penetrating radar studies of the necessary locations have not been done.

In the text, many of the sites discussed mentioned the possibility of adverse effects determinations due to design refinement, but assumed *de minimis* impacts, and deferred the determination of effects until later in the FEIS.

MDOT SHA had included provisions for making an effect determination at a later time (upon design advancement) to Carderock Springs Historic District under an initial draft Section 106 Programmatic Agreement. However, based on refined design MDOT SHA anticipates that there would be no adverse effect, and will coordinate the finding with MHT for concurrence. If MHT concurs, FHWA would make a *de minimis* impact determination for the Carderock Springs Historic District. A final *de minimis* determination would be documented in the Final Section 4(f) Evaluation and FEIS.

SDEIS at 5-17.

---

[255] Sierra Club Maryland Chapter et al. Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) (Nov. 9, 2020), https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/2020-11-09-Comments%20on%20DEIS%2C%204%28f%29%2C%20and%20JPA%20%281%29%20%281%29.pdf.

00158702

Given that the Section 106 consultations are as yet incomplete and many determinations have not yet been finalized, it is likely that additional adverse effects will be acknowledged prior to the issuance of the FEIS as well. This further impairs the reliability of the determinations made in the draft Section 4(f) Evaluation.

**B.    The SDEIS's 4(f) Chapter Provides More than Simply "Additional Analysis"**

The preceding section shows that the scope of impacts for most properties has changed, and in most cases increases. Yet the SDEIS maintains on page 5-2 that "This supplemental chapter does not replace the Draft Section 4(f) Evaluation; it only provides additional analysis." That is simply untrue. The chapter does not only provide additional analysis but updated figures and new information. In essence the SDEIS does replace the information in the DEIS. It is a challenging and messy prospect for the public or the Agencies themselves to be utilizing 19,000 pages of DEIS and 8,000 pages of SDEIS and try to sort out which information is still valid (assuming it was valid to begin with) from the DEIS.

The information on the 4(f) sites profiled in the SDEIS cannot be simultaneously true with what is presented in the DEIS in cases where the information in the DEIS and SDEIS are contradictory.

The SDEIS states on page 4-34 that "On September 8, 2021, MDOT SHA requested concurrence that the historic properties that are now outside the APE for the Preferred Alternative would experience no adverse effect." That request fails to acknowledge that properties along the eastern part of I-495 will in fact be adversely affected by future phases of the Project whose cultural resource investigations and determinations have been deferred for political reasons. Future detailed investigations will likely increase the scale and nature of impacts; thus, the SDEIS's determinations for the historic properties outside of Phase 1 South would be premature and inappropriate, and contrary to the views expressed by M-NCPPC.[256]

**C.    The Agencies' Deferral of the Federally Required Assessment of Impacts Impermissibly Forecloses Opportunities to Avoid, Minimize, and Mitigate Impacts to Historic Properties**

The Section 106 Programmatic Agreement approach for this Project remains inappropriate and inadequate, as it impermissibly defers and forecloses large measures to avoid impacts (such as Project scope, number of new lanes, and road alignment) to historic properties, including Section 4(f)-protected historic properties. Please see Sierra Club Maryland Chapter's April comments in this regard.

---

[256] "The Commission wants to ensure that by responding to substantive comments made by interested parties to the broader Purpose and Need, SHA and FHWA will not be able to justify conducting a less rigorous environmental review of future phases. In particular, we raise concerns that SHA and FHWA would be able to take the position that it only is required to undertake an Environmental Assessment versus an EIS for future phases and rely on the findings of the broader Purpose and Need Statement and EIS process for the Study culminating in the selection of the New RPA." Letter from Elizabeth M. Hewlett and Casey M. Anderson to Jeanette Mar and Time Smith re Non-Concurrence Letter on New Recommended Preferred Alternative (June 25, 2021), https://montgomeryplanningboard.org/wp-content/uploads/2021/06/MNCPPC_Non-Concurrence_RPA_06-25-2021_SIG.pdf.

00158703

The purely Programmatic Agreement approach to Section 106 is inadequate to meet federal regulations, given the incomplete identification of historic properties and assessment of impacts to them in the I-495 & I-270 MLS DEIS and SDEIS.

A hybrid approach to the Section 106 process which involves Programmatic Agreement for some sites and Memorandum of Agreement for sites that will experience known adverse impacts is appropriate for a project of this nature, magnitude, and complexity. Further detail is provided in Sierra Club Maryland Chapter's Section 106 comments dated April 12, 2021.

The Project's planned deferral of assessment of impacts of some of these sites to the FEIS offers inadequate protection for historical and cultural sites, many of which are known now to face significant adverse effects. Deferral of identification and assessment of impacts forecloses to these historical sites the opportunity of benefiting from important avoidance, minimization, and mitigation measures.

> **D.    Lack of an Appropriate Alternatives Analysis in the SDEIS for the American Legion Bridge Impairs Legally Required Avoidance, Minimization, and Mitigation Decisions about Historical Properties**

Alternatives to widening the American Legion Bridge with more car lanes were not considered. Rail over the bridge was not considered. A one-lane addition per side alternative was not fully considered for the American Legion Bridge and should have been. Over a decade of study by MDOT, VDOT, and FHWA conclude that:

> Along the Capital Beltway, there were two proposed typical sections for the long-term alternatives: a one-lane and a two-lane managed system. However, the physical footprint for all of the alternatives was the same and it included widening for two lanes per direction in Virginia and widening for one lane per direction on the American Legion Bridge and in Maryland. The widening in Maryland was constrained by the right-of-way, proximity to sensitive environmental features, and proximity to adjacent residences.[257]

A one-lane addition per side, rather than two, would significantly reduce risks and adverse impacts to historical sites, among others. Previous studies only considered it possible to widen the Capital Beltway by one lane per direction on the American Legion Bridge and in Maryland. Yet a one-lane addition per side alternative (Alternative 5) for the American Legion Bridge and most of the Maryland Beltway was rejected by MDOT and FHWA as "not a reasonable alternative," DEIS App'x D at 1, and excluded from the Joint Permit Application alternatives. It is worth asking again in this context why a one-lane addition per direction alternative was not considered more fully, an alternative which would entail less harm to the historic Plummers Island and would preserve the integrity and reduce the closure time of the C&O Canal NHP towpath. A one additional lane per side alternative would also be much less disruptive for the adjacent impacted

---

[257] West Side Mobility Study, Maryland State Highway Administration, Maryland Transportation Authority, & Virginia Department of Transportation, at 21 (Nov. 2009), https://web.archive.org/web/20131102090131/http:/capitalbeltway.mdprojects.com/pdfs/Final_WestSideMobilityStudyReport.pdf.

historical sites all along the entire Maryland Beltway, including the two Gibson Grove historical sites.

In 2005, the Capital Beltway Study considered five alternatives for the American Legion Bridge. In addition to the no build alternative, it considered one additional lane plus a conversion of a lane, one additional lane, and for each of those alternatives rebuild or replace.[258]

The DEIS failed to include any upstream alternative (adding new lanes and bike/pedestrian path only to the upstream side of the American Legion Bridge). This is a reasonable, prudent and feasible alternative that would significantly reduce harm to Plummers Island and the C&O Canal NHP and should have been considered. In 2021, an MDOT "strike team" noted the possibility of an upstream bridge alternative in which new lanes would all be added to the upstream side of the American Legion Bridge to reduce impacts to Plummers Island. The addition of lanes only to the upstream side of the bridge would better protect Plummers Island from the worst adverse impacts of bridge construction. Yet, this option was not presented in the DEIS or SDEIS for public comment. This reasonable, feasible and prudent bridge option must be considered and analyzed as required by NEPA and Section 106, and Section 4(f). As a prudent and feasible alternative that would minimize harm to Plummers Island, Section 4(f) further requires that it be selected and incorporated into MDOT's preferred alternative.

Bridge construction alternatives for the ALB were not considered by Virginia in their I-495 Express Lanes Northern Extension (495 NEXT) Environmental Assessment (EA). Bridge construction alternatives could have avoided or minimized impacts to multiple historic properties, including Plummers Island, the C&O Canal National Historic Park, and the George Washington Memorial Parkway. Virginia owns 21% of the American Legion Bridge, while Maryland owns 79% of it and the Potomac River. Virginia's EA for the bridge analyzed only build or no build alternatives, assuming continuation of Virginia's pattern of adding two new toll lanes, which does not consider what might be in the best interests of Maryland. This means that Virginia did not pose any bridge alternatives and by doing so may have foreclosed options for other alternatives. It is unclear to what extent the Capital Beltway Accord (an agreement between Maryland Governor Larry Hogan and Virginia Governor Ralph Northam and Transurban, announced November 12, 2019),[259] its partial sale by Transurban on December 17, 2020,[260]and the heavily redacted January 2019 agreement[261] may have biased the process and foreclosed opportunities for other alternatives,

---

[258] Capital Beltway Study Natural Environment Technical Report, at 1-3 to 1-5 (2005). This study and the other studies in the Capital Beltway Study have been the subject of protracted contention between the public and the Agencies who wish to keep the information in these studies hidden. Only a few of the parts have been released in heavily redacted form. *See* DEIS and SDEIS comments for further detail.

[259] Ben Ross, Testimony on Toll Lane P3 Contract (June 29, 2021), https://f0d3dd92-98e8-4a26-bc62-0ccf9ff9f227.filesusr.com/ugd/9cb12f_498e67c0295a4f218ea005ae8a9e2e78.pdf.

[260] Patrick Hatch, *Transurban Readies For Buying Spree With $2.8b US Road Sale*, Sydney Morning Herald (Dec. 17, 2021), https://www.smh.com.au/business/companies/transurban-readies-for-buying-spree-with-2-8b-us-road-sale-20201217-p56oce.html; *Transurban : Chesapeake Partnership and Traffic Update*, Market Screener (Dec. 16, 2020), https://www.marketscreener.com/quote/stock/TRANSURBAN-GROUP-6493737/news/Transurban-Chesapeake-Partnership-and-Traffic-Update-32030618/ (search "Capital Beltway Accord").

[261] *Press Release: Citizens Demand "Stop the P3 Toll Lane Boondoggle" As Virginia's Secret Contract with Toll Company Is Revealed*, Maryland Transit Opportunities Coalition (June 8, 2021),

00158705

including in the design and reconstruction of the bridge to accommodate rail. The misalignment of the processes with an EA in Virginia and EIS in Maryland also raises questions about the appropriateness and adequacy of the analysis of alternatives for the American Legion Bridge. This inattention to bridge alternatives in a NEPA process contrasts starkly with the thorough process of review, analysis, and vetting that occurred for the Woodrow Wilson Bridge, which was ultimately built to accommodate heavy rail to support multimodal connectivity. It also begs the question why the Virginia side of the Beltway expansion project was not subjected to an equivalent level of review as the Maryland side if they are supposed to be coordinating the projects.

MDOT's January 27, 2021, recommended preferred alternative, which includes four new tolled lanes on the American Legion Bridge, further seems to have foreclosed alternatives from consideration that should have been explored during the NEPA process and been informed by the Section 106 process. MDOT's recommended preferred alternative was premature given the inadequacy of the analysis presented in the DEIS and the early stage of the Section 106 process. The SDEIS's preferred alternative is also premature given the stage of the impact assessment and inadequate consideration of prudent and feasible alternatives, which have expanded and require reassessment due to influx of money to the state and increasing understanding of the impacts of COVID-19 and the climate crisis.

A serious study of bridge alternatives and bridge construction impacts has not been undertaken. Instead, the DEIS merely notes that "Other minimizations options were also considered and discussed with NPS such as a double deck bridge, top-down construction and reduced typical sections and pier locations (Appendix F, Section 2.1.2.C)." DEIS at 6-8. Given the scenic value of the river and the sensitivity of the historic sites and ecological significance of the sites under the American Legion Bridge, this is not acceptable. Further, the Project will have adverse effects on the George Washington Memorial Parkway and the Clara Barton Parkway as a result of the American Legion Bridge and 495 NEXT project in Virginia.

Lastly, although the DEIS mentioned a U.S. Coast Guard (USCG) letter stating that a bridge permit[262] for the American Legion Bridge would not be required,[263] that letter has not been disclosed to the public despite repeated requests, in violation of the CEQ regulations. 40 C.F.R. § 1506.6(f) (2019). Without seeing the letter, it cannot be determined why such a decision was made, the legitimacy of the decision, and whether there are any conditionalities or new circumstances that invalidate the decision. The bridge permit process is a standard requirement that should be followed and can further build awareness of and protection for sensitive historic and ecological sites that fall in the vicinity of the American Legion Bridge, including Plummers Island, the C&O Canal NHP, and C&O Canal area Native American and 19th & 20th Century sites.

---

https://web.archive.org/web/20210610153721/https:/transitformaryland.org/latest-news;   Redacted Development Framework Agreement, (Jan. 29, 2019), http://www.actfortransit.org/archives/reports_and_other/DFAredacted.pdf.

[262] Bridge Permit Application Guide, Office of Bridge Programs, U.S. Coast Guard (July 2016), https://www.dco.uscg.mil/Portals/9/DCO%20Documents/5pw/Office%20of%20Bridge%20Programs/BPAG%20C OMDTPUB%20P16591%203D_Sequential%20Clearance%20Final(July2016).pdf.

[263] Sierra Club Maryland Chapter et al. Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA), at 64 (Nov. 9, 2020), https://jillgrantlaw.com/wp-content/uploads/2020/11/2020-11-06-Comments-on-DEIS-4f-and-JPA.pdf.

E.    **The SDEIS Continues to Neglect Other Issues That Require Attention and Were Described in Section 106 Comments and Comments on the DEIS**

Other significant points about the Section 106 and 4(f) properties and process are also made in the Section 106 comments on the Project and in comments on the DEIS, which MDOT has on file and are in the administrative record. Those issues remain. Some relate to concerns with the contract language and the construction contractor. Others make specific recommendations to the Agencies and Section 106 team.

One that bears repeating here is related to dust emissions from the preferred alternative. If the preferred alternative goes forward, dust minimization and specifically OSHA crystalline silica construction dust standards must be upheld and the users and visitors of historic parkland and sites adjacent to the highway widening must be protected. The SDEIS references only local and state regulations, SDEIS at 4-103, whereas federal regulations must also be followed. Requirements for compliance should be included in the Programmatic Agreement. The roads and bridges deconstruction processes required for the preferred alternative will create large amounts of fugitive dust, including toxic crystalline silica construction dust. These emissions will occur on and around the American Legion Bridge, and the toxic dust will drift locally and downriver and impact Plummers Island and the C&O Canal National Historic Park (the eighth most visited national park during 2020),[264] including its popular towpath. Plummers Island animal and plant life and the biologists studying it would be at risk from this dust. Visitors to the C&O Canal NHP and its towpath will be as well. Such toxic air pollution causes respiratory diseases including asthma, silicosis, chronic obstructive pulmonary disease (COPD), and lung cancer. As a matter of public health, this issue must be addressed in the NEPA environmental impact documents, Programmatic Agreement, and environmental rules for contractors included in bidding documents.

F.    **The SDEIS Improperly Excludes "Future Phase" Section 106 Historical and 4(f) Impacts from the Project's Impacts**

The Section 106 and 4(f) review of properties for the I-495 east segment of the Project, being called "no action at this time," is incomplete and inadequate.[265] Like in the Phase 1 South segment of the Project, many of the sites initially assumed to have *de minimis* impacts will in fact have greater and more serious impacts. Desk review is not the same as on-site investigation, interviews, and meaningful efforts to understanding community use and importance to stakeholders and local communities.

Many of the sites in the I-495 east segment should and have not been screened for National Register of Historic Places eligibility. This includes Sligo Creek Parkway and Indian Springs community in Silver Spring, which merit specific attention to both their Native American history and more recent history connected to the early days of settlement the area (the Blair family, etc.) and the 20th Century. There is also a C&O Canal area Native American site and a 19th and 20th

---

[264] *C&O Canal National Historic Park Was Eighth Most-Visited National Park in 2020*, Montgomery County Update (April 7, 2021), https://montgomerycomd.blogspot.com/2021/04/c-canal-national-historic-park-was.html.

[265] Detailed identification and impact assessments of historic sites for all of the I-495 & I-270 MLS are required because I-495 east of the eastern spur was not officially designated "no build."

00158707

Century site that have each been recommended eligible for the National Register of Historic Places but do not appear in the SDEIS to have been reviewed for eligibility or otherwise addressed.[266]

It is improper to not have reviewed Section 106 and 4(f) sites from upper 270 between I-370 and I-70. This includes the Monocacy Battlefield. That upper 270 segment is already conditionally contracted to the developer Transurban and has a specific name (Phase 1 South plus upper I-270 is being called the American Legion Bridge Traffic Relief Plan). It is part of the plan and therefore needs to be considered a foreseeable future cumulative effect of the plan. To have not reviewed and disclosed the Section 106 and 4(f) impacts in the upper I-270 segment is to severely underestimate and inaccurately reflect the impacts of the preferred alternative presented in the SDEIS.

The SDEIS has misrepresented and grossly underestimated Project impacts on Section 4(f)-protected resources by excluding the impacts of reasonably foreseeable eastern I-495 and upper I-270 future phases.

### G.   The Mismatch and Overlap of Multiple Short I-495 & I-270 Review Periods Hindered Meaningful Review and Comment Both by the Public and Section 106 Consulting Parties

The short and overlapping timing of three different comment periods for the I-495/I-270 Project during a pandemic is contrary to reason and the principles of Section 106, which emphasize the importance of meaningful public participation. This timing does not allow consulting parties sufficient opportunity to comment meaningfully on any one process. The 8,000+ page SDEIS was published on October 1, 2021, with a 45-day comment period and a four-week Toll Rate Range Setting comment period was begun on the same day. The October 8, 2021, deadline for the Section 106 process did not give time to reflect information from the SDEIS in the Section 106 comments.

### H.   The SDEIS Is Outdated Compared to the Section 106 Process Findings

The SDEIS and draft Section 4(f) evaluation is outdated and fails to incorporate preliminary findings made during the ongoing Section 106 process. Much more is known about impacts to historic properties than was presented. This is true about some of the most sensitive sites, including the Gibson Grove properties, Plummers Island, and Carderock Springs, as has been reflected in Section 106 and SDEIS comments.[267] Those newer known impacts were not identified or shared with the public for review, analysis, and comment. The purpose of the NEPA process is disclosure of impacts for public comment, and in regard to Section 106 and 4(f)-protected sites, among others, that purpose has not been met.

---

[266] See DEIS App'x G, Cultural Resources Technical Report, Volume 5, at ii (Dec. 12, 2019), page ii., https://oplanesmd.com/wp-content/uploads/2020/07/CulturalResourcesTR_Volume_5.pdf.

[267] See submissions to MDOT on file.

00158708

**I.     The SDEIS Contains an Incomplete and Inadequate Assessment of Impacts on Plummers Island, Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Gibson Grove A.M.E. Zion Church, Cedar Lane Unitarian Universalist Church, and Native American Site(s) near the American Legion Bridge**

Several specific sites impacted by Phase 1A South of the Project deserve significantly greater attention and assessment of adverse effects. These include Plummers Island, Morningstar Tabernacle No. 88 Cemetery and Hall, Gibson Grove A.M.E. Zion Church, and Carderock Springs, Cedar Lane Unitarian Universalist Church, C&O Canal Native American and Lockkeeper sites. Some key issues regarding specific sites are presented below.

**1.     Plummers Island**

The Washington Biologists' Field Club ("WBFC") has studied long-term trends on the biodiversity of Plummers Island and its riparian areas for 120 years.[268] The island has now been found to be eligible for both the Maryland Historical Trust and National Register of Historic Places owing to that ongoing long-term research, independent of the island's inclusion in the C&O Canal National Historical Park. The island has recorded a large number of rare, threatened, and endangered species, including species new to science as recently as 2014. Over 400 scientific papers have been produced on the flora and fauna of Plummers Island, documenting over 4,000 species there. It is known as the most studied island on earth and the place where every species has a bar code. These research sites contribute importantly to the independent historic significance of Plummers Island, and the preferred alternative's overshadowing, runoff, and noise impacts will severely impair these significant attributes of these highly sensitive contributing areas. When the plans for the original American Legion Bridge were developed in 1959, WBFC sold its adjacent mainland tract of land up to the C&O Canal to the Federal Government and gave Plummers Island to the U.S. Government in exchange for protecting the island from construction of the bridge and giving WBFC rights in perpetuity (so long as it existed) to maintain the Island as a Wild Natural Area on which to continue the Club's long-term research. The island is a historic site within a historic site, the Chesapeake and Ohio Canal National Historical Park.

Unfortunately, and shockingly, this rare and nationally and internationally important historical site is ground zero for construction of a new double wide American Legion Bridge. MDOT SHA and the selected developer Transurban plan to take part of Plummers Island, place a pier on the Island, undertake construction from the island, destroy important research plots of rare plant species and habitat, and overshadow the island and its significant research areas by as much as 30 feet with noisy new bridge lanes.

According to WBFC, under the Section 106 evaluation published in September 2021, MDOT cartographers redrew the island boundaries in Map 3 in a misleading and deceptive way. First, they eliminated all the riparian areas (the wetland margins of the Island) out of Plummers Island and assigned those to the C&O Canal National Historical Park. Then they subtracted the

---

[268] Katherine Shaver, *Plummers Island: Biologists Say Wider American Legion Bridge Would Destroy Critical Research Site*, Washington Post (Dec. 11, 2020), https://www.washingtonpost.com/local/trafficandcommuting/plummers-island-beltway-bridge/2020/12/10/ccae16e6-398e-11eb-bc68-96af0daae728_story.html.

00158709

rare Potomac River Gorge Riverside Outcrop Barren plant community on the southwest corner of the Island and simply assigned that to the Potomac River, effectively Waters of the United States. There is no support or explanation for why these areas that are historically part of Plummers Island and that contribute importantly to its historic significance were excluded. As a result of this unsupported Section 106 mapping, the SDEIS incorrectly asserts that only 0.2 acres of Plummers Island are within the Limit of Disturbance. SDEIS at 4-16.

Furthermore, page 5-13 of the SDEIS makes the following highly troubling statement: "MDOT SHA, FHWA, and NPS have agreed that Section 4(f) impacts to C&O Canal could exclude the area that currently has an existing transportation use. The area within NPS property defined as transportation use includes existing I-495 at-grade roadway sections to the toe of slope, Clara Barton Parkway Interchange ramp sections to the toe of slope, existing pier locations for the structure over the C&O Canal and eastbound Clara Barton Parkway, and existing pier locations for the ALB."

This is misleading. While the existing roadways, ramps, and bridges within the C&O National Historical Park are noncontributing features of the park, they do not destroy the integrity of the park or alter its boundaries. It is highly misleading to suggest that only 0.2 acres of Plummers Island would be impacted by the preferred alternative and to ignore these past intrusions and disturbances. The cumulative impacts of impacts of these past intrusions must also be considered in totality in assessing the impact of the preferred alternative on Plummers Island. Plummers Island land cannot just be arbitrarily designated "transportation use" and given away because of existing pier locations. The WBFC deed agreement with the U.S. Government stipulates that WBFC has "the right to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists . . ." Similarly, Plummers Island's riparian areas cannot be arbitrarily reassigned for the convenience of the preferred alternative.

In the early 1900s, WBFC purchased the island for their Research Station and Meeting place, and they have studied the entire island including the riparian margins for 120 years. The riparian margins of Plummers Island *must* be included in the boundaries of the protected Historical Property and given full consideration under Section 4(f) and Section 106. The boundaries of the site in NEPA and Section 106 documentation need to be updated in accordance with new information in National Register of Historic Places eligibility determination.

This preferred alternative will violate the conditions of WBFC's agreement with the Federal Government,[269] and the planned disturbance seriously impacts its ongoing long-term research, a contributing feature of this historic property.

---

[269] "WHEREAS, The Washington Biologists' Field Club, Inc. and the United States Government desire to preserve this natural wild area as a sanctuary and scientific research preserve. . . . reserving in said deed to the Washington Biologists' Field Club, Inc., the right to continue to maintain the island as a natural wild area and use it for scientific research and for meetings of the Club and to pursue its studies in the field of biology and natural history on the said island so long as the Washington Biologists' Field Club, Inc. exists and desires to continue to use the island for scientific research . . ." Full Text of Agreement with National Park Service, available at Letter from Washington

00158710

One year ago, the over 19,000-page DEIS with appendices mentioned Plummers Island in only one paragraph. The passing mention was buried in a DEIS technical report, the 18th Appendix of Appendix L (i.e., sub-Appendix R of Appendix L). The entirety of the discussion about Plummers Island was: "The study area includes a portion of Plummers Island south of the American Legion Bridge and a small stream known as Rock Run Culvert. Exposed bedrock occurs on Plummers Island." DEIS App'x L, App'x R at PDF p.4.[270] That lack of attention to the importance of Plummers Island is shocking given the fact that the impacts to Plummers Island are so lengthy and extensive that they require referral to more detailed comments.[271] Mitigation measures requested by WBFC in April 2021 still have not received a response from MDOT as of November 28, 2021.

The preferred alternative stands to greatly harm Plummers Island in numerous ways, including: (1) damage to waterways, (2) destruction of rare plants and rare plant communities from the far west end of the island, (3) destruction of WBFC research plots, (4) destruction of past collection sites, (5) habitat destruction and disturbance lead to more invasive organisms, (6) potential for catastrophic destruction from major floods if water barriers and/or construction platforms emplaced for construction blow out, (7) sound from bridge construction and closer proximity of traffic in six new bridge lanes after they open on the bridge, (8) impacts on biota from salt, deicing compounds, and oil runoff from the bridge. All of these impacts destroy the long-term continuity of 120 years of research and thus severely impair this significant feature of the site that contributes critically to its historic significance.

Complete avoidance of Plummers Island is both a prudent and feasible alternative that must be considered under Section 4(f). The SDEIS states on page 4-15 that "The ALB Strike Team also considered a 'west shift' of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option." Yet, this alternative for avoidance has already been rejected. Instead, the SDEIS states that:

> Under the Preferred Alternative, approximately 0.2 acres of impact at Plummers Island would be required for the ALB substructure, including permanent pier placement and construction activities. Construction activities may include efforts such as excavation, demolition of existing bridge foundation and piers, installation of proposed foundations, piers, abutments and slope protection. Access to the existing and proposed piers is required for these activities.

SDEIS at 4-16.

---

Biologists' Field Club (April 9, 2021), https://wbfc.science/wp-content/uploads/2021/04/WBFC-Comment-2021-April9.pdf.

[270] Available at https://495-270-p3.com/wp-content/uploads/2020/07/NRTR_App-R-RTE-Plant-Species-Survey_2020.05.05.pdf.

[271] WBFC Section 106 comments from November 2020, April 2021, and October 2021 can be reviewed at the following links: https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/WBFC%20written%20Testimony%20on%20I-495%20270%20DEIS%20Nov%206%202020%20%281%29.pdf; https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/WBFC-Section106-CommentLetter-PlummersIsland-2021-October8.pdf; and https://wbfc.science/wp-content/uploads/2021/04/WBFC-Comment-2021-April9.pdf.

00158711

Delaying identification of the location and boundaries of this site until after implementation of a Programmatic Agreement prevents consideration of the impacts to the site during alternative selection under NEPA and undermines discussion of potential avoidance and mitigation measures for any adverse effects under Section 106.

WBFC supports the no build option and total avoidance of the island under any circumstances. The whole of Plummers Island including its riparian fringes and waterways are the sites of ongoing research and therefore make the island as whole plus riparian areas a 4(f)-protected site. Plummers Island is an internationally recognized biodiversity hotpot. MDOT and FHWA in 2005 knew it was only possible to widen the American Legion Bridge by one lane a side.[272] It is only that now, one governor is trying to overcome all that has been protected for generations by sheer force of will. Awareness, respect, and defense for historic sites and irreplaceable biological diversity and cultural heritage must be urgently awakened and activated in the face of this rushed process to build ineffective toll lanes for a private company's benefit.

## 2.    Morningstar Tabernacle No. 88 Moses Hall and Cemetery

We concur with Friends of Moses Hall in their comments that the ground penetrating radar work done to date is incomplete and therefore not an adequate basis for determining avoidance of burial sites.[273] Current plans do not address decades of cumulative negative impacts on the site. NEPA requires agencies to adequately disclose impacts in the DEIS, 40 C.F.R. § 1502.9(a) (2019), yet the SDEIS impermissibly ignores and defers this analysis. SDEIS at 4-33, 4-38, 4-104, 5-53. Additionally, construction impacts (noise and vibration) and post-construction noise and visual impacts have not been assessed and disclosed as is required by law. The Friends of Moses Hall SDEIS and Section 106 comments contain further detail on these issues and note that the NEPA and Section 106 processes cannot move forward until the needed ground penetrating radar tests have been done to determine the boundaries of the burials. Furthermore, that information is a prerequisite to any suggestion that physical effects to the site have been avoided.

Until there has been a fuller ground penetrating survey that expands outside the borders of the already-surveyed site, including within the existing right-of-way, it is premature and improper for MDOT to claim that 4(f) impacts have been avoided.

The boundaries of the Moses Hall and Cemetery site need to be redrawn taking into account the new information found in the two studies as part of the Section 106 process and a new fuller ground penetrating radar survey. The NRHP eligibility designation form also needs to be updated

---

[272]    WBFC    DEIS    Comments    and    Testimony    (Nov.    2020), https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/WBFC%20written%20Testimony%20on%20I-495%20270%20DEIS%20Nov%206%202020%281%29.pdf; Letter    from    Washington    Biologists'    Field    Club    (Oct.    8,    2021), https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/WBFC-Section106-CommentLetter-PlummersIsland-2021-October8.pdf; Letter from Washington Biologists' Field Club (April 9, 2021), https://wbfc.science/wp-content/uploads/2021/04/WBFC-Comment-2021-April9.pdf.

[273]    Letter    from    Friends    of    Moses    Hall    (Oct.    8,    2021),    available    at    PDF    p.32    of https://montgomeryplanningboard.org/wp-content/uploads/2021/10/Item-10-Correspondence-I495-I270-Managed-Lanes-Study.pdf.

00158712

to reflect the new information found in the studies and new site boundaries. We fully support the Friends of Moses Hall in their requests for additional mitigation measures.

Earlier in 2021, the National Trust for Historic Preservation named Morningstar Tabernacle No. 88 Moses Hall and Cemetery as one of the Nation's 11 Most Endangered Historic Places[274] and submitted comments in the Section 106 process affirming points made by Friends of Moses Hall. Specifically, the National Trust stated:

> As MDOT and consulting parties consider further evaluation to assess and resolve the potential adverse effects to the cemetery, we strongly encourage MDOT to undertake additional non-invasive investigation in areas of the property and adjacent ROW that were not included in the previous GPR survey, in case additional potential graves may be found in these areas. We understand that lack of survey in these areas was due to obstacles; however, obstacles such as bamboo stems, vegetation, fallen tree, and hay bales could be removed or temporarily relocated to allow additional study. Without additional study, our understanding of the footprint of the historic cemetery is incomplete, and direct adverse impacts to burial sites remains a serious risk.[275]

A recent article in the National Trust's magazine gives a deeper sense of the importance of this site and what is at stake.

> Independent researcher L. Paige Whitley described the need for cemetery preservation as a way to honor erased and hidden histories: "[Morningstar Moses Cemetery] was a community in life, and it is still a community in death, and should not be separated by anything or anyone. This history should be better known in the county and in the state. Younger kids should be more aware of what was lost for [Black] American communities. … It's about bringing voices to the forefront and letting them speak. These are voices that have not been heard for quite some time. And the descendants would like for their ancestor's voices to be heard.[276]

### 3. Gibson Grove A.M.E. Zion Church (currently First Agape A.M.E. Zion Church)

Changes in the planned alignment of the highway since the DEIS have resulted in new and increased impacts on the National Register of Historic Places-eligible Gibson Grove A.M.E. Zion Church property. The 0.4-acre church property will experience significant loss of integrity under MDOT's new plan. This church has extraordinary historical significance, and the LOD increase to the site is excessive. Moreover, the historic boundaries of the Church extend beyond the land

---

[274] Discover America's 11 Most Endangered Historic Places for 2021 , National Trust for Historic Preservation (June 3, 2021), https://savingplaces.org/stories/11-most-endangered-historic-places-2021#.YYvqBPnMKUk.

[275] Letter from the National Trust to Mr. Steve Archer of MDOT SHA, Re: I-270 and I-495 Managed Lanes Study Section 106 Consultation – Response to Updated Section 106 Documentation (Oct. 8, 2021).

[276] Jordan Ryan, *Hope for Historic Black Cemetery Threatened by Highway, National Trust for Historic Preservation*, Preservation Magazine (Sept. 29, 2021), https://savingplaces.org/stories/hope-for-historic-black-cemetery-threatened-by-highway#.YaRGFPnMKUI.

00158713

presently owned by the Church and include land presently owned by MDOT that contributes importantly to the historic setting of the Church, which will be destroyed by the preferred alternative.

As a place of worship, the church site is highly sensitive to air quality and noise impacts, and the closer proximity of the highway to the Church will impair church activities, including the socializing and services and singing of hymns, which will no longer be able to occur in the ways that are needed for a church. There are many different dimensions of harm which the church will experience under MDOT's most recent plans. Due to the constraints of the site location and the highway's encroachment, the safety aspect of the future church parking lot and safety of pedestrians will need to be given special priority. The adverse impacts to the church site are exceptionally harmful and are certainly a very serious environmental injustice added to the historical injustice done in the building of the Beltway deliberately through the single Black settlement in the area.

Knowing the site constraints, it is hard to believe that any acceptable solution for making this historic church into a larger church would be possible, even putting the parking lot under the widened I-495. The area under the bridge is not hospitable, safe, or welcoming. There is no other suitable space for parking on the church side of Seven Locks Road. The site should have been protected as a rare and treasured historic asset, sold to M-NCPPC or another entity with purview for historic preservation, and rebuilt at MDOT's cost to be a place of historical pilgrimage and historical education similar to what was done at the Josiah Henson House. Agape A.M.E. could be helped to find a more suitable, accessible location for a contemporary church with fewer stairs, adequate parking, and located closer to the homes of congregants. Currently, there is a glut of commercial properties nearly everywhere at low prices due to the changes COVID-19 has wrought.

History will look upon the decisions made at the Gibson Grove church site and decry that its importance was not recognized sooner or in time. Gibson Grove Church was named for Sarah Gibson, the Harriet Tubman of the Reconstruction Era who helped form the Gibson Grove community and gave land for the church. Much of the original locations for Harriet Tubman's story will be lost to climate change and tidal flooding,[277] but this special site of historical, cultural, and educational importance on the other side of Maryland could have been saved, restored, and the original look and feel preserved.

Reports shared in September 2021 as part of the Section 106 process show graves on the church property. The historic boundaries of the Church need to be updated taking into account the

---

[277] Oliver Milman, *'Culture Will Be Eroded': Climate Crisis Threatens to Flood Harriet Tubman Park*, The Guardian, (Nov. 23, 2019), https://web.archive.org/web/20211102121247/https://www.theguardian.com/us-news/2019/nov/23/harriet-tubman-national-park-climate-crisis; Rona Kobell, *Climate Change is Wiping Out Harriet Tubman's Homeland, and We're Doing Little About it*, Boston Globe (Oct. 24, 2019), https://www.bostonglobe.com/ideas/2019/10/24/climate-change-claiming-harriet-tubman-homeland-among-other-key-sites/hCnqd8w61SdnWBVJvfYTkl/story.html; Veronica Johnson, *Harriet Tubman's Legacy is Threatened by Sea Level Rise and Climate Change. Here's How*, ABC7 (Feb. 23, 2021), https://wjla.com/news/local/harriet-tubman-legacy-climate-change.

00158714

new information found in the reports. The NRHP eligibility designation also needs to be updated with the new information and updated site boundaries.

Additionally, SHA must minimize impacts to these historic Gibson Grove church and cemetery by preserving most of the tree canopy and topography, constructing context sensitive noise barriers, preserving air quality, and minimizing visual impacts. These are sensitive areas with residential homes and historic resources within close proximity to the highway, all of which are adversely affected by this preferred alternative.[278]

While design modifications that minimize impacts to Morningstar Tabernacle 88 Moses Cemetery and Hall were needed and made, the significantly increased adverse impacts to the historic First Agape A.M.E. Zion Church (Gibson Grove Church) are extremely concerning. In the late 2021 consultant reports pertaining to these two sites, there was no apparent attempt to reconcile the tension of two sensitive sites on either side of the highway. Rather, the research reports seemed to measure site importance of both sites primarily in terms of burials. Yet the church as the only extant structure from the Gibson Grove settlement has very high historic and cultural significance and needs to be carefully protected.

The Gibson Grove Church property has suffered cumulative impacts from stormwater damage over many years due to the original I-495 Beltway construction. Instead of increasing impacts to the site, MDOT should be righting past wrongs by minimizing impacts to the Gibson Grove Church property and by mitigating damage caused by poor stormwater management. Instead, MDOT seems to be viewing the church property as the path of least resistance.

MDOT's current actions are exacerbating a historic wrong to the church, begun when the church property and community were bisected by the original construction of the Beltway. Impacts to the Gibson Grove A.M.E. Zion Church should be avoided to avoid yet another environmental injustice to this historically very significant reconstruction era Black community, which is tied to regional history and just minutes away from an Order of Moses benevolent society cemetery with over 400 graves.

### 4.    Cedar Lane Unitarian Universalist Church

The historic Cedar Lane Unitarian Universalist Church, which also predates the Beltway, has a unique architectural design[279] meant to blend with the environment. It was mentioned in the DEIS but is not mentioned in the SDEIS.

Designed by renowned architect Pietro Belluschi who designed the Julliard School building, Cedar Lane Unitarian Universalist Church should be considered for potential NRHP eligibility and does not yet appear to have been reviewed for eligibility. This church was listed in the same DEIS table as the Gibson Grove A.M.E. Church, in the table entitled: "Section 4(f) Properties where there is no Use or Impact." Clearly the Gibson Grove Church site would be

---

[278] Several of these paragraphs have drawn from information from the Friends of Moses Hall document located at Item-10-Correspondence-I495-I270-Managed-Lanes-Study.pdf (montgomeryplanningboard.org), Item 11.

[279] Donald E. Skinner, *Cedar Lane's Modernist Auditorium*, UUWorld (Summer 2008), https://www.uuworld.org/articles/cedar-lanes-modernist-auditorium.

00158715

impacted due to noise and air pollution and visual impacts, as well as likely ground vibration and construction impacts. Likewise, Cedar Lane faces imminent risk to its use and enjoyment of its property and surroundings from increase in noise and impacts to its surrounding natural landscape that is part of its appreciation of spirituality in nature. As was pointed out in DEIS testimony:

> Cedar Lane Unitarian Universalist Church would be greatly impacted by this project, although the DEIS chart lists it as "no impact." The natural habitats and walking trails of Rock Creek Park are part of Cedar Lane's appreciation of spirituality in nature. The creek, the estuaries and wildlife adjoining Beach Drive and our church grounds are a community gathering place. The noise level is already extremely high and would be higher with this project.[280]

Although now there is no immediate direct impact to Cedar Lane, due to the pared down preferred alternative phasing decision to proceed at this time only with Alternative 9 South, it would be impacted by a future phase as was pointed out in testimony on the DEIS.[281]

### 5.    Carderock Springs Community

A community of approximately 600 homes, Carderock Springs is designated as a National Historic District for being a notable example of "situated modernism." This community will experience significant adverse effects from the proposed toll lane highway expansion. Comments submitted by the Carderock Springs Citizens Association ("CSCA"), a community organization that represents Carderock Springs and Carderock Springs South, show that the SDEIS fails to include a sufficient visual impact analysis based on the scoping questionnaire (Appendix J) and includes an inconsistent and misleading analysis of noise impacts on the Carderock Springs community (Appendix E). The fields of Carderock Springs Elementary School, which are used by the community and adjacent to the highway, are also a Section 4(f)-protected public recreation area. The school will suffer noise impacts from a widened highway that will impact educational instruction. The issues raised need to be addressed by MDOT SHA prior to the release of the Final EIS.

Proposed flyover ramps for the MD 190/Cabin John Parkway interchange have the potential to alter the visual setting and context of the adjacent historic district.

For these impacts and more, it is false to conclude, as the SDEIS does, that the preferred alternative would have no adverse impact on Carderock Springs or only *de minimis* impacts. As a result of the preferred alternative, the residents of the community and the children and staff of the Carderock Springs Elementary School will be faced with loss of tree canopy, increased exposure to air pollution, and increased noise and visual impacts. These issues have been raised with MDOT SHA in DEIS, SDEIS, and Section 106 comments and need to be addressed as soon as possible before an FEIS can be issued.

---

[280] DEIS testimony of Montgomery County Faith Alliance for Climate Solutions, October 27, 2020.

[281] Impacts to the Cedar Lane Church should therefore be considered as a foreseeable future impact in this Section 4(f) evaluation and SDEIS.

00158716

6.    **Native American Site(s)**

This private toll lane highway project would negatively impact the C&O Canal National Historic Park and very rare and valuable sites therein. The Cultural Resources Technical Report recommended a particular site for National Register of Historic Places eligibility due to its "artifact density, buried context, and the frequency, type, and context of the material recovered." DEIS App'x G Vol. 4 at 54. That site is "is believed to have the ability to answer significant questions about precontact settlement patterns and the nature and use of the site through further research and excavation." *Id.* "[It] appears to retain a high degree of stratigraphic integrity and has the potential to provide meaningful new data on precontact lifeways in the area." *Id.* "It may also provide additional information that can be used to compare and contrast with the concentration of precontact sites located on the south shore of the Potomac River across from the site." *Id.*

In December 2019, a Phase II archaeological evaluation stated: "This site is recommended eligible under NRHP Criterion D, and avoidance or data recovery investigation is recommended." DEIS App'x G Vol. 5 at i. There are also other sites of Native American heritage in the park that would be negatively impacted by the preferred alternative, some of which have already been largely ruined by highway construction, runoff, utilities, etc.

Finds of this level of importance are reason to avoid a site and reopen selection of alternatives to ensure total avoidance. Between the level of importance of this site, Plummers Island, and the Gibson Grove sites alone, this Project should be reconsidered and ultimately redesigned. Phase 1 South has been found to have very limited utility unless paired with continued toll lanes into areas with even larger numbers of sensitive sites that have not yet been adequately evaluated.

At least one cooperating agency, the Army Corps of Engineers, provided conditional concurrence on the revised preferred alternative (Alternative 9-Phase 1 South), saying:

> Since at this time it is unknown if comments and responses received during a future comment period may raise additional questions or concerns regarding the Revised Preferred Alternative or the project as a whole; the Corps acknowledges the potential that new significant information could change our conditional concurrence on the Revised Preferred Alternative.[282]

This find is one of the kinds of things that would be just such an extenuating concern wherein concurrence could justifiably be withheld or withdrawn.

Despite the importance of this site, the SDEIS makes no mention of it at all. This issue surely requires further attention and action.

7.    **C&O Canal Lockhouse Keeper Site**

There is yet another C&O Canal site recommended for NRHP eligibility, one where there is:

---

[282] Recommended Preferred Alternative Concurrence Form, U.S. Army Corps of Engineers, June 23, 2021.

00158717

> [G]ood potential for the presence of additional cultural features and patterned artifact deposits. Site 18MO751 has the potential to provide substantive data that could be useful in addressing a variety of regional research issues, including those related to early 19th through early 20th century consumer behavior and the lifeways of C&O Canal lock house keepers. This site is recommended eligible under NRHP Criteria A, C, and D, and avoidance or data recovery investigation is recommended.

DEIS App'x G Vol. 5 at i. The status of this site's NRHP eligibility determination and avoidance, minimization, and mitigation measures are not disclosed in the SDEIS.

The above list of historical sites in not exhaustive and there are many other sites that would be harmed by this Project, in Phase 1 South and beyond, and that are deserving of advocacy and closer scrutiny and attention.

**B.      Without Full Accounting of Harms to Historic and 4(f) Sites, the Agencies Cannot Reasonably Select a Preferred Alternative or Identify an Alternative that Avoids 4(f) Properties as Required by Section 4(f)**

Without a complete understanding of the preferred alternative's full range of environmental effects, including a complete accounting of harm to historic properties, there is no way that the Agencies can reasonably select a preferred alternative as required by NEPA or identify an alternative that avoids use of or minimizes harm to historic properties, parks, and recreation areas as required by Section 4(f).

The identification of those historic properties and the preferred alternative's potential effects on them must be completed at a time when they can actually inform the selection of alternatives, rather than being deferred to a later date after alternatives have been foreclosed.

**X.      Miscellaneous Defects in the SDEIS**

**A.      The SDEIS's Statements on the American Legion Bridge's Potential Reconstruction are Inconsistent and Confusing**

The SDEIS's discussion of the structural soundness of the American Legion Bridge directly contradicts MDOT's other statements on the issue. The SDEIS states that the American Legion Bridge "is nearly 60 years old and would need to be replaced sometime over the next decade regardless of this study." SDEIS at ES-9. This alarming assessment of the condition of the bridge contradicts repeated statements made recently by MDOT Secretary Greg Slater on the longer structural life of the bridge.

On February 25, 2021, Secretary Slater told the board of the MDTA that the bridge was "structurally sound" but that the deck of the bridge needed to be replaced within the next 10 years.[283] He went on to explain that if the deck were not replaced, then the entire bridge would need to be replaced within 15 years. Secretary Slater made similar comments about the need to replace the deck of the bridge, but not the entire bridge, at a joint hearing of State House and Senate

---

[283] Maryland Department of Transportation Board Meeting (Feb. 25, 2021), https://vimeo.com/516219338 (1:10:50).

00158718

committees on June 29, 2021.[284] Most recently, during a November 10, 2021 presentation to state legislators and local government officials from Montgomery County on MDOT's Consolidated Transportation Program, Secretary Slater was asked about a recent news report on the condition of the bridge. He stated that the bridge is "not unsafe" and went on to say that it has "a lot of structural life left."[285]

The Agencies' statement about the condition of the bridge not only contradicts the Maryland Secretary of Transportation but creates a false sense of urgency over the need to rebuild or replace the American Legion Bridge. The Agencies must set the record straight in the FEIS.

It is unclear how a new ALB can be built in the exact same location as the existing bridge without completely closing the corridor throughout construction, which would reverse the preferred alternative's anticipated benefits throughout that period as traffic halts through the construction zone. The bike/pedestrian lane options should also have been presented for public comment as alternatives during this phase rather than just being mentioned as possible solutions to the unanalyzed problem.

The SDEIS also mentions that it is "typical practice" to obtain a water quantity waiver. While such a waiver may be "typical practice," there is precedent throughout the country to require stormwater vaults and treatment facilities for new bridges across sensitive waters (*see, e.g.*, expansion of the Tacoma Narrows Bridge in Puget Sound, WA State).[286] Presuming that a water quantity waiver will be granted has not been acknowledged by MDE as part of this SDEIS, and the public must be given an opportunity to comment on this issue.

> **B.**   **The SDEIS's Lack of Disclosure and Deceptive Language Denies the Public a Fair Opportunity to Comment on the Issue of Possible Rail Alignment on the American Legion Bridge**

The SDEIS states:

> Further, the ALB will be designed and constructed such that a future capital improvement project will have one or more feasible options to achieve the full design and implementation of a transit line across the ALB. These options will be enabled by designing the northbound and southbound structures to not preclude future superstructure modifications and additional foundation and substructure capacity capable of supporting a new transit line.

SDEIS at 2-23 to 2-24.

---

[284]   Maryland General Assembly, Transportation and Environmental Subcommittee (Jun. 29, 2021), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=t%26e&clip=TAE_6_29_2021_meeting_1&ys=2021rs (2:27:25).

[285]   MDOT Consolidated Transportation Program Presentation (Nov. 10, 2021), https://www.youtube.com/watch?app=desktop&v=0rFAps6rNpo (3:19:10).

[286]   *See* City of Tacoma, Stormwater Management Manual (July 2021 ed.), https://www.cityoftacoma.org/UserFiles/Servers/Server_6/File/cms/enviro/SurfaceWater/2019%20SWMM%20Manual/Tacoma%20SWMM%20Draft%202021%20(Clean).pdf.

00158719

This language is deceptive. It suggests to the reader that the bridge will be structurally capable of carrying rail transit, but in fact only commits to a bridge capable of carrying buses, which is no commitment at all, because the bridge must be strong enough to carry 18-wheel trucks which are heavier than buses.

It further misleads the reader by concealing the existence of language hidden in a contract between Transurban and Maryland's partner state in this project, Virginia, that is likely to pose an insuperable barrier to construction of a rail connection across the American Legion Bridge. Under this clause, Transurban would collect a toll from Virginia taxpayers each time a passenger takes a train instead of driving, thereby creating an economic disincentive to construct a rail connection.[287] The payments would start when the rail line opens and continue until 2087.

As the Maryland-National Capital Park and Planning Commission stated:

> it is essential for SHA to eliminate any impediment to the addition of new transit service between Virginia and Maryland, even if that means modifying any contractual limitations imposed on such transit under Virginia DOT's contract with its P3 vendor.[288]

This lack of disclosure and deceptive language deprived the public of important information about the preferred alternative and denied the public a fair opportunity to comment and may have deceived higher-level decision makers.[289]

## C.    The Preferred Alternative's Reduction of Free Lanes Violates Federal Requirements

According to the U.S. Congressional Service, a requirement for newly-tolled highways is that "the existing free-lane count on surface Interstate highways must remain the same, even if reconstructed."[290] *See* 23 U.S.C. § 129(a)(1)(C).

The preferred alternative is in violation of this requirement. In multiple locations, including lower I-270 and the northbound I-270 West Spur, the preferred alternative will result in fewer free lanes than exist now.

Lower I-270 presently has as many as 7-8 free lanes in each direction, including HOV-2 lanes that are free of cost at all times and free of restrictions 91% of the time. Starting in 2017,

---

[287] *Citizens Demand "Stop the P3 Toll Lane Boondoggle" As Virginia's Secret Contract with Toll Company Is Revealed*, MTOC (June 8, 2021), https://web.archive.org/web/20210610153721/https:/transitformaryland.org/latest-news.

[288] Letter from Elizabeth M. Hewlett and Casey M. Anderson to Jeanette Mar and Tim Smith, re Non-Concurrence on the Recommended Preferred Alternative (June 25, 2021), https://montgomeryplanningboard.org/wp-content/uploads/2021/06/MNCPPC_Non-Concurrence_RPA_06-25-2021_SIG.pdf.

[289] There is ongoing and high public interest in a rail alignment across the American Legion Bridge, such as is mentioned in this article. Katherine Shaver, *A New American Legion Bridge Should Accommodate a Possible Beltway Rail Line, Transit Advocates Say*, Washington Post, (May 22, 2021), https://www.washingtonpost.com/transportation/2021/05/22/american-legion-bridge-new-rail-toll-lanes/.

[290] *Tolling U.S. Highways and Bridges*, CRS Reports R41990 (Aug. 4, 2017).

00158720

lanes were added to lower I-270 as part of MDOT's ICM project.[291] MDOT Secretary Greg Slater has publicly confirmed the success of the ICM project in eliminating most congestion on lower I-270. But documentation for the preferred alternative indicates the number of free lanes on lower I-270 will be reduced to five and in some places six lanes in each direction. In addition to violating the federal requirement to maintain the number of free lanes, the reduction in lanes will cause massive congestion where currently there is virtually none.

Northbound I-270 West Spur: The West Spur currently has three lanes northbound, including the HOV-2 lane, which is free of cost at all times and free of restrictions 91% of the time. The Phase 1 South plan calls for only two lanes northbound on the West Spur from Bradley Boulevard to Democracy Boulevard.[292] This one-third reduction in free lanes is not only a violation of the federal requirement, but will likely create more car-truck safety risks and a new bottleneck to match the one on the East Spur already labeled by MDOT as "new bottleneck."[293]



Map showing two free lanes on northbound I-270 Spur (shown in yellow) between Bradley and Democracy Boulevards

Considering the number of toll lanes MDOT is planning, any attempt to comply with the requirement to maintain the existing number of free lanes will require major new property takings

---

[291] https://mdot-sha-i270-i70-to-i495-inno-cong-mgmt-mo0695172-maryland.hub.arcgis.com/.

[292]                    *See*                    MDOT's                    Interactive                    Map, https://rkk.maps.arcgis.com/apps/webappviewer/index.html?id=a00b453bd630450ca487d1502c94143b.

[293] *See* reference to "new bottleneck" in letter to Acting FHWA Administrator Stephanie Pollack, Oct. 18, 2021, https://transitformaryland.org/sites/default/files/pollackletter.pdf.

00158721

and lead to significantly more environmental impacts. The preferred alternative already calls for 19 lanes just south of the I-270/I-495 split.

### D.    The SDEIS Does Not Disclose Taxpayer Costs

The NEPA documents should disclose project cost, including public subsidies, to allow a fair and balanced assessment of costs and benefits. The DEIS issued in 2020 provided the range of public subsidies that would be necessary to fund the toll lanes. The SDEIS does not address or include an estimate of the subsidy that may be needed for the preferred alternative. The trend toward allowing more telework by the federal government,[294] the region's largest employer, as well as by other employers could significantly reduce traffic congestion on I-495 and I-270 over the long term. It is important to understand how the increase in telework will impact the financing of the preferred alternative. If traffic congestion and toll revenues are less than expected, taxpayers may be forced to provide even greater subsidies to the tollway developer. The extent to which the State will be subsidizing the toll lanes is of immense concern to Maryland taxpayers and this information needs to be shared with the public prior to issuing an FEIS.

A document released at an August 26, 2021, MDTA board meeting shows amendments to the P3 contract by way of a document associated with but not included in the contract documents submitted for review to the legislature, Department of Legislative Services, state treasurer, and comptroller.[295]

Called an interagency agreement between MDOT, MDOT SHA, and MDTA, it pertains to contractual obligations related to the P3 contract. Even if the original Interagency Agreement had been in the packet presented for public review between June 10 and July 10, 2021, some of the agreement's cost implications could not have been assessed because certain language was not added to the document until late August.

MDOT changed the contract terms by way of the Interagency Agreement two weeks after the BPW vote and a month and a half after the comment period on the contract closed.

One new late-August addition to the Interagency Agreement with taxpayer implications related to issuance of bonds or notes:

---

[294] *Memorandum for the Heads of Executive Departments and Agencies on "Integrating Planning for A Safe Increased Return of Federal Employees and Contractors to Physical Workplaces with Post-Reentry Personnel Policies and Work Environment,"* OMB, OPM, GSA (June 10, 2021), https://www.whitehouse.gov/wp-content/uploads/2021/06/M-21-25.pdf. The memo encourages federal agencies to adopt more telework on a permanent basis. On page 13, the memo states, "As agencies consider what their post-reentry policies should be, OPM encourages them to consider telework as part of the overall strategic workforce planning that provides new flexibilities to agencies competing for top talent with other sectors across the country."

[295]    MDTA    Board    Materials,    August    26,    2021, https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

00158722

MDTA will issue bonds or notes to fund certain costs in which the State is best equipped to manage and reduce the overall risk.[296]

This contradicts earlier assurances by the governor that the cost of toll lanes would not be imposed on taxpayers and that the developer would bear the risks.[297]

One concerning deletion was mention of the specific bodies that need to review the presolicitation reports and P3 agreements. This is concerning and could pave the way for amendments or changes made by the legislature or BPW that allow for review by fewer entities and little to no public accountability.

> submitting a joint Pre-Solicitation Report as required by State law to all applicable State entities, including the State Comptroller, State Treasurer, Senate Budget and Taxation Committee, House Ways and Means Committee, House Appropriations Committee, Department of Legislative Services, and the Maryland Board of Public Works (the "Maryland BPW");;

> iv.(iv)jointly submitting the a joint Final Agreement Report for each P3 Agreement and each proposed P3 Agreement as required by State law to all applicable State entities, including the State Comptroller, State Treasurer, Senate Budget and Taxation Committee, House Ways and Means Committee, House Appropriations Committee, Department of Legislative Services, and the Maryland BPW;[298]

The Interagency Agreement states that MDOT will request appropriations from the Maryland General Assembly to pay for compensation events:

> Subject to availability of funds in the Upfront Payment Account or appropriation by the Maryland General Assembly, to the extent any Phase Developer or Section Developer under a P3 Agreement is entitled to receive any amount for a compensation event or termination compensation, MDOT SHA will pay such amount to such Phase Developer or Section Developer, as applicable, on or before the date when such amount becomes due and payable. MDOT will take such actions as are necessary from time to time to request sufficient appropriations from the Maryland General Assembly to pay such amounts as and when they come due.[299]

---

[296] MDTA Board Materials, at PDF p. 195 (Aug. 26, 2021), https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

[297] "'The state will have no risk from the standpoint of how it performs,' Rahn said of the toll lanes." Katherine Shaver, *Hogan's Idea to Widen Washington-Area Highways to Add Toll Lanes Has Hit Barriers Before*, Washington Post (Oct. 17, 2017), https://www.washingtonpost.com/local/trafficandcommuting/hogans-idea-to-widen-washington-area-highways-to-add-toll-lanes-has-hit-barriers-before/2017/10/21/7c14a466-af85-11e7-9e58-e6288544af98_story.html.

[298] MDTA Board Materials, at PDF p. 189 (Aug. 26, 2021), https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

[299] *Id.* at PDF pp. 167 & 193.

00158723

The following list of compensation and relief events ("among others") that could cost current and future generations of taxpayers are as follows:

To the extent a Compensation Event or a Relief Event directly causes an adverse cost or schedule impact on the Section Developer, the Section Developer may claim an extension to applicable deadlines for performance or relief from compliance with its obligations. Notice of such claim must be provided within 30 days after the date the Section Developer first became aware (or should reasonably have become aware) that the relevant Compensation Event or Relief Event had occurred.

If such adverse impact is caused by a Compensation Event, the Section Developer may also claim compensation which places the Section Developer in a "no better/no worse" position, as compared to immediately prior to the occurrence of the Compensation Event.

The Section P3 Agreement will include "**Compensation Events**" addressing the following matters, among others:

a) breach of the Section P3 Agreement by MDOT or MDTA (including a failure by MDOT to provide the Section Developer with access to each MDOT Provided Parcel in accordance with the access schedule agreed under Section 7 (Right of Way));

b) violation of law by MDOT or MDTA;

c) Discriminatory Change in Law;

d) suspension of the Work (except as permitted by Section 38 below) or suspension of tolls in the Priced Managed Lanes (except as permitted by Section 38.A below);

e) issuance of directive letters;

f) physical damage to the Work caused by other MDOT capital works projects [or VDOT capital works projects] in the immediate vicinity of the Section (excluding work undertaken by a Section Developer Related Entity);

g) MDOT's or MDTA's exercise of step-in rights except in cases of Section Developer's breach;

h) the discovery of any Unknown Utility during the carrying out of the Construction Work;

i) the discovery of any Unknown Hazardous Environmental Conditions during the carrying out of the Construction Work;

j) the discovery of any Unknown Endangered Species during the carrying out of the Construction Work;

k) the discovery of any Unknown Archaeological Remains during the carrying out of the Construction Work;

l) issuance of injunctions or restraining orders relating to the Section or the P3 Program that prohibits the performance of a material part of the Work under the Section P3 Agreement or materially and adversely affects a Party's performance under the Section P3 Agreement;

m) release of Hazardous Materials caused by an MDOT Related Entity;

159

n) signing by MDOT or MDTA of new or amended Utility Framework Agreement, Utility Agreement, or Third Party MOU on terms different to the Setting Date MOUs, except to the extent caused by a change to the design made by the Section Developer after the Setting Date (and "**Setting Date MOUs**" means (i) the MOUs or agreements executed by MDOT or MDTA and the relevant utility/third party and made available to the Phase Developer prior to the Setting Date and (ii) Utility Framework Agreement, Utility Agreement, or Third Party MOU in a form that has not yet been executed at the Setting Date but that has been agreed as between MDOT and the Phase Developer as the form of MOU or agreement that the Phase Developer will base its pricing on at the Setting Date);

o) construction or expansion of a Competing Facility as defined in Section 37 below;

p) an extended Force Majeure Event, to the extent MDOT elects to treat it as a Compensation Event in lieu of termination;

q) with respect to the 495 NEXT Project, breach by the 495 NEXT Developer or VDOT of certain defined interface obligations set forth in the Section P3 Agreement;

r) any suspension, termination, amendment, or variation to the terms and conditions of any MDOT Provided Approval, except to the extent that such suspension, termination, amendment, or variation results from failure of any Section Developer-Related Entity to locate or design the Section or carry out the Work in accordance with the relevant MDOT-Provided Approval (including any differences between the Section Developer's design and the design used for the MDOT-Provided Approvals);

s) an MDTA Outage occurs that constitutes a Compensation Event in accordance with Section 26 (*System Faults and Failures*) of the Tolling Services Agreement Term Sheet; and

t) changes are made to any of the toll rate setting terms that constitute a Compensation Event in accordance with Section 36 (*Change Orders*) of the Tolling Services Agreement Term Sheet, except, in each case, to the extent attributable to any breach of the Section P3 Agreement, applicable law, or any governmental approval by, or negligent act or negligent omission of, a Section Developer-Related Entity and subject to such other limitations and conditions as will be set forth in the Section P3 Agreement.

The Section P3 Agreement will include "**Relief Events**" addressing the following matters, among others:

a) any Changes in Law other than Discriminatory Changes in Law;

b) Force Majeure Events (as defined in Section 40);

c) floods in excess of the Base Flood, fires, explosions, earthquakes causing ground acceleration in excess of AASHTO design standards, tornadoes, named windstorms, and ensuing storm surges;

d) riot or civil commotion;

e) blockade or embargo;

f) strikes or labor unrest affecting the construction industry generally;

160

g) a failure by a Utility Owner to comply with its obligations under its Utility Framework Agreement or Utility Agreement or to cooperate with the Section Developer in relation to a Utility Adjustment where, in each case, such failure continues for a period of [•] days or more after the Section Developer has issued a request for assistance and continues to satisfy certain conditions to assistance under the Section P3 Agreement;

h) a delay in obtaining any Major Governmental Approval due to delays in receiving responses from the relevant permitting agency that exceed the applicable Major Governmental Approval Period to the extent that such delay is beyond the reasonable control of any Section Developer-Related Entity;

i) Pandemic Event; and

j) the release of Hazardous Materials onto the Site that is not caused by a Section Developer-Related Entity, except, in each case, to the extent attributable to any breach of the Section P3 Agreement, applicable law, or any governmental approval by, or negligent act or negligent omission of, a Section Developer-Related Entity and subject to such other limitations and conditions as will be set forth in the Section P3 Agreement.[300]

These and other things that could reduce revenue for Transurban over the next 60 years can be paid back to Transurban by the state as compensation payments or other hidden payments, including renegotiations, contract amendments, or new deals.[301] With future phases and more, the contracts could bind Maryland elected officials into renegotiations not just for 60 years but indefinitely.

Another provision of the Interagency Agreement allows possible operations and maintenance of the general-purpose lanes to be later outsourced to Transurban. Then the developer would be in charge of operations and maintenance of the entire road, not just the toll lanes. And they would not be operating and maintaining the roads free of charge; such an arrangement could be highly profitable for the developer and would rely on taxpayer money:

> O&M OF GENERAL PURPOSE LANES MDOT SHA shall retain all operations and maintenance obligations with respect to the ~~I495~~I-495 & I-270 P3 Program's general‑-purpose lanes and associated infrastructure, unless such responsibilities are transferred to a <u>Section</u> Developer under a P3 Agreement.[302]

Also written into the Interagency Agreement, the toll rates for drivers on the tolled lanes would only go up, never down.

---

[300] Ex. 8 Section P3 Agreement Term Sheet, at 13-16, https://oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement-Exhibit-8-%E2%80%93-Section-P3-Agreement-Term-Sheet.pdf (footnotes omitted).

[301] Maryland Sierra Club Testimony on the 495-270 Relief Plan P3 Agreement, (June 29, 2021) https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/Testimony-495-270ReliefPlan-P3Agreement-2021June29.pdf.

[302] MDTA Board Materials, at PDF p. 203 (Aug. 26, 2021), https://mdta.maryland.gov/sites/default/files/Files/Board_Meeting/2021_0826%20Board%20Materials%20-%20Posting.pdf.

00158726

MDTA agrees that it shall not (unless compelled to by law), reduce the civil penalty for late payment of tolls, citation fees, or enforcement fees applicable to the P3 Program, or take other rate setting action that causes P3 Program revenues to decrease.[303]

MDTA is not authorized to issue debt for as long as this P3 would last. To address that limitation, it would have to refinance after 10 years. Refinancing rates could be worse in 10 years compared to today and entail additional cost to Maryland.

MDTA is statutorily limited to issuing debt with a maximum term of 40 years. In order that the MDTA Notes are in place throughout the term of the Section P3 Agreement, it will be necessary to refinance the MDTA Notes following the 10th anniversary of the Section P3 Agreement to ensure that each section maintains MDTA Notes outstanding during the entire term of the Section P3 Agreement.[304]

Rate covenant shortfall payments will also be paid to the developer by MDOT or by way of operational changes or changes in the toll rates.[305]

All of this comes on top of other known expenses that would be borne by taxpayers in relation to this project.[306]

Beyond financial costs, individuals and communities in the region would pay costs in terms of health and quality of life—dealing with increased noise, less safe public highways, and reductions in air quality, water quality, green space, and climate resiliency.

**E.     The NEPA Alternatives Selection Process Has Been Window Dressing; For MDOT Adding Four Toll Lanes is Not an Option but a Requirement and Foregone Conclusion**

On October 17, 2017, Governor Hogan announced a plan that included adding four toll lanes each to Maryland's portion of the Capital Beltway (I-495) and to I-270. An article on that day stated that his proposal:

reaches beyond similar proposals that stalled over the years after being deemed too expensive or disruptive to adjacent communities. . . . The success of Hogan's plan hinges, in part, on whether the private companies can figure out what state planners

---

[303] *Id.* at 156.

[304] *Id.* at 77.

[305] *Id.* at 76; Maryland Sierra Club Toll Rate Range Setting Testimony, Oct. 28, 2021. https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-TollRateSettingTestimony-2021Oct28.pdf.

[306] Jeremy Mohler, *Opinion: The True Cost of Maryland's Toll-Road Plan*, Washington Post (Nov. 12, 2021), https://www.washingtonpost.com/opinions/2021/11/12/true-cost-marylands-toll-road-plan/.

00158727

haven't been able to: how to add four cost-effective toll lanes without having to demolish dozens, and potentially hundreds, of homes and businesses.[307]

Despite studies by MDOT and FHWA that were unsupportive of the idea and the fact that megaprojects with major long-term, irreversible adverse impacts must be based on data and research, the article goes on to say:

> Doug Mayer, Hogan's communications director, said the governor isn't basing his four-lane plan on previous research.

> "If the world only moved forward based on studies that are 10 years old, there would be no forward progress ever again," Mayer said.[308]

There was not any question about what the outcome was meant to be. It was four new toll lanes on I-495 and I-270. There were no alternatives, just variations of how to achieve that goal. Hogan presented as "traffic facts" that: "Our administration has proposed the *only solution* to finally end the congestion crisis."[309]

On November 17, 2017, former Maryland Transportation Secretary Pete Rahn is quoted as saying the following:

> "We know we want — we want four additional lanes of travel," Rahn said after the meeting. "How those are configured will be up to the concessionaires when they bring their proposals forward. That's why we're not being prescriptive as to how they accomplish it. We're being very clear in what we want, and it's up to them to bring us the how."[310]

This pre-determined outcome, decided well in advance of any NEPA review, now appears to be at the cost of human health and safety on the road (*see* Sections II.H.7 to 13) with hidden taxpayer subsidies (*see* Section X.D), and still with major expense and disruption to adjacent communities and the environment.

Importantly, this is the biasing context in which the NEPA alternatives analysis was conducted.

---

[307] Katherine Shaver, *Hogan's Idea to Widen Washington-Area Highways to Add Toll Lanes Has Hit Barriers Before*, Washington Post (Oct. 17, 2017), https://www.washingtonpost.com/local/trafficandcommuting/hogans-idea-to-widen-washington-area-highways-to-add-toll-lanes-has-hit-barriers-before/2017/10/21/7c14a466-af85-11e7-9e58-e6288544af98_story.html.

[308] *Id.*

[309] Larry Hogan Facebook Post (June 3, 2019), https://m.facebook.com/LarryHogan/posts/traffic-facts-the-capital-beltway-and-i-270-are-two-of-the-most-congested-roads-/3067388883286254/ (emphasis added).

[310] Douglas Tallman, *Rahn Provides Some Answers on I-270, I-495 Projects*, Montgomery County Media (Nov. 17, 2017), https://web.archive.org/web/20181012114028/https://www.mymcmedia.org/rahn-provides-answers-270-495-projects/.

00158728

**F.      Extensive Tree Canopy Loss from the Preferred Alternative is Not Justifiable in a Climate Crisis**

For a project that will not solve congestion but increase it, 500 acres is far, far too much tree canopy loss. The likely cumulative impacts of tree loss are 1,500 acres plus the not yet estimated tree loss from potential extension of toll lanes from I-370 to I-70.

Maryland's mature trees are precious and under threat by multiple powerful forces. The region cannot afford to lose so much tree canopy when flash flooding risks and impacts to the Chesapeake Bay and other watersheds are serious and when trees are dying and tree canopy loss is accelerating due to natural and human forces. A November 25, 2021, article in the Washington Post notes:

> Oak trees are dying across the Mid-Atlantic region, crippled by extreme weather, old age, construction and development, then finally succumbing to disease and pests. Experts say the oak decline was triggered by the year of record rainfall that waterlogged the Washington region from 2018 to 2019, immediately followed by a flash drought in the hot, dry summer of 2019.[311]

Trees are one of our defenses and contributors to resiliency in the face of climate change. Decision makers and residents are blind to these realities at their own peril. Furthermore, based on the Virginia case, additional hundreds of acres of tree canopy loss may be in store in these projects due to extensions, adjustments, and additional needs during construction and staging areas for workers and their vehicles.

As was said in an SDEIS comment to MDOT by a Silver Spring, MD community icon named Arlene, age 83:

> MDOT, First, let me say I OPPOSE THE TOLL LANES AND SUPPORT THE NO-BUILD OPTION........
>
> Those involved in pushing this absurd plan, at the worst possible time in our devolution toward our own extinction through the burning of fossil fuels, those people should feel deeply ashamed and guilty. Why? Because it is a crime they are committing. And they are being bull-headed enough, blinded by greed and shortsightedness, to do whatever they can get away with in order to get their scheme accomplished at all costs.
>
> Blinded to the fact that it will never achieve its stated goal of reducing traffic for more than a few minutes. Reducing traffic is one lie. History screams to us that adding more asphalt adds more vehicles. They think this one time it will be different? Do they think they can fool us into believing that?
>
> Blinded to the world of hurt our communities will endure as this thing encroaches deep into our lives, and we are left to mourn our woods, few remaining wild things,

---

[311] Alisa Tang, *Oak Trees in the Mid-Atlantic Region are Dying*, Washington Post (Nov 25, 2021), https://www.washingtonpost.com/dc-md-va/2021/11/25/oak-trees-dc-mid-atlantic-dying/.

homes, backyards, parks, waterways, gathering places and open areas. We will choke on worsened air quality, have our nerves strained by elevated and constant noise that we cannot escape, exit and entrance ramps multiplied and everywhere now, where none had existed before. Also to be mourned is all that thrown-away money!

It is irrational and self-defeating to push on with it. The world has changed radically since 2017. Circumstances have changed and we have learned a lot, or should have.

Climate change is breaking down the systems that support life on Earth. Doing this gigantic expansion will only accelerate the degradation of our environment. Pay attention to the public whom you are ostensibly serving. Work to minimize traffic. Don't accommodate it! And for Pete's sake do NOT invite more.:

### G.    The SDEIS Does Not Disclose the Larger Agenda of the P3 Toll Lane Deal

Marylanders are being left out of the policy conversation about the top-level purpose of this Project, which seems to be not to relieve congestion but to kickstart Australian-style "asset recycling" in Maryland.[312] It appears that if this Project can just move to construction, as Governor Hogan hopes, Maryland can link itself with Transurban for the purpose of asset recycling. Maryland toll lanes can be an advertisement to visiting U.S. politicians about the "benefits" of implementing the Australian asset recycling model in the United States. To understand what the Project is really about, beneath the false hype about reducing congestion for all at no cost to the taxpayer, here are several data points to consider. This Project has been in development for four years and only hints of the larger agenda occasionally appear. Below are some.

Former Transurban North America President Jennifer Aument in a 2020 webinar described the United States as "the great emerging market for infrastructure investment that has been relatively slow to emerge." She continues:

So I'm certainly hoping that with about $200 billion of dry powder out there and private capital waiting to be deployed in this market that we will find ways moving forward post COVID to be able to use public private partnerships . . . including toll roads. And another area where we can really work to do a step forward in using public private partnerships here in the United States is to finally, adopt into, to advance a modern approach to asset recycling.[313]

---

[312] Asset recycling entails "funding new infrastructure by leasing existing public assets—like roads or electrical grids—to private companies." Hannah Levintova and Noah Lanard, *Senators Want to Pay for Infrastructure With "Asset Recycling." That's Just a Fancy Term for Privatization*, Mother Jones (July 2, 2021), https://www.motherjones.com/politics/2021/07/senators-want-to-pay-for-infrastructure-with-asset-recycling-thats-just-a-fancy-term-for-privatization/. An assessment of it can be read at John Quiggin, *Asset Recycling: A Spurious Justification for Privatisation*, Submission to Senate Standing Committees on Economics, https://www.aph.gov.au/DocumentStore.ashx?id=6c33d95e-0376-4731-8161-6b6de7cf01cf&subId=303245. The Australian model of asset recycling often involves partnering with pension funds.

[313] Road to Recovery Webinar: Jennifer Aument, Eno Center for Transportation, June 3, 2020 https://www.youtube.com/watch?v=zbKddAqxFAw.

00158730

Governor Hogan in September 2019 had travelled with Aument and others to Australia to learn about asset recycling and meet with Transurban and Macquarie, who later were selected to develop Hogan's toll lane project.[314]

On December 17, 2020, Transurban sold half its stake in the toll roads in the Washington area for $2.8 billion, including its 2.6 mile (4.2 km) Capital Beltway Accord project which extends into Maryland.[315] On December 18, with no notice to the public, MDOT issued its formal Request for Proposals for the Maryland toll lanes project, revealing the Project had changed significantly.[316] The upspoken message of this and prior interactions was that lack of transparency is also part of the larger agenda.[317]

When the bidding team led by Transurban was selected for the toll lanes contract on February 13, 2021, Transurban's Chief Executive Officer Scott Charlton remarked, "It really sets us on a path for further growth and expansion into North America. It's a big deal in its size . . . but it has much bigger meaning for Transurban in the sense of a new client in the Maryland Department of Transport."[318]

On May 12, 2021, when the project was downsized to Phase 1 South extending from the American Legion Bridge to I-370, MDOT Transportation Secretary Greg Slater said: "This will show we believe in [toll] lanes as a solution and the P3 model, and we can show that in an area that has more consensus."[319]

Comptroller Peter Franchot also appeared eager to get started with the P3 toll lane model, providing more insights on May 10, 2021:

> The P3 for American Legion bridge is going to be much tighter. And I think we'll be more successful. But the key thing is we'll be able to see whether there's any relief of traffic congestion and any real uproar over the tolls. And, you know, we'll be able to without completely turning the area on its head, we're going to be able

[314] Bruce DePuyt, *MDOT Chooses Transurban for I-495/I-270 Project*, Maryland Matters (Feb. 13, 2020), https://www.marylandmatters.org/2021/02/18/mdot-chooses-transurban-for-i-495-i-270-project/.

[315] Patrick Hatch, *Transurban Readies For Buying Spree With $2.8b US Road Sale*, Sydney Morning Herald (Dec. 17, 2021), https://www.smh.com.au/business/companies/transurban-readies-for-buying-spree-with-2-8b-us-road-sale-20201217-p56oce.html; *Transurban : Chesapeake Partnership and Traffic Update*, Market Screener (Dec. 16, 2020), https://www.marketscreener.com/quote/stock/TRANSURBAN-GROUP-6493737/news/Transurban-Chesapeake-Partnership-and-Traffic-Update-32030618/.

[316] Bruce DePuyt, *MDOT Accelerates Timetable for Next Steps on Beltway Widening, Rearranges Project Phases*, Maryland Matters (Dec. 29, 2020), https://www.marylandmatters.org/2020/12/29/mdot-accelerates-timetable-for-next-steps-on-beltway-widening-project/.

[317] Ben Ross, *Opinion: Highway P3 Process Has Lacked Transparency*, Maryland Matters (Feb. 13, 2020), https://www.marylandmatters.org/2020/02/13/opinion-highway-p3-process-has-lacked-transparency/.

[318] Patrick Hatch, *Transurban Says Maryland-Virginia Road Win Sets Up US Expansion*, Sydney Morning Herald (Feb. 19, 2021), https://www.smh.com.au/business/companies/transurban-wins-bid-for-5b-maryland-virginia-toll-project-20210219-p57411.html.

[319] Katherine Shaver, *Maryland Scales Back Most Controversial Part of Beltway Toll Lanes Plan East of I-270*, Washington Post (May 12, 2021), https://www.washingtonpost.com/transportation/2021/05/12/maryland-toll-lanes-plan/.

to test a properly drafted P3, and we'll see how it goes. . . . We're going to do a new Bay Bridge, and the reason why this American Legion Bridge P3 is so important, we can't possibly do another Bay Bridge without a P3. The private sector is the only entity that has the capital that would permit that. So, yeah, a lot of what we're doing with experimenting with P3s right now is getting ready for that massive project.[320]

In September 2021, Australian newspaper *The Age* shared further details about the plan for Maryland:

Not far from the White House and the Lincoln Memorial, there's something else Transurban boss Scott Charlton thinks visitors to Washington DC should see: his network of toll roads gradually encircling the United States capital.

"Almost every politician in the country — even if they're state politicians — comes to Washington," says the chief executive of the ASX-listed toll road giant. "So at some point or other almost every politician in the country drives on our roads and, hopefully, they have a good experience."

And while lucrative in its own right, delivering the first section of the road also sets his company up to win future stages of the project, valued at another $US9 billion to $US11 billion over the next decade or so. That would give Transurban a continuous network of roads through Maryland and Virginia that encircle Washington DC.

Charlton says Transurban's growing footprint around the US capital (with 85 kilometres of express lanes operating currently) also positions it bid for other roads across America, where there are between $US200 billion to $US300 billion worth of toll roads owned by state or local governments.[321]

Transurban North America President Pierce Coffee gives the most recent a big picture overview:

This new infrastructure funding package [*Infrastructure Investment and Jobs* Act, a $1.2 trillion investment in America's transportation, broadband and utilities infrastructure] offers governments a number of ways to maximize their return on investment by partnering with the private sector. The *Infrastructure Investment and Jobs* Act provides expanded opportunities to deliver projects through public-private partnerships and bolsters existing programs by expanding the cap on Private Activity Bonds (PABs) and streamlining the Transportation Infrastructure Finance and Innovation Act (TIFIA) Program – two financial tools utilized by Transurban

---

[320] Peter Franchot Interview on "Everyday Law" Podcast, (Mar. 10, 2021), https://podcasts.google.com/feed/aHR0cHM6Ly9ldmVyeWRheWxhdy5wb2RiZWFuLmNvbS9mZWVkLw/episod e/ZXZlcnlkYXlsYXcucG9kYmVhbi5jb20vYTBmYjdlMGMtMmQ4Ny0zYTc0LWIzN2ItYjI1YzRjNWRlZTI0.

[321] Patrick Hatch, *Roads to Riches: Transurban, Super Funds Vie for Bigger Slice of America's Pie*, The Age (Sept. 11, 2021), https://www.theage.com.au/business/companies/roads-to-riches-transurban-super-funds-vie-for-bigger-slice-of-america-s-pie-20210902-p58o5e.html.

00158732

to deliver the Virginia Express Lanes. The bill also creates a program designed to support asset recycling transactions, indicating growing public interest in implementing the Australian public-private partnership model in the United States. Governments across the U.S. can look to Transurban's Express Lanes network as a model for turning measured public investment into transformational infrastructure projects.[322]

Meanwhile, Australians certainly appear unconvinced about the purported benefits of Australian asset recycling done by Transurban.[323]

This is all occurring within the context of a wider trend toward privatization of public goods, described in a 2021 book *The Privatization of Everything*.[324]

Few members of the public are aware of the bigger picture dynamics and what saying yes to one seemingly smaller project might actually mean in the long term. These selections reveal the significant cumulative effects of going forward with this project and should have been shared transparently with the public, including in the NEPA context.

### H.    Climate Change and COVID-19 Have Changed Everything

Maryland, like everywhere else in the world, is entering uncharted territory due to increasingly frequent and clear manifestations of climate change impact. Places where people lived and played 50 years ago are literally underwater in Dorchester County, Maryland. Maryland is getting hotter and wetter, so much so that worker safety in heat is a state-level and national issue. Storms are becoming more frequent and destructive and flash flooding worse. The things the state has now, like 500 acres of tree canopy and over 150 acres of permeable surface rather than macadam, are the things that will protect Maryland's inhabitants from these strengthening trends. Climate change is a policy priority and is changing the equation.[325]

---

[322] Pierce Coffee, *US Infrastructure Sector Boosted by Historic Investment*, Transurban Group (Nov. 17, 2021), https://www.transurban.com/news/infrastructure-sector-boosted-by-historic-investment.

[323] Deborah Snow & Matt O'Sullivan, *WestConnex: The Toll Road That Ate Sydney*, Sydney Morning Herald (March 26, 2021), https://www.smh.com.au/national/nsw/westconnex-the-toll-road-that-ate-sydney-20210323-p57d9y.html; *NRMA Calls for Toll Price Transparency*, Riverine Herald (Oct. 25, 2021), https://www.riverineherald.com.au/national/2021/10/25/5511055/nrma-calls-for-toll-price-transparency; Tom Rabe, *'Cost Outweighs Benefit': Trucking Giant's Toll Message to Drivers*, The Age (Sept. 28, 2021), https://www.theage.com.au/national/nsw/cost-outweighs-benefit-trucking-giant-s-toll-message-to-drivers-20210928-p58vi1.html; Richard Olsen, *Job Security and Shoddy Deals for Transport Workers*, Big Rigs (Nov. 25, 2021), https://bigrigs.com.au/index.php/2021/11/25/job-security-and-shoddy-deals-for-transport-workers/#more-39374; *Transurban's Tentacles are Around 14m Aussie Wallets*, Herald Sun, https://www.heraldsun.com.au/business/terry-mccrann/transurbans-tentacles-are-around-14m-aussie-wallets/news-story/b694aa66ff433f793f2531149961242f; Joe Aston, *Sam Mostyn Says One Thing, Transurban Does Another*, Financial Review (April 7, 2020), https://www.afr.com/rear-window/sam-mostyn-says-one-thing-transurban-does-another-20200406-p54hj2.

[324] Donald Cohen and Allen Mikaelian, *The Privatization of Everything: How the Plunder of Public Goods Transformed America and How We Can Fight Back*, The New Press, 2021.

[325] Rockville Mayor Bridget Donnell Newton called the toll lane proposal "a complete denial of climate change and social justice." Danielle E. Gaines, *Advocates, Elected Officials Oppose Beltway Toll Rate Plan at Public Hearing*, Maryland Matters (July 12, 2021), https://www.marylandmatters.org/2021/07/12/advocates-elected-officials-oppose-

00158733

Likewise, the world has changed since the COVID-19 pandemic and the emergence of the variants. It won't be going back ever to life as was once known. The world is different this week than last week. Now there is an omicron strain that is shutting down travel[326] and COVID-19 is being found to be rapidly spread among white-tailed deer in the United States.[327] The SDEIS's analysis of the preferred alternative in terms of climate change mitigation and adaptation and COVID-19 impacts is inadequate and becomes more so daily. It fails to meaningfully assess these foreseeable risks and impacts.

The landscape for P3s and how much risk the private sector would take on changed after the 2007–2009 recession. The private partners went from requiring a 17% to a 44% public sector guarantee.[328] It changed again after COVID-19. Knowing things could change so drastically in terms of lockdowns and mobility, the private sector P3 community is now not interested in fixed price contracts, but progressive P3s and other ways to guarantee profitability. It appears Maryland is guaranteeing the loans for this project up to 80% or more.[329] That isn't the private sector taking all the risk as Governor Hogan and his former transportation secretary assured.[330] Instead, it appears that the private sector is taking only a small fraction of the risk, at the public's expense. And the landscape is still changing. How much more risk will the taxpayers of Maryland have to

---

beltway-toll-rate-plan-at-public-hearing/. Montgomery County Council President remarked: "You can add lipstick to the pig, but it still doesn't make it an attractive proposal. It's out of alignment with our climate goals and our transportation equity goals." Coleen Grablick, *Maryland Shrinks Plan To Add More Lanes To The Beltway*, DCist (May 12, 2021), https://dcist.com/story/21/05/12/maryland-reduces-beltway-expansion-plan-to-focus-on-northern-region/; *see also TPB Making Changes to Long-Range Plan: Adds New Climate Change Commitments to Planning Process, Removes I-270/I-495 Toll Lanes*, MWCOG (June 16, 2021), https://www.mwcog.org/newsroom/2021/06/16/tpb-making-changes-to-long-range-plan-adds-new-climate-change-commitments-to-planning-process-removes-i-270/i-495-toll-lanes-/.

[326] *See* Perry Stein, William Booth, and Frances Stead Sellers, *Announcement of New Virus Variant Alarms World, as Stocks Crash and Flights are Banned*, Washington Post (Nov. 26, 2021), https://www.washingtonpost.com/world/europe/europe-south-africa-variant-coronavirus/2021/11/26/0f7f5a78-4e99-11ec-a7b8-9ed28bf23929_story.html.

[327] *See* Michaeleen Doucleff, *How SARS-CoV-2 in American Deer Could Alter the Course of the Global Pandemic*, NPR (Nov. 10, 2021), https://www.npr.org/sections/goatsandsoda/2021/11/10/1054224204/how-sars-cov-2-in-american-deer-could-alter-the-course-of-the-global-pandemic.

[328] Congress of the United States Congressional Budget Office, Public-Private Partnerships for Transportation and Water Infrastructure, CBO (Jan. 2020), https://www.cbo.gov/system/files/2020-01/56003-CBO-PPP.pdf. In the past decade versus the two decades before, the share of private financing subsidized by federal taxpayers nearly doubled (25% to 49%).

[329] Final Phase 1 P3 Agreement Exhibit 8 – Section P3 Agreement Term Sheet, August 2021, page 27, item 62a on both lists, https://oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement-Exhibit-8-%E2%80%93-Section-P3-Agreement-Term-Sheet.pdf. The text mentions that upon developer default during operation of the toll lanes that the state would pay up to 80% of the Lenders' Liabilities, plus the balance of the handback reserve account (if any), plus any amounts payable as compensation relating to Compensation Events agreed between the Parties which remains unpaid. There are some items subtracted as well.

[330] "The state will have no risk from the standpoint of how it performs," Rahn said of the toll lanes. Katherine Shaver, *Hogan's Idea to Widen Washington-Area Highways to Add Toll Lanes Has Hit Barriers Before*, Washington Post (Oct. 17, 2017), https://www.washingtonpost.com/local/trafficandcommuting/hogans-idea-to-widen-washington-area-highways-to-add-toll-lanes-has-hit-barriers-before/2017/10/21/7c14a466-af85-11e7-9e58-e6288544af98_story.html.

00158734

take on in the section contract or revisions (amended, restated agreements) to the phase contract in this new reality where "back to normal" looks further and further away?

There is a common saying in urban and transportation planning—it may be the early bird that gets the worm, but it's the second mouse that gets the cheese. It is wise to observe and learn from others' mistakes. Maryland must pause from this misguided and temporally inappropriate project. It is a good time to reevaluate if Maryland wants a project that generates revenue for a monopolistic multinational company or a project that generates revenue for Maryland. These are not favorable times to be the first mouse or to ignore how drastically the world has changed. And Maryland is definitely the first mouse in this moment, and Transurban's hoped pathway to U.S. expansion.

No one could have predicted in 2017 how the world would change. When circumstances change, it is okay to recognize that and respond in kind.

## I.    The SDEIS's Public Involvement and Agency Coordination Section Is Inaccurate and Misleading

An environmental impact statement may not present inaccurate and misleading information. That requirement applies whether evaluating specific environment effects or discussing NEPA compliance, including evaluating and responding to public comments on a project. This requirement is especially important here, when the project sponsor has been publicizing misleading and inflammatory information regarding public comments on, support for, and opposition to the Project.

The SDEIS claims that MDOT SHA has considered nearly 3,000 comments on the DEIS and that the has Agencies have communicated with many other agencies, stakeholders, and members of the public in response to their concerns. SDEIS at 7-19.

Our November 9, 2020, comments on the DEIS explained that in the DEIS and throughout the NEPA process, MDOT improperly downplayed public opposition to the Project. The SDEIS not only does not remedy this flaw but perpetuates it. EPA's comments on the preferred alternative explain: "Based on data from the January 2021 MLS Interagency Working Group Meeting, EPA recognizes that approximately 1,218 of 1,475 (or 83% of) public comments for the DEIS support the No Build Alternative rather than a Build Alternative." Yet the SDEIS makes no mention of this opposition.[331]

---

[331] *See also* Memorandum to County Council from Glenn Orlin re Comments on I-495/I-270 Managed Lanes Study (MLS) Draft Environmental Impact Statement (DEIS), including County Preferred Alternative, at PDF p. 12 (Nov. 3, 2020), https://www.montgomerycountymd.gov/council/Resources/Files/agenda/col/2020/20201105/20201105_1.pdf ("127 people testified over the course of six public hearings, of which 15 showed support for a Build Alternative, and 112 indicated their preference for the No-Build Alternative."); Danielle E. Gaines, *Advocates, Elected Officials Oppose Beltway Toll Rate Plan at Public Hearing*, Maryland Matters (July 12, 2021), https://www.marylandmatters.org/2021/07/12/advocates-elected-officials-oppose-beltway-toll-rate-plan-at-public-hearing/; Katherine Shaver, *Maryland Tolling Authority Suggests Lowering Minimum Rates for Toll Lanes on Beltway, I-270*, Washington Post (Sept. 30, 2021), https://www.washingtonpost.com/transportation/2021/09/30/maryland-beltway-270-toll-rates/ ("Of the 666 comments received during the public feedback period over the summer, the authority said 67 percent opposed the toll rate ranges.").

00158735

Accurately reflecting public involvement in the NEPA process is all the more important here, because the Governor of Maryland and the Maryland Transportation Secretary have been presenting an inaccurate view of public opinion on the Project, including well after the overwhelming opposition to the Project was known. They have publicly called those opposed to the Project a tiny, whiny minority of pro-traffic activists who plot to keep the roads filled with traffic.[332] Not only is this rhetoric factually wrong, but it also serves to reduce public participation except from members of the public who agree with MDOT's predetermined outcome. While MDOT may have already decided that it would move forward with this Project before the NEPA process began,[333] and may have already committed resources to it, both of which biased the NEPA process, *see* 40 C.F.R. §§ 1502.1(f), 1506.1 (2019), FHWA is ultimately responsible for compliance with NEPA, including assuring the public is properly informed and that the Agency's decision takes public feedback into account. FHWA must consider the public's input and, doing so, should not move forward with this Project.

The SDEIS also claims the Agencies conducted outreach to environmental justice populations in non-English languages. If the Agencies move forward with an FEIS, the outreach section must document that the Agencies provided an inaccurate SDEIS Executive Summary and knowingly provided non-English readers less time than English readers to review and comment on the corrected versions (less than 13 days), as discussed above.

### J.    The Agencies Have Withheld from the Public Documents That Were Considered in Drafting the DEIS and SDEIS

Our November 9, 2020, comments identified many of the documents that the DEIS considered and relied on but that the Agencies refused to provide to the public to evaluate with the DEIS. The Agencies still have not provided these documents, including documents that were used to develop the purpose and need for the Project and to eliminate alternatives from consideration. The Agencies should not move forward until this information is provided.

Moreover, regarding stormwater management requirements, SDEIS Appendix C, references, and the SDEIS rely on the following reports: On-Site Stormwater Management Analysis for the Managed Lane Study (June 2021) and On-Site Stormwater Management Analysis for the Managed Lanes Study, Phase 1 South (June 2021). *See* SDEIS App'x C at 3, 57; SDEIS at

---

[332] Ryan Miner, *MoCo Politicians Appeal to 'Tiny, Whiny Minority' on Traffic Relief*, Hogan Says, A Miner Detail (July 7, 2021), https://aminerdetail.com/hoganripsmocopoliticians/; John Kelly, *Who Are the Sick Marylanders Gov. Hogan Accused of Craving Traffic Congestion?*, Washington Post (June 4, 2019), https://www.washingtonpost.com/local/who-are-the-sick-marylanders-gov-hogan-accused-of-craving-traffic-congestion/2019/06/04/572b9c04-86ca-11e9-98c1-e945ae5db8fb_story.html; Kirill Reznik, *Hogan Trying to Sell 'Shortsighted' Road Plan With Misleading Information*, Maryland Matters (June 5, 2019), https://www.marylandmatters.org/2019/06/05/opinion-hogan-trying-to-sell-shortsighted-road-plan-with-misleading-information/ ("Gov. Hogan's inclusion of my name on his news release continues a dishonest pattern that relies more on sleight of hand than actual transportation planning.").

[333] Douglas Tallman, *Rahn Provides Some Answers on I-270, I-495 Projects*, Montgomery County Media (Nov. 17, 2017), https://web.archive.org/web/20181012114028/https://www.mymcmedia.org/rahn-provides-answers-270-495-projects/; Katherine Shaver, *Hogan's Plan to Add Additional Toll Lanes Faces a Long, Tough Road Ahead*, Frederick News-Post (Oct. 22, 2017), https://www.fredericknewspost.com/news/politics_and_government/transportation/hogans-plan-to-add-additional-toll-lanes-faces-a-long-tough-road-ahead/article_596a73a6-8b97-5124-b731-ff2a847bed37.html.

00158736

ES-10, ES-13, 2-12, 2-13, 2-18, 4-3, 4-6. However, the Organizations did not receive a response from MDOT or FHWA to our November 9, 2021, request for these documents until November 29, twenty days later and one day before the comment deadline. Moreover, MDOT's response unlawfully withheld the reports claiming the right to do so because they remain in draft form and were never finalized. NEPA does not permit an agency to withhold documents that were considered in the preparation of an EIS based on the claim that those documents were in draft form.

## XI.    Conclusion

The preferred alternative would have massive irreversible and significant negative impacts on Maryland, its air, water, land, climate, residents and communities, ecosystems, flora, and fauna. These impacts are either ignored or grossly underestimated in the DEIS and SDEIS, documents which are required by law to accurately reflect reasonably foreseeable impacts. The limited benefits of the preferred alternative, meanwhile, are routinely overstated in the SDEIS and to the public, even relative to the SDEIS appendices (which many will not have time to review). The appendices show that congestion reduction from building the toll lanes will be minimal during rush hours and that in some cases toll lanes will make commutes even worse for general lane travelers than the no-build alternative.

When considering the cost of widening the American Legion Bridge and both the Maryland and Virginia I-495 projects, there is virtually no benefit provided to the traveling public except for marginal benefits for toll payers that evaporate when they too will be faced with heavy traffic congestion at the termini of the toll lanes. The tradeoffs and harms to the environment, climate, taxpayers, Section 4(f)-protected properties, and communities at large were not quantified in a cost-benefit analysis, but had such an analysis been performed, it would be clear that the preferred alternative's harm to the interests of the state and adjacent municipalities far outweighs its benefits.

This $3-to-$7 billion-dollar first phase of a Project that will not relieve congestion and will worsen bottlenecks does not fulfill its purpose and need, which, regardless, is no longer valid in light of COVID-19 commuting changes, the Innovative Congestion Management Project, and changes in state transportation finances. On lower I-270, the Innovative Congestion Management Project adopted by MDOT in 2021 is already addressing current congestion and, according to the documentation for that project and the MWCOG models, those improvements also address future congestion to 2045. DEIS at 3-2 to 3-5; SDEIS at 3-2 to 3-4. The state had $5 billion[334] in surplus funds even before the Bipartisan Infrastructure Bill passed and was signed into law on November 15, 2021, giving the state further billions for transportation infrastructure.[335] The stated cost reason for eliminating all but privately operated toll lane alternatives no longer exists (nor did it ever exist, as the state's bond cap could have been raised, as pointed out by the State Treasurer).

---

[334] Peter Franchot, *With Good Fiscal News, It's Time to Deliver for Marylanders*, Maryland Matters (Oct. 4, 2021), https://www.marylandmatters.org/2021/10/04/franchot-with-good-fiscal-news-its-time-to-deliver-for-marylanders/.

[335] Jeff Barker, *Infrastructure, Build Back Better and Earmarks: What Big Projects Could be Coming to Maryland?*, Baltimore Sun (Nov. 15, 2021), https://www.baltimoresun.com/politics/bs-md-pol-maryland-federal-funding-20211115-jnniz5lhzvgk3brgskkf3krnkm-story.html.

00158737

If the Project is to go forward, it should be rethought entirely, constructed as a public project with public money, and scaled to the needs and constraints of the affected region of Maryland. MDOT and VDOT were previously in firm agreement that the American Legion Bridge and I-495 in Maryland could only be widened by one lane on each side at most. Under pressure from a multinational company making deals with the two state governors, this agreement seems to have been forgotten and some of the historical reports containing important relevant information, which the Agencies relied on during the NEPA process, are being withheld from the public.

Phasing of investments in mobility and traffic congestion reduction should be designed to address the most urgent problems first, such as constructing a third track and providing all-day service on the MARC Brunswick line to upper I-270 and completing the Purple Line. Safety goals should also be prioritized. Phasing can be best determined and justified by consideration of origin-destination studies (which have also been unlawfully withheld from the public and cooperating agencies). After such projects are completed, needs can be reassessed, and policy and multimodal solutions reconsidered. MWCOG has analyzed a number of viable, low-cost options that outperform toll lanes.[336]

Regional transit-first policies, new infusions of funds from the federal government, fundamental changes in travel behavior resulting from the COVID-19 pandemic, and the growing urgency of the climate crisis require more nimble ways of thinking about land use and transportation planning other than locking in and increasing car dependency for generations to come. The SDEIS Appendix B says something similar:

> While traffic volumes regionally recently have been about 20% below pre-pandemic levels, peak period speed data remain near free-flow. Traffic flow theory and longstanding empirical data have established that when demand exceeds capacity and traffic operations are in unstable or saturated conditions, a small reduction in demand results in a disproportionate improvement in speeds. As such, strategies to marginally reduce single occupant vehicle (SOV) demand during peak demand via flexible work schedules, pricing or ridesharing (including express bus service) are effective ways to address peak period congestion, conserve energy and reduce emissions.

SDEIS App'x B at PDF p. 146.

To reiterate our opening comments, the Agencies must pause this process and immediately analyze less costly multimodal options to improve mobility in the region that do not cause such significant harm to human health and the environment. The Agencies must also provide the public with a true opportunity to review and comment on these options prior to undertaking an FEIS.

At a minimum, the Agencies must not move forward with MDOT's preferred alternative or any of the fundamentally flawed build alternatives without a new purpose and need statement, additional new alternatives, the many analyses that have been ignored or improperly deferred, and

---

[336] David Alper, *The Best Way to Improve Transportation in our Region is . . .* , Greater Greater Washington (Nov. 16, 2017), https://ggwash.org/view/65596/the-best-way-improve-transportation-our-region-tpb-study.

00158738

a new SDEIS that addresses the failures identified in these comments and prior comments on the DEIS.

00158739