

## MARYLAND STATE TREASURER
Nancy K. Kopp

July 9, 2021

The Honorable Guy J. Guzzone
Chair, Senate Budget and Taxation Committee
3 West Miller Senate Office Building
11 Bladen Street
Annapolis, Maryland 21401

The Honorable Maggie McIntosh
Chair, House Appropriations Committee
121 House Office Building
6 Bladen Street
Annapolis, Maryland 21401

The Honorable Anne R. Kaiser
Chair, House Ways and Means Committee
131 House Office Building
6 Bladen Street
Annapolis, Maryland 21401

Victoria L. Gruber
Executive Director
Department of Legislative Services
90 State Circle
Annapolis, Maryland 21401

Dear Chair Guzzone, Chair McIntosh, Chair Kaiser, and Mrs. Gruber:

Section 10A-203 of the State Finance and Procurement Article of the Maryland Annotated Code requires the State Treasurer, in coordination with the Comptroller, to analyze the impact of a Public-Private Partnership ("P3") Agreement proposed by a unit of State government and submit its report to the Budget Committees and the Department of Legislative Services within 30 days of receiving a copy of the proposed agreement. The Board of Public Works ("BPW") may not approve the proposed P3 agreement until the report has been submitted.

On June 10, 2021, my office received a P3 Agreement proposed to be entered into by the Maryland Department of Transportation ("MDOT"), the Maryland Transportation Authority ("MDTA"), and Accelerate Maryland Partners. In coordination with the Office of the Comptroller and with the cooperation of MDOT and MDTA, my staff has conducted an analysis of the P3 Agreement. The resulting report is included under this cover letter.

In addition to analyzing the proposed P3 Agreement, the report discusses our concern that my office was unable to fully engage the State's Financial Advisor and Bond Counsel to assist with the review due to a lack of funding. The report therefore recommends updates to Maryland's P3 statute, including the provision of a funding mechanism and a requirement that the Financial Advisor and Bond Counsel analyze the documents, which we believe would

Goldstein Treasury Building • 80 Calvert Street • Annapolis, Maryland 21401
410-260-7160 • 800-322-4296 • FAX: 410-260-6056 • TTY: 800-735-2258 • nkopp@treasurer.state.md.us

facilitate a more robust review of future P3 Agreements. My office would be glad to assist with this process if the General Assembly decides it is appropriate.

If you have any questions, please do not hesitate to reach out to my Director of Debt Management, Christian Lund, who is the primary author of the report. He may be reached by phone at (410) 260-7920 or by email at clund@treasurer.state.md.us.

Sincerely,

Nancy K. Kopp

Nancy Kopp
State Treasurer

cc:    The Honorable Peter Franchot, Comptroller of Maryland
       The Honorable Greg Slater, Secretary, Maryland Department of Transportation
       Bernadette Benik, Chief Deputy Treasurer, State Treasurer's Office
       Christian Lund, Director of Debt Management, State Treasurer's Office
       Jaclyn Hartman, Chief Financial Officer, Maryland Department of Transportation

Goldstein Treasury Building • 80 Calvert Street • Annapolis, Maryland 21401
410-260-7160 • 800-322-4296 • FAX: 410-260-6056 • TTY: 800-735-2258 • nkopp@treasurer.state.md.us

00159155



# OFFICE OF THE STATE TREASURER:

# REVIEW OF PROPOSED PUBLIC-PRIVATE PARTNERSHIP

## JULY 9, 2021

**For further information or questions, contact:**

Christian Lund
Director, Debt Management Division
Maryland State Treasurer's Office

80 Calvert Street
Annapolis, Maryland 21401
(410) 260-7920 | clund@treasurer.state.md.us

00159157

## I.  Introduction

Under Section 10A-203 of the State Finance and Procurement Article of the Annotated Code of Maryland ("SF&P 10A-203") the State Treasurer's Office ("STO"), in coordination with the Office of the Comptroller, is required to analyze the impact of a public-private partnership ("P3") proposed by a unit of State government on the State's capital debt affordability limits and submit that analysis to the Budget Committees and Department of Legislative Services within 30 days. The Board of Public Works ("BPW"), which is responsible for approving all P3s in the State, may not act on the proposed P3 until this report has been submitted. This report is the result of the submission of a proposed P3 by the Maryland Transportation Authority ("MDTA") and the Maryland Department of Transportation ("MDOT") to STO on June 10, 2021.

Note that this report is organized differently than the most recent report completed under SF&P 10A-203, which was for the Purple Line P3 Agreement approved by BPW in 2016. The Purple Line P3 Agreement had a financial plan that included clearly defined progress, milestone, and availability payments, which allowed STO to focus on whether the various payment streams should be considered tax-supported debt under the State's capital debt affordability limits. This P3 Agreement instead uses a progressive delivery approach, which limits the defined costs to certain predevelopment work but also grants exclusive rights for the future construction and operation of the facility to the concessionaire. This leaves many of the costs and details of the P3 Agreement undefined (though it should be noted that MDOT's stated goal is to complete the P3 at no direct cost to the State, only to tollpayers.)

The State's experience with the Purple Line P3 has also shown that the narrow focus on payment streams in that report meant that some broader risks and potential costs went unrecognized. While one of the key objectives of using a P3 method of delivery to build the Purple Line was to minimize the State's direct costs, unforeseen circumstances have delayed the project and led to the State paying hundreds of millions of dollars in own-source funds to ensure it can be completed.

For these reasons, this report has a broader focus. It examines other risks and considerations that BPW should be aware of before approving the project, in addition to a discussion of the costs and payment streams of the P3 itself. The report also recommends changes to SF&P 10A-203 to improve its utility in the future.

## II.  Background

MDTA, working in concert with MDOT, recently completed a procurement to initiate the first phase of a P3 on a project to upgrade certain transportation facilities, including portions of I-495, I-270 and the American Legion Bridge (the "Project"). The Project is proposed to be delivered using a progressive delivery approach with individual agreements covering different portions of the Project. The proposed P3 agreement (the "Phase P3 Agreement") currently under evaluation will be focused on the predevelopment work necessary for a portion of the Project. Accelerate Maryland Partners ("AMP") has been selected as a private partner for the predevelopment phase of the Project. Upon successful completion of the predevelopment work under the Phase P3

00159158

Agreement, AMP may become a "Section Developer" by entering into additional P3 agreements ("Section P3 Agreements") with MDOT and MDTA for the responsibility of designing, constructing, financing, operating, and maintaining a portion of the Project for a term of 50 years. These activities will be supported primarily by future toll revenues associated with the Project facilities. MDTA would set the minimum and maximum toll rates, as well as a "soft rate" cap on tolls when the facility is operating within designated metrics[1]. Section P3 Agreements may also include revenue sharing between the State and the developer of that section of the Project[2].

## III.    Lack of Funding Limits Scope of This Report

As STO began its analysis of the Phase P3 Agreement, it became clear that it would require outside assistance to adequately review the agreement within 30 days. STO is a small agency with only a handful of individuals with public finance experience. The P3 Agreement itself is 123 pages long and includes 1,168 pages of exhibits, in addition to several years' worth of related studies, letters, presentations, and news articles that need to be understood for context. Additionally, the State's experience with the Purple Line P3 has definitively shown that P3 Agreements are complex documents with many possible ways for unexpected roadblocks and/or costs to arise for the State.

Due to these factors, STO determined that in order to properly fulfill the oversight role required by SF&P 10A-203, it was necessary to engage the State's Bond Counsel, Kutak Rock, and Financial Advisor, Public Resources Advisory Group ("PRAG"), to work with STO to examine the Phase P3 Agreement and produce their own independent assessments of the impact to the State, which would have informed and complemented this report. Doing so would have given the State the benefit of Kutak Rock and PRAG's professional staff, who collectively possess decades of expertise in designing, analyzing, and negotiating P3s. Their assessments would have included:

- A thorough review of the Phase P3 Agreement by lawyers and financial advisors who specialize in P3s, which might have identified additional risks and considerations not described in this report (or alleviated concern over some of these risks and considerations)
- A comparison of the structure, contractual terms and conditions, and risks of the proposed P3 to similar P3s around the country, which could have helped policymakers understand the possible outcomes of the Phase P3 Agreement
- More formal, definitive guidance of the potential costs and risks associated with the Phase P3 Agreement

Based on cost estimates prepared by Kutak Rock and PRAG, STO made a request to the Department of Budget and Management ("DBM") for $100,000 for this purpose. However, DBM

---

[1] December 18, 2020 Letter from MDTA to AMP, I-495 and I-270 P3 Program Revised Preliminary Toll Rate Proposal.
[2] Exhibits to Phase P3 Agreement, Exhibit 8 – Section P3 Agreement Term Sheet, pp. 23-24.

00159159

denied STO's request for additional funding. With no other funds available in its budget to redirect towards this project, STO was unable to fully engage Kutak Rock and PRAG.

STO has analyzed the Phase P3 Agreement to the best of its ability and has received limited, informal assistance from PRAG and Kutak Rock with some aspects of the review. However, because STO could not fully engage Kutak Rock and PRAG and obtain formal assessments, we warn that this analysis is not fully complete; there could be key risks, costs, terms, and conditions not contemplated here. In a later section, this report will discuss the need for legislative and budgetary changes to ensure proper oversight of proposed P3 Agreements in the future.

## IV.    Phase P3 Agreement Costs

Since the Phase P3 Agreement only covers predevelopment work, the types of costs and risks allocated to the State are limited. The Phase P3 Agreement establishes caps on the anticipated costs; however, there are several situations in which the caps intended to contain costs could be exceeded, renegotiated, or are not yet defined.

### Types of Phase 1 South costs

*Predevelopment costs*. Predevelopment costs such as design, financial plan development, etc. would be reimbursed to AMP upon successful financial close of the first Section P3 Agreement for Phase 1 South. This reimbursement is capped at $54.3 million[3], but the cap could be increased if certain events occur (see next section).

*Termination costs*. If Phase 1 South is cancelled by MDOT for convenience, the NEPA process does not allow the project to move forward, a court order determines the contract to be void not for the fault of the Developer, or changes to key assumptions render the project not financially viable, MDOT will be responsible for paying AMP a termination fee of up to $50.0 million[4]. MDOT would receive any work products developed by AMP.

### Situations in which Phase 1 South cost caps could be exceeded

As noted above, the Phase P3 Agreement sets forth nominal caps on both predevelopment and termination costs. However, there are situations in which these caps can be exceeded. There are no limits on the amounts by which the caps can be exceeded in these cases.

*"Relief events" which impact the predevelopment timeline[5]*. Relief events include BPW declining to approve a Section P3 Agreement within 150 days; litigation, injunctions, or other legal challenges; and *force majeure* events, among other things. If a relief event occurs, AMP may claim an increase to the predevelopment cost cap, in addition to extensions to affected deadlines and relief from other obligations under the Phase P3 Agreement.

---

[3] Exhibits to Phase P3 Agreement, Exhibit 1 – Definitions, p. 112.
[4] Exhibits to Phase P3 Agreement, Exhibit 1 – Definitions, p. 111.
[5] Phase P3 Agreement, Article 16 – Relief Events, pp. 33-35.

00159160

*"Reasonable and proper" costs*[6]. This would include costs such as the removal of hazardous materials, the discovery of archaeological sites, and change orders requested by MDOT.

## Phase 1 North predevelopment costs not defined

No cost estimates or caps for Phase 1 North are established in the Phase P3 Agreement. MDOT and AMP would need to negotiate in good faith to establish the cost caps for Phase 1 North[7]. It is not clear if BPW approval of any agreement would be required, though MDOT has stated to STO that the agreement would be a contract modification subject to BPW review. Additionally, certain predevelopment work for Phase 1 North related to environmental and NEPA review would not be subject to any cap and would be paid even if NEPA approvals are not obtained for Phase 1 North[8].

## Costs and risks for Section P3 Agreements not contemplated

Because the Phase P3 Agreement's scope only covers predevelopment work, the costs, terms, and conditions of the future Section P3 Agreements are not contemplated. These Section P3 Agreements would include the actual construction and operation of the facilities comprising the Project, which will make their cost, complexity, and risk far greater than anything included in the Phase P3 Agreement. However, information on those costs, complexities, and risks will not be available until the Phase P3 Agreement is already approved, the predevelopment work is completed, and the Section P3 Agreements are presented for review.

## V.      Key Risks Associated with Phase P3 Agreement

As part of STO's review of the proposed Phase P3 Agreement, it has identified several major areas of risk associated with it. STO's approach here is to simply identify these risks; it should be noted that MDOT is aware of these in many cases and has sought to mitigate them in various ways. The identified risks include:

*Lack of funding limits the thoroughness of this review*. As mentioned earlier in this report, STO's request for funding to engage its Bond Counsel and Financial Advisor to assist with the review of this P3 Agreement was denied. While STO has analyzed the P3 Agreement to the best of its ability, there could be other risks, costs, terms, and conditions that were missed and are therefore not discussed in this report.

*Phase 1 South cost caps may be exceeded or renegotiated under many circumstances.* Events that could allow the cost caps to be exceeded or renegotiated include BPW declining to approve a Section P3 Agreement, *force majeure*, MDOT-directed change orders, discovery of

---

[6] Phase P3 Agreement, Article 9 – Phase Site Access and Investigations, p. 16; Article 22 – Change Orders, pp. 55-56.
[7] Phase P3 Agreement, Article 14 – Section Viability, pp. 31-33.
[8] Phase P3 Agreement, Article 10 – Predevelopment Work, pp. 19-20.

00159161

hazardous materials, and delays caused by litigation[9]. There is no limit on the amount by which the caps can be increased or exceeded.

*Phase 1 North costs are undefined[10].* Predevelopment and termination cost caps for Phase 1 North would be negotiated between MDOT and AMP at a later time. There are no parameters establishing limits or caps on what the total cost for Phase 1 North will be. Furthermore, the costs for Phase 1 North would be directly negotiated between AMP and MDOT. It is unclear if any resulting agreement would be subject to BPW approval; MDOT has asserted that BPW approval would be required as it would be considered a contract modification.

*AMP's financial plan for Phase 1 South could depend on sources of funding not currently available.* Phase 1 South is expected to be funded by a combination of a Transportation Infrastructure Finance and Innovation Act ("TIFIA") loan, Private Activity Bonds ("PABs"), and equity investments; availability of these funding sources is listed as two "Key Assumptions" for Phase 1 South[11]. However, to be eligible for a TIFIA loan, Phase 1 South will need to complete the NEPA process, including the Air Quality Conforming Analysis from which it was removed by the National Capital Region Transportation Planning Board in June 2021. Furthermore, there is no PABs allocation currently available from the federal government; a new PABs allocation would need to be included in federal legislation such as the proposed infrastructure bill for PABs to be a viable option for funding. In the absence of TIFIA and/or PABs, more expensive sources of funding might be needed, with the cost possibly passed on to tollpayers and/or negatively impacting future revenue sharing with the State. If the absence of TIFIA and/or PABs led AMP to conclude that that Phase 1 South was no longer financially viable, AMP would have the right to terminate the Phase P3 Agreement and MDOT would be required to reimburse all eligible costs up to the termination cap[12].

*Unclear if P3 Model is best method of delivery.* Though a confidential, preliminary value for money analysis examining managed lanes throughout the entirety of I-495 and I-270 was completed in 2020, no public value for money analysis examining Phase 1 South and Phase 1 North has been completed. Without an analysis directly comparing the costs and risks associated with P3 delivery to a comparable project using public sector delivery, there is no way for the State to make an informed choice between the two alternatives. MDOT and AMP intend to perform their own separate value for money analyses as part of the predevelopment phase, but only after the Phase P3 Agreement would have already been approved. In the past, MDOT has dismissed the possibility of public sector delivery based on legislative debt caps, bond ratings, and coverage ratios, though these are all issues that STO believes could be solved through discussion and reexamination. It is unclear if MDOT will continue to dismiss public sector delivery out of hand, or if the planned value for money analyses will be a legitimate comparison of P3 versus public delivery.

---

[9] Phase P3 Agreement, Article 9 – Phase Site Access and Investigations, p. 16; Article 22, Change Orders, pp. 55-56; Exhibits to Phase P3 Agreement, Exhibit 1 – Definitions, pp. 114-116.
[10] Phase P3 Agreement, Article 14 – Section Viability, pp. 31-33.
[11] Exhibits to Phase P3 Agreement, Exhibit 18 – Key Assumptions for Phase South A, p. 141.
[12] Phase P3 Agreement, Article 26 – Termination, p. 72.

00159162

*May be difficult to contain costs using progressive delivery model*. While there are advantages to the progressive delivery model, the approach could make it challenging to keep costs competitive. Once the State approves the Phase P3 Agreement, future phases of the Project will not be subject to the typical competitive procurement process which helps to ensure costs are kept at market levels[13]. Though MDOT would not be required to move forward with the Section P3 Agreements, inertia could lead it to move forward with future steps even if best execution is not attained. Higher costs could be borne by tollpayers and/or impact potential revenue sharing with the State.

## VI.    Other Considerations for the Phase P3 Agreement

STO also noted several other considerations regarding the proposed Phase P3 Agreement that policymakers should be aware of. These considerations include:

*Cost of equity is very high compared to traditional capital funding*. The rate of return for AMP's equity is confidential under the terms of MDOT's RFP, but a typical annual rate of return on equity for this type of P3 is in the low to mid-teens. Compare this to the current rate of less than 2% for a 30-Year Treasury Bond. This cost could be borne by the tollpayers and/or impact potential revenue sharing with the State.

*MDTA notes may be purchased by AMP using equity.* The Phase P3 Agreement contemplates MDTA selling $100.0 million or less in notes directly to AMP to fund MDTA's costs related to the project[14]. The expectation is that AMP will use equity to purchase these notes. This could lead to a situation in which the stated rate of return on the notes is quite low, but AMP earns a very high return on the equity it uses to purchase the notes. The equity repayment cost could be recovered from tollpayers and/or impact future revenue sharing with the State. MDTA might be able to reduce costs for tollpayers by instead selling the notes via a public process or with alternative funding.

*Improvements to public transit in Frederick and Montgomery County could be limited if they threaten the financial viability of the managed lanes[15]*. Though public transit improvements are contemplated as a potential component of future Section P3 Agreements, the P3 Agreement restricts these improvements to public transit projects for which the cost and scope "are not of an amount that prevents the Section from being financially viable." This language could exclude otherwise worthy public transit projects from inclusion in the Section P3 Agreements. Note that it should not prevent the State from pursuing public transit projects separately from the Project, as Section 10A-401 of the State Finance and Procurement Article of the Annotated Code of Maryland prohibits P3 agreements from including noncompete clauses that inhibit the planning, construction, or implementation of State-funded transit projects.

---

[13] Phase P3 Agreement, Article 4 – Exclusive Rights and Obligations, p. 6.
[14] Exhibits to Phase P3 Agreement, Exhibit 8 – Section P3 Agreement Term Sheet, p. 24.
[15] Phase P3 Agreement, Article 11 – Section P3 Agreements and Committed Section Proposals, pp. 24-25.

00159163

***The State might not be permitted to build new general purpose lanes on I-270 unless it compensated AMP for any loss of cash flow***[16]. The compensation would be negotiated between MDOT and AMP. It would not necessarily be a monetary payment from the State to AMP; it could take the form of other changes to the Section P3 Agreements.

***Phase 1 North may be divided into two or more Section Agreements.*** Though Phase 1 South is expected to be completed as a single Section Agreement, MDOT believes Phase 1 North could ultimately be divided into multiple Section Agreements. This could significantly extend the timeline and complexity of Phase 1 North.

## VII.    Impact on State's Capital Debt Affordability Limits

The impact of the Phase P3 Agreement on the State's capital debt affordability limits cannot be determined due to the uncertainties around its full costs. These uncertainties include:

- The actual cost of predevelopment and termination fees for Phase 1 South cannot be determined due to provisions allowing cost caps to be exceeded or re-negotiated.
- All costs for Phase 1 North are left undefined in the agreement.
- STO was denied funding for external assessments of the Phase P3 Agreement, which it views as necessary for a complete analysis.

Note that even if the costs of the Phase P3 Agreement could be quantified, they might or might not be considered tax-supported debt and impact the State's capital debt affordability limits depending on how any payments are structured. For example, a reimbursement from future toll revenues generated from the Project likely would not be considered tax-supported debt, while a termination fee for predevelopment design work funded by Consolidated Transportation Bond proceeds would be considered tax-supported debt. MDOT should ensure that any payments made under the Phase P3 Agreement are structured to avoid being considered tax-supported debt.

## VIII.    Recommended Updates to SF&P 10A-203

Given the State's experience with the Purple Line P3, STO determined early on that the report required under SF&P 10A-203 for this proposed P3 Agreement should have a broad focus on the various costs and risks involved, rather than the narrow focus on payment structures that STO used for its 2016 report on the Purple Line P3. However, STO was stymied by funding and time limitations that prevented this broader analysis from being adequately conducted.

STO is therefore recommending updates to SF&P 10A-203. These recommended changes are primarily focused on improving the utility of this report by making it a more in-depth, substantive tool for decision making and oversight of proposed P3s in the State. At a minimum, STO believes the changes to the statute should include:

---

[16] Exhibits to Phase P3 Agreement, Exhibit 8 – Section P3 Agreement Term Sheet, pp. 16-17.

9

- A focus on the broader set of the costs and risks involved with any proposed P3 Agreement, rather than a narrow focus on the impact on the State's debt affordability limits
- Additional time for review before this report is due
- A requirement to engage STO's financial advisor and bond counsel to perform outside review of proposed P3 documentation and risk allocations
- A requirement for the agency proposing the P3 Agreement to reimburse STO for the cost of outside review

If the General Assembly would like to consider these updates to the P3 law, STO suggests it might be prudent to convene a taskforce similar to the one created to design the P3 law. STO would gladly assist with this process.

## IX.    Conclusion

While STO is unable to draw a firm conclusion regarding the impact on the State's capital debt affordability limits, it is STO's view that there are significant uncertainties around the costs, risks, and ultimate benefits of the Phase P3 Agreement. Members of the BPW should recognize these uncertainties and view them as acceptable before approving the agreement. Additionally, given the possibility that there could be multiple Section P3 Agreements in the State's future as part of the Project, STO believes the State should quickly act to amend its P3 law to allow for a more thorough, workable oversight process moving forward.

00159165



**THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION**
6611 Kenilworth Avenue · Riverdale, Maryland 20737

November 30, 2021

Jeanette Mar
Environmental Program Manager
U.S. Department of Transportation
Federal Highway Administration
Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza
Suite 1520
Baltimore, MD 21201

Tim Smith
Administrator
Maryland Department of Transportation
State Highway Administration
Mailstop C-400
MDOT State Highway Administration
PO Box 717
Baltimore, MD 21203-0717

      Re:    I-495 & I-270 Managed Lanes Study – Supplemental Draft Environmental Impact
              Statement

Dear Ms. Mar and Mr. Smith:

The Maryland-National Capital Park and Planning Commission ("M-NCPPC" or "the
Commission") submits the following comments, along with the attached and incorporated by
reference Comment Response Table, regarding the Supplemental Draft Environmental Impact
Statement ("SDEIS") prepared by the Maryland Department of Transportation State Highway
Administration ("MDOT SHA") and the Federal Highway Administration ("FHWA")
(collectively the "Lead Agencies") for the I-495 & I-270 Managed Lanes Study (the "Project").
Through this letter, the Commission shares its concerns with the Lead Agencies' updated analysis
underpinning the SDEIS, including, among others, concerns resulting from the limited scope of
the Project's current National Environmental Policy Act ("NEPA") analysis, potential impacts to
protected parkland and natural resources subject to M-NCPPC's jurisdiction, equity and cultural
considerations, transportation and local roadway impacts, and generally inadequate mitigation
measures. Although the Lead Agencies narrowed the scope of their preferred alternative (the
"Preferred Alternative") in response to comments to the Draft Environmental Impact Statement

Jeannette Mar & Tim Smith
November 30, 2021
Page 2

("DEIS"), significant issues remain that require further review and potential adjustments to the Project's planning and design, along with commitments to ensure that the Lead Agencies comply with NEPA and all other applicable federal laws, including the Capper-Cramton Act (the "CCA").

M-NCPPC does not intend for its comments to express a decision to oppose or support the Project or the Lead Agencies' Preferred Alternative. Rather, as the governing body of this Cooperating Agency, the Commission is carrying out its responsibilities as the planning agency for Montgomery and Prince Georges Counties and as the parkland steward in these counties. M-NCPPC has made the Lead Agencies aware of its concerns regarding the environmental review process, attributable largely to the Lead Agencies' failure to undertake a comprehensive analysis of reasonable alternatives, impacts, and mitigation measures, and failure to incorporate best practices in transportation, environmental protection, and land use planning.

The Lead Agencies' approach remains at odds with M-NCPPC's statutory obligation to make well-reasoned and informed decisions regarding parkland, cultural resources, and historic resources. Still, M-NCPPC is, as it has been throughout this process, committed to collaborating with the Lead Agencies as they continue their environmental review of the Project and proceed through the NEPA review process. The Commission remains optimistic that the Lead Agencies will consider changes to the Project that minimize impacts to parkland, streams, and protected cultural and historic resources. M-NCPPC is also hopeful that the Lead Agencies will take meaningful steps to responsibly address the unavoidable impacts to parkland that could result from the Project, notwithstanding its narrower scope compared to the build alternatives initially proposed.

## I.    Background

### A. The Maryland-National Capital Park and Planning Commission

The Maryland General Assembly created M-NCPPC in 1927 to plan for the orderly development, acquisition and maintenance of parkland and open space, and to protect natural resources in Prince George's and Montgomery Counties.[1] Since that time, M-NCPPC has acquired several hundred parks in the two counties, including parks requiring special protection due to their acquisition with funds made available from the federal government and state of Maryland pursuant to the CCA.

---

[1] The Maryland Court of Appeals has outlined M-NCPPC's regional functions as follows:

The [M-NCPPC], as its name suggests, administers parks, public recreation, and, in conjunction with the governments of Prince George's and Montgomery counties..., participates in the planning of development within the [Maryland-Washington Regional District]. Among other things, [a Maryland statute] authorizes the MNCPPC to: (1) acquire property for parks, forests, roads, and other public spaces; (2) rename streets and highways and number and renumber houses within the district to fix mistakes, remove confusion, and establish uniformity; (3) acquire, improve, and manage land for flood control purposes; (4) establish road grades in Montgomery County; and, (5) recommend amendments to the zoning laws and subdivision regulations.

*Cty. Council of Prince George's Cty. v. Zimmer Dev. Co.*, 120 A.3d 677, 699 (2015) (internal citations omitted).

00159732

Jeannette Mar & Tim Smith
November 30, 2021
Page 3

The parkland acquired with CCA funds includes areas in the vicinity of the Clara Barton Parkway covered by agreements between M-NCPPC, the National Capital Planning Commission ("NCPC"), and the federal government that require the land to be used for park purposes and give M-NCPPC authority to approve or reject its use for other purposes.

The Lead Agencies engaged M-NCPPC as a Cooperating Agency to provide input regarding the environmental impacts of the Project. To fulfill its role as a Cooperating Agency, M-NCPPC must ensure that the Project is undertaken in compliance with NEPA and that M-NCPPC complies with its own mandates under state and federal law. As a Cooperating Agency, M-NCPPC staff has taken its responsibilities seriously by fully engaging with the Lead Agencies and the Interagency Working Group established by the Lead Agencies during every stage of review of the Project.

### B. Development of the Preferred Alternative

The stated purpose of the Project is to develop travel demand management solutions that address congestion, improve trip reliability on I-495 and I-270 within the Project limits, and enhance existing and planned multimodal mobility.[2] The stated needs for the Project are: accommodating existing traffic and long-term traffic growth, enhancing trip reliability, providing additional roadway travel choices, enhancing homeland security, and facilitating the movement of goods and the ability of businesses to provide services.[3] The Project limits are: I-495 from south of the George Washington Memorial Parkway in Virginia, including improvements to the American Legion Bridge ("ALB") over the Potomac River, to the west of MD 5 in Maryland and along I-270 from I-495 to north of I-370, including the east and west I-270 spurs in Montgomery and Prince George's Counties.[4]

The Lead Agencies issued their DEIS and Draft Section 4(f) Evaluation for the Project and published a Notice of Availability in the Federal Register on July 10, 2020. The Lead Agencies considered a range of 15 preliminary alternatives and retained and analyzed seven alternatives in the DEIS. The DEIS noted that after circulating the DEIS and receiving comments, the Lead Agencies would issue a Final Environmental Statement ("FEIS") that would identify the Preferred Alternative as well as respond to substantive comments. M-NCPPC, as a Coordinating Agency, provided comments to MDOT SHA by letter dated November 9, 2020, raising concerns about the effect of the alternatives on parkland, traffic and historic resources, wetlands, and environmental justice communities. In January 2021, the Lead Agencies announced Alternative 9 as their Preferred Alternative based on the results of public comment and the ongoing traffic, engineering, financial, and environmental analyses.[5] Alternative 9 envisioned the addition of two priced, managed lanes in each direction on I-495 and the conversion of one existing high-occupancy vehicle lane to a price-managed lane and addition of one priced, managed land in each direction on I-270.[6]

---

[2] SDEIS at 1-2.
[3] SDEIS at 1-2, 1-3.
[4] SDEIS at 1-2.
[5] SDEIS at 1-1.
[6] DEIS at ES-8.

3

00159733

Jeannette Mar & Tim Smith
November 30, 2021
Page 4

After Coordinating Agencies and other stakeholders raised concerns about the impacts of Alternative 9 and in particular those on and around I-495 east of the I-270 spur to MD 5, the Lead Agencies decided to change the Preferred Alternative to Alternative 9 – Phase 1 South, which would consist of building a new American Legion Bridge and delivering two high-occupancy toll managed lanes in each direction on I-495 from the George Washington Memorial Parkway in Virginia to east of MD 187 on I-495, and on I-270 from I-495 to north of I-370 and on the I-270 eastern spur from east of MD 187 to I-270."[7]  The Lead Agencies issued their SDEIS on October 1, 2021 describing the change in the Preferred Alternative and seeking comments from interested parties.

While M-NCPPC appreciates that the Lead Agencies have narrowed the Project to avoid the most significant impacts, the newly envisioned Preferred Alternative should be adjusted to have the fewest practicable impacts.  Through this letter, M-NCPPC provides comments focused on that purpose.

II.    **Discussion**

A. **The Preferred Alternative must reflect the "No-Build Alternative" outside of Phase 1 and should include both transportation demand management (formerly Alternative 2) and transit (formerly Alternative 14).**

The Lead Agencies should clarify their obligation to conduct a new or updated NEPA analysis when considering improvements outside of Phase 1 of the Project. Although the area outside Phase 1 (i.e., I-495 east of Old Georgetown Road) is neither specifically included as part of the Preferred Alternative nor included in the upcoming 2022 update to the Visualize 2045 Long Range Plan being advanced by the National Capital Region Transportation Planning Board ("TPD"), the SDEIS does not indicate clearly that I-495 east of Old Georgetown Road is now excluded from the NEPA analysis.[8]  To the contrary, the SDEIS states, "There is no action or no improvements on I-495 east of the I-270 east spur to MD 5. While the Preferred Alternative does not include improvements to the remaining parts of I-495 within the scope of this Study, *improvements on the remainder of the interstate system may still be needed in the future* and would advance separately, subject to additional environmental studies, analysis and collaboration with the public, stakeholders and local agencies."[9]  While the Lead Agencies correctly acknowledge that future environmental studies and analysis would be needed prior to future phases, the Lead Agencies should clarify in the FEIS that a new *NEPA* study is required by law prior to any development in the area of I-495 east of Old Georgetown Road.

The Lead Agencies' state in the SDEIS that all of the parkland outside of the Phase 1 area is now "avoided."  Should the Lead Agencies determine to build future phases, it stands to reason that they would be required to conduct a new study to determine the impacts of the future alignments

---

[7] *Id.*
[8] SDEIS at 1-2.
[9] SDEIS at ES-1 (emphasis added).

4

Jeannette Mar & Tim Smith
November 30, 2021
Page 5

on natural resources.[10] This must be the case even if the Preferred Alternative reflects the "No-Build Alternative" for future phases, since the NEPA analysis to date did not adequately consider all potential impacts to protected parkland and natural resources, such as local bodies of water.[11] The Lead Agencies also must ensure that their selection of the Preferred Alternative does not commit them to a course of action that they have not fully analyzed.[12]

With that said, even the Preferred Alternative requires further analysis. For example, if the portion of I-495 outside of Phase 1 is no longer part of the Managed Lanes Study, the transition areas to I-495 on the east spur travelling south and north from the ALB to Old Georgetown Road from the "split" may not be necessary. Creating the transition in this manner would encourage vehicle travel to continue on I-495, as described in the Commission's SDEIS Comment #6 .[13] Therefore, as MDOT Secretary Slater noted during the Washington Council of Government's Transportation Planning Board July 21, 2021, meeting, TDM such as dynamic signage is necessary to direct traffic to use the I-270/MD 200 combination for travel along the I-95 corridor.[14] Encouraging vehicle travel on that route will provide additional capacity on the topside of I-495 for local travel needs. All of these impacts must be properly assessed, especially if the Project will include future phases.[15]

Project-related mitigation also should include travel demand management and transportation system management ("TSM") measures, such as improvements along impacted corridors outside the project limits, including I-495 between the I-270 western spur and US 50. The Lead Agencies should consider incorporating into the Project TSM improvements, such as those being implemented along I-370 as part of the I-270 Innovative Congestion Management project, including variable message signage and ramp metering. FHWA's NEPA regulations are designed to facilitate this type of analysis before FHWA commits to an alternative.[16] The Lead Agencies should consider incorporating TSM/TDM and transit into the Project as part and parcel of the Preferred Alternative, not as ancillary components.

---

[10] *See* SDEIS at ES-13 ("The Preferred Alternative, with build improvements only within the limits of Phase 1 South, avoids over 100 acres of parkland and hundreds of wetland and stream features.").

[11] *See* 40 C.F.R. § 1502.9(c)(1)(i), (ii) (requiring a supplemental EIS if an agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts").

[12] *Defs. of Wildlife v. N.C. DOT*, 762 F.3d 374, 397 (4th Cir. 2014).

[13] M-NCPPC's SDEIS Comment/Response Errata dated November 4, 2021.

[14] mwcog.org/events/2021/7/21/transportation-planning-board/

[15] *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 426 (4th Cir. 2012) (quoting *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 311 (2d Cir. 2009)) (prohibiting agencies from engaging "in segmentation, which involves 'an attempt to circumvent NEPA by breaking up one project into smaller projects and not studying the overall impacts of the single overall project'").

[16] *See* 23 C.F.R. § 771.111(f) (purpose of FHWA's NEPA regulations is to "ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated").

00159735

Jeannette Mar & Tim Smith
November 30, 2021
Page 6

While the Lead Agencies considered these elements as alternatives early in the NEPA process, they quickly eliminated them from further consideration, finding that they do not "support long-term traffic growth" or "would not enhance trip reliability."[17]  After dropping these alternatives, MDOT SHA promised that "transit solutions are part of the overall traffic relief plan" and would play a role in the Preferred Alternative.  The SDEIS's brief discussion of "transit-related elements"—which describes the ability of transit buses to use high-occupancy travel lanes without charge, connections to existing transit stations, and regional transit improvements (e.g., new bus bays and parking capacity in two areas)—contemplates transit improvements that fall considerably short of the type necessary to have a real impact on traffic congestion in the area – much less to mitigate or avoid the economic and environmental consequences of increasing reliance on travel by automobile, including, without limitation, the emissions associated with increasing vehicle miles traveled and the disruption to sound land use planning caused by the project.[18]  In order to follow through on transit commitments the Lead Agencies made to Montgomery County during the early stages of the NEPA process, which are integral to the Project's success, the Lead Agencies should designate transit as a contributing alternative, as opposed to an ancillary improvement.

### B. The SDEIS does not consider adequately environmental justice, equity, and historic resource preservation concerns.

The Lead Agencies must identify impacts to all resources of environmental, cultural, and historic significance, as opposed to evaluating these concerns in a piecemeal approach.[19]  NEPA requires the Lead Agencies, in consultation with the Coordinating Agencies, to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."[20]  The consulting parties must consult with one another to find ways to avoid, minimize, or mitigate adverse effects on historic property and summarize their agreed-upon course of action in a memorandum of agreement.[21]  This consultation process should occur early in the NEPA review process to allow adequate time for the agencies to consider all potential impacts on historic properties and alternatives to avoid, minimize, or mitigate such impacts.[22]  In other words, the Lead Agencies must take steps now, before promulgation of the FEIS, to conduct a comprehensive evaluation of these properties for historic and cultural significance.

M-NCPPC also notes that while the Lead Agencies have taken steps to consider environmental justice and features of cultural and historic significance, they must take more significant action to ensure that minority and low-income populations are not disparately impacted by the Project.  Of note, the Lead Agencies have consulted with local stakeholders and conducted a ground-penetrating radar survey to identify *some* areas of potential disturbance to the impacted historic

---

[17] "Screened Alternatives," MDOT SHA,
https://oplanesmd.com/environmental/alternatives/screened-alternatives/ (last visited Oct. 29, 2021).
[18] SDEIS at 2-22 to 2-23.
[19] *See, e.g.,* 54 U.S.C. § 306108; 36 C.F.R. 800 *et seq.* (requiring agencies to consider a federal project's effects on historic resources and consult with parties having jurisdiction over the same).
[20] 36 C.F.R. §800.6(a).
[21] 36 C.F.R. § 800.6(c).
[22] 36 C.F.R. § 800.8(a)(2).

00159736

Jeannette Mar & Tim Smith
November 30, 2021
Page 7

cemeteries, such as the Morningstar Tabernacle No. 8 Moses Hall and Cemetery. While this effort is a good first step, the Lead Agencies' assessment of impacts needs to include *all* of the cemetery property (including *all* potential grave sites), the results of which should inform specific mitigation measures that the Lead Agencies tailor appropriately to reduce or avoid those impacts to the maximum extent possible.

Furthermore, the SDEIS indicates that environmental justice issues omitted from the SDEIS will be remedied in the FEIS. This is far from a best practice since it obstructs public comment and community input. Waiting until after selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention NEPA and Title VI of the Civil Rights Act of 1964 ("Title VI") demand from the Lead Agencies.[23] This course of action also runs afoul of Department of Transportation Order 5610.2(a), which commits the Department to promote the principles of environmental justice "by fully considering environmental justice principles *throughout planning and decision-making processes* in the development of programs, policies, and activities, using the principles of the National Environmental Policy Act of 1969 . . ." FHWA Order 6640.23A espouses a similar theme, committing FHWA to "identify and prevent discriminatory effects . . . to ensure that social impacts to communities and people are recognized early and continually throughout the transportation decision-making process—from early planning through implementation." Acting later, after the Lead Agencies have already responded to stakeholder concerns and continued designing the Project, would violate Title VI, these orders, and fundamental environmental justice principles.

The SDEIS's community and environmental justice analysis of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and the Poor Farm Cemetery acknowledges that the Project may impact culturally significant sites. However, the SDEIS's environmental justice discussion relates primarily to *current* minority population concentrations and fails to address how the Project may exacerbate the historical and ongoing injustice to small African American communities displaced by construction of the Beltway.[24] The National Trust for Historic Preservation explicitly acknowledged this issue as key to social justice by selecting the Moses Cemetery as one of the 11 most endangered historic sites in the United States in 2021.[25] To their credit, the Lead Agencies promised to "fully investigate areas to be impacted by construction." A "full investigation,"

---

[23] *See* 2 U.S.C. § 2000d *et seq.* ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."); Promising Practices for EJ Methodologies in NEPA Reviews, FED. INTERAGENCY WORKING GROUP ON ENVIRON. JUSTICE & NEPA COMM. (March 2016), https://www.epa.gov/sites/default/files/2016-08/documents/nepa_promising_practices_document_2016.pdf ("Agencies may wish to consider which alternative(s) have the least impact to minority populations and low-income populations and alternatives that would minimize or mitigate disproportionately high and adverse impacts as a factor when identifying reasonable alternatives and the preferred alternative").

[24] SDEIS at 4-33.

[25] "Discover America's 11 Most Endangered Historic Places for 2021," NAT'L TRUST FOR HIST. PRESERVATION (June 3, 2021), https://savingplaces.org/stories/11-most-endangered-historic-places-2021#.YXoRGhrMI2w.

00159737

Jeannette Mar & Tim Smith
November 30, 2021
Page 8

however, means complete ground-penetrating radar surveys of all potential historic grave sites, as well as robust and frequent communication with local community members. The Lead Agencies must ensure that their analysis is fulsome and exhaustive prior to approving any further development in these historically and culturally significant areas that already faced significant disruption in the past.[26]

Additionally, neither the DEIS nor the SDEIS reference any cumulative effects to specific cultural resources. For instance, additional historical research conducted subsequent to the DEIS in Cabin John related to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery and associated Gibson Grove community show that the construction of the Beltway divided the fraternal hall and cemetery from the neighboring church, physically fragmented the community, and contributed to the decline of these institutions.[27] The community's decline, in turn, contributed to the closure and loss to fire of the Moses fraternal hall. As currently designed, the Preferred Alternative will result in a "long-term diminishment of the property's setting and feeling due to construction impacts on a small sized property."[28] This "diminishment" is just the latest in a series of diminishments beginning with the Beltway that the Lead Agencies do not appear to account for or seek to mitigate. By failing to account for cumulative impacts on cultural resources, the Lead Agencies risk violating NEPA and Title VI.[29]

## C. The Preferred Alternative's design will shift bottleneck issues instead of relieving traffic congestion at the ALB.

A detailed technical transportation review of the SDEIS concludes that the Preferred Alternative will relieve congestion at the ALB. However, the Preferred Alternative does not eliminate congestion in the corridors studied but and instead shifts it from the vicinity of the ALB (e.g., McLean and Potomac) to other areas in Maryland. While some of these bottleneck shifts were expected, the degree of congestion resulting from the proposed project is severe on I-270 north of

---

[26] On November 15, 2021, the President signed into law the Infrastructure Investment and Jobs Act ("IIJA"), which is a once-in-a-generation investment in infrastructure throughout the country with bipartisan support. Included in the measure is a commitment to "Reconnecting Communities," a concept not even mentioned in the SDEIS. "Too often, past transportation investments divided communities or it left out the people most in need of affordable transportation options. In particular, significant portions of the interstate highway system were built through Black neighborhoods. The IIJA creates a first-ever program to reconnect communities divided by transportation infrastructure. The program will fund planning, design, demolition, and reconstruction of street grids, parks, or other infrastructure through $1 billion of dedicated funding." *See* IIJA Sec. 11509. While this is a grant program that does not bear directly on the Project, the Lead Agencies should take notice of Congress's focus on restoring divided communities and commitment to considering these communities in future transportation planning.

[27] *See generally* Alexandra Jones, *Gibson Grove Gone But Not Forgotten: The Archaeology of an African American Church*, Univ. of Cal., Berkeley (2010),
https://escholarship.org/content/qt8z67f3ns/qt8z67f3ns_noSplash_ef033302034ec0876e83c89c1b0c66f0.pdf.

[28] SDEIS at 4-36.

[29] *See Te-Moak Tribe of W. Shoshone of Nev. v. United States DOI*, 608 F.3d 592, 607 (9th Cir. 2010) (Bureau of Land Management's environmental assessment inadequate because the agency failed to conduct a proper analysis of a project's cumulative impacts on cultural resources).

00159738

Jeannette Mar & Tim Smith
November 30, 2021
Page 9

I-370, on the Inner Loop on the top side of the Beltway, and on the Inner Loop in Prince George's County. These bottleneck shifts are Project-related impacts, and so the Lead Agencies should address mitigation measures to minimize these projected deficiencies in the SDEIS and incorporate them into the Project design. NEPA requires the Lead Agencies to consider mitigation measures that address adverse impacts, including, among others, areas of traffic congestion points.[30]

Specifically, if the construction of Phase 1A is likely to shift congestion in a way that logically requires construction of Phase 1B (currently the subject of the I-270 Pre-NEPA Study) in order to avoid creation of new bottlenecks, then it follows that any decision to proceed with Phase 1A must await completion of the NEPA analysis for Phase 1B. MDOT SHA should further consider the implications of language in the FEIS concerning the impact of Section 27.3 of the Phase Public Private Partnership Agreement (the "P3 Agreement").[31] Section 27.3 is entitled Financial Viability of an Uncommitted Section and it explicitly states that future phases may be cut based upon a financial viability formula applied to a prior phase of the project. The FEIS should at minimum discuss the impact of this language on the effect of a decision to construct Phase 1A for construction of Phase 1B. In other words, the traffic analysis raises serious questions about how a decision on Phase 1A can or should be made in the absence of a comprehensive analysis that assesses the impact of building this segment on future phases.

For the other bottleneck issues, M-NCPPC recommends the following design changes to the Preferred Alternative:

- Eliminate the managed lanes from the I-270 Eastern Spur between I-270 and I-495 because I-270 traffic headed south to the eastern spur would not use the managed lane network. The managed lanes would provide minimal travel time benefits for drivers from Gaithersburg and Rockville to most Montgomery County destinations.
- Eliminate the managed lanes and exit/entrance ramps from I-495 between the two spurs.
- Managed lane traffic destined to and from the Inner Loop should enter/exit the managed lane network at the River Road crossover interchange.

Additionally, there are a number of inconsistent conclusions[32] and assumptions in the SDEIS's transportation modeling and forecasts.[33] The Project claims to improve traffic congestion, but its

---

[30] See O'Reilly v. United States Army Corps of Eng'rs, 477 F.3d 225, 233-34 (5th Cir. 2007) (environmental assessment failed to demonstrate that mitigation measures adequately address and remediate adverse impacts to traffic and transportation patterns).

[31] P3 Agreement at 74.

[32] SDEIS, Appendix D Traffic Evaluation Memo – Attachment D Travel Time Matrix states that during the 2045 PM peak hour, the MD 5 to MD 97 route (Outer Loop) results in a 36-minute travel time benefit between the No Build and the Preferred Alternative. Based on 2045 PM peak hour Inner Loop results on the northeastern side of the Beltway, it appears that a dramatic regional shift is projected from traffic with an origin in Virginia and with a Maryland destination that now (and during the 2045 No Build condition) uses I-495 in Virginia crossing the Woodrow Wilson bridge. Lacking travel time data for I-495 in most of Virginia, this is both anomalous and speculative.

[33] SDEIS, Table 4 of Appendix A states that the Travel Time Index worsens from 6.6 to 6.9 in the

9

Jeannette Mar & Tim Smith
November 30, 2021
Page 10

analysis finds that there are significant segments where the General Purpose lanes worsen significantly as a result of this Project. While the cause of these issues may be subject to debate, MDOT SHA surely has a responsibility to explain or reanalyze the transportation model, its assumptions, and conclusion to resolve these inconsistencies. The purpose and need cannot be achieved if the very basis of the Project, to relieve congestion, is called into question.

### D. The FEIS must address impacts to the local road network during this phase of Project planning.

Because the SDEIS lacks travel time index ("TTI") results from areas extending beyond the Managed Lanes Study area, it is critical that the Lead Agencies address impacts to the local road network in the FEIS in order to incorporate appropriate considerations into the Project design. To do this, the Lead Agencies must extend the Interchange Access Point Approval ("IAPA") study now under development beyond a single intersection, since the increased congestion on I-270 and I-495 undoubtedly will lead both to peak spreading effects and local traffic diversions that the Lead Agencies have not considered adequately to date.

A simple example demonstrates the issue that the Lead Agencies need to consider. While it can take over 30 minutes to travel two to three miles on some segments of the Beltway, as presented in this SDEIS, this is not always the case. Traffic will vary on a daily basis, and some travelers will identify shorter travel time routes, regardless of the impact to local streets. The scope therefore agreed upon by FHWA for the IAPA (i.e., performing traffic operational analyses at ramp terminal intersections and one adjacent intersection on both sides of the road beyond service interchanges that the Managed Lane Study will modify) is inadequate in areas where either I-270 or I-495 exhibit high TTIs and extreme congestion. In those areas, the Managed Lane Study area should follow all significant diversionary traffic that switches to the local road network, defined as all non-interstate roads. The Lead Agencies can determine the extent of this additional study area by adding routes on parallel roads with travel times equal to the general-purpose lanes travel time.

Courts have found that, where impacts on local road networks are possible, FHWA and its state partners must address these issues prior to or in the FEIS. In *Sierra Club v. United States DOT*, plaintiffs successfully challenged a FHWA decision to build a toll road across an Illinois river without adequately evaluating the extent to which the road would alleviate local transportation problems.[34] There, FHWA decided to wait for additional studies to demonstrate that the selected alternative would improve travel times, but the court required FHWA to produce additional studies evaluating the degree to which various alternative would meet current transportation needs and improve travel times.[35] In another case where FHWA and the New Hampshire Department of Transportation proposed a highway expansion to address traffic congestion, FHWA's traffic sensitivity analysis failed to account for the project's indirect effects on secondary road traffic.[36]

---

un-tolled lanes west of I-270 but improves from 4.8 to 3.0 between I-270 and I-95. The implication is that congestion on the Inner-Loop in Montgomery County will get worse where the highway is widened and get better where it is not.

[34] 962 F. Supp. 1037, 1044 (N.D. Ill. 1997).

[35] *Id.*

[36] *Conservation Law Found. v. FHA*, 630 F. Supp. 2d 183, 213 (D.N.H. 2007) (quoting *Robertson*

Jeannette Mar & Tim Smith
November 30, 2021
Page 11

Finding that the EIS process "guarantees that the relevant information will be made available to the larger audience that may also play a role both in the decision-making process and the implementation of that decision," the court remanded the FEIS to the lead agencies.[37] FHWA must expand the scope of the IAPA in order to avoid relying on a study with similar deficiencies.

If an expanded IAPA is conducted, mitigation of local road impacts could be considered and included in the FEIS. In the absence of an expanded analysis, there is no opportunity to analyze indirect effects on secondary road traffic, which may include maintenance frequency as well as funding.

### E. The Preferred Alternative's bicycle and pedestrian improvements are inconsistent with local master plans, particularly related to design.

The Lead Agencies made commitments during prior coordination meetings with Commission staff to construct the new high-occupancy travel lanes in accordance with local master plans. The SDEIS indicates that the FEIS will include an "updated review of the county and local master plans," but the document does not contain any statements reflecting this commitment.[38] Courts generally expect agencies to honor commitments made prior to or during the NEPA review process, even if a Project otherwise complies with NEPA.[39] Accordingly, M-NCPPC respectfully requests that the Lead Agencies memorialize this commitment and take steps to implement it in the FEIS.

### F. The Cooperating Agencies have not completed their analysis of the parkland limit of disturbance, and so the FEIS will need to resolve potential parkland impacts.

Before the Lead Agencies finalize the FEIS and any work can occur on parkland, M-NCPPC must review and approve the limits and nature of the work and grant permission for construction to commence, consistent with the CCA.[40] The CCA authorized federal funding for M-NCPPC to acquire land in Maryland for the development of a comprehensive park, parkway, and playground system in the National Capital area. Congress charged M-NCPPC with representing the State of Maryland in protecting and stewarding CCA-acquired property in the state, in accordance with

---

v. Methrow Valley Citizen's Council, 490 U.S. 332, 349 (1989)).

[37] Id. at 216.

[38] SDEIS at p. 4-106.

[39] Saint Paul Branch of the NAACP v. United States DOT, 764 F. Supp. 2d 1092, 1109 (D. Minn. 2011) ("The Court hopes and expects that the Agencies will continue to honor their commitment to resolving community concerns going forward, despite their technical compliance to NEPA."); see also Cty. of Rockland v. FAA, 335 F. App'x 52, 55 (D.C. Cir. 2009) (suggesting in dicta that an agency's "firm commitment" to undertake an initiative during the NEPA process may be binding upon the agency).

[40] Act of May 29, 1930 (46 Stat. 482), as amended by the Act of August 8, 1946 (60 Stat. 960), Section 3 of the Act of July 19, 1952 (66 Stat. 781, 791), and the Act of August 21, 1958 (72 Stat. 705) at § 1(b) ("The title to the lands acquired hereunder shall vest in the State of Maryland. The development and administration thereof shall be under [M-NCPPC] and in accordance with plans approved by [NCPC].") (emphasis added).

00159741

Jeannette Mar & Tim Smith
November 30, 2021
Page 12

plans approved by NCPC.[41] At the time of its enactment, the CCA's drafters recognized that the law's purpose is "to preserve for all time to come the natural scenic beauty of the upper and lower Potomac River valleys, to insure a continuous flow of water into Rock Creek, and to enable the National Capital Park and Planning Commission to procure many delightful wooded areas and charming valleys in the District of Columbia before they are destroyed by building or some other operation."[42] That purpose continues to be of paramount importance today, nearly one hundred years later, as the Lead Agencies plan to make significant changes to the highway infrastructure surrounding these critical protected areas.

Over time, M-NCPPC acquired and assisted in the acquisition of various properties for parkland and parkway purposes. Properties acquired under the CCA are governed by a series of agreements between M-NCPPC and NCPC. These include, among others, a September 15, 1939 agreement (the "1939 Agreement") through which the Clara Barton Parkway (formerly the George Washington Memorial Parkway) in Montgomery County, which the Project will impact, was acquired. The 1939 Agreement included a map, known as "Plan No. 105.31-455," identifying the land acquired. Although title of the land vested in the United States, the 1939 Agreement contained a key provision relevant to the Project:

> That except as provided in this agreement, the property *shall be acquired only for park and parkway purposes and that the United States will never use the land so acquired for any other purpose except with the consent of the Maryland Commission.* It is further agreed that the National Commission will use its best efforts to see that the areas acquired under this agreement are developed and maintained in a manner similar to other comparable park areas of the National Capital and environs.

(emphasis added). The 1939 Agreement was signed by M-NCPPC, NCPC, and the President of the United States.

On October 1, 1941, M-NCPPC and NCPC entered into another agreement (the "1941 Agreement"), which governed the acquisition "of units of park lands needed for said George

---

[41] The Maryland Court of Appeals recently described M-NCPPC's role with respect to the CCA as follows:

> MNCPPC is responsible for protecting lands under the Capper-Cramton Act, which was enacted by Congress in 1930 to "protect land on both sides of the Potomac River as an integrated park and parkway system known as the George Washington Memorial Parkway." Land Use § 15-302(3) provides MNCPPC with the authority to act as the representative of this State in fulfilling the mandate of the Capper-Cramton Act in Maryland. The Act enables MNCPPC to enter into agreements with the National Capital Park and Planning Commission ("NCPPC") for extending and developing protected lands in Maryland. Therefore, the Capper-Cramton Act provided for cooperation between NCPPC and MNCPPC, enabling MNCPPC to act as administrator over preserved lands.

*Town of Forest Heights v. Maryland-Nat'l Capital Park & Planning Comm'n,* 463 Md. 469, 518-19, 205 A.3d 1067, 1096 (2019) (internal citations omitted).

[42] CR-1930-0127, 2414, 2456 (Jan. 27, 1930).

00159742

Jeannette Mar & Tim Smith
November 30, 2021
Page 13

Washington Memorial Parkway in the Maryland-Washington Metropolitan District."    Notably, this Agreement contained a similar prohibition on the use of the acquired land for anything other than park or parkway purposes by providing that "no part of the lands so acquired for the George Washington Memorial Parkway shall in any manner be used or developed by the National Commission or by the United States of America for other than park or parkway purposes."[43]

The CCA and M-NCPPC's enabling law limit disposition of M-NCPPC-administered parkland for purposes inconsistent with their use as parkland, and the agreements described above[44] give M-NCPPC authority to approve or reject the use of land subject to such agreements for purposes other than park purposes.  While there are circumstances in which M-NCPPC-administered parkland can be used for legitimate, non-park purposes with M-NCPPC's consent, the CCA's underlying presumption is that this land should be prioritized for protection and, where complete protection is not possible, appropriate mitigation.[45]

Because MDOT SHA does not plan to finalize the Project's design until after it completes the NEPA review, there is significant risk that the Project's limit of disturbance ("LOD") will be much larger than what is reflected in the SDEIS.  M-NCPPC described this issue at length in its November 9, 2020, DEIS comment letter, but some points are worth raising again here. Specifically, proper avoidance and minimization measures call for minimizing the roadway footprint while maintaining a larger LOD to account for environmental issues and to restore disturbed areas.  A larger LOD is warranted to ensure that the Project will appropriately handle the increased drainage pressures that will result from advancing one of the build alternatives in the future.  The Project's ongoing design changes also must incorporate stable tie-ins for outfalls, protection and restoration of stream banks, and improvements to resources based on anticipated Project impacts.  Although MDOT SHA has stated that "[a]ll possible planning to minimize harm will additionally involve an agreement document that outlines the process to continue coordination with the OWJs over Section 4(f) properties through the design phase of the project," the impacts to parkland are not known at this time.[46]

The Lead Agencies cannot fully address these impacts until the developer completes the Project's design, and so need to build into the NEPA review a mechanism to account for these adjustments

---

[43] The 1941 Agreement contains a limited exception on the park/parkway restriction by referencing subsection 1(a) of the CCA.  That subsection provides a limited exception for "such works as Congress may in the future authorize for the improvement and the extension of navigation, including the connecting of the upper Potomac River with the Ohio River, or for flood control irrigation or drainage, or for the development of hydroelectric power."

[44] M-NCPPC and NCPC also entered into a February 12, 1951, agreement that referenced the 1941 Agreement and approved the acquisition of "the balance of the land in Montgomery County needed for said George Washington Memorial Parkway."

[45] See CR-1930-0127, 2414, 2458 (Jan. 27, 1930) ("[T]his bill does not tie the hand of Congress. There is nothing in it to declare any priority policy, *but it does morally afford a priority for park purposes.*") (emphasis added).

[46] SDEIS at 5-51.

00159743

Jeannette Mar & Tim Smith
November 30, 2021
Page 14

resulting in a larger LOD. A larger LOD that extends beyond the confines of Phase 1 of the Project should account for potential future impacts to parkland that will result after the NEPA process, including potential impacts on lands acquired with CCA funds that are not currently located in the immediate vicinity of the Preferred Alternative's improvements. If the Lead Agencies decide that the Project should progress under the current LOD, M-NCPPC respectfully requests an opportunity for further consultation in the event additional disturbance is anticipated in the future as a result of the current scope of the Project or future phases.

## G. The Project's proposed stormwater management plans are inadequate.

Although the Preferred Alternative addresses stormwater management, the SDEIS ignores existing untreated impervious surfaces and requires a minimum of 50% treatment only if the roadway is fully reconstructed.[47] Additionally, the SDEIS only requires that 45% of the required water quality treatment occur on site. This is insufficient to protect the quality of local and downstream waters, which some stakeholders claim are among the worst water quality offenders in Montgomery County.[48] While M-NCPPC is pleased that the Lead Agencies have considered stormwater management issues in the SDEIS, the Lead Agencies must take greater responsibility for protecting downstream water resources, the quality of which will never improve and may be further degraded absent proper planning and implementation of the Project. M-NCPPC encourages the Lead Agencies to take this responsibility seriously and follow the example of other federal agencies that have addressed cumulative impacts of stormwater runoff by imposing stringent stormwater management standards that strive to exceed the minimum criteria required under state law.[49]

To mitigate the Project's anticipated impacts on water quality, the Lead Agencies should prioritize on-site stormwater quality treatment to a minimum of 80% of the environmental site design requirements, thereby allowing for a maximum of 20% to be treated with the use of compensatory stormwater management mitigation at off-site sources. The Lead Agencies also need to make specific commitments to incentivize the chosen developer to use innovative technologies and techniques to maximize on-site stormwater quality treatment. The situation involving untreated stormwater runoff entering our streams and rivers is an issue that will worsen due to climate change. This project presents a singular opportunity to address this issue, an opportunity which is unlikely to ever occur again. Requiring minimum standards for stormwater treatment under these circumstances is extremely short-sighted.

A similar issue arises in the Lead Agencies' use of the Maryland Department of the Environment's 6-digit watershed scale for off-site stormwater management water quality projects. This scale does

---

[47] SDEIS at 2-10.
[48] Stormwater issues with I-495 and I-270 expansion, STORMWATER PARTNERS OF MONTGOMERY COUNTY, https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/Stormwater%20issues%20with%20I-495%20and%20I-270%20plan.pdf.
[49] E.g., Sierra Club v. United States Army Corps of Eng'rs, 464 F. Supp. 2d 1171, 1222 (M.D. Fla. 2006).

14

Jeannette Mar & Tim Smith
November 30, 2021
Page 15

not address the severe water quality impacts of the existing highways and proposed expansion. To account for those impacts, the Lead Agencies must consider off-site compensatory stormwater management mitigation within 1,500 feet of the LOD. By doing so, the Lead Agencies would make the realized mitigation benefits meaningful to the location of the impacts and the surrounding waterways. Moreover, a maximum of 25% of the off-site compensatory stormwater impervious area treatment should come from stream restoration in order to ensure that the most critical waterways surrounding the Project receive appropriate mitigation.

Lastly, the Lead Agencies should continue to consider stormwater management opportunities located on parkland. The SDEIS effectively eliminates any consideration of mitigation opportunities on parkland despite the copious amount of time M-NCPPC spent working with MDOT SHA to identify and review potential off-site compensatory stormwater management opportunities on parkland. These measures can have minimal or non-existent impacts on parkland and natural resources but provide an effective and feasible mechanism to address the off-site water quality concerns.

### H. The Lead Agencies have not established an adequate Section 4(f) mitigation plan for natural resources or historic and cultural resources.

The Lead Agencies must comply with Section 4(f) of the Department of Transportation Act, which, like the CCA, protects the natural and built land the Project has the potential to impact. Section 4(f) and the statute's implementing regulations require avoidance, minimization, and, lastly, mitigation of the Project's impacts to parkland.[50] FHWA may not approve a transportation project that uses any Section 4(f) property unless it determines that: (1) there is no feasible and prudent avoidance alternative to the use of the property and the action includes all possible planning to minimize harm to the property resulting from such use; or (2) the use of the property, including any measures to minimize harm committed by the applicant, will have a *de minimis* impact on the use of the property.[51] If the avoidance analysis determines that there is no feasible and prudent avoidance alternative, then FHWA may approve the alternative that causes the least overall environmental harm.[52] The appropriate time to identify avoidance and mitigation measures is prior to the elimination of reasonable alternatives that have fewer environmental impacts than the retained alternatives. NEPA requires—and courts have recognized—that agencies must take a "hard look" at impacts to sensitive resources throughout the environmental review process.[53]

---

[50] 23 U.S.C. § 138; 49 U.S.C. § 303; 23 C.F.R. Part 774.

[51] 23 C.F.R. § 774.3(a), (b).

[52] 23 C.F.R. § 774.3(c).

[53] *See Davis v. Mineta,* 302 F.3d 1104, 1120 (10th Cir. 2002) (NEPA review failed to take a "hard look" by rejecting avoidance alternatives and failing to consider transportation systems management, mass transit, and various build alternatives by simply concluding that they were unfeasible); *see also Ass 'ns Working for Aurora's Residential Env 't v. Colo. Dep't of Transp.,* 153 F.3d 1131 (10th Cir. 1998) ("§4(f) requires the problems encountered by proposed alternatives to be truly unusual or to reach extraordinary magnitudes if parkland is taken.") (internal quotation marks and citation omitted); *Assn Concerned About*

00159745

Jeannette Mar & Tim Smith
November 30, 2021
Page 16

The SDEIS's Section 4(f) evaluation does not include enough specificity to allow M-NCPPC to review or comment on a "mitigation plan," which, requires the Commission's approval. As the Lead Agencies are well aware, the Project will impact land of significant natural and cultural value due to its geographic location in a largely developed area with little "unused" land. M-NCPPC appreciates that the Lead Agencies have evaluated potential impacts to some land under M-NCPPC's jurisdiction, such as Cabin John Stream Valley Park Unit 2.[54] Unfortunately, the Lead Agencies have yet to provide the Commission with a mitigation plan outlining, with specificity, what steps they plan to take to minimize and avoid impacts to all land under M-NCPPC's jurisdiction. For example, MDOT SHA committed to identifying and pursuing the acquisition of replacement parkland or implementing other mitigation measures at Cabin John Stream Valley Park Unit 2, such as construction of visual barriers, stream bank and bed stabilization, and removal of concrete lined channels.[55] M-NCPPC welcomes these discussions, but reiterates that those discussions must occur *before* the Lead Agencies finalize the EIS. As the Lead Agencies are well aware, land acquisition is a timely process. Therefore, mitigation properties to be acquired must be presented to M-NCPPC for approval before the FEIS and forthcoming Record of Decision. Consistent with the Supreme Court's recognition that lead agencies must provide a "detailed discussion of possible mitigation measures" so that "interest groups and individuals can properly evaluate the severity of the adverse effects," M-NCPPC simply will not consider any impact to be *de minimis* until it approves formally the chosen parkland mitigation requirements.[56]

Similarly, Section 4(f) requires that the Lead Agencies avoid historic and cultural resources, unless they can demonstrate that other alternatives are infeasible and contrary to the purpose and use of the undertaking. To date, the Lead Agencies have conducted limited investigation of the Moses Hall Tabernacle and Cemetery, but the limits of the burial sites have not been established. We are concerned that the public commitment made by the Lead Agencies to avoid disturbing burial sites cannot be honored if limits of the area containing gravesites have not been established. Avoidance alternatives for Section 4(f) use of the Moses Hall Tabernacle and Cemetery, the Gibson Grove Church, and the Carderock Springs National Register Historic District should be prioritized. Further impacts to the Gibson Grove Church, a historic resource that has already suffered cumulative adverse effects from the first Beltway construction, should not be accepted as a 4(f) alternative to avoid impacts to Moses Hall Tabernacle and Cemetery. If the Lead Agencies plan to use this land for the Project, they must evaluate other design solutions and demonstrate

*Tomorrow, Inc. (ACT) v. Dole,* 610 F. Supp. 1101, 1113 (N.D. Tex. 1985) (requiring supplementation of a NEPA analysis when a road would have traversed public parkland containing relatively unique vegetation); *Klein v. U.S. Dep't of Energy,* 753 F.3d 576, 584 (6th Cir. 2014) (NEPA review must consider the unique characteristics of a region); *Ohio Valley Envtl. Coal. v. U.S. Army Corps of Eng'rs,* 479 F. Supp. 2d 607, 634 n.33 (S.D. W. Va. 2007) (same), *rev d and remanded on different grounds sub nom. Ohio Valley Envtl. Coal. v. Aracoma Coal Co.,* 556 F.3d 177 (4th Cir. 2009).

[54] SDEIS at 5-19 to 5-21.

[55] SDEIS at 5-21.

[56] *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 352 (1989).

00159746

Jeannette Mar & Tim Smith
November 30, 2021
Page 17

avoidance is infeasible. On this point, M-NCPPC notes that a 4(f) use may be the most appropriate use of this land given the Project's design; however, the Lead Agencies must undertake additional detailed design work in coordination with all stakeholders in the community to evaluate alternatives as required.

Lastly, M-NCPPC hopes that the conclusion of the Lead Agencies' ongoing Section 106 review process under the National Historic Preservation Act ("NHPA") yields strong commitments to avoid, minimize, and, if necessary, mitigate adverse effects to the historic properties described above and those additional properties identified in the SDEIS, including the Clara Barton Parkway.[57] Given the nature of these historic properties, which are important not just for historic purposes but also from an equity perspective due to their significance for minority communities, M-NCPPC expects the Lead Agencies to take every precaution to avoid impacts.

Consistent with its statutory duties, M-NCPPC will require a thorough and implementable mitigation package to include park enhancements, extensive parkland replacement, and consideration of the valuable natural, cultural, and historic resources present in the Project's vicinity. As currently drafted, meaningful mitigation commitments and progress are absent from the SDEIS, and so significant advancements are necessary prior to publication of the FEIS. A lack of progress in the development of an acceptable mitigation plan could endanger the aggressive schedule set forth by MDOT SHA.

\* \* \*

---

[57] *See* 36 C.F.R. § 800.6(c) (requiring consulting parties to find ways to avoid, minimize, or mitigate adverse effects on historic property and summarize their agreed-upon course of action in a memorandum of agreement).

00159747

Jeannette Mar & Tim Smith
November 30, 2021
Page 18

M-NCPPC appreciates the Lead Agencies' consideration of the comments provided above. The Commission will continue to work with the Lead Agencies to ensure that the Project's impacts to parkland, stream, and wetland resources are avoided, minimized, and mitigated to the maximum extent possible. M-NCPPC also would like to remind the Lead Agencies that it will not concur with the Preferred Alternative until the Lead Agencies present a thorough and reasonable mitigation package that includes park enhancements and extensive parkland replacement, as well as adequate consideration of alternatives to avoid impacts to properties of historic and cultural significance. The Commission welcomes the opportunity to engage further with the Lead Agencies to prepare mitigation and design plans, and to evaluate all of the Project's significant impacts.

Sincerely,

Elizabeth M. Hewlett
Chair

Casey Anderson
Vice Chair

Attachment – SDEIS Comment Response Table

00159748

Message

| | |
|---|---|
| **From**: | Steve Archer [SArcher@mdot.maryland.gov] |
| **Sent**: | 12/13/2021 10:57:15 AM |
| **To**: | Matt Manning (Consultant) [MManning.consultant@mdot.maryland.gov]; Richard Ervin [RErvin@mdot.maryland.gov]; Karen Hutchins-Keim [khutchins-keim@rkk.com] |
| **Subject**: | FW: LOD above Live Oak |
| **Attachments**: | RE_ VDOT SDEIS comment - Live Oak Drive.msg |

OK, this line is accurate, so no edits needed for our APE graphic on the Live Oak area LOD.

Steve

---

**From:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Sent:** Monday, December 13, 2021 10:54 AM
**To:** Steve Archer <SArcher@mdot.maryland.gov>
**Subject:** Fw: LOD above Live Oak

Apparently the LOD follows VDOTs ROW line. See Christine's email below.

**Caryn J. G. Brookman**
*Environmental Program Manager*
**Office** 410-637-3335 **Other** 410-252-7870
**Email** cbrookman@mdot.maryland.gov
**Office Address** 601 N. Calvert Street | Baltimore, MD 21202
**Mailing Address** 707 North Calvert Street,
P-601 | Baltimore MD 21202

---

**From:** Christine Sutkowski <csutkowski@rkk.com>
**Sent:** Monday, December 13, 2021 10:48 AM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>; Erron Ramsey <eramsey@rkk.com>; Karen Kahl <kkahl@rkk.com>
**Subject:** RE: LOD above Live Oak

Hi Caryn – thanks!

The LOD is accurate and follows the existing right-of-way/parcel boundaries along Live Oak Drive. I had coordinated with Jim on this a couple months ago to see if we could exclude Live Oak Drive from the work area (even though it's within VDOT ROW) – see the attached email chain. He preferred to keep the LOD to the ROW line to give the designer room for design of the tiebacks for the retaining wall along the outer loop. He suggested we could put a commitment in the FEIS for no surface disturbance or construction along Live Oak Drive.

I highlighted the two discrete areas of private property impacts along Live Oak west of the interchange in the attached PDF. These were identified by the GEC utility team for a water booster pump relocation and a launch pit for relocation of

a water line; however, Rod Hill recently pointed out to me that this utility relocation is included in VDOT's work approaching the interchange, so these impacts may also be accounted for in the LOD for the NEXT project.

Thanks,
Christine

---

**CHRISTINE M. SUTKOWSKI, PE**
(she/her/hers)
Senior Project Engineer

410.728.2900 P | 410.462.9193 D | 301.602.1079 C

**From:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Sent:** Monday, December 13, 2021 9:54 AM
**To:** Christine Sutkowski <csutkowski@rkk.com>; Erron Ramsey <eramsey@rkk.com>; Karen Kahl <kkahl@rkk.com>
**Subject:** Fw: LOD above Live Oak

> **EXTERNAL EMAIL:** Do not click links or open attachments unless you trust the 'Sender' and know the content is safe.

Christine,
Welcome back! Can you look at the attached and let me know if the LOD is accurate? Im concerned about the LOD on private property past Live Oak Drive. I didn't think we were even impacting Live Oak.
Thanks!

**Caryn J. G. Brookman**
*Environmental Program Manager*
**Office** 410-637-3335 **Other** 410-252-7870
**Email** cbrookman@mdot.maryland.gov
**Office Address** 601 N. Calvert Street | Baltimore, MD 21202
**Mailing Address** 707 North Calvert Street, P-601 | Baltimore MD 21202

---

**From:** Steve Archer <SArcher@mdot.maryland.gov>
**Sent:** Monday, December 13, 2021 9:40 AM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Cc:** Karen Hutchins-Keim <khutchins-keim@rkk.com>; Matt Manning (Consultant) <MManning.consultant@mdot.maryland.gov>
**Subject:** LOD above Live Oak

Caryn, as discussed, this is what is showing in our draft APE for our LOD above/west of Live Oak Drive – again, not 106 since these are not historic properties but just wondering if this is accurate.

Thanks!

Steve

"RK&K" and "RK&K Engineers" are registered trade names of Rummel, Klepper & Kahl, LLP, a Maryland limited liability partnership. This message contains confidential information intended only for the person or persons named above. If you have received this message in error, please immediately notify the sender by return email and delete the message. Thank you.

RK&K is an equal opportunity employer that values diversity at all levels. RK&K does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, parental status, military and veteran status, and any other characteristic protected by applicable law. Consistent with the requirements of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, we also note that RK&K does not discriminate in its selection or retention of subcontractors on the grounds of race, color, or national origin. We also note that RK&K will ensure that Minorities will be afforded full opportunity to submit proposals and not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

| | |
|---|---|
| **From**: | Guinther, James [jguinther@wrallp.com] |
| **Sent**: | 10/11/2021 4:52:30 PM |
| **To**: | Bryan Townsend (Consultant) [BTownsend3.consultant@mdot.maryland.gov]; Christine Sutkowski [csutkowski@rkk.com]; Carlos Brown [carlos.brown@wsp.com] |
| **CC**: | Jeff Roberta [jroberta@rkk.com]; Bauer, Kenneth [kbauer@wrallp.com]; Catherine Robbins (Consultant) [CRobbins.consultant@mdot.maryland.gov] |
| **Subject**: | RE: VDOT SDEIS comment - Live Oak Drive |

Correct, keeping LOD to ROW line gives the designer room for the design of the tiebacks. I would just put a commitment in the SDEIS for no surface disturbance or construction along Live Oak.

---

**From:** Bryan Townsend (Consultant) <BTownsend3.consultant@mdot.maryland.gov>
**Sent:** Monday, October 11, 2021 4:47 PM
**To:** Christine Sutkowski <csutkowski@rkk.com>; Carlos Brown <carlos.brown@wsp.com>
**Cc:** Jeff Roberta <jroberta@rkk.com>; Bauer, Kenneth <kbauer@wrallp.com>; Catherine Robbins (Consultant) <CRobbins.consultant@mdot.maryland.gov>; Guinther, James <jguinther@wrallp.com>
**Subject:** Re: VDOT SDEIS comment - Live Oak Drive

Hi Christine,

I'm looping Jim in since I know one of the concerns was potentially the length of tie-backs from the massive retaining wall.  I don't know if we know how far back those might go at this point, but we may need to be cautious about pulling the LOD in based on the subsurface needs.

That said, maybe there is some nuance we can introduce re: surface disturbance along Live Oak...

Thanks,

Bryan

---

**From:** Christine Sutkowski <csutkowski@rkk.com>
**Sent:** Monday, October 11, 2021 4:40 PM
**To:** Bryan Townsend (Consultant) <BTownsend3.consultant@mdot.maryland.gov>; Carlos Brown <carlos.brown@wsp.com>
**Cc:** Jeff Roberta <jroberta@rkk.com>; Bauer, Kenneth <kbauer@wrallp.com>; Catherine Robbins (Consultant) <CRobbins.consultant@mdot.maryland.gov>
**Subject:** VDOT SDEIS comment - Live Oak Drive

Hi Bryan and Carlos,

We received the following comment from VDOT on the Administrative Draft SDEIS mapping at the GWMP interchange: "Concerned that the limits of disturbance include all of Live Oak Drive. If there is some way to clarify that no work is anticipated on Live Oak Drive, or otherwise caveat the LOD in this area."

Now that we have incorporated the latest interchange design, is a change in the LOD to exclude Live Oak Drive warranted? The LOD is set along existing right-of-way along the I-495 outer loop in this area so we would not be reducing property impacts. The design does not show MDOT work along Live Oak Drive so perhaps that alone is enough to clarify that no work is anticipated. Please let me know your thoughts on modifying the LOD.

00159975

Including Ken and Catherine in case the latest noise barrier analysis/design does necessitate LOD along Live Oak Drive.

Thanks,
Christine

_____

**CHRISTINE M. SUTKOWSKI, PE**
(she/her/hers)
Senior Project Engineer

700 East Pratt Street, Suite 500
Baltimore, MD 21202

410.728.2900 P | 410.462.9193 D | 301.602.1079 C
www.rkk.com

**Responsive People | Creative Solutions**

"RK&K" and "RK&K Engineers" are registered trade names of Rummel, Klepper & Kahl, LLP, a Maryland limited liability partnership. This message contains confidential information intended only for the person or persons named above. If you have received this message in error, please immediately notify the sender by return email and delete the message. Thank you.

RK&K is an equal opportunity employer that values diversity at all levels. RK&K does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy), national origin, political affiliation, sexual orientation, marital status, disability, genetic information, age, parental status, military and veteran status, and any other characteristic protected by applicable law. Consistent with the requirements of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, we also note that RK&K does not discriminate in its selection or retention of subcontractors on the grounds of race, color, or national origin. We also note that RK&K will ensure that Minorities will be afforded full opportunity to submit proposals and not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

The information supplied in this message may be privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, the sender does not intend delivery to you to waive any privilege or right pertaining to this message. You have no right to retain, disseminate, copy or disclose the material contained herein. If you have received this message in error, please immediately notify the sender by return e-mail, and delete the errant message. Thank you.

Whitman, Requardt & Associates, LLP (WRA) is an equal opportunity employer that values and fosters diversity at all levels. WRA does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy), national origin, political affiliation, sexual orientation, gender identity, marital status, disability, genetic information, age, parental status, military and veteran status, and any other characteristic protected by applicable law. Consistent with the requirements of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, we also note that WRA does not discriminate in its selection or retention of subcontractors on the grounds of race, color, or national origin. WRA will ensure that individuals and minority business enterprises will be afforded full opportunity to submit proposals and not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

WRA_Disclaimer_v20210609



Sierra Club Maryland Chapter
P.O. Box 278
Riverdale, MD 20738
(301) 277-7111

January 4, 2022

Jeanette Mar, Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201

Jeff Folden, Project Director
I-495 and I-270 P-3 Project Office
Maryland Department of Transportation State Highway Administration
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202

Dear Ms. Mar and Mr. Folden,

We write in regard to the I-495 & I-270 Managed Lanes Study Supplemental Draft
Environmental Impact Statement (SDEIS). The SDEIS deferred required
evaluations of key impacts and failed to identify or discuss mitigation measures
for many significant adverse impacts. Therefore, proceeding directly to a Final
Environmental Impact Statement (FEIS) with no additional formal review period
will not be adequate to fulfill statutory requirements of several agencies and would
run afoul of several federal laws.[1] A revised SDEIS is needed due to the deferral of
impact analyses and lack of discussion of mitigation measures. Additionally, a 90-
day public review period on the FEIS is needed to allow the EPA and other
stakeholders to discharge their statutory responsibilities.[2]

Regarding the SDEIS, the EPA on November 30, 2021 stated: "EPA looks forward to
reviewing project details that were deferred to the Final EIS and seeing
development of mitigation to offset unavoidable impacts." Concerns about the

---

[1] Including NEPA, Clean Air Act, and Section 4(f) of the U.S. Department of Transportation Act
of 1966, as raised by multiple agencies and groups, including M-NCPPC and Sierra Club et al. in
their 2021 SDEIS comments.
[2] Stakeholders have relied on FHWA's statement in the SDEIS that it "does not intend to issue a
combined FEIS/ROD." SDEIS at PDF p.2. However, FHWA should also commit to an adequate
public review period on an FEIS.

deferral of analyses and mitigation measures have been raised as issues by other agencies and stakeholders.[3]

The EPA is charged under Section 309 of the Clean Air Act to review the environmental impact statements of other federal agencies and to comment on the adequacy and the acceptability of the environmental impacts of the proposed action. EPA's recently issued draft strategic plan commits the Agency to "promote robust consideration of climate change mitigation, adaptation, and resilience in review of proposed actions, such as . . . transportation projects" and "promote robust consideration and mitigation of environmental impacts on overburdened communities with environmental justice concerns in the review of . . . transportation related projects," two areas of which evaluation was particularly deficient in the Draft Environmental Impact Statement (DEIS) and SDEIS.[4]

EPA's statutory functions cannot be discharged with an insufficient comment period on a megaproject whose key safety, environmental justice, and impact evaluations and mitigation measures had been deferred to the FEIS and even later (in the case of safety). The mandated 30-day review period before issuance of a Record of Decision (ROD) is not sufficient. Without issuance of either another SDEIS or a longer formal review period on the FEIS, EPA may need to refer the project to the Council on Environmental Quality, potentially causing larger delays. The Nov. 30, 2021 SDEIS comment letter of the Maryland-National Capital Park and Planning Commission (M-NCPPC) has also warned that lack of progress in key identified deficiencies in the SDEIS could "endanger the aggressive schedule" set forth for the project.

Serious concerns have been raised in the comments submitted by Sierra Club et al. regarding the accuracy of the traffic modeling, the results of which bear on impact estimates pertaining to safety, air quality, and environmental justice, all areas that the EPA has a statutory requirement and special interest[5] in reviewing. The traffic model issues have also been raised by multiple stakeholders,[6] including the

---

[3] M-NCPPC SDEIS Comment Letter, Nov. 30, 2021, https://montgomeryplanningboard.org/wp-content/uploads/2022/01/SDEIS-MNCPPC-Comment-Cvrltr_11.30.21.pdf; Sierra Club et al. I-495 & I-270 SDEIS comments, Nov. 30, 2021. https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/2021-12-27%20-%20Sierra%20Club%20et%20al.%20SDEIS%20comments.pdf.
[4] FY 2022-2026 EPA Strategic Plan Draft, EPA, at 11, 23, Oct. 1, 2021, https://www.epa.gov/system/files/documents/2021-10/fy-2022-2026-epa-draft-strategic-plan.pdf.
[5] Laurie A. Shuster, What does infrastructure have to do with social justice and equity? ASCE, Nov. 1, 2021, https://www.asce.org/publications-and-news/civil-engineering-source/civil-engineering-magazine/issues /magazine-issue/article/2021/11/what-does-infrastructure-have-to-do-with-social-justice-and-equity; see also footnote 4.
[6] Bruce DePuyt, Seizing on MDOT's Own Analysis, Toll Lane Foes Urge Feds to Reject Project Study, Maryland Matters, Oct. 21, 2021,

00160596

majority of the Montgomery County Council[7] and U.S. Senators Ben Cardin and
Chris Van Hollen and U.S. Representatives Anthony Brown and Jamie Raskin.[8]
Without a valid traffic model, it is impossible to determine the extent to which the
project satisfies the purpose and needs identified in the SDEIS and therefore the
extent to which project alternatives meet those needs.

M–NCPPC has also flagged numerous concerns with the traffic model that require
action prior to issuance of the FEIS:

> Additionally, there are a number of inconsistent conclusions and
> assumptions in the SDEIS's transportation modeling and forecasts.
> The Project claims to improve traffic congestion, but its analysis finds
> that there are significant segments where the General Purpose lanes
> worsen significantly as a result of this Project. While the cause of these
> issues may be subject to debate, **MDOT SHA surely has a responsibility
> to explain or reanalyze the transportation model, its assumptions,
> and conclusion to resolve these inconsistencies.** The purpose and
> need cannot be achieved if the very basis of the Project, to relieve
> congestion, is called into question.[9]

The absence from the SDEIS of a valid traffic model made it impossible for
agencies and the public to comment meaningfully on (1) whether the preferred
alternative satisfies the purpose and need and the extent to which project
alternatives meet those needs; and (2) impacts that are dependent on traffic

---

https://www.marylandmatters.org/2021/10/21/seizing-on-mdots-own-analysis-toll-lane-
foes-urge-feds-to-reject-project-study/. Sierra Club et al. I–495 & I–270 SDEIS Comments,
Nov. 30, 2021, at 18–84,
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/2021-12-
27%20-%20Sierra%20Club%20et%20al.%20SDEIS%20comments.pdf; Letter from MTOC,
CABE, and DontWiden270 to Acting FWHA Administrator S. Pollack, Oct. 18, 2021, attached to
the SDEIS comments submitted by MTOC and ten other organizations,
https://transitformaryland.org/sites/default/files/pollackletter.pdf.
[7] Letter from Montgomery County Council to FHWA and MDOT, Oct. 27, 2021,
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-
chapter/Extension%20Letter.pdf. Quoting from the letter: "Serious questions have been raised
about the validity of the traffic modeling that underpins the SDEIS, which focuses on the new
project scope (Phase 1 South). The traffic modeling feeds into toll rate assumptions, financial
assumptions, and congestion, air quality, and noise impacts, so errors in the traffic modeling
affect determination of impacts across a wide range of types. We need time for our county's
transportation and planning staff to independently analyze the traffic effects of this project."
[8] Letter to FHWA and MDOT from U.S. Sens. Ben Cardin and Chris Van Hollen and U.S. Reps.
Anthony Brown and Jamie Raskin, Oct. 28, 2021,
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-
chapter/270_495%20Comment%20Extension%20%20Letter_Final_10.28.21.pdf. The letter
references "traffic model issues" needing to be addressed by the agencies (FHWA and MDOT).
[9] M–NCPPC SDEIS Comment Letter, at 9-10 (emphasis added) (footnotes omitted).

00160597

volumes and speed, including road safety, air quality, climate emissions, and environmental justice. These issues are at the heart of an environmental impact analysis.

In addition, the comments of M-NCPPC, a cooperating agency, identify several other topics on which agencies and the public were unable to make meaningful comment because the analysis was deferred to the FEIS.

In its November 30, 2021 letter, M-NCPPC cites the "Lead Agencies' failure to undertake a comprehensive analysis of reasonable alternatives, impacts, and mitigation measures."[10] The letter states: "The SDEIS does not consider adequately environmental justice, equity, and historic resource preservation concerns."[11] It goes on to say,

> Consistent with its statutory duties, M-NCPPC will require a thorough and implementable mitigation package to include park enhancements, extensive parkland replacement, and consideration of the valuable natural, cultural, and historic resources present in the Project's vicinity. As currently drafted, meaningful mitigation commitments and progress are absent from the SDEIS.[12]

Environmental justice is a specific issue identified in the M-NCPPC letter that requires further formal review:

> **[T]he SDEIS indicates that environmental justice issues omitted from the SDEIS will be remedied in the FEIS. This . . . obstructs public comment and community input.** Waiting until after selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention NEPA and Title VI of the Civil Rights Act of 1964 ("Title VI") demand from the Lead Agencies. This course of action also runs afoul of Department of Transportation Order 5610.2(a), which commits the Department to promote the principles of environmental justice "by fully considering environmental justice principles throughout planning and decision-making processes in the development of programs, policies, and activities, using the principles of the National Environmental Policy Act of 1969 . . ." FHWA Order 6640.23A espouses a similar theme, committing FHWA to "identify and prevent discriminatory effects . . . to ensure that social impacts to communities and people are recognized early and continually throughout the

---

[10] M-NCPPC SDEIS Comment Letter, Nov. 30, 2021, at 2.
[11] M-NCPPC SDEIS Comment Letter, Nov. 30, 2021, at 6.
[12] M-NCPPC SDEIS Comment Letter, Nov. 30, 2021, at 17.

00160598

transportation decision-making process—from early planning through implementation." Acting later, after the Lead Agencies have already responded to stakeholder concerns and continued designing the Project, would violate Title VI, these orders, and fundamental environmental justice principles.[13]

Another important issue in the M-NCPPC comments relates to project-caused bottlenecks, which are a major safety issue.[14] M-NCPPC makes the following observations on the lack of analysis and proposed mitigations for the new traffic bottlenecks the project would create.

> [T]he Preferred Alternative does not eliminate congestion in the corridors studied but and instead shifts it from the vicinity of the ALB (e.g., McLean and Potomac) to other areas in Maryland. . . . **the degree of congestion resulting from the proposed project is severe on I-270 north of I-370, on the Inner Loop on the top side of the Beltway, and on the Inner Loop in Prince George's County. These bottleneck shifts are Project-related impacts,** and so the Lead Agencies should address mitigation measures to minimize these projected deficiencies in the SDEIS and incorporate them into the Project design. NEPA requires the Lead Agencies to consider mitigation measures that address adverse impacts, including, among others, areas of traffic congestion points.

> Specifically, if the construction of Phase 1A is likely to shift congestion in a way that logically requires construction of Phase 1B (currently the subject of the I-270 Pre-NEPA Study) in order to avoid creation of new bottlenecks, then it follows that any decision to proceed with Phase 1A must await completion of the NEPA analysis for Phase 1B. MDOT SHA should further consider the implications of language in the FEIS concerning the impact of Section 27.3 of the Phase Public Private Partnership Agreement (the "P3 Agreement"). Section 27.3 is entitled Financial Viability of an Uncommitted Section and it explicitly states that future phases may be cut based upon a financial viability formula applied to a prior phase of the project. . . . In other words, **the traffic analysis raises serious questions about how a decision on Phase 1A can or should be made in the absence of a comprehensive analysis that assesses the impact of building this segment on future phases.**[15]

---

[13] M-NCPPC SDEIS Comment Letter, Nov. 30, 2021, at 7 (emphasis added) (footnote omitted).
[14] See Sierra Club et al. SDEIS Comments on bottlenecks and safety, Nov. 30, 2021, at 70–76 (emphasis added).
[15] M-NCPPC SDEIS Comment Letter, Nov. 30, 2021, at 8–9 (emphasis added) (footnotes omitted).

00160599

In an interview with Transurban North American President Pierce Coffee published in *The Washington Post* on December 30, 2021, Coffee admits that bottlenecks will be created and that the remedy requires further construction beyond the project limits. Coffee states:

> My former boss used to say that the worst thing about the express lanes is when they end. So that is a problem, and that's something we'll have to work on with Maryland. . . . When the 495 Express Lanes first opened, there was a choke point right before Georgetown Pike where the express lanes were coming into the regular lanes, and that was causing backups. . . . After the I-95 express lanes opened, relatively quickly it became apparent that two lanes going back into the regular lanes was causing a choke point. So [the Virginia Department of Transportation] and Transurban worked on a one-lane extension to the [I-95] express lanes that would allow that merge to be smoother.[16]

These comments indicate that the SDEIS was incomplete and insufficient in terms of both required analysis and information presented for agency and public review. For a controversial project of this magnitude and sensitivity, complete analysis and meaningful opportunity for agency and public review are essential.

That such project-critical analysis is incomplete and insufficient and not presented for public review and comment shows the need for a further formal review and comment opportunity for agencies and the public.

For all these reasons, moving forward on this project without an additional SDEIS and/or without a meaningful public review period on any FEIS would not allow EPA and other agencies to discharge their statutory functions or the project to meet statutory requirements under NEPA, the U.S. Department of Transportation Act of 1966, Section 309 of the Clean Air Act, and other laws and regulations.

Therefore, we ask the FHWA to confirm by February 15, 2022 that it will issue another revised SDEIS with a 60-day review period reconciling the conflicting information in the DEIS and SDEIS, providing the deferred impact analyses, revising the seriously flawed traffic model and all analyses that are reliant on traffic modeling, including the project's purpose and need and alternatives, and identifying and discussing mitigation measures. In any case, we ask that the FHWA confirm that any FEIS will be issued with a 90-day public review period before issuance of any ROD.[17]

---

[16] Katherine Shaver, Transurban leader Pierce Coffee calls Maryland toll lanes 'transformative', The Washington Post, Dec. 30, 2021, https://www.washingtonpost.com/transportation/2021/12/30/transurban-pierce-coffee-maryland/.

[17] Recent examples of 60-day or more FEIS review periods: FEIS for I-26 Connector, 2020, 60 days, https://www.ncdot.gov/news/press-releases/Pages/2020/2020-02-04-i-26-

00160600

The EPA and other stakeholders must have an adequate formal opportunity to review and comment on ignored, deferred, and traffic model–associated project impacts and on proposed mitigation measures, including their adequacy and effectiveness. Affording only the regulatory minimum public review period is insufficient in the case of this complex and highly controversial project.

Respectfully,

Josh Tulkin, Director
Sierra Club Maryland Chapter

Cc:
Stephanie Pollack, Acting Administrator, FHWA
Adam Ortiz, Regional Administrator for USEPA Region III, EPA
Barbara Rudnick, NEPA Program Coordinator, EPA
Timothy Whitman, Environmental Assessment Branch, EPA
Adrian Gardner, General Counsel, M–NCPPC
Debra Borden, Deputy General Counsel, M–NCPPC
Casey Anderson, Chair, Montgomery County Planning Board, M–NCPPC
Gerald Cichy, Commissioner, Montgomery County Planning Board, M–NCPPC
Tina Patterson, Commissioner, Montgomery County Planning Board, M–NCPPC
Carol Rubin, Commissioner, Montgomery County Planning Board, M–NCPPC
Partap Verma, Commissioner, Montgomery County Planning Board, M–NCPPC
Marc Elrich, County Executive, Montgomery County
Gabe Albornoz, Montgomery County Council President
Evan Glass, Montgomery County Council Vice President
Tom Hucker, Chair, Montgomery County Council Transportation & Environment Committee
Senator Ben Cardin
Senator Chris Van Hollen
Congressman Anthony Brown
Congressman Jamie Raskin
Delegate Marc Korman, District 16
Delegate Jared Solomon, District 18

---

connector-feis.aspx; FEIS for I-45, Sept. 25-Dec. 9, 2020, 75 days, https://community impact.com/houston/heights-river-oaks-montrose/transportation/2020/10/28/public-comment-period-extended-on-i-45-environmental-report/.

00160601



**FRIENDS OF MOSES HALL**
**MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**
7550 Seven Locks Road
Cabin John, MD 20818
morningstarmosescj@gmail.com
https://www.friendsofmoseshall.org/

February 3, 2022

*By Email to:* sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

**Re:  Draft Programmatic Agreement and No Adverse Effects Finding for Morningstar Tabernacle No. 88 Moses Hall and Cemetery, Cabin John, MD**

Dear Mr. Archer:

Thank you for the opportunity to review and comment on the Report on the draft Programmatic Agreement prepared by MDOT SHA. Friends of Moses Hall wish to again thank MDOT SHA for your reports and efforts to date.

Friends of Moses Hall (FMH) has serious concerns with the material presented to us and the decision-making approach that SHA has taken in the Section 106 and NEPA process. We believe that a reasonable third party would conclude that SHA has taken a series of arbitrary and capricious steps to avoid appropriate responsibility to the effects to the Morningstar site that are the result of proposed and past SHA actions.

We find the finding of no adverse effect to the site to be arbitrary in light of the facts on the ground. As we indicated in previous letters, the state's ground penetrating radar (GPR) efforts are incomplete. The tremendous volume of positive results should have resulted in a more thorough investigation of the area. We understand that incomplete bamboo removal and other physical obstacles prevented further GPR investigation in some locations; however, these

00161295

problems can be undoubtedly addressed to allow for a more thorough investigation. It is appropriate practice in a GPR survey to cast a wider buffer than is apparent from this work. The investigation should have continued northward up to the edge of the highway, as well as extending further east and west. The fact that the investigation did not continue further northward precludes any determination that the graves have been "completely avoided."

Instead of appropriately addressing this deficiency with the GPR, SHA presented FMH with an aerial photograph and indicated its belief that the 1957 image suggests that the boundary of the cemetery was a roadway. This may be true, but even if we assume for the purposes of our analysis here that it is true, it does not yield SHA's interpretation. The roadway curves northward into the limits of disturbance. The westernmost grave along the roadway is further north than the easternmost. Given the incomplete nature of the GPR, one might extrapolate that if the roadway is indeed the boundary of the cemetery and graves appear to be tracking it northward, graves may be located within the LOD. This conclusion is easily inferable from the provided material, but SHA chooses to make the inference that favors the agency's interests.

In making that determination, SHA also disregards our reasonable concern regarding **the location of the limits of disturbance (LOD) in relation to the *known* burial sites, which raises substantial questions about physical avoidance.** The updated LOD still appears to be immediately adjacent to a grave. As SHA's report acknowledges, GPR is imperfect. The entirety of the grave feature may not exactly correspond with the GPR findings. This risk is usually addressed by establishing a buffer, which still does not appear to have been done for this LOD.

Given these facts, one would reasonably conclude that a finding of direct **adverse effect** or **potential for adverse effect** would be appropriate. Instead, SHA has used a single picture from 1957 and an incomplete approach to GPR and setting of the LOD to make a definitive determination in the other direction that benefits the agency.

We find other evidence of arbitrary decision-making in the materials provided to us. SHA has made a reasonable commitment to transfer "the right-of-way where GPR has indicated potential burials to cemetery trustees." However, it noted that "Based on FHWA input, this commitment will NOT be in the Section 106 PA but may be documented in the ROD."

The decision to transfer the right-of-way is a *connected action* to the Managed Lane Study undertaking. If not for the study, SHA would not be engaging in this transfer. We and SHA know this because SHA took no action to engage in such a transfer until FMH and other stakeholders highlighted the Morningstar property. It even expanded the roadway in this vicinity previously while taking no such action. It is engaging in this transfer to respond to public policy concerns raised in the NEPA, Section 4(f), and Section 106 processes of this specific undertaking. It must, *not may*, be documented in the final documentation associated with all three regulatory processes. Failure to document this activity would violate the requirements under 40 CFR 1508.25 and represent an arbitrary approach to complying with well-established regulatory requirements and precedent.

We note briefly that the request for a shorter PA duration raised by multiple stakeholders was also met with arbitrary decision-making. We previously laid out our rationale for why seven years was more appropriate than 20. Rather than respond to any of the substantive points raised, MDOT SHA replied, "20-year agreement is FHWA's decision." FHWA has an obligation

00161296

to provide a rationale for this period. In fact, the FHWA template PA has a five-year duration.[1] Deviating from a standard "because FHWA said so," does not represent reasoned decision-making.

Having identified a pattern of *arbitrary* behavior, we turn to the *capricious* steps that SHA has taken during this process. On September 9, 2021, the *Washington Post* ran a story covering SHA's efforts to avoid impacts/effects to the Morningstar site.[2] In that story, Julie M. Schablitsky, chief archaeologist for the Maryland Department of Transportation, stated, "'We own the faults of the Maryland Roads Commission impacting the community 60 years ago…It's our responsibility now to repair the damage and come in and do the right thing.'"

As chief archaeologist for MDOT, Ms. Schablitsky is in an appropriate position to make such a statement concerning the responsibility that the state feels it has and the actions it intends to take.

On January 4, 2022, SHA concluded that it did not have to consider cumulative effects to the site because "Impacts to the Gibson Grove community occurred with original I-495 construction, prior to the passage of NEPA and NHPA (Section 106)."[3]

This set of statements is galling on a number of levels. First, it is contrary to the regulations. Section 106 requires consideration of cumulative effects (36 CFR 800.5 (a)(1)) and provides no carve out for effects that began before NHPA's passage. The NEPA regulations define cumulative impacts as those which result "from the incremental effect of an action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such actions" (40 CFR 1508.7). The regulations provide no carve out for excluding the pre-NEPA/NHPA timeframe from cumulative effects. In fact, CEQ's handbook *Considering Cumulative Effects Under the National Environmental Policy Act*, in seeking to answer the question of how far back to look at cumulative effects, noted, "The availability of data often determines how far back past effects are examined. Although certain types of data (e.g., forest cover) may be available for extensive periods in the past (i.e., several decades), other data (e.g., water quality data) may be available only for much shorter periods."[4] In this case, the data are available and clear regarding the State's continued actions in relation to the Morningstar site.

The second galling element at play here is that the framework for cumulative effects is clear. In building the Beltway, the State improperly incorporated a black cemetery into state public right-of-way. Several decades later, it widened the highway in the vicinity of the site without considering effects to it. And now, it aims to move that highway even closer, bringing the LOD immediately adjacent to the known burial site of a person whose resting place the state wrongly took control of several decades prior. These clear, discrete, definable additive effects are

---

[1] See here: https://www.fhwa.dot.gov/design/interstate/pa_template16.cfm
[2] Katherine Shaver, "African American gravesites detected near Capital Beltway will be spared in road-widening plans." *Washington Post* September 9, 2021.
[3] MDOT. "Morningstar/Moses Hall Cemetery Update." January 4, 2022.
[4] CEQ. *Considering Cumulative Effects Under the National Environmental Policy Act*. Section 2. Pages 17-19. https://ceq.doe.gov/docs/ceq-publications/ccenepa/sec2.pdf

precisely the kind of issue that NEPA/NHPA were designed to address. SHA must do so to comply with law and regulation.

But what is most concerning is the clear distinction between the public and the private statements. In a public forum in front of the media, the State declares, "We take responsibility." It says SHA will "repair the damage." In private, before the affected stakeholder, it declares, "We do not take responsibility." It offers nothing to repair the physical damage to the site. Such an about-face is the definition of a capricious act.

FMH once again stresses that the original I-495 construction had significant economic, physical, and social impacts on this historic community through land takings and the splitting of this once vibrant African American community in Cabin John. Evidencing the cumulative effects of racial inequity inherent in the original land takings, FMH shares our report of findings following our examination of Maryland State Roads Commission (MD SRC) records pertaining to the construction of I-495 from the late 1950s through the early 1960s **(Attached Exhibit A).**

**FMH also takes issue with the Determination of Eligibility (DOE) form submitted in December 2021 by MDOT SHA.** As with the original DOE prepared in May 2020 (to which FMH submitted corrections and edits on August 24, 2021), substantial errors and omissions are contained in this second DOE. While MDOT SHA says it agrees that the site is National Register-Eligible, thus far its two DOE reports have consistently minimized or omitted historical and archaeological facts. It is unclear whether this newly completed form is replacing or adding to the DOE submitted in May 2020 to MHT. FMH is deeply concerned that its previous edits to MDOT SHA's first DOE have been disregarded by MDOT SHA and MHT. The DOE becomes a permanent, public document. We believe accurate and complete information should be the basis of this document. Accordingly, we include FMH's comments to the DOE, attached as **Exhibit B.**

While FMH has serious concerns about the process and we believe a third party reviewing the record would share these concerns, we remain willing to work with SHA on appropriate mitigations for the direct and cumulative effects that the Morningstar site is likely to experience as a result of this Project. Our previous comments have outlined an appropriate set of activities consistent with those effects. However, SHA has categorically rejected these comments due to their no adverse effect finding. We welcome the opportunity to coordinate with SHA on these mitigations upon the agency's review of the points raised in this letter.

We appreciate your consideration of these comments and look forward to further coordination on revisions to the assessment of effects and to the PA that reflect the likely effects to this site and the public commitments that SHA has made.

Sincerely,

**FRIENDS OF MOSES HALL**
**and The Board of Trustees of**
**Morningstar Tabernacle Number 88, Incorporated**

00161298

**Diane E. Baxter**
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation

**Montgomery Crawford**
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Trustee and Chair, Friends of Moses Hall Committee,
Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

00161299

cc:    Governor Lawrence J. Hogan – governor.mail@maryland.gov
       Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
       Treasurer Nancy Kopp – treasurer@treasurer.state.md.us
       Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
       Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
       Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
       Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
       Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
       Steve Archer, MDOT SHA – sarcher@mdot.maryland.gov
       Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
       Richard Ervin, MDOT SHA – rervin@mdot.marylalnd.gov
       David Clarke, USDOT - david.clarke@dot.gov
       April Marchese, USDOT – april.marchese@dot.gov
       Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
       Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
       Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
       Samantha Beers, US EPA - beers.samantha@epa.gov
       Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
       James Gavin, Federal Highway Administration – james.gavin@dot.gov
       Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
       Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
       Reid Nelson, ACHP – rnelson@achp.gov
       Mandy Ranslow, ACHP - mranslow@achp.gov
       Jaime Loichinger, ACHP - jloichinger@achp.gov
       Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
       Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
       Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
       John Simkins, FHWA Virginia Division - john.simkins@dot.gov
       Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
       Debra Borden, M-NCPPC – debra.borden@mncppc.org
       Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
       Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
       Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
       Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
       Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
       Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
       Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
       Sara Love, Maryland State Delegate – sara.love@house.state.md.us
       Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
       Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
       Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
       Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
       Gabe Albornoz, Montgomery County Councilmember- councilmember.albornoz@montgomerycountymd.gov
       Andrew Friedson, Montgomery County Councilmember- councilmember.friedson@montgomerycountymd.gov
       Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
       Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
       Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
       Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
       Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
       Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
       Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00161300

**EXHIBIT A**
**FRIENDS OF MOSES HALL**
**REPORT OF FINDINGS FROM HISTORICAL I-495 RIGHT-OF-WAY RECORDS RESEARCH**

In 2021, Friends of Moses Hall (FMH) received documents in response to our Maryland Public Information Act (PIA) requests to MDOT SHA. These documents, per our PIA request, included correspondence, appraisals, and other records pertaining to specific Right-of-Way (ROW) file numbers and court cases for the development of I-495 from the late 1950s through the early 1960s. Our PIA request was limited to those records involving landowners along the section of I-495 at Seven Locks Road. Friends of Moses Hall and others have been examining these documents and are alarmed by some of our findings.

FMH once again stresses that the original I-495 construction had significant economic, physical and social impacts on this historically black community through land takings and the splitting of this once vibrant Gibson Grove community in Cabin John. Furthermore, systemic racism ingrained in the state's land takings resulted in black landowners being compensated significantly less than adjacent white landowners. Different values were assigned to properties based on the race of the landowner, even though the properties were in the same neighborhood or even abutted each other. Additionally, there are noticeable record-keeping disparities between ROW files for black and white landowners. Many black landowner files delivered to us were heavily and inappropriately redacted, were of poor scanning copy quality compared to those of white landowner files, and contained scant records and/or inaccuracies. For example, the Morningstar Moses Cemetery file (MD SRC ROW files 46729 and 48363) incorrectly identified the site as "Moses Lodge #74" (Liber 344/F 274), a distant Order of Moses property located in Emory Grove. Additionally, the size of the land taking for this property was found to be inconsistent among the records reviewed.

Alarmingly, Law Case file 10749 "State Roads Commission vs. Mickens et al" involving Peter Jones property in MD SRC ROW file 48288 contains a "First and Final Account" of payouts in the case and we note specifically a 1963 payout to The McGuire Funeral Service, Inc. in the amount of $411.00 (**See Attachment 1**). This indicates that the MD SRC knew that burials were on the site, casting doubt on MDOT SHA's current claim of prior ignorance when burials were found within the ROW by ground penetrating radar (GPR) study done in July 2021. The Jones property was directly adjacent to the Morningstar Moses cemetery property (**See Attachment 2**).

One notable example of racial inequity inherent in the original I-495 land takings can be found in the Peter and Dorcas Jones files (Law Case 10749 for MD SRC ROW file 48288). The assessed value for the 2.5-acre parcel was $6,250.00 and the state's valuation for the complete taking of this land was $5,000 ($2,000 per acre). The case went to trial, with the state arguing that even the $5,000 valuation was excessive. We highlight the following appraisal notes from Law Case 10749:

> **MD SRC ROW File 48288, scanned in three file sections for FMH, contains an appraisal from Samuel E. Bogley Realtors appraisal (Robert Lebling appraiser*) dated 2/20/1961. It valued the property at $5,000 and noted "There are no improvements on the subject property. The surrounding neighborhood improvements at Seven Locks Road and along the deeded right of way, previously referred to, are of poor quality and negro inhabited. (See photographs herein)." Note that a photo of Moses Hall lodge is one of the referred photographs. See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 49-50 of 91.**

> **Mr. Lebling's appraisal goes on to state: "It should be noted that the assessment on this property is extremely excessive in relation to the two nearest adjoining properties, both of which have access from dedicated and County maintained streets which the subject property lacks." The valuation summary states: "Seven Locks Road in this neighborhood consists of negro colony occupying, generally speaking, inferior and sub-standard homes in the price bracket ranging from an irreducible minimum of $250 to around $10,000. This value depressing influence has a very marked effect on the selectability of land in this negro inhabited pocket." See Peter and Dorcas Jones MD SRC ROW File 48288, file 1 of 3, digital image 51-52 of 91.**

00161301

The state's appraiser incorrectly states that the Jones and Morningstar Moses properties did not have road access from Seven Locks, while noting that the adjacent Farrar property had access to Seven Locks. In fact, all three properties had road access to Seven Locks.

*Robert Lebling conducted a number of appraisals for the I-495 land takings, but he was also a white landowner in the area subject to a land taking (MD SRC ROW file 46734) — an apparent conflict of interest.

The Jones defendants in Law Case 10749 retained a professional appraiser named Adolph C. Rohland to provide testimony at trial. The jury in the Jones Case 10749 ultimately awarded the Jones heirs $7,210 plus interest (~$3,000/acre) for a complete taking. Mr. Rohland was paid $225 for his service in the case.

Only one other eminent domain case for a black landowner went to trial in the Gibson Grove community, which was Law Case 10748 State Roads Commission vs. Elizah Harris et al (heirs to Mary Eliza Harris, daughter of Peter Jones) for SRC ROW file 46730. Harris' heirs were awarded a total of $3,500, with interest, at trial for a complete taking of 0.5 acres, including what the state's appraiser described as a "negro occupied" "shack" and 1-story frame "bungalow".

With the exception of these black landowner estate cases that went to trial, the ROW records for the Gibson Grove community revealed that black landowners were paid $2,000 to $2,500 per acre for their properties by the state. In stark contrast, white landowners were paid $3,500 to $7,000 per acre.

Wealthier white landowners in this area, such as the neighboring Lillie [sic] Stone estate (MD SRC ROW files 40826 and 46732), retained legal counsel to secure larger payments of $4,000 per acre plus "damages" in the amount of $21,000. Word of these larger payouts quickly spread within the white community in this area, causing other white landowners, like Frederick Farrar (MD SRC ROW file 46727), a US Navy doctor, to contest state payout offers. Although he initially demanded $55,000, in the end, Farrar was paid $33,000 for the state's taking of approximately 3.5 acres with a stucco cinder-block dwelling on the premises.

The apparent racial inequity evident in the records for the original I-495 construction project, as well as the detrimental social and economic impacts directly related to the project, set the stage for ongoing degradation of the Gibson Grove community in Cabin John, along with its historic and cultural resources. The psychological and economic damage inflicted on these once thriving and resilient communities is evidence of a history of racial inequity in infrastructure projects in Maryland.

# State Rds Comm vs. Andrew Mickens and Jones' heirs

STATE OF MARYLAND )
            Plaintiff )
            v. )  Law No. 10749
ANDREW MICKENS, et al )
          Defendants. )

FIRST AND FINAL ACCOUNT

Mr. James Harris    $244.01
Mrs. Ida Stewart Hall    338.63
Mrs. Sarah Thompson    336.85
Mr. Charles Harris    40.67
The McGuire Funeral Service,Inc.    411.00
Mrs. Delores Crawford    48.81
Mrs. Susie Walker    48.10
Mr. Charles Harris    48.80
Miss Elizabeth Harris    48.81
Mrs. Helen Branch    Executor's Fee    48.80
Joseph N. Dodson    527.09
Estate of Fannie Dodson    411.75
Mr. Andrew Mickens    96.94
Mrs. Lelia Lane    961.93
Mr. Walter Stewart    442.01
Miss Julia Stewart)    346.45
Miss Julia Stewart)
Mrs. Sadie Cross    48.80
Mr. Leroy Harris    48.80
Mr. Herbert Harris    48.80
Mrs. Hazel McKay    48.80
Mr. Ernest Harris    48.81
Mrs. Jessie Toney    244.01
Lester Harris    244.01
Mrs. Hester Harris    71.80
Mr. Worthy Harris    40.61
Mrs. Cecelia Lindsay    40.61
Mr. Leonard Harris    40.66
Mr. Percy Harris    40.67
Mrs. Lucille Cook    40.69
Newman Insurance Agency    Bond    47.00
Mrs. Mabel G. Matthews    170.61
Mrs. Mildred Alexander    170.60
Mrs. Edna G. Lindsay    140.61
Mrs. Edna E. Gordon    140.60

FILED JUN 15 1964

FILED JUN 15 1964

Total    $6489.19

Deposit in Riggs Bank 11th Branch
Jan 28 -1963    $6,488.49
Paid as above    6,489.19
Balance    $1.30

Submitted by Joseph N Dodson

Subscribed and sworn to before me this 29th day
of January 1964

**EXHIBIT A - ATTACHMENT 2**







00161304

**EXHIBIT B**
**FRIENDS OF MOSES HALL**
**COMMENTS REGARDING DETERMINATION OF ELIGIBILITY (DOE) FILED DECEMBER 2021**

FMH takes issue with statements in the Determination of Eligibility (DOE) form submitted in December 2021 by Matt Manning of MDOT SHA. As was the case with the original DOE prepared in May 2020 (to which FMH submitted corrections and edits on August 24, 2021), substantial errors and omissions are contained in this second DOE. While MDOT SHA says it agrees that the site is National Register-Eligible, thus far its two DOE reports have consistently minimized or omitted historical and archaeological facts. Both now and in August 2020 FMH has submitted comments to correct and add information deemed vital to the Morningstar Moses Cemetery and Hall site in Cabin John, Maryland. In a virtual meeting on September 16, 2021, Steve Archer of MDOT SHA stated that there would be future opportunities to incorporate a detailed and more complete history of the site.

The first line of the *Description of Property & Justification* reads "*This update to the 2020 Determination of Eligibility form provides new information regarding the property based in part on archaeological surveys completed in May and September 2021.*"

It is unclear whether this newly completed form is replacing or adding to the DOE submitted in May 2020 to MHT. FMH is deeply concerned that its edits to MDOT SHA's first DOE, submitted in August 2020, have been disregarded by MDOT SHA and MHT. As the DOE becomes a permanent, public document, we believe it should contain accurate and complete information.

FMH identifies the following substantive areas of concern within the DOE form submitted in December 2021.

## Morningstar Moses Hall foundation *extant*

**On page 3, paragraph 2:**   DOE states "Two other Moses tabernacles established in Montgomery County before 1900 were Mackalls in Norbeck and Moses Lodge No. 74 in Emory Grove.[1]  *Like Morningstar, neither organization's Moses Hall remains standing,* and the original construction dates of the buildings are unknown." (emphasis ours; please note corrected citations and references)

Correction: Morningstar Moses Hall is unique in Montgomery County in that its foundation *exists* as described by Horsley (August 2021) in his Geophysical Survey report.[2]  *Nothing* remains of Mackalls Lodge in Norbeck and Moses Lodge No. 74 in Emory Grove, the other two Montgomery County Moses lodges. FMH disagrees with MDOT SHA's minimization of the existence of Morningstar's foundation and the future potential it holds for more information to be realized.

The Moses Hall lodge foundation joins a number of important Morningstar artifacts that contribute to our understanding of and greater appreciation for the interred individuals of the Morningstar Moses Cemetery and their lives within the greater context of Segregation and African American benevolent societies. These unique items include grave and fieldstone markers, 300+ presumed or potential gravesites, a casket handle, a ceremonial Order of Moses sword, the Morningstar Tabernacle No. 88 minutes book dated 1904-1914, an embossing seal used for official Morningstar business, and records of funeral homes.

---

[1] Montgomery County, Maryland, Circuit Court, Charter Record EBP 1/235, 28 May 1895, Mackall's Tabernacle, Maryland State Archives, Annapolis, MD; Montgomery Co., deed JA 34/468, A. Lancaster to J. Ennis et al, 1 Nov 1892;

[2] Horsley, T. J. (August 2021) *Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove A.M.E. Zion Church, Cabin John, Montgomery County, Maryland. Report on Geophysical Surveys, July 6-9, 2021.*

00161305

**Wrong conclusion re: use of Morningstar Moses Cemetery by other Moses tabernacles**

MDOT SHA shows a lack of understanding of the relationship between Morningstar Tabernacle No. 88 and its juvenile division called Lily of the Valley No. 36 (noted as a "Jubinicki" or "Jubinise" in the *Morningstar Minutes Book*) in the following statement made on **page 4, paragraph 1**:

> *"The Morningstar minutes book also confirms the cemetery was used by more than just members of Morningstar Tabernacle No. 88. In July 1910, the Morningstar members voted to allow another Moses society, the "Jubinickl" or "Jubinise" (possibly Jubinacle or a misspelling of Gemini/Geminis) Tabernacle No. 36, free use of the cemetery in exchange for $50 to be used for the repair of the Morningstar Moses Hall (Morningstar Tabernacle No. 88 1910, 143-145). It is possible similar arrangements were made with other Moses societies."*

In fact, members of the juvenile division No. 36 were the sons and daughters of Morningstar members. When they "graduated" they advanced to the adult Morningstar Tabernacle No. 88 division. In making the offer of $50 in June 1910 towards repairs of the hall, the younger set in effect asked that this payment be considered towards their cemetery dues normally paid as adults. The *Minutes Book* notes that the adult lodge accepted the $50 offer and moved and seconded "that the Jubinise Tab should have a place to berry [sic] the ded [sic] a free of charge at No. 88 bering [sic] ground."[3]   Juvenile members of No. 36 mentioned in the *Morningstar Minutes Book* (1904-1914) included Sarah C. Gibson, granddaughter of Gibson Grove community founder Sarah Gibson; Leita Carter, daughter of early landowner Henry Carter and Delia Crawford; William Coates, son of early landowner James Coates ; Jessie Harris, daughter of Charles D. Harris and Mary Eliza Jones and granddaughter of early landowners Peter and Dorcas Jones; and Lydia Burley, daughter of Rev. Lewis and Laura Virginia "Jennie" Burley.  Most former juveniles of No. 36 named in the *Minutes Book* are buried in the cemetery. Their names can be found on the Morningstar Burial List provided in an email to Steve Archer and others at MDOT SHA on March 30, 2021 by L. Paige Whitley and in the updated additions contained in this document.

**In sum, there is NO evidence in the *Morningstar Minutes Book* or other documents related to those buried in the cemetery that members of other local Moses tabernacles were sold plots and were buried in the Morningstar Moses Cemetery**.

**Demand for Removal of Sensitive Data on Plat of Survey**

Continuation Sheet Page 6 of 6 shows sensitive private information regarding adjacent homeowners to the cemetery.  Given that MDOT SHA required extensive redaction of 1960s-era ROW files shared with FMH, much of it containing addresses for lawyers and real estate offices involved in that era's land-taking, inclusion of current private information here is inconsistent with prior redaction of information.  SHA should include an informative plat of survey that redacts sensitive information.

**Updated Morningstar Moses Cemetery Burial Information**

Since Whitley's 2021 research, more burials have been identified through careful examination of the *Morningstar Minutes Book*, death certificates, newspaper death notices and/or information provided by descendants.  **Eighteen (18) additional burials have been discovered and are noted at the end of Exhibit B.** The

---

[3] *Morningstar Minutes Book*, June 20, 1910 pp. 143-144.

00161306

total listed on **page 3, paragraph 5** should thus indicate 95 (not 77) and **Table 2** should indicate the following numbers:

**Table 2.** *Confirmed Burials by Decade.*

| Decade | # of Confirmed Burials | Revised # of Confirmed Burials |
|---|---|---|
| 1890 | 2 | 2 |
| 1900 | 4 | 13 |
| 1910 | 4 | 10 |
| 1920 | 10 | 10 |
| 1930 | 17 | 19 |
| 1940 | 18 | 18 |
| 1950 | 7 | 8 |
| 1960 | 8 | 8 |
| 1970 | 7 | 7 |
| **Total:** | **77** | **95** |

**Please view *Updated Morningstar Moses Burial List* at end of this document.**

<u>**Incorrect citations**</u>

There are numerous inaccurate citations made in the DOE text and in the references section. Sources were provided in FMH comments re: original DOE dated May 2020 and reaffirmed in attachment to FHM comments dated August 24, 2021. There is inconsistent use of secondary vs. primary sources, many with incorrect names. Corrections and comments are made in BOLD.

**On page 2, paragraph 3:  "**It is possible one of these additions is a result of improvements by Charles Harris, who was approved in March 1910 to "make the hall larger" and plaster and wash coat the walls (Morningstar Tabernacle No. 88 1910, digital image 84 of 144). **This is a scanned book with digital page images; these images do not correspond to physical page numbers and should be noted accordingly.  Also, convention in various documents until this DOE has been to use short form *Morningstar Minutes Book* as citation source. (The physical page is 140.)**

**On page 2, paragraph 4**:  "The recovered portion of the minutes books also notes a "$110.00 draft [unreadable text] repairing the hall" from the January 27, 1904, meeting (Morningstar Tabernacle No. 88 1904, i**mage 4 of 144)  See above comment. (The physical page was also 4, in this case.)**

**On page 3, paragraph 1:**  "In the minutes from a 1907 lodge meeting was a comment from Sarah Gibson that 'she had been a Moses since 1885' ... **(Morningstar Tabernacle No. 88 1907, image 56 of 144)  See above comment. (The physical page is 87.)**

On page 3, paragraph 2:   "*Two other Moses tabernacles established in Montgomery County before 1900 were Mackalls in Norbeck and Moses Lodge No. 74 in Emory Grove.* **(MCDB 1895, MCDB 1892, ~~Troup Leighton et al. 2020~~)  DELETE Troup Leighton citation. The 1895 reference is to a charter document, not a land deed. The 1892 reference is to a land deed. The correct sources are as follows:**

> **Montgomery County, Maryland, Circuit Court, Charter Record EBP 1/235, 28 May 1895, Mackall's Tabernacle, Maryland State Archives, Annapolis, MD.**

Montgomery County, Maryland, Circuit Court, land deed JA 34/468, A. Lancaster to J. Ennis et al, 1 Nov 1892.

**Same paragraph**: "However, an article from *The Village News* (Martin, 1985)." **Author was ignored in citation; should be included here and in references.**

**On page 4, paragraph 1**: "In ~~June~~ July 1910, the Morningstar members voted to allow another Moses society, the "Jubinickl" or "Jubinise" (possibly Jubinacle or a misspelling of Gemini/Geminis) Tabernacle No. 36, free use of the cemetery in exchange for $50 to be used for the repair of the Morningstar Moses Hall (Morningstar Tabernacle No. 88 1910, **images 85-86 of 144.) (Physical pages 143-144)**

**On page 5, References:**

"Appraisal Report of Frederick W. Farrar Property." Part of MDOT SHA Office of Real Estate Item No. 46727. January 11, 1961. **Specific page numbers should be given if this is considered to be a subsection of larger file, e.g. chapter in a book.**

Falchetta, J., Slovinac, P., McCarthy Watts, K. Mikolic, F., and Stevenson, R. *Cultural Resources Technical Report: Documentation and Archaeological Monitoring for the I-495 & I-270 Managed Lanes Study, Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212), Montgomery County, Maryland.* A. D. Marble. Archaeological Report Number 560. May 2021.

"Frederick W. Farrar **Right of Way** Report." MDOT SHA Office of Real Estate Item No. 46727. 1961. **Is this not the same as first? And why is it not clearly stated "Right of Way" report? R.W. is not specific enough nor is it part of the original file name.**

Horsley, T. J. "Morningstar Tabernacle No. 88 Moses Hall and Cemetery and Gibson Grove A.M.E. Zion Church, Cabin John, Montgomery County, Maryland. Report on Geophysical Surveys, July 6-9, 2021." Horsley Archaeological Prospection, LLC. August 2021.

Jones, Alexandra. "Gibson Grove A.M.E. Zion Church Gone But Not Forgotten: The Archaeology of an African American Church." Dissertation, University of California, Berkeley. 2010. Electronic document. Accessed November 8, 2021. https://escholarship.org/uc/item/8z67f3ns.

**Martin, Barbara.** "The People of Cabin John: Bill White: Always Part of Cabin John." *The Village News,* Volume 18, Number 6. February 1985. ~~**Article received from Charlotte Troup Leighton, Rockville, Cabin John, Maryland.**~~ **Why is this latter statement necessary? Delete.**

**Montgomery County, Maryland, Circuit Court, Charter Record EBP 1/235, 28 May 1895, Mackall's Tabernacle, Maryland State Archives, Annapolis, MD.**

**Montgomery County, Maryland, Circuit Court, Land Deed JA 34/468, A. Lancaster to J. Ennis et al, 1 Nov 1892; Archives of Maryland Online, Electronic document, http://www.mdlandrec.net/, accessed April 2020.**

"Morning Star Lodge No. 88 **Right of Way** Report." MDOT SHA Office of Real Estate Item No. 48363. 1958-1962. **See Farrar comment above re: RW use**

*Morningstar Tabernacle No. 88 of the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses: Minutes Book, 1904-1914,* unpublished manuscript. Electronic document, pp. 1–144, on file at the Montgomery County Historical Society, Rockville, Maryland. Accessed November 4, 2021. https://mchdr.montgomeryhistory.org/xmlui/handle/20.500.12366/297 **Note title corrected as presented on Montgomery History website.  *Convention has used Morningstar Minutes Book as short form in text. Why not in this DOE?***

Nationwide Environmental Title Research, LLC [NETR]. Misc. years. Historic Aerial Mosaic Montgomery County, Maryland. Accessed May 20, 2021. https://www.historicaerials.com/viewer.

Whitley**, L. Paige**. "The History of the Gibson Grove Community and the Gibson Grove AMEZ Church, Cabin John School and Morningstar Tabernacle No. 88 Moses Hall and Cemetery." January 2021. Accessed September 28, 2021. https://mchdr.montgomeryhistory.org/xmlui/handle/20.500.12366/381.


## Additional Morningstar Moses Cemetery Burials and Death Information, updated January 2022

**The below burials were identified via official Death Certificates, newspaper Death Notices or Obituaries, oral interviews and/or references in the *Morningstar Tabernacle No. 88 of the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses: Minutes Book, 1904-1914*, cited simply as *Morningstar Minutes Book.* Presented in chronological order of burial.**
**Compiled by L. Paige Whitley**

1. Noah Mason, January 1904. Death mentioned in *Morningstar Minutes Book* on 27 Jan 1904 & 9 Mar 1904. *Minutes Book*, images 4-5 of 144.
2. Benjamin Harris, died 17 February 1904. *Morningstar Minutes Book* notes "About 4.20 oclock [sic] Bro Benjamin Harris departed his life."  Burial on February 19. The *Minutes Book* notes member processional from place of death on nearby farm to Moses Cemetery. *Morningstar Minutes Book*, image 18 of 144.
3. George Washington, Sr., died June 7, 1904.   *Morningstar Minutes Book* notes "departed this life about 2 o'clock June 7, 1904."  Bro. Silas Richards bought a coffin on the 8th and on June 9 the lodge "Buried Bro. George Washington in proper stile [sic]". *Morningstar Minutes Book*, image 8 of 144.
4. Alfred Stewart, died February 1906?  Minutes Book notes "Alferd [sic] Stewart grave."  *Morningstar Minutes Book*, image 31 of 144.
5. **Two (2)** Children of Lloyd Jackson, mentioned March 1907 in the *Morningstar Minutes Book*. "... pass a resolution for Lloyd Jackson to fence his to [sic] children grave in to suit himself." *Morningstar Minutes Book*, images 47-48 of 144. **One possible child**:  "Fannie" Jackson, age sixteen, died 30 November 1899 of severe burns received while working in the Miles Fuller home in Somerset Heights, MD. Daughter of **Lloyd Jackson**, **early landowner, deed EBP 35/105**. "Undertaker will remove the remains to the home of her father."  News Article, *The Evening Times*, 30 Nov 1899, 1.
6. Annie Steward, died October 1908?   *Morningstar Minutes Book* mentions Bro Samuel Steward paid $3 for his Sister Annie Steward grave. *Morningstar Minutes Book*, image 70 of 144.
7. Henrietta Barber, died 14 April 1909. *Morningstar Minutes Book* mentions "death at 6 oclock [sic] this morning."  Burial 16 April. Funeral preached at No. 10 Hall at 11 o'clock. *Morningstar Minutes Book*, image 74 of 144; *MD Death Certificate.*
8. Child of Ella Crawford, Oct 1909?  *Morningstar Minutes Book* notes "It was moved and seckond [sic] to let sister Ellar Crofert [sic] have the hall anytime that she wanted it for to have her childe [sic] funel [sic] preached." *Minutes Book*, image 80 of 144.
9. Boy Stewart, died 28 July 1910 in Tenleytown, DC. *DC Death Certificate* indicates buried same day in Cabin John, Md.

00161309

10. <u>Daisy Crockett</u>, died December 1910. *Morningstar Minutes Book* on Dec. 28 notes "moved and Seckond [sic] to receive $3 from Bro Smiel [Samuel?] Steward for Disey [sic] Crockett's graive [sic]" *Morningstar Minutes Book*, image 93 of 144. *MD Death Certificate* for Mazie [sic] Crockett, died 25 December 1910 at age 15. Daughter of Julia Stewart and John Crockett of Scotland.

11. <u>John Price</u>, died 15 January 1911, buried January 17 at No. 10 Moses Cemetery, *MD Death Certificate*. *Morningstar Minutes Book* notes "Brother Philip Jackson reported that he had $3 for a grave which he sold for the body of John Price." *Minutes Book*, image 94 of 144.

12. <u>Anna Jackson</u>, died August 1911? *Morningstar Minutes Book* notes "receive the sum of $3 from Bro Lloyd Jackson for Miss Anner [sic] Jack [Jackson] grave." *Morningstar Minutes Book*, image 103 of 144.

13. <u>Lucy Dove</u>, died 27? October 1911. *Morningstar Minutes Book* notes "Call a meeting on the 27 Friday night for to perpair [prepare] for sis L Dove buriel [sic] ... Sunday morning perpaird [sic] for Bro Silas Richard buriel [sic] ... fond Sistr Hellon Dove $1 for not attending sister Lucie Dove funiel [sic]." *Morningstar Minutes Book*, images 107 & 111 of 144.

14. <u>Louise Dorsey</u>, died May? 1912. *Morningstar Minutes Book* mentions funeral expenses for Sis Louise Dorsey. *Morningstar Minutes Book*, image 114 of 144.

15. <u>Stanley Butler,</u> died 1 December 1936. Interment December 6. *Evening Star*, 5 December 1936, 12.

16. <u>Mary Catherine (nee Gravatt) Warren</u>, died 12 July 1937 age 37. Buried July 16, 1937 Cabin John #10 Cemetery. Father John Gravatt; mother Ada Stewart. *MD Death Certificate*.

17. <u>Cora Ann Dove</u>, died 20 April 1956. Funeral April 24th at Gibson Grove AME Church, Cabin John, Md. and burial at Moses Lodge Cemetery. *Evening Star*, 23 April 1956, A12.



Larry Hogan, Governor
Boyd Rutherford, Lt. Governor

Robert S. McCord, Secretary
Sandy Schrader, Deputy Secretary

# Maryland
## DEPARTMENT OF PLANNING
### MARYLAND HISTORICAL TRUST

February 4, 2022

Dr. Julie M. Schablitsky
MDOT State Highway Administration
707 North Calvert Street
Baltimore, MD 21202

Re:    I-495 & I-270 Managed Lanes Study (MLS)
       Montgomery and Prince George's Counties, Maryland
       MDOT SHA Project No. AW073C12

Dear Dr. Schablitsky:

Thank you for providing the Maryland Historical Trust (Trust), the Maryland State Historic Preservation Office, with additional information regarding the above-referenced undertaking. The Maryland Department of Transportation State Highway Administration's (MDOT SHA) submittal represents ongoing consultation to assess the project's effects on historic properties, pursuant to Section 106 of the National Historic Preservation Act of 1966, as amended, and the Maryland Historical Trust Act of 1985, as amended, State Finance and Procurement Article §§ 5A-325 and 5A-326 of the Annotated Code of Maryland. MDOT SHA has revised Area of Potential Effects (APE) to reflect engineering adjustments of the Preferred Alternative and the consideration of additional potential compensatory stormwater management (SWM) sites. The letter includes the results of MDOT SHA's architectural and archeological investigations within the revised APE, as well as an updated Determination of Eligibility (DOE) Form and assessment of effects for the Morningstar Tabernacle No. 88 Moses Hall & Cemetery. Trust staff have conducted a thorough review of the materials and we are writing to provide our comments.

The Trust appreciates receiving copies of the detailed written comments prepared by multiple consulting parties in response to this latest MDOT SHA submittal. We felt it was critical to defer our response until we had the benefit of understanding and considering the comments of these parties. Consulting parties have an essential role in the Section 106 consultation process in helping to inform project planning and resolve adverse effects to historic properties. We value the input and advocacy of these parties from their varied perspectives as representatives of local governments, non-profit organizations, and the stewards of the affected historic properties. We look forward to their continued active participation as consultation proceeds for this undertaking.

**Revised Area of Potential Effects (APE)**: Based on ongoing design development and the consideration of additional compensatory SWM sites, MDOT SHA has revised the undertaking's APE. The Trust agrees that the MDOT SHA's redefined APE encompasses the geographic area within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties.

**Compensatory Stormwater Management Sites**: MDOT SHA has assessed 19 new compensatory SWM sites resulting in the identification of two previously unrecorded properties requiring National Register evaluations. Trust staff reviewed the two Determination of Eligibility (DOE) Forms and concur that 7309 and 7311 River

---

Maryland Historical Trust  •  100 Community Place  •  Crownsville  •  Maryland  •  21032

Tel: 410.697.9591  •  toll free 877.767.6272  •  TTY users: Maryland Relay  •  MHT.Maryland.gov

00161429

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 2

Road are not eligible for listing in the National Register of Historic Places (NRHP). The Trust also concurs with the findings presented in Attachment 3 of MDOT SHA's letter.

**Steam/Wetland and Parkland Mitigation**: The Trust concurs with the findings and recommended treatments presented in Attachment 4 of MDOT SHA's letter. A potential wetland mitigation site (CHOH-13) is under consideration within the C&O Canal National Historical Park. Based on the proximity of the mitigation site to archeological site 18MO749, MDOT SHA proposes full Phase I survey of the mitigation site. The Trust agrees with this assessment and looks forward to receiving the survey results in accordance with provisions of MDOT SHA's treatment plan for archeological sites within the Programmatic Agreement (PA) currently under negotiation pursuant to 36 CFR 800.14(b) for this undertaking.

**Revised DOE for Morningstar Tabernacle No. 88 Moses Hall & Cemetery**: The Trust previously concurred that the Morningstar Tabernacle No. 88 Moses Hall & Cemetery (Morningstar Hall and Cemetery) is eligible for listing in the NRHP under Criteria A and C in September 2020. The property remains NRHP-eligible, and we appreciate the completion of a revised DOE for this resource to reflect additional background research and the archeological surveys conducted in May and September 2021.

The Trust believes that sufficient information exists through research efforts and extensive remote sensing of the property to assess and demonstrate the information potential of this NRHP-eligible property under Criterion D. Throughout the cemetery site, ground-penetrating radar (GPR) revealed a significant number of burial shafts and facilitated the mapping of existing surface features. Furthermore, archeology investigations have led to conclusions about Moses Hall, including its construction date, expansion and repair campaigns, demolition, and how the space was used. Archeology will continue to inform the community and holds potential to provide information about African American benevolent societies and their burial practices. Therefore, it is the Trust's opinion that the Morningstar Hall and Cemetery is eligible under Criterion D. Any additional revisions to the DOE form by MDOT SHA should reconsider the application of Criterion D and incorporate the edits suggested by the Friends of Moses Hall in August 2020.

**Updated Effects Assessments**: The Trust continues to agree with MDOT SHA's determination that the overall proposed undertaking will have an *adverse effect* on historic properties in Maryland. With the exception of the Morningstar Hall and Cemetery, the Trust agrees with the specific effect assessments stated in Attachment 6, Tables 3, 4, and 5 of MDOT SHA's letter. We also acknowledge FHWA's intent to make a Section 4(f) de minimis finding for the properties listed in Attachment 6, Table 6.

The Trust would like to commend MDOT SHA for the robust outreach, research and minimization efforts at the Morningstar Hall and Cemetery that has led to the discovery of additional burial features and reduced the overall limits of disturbance (LOD) in the vicinity of the Morningstar Hall and Cemetery. However, we remain concerned about the potential for additional burials within the unevaluated portions of the LOD. As noted in MDOT SHA's correspondence, possible burials indicated by GPR may extend into MDOT SHA's right-of-way. Additionally, areas within the undertaking's LOD remain unevaluated due to mature vegetation, slope, accessibility and other issues. While MDOT SHA believes this area has low potential for burials since they are either significantly removed from historically understood boundaries for the cemetery or are disturbed by prior cut/fill activities, it is known that African American cemeteries often extend beyond contained boundaries. The potential for burials within the LOD cannot be ruled out. Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property. The Trust recommends that the Federal Highway Administration (FHWA) request the Advisory Council on Historic Preservation (ACHP) review of this issue pursuant to 36 C.F.R. § 800.5(c)(2)(i).

00161430

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 3

The PA currently requires the development of a cemetery treatment plan that provides for protective measures, ongoing investigations and excavation of the remaining LOD. The PA should identify measures that will be implemented to take into account any adverse effects identified during ongoing archeological investigations of the LOD as specified in the cemetery treatment plan. Additional property-specific measures pertaining to context-sensitive design, community enhancements and other elements of the project that are beneficial to the property and minimize potential for project effects should also be included in the PA.

**Comments on the Second Draft of the PA**: The Trust offers the follow comments on the draft PA.

Stipulation IV.B - Consultation Regarding Project Development: This section presents a very general statement regarding ongoing consultation with SHPOs and various parties. It should be expanded to include greater specificity and cite relevant sections of the regulations. For instance, how would adverse effects be resolved? See the following example from the statewide FHWA/MDOT SHA PA for MD (Stipulation II.B.II):

> *1. MDOT SHA will determine and document the Area of Potential Effect(s) (APE), as defined in 36 C.F.R. § 800.16(d); identify consulting parties for the specific undertaking (or "project"), including federally recognized Indian Tribes that may ascribe religious and cultural significance to properties in a project's APE pursuant to 36 C.F.R. § 800.3(f)(2), and local public agencies with jurisdiction; identify historic properties and prepare documentation; and assess effects to historic properties in consultation with MD SHPO, consulting parties for the project, and in accordance with the principles and processes described at 36 C.F.R. §§ 800.3 – 6.*

> *2. When MDOT SHA determines an undertaking will have an adverse effect on historic properties, it will notify the FHWA and initiate further consultation with MD SHPO and identified consulting parties for the project to resolve the adverse effects in accordance with 36 C.F.R. § 800.6, including alternatives to avoid, minimize, or mitigate adverse effects to historic properties resulting from the undertaking. Such alternatives or mitigation will be documented in a Section 106 Memorandum of Agreement or PA executed by FHWA, MD SHPO, and MDOT SHA or MDTA, and ACHP if participating in consultation.*

Stipulation V - Property Specific Commitments: This stipulation does not contain the level of specificity, timelines, etc. generally expected for treatment measures. While some of that may be a reflection of the lack of detailed design information to date, further clarity is needed for these commitments.

Stipulation V.A - George Washington Memorial Parkway (Including Clara Barton Parkway):
- Stipulation V.A.1 - What is the intent of the design review and how will MDOT SHA address and respond to comments provided by SHPOs and NPS as a result of the review. Does MDOT SHA propose to implement any protection measures during construction, or would those be developed as an outcome of the design review?
- Stipulation V.A.2 - The PA should provide a general timeline for completion of the Cultural Landscape Report, provision to provide copies of the document to SHPOs, and reporting on the implementation of treatment recommendations.

Stipulation V.C. - Chesapeake and Ohio Canal NHP:
- Stipulation V.C.1 - What is the intent of the design review and how will MDOT SHA address and respond to comments provided by SHPOs and NPS as a result of the review. Does MDOT SHA propose to implement any protection measures during construction, or would those be developed as an outcome of the design review?

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 4

- Stipulation V.C.3 - The PA needs to include a review process for the reconstruction of Lock 13 - in consultation with NPS and SHPO.
- Stipulation V.C.4 - This section needs to specify that MDOT SHA will provide copies of the pre-construction condition assessment to NPS and SHPO and address the review process for rehabilitation of the lock structures, the Canal, and Towpath, within the LOD following construction and add a timeline for completion of that work following construction.
- Stipulation V.C.5 - The vibration monitoring provision needs to state how MDOT SHA will assess the vibration monitoring and address any potential damage as a result of vibration.

Stipulations V.D and V.E - Archeological Sites 18MO749 and 18MO751 (C&O Canal): These stipulations should follow the same language as V.B.1 - *In consultation with the MD SHPO, NPS, and other appropriate consulting parties, including Tribes, MDOT SHA will develop and implement a Phase III Data Recovery and associated public interpretation commitments as specified in Stipulation VI.*

Stipulation V.F - Washington Biologists' Field Club on Plummers Island:
- Stipulation V.F.1 - Greater specificity is needed on how the nomination will be submitted following NPS staff review - to SHPO, to NPS NR program? Do we need to add the NR nomination standards to Stipulation II.A?
- Stipulation V.F.2 - Any additional protection measures needed for this resource?

Stipulation V.G - Morningstar Tabernacle No. 88 Moses Hall and Cemetery:
- Stipulation V.G.1 -The PA should state how MDOT SHA will address and respond to comments provided by consulting parties and SHPOs as a result of the review. Does MDOT SHA propose to implement any protection measures during construction, or would those be developed as an outcome of the design review?
- The PA should include additional stipulations that document MDOT SHA's commitment to oncoming coordination with the consulting parties for this resource - as discussed in the updated effect assessment (Attachment 5 to MDOT SHA's letter), including a possible property transfer: *MDOT SHA will continue to commit to "context-sensitive design", "context-sensitive solutions" or "community enhancements" such as improved and/or new pedestrian connection between the cemetery and church, sympathetic design treatment of new noise barrier that faces the cemetery, and potentially other design elements of the project that are compatible and beneficial to the property but are not mitigation.*
- The PA should identify measures that will be implemented to take into account any adverse effects identified during ongoing archeological investigations of the LOD as specified in the cemetery treatment plan.

Stipulation VI - Archaeological Treatment Plan (ATP):
- The preamble to this stipulation implies that there is only one ATP for the entire project, when it may make more sense to have multiple ATPs that address specific levels of investigation which will likely occur over differing time spans - such as the Phase I survey for areas were access could not be obtained, Phase II evaluations, Phase III data recovery plans. Having multiple ATPs will make the review and consultation process on the ATPs more manageable and targeted to the appropriate consulting parties for that plan.
- The PA needs to state the MDOT SHA will not only develop an ATP, but also *implement* the ATP.
- The PA should provide additional clarification on the timing for developing and implementing the plans to allow sufficient time to implement and complete the necessary investigations well in advance of construction. For Phase I or II work, MDOT SHA needs to build in contingency time for developing additional evaluation or mitigation work. For Phase III work, data recovery and related analyses may be lengthy and should be accomplished well in advance of construction.

Dr. Julie M. Schablitsky
I-495 & I-270 Managed Lanes Study (MLS)
Page 5

- This section should reference that the ATPs will be developed following the draft table of contents included in PA Attachment 5(a), including but not limited to the listed contents.

Stipulation - VII Cemeteries and Human Remains Treatment Plan:
- This section needs a brief preamble statement, see Stipulation VI as example. The PA needs to state the MDOT SHA will develop and *implement* the Cemeteries and Human Remains Treatment Plan.
- The PA should provide additional clarification on the timing for developing and implementing the plans to allow sufficient time to implement and complete the necessary investigations well in advance of construction and/or in conjunction with construction in the case of monitoring.
- This section should reference that the plans will be developed following the draft table of contents included in PA Attachment 5(b), including but not limited to the listed contents.

Attachments 5(a) and 5(b): These attachments provide an informed framework for the development of Archaeological Treatment Plans and Cemeteries and Human Remains Treatment Plan with a suggested draft table of contents. Nevertheless, treatment plans are unique to a given resource/affected historic property. There may be additional items that need to be included in a plan for a specific resource, based on the nature of the resource and the results of consultation with the SHPOs and other consulting parties.

Thank you for the opportunity to comment. We look forward to further consultation with MDOT SHA and the other consulting parties to resolve adverse effects and develop of a comprehensive and achievable agreement document. If you have questions or need further assistance, please contact Tim Tamburrino (for historic structures) at [ HYPERLINK "mailto:tim.tamburrino@maryland.gov" ] or Beth Cole (for archeology) at [ HYPERLINK "mailto:beth.cole@maryland.gov" ].

Sincerely,

Elizabeth Hughes
Director/State Historic Preservation Officer

EH/BC/TJT/20220050

cc:     Caryn Brookman (SHA)
        Jeanette Mar (FHWA)
        Mandy Ranslow (ACHP)
        I-495 & I-270 MLS Section 106 Consulting Parties

00161433





# McLean Citizens Association
# 495 Express Lanes Northern Extension Project

February 8, 2022

00163466

# 495 NEXT Project Overview

- Approximate three-mile extension of 495 Express Lanes from I-495 and Dulles Toll Road interchange to George Washington Memorial Parkway in the vicinity of the American Legion Bridge

- Public-private project partnership between Commonwealth and Transurban through 2087

- Design-build contractor is Lane Construction



| PROJECT GOALS | Reduce congestion | Provide additional travel choices | Improve travel reliability | Enhance safety | Move more people |
|---|---|---|---|---|---|





00163467

# I-495 NEXT Project Timeline





3



00163468

# Maryland and Virginia Coordination

Maryland and Virginia working together to coordinate Maryland's Phase 1 South project and Virginia's 495 NEXT project

**Key Elements:**

- Provide a new American Legion Bridge and new bicycle and pedestrian access to connect trails on both sides of Potomac River.

- Final agreement will define how Maryland and Virginia projects will "interface" including:

  - Design and construction requirements

  - Operations and maintenance roles

  - Seamless regional dynamic toll lane network with each state operating its system independently



 | 

4

 | 

# Live Oak Drive Design Refinements

- Beltway widening requires repositioning Live Oak Dr. (west side of Beltway) and expansion on east side

- Final design to reduce project footprint to maximum extent possible, while meeting design and safety requirements



 

00163470

# Live Oak Drive Design Refinements

- Design plans now being refined

- Design refinements to be uploaded to website in Spring 2022

- Interactive map being developed to spotlight features (e.g., noise walls, limits of disturbance, right of way, etc.)



**SECTION A-A**
Live Oak Drive Realignment

*11/8/21 Cross Section – Preliminary design subject to change*





# Field Activities Underway

- Survey work underway to facilitate final design

- Tree inventory nearing completion within the potential Limits of Disturbance

  - Installed small stakes and wrapped 12"-plus trees with striped tape, and took measurements

  - Markings do not represent whether a tree will be kept or removed

- Final design to determine the number and location of trees to be impacted. Information anticipated in second half of 2022



  |

7



# Field Activities Underway

## Geotechnical Test Borings

- Majority of borings on Beltway mainline

- All borings on VDOT right of way

- Rigs drill 30-75 feet, take samples of soil conditions to guide design

- May produce moderate noise

- Tree clearing only where necessary to perform work safely. To date, only small brush and trees <2" have been removed

- Noise walls removed in 3 locations to provide access for rigs; anticipated reinstallation by early March







00163473

# Field Activities Underway

## Boring Locations

- Borings in progress or soon to occur in the vicinity of:

  - Balls Hill Road
  - Lupine Lane
  - Arbor Lane
  - Lawton Street
  - River Oaks Drive
  - Butternut Court
  - Old Dominion Drive

  - Churchill Road
  - Delf Drive
  - Dulany Drive
  - Scotts Run Road
  - Spring Gate Road
  - Dominion Court







00163474

# **Upcoming Field Activities**

- Additional exploratory activities:

  - Survey

  - Soil borings

  - Utility designation and confirmation

  - Continue tree survey

- Install roadway signage where needed

- Continue to move project design forward



10



00163475

# Design Noise Analysis Process

- Final noise analysis to be completed in spring 2022
- Based on design plans and updated traffic:
  - Is the wall warranted?
  - Is the wall feasible?
  - Is the wall reasonable?



- Publish final noise study results and proposed noise wall locations on 495NorthernExtension.org
- Solicit input from benefited property owners and renters (voting process)
- Include approved noise walls into final plans
- If construction impacts an existing wall, a replacement wall will be provided





00163476

# Early Construction Activities

- Initial work will be focused on the Beltway within existing right of way
- First activity: Strengthen shoulders to support future travel lanes
- Anticipated start: mid 2022
- Begin at Dulles Toll Road Interchange and work north

# Overall Construction Impacts

- Committed to minimizing construction noise and other impacts, while maintaining schedule
- Certain activities are unavoidably noisy and impactful, and some must be performed during night-time hours
- Expect periodic traffic impacts on local roads crossing or in the vicinity of the Beltway





00163477

# Learn More

- Check out **www.495northernextension.org**

- **Sign up here** to receive project email updates

- Email **495NorthernExtension@VDOT.Virginia.gov**

- **Contacts**
  - VDOT: Michelle Holland, 703-586-0487
  - Transurban: Brent McKenzie, 571-326-5609
  - Lane: John Undeland, 703-785-3461





**Project Update and Field Activity Report**
I-495 Express Lanes Northern Extension (495 NEXT) Project

Issue 3 | February 2, 2022

**Activities In the Field**

Early project activities now or soon underway on the I-495 Express Lanes Northern Extension (495 NEXT) project involve exploratory work including surveys, geotechnical test borings, tree inventories, and identification of utility locations.

**Current and Upcoming Work**

**Test Borings**

Test borings continue to be drilled along the two-and-a-half-mile project corridor, both alongside I-495 (the Capital Beltway) as well as on VDOT right-of-way behind residences on streets listed below. Depending upon weather and other factors, the boring work is expected to be completed in spring 2022.

*Noise wall panels removed to provide access for boring rigs along southbound I-495 between Georgetown Pike and Old Dominion Drive.*

To provide access for boring rigs from the Capital Beltway (as opposed to entering from residential streets), three noise wall panels were recently removed. The resulting gaps are closed off with caution tape and permanent barrier fence exists behind the walls to prevent public access. Following completion of behind-the-wall boring work, the panels are planned to be reinstalled by early March.

Drilling is currently or soon will be active on VDOT right-of-way in the vicinity of the following neighborhood streets:





00163478



00163479

# New American Legion Bridge
# I-270 to I-70 Traffic Relief Plan

## McLean Citizens Association

February 8, 2022





00163480

# New American Legion Bridge I-270 to I-70 Traffic Relief Plan

- **Phase 1 South** is I-495 from the George Washington Memorial Parkway to I-270 and I-270 from I-495 to I-370

- **Phase 1 North** is I-270 from I-370 to I-70 and is a separate study that is in Pre-NEPA Phase







2

00163481

# Alternative 9 – Phase 1 South



 Convert existing HOV lane to HOT lane and add one HOT lane in each direction on I-270 between I-495 and I-370 and the I-270 East Spur from MD 187 to I-270





00163482

# Phase 1 South – Predevelopment & MLS Schedule

**July 2020**
- Phase 1 shortlist announced with four teams on July 17
- Draft RFP issued July 24

**December 2020 -January 2021**
- Issuance of Final RFP – Dec. 18
- Technical Proposals Submitted – Dec. 23
- Financial Proposals Submitted – Jan. 8

**August 2021**
- BPW approved Phase P3 Agreement

Predevelopment work for first section

**Fall 2022**
- Seek BPW Approval of Phase 1 South Section P3 Agreement

**2020**          **2021**          **2022**

**November 2020 – September 2021**
- Respond to DEIS Comments, Refine Engineering and Environmental
- Identify Recommended Preferred Alternative

**October 2021**
- Publish SDEIS

**October - November 2021**
- Hold SDEIS Extended 60-Day Public Comment Period

**November 2021**
- Hold Public Hearing for SDEIS

**Spring/ Summer 2022**
- Publish the FEIS and ROD

4





00163483

# I-495 at George Washington Memorial Parkway Bird's Eye View Rendering – Looking North



**EXISTING**



**PROPOSED**

Note: VDOT's 495 NEXT project limits shown in blue in proposed rendering.

5





00163484



Note: VDOT's 495 NEXT project limits shown in blue.

# I-495 at George Washington Memorial Parkway Bird's Eye View Rendering – Looking North







Note: VDOT's 495 NEXT project limits shown in blue.

**I-495 at George Washington Memorial Parkway Bird's Eye View Rendering – Looking Southwest**





00163486



Note: VDOT's 495 NEXT project limits shown in blue.

**I-495 at George Washington Memorial Parkway Bird's Eye View Rendering – Looking Southeast**







Note: VDOT's 495 NEXT project limits shown in blue.

**I-495 at George Washington Memorial Parkway Bird's Eye View Rendering – Looking Northeast**





00163488

# I-495 Inner Loop – Looking North Toward GWMP Bridge



**EXISTING**



**PROPOSED**

MARYLAND DEPARTMENT OF TRANSPORTATION
STATE HIGHWAY ADMINISTRATION

OP•LANES
MARYLAND

00163489

# I-495 Outer Loop – Looking South Toward GWMP Bridge



**EXISTING**



**PROPOSED**



# WB George Washington Memorial Parkway – Looking Toward I-495





**EXISTING**

**PROPOSED**



# Existing Right of Way and Limit of Disturbance



**Legend**

☐ ROW/LOD
🟨 General Purpose
🟪 Managed Lanes
🟧 Bridges

# Noise Analysis and Barrier Alignments

- Noise Barrier Alignment to tie into Noise Barrier constructed as part of 495 NEXT north of GWMP
- VDOT state noise abatement policy and guidance
- Materials and finish to match adjacent noise barrier constructed as part of 495 NEXT
- Similar to 495 NEXT – the Design Builder is required to monitor construction related noise and take action to minimize noise levels where they exceed established criteria






00163493

# Forest Mitigation in Virginia

- Developer is required to comply with all applicable laws, regulations, and commitments for tree and forest impacts in the Commonwealth of Virginia

- Same requirements as 495 NEXT

- Impacts to trees on National Park Service Property must be mitigated based on the Diameter of Breast Height (DBH) of impacted trees

- Mitigation for NPS will occur at locations identified by the National Park Service



# More Information and Progress Updates

 Options & Opportunities for All

[OpLanesMD.com](OpLanesMD.com)

Follow @oplanesmd



     

 

00163495

 I-495 & I-270 Managed Lanes Study

## I-270 & I-495 Managed Lane Study IAPA comments

| Comment No. | FHWA Reviewer | Page and Section | Comment |
|---|---|---|---|
| 1 | Serena Liu | Page General Section All | If a table does not fit on one page or is split into multiple parts by the page break, please include the title and full caption before the table starts, as it is standard. Any subsequent page on which the table continues should include the table title followed by the word "continued" or "con't" in parentheses. |
| 2 | Serena Liu | Page 11-12 Section 1.2 | This section appears to reiterate the purpose and need in the EIS, and not so much the scope of the study. |
| 3 | Serena Liu | Page 15 Section 2 | This section should reference the IAPA Framework, which documented the methodology (traffic forecasting, software uses, MOE, etc.) for this study. In addition, this section includes a lot of information that appears to be more appropriate in other sections of the report; for example, the existing roadway description is more appropriate in Chapter 3.3 (in fact, Chapter 3.3 refers back to chapter 2.1 2.2). This section should focus on the methodology for this study and minimize repeating language that is in the IAPA Framework. |
| 4 | Serena Liu | Page 36 Section 3.6 and 3.7 | Is chapter 3.6 and 3.7 necessary? They are simply referencing other chapter for optional and safety. |
| 5 | Serena Liu | Page 36 Section 4 | Chapter 3 can focus on the preferred alternative. For other alternatives considered but not selected can reference DEIS/SDEIS/EIS to minimize repeating the EIS documents. |
| 6 | Serena Liu | Page 44 Section 5.2 | Please ensure that Design Exception (Appendix E) is in the future submittal. Also, A map showing the location of the design exception in additional to Table 5-1 will be helpful. |
| 7 | Serena Liu | Page 68-69, 81-82, 95-96 Section 7.4.1, 7.4.2 and 7.4.3 | Figure 7-2, 7-3, 7-4, 7-5, 7-6, 7-7, please include number associates with the color on the pie chart. It unclear if the same size of the pie slide from the No Build is equal to the Preferred Alternative. In this review, I am assuming they are equal for my comments below. |

| 8 | Serena Liu | age 93-144 Section 7.4.3 | FHWA internal note: the results show that MLS benefits the I-495 OL the most, but it is at a cost from other directions.  While average traffic operation for the system is expected to be better under the preferred alternative, the benefit is not equally distributed.  Also, with the cost of this project and during opening day/2027, traffic operation is not better everywhere.  In my opinion, it is hard to justify all the work, money, and impacts for this opening day results.  For I-495 IL, I am not sure what they can do as the P3 team stated that they had looked at a number of the mitigation (ramp metering, extending the endpoint, etc.), and that did not mitigate the impacts.  What made the results better than what they had shown us previously was the change in the volume forecast model (which we are ok with based on Chung's note).  For I-270 SB and NB, that may be something that could be done, like minor geometry changes, ITS, etc.  Please feel free to omit my comment if needed. |
|---|---|---|---|
| | | | • Consider group the summary points based on the peak hour for an easier read.  For example, all bulletins related to AM peak are together one after another.  The current report text has AM peak results in the 1st, 3rd, 4th, and last bulletins. (This also apply to section 7.4.5-2045) |
| | | | • There is no comparison for vehicle delays and should be part of the report text. |
| | | | • I-495 IL AM is showing a worse traffic operation than no-build.  This is due to the increase of demand with the addition of the HOT lanes and the new bottleneck created at the HOT lane terminus.  However, the degradation during the AM creates a significant operational impact and should be mitigated. |
| | | |     o  Figures 7-4 and 7-5 show portion of LOS D, E, and F for I-495 IL HOT Lanes has increased under the Preferred Alternative.  For I-495 IL GPL, the portion of the LOS F has increased.  |
| | | |     o  Figure 7-16 and 7-18 show significant increase of travel time during the hour 8-9AM and occurring at the bottleneck where the HOT Lanes ends. |

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study





- For PM Conditions, I-270 SB and I-270 NB GPLs are expected to have worse traffic operation than no-build.
  - Figures 7-17, Figure 7-13, and Figure 7-15 show lower traveling speeds for the GPLs and longer travel time. Especially for I-270 SB, it appears that under no-build conditions, the background improvements have lowered the travel time, but with the proposed HOT lanes, it will take longer for people in the GPLs to travel this section.





| 9 | Serena Liu | Page 142, 207 Section 7.4.3 and 7.4.4 | Please consider adding more details to the queue spillback discussion. What is currently in the report text discusses the system-wide improvement as percentages. It is beneficial to identify any critical location where the improvements are significant (for example, the queue is shorter for locations A,B,C, which allow better traffic operation for the exit/entrance ramps). Without context, it is difficult to relate the percentage of the queue spillback. |
| 10 | Serena Liu | Page 146-160 Section 7.4.4 and 7.4.4 | Similar to 2027, the locations noted in the comment above still in play and they had gotten worse due to increase of the traffic volume in the 2045. |


| 11 | Serena Liu | Page 140, 197 Section 7.4.3, 7.4.5 | FHWA internal note: The -8% and -22% change in throughput really don't make sense to me as the throughput for the link before and after that is showing increases. Table 7-11, 7-18 show -8 and -22% change in throughput for 2027 and 2045, respectively, at I-270 SB between Montrose Rd and I-270 Split. No discussion in the report on this, and discussion should be included to explain this case. |

Table 7-11: 2027 I-495 Outer Loop and I-270 Southbound Throughput Comparison

| Time Interval | Existing | No Build | Preferred Alternative | | | |
|---|---|---|---|---|---|---|
| | | | HOT | GP | Total | Improvement from No Build |
| Between I-370 & Shady Grove Road | | | | | | |
| 6-7 AM | 10566 | 10408 | 2066 | 9269 | 11335 | 9% |
| 7-8 AM | 9787 | 9385 | 2042 | 8394 | 10436 | 11% |
| 8-9 AM | 8862 | 8889 | 2187 | 7755 | 9942 | 12% |
| 9-10 AM | 9506 | 9149 | 2208 | 7534 | 9742 | 6% |
| AM Total | 38721 | 37831 | 8503 | 32952 | 41455 | 10% |
| 3-4 PM | 5578 | 6343 | 1526 | 5385 | 6911 | 9% |
| 4-5 PM | 5806 | 6211 | 1580 | 5646 | 7226 | 16% |
| 5-6 PM | 6307 | 6023 | 1639 | 5756 | 7395 | 23% |
| 6-7 PM | 6102 | 6548 | 1615 | 5632 | 7247 | 11% |
| PM Total | 23793 | 25125 | 6360 | 22419 | 28779 | 15% |
| Between Montrose Road & I-270 Split | | | | | | |
| 6-7 AM | 9707 | 10512 | 2385 | 9418 | 11803 | 12% |
| 7-8 AM | 10203 | 10974 | 2363 | 9827 | 12190 | 11% |
| 8-9 AM | 9818 | 10348 | 2355 | 9072 | 11427 | 10% |
| 9-10 AM | 9639 | 9760 | 2395 | 8101 | 10496 | 8% |
| AM Total | 39367 | 41594 | 9498 | 36418 | 45916 | 10% |
| 3-4 PM | 6721 | 7282 | 2249 | 6260 | 8509 | 17% |
| 4-5 PM | 7215 | 7499 | 2386 | 6683 | 9069 | 21% |
| 5-6 PM | 7487 | 7012 | 2377 | 6344 | 8721 | 24% |
| 6-7 PM | 7277 | 7610 | 2254 | 4735 | 6989 | -8% |
| PM Total | 28700 | 29403 | 9266 | 24022 | 33288 | 13% |

Table 7-18: 2045 I-495 Outer Loop and I-270 Southbound Throughput Comparison

| Time Interval | Existing | No Build | Preferred Alternative | | | |
|---|---|---|---|---|---|---|
| | | | HOT | GP | Total | Improvement from No Build |
| Between I-370 & Shady Grove Road | | | | | | |
| 6-7 AM | 10566 | 10496 | 2327 | 9155 | 11482 | 9% |
| 7-8 AM | 9787 | 9560 | 2339 | 8186 | 10525 | 10% |
| 8-9 AM | 8862 | 8989 | 2570 | 7500 | 10070 | 12% |
| 9-10 AM | 9506 | 9101 | 2615 | 7457 | 10072 | 11% |
| AM Total | 38721 | 38146 | 9851 | 32298 | 42149 | 10% |
| 3-4 PM | 5578 | 7213 | 1716 | 5768 | 7484 | 4% |
| 4-5 PM | 5806 | 6933 | 1847 | 5945 | 7792 | 12% |
| 5-6 PM | 6307 | 6482 | 1957 | 5945 | 7902 | 22% |
| 6-7 PM | 6102 | 7460 | 1881 | 5750 | 7631 | 2% |
| PM Total | 23793 | 28088 | 7401 | 23408 | 30809 | 10% |
| Between Montrose Road & I-270 Split | | | | | | |
| 6-7 AM | 9707 | 10894 | 2693 | 9621 | 12314 | 13% |
| 7-8 AM | 10203 | 11454 | 2744 | 9923 | 12667 | 11% |
| 8-9 AM | 9818 | 10842 | 2860 | 9397 | 12257 | 13% |
| 9-10 AM | 9639 | 9962 | 2869 | 8429 | 11298 | 13% |
| AM Total | 39367 | 43152 | 11166 | 37370 | 48536 | 12% |
| 3-4 PM | 6721 | 7962 | 2515 | 6659 | 9174 | 15% |
| 4-5 PM | 7215 | 8147 | 2777 | 6951 | 9728 | 19% |
| 5-6 PM | 7487 | 6885 | 2762 | 6522 | 9284 | 35% |
| 6-7 PM | 7277 | 7256 | 2602 | 3059 | 5661 | -22% |
| PM Total | 28700 | 30250 | 10656 | 23191 | 33847 | 12% |

| 12 | Serena Liu | Page 225 Section 8.1 | The crash data used was from 1/1/2016 0 12/31/2018. Are there more recent crash data available? Typically, crash data shouldn't be more than 3 years old. |
| 13 | Serena Liu | Page 244 Section 8.3 | • It is beneficial to include brief background information on crash modification factors (CMFs), like why it is selected as a tool to quantify the safety benefit or what is considered high-quality CMF, as not all reader of this document is familiar with it. It is also very helpful to note that CMFs less than 1 associate with the reduction of crashes and CMFs greater than 1 associate with increased crashes.<br>• The project will install new signals on crossroads/ramp terminus, shouldn't be CMF related to the new signal installation? |

| 14 | Serena Liu | Page General Section Appendix F | FHWA internal note: Generally, aside from what we already discussed; no big item jumps out to me. I have a couple of general concerns: (1)The available space for the huge signing related to the tolls, especially at the crossroads with the on/off ramps (like the interchange at I-270) as some of those roads have limited space for what they already there. (2) The signing only shows the critical signs (which is what it is supposed to show); there are many other existing signings that maybe in conflict with the proposed signing (there are A LOT of signing in that area).   However, that type of detail is beyond the scope of the conceptual signing. "George Washington Memorial Parking" should have a green background. |
|----|-----------|-------------------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 15 | Serena Liu | Page SN-2 Section Appendix F | • "ALL TRUCKS" message on the I-495 SB sign can be confusing as there is a "NO TRUCK" message on the same panel. Consider removing the "ALL TRUCKS" message.<br>• The message from GWMP ramp to I-495 SB Express lane has the message of "TWO AXLE VEHICLES TOWING TRAILERS PROHIBITED" can be confusing and too long for driver to comprehend. Considered using simpler message, such as 2 axel vehicles only. |
| 16 | | Page Section | |
| 17 | | Page Section | |
| 18 | | Page Section | |
| 19 | | Page Section | |
| 20 | | Page Section | |
| 21 | | Page Section | |
| 22 | | Page Section | |
| 23 | | Page Section | |
| 24 | | Page Section | |
| 25 | | Page Section | |
| 26 | | Page Section | |

OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

| 27 | | Page | |
| | | Section | |
| 28 | | Page | |
| | | Section | |
| 29 | | Page | |
| | | Section | |
| 30 | | Page | |
| | | Section | |

02-04-2022
\* MERGEFORMAT ]

[ PAGE



ENHANCED CONSPICUITY
OPTIONS A THROUGH G (PER
MUTCD SECTION 2A.15) FOR
R4-5 MODIFIED SIGNS SHOWN
TO THE LEFT

R4-5 MODIFIED
SIGNS (TYP.)

"NO TRUCKS" WORD
PAVEMENT MARKINGS IN
RIGHT LANE (TYP.)

## I-270 & I-495 Managed Lane Study IAPA comments

| Comment No. | Page and Section | Comment |
|---|---|---|
| 1 | Page General Section | The IAPA technical report is a single technical report describing the types and results of technical analyses conducted to show that the change in access will not have significant negative impact on the safety and operations of the Interstate System.  The social, economic, and environmental impacts and planning considerations will be addressed through the NEPA review of the project and other statutes and regulations applicable to the approval process. **This report should be shortened to remove all NEPA related information.**

Again, the main goal is to eliminate duplicative information that is already part of the NEPA documentation and focus on the technical feasibility of the proposed change in access in support of FWHA's determination of safety, operational and engineering acceptability. |
| 2 | General | The proposed design of the managed lane interchanges at River Road, Westlake Terrace, Wootton Parkway, and Gude Drive look to be susceptible to wrong way movements.  Please provide geometric elements in the design to discourage wrong way movements. |
| 3 | Page General Section All | If a table does not fit on one page or is split into multiple parts by the page break, please include the title and full caption before the table starts, as it is standard.  Any subsequent page on which the table continues should include the table title followed by the word "continued" or "con't" in parentheses. |
| 4 | General Section Executive Summary | The executive summary should focus on the two policy points and present only the traffic operational and safety analysis findings. |
| 5 | Page 4, 51 and 60 | Please note that the IAPA Framework outlines the understanding between FHWA and MDOT during a specific moment in time. Since then updates have occurred and this IAPA report should acknowledge when the framework was done and why, highlight any changes after this date and avoid using additional references to the framework in other sections. The IAPA report should describe the scope of work of the IAPA, including the study area, traffic forecasting and analysis methodology, model calibration, and study assumptions, etc. even if some of this information is already part of the framework. |
| 6 | Page 4 & 5 Section Executive Summary | The results of the VISSIM analysis with 2027 and 2045 conditions are too detailed and difficult to follow as described in the text, please consider using a table or chart to simplify representation of results and facilitate comparisons. |


I-495 & I-270 Managed Lanes Study

| | | |
|---|---|---|
| 7 | Page 4<br>Section Exec. Sum.<br>Sec. D | 1st bullet, how about inner loop during AM peak period? Need to specify the numbers of miles on I-270 and I-495 in relation to reduction in LOS 'F'.<br><br>No information is provided for AM peak periods along Northbound I-270 GP lanes and for Southbound I-270 GP for AM and PM peak periods. |
| 8 | Page 4<br>Section Exec. Sum.<br>Sec. D | 2nd bullet needs to include results from PM peak period.  Also, why 9-10 AM time was picked for AM peak period? What is the duration for AM peak period? |
| 9 | Page 4<br>Section Exec. Sum.<br>Sec. D | Last bullet, what mitigation measures are being proposed to eliminate spillbacks onto the mainlines? Please list all improvements that will be implemented. |
| 10 | Page 5<br>Section D | 1st bullet: For Inner Loop information is provided for AM whereas no information is provided for PM peak period for Outer Loop.  Specify that the reduction in lane miles of level of service F is for GP lanes for OL and IL.<br>No information is provided for AM peak periods along Northbound I-270 GP lanes and for Southbound I-270 GP for AM and PM peak periods. |
| 11 | Page 6<br>Section Exec. Sum.<br>Sec. E | Why are we using old crash data?  If possible, use data from 2018 to 2020. |
| 12 | Page 6, 12<br>Section Exec.<br>Summary F & 1.3 | Revise, Section F. FHWA POLICY ~~POINTS~~ REQUIREMENTS |
| 13 | Page 6<br>Section Exec.<br>Summary Sec. F | Please remove unnecessary information as suggested below.<br><br>~~On May 22, 2017, FHWA published a change to their Policy on Access to the Interstate System. The revised policy reduces the policy points to be considered for access approvals from eight to two. These changes were made to streamline the approval process and eliminate duplication of efforts with other project reviews including the National Environmental Policy Act (NEPA) review process. Because the policy became effective on its publication date of May 22, 2017~~ and was incorporated into IIM-LD-200.11, FHWA Policy on Access to the Interstate System, published on May 22, 2017 ~~this IAR~~ addresses the two considerations and requirements defined in the memorandum as follows: |
| 14 | Page 6<br>Section Exec.<br>Summary Sec. F | Consideration and Requirement 2 should include, "designed to meet or exceed current standards."<br><br>•    *Consideration and Requirement 1: Operational and safety analysis*<br>•    *Consideration and Requirement 2: Connects to a public road and provides for all movements* |

OP·LANES™
MARYLAND    I-495 & I-270 Managed Lanes Study

| 15 | Page 8<br>Section Exec. Sum.<br>Sec. F | The language should be included in this paragraph to state that partial movements are allowed for the managed lanes connections and for the park and ride lots connections.  Not sure, if we have Park & Ride lots connections. |
|---|---|---|
| 16 | Page 9<br>Section 1 | Most of the paragraphs under Section 1 Introduction are not necessary, please remove. |
| 17 | Page 11<br>Section 1.1 | Revise.<br><br>"MDOT SHA developed this Interstate Access Point Approval (IAPA) report for the I-495 & I-270 Managed Lanes Study that documents information necessary to allow MDOT SHA to make informed decisions and to be acceptable to the Federal Highway Administration (FHWA) for safety, operations, and engineering. ~~This document and its analysis use and build upon the traffic modeling and analysis completed for the Draft Environmental Impact Statement (DEIS) but provide a more in-depth evaluation of operations and safety of the Preferred Alternative (PA) limits.~~ The IAPA report is reflective of the future design year of 2045 ~~(while the design year for the DEIS reflected 2040)~~, interim year (2027) analysis for the opening year, revisions to the limits of the managed lanes, and revisions to the proposed managed lanes access points.<br><br>The IAPA for the MLS documents the information necessary to allow FHWA to make an informed decision regarding the potential impacts of a change in access." |
| 18 | Page 11<br>Section 1.2 | A discussion of the need for the action, all reasonable alternatives considered, evaluation of consistency with local and regional land use and transportation plans is not necessary as part of the IAPA report as it is included in the NEPA decision document.  Please eliminate this section in its entirety. |
| 19 | Page 15<br>Section 2 | We do not need to repeat the methodology used for the FEIS Traffic Analysis which involves a larger study limit due to the scope of the NEPA decision document.  Conversely, the IAPA technical report should <u>focus on the impact of the proposed changes in access resulting from the alternative being considered</u>.<br><br>This section should reference the IAPA Framework, which documented the methodology (traffic forecasting, software uses, MOE, etc.) for this study. This section should focus on the methodology for this study and minimize repeating language that is in the IAPA Framework.<br><br>Revise. "*The traffic analysis area for the ~~DEIS~~ FEIS extended beyond the MLS limits to capture upstream and downstream effects. Evaluation of the Preferred Alternative ~~in the SDEIS~~ used the same limits for the VISSIM simulation models ~~as in the DEIS~~, as shown in **Figure 2-1...**"* |
| 20 | Page 15<br>Section 2 | Why can't be use the simulation just for the Phase 1 South (Preferred Alternative). |

| 21 | Page 18<br>Section Table 2-2 | Has MDOT SHA analyze if removing local lanes north of I-370 would help operations on NB and or SB I-270?<br><br>*The existing Collector-Distributor lane system will be removed as part of the Preferred Alternative to minimize the footprint and associated impacts. The removal of the Collector-Distributor lanes eliminates conflict points at the slip ramps and helps to balance volumes evenly across the general-purpose lanes, which improves traffic flow. However, there is some tradeoff as this change causes additional merging and weaving in the general-purpose lanes, which can negatively impact operations. Removal of the Collector-Distributor lanes was evaluated as part of the operational and safety analysis.* |
|---|---|---|
| 22 | Page 22<br>Section 2.4.1 | Please remove this paragraph on COVID-19 travel analysis and monitoring plan unless this information effected the safety and operational analysis completed for the IAPA.  This paragraph is not providing any correlation with the traffic volumes used as part of this technical report. Consider adding a statement indicating the data used does not reflect conditions after the onset of the COVID-19 pandemic. Please remove:<br><br>~~The COVID-19 global pandemic had a profound impact on the daily routines of people across the world, affecting the way residents and commuters in the National Capital Region work, travel, and spend their free time. These changes have altered traffic demand, transit use, and traffic volumes on all roadways in Maryland, the District of Columbia, and Virginia, including I-495 and I-270. MDOT SHA has been closely monitoring the changes in traffic patterns throughout the pandemic. The FEIS includes a COVID-19 Travel Analysis and Monitoring Plan. The plan includes three components, with additional details on each in the following sections:~~<br><br>    • **~~Monitoring~~**~~: tracking changes in roadway and transit demand during the pandemic, including daily and hourly volume data, i.e., how does travel change in response to the number of cases, vaccine distribution, unemployment rates, school closings, and policy changes;~~<br>    • **~~Research:~~** ~~reviewing historical data and surveys/projections from the Transportation Research Board and the National Capital Region Transportation Planning Board; and~~<br>**~~Sensitivity Analyses~~**~~: evaluating "what if" scenarios, including potential changes in teleworking, eCommerce, and transit use on projected 2045 travel demand and operations.~~ |
| 23 | Page 24<br>Section Footnote 3 | Link is not related to the project. |
| 24 | Page 24<br>Section | Please replace the following with current information as the FONSI was completed in June 29, 2021<br>*'…and has completed a draft Environmental Assessment which was released for public comment.'* |
| 25 | Page 25<br>Section 2.6 | Please remove.<br>Lane diagrams for the Preferred Alternative are included in **Appendix C**. ~~Environmental resource mapping is included as Appendix E of the FEIS.~~ |


| 26 | Page 29 - 31<br>Section 3 | A discussion of the need for the action, all reasonable alternatives considered, evaluation of consistency with local and regional land use and transportation plans is not necessary as part of the IAPA report as it is included in the NEPA decision document. Please remove Sections 3.1 and 3.2, and Figure 3-1. There is no need to repeat Sections 3.3, 3.4, 3.6 & 3.7 if they are described in detail in another section (avoid duplication). |
| --- | --- | --- |
| 27 | Page 32<br>Section 3.5 | Why don't we stay within the boundary of the preferred alternative? |
| 28 | Page 33-35<br>Section Figures 3-2 through 3-4 | Please revise these figures to show only the limits of the Preferred Alternative. |
| 29 | Page 36<br>Section 3.6 and 3.7 | Is chapter 3.6 and 3.7 necessary? They are simply referencing other chapter for operations and safety. |
| 30 | Page 36<br>Section 4 | Chapter 3 can focus on the preferred alternative.  For other alternatives considered but not selected can reference DEIS/SDEIS/EIS to minimize repeating the EIS documents. |
| 31 | Page 36 - 43<br>Section 4 | A discussion of the need for the action, all reasonable alternatives considered, evaluation of consistency with local and regional land use and transportation plans is not necessary as part of the IAPA report as it is included in the NEPA decision document. Remove Section 4 in its entirety including Figure 4-2 & 4-3. Section 4.10 Preferred Alternative could be further shortened to include only (1) a description of this alternative (portion of 2nd paragraph) and (2) the removal of C-D lanes (5th paragraph). |
| 32 | Page 44<br>Section 5.2 | Please ensure that Design Exception (Appendix E) is in the future submittal.  Also, A map showing the location of the design exception in additional to Table 5-1 will be helpful. |
| 33 | Page 47<br>Section 5.2.3 | AASHTO allows for 1% steeper grade in urban areas on the freeway segments, Green Book 2018 Table 8-1.  In regard to ramps, the range is from 3-5% for upgrades and downgrades, Green Book 2018 Table 10-2.  The report indicates that the ramps and freeway segments have maximum grades less than 5%.  Please review the design to determine if design exceptions are required. |
| 34 | Page 48<br>Section 5.2.5 | This design exception should be for the horizontal curve radius and superelevation rather than the design speed.  When the design speed is lowered it affects several of the other design criteria.  Therefore, it is recommended that the design speed remain the same and design exceptions be provided for the criteria that do not meet the standard based on the design speed. |
| 35 | Page 51-59<br>Section 6 | Most of Section 6 could be added as an appendix or a weblink to the NEPA Appendix as it is the methodology used during NEPA. Like the following statement under 7.1.1 *"The MLS Traffic Technical Report provides the modeling methodologies and assumptions in detail[14]"* |

| | | |
|---|---|---|
| 36 | Page 52<br>Section 6.1 | Please include findings and/or conclusions of the COVID-19 Travel Analysis or remove as it has no relevance by itself on this technical report. Please remove any reference to FEIS.<br><br>*"To adapt to the ongoing and potential long-term travel impacts associated with the pandemic, MDOT SHA developed a COVID-19 Travel Analysis and Monitoring Plan. ~~Please refer to FEIS, Appendix C~~."* |
| 37 | Page 52<br>Section 6.1 | Please revise Table 6-1 and the sentence below to show only the limits of the Preferred Alternative.<br>*"**Table 6-1** shows the baseline existing (year 2017) ADT for each segment within the study area, which reflects total traffic in both directions."* |
| 38 | Page 56-58<br>Section 6.3.2 | This section aligns with how the traffic analysis in NEPA evolved, but it should be re-written in a way it can stand by itself without making references to DEIS, etc. This information should be summarized differently (e.g. earlier in the NEPA process assumptions were... and after additional coordination with XYZ those key assumptions changed to...). |
| 39 | Page 60<br>Section 7.1.1 | Revise to *"During NEPA ~~As part of the traffic analysis to support the DEIS~~, VISSIM models were developed using Version 10."*<br>Footnote 14 should refer to the latest NEPA document. |
| 40 | Page 61<br>Section 7.1.2 | Revise to *"Using the ~~DEIS~~ NEPA VISSIM microsimulation models as a base, refinements were made to improve calibration in some areas, including coding error corrections and driver behavior modifications at spot locations to better reflect 2017 conditions."* |
| 41 | Page 62<br>Section 7.2 | Please add section location.<br><br>*These improvement recommendations were incorporated and evaluated as part of future year 2045 arterial level traffic analyses.* |
| 42 | Page 62<br>Section 7.2 | Revise to *"The VISSIM microsimulation model used in the Traffic Technical Report, which is part of the NEPA document ~~DEIS~~, did not include all of the signalized intersections required for the IAPA analysis (due to the size of the models, amount of data collection required, and model runtime)."* |
| 43 | Page 63<br>Section 7.3 | 2nd bullet, 2nd sub-bullet, maybe we should consider converting density into speed rather than HCM based LOS grade. |
| 44 | Page 64<br>Section 7.3 | Last bullet, we should add travel time also. |
| 45 | Page 68-69, 81-82, 95-96<br>Section 7.4.1, 7.4.2 and 7.4.3 | Figure 7-2, 7-3, 7-4, 7-5, 7-6, 7-7, please include number associates with the color on the pie chart. It is unclear if the same size of the pie slide from the No Build is equal to the Preferred Alternative. |


I-495 & I-270 Managed Lanes Study

| 46 | Page 68 & 69<br>Section Figure 7-2 &<br>7-3 | Need to make it clear it is for the preferred alternative. |
|---|---|---|

| 47 | Page 70<br>Section Table 7-4 | Please verify average density numbers on this table match the raw data in Appendix H. Also, verify it aligns with similar shading used under Appendix H. In addition, consider clarifying why some segments with similar average densities are shaded differently (e.g. 26 pc/hr/ln are green and yellow). |

| Between I-270 West Spur & MD 187 | Basic | 54 | 52 | 31 | 26 | 26 | 26 | 54 | 73 |
|---|---|---|---|---|---|---|---|---|---|
| | Diverge | 46 | 28 | 13 | 19 | 22 | 40 | 89 | 76 |

| 48 | Page 75<br>Section Table 7-5 | Please verify average density numbers on this table. For example, under I-495 IL, rows 'I-270 East Spur Interchange & Between I-270 East Spur & MD 185' do not match the average density numbers on Appendix H (pdf page 22) under Average Density (6-7 PM) for the same segments. |
|---|---|---|

| 49 | Page 81, 82, 146,<br>147<br>Section figures 7-4,<br>7-5, 7-30 and 7-31 | Insert in parenthesis "between VA193 and GWMP" next to I495 IL and OL Hot Lanes. |
|---|---|---|

| 50 | Pages<br>Section Tables 7-6,<br>7-7, 7-13 and -14 | It would be helpful if you provide information from tables 7-4, 7-6, 7-8, 7-13 and 7-15 side by side in one table for comparison purpose.  Separate tables make it difficult to compare.<br>Same comment for tables PM tables. |
|---|---|---|

| 51 | Page 86<br>Section Table 7-6 | Any particular reason, under **I-270 Southbound General Purpose Lanes,** the row 'MD 117 Interchange' was excluded. Previous tables and Appendix H include this interchange. |
|---|---|---|

| 52 | Page 86<br>Section Table 7-6 | Please be consistent and/or consider clarifying why some segments with similar average densities are shaded differently (e.g. 27 pc/hr/ln are green and yellow). |
|---|---|---|

| MD 189 Interchange | Basic | 53 | 53 | 53 | 53 | 31 | 27 | 25 | 25 |
|---|---|---|---|---|---|---|---|---|---|
| Montrose Road Interchange | Merge | 53 | 53 | 53 | 53 | 29 | 29 | 27 | 28 |
| Between Montrose Road & Spur Split | Basic | 53 | 53 | 53 | 53 | 29 | 27 | 26 | 26 |
| | Weave | 52 | 50 | 51 | 52 | 30 | 32 | 30 | 27 |
| | Diverge | 53 | 53 | 53 | 53 | 18 | 20 | 20 | 19 |
| | Weave | 53 | 53 | 53 | 53 | 26 | 28 | 26 | 24 |

OP·LANES™ MARYLAND    I-495 & I-270 Managed Lanes Study

| | Page 91<br>Section Table 7-7 | Under I-270 Southbound GP Lanes, the last column was incorrectly shaded, please correct as they should have been all green. |
|---|---|---|

| | | Basic | 63 | 63 | 63 | 63 | 18 | 18 | 19 | 20 |
|---|---|---|---|---|---|---|---|---|---|---|
| | I-370 Interchange | Diverge | 64 | 64 | 63 | 63 | 15 | 15 | 15 | 16 |
| | | Basic | 64 | 64 | 64 | 64 | 14 | 15 | 14 | 16 |
| | | Merge | 60 | 60 | 60 | 60 | 16 | 17 | 16 | 18 |
| | Shady Grove Road Interchange | Basic | 61 | 61 | 61 | 60 | 19 | 19 | 19 | 21 |
| | | Diverge | 61 | 61 | 61 | 61 | 21 | 22 | 20 | 23 |
| | | Basic | 61 | 61 | 61 | 60 | 17 | 16 | 16 | 19 |
| | Between Shady Grove Road & MD 28 | Merge | 61 | 61 | 61 | 60 | 15 | 14 | 15 | 16 |
| | | Basic | 61 | 61 | 61 | 60 | 20 | 19 | 19 | 21 |
| | | Merge | 61 | 61 | 61 | 61 | 16 | 15 | 16 | 16 |
| | MD 28 Interchange | Basic | 60 | 60 | 60 | 60 | 20 | 19 | 20 | 22 |
| | | Diverge | 60 | 60 | 60 | 60 | 22 | 21 | 21 | 23 |

**53**

Similarly, under I-270 Southbound GP Lanes, along 'Spur Split through MD 187 Interchange' – Basic, under 6-7 pm, the 50 average density should be shaded red.

| **54** | Page 93-144<br>Section 7.4.3 | Consider group the summary points based on the peak hour for an easier read. For example, all bulletins related to AM peak are together one after another. The current report text has AM peak results in the 1st, 3rd, 4th, and last bulletins. (This also apply to section 7.4.5-2045)<br><br>There is no comparison for vehicle delays and should be part of the report text.<br><br>I-495 IL AM is showing a worse traffic operation than no-build. This is due to the increase of demand with the addition of the HOT lanes and the new bottleneck created at the HOT lane terminus. However, the degradation during the AM creates a significant operational impact and should be mitigated.<br>• Figures 7-4 and 7-5 show portion of LOS D, E, and F for I-495 IL HOT Lanes has increased under the Preferred Alternative. For I-495 IL GPL, the portion of the LOS F has increased.<br>• Figure 7-16 and 7-18 show significant increase of travel time during the hour 8-9AM and occurring at the bottleneck where the HOT Lanes ends.<br>For PM Conditions, I-270 SB and I-270 NB GPLs are expected to have worse traffic operation than no-build.<br>• Figures 7-17, Figure 7-13, and Figure 7-15 show lower traveling speeds for the GPLs and longer travel time. Especially for I-270 SB, it appears that under no-build conditions, the background improvements have lowered the travel time, but with the proposed HOT lanes, it will take longer for people in the GPLs to travel this section. |
|---|---|---|

 I-495 & I-270 Managed Lanes Study

| 55 | Page 100 Section Table 7-8 | Any particular reason, under **I-270 Southbound General Purpose Lanes,** the row 'MD 117 Interchange' was excluded. Previous tables and Appendix H include this interchange. |
|---|---|---|
| 56 | Page 109 Section Figure 7-8 | Why 2027 No Build is better than 2027 Build Condition? |
| 57 | Page 116 Section Figure 7-15 | Why there is congestion on the HOT lanes between I-370 and Gude Drive? |
| 58 | Page 117 Section PM Peak Period | The report indicates that the eastbound to northbound loop ramp at Montrose Road interchange blocks vehicles using the southbound to eastbound loop ramp and impacts travel times along I-270 southbound. This is an instance where the configuration of this interchange is causing safety concerns along the mainline GP lanes.  Was there any consideration given to altering the geometrics of the Montrose Road interchange?  Please provide information about how the safety concerns will be addressed in this project. |
| 59 | Page 119 Section Figure 7-16 | Is it correct that travel time for GP lanes under 2027 No Build between 8-9 AM is better than HOT lanes travel time under 2027 Preferred Alternate for the same time period? |
| 60 | Page 121 Section Figure 7-18 | Looks like existing and no build conditions are better than preferred alternate, which means that HOT lane termination point needs to be extended. |
| 61 | Page 138 - 141 Section Table 7-10 & 7-11 | Could you explain why in many cases existing throughput (2017) is more than 2027 no-build throughput?  In one instance, the total preferred alternative throughput is less than existing throughput. |
| 62 | Page 119 Section Figure 7-16 | Please use the same y axis scale among the four graphs to avoid confusion and ease of comparison. |
| 63 | Page 120 Section Figure 7-17 | Please use the same y axis scale among the four graphs to avoid confusion and ease of comparison. |
| 64 | Page 140, 197 Section 7.4.3, 7.4.5 | Table 7-11, 7-18 show -8 and -22% change in throughput for 2027 and 2045, respectively, at I-270 SB between Montrose Rd and I-270 Split.  No discussion in the report on this, and discussion should be included to explain this case. |
| 65 | Page 142 Section 7.4.3 & Table 7-12 | Identify the queues that will impact the mainline and crossroad safety.  Provide a figure that shows the extent of the queue and what improvements and mitigations are proposed to alleviate the impacts to safety and operations (give the queue length in feet). What is currently in the report text discusses the system-wide improvement as percentages.  It is beneficial to identify any critical location where the improvements are significant.  Without context, it is difficult to relate the percentage of the queue spillback. |

 I-495 & I-270 Managed Lanes Study

| 66 | Page 142 & 207 Section 7.4.3 & 7.4.4 | Using the below statement as example, please tell us in real terms, how many feet is 74% less ramp spillback? Give us what is the max queue and average queue. Tell us the duration of the model, what is the average queue. For example, if the duration of the model was 2 hours, what percent of time does the queue stays within the ramp and it does not back up unto the interstate; if backs up unto the Interstate how often does it occurs and how long does it stays?  Based on these results (e.g. if queue stays for more than 30 mins), please indicate what improvements will be implemented at these locations – e.g. (1) modifying signal timing or (2) providing more storage space on the ramp?<br><br>*The following ramp maximum queue spillback improvements from the No Build condition to the Preferred Alternative are observed:*<br>*• 2027 AM Period: 74% less ramp spillback*<br>*• 2027 PM Period: 28% less ramp spillback* |
|---|---|---|
| 67 | Page 143 Section Figure 7-29 | Identify those ramps where queue length exceeds the ramp capacity under the preferred alternate and what mitigations are being proposed. |
| 68 | Page 144 | You should not be using one-hour data from the AM peak hour or PM peak hour to show the % of time reduction. It is very misleading information.  Use the average of the total rush hours duration to calculate % age reduction in travel time. |
| 69 | Page 144 Section 7.4.3 | Instead of percentages, could we refer to number of locations?  Possibly list those locations that will be affected.<br><br>*'Queue spillback is reduced during all hours of the AM peak period and the first three hours of the four-hour PM peak period. While queue spillback is slightly greater during the 6-7 PM hour, overall queue spillback during the four-hour PM peak period is reduced.'* |
| 70 | Page 145 Section 7.4.4 | Need to make it clear if this information is related to the preferred alternate or the entire length of the study area under MLS.  It will be easy to understand if we give average travel time and speed rather than % of lane miles. |
| 71 | Page 146-160 Section 7.4.4 and 7.4.4 | Similar to 2027, the locations noted in the comment above (page 93-144, Section 7.4.3) still in play and they had gotten worse due to increase of the traffic volume in the 2045. |
| 72 | Page 148 - 152 Section Table 7-13 | Please verify all numbers and shading for Speed and Density are *consistent* with data under Appendix H for 2045 No Build AM. |

00167687

| 73 | Page 156<br>Section Table 7-14 | Under I-270 Southbound GP Lanes, the last column and last row was incorrectly shaded, please correct it should have been red. |

| 73 | Page 156<br>Section Table 7-14 | Under I-270 Southbound GP Lanes, the last column and last row was incorrectly shaded, please correct it should have been red. |
|---|---|---|

| Spur Split through MD 187 Interchange | Basic | 59 | 59 | 60 | 59 | 17 | 16 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|
| | Diverge | 59 | 59 | 59 | 59 | 17 | 17 | 14 | 15 |
| | Basic | 59 | 59 | 37 | 47 | 18 | 17 | 35 | 21 |
| | Merge | 54 | 53 | 25 | 33 | 17 | 18 | 77 | 38 |
| | Basic | 58 | 54 | 24 | 29 | 20 | 23 | 93 | 52 |

| 74 | Page 157<br>Section Table 7-14 | Please verify the shading for Density under I-270 SB local lanes below. Please be consistent and/or consider clarifying why some segments with similar average densities are shaded differently (e.g. 24 pc/hr/ln are green and yellow, and 29 pc/hr/ln should be yellow). |
|---|---|---|

| Between I-370 & Shady Grove Road | Weave | 51 | 52 | 49 | 40 | 18 | 15 | 14 | 29 |
|---|---|---|---|---|---|---|---|---|---|
| | Diverge | 52 | 53 | 52 | 43 | 16 | 14 | 12 | 28 |

| Between MD 28 & MD 189 | Merge | 52 | 52 | 52 | 39 | 19 | 20 | 18 | 59 |
|---|---|---|---|---|---|---|---|---|---|
| | Basic | 53 | 53 | 53 | 38 | 19 | 20 | 18 | 62 |
| | Merge | 53 | 53 | 53 | 37 | 21 | 20 | 20 | 63 |
| | Basic | 52 | 52 | 52 | 38 | 25 | 24 | 24 | 65 |
| | Diverge | 53 | 52 | 52 | 37 | 25 | 25 | 24 | 63 |

| 75 | Page 158<br>Section 7.4.5 | The report references existing bottlenecks at locations outside of the study area causing congestion impacts to the traffic operations. At the onset of the congestion there could be significant speed differentials. What mitigation strategies are proposed for this project to combat the potential safety concerns related to this congestion? Document them in the report. |
|---|---|---|
| 76 | Page 158<br>Section 7.4.5 | States, "The following figures summarize density and speed with 2027 conditions:" is 2027 correct? |
| 77 | Page 165<br>Section Table 7-15 | Any particular reason, under **I-270 Southbound General Purpose Lanes,** the row 'Through MD 117 Interchange' was excluded. Previous tables and Appendix H include this interchange. |
| 78 | Page 181<br>Section Figure 7-41 | What mitigation strategies are being proposed and will be implemented to reduce congestion in the HOT lanes during PM rush hours? |
| 79 | Page 182<br>Section 7.4.5 | Please add a heading to this section '**Freeway Travel Time Analysis'.** |



I-495 & I-270 Managed Lanes Study

| 80 | Page 184 Section Figure 7-42 | Please use the same y axis scale among the four graphs to avoid confusion and ease of comparison. |
|---|---|---|
| 81 | Page 185 Section Figure 7-43 | Please use the same y axis scale among the four graphs to avoid confusion and ease of comparison. |
| 82 | Page 195 Section Table 7-17 | Please correct number (comma incorrectly placed) under Existing AM Total for the '**Between George Washington Memorial Parkway & Clara Barton Parkway**' |
| 83 | Page 195 - 198 Section Table 7-17 & Table 7-18 | Could you explain why in many cases existing (2017) throughput is more than 2045 no-build throughput?  In some cases, total preferred alternative throughput is less than existing throughput. |
| 84 | Page 204 | Existing throughput is more than 2045 preferred alternate throughput. Please explain. |
| 85 | Page 207 | Specify the ramps locations. |
| 86 | Page 207 Section 7.4.4 & Table 7-19 | Include specific description of on ramps and/or off ramps where queues spillback on to the Interstate main line or crossroad, add queue length (ft) and ensure sufficient storage is provided and mitigations are incorporated to reduce queue spillback.

What is currently in the report text discusses the system-wide improvement as percentages.  It is beneficial to identify any critical location where the improvements are significant (for example, the queue is shorter for locations A, B, C, which allow better traffic operation for the exit/entrance ramps).   Without context, it is difficult to relate the percentage of the queue spillback. |
| 87 | Page 208 | Need to identify the ramps where queue spillback onto the mainline and what mitigations are being proposed. |
| 88 | Page 209 Section | Instead of percentages, could we refer to number of locations?  Possibly list those locations that will be affected.

During the AM Period, queue spillback improved by 63%. During the PM Period, queue spillback improved by 36%. |
| 89 | Page 219 Section Figure 7-58 | Please ensure the number of intersections operating at LOS A through F with the Preferred Alternative for AM and PM is correct (it is not consistent with information in Table 7-23). |
| 90 | Page 222 Section 7 | Please add a Traffic Analysis Summary at the end of Section 7.  Also, please clarify the differences between the two tools used (Synchro and VISSIM) and explain the differences in the results. For example, Synchro analysis (runs 1-2 intersections by itself and makes assumptions that traffic is fed by the expressway but does not have a direct interaction like VISSIM model does.) VISSIM results are more realistic than Synchro as it connects arterial through the freeway. |
| 91 | Page 223 Section 8 | Please provide a brief define or explain the term crash frequency. It is used extensively throughout the IAPA document and especially in the Safety Analysis Section. All readers of this document may not be familiar with the term. |

 I-495 & I-270 Managed Lanes Study

| | Page 223 Section 8 | Identify the agency were historical crash data was obtained from. |
|---|---|---|
| 92 | | *The qualitative analysis methodology includes the following:*<br>1. *Collecting historical crash data (January 1, 2016 – December 31, 2018) and traffic volumes to compute crash rates for quarter-mile segments of the freeway mainline lanes and along the crossroads; comparing crash rates to the statewide average crash rates for other similar facilities.* |
| 93 | Page 223 Section 8 | Revise.<br><br>*The tools employed for the quantitative analysis include the following:*<br>2. *The Enhanced ~~Interstate~~ Intersection Safety Analysis Tool enhanced (ISATe) for the predictive crash analysis of interstate General Purpose (GP) and Collector-Distributor (C-D) segments, ramps, ramp terminals (ramp intersections with crossroad), and freeway crossroad segments.* |
| 94 | Page 225 Section 8.1 | The crash data used was from 1/1/2016 0 12/31/2018.  Are there more recent crash data available?  Typically, and per MD IAPA Guidance, crash data shouldn't be more than 3 years old. |
| 95 | Page 225 Section 8.1 | 4th bullet, the following should be summarized and shown based on the data collected.<br><br>*'Environmental factors such as lighting, weather, and pavement conditions did not significantly affect the overall safety performance of the freeway.'* |
| 96 | Page 225 Section Table 8-1 | Consider separating fatal crashes from injuries to differentiate from higher number if injuries, as in some areas the total fatal crashes were zero.  The total number of fatal crashes among the corridor was 9 vs 1484 total injuries. |
| 97 | Page 226 Section 8.1 | 1st paragraph, 2nd sentence, please clarify. Based on Figure 8-2, the next largest crash type for freeways is single vehicle with 26% and then sideswipe with 16%.<br><br>*'Half of the freeway crashes were rear-end, with the next largest crash type being sideswipe, inferring that heavy congestion contributes to the most significant crash patterns along these roadways.'* |
| 98 | Page 228 Section 8.1 | 1st paragraph, 3rd sentence, has MDOT SHA examined the possible factors contributing to the high number of crashes at this ramp? What type of collisions are the most frequent along this ramp? *'The ramps within the I-270 at I-370 interchange experienced the most crashes…'* |
| 99 | Page 228 Section 8.1 | Last sentence, please revise since Table 2-3 does not details the geometric conditions of each interchange, *'Please see **Table 2-3** for the proposed access ~~and geometric conditions~~ of each interchanges under the Preferred Alternative.'* |



| 100 | Page 230<br>Section 8.1 | Has MDOT SHA assessed why MD 187 at Tuckerman Lane and MD 355 at Grosvenor Lane are intersections with high severity index crashes? |
|---|---|---|
| 101 | Page 232<br>Section 8.2.1 | Please indicate what section is referred to below and use a different color text to indicate freeway segments with average crash rates not greater than 2x the statewide average.<br><br>*'Bolded referenced interchanges indicate freeway segments that are identified as an MDOT CSIL; See section 9.2.1. Gray and italicized text indicate freeway segments with average crash rates that are not greater than two times the statewide average for similar facilities for respective crash rate type.'* |
| 102 | Page 233<br>Section 8.2.3 | Where can we find additional information on the crash cluster analysis for ramps and crossroads. Did MDOT SHA created a diagram or a list showing all locations? |
| 103 | Page 234<br>Section 8.2.4 | Where is the supporting information that arrived at this conclusion? So far in the text, there is no correlation between high crash locations and congestion-related crashes.<br><br>By addressing congestion, the Preferred Alternative reduces the potential for congestion-related crashes, including rear-end crashes. |
| 104 | Page 235<br>Section Figure 8-6 | What was the process of selecting the 7 adjacent intersections and ramp terminals along crossroads with high crash frequencies included in Figure 8-6? Based on Figure 8-5 the top 7 higher crash intersections were the following:<br>1. MD 187 at Tuckerman Lane – included<br>2. MD 355 at Grosvenor Lane – not included<br>3. Shady Grove Road at I-270 NB ramps – included<br>4. MD 187 at I-495 Outer Loop Ramps – not included<br>5. Wootton Parkway at Tower Oaks Blvd – included<br>6. Sam Eig Highway at MD 119 – included<br>7. MD 189 at Wootton Parkway – not included<br><br>Why MDOT SHA excluded the ones in red above? |
| 105 | Page 237<br>Section Table 8-6 | Location E, what other improvements/mitigations MDOT SHA has considered and will implement besides the removal of the C-D lanes? Since, even if the C-D lanes are removed, the short weaving sections between loop ramps will remain. |
| 106 | Page 237<br>Section Table 8-6 | Location F, is MDOT SHA considering a specific pavement treatment to improve surface friction and skid resistance? Or any other strategy to reduce lane departure crashes? |


OP·LANES™
MARYLAND
I-495 & I-270 Managed Lanes Study

| | Page 238<br>Section Table 8-6 | Location I, I-495 at MD 187 interchange. The statement below should refer to I-495 instead of I-270.  Also, what improvements MDOT SHA will implement at this location to mitigate for the increase in traffic along this segment which may increase the crash frequency? |
| 107 | | *'Additionally, the Preferred Alternative mainline ADT along* I-270 East Spur westbound *is eight percent more than the No Build alternative. The increase in exposure may increase the crash frequency'.* |
| | Page 239<br>Section Table 8-6 | Location K, I-495 at MD 190/Cabin John Parkway interchange. What improvements MDOT SHA will implement at this location to mitigate for the increase number of merges and diverges that may increase the crash frequency in the area? |
| 108 | | *'The Preferred Alternative includes direct access ramps and exchange ramps for the HOT lanes at this interchange which will increase the number of merges and diverges including a left-hand merge from Cabin John Parkway along the inner loop.'* |
| | Page 240<br>Section Table 8-6 | Location 2, I-270 SB exit ramp to Omega Drive (Shady Grove Road Interchange), please add under *'Geometric Features & Potential Contributing Factors'* that this ramp has an unusual access point (contrary to driver's expectations).  *'The Preferred Alternative widens this ramp using a larger horizontal curvature and constructs a longer deceleration and storage lane for the I-270 southbound to Omega Drive movement.'* It will be helpful to show |
| 109 | | where this is occurring. |
| | Page 240<br>Section Table 8-6 | Location 3, I-270 NB exit ramp to Redland Boulevard (Shady Grove Road Interchange), the statement below should refer to I-270 NB exit ramp to Redland Blvd instead of *I-270 southbound to Omega Drive*. In addition, please add under *'Geometric Features & Potential Contributing Factors'* that this ramp has an unusual access point (contrary to driver's expectations). *'The Preferred Alternative converts the existing single-lane exit to a double-lane exit with a larger horizontal curvature and constructing a longer deceleration and storage lane for the* I-270 southbound to |
| 110 | | Omega Drive *movement.' Also, i*t will be helpful to show where this is occurring. |
| | Page 240<br>Section Table 8-6 | Table 8-6 includes multiple high-crash locations were the predominant crashes involved wet pavement conditions conflicting with a statement introduced at the beginning of Section 8.1 (page 225). Clarify. |
| 111 | | Environmental factors such as lighting, weather, and pavement conditions did not significantly affect the overall safety performance of the freeway. |
| | Page 241<br>Section 8.2.4 | In Table 8-6 all the locations that have a high number of wet pavement crashes have poor surface friction, tight horizontal and reverse curves as potential contributing factors. The preferred alternative includes resurfacing which will improve roadway surface friction, resurfacing with a High Friction Surface Treatment at locations with poor surface friction, tight horizontal and reverse curves will provide a better Crash Modification Factor and reduce more |
| 112 | | crashes. |



OP·LANES™  I-495 & I-270 Managed Lanes Study
MARYLAND

| | | |
|---|---|---|
| 113 | Page 244<br>Section 8.3 | It is beneficial to include brief background information on crash modification factors (CMFs), like why it is selected as a tool to quantify the safety benefit or what is considered high-quality CMF, as not all reader of this document is familiar with it.<br><br>The project will install new signals on crossroads/ramp terminus, shouldn't be CMF related to the new signal installation? |
| 114 | Page 245 & 246<br>Section 8.3 | This section does not identify any crash modification factors for ramps. The text states that they are listed in table 8-7, but none are there, and they are not described in this section. Also, table 8-6 identifies freeway and crossroads only. |
| 115 | Page 249<br>Section Table 8-8 | Add another Table to compare 2045 predicted annual crash data with existing annual crash data. |
| 116 | Page 249<br>Section Table 8-8 | Recommend adding to Table 8-8 the predicted crash frequency results by overall freeway segments, ramps, and adjacent intersections along the crossroads to accurately represent the 2045 predicted annual crash frequency results. What is currently displayed in Table 8-8 is misleading. |
| 117 | Page 250<br>Section 8.4 | In Section 8.4, Predicted Crash Results, table 8-8 provides the overall 2045 predicted annual crash frequency results for I-270, east and west spurs and I-495 in Maryland and Virginia. This section states that a detailed breakdown of predicted crash frequency is provided in appendix K. I attempted to find the detailed predicted crash frequencies between the 2045 Build and the 2045 No Build scenario for the freeway segments, ramps and adjacent intersections both spurs of I-270 and I-495 in MD and VA. Appendix K is more than 500 pages long without page numbers or headers to identify where this information is located.<br><br>Rather than having to find this data in the appendix K a table should be created for each heading (Freeway Segments, Ramps and Adjacent Intersections) for Sections 8.4.3, 8.4.4, 8.4.5 and 8.4.6. Each of these headings state the increases and decreases in fatal and injury crash frequency and it would aid the review if the detailed breakdowns were in the document. |
| 118 | Page 252<br>Section 8.4.6 | Under I-495 in VA Freeway Segments, please make sure there is consistency with the representation of results between the MLS and the I-495 NEXT project between page 252 and Table 8-6, page 239 Location L. |

 I-495 & I-270 Managed Lanes Study

| | | |
|---|---|---|
| 119 | Page 253<br>Section 8.5 | Please ensure mitigation strategies for this higher risk locations are discussed in detail and highlighted in this section.<br><br>*'The Preferred Alternative will reduce congestion, replace aging structures, provide new pavement, and include improved geometrics that will address existing deficiencies, which would all be expected to improve safety. Conversely, the project will include narrow shoulders along the HOT lanes, provide tighter than desired cross sections in some areas to avoid impacts to critical resources, and introduce new signalized intersections, which are elements that could increase crash potential.'* |
| 120 | Page 254<br>Section 8.5 | This report must include a narrative summarizing the findings and supporting a conclusion that the proposed action does not have a significant adverse safety and operational impact on the Interstate facility or the local street network. |
| 121 | Page General<br>Section Appendix F | George Washington Memorial Parking" should have a green background. |
| 122 | Page SN-2<br>Section Appendix F | "ALL TRUCKS" message on the I-495 SB sign can be confusing as there is a "NO TRUCK" message on the same panel. Consider removing the "ALL TRUCKS" message.<br><br>The message from GWMP ramp to I-495 SB Express lane has the message of "TWO AXLE VEHICLES TOWING TRAILERS PROHIBITED" can be confusing and too long for driver to comprehend. Considered using simpler message, such as 2 axel vehicles only. |
| 123 | Page SN-4<br>Section Appendix F | The report references existing bottlenecks at locations outside of the study area causing congestion impacts to the traffic operations.  At the onset of the congestion there could be significant speed differentials.  What mitigation strategies are proposed for this project to combat the potential safety concerns related to this congestion?  Document them in the report. |
| 124 | Page SN-12<br>Section Appendix F | DDI Falls Road, the design of the ramp terminals encourages higher speeds which would impact pedestrians.  What considerations have been proposed and will be implemented as part of this project to mitigate the impact to pedestrians at the ramp terminal pedestrian crossings? |
| 125 | Appendix G | MDOT SHA did not follow the 2019 TAT VOL III guide but the 2004 methodology. Please correct this information embedded in Appendix G VISSIM calibration document. |
| 126 | Page 7-10<br>Section Appendix H | A merge row may be missing under 'Btw I-270 East Spur & MD 185 as compared with Table 7-4. |
| 127 | Page 23-26<br>Section Appendix H | A merge row may be missing under 'Btw I-270 East Spur & MD 185 as compared with Table 7-5. |

00167694

| | Page 31-34, 119-134, 151-154 & 163-166 | For consistency purposes, please make sure numbers in the table are rounded |
|---|---|---|
| 128 | Section Appendix H | |
| 129 | Page 72-78 Section Appendix H | Please identify the measured segment for each table (e.g. I-495 Outer Loop or I-270 Southbound) |
| 130 | Page 7 & 8 Section Appendix J | The Appendix J should have a legend or tables in Appendix should have their own legends that describe what the shaded cells represent. |
| 131 | Page 8 Section Appendix J | This table in Appendix J has an error for the number of Fatal crashes where it lists 600%. This may be a typo that needs to be addressed. |
| 132 | Page 8 Section Appendix J | I do not understand the data that this table is providing (**Preferred Alternative Crash Patterns Summary**). The column tables do not describe the data that is presented. Most of the grouped percentages do not sum to 100%. |

00167695

MAF:RCW
54644

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,        :
      Petitioner

                       :     CIVIL NO. **10676**

      vs                   :

CERTAIN PARCELS OF LAND IN      :
MONTGOMERY COUNTY, STATE OF
MARYLAND, AND C.L. HILL, ET    :
AL.,
       Defendants       :

                        :

                ..oOo...

COMPLAINT

    1.  This is an action of a civil nature brought by the
United States of America at the request of Harland Bartholomew,
Chairman of the National Capital Planning Commission, for the
taking of property under power of eminent domain and for the as-
certainment and award of just compensation to the owners and par-
ties in interest.

    2.  The authority for the taking is the Act of Congress
approved August 1, 1888, (25 Stat. 357; 40 U.S.C. 257), the Act
of February 26, 1931, (46 Stat. 1421; 40 U.S.C. 258a), and the
Act of May 29, 1930, (46 Stat. 482) as amended, which Act authorized
and directed the acquisition of land for the George Washington Memorial
Parkway, and Acts supplementary thereto and amendatory thereof.

    3.  The use for which the property is to be taken is in connection
with the George Washington Memorial Parkway as a part of the park and
parkway system in the environs of Washington.

    4.  The estate taken for said public use is the full fee simple
title absolute, subject only to the exceptions specified in Schedule "A"
attached hereto.

# FILED

**JUN 24 1958**

U. S. DISTRICT COURT
DISTRICT OF MARYLAND
WILFRED W. BUTSCHKY,
CLERK

5. The property to be taken is described in Schedules "A" and "B" attached hereto.

6. The persons having or claiming an interest in the property as are now known are as follows:

### Tract 1 - Parcel A

Jacob Mehlman ✓
3900 16th Street, N.W.
Washington, D.C.

Max Spar ✓
1515 Ogden Street, N.W.
Washington, D.C.

### Tract 1 - Parcel B

Clarence L. Hill and
Rose Hill ✓
MacArthur Blvd.
near Potomac, Maryland

### Tract 1 - Parcel C

Sara F. Bodine and
Charles F. Bodine ✓
Conduit Road
near Potomac, Maryland

### Tract 1 - Parcel D

George B. Fiske ✓
c/o Arlington Trust Co.
404 Arlington Trust Bldg.
Arlington, Virginia

### Tract 1 - Parcel E

Isabella M. Leizear ✓
RFD #3
Bethesda, Maryland

### Tract 1 - Parcel F

Thomas G. Hill ✓
c/o H.W. Wheatley, Jr., Esq.
1010 Vermont Avenue, N.W.
Washington, D.C.

### Tract 2 - Parcels A,B,C

Emma W. Eberhardt ✓
Bernardsville, New Jersey

### Tract 4

Malcolm S. McConihe, Jr. ✓
Cove Road, Oyster Bay
Long Island, New York

Tract 5

Colonel H. Grady Gore ✓
Marwood
Potomac, Maryland

Tract 6 - Parcels A,B,C

Donal L. Chamberlin ✓
50 Kennedy Drive, Kenwood
Chevy Chase, Maryland

Tract 7 - Parcels A & B

Washington Biologists Field Club ✓
c/o Lloyd W. Swift
323 N. Oxford Street
Arlington, Virginia

Tract 8

George S. Gandy, Jr. ✓
2700 Driftwood Road
St. Petersburg, Florida

7.  The State of Maryland and Montgomery County may have or claim an interest in the property by reason of taxes and assessments due and exigible.

8.  In addition to the persons named, there are or may be others who have or may claim some interest in the property to be taken whose names are unknown to the Plaintiff and such persons are made parties to the action under the designation "Unknown Owners".

WHEREFORE, the Plaintiff demands judgment that the property be condemned and that just compensation for the taking be ascertained and awarded and for such other relief as may be lawful and proper.

_Leon H. A. Pierson_
Leon H. A. Pierson
United States Attorney

_Martin A. Ferris_
Martin A. Ferris
Assistant United States Attorney

Trial by jury of the issue of just compensation is demanded by the Plaintiff.

_Leon H. A. Pierson_
United States Attorney

_Martin A. Ferris_
Assistant United States Attorney

Schedule "B"

Tract I

Parcel A

7B



WASHINGTON                                    AQUEDUCT

STONE WAU 31        STONE WAU 30        S 68-53-30 E        STONE WAU 28
S 69-46-00 E                              225.76'
180.51'              100.00'        N 19-36-50 E
S 20-25-40 W    S 71-26-00 E          23.98'        STONE WAU 29
12.00'        STONE WAN 108    STONE WAN 107

JAMES R. ELLIS
AREA TO BE ACQUIRED
153,154 SQ. FT. = 3.515932 AC.
NOW
JACOB MEHLMART AND MAX SPAR

N 21-52-50 E                                              S 26-08-20 W    284.00'
350.72'                                                    16.43'

U.S. STONE 6-11

433.17'
N 77-06-20 W

66.00'        U.S. STONE 7-8
S 88-51-50 W                    C. & O.  CANAL        "U.S."

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY
NOW JACOB MEHLMART and MAX SPAR
JAMES R. ELLIS, PROPERTY SURVEY
MONTGOMERY CO., MARYLAND
SURVEY BY J.M. DAVIS, CIVIL ENGINEER
COMPUTED BY A.F. DARDIS, DRAWN BY H.G. WEEDEN
MARCH 1941

SCALE  I IN. = 100 FT.

FILE Nº 105.313-529    NCP-1147-112

00169480

7 C 1

Tract 1
Parcel B

N

WASHINGTON AQUEDUCT
U.S.

N88°59'44"E
325.77

C.L. HILL
AREA TO BE ACQUIRED
78,891 SQ.FT. = 1.81109 AC.

N21°52'50"E
300.00

S21°57'50"W
250.00

S75°04'50"W
190.00

S88°51'50"W
160.77

66.00

U.S. MON. 7-8

U.S. MON. 7-7

U.S. MON. 7-6

C. & O. CANAL
U.S.

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY

C.L. HILL PROPERTY SURVEY

MONTGOMERY CO., MARYLAND
SURVEY BY E.P. FITTS, CIVIL ENGINEER
COMPUTED AND DRAWN BY E. O'BRIEN
SEPTEMBER 1943

SCALE 1 IN. 200 FT.

FILE Nº 105.313-538   NCP #7.2-256

00169481

Tract 1

Parcel C

7D1



WASHINGTON AQUEDUCT U.S.

N 47°07'30"W 2125

N 26°51'30"E 100.16

S 80°59'15"E    609.92

N 51°37'30"W 275.05

S 21°52'50"W 300.00

SARAH F. and
C. F. BODINE
AREA TO BE ACQUIRED
203,763 SQ. FT. = 4.67750 AC.

U.S.MON. 7-5

N 44°37'20"W 156.39

S 70°08'50"W 291.05

U.S.MON. 7-6

U.S.MON. 7-4

N 86°50'10"W 63.79

C. & O. CANAL U.S.

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY

C.F. BODINE PROPERTY SURVEY
(NOW C.F. BODINE & SARAH F. BODINE)
MONTGOMERY CO., MARYLAND
SURVEY BY E.P. FITTS, CIVIL ENGINEER
COMPUTED AND DRAWN BY E. O'BRIEN
SEPTEMBER 1943

SCALE 1 IN. = 200 FT.

FILE No. 105.313-539    NCP-117275

00169482

*Tract 1    8C1*

*Parcel D*

WASHINGTON AQUEDUCT
U.S.

STONE
W.A.U. 41

N 47°07'30" W

1179.22

CHAS. CUMMINGS

FRED B. HILL

S 72°44'40" E
70.04

N 2°14'20" E
67.14

N 47°07'36" W
78.39

S 2°65'36" W
100.16

C.F. BODINE

NOW GEO. B. FISKE
J.J. PICKETTS
AREA TO BE ACQUIRED
6,044 SQ FT. = 0.13875 AC.

N

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY

J.J. PICKETTS PROPERTY SURVEY
NOW GEO. B. FISKE
MONTGOMERY CO., MARYLAND
SURVEY BY E.P. FITTS, CIVIL ENGINEER
COMPUTED AND DRAWN BY E. O'BRIEN
SEPTEMBER 1943

SCALE 1 IN.=100 FT.

FILE Nº 105.313-540    NCP H72-267

00169483



8 DI

Tract 1

Parcel E

WASHINGTON AQUEDUCT
U.S.

STONE
W.A.U. 41

N.27°07'30"W. 1028.22

NOW MRS. ISABELLA M. LIZEAR

CHAS. CUMMINGS
AREA TO BE ACQUIRED
4,949 SQ FT. = 0.11361 AC.

S72°44'40"E
152.61

N.27°07'30"W.
150.00

67.14

S72°44'40"W

N

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY
NOW MRS. ISABELLA M. LIZEAR
CHAS. CUMMINGS PROPERTY SURVEY

MONTGOMERY CO., MARYLAND
SURVEY BY E.P. FITTS, CIVIL ENGINEER
COMPUTED AND DRAWN BY E. O'BRIEN
SEPTEMBER 1943

SCALE 1 IN. = 100 FT.

FILE № 105.313-541

00169484



NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY

FRED B. HILL PROPERTY SURVEY

MONTGOMERY CO., MARYLAND
SURVEYED BY J.M.DAVIS, CIVIL ENGINEER
COMPUTED BY A.R.GIERASCH, DRAWN BY H.G.WEEDEN
AUGUST 1941

FILE Nº 105.303-532

Tract 1
Parcel F

FRED B. HILL
AREA TO BE ACQUIRED
724,228 SQ. FT. = 16.62359 87 A.C.

SCALE 1 IN. = 200 FT.

00169485



NATIONAL CAPITAL PARK & PLANNING COMM.
GEORGE WASHINGTON MEMORIAL PARKWAY

EMMA EBERHART, PROPERTY
MONTGOMERY CO. MD.
SURVEY BY E.R.FITTS, CIVIL ENGINEER
COMPUTATION AND DRAWING BY A.F.DARDIS.
DEC. 1940.

FILE NO. 105.39-522

6A

Tract 2

Parcel A

GEORGE WASHINGTON MEMORIAL PARKWAY "U.S."

C. & O. CANAL "U.S."

POTOMAC RIVER

EMMA EBERHART
DEED AREA TO BE ACQUIRED
1,647,626 SQ. FT. = 37.82429 AC.

EMMA EBERHART
AREA TO BE QUIT-CLAIMED
350,023 SQ. FT. = 8.03542 AC.

U.S.
BY 1939 SHORE LINE

S34-25-10W
366.40

S71-34-50E
350.00

S37-34-50E
1356.00

S35-25-10W
435.00

S31-11-30W
66.00

S51-27-00E
323.00

S61-27-00E
322.00

1" IN. = 200 FT.

00169486



Tract 3

WASHINGTON AQUEDUCT

STONE WAN 98

S 81-30-30 E
47.07'

S 82-46-10 E
65.75'

N 1-26-20 E
343.27'

MT. GLORY BAPTIST CHURCH, Owner
AREA TO BE ACQUIRED
42,319 SQ.FT. = 0.97151 AC.

S 86.38'
S 1-26-20 W

128.97'
N 62-50-30 W

C. & O. CANAL "U.S."

U.S. STONE 6-20

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY
PROPERTY SURVEY
MT. GLORY BAPTIST CEMETARY
MONTGOMERY CO. MARYLAND
SURVEYED BY D.S. KELLEY, CIVIL ENGINEER
COMPUTED BY G.W. KEFFER   DRAWN BY H.G. WEEDEN
NOVEMBER 1941

SCALE 1 IN. = 100 FT.

FILE Nº 105. 313-527

00169487



Tract 4    10 L-2

GEO. WASH.
MEM. PKWY.

GEORGE WASHINGTON
MEMORIAL PARKWAY

G. H. COLKET
PROPERTY

N 9° 22' 21" E
198.00

S 20° 44' 40" E
217.72

N 20° 44' 40" W
128.52

16.35'
S 58° 46' 50" W

151.80'
N 43° 13' 10" W
N 30° 2'...

C & O

STONE
WA 2

DEED OVERLAPS

S 28° 19' 40" E  G 34° 68'

163.0
N 28° 19' 40" W

N 38° 13' 10" W
215.74

N 34° 13' 10" W
440.39

N 34° 13' 10" W
425.70   C & O CANAL (US)

WASHINGTON

AQUEDUCT

STONE
WA 3

213.39

MALCOLM S. McCONIHE, JR.
AREA TO BE ACQUIRED
180,487.63 SQ. FT. =
4.1434258 AC.

S 34° 18' 20" E
208.67

152.74'
S 55° 21' 40" E

45.27'
N 28° 13' 10" W

W. S. NICHOLSON
PROPERTY

STONE
WA 4

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY

M. S. McCONIHE, JR. PROP SURVEY
MONTGOMERY CO., MARYLAND
SURVEY BY E. P. FITTS, CIVIL ENGINEER
COMPUTATION AND DRAWING BY H. G. WEEDEN
NOVEMBER 1946

SCALE: 1 IN. = 200 FT.

FILE N° 105.314543

00169488



14 E

*Tract 5*

1" - 542.08'

S.40°42'40"E
130.00'

S.70°11'58"W    600.60'

*Fence along north side of county road*

*Traveled way*

*Stream*

N72°32'50"E

578.70'

GEORGE WASHINGTON
MEMORIAL PARKWAY
"U. S."

COL. H. GRADY GORE

AREA TO BE ACQUIRED
78,102.28 SQ. FT. =
1.792982 ACRES
INCLUDING COUNTY ROAD

STONE
S.K.M.4

147.00'
N28°57'55"W

MRS. J. ARMISTEAD LEWIS
& GEORGE BOYD

*Fence not on property line*

N28°57'55"W    405.15'

C. & O. CANAL    "U. S."

N1°43'30"W
168.87'

STONE MARKED "O"
U.S. MON. 14-A1

NATIONAL CAPITAL PARK & PLANNING COMMISSION
GEORGE WASHINGTON MEMORIAL PARKWAY

COL. H. GRADY GORE, PROPERTY SURVEY

MONTGOMERY CO., MARYLAND
SURVEYED, COMPUTED & DRAWN BY H.G.WEEDEN
SCALE: 1" = 100'        JULY 1947

SUPERCEDES Nº 105.314-536        FILE Nº 105,314-544

00169489

Tract 6 Parcel A

3E

NATIONAL CAPITAL PARK & PLANNING COMM
GEORGE WASHINGTON MEMORIAL PARKWAY.

WM. E. SWAINSON, PROP. SURVEY.
MONTGOMERY CO. MD.

SURVEY BY D. S. KELLEY, CIVIL ENGINEER.
COMPUTATION AND DRAWING BY A. F. DARDIS.

JAN. 1941.

FILE Nº 105.312.523

C. & O. CANAL "U.S."

WM. E. SWAINSON
AREA TO BE ACQUIRED
245,641 SQ. FT. = 5.6391/4 AC.

WM. E. SWAINSON
AREA TO BE QUIT-CLAIMED
29,364 SQ. FT. = 0.6741 AC.

1939 SHORE LINE

RIVER

POTOMAC

N

SCALE 1 IN. = 200 FT.

00169490



AREA TO BE ACQUIRED
2.18 ACRES ±

BEGINNING

WADE ISLAND

POTOMAC RIVER

S 44°30' W
33.30

S 84°22' W
112.72

S 79°44' E
191.25

S 85°35' E
143.00

S 89°53' W
207.20

N 88°58' W
143.35

S 71°40' E
225.55

N 84°56' W
91.00

N 76°39' W
78.40

N 67°37' W
74.60

S 88°14' E
133.00

S 86°00' E
233.00

S 86°00' E
109.00

N 84°21' E
134.00

N 81°04' W
152.60

S 84°29' W
79.50

N 48°32' E
71.50

S 75°00' W
102.65

N 21°55' W
73.65

DESCRIPTION AND AREA TAKEN
FROM THE LAND RECORDS OF
MONTGOMERY COUNTY, MARYLAND
IN LIBER PBR 262 FOLIO 186

| GEORGE WASHINGTON MEMORIAL PARKWAY, SECTION 2 MONTGOMERY COUNTY, MARYLAND | PREPARED FOR NATIONAL CAPITAL PLANNING COMMISSION |
|---|---|
| DEED PLOTTING OF WADE ISLAND | U.S. DEPARTMENT OF THE INTERIOR NATIONAL PARK SERVICE NATIONAL CAPITAL PARKS |

SURVEYED BY

DRAWN BY PELLICANO

CHECKED BY W.O. REID

CHIEF SURVEY SECTION Henry G. Werden 7-9-57
DATE

CHIEF, ENG'R BRANCH Robert C. Horne 7/8
DATE

SCALE 1=200'

DRAWING NUMBER
NCP 117.2-226

N.C.P. COMM. 105.312-543

00169491



*Tract 8 Parcel C*

DESCRIPTION AND AREA TAKEN
FROM THE LAND RECORDS OF
MONTGOMERY COUNTY, MARYLAND
IN LIBER PBR262 FOLIO 185

| | |
|---|---|
| GEORGE WASHINGTON MEMORIAL PARKWAY, SECTION 2<br>MONTGOMERY COUNTY, MARYLAND | PREPARED FOR<br>NATIONAL CAPITAL PLANNING COMMISSION |
| DEED PLOTTING OF<br>SWAINSONS ISLAND | U.S. DEPARTMENT OF THE INTERIOR<br>NATIONAL PARK SERVICE<br>NATIONAL CAPITAL PARKS |

SURVEYED BY
DRAWN BY S. DAVIS
CHECKED BY W.O. REID

CHIEF SURVEY SECTION *Henry G. Weeden* 7-9-57 DATE
CHIEF, ENG'R BRANCH *Robert C. Horne* 7/8 DATE

SCALE 1"=100'

DRAWING NUMBER
NCP 117.2-222

N.C.P. COMM. 105.312-540

00169492



Tract 7
Parcel "A"

NATIONAL CAPITAL PARK & PLANNING COMM.
GEORGE WASHINGTON MEMORIAL PARKWAY.
WASHINGTON BIOLOGISTS FIELD CLUB
PROPERTY SURVEY
MONTGOMERY CO. MD.
SURVEY BY H.C. WALDO, CIVIL ENGINEER.
COMPUTATION AND DRAWING BY A.F. DARDIS.
JAN. 1941.

FILE NO. 105-313-534

C. & O. CANAL "U.S."

WASHINGTON BIOLOGIST FIELD CLUB
AREA TO BE ACQUIRED
1,794,100 SQ. FT. = 41.186804 ACRES.

POTOMAC RIVER

N

Schedule "C"

| Tract and Parcel | Owner | Estimated Compensation |
|---|---|---|
| 1 – A | Jacob Mehlman – 3900 16th Street, N.W., Washington, D. C. Max Spar – 1515 Ogden Street, N.W. Washington, D. C. | $2,500.00 |
| 1 – B | Clarence L. and Rose Hill – MacArthur Blvd. near Potomac, Maryland | 2,000.00 |
| 1 – C | Sara F. & Charles F. Bodine – Conduit Road, near Potomac, Maryland | 4,000.00 |
| 1 – D | George B. Fiske – c/o Arlington Trust Co. 404 Arlington Trust Bldg., Arlington, Va. | 200.00 |
| 1 – E | Isabella M. Leizear – RFD #3, Bethesda, Maryland | 150.00 |
| 1 – F | Thomas G. Hill – c/o Atty. H. W. Wheatley, Jr. 1010 Vermont Ave., NW, Washington, D.C. | 4,000.00 |
| 2–A,B,C | Emma W. Eberhardt – Bernardsville, New Jersey | 20,000.00 |
| 3 | Mt. Glory Baptist Cemetery – c/o Rev. Geo. A. Windear 5716 Addison Road Washington 27, D.C. | 5,000.00 |
| 4 | Malcolm S. McConihe, Jr. – Cove Road, Oyster Bay Long Island, New York | 828.69 |
| 5 | Col. H. Grady Gore – Marwood, Potomac, Maryland | 1,850.00 |
| 6–A,B,C | Donal L. Chamberlin – 50 Kennedy Drive, Kenwood Chevy Chase, Maryland | 2,000.00 |
| 7–A, B | Washington Biologists Field Club – c/o Lloyd W. Swift, 323 N. Oxford Street, Arlington, Virginia | 25,000.00 |
| 8 | George S. Gandy, Jr. – 2700 Driftwood Road St. Petersburg, Florida | 35,000.00 |

34938

00169494



00169495



00169496



00169497



**FRIENDS OF MOSES HALL**
**MORNINGSTAR TABERNACLE NUMBER 88**
**ANCIENT UNITED ORDER OF SONS AND DAUGHTERS, BROTHERS AND SISTERS OF MOSES**
**7550 Seven Locks Road**
**Cabin John, MD 20818**
**morningstarmosescj@gmail.com**
**https://www.friendsofmoseshall.org/**

May 2, 2022

By Email to: sarcher@mdot.maryland.gov

Mr. Steve Archer
Cultural Resources Team Leader
Maryland Department of Transportation
State Highway Administration
Environmental Planning Division
707 North Calvert Street
Baltimore, MD 21202

Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft - Archaeological Treatment Plan (Attachment 5) and Cultural Resources Treatment Plan (Attachment 4)

Dear Mr. Archer:

Thank you for the opportunity to review the additional Section 106 materials released on March 31, 2022. Our comments below are intended to supplement our comments that we submitted on April 14, 2022, but will specifically focus on the Cultural Resources Treatment Plan ("Cemetery Treatment Plan" - Attachment 4) and the Archaeological Treatment Plan (Attachment 5). Our comments to these documents are limited to their pertinence to Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M: 35-212 - hereafter "Morningstar Moses").

To put our comments and concerns into visual perspective, we have included a graphic map (*See Attachment 1*) based on the Report of Geophysical Survey (GPR) conducted July, 2021 by esteemed archaeologist Dr. Tim Horsley. As previously stated, Dr. Horsley's GPR survey covered only a portion of the Morningstar Moses property and a limited area of the state's I-495 Right-of-Way. Dr. Horsley's Report Summary stated that the total of 377 probable and possible burials "is likely lower than the actual total number of graves present." Dr. Horsley went on to state:

> "Importantly, these results reveal that subsurface anomalies interpreted as graves continue into the Maryland Department of Transportation State Highway Administration Right-of-Way (MDOT SHA ROW) to the north of the enclosed cemetery. While the exact number is difficult to define from these data, some 14 probable unmarked burials are indicated in this area. As many as 34 burials are suggested in total; however, most of the anomalies suggesting these likely have alternative, natural explanations."

The area of the MDOT SHA ROW where graves are indicated has already been subjected to significant ground

00173462

disturbance from construction and earth-moving when I-495 was originally constructed and again when the highway was widened in the 1990s. Additionally, decades of stormwater runoff, as well as highway use and maintenance, have further impacted burials.

It is therefore reasonable to conclude that human remains have been disturbed and dislocated, and that it is likely that human remains **will** be discovered within the LOD area adjacent to Morningstar Moses. Any treatment plan and mitigation commitment must require the reinterment of human remains on the Morningstar Moses site. Prior to any such reinterment, a thorough archaeological survey of the Morningstar Moses property would be required to identify locations for reinterment. We emphasize that Order of Moses Tabernacle No. 88 members paid to bury their family members at Morningstar Moses and it is vital that this community of dead remain together.

We restate our rejection of SHA's convenient definition of the boundary of the cemetery. SHA is, in fact, now basing the cemetery boundary on a 1957 aerial map that was shared in consulting party meetings. The 1957 aerial was used as a graphic underlay during a Consulting Party meeting with SHA on January 4, 2022, for the depiction of grave shafts revealed in the limited area where GPR was conducted. We reject SHA's assumptions and interpretation of the 1957 aerial as sufficient to evaluate the extent of the boundaries of the Morningstar Moses Cemetery. Historical research and the absence of burial records for most of the 377 GPR-indicated probable and possible graves in the limited survey areas point to the distinct possibility that the cemetery is older and larger than originally thought. The historical evidence suggests that this could be a Reconstruction-era cemetery. Most graves were marked by stones and not inscribed markers, and it is likely that landowners and descendants present in 1957 would not have been able to identify the specific boundaries of the cemetery.

## Archaeological and Cultural Monitoring

We reiterate our previous requirement that the monitoring of ground-disturbing and archaeological activities at the Morningstar Moses site, including areas of the adjacent LOD, must be carried out by an appropriate, qualified professional. Morningstar Moses' cultural and historic importance requires that a professional supervising ground-disturbing and archaeological investigations at the site have extensive experience in African American cemetery archaeology. The Archaeological and Cemetery Treatment Plans should include the following provision:

> The archaeological studies of Morningstar Moses cemetery required under the terms of the PA shall be carried out by a cultural resources management (CRM) firm with extensive experience in African American archaeology, community archaeology, and oral history selected by The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated (MT88) and Friends of Moses Hall (FMH), and under the direct supervision of a qualified professional approved by MT88 and FMH. The cultural monitor approved by MT88 and FMH is required to be on site at the Morningstar Moses project location at all times to monitor archaeological project activity. MDOT SHA shall cover the cost of the archaeologist and cultural monitor.

Archaeological Treatment Plan

The Morningstar Moses site is NRHP eligible under Criteria A and C, but the Maryland Historical Trust (MHT) has recommended that this site also be considered eligible under Criterion D. As previously stated, we concur with MHT that this site be deemed eligible under Criteria A, C and D. Accordingly, the Archaeological Treatment Plan should be updated to include the Morningstar Moses site.

The Cemetery Treatment Plan limits archaeological investigations to the presence of human remains and funerary objects, and does not consider that there is a potential for significant archaeological remains at the edge of the LOD and the northern cemetery boundary, including areas of the cemetery within the existing I-495 Right-of-Way, and along the access footpath that have not been subject to archaeological investigations.

00173463

Additionally, the Morningstar Moses site holds the only remaining extant foundation of a once thriving Order of Moses Hall building in Montgomery County. The close proximity of the Hall to the LOD and the history of significant past disturbance of the Morningstar Moses site from the original I-495 construction and subsequent widening — and highway traffic impacts in general — further supports that the site should be included in the Archaeological Treatment Plan.

Turning our attention to the Archaeological Treatment Plan document, we have the following preliminary comments, but reserve the right to review and comment further on this document once the Morningstar Moses site is included.

## Human Remains Protocols During Archaeological Investigations (Appendix 1)

We take issue with the following language:

> "Within Maryland, pursuant to State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains until determined to be archaeological."

It is our understanding of the statute that unless the removal is temporary, the authorization of the State's Attorney is required for the removal of any remains for any reason, regardless of whether they are considered archaeological or for any other consideration. The section also requires publication of "a notice of the proposed relocation in a newspaper of general circulation in the county where the burial site is located." There is no exception to this requirement for archaeology. The statute does allow for remains to be reinterred in the presence of "a trained anthropologist or archaeologist" rather than a "a mortician, professional cemeterian, or other individual qualified in the interment of human remains" or "a minister, priest, or other religious leader." This language should be corrected to accurately reflect State of Maryland Criminal Code § 10-402.

<u>Cemetery Treatment Plan</u>

## Site Treatment Plan Research Methods - Previously Conducted Research

MDOT SHA appears to have carefully crafted its language in this section to support its assumptions and/or downplay findings — in some cases deceptively so. For example, we point to the mischaracterization of Dr. Tim Horsley's GPR survey findings at the top of Page 5:

> "The study identified 14 subsurface anomalies interpreted as possible graves within the MDOT SHA ROW to the north of the enclosed cemetery; an additional 20 anomalies in this area were thought more likely to be related to natural soil variations (Falchetta et al. 2021). Although the GPR reflections in this area are weaker than other parts of the survey area, as a result of this study, the area of possible burials features within the MDOT SHA ROW has been included within the NRHP eligible boundary of the property."
>
> **We repeat for emphasis the precise language from Dr. Tim Horsley's Report Summary:**
>
> "Importantly, these results reveal that subsurface anomalies **interpreted as graves** continue into the Maryland Department of Transportation State Highway Administration Right-of-Way (MDOT SHA ROW) to the north of the enclosed cemetery. While the exact number is difficult to define from these data, **some 14 probable unmarked burials are indicated in this area**. As many as 34 burials are suggested in total; however, most of the anomalies suggesting these likely have alternative, natural explanations."

MDOT SHA's characterizations in this document and elsewhere appear aimed to convince consulting parties and the public to trust its version of a "revised cemetery boundary" and that "MDOT SHA developed an alternative design and LOD configuration that eliminates all Project impacts within the revised property boundary and avoids associated potential burial features within the MDOT SHA ROW adjacent to the cemetery boundary". We reject and take offense to MDOT SHA's characterizations and attempts to downplay

00173464

impacts to the Morningstar Moses site.

With reference to Page 5, Paragraph 2, we have twice submitted corrections to the MHT Determination of Eligibility (DOE) form submitted by MDOT SHA and again state that errors and omissions still exist. We also reemphasize that this site should be deemed eligible under Criteria A, C and D.

**Site Treatment Plan Research Methods - Defining Areas that Require Archaeological Investigation**

We believe that MDOT SHA again mischaracterizes Dr. Tim Horsley's GPR Report in stating that "Given the weak nature of feature signals identified on the nearby high ground, it may be impossible to confidently identify potential graves in this area." We also object to MDOT SHA's use of the word "potential graves" as misleading in certain places in the document. We look to Dr. Tim Horsley's GPR report for his interpretations of "probable" and "possible" burials as follows:

> "For ease of interpretation, burials are divided into *"probable burials"* and *"possible burials"* depending on the confidence that such an interpretation can be made. This distinction is based on several characteristics of the geophysical anomaly (i.e., strength, dimensions, depth, and orientation), as well as its associated grave marker or other similar anomalies. In the case of possible burials, other explanations are possible and cannot be ruled out, although it is more likely that the anomaly is burial related."

We again point to Dr. Horsley's GPR report for his findings related to burials within the MDOT SHA ROW and, more specifically, to the cause of "weak signals" in this area:

> "**While the absolute number of burials within the ROW is impossible to determine with confidence, there is strong evidence that graves continue into this area.** 14 probable burials are identified in Figure 21, with an additional 13 possible burials highlighted. A further 7 other features/ disturbance are shown, either fully or partially within this area. Together, this suggests as many as 27-34 unmarked graves with the ROW; however, this may be an over-estimate. In general, the GPR reflections in this area are weaker than other parts of the survey area; given the sensitivity of the ROW, great care has been taken to identify all potentially significant anomalies. It is quite possible that many of the possible burials are caused by other subsurface disturbances or natural soil variations, as well as the other feature/disturbance anomalies; however, it is impossible to rule out the presence of an unmarked burial in each case.
>
> The difficulty in confidently identifying burials in this area might in part be related to a change in soil type. As described in Section and 1.5 and Figure 2, Brinklow-Blocktown channery silt loams are present in this corner of the cemetery (although it should be cautioned that the soil maps may not be accurate at the scale shown). Channery soils produce increased noise levels due to the greater concentration of stony material; however, the GPR data from this area are not discernibly noisier than the rest of the cemetery. The weaker reflections here indicate a lower physical contrast (primarily conductivity) between the causative features and the surrounding soil. Several factors could cause such a reduction in contrast, including (i) a change in soil type; (ii) variations in soil moisture (that can be related to soil type and/or topography); (iii) the nature of the burial (i.e., casket vs. shroud); and (iv) the state of preservation of the inhumation. While identifying which factors are the most significant is not usually possible solely based on the geophysical data in this instance it is likely a combination of at least (i), (ii) and (iv). **As Falchetta et al. note, the top of the hill may have been the site of the earliest burials, and consequently their associated anomalies would be expected to be weaker due to more advanced decomposition.**
>
> The GPR reflections suggesting probable and possible burials in this area begin at a depth of around 1' (0.3m) and extend to at least 4-5' (1.2-1.5m). While the remains of any inhumations are likely below at least 3', distinct soil variations associated with the grave shafts can be expected at a depth of 1' (0.3m)."

**Environmental Context - Land Use History and Current Conditions**

We wish to clarify the following sentence: "The central portion of the path runs along a gully and was constructed on top of fill piles; railroad tie steps placed along that portion of the path by Boy Scouts working on an Eagle Scout project in 2008 were still in place." The source of the "fill piles" (shown as "Artificial Berm" on the map in *Attachment 1*) is undetermined, but the presence of large chunks of thick concrete indicate that this fill may have been associated with highway construction. We wish to clarify that the Boy Scouts did not create the fill piles, but simply created steps in the artificial berm to allow pedestrian access to the cemetery. It should be noted that MDOT SHA's perpetual stormwater easement is also located in this area and the fill piles could have been associated with construction of the stormwater drain. MDOT SHA's lack of maintenance of their stormwater easement on the property has contributed to soil erosion and physical degradation of the site.

**Treatment Goals - Additional Remote Sensing Survey/Archaeological Fieldwork**

The document states that "No further ground disturbing investigations will be conducted within the identified cemetery boundary at this time. A series of further steps, including additional GPR and examination of the LOD to identify burials outside the understood boundary of the cemetery will be conducted to evaluate avoidance of impacts to the Morningstar Cemetery as a result of MLS Project activities."

We point out that only non-invasive field investigations have been conducted at the site so far. GPR was conducted on a portion of the Morningstar Moses cemetery property and a portion of the MDOT SHA ROW. The areas where the GPR survey was conducted are shown on *Attachment 1*. In the likely event that human remains are present in the LOD, they must be reinterred within the Morningstar Moses cemetery. Prior to any such reinterment, a proper archaeological survey of the Morningstar Moses property, at the sole cost and expense of MDOT SHA, would be required to identify locations for reinterment.

MDOT SHA further states that, "The primary goal of the archaeological investigations in the MDOT SHA right-of-way is to confirm that no interments are located within the MLS Project LOD that would be impacted by the proposed construction in this area."

MDOT SHA's proposed areas within the LOD for additional GPR study seem to presume the end results of the investigations before they are carried out and do not demonstrate to us that the MDOT SHA is proactively seeking to avoid impacting all Morningstar Moses burials. MDOT SHA seems committed to their arbitrary definition of the boundary of the cemetery and does not consider that graves and artifacts could be present along the entire length of the LOD adjacent to the Morningstar Moses site.

**Machine and Hand Stripping of the LOD (P-10)**

This paragraph should be revised to read:

> Following the GPR effort, LOD will have been reduced to the maximum extent feasible while still accomplishing the purpose and need of the Project if the GPR has indicated a potential for additional burials within the LOD. At this time, substantial remaining vegetation will have been removed from the LOD in the vicinity of the Morningstar Cemetery as depicted in Figure 2.3 with an **appropriate, qualified archaeologist and cultural monitor present** for all ground disturbance. The area to be cleared encompasses the area between the roadway and the staked LOD. The mechanical removal of the topsoil in these areas will be accomplished with a Gradall, trackhoe, or similar vehicle with a bucket fitted with a smooth (not toothed) blade, and the soil removal will proceed, directed by the archaeologist **and cultural monitor, in a slow and careful manner removing only a few inches at a time** — as noted in the GPR study, "distinct soil variations associated with the grave shafts can be expected at a depth of 1 ft." The topsoil **will be sampled by screening for artifacts** and will be removed under the direction of the archaeologist **and cultural monitor,** and the interface between

00173466

the topsoil and subsoil will be cleaned by shovel, trowel, or a combination thereof to evaluate any features or artifacts indicative of interments **and/or archaeological remains.**

## Summary of Expected Steps of Coordination and Fieldwork

As the document states, "The community has expressed a preference for re-interment of remains within Morningstar Cemetery, and the MDOT SHA will accommodate this to the extent practicable and permissible by law." We repeat that any treatment plan and mitigation commitment must require the reinterment of human remains on the Morningstar Moses site, in order to keep the community together. We restate that prior to any such reinterment, a thorough archaeological survey of the Morningstar Moses property, at the sole cost and expense of MDOT SHA, would be required to identify locations available within the Morningstar Moses site for reinterment.

## Respectful Treatment of Human Remains

The following paragraph should be revised to read:

> The MDOT SHA archaeologists and archaeological consultants will treat any human remains encountered during the Project in a manner guided by the relevant federal and state laws and guidelines. In addition, human remains will be treated with the utmost dignity and respect at all times. Human remains and/or associated artifacts (including grave markers, casket/coffin materials, or funerary objects) will be left in place where possible and not disturbed unless necessary, and no personal or media photographs **or filming** will be allowed of human remains other than what is needed for technical documentation, and consultant Project and MDOT SHA personnel will be restricted from posting or disclosing information, **videos,** or photographs on social media or other venues. The MDOT SHA and FHWA will be the only authorized sources to disseminate information to consulting parties or media. **However, in no event shall photographs or video of skeletal remains or funerary objects be released to the media or press without the express written consent of The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated.** No skeletal remains or materials associated with the remains be collected or removed until appropriate consultation has taken place. All personnel involved with the discovery will maintain confidentiality concerning the remains, and any press contacts will be referred to the MDOT SHA.

We appreciate your consideration of these comments.

Sincerely,

**Friends of Moses Hall and**
**The Board of Trustees of Morningstar Tabernacle Number 88, Incorporated**

**Diane E. Baxter**
President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Dr. Charles W. Harris**
Vice President, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Eileen McGuckian**
Secretary, Morningstar Tabernacle Number 88, Incorporated
Historian and President, Montgomery Preservation. Inc.

**Montgomery Crawford**
Treasurer, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Alexandra Jones, PhD, RPA**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Executive Director and Founder, Archaeology in the Community

**Austin E. White**
Trustee, Morningstar Tabernacle Number 88, Incorporated
Descendant

**Charlotte Troup Leighton**
Trustee and Chair, Friends of Moses Hall Committee,
Morningstar Tabernacle Number 88, Incorporated
Vice President of Advocacy, Cabin John Citizens Association

**L. Paige Whitley**
Chair, Research Committee, Morningstar Tabernacle Number 88, Incorporated
Independent Researcher

**Sondra Raspberry**
Descendant

**Shannon S. Steward**
Descendant

**Christopher Waynes**
Descendant

**Austin White II**
Descendant

**Nathan White II**
Descendant

**Pandora White**
Descendant

**ATTACHMENT 1**
## Morningstar Tabernacle No. 88 Moses Hall and Cemetery
### Cabin John, Montgomery County, Maryland



00173469

cc:      Governor Lawrence J. Hogan – governor.mail@maryland.gov
Comptroller Peter V.R. Franchot – pfranchot@comp.state.md.us
Treasurer Derek E. Davis – treasurer@treasurer.state.md.us
Jeffrey T. Folden, MDOT SHA – mls-nepa-P3@mdot.maryland.gov
Kendra Parzen, National Trust for Historic Preservation - KParzen@savingplaces.org
Elizabeth S. Merritt, National Trust for Historic Preservation - emerritt@savingplaces.org
Elizabeth Hughes, Maryland Historical Trust – elizabeth.hughes@maryland.gov
Julie Langan, Virginia DHR - julie.langan@dhr.virginia.gov
Steve Archer, MDOT SHA – sarcher@mdot.maryland.gov
Julie Schablitsky, MDOT SHA – jschablitsky@mdot.maryland.gov
Richard Ervin, MDOT SHA – rervin@mdot.maryland.gov
David Clarke, USDOT - david.clarke@dot.gov
April Marchese, USDOT – april.marchese@dot.gov
Colleen Vaughn, USDOT – colleen.vaughn@dot.gov
Brenda Mallory, Chair, White House Council on Environmental Quality – brenda_mallory@ceq.eop.gov
Vivian Lee, National Capital Planning Commission – vivian.lee@ncpc.gov
Samantha Beers, US EPA - beers.samantha@epa.gov
Emily Biondi, Federal Highway Administration – emily.biondi@dot.gov
James Gavin, Federal Highway Administration – james.gavin@dot.gov
Jitesh Parikh, Federal Highway Administration – jitesh.parikh@dot.gov
Jeanette Mar, FHWA Maryland Division - jeanette.mar@dot.gov
Reid Nelson, ACHP – rnelson@achp.gov
Mandy Ranslow, ACHP - mranslow@achp.gov
Jaime Loichinger, ACHP - jloichinger@achp.gov
Beth Cole, Maryland Historical Trust - beth.cole@maryland.gov
Tim Tamburrino, Maryland Historical Trust - tim.tamburrino@maryland.gov
Marc Holma, Virginia DHR - marc.holma@dhr.virginia.gov
John Simkins, FHWA Virginia Division - john.simkins@dot.gov
Rebeccah Ballo, Montgomery County Planning Department – rebecccah.ballo@montgomeryplanning.org
Debra Borden, M-NCPPC – debra.borden@mncppc.org
Brian Crane, Montgomery County Planning Department – brian.crane@montgomeryplanning.org
Susan Shipp, Cabin John Citizens Association - jsjshipp3@verizon.net
Jack Orrick, Carderock Springs Citizens Association – jack.orrick@offitkurman.com
Eddie Bankhead, First Agape AME Zion Church - esbj@pobox.com
Rev. Edgar Bankhead, First Agape AME Zion Church - ebankjs@verizon.net
Susan Lee, Maryland State Senator – susan.lee@senate.state.md.us
Marc Korman, Maryland State Delegate – marc.korman@house.state.md.us
Sara Love, Maryland State Delegate – sara.love@house.state.md.us
Ariana Kelly, Maryland State Delegate – ariana.kelly@house.state.md.us
Casey Anderson, Chair, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Carol Rubin, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Partap Verma, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Tina Patterson, Commissioner, Montgomery County Planning Board - MCP-Chair@mncppc-mc.org
Gerald Cichy, Commissioner, Montgomery County Planning Board -MCP-Chair@mncppc-mc.org
Marc Elrich, Montgomery County Executive - marc.elrich@montgomerycountymd.gov
Gabe Albornoz, Montgomery County Councilmember-councilmember.albornoz@montgomerycountymd.gov
Andrew Friedson, Montgomery County Councilmember- councilmember.friedson@montgomerycountymd.gov
Evan Glass, Montgomery County Councilmember - councilmember.glass@montgomerycountymd.gov
Tom Hucker, Montgomery County Councilmember - councilmember.hucker@montgomerycountymd.gov
Will Jawando, Montgomery County Councilmember - councilmember.jawando@montgomerycountymd.gov
Sidney Katz, Montgomery County Councilmember - councilmember.katz@montgomerycountymd.gov
Nancy Navarro, Montgomery County Councilmember - councilmember.navarro@montgomerycountymd.gov
Craig Rice, Montgomery County Councilmember - councilmember.rice@montgomerycountymd.gov
Hans Riemer, Montgomery County Councilmember - councilmember.riemer@montgomerycountymd.gov

00173470