MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

# DESIGN EXCEPTION REQUEST FORM – DE09

**A. GENERAL INFORMATION:**

Date: <u>May 27, 2022</u>  Agency: <u>MDOT SHA</u>

MDOT SHA District: <u>3</u>  County: <u>Montgomery</u>

Route Number/Name: <u>Interstate 495 (I-495)</u>  On NHS: (Yes) / No

Contract Number / FMIS Number: <u>AW073A13</u>

Project Name: <u>Phase 1 South of the I-495 and I-270 P3 Program</u>

Functional Classification:

Interstate: <u> X </u> Principal Arterial: ___ Collector: ___ Local: ___

AASHTO Context Classification:

Rural _____  Urban _____
Rural Town _____  Urban Core _____
Suburban <u> X </u>.

MDOT SHA Context Classification

Rural _____  Traditional Town Center _____
Suburban <u> X </u>  Urban Center _____
Suburban Activity Center_____  Urban Core _____

Brief Description of the Project Scope:

The purpose of the I-495 and I-270 P3 Program Phase 1 South project is to develop and implement a travel demand management solution that addresses congestion, improves trip reliability on I-495 and I-270 within the Phase 1 South limits and enhances existing and planned multimodal mobility and connectivity. The Preferred Alternative (Alternative 9 - Phase 1 South) includes building a new, wider American Legion Bridge and providing two High-Occupancy Toll (HOT) managed lanes (referred to as Price Managed Lanes (PMLs) in this document and attached plans) in each direction on I-495 from the George Washington Memorial Parkway in Virginia to west of MD 187 and on I-270 from I-495 to north of I-370 including the I-270 East and West Spurs.

The project will include the following elements: roadway widening and roadway reconstruction when necessary, roadway pavement resurfacing, safety barriers and

1

00174407

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

roadside protection, roadway drainage, stormwater management, structure replacement and upgrade (including bridges and retaining walls), noise wall construction, environmental mitigation, traffic signalization when necessary at crossing roadways, roadway lighting, signing and pavement marking, landscaping, utility relocations, pedestrian and bicycle facilities, construction of direct access and exchange ramps, toll gantries and ITS equipment.

Specific to the location noted with this Design Exception Request, the project will reconstruct the northbound General-Purpose Lanes (GPLs) for I-495 near the historically sensitive Morningstar Tabernacle No. 88 Moses Hall and Cemetery (noted herein as "Moses Hall Cemetery"), located just south of the northbound lanes.  The alignment of I-495 as designed has incorporated a maximized offset to this sensitive area already; however, further investigation and discovery of additional burial sites still necessitates a shift of the improvements away from this site.  Due to the constrained conditions and nearby roadway geometric requirements for the Cabin John Parkway and MD 190 (River Road) interchanges, a reduction to the shoulder is proposed here for a short length to avoid impacting the burial sites.

Date of NEPA Approval:   Anticipated Summer 2022

**B.  TRAFFIC INFORMATION AND CRASH HISTORY:**

Design Year:  2045 & ADT:  113,270 vehicles (NB GPL)
                                          25,090 vehicles (NB PML)

Current Year: 2017 & ADT:  112,015 vehicles (NB)

Design Year: Truck %:  7%                    DHV %:  52%

Current Year: Truck %:  7%                   DHV %:  52%

Design Speed: 60 MPH (GPL) / 65 MPH (PML)

Posted Speed: 55 MPH (GPL) / 65 MPH (PML)

Operational Speed (if known): Not Known

Most recent three-year overall crash history from MDOT SHA Office of Traffic and Safety's Traffic Development Support Division (OOTS TDSD):

Available crash history is provided with *Attachment B* attached, which reflects three-year data from 2016 through 2018.  The area being discussed is along northbound I-495 at approximately mile marker 1.65 per the document in *Attachment B*. For reference, this location is near mile marker "41.0", as posted in the field. For the purposes of this Design Exception, crashes noted along northbound I-495 between 1.37 and 1.72 were analyzed.

2

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

The analyzed segment experienced nine (9) crashes from 2016 through 2018, seven of which were noted at mile marker 1.37 (approximately ¼ mile from the location of this Design Exception). Crashes included two (2) fixed object crashes with guardrail, four (4) rear end crashes, two (2) sideswipe crashes, and one (1) crash involving an animal. This crash rate of approximately three (3) crashes per year represented within this segment (nine (9) crashes divided by three (3) years) does not demonstrate a segment of significant concern. The types of crashes typically attributed to reduced shoulders do include sideswipe and fixed object crashes, and thus a reduced shoulder could cause an increase in crash frequency. However, with only four (4) crashes in these categories in the three-year period, this area does not represent an existing issue which would be exacerbated by a reduced shoulder. Mitigation to limit increases in crashes will be implemented as described later in the document. No fatalities were noted within this segment, and the severity was noted as mainly property damage and few injuries.

**C.** DETAILS OF DESIGN EXCEPTION(S)

Number of design exception elements in this request: **One (1)**

**DESIGN EXCEPTION:**

1. Element for This Design Exception Request: Reduced shoulder width

2. Location:

    Right shoulder of I-495 NB GPL between station 1182+36 and station 1184+70. The shoulder width required per contract documents within this segment is 12' (10' paved and 2' graded). For the length noted, the proposed width will be 6' paved total to a concrete barrier. See ***Attachment A*** for additional information.

3. AASHTO Design Criteria Reference:

    AASHTO's *2016 A Policy on Design Standards – Interstate System*, Page 4:

    "Minimum paved shoulder widths in each direction of travel as a function of terrain and the number of through lanes shall be in accordance with the following table:

**Table 3. Minimum Paved Shoulder Widths**

| One-Directional No. Through lanes | Terrain | Left Shoulder (ft) | Right Shoulder (ft) | Left Shoulder (m) | Right Shoulder (m) |
|---|---|---|---|---|---|
| 2-lane | Level or Rolling | 4 | 10 | 1.2 | 3.0 |
| 3-lane or more | Level or Rolling | 10 | 10 | 3.0 | 3.0 |
| 2 or 3-lane | Mountainous | 4 | 8 | 1.2 | 2.4 |
| 4-lane or more | Mountainous | 8 | 8 | 2.4 | 2.4 |

3

00174409

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

AASHTO's *2018 A Policy on Geometric Design of Highways and Streets* (Green Book), Page 8-3, Section 8.2.4:

"On four-lane freeways, the median (or left) shoulder is normally 4 to 8 ft [1.2 to 2.4 m] wide, at least 4 ft [1.2 m] of which should be paved, and the remainder stabilized. The paved width of the right shoulder should be at least 10 ft [3.0 m]; where the DDHV for truck traffic exceeds 250 veh/h, a paved right shoulder width of 12 ft [3.6 m] should be considered. On freeways with six or more lanes, the paved width of the right and left shoulder should be 10 ft [3.0 m]; where the DDHV for truck traffic exceeds 250 veh/h, a paved shoulder width of 12 ft [3.6 m] should be considered.

4. <u>Existing Geometric Conditions</u>:

The existing cross section for I-495 NB GPLs and shoulder are as follows. In the direction of travel and stationing, the left most paved shoulder is between 11.5' and 12.0'. The entire shoulder is paved up to a roadway median barrier. There are four (4) lanes along this portion of I-495, and all lanes are generally 12' in width. The right most shoulder at the location of this Design Exception request is paved for a width between 10.75' and 11.5', followed by a stabilized area of 2' to 3.5'. A small portion of this area has existing guardrail at the edge of this stabilized shoulder, while the remainder is graded to a small ditch. The design speed of the facility is 60 MPH and posted for 55 MPH. See Graphic 1 below for a visual representation of the existing conditions.



Graphic 1 – I-495 NB existing lanes just prior to Seven Locks Road overpass

4

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

5. Proposed Geometric Conditions:

Proposed roadway geometry within the area of this Design Exception meets or exceeds AASHTO minimum widths. The left shoulder within the PMLs is a minimum 12' in width. The buffer between the managed lanes and the GPLs is the project standard width of 4', including the flex post delineators separating the facilities. All travel lanes within this area are 12' in width. For the right shoulder (direction of travel and stationing), the NB GPL shoulder has been proposed as a 6' paved shoulder with barrier at the edge of paved shoulder between station 1182+36 and station 1184+70. The reduction is accomplished through tapering the right shoulder from its full standard width of 12' at station 1180+80 to the 6' width at station 1182+36, meeting the required flare rate for a rigid barrier. Then starting at 1184+70 the 6' shoulder width will be tapered back to the full standard 12' width at station 1185+20.

Areas prior to and beyond the subject area (500' minimum before and after the subject area) do not propose to have any restrictions in typical section width, either to lane widths or shoulder widths.

6. Design Restrictions/Justification-Impacts:

The alignment of I-495 has been optimized to the best ability possible to avoid impacts to the adjacent Moses Hall Cemetery. This site is noted as a Section 106 historic site, and NEPA commitments have identified these as sites which must be avoided by the project utilizing all reasonable methods. The Final Environmental Impact Statement (FEIS) notes the Permanent Limit of Disturbance (LOD) as that shown in blue on *Attachment A*. On this same exhibit shown in green, recently performed ground penetrating radar suggested that burial sites were even closer than anticipated. Thus, the design described and graphically shown is proposed as the best solution to limit impacts. The proposed configuration locates the FEIS LOD a minimum of 5' from the closest identified burial site. A 6' offset is then provided to the required noise barrier in this area, followed by the required 4' offset to the face of roadway barrier. The result from limiting the shoulder width to 6' in paved width is an offset of 15' from the edge of shoulder (reduced to limit impacts) to the closest surveyed burial site. A graphical representation of this typical section is provided with Graphic 2 below.

00174411

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13



Graphic 2 – Proposed Configuration Typical Section

Re-alignment of I-495 to achieve the full 12' shoulder width would create additional impacts to the property north of the interstate at the Carderock Springs Historic District, also a Section 106 historic property. We estimate the additional impacts if this alternative were utilized to be approximately 3,000-5,000 square feet beyond the current impact. Impacts to the Gibson Grove Church property would likely occur as well; however, those impacts would be in conjunction with the already realized impacts created from drainage and stormwater management improvements.

Additionally, re-alignment of the roadway in this area creates additional impacts and challenges with the nearby underpass of Seven Locks Road and the ramp connections that must be made to the MD 190 (River Road) interchange. To the north of this area, sensitive roadway geometric curvature is closely coordinated with the Seven Locks Road bridges and then the immediate ramp crossings and connections with Cabin John Parkway and River Road. Additional to staying within a very tight right-of-way envelope within this area of I-495, the roadway creates sight distance obstructions on the insides of these tight curves, which is exacerbated due to profile and necessary barrier protection. Manipulation of this curvature would likely create sight distance conflicts, a safety issue that has had much coordination with MDOT to this point.

Per the 2007 Federal Highway Administration's *Mitigation Strategies for Design Exceptions*, Page 38, by providing the 6' shoulder there should not be any adverse effects on Free-Flow speed of the facility. From Table 8, right shoulders with a minimum 6' width do not experience reduction in speed with any lane configuration.

7. IHSDM Crash Prediction Module (CPM), Results of Highway Safety Manual Analysis:

ISATe analysis was performed for the roadway segment impacted by the design exception. The predicted number of crashes was calculated for the road segment containing the design exception (6' shoulder) and compared to an equivalent segment using the design standard (10' shoulder). The analysis was run for a period spanning

6

00174412

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

the opening year (2027) to the design year (2045). When comparing the predicted number of crashes, the design exception resulted in a decrease of 0.1 crashes over the 19-year analysis period. However, the exception resulted in an increase in fatal/injury crashes of 0.1/year. The average yearly crash frequency for both the design exception shoulder width and design standard shoulder remain at 8.4 crashes/year. There is no material significance related to crashes and the proposed design exception.

| Design Exception 9 ISATe Analysis Results | With Design Exception | | | Without Design Exception | | |
|---|---|---|---|---|---|---|
| | Total | Fatal / Injury | PDO | Total | Fatal/ Injury | PDO |
| Predicted number of crashes per study period | 159.6 | 46.7 | 112.9 | 159.7 | 45.7 | 114.0 |
| Predicted crash frequency per study year | 8.4 | 2.5 | 5.9 | 8.4 | 2.4 | 6.0 |

8. Alternates Considered:

Prior to selection of the current alignment, various geometric configurations were developed to evaluate the preferred alignment in the vicinity of Moses Hall Cemetery.

The DEIS evaluated a variety of geometric alternatives (Alternatives Retained for Detailed Study, or ARDS) for the project corridor, including a No-Build alternative and series of alternatives that provided two PMLs in each direction on I-495. Prior to selection of the ARDS, additional preliminary alternatives were screened, including a Transportation System Management/Transportation Demand Management alternative (Alternative 2); alternatives that would provide one additional GPL (Alternative 3), HOV (Alternative 4), or Price Managed (Alternative 5) lane in each direction along I-495; an alternative to add two GPLs (Alternative 6) or HOV (Alternative 7) lanes to I-495; an alternative that would add two GPLs in each direction on I-495 with the use of C-D lanes (Alternative 11); an alternative that would convert one GPL in each direction on I-495 to a contraflow lane (Alternative 12A); and an alternative that would add two price managed reversible lanes on I-495 (Alternative 11.) The Federal Highway Administration (FHWA) and MDOT SHA determined that these alternatives which were not retained for detailed study did not meet the project's Purpose and Need, generally due to their deficiencies in addressing existing traffic and long-term traffic growth and trip reliability, as well as concerns with the alternatives' financial viability.

The No Build alternative was also confirmed to not meet the Study's Purpose and Need. All of the remaining alternatives, including the Preferred Alternative, proposed to provide two additional lanes in each direction at the location of Moses Hall Cemetery, with a buffer separating the GPLs from the newly added PMLs. Alternative 9 – Phase 1 South has been identified as the Preferred Alternative and includes a two-lane, PMLs network on I-495 and I-270 in each direction. The Preferred Alternative is projected to provide substantial, tangible operational benefits

7

to the regional system, increasing throughput on the American Legion Bridge, and increasing speeds, improving reliability, and reducing travel times along I-495 and I-270.

The initial alignment configuration for Alternative 9 as provided in the DEIS proposed symmetrical widening along the highway centerline. The DEIS alignment also proposed a flyover ramp along the I-495 inner loop in the vicinity of the Moses Hall Cemetery to allow traffic to exit from the NB PMLs and merge with traffic originating from the GPLs and Cabin John Parkway, to access MD 190 (River Road.) The ramp alignment was developed with sensitivity to minimizing impacts to the Cemetery, but the roadway widening, and ramp piers were anticipated to impact the Cemetery property. The DEIS configuration included an impact of 13,068 SF (0.3 acres) on Moses Hall Cemetery. The DEIS and SDEIS configurations can be viewed in Appendix D of the DEIS and SDEIS; the applicable drawings have been provided in **Attachment D** of this document for reference.

In response to comments received on the DEIS and Draft Section 106 Evaluation, impacts to the Moses Hall Cemetery boundary were reduced by conducting a series of alignment evaluations in the context of the sensitive resources at the Cemetery, and at Gibson Grove Church and the Carderock Springs Historic District on the opposite side of I-495. This series of evaluations, which included modifying the Cabin John Parkway and River Road interchange configurations, resulted in a proposed alignment that diverged from the existing centerline of I-495 by realigning the highway such that I-495 moved to the north at the Cemetery. Alternate alignments for the flyover bridge were also investigated to facilitate the exit from the NB PMLs to MD 190, with the selected configuration moving the flyover to the west. This allowed a narrowing of the overall cross section of the highway at the location of the Cemetery. The combined result of the alignment modifications reduced the Cemetery impacts in the SDEIS to approximately 14 square feet of temporary area needed for construction access to build a noise barrier adjacent to the property. This design refinement also resulted in complete avoidance of ground disturbance within the cemetery boundary. The SDEIS configuration can be viewed in Appendix D of the SDEIS; the applicable drawing has been provided in Appendix D of this document for reference.

In July 2021, additional investigation was conducted to detect and map both potential marked and unmarked graves within and adjacent to the cemetery boundary. In parallel with this effort, an assessment was underway to eliminate the flyover connection from the I-495 PMLs to MD 190 by providing an alternate interchange configuration with median ramps from the I-495 PMLs to MD 190. An alignment was developed such that the associated ramps and auxiliary lanes to access MD 190 did not extend to the Cemetery location, further allowing reduction of the overall roadway width at the Cemetery. These alignment refinements, combined with the shoulder reduction discussed in this Design Exception, resulted in complete avoidance of the Moses Hall Cemetery property, and avoidance of known resources associated with the Cemetery.

8

00174414

Finally, additional alignment modifications were evaluated to provide the same avoidance measures for the Cemetery while retaining a full-width shoulder along I-495 Northbound. Alternative geometry was investigated to potentially shift the entire I-495 alignment to the north, which would provide further buffer between the right side of the I-495 NB GPLs. However, when this is investigated this shift creates potential impacts to the adjacent residential properties and Carderock Elementary school north of the I-495 NB GPLs, within the Carderock Springs Historic District. Additional considerations need to be contemplated when shifting the I-495 alignment:

- ∞ Horizontal sight distance must be considered for the Northbound PMLs, as these lanes curve to the left on the inside of that curve. This requires additional offset to median barriers along Northbound PML to meet horizontal sight distance, which further increases the roadway footprint.

- ∞ Geometric adjustment must be considered to the approaching curves on the either ends of the proposed location in order to shift the entire I-495 to the north by approximately 6' , this will impact the interchange ramp connections at Cabin John Parkway and MD 190 (River Road), and the newly created PML connections. Any further geometric adjustments that might be needed due to the horizontal shift at these ramp locations and to meet AASHTO criteria will potentially have further impacts to the properties within Carderock Springs Historic District.

- ∞ A horizontal shift would potentially create constructability issues adjacent to the retaining wall and noise barrier along the I-495 SB GPLs in relation to the Carderock Springs Historic District.

- ∞ Other potential impacts could include Utility (the existing 69 kv PEPCO Aerial Line.), Environmental (flood plain), and the Gibson Grove Church which is included in Maryland's Inventory of Historic Places.

Considering this sensitive geometry, the best approach in order to limit impacts to historical and cultural areas and still provide a viable interchange design is to reduce the shoulder for this relatively short area maintaining the proposed mainline alignment in lieu of shifting the alignment to the north.

9. <u>Proposed Mitigation</u>:

The relatively short distance requested with a reduced shoulder width can be mitigated with enhanced pavement markings and safety features that still meet the Maryland MUTCD requirements. The barriers at the edge of this shoulder will be standard crashworthy barriers with appropriate flare rates for the transition of the shoulder width. Reflectors mounted on top of the barriers will be provided per MDOT SHA standards in this area to draw attention to the barriers being closer to the travel-way than for the rest of the corridor.

Advanced signing was considered originally as a mitigation measure, but per Maryland MUTCD guidelines signing is not appropriate in this location under the proposed geometric circumstances. The MUTCD guidance explains that highway

00174415

signage is intended to demand attention from the driver and thus is reserved for situations that warrant extra attention. Based on this situation and experience on similar situations (shoulder width reduced for relatively short lengths, but still providing a usable width and adequate buffer to roadside barrier), additional signage indicating a "narrow shoulder" is typically discouraged and would likely not be accepted during project design development.

## D. CONTEXT OF FACILITY:

Future Upgrades & Compatibility with Land Use Planning:

Future planning to widen I-495 beyond the limits shown within this area are not anticipated at this time per the various Masterplans available through Montgomery County. Any future widening of I-495 would not be prevented due the proposed reduction of the shoulder at this location. However, any future widening will still be constrained due the impacts to the adjacent Moses Hall Cemetery. The reduction of the right shoulder to 6' has no adverse impact on the future upgrades or Land Use Planning for I-495 or nearby properties.

Right of Way Impacts:

The project throughout the corridor aims to minimize impacts to the greatest extent possible through a variety of strategies. This corridor is highly constrained by both personal property and sites of historical and cultural significance. As outlined with the DEIS and adopted through the proposed conceptual design, avoidance is prioritized over assuming impacts. Optimized roadway geometry, retaining walls, underground stormwater management infrastructure, and similar tactics are employed to promote avoidance. In certain situations, reductions to the roadway typical section are utilized in combination with the strategies above, such is the case here at Carderock and the Moses Hall Cemetery. Reductions in typical section to limit right of way impacts are reserved for special situations, which this required to maintain preservation of this historically significant obstacle.

Impacts to the Community:

The purpose for requesting this Design Exception is to limit impacts to the surrounding historically and culturally sensitive areas. While a reduction to shoulder width accomplishes this goal, the roadway facility still meets the needs of the public with marginal reduction in service or safety. The shoulder width reduction included with this Design Exception is an extra measure to practice avoidance of the historic Cemetery, ensuring that all sensitive areas are avoided and preserved.

Compatibility:

This Design Exception for a reduced right shoulder is limited to a relatively short length, and appropriate tapers have been provided to transition to and from this section to make it

00174416

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

compatible with the approach and trailing full width shoulders.  See the section on Proposed Geometric Conditions for details on this transition.

**E.** <u>REQUIRED ATTACHMENTS</u>:

        Attachment A:  Proposed Design for Shoulder Reduction at Moses Hall Cemetery
        Attachment B:  MDOT SHA, OOTS-TDSD Accident Data
        Attachment C:  ISATe Safety Analysis
        Attachment D:  DEIS & SDEIS Configurations at Moses Hall Cemetery

**F.** <u>APPROVAL SIGNATURES</u>:

Prepared by: _____    Date _____
      *(Originating Office Project Manager/Project Management Consultant)*

Reviewed by: _____    Date _____
      *(Division Chief or Assistant District Engineer)*

Approved by: _____    Date _____
      *(Director, Office of Highway Development)*    ☒Check if Not Applicable

Approved by: _____    Date _____
      *(Director, Office of Structures)*    ☒Check if Not Applicable

Approved by: _____    Date _____
      *(Director, I-495 & I-270 P3 Office)*    ☐Check if Not Applicable

Approval by: _____    Date _____
      *(FHWA - for select PoDI projects)*    ☐Check if Not Applicable

00174417

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

ATTACHMENT A:   PROPOSED DESIGN FOR SHOULDER WIDTH
REDUCTION AT MOSES HALL CEMETERY

00174418



PROPOSED CULVERT AUGMENTATION

GIBSON GROVE A.M.E. CHURCH SECTION 106 HISTORIC PROPERTY

PROPOSED STORMWATER MANAGEMENT POND

CARDEROCK SPRINGS HISTORIC DISTRICT SECTION 106 HISTORIC PROPERTY

I-495 SB GPL PC STA. 1300+00.00

I-495 SB PML PC STA. 1186+70.10

I-495 NB PML

PC STA. 1185+74.13

I-495 NB GPL

200 LF OF 6' SHOULDER

PC STA. 1300+00.00

MORNINGSTAR TABERNACLE NO. 88 MOSES HALL & CEMETERY SECTION 106 HISTORIC PROPERTY

PROPOSED NOISE BARRIER (TYP.)

CABIN JOHN SVP, UNIT 2 SECTION 106 PARKS

SEVEN LOCKS RD

PROPOSED NOISE BARRIER ON RETAINING WALL (TYP.)

PROPOSED LIMIT OF DISTURBANCE PER THE FEIS

MORNINGSTAR BURIAL SITES (TYP.)

ACCELERATE MARYLAND PARTNERS

MDOT

MARYLAND DEPARTMENT OF TRANSPORTATION

STATE HIGHWAY ADMINISTRATION

I-495 AND I-270 P3 PROGRAM
PHASE 1

PHASE SOUTH A

| REVISIONS | | **MORNINGSTAR BURIAL SITES EXHIBIT** | |
|---|---|---|---|
| | SCALE 1" = 50' DATE 05-20-2022 CONTRACT NO. TBD | | |
| **TENTATIVE** MONTH DD, 20YY | DESIGNED BY | COUNTY MONTGOMERY COUNTY | |
| | DRAWN BY | LOGMILE | |
| THIS DOCUMENT/PLAN IS DRAFT AND SUBJECT TO CHANGE. IT IS AN INTERAGENCY/INTRA-AGENCY DELIBERATIVE COMMUNICATION THAT IS NOT FOR PUBLIC DISCLOSURE UNDER MD. GENERAL PROVISIONS CODE ANN. § 4-344 (MARYLAND PUBLIC INFORMATION ACT). | CHECKED BY | | |
| | MDE/PRID | | |
| | **RFP CONCEPTUAL PLAN, FOR INFORMATION ONLY** | | |

PLOTTED: 5/26/2022
FILE: pw:\\bentleyy-pw.bentley.com:sbwbery-pw-03\Documents\80002712\POST AWARD DESIGN\Phase South\Phase Wide\Disciplines\HWY\Design Exceptions-Variances-Waivers\01_Design Exceptions\E09 - Shoulders for I-495 at Morningstar\HVD-0000-Exh-CemeteryAvoidance.dgn

00174419

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

ATTACHMENT B:    MDOT SHA, OOTS-TDSD ACCIDENT DATA/
ANALYSIS

13

00174420

Attachment B

 *Office of Traffic and Safety*
*Traffic Development Support Division*

**Accident Data/Analysis Request Form**

**Request Date:** April 24, 2020

**Location:**
County: Montgomery                    Town/Place:
Route: I-495                          Log Mile:
☐ at

☒ from Milepoint 0                    to Milepoint 2.6

**Purpose Needed:**
☐ Signal Study          ☐ Surface Evaluation      ☐ Pavement Marking Study
☐ Sign Study            ☐ Lighting Study          ☐ General Traffic Study
☒ Other (Explain) IAPA

Originally Requested By:
When Needed: 05/01/20

**Work Requested:**
☒ Accident Summary      ☒ Accident History        ☒ Accident Rates
☒ Study Worksheet       ☒ Collision/Line Diagram  ☒ Other (Explain in Remarks)

        ☐ One Year              ☐ Two Years
        ☒ Three Years           ☐ Combined Years
    ☒ Specific Date(s) 2016         to 2018

Additional Instructions or Remarks: See attached cover email for AADT information.

Requested by: Jeff Folden              Title: Deputy Director
Department: I-495 I-270 P3 Program     District: n/a
Phone: 410-637-3321                    Fax: n/a

Please indicate map coordinates of location to be studied.
  ADC Map Book                    MD General Hwy. Grid Map

        Send to: Traffic Development Support Division, 7491 Connelley Drive
                        Hanover, Maryland 21076
                        Phone: (410) 787-5822
                        Fax: (410) 787-5823

Accident Data Request Form 03A TDSD.doc

Maryland State Highway Administration
Office of Traffic and Safety - Traffic Development and Support
SHA ADC Study Worksheet Output rev. 10/2017-1

Name: Matthew Flagg
Date:     04/28/2020

| | | |
|---|---|---|
| Location: | I-495 From: Virginia To: MD-190 | Logmiles:  From 0 To 2.6  Length:  2.60 |
| County: | Montgomery, D3 | |
| Period: | January 01, 2016 To December 31, 2018 | Note:  AADT's data are provided: IAPA. |

**Type Controls:**     1U-100%                                              * **Significantly Higher than Statewide**

| YEAR  >> | 2016 | 2017 | 2018 | Total | Study | StateWd |
|---|---|---|---|---|---|---|
| **Fatal** | 1 | 1 | 0 | 2 | 0.3 | 0.3 |
| No. Killed | 1 | 1 | 0 | 2 | | |
| **Injury** | 44 | 48 | 53 | 145 | 21.8 * | 15.8 |
| No. Injured | 65 | 81 | 81 | 227 | | |
| **Prop. Damage** | 100 | 99 | 154 | 353 | 53.1 * | 28.2 |
| **Total Crashes** | 145 | 148 | 207 | 500 | 75.3 * | 44.3 |
| **Severity Index** | 252 | 229 | 274 | Avg 252 | | |
| **RATE** | 66.4 | 66.0 | 93.3 | | | |
| **WAADT** | 229502 | 236298 | 233708 | | | |
| **VMT  millions** | 218.4 | 224.2 | 221.8 | 664.4 | | |
| **Opposite Dir.** | 0 | 0 | 0 | 0 | 0.0 | 0.3 |
| **Rear End** | 92 | 87 | 134 | 313 | 47.1 * | 17.5 |
| **Sideswipe** | 27 | 30 | 28 | 85 | 12.8 * | 7.5 |
| **Left Turn** | 0 | 0 | 0 | 0 | 0.0 | 0.1 |
| **Angle** | 0 | 0 | 0 | 0 | 0.0 | 0.5 |
| **Pedestrian** | 1 | 1 | 0 | 2 | 0.3 * | 0.1 |
| **Parked Veh.** | 2 | 0 | 3 | 5 | 0.8 * | 0.3 |
| **Fixed Object** | 19 | 23 | 33 | 75 | 11.3 | 11.9 |
| **Other** | 4 | 7 | 9 | 20 | 3.0 * | 0.4 |
| **U-Turn** | 0 | 0 | 0 | 0 | | |
| **Backing** | 1 | 2 | 0 | 3 | | |
| **Animal** | 2 | 3 | 1 | 6 | | |
| **Railroad** | 0 | 0 | 0 | 0 | | |
| **Fire / Expl.** | 1 | 0 | 3 | 4 | | |
| **Overturn** | 0 | 2 | 2 | 4 | | |
| **Truck Related** | 18 | 19 | 15 | 52 | 7.8 * | 5.0 |
| **Night Time** | 45 | 47 | 78 | 170 | 34 % | 31 % |
| **Wet Surface** | 28 | 20 | 48 | 96 | 19 % | 21 % |
| **Alcohol** | 4 | 1 | 2 | 7 | 1 % | 8 % |
| **Intersection** | 0 | 0 | 0 | 0 | | |
| **Total Vehicles** | 309 | 311 | 441 | 1061 | | |
| **Total Trucks** | 19 | 20 | 15 | 54 | | |
| **Truck %** | 6.1 | 6.4 | 3.4 | 5.1 | | |

Comments:
_____
_____
_____

00174422

Maryland State Highway Administration
Office of Traffic and Safety - Traffic Development and Support
SHA ADC Summary Output rev. 10/2017-1

Name: Matthew Tagg
Date:   04/28/2020

| | | |
|---|---|---|
| Location: | I-495 From: Virginia To: MD-190 | Logmiles:  From 0 To 2.6   Length:  2.60 |
| County: | Montgomery, D3   Period:   January 1, 2016 To December 31, 2018 | Note:   AADT's data are provided: IAPA. |

| SEVERITY | FATAL | INJURY | P-DAMAGE | TOTAL |
|---|---|---|---|---|
| Accidents | 2 | 145 | 353 | 500 |
| Veh Occ | 1 | 227 | | |
| Pedestrian | 1 | | | |

AVG Severity Index: 252

**DAY OF THE WEEK**

| SUN | MON | TUE | WED | THU | FRI | SAT | UNK |
|---|---|---|---|---|---|---|---|
| 37 | 83 | 77 | 81 | 67 | 93 | 62 | |

**MONTH OF THE YEAR**

| JAN | FEB | MAR | APR | MAY | JUN | JUL | AUG | SEP | OCT | NOV | DEC | UNK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50 | 49 | 34 | 34 | 39 | 36 | 44 | 40 | 35 | 53 | 41 | 45 | |

| CONDITION | DRIVER | PED |
|---|---|---|
| Normal: | 828 | 2 |
| Alcohol: | 7 | |
| Other: | 229 | 1 |

| TIME | 12 | 01 | 02 | 03 | 04 | 05 | 06 | 07 | 08 | 09 | 10 | 11 | UNK |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| AM: | 9 | 11 | 5 | 9 | 7 | 9 | 23 | 25 | 24 | 22 | 18 | 17 | |
| PM: | 11 | 25 | 28 | 32 | 43 | 54 | 47 | 25 | 16 | 17 | 12 | 11 | |

**VEHICLES INVOLVED PER ACCIDENT**

| 1 | 2 | 3 | 4 | 5 | 6+ | UNK | TOTAL |
|---|---|---|---|---|---|---|---|
| 101 | 271 | 101 | 21 | 5 | 1 | | 1061 |

**VEHICLE TYPE**

| | |
|---|---|
| 9 | Motorcycle/Moped |
| 595 | Passenger Vehicle |
| 141 | Sport Utility Veh |
| 48 | Pick-Up Truck |
| 22 | Trucks (2+3 axles) |
| 32 | Tractor Trailer |
| 1 | Passenger Bus |
| | School Bus |
| 8 | Emergency Veh |
| 306 | Other Types |

**SURFACE**

| | |
|---|---|
| 96 | Wet |
| 387 | Dry |
| 5 | Sno/Ice |
| | Mud |
| 12 | Other |

**MOVEMENTS**

| | NORTH | | | SOUTH | | | EAST | | | WEST | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | LF | ST | RT | LF | ST | RT | LF | ST | RT | LF | ST | RT |
| | | 70 | | | 61 | | | 344 | | | 394 | |

OTHER MOVEMENTS   192

**PROBABLE CAUSES**

| | | | |
|---|---|---|---|
| 3 | Influence of Drugs | 22 | Improper Lane Change |
| 5 | Influence of Alcohol | 1 | Improper Backing |
| | Influence of Medication | 3 | Improper Passing |
| | Influence of Combined Subst. | | Improper Signal |
| 1 | Physical/Mental Difficulty | | Improper Parking |
| 9 | Fell Asleep/Fainted, etc. | | Passenger Interfere/Obstruct. |
| 171 | Fail to give full Attention | | Illegally in Roadway |
| | Lic. Restr. Non-compliance | | Bicycle Violation |
| 16 | Fail to Drive in Single Lane | | Clothing Not Visible |
| | Improper Right Turn on Red | | Sleet, Hail, Freezing Rain |
| 4 | Fail to Yield Right-of-way | | Severe Crosswinds |
| | Fail to Obey Stop Sign | | Rain, Snow |
| 1 | Fail to Obey Traffic Signal | | Animal |
| 1 | Fail to Obey Other Control | | Vision Obstruction |
| | Fail to Keep Right of Center | | Vehicle Defect |
| | Fail to Stop for School Bus | | Wet |
| | Wrong Way on One Way | | Icy or Snow Covered |
| 1 | Exceeded Speed Limit | | Debris or Obstruction |
| 1 | Operator Using Cell Phone | | Ruts, Holes or Bumps |
| 1 | Stopping in Lane Roadway | | Road Under Construction |
| 71 | Too Fast for Conditions | | Traffic Control Device Inop. |
| 47 | Followed too Closely | | Shoulders Low, Soft or High |
| 1 | Improper Turn | 141 | Other or Unknown |

**COLLISION TYPES**

| | | FATAL | INJURY | PROP | TOTAL |
|---|---|---|---|---|---|
| Opposite Dir | Related: | | | | |
| | UnRelated: | | | | |
| Rear End | Related: | | | | |
| | UnRelated: | | 88 | 225 | 313 |
| Sideswipe | Related: | | | | |
| | UnRelated: | 1 | 28 | 56 | 85 |
| Left Turn | Related: | | | | |
| | UnRelated: | | | | |
| Angle | Related: | | | | |
| | UnRelated: | | | | |
| Pedestrian | Related: | | | | |
| | UnRelated: | 1 | | 1 | 2 |
| Parked Vehicle | Related: | | | | |
| | UnRelated: | | 3 | 2 | 5 |
| Other Collision | Related: | | | | |
| | UnRelated: | | 3 | 17 | 20 |

| | | | FATAL | INJURY | PROP | TOTAL |
|---|---|---|---|---|---|---|
| F | Bridge | 01 | | | 1 | 1 |
| I | Building | 02 | | | | |
| X | Culvert/Ditch | 03 | | 2 | 1 | 3 |
| E | Curb | 04 | | | 3 | 3 |
| D | Guardrail/Barrier | 05 | | 19 | 43 | 62 |
| | Embankment | 06 | | | 2 | 2 |
| O | Fence | 07 | | | | |
| B | Light Pole | 08 | | | 1 | 1 |
| J | Sign Pole | 09 | | | | |
| E | Other Pole | 10 | | | | |
| C | Tree/Shrubbery | 11 | | | | |
| T | Contr. Barrier | 12 | | 1 | | 1 |
| S | Crash Attenuator | 13 | | 1 | 1 | 2 |
| | Other Fixed Object | | | | | |

**WEATHER**

| | |
|---|---|
| 391 | Clear / Cloudy |
| 1 | Foggy |
| 69 | Raining |
| 6 | Snow / Sleet |
| 33 | Other |

**ILLUMINATION**

| | |
|---|---|
| 292 | Day |
| 27 | Dawn/Dusk |
| 156 | Dark - Lights On |
| 14 | Dark - No Lights |
| 11 | Other |

**TOTALS**

| | |
|---|---|
| 16-18 | 500 |

Maryland State Highway Administration
Office of Traffic and Safety - Traffic Development and Support

SHA ADC History Output rev. 10/2017-1          - Combined Year Listing

Name: Matthew Jagg
Date:    04/28/2020

| Location: | I-495 From: Virginia To: MD-190 | | Logmiles: | From 0 To 2.6   Length:   2.60 |
| County: | Montgomery, D3    Period:    January 01, 2016 To December 31, 2018 | | Note: | AADT's data are provided: IAPA. |

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | Movement V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|-------------|----|----------------|
| **IS495** | | | | | | | | | | | | |
| 0.000 | | 02052016 | Property | 07A | Day | Dry | | | RREND | NS | NS | Followed too closely |
| 0.000 | | 04082016 | Property | 10A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.000 | | 05262016 | 1 Injured | 06P | Day | Dry | | | RREND | Nu | NS | Other or Unknown |
| 0.000 | | 10152016 | Property | 02P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 0.000 | | 12142017 | Property | 08P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.000 | | 01152018 | Property | 03A | Night | | | 05 | FXOBJ | ES | -- | Too fast for conditions |
| 0.000 | | 02062018 | Property | 04A | Night | Dry | | 01 | FXOBJ | ES | -- | Fail to give full attention |
| 0.000 | | 02072018 | Property | 08P | Night | Wet | | | RREND | ES | ES | Fail to give full attention |
| 0.000 | | 02162018 | Property | 10A | Day | Wet | | | RREND | WS | WS | Followed too closely |
| 0.000 | | 04182018 | 1 Injured | 11P | Night | Dry | | | SDSWP | WS | WS | Too fast for conditions |
| 0.000 | | 04252018 | Property | 11P | Night | Dry | | 05 | FXOBJ | WS | -- | Fail to give full attention |
| 0.000 | | 06042018 | Property | 09P | Night | Dry | | | OTHER | NS | -- | Fail to give full attention |
| 0.000 | | 08082018 | 1 Injured | 02P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.000 | | 12182018 | Property | 08P | Night | Dry | | | SDSWP | ES | ES | Improper lane change |
| 0.020 | | 05032016 | Property | 10A | Day | | | | RREND | NS | NS | Followed too closely |
| 0.020 | | 11232016 | Property | 07A | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.050 | | 03202017 | 2 Injured | 05P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 0.060 | | 03292016 | Property | 03P | Day | Dry | | | RREND | NS | NS | Fail to give full attention |
| 0.060 | | 08152016 | 2 Injured | 07A | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.060 | | 09122016 | Property | 08A | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.060 | | 10122016 | Property | 07P | Night | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.060 | | 10282016 | Property | 04P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 0.060 | | 11232016 | Property | 09A | Day | Dry | | | PED | SS | -- | Fail to obey traffic signal |
| 0.060 | | 02132017 | Property | 05P | Day | Dry | | | SDSWP | ES | ES | Fail to yield right-of-way |
| 0.060 | | 04242017 | 1 Injured | 07A | Day | Wet | | | RREND | WS | WS | Other or Unknown |
| 0.060 | | 06152017 | 2 Injured | 11P | Night | Dry | | | SDSWP | WS | WS | Fail to drive in single lane |
| 0.060 | | 07052017 | Property | 02P | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 0.060 | | 07312017 | 1 Injured | 03P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 0.060 | | 08242017 | 2 Injured | 01P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.060 | | 09152017 | Property | 08P | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.060 | | 10202017 | 3 Injured | 12P | Day | | | | RREND | ES | ES | Too fast for conditions |
| 0.060 | | 12212017 | Property | 07P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 0.060 | | 01052018 | Property | 01P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.060 | | 01072018 | Property | 05P | Night | Dry | | 05 | FXOBJ | ES | -- | Too fast for conditions |
| 0.060 | | 01102018 | 1 Injured | 07A | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.060 | | 01142018 | Property | 01P | Day | Dry | | | RREND | ES | ES | Other or Unknown |

Fixed Object:  01 = Bridge    02 = Building    03 = Culvert/Ditch    04 = Curb    05 = Guardrail/Barrier    06 = Embankment    07 = Fence
08 = Light Pole    09 = Sign Post    10 = Other Pole    11 = Tree/Shrubbery    12 = Construction Barrier    13 = Crash Attenuator

00174424

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 0.060 | | 02072018 | 1 Injured | 09P | Night | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.060 | | 02212018 | Property | 06A | Night | Wet | | | RREND | ES | ES | Too fast for conditions |
| 0.060 | | 05152018 | Property | 04P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.060 | | 08012018 | Property | 11A | Day | Dry | | | RREND | SS | SS | Fail to give full attention |
| 0.060 | | 09102018 | Property | 06P | Day | Wet | | | RREND | WS | WS | Fail to give full attention |
| 0.060 | | 12182018 | 2 Injured | 07P | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.060 | | 12192018 | 1 Injured | 07A | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.070 | | 11202017 | Property | 08P | Night | | | | RREND | ES | ES | Too fast for conditions |
| 0.080 | | 05312016 | 2 Injured | 10A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.080 | | 05302017 | Property | 05P | Day | Dry | | | RREND | SS | SS | Followed too closely |
| 0.080 | | 07062018 | Property | 02P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.100 | | 02232017 | Property | 05P | Day | Dry | | | RREND | NS | NS | Followed too closely |
| 0.100 | | 03062017 | Property | 06A | Day | Dry | | | OTHER | WS | -- | Other or Unknown |
| 0.140 | | 07312016 | Property | 06P | Day | Wet | | | RREND | WS | WS | Fail to give full attention |
| 0.150 | | 07202017 | 1 Injured | 12A | Night | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 0.150 | | 12072017 | Property | 03P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.150 | | 01022018 | Property | 06P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.150 | | 10072018 | Property | 07P | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.260 | | 07162016 | 3 Injured | 03P | Day | Dry | | | SDSWP | SS | SS | Other or Unknown |
| 0.260 | | 08132018 | Property | 06P | Day | Dry | | | SDSWP | ES | ES | Fail to give full attention |
| 0.270 | | 03152017 | Property | 01P | Day | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 0.270 | | 12042017 | Property | 02P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.270 | | 11162018 | Property | 07A | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 0.280 | | 06062016 | 1 Injured | 05P | Day | Dry | | | RREND | NS | NS | Fail to give full attention |
| 0.280 | | 12072018 | Property | 04P | Day | Dry | | | RREND | SS | SS | Fail to give full attention |
| 0.290 | | 11232016 | Property | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.300 | | 01302018 | 3 Injured | 02P | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 0.310 | | 11162016 | Property | 09A | Day | Dry | | | RREND | SS | SS | Fail to give full attention |
| 0.320 | | 12202018 | Property | 07A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.330 | | 04122016 | Property | 04P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.330 | | 05162016 | Property | 09A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.330 | | 10182016 | Property | 02P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.330 | | 02012017 | Property | 08A | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 0.330 | | 10182017 | Property | 04P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.330 | | 03102018 | Property | 12P | Day | Dry | | | RREND | SS | SS | Followed too closely |
| 0.330 | | 08212018 | 1 Injured | 11P | Night | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 0.330 | | 09042018 | Property | 07A | Day | Dry | | | SDSWP | SS | SS | Fail to give full attention |
| 0.330 | | 09252018 | Property | 07A | Day | Wet | | | RREND | WS | WS | Fail to give full attention |
| 0.340 | | 05252017 | Property | 09P | Night | Wet | | | OTHER | WS | -- | Other or Unknown |
| 0.340 | | 09182018 | Property | 05P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.340 | | 11162018 | Property | 06A | Night | Ice | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 0.340 | | 11162018 | Property | 07A | Night | Ice | | 04 | FXOBJ | WS | -- | Other or Unknown |

---

Fixed Object:   01 = Bridge    02 = Building    03 = Culvert/Ditch    04 = Curb    05 = Guardrail/Barrier    06 = Embankment    07 = Fence

08 = Light Pole    09 = Sign Post    10 = Other Pole    11 = Tree/Shrubbery    12 = Construction Barrier    13 = Crash Attenuator

00174425

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.340 | | 11162018 | Property | 07A | Night | | | 04 | FXOBJ | WS | -- | Other or Unknown |
| 0.350 | | 11292017 | Property | 05P | Night | Dry | | | RREND | Wu | WS | Other or Unknown |
| 0.360 | | 07262018 | Property | 06P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.370 | | 11082016 | Property | 10A | Day | Dry | | | PARKD | Su | SP | Improper backing |
| 0.370 | | 03022017 | 1 Injured | 08P | Night | Dry | | | SDSWP | NS | NS | Fail to give full attention |
| 0.390 | | 01112016 | 1 Injured | 06P | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.390 | | 02122016 | Property | 06A | Night | Dry | | | SDSWP | WS | WS | Fail to give full attention |
| 0.390 | | 07312016 | Property | 06P | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 0.390 | | 09132016 | Property | 05P | Day | Dry | | | RREND | ES | ES | Fell asleep, fainted, etc. |
| 0.390 | | 10152016 | Property | 03P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 0.390 | | 06092017 | 1 Injured | 07A | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 0.390 | | 10272017 | Property | 04P | Day | | | | RREND | | | Too fast for conditions |
| 0.390 | | 10292017 | Property | 09A | Day | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 0.390 | | 01202018 | Property | 02A | Night | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 0.390 | | 01242018 | Property | 11A | Day | | | | RREND | ES | ES | Improper lane change |
| 0.390 | | 02162018 | Property | 11A | Day | Wet | | | RREND | ES | ES | Fail to give full attention |
| 0.390 | | 06272018 | Property | 06P | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 0.390 | | 10302018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.390 | | 12122018 | Property | 06P | Night | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.390 | | 12202018 | Property | 04P | Night | Wet | | | RREND | ES | ES | Followed too closely |
| 0.390 | | 12242018 | Property | 05P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 0.400 | | 07142016 | Property | 09P | | Dry | | 03 | FXOBJ | ES | -- | Other or Unknown |
| 0.400 | | 09292016 | Property | 04A | Night | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 0.400 | | 10212018 | 4 Injured | 01P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.400 | | 10262018 | Property | 10P | Night | Wet | | | SDSWP | SS | SS | Fail to give full attention |
| 0.410 | | 08172016 | Property | 02A | Night | Wet | ✓ | | RREND | WS | WS | Under influence of alcohol |
| 0.410 | | 05012017 | Property | 07P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.420 | | 12062016 | Property | 07P | Night | Wet | | | RREND | WS | WS | Other or Unknown |
| 0.420 | | 10202018 | Property | 04P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.430 | | 01132017 | 1 Injured | 06A | Night | Dry | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 0.430 | | 05132017 | Property | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.440 | | 10092018 | Property | 10P | Night | Dry | | | OTHER | WS | -- | Other or Unknown |
| 0.470 | | 09232016 | Property | 06P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.490 | | 09232017 | 3 Injured | 01P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.500 | | 11012017 | Property | 09P | Night | Dry | | | OTHER | SS | -- | Other or Unknown |
| 0.500 | | 02252018 | Property | 09A | Day | Wet | | 05 | FXOBJ | WS | -- | Fail to give full attention |
| 0.500 | | 04082018 | Property | 11P | Night | Dry | | | RREND | SS | SS | Fail to give full attention |
| 0.500 | | 07112018 | Property | 02P | Day | Dry | | | SDSWP | NS | NS | Fail to give full attention |
| 0.500 | | 08262018 | 3 Injured | 05A | Night | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.510 | | 03032017 | 1 Injured | 06P | | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.510 | | 03162017 | Property | 04P | Day | Dry | | | RREND | SS | SS | Followed too closely |
| 0.510 | | 08262018 | Property | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |

Fixed Object:   01 = Bridge     02 = Building     03 = Culvert/Ditch     04 = Curb     05 = Guardrail/Barrier     06 = Embankment     07 = Fence

08 = Light Pole     09 = Sign Post     10 = Other Pole     11 = Tree/Shrubbery     12 = Construction Barrier     13 = Crash Attenuator

00174426

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.520 | | 01042016 | 1 Injured | 07A | Night | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 0.520 | | 01292016 | 1 Injured | 12A | Night | Snow | | | RREND | WS | WS | Other or Unknown |
| 0.520 | | 02172016 | Property | 07P | Night | Dry | | | RREND | SS | SS | Other or Unknown |
| 0.520 | | 04132016 | Property | 11A | Day | Dry | | | SDSWP | ES | ES | Fail to give full attention |
| 0.520 | | 04132016 | Property | 04P | Day | Dry | | | SDSWP | WS | WS | Fail to drive in single lane |
| 0.520 | | 04142016 | Property | 09A | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.520 | | 05062016 | Property | 01A | Night | Dry | | | SDSWP | ES | ES | Fail to drive in single lane |
| 0.520 | | 07012016 | 1 Injured | 05P | Day | Dry | | | SDSWP | ES | ES | Improper lane change |
| 0.520 | | 07312016 | Property | 04A | Night | Dry | ✓ | 05 | FXOBJ | WS | -- | Under influence of alcohol |
| 0.520 | | 08312016 | Property | 03P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 0.520 | | 01052017 | Property | 05P | Night | Dry | | | RREND | WS | WS | Too fast for conditions |
| 0.520 | | 02162017 | Property | 10A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.520 | | 07082017 | 2 Injured | 01P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 0.520 | | 07292017 | Property | 01A | Night | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 0.520 | | 07292017 | Property | 01A | Night | Wet | | 05 | FXOBJ | WS | -- | Exceeded speed limit |
| 0.520 | | 08062017 | 4 Injured | 12P | Day | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 0.520 | | 08222017 | Property | 03P | Day | Dry | | | SDSWP | ES | ES | Other or Unknown |
| 0.520 | | 11292017 | Property | 06A | Night | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.520 | | 12012017 | Property | 08A | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.520 | | 01262018 | Property | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.520 | | 02082018 | 1 Injured | 03P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.520 | | 02122018 | Property | 09A | Day | Wet | | | RREND | WS | WS | Followed too closely |
| 0.520 | | 02122018 | Property | 09A | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 0.520 | | 02192018 | Property | 03P | Day | Wet | | | RREND | WS | WS | Other or Unknown |
| 0.520 | | 04022018 | Property | 10A | Day | Wet | | | RREND | WS | WS | Followed too closely |
| 0.520 | | 05192018 | 1 Injured | 12A | Night | Wet | | | SDSWP | ES | ES | Too fast for conditions |
| 0.520 | | 08192018 | Property | 11A | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 0.520 | | 08262018 | 1 Injured | 05A | Night | Dry | | 13 | FXOBJ | SS | -- | Fail to give full attention |
| 0.520 | | 09292018 | 2 Injured | 05P | Day | Dry | | | RREND | WS | WS | Under influence of drugs |
| 0.520 | | 10062018 | Property | 06A | Night | Dry | | | OTHER | WS | -- | Other or Unknown |
| 0.520 | | 10282018 | 2 Injured | 09P | Night | Dry | | | PARKD | ES | EP | Fail to give full attention |
| 0.520 | | 12082018 | Property | 06A | Night | Dry | ✓ | | SDSWP | ES | ES | Other or Unknown |
| 0.530 | | 10282016 | Property | 07P | Night | Dry | | | RREND | WS | WS | Followed too closely |
| 0.530 | | 12282017 | Property | 02P | Day | Dry | | | RREND | SS | SS | Too fast for conditions |
| 0.530 | | 07112018 | Property | 05P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 0.540 | | 07192016 | Property | 06P | Day | Dry | | | RREND | ES | ES | Fail to yield right-of-way |
| 0.540 | | 10052016 | Property | 06P | Day | Dry | | | SDSWP | ES | ES | Fail to give full attention |
| 0.540 | | 02162018 | 1 Injured | 06P | Night | Dry | | | RREND | SS | SS | Fail to give full attention |
| 0.540 | | 03192018 | 1 Injured | 10P | Night | Dry | | | OTHER | NS | -- | Too fast for conditions |
| 0.540 | | 10242018 | 3 Injured | 09P | Night | Dry | | | RREND | NS | NS | Fail to give full attention |
| 0.550 | | 09092018 | Property | 02P | Day | Wet | | | RREND | WS | WS | Fail to give full attention |
| 0.580 | | 04152016 | Property | 05A | Night | Dry | | | SDSWP | WS | WS | Fail to drive in single lane |

Fixed Object:  01 = Bridge    02 = Building    03 = Culvert/Ditch    04 = Curb    05 = Guardrail/Barrier    06 = Embankment    07 = Fence
08 = Light Pole    09 = Sign Post    10 = Other Pole    11 = Tree/Shrubbery    12 = Construction Barrier    13 = Crash Attenuator

00174427

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|-----------------|
| 0.580 | | 11122018 | Property | 08P | Night | Wet | | | SDSWP | ES | ES | Improper lane change |
| 0.610 | | 11182016 | Property | 11A | Night | Dry | | | SDSWP | SS | SS | Other or Unknown |
| 0.610 | | 05152017 | Property | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.610 | | 05232017 | Property | 04P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 0.610 | | 10232018 | Property | 05A | Night | Dry | | | RREND | NS | NS | Fail to give full attention |
| 0.610 | | 10252018 | Property | 12A | | Dry | | | OTHER | ES | -- | Other or Unknown |
| 1.000 | | 04062016 | Property | 04P | Day | Dry | | | SDSWP | NS | NS | Improper lane change |
| 1.000 | | 06302016 | Property | 08A | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 1.000 | | 10072018 | 4 Injured | 07P | Night | Dry | | | RREND | NS | NS | Fail to give full attention |
| 1.020 | | 06032016 | 1 Injured | 06P | Day | Wet | | | RREND | ES | ES | Followed too closely |
| 1.020 | | 09222016 | Property | 05P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.070 | | 12112017 | Property | 06P | Night | Dry | | | RREND | WS | WS | Too fast for conditions |
| 1.070 | | 07032018 | Property | 04P | Day | Dry | | | SDSWP | WS | WS | Improper lane change |
| 1.090 | | 06012018 | Property | 04P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 1.100 | | 10072017 | Property | 11A | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 1.110 | | 01162016 | Property | 01P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.110 | | 06182016 | 1 K, 0 I | 01A | Night | Dry | | | SDSWP | ES | ES | Improper turn |
| 1.110 | | 06242016 | 1 Injured | 04P | Day | Dry | | | SDSWP | NS | NS | Fail to give full attention |
| 1.110 | | 08292016 | Property | 10P | Day | Dry | | | OTHER | ES | -- | Other or Unknown |
| 1.110 | | 12122016 | Property | 07P | Night | Dry | | | RREND | ES | ES | Other or Unknown |
| 1.110 | | 09302017 | Property | 09P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.110 | | 03052018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.110 | | 03132018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.110 | | 04052018 | 2 Injured | 02P | Day | Dry | | | RREND | ES | ES | Fail to drive in single lane |
| 1.110 | | 05192018 | Property | 03A | Night | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 1.110 | | 05192018 | Property | 07A | Day | Wet | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 1.110 | | 06252018 | Property | 05P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 1.110 | | 06252018 | Property | 05P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 1.110 | | 10222018 | Property | 04P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 1.110 | | 12042018 | Property | 05P | Night | Dry | | | OTHER | ES | -- | Other or Unknown |
| 1.110 | | 12112018 | Property | 05P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 1.120 | | 06122018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 1.140 | | 02122018 | Property | 04A | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.150 | | 08232016 | Property | 06P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.150 | | 11052018 | Property | 05A | Night | Wet | | | SDSWP | WS | WS | Fail to give full attention |
| 1.170 | | 10272017 | Property | 05P | Day | | | | RREND | WS | WS | Too fast for conditions |
| 1.170 | | 10192018 | Property | 03P | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 1.370 | | 04282016 | 1 Injured | 05P | Day | Wet | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 06082016 | Property | 04P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 08032016 | Property | 05P | Day | Dry | | | RREND | ES | ES | Fell asleep, fainted, etc. |
| 1.370 | | 08232016 | Property | 06P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 10192016 | Property | 07P | Night | Dry | | | SDSWP | ES | ES | Other or Unknown |

Fixed Object:   01 = Bridge    02 = Building    03 = Culvert/Ditch    04 = Curb    05 = Guardrail/Barrier    06 = Embankment    07 = Fence

08 = Light Pole    09 = Sign Post    10 = Other Pole    11 = Tree/Shrubbery    12 = Construction Barrier    13 = Crash Attenuator

00174428

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|-----|-----|----------------|
| 1.370 | | 03142017 | 1 Injured | 08A | Day | Snow | | | SDSWP | WS | WS | Other or Unknown |
| 1.370 | | 04222017 | Property | 01P | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 1.370 | | 05082017 | Property | 05P | Day | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 1.370 | | 06032017 | Property | 05A | Night | Dry | | 05 | FXOBJ | ES | -- | Too fast for conditions |
| 1.370 | | 07082017 | Property | 03P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.370 | | 07212017 | 1 Injured | 08A | Day | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 1.370 | | 08222017 | 1 Injured | 07P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 1.370 | | 09042017 | 1 Injured | 05A | | Dry | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 1.370 | | 09092017 | Property | 03P | Day | Dry | ✓ | | SDSWP | WS | WS | Under influence of alcohol |
| 1.370 | | 09112017 | Property | 07A | | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 09132017 | Property | 05P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 10102017 | Property | 09A | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 1.370 | | 12042017 | Property | 01P | Day | Dry | | | OTHER | ES | -- | Other or Unknown |
| 1.370 | | 12072017 | Property | 05P | Day | Dry | | | RREND | Nu | NS | Other or Unknown |
| 1.370 | | 01102018 | Property | 05P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.370 | | 01122018 | Property | 09P | Night | Wet | | | RREND | ES | ES | Too fast for conditions |
| 1.370 | | 01242018 | Property | 10A | Day | Dry | | 05 | FXOBJ | WS | -- | Fail to drive in single lane |
| 1.370 | | 02272018 | Property | 12P | | Dry | | | SDSWP | ES | ES | Improper lane change |
| 1.370 | | 03292018 | Property | 09A | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 1.370 | | 04162018 | Property | 01A | Night | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 1.370 | | 05162018 | Property | 06P | Day | Wet | | | RREND | WS | WS | Fail to give full attention |
| 1.370 | | 07272018 | 1 Injured | 05A | Night | Dry | | 05 | FXOBJ | NS | -- | Other or Unknown |
| 1.370 | | 08182018 | 1 Injured | 01P | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 1.370 | | 10112018 | Property | 03P | Day | Wet | | | RREND | WS | WS | Fail to give full attention |
| 1.370 | | 10122018 | Property | 10A | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 1.370 | | 10122018 | Property | 03P | Day | | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 10172018 | 1 Injured | 01A | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 1.370 | | 10222018 | Property | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.370 | | 11072018 | Property | 02P | Day | Dry | | 05 | FXOBJ | WS | -- | Fail to give full attention |
| 1.370 | | 11222018 | Property | 08A | Day | Dry | | | OTHER | ES | -- | Other or Unknown |
| 1.390 | | 06132016 | 1 Injured | 04P | Day | Dry | | | SDSWP | SS | SS | Fail to drive in single lane |
| 1.520 | | 04182017 | Property | 03P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 1.520 | | 07262017 | 1 Injured | 09P | Night | Dry | | | SDSWP | ES | ES | Other or Unknown |
| 1.520 | | 09022017 | 1 Injured | 10A | Day | Wet | | | SDSWP | WS | WS | Too fast for conditions |
| 1.520 | | 05192018 | Property | 11A | Day | Wet | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 1.520 | | 06152018 | Property | 06P | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 1.520 | | 10202018 | Property | 02P | Day | | | | RREND | ES | ES | Fail to give full attention |
| 1.520 | | 12152018 | Property | 09A | Day | Wet | | 05 | FXOBJ | WS | -- | Fail to give full attention |
| 1.520 | | 12202018 | Property | 06A | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 1.520 | | 12282018 | Property | 08A | Day | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 1.560 | | 10062016 | 1 Injured | 07A | Day | Dry | | 05 | FXOBJ | ES | -- | Improper lane change |
| 1.720 | | 11122016 | Property | 03A | Night | Dry | | 05 | FXOBJ | SS | -- | Fell asleep, fainted, etc. |

---

Fixed Object:  01 = Bridge  02 = Building  03 = Culvert/Ditch  04 = Curb  05 = Guardrail/Barrier  06 = Embankment  07 = Fence
08 = Light Pole  09 = Sign Post  10 = Other Pole  11 = Tree/Shrubbery  12 = Construction Barrier  13 = Crash Attenuator

00174429

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 1.720 | | 03072017 | 1 Injured | 03P | Day | Dry | | | RREND | NS | NS | Improper lane change |
| 1.750 | | 02282017 | Property | 09A | Day | Dry | | | SDSWP | SS | SS | Improper lane change |
| 1.820 | | 05082018 | Property | 10A | Night | Dry | | | SDSWP | SS | SS | Other or Unknown |
| 1.860 | | 01222016 | Property | 01A | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 1.900 | | 01042016 | Property | 04P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 1.900 | | 02132016 | Property | 01P | Day | Dry | | 06 | FXOBJ | NS | -- | Fail to give full attention |
| 1.900 | | 11262016 | Property | 12P | Day | Dry | | | RREND | NS | NS | Fail to give full attention |
| 1.900 | | 11092017 | Property | 06A | Day | Wet | | 04 | FXOBJ | NS | -- | Other or Unknown |
| 1.900 | | 01092018 | 1 Injured | 06P | Night | Dry | | | RREND | WS | WS | Fail to drive in single lane |
| 1.900 | | 04122018 | Property | 12P | Day | Dry | | 05 | FXOBJ | WS | -- | Fell asleep, fainted, etc. |
| 1.900 | | 06242018 | Property | 01P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 1.900 | | 12042018 | Property | 03P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 1.910 | | 05022018 | 3 Injured | 03P | Day | Dry | | | RREND | SS | SS | Fail to give full attention |
| 1.990 | | 06222018 | Property | 10A | Day | Wet | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.020 | | 02022018 | Property | 06P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.110 | | 05102017 | Property | 06P | Day | Dry | | | RREND | WS | Wu | Fail to give full attention |
| 2.110 | | 07252018 | Property | 02P | Day | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.110 | | 10232018 | 2 Injured | 07A | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.110 | | 12312018 | Property | 01A | Night | Dry | | | OTHER | WS | -- | Other or Unknown |
| 2.190 | | 04232017 | Property | 06A | Day | Dry | | | OTHER | ES | -- | Too fast for conditions |
| 2.190 | | 06242017 | Property | 10P | Night | Dry | | | RREND | ES | ES | Followed too closely |
| 2.190 | | 10172018 | Property | 09A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.200 | | 01082018 | Property | 06A | Day | Dry | | | SDSWP | NS | NS | Other or Unknown |
| 2.200 | | 09132018 | 1 Injured | 07A | Day | Dry | | | RREND | ES | ES | Fail to drive in single lane |
| 2.210 | | 01212016 | 3 Injured | 02A | Night | Wet | | | PARKD | WS | WP | Fail to give full attention |
| 2.210 | | 02262016 | Property | 01P | Day | Dry | | | SDSWP | NS | NS | Improper lane change |
| 2.210 | | 09222016 | Property | 05P | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 2.210 | | 11242017 | 4 Injured | 06P | Night | Dry | | 12 | FXOBJ | WS | -- | Fail to give full attention |
| 2.210 | | 11302017 | 3 Injured | 05P | Night | Dry | | | RREND | SS | SS | Fail to give full attention |
| 2.210 | | 03192018 | Property | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.210 | | 06232018 | 2 Injured | 03P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.210 | | 08062018 | Property | 08A | Day | Dry | | | SDSWP | WS | WS | Improper passing |
| 2.210 | | 11082018 | Property | 11P | Night | Dry | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.210 | | 12202018 | Property | 11P | Night | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 2.220 | | 10302016 | 1 Injured | 09P | Night | Wet | | | RREND | ES | ES | Fail to give full attention |
| 2.220 | | 02032017 | 1 Injured | 09P | Night | Dry | | | RREND | SS | SS | Fail to give full attention |
| 2.230 | | 04202018 | Property | 07P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.250 | | 05222018 | Property | 04P | Day | Wet | | | RREND | WS | Wu | Fail to give full attention |
| 2.280 | | 10112016 | Property | 11A | Day | Dry | | | SDSWP | ES | ES | Other or Unknown |
| 2.280 | | 06272017 | Property | 04P | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 2.280 | | 01092018 | Property | 06P | Night | Dry | | | RREND | ES | ES | Followed too closely |
| 2.280 | | 08272018 | Property | 05P | Day | Dry | | | RREND | WS | WS | Followed too closely |

---

Fixed Object:  01 = Bridge   02 = Building   03 = Culvert/Ditch   04 = Curb   05 = Guardrail/Barrier   06 = Embankment   07 = Fence
08 = Light Pole   09 = Sign Post   10 = Other Pole   11 = Tree/Shrubbery   12 = Construction Barrier   13 = Crash Attenuator

00174430

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 2.280 | | 10062018 | 2 Injured | 04P | Day | Dry | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.280 | | 12042018 | 2 Injured | 03P | Day | | | | RREND | ES | ES | Other or Unknown |
| 2.290 | | 04072017 | Property | 04P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.290 | | 04242017 | Property | 10A | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 2.290 | | 10302018 | Property | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.300 | | 07042016 | Property | 06P | Day | Wet | | 05 | FXOBJ | WS | -- | Fail to give full attention |
| 2.300 | | 12052017 | 1 K, 0 I | 09P | Night | Wet | | | PED | ES | ES | Other or Unknown |
| 2.300 | | 10012018 | Property | 04P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.310 | | 02152017 | Property | 06P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.310 | | 05312018 | Property | 12A | Night | Wet | | | SDSWP | WS | WS | Improper lane change |
| 2.330 | | 03182017 | Property | 12A | Night | Wet | | 05 | FXOBJ | WS | -- | Too fast for conditions |
| 2.330 | | 03182017 | 2 Injured | 06A | Day | Wet | | | SDSWP | WS | WS | Other or Unknown |
| 2.330 | | 04012017 | Property | 06A | Day | Wet | | 05 | FXOBJ | ES | -- | Fell asleep, fainted, etc. |
| 2.330 | | 06032017 | 1 Injured | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.330 | | 06262018 | Property | 01P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.330 | | 07282018 | 1 Injured | 05P | Day | Dry | | | RREND | SS | SS | Followed too closely |
| 2.330 | | 12222018 | 1 Injured | 11A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.350 | | 07112016 | Property | 03P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.350 | | 11292016 | 1 Injured | 09A | Day | Wet | | 05 | FXOBJ | ES | -- | Too fast for conditions |
| 2.350 | | 03022017 | Property | 02P | Day | Dry | | | SDSWP | WS | WS | Fail to drive in single lane |
| 2.350 | | 12132017 | Property | 12P | | Dry | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.350 | | 03122018 | Property | 10P | Night | Wet | | | SDSWP | ES | ES | Other or Unknown |
| 2.350 | | 03142018 | 1 Injured | 04P | Day | Dry | | | RREND | SS | SS | Physical or mental difficulty |
| 2.350 | | 07192018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.350 | | 10232018 | 2 Injured | 08P | Night | Dry | | | RREND | NS | NS | Fail to give full attention |
| 2.360 | | 02202016 | Property | 07P | Night | Dry | | | RREND | SS | SS | Other or Unknown |
| 2.360 | | 08242016 | 1 Injured | 01A | Night | Dry | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 2.360 | | 01182018 | Property | 03P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.360 | | 01262018 | 1 Injured | 01P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.360 | | 02142018 | Property | 05P | Day | Dry | | | RREND | NS | NS | Fail to give full attention |
| 2.360 | | 06092018 | Property | 03P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.360 | | 07232018 | Property | 03A | Night | Wet | | 06 | FXOBJ | WS | -- | Fail to give full attention |
| 2.360 | | 09112018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.370 | | 01012016 | Property | 07A | Night | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.370 | | 01042016 | 1 Injured | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 01052016 | 1 Injured | 08P | Night | Dry | | | OTHER | ES | -- | Other or Unknown |
| 2.370 | | 01062016 | Property | 08P | Night | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 01112016 | Property | 06P | Night | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 01122016 | 1 Injured | 05P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.370 | | 01122016 | Property | 08P | Night | Dry | | | SDSWP | ES | ES | Improper lane change |
| 2.370 | | 01152016 | Property | 07P | Night | Wet | | | RREND | ES | ES | Fell asleep, fainted, etc. |
| 2.370 | | 02092016 | 1 Injured | 08A | Day | Wet | | 03 | FXOBJ | WS | -- | Too fast for conditions |

---

Fixed Object:   01 = Bridge     02 = Building     03 = Culvert/Ditch     04 = Curb     05 = Guardrail/Barrier     06 = Embankment     07 = Fence
08 = Light Pole     09 = Sign Post     10 = Other Pole     11 = Tree/Shrubbery     12 = Construction Barrier     13 = Crash Attenuator

00174431

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 2.370 | | 02132016 | 1 Injured | 10A | Day | Wet | | | RREND | ES | ES | Too fast for conditions |
| 2.370 | | 02132016 | 1 Injured | 12P | Day | Dry | | | RREND | NS | NS | Fail to give full attention |
| 2.370 | | 02152016 | 1 Injured | 03P | Day | Wet | | 05 | FXOBJ | WS | -- | Fail to give full attention |
| 2.370 | | 02182016 | 1 Injured | 09A | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 03012016 | 2 Injured | 05P | Day | Dry | | | SDSWP | ES | ES | Improper lane change |
| 2.370 | | 03022016 | Property | 08A | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 03022016 | 1 Injured | 09A | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 03112016 | 1 Injured | 03P | Day | Dry | | | RREND | NS | NS | Other or Unknown |
| 2.370 | | 03112016 | 3 Injured | 07P | Night | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 03142016 | Property | 06A | Night | Wet | | | SDSWP | WS | WS | Too fast for conditions |
| 2.370 | | 03172016 | Property | 06A | Night | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.370 | | 03302016 | Property | 05P | Day | Dry | | | RREND | NS | NS | Followed too closely |
| 2.370 | | 04082016 | 1 Injured | 10A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 04082016 | 2 Injured | 06P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 04192016 | Property | 04P | Day | Dry | | | RREND | ES | SS | Other or Unknown |
| 2.370 | | 04192016 | Property | 04P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 04272016 | Property | 09A | Day | Wet | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 05022016 | Property | 07P | Day | Wet | | | RREND | NS | NS | Followed too closely |
| 2.370 | | 05022016 | Property | 09P | Night | Wet | | | SDSWP | NS | NS | Fail to drive in single lane |
| 2.370 | | 05022016 | 1 Injured | 10P | Night | Wet | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 05212016 | Property | 07A | Day | Wet | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 2.370 | | 05272016 | 2 Injured | 03P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 06122016 | Property | 01P | Day | Dry | | | RREND | NS | NS | Other or Unknown |
| 2.370 | | 06142016 | Property | 04P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 06162016 | Property | 06P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 06192016 | Property | 03P | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 07062016 | Property | 07P | Day | Dry | ✓ | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 07152016 | Property | 05P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 07222016 | Property | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 08022016 | Property | 03A | Night | Dry | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 2.370 | | 08242016 | 1 Injured | 10A | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.370 | | 08292016 | Property | 04P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 08312016 | Property | 04P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 08312016 | Property | 10P | Night | Dry | ✓ | | SDSWP | ES | ES | Under influence of alcohol |
| 2.370 | | 09152016 | Property | 07P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 09222016 | 1 Injured | 11A | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 09252016 | 5 Injured | 04P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 10062016 | Property | 06P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 10072016 | Property | 12P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.370 | | 10272016 | Property | 05P | Day | Wet | | | SDSWP | ES | ES | Improper lane change |
| 2.370 | | 11042016 | Property | 11P | Night | Dry | | | OTHER | ES | -- | Other or Unknown |
| 2.370 | | 11112016 | Property | 09A | Day | Dry | | | OTHER | NS | -- | Other or Unknown |

Fixed Object:   01 = Bridge    02 = Building    03 = Culvert/Ditch    04 = Curb    05 = Guardrail/Barrier    06 = Embankment    07 = Fence
08 = Light Pole    09 = Sign Post    10 = Other Pole    11 = Tree/Shrubbery    12 = Construction Barrier    13 = Crash Attenuator

00174432

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 2.370 | | 01262017 | 3 Injured | 05P | Night | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 01272017 | 1 Injured | 06P | Night | Dry | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 01282017 | Property | 06P | Night | Dry | | | RREND | SS | SS | Followed too closely |
| 2.370 | | 01292017 | Property | 07P | Night | Dry | | 05 | FXOBJ | SS | -- | Fail to give full attention |
| 2.370 | | 02062017 | Property | 06A | Night | Dry | | 05 | FXOBJ | SS | -- | Fail to give full attention |
| 2.370 | | 02092017 | 3 Injured | 08P | Night | Dry | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 02172017 | Property | 01P | Day | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 2.370 | | 02242017 | 1 Injured | 03P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.370 | | 03132017 | 1 Injured | 01P | Day | Dry | | | SDSWP | ES | ES | Fail to drive in single lane |
| 2.370 | | 04142017 | Property | 04P | Day | | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 04172017 | Property | 01A | Night | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 04212017 | Property | 12P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 05032017 | 1 Injured | 05P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 05102017 | 3 Injured | 01A | Night | Dry | | | RREND | WS | WS | Stopping in lane roadway |
| 2.370 | | 05122017 | 2 Injured | 11A | Day | Dry | | | OTHER | SS | NS | Other or Unknown |
| 2.370 | | 05142017 | Property | 08A | Day | Dry | | | SDSWP | WS | WS | Fail to give full attention |
| 2.370 | | 05302017 | Property | 04P | Day | Dry | | | RREND | WS | WS | Followed too closely |
| 2.370 | | 05312017 | Property | 11A | Day | Dry | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.370 | | 06152017 | 1 Injured | 11A | Day | Dry | | | SDSWP | ES | ES | Other or Unknown |
| 2.370 | | 06172017 | 1 Injured | 12A | Night | Wet | | 05 | FXOBJ | ES | -- | Fail to drive in single lane |
| 2.370 | | 07012017 | 1 Injured | 04A | | Dry | | | SDSWP | WS | WS | Improper lane change |
| 2.370 | | 07142017 | Property | 03A | Day | Dry | | 13 | FXOBJ | WS | -- | Fail to give full attention |
| 2.370 | | 07152017 | Property | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 07162017 | 1 Injured | 01P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 07242017 | 2 Injured | 07A | Day | Dry | | | RREND | WS | WS | Improper lane change |
| 2.370 | | 08062017 | 2 Injured | 03P | Day | Dry | | | SDSWP | ES | ES | Fail to yield right-of-way |
| 2.370 | | 08092017 | Property | 11A | Day | Dry | | | SDSWP | ES | ES | Fail to give full attention |
| 2.370 | | 08192017 | Property | 07P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 08312017 | 1 Injured | 07P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 09022017 | Property | 10P | Night | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.370 | | 09102017 | Property | 02P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 09192017 | Property | 10A | Day | Dry | | | SDSWP | WS | WS | Improper lane change |
| 2.370 | | 09202017 | 6 Injured | 06P | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.370 | | 10032017 | 1 Injured | 05P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 10122017 | Property | 02A | Night | Wet | | | OTHER | ES | -- | Too fast for conditions |
| 2.370 | | 10132017 | 1 Injured | 06P | Day | Wet | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 10162017 | Property | 02P | Day | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.370 | | 10202017 | Property | 06A | Day | Dry | | | SDSWP | ES | ES | Fail to obey other control |
| 2.370 | | 11092017 | Property | 06P | Night | Wet | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 11132017 | Property | 10A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 11192017 | 1 Injured | 10P | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 11212017 | Property | 07P | Night | Dry | | | SDSWP | ES | ES | Fail to give full attention |

Fixed Object:   01 = Bridge     02 = Building     03 = Culvert/Ditch     04 = Curb     05 = Guardrail/Barrier     06 = Embankment     07 = Fence
08 = Light Pole     09 = Sign Post     10 = Other Pole     11 = Tree/Shrubbery     12 = Construction Barrier     13 = Crash Attenuator

00174433

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 2.370 | | 11282017 | 1 Injured | 06A | Day | Dry | | 05 | FXOBJ | NS | -- | Operator using cell phone |
| 2.370 | | 12012017 | Property | 02P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 12012017 | Property | 02P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 12122017 | Property | 06P | Night | Dry | | | SDSWP | WS | WS | Fail to give full attention |
| 2.370 | | 12132017 | Property | 01P | Day | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 2.370 | | 12232017 | Property | 08A | Night | Wet | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 12272017 | Property | 06P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 01032018 | Property | 05A | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 01052018 | 1 Injured | 06P | Night | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 01122018 | 1 Injured | 10P | Night | Wet | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 2.370 | | 01122018 | Property | 11P | Night | Wet | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 01222018 | Property | 05P | Night | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.370 | | 01242018 | Property | 07A | Day | Dry | | | RREND | ES | ES | Too fast for conditions |
| 2.370 | | 01262018 | Property | 02P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.370 | | 02032018 | 1 Injured | 09A | Day | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.370 | | 02132018 | Property | 09A | Day | Dry | | | SDSWP | WS | WS | Other or Unknown |
| 2.370 | | 02162018 | Property | 02P | Day | Wet | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 02162018 | Property | 05P | Day | Dry | | | SDSWP | ES | ES | Fail to yield right-of-way |
| 2.370 | | 02202018 | 1 Injured | 06A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 02202018 | 1 Injured | 06P | Night | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 02212018 | Property | 01P | Day | Dry | | | OTHER | ES | -- | Other or Unknown |
| 2.370 | | 02252018 | Property | 03P | Day | Dry | | | SDSWP | WS | WS | Improper lane change |
| 2.370 | | 02282018 | Property | 06P | Night | Dry | | | RREND | NS | NS | Followed too closely |
| 2.370 | | 03072018 | 1 Injured | 06P | Night | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 03152018 | Property | 05P | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.370 | | 03162018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.370 | | 03182018 | Property | 04P | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 04122018 | 1 Injured | 04A | Night | Dry | | 03 | FXOBJ | ES | -- | Fell asleep, fainted, etc. |
| 2.370 | | 05142018 | Property | 06P | Night | Wet | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 05212018 | Property | 07P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 05282018 | 2 Injured | 09P | Night | Dry | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.370 | | 06012018 | Property | 02P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 07062018 | 1 Injured | 12P | Day | Dry | | 05 | FXOBJ | NS | -- | Under influence of drugs |
| 2.370 | | 07152018 | Property | 02P | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 07162018 | 1 Injured | 05P | Day | Wet | | | RREND | ES | ES | Improper passing |
| 2.370 | | 07242018 | Property | 07A | Day | Wet | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 2.370 | | 08012018 | 1 Injured | 03A | Night | Wet | ✓ | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 08022018 | 1 Injured | 12A | Night | Wet | | | RREND | NS | NS | Other or Unknown |
| 2.370 | | 08022018 | 1 Injured | 12A | Night | Wet | | | PARKD | NS | NP | Fell asleep, fainted, etc. |
| 2.370 | | 08092018 | Property | 05P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 08142018 | Property | 03P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.370 | | 08152018 | Property | 05P | Day | Dry | | | RREND | NS | NS | Fail to give full attention |

Fixed Object:  01 = Bridge    02 = Building    03 = Culvert/Ditch    04 = Curb    05 = Guardrail/Barrier    06 = Embankment    07 = Fence

08 = Light Pole    09 = Sign Post    10 = Other Pole    11 = Tree/Shrubbery    12 = Construction Barrier    13 = Crash Attenuator

00174434

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|----|----|----------------|
| 2.370 | | 08202018 | Property | 04P | Day | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 09072018 | Property | 08P | Night | Wet | | | RREND | ES | ES | Other or Unknown |
| 2.370 | | 09072018 | Property | 09P | Night | Wet | | | PARKD | ES | EP | Other or Unknown |
| 2.370 | | 10222018 | Property | 02P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 11012018 | Property | 08A | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.370 | | 11022018 | 1 Injured | 08A | Day | Dry | | | SDSWP | WS | WS | Improper passing |
| 2.370 | | 11132018 | 1 Injured | 02P | Day | Dry | | 05 | FXOBJ | ES | -- | Under influence of drugs |
| 2.370 | | 11192018 | Property | 06P | Night | Dry | | | RREND | WS | WS | Too fast for conditions |
| 2.370 | | 12112018 | 1 Injured | 06A | Night | Dry | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.370 | | 12222018 | 3 Injured | 06P | Night | Dry | | | SDSWP | WS | WS | Improper lane change |
| 2.380 | | 01252016 | 1 Injured | 06P | Night | Wet | | | SDSWP | WS | WS | Too fast for conditions |
| 2.380 | | 11022016 | 1 Injured | 08A | Day | Dry | | | RREND | WS | WS | Other or Unknown |
| 2.380 | | 01192017 | Property | 03A | Day | Dry | | 08 | FXOBJ | WS | -- | Fell asleep, fainted, etc. |
| 2.380 | | 02052017 | Property | 06A | Day | Dry | | | SDSWP | ES | ES | Other or Unknown |
| 2.380 | | 06082017 | Property | 04P | Day | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.380 | | 12292017 | Property | 03P | Day | Dry | | | SDSWP | SS | SS | Fail to give full attention |
| 2.390 | | 07072016 | Property | 11A | Day | Dry | | | SDSWP | WS | WS | Fail to give full attention |
| 2.390 | | 07302016 | Property | 02P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.390 | | 09212016 | Property | 10P | Night | Dry | | 05 | FXOBJ | ES | -- | Other or Unknown |
| 2.390 | | 11302016 | 2 Injured | 11P | | Wet | | | RREND | ES | ES | Other or Unknown |
| 2.390 | | 03182017 | Property | 06A | Night | Wet | | | RREND | NS | NS | Fail to give full attention |
| 2.390 | | 04282017 | Property | 02P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.390 | | 08252017 | 3 Injured | 01P | Day | Dry | | | SDSWP | WS | WS | Fail to drive in single lane |
| 2.390 | | 04302018 | Property | 09A | Day | Dry | | | RREND | ES | ES | Other or Unknown |
| 2.410 | | 05042016 | Property | 01P | Day | Dry | | | RREND | ES | ES | Followed too closely |
| 2.410 | | 05142016 | Property | 05P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.410 | | 09022016 | 2 Injured | 02A | Night | Wet | | | RREND | WS | WS | Other or Unknown |
| 2.420 | | 11202017 | Property | 08P | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.420 | | 12262018 | Property | 02P | Day | Dry | | | RREND | WS | WS | Fail to give full attention |
| 2.430 | | 11192016 | Property | 07A | Day | Dry | | | SDSWP | SS | SS | Improper lane change |
| 2.430 | | 06302017 | Property | 01P | Day | Dry | | | RREND | SS | SS | Too fast for conditions |
| 2.430 | | 11132017 | Property | 09A | Day | Wet | | | RREND | WS | WS | Too fast for conditions |
| 2.430 | | 02242018 | 3 Injured | 05P | Day | Wet | | | SDSWP | NS | NS | Fail to drive in single lane |
| 2.450 | | 01212016 | Property | 04A | Night | Ice | | 05 | FXOBJ | WS | -- | Other or Unknown |
| 2.450 | | 06302017 | 1 Injured | 11A | Day | Dry | | | SDSWP | NS | NS | Other or Unknown |
| 2.450 | | 12172018 | Property | 08A | Day | Dry | | | SDSWP | ES | ES | Fail to drive in single lane |
| 2.460 | | 01102016 | 5 Injured | 05P | Day | Wet | | | SDSWP | WS | WS | Improper lane change |
| 2.460 | | 06052016 | Property | 08P | Day | Wet | | 05 | FXOBJ | ES | -- | Fail to give full attention |
| 2.460 | | 09182016 | 1 Injured | 03A | Night | Dry | | | RREND | ES | ES | Fail to give full attention |
| 2.460 | | 07292017 | Property | 08A | Day | Dry | | | SDSWP | NS | NS | Fail to drive in single lane |
| 2.460 | | 07202018 | 1 Injured | 08P | Night | Dry | | | SDSWP | ES | ES | Under influence of alcohol |
| 2.480 | | 12062016 | Property | 11P | Night | Wet | | 05 | FXOBJ | NS | -- | Other or Unknown |

Fixed Object:   01 = Bridge   02 = Building   03 = Culvert/Ditch   04 = Curb   05 = Guardrail/Barrier   06 = Embankment   07 = Fence
08 = Light Pole   09 = Sign Post   10 = Other Pole   11 = Tree/Shrubbery   12 = Construction Barrier   13 = Crash Attenuator

00174435

| MilePt | Int Rel | Date | Severity | Time | Light | Surface | Alc Rel | FixObj | Collision | Movement V1 | V2 | Probable Cause |
|--------|---------|------|----------|------|-------|---------|---------|--------|-----------|-------------|-----|----------------|
| 2.540 | | 09242018 | Property | 07P | | Wet | | | RREND | ES | ES | Too fast for conditions |
| 2.560 | | 12312018 | Property | 09P | | Wet | | | SDSWP | WS | WS | Too fast for conditions |

Fixed Object:   01 = Bridge     02 = Building     03 = Culvert/Ditch     04 = Curb     05 = Guardrail/Barrier     06 = Embankment     07 = Fence

08 = Light Pole     09 = Sign Post     10 = Other Pole     11 = Tree/Shrubbery     12 = Construction Barrier     13 = Crash Attenuator

00174436

**SHA** State Highway Administration — Maryland Department of Transportation

Office of Traffic & Safety
Traffic Development & Support Division
Crash Analysis Safety Team

Location: **I-495 From: Virginia To: MD-190 (2016)**
County: **MONTGOMERY**
Study Period: **01/01/2016 to 12/31/2016**
Analyst: **Matthew Jagg**   Date: **04/28/2020**



KEY: LogMile-CollisionType (FixedObjectStruck) -Date-Severity-Time-Surface-Illumination-Alcohol

template 06-27-06

| | | | | |
|---|---|---|---|---|
| F - Fatalities | SS - Sideswipe | FO - Fixed Object | OFFRD - Off Road | 00 - Not Applicable | 08 - Light Support Pole |
| I - Injury | PARKD - Parked Vehicle | OOBJ - Other Object | RUNWY - Downhill Runaway | 01 - Bridge or Overpass | 09 - Sign Support Pole |
| P - Property Damage | PED - Pedestrian | OT - Overturn | FIRE - Explosion Fire | 02 - Building | 10 - Other Pole |
| OD - Opposite Direction | BIKE - Bicycle | SPILL - Spilled Cargo | BCKNG - Backing | 03 - Culvert or Ditch | 11 - Tree Shrubbery |
| LT - Left Turn | PEDAL - Other Pedalcycle | JCKKNF - Jackknife | UTURN - U-Turn | 04 - Curb | 12 - Construction Barrier |
| RE - Rear End | CONVY - Other Conveyance | SPRTD - Units Separated | OTHR - Other | 05 - Guardrail or Barrier | 13 - Crash Attenuator |
| ANG - Angle | ANIML - Animal | NCOLL - Other Non Collision | UNK - Unknown | 06 - Embankment | 88 - Other |
| | | | | 07 - Fence | 99 - Unknown |

N - Night
X - Alcohol
D - Dry Surface
W - Wet Surface
I - Icy Surface
S - Snowy Surface

| SHA State Highway Administration | Office of Traffic & Safety Traffic Development & Support Division Crash Analysis Safety Team | Location: I-495 From: Virginia To: MD-190 (2017) County: MONTGOMERY Study Period: 01/01/2017 to 12/31/2017 Analyst: Matthew Jagg          Date: 04/28/2020 |
| --- | --- | --- |



KEY:LogMile-CollisionType (FixedObjectStruck) -Date-Severity-Time-Surface-Illumination-Alcohol

template 06-27-06

| | | | | | |
| --- | --- | --- | --- | --- | --- |
| F - Fatalities | SS - Sideswipe | FO - Fixed Object | OFFRD - Off Road | 00 - Not Applicable | 08 - Light Support Pole |
| I - Injury | PARKD - Parked Vehicle | OOBJ - Other Object | RUNWY - Downhill Runaway | 01 - Bridge or Overpass | 09 - Sign Support Pole |
| P - Property Damage | PED - Pedestrian | OT - Overturn | FIRE - Explosion Fire | 02 - Building | 10 - Other Pole |
| OD - Opposite Direction | BIKE - Bicycle | SPILL - Spilled Cargo | BCKNG - Backing | 03 - Culvert or Ditch | 11 - Tree Shrubbery |
| LT - Left Turn | PEDAL - Other Pedalcycle | JCKKNF - Jackknife | UTURN - U-Turn | 04 - Curb | 12 - Construction Barrier |
| RE - Rear End | CONVY - Other Conveyance | SPRTD - Units Separated | OTHR - Other | 05 - Guardrail or Barrier | 13 - Crash Attenuator |
| ANG - Angle | ANIML - Animal | NCOLL - Other Non Collision | UNK - Unknown | 06 - Embankment | 88 - Other |
| | | | | 07 - Fence | 99 - Unknown |

N - Night
X - Alcohol
D - Dry Surface
W - Wet Surface
I - Icy Surface
S - Snowy Surface



00174439

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

ATTACHMENT C:   ISATe SAFETY ANALYSIS

00174440

| Design Exception 9 ISATe Analysis Results | With Design Exception | | | | | | Without Design Exception | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Total | K | A | B | C | PDO | Total | K | A | B | C | PDO |
| Predicted number of crashes per study period | 159.6 | 0.4 | 1.2 | 8.5 | 36.5 | 112.9 | 159.7 | 0.4 | 1.2 | 8.3 | 35.8 | 114.0 |
| Predicted crash frequency per study year | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 6.0 |

00174441

Design Exception 9 ISATe Analysis – Procedural Narrative:

1. The proposed Paid Managed Lanes (PML) are separated by a 4 foot buffer area with delineators running along the center.



*DE9 Display*

ISATe analysis does not account for the influence of freeways with managed lanes (PML) which are buffer-separated from the General Purpose Lanes (GPL).

The predictive method for freeways does not account for the influence of the following conditions on freeway safety:

- Freeways with 11 or more through lanes in urban areas.
- Freeways with 9 or more through lanes in rural areas.
- Freeways with continuous access high-occupancy vehicle (HOV) lanes.
- Freeways with limited access managed lanes that are buffer-separated from the general purpose lanes.
- Ramp metering.
- Use of safety shoulders as travel lanes.
- Toll plazas.
- Reversible lanes.

*ISATe User Manual, Page 3*

ISATe handles these lanes as outlined below. No safety analysis was performed to determine the predicted number of crashes within the PMLs nor between PMLs and GPLs. ISATe only predicts crashes within the GPLs.

> **Evaluating a Freeway with Barrier-Separated Managed Lanes**
> ISATe can be used to evaluate freeways with barrier-separated managed lanes. The managed lanes are considered to be part of the median (i.e., the median width is measured between the near edges of the traveled way for the general purpose lanes), and the managed lane's entry or exit points are treated as entrance or exit ramps, respectively, on the adjacent freeway. The average lane width is based on the general purpose lanes (i.e., the managed lanes are not considered). The shoulder width is measured from the edge of the general-purpose-lanes traveled way. The barrier between the general purpose lanes and managed lanes is treated as median barrier.
>
> The safety of the managed lanes is not addressed by this technique. The estimate of average crash frequency only includes crashes that occur in the general purpose lanes.

*ISATe User Manual, Page 60*

2. The entrance ramp upstream in the decreasing milepost direction was coded as a Lane-Add because the lane length exceeds 0.30 miles.

> Do not include the speed-change lane that is associated with a ramp that merges with (or diverges from) the freeway, unless its length exceeds 0.30 mi (1,600 ft). If this length is exceeded, then the speed-change lane is counted as a through lane that starts as a lane-add ramp entrance and ends as a lane drop by taper (or starts as a lane add by taper and ends as a lane-drop ramp exit).

*ISATe User Manual, Page 19*

List of Assumptions:

1. The northbound (station ahead) direction is assumed the milepost ahead direction.
2. The milepost ahead outside shoulder width tapers from 12 feet to 6 feet along the segment and is the location of the design exception (6' shoulder). A constant 6' shoulder was assumed along the segment as a conservative analysis of the design exception.
3. For analysis to be possible per ISATe limitations, barrier must be present between the GPLs and PMLs (see manual excerpts above). For the purposes of this analysis, the proposed delineators between the GPLs and PMLs are considered barrier.
4. It is assumed the delineators between the GPLs and PMLs will be placed centrally in the buffer width. Therefore, the inside shoulders are assumed to be 2 feet, or half of the 4-foot buffer space between the GPLs and PMLs. The width of the delineators is assumed to be negligible.

| Input Worksheet for Freeway Segments | | | | |
|---|---|---|---|---|
| | | | Segment 1 | Segment 2 |
| Clear | Echo Input Values | Check Input Values | **Study** | **Study** |
| | (View results in Column AV) | (View results in Advisory Messages) | **Period** | **Period** |
| *Basic Roadway Data* | | | | |
| Number of through lanes (n): | | | 9 | |
| Freeway segment description: | | | 1180+80 to 1185+20 | |
| Segment length (L), mi: | | | 0.083333 | |
| *Alignment Data* | | | | |
| *Horizontal Curve Data* | | ←See note | | |
| 1 | Horizontal curve in segment?: | | No | |
| | Curve radius ($R_1$), ft: | | | |
| | Length of curve ($L_{c1}$), mi: | | | |
| | Length of curve in segment ($L_{c1,seg}$), mi: | | | |
| 2 | Horizontal curve in segment?: | | | |
| | Curve radius ($R_2$), ft: | | | |
| | Length of curve ($L_{c2}$), mi: | | | |
| | Length of curve in segment ($L_{c2,seg}$), mi: | | | |
| 3 | Horizontal curve in segment?: | | | |
| | Curve radius ($R_3$), ft: | | | |
| | Length of curve ($L_{c3}$), mi: | | | |
| | Length of curve in segment ($L_{c3,seg}$), mi: | | | |
| *Cross Section Data* | | | | |
| Lane width ($W_l$), ft: | | | 12 | |
| Outside shoulder width ($W_s$), ft: | | | 9 | |
| Inside shoulder width ($W_{is}$), ft: | | | 2 | |
| Median width ($W_m$), ft: | | | 90 | |
| Rumble strips on outside shoulders?: | | | No | |
| | Length of rumble strips for travel in increasing milepost direction, mi: | | | |
| | Length of rumble strips for travel in decreasing milepost direction, mi: | | | |
| Rumble strips on inside shoulders?: | | | No | |
| | Length of rumble strips for travel in increasing milepost direction, mi: | | | |
| | Length of rumble strips for travel in decreasing milepost direction, mi: | | | |
| Presence of barrier in median: | | | Center | |
| 1 | Length of barrier ($L_{ib,1}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,1}$), ft: | | | |
| 2 | Length of barrier ($L_{ib,2}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,2}$), ft: | | | |
| 3 | Length of barrier ($L_{ib,3}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,3}$), ft: | | | |
| 4 | Length of barrier ($L_{ib,4}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,4}$), ft: | | | |
| 5 | Length of barrier ($L_{ib,5}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,5}$), ft: | | | |
| Median barrier width ($W_{ib}$), ft: | | | 86 | |
| Nearest distance from edge of traveled way to barrier face ($W_{near}$), ft: | | | | |

00174444

| Roadside Data | | |
|---|---|---|
| Clear zone width ($W_{hc}$), ft: | 30 | |
| Presence of barrier on roadside: | Full | |
| 1 Length of barrier ($L_{ob,1}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,1}$), ft: | | |
| 2 Length of barrier ($L_{ob,2}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,2}$), ft: | | |
| 3 Length of barrier ($L_{ob,3}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,3}$), ft: | | |
| 4 Length of barrier ($L_{ob,4}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,4}$), ft: | | |
| 5 Length of barrier ($L_{ob,5}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,5}$), ft: | | |
| Distance from edge of traveled way to barrier face, increasing milepost ($W_{off,inc}$), ft: | 9 | |
| Distance from edge of traveled way to barrier face, decreasing milepost ($W_{off,dec}$), ft: | 12 | |
| Ramp Access Data | | |
| Travel in Increasing Milepost Direction | | |
| Entrance Ramp | Ramp entrance in segment? (If yes, indicate type.): | No | |
| | Distance from begin milepost to upstream entrance ramp gore ($X_{b,ent}$), mi: | 999 | |
| | Length of ramp entrance ($L_{en,inc}$), mi: | | |
| | Length of ramp entrance in segment ($L_{en,seg,inc}$), mi: | | |
| | Entrance side?: | | |
| Exit Ramp | Ramp exit in segment? (If yes, indicate type.): | No | |
| | Distance from end milepost to downstream exit ramp gore ($X_{e,ext}$), mi: | 0.391477 | |
| | Length of ramp exit ($L_{ex,inc}$), mi: | | |
| | Length of ramp exit in segment ($L_{ex,seg,inc}$), mi: | | |
| | Exit side?: | | |
| Weave | Type B weave in segment?: | No | |
| | Length of weaving section ($L_{wev,inc}$), mi: | | |
| | Length of weaving section in segment ($L_{wev,seg,inc}$), mi: | | |
| Travel in Decreasing Milepost Direction | | |
| Entrance Ramp | Ramp entrance in segment? (If yes, indicate type.): | Lane Add | |
| | Distance from end milepost to upstream entrance ramp gore ($X_{e,ent}$), mi: | | |
| | Length of ramp entrance ($L_{en,dec}$), mi: | | |
| | Length of ramp entrance in segment ($L_{en,seg,dec}$), mi: | | |
| | Entrance side?: | | |
| Exit Ramp | Ramp exit in segment? (If yes, indicate type.): | No | |
| | Distance from begin milepost to downstream exit ramp gore ($X_{b,ext}$), mi: | 999 | |
| | Length of ramp exit ($L_{ex,dec}$), mi: | | |
| | Length of ramp exit in segment ($L_{ex,seg,dec}$), mi: | | |
| | Exit side?: | | |
| Weave | Type B weave in segment?: | No | |
| | Length of weaving section ($L_{wev,dec}$), mi: | | |
| | Length of weaving section in segment ($L_{wev,seg,dec}$), mi: | | |

| Traffic Data | Year | |
|---|---|---|
| Proportion of AADT during high-volume hours ($P_{hv}$): | | 0.83 |
| **Freeway Segment Data** | 2027 | 210980 |
| Average daily traffic ($AADT_{fs}$) by year, veh/d: | 2028 | |
| (enter data only for those years for which | 2029 | |
| it is available, leave other years blank) | 2030 | |
| | 2031 | |
| | 2032 | |
| | 2033 | |
| | 2034 | |
| | 2035 | |
| | 2036 | |
| | 2037 | |
| | 2038 | |
| | 2039 | |
| | 2040 | |
| | 2041 | |
| | 2042 | |
| | 2043 | |
| | 2044 | |
| | 2045 | 221475 |
| | 2046 | |
| | 2047 | |
| | 2048 | |
| | 2049 | |
| | 2050 | |
| **Entrance Ramp Data for Travel in Increasing Milepost Dir.** | Year | |
| Average daily traffic ($AADT_{b,ent}$) by year, veh/d: | 2027 | |
| (enter data only for those years for which | 2028 | |
| it is available, leave other years blank) | 2029 | |
| | 2030 | |
| | 2031 | |
| | 2032 | |
| | 2033 | |
| | 2034 | |
| | 2035 | |
| | 2036 | |
| | 2037 | |
| | 2038 | |
| | 2039 | |
| | 2040 | |
| | 2041 | |
| | 2042 | |
| | 2043 | |
| | 2044 | |
| | 2045 | |
| | 2046 | |
| | 2047 | |
| | 2048 | |
| | 2049 | |
| | 2050 | |

| Exit Ramp Data for Travel in Increasing Milepost Direction | Year | | |
|---|---|---|---|
| Average daily traffic ($AADT_{e,ext}$) by year, veh/d: | 2027 | 7185 | |
| (enter data only for those years for which | 2028 | | |
|  it is available, leave other years blank) | 2029 | | |
| | 2030 | | |
| | 2031 | | |
| | 2032 | | |
| | 2033 | | |
| | 2034 | | |
| | 2035 | | |
| | 2036 | | |
| | 2037 | | |
| | 2038 | | |
| | 2039 | | |
| | 2040 | | |
| | 2041 | | |
| | 2042 | | |
| | 2043 | | |
| | 2044 | | |
| | 2045 | 7400 | |
| | 2046 | | |
| | 2047 | | |
| | 2048 | | |
| | 2049 | | |
| | 2050 | | |
| Entrance Ramp Data for Travel in Decreasing Milepost Dir. | Year | | |
| Average daily traffic ($AADT_{e,ent}$) by year, veh/d: | 2027 | 9400 | |
| (enter data only for those years for which | 2028 | | |
|  it is available, leave other years blank) | 2029 | | |
| | 2030 | | |
| | 2031 | | |
| | 2032 | | |
| | 2033 | | |
| | 2034 | | |
| | 2035 | | |
| | 2036 | | |
| | 2037 | | |
| | 2038 | | |
| | 2039 | | |
| | 2040 | | |
| | 2041 | | |
| | 2042 | | |
| | 2043 | | |
| | 2044 | | |
| | 2045 | 9875 | |
| | 2046 | | |
| | 2047 | | |
| | 2048 | | |
| | 2049 | | |
| | 2050 | | |

00174447

## Output Summary

**General Information**

| | |
|---|---|
| Project description: | MD P3 Design Exception 9 (with Design Exception, 6' shoulder) |
| Analyst: AMR / ARM | Date: 3/18/2022 · Area type: Urban |
| First year of analysis: | 2027 |
| Last year of analysis: | 2045 |

**Crash Data Description**

| | | | |
|---|---|---|---|
| Freeway segments | Segment crash data available? | No | First year of crash data: |
| | Project-level crash data available? | No | Last year of crash data: |
| Ramp segments | Segment crash data available? | No | First year of crash data: |
| | Project-level crash data available? | No | Last year of crash data: |
| Ramp terminals | Segment crash data available? | No | First year of crash data: |
| | Project-level crash data available? | No | Last year of crash data: |

**Estimated Crash Statistics**

| Crashes for Entire Facility | Total | K | A | B | C | PDO |
|---|---|---|---|---|---|---|
| Estimated number of crashes during Study Period, crashes: | 159.6 | 0.4 | 1.2 | 8.5 | 36.5 | 112.9 |
| Estimated average crash freq, during Study Period, crashes/yr: | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |

| Crashes by Facility Component | Nbr. Sites | Total | K | A | B | C | PDO |
|---|---|---|---|---|---|---|---|
| Freeway segments, crashes: | 1 | 159.6 | 0.4 | 1.2 | 8.5 | 36.5 | 112.9 |
| Ramp segments, crashes: | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Crossroad ramp terminals, crashes: | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| Crashes for Entire Facility by Year | Year | Total | K | A | B | C | PDO |
|---|---|---|---|---|---|---|---|
| Estimated number of crashes during the Study Period, crashes: | 2027 | 8.1 | 0.0 | 0.1 | 0.4 | 1.9 | 5.7 |
| | 2028 | 8.1 | 0.0 | 0.1 | 0.4 | 1.9 | 5.7 |
| | 2029 | 8.1 | 0.0 | 0.1 | 0.4 | 1.9 | 5.8 |
| | 2030 | 8.2 | 0.0 | 0.1 | 0.4 | 1.9 | 5.8 |
| | 2031 | 8.2 | 0.0 | 0.1 | 0.4 | 1.9 | 5.8 |
| | 2032 | 8.3 | 0.0 | 0.1 | 0.4 | 1.9 | 5.8 |
| | 2033 | 8.3 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2034 | 8.3 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2035 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2036 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2037 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 6.0 |
| | 2038 | 8.5 | 0.0 | 0.1 | 0.5 | 1.9 | 6.0 |
| | 2039 | 8.5 | 0.0 | 0.1 | 0.5 | 1.9 | 6.0 |
| | 2040 | 8.5 | 0.0 | 0.1 | 0.5 | 1.9 | 6.1 |
| | 2041 | 8.6 | 0.0 | 0.1 | 0.5 | 2.0 | 6.1 |
| | 2042 | 8.6 | 0.0 | 0.1 | 0.5 | 2.0 | 6.1 |
| | 2043 | 8.7 | 0.0 | 0.1 | 0.5 | 2.0 | 6.1 |
| | 2044 | 8.7 | 0.0 | 0.1 | 0.5 | 2.0 | 6.2 |
| | 2045 | 8.7 | 0.0 | 0.1 | 0.5 | 2.0 | 6.2 |
| | 2046 | | | | | | |
| | 2047 | | | | | | |
| | 2048 | | | | | | |
| | 2049 | | | | | | |
| | 2050 | | | | | | |

**Distribution of Crashes for Entire Facility**

| Crash Type | Crash Type Category | Estimated Number of Crashes During the Study Period | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total | K | A | B | C | PDO |
| Multiple vehicle | Head-on crashes: | 0.5 | 0.0 | 0.0 | 0.1 | 0.2 | 0.2 |
| | Right-angle crashes: | 2.8 | 0.0 | 0.0 | 0.2 | 0.9 | 1.7 |
| | Rear-end crashes: | 92.3 | 0.2 | 0.7 | 4.9 | 21.0 | 65.5 |
| | Sideswipe crashes: | 31.7 | 0.1 | 0.2 | 1.2 | 5.0 | 25.2 |
| | Other multiple-vehicle crashes: | 3.4 | 0.0 | 0.0 | 0.2 | 0.9 | 2.3 |
| | Total multiple-vehicle crashes: | 130.7 | 0.3 | 0.9 | 6.5 | 28.0 | 94.9 |
| Single vehicle | Crashes with animal: | 0.4 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| | Crashes with fixed object: | 20.7 | 0.1 | 0.2 | 1.4 | 6.1 | 12.9 |
| | Crashes with other object: | 3.1 | 0.0 | 0.0 | 0.1 | 0.4 | 2.5 |
| | Crashes with parked vehicle: | 0.5 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 |
| | Other single-vehicle crashes | 4.2 | 0.0 | 0.1 | 0.4 | 1.8 | 1.9 |
| | Total single-vehicle crashes: | 28.9 | 0.1 | 0.3 | 2.0 | 8.5 | 18.0 |
| | Total crashes: | 159.6 | 0.4 | 1.2 | 8.5 | 36.5 | 112.9 |

## Evaluation Site Summary

**General Information**

| | |
|---|---|
| Project description: | MD P3 Design Exception 9 (with Design Exception, 6' shoulder) |
| Analyst: AMR / ARM | Date: 3/18/2022 · Area type: Urban |
| First year of analysis: | 2027 |
| Last year of analysis: | 2045 · Total length of freeway segments for Study Period (mi): 0.083 |

**Site Description**

**Freeway Segments**

| Number | Lanes | Study Period Length (mi) | Study Period Description |
|---|---|---|---|
| 1 | 9 | 0.083 | 1180+80 to 1185+20 |
| 2 | 0 | 0.000 | 0 |
| 3 | 0 | 0.000 | 0 |
| 4 | 0 | 0.000 | 0 |
| 5 | 0 | 0.000 | 0 |
| 6 | 0 | 0.000 | 0 |
| 7 | 0 | 0.000 | 0 |
| 8 | 0 | 0.000 | 0 |
| 9 | 0 | 0.000 | 0 |
| 10 | 0 | 0.000 | 0 |
| 11 | 0 | 0.000 | 0 |
| 12 | 0 | 0.000 | 0 |
| 13 | 0 | 0.000 | 0 |
| 14 | 0 | 0.000 | 0 |
| 15 | 0 | 0.000 | 0 |
| 16 | 0 | 0.000 | 0 |
| 17 | 0 | 0.000 | 0 |
| 18 | 0 | 0.000 | 0 |
| 19 | 0 | 0.000 | 0 |
| 20 | 0 | 0.000 | 0 |

**Ramp Segments**

| Number | Study Period Description | Number | Study Period Description |
|---|---|---|---|
| 1 | 0 | 21 | 0 |
| 2 | 0 | 22 | 0 |
| 3 | 0 | 23 | 0 |
| 4 | 0 | 24 | 0 |
| 5 | 0 | 25 | 0 |
| 6 | 0 | 26 | 0 |
| 7 | 0 | 27 | 0 |
| 8 | 0 | 28 | 0 |
| 9 | 0 | 29 | 0 |
| 10 | 0 | 30 | 0 |
| 11 | 0 | 31 | 0 |
| 12 | 0 | 32 | 0 |
| 13 | 0 | 33 | 0 |
| 14 | 0 | 34 | 0 |
| 15 | 0 | 35 | 0 |
| 16 | 0 | 36 | 0 |
| 17 | 0 | 37 | 0 |
| 18 | 0 | 38 | 0 |
| 19 | 0 | 39 | 0 |
| 20 | 0 | 40 | 0 |

**Crossroad Ramp Terminals**

| Number | Config. | Control | Study Period Description |
|---|---|---|---|
| 1 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 3 | 0 | 0 | 0 |
| 4 | 0 | 0 | 0 |
| 5 | 0 | 0 | 0 |
| 6 | 0 | 0 | 0 |

| Input Worksheet for Freeway Segments | | | Segment 1 | Segment 2 |
|---|---|---|---|---|
| Clear | Echo Input Values | Check Input Values | **Study** | **Study** |
| | (View results in Column AV) | (View results in Advisory Messages) | **Period** | **Period** |
| **Basic Roadway Data** | | | | |
| Number of through lanes (n): | | | 9 | |
| Freeway segment description: | | | 1180+80 to 1185+20 | |
| Segment length (L), mi: | | | 0.083333 | |
| **Alignment Data** | | | | |
| **Horizontal Curve Data** | ←See note | | | |
| 1 | Horizontal curve in segment?: | | No | |
| | Curve radius ($R_1$), ft: | | | |
| | Length of curve ($L_{c1}$), mi: | | | |
| | Length of curve in segment ($L_{c1,seg}$), mi: | | | |
| 2 | Horizontal curve in segment?: | | | |
| | Curve radius ($R_2$), ft: | | | |
| | Length of curve ($L_{c2}$), mi: | | | |
| | Length of curve in segment ($L_{c2,seg}$), mi: | | | |
| 3 | Horizontal curve in segment?: | | | |
| | Curve radius ($R_3$), ft: | | | |
| | Length of curve ($L_{c3}$), mi: | | | |
| | Length of curve in segment ($L_{c3,seg}$), mi: | | | |
| **Cross Section Data** | | | | |
| Lane width ($W_l$), ft: | | | 12 | |
| Outside shoulder width ($W_s$), ft: | | | 11 | |
| Inside shoulder width ($W_{is}$), ft: | | | 2 | |
| Median width ($W_m$), ft: | | | 90 | |
| Rumble strips on outside shoulders?: | | | No | |
| | Length of rumble strips for travel in increasing milepost direction, mi: | | | |
| | Length of rumble strips for travel in decreasing milepost direction, mi: | | | |
| Rumble strips on inside shoulders?: | | | No | |
| | Length of rumble strips for travel in increasing milepost direction, mi: | | | |
| | Length of rumble strips for travel in decreasing milepost direction, mi: | | | |
| Presence of barrier in median: | | | Center | |
| 1 | Length of barrier ($L_{ib,1}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,1}$), ft: | | | |
| 2 | Length of barrier ($L_{ib,2}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,2}$), ft: | | | |
| 3 | Length of barrier ($L_{ib,3}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,3}$), ft: | | | |
| 4 | Length of barrier ($L_{ib,4}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,4}$), ft: | | | |
| 5 | Length of barrier ($L_{ib,5}$), mi: | | | |
| | Distance from edge of traveled way to barrier face ($W_{off,in,5}$), ft: | | | |
| Median barrier width ($W_{ib}$), ft: | | | 86 | |
| Nearest distance from edge of traveled way to barrier face ($W_{near}$), ft: | | | | |

00174449

| Roadside Data | | |
|---|---|---|
| Clear zone width ($W_{hc}$), ft: | 30 | |
| Presence of barrier on roadside: | Full | |
| 1 Length of barrier ($L_{ob,1}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,1}$), ft: | | |
| 2 Length of barrier ($L_{ob,2}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,2}$), ft: | | |
| 3 Length of barrier ($L_{ob,3}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,3}$), ft: | | |
| 4 Length of barrier ($L_{ob,4}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,4}$), ft: | | |
| 5 Length of barrier ($L_{ob,5}$), mi: | | |
| Distance from edge of traveled way to barrier face ($W_{off,o,5}$), ft: | | |
| Distance from edge of traveled way to barrier face, increasing milepost ($W_{off,inc}$), ft: | 11 | |
| Distance from edge of traveled way to barrier face, decreasing milepost ($W_{off,dec}$), ft: | 12 | |
| Ramp Access Data | | |
| Travel in Increasing Milepost Direction | | |
| Entrance Ramp | Ramp entrance in segment? (If yes, indicate type.): | No | |
| | Distance from begin milepost to upstream entrance ramp gore ($X_{b,ent}$), mi: | 999 | |
| | Length of ramp entrance ($L_{en,inc}$), mi: | | |
| | Length of ramp entrance in segment ($L_{en,seg,inc}$), mi: | | |
| | Entrance side?: | | |
| Exit Ramp | Ramp exit in segment? (If yes, indicate type.): | No | |
| | Distance from end milepost to downstream exit ramp gore ($X_{e,ext}$), mi: | 0.391477 | |
| | Length of ramp exit ($L_{ex,inc}$), mi: | | |
| | Length of ramp exit in segment ($L_{ex,seg,inc}$), mi: | | |
| | Exit side?: | | |
| Weave | Type B weave in segment?: | No | |
| | Length of weaving section ($L_{wev,inc}$), mi: | | |
| | Length of weaving section in segment ($L_{wev,seg,inc}$), mi: | | |
| Travel in Decreasing Milepost Direction | | |
| Entrance Ramp | Ramp entrance in segment? (If yes, indicate type.): | Lane Add | |
| | Distance from end milepost to upstream entrance ramp gore ($X_{e,ent}$), mi: | | |
| | Length of ramp entrance ($L_{en,dec}$), mi: | | |
| | Length of ramp entrance in segment ($L_{en,seg,dec}$), mi: | | |
| | Entrance side?: | | |
| Exit Ramp | Ramp exit in segment? (If yes, indicate type.): | No | |
| | Distance from begin milepost to downstream exit ramp gore ($X_{b,ext}$), mi: | 999 | |
| | Length of ramp exit ($L_{ex,dec}$), mi: | | |
| | Length of ramp exit in segment ($L_{ex,seg,dec}$), mi: | | |
| | Exit side?: | | |
| Weave | Type B weave in segment?: | No | |
| | Length of weaving section ($L_{wev,dec}$), mi: | | |
| | Length of weaving section in segment ($L_{wev,seg,dec}$), mi: | | |

00174450

| Traffic Data | Year | |
|---|---|---|
| Proportion of AADT during high-volume hours ($P_{hv}$): | | 0.83 |
| **Freeway Segment Data** | **Year** | |
| Average daily traffic ($AADT_{fs}$) by year, veh/d: | 2027 | 210980 |
| | 2028 | |
| (enter data only for those years for which | 2029 | |
| it is available, leave other years blank) | 2030 | |
| | 2031 | |
| | 2032 | |
| | 2033 | |
| | 2034 | |
| | 2035 | |
| | 2036 | |
| | 2037 | |
| | 2038 | |
| | 2039 | |
| | 2040 | |
| | 2041 | |
| | 2042 | |
| | 2043 | |
| | 2044 | |
| | 2045 | 221475 |
| | 2046 | |
| | 2047 | |
| | 2048 | |
| | 2049 | |
| | 2050 | |
| **Entrance Ramp Data for Travel in Increasing Milepost Dir.** | **Year** | |
| Average daily traffic ($AADT_{b,ent}$) by year, veh/d: | 2027 | |
| | 2028 | |
| (enter data only for those years for which | 2029 | |
| it is available, leave other years blank) | 2030 | |
| | 2031 | |
| | 2032 | |
| | 2033 | |
| | 2034 | |
| | 2035 | |
| | 2036 | |
| | 2037 | |
| | 2038 | |
| | 2039 | |
| | 2040 | |
| | 2041 | |
| | 2042 | |
| | 2043 | |
| | 2044 | |
| | 2045 | |
| | 2046 | |
| | 2047 | |
| | 2048 | |
| | 2049 | |
| | 2050 | |

00174451

| Exit Ramp Data for Travel in Increasing Milepost Direction | Year | | |
|---|---|---|---|
| Average daily traffic (AADT$_{e,ext}$) by year, veh/d: | 2027 | 7185 | |
| (enter data only for those years for which | 2028 | | |
| it is available, leave other years blank) | 2029 | | |
| | 2030 | | |
| | 2031 | | |
| | 2032 | | |
| | 2033 | | |
| | 2034 | | |
| | 2035 | | |
| | 2036 | | |
| | 2037 | | |
| | 2038 | | |
| | 2039 | | |
| | 2040 | | |
| | 2041 | | |
| | 2042 | | |
| | 2043 | | |
| | 2044 | | |
| | 2045 | 7400 | |
| | 2046 | | |
| | 2047 | | |
| | 2048 | | |
| | 2049 | | |
| | 2050 | | |
| Entrance Ramp Data for Travel in Decreasing Milepost Dir. | Year | | |
| Average daily traffic (AADT$_{e,ent}$) by year, veh/d: | 2027 | 9400 | |
| (enter data only for those years for which | 2028 | | |
| it is available, leave other years blank) | 2029 | | |
| | 2030 | | |
| | 2031 | | |
| | 2032 | | |
| | 2033 | | |
| | 2034 | | |
| | 2035 | | |
| | 2036 | | |
| | 2037 | | |
| | 2038 | | |
| | 2039 | | |
| | 2040 | | |
| | 2041 | | |
| | 2042 | | |
| | 2043 | | |
| | 2044 | | |
| | 2045 | 9875 | |
| | 2046 | | |
| | 2047 | | |
| | 2048 | | |
| | 2049 | | |
| | 2050 | | |

00174452

## Output Summary

### General Information

| | | | | |
|---|---|---|---|---|
| Project description: | MD P3 Design Exception 9 (with Design Exception, 6' shoulder) | | | |
| Analyst: | AMR / ARM | Date: | 3/18/2022 | Area type: | Urban |
| First year of analysis: | 2027 | | | |
| Last year of analysis: | 2045 | | | |

### Crash Data Description

| | | | |
|---|---|---|---|
| Freeway segments | Segment crash data available? | No | First year of crash data: |
| | Project-level crash data available? | No | Last year of crash data: |
| Ramp segments | Segment crash data available? | No | First year of crash data: |
| | Project-level crash data available? | No | Last year of crash data: |
| Ramp terminals | Segment crash data available? | No | First year of crash data: |
| | Project-level crash data available? | No | Last year of crash data: |

### Estimated Crash Statistics

| Crashes for Entire Facility | Total | K | A | B | C | PDO |
|---|---|---|---|---|---|---|
| Estimated number of crashes during Study Period, crashes: | 159.7 | 0.4 | 1.2 | 8.3 | 35.8 | 114.0 |
| Estimated average crash freq. during Study Period, crashes/yr: | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 6.0 |

| Crashes by Facility Component | Nbr. Sites | Total | K | A | B | C | PDO |
|---|---|---|---|---|---|---|---|
| Freeway segments, crashes: | 1 | 159.7 | 0.4 | 1.2 | 8.3 | 35.8 | 114.0 |
| Ramp segments, crashes: | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| Crossroad ramp terminals, crashes: | 0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

| Crashes for Entire Facility by Year | Year | Total | K | A | B | C | PDO |
|---|---|---|---|---|---|---|---|
| Estimated number of crashes during | 2027 | 8.1 | 0.0 | 0.1 | 0.4 | 1.8 | 5.7 |
| the Study Period, crashes: | 2028 | 8.1 | 0.0 | 0.1 | 0.4 | 1.8 | 5.8 |
| | 2029 | 8.2 | 0.0 | 0.1 | 0.4 | 1.8 | 5.8 |
| | 2030 | 8.2 | 0.0 | 0.1 | 0.4 | 1.8 | 5.8 |
| | 2031 | 8.2 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2032 | 8.3 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2033 | 8.3 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2034 | 8.3 | 0.0 | 0.1 | 0.4 | 1.9 | 5.9 |
| | 2035 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 6.0 |
| | 2036 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 6.0 |
| | 2037 | 8.4 | 0.0 | 0.1 | 0.4 | 1.9 | 6.0 |
| | 2038 | 8.5 | 0.0 | 0.1 | 0.4 | 1.9 | 6.1 |
| | 2039 | 8.5 | 0.0 | 0.1 | 0.4 | 1.9 | 6.1 |
| | 2040 | 8.6 | 0.0 | 0.1 | 0.4 | 1.9 | 6.1 |
| | 2041 | 8.6 | 0.0 | 0.1 | 0.4 | 1.9 | 6.1 |
| | 2042 | 8.6 | 0.0 | 0.1 | 0.4 | 1.9 | 6.2 |
| | 2043 | 8.7 | 0.0 | 0.1 | 0.4 | 1.9 | 6.2 |
| | 2044 | 8.7 | 0.0 | 0.1 | 0.4 | 1.9 | 6.2 |
| | 2045 | 8.7 | 0.0 | 0.1 | 0.5 | 1.9 | 6.3 |
| | 2046 | | | | | | |
| | 2047 | | | | | | |
| | 2048 | | | | | | |
| | 2049 | | | | | | |
| | 2050 | | | | | | |

### Distribution of Crashes for Entire Facility

| Crash Type | Crash Type Category | Estimated Number of Crashes During the Study Period | | | | | |
|---|---|---|---|---|---|---|---|
| | | Total | K | A | B | C | PDO |
| Multiple vehicle | Head-on crashes: | 0.5 | 0.0 | 0.0 | 0.1 | 0.2 | 0.2 |
| | Right-angle crashes: | 2.8 | 0.0 | 0.0 | 0.2 | 0.9 | 1.7 |
| | Rear-end crashes: | 92.3 | 0.2 | 0.7 | 4.9 | 21.0 | 65.5 |
| | Sideswipe crashes: | 31.7 | 0.1 | 0.2 | 1.2 | 5.0 | 25.2 |
| | Other multiple-vehicle crashes: | 3.4 | 0.0 | 0.0 | 0.2 | 0.9 | 2.3 |
| | Total multiple-vehicle crashes: | 130.7 | 0.3 | 0.9 | 6.5 | 28.0 | 94.9 |
| Single vehicle | Crashes with animal: | 0.5 | 0.0 | 0.0 | 0.0 | 0.0 | 0.4 |
| | Crashes with fixed object: | 20.8 | 0.1 | 0.2 | 1.3 | 5.6 | 13.7 |
| | Crashes with other object: | 3.2 | 0.0 | 0.0 | 0.1 | 0.4 | 2.7 |
| | Crashes with parked vehicle: | 0.5 | 0.0 | 0.0 | 0.0 | 0.1 | 0.3 |
| | Other single-vehicle crashes | 4.1 | 0.0 | 0.1 | 0.4 | 1.6 | 2.0 |
| | Total single-vehicle crashes: | 29.0 | 0.1 | 0.3 | 1.8 | 7.8 | 19.1 |
| | Total crashes: | 159.7 | 0.4 | 1.2 | 8.3 | 35.8 | 114.0 |

## Evaluation Site Summary

### General Information

| | | | | |
|---|---|---|---|---|
| Project description: | MD P3 Design Exception 9 (with Design Exception, 6' shoulder) | | | |
| Analyst: | AMR / ARM | Date: | 3/18/2022 | Area type: | Urban |
| First year of analysis: | 2027 | Total length of freeway segments for Study Period (mi): | 0.083 | |
| Last year of analysis: | 2045 | | | |

### Site Description

### Freeway Segments

| Number | Lanes | Study Period Length (mi) | Study Period Description |
|---|---|---|---|
| 1 | 9 | 0.083 | 1180+80 to 1185+20 |
| 2 | 0 | 0.000 | 0 |
| 3 | 0 | 0.000 | 0 |
| 4 | 0 | 0.000 | 0 |
| 5 | 0 | 0.000 | 0 |
| 6 | 0 | 0.000 | 0 |
| 7 | 0 | 0.000 | 0 |
| 8 | 0 | 0.000 | 0 |
| 9 | 0 | 0.000 | 0 |
| 10 | 0 | 0.000 | 0 |
| 11 | 0 | 0.000 | 0 |
| 12 | 0 | 0.000 | 0 |
| 13 | 0 | 0.000 | 0 |
| 14 | 0 | 0.000 | 0 |
| 15 | 0 | 0.000 | 0 |
| 16 | 0 | 0.000 | 0 |
| 17 | 0 | 0.000 | 0 |
| 18 | 0 | 0.000 | 0 |
| 19 | 0 | 0.000 | 0 |
| 20 | 0 | 0.000 | 0 |

### Ramp Segments

| Number | Study Period Description | Number | Study Period Description |
|---|---|---|---|
| 1 | 0 | 21 | 0 |
| 2 | 0 | 22 | 0 |
| 3 | 0 | 23 | 0 |
| 4 | 0 | 24 | 0 |
| 5 | 0 | 25 | 0 |
| 6 | 0 | 26 | 0 |
| 7 | 0 | 27 | 0 |
| 8 | 0 | 28 | 0 |
| 9 | 0 | 29 | 0 |
| 10 | 0 | 30 | 0 |
| 11 | 0 | 31 | 0 |
| 12 | 0 | 32 | 0 |
| 13 | 0 | 33 | 0 |
| 14 | 0 | 34 | 0 |
| 15 | 0 | 35 | 0 |
| 16 | 0 | 36 | 0 |
| 17 | 0 | 37 | 0 |
| 18 | 0 | 38 | 0 |
| 19 | 0 | 39 | 0 |
| 20 | 0 | 40 | 0 |

### Crossroad Ramp Terminals

| Number | Config. | Control | Study Period Description |
|---|---|---|---|
| 1 | 0 | 0 | 0 |
| 2 | 0 | 0 | 0 |
| 3 | 0 | 0 | 0 |
| 4 | 0 | 0 | 0 |
| 5 | 0 | 0 | 0 |
| 6 | 0 | 0 | 0 |

00174453



CARDEROCK SPRINGS
HISTORIC DISTRICT
SECTION 106 HISTORIC PROPERTY

SEGMENT 1

I-495 SB GPL

DELINEATORS

I-495 SB PML

I-495 NB PML

DELINEATORS

200 LF OF 6' SHOULDER

I-495 NB GPL

MORNINGSTAR TABERNACLE NO. 88
MOSES HALL & CEMETERY
SECTION 106 HISTORIC PROPERTY

PROPOSED LIMIT OF
DISTURBANCE PER
THE FEIS

PROPOSED NOISE BARRIER
ON RETAINING WALL (TYP.)

MORNINGSTAR
BURIAL SITES
(TYP.)

I-495 HORIZONTAL DATA:
SEGMENT LENGTH = 440'
NO CURVES
LANE WIDTH = 12'
SHOULDER WIDTH (AVG) OUTSIDE = 9'; INSIDE = 2'
BARRIER INCREASING MP:   6' FROM LANE
BARRIER DECREASING MP:   12' FROM LANE
SB ON-RAMP (LANE ADD):  LENGTH = 1886'
NB OFF-RAMP:     LENGTH = 2067'

MARYLAND DEPARTMENT
OF TRANSPORTATION

STATE HIGHWAY
ADMINISTRATION

I-495 AND I-270 P3 PROGRAM
PHASE 1

PHASE SOUTH A

ISATs ANALYSIS BACKUP
DESIGN EXCEPTION 9
I-495 SHOULDER WIDTH

PLOTTED: 5/26/2022
FILE: pw:\bentley-pw.bentley.com:bentley-pw-03\Documents\800327\2\POST AWARD DESIGN\Phase South\Phase Wide\Disciplines\HWY\Design Exceptions-Variances-Waivers\ISATs Aneaysis\DE9\HHD-0030-Exh-Cemetery\Avoidance.dgn

BY: mbrewer –

00174454

| | DE1 | | DE2 | | | DE6 | DE9 | | | DE10 | | | | | | |
| | | | | | | | | | | Segment 1 | | Segments 2-4, Ramps | | | | |
| Year | GPLs | Ramp | GPLs | WB PMLs | EB PMLs | Ramp | GPLs | Entrance Ramp | Exit Ramp | NB + EB + WB GPLs | NB GPL | EB + WB GPLs | EB GPL | WB GPL | EB PML | WB PML |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2027 | 123,915 | 9,600 | 116,910 | 7,245 | 7,065 | 4,010 | 210,980 | 9,400 | 7,185 | 181,540 | 64,630 | 116,910 | 55,475 | 61,435 | 7,065 | 7,245 |
| 2045 | 132,050 | 10,220 | 120,800 | 7,485 | 7,305 | 4,875 | 221,475 | 9,875 | 7,400 | 190,025 | 69,225 | 120,800 | 57,340 | 63,460 | 7,305 | 7,485 |

00174455



**Location ID:** P0040

**Location:** IS 495 - 50ft East of Persimmon Tree Rd Overpass (ATR#40 Includes ATR#102OL)

Montgomery

**County:**

**Date Range:** 11/11/2021    to    11/11/2021

### *** Summary Of Total Report ***

| Begin Hour | SUN | MON | TUE | WED | THU | FRI | SAT | DAILY AVG | WEEKDAY AVG | WEEKEND AVG | Vol'm/ln/hr Thu |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0:00 | 0 | 0 | 0 | 0 | 1,983 | 0 | 0 | 1,983 | 1,983 | 0 | 248 |
| 1:00 | 0 | 0 | 0 | 0 | 1,307 | 0 | 0 | 1,307 | 1,307 | 0 | 163 |
| 2:00 | 0 | 0 | 0 | 0 | 1,262 | 0 | 0 | 1,262 | 1,262 | 0 | 158 |
| 3:00 | 0 | 0 | 0 | 0 | 1,377 | 0 | 0 | 1,377 | 1,377 | 0 | 172 |
| 4:00 | 0 | 0 | 0 | 0 | 3,167 | 0 | 0 | 3,167 | 3,167 | 0 | 396 |
| 5:00 | 0 | 0 | 0 | 0 | 7,021 | 0 | 0 | 7,021 | 7,021 | 0 | 878 |
| 6:00 | 0 | 0 | 0 | 0 | 11,042 | 0 | 0 | 11,042 | 11,042 | 0 | 1380 |
| 7:00 | 0 | 0 | 0 | 0 | 13,340 | 0 | 0 | 13,340 | 13,340 | 0 | 1668 |
| 8:00 | 0 | 0 | 0 | 0 | 12,999 | 0 | 0 | 12,999 | 12,999 | 0 | 1625 |
| 9:00 | 0 | 0 | 0 | 0 | 12,619 | 0 | 0 | 12,619 | 12,619 | 0 | 1577 |
| 10:00 | 0 | 0 | 0 | 0 | 13,420 | 0 | 0 | 13,420 | 13,420 | 0 | 1678 |
| 11:00 | 0 | 0 | 0 | 0 | 13,425 | 0 | 0 | 13,425 | 13,425 | 0 | 1678 |
| 12:00 | 0 | 0 | 0 | 0 | 13,752 | 0 | 0 | 13,752 | 13,752 | 0 | 1719 |
| 13:00 | 0 | 0 | 0 | 0 | 14,355 | 0 | 0 | 14,355 | 14,355 | 0 | 1794 |
| 14:00 | 0 | 0 | 0 | 0 | 14,777 | 0 | 0 | 14,777 | 14,777 | 0 | 1847 |
| 15:00 | 0 | 0 | 0 | 0 | 14,352 | 0 | 0 | 14,352 | 14,352 | 0 | 1794 |
| 16:00 | 0 | 0 | 0 | 0 | 13,382 | 0 | 0 | 13,382 | 13,382 | 0 | 1673 |
| 17:00 | 0 | 0 | 0 | 0 | 13,320 | 0 | 0 | 13,320 | 13,320 | 0 | 1665 |
| 18:00 | 0 | 0 | 0 | 0 | 11,827 | 0 | 0 | 11,827 | 11,827 | 0 | 1478 |
| 19:00 | 0 | 0 | 0 | 0 | 9,582 | 0 | 0 | 9,582 | 9,582 | 0 | 1198 |
| 20:00 | 0 | 0 | 0 | 0 | 7,383 | 0 | 0 | 7,383 | 7,383 | 0 | 923 |
| 21:00 | 0 | 0 | 0 | 0 | 6,228 | 0 | 0 | 6,228 | 6,228 | 0 | 779 |
| 22:00 | 0 | 0 | 0 | 0 | 4,596 | 0 | 0 | 4,596 | 4,596 | 0 | 575 |
| 23:00 | 0 | 0 | 0 | 0 | 3,062 | 0 | 0 | 3,062 | 3,062 | 0 | 383 |
| **TOTAL** | **0** | **0** | **0** | **0** | **219,578** | **0** | **0** | **219,578** | **219,578** | **0** | |
| AM Peak Hour | 0:00 | 0:00 | 0:00 | 0:00 | 12:00 | 0:00 | 0:00 | | | | |
| 6PM-12PM Volume | 0 | 0 | 0 | 0 | 13,752 | 0 | 0 | | | | |
| PM Peak Hour | 0:00 | 0:00 | 0:00 | 0:00 | 14:00 | 0:00 | 0:00 | | | | |
| PM Peak Volume | 0 | 0 | 0 | 0 | 14,777 | 0 | 0 | | | | |

| Proportion of AADT during high-volm hours | | | | | 0.830 | | | | | | |

00174456

MDOT SHA Design Exception Request Form – DE09
FMIS No.: AW073A13

ATTACHMENT D:   DEIS & SDEIS CONFIGURATIONS AT MOSES
HALL CEMETERY

00174457



The information shown is for the purpose of determining preliminary cost estimates and environmental impacts and is subject to change during final design. Any reliance on these plans is made with the full understanding of their draft status. The proposed managed lane access points are based on preliminary traffic and revenue analyses and may change as more detailed analyses are completed.

Direct access to/from managed lanes proposed at Cabin John Parkway / MD 190 interchange.

**DEIS CONFIGURATION AT MOSES HALL CEMETERY**

Improvements that required reconfiguration of interchange ramps, adjustments to the existing ramps, or the profile for roads that cross over I-495 and I-270 due to mainline widening were designed at a preliminary level. In general, the limits of disturbance were set along existing right-of-way at existing interchanges to incorporate these modifications and to allow for flexibility to accommodate the ultimate interchange configuration and maintenance of traffic needs along the crossroads with consideration for resources in these areas.

Property and environmental needs are preliminary. As the study moves forward, further avoidance and minimization to reduce needs will be evaluated and prioritized, including, incentivizing the private sector through innovation.

**Legend**

- Alternative 8, 9, 10, 13B, & 13C LOD
- Map Match Line
- Right-of-Way
- Parcel Boundaries
- Roadway Baseline

- Edge of Lane
- Proposed New or Reconstructed Bridge
- Proposed Stormwater Management Facility
- General Purpose Lanes
- Managed Lanes

- Potential Noise Barrier Replacement or Construction (Approximate Location)
- Trails
- FEMA Floodplain 100 Year
- Delineated Waterways (Feature ID, Refer to NRTR)

- Delineated Wetlands (Feature ID, Refer to NRTR)
- NWI Wetlands and Waterbodies
- Forest Interior Dwelling Habitat
- Forest Conservation Act Easements
- Historic Properties

- Park Property
- Place of Worship
- School

1 in = 400 feet
0  100  200    400
Feet

**Environmental Resource Mapping**
Alternatives 8, 9, 10, 13B, 13C
*for I-495*

Appendix D
Map 59

495 270 MANAGED LANES STUDY

00174458



SDEIS CONFIGURATION AT MOSES HALL CEMETERY

00174459

Message

**From:** Stacy Talmadge (Consultant) [STalmadge.consultant@mdot.maryland.gov]
**Sent:** 5/31/2022 9:20:04 AM
**To:** SHA MIsadminrecord [MIsadminrecord@mdot.maryland.gov]
**Subject:** FW: [EXTERNAL] RE: Plummers Island Piers

**Stacy Talmadge**
Environmental Program Support
I-495 & I-270 P3 Office

**Office** 410-637-3349 **Mobile** 443-414-7723
**Email** STalmadge@mdot.maryland.gov

**Office Address** 601 N. Calvert Street | Baltimore, MD 21202
**Mailing Address** 707 North Calvert Street,
P-601 | Baltimore MD 21202

---

**From:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
**Sent:** Tuesday, May 31, 2022 8:14 AM
**To:** Guinther, James <jguinther@wrallp.com>; MacLean, Don <Donald.Maclean@wsp.com>; Linda Strozyk DeVuono <LDeVuono@mdot.maryland.gov>; Walter Miller (Consultant) <WMiller3.consultant@mdot.maryland.gov>; Michael Lynch (Consultant) <MLynch7.consultant@mdot.maryland.gov>; kkahl <kkahl@rkk.com>; Stacy Talmadge (Consultant) <STalmadge.consultant@mdot.maryland.gov>
**Subject:** Fw: [EXTERNAL] RE: Plummers Island Piers

Good morning,
So everyone is on the same page for our meetings today, below is the email chain between NPS and USACE.

**Caryn J. G. Brookman**
*Environmental Program Manager*
**Office** 410-637-3335 **Other** 410-252-7870
**Email** cbrookman@mdot.maryland.gov
**Office Address** 601 N. Calvert Street | Baltimore, MD 21202
**Mailing Address** 707 North Calvert Street,
P-601 | Baltimore MD 21202

---

**From:** Ozburn, Nicholas R CIV USARMY CENAB (USA) <Nicholas.R.Ozburn@usace.army.mil>
**Sent:** Wednesday, May 18, 2022 6:18 PM

**To:** Landsman, Andrew P <Andrew_Landsman@nps.gov>; Hammig, Laurel D <Laurel_Hammig@nps.gov>; Davia, Joseph P CIV USARMY CENAB (USA) <Joseph.DaVia@usace.army.mil>; Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>; Stidham, Tammy <Tammy_Stidham@nps.gov>
**Subject:** RE: [EXTERNAL] RE: Plummers Island Piers

Thanks Andrew,

Regarding the preliminary discussion on potential in-water pier effects on the island:
1) We cannot be certain whether increased flooding would occur without modeling. However, I do not anticipate flooding of the island to change measurably due to in-water piers at this location.
2) Hydraulics and scour are more complex and would depend on pier location. Again modeling would help verify. Some things are not captured in models though like 3-dimensional flow considerations (eddies, etc), but velocities could be modeled and would help answer the question.

My input here is based only on my observations of structures in river/stream flows over time. Hydraulic modeling would help answer those two questions with more certainty.

Thanks,


Nick Ozburn
Senior Project Manager
U.S. Army Corps of Engineers
Baltimore District
Cell: 410.395.4662

Assist us in better serving you!
Please complete our brief customer survey, located at the following link:
https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fregulatory.ops.usace.army.mil%2Fcustomer-service-survey%2F&amp;data=05%7C01%7Ccbrookman.consultant%40mdot.maryland.gov%7C50f2183639f146101f7f08da391c5565%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637885091122553521%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=9Kia2whjSEPY%2BEjOBViCGty%2FoXBUADUsQzXYP1udTVE%3D&amp;reserved=0


-----Original Message-----
From: Landsman, Andrew P <Andrew_Landsman@nps.gov>
Sent: Wednesday, May 18, 2022 11:23 AM
To: Hammig, Laurel D <Laurel_Hammig@nps.gov>; Davia, Joseph P CIV USARMY CENAB (USA) <Joseph.DaVia@usace.army.mil>; Caryn Brookman (Consultant) <cbrookman.consultant@mdot.maryland.gov>; Stidham, Tammy <Tammy_Stidham@nps.gov>
Cc: Ozburn, Nicholas R CIV USARMY CENAB (USA) <Nicholas.R.Ozburn@usace.army.mil>
Subject: [URL Verdict: Neutral][Non-DoD Source] Re: [EXTERNAL] RE: Plummers Island Piers

Hello,

Yes - MDOT had shifted the piers from the river channel onto Plummers Island as a means to address the Washington Biologists' Field Club concerns about the piers in the river. Moving the piers onto the island would negatively affect several listed plant species, and the Field Club is more interested in having those piers back in the original location (as is the NPS, the land owner). In very preliminary discussions with Nick, there was not necessarily a significant concern that piers within the river channel would significantly increase flood levels on the island or cause the other scouring issues

that the Field Club had expressed.  We also understand that USACE has not reached any final decisions, conclusions, etc.  We look forward to hearing USACE's findings moving forward!

Thank you,
Andrew

Andrew P. Landsman, Ph.D.
Program Manager - Natural Resources and Compliance
C&O Canal National Historical Park
142 West Potomac Street
Williamsport, MD  21795

_____

From: Hammig, Laurel D <Laurel_Hammig@nps.gov>
Sent: Wednesday, May 18, 2022 11:14 AM
To: Davia, Joseph P CIV USARMY CENAB (USA) <Joseph.DaVia@usace.army.mil>; Caryn Brookman (Consultant) <cbrookman.consultant@mdot.maryland.gov>; Tammy_Stidam@nps.gov <Tammy_Stidam@nps.gov>; Landsman, Andrew P <Andrew_Landsman@nps.gov>
Subject: Re: [EXTERNAL] RE: Plummers Island Piers

Hi Joe,
Thanks for the email. That was my understanding; USACE does not have a requirement for the piers to be located on land so NPS is requesting the project team move the piers into the river as originally proposed. I'm looping Andrew into this also in case he has additional thoughts.

Thank you,
Laurel

Laurel Hammig, AICP | National Park Service
Acting Memorials Program Manager
National Capital Region
1100 Ohio Drive SW
Washington, DC 20242

Call or text: 202-875-3609

Video: MS Teams preferred, others on request

_____

From: Davia, Joseph P CIV USARMY CENAB (USA) <Joseph.DaVia@usace.army.mil>
Sent: Wednesday, May 18, 2022 11:07 AM
To: Caryn Brookman (Consultant) <cbrookman.consultant@mdot.maryland.gov>; Hammig, Laurel D <Laurel_Hammig@nps.gov>; Tammy_Stidam@nps.gov <Tammy_Stidam@nps.gov>
Subject: [EXTERNAL] RE: Plummers Island Piers


This email has been received from outside of DOI - Use caution before clicking on links, opening attachments, or responding.

Caryn/Laurel --

The Corps had a recent field meeting at the ALB bridge location with MDE and MD SHA reps.

We discussed options for pier placement and potential avoidance and minimization measures.

However, to be clear, we reached no conclusions or final decisions on pier placements on or off Plummers Island.

Should you wish to discuss, pls let me know.

Thx, Joe

Joseph P. DaVia
Chief, Maryland North Section
US Army Corps of Engineers, Baltimore District
410.962.5691
410.935.3378 (Cell)
joseph.davia@usace.army.mil

Assist us in better serving you!
Please complete our brief customer survey, located at the following link:

https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fregulatory.ops.usace.army.mil%2Fcustomer-service-survey%2F&amp;data=05%7C01%7Ccbrookman.consultant%40mdot.maryland.gov%7C50f2183639f146101f7f08da391c5565%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637885091122553521%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=9Kia2whjSEPY%2BEjOBViCGty%2FoXBUADUsQzXYP1udTVE%3D&amp;reserved=0
<Blockedhttps://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fregulatory.ops.usace.army.mil%2Fcustomer-service-survey%2F&amp;data=05%7C01%7Ccbrookman.consultant%40mdot.maryland.gov%7C50f2183639f146101f7f08da391c5565%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637885091122553521%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=9Kia2whjSEPY%2BEjOBViCGty%2FoXBUADUsQzXYP1udTVE%3D&amp;reserved=0> <https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fregulatory.ops.usace.army.mil%2Fcustomer-service-survey%2F&amp;data=05%7C01%7Ccbrookman.consultant%40mdot.maryland.gov%7C50f2183639f146101f7f08da391c5565%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637885091122553521%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=9Kia2whjSEPY%2BEjOBViCGty%2FoXBUADUsQzXYP1udTVE%3D&amp;reserved=0
<Blockedhttps://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Fregulatory.ops.usace.army.mil%2Fcustomer-service-survey%2F&amp;data=05%7C01%7Ccbrookman.consultant%40mdot.maryland.gov%7C50f2183639f146101f7f08da391c5565%7Cb38cd27c57ca4597be2822df43dd47f1%7C0%7C0%7C637885091122553521%7CUnknown%7CTWFpbGZsb3d8eyJWIjoiMC4wLjAwMDAiLCJQIjoiV2luMzIiLCJBTiI6Ik1haWwiLCJXVCI6Mn0%3D%7C3000%7C%7C%7C&amp;sdata=9Kia2whjSEPY%2BEjOBViCGty%2FoXBUADUsQzXYP1udTVE%3D&amp;reserved=0> >


From: Hammig, Laurel D <Laurel_Hammig@nps.gov>
Sent: Tuesday, May 17, 2022 3:26 PM
To: Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>
Cc: Stidham, Tammy <Tammy_Stidham@nps.gov>

00174495

Subject: Plummers Island Piers

Hi Caryn,

NPS reached out to USACE and they are not requiring the piers to be on Plummers Island. NPS would prefer the piers be moved off of Plummers Island and into the river, as originally proposed. If you'd like to discuss this further, please let me know.

Thank you,
Laurel

Laurel Hammig, AICP | National Park Service
Acting Memorials Program Manager
National Capital Region
1100 Ohio Drive SW
Washington, DC 20242

Call or text: 202-875-3609

Video: MS Teams preferred, others on request

Message

| | |
|---|---|
| **From**: | Harrell, Matthew T. [Matthew.Harrell@wsp.com] |
| **Sent**: | 6/6/2022 1:00:20 PM |
| **To**: | Nomani, Ali [ali.nomani@vdot.virginia.gov] |
| **CC**: | Jeffrey Folden [JFolden1@mdot.maryland.gov]; Lerner, Abraham [abraham.lerner@vdot.virginia.gov]; Susan Shaw [susan.shaw@vdot.virginia.gov]; Walter Miller (Consultant) [WMiller3.consultant@mdot.maryland.gov]; MacLean, Don [Donald.Maclean@wsp.com]; Hill, Rodney [rhill@wrallp.com] |
| **Subject**: | RE: I-495 Express Lanes Northern Extension Project Update #5 - May 11, 2022 |
| **Attachments**: | 20220602_Enlarged v4 VDOT Next Mapping June 2022 with Op Lanes Maryland Logo Views.pdf; 20220602_Enlarged v3 VDOT Next Mapping June 2022 with Op Lanes Maryland Logo Map.pdf |

Ali/Abi,

Please see attached our boards for the 495 NEXT Project Update Meetings. We will plan to get there around 6 tonight. I also have the call-in details and webex link for tomorrow's virtual meeting from the website. Are there any other details we need?

Thanks,
Matt



**Matthew Harrell, P.E.**
Maryland Business Lead - Transportation
Assistant Vice President

T+ 1 410-385-4174
M+ 1 240-490-1976

---

**From:** Nomani, Ali <ali.nomani@vdot.virginia.gov>
**Sent:** Tuesday, May 17, 2022 9:25 AM
**To:** Harrell, Matthew T. <Matthew.Harrell@wsp.com>
**Cc:** Jeffrey Folden <jfolden1@mdot.maryland.gov>; Lerner, Abraham <abraham.lerner@vdot.virginia.gov>; Susan Shaw <susan.shaw@vdot.virginia.gov>; Walter Miller (Consultant) <WMiller3.consultant@mdot.maryland.gov>; MacLean, Don <Donald.Maclean@wsp.com>; Hill, Rodney <rhill@wrallp.com>
**Subject:** Re: I-495 Express Lanes Northern Extension Project Update #5 - May 11, 2022

Matt,

MDOT can bring a couple of boards displaying project information, status and timeline etc. A powerpoint presentation is not needed. Thanks.



**Ali Nomani, PE**
*Engineering Manager Design-Build Megaprojects*
Virginia Department of Transportation
Office: 703-691-6740, Cell:703-537-6630
ali.nomani@vdot.virginia.gov

On Mon, May 16, 2022 at 4:21 PM Harrell, Matthew T. <Matthew.Harrell@wsp.com> wrote:

00174746

Thanks, Ali.  I'll coordinate with our team to have representatives at the upcoming public meetings.  Do you do you want MDOT representatives to have a presentation prepared for a general project update, or will we just answer questions?  If you expect us to have a presentation, can you send over your slideshow template so we can match?

Thanks,
Matt

**Matthew Harrell, P.E.**

Maryland Business Lead - Transportation

Assistant Vice President

T+ 1 410-385-4174

M+ 1 240-490-1976

---

**From:** Nomani, Ali <ali.nomani@vdot.virginia.gov>
**Sent:** Friday, May 13, 2022 3:43 PM
**To:** Harrell, Matthew T. <Matthew.Harrell@wsp.com>
**Cc:** Jeffrey Folden <jfolden1@mdot.maryland.gov>; Lerner, Abraham <abraham.lerner@vdot.virginia.gov>; Susan Shaw <susan.shaw@vdot.virginia.gov>
**Subject:** Fwd: I-495 Express Lanes Northern Extension Project Update #5 - May 11, 2022

Matt,

Below please find our latest I-495 NEXT Newsletter. It contains information about our upcoming public meetings. We would like to request that MDOT send one or more representatives to the upcoming public meetings (June 6 and June 7). Please provide Abraham Lerner (copied in this email) the names of the I495/I270 ALB ML Project representatives who will be attending the in-person meeting so that we can prepare name tags for them. Please call me or email me if you have any questions with respect to my request.



# Project Update and Field Activity Report
## I-495 Express Lanes Northern Extension (495 NEXT) Project

Issue 5 | May 11, 2022

## In This Issue...

- Project Update Meetings on June 6 and 7
- Upcoming construction activities and traffic changes
- Current field work
- New interactive map with the most recent project plans

## Project Update Meetings on June 6 and 7

The Virginia Department of Transportation (VDOT), along with project partner, Transurban, and contractor, Lane Construction, will host two project update meetings on June 6 and 7 to provide residents and travelers an overview of project construction and design updates. The

00174748

meetings will include a virtual and in-person option, and will include a presentation, followed by a question and answer session. Project representatives from VDOT and its partners will be present at the meetings to answer questions and address comments.

## Meeting Details

**In-Person Meeting**
Monday, June 6, 6:30 to 8:30 p.m. (presentation at 7 p.m.)
Langley High School Auditorium
6520 Georgetown Pike, McLean VA 22101

**Virtual Meeting**
Tuesday, June 7, 6:30 to 8:30 p.m. (presentation at 6:30 p.m.)
Visit **495NEXT.org/public_meetings** for details on how to join the meeting

The project update meetings will focus on:

• Upcoming construction activities, including a preliminary timeline

• Expected construction impacts

• Project design changes and enhancements

• New interactive map showing latest construction, designs and plans

• Coordination with the adjacent George Washington Memorial Parkway rehabilitation project and the New American Legion Bridge I-270 Traffic Relief Plan

# Upcoming Construction

## Permanent Closure of Left Shoulder Lane and Reconfiguration of Beltway Lanes

To accommodate upcoming construction work, the northbound left shoulder (green arrow/red X) lane, which is open during morning and afternoon peak travel periods from where the current 495 Express Lanes end to the George Washington Memorial Parkway, will close permanently to accommodate upcoming construction. This work is planned to begin as early as May 31.

This section of I-495 will be restriped to maintain four lanes in each direction and to make space in the center of the Beltway for construction of center bridge piers at Old Dominion Drive, Georgetown Pike and Live Oak Drive. Temporary barriers will be placed to secure the center work zone for the safety of travelers and workers.

Prior to closing the left shoulder lane, the traveling public will be notified via electronic signs, a news release, social media and other means. Periodic lane closures are required to complete this work. Closures will be limited to non-peak travel hours.



## Georgetown Pike Bridge

Planned for late spring or early summer, the center median of the Georgetown Pike bridge over I-495 will be demolished and a temporary traffic barrier will be installed along the westbound shoulder. East- and westbound traffic will be shifted slightly south on the existing bridge to prepare for demolition of the northern portion of the bridge and temporary traffic signals will be installed.

The work will occur during day- and nighttime hours, and will require lane closures during non-peak travel periods.

*All field work is subject to change based on weather and other factors.*

# Current Field Activities

### Test Borings

Geotechnical test borings continue and are anticipated to be completed by early summer. The majority of borings on VDOT right-of-way adjacent to residences have been completed. The boring operations along I-495 require single-lane closures during daytime off-peak hours to provide a safety buffer between work crews and traffic.



# New Interactive Map and Website Refresh

A new interactive map has been added to the **495 NEXT website** providing details on the full range of project features, such as the new express lanes and associated access ramps, environmental features, the new bicycle pedestrian trail, and much more. The map also allows users to select project elements and features they wish to see in detail, such as right-of-way lines, proposed noise barrier locations and other features. Additionally, the **495 NEXT website** continues to be refreshed with new and updated content to reflect the project's transition to design and construction.



# Project Background

The 495 Express Lanes Northern Extension project (495 NEXT) is extending the existing 495 Express Lanes north by two-and-a-half miles from the Dulles Corridor interchange to the George Washington Memorial Parkway interchange in the vicinity of the American Legion Bridge. The project will provide new and improved connections at the Dulles Corridor and George Washington Memorial Parkway.

Other project benefits include four miles of new bicycle and pedestrian connections including a shared-use path parallel to I-495 from Lewinsville Road to near Live Oak Drive, replacement or rehabilitation of seven bridges with pedestrian accommodations, replacement of nine existing noise walls and construction of a new noise wall along Live Oak Drive in the vicinity of the George Washington Memorial Parkway interchange, environmental improvements introducing stormwater management facilities and funding restoration of the stream at Scotts Run, and dedicated funding to support transit improvements in the corridor including new bus service over the American Legion Bridge.

*495 NEXT is a public-private partnership project between the Commonwealth of Virginia and Transurban, operator of the existing 495 Express Lanes. Lane Construction is the design-build contractor for the project. The new extended lanes are scheduled to open in 2025.*



00174753

# Learn More About the Project

Check out **www.495NEXT.org** for additional information.

**Sign up** here to receive project email updates.



# Questions?

**Visit:** www.495NEXT.org
**Email:** 495NorthernExtension@vdot.virginia.gov
**Call:** Virginia Department of Transportation, Michelle Holland, 703-586-0487
Transurban, Brent McKenzie, 571-326-5609 | Lane Construction, John Undeland, 703-785-3461

   

    

00174754

Virginia Department of Transportation | 4975 Alliance Drive, Fairfax, VA 22030

--

**Ali Nomani, PE**

*Engineering Manager Design-Build Megaprojects*

Virginia Department of Transportation

Office: 703-691-6740, Cell:703-537-6630

ali.nomani@vdot.virginia.gov

NOTICE: This communication and any attachments ("this message") may contain information which is privileged, confidential, proprietary or otherwise subject to restricted disclosure under applicable law. This message is for the sole use of the intended recipient(s). Any unauthorized use, disclosure, viewing, copying, alteration, dissemination or distribution of, or reliance on, this message is strictly prohibited. If you have received this message in error, or you are not an authorized or intended recipient, please notify the sender immediately by replying to this message, delete this message and all copies from your e-mail system and destroy any printed copies.

1 in = 450 feet

0  115  230    460
Feet

Potomac River

Maryland

Virginia

Potomac River

**OP·LANES**
MARYLAND

Options & Opportunities for All

Long Oak Dr

George Washington Memorial Pkwy

Balls Hill Rd

I-495

I-495

**Legend**

- Proposed General Purpose Lanes
- Proposed General Purpose Lanes VDOT 495 NEXT Project
- Proposed Managed Lanes
- Proposed Managed Lanes VDOT 495 NEXT Project
- Proposed New or Reconstructed Bridge
- Proposed New or Reconstructed Bridge VDOT 495 NEXT Project
- Proposed Shared Use Path
- Proposed Shared Use Path VDOT 495 NEXT Project
- Existing Noise Barrier
- Proposed Noise Barrier
- Proposed Noise Barrier VDOT 495 NEXT Project
- Project Limit of Disturbance
- Existing Right-of-Way

00174756

**OP LANES**
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

## Summary of American Legion Bridge

## Conceptual Design and Avoidance and Minimization

## June 2022

**Timeline:**

- **Summer 2019 – Preliminary alternatives' design and constructability considerations.** Included extensive impacts to Plummers Island, particularly the extensive impacts to the rock outcropping, due to relocation of Oxbow of the Potomac River east onto the island to accommodate traditional piers arranged with 250-foot spans. Construction access proposed in all four quadrants of the ALB.
- **Fall 2019 – Field Meeting with USACE, MDE, EPA, USFWS, DNR.** Determined that it was not practicable to relocate the oxbow to the east because of the extensive bedrock outcropping. Identified that the oxbow should be spanned by substructure units to allow the oxbow to remain in place and functioning during construction and in relatively the same position as it currently exists. Construction access over the oxbow would be accomplished by placing a temporary culvert and filling the oxbow, followed by removal of fill and restoration after construction.
- **2020 – DEIS Comments.** Additional avoidance and minimization requested, including spanning the oxbow during construction in lieu of a temporary culvert and causeway construction.
- **Early 2021 – Strike Team Evaluation.** Efforts resulted in significant reductions of the LOD, primarily by limiting construction access to the northwest quadrant and identifying trestles to support construction over the oxbow. (see selected text from Avoidance and Minimization Report in Attachment A). Design included two drilled shaft piers on Plummers Island each spanning the oxbow, one located on top of research plot 5 near the rocky headlands.
- **Spring 2021 – Strike Team Results presentations.** NPS, USACE , MDE and other agencies were presented with the results of the Strike Team avoidance and minimization efforts.
- **Summer 2021 – Design Refinement and identification of permanent and temporary impacts.** Additional avoidance and minimization and pier optimization resulted in the current design with one pier located on Plummers Islands north of research plot 5. The pier that impacts Plummers island consists of three drilled shafts on the island, and three drilled shafts on NPS lands west of the island and the Oxbow of the Potomac River.
- **Fall 2021 – SDEIS Publication**
- **Spring 2022 – Joint Permit Application Submitted.** documents impacts identified in the SDEIS including two piers in the mainstem of the Potomac River and one pier spanning the oxbow (with drilled shafts on Plummers Island).

OP LANES
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

**Structural Considerations for Pier Placement on Plummer's Island and outside of Oxbow:**

After gathering the information from the field meeting in Fall 2019 with USACE, MDE, EPA, USFWS, DNR, MDOT SHA evaluated how to provide the widening alternative that would remain on the same centerline (called On-alignment), while 1) avoiding the research plots on Plummer's Island, 2) avoiding impacts to the rock outcropping on Plummer's Island, 3) keeping the oxbow open without significant impacts by footings or permanent construction, and 4) minimizing the number of piers and/or foundations on Plummer's Island.

MDOT SHA evaluated how to maximize the bridge spans (the distance between adjacent piers) for the steel superstructure. The span length needed to stay within industry guidelines of no more than 300 feet for this bridge layout to accommodate constructability. Additionally, MDOT SHA needed to ensure the construction equipment could be located such that it could reach the site without causing significant temporary or permanent impacts to NPS property, considering that the construction access had been reduced to primarily the northwest quadrant.

MDOT SHA proposed drilled shaft piers at discreet locations just north of the Plummer's Island research plots and located them where the oxbow is constrained by the rock ledge along the southside of the oxbow to minimize ground disturbance. This location would require approximately 292-foot spans on both sides of the drilled shaft piers to span the oxbow and minimize additional foundations on the island. The attached map on the next page shows the location for the piers and drilled shafts.

MDOT SHA is proposing to maximize the overhang of the pier cap from the superstructure edge to reduce the number of piers needed on the island. Additionally, utilizing 300-foot long spans would not eliminate the need for drilled shafts or other foundations from impacting Plummer's island. The length of the island along the bridge is greater than 500', which is too long to span the entire island using conventional structural steel superstructures. Larger, more intrusive structures could be used, such as a cable stay bridge (see summary of the ALB Strike Team analysis in Attachment A), but that would have significant effects on the visual impacts to NPS parks.

Following this office analysis, the MDOT SHA team performed a field visit to identify locations where the drilled shafts could be located that would allow for the span lengths to be maximized and the natural resource impacts to be minimized to the greatest extent possible. The photos in Attachment B show the proposed placement of the drilled shafts and the surrounding area.



MARYLAND
VIRGINIA

POTOMAC RIVER

Virginia
Wetland and Waterway
Impact Plates

*Mainline Impact Plate 2*

May 2022

0   100   200   400

1 inch = 200 feet

| | | |
|---|---|---|
| ▨▨ RPA Limit of Disturbance Temp | — Proposed Retaining Wall | ▨ Bridge |
| ▨▨ RPA Limit of Disturbance Perm | — New/Augmented Pipe/Culvert | □ Limit Of Improved SWM / Storage |
| ▨ Delineation Limits | ▬ Relocated Channel | □ Limit Of Restoration |
| ✕ Proposed Pavement | ●—● Proposed SWM - Pond | □ Limit Of Stabilization |
| —●— Noise Wall Proposed | ●—● Proposed SWM - Swale | □ Shared Use Path |
| —●— Noise Wall Existing | ▦▦ Proposed SWM - Vault | ～～ Flow Direction |

| | |
|---|---|
| ▨ Waterway Impact Perm | □ Wetland Buffer Impact Perm |
| ▨ Waterway Impact Temp | □ Wetland Buffer Impact Temp |
| ▨ Culvert Impact Perm | □ Stream No Impact |
| ▨ Culvert Impact Temp | □ Wetland No Impact |
| ▨ Wetland Impact Perm | □ Wetland Buffer No Impact |
| ▨ Wetland Impact Temp | ▨ FEMA 100-Year Floodplain |

495 270 MANAGED LANES STUDY

00174840

**OP-LANES**
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

# Attachment A

# Summary of Avoidance & Minimization Report



I-495 & I-270 Managed Lanes Study

# FINAL AVOIDANCE, MINIMIZATION, AND IMPACTS FOR AMERICAN LEGION BRIDGE AND PLUMMERS ISLAND

# Draft



## AVOIDANCE & MINIMIZATION APPROACH

The MLS Team worked closely with regulatory and resource agencies for over 4 years to limit impact to wetlands, wetland buffers, waterways, and floodplains to the greatest extent practicable during preliminary design, while assuring there was enough room for construction of the roadway and the required ancillary roadway systems, such as drainage culverts.

Avoidance and minimization was conducted corridor-wide using a five-stage standardized process to avoid and minimize impacts to all wetlands and waterways throughout the corridor by adding retaining walls, where necessary, to limit roadway impacts and by altering the preliminary stormwater management (SWM) design. This five-step process established the SDEIS LOD and set the design limits for the FEIS and developer. The preliminary design for the Preferred Alternative is within these design limits. Targeted avoidance and minimization of the Potomac River and Plummers Island, Thomas Branch, and other major stream crossings within Phase I South was closely investigated and the LOD and preliminary design were refined to avoid impacts to these resources to the greatest extent practicable during this stage of design.

The MLS Team made a concerted effort to avoid and minimize impacts throughout the planning process and the P3 Developer will continue to implement avoidance and minimization during the design-build stage of the project as the design advances and the LOD is refined. Following the Record of Decision (ROD), the developer will be required to continue avoidance and minimization throughout final design and construction and document that the final design has fewer impacts to the Preferred Alternative or submit a permit modification.

### Targeted Areas of Avoidance and Minimization: Potomac River, Plummers Island, and the American Legion Bridge

U.S. Army Corps of Engineers (USACE), Maryland Department of the Environment (MDE), U.S. Fish and Wildlife Service (USFWS), Environmental Protection Agency (EPA), Maryland Department of Natural Resources (MDNR), Maryland National Capital Park and Planning Commission (M-NCPPC), and National Park Service (NPS) requested a series of avoidance and minimization coordination meetings to focus on areas of particular concern, such as the Potomac River crossing (including Plummers Island), within the corridor study boundary to ensure that avoidance and minimization measures were applied to the maximum extent practicable while still meeting the MLS purpose and need.

The existing ALB structures, linking the Virginia and Maryland portions of I-495 over the Potomac River, were constructed in the early 1960s and must be replaced by 2030 due to age and condition. Replacing these bridge structures as part of the MLS would eliminate the need for a follow-up bridge replacement project for which the state does not have funding allocated. MDOT SHA carefully considered various potential roadway alignments as well as various types of potential bridge structures to inform the LOD in this area to accommodate roadway widening and bridge replacement across the Potomac River while limiting impact to NPS property and resources underneath the bridge and on the shorelines.



The Preferred Alternative includes numerous LOD modifications since the DEIS, one of the most significant of which is in the vicinity of the ALB to address comments and concerns received from the NPS regarding impacts to NPS lands and resources.

Multiple alignments were considered when determining the LOD for the replacement of the ALB. Off-alignment bridge options were considered but were not retained for further study in the DEIS, since they were not practicable. Tunnel and full-span suspension on-alignment alternatives were also considered but were not retained for further study in the DEIS, because they would not allow for connection with the Clara Barton Parkway or George Washington Memorial Parkway and would be cost prohibitive. Alignment options that were investigated further include: an entirely offset alignment to either the east or west; a minimally offset alignment to either the east or west; and widening the structure on the existing alignment.

The ALB alignment determination required assessing impacts to wetlands, streams, forests, rare plant species, cultural resources, and adjacent properties such as the Naval Surface Warfare Center at Carderock in Maryland and a residential community along the Virginia shoreline of the Potomac River. Other factors considered when evaluating the proposed alignments included maintenance of traffic, constructability, construction access, and roadway engineering issues such as re-aligning the interchanges that lead to the ALB.

Building the replacement ALB on an entirely offset alignment to the east of the existing structure while traffic remains in its current configuration would result in unacceptable impacts to Plummers Island, an important biological and cultural resource within the Chesapeake and Ohio National Historical Park, and impacts the two other NPS parks in the vicinity of the ALB. This approach would not be feasible on the west side of the existing ALB either, due to unacceptable impacts to the Naval Surface Warfare Center Carderock Division property located on the north side of the Potomac River, to a residential community on the south side of the Potomac River and to two NPS parks (Clara Barton Parkway and Chesapeake and Ohio Canal National Historical Park).

A less impactful approach would be to construct a new structure on a minimally offset alignment, while placing traffic partly on the existing structure and partly on a new structure during construction. The minimally offset alignment to the east would still impact Plummers Island and NPS property more than would be acceptable and this alignment is not feasible. The minimally offset alignment to the west would avoid impacts to Plummers Island but would impact more NPS property and would require displacement of a residential property on the Virginia shoreline of the Potomac River. This "west shift" alignment was considered post-DEIS and is discussed further in **Section A**.

Widening on the existing alignment would impact Plummers Island to some extent but would avoid impacts to the residential property on the Virginia side of the ALB and would impact less NPS property than the "west shift" alignment option. This "on-center" widening alignment, or base option, was considered post-DEIS and is discussed further in **Section A**.

See **Figure 1** through **Figure 3** for a visualization of the base option and the west shift. A comparison of impacts for the base option, west shift, and on-center widening included in the Preferred Alternative LOD are displayed below.




I-495 & I-270 Managed Lanes Study

Final Avoidance, Minimization, & Impacts: ALB/Plummers Island

## Table 1. Comparison of Impacts for ALB Alignment Options

| Resource (unit) | DEIS LOD Conventional Construction (June 2020) | | | Centerline ALB Alignment (Base Option) March 4, 2021 | | | West Shift ALB Alignment March 4, 2021 | | | FEIS MDOT SHA RPA[3] March 21st, 2022 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Perm | Temp | Total | Perm | Temp | Total | Perm | Temp | Total | Perm | Temp | Total |
| **NPS Park Properties[1]** | | | | | | | | | | | | |
| **Total NPS Properties Around ALB[2] (acres)** | **4.88** | **11.30** | **16.18** | **5.26** | **4.51** | **9.77** | **5.88** | **5.23** | **11.11** | **0.90** | **8.76** | **9.66** |
| Chesapeake and Ohio Canal National Historical Park (acres) | 4.88 | 7.69 | 12.57 | 5.09 | 4.25 | 9.34 | 5.88 | 4.93 | 10.81 | 0.87 | 8.46 | 9.33 |
| Clara Barton Parkway (acres) | 0 | 0.19 | 0.19 | 0 | 0.19 | 0.19 | 0 | 0.19 | 0.19 | 0.00 | 0.19 | 0.19 |
| George Washington Memorial Parkway (acres) | 0 | 3.42 | 3.42 | 0.17 | 0.07 | 0.24 | 0 | 0.11 | 0.11 | 0.03 | 0.11 | 0.14 |
| **Individual Trees within Park Boundaries** | | | | | | | | | | | | |
| Live Tree Impacts (#/DBH) | 1,108 / 14,033 | N/A | 1,108 / 14,033 | 805 / 10,032 | N/A | 806 / 10,032 | 878 / 11,136 | N/A | 878 / 11,136 | 803 / 9,994 | N/A | 803 / 9,994 |
| Standing Dead Tree Impacts (#/DBH) | 190 / 2,202 | N/A | 190 / 2,202 | 116 / 1,335 | N/A | 116 / 1,335 | 129 / 1,608 | | 129 / 1,608 | 118 / 1,363 | N/A | 118 / 1,363 |
| **Natural Resources within the Potomac River Gorge** | | | | | | | | | | | | |
| NR Waters (acres) | 8.81 | N/A | 8.81 | 4.56 | 3.68 | 8.24 | 4.46 | 3.66 | 8.12 | 0.92 | 7.33 | 8.25 |
| NR Waters (linear feet) | 3,830 | N/A | 3,830 | 1,985 | 1,110 | 3,095 | 2,142 | 821 | 2,963 | 1,075 | 2,188 | 3,263 |
| NR Wetlands (acres) | 0.78 | N/A | 0.78 | 0.36 | 0.33 | 0.69 | 0.73 | 0.49 | 1.22 | 0.16 | 0.40 | 0.56 |
| Plummers Island Area (acres) | 0.28 | 1.69 | 1.97 | 0.28 | 0 | 0.28 | 0.00 | 0.04 | 0.04 | 0.004 | 0.26 | 0.26 |
| Forest Canopy (acres) | 17.74 | N/A | 17.74 | 6.72 | 4.56 | 11.28 | 6.56 | 6.06 | 12.62 | 4.85 | 6.93 | 11.78 |
| FEMA 100 Year Flood (acres) | 22.22 | N/A | 22.22 | 11.31 | 7.52 | 18.83 | 11.11 | 8.64 | 19.75 | 3.64 | 7.25 | 10.89 |
| FIDS (ac) | 7.01 | N/A | 7.01 | 3.29 | 1.01 | 4.30 | 1.27 | 2.71 | 3.98 | 1.70 | 2.46 | 4.16 |
| FIDS - DNR (ac) | 8.79 | N/A | 8.79 | 1.75 | 3.94 | 5.69 | 2.21 | 5.21 | 7.42 | 0.94 | 4.77 | 5.71 |
| RTEs (# species impacted) | 7 (4 poly / 3 point) | | | 6 (4 poly / 2 point) | | | 5 (4 poly / 1 point) | | | 6 (4 poly / 2 point) | | |

Notes:

1. These impact calculations are based on the NPS GIS Park Boundaries received via email from NPS personnel on 4/29/2021 (Tammy Stidham).
2. Impacts to properties excludes the areas within existing transportation easements; portions removed in GIS using spatial overlay before the impacts were calculated.
3. MDOT SHA RPA includes the Centerline ALB Alignment from March 4, 2021 with additional refinements to the design and constructability assumptions.

00174845

## Figure 1. Roadway Comparison Base and West Shift Options



00174846

**Figure 2. LOD Comparison Base and West Shift Options**



00174847

OP·LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

Final Avoidance, Minimization, & Impacts: ALB/Plummers Island

**Figure 3. Impact Comparison Base and West Shift Option**



00174848

## A. Alternative Bridge Design Options

Alternative bridge design options were considered to inform the LOD in the vicinity of the ALB, to determine the extent to which the LOD could be minimized to limit impacts to NPS land and natural and cultural resources, while still providing enough space to accommodate bridge construction and maintenance.

### a. Avoidance

Long-span Bridge:

The only avoidance option identified was replacement of the ALB with a long-span bridge. In order to avoid natural resources at the bridge location, permanent piers would need to be constructed completely beyond the limits of the resources. This would require a pier north of the Washington Aqueduct on the Maryland side and at, or south, of the existing south abutment in Virginia. The resulting clear span is at least 3,250 feet. A suspension bridge is the only feasible bridge type to span this distance and a bridge this long would be the 35th longest suspension bridge in the world, or the 5th longest in the U.S. Additional back-span dimensions for anchorage would be at least another 800-feet on each end for a total bridge length between cable anchorages of 4,850 feet. This length does not include a likely need for approach spans on either end to transition from the highway on grade to the suspended roadway. The total bridge length needed would make the interchanges at Clara Barton Parkway and George Washington Memorial Parkway inaccessible. Replacing the ALB with a suspension bridge would not be practicable, since it would eliminate the interchanges with the parkways in Maryland and Virginia; would be cost-prohibitive; and would drastically alter the viewshed of the surrounding natural area.

### b. Minimization

#### i. DEIS Minimization Options

Reconstruct Bridge without Widening:

One minimization option identified was reconstructing the ALB without widening. The existing bridge out-to-out width is approximately 138-feet and carries five lanes of traffic in each direction. To maintain 10 lanes of traffic during construction with minimal offsets to temporary barriers requires 119-feet of bridge width. Therefore, a maximum of 19-feet of the existing bridge is available for demolition and reconstruction in the first phase. This means that only one lane at a time could be reconstructed and shifted onto the new bridge. A minimum of nine phases of traffic control would be required to fully replace the bridge. This assumes that all the deck joints between phases are structurally feasible; the existing piers are stable in a partially loaded and/or demolished condition; and the new superstructure configuration could be made compatible with the temporary lane placement. The resulting superstructure would be inefficient, because uniform girder spacing would not be feasible while accommodating the required construction phasing. In addition, in the middle three phases of demolition and construction, work would have to occur between active lanes of traffic. In the same phases, traffic in the same direction would be divided with a construction zone in between the travel lanes. No work zone for construction vehicles and equipment would be available on the bridge, because all bridge deck that is in place, either existing or proposed, would be required to carry traffic. This approach to construction is very unsafe for motorists and construction staff. There would be no emergency pull off lanes for five lanes of traffic in each direction. Construction work would occur between and over open lanes of traffic. The duration of construction, number of traffic shifts, and inefficient structure configuration would result in a highly





undesirable and expensive approach to construction. This option is not practicable due to extreme safety issues, construction inefficiencies and challenges, and prohibitive cost and duration.

Double-Deck Existing Bridge:

A double-deck bridge was considered in hopes of reducing the extent of the construction footprint and minimizing impacts to NPS property and natural resources. The out-to-out superstructure width of one direction of travel in the proposed condition would be approximately 124-feet. Since this is less than existing superstructure width, constructing a second deck over the existing bridge superstructure would provide sufficient width for the proposed lane configuration. Previous analysis of the existing substructure units indicate that the piers are currently loaded to the point that there is no additional capacity. The additional dead load from the second deck and the live load from the vehicles could not be accommodated by the existing substructure. In order to support the second deck, new substructure units independent from the existing, would need to be constructed. These would consist of new pier caps spanning across the entire width of the existing bridge to newly constructed column elements supported on large, deep foundations located outside the existing bridge. To minimize the impact of the foundation elements, they would likely consist of large diameter drilled shafts. The associated pier cap would span a minimum of 155-feet, resulting in a significant concrete beam that would greatly increase the vertical profile of the top deck in order to provide sufficient vehicular under clearance to the lower deck. The approach roadway modifications necessary to transition from side-by-side to stacked roadways would extend well beyond the interchanges on each end of the bridge.

Proposed Double-Deck Bridge:

Building on the discussion above, it is clear that the out-to-out superstructure width of a completely new double-deck bridge would be 124-feet. To support both decks, the substructure would need to be wider than the superstructure. Again, assuming large, drilled shaft foundations and columns, the out-to-out of the entire bridge would be approximately 144-feet, which is wider than the existing bridge. Some minor additional impacts to the resources would be likely. To build an entirely new bridge, the construction phasing would ideally require the new bridge to be built off of the existing bridge alignment. This would allow conventional maintenance of traffic on the existing bridge while the new double-deck structure is completed. The approach roadway modifications required for the option to double-deck the existing bridge remain with this option. Construction of either double-deck bridge option is not practicable, since it would require a new substructure so far beyond the width of the existing structure that it would not reduce the construction footprint or minimize impacts to natural resources from a conventional construction method but would be far more expensive than a conventionally constructed bridge.

Top-Down Construction:

Utilizing top-down construction techniques for the proposed bridge structure means that all construction equipment and access would be provided from the completed bridge deck. The contractor would begin construction at an abutment and the first pier working from the approach roadway behind the abutment. Next the superstructure would be constructed on the first span. All construction operations would then move onto the completed first span in order to construct the next pier and next span of superstructure. Construction would proceed in this manner along the entire length of the bridge until the full structure is complete. Two separate crews working from opposite ends of the bridge could each begin at opposite abutments and meet in the middle of the bridge. This technique would result in relatively short spans





between pier locations due to limited equipment reach and capacity. The total footprint of pier elements would be much larger than the footprint of a bridge with conventional span lengths. In addition, utilizing top-down construction does not address any of the issues with traffic phasing and work zones discussed in previous options.  While this type of construction would still require a construction access road to remove materials and would be relatively more expensive to construct than the conventional method, it was determined to be a viable option.

### ii. Strike Team Minimization Options

MDOT SHA and Federal Highway Administration met with the NPS to discuss the LOD presented in the MLS DEIS on December 8, 2020. The NPS requested that MDOT SHA re-assess the LOD in the vicinity of the ALB to limit impacts to NPS land and its natural resources. MDOT SHA convened an 'ALB Strike Team' composed of national and local experts on bridge design, natural resources, and cultural resources who were charged with the following mission:

*To develop and evaluate alternatives for the replacement of the ALB to avoid impacts, to the greatest extent practicable, and reduce overall acreage impacts to the Chesapeake and Ohio Canal National Historical Park and George Washington Memorial Parkway units of the NPS.*

The ALB Strike Team conducted its intensive investigation in January 2021 to explore alternative design solutions, project phasing solutions, site access solutions, and the potential use of specialty construction techniques to limit the LOD. The ALB Strike Team presented its results to the NPS on February 8, 2021.

MDOT SHA established the Base LOD as the "Base Option," which includes a conventionally constructed bridge structure built in two phases on the existing bridge centerline with the assumption of temporary construction access over the Potomac River via trestles and causeways. This Base Option included minor LOD reductions from the DEIS LOD to minimize impacts to Plummers Island. The Base Option also started with construction access in all four quadrants and was minimized to remove the construction access in the southwest, southeast, and northeast quadrants, which significantly reduced impacts to NPS property.

The ALB Strike Team first reviewed the avoidance and minimization options developed by MDOT SHA to date, as described above, and the Strike Team agreed that these options were not practicable, except perhaps the top-down construction option, which they investigated in further detail. The Strike Team then reviewed the viability of the Base Option and confirmed that this on-center alignment with a conventional construction approach was a viable option. The ALB Strike Team also considered a "west shift" of the LOD to entirely avoid impacts to Plummers Island and determined that a conventional construction approach with a west shift was also a viable option.

The ALB Strike Team then considered other bridge construction approaches to determine if any of them could limit the LOD further than the Base Option could. The Strike Team conducted detailed investigation on a top-down segmental construction approach; a top-down cable stayed approach; and a slide-in place bridge construction approach.

Top-Down Construction
The first type of construction method assessed by the Strike Team was the top-down approach. The Strike Team investigated whether the existing bridge could be used as a work platform as part of the top-down

DRAFT, PREDECISIONAL, DELIBERATIVE



00174851



construction method, but determined it could not, since the northbound and southbound lanes are at very different elevations, making it impossible to shift traffic across the bridge during construction. This also means that the existing bridge cannot be used for construction and material deliveries, except during light traffic periods that would allow a lane closure. Top-down construction approaches investigated included: gantry, pre-cast segmental, cast-in-place segmental, and cable stayed. The Strike Team determined that the gantry method was not viable, because the ALB would require either spread footing foundations on rock or drilled piers, both of which would require ground access to the foundation locations for construction. Pre-cast segmental construction would also not be viable, because segments for the ALB would be too large and heavy to transport to the site.

Cast-In-Place Segmental
A cast-in-place segmental construction method was determined to be viable. A cast-in-place segmental bridge option would fit within the Base LOD, with impacts similar to the Base Option. The cost of this option is likely competitive with the Base Option and would likely be faster to construct.

Cable Stayed
The next top-down option reviewed by the Strike Team was the Cable Stayed Option, which would use a top-down cantilever method of construction. The primary advantage of this method is that it requires the fewest number of foundations of all options considered, minimizing the permanent ground displacement area. This option would also reduce the shade and shadow areas under the bridge, which is known to affect anadromous fish species. The cable stayed option would require a 200-foot tower and cables and would have a significant effect on the overall viewshed. This is the most expensive construction method considered.

Slide-In Place
A third type of bridge construction considered by the Strike Team for the ALB is the Slide-In Place Option. This option would construct the entire new superstructure on falsework situated west of the existing bridge and then slide it in place over a weekend. This option was found to be the most impactful strike team option and therefore not viable.

### B. Constructability Considerations

Construction equipment and personnel must be able to work below the bridge structures at river level to construct proposed piers and demolish the existing structure. Given the steep slopes on both shorelines of the Potomac River, limited access opportunities, and characteristics of the Potomac River channel, a site access plan is needed that requires additional LOD beyond the limits of the existing and proposed structures.

After field analysis and known information review, MDOT SHA and the ALB Strike Team determined that access to the site at river level can be consolidated to the north side of the river along Clara Barton Parkway, eliminating the construction access from the other three quadrants around the bridge and significantly reducing impacts to NPS land. This would be achieved by constructing a temporary construction access road entrance off of Clara Barton Parkway in the northwest quadrant and installing a temporary bridge over the Chesapeake and Ohio Canal and a temporary haul road paralleling the towpath. Construction traffic could then turn south parallel to the existing structure and follow existing right-of-




way to the area below the existing/proposed bridge. It is important to note that pedestrian traffic on the Chesapeake and Ohio Canal towpath must be maintained throughout construction. A barrier between the haul road and the towpath would need to be constructed to ensure public safety. The site access plan on the north side of the ALB would require an approximate travel way width of 40 feet beyond the extent of the proposed bridge to supply enough area for crane booms, pump trucks, man lifts, and other equipment needed to reach the proposed bridge deck from river level.

Access to the site at river level from the south side is more difficult. The existing residential neighborhood in the bridge's southwest quadrant constricts this area for site access. It is proposed that access to the south side of the river be via means of a temporary river causeway and temporary bridge, such as floating bridges and barges. River flooding would also need to be considered in the design of this temporary structure, which would require a contingency plan should water levels rise and would require the temporary structures and barges be built to withstand the 100-year flood or be removable prior to flood events.

The proposed construction access is shown in **Figure 4**. Storage of construction equipment, vehicles, and materials could be accommodated within the temporary LOD indicated in the Final EIS (FEIS).



**Figure 4. Proposed Construction Access for American Legion Bridge**

00174854

## C. Avoided and Minimized LOD in the Vicinity of the American Legion Bridge

MDOT SHA determined the LOD options for the ALB based on the results of the ALB Strike Team investigations. The bridge construction types with the smallest LOD footprint were the Base Option and the Cast-In-Place Segmental Option, both with a similar LOD requirement. Both construction types could be built with an on-center alignment or a west-shift alignment. MDOT SHA compared the NPS land impacts and those of the natural and cultural resources surrounding the ALB and determined that the on-center alignment would impact the least amount of total NPS Land; would not require re-configuration of the Clara Barton Parkway interchange; and would not require residential displacement, as the west shift alignment would. For these reasons, the on-center alignment with the reduced LOD required by the Base Option or Cast-In-Place Segmental bridge types was incorporated into the Preferred Alternative LOD.

**OP·LANES**
M A R Y L A N D

I-495 & I-270 Managed Lanes Study

# Attachment B
# Photos of Plummers Island

00174856

## Photo Summary of ALB Proposed Pier Locations on Plummer's Island



Looking East Towards Plummer's Island-Proposed Drilled Shaft 4, 5, and 6 Locations
(20220327_113545.jpg)

00174857



Looking East Towards Plummer's Island-Proposed Drilled Shaft 4, 5, and 6 Locations
(20220327_113627.jpg)



Angled View Looking Southeast Towards Plummer's Island-Proposed Drilled Shaft 4, 5, and 6 Locations (20220327_113652.jpg)



Looking West From Plummer's Island Towards I-495 NB-Proposed Drilled Shaft 6, 5, and 4 Locations
(20220327_113007.jpg)



Panoramic View Looking West From Plummer's Island Towards I-495 NB-Proposed Drilled Shaft 6, 5, and 4 Locations (20220327_113033.jpg)



Looking South From Plummer's Island Towards Potomac River-Proposed Drilled Shaft 6, 5, and 4 Locations (20220327_113145.jpg)



Panoramic View Looking South From Plummer's Island Towards Potomac River-Proposed Drilled Shaft 6, 5, and 4 Locations (20220327_113200.jpg)



Distant View Looking South From Plummer's Island Northern Rock Outcropping Towards Potomac River-Proposed Drilled Shaft 6, 5, and 4 Locations (20220327_113312.jpg)



Detailed View of Proposed Drilled Shaft 4 Location-Looking Northwest towards I-495 NB
(20220327_113956.jpg)



Detailed View of Proposed Drilled Shaft 5 Location-Looking East (20220327_114100.jpg)



Panoramic View of Proposed Drilled Shaft 5 Location-Looking South (20220327_114129.jpg)



Detailed View of Proposed Drilled Shaft 6 Location-Looking North (20220327_114207.jpg)



Panoramic View of Proposed Drilled Shaft 6 Location-Looking North (20220327_114227.jpg)



Panoramic View of Proposed Drilled Shaft 6 Location-Looking South (20220327_114305.jpg)



Case 8:22-cv-02597-DKC    Document 67-7    Filed 10/30/23    Page 99 of 141

Section 106 Programmatic Agreement Draft #3 Comment Table
I-495 I-270 Manged Lanes Study - Responses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

1

| Comment No. | Commenting Agency | Section<br>Whereas or Stipulation Number | Topic<br>Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 1 | DHR | Whereas | N/A | VA SHPO continues to believe 1) the definition of the APE needs to come higher in the WHEREAS clauses, 2) should be a stand-alone WHEREAS clause, and; 3) Should be clearly stated in the PA itself without having to reference other documents.   In reference to: "WHEREAS, MDOT SHA, on behalf of FHWA, pursuant to 36 C.F.R. 800.4(a)(1), has established and updated the APE  for the Project in consultation with the MD and VA SHPO, has identified historic properties within the APE, and has identified adversely affected properties, as described in the Draft Section 106 Technical Report of January 2020 and subsequent documentation (linked in Attachment 4); and" | Accepted, a new whereas defining the APE is included. |
| 2 | DHR | Whereas | N/A | VA SHPO still believes this WHEREAS Clause should be moved up below the ones addressing NPS designating FHWA as lead federal agency.  Thematically it makes more sense to have it there. In reference to "WHEREAS, federal agencies which, at FHWA's invitation, designate FHWA as the lead federal agency for the Project may use this PA to fulfill their obligations under Section 106 of the NHPA according to 36 C.F.R. 800.2(a)(2), without the need for amendment of this PA, provided that FHWA follows the requirements of this PA; and" | Accepted, reordered. |
| 3 | DHR | IV.B | General | Added "3. New or revised determinations of effect to historic properties within the APE as described above." | Accepted |
| 4 | C&O Canal Association | V.F | WBFC; C&O Canal NHP | There are more specifics of plans to mitigate impact (including funding for baseline measurements) upon the Washington Biologists' Field Club research facility on Plummers Island, within the C&O Canal HNP.  This should still be considered an adverse impact. | Comment noted; no PA change. |
| 5 | C&O Canal Association | SHPO Letter Attachment 1B | Clara Barton Parkway; Shared Use Path | The idea to extend the "shared use path" connection to the sidepath on MacArthur Boulevard has been scrapped.  Instead, the sidewalk (as I call it) will connect directly to the C&O Canal towpath.  The second illustration, "LOD Location in Change, Clara Barton Parkway, 1b", shows the off ramp from the Beltway, north-bound, onto the Clara Barton Parkway (inbound), but does not show the connection to the towpath.  Do you have any more detailed maps showing this connection?  This change has the potential to increase Park visitor numbers in the Seven Locks area. | Comment noted, online project mapping is the best tool to see the preferred alternative. |
| 6 | FMH | N/A | Morningstar | Most pressingly, we believe, for the reasons set forth in our previous communications, that MDOT SHA (hereafter "SHA") and FHWA have erred in concluding that there are not clear cumulative effects at the Morningstar site. The history of this site shows that SHA and its predecessors have repeatedly engaged in activities that have both cumulatively and negatively affected conditions at a historic, African-American cemetery. The record of this Section 106 process also shows how SHA has created an arbitrary cutoff for cumulative effects, has failed to provide reasoned decision-making on the topic, and has acted capriciously in the substantial difference between how it communicated to the public and the press and the ways it has sought to substantively address the issue with the affected party. We therefore strenuously object to FHWA's "finding," (March 31, 2022 update letter to MHT/DHR, P.4) that the cumulative effect issue has been addressed or settled. FHWA and SHA's continued inability to articulate a defensible rationale for their decision-making further strengthens our objections.  Because SHA and FHWA have misapplied the law and acted arbitrarily and capriciously on the issue of cumulative effects, as articulated in our previous letter, we are unable to support the current effects determination (or lack thereof) made by SHA. | MDOT SHA has provided detailed and specific supporting information in our January 2022 letter regarding the evaluation of cumulative effects for the MLS and the factors considered.  Cumulative effects are factors in evaluating the current undertaking, not whether any impacts have occurred in the past.  FMH's disagreement with the finding is noted.  FMH have not provided specific information as to why the Managed Lanes Study contributes to an incremental 'cumulative' effect when the project will provide benefits to the existing condition for the cemetery, specifically in providing noise reduction from existing levels and reducing stormwater input. |

## Section 106 Programmatic Agreement Draft #3 Comment Table

I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section | Topic | Comment | Response |
|---|---|---|---|---|---|
| | | Whereas or Stipulation Number | Specific Historic Property, Multiple Properties, General, etc. | | |
| 7 | FMH | N/A | Morningstar | We request the meeting notes from the referenced meeting with MHT Staff, as it relates directly to the Morningstar site and is critical for our understanding of effects under the Section 106 process. | This was an informal technical assistance discussion and no formal notes were taken. The formal direction and findings are documented in MDOT SHA's March 31, 2022, letter shared with consulitng parties. |
| 8 | FMH | N/A | Morningstar | We note that within the letter, as well as in consulting party meetings, that SHA uses the term "boundaries of the cemetery." SHA is, in fact, now basing the cemetery boundary on a 1957 aerial map that was shared in consulting party meetings. The 1957 aerial was used as a graphic underlay for the depiction of grave shafts revealed in the limited area where GPR was conducted during a Consulting Party meeting with SHA on January 4, 2022. We reject SHA's assumption/interpretation as sufficient to evaluate the extent of the boundaries of the Morningstar Moses Cemetery. Historical research and the absence of burial records for most of the 377 GPR-indicated probable and possible graves in the limited survey areas points to the distinct possibility that the cemetery is older than originally thought. The historical evidence suggests that this could be a Reconstruction-era cemetery. Most graves were marked by stones and not inscribed markers, and it is likely that landowners and descendants present in 1957 would not have been able to identify the boundaries of the cemetery. We reiterate: SHA has presented a convenient definition of the boundary of the property that we reject. | This is an incorrect assertion of how MDOT SHA has defined the historic property boundary of the cemetery. As FMH notes, MDOT SHA conducted a legal survey of the three tax parcels that initially formed the historic property boundary. Following the GPR survey, MDOT SHA extended the boundary into the right-of-way to encompass where potential burials were indicated by the GPR. The boundary is based on legal survey of parcels augmented with where GPR survey evidence suggests additional burials may be located. The 1957 aerial helps interpret the patterns seen in the GPR, but is not in any way the basis for how the historic property boundary is defined. |
| 9 | FMH | N/A | Morningstar | Re: Comment #68. The comment notes that "FHWA has determined that [the future ROW transfer between SHA and Morningstar] cannot be a Section 106 PA commitment, but it can be documented in the ROD." This response fails to consider the rest of our comment, which notes that law and regulation require this act to be so documented in the ROD. It is a "must," not "can" situation and we request that this language be revised accordingly. Additionally, FHWA is required to provide justification for this determination, which has not been done to-date despite our repeated raising of this issue. | FHWA believes the commitment is better captured under NEPA, as a project commitment addressing community concerns, rather than under Section 106, because effects to the cemetery as a historic property are not determined under the NHPA. NEPA has greater flexibility to accommodate broader and more subjective commitments. The commitment will be included in the ROD. |

Case 8:22-cv-02597-DKC    Document 67-7    Filed 10/30/23    Page 101 of 141

Section 106 Programmatic Agreement Draft #3 Comment Table
I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

3

| Comment No. | Commenting Agency | Section — Whereas or Stipulation Number | Topic — Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 10 | FMH | V.G.1 | Morningstar | Cumulative impacts caused by this project warrant stronger mitigation commitments. Mitigation proposed is insufficient, and fuzzy language, such as "may include", is unacceptable. Further, absent a commitment to the mitigation proposed in our April 12, 2021 first draft PA comment letter – specifically ADA-compliant access to the cemetery and SHA cleaning up its own perpetual stormwater easement on the property – the site must remain closed to the public. | MDOT SHA has evaluated cumulative effects and has not found that there are adverse effects resulting from cumulative impacts. The closure of the property to the public is a decision by the trustees of the property and is not the result of any action by MDOT SHA. MDOT SHA has assisted the trustees at their request to provide invasive vegetation removal, temporary erosion stabilization measures, and an entrance gate to the property. MDOT SHA has considered the request previously to build new access paths. MDOT SHA is not obligated to construct a non-historic feature that would involve ground disturbance on the property. |
| 11 | FMH | V.G.2 | Morningstar | Define "unavoidably." Additionally, we concur with MHT's comment to this stipulation shared in their email to consulting parties shared this morning. | "Unavoidably" is a term with clear meaning. No change to the PA. |
| 12 | FMH | VII.I | Cemeteries Treatment Plan | Confirm who determines the relocation site and what is included within the definition of "disposition" of human remains or associated funerary objects. | These processes are contained in the treatment plan that is being developed in consultation with relevant consulting parties, including FMH. |
| 13 | FMH | VII.I | Cemeteries Treatment Plan | (Pg. 17) Regarding progress meetings, FMH reserves the right to request meetings at reasonable junctures once the timing and work plan is understood. We recommend that SHA be required to provide adequate information regarding timing and work plan to facilitate determining the appropriate cadence of meetings. | Comment is noted, no specific change to the PA. |
| 14 | FMH | PA Attachment 1 | IDP | (Pg. 21) Please confirm that FMH would be notified before any movement or removal of remains. Confirm that FMH would have input on any resource determined eligible for removal from the Morningstar site. | These processes are contained in the treatment plan that is being developed in consultation with relevant consulting parties, including FMH. |

Section 106 Programmatic Agreement Draft #3 Comment Table
I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

4

| Comment No. | Commenting Agency | Section / Whereas or Stipulation Number | Topic / Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 15 | Sierra Club | N/A | General | We received the new Section 106 materials less than a week ago on Thursday. These materials were provided with a two-week comment period ending on April 14, 2022. All previous Section 106 comment periods for the I-495 & I-270 Managed Lanes Study have been 30 days long. We have learned of your denial of Friends of Moses Hall's request for the usual 30-day comment period on the new Section 106 materials. We echo their concerns about the inadequacy of the proposed two-week review period, particularly when one of those weeks overlaps with the public school spring break in the affected jurisdictions. Many people, including my key staff, have previously scheduled vacations during this timeframe, and this will make it very difficult if not impossible to provide meaningful comments on the new materials. There was no advance notice of when this new set of Section 106 materials would be circulated for public review and comment, so no advance planning was possible to schedule and reserve time to provide comments, an additional reason why a two-week period is not adequate. We therefore ask that you reconsider the request for an enlargement of time to provide comments on these key documents and provide a 30-day comment period on the latest materials up to and including April 30, 2022. | MDOT SHA reviewed these requests in coordination with FHWA and a 14 day review period was held as adequate for the third draft of the PA given limited changes. 30+ days were provided for other materials submitted at the same time. |
| 16 | ACHP | V.B.1 | Dead Run Ridges | What does "associated public interpretation committments" mean? | Clarified lanaguage that interpretive materials for the general public will be required; the specific products (digital, hard copy, wayfinding, etc) will be worked out in the treatment plan process. |
| 17 | ACHP | V.D | 18MO749 | What does "associated public interpretation committments" mean? | Clarified lanaguage that interpretive materials for the general public will be required; the specific products (digital, hard copy, wayfinding, etc) will be worked out in the treatment plan process. |
| 18 | ACHP | V.E | 18MO751 | What does "associated public interpretation committments" mean? | Clarified lanaguage that interpretive materials for the general public will be required; the specific products (digital, hard copy, wayfinding, etc) will be worked out in the treatment plan process. |
| 19 | ACHP | VI.E | Archaeological Treatment Plan | What does "associated public interpretation committments" mean? | Clarified lanaguage that interpretive materials for the general public will be required; the specific products (digital, hard copy, wayfinding, events, etc) will be worked out in the treatment plan process. |
| 20 | ACHP | Signatories | | Reid J. Nelson, Executive Director (Acting) | Noted. |

00174973



Case 8:22-cv-02597-DKC    Document 67-7    Filed 10/30/23    Page 103 of 141

5

**Section 106 Programmatic Agreement Draft #3 Comment Table**
I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section<br>Whereas or Stipulation Number | Topic<br>Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 21 | MHT | IV.B. | Consultation Regarding Project Development | We continue to assert that greater specificity is needed in Stipulation IV.B, particularly regarding the assessment of effects/updated determination of effects to historic properties as well as the process for resolution of adverse effect findings during implementation of the PA. Reference to 36 CFR 800.3-6 is a beneficial addition to the text. This stipulation IV.B should add an item 3 for assessment of effects and an item 4 for resolution of adverse effects - particularly since the determination of effects on Morningstar Tabernacle No. 88 Moses Hall and Cemetery remain undetermined. The Trust requests that MDOT SHA revise this section, consistent with the language proposed in our prior comments on the second draft PA. | Accepted, language has been augmented for more consistency with the statewide PA and specific regulatory language from 36 CFR 800 has been cited. |
| 22 | MHT | V.G.2 | Morningstar | Stipulation V.G.2 acknowledges that FHWA and MDOT SHA will utilize the results of the additional studies, in coordination with the final design plans, to determine the effects of the undertaking on this historic property, in consultation with the MD SHPO and consulting relevant parties. Until the study results and detailed plan information are available, an informed assessment of effects is not achievable. The sentence If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative should be deleted from the PA as it makes assumptions that are not defensible until the information is available. | MDOT SHA has committed to further archaeological evaluation for the identification of any potential burials as the necessary remaining inventory and assessment work. MDOT SHA has not identified other likely or potential adverse effects to the cemetery, or additional non-archaeological studies needed to assess effects that would result from the preferred alternative. In the event of changes to the preferred alternative, as with any historic property, the changes would need to be evaluated for any adverse effects. MDOT SHA and FHWA have modified the language to note that the effect determination would be made in consideration of the results of the studies and removed the language regarding "will be no adverse effects". |
| 23 | MHT | | General | In finalizing the PA, FHWA and MDOT SHA should continue to address the comments provided by the other consulting parties (particularly the owners and stewards of historic properties) as it relates to the treatment of adversely affected or potentially affected historic properties. | Noted. |
| 24 | MNCPPC | IV.B. | Consultation Regarding Project Development | We echo the comments of the Maryland Historical Trust dated April 14, 2022 (email Tim Tamburrino to Steve Archer Re: I-495 and I-270 MLS Section 106 Materials, PA Third Draft, Comments Requested by April 14, 2022) noting that there should be greater specificity in Stipulation IV.B and support each of the text edits and updates requested by MHT for this Stipulation. | Accepted as above. |



Section 106 Programmatic Agreement Draft #3 Comment Table

I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

6

| Comment No. | Commenting Agency | Section<br>Whereas or Stipulation Number | Topic<br>Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 25 | MNCPPC | N/A | Morningstar | We agree with the statement of the MHT in its letter dated February 4, 2022: "Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property. The Trust recommends that the Federal Highway Administration (FHWA) request the Advisory Council on Historic Preservation (ACHP) review of this issue pursuant to 36 C.F.R. §800.5(c)(2)(i)." We believe that this remains unresolved as the Consulting Parties to the undertaking, including this office as the Certified Local Government, object to the determination of no adverse effect. We continue to request that the Advisory Council review the determination before proceeding to the ROD. | Decline; MDOT SHA and FHWA have requested technical assistance from ACHP in lieu of formal comment and have deferred determination of effects to the cemetery until completion of further studies. |
| 26 | MNCPPC | N/A | Morningstar | We also note that the LOD east of the area of known graves appears to extend into the narrow access path from Seven Locks Road to the Cemetery. Such an encroachment would appear to be an adverse effect to the property as it would diminish the setting and further limit physical access to known gravesites. | Incorrect, there is no LOD encroachment onto property. |
| 27 | MNCPPC | N/A | Morningstar | We agree with the Historical Trust and Friends of Moses Hall that the PA should address the effects of MDOT SHA's commitment to transfer property in its ROW containing graves to the ownership of the Trustees of Morningstar Tabernacle Number 88. We note that MDOT SHA responded in the comment response matrix distributed in March 2022 that "per FHWA this cannot be in the 106 PA but can be in ROD." Transfer of property outside of federal ownership or control is an adverse effect; how can this be addressed in the ROD, but not mentioned in the PA? | FHWA believes the commitment is better captured under NEPA, as a project commitment addressing community concerns, rather than under Section 106, because effects to the cemetery as a historic property are not determined under the NHPA. NEPA has greater flexibility to accommodate broader and more subjective commitments. The property is state not federal, and in this instance would be a positive preservation enhancement to put under the stewardship of the cemetery trustees and convert from highway right of way; this commitment is not an adverse effect. |
| 28 | MNCPPC | N/A | Morningstar | We believe that an adverse effect determination is appropriate for Morningstar Tabernacle Cemetery as it is for Gibson Grove Church. For this reason, we also believe that it is necessary to consider and mitigate the cumulative adverse effects of the beltway's separation of these two historically adjacent properties at this juncture. | Decline, issue has been resolved. See also above responses regarding "cumulative" issue. Cumulative effects are a consideration for evaluating the MLS undertaking's effects, not whether any effects have ever occurred. |

00174975



| Comment No. | Commenting Agency | Section | Topic | Comment | Response |
|---|---|---|---|---|---|
| | | Whereas or Stipulation Number | Specific Historic Property, Multiple Properties, General, etc. | | |
| 29 | MNCPPC | V.G.1 | Morningstar | We are disappointed that MDOT SHA has declined to consider to assist with improving access to the cemetery. SHA/FHWA have already acknowledged an adverse effect from the undertaking as a whole and have acknowledged the adverse effect for the Gibson Grove property immediately to the North.  Given the appropriateness of an adverse effect determination, an ADA compatible pedestrian access should be constructed along the northern portion of the cemetery property from Seven Locks Road in order for the design elements and any interpretive signage on the sound barrier to be accessible to the public. We note that under provision H.5, MDOT SHA proposes to construct sidewalk along Seven Locks Road in order to restore the historical physical connection between Gibson Grove Church and the Morningstar Cemetery severed by construction of the Beltway. Furthermore, we agree with the Friends of Moses Hall that SHA's perpetual stormwater management easement on the cemetery site has not been adequately maintained. This should be addressed in mitigation for adverse effects at the site and for the undertaking as a whole. Absent these mitigations, to whom are the interpretive signs directed and how will they be meaningfully accessible to the public or the descendant community? We believe that these are very modest requests. | Decline pedestrian access, already considered. |
| 30 | MNCPPC | V.G.2 | Morningstar | We do not agree that MDOT SHA can limit its effects determination to the presence or absence of interments within the LOD. We note that MDOT SHA found the cemetery property eligible for the NRHP under Criteria A and C, and MHT has concurred. While the discovery of additional graves beyond the present real property boundary may warrant an expansion of the NHRP historic property boundary, any effects determination must take into consideration all aspects of the property that contribute to its NRHP eligibility, including the setting, and cannot be limited to the distribution of graves alone. We continue to believe that an adverse effect determination is appropriate. | See above response to MHT comment on this issue; language modified. |
| 31 | MNCPPC | V.H.1 | Gibson Grove | The document should note that the Gibson Grove A.M.E. Zion Church is a designated Montgomery Master Plan Historic Site. All alterations on this property should be reviewed and permitted by the Historic Preservation Commission/M-NCPPC. MNCPPC should be included in these design discussions at each phase, as our agency will also be responsible for some of the permitting approvals that will be necessary on the Church property. Please amend Section H throughout to add "M-NCPPC, Historic Preservation Commission" as a party to each of the mitigation items called out in H.1-H.5. | Decline.  Local historic designation is not part of the Section 106 process.   M-NCPPC will be consulted as a relevant consulting party within their jurisidiction but is not called out specifically. |
| 32 | MNCPPC | Attachment 1.C | IDP | Per State of Maryland Criminal Code § 10-402, the State's Attorney must authorize movement or removal of any remains. The statute includes no exception for human remains "determined to be archaeological." Such language does not exist in the statute. Please revise language to note the steps that must be taken in coordination with the State's Attorney regarding the movement or removal of human remains. | Decline, comment has already been reviewed and responded to in prior PA drafts. |
| 33 | MNCPPC | Attachment 2 | Consulting Parties Invited to Consult | Cabin John Citizens Association appears to be missing from the list of consulting parties. | Accept |
| 34 | MNCPPC | Attachment 3 | Consulting Parties Invited to Concur | The Maryland National Capitol Park and Planning Commission, Historic Preservation Office is the designated Certified Local Government (CLG) for this Undertaking with a clearly defined role under Section 106 proceedings. We request a line-item call-out in Attachment 3 as the CLG separate from "Local and Other Agencies and Groups". | Decline.  Other CLGs are listed as local governments. |



| Comment No. | Commenting Agency | Section — Whereas or Stipulation Number | Topic — Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 35 | MNCPPC | II.A.7 | Professional Standards | There is no hyphen in 36 CFR 79 "Curation of Federally-Owned and Administered Archeological Collections" [sic]. Also, in contrast to most NPS usage, archaeology is spelled with two "a"s. It should read: "36 CFR Part 79: Curation of Federally Owned and Administered Archaeological Collections." | Accepted in part.  Hyphen is correct, two "a" archaeology spelling has been  conformed to the CFR. |
| 36 | MNCPPC | N/A | General | There is reference throughout the document on consulting with 'relevant SHPO(s) ... and appropriate consulting parties' on further documentation and effects determinations. As the CLG, M-NCPPC expects to participate in each of those discussions that occur within the Maryland portion of the undertaking. | Noted; M-NCCPPC will be consulted within its jurisdiction |
| 37 | NPS | Attachment 1b | Clara Barton Parkway | NRHP eligible boundaries are incorrect. Please refer to the boundaries provided from the Clara Barton Parkway CLI for the cultural landscape. The exhibit is not representing the entirety of the landscape, including the outbound lanes and the adjacent forested areas owned by the NPS. | We are using the known NR boundaries from MD SHPO, consistent with project mapping since 2018. The CLI available to MDOT SHA does not contain boundary mapping. |
| 38 | NPS | APE-Mainline Corridor Map | Clara Barton Parkway | They are not showing the correct boundaries for the Eligible/Listed property for the Clara Barton Parkway interchange!! Please refer to the Clara Barton Parkway CLI for the cultural landscape boundaries. | We are using the known NR boundaries from MD SHPO, consistent with project mapping since 2018. The CLI available to MDOT SHA does not contain boundary mapping. |
| 39 | NPS | APE Park Mitigation Map | Dead Run Ridges | Need to show a map for the Virginia Dead Run Ridges Arch. Site. Only show a portion of the boundaries, regarding "Further investigation or treatment proposed" for Dead Run Ridges are shown on PDF Pg 1. | The full boundary is shown in the APE mapbook. This is a callout map showing additional "park mitigation" activities. |
| 40 | NPS | V.A.2 | GWMP | They have a three year time period to complete the CLR once funds are received is this a set time allotment? I recommend changing it to within 5-years to complete the CLR once NPS receives the funds, instead of 3-years. It has been a change to meet the Long Bridge mitigation time lines. At least with a 5-year time, we can make sure it is incorporated in our 5-year workplan. I am assuming these funds would be provided to a third party - the Conservation Fund? | Accepted 5 year duration; MDOT SHA will coordinate with NPS on the exact mechanism of funding transfer, PA language should be sufficient to note NPS. |
| 41 | NPS | V.B.1 | Dead Run Ridges | Dead Run Ridges Arch Site - Phase III data recovery - does this include cost of cataloging artifacts? Mention Stipulation VI. F in comment response. | Cataloging has been added to Stipulation VI to note it is a requirement to catalog to NPS standards for all the archaeological work on NPS property. |
| 42 | NPS | V.B.2 | Dead Run Ridges | Asking Matt and Jay if this is an acceptable language if VA DHR does not accept the nomination prepared by MDSHA [regarding preparation of NRHP nomination form] | This appears to be an internal NPS comment. |
| 43 | NPS | V.B.1 | Dead Run Ridges | Phase III data recovery;  their archeological investigations will have to be done under an ARPA Permit that requires proper NPS cataloging and curation for the artifact collection | ARPA permit requirement is included/acknowledged in both the PA and Treatment Plans. |
| 44 | NPS | V.B | Dead Run Ridges | Add bold text to PA Stipulation V.B no later than 12 months following finalization of the report documenting the Phase III data recovery in Stipulation V. B. 1 above, basing the nomination on the report findings **and the previous archeological investigations and the NRHP Keeper's Determination Of Eligibility dated  09/10/2020** | Accept. |



Section 106 Programmatic Agreement Draft #3 Comment Table

9

I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section<br>Whereas or Stipulation Number | Topic<br>Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 45 | NPS | VI.E | Archaeological Treatment Plan; Dead Run Ridges | Add bold text to PA Stipulation VI.E  MDOT SHA will prepare a draft NRHP Nomination form for the Dead Run Ridges archaeological district based on the results of Phase III Data Recovery investigation and **the previous archeological investigations and the NRHP Keeper's Determination Of Eligibility dated  09/10/2020** as described in Stipulation V. B. | Accept. |
| 46 | NPS | N/A | General | Will the final mitigation list be included via reference in the PA | No, the document referred to includes non-106 mitigation and therefore is not relevant here. |
| 47 | CSCA | N/A | Carderock Springs HD | Consistent with our previous comments to the SHA, we continue to disagree strongly with SHA's determination that the project will not adversely affect the Carderock Springs Historic District (CSHD) and with SHA's previous statement that "these actions will not disturb the original topography and natural vegetation within Carderock Springs." We assert that there will be visual, atmospheric and audible effects as a result of the Project. We have summarized our previous comments below and have provided additional comments based on the latest information provided. [Note: see letter for detailed summary of previous consultation comments on effects and additional comments.] | Noted; not PA change request. |
| 48 | CSCA | N/A | General | Without the determination of adverse effects, it appears that no specific language is currently included for Carderock Springs in the Programmatic Agreement. | Noted. |
| 49 | CSCA | N/A | Carderock Springs HD | As a Consulting Party, we request that the following language be added to the PA: MDOT SHA will continue property-specific Design-Review consultation with Carderock Springs Citizens Association to ensure a context-sensitive design for new facilities, and, through the ongoing design process, minimize, to the extent practicable, impacts to character-defining features and resources that contribute to the Carderock Springs Historic District as a historic property. Key elements for CSCA review included the noise barriers, fly-over ramps, signage and lighting. MDOT SHA will provide CSCA a comment opportunity on plans at a draft level of design and a second opportunity prior to finalization of design for elements within the APE adjacent to property within  the Carderock Springs Historic District, for each review there will be minimum 30-day review period. In the event objections relating to the final design from CSCA that cannot be resolved, MDOT SHA and FHWA will follow Stipulation XIII of this PA. | MDOT SHA has previously considered this request and has determined there are not elements of the Preferred Alternative that require specific context-sensitive design with respect to compatibility with the Carderock Springs district.  MDOT SHA will continue to consult with all consulting parties, per the PA, on any design changes that would affect historic properties differently than understood from the Preferred Alternative. |
| 50 | CSCA | N/A | General/Reforestation | We also request that language be added to the Programmatic Agreement regarding specific reforestation commitments both in the ROW and in the bordering areas within the private properties where tree roots and therefore adjacent mature trees are affected by the Project. | Decline; reforestation is a separate process/requirement and not appropriate for Section 106 agreement. |
| 51 | CSCA | N/A | Carderock Springs HD | We request that the Programmatic Agreement allow for continued consultation should any unexpected discoveries or changes to the design be found necessary within the portion of the APE adjacent to CSHD and Carderock South | Consultation will be required with affected consulting parties in the event of a substantial project change. |
| 52 | NPS | V.B | Dead Run Ridges | Add an addendum in property specific commitments that if VA SHPO rejects the nomination, MDOT will submit it to the Keeper. | Decline, this would be an NPS responsibilty as the land managing agency.  MDOT SHA will prepare the nomination, address NPS/DHR comments, per NPS's agreement to work with VA SHPO on the nomination, but is not obligated to pursue until the property is listed. |



| Comment No. | Commenting Agency | Section<br><br>Whereas or Stipulation Number | Topic<br><br>Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 53 | CJCA | N/A | General | But when reviewing the matrix, glaring omissions are evident. The matrix lists 91 comments from various consulting parties and provides what it calls the SHA "Response." There were many, many substantive comments not included in that document. The most egregious omission may be the comments made by numerous consulting parties including the National Trust for Historic Preservation and the Maryland Historic Trust, strongly objecting to Maryland State Highway Administration (SHA) and the Federal Highway Administration (FHWA) changing their determination to find that the Beltway expansion project will have "no adverse effect" on the cemetery property in Cabin John. [Note: See comment letter for additional comments related to comments CJCA identified as not being included in the Programmatic Agreement comment reponse matrix. They include: Morningstar no adverse effect determination; ROW transfer; cemetery boundaries; and cumulative impacts.] | As MDOT SHA noted, the comment response-matrix for PA Draft 2 considered comments that were specific to the PA content. Comments on other issues or prior decisions were not specifically responded to in that document. |
| 54 | CJCA | N/A | General | It is truly hard to know where to begin when trying to respond to the latest Section 106 materials and the 3rd draft of the Programmatic Agreement as it's almost impossible to get past the omission, misrepresentation and inexcusable lack of action even a lay person can find in these documents. Thankful I can turn to the expertise of a number of the other consulting parties and say that the Cabin John Citizens Association endorses and incorporates by reference the April 14, 2022 comments of the Friends of Moses Hall, The Maryland-National Capital Park and Planning Commission and the Sierra Club Maryland Chapter regarding the Morningstar Tabernacle No. 88 Moses Hall and Cemetery site as well as their comments regarding stormwater runoff into the Potomac River, and, I would add, Cabin John Creek. | Noted. Natural resources impacts are considered through NEPA and permitting processes not Section 106. |
| 55 | CJCA | N/A | General | I am sure there is even more to uncover, but there is no time. Consulting parties were given two weeks to comment on this 3rd round of materials. When a number of the groups asked for more time, they were told by Steve Archer that "Changes to the PA are generally minor and of a clarifying nature as shown in our provided comment-response matrix. We emphasize that this is the third draft of an agreement that MDOT SHA has provided for prior review. We have consistently maintained that as the PA nears finalization, the review cycles/comment periods would be shorter for later drafts, as fewer changes and new content are included. A two-week review period affords adequate opportunity for comment given the parties have seen multiple prior versions of the document and the limited extent and nature of changes." | Noted. |
| 56 | CJCA | N/A | General | What a gross misrepresentation of this 3rd round of materials, especially the Comment-Response matrix. While I cannot speak on behalf of all the consulting parties, the Cabin John Citizens Association considers a new determination of no determination regarding adverse effects and the Morningstar cemetery to be quite significant as is the complete disregard for so many of the thoughtful, important and challenging comments that were supposed to have been considered as part of this 3rd draft of the Programmatic Agreement. | As above, all comments on the prior PA draft were considered. MDOT SHA and FHWA understand some consulting parties may still have disagreement with findings, but after consideration of input, must move forward unless there is disagreement among signatory parties. |

Section 106 Programmatic Agreement Draft #3 Comment Table

I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section | Topic | Comment | Response |
|---|---|---|---|---|---|
| | | Whereas or Stipulation Number | Specific Historic Property, Multiple Properties, General, etc. | | |
| 57 | Sierra Club | N/A | Morningstar | THE PA IS PREMATURE BECAUSE SERIOUS LEGAL ISSUES REGARDING CUMULATIVE EFFECTS WERE IGNORED. Sierra Club and multiple consulting parties raised legal objections to the MDOT's arbitrary and incorrect argument that no cumulative effects prior to 1966 and 1970 could be considered.  Yet the March 31, 2022 MDOT Section 106 cover letter in this set of materials glosses over the legally insufficient argument, does not address that issue in the response matrix, and falsely implies there are no issues with cumulative impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery site, saying: "FHWA finds that the issues related to atmospheric, audible, visual, and cumulative effects to the property, have been addressed."...The PA is premature given that the serious legal issues regarding cumulative effects have been ignored. [Note: see comment letter  for additional comments related to cumulative effects.] | See above responses regarding cumulative effects. |
| 58 | Sierra Club | N/A | Morningstar | We endorse and incorporate by reference the April 14, 2022 comments of the Friends of Moses Hall regarding the Morningstar Tabernacle No. 88 Moses Hall and Cemetery site. In additional to Sierra Club objecting to MDOT's dismissing and ignoring of cumulative effects and other adverse effects to this site, as described above, we have significant concerns about (1) MDOT's deferral of the determination of effects for the site and (2) the lack of specificity in the PA language concerning the site. | Comment noted. |
| 59 | Sierra Club | N/A | Morningstar | After a determination of adverse effects and then a contested determination of no adverse effect, MDOT is now proposing to defer its effects determination for the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland.  The contentious issue surrounding the adverse effect determination for Morningstar Tabernacle No. 88 site cannot be deferred. In a letter to Dr. Julie M. Schablitsky of MDOT, the MHT clearly stated on February 4, 2022 that: "it is our opinion that the finding of adverse effect remains valid for this historic property."

Sierra Club objects to MDOT's deferral of the adverse effect determination for several additional specific reasons.
1. MDOT's new proposed plan to defer a determination of adverse effect for Morningstar Tabernacle No. 88 site until after issuance of the Record of Decision will foreclose major options for alternatives and redress.
2. Adverse effects are able to be determined now since there are over two dozen probable or possible grave shafts in the right-of-way abutting the land where the highway will be widened and heavy construction equipment will be used. The probable and possible grave shafts conform to the same patterns observed in the rest of the cemetery.
3. These effects, when added to the cumulative impacts from past Beltway construction, are indisputably adverse; hence, even assuming some degree of post-ROD mitigation, there is no basis for arguing that there would be no adverse cumulative effects to this important historical site, which has been subject to longstanding, historic race-based discrimination in transportation planning in this state.

In summary, while the full extent of the adverse effect can be addressed as part of the PA, the adverse effect determination must be made now. | MDOT SHA has previously responded to the first issue noting that 36 CFR 800 specifically provides for phased identificaiton and evaluation and programmatic agreements for complex projects. The preferred alternative avoids all known or suspected interments, and MDOT SHA has consistently committed to further evaluation.  See above responses regarding cumulative effects. |

OP LANES
MARYLAND
I-495 & I-270 Managed Lanes Study

**Section 106 Programmatic Agreement Draft #3 Comment Table**

I-495 I-270 Manged Lanes Study - Responses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section<br>Whereas or Stipulation Number | Topic<br>Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 60 | Sierra Club | V.G | Morningstar | In addition to the April 14, 2022 comments on the PA made by Friends of Moses Hall, we ask that:<br>1. the PA include a binding commitment to avoid any disturbance or physical intrusion to the portion of the cemetery within the right-of-way that contains the probable and possible grave shafts | Decline. The PA is for the Preferred Alternative and the Preferred Alternative avoids all known or suspected interments. |
| 61 | Sierra Club | V.G | Morningstar | 2. the PA section pertaining to the Morningstar site be specific about which studies will be done and which boundaries (historical boundaries, or boundaries set on a certain date) are being referred to and include the referenced boundary map as an attachment to the PA | These elements are included in the PA (APE map attachment) and the treatment plans to be incorporated by reference. |
| 62 | Sierra Club | V.G.2 | Morningstar | 3. this statement in Section V.G.2 be removed from the PA as it is not accurate, legally or otherwise – "If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative." | See above comment responses; this language has been modified. |
| 63 | Sierra Club | V.G.2 | Morningstar | 4. this statement in Section V.G.2 be amended to include italicized text: "Should interments be identified outside the identified boundary of the cemetery, and no additional project avoidance options are feasible, MDOT SHA, ~~and~~ FHWA *and Friends of Moses Hall, National Trust for Historic Preservation, M-NCPPC, MHT, Sierra Club Maryland Chapter and other interested parties* will consult on the likely adverse effect, identify mitigation options, and amend this PA as necessary following the procedures in Stipulations IV and XIII of this PA." | Decline. The transportation agencies conduct the consultation but "in consultation" with consulting parties, including relevant SHPOs, as is clear throughout the PA. |
| 64 | Sierra Club | V.F | WBFC | We endorse and incorporate by reference the April 14, 2022 comments of the Washington Biologists' Field Club. Given the recent groundbreaking of the 495 NEXT toll lane expansion project in Virginia, cumulative effects (including stormwater runoff) of the 495 NEXT project combined with the Maryland toll lanes project need to be documented and taken into account for the intervening historical properties, Potomac River, and the American Legion Bridge, from which runoff will empty untreated into the Potomac River and directly impact Plummers Island. | Noted. |
| 65 | Sierra Club | N/A | Carderock Springs HD | We endorse and incorporate by reference the April 2022 comments of Carderock Springs Citizens Association, who represent a National Register of Historic Places community. | Noted. |
| 66 | Sierra Club | N/A | General | INSUFFICIENT COMMENT PERIOD Every other time Section 106 materials have been sent to consulting parties as part of the I-495 & I-270 Managed Lanes Study there has been a 30-day review period. This time, at the most critical juncture in this process, that of requesting concurrence, only a two-week comment period has been provided despite new information and materials to review, a change in determination status for an important historical site, and unresolved conflicts. The regulations say that if information is missing, more time may be requested. At the request of the agency official or any of the consulting parties, the Council shall review any disputes over whether documentation standards are met and provide its views to the agency official and the consulting parties."<br>In the comment response table circulated on March 31, 2022, there is a notably cursory and incomplete response to the issues raised by consulting parties in the last round of comments. In some cases, MDOT just picked out a single point to respond to, such as in the case of Friends of Moses Hall. In Sierra Club's case, MDOT only responded to three comments and ignored all the other issues raised. [Note: see full comment for discussion of other items the Sierra Club identified as missing from the consultation submission: failure to respond to a significant number of consulting party substantive comments, incomplete Attachment 6 Eligibility and Effects Tables (non- de minimus 4f properties), and a response to the cumulative impacts issue]. | See above responses regarding the comment response matrix on Draft 2. All comments were considered, although only comments specific to the PA were included in the matrix. |



Section 106 Programmatic Agreement Draft #3 Comment Table

I-495 I-270 Manged Lanes Study - Responses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section — Whereas or Stipulation Number | Topic — Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 67 | National Trust for Historic Preservation | N/A | General | First, we would like to echo the comments of other consulting parties that the two week review period provided for these materials was inadequate in length.  For future review opportunities, we strongly encourage adhering to a standard thirty day comment period to allow all consulting parties sufficient time to review and comment. | See above responses regarding comment period. 30+ days were provided for other materials outside the third PA draft. |
| 68 | National Trust for Historic Preservation | N/A | Morningstar | In our letter dated February 3, 2022, we stated our disagreement with the previous finding of "No Adverse Effect."  We appreciate that the determination has at least been updated to impact "Not Determined."  We continue to advocate for additional Ground Penetrating Radar (GPR) investigation to search for more potential burials.  However, we also believe that at this time, there is reason to conclude that, in fact, the proposed action will have an adverse effect on Morningstar Tabernacle No. 88 Moses Hall and Cemetery.  The limitations of the GPR investigation to date leave open the possibility that further investigation will uncover additional burials within the Limits of Disturbance (LOD).

For example, according to the presentation shared with the consulting parties at the Section 106 meeting on January 4, 2022, the portion of the cemetery that is within the existing right-of-way includes at least 14 "probable" burials, 13 "possible" burials, and 6 "tentative" burials.  And that's based on incomplete GPR investigation. It will be important to ensure that the PA includes a binding commitment to avoid any disturbance or physical intrusion whatsoever to this portion of the cemetery within the right-of-way. | Decline additional PA commitment.  The PA is for the Preferred Alternative and the Preferred Alternative avoids all known or suspected interments. |
| 69 | National Trust for Historic Preservation | N/A | Morningstar | In addition, the cumulative impacts of the original highway construction continue to reverberate at this site.  As we stated in our February 22 letter, we strongly disagree with the new argument that cumulative impacts analysis can ignore past impacts prior to the passage of NEPA and NHPA.  There is no basis for excluding the original construction of the highway from the analysis of cumulative impacts to Morningstar Tabernacle No. 88 Moses Hall and Cemetery – especially since the original beltway construction that bulldozed a portion of the historic Cemetery was funded and carried out by the same agencies as those proposing the current project.  Indeed, the stormwater easement retained by SHA continues to cause adverse effects. This is not a case of cumulative impacts by an unrelated third party over which the current project proponent has no control.  Nor was the original beltway construction an individually minor action or one with speculative impacts. These cumulative impacts must be considered when making a final determination of effect. In our view, the cumulative impacts compel the unavoidable conclusion that the effect on the Morningstar Tabernacle No. 88 Moses Hall and Cemetery is and will continue to be adverse. | See above responses regarding cumulative effects. While the timing of the last impacts occurring prior to NEPA and NHPA is a significant consideration, the MLS generally benefits the existing condition of the cemetery and the Preferred Alternative does not cause any incremental impacts to the NRHP-eligible aspects of the property. |
| 70 | National Trust for Historic Preservation | V.G | Morningstar | In our February 22 letter, we stated our disagreement with the agencies' refusal to include a commitment in the PA to convey to the cemetery trustees a portion of the right-of-way containing potential burials.  We continue to urge that a commitment to conveyance be included as part of the PA. The responses to our previous round of comments state that the proposed conveyance "per FHWA . . . can not be in the 106 PA," but could potentially be included in the ROD. However, the responses fail to provide an explanation as to WHY this commitment cannot be included in the Section 106 agreement. | FHWA believes the commitment is better captured under NEPA, as a project commitment addressing community concerns, rather than under Section 106, because effects to the cemetery as a historic property are not determined under the NHPA. NEPA has greater flexibility to accommodate broader and more subjective commitments. |

Case 8:22-cv-02597-DKC    Document 67-7    Filed 10/30/23    Page 112 of 141

14

Section 106 Programmatic Agreement Draft #3 Comment Table
I-495 I-270 Managed Lanes Study - Responses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section — Whereas or Stipulation Number | Topic — Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 71 | National Trust for Historic Preservation | N/A | Morningstar | We encourage MDOT and FHA to continue to work with local advocates to identify appropriate measures both to minimize and to mitigate potential adverse effects to Morningstar Tabernacle No. 88. Because of the historic impacts to this site, we believe that it would be appropriate for MDOT and FHA to commit to pursuing these minimization and mitigation measures, regardless of the ultimate finding regarding adverse effect; however, at a minimum, these mitigation efforts should be agreed to conditionally if a finding of adverse effect is ultimately made. | FHWA policy precludes identifying conditional mitigation. Mitigation must be reasonable, feasible, and commensurate with impacts, and the nature and extent of any impacts, should they exist and be unavoidable, have not been defined. |
| 72 | National Trust for Historic Preservation | V.G.1 | Morningstar | 1. Stipulation V.G.1. provides for the development of a context-sensitive treatment for the noise barrier facing the Cemetery, including appropriate decorative elements, memorial plaques, and/or signage, with input from consulting parties with a demonstrated interest in the Cemetery. This needs to be expanded to include a commitment to establish ADA-compliant public access to the cemetery. In addition, the National Trust requests to be included in this consultation process as a party with a demonstrated interest in the Cemetery. | MDOT SHA has previously considered the request to construct ADA access within the cemetery, see above responses. MDOT SHA and FHWA will continue to include the National Trust in consultation regarding the cemetery per Morningstar Tabernacle No. 88/FMH's requests. |
| 73 | National Trust for Historic Preservation | V.G.2 | Morningstar | Stipulation V.G.2. addresses the use of additional studies in the treatment plans to further evaluate and address effects to the Cemetery. We strongly agree with the Maryland Historical Trust that the following sentence must be deleted from the Draft PA: "If no interments are identified that would unavoidably be affected by the project, there will be no adverse effects to the cemetery from the Preferred Alternative." | See above comment responses; this language has been modified. |
| 74 | National Trust for Historic Preservation | V.G.2 | Morningstar | We also object to the final sentence in Stipulation V.G.2., on two grounds. First, it fails to spell out a procedure for determining whether "no additional project avoidance options are feasible," and appears to presume that MDOT-SHA will make this determination unilaterally. Second, if the determination is made that "no additional project avoidance options are feasible," the Draft PA calls for the resulting consultation (regarding likely adverse effects and mitigation options) to be carried out exclusively by the federal and state transportation agencies, without the involvement of the Maryland Historical Trust or any other consulting parties. This is unacceptable. | The word "feasible" has been replaced with the word "practicable", commonly used to denote "capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes". The transportation agencies conduct the consultation but "in consultation" with consulting parties, including relevant SHPOs, as is clear throughout the PA. |
| 76 | WBFC | N/A | WBFC | WBFC declines to concur with the Section 106 Programmatic Agreement. In our view, the 106 team has not justly considered or included most of our partial recommendations for avoidance, minimization, and mitigations made in WBFC comments letter to Section 106, dated 2 February 2022. | Noted; not PA change request. |
| 77 | WBFC | N/A | WBFC | The Section 106 process has been a sham to WBFC. Plummers Island is unjustly being treated as a sacrifice area. The most environmentally damaging alternative, Alternative 9, has already been predestined for selection by Maryland government officials and the P3 financially interested construction and the preselected investor and toll road operator. [Note: see the comment letter for more detail about WBFC objections to the Section 106 process, the Preferred Alternative, and the American Legion Bridge design]. | Noted; not PA change request. |
| 78 | City of Rockville | N/A | Ward Building | The City concurs that the Ward Building is eligible for the National Register of Historic Places (NRHP), and the project will not have an adverse effect on the property. [Note: see comment letter for an elaboration on this comment] | Comment noted. |

Section 106 Programmatic Agreement Draft #3 Comment Table
I-495 I-270 Manged Lanes Study - Repsonses to Comments Received on Draft 3 of the Section 106 Programmatic Agreement, May 2022

| Comment No. | Commenting Agency | Section / Whereas or Stipulation Number | Topic / Specific Historic Property, Multiple Properties, General, etc. | Comment | Response |
|---|---|---|---|---|---|
| 79 | City of Rockville | N/A | Woodley Gardens | The City concurs that Woodley Gardens is eligible for the NRHP, and if the project remains outside the Limits of Disturbance (LOD), it will have little to no impact on Woodley Gardens. [Note: see comment letter for an elaboration on this comment] | Comment noted. |
| 80 | City of Rockville | VI | Archaeological Treatment Plan | With the reduction of the LOD for the Montgomery County Poor Farm and Cemetery, the city concurs with the Archaeological Treatment Plan (ATP) as proposed. [Note: see comment letter for an elaboration on this comment] | Comment noted. |
| 81 | City of Rockville | VII | Cemeteries Treatment Plan | The City concurs with the Cemeteries and Human Remains Treatment Plan, if the State guidelines are followed as required. [Note: see comment letter for an elaboration on this comment] | Comment noted. |
| 82 | City of Rockville | N/A | Rockville Senior Center in Woodley Gardens | The Rockville Senior Center in Woodley Gardens is owned by the City of Rockville.  It is located at 1150 Carnation Drive and is located west of I -270 and south of West Gude Drive.  The building was constructed c. 1964 as Woodley Gardens Elementary School. The school closed in 1978, and the building became the Rockville Senior Center in 1982. This an important historic resource in the City of Rockville, and it is essential that construction along I-270 does not impact the property or endanger its NRHP eligibility. | Comment noted. |

00174984



1319 F Street NW, Suite 300
Washington. DC 20004
www.jillgrantlaw.com

Jill Grant & Associates LLC
Attorneys at Law

Jill Elise Grant
Phone: 202-821-1950
Fax:   202-459-9558

June 29, 2022

Jeffrey T. Folden, PE, DBIA
Director, I-495 & I-270 P3 Office
Maryland Department of Transportation State
Highway Administration
707 North Calvert Street
Mail Stop P-601
Baltimore, MD 21202
495-270-P3@sha.state.md.us

**Re:    I-495 & I-270 Managed Lanes Study DEIS Traffic Files/Data**

Dear Mr. Folden,

We request that MDOT provide the requested traffic spreadsheets and model files underlying its conclusions in the FEIS, no later than July 7, 2022. To do a full review of the traffic modeling in the FEIS, including understanding changes between the FEIS modeling and the SDEIS modeling, we require the following traffic modeling files and documentation:

1)  VISSIM output files corresponding to the information presented in FEIS Appendix A (01_MLS_FEIS_AppA_Traffic-Tech-Report_June-2022p.pdf), Appendix H: Existing and Future Level of Service (p. 756-800)
2)  All VISSIM input files required to recreate the outputs described in #1
3)  VISSIM output files corresponding to the information presented in SDEIS Appendix A (SDEIS_AppA_Traffic-Evaluation-Memo_web.pdf), Attachment F: Link Evaluation (p. 145-177)
4)  All VISSIM input files required to recreate the outputs described in #3
5)  All reports, memorandum, letters and/or emails that describe VISSIM model development (in addition to the information provided in FEIS Appendix A). This should include documentation of the VISSIM model parameter changes and any other changes that were made between the publication of the DEIS in July 2020 and the publication of the FEIS in June 2022. This also should include documentation of how the VISSIM model develop process followed the Maryland Department of Transportation State Highway Department Vissim Modeling Guidance document.
6)  MWCOG output files that correspond to the 2045 AM Peak Travel Demand and PM Peak Travel Demand tables for both the No Build and Preferred Alternative scenarios presented in FEIS Appendix A, p. 737-738.
7)  All MWCOG model files (except for proprietary Cube software) required to recreate the outputs described in #6.
8)  MWCOG output files that correspond to the 2045 AM Peak Travel Demand and PM Peak Travel Demand tables for both the No Build and Alt 9 Phase 1 Alternative scenarios presented in SDEIS Appendix A, p. 118-121.

00175918

9) All MWCOG model files (except for proprietary Cube software) required to recreate the outputs described in #8.

10) All reports, memorandum, letters and/or emails that describe the development of the 2045 travel demand numbers listed in #6 and #8 (in addition to the information provided in FEIS Appendix A). This should include documentation explaining why the numbers changed between the publication of the SDEIS in October 2021 and the publication of the FEIS in June 2022.

11) All reports, memorandum, letters and/or emails that describe the VISUM model base year and future year model development (in addition to the information provided in FEIS Appendix A).

12) VISUM base year, 2045 No Build and 2045 Preferred Alternative networks.

13) All reports, memorandum, letters, and/or emails that describe adjustments to the VISUM trip tables and assigned volumes (in addition to the information provided in FEIS Appendix A) that provides detail concerning the adjustments described in FEIS, p. 84 including: "adjustments required for base year calibration", "modified ratio adjustment method", "additional reviews to ensure individual O-D pair growth was reasonable" "extensive coordination and post-processing efforts, "reflected key trends from the regional travel demand model", and "aligning with previous and concurrent forecasting efforts for various locations within the project study area."

14) VISUM traffic assignment files for each analyzed hour for the base year, 2045 No Build and 2045 Preferred Alternative alternatives that link to the network files (#12).

15) All VISUM "peak hour correction matrices" described in FEIS Appendix A p. 84.

If you have any technical questions about this request, please contact our consultant:

Norm Marshall, President
Smart Mobility Inc.
nmarshall@smartmobility.com
802-356-2969

We request an expedited response for the following reasons. First, the underlying data requested is required to be disclosed publicly with the FEIS. 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); *id.* § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions."). MDOT and FHWA's failure to provide this data before releasing the FEIS violates NEPA.

Second, this is not a request under Maryland's Public Information Act (PIA); rather, this is a request for data files that were required to be disclosed under NEPA. It is not subject to Maryland's PIA procedures.

In the past, MDOT has suggested that traffic modeling data is sufficiently disclosed when it is presented in tables of a PDF. As we have noted in prior correspondence with MDOT, final numbers presented in tables of a PDF cannot be substituted for the actual underlying spreadsheets and model files used to create those tables, which include formulas, calculations, and numbers that are not rounded. To reach their conclusions in the FEIS, the Agencies were not limited merely to numbers in tables of a PDF, and they cannot limit the public to that either.

Fourth, we request that fees be waived. This is not a request under Maryland's PIA but rather a request for documents that should have been disclosed in the first instance—thus no fee waiver request is necessary. We nonetheless note that a waiver would be appropriate under Md. Code Ann., GP § 4-206(e)

and Md. Code Regs. 11.01.13.13(A)(7); the non-profit organizations' ability to pay fees is constrained and the requested records are in the public interest and will enable the public to meaningfully comment on the FEIS's traffic conclusions. The public cannot evaluate the report fully without these documents, and furthermore these documents were required to be disclosed in the first instance. Providing the requested files simply requires copying and pasting computer folders to a Dropbox or other cloud-based folder and emailing the link. In fact, Smart Mobility has requested this same type of data many times for other highway EISs and has always been promptly provided it without charge. A non-exhaustive list includes:

1. Florida Department of Transportation District 1 – Collier County MPO RTP Update
2. Colorado Department of Transportation – I-70 East EIS
3. Berkeley Charleston Dorchester Council of Governments (South Carolina) – RTP Update and I-526 Extension
4. New York Department of Transportation – Hunts Point Interstate Access Improvement Project DEIS
5. Southern California Association of Governments – High Dessert Corridor DEIR
6. Arkansas Department of Transportation – I-30 Planning and Linkages Study
7. Utah Department of Transportation – West Davis Corridor DEIS
8. Texas Department of Transportation – RTP Update and South Mopac modeling
9. Charlottesville/Albemarle Metropolitan Planning Organization (Virginia) – Charlottesville Bypass

The requested files should be organized and readily available from the person or entity that undertook the traffic analysis.

By not disclosing these documents, MDOT is preventing the public from meaningfully reviewing and commenting on the traffic analysis in the FEIS. **We request that MDOT immediately provide the requested traffic spreadsheets and model files underlying its decisions in the FEIS, no later than July 7, 2022.** Because the Agencies have unlawfully hindered a proper review by not disclosing this in the first place, and as we have requested several times in the past, we request that the FEIS comment period be extended, consistent with letters submitted to the U.S. Department of Transportation, FHWA and MDOT, so that the public has a reasonable opportunity to review and comment on the FEIS's traffic analysis and conclusions.

Christina C. McClintock
Jill Grant & Associates, LLC
1319 F Street NW, Suite 300
Washington, DC 20004
202-821-1951
cmcclintock@jillgrantlaw.com

cc:    Gregory Murrill, FHWA
       Jitesh Parikh, FHWA
       Jeanette Mar, FHWA
       Josh Tulkin, Sierra Club Maryland Chapter
       Norm Marshall, Smart Mobility Inc.

# MARYLAND HISTORICAL TRUST
## DETERMINATION OF ELIGIBILITY FORM

NR Eligible: Yes ___

No ___

Property Name: **Washington Biologists' Field Club on Plummers Island**       Inventory Number: **M: 12-46-2**

Address: <u>Plummers Island on the Potomac River</u>                    Historic District: <u>No</u>

City: <u>Cabin John</u>                    Zip Code: <u>20818</u>                    County: <u>Montgomery</u>

USGS Quadrangle(s): <u>Falls Church</u>

Property Owner: <u>United States of America</u>                    Tax Account ID: <u>07-00437236</u>

Tax Map Parcel(s): <u>P705</u>                    Tax Map: <u>GN121</u>

Project: <u>I-495 & I-270 Managed Lanes Study</u>                    Agency: <u>MDOT SHA</u>

Agency Prepared By: <u>Dovetail CRG</u>

Preparer's Name: <u>Mical Tawney Adriana T. Moss</u>                    Date Prepared: <u>August 20, 2021</u>

Documentation is presented in: <u>Project review and compliance files</u>

Preparer's Eligibility Recommendation: <u>Recommended</u>

Criteria: <u>X</u> A       B       C       D

Considerations:    A       B       C       D       E       F       G

> *Complete if the property is a contributing or non-contributing resource to a NR district/property:*
>
> Name of the District/Property: <u>C&O Canal National Historical Park</u>
>
> Inventory Number: <u>M: 12-46</u>                    Eligible:                    Listed: <u>Yes</u>

Site visit by MHT Staff ___ yes    ___ no                    Name:                    Date:

Description of Property and Justification:

Setting

The Washington Biologists' Field Club on Plummers Island (WBFC) is a private research station composed of a cabin, recreational elements, and landscape features situated on a 12.23-acre island known as Plummers Island in the Potomac River (Eckerlin et al. 2021). The island is situated on the northern side of the river, south of the Clara Barton Parkway and Locks 11 and 12 of the Chesapeake and Ohio (C&O) Canal, and east of I-495 and the American Legion Memorial Bridge in Montgomery County, Maryland. According to WBFC records, the cabin building was constructed in 1901 by the club and is still used by club members and the public (Carla Dove, personal communication 2021; Perry 2007). The island is accessed by crossing Rock Run Culvert from an unpaved trail that extends south from the C&O Canal Towpath near Lock 10. The island, currently owned by the National Park Service (NPS), is located within the National Register of Historic Places (NRHP) boundaries of the C&O Canal National Historical Park (M: 12-46).

Description

| MARYLAND HISTORICAL TRUST REVIEW | |
|---|---|
| Eligibility recommended: | Eligibility not recommended: |
| Criteria: ___ A ___ B ___ C ___ D | Considerations: ___ A ___ B ___ C ___ D ___ E ___ F ___ G |
| MHT Comments: | |
| | |
| | |
| Reviewer, Office of Preservation Services: | Date: |
| | |
| Reviewer, National Register Program: | Date: |

*Special DOE form produced for the I-270 & I-495 Managed Lanes Study*

**Exhibit J**

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                                    Washington Biologists' Field Club on Plummers Island

Page 2

---

The WBFC cabin and several associated recreational elements, situated atop the highest part of the island on the eastern of two naturally terraced rock formations, are surrounded by local native, introduced, and invasive flora, fauna, birds, and insects that the club members research (Washington Biologists' Field Club 2021a). The two rock formations (late Precambrian muscovite schist to the west and gneiss to the east), also called rock buttresses, feature many small to large rock outcrops of erosional remnants of former falls and gorge walls with sparse herbaceous vegetation (Fleming 2015; Simmons et al. 2016). Lower points of the island, between and surrounding the rock formations, are covered with plants and trees whereas the southern bank of the island, exposed to the Potomac River, features a sandy and muddy bank with boulder-like colluvium and rocky outcrops (Fleming 2015). The island is thickly covered by primarily mature deciduous trees including silver maple, red oak, birch, and other minor species such as sycamores. The island comprises 12 natural communities of which four are globally rare communities (two of which are also rare to the state). Twenty-one species within the communities are state-rare extant flora species (including one globally rare extant species) and 36 state-rare historic flora species (four of which are globally rare historic taxa) (Simmons et al. 2016, 2020). For over a century, the vegetation on the island has grown unplanned and organically, without intervention by the researchers. The scientists mark their research plots of study with pin flags or flagging tape, which can be found all over the island today. South and downslope from the cabin is Cactus Rock, a part of lichen studied throughout the mid-twentieth century and a traditional gathering spot for the club members due to its vistas of the Potomac River and associated wildlife (Perry 2007, 30, 34; Robert Soreng, personal communication 2021). The island is also open to the public who use it for fishing, hiking, or to observe wildlife (Carla Dove, personal communication 2021).

The one-story, three-bay cabin faces south and has a side-gabled roof. Constructed into a slope, the building sits on a stone and timber post foundation supporting a wood-frame structural system clad in cypress shingles. A one-story, three-bay full-width porch with wood decking spans the south elevation, and timber posts support the moderately pitched shed roof. The main entrance, centrally positioned beneath the porch, is filled with a single-leaf flush wood door, a replacement of the original. A secondary entrance in the north elevation has a similar door and mirrors the primary entrance on the opposite elevation. Window openings are unglazed, enclosed only by operable, wood, vertical board shutters. The low-pitched, side-gabled roof features replacement asphalt shingles. An exterior-end, broad, rubble stone chimney is centered on the west elevation; it was repaired with new mortar where necessary in the 1990s but entirely reconstructed in 2015 utilizing the stone of the original chimney (Perry 2007, 10; Steve Sheffield, personal communication 2021). A one-story, shed-roofed wing is appended to the east half of the north elevation. This wing, which appears original to the building according to historic images on file with the club, is clad with cypress shingles and features a metal stovepipe flue and an engaged, poured-concrete porch that covers a single-leaf, wood door on the wing's west elevation and the single-leaf door on the main block's north elevation (Perry 2007, 18).

The interior of the cabin has an open plan, and the structural system is left exposed. New wooden cross beams were installed in the 1990s; however, the floor, floor supports, and walls were only repaired as necessary (Perry 2007, 10). A loft area, where researchers formerly slept during periods of on-site study, is in the west half of the building above the fireplace (Carla Dove, personal communication 2021). The brick fireplace hearth and surround which formerly featured a wooden mantel supported by wood rounded posts, were completely reconstructed using brick for the surround and concrete block for the fire box in 2015 (Perry 2007, 10, 17; Steve Sheffield, personal communication 2021). Above the fireplace surround, the chimney is parged. The wing contains a kitchen, which has a stove, stainless-steel stovepipe, and cabinets.

In addition to the cabin, there are many man-made recreational and landscape elements on the island associated with the WBFC. Four circa-1990 wood picnic tables and benches are permanently installed to the north of the cabin atop the eastern rock formation, and just northwest of the tables is a circa-1904 stone fire pit (A) (associated letter throughout remainder of text correlates to the site plan submitted with this DOE) that is used for roasting oysters at annual gatherings (Perry 2007, 10, 18). Also near the cabin are a series of four steel posts stamped with "U.S.S.," standing for United States Steel, set in a rectangle shape just northwest of the cabin on the west side of the picnic site; they are the supports to set up a temporary latrine on event days (Robert Soreng, personal communication 2021). The original signage situated at the eastern end of the island upon entry was recently replaced with a metal sign on wood posts by the NPS; the original sign is currently kept inside the cabin. Bronze memorial plaques, dating between the 1940s and the early 2000s, have been fixed to the eastern stone formation marking the scattering of cremated remains of former club members, or other commemorative honors.

In the western section of the island is a fire pit (B) and the remains of a possible fire pit (C) created from stone found on the island. The fire pit (B) is located atop the highest point of the western rock formation while the remnants of a possible fire pit (C)

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                                    Washington Biologists' Field Club on Plummers Island

Page 3

---

is situated just southeast of the western rock formation in a lower-lying area of the island. WBFC members do not know for whom or when these were constructed and if they are still in use (Robert Soreng, personal communication 2021).

Historic Context

The WBFC was founded in the early twentieth century by a group of like-minded scientists and researchers. The idea for a club came about after Charles L. Pollard (1872–1945) learned about a biology club in New Jersey. Pollard, a curator at the U.S. National Museum (the Smithsonian Institute) and editor of the Plant World magazine, was inspired to form a similar club for biologists in the Washington, D.C., area (The Manchester Journal 1945; Perry 2007, 2). In January 1900, Pollard and other scientists met for the first time in Pollard's home at 1854 Fifth Street in Washington, D.C.; it was here that the WBFC was born (Perry 2007, 2). In addition to Pollard, the other early members of the club included Adrian Pieters (botanist in charge of seed and plant introduction and distribution in the U.S. Department of Agriculture), William Palmer (a taxidermist and modeler at the Smithsonian), Orator Cook (curator at the National Herbarium and professor of botany at George Washington University), William Hay (head of biology at Washington High School and visiting professor at Howard University and Georgetown University), Guy Collins (Office of Botanical Investigations), William Maxon (chairman of botany at the U.S. National Museum/Smithsonian), Edward Morris (a biologist with Washington high schools), and William Pollock (U.S. National Herbarium) (Perry 2007, 2). These founding members were all scientists, botanists, curators, geneticists, zoologists, and biologists living in and around the Washington, D.C. area. Many taught at local schools, such as Georgetown or Howard University, or worked closely with the United States Department of Agriculture, the Smithsonian Institution, and other institutions (Perry 2007).

Soon after forming, the WBFC began looking for a more permanent location for their club to meet and conduct research. According to the early club members, it was necessary for the WBFC headquarters to be situated in an area with easy access to the natural environment in order to research and collect biological materials, the focus of their club's activities. Initially, the WBFC rented a cottage in Upper Marlboro, Maryland; however, the inconvenient distance of the cottage from Washington, D.C., made it difficult for members to make the trip, and the club began looking for another location (Perry 2007, 2). In 1901, the same year that the WBFC was formally incorporated "for the promotion of research of fauna and flora and the general advancement of biological science," the club relocated to Plummers Island, the present-day location of the club (The Evening Star 1901, 3; Perry 2007, 2). Plummers Island, an island situated in the Potomac River and located to the northwest of Washington, D.C., was an ideal location for the WBFC as it offered a natural setting where the club could conveniently conduct research and gather data. The island had been brought to the club members' attention by a fellow researcher who had collected biological specimens on the island before (Perry 2007, 2).

The WBFC originally rented the land on Plummers Island for $30 a year, but after several years of negotiation with the landowner, the club purchased the 12.23-acre island in 1908 (Washington Biologists' Field Club Archives n.d.; Washington Biologists' Field Club 2021a). In that same year, they purchased 25 acres of land on the mainland, just to the north of the island past the C&O Canal (Washington Biologists' Field Club 2021a). Since the island was undeveloped, the WBFC constructed a cabin to support their research mission and provide a place where club members could stay during trips to the island. Club members William Beattie and William Palmer drew the plans for the cabin, which was to be constructed on the highest point of the island, and obtained building materials for its construction (Perry 2007, 2; Washington Biologists' Field Club 2021a). Construction started in the spring of 1901 and the cabin was completed by November of that year, comprising a one-story one-room building with a rear kitchen wing (Perry 2007, 3). The total cost of the cabin came to $200, which is approximately $6,200 today (Perry 2007, 3).

As the WBFC continued to grow, so too did their land holdings in the area. Issues with individuals trespassing on their mainland property prompted the organization to purchase additional land in the 1920s, bringing their mainland holdings to 38.5 acres (The Washington Post 1927; Perry 2007, 6). Throughout the early- to mid-twentieth century, the club continued to maintain, visit, and research the island and the mainland property. However, in June 1958, the National Capital Planning Commission (NCPC) initiated condemnation proceedings against the WBFC's land holdings for the expansion of the George Washington Parkway under the Capper-Cramton Act. (Perry 2007, 7). It was also around this time that a site to the west of Plummers Island was selected for the construction of a bridge across the Potomac River that would connect with the planned Capital Beltway (I-495) (Perry 2007, 7). After an unsuccessful attempt to find a new location for their club, an agreement was reached with the NCPC in February 1959 that allowed the club to transfer the property to NPS but maintain use of the island (The Washington

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                    Washington Biologists' Field Club on Plummers Island

Page 4

---

Post 1959). In exchange, the WBFC received financial compensation only for its mainland holdings (Perry 2007, 7). In the agreement, the club was permitted to fence the island to keep the public out. Instead, the club has asked non-members to respect the island and the cabin, to not stay overnight, and to remove their trash (Robert Soreng, personal communication 2021). Today, the WBFC continues to operate under that agreement with NPS.

Since its inception, the WBFC has sought to conduct research and advance various biology-affiliated fields of study. Using Plummers Island as the base for most of the club's research, members have conducted a wide variety of studies, many of which have been long term, intending to provide a better understanding of the natural environment over time. Topics ranged from field- or species-specific research to research on the general natural history of the island and surrounding area. Studies from the 1900s, 1910s, and 1920s examined fish, insects, reptiles, birds, and mammals located on the island and in the surrounding D.C. area. (Washington Biologists' Field Club 2021b). The earliest study that explored the natural history of Washington, D.C., was conducted by Waldo McAtee in 1918, and future studies expanded upon his work (McAtee 1918; Perry 2007, 191–192).

Starting in the mid to late 1930s, club members began a series on the natural history of Plummers Island. The series, documenting the flora and fauna observed on the island to that time, included the contributions of multiple club members, including William Maxon, co-founding member; Albert Kenrick Fisher, surgeon and co-founder of the Branch of Economic Ornithology in the U.S. Department of Agriculture (USDA) and the Division of Economic Ornithology and Mammalogy; Sidney Blake, botanist and plant taxonomist; Ellsworth Killip, botanist and curator at the Smithsonian Institution; Emery Leonard, botanist; Edna M. Ermold, biologist with the USDA specializing in mycological collections; and Maurice Brady, research staffer for the Bureau of Biological Survey of the USDA (Washington Biologists' Field Club 2021b). By 1960, the WBFC had documented 26 mammals, 186 birds, 22 reptiles, 20 amphibians, 55 fishes, 776 flowering plants, 70 mosses, 80 lichens, and 118 fungi on the island (Christmas 1960). This ongoing series has continued into the 21st century.

The club's early studies have provided important baselines for identifying environmental changes on the island over time. Already by the 1930s, club members and other scientists recognized the value of continuous observation of the island to outside researchers. In his 1935 introduction to the "Natural History of Plummers Island," cofounding member William Maxon noted the alteration of habitat and resulting changes in species on the island over 35 years and how scientific observations throughout that period had given it an "almost unique place in current natural history studies" (Maxon 117). The club's long history of extensive research on the island, if not wide-ranging or individually groundbreaking, is rare in the field of biological studies, making the island a valuable point of comparison for future studies in the area or in similar environments (Cohn 1994).

In a notable study starting in the 1960s, Mason E. Hale, Jr., curator of lichens at the Smithsonian Institution, and James Lawrey, of George Mason University, examined the long-term growth rate of rock-inhabiting lichens on the island. To do so, Hale and Lawrey relied on data from specimens collected by WBFC members on Plummers Island since 1907, giving them access to over 60 years of detailed information (Lawrey 2011, 6). Lawrey and Hale found that lichen growth was slower on Plummers Island than other nearby areas. The study demonstrated that lichens located near roads and other heavily populated regions can accumulate lead and other metals (Lawrey and Hale Jr. 1979) and inferred through comparisons of past and present-day lichen species on the island that a less diverse community and fewer species existed on the island because of environmental stressors (Lawrey 2011, 7). This research added to the growing body of evidence demonstrating how elements of the natural environment can be negatively impacted by roadways and other forms of air pollution, supporting efforts in Congress and at the EPA in the 1970s to eventually eliminate the use of tetraethyl lead in gasoline as part of air quality and emissions standards (Eckerlin et al. 2021, 13; Environmental and Energy Study Institute 2016; U.S. Energy Information Administration 2020).

Throughout its history, the WBFC membership has included prominent scientists, researchers, and practitioners in diverse fields of biology. From 1901 to 1996, membership of the club was limited to 50 members, all of whom were male (Perry 2007, 8). It was not until 1995 that women were recruited to join the club; the organization's first female president was elected in 2005 (The Washington Post 2005). Because of the limited membership opportunities, club members have historically been leaders in their respective fields. Members have often held influential positions in Washington, D.C.-area educational institutions, government agencies, and non-profit organizations, directing research and policy at the national level. Since its inception, the WBFC has provided a forum for members with ties to the Smithsonian Institution, the USDA, the Department of the Interior, the National Institute of Standards and Technology, the University of Maryland, Georgetown University, George Washington University, the National Council for Science and the Environment, and many others. Their membership has included multiple directors of the National Museum of Natural History, the National Zoological Park, the Fish and Wildlife Service, and the

00177563

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                              Washington Biologists' Field Club on Plummers Island

Page 5

Patuxent Wildlife Refuge. These ties with various institutions have made the WBFC a uniquely influential avocational club.

Notable members with achievements outside the WBFC include Vernon Bailey, who developed live traps that would not harm small animals during study; Frederick Coville, whose research allowed for blueberries and cranberries to be grown commercially; Henry Henshaw, a zoologist and ethnologist who completed an extensive study on native North American languages; Charles Piper, who is credited with making the soybean one of America's top crops; and Roger Tory Peterson, who developed the first modern field guide with his "A Field Guide to the Birds" in 1934.

In the realm of national policy, influential members have included Gifford Pinchot, the first chief of the U.S. Forest Service and "father" of modern forestry; Howard Zahniser, who was critical to the creation of the 1964 Wilderness Act which made it possible to preserve and protect certain lands in the U.S. from development (Eckerlin et al. 2021, 13); Clarence Fredine, who as chief of the National Park Service's Division of International Affairs in 1964 organized and expanded student conservation programs and developed the service's policies for international activities; and John S. Gottschalk, who as director of the Bureau of Sport Fisheries and Wildlife (1964-70), initiated the first formal endangered species program, introduced innovative waterfowl management concepts, and brought about the ban on the use of DDT (Ravo 1999). Although these achievements were made outside the WBFC, the prestigious membership of the WBFC was particularly unique for a scientific club.

Today, the WBFC has about 65 active members. Research is still conducted on the island by members and outside researchers; the club offers research grants to those seeking financial assistance to complete a study (Washington Biologists' Field Club 2021c). Grants have helped fund studies on fish in the Potomac River, on breeding birds on the island, on plants specific to the area, and many other topics (Perry 2007, 11). The breadth of research completed on Plummers Island supports the claim that it is the most thoroughly studied island in North America (Ethridge 1951; Eckerlin et al. 2021, 12).

In addition to conducting research, members of the club have maintained the natural and man-made elements of the island. In the mid-1960s, repairs were made to the property, specifically the cabin, which had been frequently vandalized. Shutters were added to windows, sturdier doors were installed, the roof was replaced, and the kitchen was enlarged and given new windows. Maintenance repairs were made again the 1990s, including reconstruction of the original fireplace with brick and concrete block, replacing an original wood surround. Support beams were added to the cabin interior to reinforce the roof and provide additional storage. In 2015, the chimney was reconstructed using the original fieldstone. This regular upkeep of the cabin has allowed members to continue to utilize the space there while completing research (Perry 2007, 10). The WBFC still meets on the island to complete research, attend annual meetings -- which often coincide with an annual shad bake and oyster roast -- and to spend time in the natural environment they have preserved on the island for over 100 years.

Evaluation

The Washington Biologists' Field Club on Plummers Island is eligible for inclusion in the NRHP under Criterion A. The WBFC is a twentieth-century, private-club research station set on an island in the Potomac River. For over a century, Plummers Island has been used by scientists for short- and long-term biological research studies as well as natural history and geological studies. Nearly 400 published studies have established and expanded upon a continuous body of research encompassing 120 years of observation. These studies have provided a unique source of long-term historical data for comparative studies involving the effects of outside forces such as climate change, invasive species, and pollution. Few places in the world provide a similar breadth of historical data with a location so close to a national capital.

In part due to the WBFC's proximity to Washington, D.C., club members, consisting of some of the leading researchers in their respective fields, have contributed to, influenced, and continue to inform new knowledge and understanding of biology, natural resources, and agriculture (Perry 2007, iv). The WBFC has been a forum for major scientific figures in the twentieth-century environmental movement for over a century. This membership of influential policymakers is unique among twentieth-century naturalist clubs.

The WBFC is eligible for listing in the NRHP under Criterion A for its association with contributions to science and conservation as the site of long-term scientific studies conducted by the club and as the meeting place for the club's collective membership of influential and accomplished scientists.

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                              Washington Biologists' Field Club on Plummers Island

Page 6

---

The WBFC is not eligible under Criterion B. Although there have been several notable individual members of the club that have made lasting and significant contributions to their fields, these specific accomplishments were made outside of their association with the WBFC. Such individuals are more appropriately represented by other properties more directly associated with their productive lives. Their cumulative importance as part of a club of prominent scientific members is best expressed under Criterion A.

With respect to NRHP Criterion C, the built environment of the WBFC is not a unique resource. The island contains a natural landscape that has evolved over time with limited human intervention. The only building on the island, the 1901 cabin, is typical of vernacular buildings of the period and has been altered. Other structures or designed elements include the fire pits, memorial plaques, hiking trails, and signs. Neither the cabin nor these simple additions represent the work of a master or possess high artistic value. As a natural landscape, its significance is derived from an association with the research and studies conducted on it; therefore, the WBFC is not significant under Criterion C.

The resource was not evaluated under Criterion D.

Period of Significance

The WBFC derives its significance from its role as an important research site and for its unique membership including influential Washington, D.C.-area biologists. Its period of significance begins in 1901, when the club acquired the island, constructed the cabin, and began their work on the island, and continues to 1971, the current 50-year cut-off date as established by the NPS in National Register Bulletin 16A, regarding historic properties in which significant activities began within the period of significance and continue to have importance, but no more specific date can be identified to end the historic period (U.S. Department of the Interior National Park Service 1997, 42). The WBFC does not qualify as exceptionally important under Criteria Consideration G, but future investigations may determine that the period of significance extends beyond 1971.

Character-Defining Features

Cabin site: the cabin site includes the cabin, picnic area, and fire pit (A) atop the easternmost rock formation. The 1901 cabin and adjacent picnic site have been used since the club's founding as a gathering place for researchers during their studies and club events and continue to be used as such. The cabin has been altered with new materials as part of repairs over time, but its use and overall design remain intact. Likewise, although the picnic tables themselves are 1990s replacements, the picnic area has been in continuous use since the establishment of the club on Plummers Island in 1901.

Memorial plaques: these plaques on the western rock formation of the island commemorate past important members of the club and indicate the location of several members' cremated remains. The plaques demonstrate the important role the island has played in members' lives and are one of the club's few physical alterations to the island, reflecting the value of past contributions of the founders and other members to the club.

Walking trails: the trails were established by club members to access the cabin, picnic site, and study areas and have been an integral part of the landscape for over a century. Although walking trails may change over time, the presence of trails on the island (as opposed to specific alignments or locations) is an important aspect of the WBFC's character.

Cactus Rock: a local landmark used as a traditional gathering spot and Potomac River overlook; it has also played an important role in the study of lichens on the island.

The natural, unplanned character of the Plummers Island landscape: although specific plants, plant communities and geological features, other than those noted above, do not contribute to the historical significance of the WBFC, the overall character of the landscape, which has been allowed to evolve naturally and organically for over a century, is a character-defining feature of the property. The continual, undirected growth and evolution of the natural environment played a pivotal role in the club's contributions over the last century, as researchers studied changes to the flora and fauna of the island resulting from outside stimuli such as drought, invasive species, pollution, etc. that reflect similar changes occurring in the world at large.

Fire pit (B) and fire pit (C) do not contribute to the property's significance. These appear similar to fire pit (A) but are not in use

NR-ELIGIBILITY REVIEW FORM

M: 12-46-2                              Washington Biologists' Field Club on Plummers Island

Page 7

---

and are not documented in the club's history. The NPS sign near the entrance to the island is a later replacement and is also noncontributing.

Integrity

The WBFC and Plummers Island have undergone continuous change and evolution over time. As such, the integrity of the WBFC is not tied closely to design, materials, and workmanship, but more to the location, setting, feeling, and association.

The WBFC has integrity of location due to its continued presence on Plummers Island.

The WBFC retains integrity of design. The layout and appearance of the buildings and structures on the island retain the appearance of an early twentieth-century naturalist club.

Setting: The WBFC retains integrity of setting. The island's natural landscape has undergone continuous change, but specific flora and fauna are not critical to the club's significance. The natural setting on Plummers Island is intact.

The WBFC lacks integrity of materials and workmanship. Changes to the cabin and picnic area over time include the replacement of doors and the roof, the addition of ceiling support beams, the reconstruction of the fireplace, and the reconstruction of the chimney.  However, these aspects of integrity are not critical to the WBFC's significance.

The WBFC retains integrity of feeling and association. The island location, natural landscape, and the presence of the cabin, picnic area, walking trails, and other features combine to convey the character of the WBFC from the early through the mid-twentieth century.

Boundary

The resource encompasses 12.23 acres and is confined to the current tax parcel which is found on Montgomery County Tax Map GN11, Parcel P705 (2021).


References:

Christmas, Anne H. 1960. "New Span to Unmask Island Jungle," Evening Star (Washington, D.C.), July 5, 1960. Accessed June 1, 2021. www.newsbank.com.

Cohn, D'Vera. 1994. "Island Under a Microscope: In Plummers, Scientists Have a Living Laboratory." The Washington Post. May 19, 1994, C1.

Eckerlin, Ralph, Robert Soreng, and Lowell Adams. 2021. Washington Biologists' Field Club Comments on Section 106 Process for Construction of I-495/I-270 Project. Letter on file at Washington Biologists' Field Club archives, Cabin John, Maryland.

Environmental and Energy Study Institute. 2016. Fact Sheet: A Brief History of Octane in Gasoline - From Lead to Ethanol. Accessed June 9, 2021. https://www.eesi.org/papers/view/fact-sheet-a-brief-history-of-octane.

Ethridge, Mark. 1951. "Biologists Devote Half Century to Lab on Potomac Island." The Washington Post. August 20, 1951, 1. Accessed April 22, 2021. www.newsbank.com.

The Evening Star. 1901. "Certificates of Incorporation." May 24, 1901, 3. Accessed May 24, 2021. www.newspapers.com.

Fleming, Tony. 2015. Geologic-Geomorphic Map of Plummers Island. Accessed June 9, 2021. https://wbfc.science/wp-content/uploads/2019/09/geologic_map_plummers_island.pdf.

Lawrey, J. D. 2011. A lichen biomonitoring program to protect resources in the National Capital

Region by detecting air quality effects. Natural Resource Technical Report NPS/NCRN/NRTR—2011/450. National Park Service, Fort Collins, Colorado. Accessed June 9, 2021. https://irma.nps.gov/DataStore/DownloadFile/428476.

Lawrey, James D., and Mason E. Hale, Jr. 1979. "Lichen Growth Responses to Stress Induced by Automobile Exhaust Pollution." Science 204, no. 4391:423–424. Accessed June 1, 2021. https://science.sciencemag.org/content/204/4391/423.

The Manchester Journal. 1945. "Arlington Librarian Dies Suddenly." August 23, 1945, 2. Accessed May 24, 2021. www.newspapers.com.

Maxon, William R. "Natural History of Plummers Island: I. Introduction." Proceedings of the Biological Society of Washington 48: 115-138. Accessed June 21, 2021. https://wbfc.science/wp-content/uploads/2020/07/1935_Maxon_NatHistPlummerIntro.pdf.

McAtee, W.L. 1918. "A Sketch of the Natural History of the District of Columbia." Bulletin of the Biological Society of Washington 1:1–150. Accessed June 1, 2021. https://wbfc.science/wp-content/uploads/2020/07/1918_McAtee_SketchNaturalHistory.pdf.

Perry, Matthew C. (editor). 2007. The Washington Biologists' Field Club: Its Members and Its History (1900–2006). The Maple Press Company, York, Pennsylvania. Accessed May 24, 2021. https://wbfc.science/wp-content/uploads/2019/09/wbfc_booksm.pdf.

Ravo, Nick. 1999. "John S. Gottschalk, 86, a Leader in Federal Efforts to Save Species." The New York Times. August 24, 1999. Section B, page 11. Accessed August 10, 2021. https://www.nytimes.com/1999/08/24/us/john-s-gottschalk-86-a-leader-in-federal-efforts-to-save-species.html.
Simmons, R.H., A.H. Fleming, and R.J. Soreng. 2016. Natural Communities of Plummers Island, Montgomery County, Maryland. Accessed June 9, 2021. https://wbfc.science/wp-content/uploads/2019/09/plummer_island_nc_map_v1.3.pdf.

Simmons, R.H., R.J. Soreng, E.M. Barrows, and L.H. Emmons. 2020. Rare Flora and Natural Communities of Plummers Island, Montgomery County, Maryland. Unpublished technical report. Report on file at the Washington Biologists' Field Club archives, Cabin John, Maryland.

U.S. Department of Interior, National Park Service. 1997. How to Complete the National Register Registration Form. National Register Bulletin 16A. Accessed June 22, 2021. https://nps.gov/subjects/nationalregister/upload/NRB16A-Complete.pdf.

U.S. Energy Information Administration. 2020. "Leaded gasoline was gradually taken off the U.S. market." Gasoline Explained. U.S. Energy Information Administration, Washington, D.C. Accessed June 9, 2021. https://www.eia.gov/energyexplained/gasoline/gasoline-and-the-environment-leaded-gasoline.php.

Washington Biologists' Field Club. 2021a. The History of the Washington Biologists' Field Club on Plummers Island. Accessed May 24, 2021. https://wbfc.science/the-history-of-the-washington-biologists-field-club-on-plummers-island/.

--- 2021b. Scientific Papers Associated with Plummers Island. Accessed June 1, 2021. https://wbfc.science/scientific-papers-associated-with-plummers-island/.

--- 2021c. Research. Accessed June 1, 2021. https://wbfc.science/research/.

Washington Biologists' Field Club Archives. n.d. Miscellaneous files on record. Accessed June 1, 2021.

The Washington Post. 1901. "District Biologists Incorporate." May 24, 1901, 12. Accessed April 22, 2021. www.newsbank.com.

--- 1927. "Suburban Rockville." June 28, 1927, 2. Accessed April 22, 2021. www.newsbank.com.

--- 1959. "Plummers Island – It's for the Birds." February 6, 1959, B1. Accessed April 22, 2021. www.newsbank.com.

NR-ELIGIBILITY REVIEW FORM

<u>M: 12-46-2</u>                        <u>Washington Biologists' Field Club on Plummers Island</u>

Page 9

---

--- 1990. "Mason E. Hale – Lichens Expert." April 27, 1990, C6. Accessed April 22, 2021. www.newsbank.com.

--- 2005. "Field Club's Gender Evolution." May 22, 2005, C02. Accessed June 1, 2021. www.newsbank.com.

**Washington Biologists' Field Club on Plummers Island**

Location: Plummers Island on the Potomac River
City: Cabin John                                                    Montgomery County



USGS 7.5' Quadrangle - Falls Church                    Scale: 1:24,000

Washington Biologists' Field Club on Plummers Island
**MAPS**

## Washington Biologists' Field Club on Plummers Island

Location: Plummers Island on the Potomac River
City: Cabin John                                                          Montgomery County



Parcel Boundaries

Scale: 1:3,000



M: 12-46-2                Washington Biologists' Field Club on Plummers Island
**MAPS**





Plummers Island signage, looking south.



Walking trail in eastern section of Plummers Island with flagging pins in the background demarcating a study area, looking west.

**PHOTOGRAPHS**



Walking trail in eastern section of Plummers Island showing natural growth of flora on the island, looking west.



WBFC cabin, southwest oblique.



WBFC cabin, northeast oblique.



WBFC cabin, east elevation.

**PHOTOGRAPHS**



WBFC cabin, west elevation.



WBFC cabin kitchen projection, north elevation, looking southeast.

M: 12-46-2                    Washington Biologists' Field Club on Plummers Island
**PHOTOGRAPHS**



Detail of WBFC cabin chimney stack on west elevation, looking south.



WBFC cabin interior, fireplace surround on western wall.

**PHOTOGRAPHS**



Set of picnic tables situated immediately northwest of the cabin, looking west.



Stone fire pit (A) immediately west of cabin, looking north.

M: 12-46-2                          Washington Biologists' Field Club on Plummers Island
**PHOTOGRAPHS**



View of memorial plaques, looking northeast.



Cactus Rock, looking south.



View of a research study location of an invasive plant with typical pin flag demarcation, looking south.



Fire pit (B) in western half of the island, looking east.



Remnants of stone fire pit (C) in western half of the island, looking east.



Original Plummers Island sign now stored inside of WBFC cabin.

M: 12-46-2          Washington Biologists' Field Club on Plummers Island
**PHOTOGRAPHS**



Plummers Island southern shore, looking west towards American Legion Bridge.

M: 12-46-2                    Washington Biologists' Field Club on Plummers Island
**PHOTO LOG**

Number of Photos: **19**
Name of Photographer: **Heather Dollins Staton**
Date of Photographs: **2021-05-26**
Location of Original Digital File:
File Format: **M: 12-46-2_2021-05-26_01.tif… etc.**

*Photographs inserted on continuation sheets:*

M: 12-46-2_2021-05-26_001
Plummers Island signage, looking south.

M: 12-46-2_2021-05-26-002
Walking trail in eastern section of Plummers Island with flagging pins in the background demarcating a study area, looking west.

M: 12-46-2_2021-05-26_003
Walking trail in eastern section of Plummers Island showing natural growth of flora on the island, looking west.

M: 12-46-2_2021-05-26_004
WBFC cabin, southwest oblique.

M: 12-46-2_2021-05-26_005
WBFC cabin, northeast oblique.

M: 12-46-2_2021-05-26_006
WBFC cabin, east elevation.

M: 12-46-2_2021-05-26_007
WBFC cabin, west elevation.

M: 12-46-2_2021-05-26_008
WBFC cabin kitchen wing, north elevation, looking southeast.

M: 12-46-2_2021-05-26_009
Detail of WBFC cabin chimney stack on west elevation, looking south.

M: 12-46-2_2021-05-26_010
WBFC cabin interior, fireplace surround on western wall.

M: 12-46-2_2021-05-26_011
Set of picnic tables situated immediately northwest of the cabin, looking west.

M: 12-46-2_2021-05-26_012
Stone fire pit(A) immediately west of cabin, looking north.

M: 12-46-2_2021-05-26_013
View of memorial plaques, looking northeast.

M: 12-46-2_2021-05-26_014
Cactus Rock, looking south.

M: 12-46-2_2021-05-26_015
View of a research study location of an invasive plant with typical pin flag demarcation, looking south.

M: 12-46-2_2021-05-26_016
Fire pit (B) in western half of the island, looking east.

Washington Biologists' Field Club on Plummers Island
**PHOTO LOG**

M: 12-46-2_2021-05-26_017
Remnants of stone fire pit (C) in western half of the island, looking east.

M: 12-46-2_2021-05-26_018
Original Plummers Island sign now stored inside of WBFC cabin.

M: 12-46-2_2021-05-26_019
Plummers Island southern shore, looking west towards American Legion Bridge.