# ROSELIE ANN BRIGHT, SC.D., M.S.

July 14, 2022

**Re: Comments on FEIS's Lack of a Serious Analysis of Impacts to Public Health**

Dear Josh Tulkin and the Sierra Club Maryland Chapter:

I have reviewed the I-495 and I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS) Chapters 1–3, Chapter 5 sections 1–3, 5–11, and 21–23, Chapters 7–9, Appendix (App'x) F sections 1–5, App'x K sections 1–4, App'x L Executive Summary, App'x Q sections 1–3 and Appendix A, and App'x T.6 in order to assess whether the FEIS adequately evaluated the public health impacts of the proposed MLS, from my perspective as an epidemiologist since 1980 with experience that includes environmental epidemiology training, observational ("real world") epidemiology research and methods development, and federal review of medical epidemiology studies and other documents. See attached CV. In my professional opinion, the FEIS fails to adequately address and review the adverse health effects of the Preferred Alternative.

The Preferred Alternative, known as Phase 1 South, will increase traffic on the highways by creating induced demand. The FEIS states that transportation improvements will result in economic growth and population growth, which it acknowledges will increase traffic and demand for further transportation improvements. See FEIS § 9.3.4.N. Yet, the FEIS ignores the indirect and cumulative effects of the increased traffic and construction for the Preferred Alternative, including, importantly, by failing to discuss and quantify its health impacts. This failure violates NEPA's mandate to "assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings," 42 U.S.C. § 4331, and to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." Id. § 4331. NEPA's mandate requires agencies to incorporate impacts on the human health into any comprehensive EIS. The Agencies fail to do so here.

Before discussing specific health impacts, it must be noted that the Agencies appear to be manipulating their traffic models to reduce the area with anticipated indirect and cumulative effects. While the area of traffic influence was initially modeled to include upper Montgomery and Frederick Counties, the Agencies reduced the modeled area of influence:

> [s]similar to the DEIS, the MWCOG model initially resulted in a relatively large, affected network area. In consultation with FHWA, additional steps were taken to reduce the footprint of the affected network area to make it more consistent with the Preferred Alternative study area. These included eliminating the travel time criterion and removing modeling artifacts.

FEIS App'x K § 3.3.2.B. Thus, for all discussed impacts, the Agencies seem to have artificially constrained the model to avoid evaluating the full impacts of the Preferred Alternative, health-related or otherwise. For example, the FEIS largely ignores the network impacts of the Preferred Alternative by declining to address impacts to feeder roads, local and other smaller regional roads,

**Exhibit E**

and alternative routes affected by the Preferred Alternative.[1] Moreover, each health impact discussed below that the Agencies ignored is compounded by the Agencies' failure to consider the entire geographic area affected by the Preferred Alternative, including those smaller and regional roads.

First, the FEIS ignores the obvious increase in traffic-related injuries and death from the increase in vehicle miles traveled in private vehicles predicted under the Preferred Alternative. It also does not discuss the likely increase in road deaths from pedestrians and cyclists,[2] risks that are higher in the United States than in 28 other high-income countries.[3]

Second, the FEIS does not quantify impacts to health from mobile source air toxic (MSAT) emissions or other health impacts from traffic-caused air pollution. The FEIS says:

> Per FHWA's Updated Interim Guidance on MSAT Analysis in NEPA Documents (2018), information is incomplete or unavailable to credibly predict the project-specific health impacts due to changes in MSAT emissions associated with a proposed set of highway alternatives. The outcome of such an assessment, adverse or not, would be influenced more by the uncertainty introduced into the process through assumption and speculation rather than any genuine insight into the actual health impacts directly attributable to MSAT exposure associated with a proposed action.

> These limitations impede the ability to evaluate how potential public health risks posed by MSAT exposure should be factored into project-level decision-making within the context of a NEPA Study such as the Study. However, the Final Air Quality Technical Report for the FEIS includes a more detailed discussion of the uncertainties associated with predicting health impacts of project alternatives. Refer to FEIS, Appendix K. The FEIS summarizes that "[a]ir toxics emissions from mobile sources have the potential to impact human health" (FHWA, 2018).

FEIS at § 9.3.4.L (9-56). The Agencies decline to quantify MSAT impacts by relying on an FHWA-funded, 2010 Health Effects Institute literature review which concludes that there is a

---

[1] While the FEIS claims that vehicle miles traveled on local roads will decrease under the Preferred Alternative, FEIS § 5.8.3.B, this claim makes no sense because more vehicles on the highway will lead to more vehicle miles on local roads.

[2] Morency P, et al. Traveling by Bus Instead of Car on Urban Major Roads: Safety Benefits for Vehicle Occupants, Pedestrians, and Cyclists. J Urban Health. 2018 Apr; 95(2): 196–207. DOI: 10.1007/s11524-017-0222-6; Beck LF, Dellinger AM, O'Neil ME. 2007. Motor Vehicle Crash Injury Rates by Mode of Travel, United States: Using Exposure-Based Methods to Quantify Differences. American Journal of Epidemiology 166(2): 212-218. doi: 10.1093/aje/kwm064; Savage I. Comparing the Fatality Risks in United States Transportation Across Modes and Over Time. Research in Transportation Economics. 2013; 43(1):9-22. DOI: 10.1016/j.retrec.2012.12.011. https://faculty.wcas.northwestern.edu/ipsavage/436.pdf.

[3] Yellman MA, Sauber-Schatz EK. Motor Vehicle Crash Deaths — United States and 28 Other High-Income Countries, 2015 and 2019. Morbidity and Mortality Weekly Report. July 1, 2022. 71(26):837-843. https://www.cdc.gov/mmwr/volumes/71/wr/mm7126a1.htm?s_cid=mm7126a1_w.

00177622

"causal relationship between exposure to traffic-related air pollution and exacerbation of asthma" and a suggestive causal relationship for other health impacts from air pollution, but ultimately concludes that for several health outcomes, the data were inadequate or insufficient to draw firmer conclusions. FEIS § 9.3.4.L. However, much more research has been done since 2010, and the FEIS should have considered and reviewed that literature. Recent research finds a causal relation between even low-levels of traffic-caused air pollution and ill health in children and adults, including lung problems (asthma, pneumonia), cardiovascular problems (myocardial infarction), poor pregnancy outcomes, poor physical growth, school absences, reduced cognitive abilities (autism, academic performance, dementia), and earlier mortality.[4]

---

[4] Ernani F. Choma, et al., Health Benefits of Decreases in On-Road Transportation Emissions in the United States from 2008 to 2017, PNAS 118(51) (Dec. 2021), *available at* doi: 10.1073/pnas.2107402118; Luo Z et al. Impacts of Vehicle Emission on Air Quality and Human Health in China, Science of the Total Environment, Vol. 813 (Mar. 20, 2022), *available at* https://doi.org/10.1016/j.scitotenv.2021.152655; WHO-Europe, Health Effects of Transport-Related Air Pollution, *available at* https://www.euro.who.int/__data/assets/pdf_file/0006/74715/E86650.pdf; Kheirbek I, et al., The Contribution of Motor Vehicle Emissions to Ambient Fine Particulate Matter Public Health Impacts in New York City: A Health Burden Assessment, Environmental Health (2016) 15:89, *available at* DOI 10.1186/s12940-016-0172-6; McCubbin DR, et al., The Health Costs of Motor-Vehicle-Related Air Pollution, Journal of Transport Economics and Policy, Vol. 33(3):253-86 (Sep. 1999), *available at* https://www.jstor.org/stable/20053815; Anderson, Michael L, As the Wind Blows: The Effects of Long-Term Exposure to Air Pollution on Mortality, Journal of the European Economic Association 18(4): 1886-1927 (Aug. 2020), *available at* DOI: 10.1093/jeea/jvz051; Austin, Wes, et al., School Bus Emissions, Student Health and Academic Performance, Economics of Education Review (2019) *available at* https://www.nber.org/papers/w25641, DOI: 10.3386/w25641; Beatty, Timothy KM and Jay P Shimshack, School Buses, Diesel Emissions, and Respiratory Health, Journal of Health Economics, 30(5): 987–999 (2011), *available at* DOI: 10.1016/j.jhealeco.2011.05.017; Bell, Michelle L, et al., Ozone and Short-Term Mortality in 95 U.S. Urban Communities, 1987-2000, Journal of the American Medical Association, 292(19), 2372–2378 (2004), *available at* DOI: 10.1001/jama.292.19.2372; Bell, Michelle L. et al, Challenges and Recommendations for the Study of Socioeconomic Factors and Air Pollution Health Effects, Environmental Science and Policy 8 (5): 525–533 (2005), *available at* https://doi.org/10.1016/j.envsci.2005.06.003; Benmarhnia, Tarik, et al., Using Instrumental Variables Under Partial Observability of Endogenous Variables for Assessing Effects of Air Pollution on Health (2017), *available at* https://mauricio-romero.com/pdfs/papers/partialiv.pdf; Bishop, Kelly C., et al., Hazed and Confused: The Effect of Air Pollution on Dementia, Technical Report, NBER Working Paper No. 24970 (2018), *available at* https://www.nber.org/papers/w24970; Case, Anne, et al, The Lasting Impact of Childhood Health and Circumstance, Journal of Health Economics 24(2): 365–389 (2005), *available at* DOI: 10.1016/j.jhealeco.2004.09.008; Currie, Janet, et al., Air Pollution and Infant Health: What Can We Learn from California's Recent Experience?, The Quarterly Journal of Economics 120(3): 1003–1030 (2005), *available at* https://www.jstor.org/stable/25098761; Currie, Janet et al., Traffic Congestion and Infant Health: Evidence From E-ZPass, American Economic Journal: Applied Economics 3(1):65–90 (2011),

00177623

*available at* https://www.aeaweb.org/articles?id=10.1257/app.3.1.65; Currie, Janet et al, Does Pollution Increase School Absences?, Review of Economics and Statistics 91(4): 672–694 (2009); Currie, Janet et al, What Do We Know About Short-and Long-Term Effects of Early-Life Exposure to Pollution?, Annu. Rev. Resour. Econ. 6(1): 217–247 (, 2014), *available at* http://www.nber.org/papers/w19571.pdf; Currie, Janet et al., Air Pollution and Infant Health: Lessons From New Jersey, Journal of Health Economics, 28(3): 688–703 (2009), *available at* DOI: 10.1016/j.jhealeco.2009.02.001; Di, Qian, et al., Association of Short-Term Exposure to Air Pollution With Mortality in Older Adults, Journal of the American Medical Association, 318(24): 2446–2456 (2017); Dominici, Francesca, et al., Science and Regulation. Particulate Matter Matters, Science, 344(6181): 257–259 (2014), *available at* DOI: 10.1126/science.1247348; Gauderman, W. et al., Childhood Asthma and Exposure To Traffic and Nitrogen Dioxide, Epidemiology, 16(6): 737–743 (2005), *available at* DOI: 10.1097/01.ede.0000181308.51440.75; Gauderman WJ, et al. Effect of Exposure to Traffic on Lung Development From 10 to 18 Years of Age: A Cohort Study, Lancet 369(9561):571-7 (Feb. 17, 2007). *available at* DOI: 10.1016/S0140-6736(07)60037-3; Gent, Janneane F., et al., Association of Low-Level Ozone and Fine Particles with Respiratory Symptoms in Children with Asthma, Journal of the American Medical Association, 290(14): 1859–1867 (2003), *available at* DOI: 10.1001/jama.290.14.1859; Hoek, Gerard, et al., Long-Term Air Pollution Exposure and Cardio-Respiratory Mortality: A Review, Environmental Health, 12(43) (2013), *available at* DOI: 10.1186/1476-069X-12-43; Hyder, Ayaz, et al., PM2.5 Exposure and Birth Outcomes: Use of Satellite- and Monitor-Based Data, Epidemiology 25(1): 58 (2014), *available at* DOI: 10.1097/EDE.0000000000000027; Isen, Adam, et al., Every Breath You Take–Every Dollar You'll Make: The Long-Term Consequences of the Clean Air Act of 1970, Journal of Political Economy 125(3): 848–902 (2017), *available at* https://www.journals.uchicago.edu/doi/abs/10.1086/691465; Jerrett, Michael, et al., Long-Term Ozone Exposure and Mortality, New England Journal of Medicine 360(11): 1085–1095 (2009), *available at* DOI: 10.1056/NEJMoa0803894; Jerrett M, et al., Traffic-Related Air Pollution and Asthma Onset in Children: A Prospective Cohort Study With Individual Exposure Measurement, Environ Health Prospect 116(10):1433-8 (Oct. 2008), *available at* DOI: 10.1289/ehp.10968; Knittel, Christopher R, et al., Caution, Drivers! Children Present: Traffic, Pollution, and Infant Health, Review of Economics and Statistics 98(2): 350–366 2016. http://hdl.handle.net/1721.1/113913; Krewski D, et al., Extended Follow-up and Spatial Analysis of the American Cancer Society Study Linking Particulate Air Pollution and Mortality, Res Rep Health Eff Inst. (140): 5-114, 115-36 (May 2009); Lleras-Muney, Adriana, The Needs of the Army Using Compulsory Relocation in the Military to Estimate the Effect of Air Pollutants on Children's Health, Journal of Human Resources, 45(3): 549–590 (2010), *available at* https://www.jstor.org/stable/25703469; Mar, Therese F. and Jane Q. Koenig, Relationship Between Visits to Emergency Departments for Asthma and Ozone Exposure in Greater Seattle, Washington, Annals of Allergy, Asthma, and Immunology 103(6): 474–479 (2009), *available at* DOI: 10.1016/S1081-1206(10)60263-3; Marcus, Michelle, On the Road to Recovery: Gasoline Content Regulations and Child Health, Journal of Health Economics, 54: 98–123 (2017), *available at* DOI: 10.1016/j.jhealeco.2017.04.003; McConnell R, et al. Traffic, Susceptibility, and Childhood Asthma, Environ Health Prospect 114(5):766-72 (May 2006), *available at* DOI: 10.1289/ehp.8594; McConnell R, et al. Childhood Incident Asthma and Traffic-Related Air Pollution at Home and School, Environ. Health Perspect. 118(7): 1021-6 (July 2010), *available*

00177624

Third, the FEIS also understates the impacts of the Preferred Alternative on MSAT emissions. While the FEIS explains numerous times that, under the Preferred Alternative, MSAT emissions are expected to "significantly decline in the Opening (2025) and Design (2040) years when compared to base conditions (2016)," see, e.g., FEIS § 9.3.4.F, the FEIS tables showing the MSAT data reveal that projected MSATs are *lower* under the No Build alternative. FEIS App'x. K, Tbl. 3-1. The FEIS of course does not grapple with this discrepancy. Recent research has shown that some air quality monitoring is manipulated to undermeasure poor air quality.[5] It is possible

---

*at* DOI: 10.1289/ehp.0901232; Medina-Ramon, Mercedes, et al., The Effect of Ozone and PM10 on Hospital Admissions for Pneumonia and Chronic Obstructive Pulmonary Disease: A National Multicity Study, American Journal of Epidemiology, 163(6): 579–588 (2006); Neidell, Matthew J, Air Pollution, Health, and Socio-Economic Status: The Effect of Outdoor Air Quality on Childhood Asthma, Journal of Health Economics 23(6): 1209–1236 (2004), *available at* DOI: 10.1016/j.jhealteco.2004.05.002; Peters, Annette, et al., Exposure to Traffic and the Onset of Myocardial Infarction, New England Journal of Medicine, 351(17): 1721–1730 (2004), *available at* DOI: 10.1056/NEJMoa040203; Ponce, Ninez A, et al., Preterm Birth: The Interaction of Traffic-Related Air Pollution with Economic Hardship in Los Angeles Neighborhoods, American Journal of Epidemiology, 162(2): 140–148 (2005), *available at* DOI: 10.1093/aje/kwi173; Schwartz, Joel, Air Pollution and Daily Mortality: A Review and Meta Analysis, Environmental Research 64(1): 36–52 (1994), *available at* DOI: 10.1006/enrs.1994.1005; Simeonova, Emilia, et al., Congestion Pricing, Air Pollution and Children's Health, Technical Report, NBER Working Paper No. 24410 (2018); Stieb, David M, et al., Ambient Air Pollution, Birth Weight and Preterm Birth: A Systematic Review and Meta-Analysis, Environmental Research 117: 100–111 (2012), *available at* doi: 10.1016/j.envres.2012.05.007; Triche EW, et al., Low-Level Ozone Exposure and Respiratory Symptoms in Infants, Environ Health Prospect., 114(6):911-6 (June 2006), *available at* DOI: 10.1289/ehp.8559; Volk, Heather E, et all, Traffic-Related Air Pollution, Particulate Matter, and Autism, JAMA Psychiatry 70(1): 71–77 (2013), *available at* DOI: 10.1001/jamapsychiatry.2013.266; Vrijheid, Martine, et al., Environmental Pollutants and Child Health—A Review of Recent Concerns, International Journal of Hygiene and Environmental Health, 219(4-5): 331–342 (2016), *available at* DOI: 10.1016/j.ijheh.2016.05.001; Zawacki, Margaret, et al., Mobile source Contribution to Ambient Ozone and Particulate Matter in 2025, Atmospheric Environment 188:129–141 (2018); Alexander D, et al., The Impact of Car Pollution on Infant and Child Health: Evidence from Emissions Cheating. Federal Reserve Bank of Chicago WP 2019-04 (2019), *available at* https://doi.org/10.21033/wp-2019-04; Schwartz, J et al., Estimating Causal Effects of Local Air Pollution on Daily Deaths: Effect of Low Levels, Environ Health Prospect, 125(1): 23-29 (Jan. 2017), *available at* DOI: 10.1289/EHP232.

[5] Grainger, Corbett, et al., Do Regulators Strategically Avoid Pollution Hotspots When Siting Monitors? Evidence from Remote Sensing of Air Pollution, 2016; Grainger, Corbet, and Andrew Schreiber. Discrimination in Ambient Air Pollution Monitoring? AEA Papers and Proceedings. 109: 277-82 (May 2019), *available at* https://www.aeaweb.org/articles?id=10.1257/pandp.20191063; Mu Y, Rubin E, Zou E. What's Missing in Environmental (Self-)monitoring: Evidence from Strategic Shutdowns of Pollution Monitors. NBER Working Paper No. w28735. Last revised 15 May 2022, *available at* http://www.nber.org/papers/w28735; Zou, Eric. Unwatched Pollution: the Effect of Intermittent

00177625

that the data used in the FEIS monitors may not be accurate so that the baseline data used in the FEIS are also inaccurate.

Fourth, the FEIS fails to adequately discuss mobile source pollution from tire and brake wear.[6] As noted in a recent article:[7]

> Every time a car brakes, accelerates, or changes direction, the friction wears down the exterior of the tire, sending particles into the environment. Some remain suspended in the air, and others get swept into local waterways, where they can have devastating effects on plant and animal life. … The vulcanized rubber compound that makes up the outermost layer, the tread, often contains sulfur, zinc, carbon black, bisphenol A (BPA), and other chemicals. A lot of that gets swept off the roads by rain, along with motor oil, bits of pavement, and other litter.

When particulate matter ($PM_{2.5}$ and $PM_{10}$) air quality analyses are done, tire and brake wear are typically components of the analysis. Non-exhaust emissions—particles released into the air from brake wear, tire wear, road surface wear and resuspension of road dust during on-road vehicle usage—"are currently believed to constitute the majority of primary particulate matter from road transport, 60 percent of $PM_{2.5}$ and 73 percent of $PM_{10}$."[8]

Fifth, the FEIS fails to discuss the health hazards caused during the construction process because of increased silica dust in construction areas. The impacts of increased silica dust were described in comments submitted by Byron Bloch, an auto safety expert, SDEIS, App. T.6.B.2 at C-95-C-107, but the FEIS fails to respond adequately to these important comments.

Sixth, while the FEIS acknowledges the need for barriers to reduce noise impacts, the FEIS generally fails to acknowledge the long-term health impacts of noise "leakage" at the highway entrance or exits or on other roads affected by the Preferred Alternative. The health impacts of traffic noise, including heart disease, blood pressure, brain damage, and cancer, are well recognized.[9] The FEIS focuses only on the health impacts from noise during construction and does

---

Monitoring on Air Quality, American Economic Review. 111(7): 2101-26 (Oct. 2017), *available at* https://files.webservices.illinois.edu/7199/zoueric-jmp.pdf.

[6] Beate Baensch-Baltruschat, et al., Tyre and Road Wear Particles (TRWP) - A Review of Generation, Properties, Emissions, Human Health Risk, Ecotoxicity, and Fate in the Environment, Science of The Total Environment 733 (2020).

[7] Lindsey McGinnis, A pollution solution where the rubber meets the road, The Christian Science Monitor (Nov. 9, 2020), *available at* https://www.csmonitor.com/Environment/2020/1109/A-pollution-solution-where-the-rubber-meets-the-road.

[8] Press Release: Pollution From Tyre Wear 1,000 Times Worse Than Exhaust Emissions, Emissions Analytics (Mar. 6, 2020), *available at* https://www.emissionsanalytics.com/news/pollution-tyre-wear-worse-exhaust-emissions.

[9] Babisch W, et al., Blood Pressure of 8-14 year old Children in Relation to Traffic Noise at Home--Results of the German Environmental Survey for Children (GerES IV), Sci Total Environ. 407(22):5839-43 (Nov. 1, 2009), *available at* DOI: 10.1016/j.scitotenv.2009.08.016;

00177626

Babisch W, et al., Traffic Noise and Risk of Myocardial Infarction, Epidemiology 16(1):33-40 (Jan., 2005), *available at* DOI: 10.1097/01.ede.0000147104.84424.24; Babisch W, et al., Increased Catecholamine Levels in Urine in Subjects Exposed to Road Traffic Noise: The Role of Stress Hormones in Noise Research, Environ Int. 26(7-8):475-81 (Jun. 2001), *available at* DOI: 10.1016/s0160-4120(01)00030-7; Babisch W, Road Traffic Noise and Cardiovascular Risk, Noise and Health 10:27-33 (2008), *available at* DOI: 10.4103/1463-1741.39005; Babisch W, et al., Road Traffic Noise and Hypertension--Accounting for the Location of Rooms, Environ Res.133:380-7 (Aug., 2014), *available at* DOI: 10.1016/j.envres.2014.05.007; Babisch W, Updated Exposure-Response Relationship Between Road Traffic Noise and Coronary Heart Diseases: a Meta-Analysis, Noise Health 16(68):1-9 (Jan. – Feb., 2014), *available at* DOI: 10.4103/1463-1741.127847; Birk M, et al., Road Traffic Noise: Self-Reported Noise Annoyance Versus GIS Modelled Road Traffic Noise Exposure, J Environ Monit. 13(11):3237-45 (Nov. 2011), *available at* DOI: 10.1039/c1em10347d; Bodin T, Albin M, Ardö J, Stroh E, Ostergren PO, Björk J, Road Traffic Noise and Hypertension: Results from a Cross-Sectional Public Health Survey in Southern Sweden, Environmental Health 8: 38 (2009), *available at* DOI: 10.1186/1476-069X-8-38; Cai Y, et al., Long-Term Exposure to Traffic Noise and Mortality: A Systematic Review and Meta-Analysis of Epidemiological Evidence Between 2000 and 2020, Environ Pollut. 269:116222 (Jan. 15, 2021), *available at* DOI: 10.1016/j.envpol.2020.116222; Cantuaria ML, et al., Residential Exposure to Transportation Noise in Denmark and Incidence of dementia: National Cohort Study, BMJ 8;374:n1954 (Sept. 2021), *available at* DOI: 10.1136/bmj.n1954; Cole-Hunter T, et al, Long-Term Exposure to Road Traffic Noise and All-Cause and Cause-Specific Mortality: a Danish Nurse Cohort Study, Sci Total Environ. 10;820:153057 (May, 2022), *available at* DOI: 10.1016/j.scitotenv.2022.153057; de Bont J, et al., Urban Environment and Obesity and Weight-Related Behaviours in Primary School Children, Environ Int. 155:106700 (Oct. 2021), *available at* DOI: 10.1016/j.envint.2021.106700; de Kluizenaar Y, Janssen SA, van Lenthe FJ, Miedema HM, Mackenbach JP, Long-Term Road Traffic Noise Exposure is Associated with an Increase in Morning Tiredness, Acoustical Society of America 126: 626-633 (2009), *available at* DOI: 10.1121/1.3158834; Foraster M, et al., Exposure to Road Traffic Noise and Cognitive Development in Schoolchildren in Barcelona, Spain: A Population-Based Cohort Study, PLoS Med. 19(6):e1004001 (Jun. 2, 2022), *available at* DOI: 10.1371/journal.pmed.1004001; Fuks K, et al., Long-Term urban particulate Air Pollution, Traffic Noise, and Arterial Blood Pressure, Environ Health Perspect. 119(12):1706-11 (Dec. 2011), *available at* DOI: 10.1289/ehp.1103564; Gui S-Y, et al., Traffic Noise and Adiposity: A Systematic Review and Meta-Analysis of Epidemiological Studies, Environ Sci Pollut Res Int. (Mar. 23, 2022), *available at* DOI: 10.1007/s11356-022-19056-7; Hoffmann B, et al., Air Quality, Stroke, and Coronary Events: Results of the Heinz Nixdorf Recall Study from the Ruhr Region, Dtsch Arztebl Int. 112(12):195-201 (Mar. 20, 2015), *available at* DOI: 10.3238/arztebl.2015.0195; Kaelsch H, et al., Are Air Pollution and Traffic Noise Independently Associated with Atherosclerosis: the Heinz Nixdorf Recall Study, Eur Heart J. 35(13):853-60 (Apr. 2015), *available at* DOI: 10.1093/eurheartj/eht426; Lan Y, et al., Transportation Noise Exposure and Anxiety: A Systematic Review and Meta-Analysis, Environ Res. 191:110118 (Dec. 2020), *available at* DOI: 10.1016/j.envres.2020.110118; Li A, et al., Environmental Noise Exposure and Mental Health: Evidence From a Population-Based Longitudinal Study, Am J Prev Med. S0749-3797(22)00156-8 (Apr. 21, 2022), *available at* DOI: 10.1016/j.amepre.2022.02.020; Lim Y-H, et al., Long-Term Exposure to Air Pollution, Road

00177627

Traffic Noise, and Heart Failure Incidence: The Danish Nurse Cohort, J Am Heart Assoc. 10(20):e021436 (Oct. 19, 2021), *available at* DOI: 10.1161/JAHA.121.021436; Lim Y-H, et al., Long-Term Exposure to Road Traffic Noise and Incident Myocardial Infarction: A Danish Nurse Cohort Study, Environ Epidemiol 5(3):e148 (Apr. 22, 2021) *available at* DOI: 10.1097/EE9.0000000000000148; Liu C, et al., The Associations Between Traffic-Related Air Pollution and Noise With Blood Pressure in Children: Results from the GINIplus and LISAplus studies, Int J Hyg Environ Health 217(4-5):499-505 (Apr. – May 2014), *available at* DOI: 10.1016/j.ijheh.2013.09.008; Liu S, et al., Long-Term Air Pollution and Road Traffic Noise Exposure and COPD: the danish nurse Cohort, Eur Respir J. 58(6):2004594 (Dec. 2, 2021), *available at* DOI: 10.1183/13993003.04594-2020; Liu S, et al., Long-Term Exposure to Ambient Air Pollution and Road Traffic Noise and Asthma Incidence in Adults: The Danish Nurse Cohort, Environ Int. 152:106464 (Jul. 2021), *available at* DOI: 10.1016/j.envint.2021.106464; Mac Domhnaill CM, et al.; Road Traffic Noise and Cognitive Function in Older Adults: A Cross-Sectional Investigation of The Irish Longitudinal Study on Ageing, BMC Public Health 21(1):1814 (Oct. 8, 2021), *available at* DOI: 10.1186/s12889-021-11853-y; Magnoni P, et al., Residential Exposure to Traffic-Borne Pollution as a Risk Factor for Acute Cardiocerebrovascular Events: A Population-Based Retrospective Cohort Study in a Highly Urbanized Area, Int J Epidemiol 50(4):1160-1171 (Aug. 30, 2021), *available at* DOI: 10.1093/ije/dyab068; Okazaki Y, et al., Characterizing Potential Risk Triggered by Road Traffic Noise in Comparison with Typical Air Pollutants NO$_2$ and PM$_{2.5}$, Environ Syst Decis. 41(1):147-162 (2021), *available at* DOI: 10.1007/s10669-021-09800-8; Pitchika A, et al., Long-Term Associations of Modeled and Self-Reported Measures of Exposure to Air Pollution and Noise at Residence on Prevalent Hypertension and Blood Pressure, Sci Total Environ. 593-594:337-346 (Sept. 1, 2017), *available at* DOI: 10.1016/j.scitotenv.2017.03.156; Sanok S, et al., Road Traffic Noise Impacts Sleep Continuity in Suburban Residents: Exposure-Response Quantification of Noise-Induced Awakenings from Vehicle Pass-Bys at Night, Sci Total Environ. 817:152594 (Apr. 15, 2022), *available at* DOI: 10.1016/j.scitotenv.2021.152594; Mette Sørensen, et al., Road and Railway Noise and Risk for Breast Cancer: A Nationwide Study Covering Denmark, Environ Res. 195:110739 (Apr., 2021), *available at* DOI: 10.1016/j.envres.2021.110739; Stansfeld SA, Noise Effects on Health in the Context of Air Pollution Exposure, Int J Environ Res Public Health 12(10):12735-60 (Oct. 14, 2015), *available at* DOI: 10.3390/ijerph121012735; Stansfeld S, Clark C, Health Effects of Noise Exposure in Children, Curr Environ Health Rep. 2(2):171-8 (Jun., 2015), *available at* DOI: 10.1007/s40572-015-0044-1; Stansfeld S, et al., Road Traffic Noise, Noise sensitivity, Noise Annoyance, Psychological and Physical Health and Mortality, Environ Health 20(1):32 (Mar. 25, 2021), *available at* DOI: 10.1186/s12940-021-00720-3; Tangermann L, et al., The Association of Road Traffic Noise with Problem Behaviour in Adolescents: A Cohort Study, Environ Res. 207:112645 (May 1, 2022), *available at* DOI: 10.1016/j.envres.2021.112645; Thacher JD, et al., Long-Term Exposure to Transportation Noise and Risk for Type 2 Diabetes in a Nationwide Cohort Study from Denmark, Environ Health Perspect 129(12):127003 (Dec., 2021), *available at* DOI: 10.1289/EHP9146; Tiesler CMT, et al., Exposure to Road Traffic Noise and Children's Behavioural Problems and Sleep Disturbance: Results from the GINIplus and LISAplus Studies, Environ Res. 123:1-8 (May, 2013), *available at* DOI: 10.1016/j.envres.2013.01.009; van Kempen E, et al., The Quantitative Relationship Between Road Traffic Noise and Hypertension: A Meta-Analysis, J Hypertens 30(6):1075-86 (Jun., 2012), *available at* DOI:

00177628

not fully address the health impacts from the anticipated long-term increases in noise under the Preferred Alternative or meaningfully consider the literature describing adverse health impacts from noise.

Seventh, the FEIS acknowledges that the Preferred Alternative will remove many acres of green space and trees along the route, see e.g., FEIS at 5-97, 5-107-5-108, 5-180, but fails to discuss the adverse impacts of a decrease in green space like health-related decreases in quality of life.[10]

Eighth, as discussed in Dr. Bialek's comments on the FEIS, the soil near the roadways contains lead deposited during the decades when motor vehicles used leaded gasoline. The DEIS explains that the companies implementing the Preferred Alternative must test the soil and mitigate lead hazards. See DEIS at R-30. However, the FEIS does not discuss any soil sampling or the extent of proposed testing and mitigation, how much that mitigation might cost, or how it will be performed, nor when or how the health impacts from activities disturbing lead-contaminated soil will be mitigated. There is no indication that that any final approval of the Preferred Alternative

---

10.1097/HJH.0b013e328352ac54; van Kempen EE, Kruize H, Boshuizen HC, Ameling CB, Staatsen BA, de Hollander AE, The Association Between Noise Exposure and Blood Pressure and Ischemic Heart Disease: A Meta-Analysis, Environmental Health Perspectives 110: 307-317 (2002), *available at* DOI: 10.1289/ehp.02110307; Voss S, et al., ENVINT-D-20-01309: Long-Term Exposure to Air Pollution, Road Traffic Noise, Residential Greenness, and Prevalent and Incident Metabolic Syndrome: Results from the Population-Based KORA F4/FF4 Cohort in Augsburg, Germany, Environ Int. 147:106364 (Feb., 2021), *available at* DOI: 10.1016/j.envint.2020.106364; Wang T-C, et al., Association Between Exposure to Road Traffic Noise and Hearing ImpAirment: A Case-Control Study, J Environ Health Sci Eng. 19(2):1483-1489 (Jul. 20, 2021), *available at* DOI: 10.1007/s40201-021-00704-y; Weyde KV, et al., A Longitudinal Study of Road Traffic Noise and Body Mass Index Trajectories from Birth to 8 Years, Epidemiology 29(5):729-738 (Sept. 2018), *available at* DOI: 10.1097/EDE.0000000000000868; WHO (World Health Organization), Guidelines for Community Noise (1999), *available at* www.who.int/docstore/peh/Noise/guidelines2.html; Yli-Tuomi T, et al., Exposure-Response Functions for the Effects of Traffic Noise on Self-Reported Annoyance and Sleep Disturbance in Finland: Effect of Exposure Estimation Method, Int J Environ Res Public Health 19(3):1314 (Jan. 25, 2022), *available at* DOI:10.3390/ijerph19031314.

[10] Alizadeh G, et al., Social, Economic, Technological, and Environmental Factors Affecting Cardiovascular Diseases: A Systematic Review and Thematic Analysis, Int J Prev Med. 13:78 (April 2022), *available at* https://www.ijpvmjournal.net/article.asp?issn=2008-7802;year=2022;volume=13;issue=1;spage=78;epage=78;aulast=Alizadeh;type=0; Moitra S, et al., Roles of the Physical Environment in Health-Related Quality of Life in Patients with Chronic Obstructive Pulmonary Disease, Environ Res. 203:111828 (Jan. 2022), *available at* DOI: 10.1016/j.envres.2021.111828; Bereziartua A, et al., Exposure to Surrounding Greenness and Natural-Cause and Cause-Specific Mortality in the ELAPSE Pooled Cohort, Environ Int. 11:166:107341 (June 2022), *available at* DOI: 10.1016/j.envint.2022.107341.

00177629

will be conditioned on a binding obligation on the part of the companies to mitigate this serious impact.

Ninth, the FEIS does not address impacts from platinum and other palladium group substances that are emitted by catalytic converters as air emissions and contaminate soil and water through air deposition. In fact, the FEIS does not even mention the health impacts from these toxic substances, even though recent studies have characterized these impacts.[11]

Thank you for allowing me to submit this letter as part of your Chapter's review of the FEIS document.

Sincerely,

Roselie Ann Bright, Sc.D., M.S.

---

[11] Khaiwal Ravindra, et al., Platinum Group Elements in the Environment and Their Health Risk, Sci Total Environ 318(1-3):1-43 (Jan. 5, 2004), DOI: 10.1016/S0048-9697(03)00372-3; Wiseman, CLS et al., Platinum Group Element and Cerium Concentrations in Roadside Environments in Toronto, Canada, Chemosphere, 145:61-7 (Feb. 2016), DOI: 10.1016/j.chemosphere.2015.11.056; Savignan L, et al., Platinum Group Elements Contamination in Soils: Review of the Current State, Chemosphere 271:129517 (2021 May), DOI: 10.1016/j.chemosphere.2020.129517.

00177630

**CURRICULUM VITAE**      **Roselie Ann Bright, Sc.D., M.S.**      July 11, 2022

roseliemail@gmail.com
(301) 807-6414
US citizen
ORCID 0000-0002-7565-1284
Web of Science ResearcherID D-2240-2016
https://www.linkedin.com/in/roselie-bright-2217aa36
https://www.researchgate.net/profile/Roselie_Bright

## PERMANENT POSITIONS

8/2015-12/2021    **Epidemiologist 15** (as of 9/30/2018), **Epidemiologist 14** (10/2017 – 9/2018) and **Project Manager 14** (8/2015 – 10/2017), Office of Health Informatics, Office of the Chief Scientist (OCS), Office of the Commissioner (OC), then realigned 9/2021 to Office of Data Analytics & Research, Office of Digital Transformation, OC, Food and Drug Administration (FDA), Silver Spring, MD.

Led "Shakespeare", a project that investigated my original idea: whether modern big data-type (meaning-free) text mining methods might be useful for real time surveillance of the notes in electronic health records to detect deaths and serious adverse events related to FDA-regulated products. We published our demonstration that our new, original method finds potential adverse events in clinical notes even if the writer did not attribute the event to a possible cause. If adopted, this technique could fill the gaps left by other projects that are using machine learning and natural language processing to derive standard codes from text notes: only known entities can be coded, and the coding rules are taking many years to develop.  The project won training and coaching for innovations in the HHS IDEA Lab Ignite competitive cycle of 2015/2016. The tool could be used to monitor the impacts of FDA-regulated products on people's health, monitor the consequences of medical countermeasure administration during emergencies, and also detect events of interest to other agencies and entities (CDC [infections], EPA [environmental hazards], FBI [criminal activity], AHRQ [patient safety threats], state and local agencies, and private healthcare businesses.

Represented FDA on the cross-federal Health IT Research & Development group (HITRD).  I made major contributions to the HITRD Strategic Framework that was published on 5/30/2017 in the Federal Register and on the Networking and Information Technology Research and Development site in 2020.

4/2014-8/2015    **Project Manager 14**, Office of Informatics and Technology Innovation (OITI), Office of Information Management and Technology, Office of Operations (OO), OC, FDA, Silver Spring, MD.

Supported the health IT and IT governance aspects of the responsibilities of the FDA Chief Health Informatics Officer, who was also the Director of OITI.

1/2013-4/2014    **Project Manager 14**, Program Management Office (PMO), OITI, OC then OIM, OO), FDA, Silver Spring, MD.

12/2011-1/2013    **Project Manager 14**, Informatics Governance Staff, Office of the Chief Scientist, then realigned to Office of Operations, FDA, Silver Spring, MD.

9/2010 – 12/2011    **Program Manager 14**, realigned to Office of the Chief Scientist, OC, FDA, Rockville, MD.

4/2008 – 9/2010    **Program Manager 14**, Bioinformatics Board Staff, Office of Administration, OC, then Office of Operations, then Office of Scientific and Medical Programs, Office of the Commissioner, FDA, Rockville, MD.  Temporary promotion to grade 15 (3/2009 – 7/2009).

10/2006 – 4/2008    **Supervisory Interdisciplinary Scientist 14, Chief**, Surveillance and Data Analysis Branch, Division of Compliance Risk Management and Surveillance, Office of Compliance, Center for Drug Evaluation and Research (CDER), Food and Drug Administration (FDA), Rockville, MD.

7/1990 – 10/2006    **Mathematical Statistician 14** (11/1995 – 10/2006), **Mathematical Statistician 13** (11/1991 - 11/1995), and **Health Statistician 13** (7/1990 - 11/1991), Epidemiology Branch, Center for Devices and Radiological Health (CDRH), FDA, Rockville, MD. Division of Postmarket Surveillance (8/1994 -) or Division of Biometric Sciences (7/1990 - 8/1994), Office of Surveillance and Biometrics (7/1993 -) or Office of Science and Technology (7/1990 - 7/1993).
Promoted from grade 13 to 14 in 1996 as the official FDA expert in "case control" methodology for epidemiologic studies of non-radiological medical devices. Provided epidemiologic expertise to regulatory questions and conducted research on medical devices.

6/1984 - 6/1990    **Instructor** (3/1986 - 6/1990) and **Research Associate** (6/1984 - 2/1986), Department of Social Medicine, Harvard Medical School, and **Research Associate** (7/1989 - 6/1990), Department of Gerontology, Beth Israel Hospital, Boston, MA.  .  Supervisor was Jerry Avorn, MD, Harvard Medical School, Boston, MA, 02115, 617-732-1005.  Worked full time 11/1985-6/1989 and half-time 6/1984-10/1985 and 7/1989-6/1990.
Epidemiologist in a team with physicians and programmers to develop raw Medicaid claims data into an epidemiologic database.  Provided epidemiologic expertise and translated decisions made by investigative group into terms that the programmers could understand and implement.  Wrote methods sections of two successful major funding proposals.  Supervised a programmer and epidemiology assistant.

00177632

## AFFILIATIONS

| | |
|---|---|
| 2016 - 2021 | FDA representative, Health Information Technology Research and Development Interagency Working Group, cross-Federal and coordinated by National Science Foundation.  It is part of the Networking and Information Technology Research and Development Subcommittee of the National Science and Technology Council, led by the Director of the White House Office of Science and Technology Policy. |
| 2014 - 2021 | Editorial Consultant, many medical and epidemiology journals |
| 2016 – 2019 | Consultant, DHHS Innovation Lab, Washington, DC |
| 2012 - 2013 | Quality and Safety of Healthcare - Adverse Event Reporting Workgroup, HHS |
| 2004 | Methods Advisory Panel for the Institute of Medicine Committee on Postmarket Surveillance of Pediatric Medical Devices, National Academy of Sciences, Washington, DC |
| 2003 - 2004 | FDA representative, National Health Surveillance Network, DHHS |
| 2003 | Expert Panel Meeting on Health Information Technology, Agency for Healthcare Research and Quality (AHRQ) |
| 2000 – 2002 | Guest Editor, Proceedings of the Conference on Epidemiology of Medical Devices in Women, *Epidemiology* Supplement |
| 2000 - 2002 | FDA group advising the liaison to the Center for Education and Research Therapeutics Program administered by AHRQ |
| 1998 | Reviewer, Epidemiology of Medical Devices, an online "supercourse" |
| 1992 | Epidemiologist in ad hoc support of the Working Party on Exposure Guidelines for Chemical Mixtures, Federal Coordinating Committee for Science, Engineering, and Technology, U.S. Government |
| 1990 - 1992 | Rural Health Data Task Force, Public Health Service |

## HONORS, EXTERNAL TO FDA

00177633

2008 Commended Award for the book, *Medical Device Epidemiology and Surveillance*, British Medical Association, United Kingdom

2003 Department of Health and Human Services (DHHS) Secretary's Award for Distinguished Service for leadership, teamwork and dedication in coordinating the integration of existing HHS Programs and systems to collect data on patient safety

2001 DHHS Secretary's Award for Distinguished Service as a member of the DHHS QuIC Patient Safety Report Team, for outstanding dedication, diplomacy, and diligence in developing the "QuIC Errors Report: Doing What Counts for Patient Safety"

## DEGREES

| 1/1979-3/1986 | Doctor of Science (Epidemiology), **Harvard School of Public Health** (currently Harvard TH Chan School of Public Health), Boston, MA, 65 semester hours |
| 9/1977-1/1979 | Master of Science (Food Science), **Cornell University**, Ithaca, NY, approximately 48 semester hours |
| 9/1973-6/1977 | Bachelor of Science (Life Science: Applied Biology), **Massachusetts Institute of Technology**, Cambridge, MA, approximately 160 semester hours |

## PUBLICATIONS AND PRESENTATIONS

### ORIGINAL TECHNICAL REPORTS

BRIGHT RA, Bright-Ponte, SJ, Palmer LAM, Rankin SK, Blok SV. Use of diagnosis codes to find blood transfusion adverse events in electronic health records. *JPS* 2022 Feb 21. DOI: 10.1097/PTS.0000000000000946.

BRIGHT RA, Rankin SK, Dowdy K, Blok SV, Bright, SJ, Palmer LAM. Finding Potential Adverse Events in the Unstructured Text of Electronic Healthcare Records: Development of the Shakespeare Method. *JMIRx Med*. 2021 Aug 11; 2(3):e27017. DOI:10.2196/27017.

BRIGHT RA, Dowdy K, Rankin SK, Blok S, Palmer LA, Bright-Ponte SJ. New and Increasing Rates of Adverse Events Can be Found in Unstructured Text in Electronic Health Records using the Shakespeare Method. *medRxiv* 2021.01.12.21249674. DOI: 10.1101/2021.01.12.21249674.

BRIGHT RA, Rankin SK, Dowdy K, Blok S, Bright-Ponte, SJ, Palmer LA. Potential Blood

00177634

Transfusion Adverse Events Can be Found in Unstructured Text in Electronic Health Records using the 'Shakespeare Method'. *medRxiv* 2021.01.05.21249239. DOI: 10.1101/2021.01.05.21249239.

BRIGHT RA, Bright-Ponte, SJ, Palmer LA, Rankin, SK, Blok S. Use of Diagnosis Codes to Find Blood Transfusion Adverse Events in Electronic Health Records. *medRxiv* 2020.12.30.20218610. DOI: 10.1101/2020.12.30.20218610.

Rankin SK, BRIGHT RA, Dowdy K. Bloatectomy (version v0.0.12). *Zenodo*. 2020, June 26. DOI: 10.5281/zenodo.3909030.

Mallory EK, de Rochemonteix M, Ratner A, Acharya A, Re C, BRIGHT R, Altman R. Extracting chemical reactions from text using Snorkel. *BMC Bioinformatics*. 2020 May 27;21(1):217. DOI: 10.1186/s12859-020-03542-1.

Mallory EK, Acharya A, Rensi SE, Turnbaugh P, BRIGHT RA, Altman RB. Chemical reaction vector embeddings: Towards predicting drug metabolism in the human gut microbiome. *Proc Pacific Symposium on Biocomputing 2018*. 2018. https://doi.org/10.1142/9789813235533_0006. Kass-Hout TA, Xu Z, Mohebbi M, Nelsen H, Baker A, Levine J, Johanson E, BRIGHT RA. OpenFDA: an innovative platform providing access to a wealth of FDA's publicly available data. *JAMIA* 2015 Dec 7. Pii: 0cv153. DOI: 10.1093/jamia/ocv153.

Duggirala HC, Tonning JM, Smith E, BRIGHT RA, Baker JD, Ball R, Bell C, Bouri K, Bright-Ponte SJ, Botsis T, Boyer M, Burkhart K, Condrey GS, Chen JJ, Chirtel S, Filice RW, Francis H, Jiang H, Levine J, Martin D, Oladipo T, O'Neill R, Palmer LAM, Paredes A, Rochester G, Sholtes D, Wong H-L, Xu Z, Szarfman A, Kass-Hout T. Use of data mining at the FDA. *JAMIA* 2015 Jul 23. Pii:ocv063. DOI: 10.1093/jamia/ocv063.

Zhan C, Kaczmarek R, Loyo-Berrios N, BRIGHT RA. Incidence and short-term outcomes of primary and revision hip replacement procedures in the United States: a 2003 nationwide claims-based analysis. *J Bone Joint Surg Am* 2007; 89(3):526-533.

Brown SL, BRIGHT RA, Dwyer DE, Foxman B. Breast pump adverse events: reports to the Food and Drug Administration. *J Hum Lact* 2005; 21(2):169-174.

Samore MH, Evans RS, Lassen A, Gould P, Lloyd J, Gardner RM, Abouzelof R, Taylor, C, Woodbury DA, Willy M, BRIGHT RA. Surveillance of medical device-related hazards and adverse events in hospitalized patients. *JAMA* 2004; 291:325-34.

BRIGHT RA, Nelson RC. Automated support for pharmacovigilance: a proposed system. *Pharmacoepidemiol and Drug Safety*. 2002; 11(2):121-125.

Barton MB, Moore S, Shtatland E, BRIGHT RA. The relation of household income to mammography utilization in a prepaid health care system. *J Gen Intern Med* 2001;16(3):200-3.

00177635

BRIGHT RA, Torrence ME, Daley WR, McClellan W.  Preliminary study of the occurrence of anaphylactoid reactions during hemodialysis (letter).  *Nephrol Dial Transplant* 1999;14:799-800.

Silverman, BG, Brown SL, BRIGHT RA, Kaczmarek RG, Arrowsmith-Lowe J, Kessler D.  An epidemiologic review of reported complications of silicone gel breast implants.  *Ann Intern Med* 1996; 124:744-756.

Ross-Degnan D, Soumerai SB, Avorn J, Bohn RL, BRIGHT R, Aledort LM.  Hemophilia home treatment: economic analysis and implications for policy making.  *Int J Technol Assessment Hlth Care* 1995; 11(2):327-344. DOI: 10.1017/S0266462300006930.

Moore RM, BRIGHT RA, Jeng LL, Sharkness CM, Hamburger SE, Hamilton P.  The prevalence of internal orthopedic fixation devices in children in the United States, 1988.  *Am J Public Health* 1993; 83:1028-1030.

BRIGHT RA, Moore RM, Jeng LL, Sharkness CM, Hamburger SE, Hamilton PM.  The prevalence of tympanostomy tubes in children in the United States, 1988.  *AJPH* 1993; 83:1026-1028.

BRIGHT RA, Jeng LL, Moore RM.  National survey of self-reported breast implants: 1988 estimates.  *J Long Term Effects of Med Implants*.  1993; 3(1):81-89.

Kaczmarek RG, Moore RM, BRIGHT RA.  The relationship of maternal race and insurance status to prenatal ultrasound use in a national population.  *Md Med J* 1992; 41(2):139-143.

BRIGHT RA, Everitt DE.  Beta-blockers and depression: evidence against an association.  *JAMA* 1992; 267:1783-1787.

Sharkness CM, Hamburger S, Kaczmarek R, Hamilton PM, BRIGHT RA, Moore RM Jr.  Racial differences in the prevalence of intraocular lens implants in the United States.  *Am J Ophthalmol* 1992; 114:667-674.

Jeng LL, Moore RM, Kaczmarek RG, Placek PJ, BRIGHT RA.  How frequently are home pregnancy tests used?  Results from the 1988 National Maternal and Infant Health Survey.  *Birth* 1991; 18(1):11-13.

BRIGHT RA, Morrison AS, Brisson J, Burstein NA, Sadowsky NS, Kopans DB, Meyer JE.  Histologic and mammographic specificity of risk factors for benign breast disease.  *Cancer* 1989; 64:653-657.

BRIGHT RA, Morrison AS, Brisson J, Burstein NA, Sadowsky NS, Kopans DB, Meyer JE.  Relationship between mammographic and histologic features of breast tissue in women with benign biopsies.  *Cancer* 1988; 61:266-271.

00177636

BRIGHT RA, Potter NN.  Acceptability and properties of carbonated apple juice.  *Food Prod Dev* 1979; 13(4):34-37.

## PATENT

Hsieh D S-T, BRIGHT RA, Rha C.  Method of making soybean beverages.  US Patent 4,119,733; October 10, 1978.  Canada Patent 1,083,879; 1980.

## SOFTWARE

BRIGHT RA. Definitions of terms in MIMIC III notes:
- https://github.com/MIT-LCP/Shakespeare-Method
- https://github.com/MIT-LCP/Shakespeare-Method/blob/main/ Definitions_of_some_terms_in_MIMIC_text_notes_Bright_20210913.csv
- https://github.com/MIT-LCP/Shakespeare-Method/blob/main/ Definitions_of_some_terms_in_MIMIC_text_notes_Bright_20210913.xlsx

Rankin SK, Dowdy K, BRIGHT RA. MIT-LCP/Shakespeare-Method: Macbeth (Version v0.3). Zenodo 2021 May 26. DOI:10.5281/zenodo.4811611.

Rankin SK, BRIGHT R, Dowdy K. Bloatectomy (Version v0.0.12). Zenodo. 2020 June 26. DOI:10.5281/zenodo.3909030.

Kass-Hout T, Levine J, BRIGHT R, Xu Z.  Device Classification Browser.  *openFDA*.  https:// openfda.shinyapps.io/deviceclassview/; 2016.

Kass-Hout T, Levine J, BRIGHT R, Xu Z.  Drug Adverse Event Report Browser.  *openFDA*. https://openfda.shinyapps.io/reportview/; 2016.

Kass-Hout T, Levine J, BRIGHT R, Xu Z.  RR-Drug.  *openFDA*.  https://openfda.shinyapps.io/ RR_D/; 2015.

## OTHER ARTICLES

BRIGHT RA, Rankin SK. New tools: Processing electronic healthcare notes and using them to find them to find new and increasing potential adverse events, even if unattributed. Expert Highlight, PrecisionFDA, Food and Drug Administration. 2022 Feb 15. https://precision.fda.gov/experts/17/ blog.

00177637

BRIGHT RA, Rankin SK, Dowdy K, Blok SV, Bright SJ, Palmer LAM. Authors' response to peer reviews of "Finding potential adverse events in the unstructured text of electronic health care records: Development of the Shakespeare method". *JMIRx Med* 2021;2(3):e31568. ttps://med.jmirx.org/2021/3/e31568/. DOI: 10.2196/31568.

Networking and Information Technology Research and Development (NITRD) Health Information Technology Research and Development (HITRD) Interagency Working Group (IWG).  The interoperability of medical devices, data, and platforms to enhance patient care: A summary of the February 2019 Request for Information and July 2019 Listening Session. *NITRD*. https://www.nitrd.gov/pubs/Medical-Interoperability-2020.pdf. 2020 March.

Networking and Information Technology Research and Development (NITRD) Health Information Technology Research and Development (HITRD) Interagency Working Group (IWG). Federal health information technology research and development strategic framework. *NITRD*. https://www.nitrd.gov/pubs/Federal-Health-IT-Strategic-Framework-2020.pdf. 2020 March.

Networking and Information Technology Research and Development (NITRD) Health Information Technology Research and Development (HITRD) Interagency Working Group [Dr. BRIGHT is a member and contributor].  Federal Health Information Technology Research and Development Strategic Framework, Draft for Public Comment. *Federal Register* 2017; 82(102): 24740-2. *NITRD*.  https://www.nitrd.gov/drafts/HITRD_StrategicFramework_Draft.pdf. 2017 May.

Kass-Hout TA, BRIGHT RA, Ferriter A. openFDA makes medical device-related data easier to access and use. *FDA Voice*. http://blogs.fda.gov/fdavoice/index.php/2015/09/openfda-makes-medical-device-related-data-easier-to-access-and-use/; 2015.

Kass-Hout TA, BRIGHT RA, Ferriter A. openFDA unveils cache of medical device data. *openFDA*. https://open.fda.gov/update/openfda-unveils-cache-of-medical-device-data/; 2015.

openFDA Team.  Mark your calendars: a new release coming soon from openFDA. *openFDA*. https://open.fda.gov/update/new-release-coming-soon/; 2015.

Kass-Hout T, BRIGHT R, Baker A. Notes on the architecture, design, and data processes in openFDA. *openFDA*. https://open.fda.gov/static/docs/openFDA-technologies.pdf; 2015.

Levine J, BRIGHT RA, Johanson E, Kass-Hout TA, Xu, Z.  A step-by-step example of analysis of openFDA drug report data.  *openFDA*.  https://open.fda.gov/static/docs/openFDA-analysis-example.pdf; 2015.

Jha AK, Prasopa-Plaizier N, Larizgoitia I, Bates DW (BRIGHT RA listed as a contributor).  Patient safety research: an overview of the global evidence. *Qual Saf Health Care* 2010; 19:42-47. DOI: 10.1136/qshc.2008.029165.

00177638

BRIGHT RA, Fahlgren B.  Adverse events and injuries due to medical devices.  IN: The Research Priority Setting Working Group of the World Alliance for Patient Safety.  *Summary of the Evidence on Patient Safety: Implications for Research*. World Health Organization, Geneva, Switzerland, 2008: 16-19. http://www.who.int/patientsafety/information_centre/ 20080523_Summary_of_the_evidence_on_patient_safety.pdf.

BRIGHT RA, Duggirala HC.  The interface between drugs and devices (chapter).  IN: Hartzema A, Tilson H, Chan KA, eds.  *Pharmacoepidemiology and Therapeutic Risk Management*, 4th edition.  Harvey Whitney Books, 2008:951-964.

BRIGHT RA.  Strategy for surveillance of adverse drug events.  *Food Drug Law J* 2007; 62(3):605-615.

BRIGHT RA, Brown SL.  Medical device epidemiology.  IN: Brown SL, BRIGHT RA, Tavris DR, eds.  *Medical Device Epidemiology and Surveillance*.  John Wiley & Sons, Ltd., 2007:21-42.  Chapter has 8 Google Scholar citations.

BRIGHT RA.  Surveillance of adverse medical device events.  IN: Brown SL, BRIGHT RA, Tavris DR, eds.  *Medical Device Epidemiology and Surveillance*.  John Wiley & Sons, Ltd., 2007:43-61.

BRIGHT RA.  Surveillance and epidemiology as tools for evaluating the materials used in medical devices.  IN: Brown SL, BRIGHT RA, Tavris DR, eds.  *Medical Device Epidemiology and Surveillance*.  John Wiley & Sons, Ltd., 2007:63-77.

BRIGHT RA, Flack MN, Gardner SN.  The Medical Product Surveillance Network (MedSun).  IN: Brown SL, BRIGHT RA, Tavris DR, eds.  *Medical Device Epidemiology and Surveillance*.  John Wiley & Sons, Ltd., 2007:273-290.

Lee D, Majumdar SR, Lipton HL, Soumerai SB, Hennessy S, Davis RL, Chen RT, BRIGHT RA, Mitchell AA, Graham DJ, Bates DW, Strom BL.  Special applications of pharmacoepidemiology.  IN: Strom B, Kimmel S, eds. *Textbook of Pharmacoepidemiology*.  John Wiley and Sons, Ltd., 2007: 399-445.

Appendix B -- Epidemiologic aspects of postmarket medical device safety.  IN: Ensuring the safety of marketed medical devices:  CDRH's medical device postmarket safety framework.  January 18, 2006.  Was available at http://www.fda.gov/cdrh/postmarket/mdpi-report.pdf.

Appendix E -- Capability analysis of surveillance programs internal and external to CDRH with respect to surveillance goals.  IN: Ensuring the safety of marketed medical devices:  CDRH's medical device postmarket safety framework.  January 18, 2006.  Was available at http:// www.fda.gov/cdrh/postmarket/mdpi-report.pdf.

Shatin D, BRIGHT R, Astor BC.  Databases for studying the epidemiology of implanted medical

00177639

devices (chapter).  IN: Johnson FE, Virgo KS, eds.  *The Bionic Human: Health Promotion for People with Implanted Prosthetic Devices*.  Humana Press, Totowa NJ, 2005:115-132.

BRIGHT RA.  Pharmacoepidemiology studies of devices (chapter).  IN:  Strom BL, ed.  *Pharmacoepidemiology*, 4th ed, John Wiley & Sons, Ltd.  2005:487-500.

Brown SL, BRIGHT RA, Tavris DR.  Medical device epidemiology and surveillance: patient safety is the bottom line. *Expert Rev Med Devices* 2004; 1:1-2. DOI: 10.1586/17434440.1.1.1.

BRIGHT RA.  The Conference on the Epidemiology of Medical Devices in Women (editorial).  *Epidemiology* 2002; 13:S1-S9.

BRIGHT RA. What is FDA doing about medical errors and adverse events related to medical devices? *Pharmacoepidemiol and Drug Safety* 2000; 9:437-440.

BRIGHT RA, Crowley J, Flack M, Gross T, Kaye R, Sawyer C, and Spitzig P. Additional Statement. National Summit on Medical Errors and Patient Safety Research. September 2000. https://archive.ahrq.gov/quic/summit/abright.htm.

Quality Interagency Coordination Task Force (BRIGHT RA listed as a contributor).  Doing what counts for patient safety: federal actions to reduce medical errors and their impact. Agency for Healthcare Research and Quality Archive.  February 2000. http://archive.ahrq.gov/quic/report/fullreport.htm.

BRIGHT RA.  Special methodological issues in pharmacoepidemiology studies of devices (chapter).  FOR: Strom BL, ed.  *Pharmacoepidemiology*, 3rd ed., John Wiley & Sons, Ltd.  2000:733-747.

Houn F, BRIGHT RA, Bushar HF, Croft BY, Finder CA, Gohagan JK, Jennings RJ, Keegan P, Kessler LG, Kramer BS, Martynec LO, Robinowitz M, Sacks WM, Schultz DG, Wagner RF.  Study design in the evaluation of breast cancer imaging technologies.  *Academic Radiol* 2000; 7:684-692.

BRIGHT RA.  Dialysis therapy (letter).  *N Engl J Med* 1998 Oct 1;339(14):1004-5.

Silverman BG, Brown SL, BRIGHT RA.  Epidemiology of silicone breast implants (response to letter).  *Ann Intern Med* 1997; 126(8):667-8.

BRIGHT RA, Moore RM.  Estimating the prevalence of women with breast implants (letter). *AJPH* 1995; 85:1122-1124.

BRIGHT RA.  The Epidemiology Branch in the Division of Postmarket Surveillance.  *OSB Monitor* 1995(3):1,9.

00177640

BRIGHT RA.  Hyperplasia and breast cancer [comment].  *Cancer Causes Control* 1993; 4: 289.

BRIGHT RA.  The CDRH epidemiologist: a rare breed.  *On Center* 1992, November: 4-5.

BRIGHT RA, Avorn J, Everitt DE.  Medicaid data as a resource for epidemiologic studies: strengths and limitations.  *J Clin Epidemiol* 1989; 42: 937-945.

## PRESENTATIONS AT SCIENTIFIC MEETINGS

BRIGHT RA. Topic Analysis is Like a Box of Chocolates: You Never Know What You Are Going to Get (talk). IN: Topics Drinking from the Data Firehose Session. 8th Annual Scientific Computing Days (SCD). FDA. Sep 29, 2020.

BRIGHT RA, Rankin S. Bloat-Ectomy: A Method for the Identification and Removal of Duplicate Text in the Bloated Notes of Electronic Health Records and Other Documents (poster). 2019 Scientific Computing Days Symposium. FDA. September 9-10, 2019.

BRIGHT R, Bright-Ponte S, Palmer LA, Blok S, Crane E. Demonstration of ngram frequency and cluster method for identifying signals of transfusion reactions (TR). International Society for Pharmacoeconomics and Outcomes Research, Baltimore, MD, May 21, 2018.

Phipps J, Mikhalchuk A, Johanson E, BRIGHT R, Bandler R, Griffin A, Hall L, Houle L. Healthy Citizen @ FDA: working to enhance public health through citizen-centric communication (accepted poster). FDA Science Forum, June 1, 2017.

Mallory E, Acharya A, BRIGHT R, Altman R.  Synthesizing scientific knowledge to uncover the connection between drugs and the human gut microbiome (accepted poster). FDA Science Forum, May 31, 2017.

BRIGHT RA.  IT and informatics innovation at FDA (invited talk).  Fourteenth Annual Bio-IT World Conference and Expo '15, Boston, MA, April 23, 2015.

BRIGHT RA.  Office of Informatics and Technology Innovation: A New Office in FDA (invited talk).  Federal Health Community, Healthcare Information and Management Systems Society, USA, May 22, 2014.

BRIGHT RA.  Approaching ideal surveillance (invited talk).  24th International Conference of the International Society for Quality in Health Care, Boston, MA, October 3, 2007.

BRIGHT RA.  Pharmacoepidemiologic studies of devices and post-marketing surveillance, or, "How frequent are adverse medical device events?", 3er Encuentro Internacional de Farmacovigilancia (Third Pharmacovigilance International Meeting), Bogota, Colombia, September

00177641

26, 2006.

BRIGHT RA.  Quantifying the threat to public health posed by adverse medical device events (invited talk).  World Congress of Epidemiology, Seattle, WA, June 23, 2006.

BRIGHT RA.  Introduction to session, "Frequency of adverse medical device events: impact on patient safety and role of HIT" (host talk).  AHRQ's Annual Patient Safety and Health Information Technology Conference, Washington, DC, June 5, 2006.

BRIGHT RA.  Literature on the frequency of adverse medical device events in hospital settings (submitted talk).  AHRQ's Annual Patient Safety and Health Information Technology Conference, Washington, DC, June 5, 2006.

BRIGHT RA, Shen J.  Using HCUPNet to estimate the frequency of adverse medical device events (submitted talk).  AHRQ's Annual Patient Safety and Health Information Technology Conference, Washington, DC, June 5, 2006.

BRIGHT RA.  Frontiers in surveillance of medical devices (invited talk).  FDA Science Forum, Washington, DC.  April 19, 2006.

BRIGHT RA, Shen JC.  Use of a free, publicly-accessible data source to estimate hospitalizations related to adverse medical device events (poster).  FDA Science Forum, Washington, DC.  April 18-20, 2006.  World Congress of Epidemiology, Seattle, WA, June 23, 2006.

Alderson N, Babu US, Chu P, Crone T, Elkins C, Fahmy RM, Gobburu JV, Johannessen J, Kavanaugh C, Kumar S, Major M, Manjanatha M, BRIGHT RA, Trinh H, Torosian SD, Uppoor RS, Woods T.  Committee for the Advancement of FDA Science (CAFDAS): The FDA scientist's liaison to the Commissioner's Office (poster).  FDA Science Forum, Washington, DC.  April 18-20, 2006.

BRIGHT RA, Mermel L, Richards C, Yoder D.  Mechanical and allergic adverse events related to central vascular catheters: epidemiology in the Medicare hospitalized surgical population, 2002 (poster).  International Conference on Pharmacoepidemiology, Bordeaux, France, August 2004.

BRIGHT RA. Panel discussion before the Committee on Postmarket Surveillance of Pediatric Medical Devices, Institute of Medicine, Washington DC, June 24, 2004.

BRIGHT RA, Anderson S, Frost T, Wiessner P, Orme J, Clemmer T, Evans RS, Williamson J, Samore MH.  Medical device problems in intensive care units: recognizing, recording, and resolving.  Second Annual Conference for MedSun Representatives, Annapolis, MD, October 8, 2003.

00177642

Hefflin BJ and BRIGHT RA.  Injuries Associated with Medical Devices: Pilot Study and Surveillance (Invited talk).  All Injury NEISS Program Fall Meeting, Bethesda, MD, September 25, 2003.

BRIGHT RA, Dwyer DE.  Retained menstrual tampons: hazards and epidemiology  (Submitted abstract).  International Society for Technology Assessment in Health Care 19th Annual Meeting, Canmore, Canada, June 23, 2003.  International Conference on Pharmacoepidemiology, Philadelphia, PA, August 24, 2003.

Hefflin BJ, BRIGHT RA.  NEISS medical device case collection (invited talk).  NEISS Hospital Coordinator Meeting, Bethesda, MD, July 31, 2003.

BRIGHT RA, Kaye R, Samore MH.  Patient safety research: a discussion of terminology, proposed definitions, and a conceptual model for adverse events involving medical devices (Submitted abstract).   International Society for Pharmacoeconomics and Outcomes Research, Arlington, VA, May 20, 2003.  International Society for Technology Assessment in Health Care 19th Annual Meeting, Canmore, Canada, June 24, 2003.

BRIGHT R, Anderson S, Frost T, Wiessner P, Orme J, Clemmer T, Evans RS, Samore MH.  Directly-observed frequency of medical device-related problems in intensive care units (Submitted abstract).  International Society for Technology Assessment in Health Care 19th Annual Meeting, Canmore, Canada, June 23, 2003.

Samore MH, Anderson S, Frost T, Wiessner P, Orme J, Clemmer T, Evans RS, BRIGHT RA.  Direct observation in intensive care units: medical device-related problems associated with alarms (Submitted abstract).  International Society for Pharmacoeconomics and Outcomes Research, Arlington, VA, May 19, 2003.

BRIGHT RA, Anderson S, Frost T, Wiessner P, Orme J, Clemmer T, Evans RS, Samore MH.  Medical device problems in intensive care units: detection, dangers, and diversity of types (Submitted abstract).  Society for Healthcare Epidemiology of America Final Program, Arlington, VA, April 7, 2003.  International Society for Pharmacoeconomics and Outcomes Research, Arlington, VA, May 19, 2003.  International Conference on Pharmacoepidemiology, Philadelphia, PA, August 22, 2003.

BRIGHT R.  Sentinel Adverse Event Reporting Systems: An Update from CDRH (invited talk).  Drug Information Association, Washington, DC, January 15, 2003.

BRIGHT R.  The "How do we know what's *really* going on with medical device related problems in hospitals?" Game!!! (invited talk).  First Annual MedSun Conference, Annapolis, MD, October 24-25, 2002.

BRIGHT R. Update on Medical Device Epidemiology and Surveillance (submitted symposium).

00177643

17th International Conference on Pharmacoepidemiology, Toronto, Canada, August 23-26, 2001.

BRIGHT R, Kessler LG.  FDA's initiatives to improve adverse medical device event surveillance (submitted talk). 17th International Conference on Pharmacoepidemiology, Toronto, Canada, August 23-26, 2001.

Patterson K, BRIGHT RA, Barr H, Kaczmarek R.  Quality and access: The Mammography Quality Standards Act (submitted talk).  17th International Conference on Pharmacoepidemiology, Toronto, Canada, August 23-26, 2001.

Gardner SN, Flack M.  The Medical product Surveillance Network (MedSuN) Program (delivered submitted talk). 17th International Conference on Pharmacoepidemiology, Toronto, Canada, August 23-26, 2001.

BRIGHT RA, Marinac-Dabic D, Torrence M, Shahrokh S, Lilienfeld D, Schone E.  Chorionic villus sampling and amniocentesis histories among births to military health care beneficiaries (Submitted talk).  American Public Health Association 126th Annual Meeting and Exposition, Washington, DC, November, 1998.

Barton MB, Moore S, BRIGHT RA.  Does managed care equalize access for poor elderly? Socioeconomic status and mammography utilization in a Medicare HMO (Submitted poster).  14th International Conference on Pharmacoepidemiology, Berlin, Germany, 16-19 August, 1998.

BRIGHT RA.  Using epidemiology to study medical devices in women.  (Invited talk), 20 min., Conference on Medical Device Epidemiology in Women, Rockville, MD, May 4-5, 1998.

BRIGHT RA, Donahue JG, Lacke L, Platt R.  Using automated patient records for medical device epidemiology: preliminary explorations (Submitted poster). 13th International Conference on Pharmacoepidemiology, Lake Buena Vista, FL, August 24-27, 1997, and 1997 FDA Forum on Regulatory Sciences, Bethesda, MD, December 8-9, 1997.

BRIGHT RA, Silverman BG, Daley R, Ruhl CE, Brahin M, Morin R.  A new menu-driven system for converting claims files into analysis datasets organized by case (Submitted poster).  13th International Conference on Pharmacoepidemiology, Lake Buena Vista, FL, August 24-27, 1997, and 1997 FDA Forum on Regulatory Sciences, Bethesda, MD, December 8-9, 1997.

BRIGHT RA, Graham D, Wise RP, Nelson RC, Szarfman A, Lu S.  Automated safety signal detection at FDA's Center for Drug Evaluation & Research (Submitted oral presentation).  13th International Conference on Pharmacoepidemiology, Lake Buena Vista, FL, August 24-27, 1997.

BRIGHT RA.  Methodologic issues in measuring extent of current use of medical devices (Submitted oral presentation).  13th International Conference on Pharmacoepidemiology, Lake Buena Vista, FL, August 24-27, 1997.

BRIGHT RA, Torrence ME, Gross TP.  A preliminary study of apheretic device and ACE inhibitor interaction causing anaphylactoid reactions in dialysis patients (Submitted poster).  Society for Epidemiologic Research, Snowbird, UT, June 21-24, 1995 and International Society for Pharmacoepidemiology, Montreal, Canada, August 27-30, 1995.

BRIGHT RA, Farup CE, Marinac-Dabic D, Kaczmarek RG, Moore RM.  National patterns of reported maternal serum alphafetoprotein test use (Submitted poster).  Society for Epidemiologic Research, June 16, 1993, Keystone, CO.

BRIGHT RA, Kaczmarek RG, Moore RM, Marinac-Dabic, D.  National patterns of amniocentesis use: Results from the National Maternal and Infant Health Survey (Submitted poster).  American Public Health Association 120th Annual Meeting and Exhibition, November 9, 1992, Washington, DC.

BRIGHT RA, Jeng LL, Sharkness CM, Hamilton PM, Hamburger SE, Moore RM.  Use of tympanostomy tubes in children in the United States, 1988 (Submitted poster).  FDA Science Expo '92, Rockville, MD, May 21-22, 1992.

BRIGHT RA, Moore RM, Jeng LL, Sharkness CM, Hamilton PM, Hamburger S.  Use of fixation devices among children in the United States, 1988 (Submitted talk).  FDA Science Expo '92, Rockville, MD, May 21-22, 1992.

BRIGHT RA, Moore RM, Jeng LL, Sharkness CM, Hamilton PM, Hamburger S.  Use of fixation devices among children in the United States, 1988 (Submitted talk).  Epidemiology Section, American Public Health Association Meeting, Atlanta, GA, November 13, 1991.

BRIGHT RA, Moore RM, Kaczmarek RG.  The relationship of maternal race and insurance status to prenatal ultrasound use in a national population (Invited talk).  Session sponsored by Radiological Health and Maternal and Child Health Sections at the American Public Health Association Meeting, Atlanta, GA, November 12, 1991.

BRIGHT RA, Sharkness CM, Moore RM, Kaczmarek RG, Jeng LL. Experience with home apnea monitors, United States, 1988 (Submitted poster).  National Perinatal Association 1991 Annual Clinical Conference and Exposition, Boston, MA, November 7 - 9, 1991.

BRIGHT RA, Kaczmarek RG, Moore RM.  Patterns of ultrasound use in a national population, U.S., 1988.  National Perinatal Association 1991 Annual Clinical Conference and Exposition, Boston, MA, November 7 - 9, 1991.

00177645

BRIGHT RA, Jeng LL, Sharkness CM, Hamilton PM, Hamburger SE, Moore RM.  Use of tympanostomy tubes in children in the United States, 1988 (Submitted poster).  Society for Pediatric Epidemiologic Research, Buffalo, NY, June 11, 1991.

BRIGHT R, Sharkness C, Kaczmarek R, Hamburger S, Moore R.  Artificial hips in the United States, 1988 (Submitted poster).  Third National Injury Control Conference, Denver, CO, April, 1991.

BRIGHT R, Moore R, Jeng L, Sharkness C, Hamilton P, Hamburger S.  Use of fixation devices among children in the U.S., 1988 (Submitted poster).  Third National Injury Control Conference, Denver, CO, April, 1991.

BRIGHT R, Kaczmarek R, Sharkness C, Hamburger S, Hamilton P, Davis Y.  Knee replacements due to injury: results of a national survey (Submitted poster).  Third National Injury Control Conference, Denver, CO, April, 1991.

BRIGHT RA, Chown MJ, Everitt DE, Gurwitz J, Avorn J.  Methodologic considerations in linking multiple databases for the study of AIDS epidemiology (Invited talk).  American Statistics Association, Washington, DC, August, 1988.

BRIGHT RA, Avorn J, Everitt DE. (Submitted talk) International Conference on Pharmacoepidemiology, Minneapolis, MN, September 1987.

BRIGHT RA.  Histologic and mammographic specificity of risk factors for benign breast disease (Submitted talk).  Society for Epidemiologic Research, Amherst, MA, June 1987.

BRIGHT R, Morrison A, Brisson J, Burstein N.  Relationships between mammographic image and histology in women who have benign biopsy (Submitted talk).  Society for Epidemiologic Research, Chapel Hill, NC, June 1985.


**OTHER PRESENTATIONS, EXTERNAL TO FDA**

"Earlier detection of new and increasing potential patient harms using the clinical notes in electronic healthcare records: The new Shakespeare Method" (invited 60 min talk). Presented to Health IT Research and Development Interagency Working Group meeting, online, February 24, 2021. Presented to Agency for Research and Healthcare Quality patient safety group, online, March 24, 2021.

 "The FDA perspective on health informatics" (invited 50 min talk).  Presented to 2018 Joint Class Day, Dietetic Internship, Department of Nutrition & Food Science, College of Agriculture and Natural Resources, University of Maryland, Baltimore, MD, January 29, 2018.

00177646

"Shakespeare Project" (5 min).  Presented at HHS Data Science CoLaboratory Demonstration Day, Washington, DC, January 18, 2018.

"Shakespeare Electronic Health Records Project: Earlier detection of patient harms using big data techniques on electronic health record free text notes" (4 min invited talk with Drs. Lee Anne Palmer and Susan J Bright-Ponte).  Presented at HHS Innovation Day, Washington, DC, July 14, 2016.

"Big Data Tools to Find Patient Harm in Health Records" (10 min invited talk with Drs. Lee Anne Palmer and Susan J Bright-Ponte).  Presented to HHS IDEA Lab Ignite Program judges, virtually, February 12, 2016.

"openFDA" (30 min invited talk).  Presented to delegation of three officials from South Korea's Ministry of Food and Drug Safety, Silver Spring, MD, May 18, 2015.

"Office of Informatics and Technology Innovation: A New Office in FDA" (50 min invited lecture). Presented to Master of Public Health students, "Introduction to Public Health Informatics" course, Emory University, Atlanta, GA, via web, August 22, 2014.

"FDA's Vision of Health IT" (1 hour invited talk), 2014 GovConNet Procurement Conference, Gaithersburg, MD, May 16, 2014.

"MedWatch FDA/VA Medical Device Adverse Event Reporting" (10 min), Health and Human Services Domain IT Steering Committee, Department of Health and Human Services, Washington, DC, May 29, 2013.

"Benefit Risk of T-Scan" (10 minutes) for an FDA Advisory Panel meeting on the T-Scan 2000 ED, CDRH, FDA, Gaithersburg, MD, August 29, 2006.

"Special Issues in the Study and Regulation of Medical Devices" (2 hours) for a course, "Advanced Topics in Pharmacoepidemiology," Harvard School of Public Health, Boston, MA, May 16, 2006.

"Patient safety and adverse event surveillance: the FDA perspective relative to medical devices" (15 minutes), Division of Clinical Epidemiology seminar, Salt Lake City Veterans Administration Medical Center, Salt Lake City, UT, June 21, 2005.

"Surveillance of medical device-related hazards and adverse events in hospitalized patients" (1 hour), Agency for Healthcare Research and Quality, Rockville, MD, June 10, 2004.

"Epidemiology of Medical Devices" (1 hour), Division of Pharmacoepidemiology and Pharmacoeconomics, Brigham and Women's Hospital, Boston, MA, May 18, 2004.

"Special Issues in the Study and Regulation of Medical Devices" (2 hours) for a course, "Advanced

00177647

Topics in Pharmacoepidemiology," Harvard School of Public Health, Boston, MA, May 18, 2004.

"Injuries Associated with Medical Devices: Pilot Study and Surveillance" (1 hour) with Dr. Brock Hefflin for the All Injury NEISS Program Fall Meeting, Bethesda, MD, September 25, 2003.

"NEISS Medical Device Case Collection" (1 hour) with Dr. Brock Hefflin as training for NEISS coordinators, Consumer Product Safety Commission, Bethesda, MD, July 2003.

"The FDA View of Vaginal Douches Epidemiology," presented to the FDA Advisory Panel, 15 minutes, Gaithersburg, MD, April 1997, and the Over The Counter Scientific Rounds, Center for Drug Evaluation and Research, FDA, Rockville, MD, May 1997.

At the FDA Workshop on Methods to Estimate Medical Device Denominator Data, made a 10 minute introductory speech on the agenda and administrative information, and moderated two 1 and a half hour sessions of prepared talks and informal discussions, Rockville, MD, September 1996.

Seminar "The Epidemiology Program at the FDA: Medical devices and radiation-emitting electronic products," to Preventive Medicine Residents, 1 hour,  Johns Hopkins University, Baltimore, MD, November 1995.

Presentation "Postmarket Surveillance of Medical Devices -- The Current Situation at FDA," at the 1994 Eye Care Technology Forum, 15 min., Bethesda, MD, December 1994.

Presentation to Health Industry Manufacturers Association and National Electrical Manufacturers Association on trend analysis of adverse event reports, 5 min., Rockville, MD, June 1994.

Presentation on guidelines for epidemiologic studies of penile inflatable implants and testicular implants to FDA Advisory Panel, 5 min., Rockville, MD, April 1993.

Presentation of Epidemiology Branch research using the National Maternal and Infant Health Survey, to the National Center for Health Statistics and FDA Interagency Advisory Group, 15 min., Rockville, MD, June 1992.

Personal testimony at the Public Hearing on the Recruitment, Retention, Re-entry, and Advancement of Women in Biomedical Careers, sponsored by the Office of Women's Health and Research, National Institutes of Health, Bethesda, MD, 10 min., March 1992.

Presentation of silicone breast implant prevalence to FDA Advisory Panel, Bethesda, MD, 5 min., February 1992.

Presentation of the hazards associated with protective restraints, made to the manufacturers in a meeting sponsored by Health Industry Manufacturers Association, Washington, DC, 15 min., October, 1991.

00177648

Presentation on breast implants, to the National Center for Health Statistics and FDA Interagency Advisory Group, 15 min., Rockville, MD, January 1991.

Presentation on latex hypersensitivity, to the National Center for Health Statistics and FDA Interagency Advisory Group, 15 min., Rockville, MD, January 1991.

Presentation to NIH Site Visitors on proposal to study breast cancer risk factors, Tufts University School of Medicine, Boston, MA, January 1989.

Lecture on the impact of computers on epidemiologic research capabilities, to class learning about computers and society, Boston College, Newton, MA, 45 min., Spring 1987 and Spring 1988.

Seminar on benign breast disease at University of Massachusetts, Amherst, MA, 45 min., May 1984.

00177649

# ZAMURS AND ASSOCIATES, LLC

Transportation  Air Quality  Energy  Climate Change  Sustainability

**Review and Comment**

**I-495 and I-270 Managed Lanes Study**

**Final Environmental Impact Study**

**And**

**Final Section 4(f) Evaluation**

**Dated June 2022**

In its comments of November 6, 2020, and November 30, 2021, the Sierra Club Maryland Chapter offered highly technical, specific, and detailed comments concerning the failings of the air quality, greenhouse gas and environmental justice aspects of the DEIS and SDEIS. In reviewing the FEIS and its response to comments, it is highly disappointing to see that the comments have not been sufficiently or significantly addressed. In many cases, the comments have been simply ignored. In other cases, they have been lumped together with other comments to facilitate a very generalized and inadequate response. In addition to new information and comments presented below, all previous comments are to be considered as outstanding and are remanded for further consideration.

**Transportation Conformity**

Under the transportation conformity rule (40 CFR Parts 51 and 93), a regionally significant transportation project must be found to conform to the purpose of the State Implementation Plan before it can be approved and adopted. Paragraph 51.400(d) indicates that FHWA projects must be found to conform before they are adopted, accepted, approved, or funded by FHWA. Similarly, §51.450(b) and 93.129(b) forbid recipients of Federal transportation assistance (for this project that is Maryland Department of Transportation) to approve a regionally significant project unless it is included in a conforming long-range Plan and Transportation Improvement Program (TIP). For a project approval, it must have the same design scope and concept as the project included in the conforming Plan or TIP (§ 51.422 (b)(1) and (c)(1) and 93.115 (b)(1) and (c)(1)). Examination of the FEIS for the project, specifically Appendix K, the Final Technical Air Quality Report, and the conformity determination of the "Visualize 2045, a Long-Range Transportation Plan for the National Capital Region", adopted June 2022, identified

1

**Exhibit G**

a substantial difference in the design scope and concept of the project as included in the conformity determination and the project as described in the FEIS, that make approval of the FEIS and the project by FHWA and Maryland Department of Transportation untenable.

The Air Quality Appendix identifies the opening year for the project as 2025. However, the air quality conformity determination distinguishes several important design elements of the project to be completed in 2030. These elements include:

1. I-270 Northbound Toll Lanes, I-370 to Middlebrook Road;
2. I-270 Southbound Toll Lanes, Middlebrook Road to I-370;
3. I-270 Northbound Toll Lanes, Middlebrook Road to MD 121;
4. I-270 Southbound Toll Lanes, MD 121 to Middlebrook Road; and
5. I-270 Toll Lanes, MD 121 to I 70 / US 40.

These design elements may contribute significant emission additions to the regional emissions for ozone precursors in the conformity determination. By not including these design elements in the emissions analysis for the horizon year 2025, the regional emissions analysis may be severely underestimating ozone precursor emissions from the transportation system. It should be noted that the 2025 analysis year comes closest to the mobile source emissions budget, as shown in Figures 6 and 7 of the conformity determination, indicating a greater possibility of not meeting the appropriate emissions test. With the exclusion of these design elements from the 2025 horizon year emissions analysis, the design scope and concept of the project as described in the FEIS and as described in the most recent conformity determination are not consistent.

The opening year of 2025 in the FEIS and the opening year of 2025 of some design elements as shown on the conformity determination seems highly unlikely. Since the conformity determination horizon year of 2025 analyzed for ozone precursors, the design elements as modeled in the determination would have to be open by the summer of 2025 (since ozone is a summertime pollutant) to properly account for the emissions from those design elements. It is highly unlikely that this estimated $3.75 − 4.25-billion-dollar project will be able to be completed in three years from now. In fact, the FEIS recognizes that construction is expected to last five years (Page 96, Appendix F – Final Community Affects Assessment and Environmental Justice Analysis Technical Report) and Appendix B of Appendix K, which considers construction greenhouse gas emissions and indicates the project will not be open in 2027. Thus, an opening year for the project of 2025 is not feasible and, therefore, the project FEIS and the conformity determination do not have the same design scope and concept. A more reasonable opening year should be determined, and both the air quality analysis and the conformity determination should be re-analyzed with a new opening year to determine the project's impact on air quality, both on a project level and on a regional basis.

As explained above, because the design scope and content of the project as described in the FEIS and as described in the National Capital Transportation Planning Board conformity determination is not consistent with one another, both FHWA and Maryland DOT cannot approve the FEIS. Under §51.406 and 93.307, this project must be treated as a project not from a conforming TIP and Plan. Accordingly, the National Capital Transportation Planning Board must re-evaluate conformity with the same opening year for all elements of the project, consistent with the FEIS. Upon completion, FHWA and Maryland DOT could approve the FEIS (assuming a successful comparison to the motor vehicle emissions budgets). Alternatively, FHWA/Maryland DOT must perform a regional ozone precursor emissions analysis to

00177665

document that the project, as completed, will not cause the motor vehicle emissions budgets to be exceeded.

**Air Quality/NEPA issues**

For a project of this scale and cost, it is surprising and disappointing to read the numerous inconsistencies, inaccuracies, and misstatements between the DEIS and its air quality study and the FEIS and its air quality study.

The response to comments (MLS_FEIS_App%20T%20DEIS%20&%20SDEIS%20C&R_T.2.A_Volume%203_June%202022p.pdf) relies on the analyses for carbon monoxide and the conformity determination (cited above) as indicating that the project will not cause a new exceedance of a National Ambient Air Quality Standard (NAAQS) or exacerbate an existing violation. This is not correct.  The conformity determination only considered ozone precursors. It did not consider any other pollutants. The Air Quality studies (DEIS and FEIS) did examine carbon monoxide (although with many technical errors). However, the pollutants that cause the greater health impacts, $PM_{2.5}$, $PM_{10}$ and $NO_2$ remain unexamined and unconsidered, despite the legal obligation to assess these pollutants under NEPA.

The Response to Comments document (cited above) indicates the Sierra Club Maryland Chapter "requested" analyses for these pollutants. That is not correct. Under NEPA, project sponsors must take a "hard look" at the potential adverse impacts of the project and mitigate to the extent practicable. The analysis for these pollutants is part of that "hard look". In their comments on the DEIS (November 6, 2020) and on the SDEIS (November 30, 2021), the Sierra Club Maryland Chapter offered numerous studies that demonstrate the potential linkage of transportation projects to elevated emissions, elevated concentration levels and increased adverse health effects. To add to this evidence, two additional studies are brought forth for consideration as to the negative health effects of these pollutants.

The Supplement to the 2019 Integrated Science Assessment for Particulate Matter (EPA/600/R-22/028, May 2022) examined recent health studies related to exposure to ambient $PM_{2.5}$ levels. The study found elevated incidences of cardiovascular effects and mortality at a short-term ambient level of 7.1 $ug/m^3$ over a 24-hour period average and a long-term ambient level of 5.9 $ug/m^3$ on an annual average. This study also found enhanced susceptibility to PM related health effects in EJ communities. This EPA study will likely lead to a tightening of the NAAQS for $PM_{2.5}$.

A recent article in the Guardian (https://www.theguardian.com/environment/2022/jun/03/car-tyres-produce-more-particle-pollution-than-exhausts-tests-show, June 3, 2022) demonstrated that tire wear produced high levels of particulates, significantly greater than produced by exhaust emissions. The particulates produced a wide range of toxic compounds. While this study focused on ultrafine particulates, it nevertheless documents the linkage between transportation and health impacts. There are currently no ambient air quality standards for ultrafine particulates but there are standards for larger particulates ($PM_{2.5}$ and $PM_{10}$). The project sponsors should use $PM_{2.5}$ and $PM_{10}$ as proxies for particulates in general and address the health concerns associated with particulate emissions by performing the required analyses for $PM_{2.5}$ and $PM_{10}$.

00177666

These two additional studies plus all the previously cited studies indicate that recent evidence shows the health connection between transportation and transportation projects and increased risk of adverse health effects. Instead of addressing this issue in a technically sound manner, the project sponsors rely on outdated FHWA guidance as an excuse for not performing an analysis for these pollutants, The cited guidance, GUIDANCE FOR PREPARING AND PROCESSING ENVIRONMENTAL AND SECTION 4(F) DOCUMENTS (FHWA TECHNICAL ADVISORY, T 6640.8A, October 30, 1987) is over 30 years old and only addresses carbon monoxide and ozone precursors. It was developed prior to the promulgation of the NAAQS for $PM_{2.5}$ (1997), $PM_{10}$ (1987) and $NO_2$ (2010) and has not been updated to account for these pollutants.

USEPA also recognized the microscale aspect of these pollutants by establishing both a short-term NAAQS (1 hour or 24-hour average) and a long-term NAAQS (annual average). In its November 6, 2020, comments on the DEIS, the Sierra Club Maryland Chapter documented how concentrations of these pollutants can vary substantially over short distances. Reliance on regulatory fixed air quality monitors many miles away from the project area does not accurately depict actual concentrations and exposures that residents and visitors in the project area are subject to. Nevertheless, in its November 30, 2021, comments on the SDEIS, the Sierra Club Maryland Chapter documented that the nearest regulatory monitors exceed the concentration level of the NAAQS for $PM_{2.5}$, indicating that elevated levels likely exist in the project area, and it is critical to determine whether the project will exacerbate those elevated concentrations as well as how much the project will increase concentrations closer to the highway and what the health impacts associated with those increased concentrations will be.

The traffic analysis continues to show that traffic levels along the project exceed the 125,000 annual average daily traffic count and it continues to fail to document levels of diesel truck traffic. In designated $PM_{2.5}$ nonattainment and maintenance areas, that level of traffic (along with a needed diesel truck percentage) would be sufficient to trigger a micro-scale $PM_{2.5}$ analysis, according to USEPA guidance (PM Hot-spot Guidance Transportation Conformity Guidance for Quantitative Hot-spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas, EPA-420-B-21-037 October 2021). The attainment/nonattainment status of an area should not be the only determinant for this type of analysis. In order to provide public health protection to the residents and visitors in the area, the project sponsors must perform a $PM_{2.5}$ analysis to ascertain the potential air quality impacts of this major project, especially since it appears the project would otherwise meet the thresholds for an analysis in a nonattainment or maintenance area.


**Environmental Justice**

Perhaps no section of the FEIS is as full of misleading and inaccurate statements as in Appendix F, Final Community Affects Assessment and Environmental Justice Analysis Technical Report, particularly with regard to air quality and the effects of the project on identified environmentally disadvantaged communities. Page 86 of Appendix F concedes that "(E)xposure to traffic-related air pollution would result from short-term construction activities (approximately four to five years) and long-term highway operations. EJ populations who live with high EPA and MD EJSCREEN EJ index scores … may experience air quality impacts from construction activities and highway operations more acutely than populations with lower EJ index scores." Yet, Appendix F inaccurately states on Page 85 "… air quality modeling at a localized level – the level at which this EJ analyses are otherwise conducted – is not available.

4

Furthermore, due to industry-wide limitations and tools/techniques for measuring project-specific health outcomes, detailed air quality effects on public health effects cannot be projected for any specific location along the Phase I South limits."

The statement on Page 85 is incorrect. The tools for doing these types of analyses are well known and available. For the criteria pollutants ($PM_{2.5}$, $PM_{10}$ and $NO_2$) emission and dispersion models are approved by USEPA for use in these types of analyses. Determination of health outcomes would be based on comparing the results from these models to the relevant peer-reviewed literature on concentration-response relationships for those pollutants. For mobile source air toxics, the November 6, 2020, comments by the Sierra Club Maryland Chapter documented examples of health risk assessment procedures for transportation projects around the country and application of a procedure to a specific transportation project. The November 6, 2020, comments also offered air quality guideline values that can be used to compare the outcome of an analysis to possible health outcomes. Although the uncertainties of health outcomes and impacts for mobile source air pollutants may be greater than those for criteria pollutants, nevertheless it is not appropriate for the project sponsors to rely on outdated and misleading guidance from FHWA to avoid informing the public of air quality and health impacts of the project. Table 3-3 of the Appendix K, Final Air Quality Technical Report, shows increases in emissions for all the mobile source air pollutants, ranging from 4.7% to as high as 6.5%. The project sponsors should not impose their judgement that the possible uncertainties in some aspects of a health risk assessment are too large and use that as an excuse not to disclose the impacts to the residents and visitors of the project area and to decision makers. Instead, the project sponsors must fully and openly assess the health impacts of the increases in mobile source emissions and let the public and decision makers decide whether those impacts are acceptable for this project to go forward. Only then would an analysis and a project EIS comply with the requirements of NEPA.

Table 5.4 of Appendix F identifies EJ communities in Gaithersburg, Rockville, North Bethesda, and Potomac. Appendix H of the Final Traffic Analysis Technical Report (Appendix A of the FEIS) identifies locations in the project area that will suffer from bottlenecks and general traffic congestion based on Level of Service (LOS) F. An LOS of F signifies severe congestion. Not surprisingly, many of these bottlenecks and congested stretches of the Preferred Alternative occur on EJ communities. According to Appendix H, some of these locations will experience the highest vehicle densities of the entire project area. Some examples of bottlenecks and severe congestion in EJ areas include:

·    I-270 between Maryland 85 and Maryland 117
·    I-270/Montrose Road interchange
·    I-270 between Shady Grove Road and I-370
·    I-270 W Spur interchange with I-495
·    I-495 between Clara Barton Parkway and Maryland 201

In these already-overburdened communities, it is imperative that negative air quality impacts do not occur or are not exacerbated. Therefore, the project sponsors are obligated to examine potential concentrations of $PM_{2.5}$, $PM_{10}$ and $NO_2$ under NEPA and under the intent of the EJ regulations and guidance. This is especially important since, as is generally well understood and as Appendix H confirms, the longest stretches of congestion and most severe bottlenecks will be in the general-purpose lanes, compared to the HOT lanes. Numerous Figures in the FEIS and Appendices show that the general-purpose lanes will be on the outside of the roadway and closer to the communities impacted. The

5

November 6, 2020, comments by the Sierra Club Maryland Chapter showed how concentrations of air pollutants emitted by traffic increase exponentially with decreasing distance from the emission source. Thus, as the roadway is expanded, the more congested general-purpose lanes will be shifted closer to the community, increasing exponentially the likelihood of a significant negative air quality impact. The project sponsors must perform these analyses to determine whether this is the case and employ mitigation measures, if needed, to lessen the impact.


**Particulate Matter Considerations**

Regarding $PM_{2.5}$ emissions and concentrations, the Sierra Club Maryland Chapter explained in its November 6, 2020, comments pertaining to the DEIS, the applicability of transportation conformity requirements for the Washington D.C.-Maryland-Virginia area. As explained in those comments, this area should be considered as a $PM_{2.5}$ orphan maintenance area. The court case that established orphan nonattainment/maintenance areas (South Coast Air Quality Management District v EPA, DC Cir. 2018) and EPA's implementing guidance with respect to transportation conformity (Transportation Conformity Guidance for the South Coast II Court Decision, EPA-420-B-18-050 November 2018) are silent on the applicability of the decision to former $PM_{2.5}$ nonattainment areas. However, conformity requirements cannot differ from pollutant to pollutant but are all governed by the general requirements of the Clean Air Act Amendments of 1990. Since conformity requirements for ozone orphan areas are non-quantitative, this would likely be the case for $PM_{2.5}$ areas as well for regional emissions. However, it is expected that $PM_{2.5}$ hot-spot analysis requirements would apply to major projects (such as the I-270/I-495 Managed Lanes project) in these types of areas. The importance of doing $PM_{2.5}$ analyses for NEPA purposes are explained above and in the previous two sets of comments by the Sierra Club Maryland Chapter. The transportation conformity aspects only add additional urgency to performing these analyses.


**Climate change**

The Preferred alternative will increase greenhouse gas emissions by close to 40 thousand tons of CO2 equivalent (CO2eq) as shown in Table 3-5 of Appendix K, an unnecessary increase on these emissions that will have to be offset by other means.

In its November 30, 2021, comments, the Sierra Club Maryland Chapter indicated it was contrary to NEPA to submit a SDEIS for the preferred alternative without including an analysis of the greenhouse gas emissions associated with the construction and maintenance of the preferred alternative. The FEIS does have such an analysis. Unfortunately, it is presented in a manner that it is impossible to isolate the emissions associated with the construction and maintenance of the preferred alternative compared to the No-Build alternative.

The construction greenhouse gas emission analysis assumes construction starts in 2023 and presents results for a 30-year lifespan, or 2053. The assumed completed project operational greenhouse gas emissions analysis goes out to 2045 (Tables 3-4 and 3-5 of Appendix K), making a direct comparison difficult. Appendix K greenhouse gas emissions are presented in tons per year while conventional reporting of greenhouse gas emissions is presented in metric tons per year.

6

00177669

In order to be able to isolate the construction and maintenance effects of the project correctly, the analysis should have presented the No-Build operational emissions from the affected transportation network plus maintenance emissions due to maintaining the existing roadway in place compared to greenhouse gas emissions (including upstream materials emissions, transportation of materials to the site emissions and direct construction equipment emissions) from the construction of the project, emissions of maintaining the additional lanes, and effects of construction on the operation of the roadways (detours and delays from construction). It should be noted that the greenhouse gas construction emission analysis incorrectly assumed speeds on the facilities during construction would be unchanged from normal operating conditions because all traffic lanes would remain open (Table on Page 4 of Appendix B of Appendix K). It is well known that during construction, the capacity of the roadways will be reduced by drivers slowing their normal driving speeds due to construction activities in the median or on the shoulders and/or due to lane narrowing during construction. Thus, assuming normal operating speeds during construction severely underestimates usage greenhouse gas emissions and the greenhouse gas emissions analysis results in the FEIS may be significantly understated.

Nevertheless, using the information that is available in the FEIS and Appendix K, it is possible to get a rough estimate of the true impact of this project on climate change. Using the annualized construction greenhouse gas emissions column from Table 3-6 as the best available estimate of combined annual construction emissions and operating emissions and converting the value to million metric tons yields 1.2 mmt (million metric tons). Table 3-5 of Appendix K estimates an additional 39,792 tons of greenhouse gas emissions from the preferred alternative. Converting this value to million metric tons yields and additional 0.36 mmt. Combining these values, produces a best available estimate of 1.56 mmt of total greenhouse gas emissions associated with this project. This means that starting in 2023 as constructions is expected to begin, greenhouse gas emissions associated with the project will increase every year until the level of 1.56 mmt of greenhouse gas emissions is reached (on an annualized basis). Although it is not possible to distinguish the actual greenhouse gas emissions from the analysis in Appendix K, it is reasonable to extrapolate that this high level of greenhouse gas emissions will continue for many years as construction proceeds and the roadways remain open during construction.

Below are Tables 3.1 and 4.1 from Appendix J of the Maryland 2030 Greenhouse Gas Emissions Reduction Act (GGRA) Plan.[1] Appendix J is the Maryland DOT component of the Plan and documents what steps and strategies are necessary to achieve Maryland's climate goals. Table 3.1 shows emission benefits and the dollar costs of various funded strategies in place to reduce greenhouse gas emissions from the transportation sector in Maryland. Table 4.1 shows additional strategies that are unfunded. The cost-benefit of amounts of mmt reduction of these strategies contrast with the I-495/I-270 Managed Lanes Phase 1 South project that will emit 1.56 mmt every year.[2] Given the urgent need to reduce greenhouse gas emissions, drastic impacts of climate change (increased extreme temperatures, increased wildfires, increased droughts, increased extreme rainfall, etc.), and the requirements of Maryland's Climate Solutions Now Act (SB528) which sets a statewide GHG reduction goal of 60% by

---

[1] https://mde.maryland.gov/programs/Air/ClimateChange/Pages/Greenhouse-Gas-Emissions-Reduction-Act-(GGRA)-Plan.aspx

[2] For another reference point on greenhouse gas emissions, the average passenger vehicle emits about 404 grams of CO2 per mile, and a typical passenger vehicle emits about 4.6 metric tons of carbon dioxide per year. Source: EPA, Greenhouse Gas Emissions from a Typical Passenger Vehicle, last updated June 30, 2022, *available at* https://www.epa.gov/greenvehicles/greenhouse-gas-emissions-typical-passenger-vehicle.

2031 and net zero by 2045, it would seem that Maryland and FHWA could find a more beneficial project to improve quality of life and fight climate change. Montgomery County, where the project is located, has also adopted ambitious greenhouse gas reduction goals in its climate action plan, which aims to cut greenhouse gas emissions 80% in five years and to eliminate them by 2035.[3]

Table 3.1 Policy Scenario 1 Strategies Summary Table

| Strategies (Funded) | GHG Emission Reduction (mmt $CO_2e$) | Estimated Costs ($M) |
|---|---|---|
| 2018/2019 MPO Plans & Programs yield lower annual VMT growth (estimated at 0.6% per year growth) | 1.712 | $10,146.5 |
| On-Road Technology (CHART, Traveler Information) | 0.142 | $247.0 |
| Freight and Freight Rail Programs (National Gateway, Howard Street Tunnel, MTA rail projects) | 0.037 | $503.2 |
| Public Transportation (New rail or bus capacity or frequency, improved operations) | 0.011 | $2,009.8 |
| Public Transportation (50% EV transit bus fleet) | 0.074 | $625.1 |
| Intercity Transportation Initiatives (Amtrak NE Corridor, Intercity bus) | 0.006 | $0.0 |
| Transportation Demand Management | 0.146 | $63.9 |
| Pricing Initiatives (Electronic Tolling) | 0.022 | $188.5 |
| Bicycle and Pedestrian Strategies (current program continuation and expansion through 2030) | 0.024 | $263.8 |
| Port of Baltimore Drayage Track Replacements | 0.005 | $18.0 |
| BWI Airport parking shuttle bus replacements | <0.001 | $26.1 |
| MDOT Vehicle Fleet (Fleet Innovation Plan) | 0.006 | n/a |
| **Total Policy Scenario #1** | **2.19** | **$14,091.9** |

---

[3] Christine Zhu, Montgomery County Council votes to require climate impact assessment for proposed legislation, Bethesda Beat, July 12, 2022, available at https://bethesdamagazine.com/bethesda-beat/government/montgomery-county-council-votes-to-require-climate-impact-assessment-for-proposed-legislation/.

00177671

**Table 4.1 Policy Scenario 2 Strategies Summary Table**

| Strategies (Unfunded) | GHG Emission Reduction (mmt $CO_2$e) | Estimated Costs ($M) |
|---|---|---|
| **Emerging Strategies** | | |
| TSMO/Integrated Corridor Management (Limited Access System) | 0.08 to 0.14 | $108 to $152 |
| TSMO//Integrated Corridor Management (Arterial System) | 0.10 to 0.18 | $453 to $680 |
| Variable Speeds/Speed Management | 0.01 to 0.02 | $108 to $152 |
| Intermodal Freight Centers Access Improvement | 0.02 | $2,240 to $3,136 |
| Commercial Vehicle Technologies (Idle Reduction, Low-Carbon Fleet, Dynamic Routing) | 0.03 to 0.05 | Uncertain [§] |
| Regional Clean Fuel Standard | 0.895 | $148 |
| Eco-Driving (informal implementation underway) | 0.042 | $3 to $5 |
| EV Market Share Ramp-up of an additional 255,000 vehicles | 0.88 | $140 |
| Extended CAFE Standards (Model Years 2026-2030) | 0.80 | $0 |
| Transit capacity/service expansion (fiscally unconstrained) | 0.019 to 0.039 | $2,307 to $2,659 |
| MARC Growth and Investment Plan / Cornerstone Plan | 0.038 to 0.054 | $1,078 |
| Transit-Oriented Development (TOD) Build-Out (20 zones) | 0.033 | $4 to $8 |
| 50% to 75% EV Transit Bus Fleet | 0.081 to 0.103 | $93 |
| Expanded TDM strategies (dynamic) | 0.274 to 0.972 | $15 to $30 |
| Expanded Telework | 0.300 to 0.793 | $100 to $200 |
| Expanded bike/pedestrian system development | 0.040 to 0.051 | $103 |
| **Innovative Strategies** | | |
| Autonomous/Connected Vehicle Technologies | 0.68 to 0.73 | $43 to $63 |
| Zero-Emission Truck Corridors | 0.03 to 0.06 | $34 to $128 |
| Freight Villages/Urban Freight Consolidation Centers | 0.03 to 0.04 | $4,705 to 6,893 |
| Speed Management on Freeways (increased enforcement) | 0.04 to 0.20 | $7 to $14 |
| High-Speed Rail/SCMAGLEV | 0.011 to 0.021 | $45,300 to $47,300 |
| Pay-As-You-Drive Insurance | 0.123 to 0.292 | n/a [§§] |
| **Total Policy Scenario #2 "Emerging and Innovative"** | **4.539 to 6.417** | **$56,893 to $62,886** |

§ Policy change with potential incentive program. Uncertain costs.
§§ Policy action with supportive technology/programs offered by private sector.

## Unaddressed or Insufficiently Addressed Previous Comments

The following comments from the Sierra Club Maryland Chapter were ignored or not sufficiently addressed and are cited again as a failing of the FEIS.

November 6, 2020

1) Comment II. 1 – The DEIS does not perform Sufficient Emissions and Health Analyses for Particulate Matter ($PM_{10}$ and $PM_{2.5}$) or Nitrogen Dioxide ($NO_2$).

   There is very little if any discussion related to $PM_{10}$ and $NO_2$ in the FEIS and the Response to comments

2) Comment II.1.a – Fine Particulate Matter Conformity
   There is very little if any discussion related to this in the FEIS and the Response to Comments. See above for additional comments.

3) Comment II.2 – The DEIS's Air Quality Analysis Missed Parking Lots
   There is very little, if any, discussion related to this in the FEIS and the Response to Comments. Parking lots are an important emission source and can have elevated levels of transportation-related pollutants associated them. These emissions sources are not included in background

00177672

concentrations and emissions must be included when analyzing pollutant hot-spot situations for a technically sound and complete analysis.

4) Comment II.4- The DEIS Fails to Sufficiently Address Mobile Source Air Toxics

Although a mobile source air toxics emissions analysis was performed, the comments on completing this analysis to make it a health risk assessment have not been addressed.

5) Comment II. 5 – The DEIS Does Not Properly Perform the Necessary Carbon Monoxide Hot-Spot Analysis

The comments on temperature and stability class have not been addressed.

November 30, 2021

1) Comment IV.B. 1 – Particulate Matter and Nitrogen Dioxide

There is very little if any discussion related to $PM_{10}$ and $NO_2$ in the FEIS and the Response to comments

2) Comment IV.B. 2 – Carbon Monoxide
The comments on source-receptor distance and persistence factor have not been addressed.

3) Comment IV. B. 3 – Mobile Source Air Toxics

See above comment regarding failure to perform a health risk assessment

4) Comment IV. B. 4 – Parking Lots

See comment above. There is very little, if any, discussion related to this in the FEIS and the Response to Comments.

5) Comment IV. C. – The SDEIS Fails to Address Air Quality Concerns in Environmental Justice Communities

The comments on adequacy of analysis sites and accounting for Environmental Indicators have not been addressed.

6) Comment IV. F.- Information in the SDEIS Reveals Numerous Additional Air Quality-Related Concerns that the SDEIS Fails to Analyze

There is very little, if any, discussion related to this in the FEIS and the Response to Comments.


There are also several air quality related inconsistencies within the FEIS and between the FEIS and the earlier DEIS and SDEIS. Namely:

⸻ The mobile source air toxics and greenhouse gas analyses used the current EPA-approved emissions model, MOVES 3.0.1. Yet the carbon monoxide analysis relies on the older version of the model, MOVES 2014b. A consistent air quality analysis should use the same emission model for all transportation-related air pollutants.

10

—— Different traffic networks were used in earlier analyses compared to the analyses in the FEIS. Page 9 of Appendix K, the Final Technical Air Quality Report, indicates two parameters were removed from the development of the traffic network, compared to the traffic network used in the earlier project documents. One parameter, the travel time criterion, likely materially affects the results of the air quality analysis. Travel time can be a surrogate for speed, delay, or congestion, all of which affect emissions and therefore, air quality levels. For a proper air quality analysis, all traffic roadways that are affected by the project, including those whose travel time is affected substantially should be included in the network. The second parameter, called "artifacts", are not sufficiently defined, or discussed. This could potentially lead to an underestimation of emissions, depending on the links (or other parameters) removed.

—— It is unclear from Appendix K whether the same roadway network was used to generate emissions for the mobile source air toxics and greenhouse gas emissions analyses. Page 23 of Appendix K states "… the Project has analyzed GHG within MSAT affected network as well as a broader more appropriate level for GHG". Later, on the same page, it is indicated that the same network was used for both pollutants. Whichever statement is actually correct, the same traffic network should be used for both pollutants.

—— As shown in the comments by Smart Mobility, Inc. on the traffic modelling performed for this study, the traffic volumes, speeds, and levels of congestion may not have been properly determined. If so, this would affect the air quality analyses that were done for the project. This could indicate that the No-Build emissions and CO concentrations (since CO was the only pollutant for which atmospheric concentrations were calculated) were overstated, leading to an incorrect impression regarding the emissions and CO concentrations of the Preferred Alternative and its supposed benefits. Given this observation, it is especially critical that the air quality studies be re-done with correct traffic inputs. This includes re-analysis for CO, greenhouse gasses, mobile source air toxics and inclusion of PM 2.5, PM 10 and NO 2 (for the reasons explained above and in earlier comments).

00177674

July 18, 2022

Ms. Jeanette Mar and Mr. Jitesh Parikh
Environmental Program Manager
Federal Highway Administration, Maryland Division
George H. Fallon Federal Building
31 Hopkins Plaza, Suite 1520
Baltimore, MD 21201
jitesh.parikh@dot.gov
jeanette.mar@dot.gov

Mr. Jeffrey Folden, P.E., DBIA
Maryland Department of Transportation State Highway Administration
I-495 & I-270 P3 Program Deputy Director
707 North Calvert Street, Mail Stop P-601
Baltimore, MD 21202
MLS-NEPA-P3@mdot.maryland.gov
oplanesMLS@mdot.maryland.gov

**Re: Comments on I-495 & I-270 Managed Lane Study Final Environmental Impact Statement and Final Section 4(f) Evaluation**

The National Environmental Policy Act ("NEPA") mandates environmental impact statements for projects of the type and scale of the I-495 & I-270 Managed Lanes Study ("Project"). In an environmental impact statement, NEPA requires that the relevant agencies disclose significant impacts and that the public have a meaningful opportunity to review and comment on those impacts before major decisions are made. On June 17, 2022, the Federal Highway Administration ("FHWA") and the Maryland Department of Transportation State Highway Administration (the "Agencies") issued a final environmental impact statement ("FEIS") for the Project and opened a 30-day review period for the FEIS.

The FEIS describes the Agencies' preferred alternative and appears to formally conclude the NEPA and Transportation Act 4(f) portions of the Agencies' environmental review process. Despite its length, and despite two rounds of public comments identifying flaws in the prior drafts, the FEIS and its appendices present incomplete and inadequate analyses of environmental impacts and fail to achieve the fundamental objectives of NEPA. The undersigned Organizations oppose the preferred alternative put forth in the FEIS and support the no build alternative.

We provide the comments below to address issues raised by the FEIS. Where new information has become available since the supplemental draft environmental impact statement ("SDEIS"), it has been included and discussed. The comments provided below refer specifically to the FEIS and supplement the comments on the draft environmental impact statement ("DEIS") and SDEIS that were provided to the Agencies on November 9, 2020, and November 30, 2021, respectively, by the Maryland Chapter of the Sierra Club and other organizations. Unfortunately, the FEIS largely disregards the technical and procedural issues raised in the previous comments. Collectively, our comments present failures of the Agencies' environmental review process that, if not addressed, constitute violations of NEPA and other governing statutes that will render any record of decision invalid.

The comments identify the Organizations' key concerns regarding the FEIS, including the FEIS's failure to:

00177760

- Allow meaningful public comment throughout the NEPA review process, in part by failing to provide key documents and analyses that underpin the FEIS
- Address previous flaws and new, serious flaws in the traffic analysis
- Adequately assess impacts to public health from the construction and operation of the Project
- Adequately address significant adverse effects on sensitive historic and cultural resources
- Take the required hard look at environmental justice issues.

As we have consistently noted in our comments, the environmental review process for the Project seemed designed to reach a pre-determined result, namely, to expand I-495 and I-270 with toll lanes, without meaningfully involving the public, considering viable alternatives, or considering the preferred alternative's environmental impacts.

The Agencies must not move forward with the preferred alternative or any of the fundamentally flawed build alternatives without full and proper consideration of additional, less harmful and costly alternatives that address the real needs for transportation improvements in the region and providing the public with a new environmental review document that addresses the failures identified and accords the public a meaningful opportunity to review and comment.

Sincerely,

Sierra Club Maryland Chapter[1]

Aloha Enterprises, Inc.

ArchPlan Inc.

Audubon Naturalist Society

Bikemore

Carderock Springs Citizens Association

Central Maryland Transportation Alliance

Chesapeake Climate Action Network

Citizens Against Beltway Expansion

---

[1] The Organizations would like to acknowledge Jill Grant & Associates, LLC, Norm Marshall (Smart Mobility, Inc.), John Zamurs, PhD (ZAMURS AND ASSOCIATES, LLC), Ronald Bialek, MPP, Byron Bloch, Roselie Bright, Sc.D., Shannon Browne, PhD, Arthur Katz, and Dr. Benjamin Ross, for assisting the groups in drafting these comments. We would also like to thank the many organizations and volunteers who dedicated their time and expertise to these comments, including: David Cottingham; Barbara Coufal, Co-Chair, Citizens Against Beltway Expansion; Andrea Ferster; Andrew Gallant, Janet Gallant, Co-coordinator, DontWiden270.org; National Parks Conservation Association; Paula Posas; Robert Soreng, PhD, President of the Washington Biologists' Field Club; Sally Stolz, Co-coordinator, DontWiden270.org; Peter Yarrington, Audubon Naturalist Society Volunteer.

00177761

City of Rockville

Climate Reality Montgomery County

Coalition for Smarter Growth

Conservation Montgomery

DontWiden270.org

Downtown Residents Advocacy Network (Baltimore)

Elders Climate Action Maryland Chapter

Environmental Justice Ministry, Cedar Lane Unitarian Universalist Church

Friends of Sligo Creek

Howard County Climate Action

Indivisible Howard County Maryland

Job Opportunities Task Force

Maryland Conservation Council

Maryland League of Conservation Voters

Maryland Legislative Coalition

Maryland Nonprofits

MLC Climate Justice Wing

National Parks Conservation Association

Neighbors of the Northwest Branch

North Hills of Sligo Creek Civic Association

Northern Virginia Citizens Association

Our Revolution Maryland

Policy Foundation of Maryland

Rogue Tulips LLC

Strong Future MD

00177762

Takoma Park Mobilization Environment Committee

The Climate Mobilization, Montgomery County Chapter

Transform Maryland Transportation Coalition

Transit Choices

Voices Maryland

Washington Area Bicyclist Association

Washington Biologists' Field Club

Waterkeepers Chesapeake

Woodside Forest Civic Association

00177763

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ........................................................................................................... 1

I.    The Agencies' Environmental Review Process Fails to Satisfy Public Participation
      Requirements. ........................................................................................................... 3

      A.    The 30-day Availability Period on the FEIS Is Insufficient and Must Be Extended. ......... 3

      B.    The Agencies Have Not Tabulated the Public Comments on the FEIS, Contrary to
            Their Prior Practice, Thereby Dismissing and Erasing the Public's Voice ...................... 6

II.   The Traffic Models Used in the FEIS Are Deeply Flawed. ........................................ 11

      A.    The Traffic Modeling in the FEIS Fails to Address Critical Errors Identified by
            Commenters and Introduces New Errors. ......................................................... 11

      B.    The U.S. DOT Must Re-Examine the Traffic Modeling in the FEIS To Ensure Its
            Integrity and the Agencies Must Address Possible Inconsistencies Between the
            FEIS's Traffic Model and the Traffic Modelling Used to Support Revenue Models
            for the Project............................................................................................. 14

      C.    There Are Serious Problems with the Current FEIS that Indicate the Traffic Models
            and How They Are Applied Should Be Reviewed Independently Before Final
            Decisions Are Made....................................................................................... 18

III.  The FEIS Fails To Address Impacts to Public Health. ............................................... 20

      A.    Respirable Crystalline Silica Construction Dust Remains a Major Unaddressed
            Public Health Hazard of this Project that the Agencies Are Ignoring. ...................... 22

      B.    The FEIS Fails To Address the Health Impacts of Traffic Safety Issues from the
            Preferred Alternative..................................................................................... 23

IV.   The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the
      Potomac River, and Impacts to the Northern Lon-Eared Bats and Other Bats Is Incomplete
      and Contrary to Applicable Legal Requirements. ..................................................... 25

      A.    Throughout the Environmental Review Processes, the Agencies Have Failed to
            Consider the Full Scope of Impacts to Plummers Island. .................................... 25

      B.    The FEIS Fails to Address Several Outstanding Issues Pertaining to National Park
            Service Land Around the American Legion Bridge, Including on Both the
            Maryland and Virginia Sides of the Potomac River. .......................................... 33

      C.    The FEIS Does Not Adequately Identify and Analyze Impacts to the Potomac
            River........................................................................................................ 36

      D.    The FEIS's Analysis of Impacts to the Northern Long-Eared Bat and Other Bats Is
            Inadequate and Even More Outdated than Before, Given Recent Regulatory
            Developments and New Revelations About the Scope of Construction........................ 38

V.    The FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite
      Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis. ........... 41

      A.    Delaying the EJ Analysis Until the FEIS Precluded Meaningful Public Review
            Including, Most Importantly, Review and Comment by EJ Populations. ...................... 41

      B.    Cumulative Impacts to the African American Morningstar Moses Hall and
            Cemetery Site Have Been Disregarded and Dismissed by the Agencies, Unlawfully

00177764

Preventing an "Adverse Effects" Determination for a Nationally-Recognized 4(f) Protected Resource. .............................................................................................................. 42

C.    In Violation of Title VI, the Agencies Failed to Provide Meaningful Opportunities for Review and Comment on Agency Plans by Non-English Speaking Populations by Directing Limited English Proficiency Commenters to an Inaccurate SDEIS Executive Summary. ....................................................................................................... 52

D.    The Agencies' EJ Analysis Suffers from Serious Deficiencies by Failing to Analyze Cumulative Impacts to EJ Populations. ......................................................................... 53

E.    The FEIS Fails to Take a "Hard Look" at Air Quality Impacts to EJ Populations. .......... 55

F.    The FEIS Fails to Quantify Impacts to the Gaithersburg EJ Area. ................................. 56

G.    The EJ Analysis Ignores Impacts to EJ Populations East of the I-270 Spur. .................. 56

H.    The FEIS Fails to Fully Assess Construction and Post-Construction Impacts to the Julius West Middle School and Other Sensitive Sites Next to the Highway. .................. 57

I.    The FEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative ................ 57

J.    The FEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes ......................................................................................................... 58

VI.    The FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies. ............................. 59

VII.    Conclusion ..................................................................................................................... 62

EXHIBIT LIST ...................................................................................................................... 64

00177765

## EXECUTIVE SUMMARY

Despite its length, and despite two rounds of public comments identifying serious flaws in the prior drafts, the FEIS and its appendices present incomplete and inadequate analyses of environmental impacts and fail to achieve the fundamental objectives of NEPA. The signatory Organizations to this comment oppose the preferred alternative put forth in the FEIS and support the no build alternative.

Viewed through the lens of NEPA's twin goals—disclosure of significant impacts and public participation—the Project's environmental review process has been operationally and legally insufficient. The FHWA- and MDOT-approved NEPA-documents have failed in numerous required areas to disclose significant impacts. The NEPA process led by these two agencies failed to allow for meaningful public participation by assigning inadequate comment periods for voluminous documents and by failing to respond to comments provided by the public and elected officials until after the public comment process closed, precluding a productive back-and-forth discussion between the public, their elected officials, and the agencies.

These comments identify the Organizations' key concerns regarding the FEIS, including but not limited to the following:

- The FEIS process itself was flawed. Public comment periods were too short to allow meaningful comments on the voluminous documents and attachments that comprised the FEIS, SDEIS, and DEIS. The Agencies provided only an availability period rather than a public comment period on the FEIS and did not even provide an email address for submission of comments. The FEIS, like the DEIS and SDEIS, relies on documents and data that the Agencies have unlawfully withheld from the public. The FEIS also fails to meaningfully respond to public comments.

- There are serious flaws in the traffic analysis. Based on changes between the model outputs in the FEIS and SDEIS, it appears that manipulation of the models may have occurred. Like others, we call on the U.S. DOT to review the traffic model in the FEIS to ensure that the ROD is based on valid and credible traffic modeling. Moreover, the information presented in the FEIS shows that the preferred alternative will create new and larger traffic problems at key interchanges and merge areas by creating bottlenecks. The limited benefits of the toll lanes, available when most needed only to those who can afford them, cannot justify the magnitude of harm they will cause.

- The FEIS ignores the negative impacts of the preferred alternative on safety on the toll lanes, general purpose lanes, and arterial roads. These human health impacts must be evaluated and presented for public review and comment. The preferred alternative will increase vehicle miles traveled and those extra miles will lead to more (preventable) deaths on the highway. In addition, the air pollution and, specifically, the extra particulate matter pollution caused by those extra miles will cause innumerable health impacts to the people living along the highway.

1

00177766

- The FEIS still does not adequately analyze air emissions, including the increase the Project will cause in harmful particulate matter and greenhouse gas emissions. Like the air quality analyses presented in the DEIS and SDEIS, the limited and error-filled air quality analysis presented in the FEIS does not support the general statements in that document downplaying air quality impacts, and in fact shows the Project will impair the health of communities around the Project, including environmental justice communities. Shockingly, the FEIS fails to meaningfully acknowledge or propose to mitigate the harmful air quality impacts and other pollution caused by construction of the preferred alternative, including from silica dust, a carcinogenic air pollutant generated by highway construction.

- The FEIS fails to adequately acknowledge or address the Project's adverse effects on historic and cultural resources, including the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland, and Plummers Island, a globally unique biodiversity hotspot and site of over 120 years of long-term research in the D.C.-metro area. The Agencies have also failed to comply with their duties under the Section 4(f) of the Department of Transportation Act (Section 4(f)) with respect to these resources in numerous ways. Throughout the process, the Agencies rejected reasonable, prudent, and feasible alternatives that would minimize harm or avoid the use and destruction of significant features and attributes of these important historic resources and, ultimately, made arbitrary determinations about the adverse effects from the Project by failing to consider many important cumulative impacts from highway construction and operation. In the case of Morningstar Tabernacle No. 88 Hall and Cemetery, FHWA came to its conclusion of no adverse effects by wrongly ignoring the historic injustices caused by the highway construction in the 1960s.

- The FEIS fails to take the required hard look at environmental justice issues. The FEIS overlooks many of the harms that EJ communities will suffer during construction and operation of the preferred alternative, including localized air quality impacts from newly created bottlenecks and impacts from the loss of an otherwise free lane on I-270. In its belated analysis of adverse impacts to EJ communities, the Agencies use a flawed methodology and fail to grapple with historic inequities facing those communities from the initial construction of the highway system and the greater susceptibility of EJ populations to the impacts of environmental pollution.

- The FEIS does not adequately analyze impacts on federally threatened or endangered species and state rare, threatened, or endangered species.

As we have consistently noted in our comments, the environmental review process for the Project seemed designed to reach a pre-determined result, namely, to expand I-495 and I-270 with costly toll lanes, without meaningfully involving the public, considering viable alternatives, or

00177767

considering the full range of the preferred alternative's environmental impacts. The Agencies should have aimed to provide a model process here that not only met but exceeded the legal baseline for proper review in recognition that there is a wider scope of impacts—including societal impacts relating to loss of governmental control and accountability—that need to be discussed for projects proceeding under a public-private partnership. The I-495 & I-270 Managed Lanes Study project and future projects being attempted as public-private partnerships have different long-term impacts than projects using a conventional design-build procurement process, which has been the norm since the interstate system developed over a half century ago.

I.    **The Agencies' Environmental Review Process Fails to Satisfy Public Participation Requirements.**

An EIS has "twin functions": preparation of the EIS is designed to require agencies to take a hard look at the consequences of their proposed actions, and distribution of the EIS is designed to provide important information about the proposed action to the public for notice and comment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 356 (1989). The NEPA process relies on public scrutiny. *See* 40 C.F.R. § 1500.1(b) (2019). Public scrutiny is meaningful only if the agencies involved provide the public with sufficient information and time to craft their comments.

Here the Agencies have instead thwarted public participation by limiting comment periods, declining to provide *any* public comment period on the FEIS, let alone one of sufficient length, and issuing their responses to comments in unwieldy PDFs that are hard to open and navigate and inaccessible to people with certain disabilities. For these reasons, as well as those detailed further below, the Agencies have failed to satisfy their public participation requirements.

A.  **The 30-day Availability Period on the FEIS Is Insufficient and Must Be Extended.**

The 26,500-page FEIS includes new studies, a revised traffic model, and a new environmental justice analysis that the public has not had any opportunity to review. A 30-day availability period without even an email address listed for submitting comments[2] does not provide meaningful opportunity to review and comment on this FEIS. According to MDOT's own press release, the FEIS contains "modified analysis methodologies, conducted new analyses, studied new or modified existing alternatives, refined design ... , and identified ... mitigation ... [and] unavoidable impacts." We therefore reiterate our letter-request to Secretary Pete Buttigieg, of June 30, 2022, for a comment period of at least 60 days.[3]

---

[2] Op Lanes Maryland, Environmental I-495 & I-270 Managed Lanes Study Final Environmental Impact Statement (FEIS), last accessed on July 9, 2022 at
https://web.archive.org/web/20220709150006/https:/oplanesmd.com/feis/.

[3] Letter from the Sierra Club Maryland Chapter, et al. to Secretary Buttigieg (June 30, 2022), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/62groups_495-270FEIS_letter_SecButtigieg_30Jun2022.pdf and attached as Exhibit A. We will be providing other materials referenced in these comments under separate cover.

00177768

Our request for an adequate comment period is not new. In the SDEIS, the Agencies announced that they would defer critical analyses until the FEIS. We reiterate our SDEIS comments that this delay of critical analyses contravenes the NEPA process. SDEIS Comments at iii, 2-3, 74, 98, 100-03, 110-12, 122-23, 128, 136-37, 151, 154, 171, 173.[4] Given this improper delay, since January 2022, we and others have explained to FHWA and MDOT the need for an extended comment period on the FEIS. We hereby incorporate by reference the letters from the Sierra Club Maryland Chapter,[5] the Mayor and Council of Rockville,[6] 82 legislators in the Maryland General Assembly,[7] ten Prince George's County mayors,[8] the Montgomery County Executive,[9] 31 civic and environmental groups, and multiple members of Congress.[10] As many Maryland legislators explained in their request, without providing a meaningful opportunity for public comment on the FEIS that includes the ability to comment on "critical analyses needed for the public and policymakers to provide input" the public is unable to "shape final decisions about the I-495/I-270 toll lanes," as required by law.

After the FEIS was released, letter-requests to FHWA for a 60-day review and comment period were made by 62 local and national groups, several Maryland jurisdiction representatives,[11]

---

[4] Sierra Club, et al., Comments on I-495 & I-270 Managed Lane Study Supplemental Draft Environmental Impact Statement and Updated Draft Section 4(f) Evaluation (Nov. 30, 2021) (hereinafter "SDEIS Comments"), *available at*,
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/2021-12-27%20-%20Sierra%20Club%20et%20al.%20SDEIS%20comments.pdf.

[5] Letter from Josh Tulkin to Jeanette Mar et al. (Jan. 4, 2022), attached as Exhibit A, *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/SC-Letter-495270MLS-SDEIS-FEISReviewPd-2022Jan4.pdf.

[6] Letter from Bridget Donnell Newton, Mayor, et al. to Jeanette Mar et al. (Jan. 26, 2022), attached as Exhibit A, *available at*
https://static1.squarespace.com/static/5b72c6a8da02bc640472bf8c/t/61fee871b03f6828336629d3/1644095602555/FHA+Letter+FINAL+012622%281%29.pdf.

[7] Letter from Senator Pamela Beidle et al. to Gregory Murrill, Div. Admin., FHWA, Maryland Division (Feb. 22, 2022), attached as Exhibit A, *available at*
https://mcusercontent.com/6cdc39da7c0238a0521e24885/files/932d6527-1fc6-5b38-81ac-cba0cf957ae1/FWHA_Letter.pdf.

[8] Letter from Mayor Sadara Barrow, et al,. to Gregory Murrill, et al. (Feb. 26, 2022), attached as Exhibit A, *available at* https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_feceda725e324136bb9f7cd6f54b9f33.pdf.

[9] Letter from Marc Elrich, Montgomery County Executive Gregory Murrill, et al. (Mar. 10, 2022), attached as Exhibit A, *available at* https://9cb12f8b-0595-4233-98ce-142d43d80a5c.usrfiles.com/ugd/9cb12f_5ea4194f64224e46b8a0a4706f543f59.pdf.

[10] Letter from Rep. Anthony Brown & Rep. Raskin to Secretary Buttigieg (June 13, 2022), attached as Exhibit A.

[11] Letter from 62 local and national civic and environmental groups and several Maryland jurisdiction representatives to Secretary Pete Buttigieg (June 30, 2022) attached as Exhibit A, *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/62groups_495-270FEIS_letter_SecButtigieg_30Jun2022.pdf

00177769

24 members of the Montgomery County Delegation of the Maryland General Assembly,[12] and, recently, from the Rockville City Council.[13]

The letter from the Maryland Delegates and Senators stated:

[T[he public, its representatives, and reviewing agencies can only now begin examining long-requested environmental justice and greenhouse gas emissions analyses, mitigation plans, the project's recently changed traffic model, and MDOT's responses to the 5,000 comments it received during the public comment periods for the Draft EIS and Supplemental Draft EIS. … In a February 22, 2022, letter to the FHWA and MDOT, over 80 members of the Maryland General Assembly called for a redo of the project's Supplemental Draft EIS to include the key missing analyses.

In spite of that February 22, 2022, letter, the Agencies did not redo the SDEIS and instead proceeded to release the 26,500 page FEIS. The FEIS includes many new analyses, but the public was provided no formal public comment period to meaningfully review and address the flaws in these late-breaking analyses. Like those legislators, we call on you to open a formal public comment period of sufficient time to meet your statutory obligations under NEPA.

In addition, as noted above, the FEIS incorporates new traffic data and analysis, and these inputs were not released as part of the FEIS—contrary to NEPA's requirements that the underlying data requested must be disclosed publicly with the FEIS. 40 C.F.R. § 1500.1(b) (2019) ("NEPA procedures must ensure that environmental information is available to public officials and citizens before decisions are made and before actions are taken. The information must be of high quality. Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA"); *id.* § 1502.21 (2019) (underlying data may be incorporated by reference only if "it is reasonably available for inspection by potentially interested persons within the time allowed for comment"); *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 925 (9th Cir. 2015) ("To fulfill NEPA's public disclosure requirements, the agency must provide to the public 'the underlying environmental data' from which the [agency] develops its opinions and arrives at its decisions."). The Agencies' failure to provide this data before *and after* releasing the FEIS violates NEPA.

On June 29, 2022, MD Sierra Club requested the underlying data for the revised traffic model.[14] Rather than comply with NEPA's mandates and release these traffic data and analyses, we had to request them from MDOT and, as of the submission of these comments, MDOT has not yet released them. MDOT stated that it is processing our request not under NEPA but, rather, as a Maryland Public Information Act request and could not commit to providing the data in time for us to analyze and address them in these comments. MDOT's information officer explained:

---

[12] Letter from 24 Delegates and Senators in the Montgomery County Delegation of the Maryland General Assembly to Gregory Murrill, et al. (July 8, 2022), attached as Exhibit A.

[13] Robert Dyer, Rockville Mayor & Council Ask for More Time To Study New I-495/I-270 Managed Lanes Material, Rockville Nights (July 12, 2022), *available at* http://www.rockvillenights.com/2022/07/rockville-mayor-council-ask-for-more.html?m=1.

[14] *See* Smart Mobility, Inc. Report, attached as Exhibit B, App'x A.

00177770

> As this is a request for records, this falls under the Maryland Public Information Act (PIA) and is being handled accordingly. We are in the initial stages of this request and are preparing the legally required 10-day letter which is due July 14, 2022. We are advising you that we do not anticipate providing these records to you within the first 10 business days.[15]

As the attached statement by Norm Marshall, our traffic expert, makes clear, his ability to meaningfully comment on the traffic model is therefore limited because "I do not have access to this underlying data." Given these delays and for all the foregoing reasons, our request for a 60-day review period is not only reasonable, it is essential to carrying out NEPA's core purpose of providing a "springboard for public comment." *Robertson*, 490 U.S. at 351–352. The review period for other recent, large highway projects has been 60 or 75 days and the Maryland (and Virginia) public deserves a similar review period.[16] The FEIS, when added to the over 19,000-page draft EIS and over 8,000-page supplemental DEIS that it incorporates by reference, consists of 53,500 pages. Adequate formal public review periods are needed to ensure that the public has sufficient time for meaningful review of the Project's impacts. For these reasons and those expressed in our June 2022 letter and in letters from many others, the Agencies must provide a comment period of at least 60 days to comply with NEPA's public disclosure obligations.

## B. The Agencies Have Not Tabulated the Public Comments on the FEIS, Contrary to Their Prior Practice, Thereby Dismissing and Erasing the Public's Voice[17]

As part of the public comment process, NEPA requires agencies to respond to all substantive comments, including those with opposing viewpoints. *See* 40 C.F.R. § 1503.4 (the final EIS "shall consider substantive comments timely submitted during the public comment."); *id.* § 1502.9(c) ("At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised."). This mandate requires agencies to disclose opposing viewpoints so that the agencies can "internalize opposing viewpoints into the final decisionmaking process." *See Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1167–68 (9th Cir. 2003) ("The [Forest] Service's failure to disclose and analyze these opposing

---

[15] Email from MDOT to Jill Grant & Associates (July 1, 2022), attached as Exhibit B, App'x B.

[16] Sixty and 75-day FEIS review periods have been provided for other recent highway projects, such as the I-26 Connector in Asheville, N.C. and the I-45 in Houston, TX, respectively. *See* John Boyle, *I-26 Connector Environmental Impact Statement released, major hurdle for project passed*, Asheville Citizen Times (Feb. 5, 2020), *available at* https://www.citizen-times.com/story/news/local/2020/02/05/asheville-i-26-connector-environmental-impact-statement-released-nc-dot/4664937002/ (describing 60-day comment period); Texas DOT, Notice Final Environmental Impact Statement Available for Public Review - North Houston Highway Improvement Project, *available at* https://www.txdot.gov/inside-txdot/get-involved/about/hearings-meetings/houston/092520.html (explaining that the comment period on the FEIS was extended by 30 days, for a total of 75 days).

[17] This section incorporates by reference DEIS and SDEIS comments describing how the Agencies' systematically downplayed and miscounted public comments opposing the Project.

viewpoints violates NEPA and 40 C.F.R. § 1502.9(b) of the implementing regulations.") (citing *Cal. v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982)) (stating that NEPA's requirement that responsible opposing viewpoints are included in the final impact statement "reflects the paramount Congressional desire to internalize opposing viewpoints into the decisionmaking process to ensure that an agency is cognizant of all the environmental trade-offs that are implicit in a decision")).

Instead of following these legal requirements, the Agencies ignored opposing viewpoints; declined to tally the number of comments opposing the Project in the FEIS, contrary to their prior practice; responded to all public comments after the public could formally reply; and, in several cases, responded to similar comments in an inconsistent manner.

1.      **The Agencies Have Failed To Provide Any Analysis or Tabulation of the Contents of the 5,000+ DEIS and SDEIS Comments, Hindering the Ability of Decisionmakers To Determine the Level and Nature of Public Opinion and Opposition to the Plan or To Take the Comments into Account.**

In the FEIS, the Agencies do more than downplay and miscount public comments opposing the Project, as they did in the DEIS. In the FEIS, the Agencies fail to provide *any* analysis or tabulation of the contents of the comments, making it virtually impossible, due to the sheer number of comments, for decisionmakers to determine the level and nature of public opinion and opposition to the Project.

The only way reviewing agencies, elected officials, decision-makers at all levels, and the public can determine public sentiment as expressed in the comments is to read and tally the contents of 5,000+ raw comments reprinted in the FEIS, Appendix T.

This is an impossibly burdensome task for reviewers and the public.

The Agencies make even limited comment review onerous in light of the laborious processes the public must go through to access the comments and associated replies and references. Among the barriers to accessing and reading the FEIS Appendix T's 13 files and 5,732 pages containing the public comments: some of the text cannot be searched; the text cannot be copied and pasted from the pdf files; printouts are difficult to read, even for those with unimpaired vision; and three screens must be open at once in order to see an original comment, its associated response page, and the referenced material.

The protected PDF format that does not allow for copying of text presents extreme difficulties for the visually impaired and renders it virtually impossible to read the FEIS responses to comments. The printouts are too small to read even assuming ready access to a printer. The visually impaired need to copy the text and enlarge it to read it. The audio text reading function is not possible or practical for many people who have visual impairments (much less who speak a language other than English and need to have text copied to translate it) and is highly inefficient for meaningful review.

A frustrated FEIS reviewer submitted this comment to the Hogan Administration: "I cannot even copy/paste text from MLS FEIS PDF files. The MLS FEIS .pdf files are password protected.

00177772

I can't even copy text to paste into an email. What am I able to do? Nothing but look and don't touch? This is terrible customer service. <Survey Comments>." The July 13, 2022, reply on behalf of the Hogan Administration from Jeffrey T. Folden, Director of the I-495 & I-270 P3 Office included this sentence:

> Each document was released as a secured PDF to ensure the document would not be manipulated. The customer-friendly PDF format also offers graphic integrity and preserves intended content and layout regardless of the operating system, device, or software application it is viewed on. All content in the FEIS can be read, printed, referenced, and shared."

*See* Exhibit C. This response confirms that the document text is not copy-and-pasteable and that this limitation was intentional. The inability to copy text presents an enormous barrier to providing meaningful comments on the FEIS (as was the case for the DEIS and SDEIS), as well as excludes people with visual limitations from the opportunity for meaningful review in the short review periods afforded. The use of a protected PDF format with uncopiable text in NEPA documents should be seriously reexamined—and ideally discontinued—at the federal and state agency level as a barrier to meaningful public participation and as a discrimination issue for people with visual impairments.[18]

None of these burdens and barriers was necessary. MDOT created a DEIS/SDEIS comments database that MDOT could have used (or shared) for comment tabulation and analysis. "As comments were received, they were reviewed, considered, and uploaded to a database used as a repository for comments received" (FEIS Appendix T Introduction, p. 3). Of note, in all 26,500+ pages of the FEIS, this is the only mention of the comments database.

    **2.    The Agencies' Extended Delay in Responding to 5,047 Comments and Providing a Response Outside of Any Formal Comment Opportunity Prevented the Public and Their Elected Officials from Having Meaningful Interaction with the Agencies During the Decisionmaking Process.**

According to the FEIS, MDOT SHA received 2,909 public comments by the DEIS deadline of November 9, 2020, and 2,138 public comments by the SDEIS deadline of November 30, 2021 (FEIS 9-2).

The public, including officials from 22 cooperating agencies and "other agencies," FEIS App'x T Introduction at 4, who submitted comments by the DEIS deadline, waited *1 year and 7 months, or 585 days*, to have access to the comments and receive some sort of response (in many cases, just a list of cross references) from the Agencies via the FEIS. Commenters to the SDEIS waited *6.5 months, or 199 days*.

---

[18] In the public hearings held in 2021, the hearing officer showed a slide entitled "Title VI of the Civil Rights Act of 1964" that states: "MDOT SHA prohibits discrimination on grounds of … disability." Source: I-495 & I-270 MLS Virtual Public Hearing, November 1, 2021 at minute 10:20, https://youtu.be/4g0L9qk-L60.

00177773

These massive delays even in responding to elected officials and the public prevented them from having needed information, meaningful constituent-elected interactions about issues, opportunities for advocacy, and input into the decisionmaking process.

###   3.    In the FEIS, the Agencies Erase the Public Voice by Failing to Make Any Analysis of the 5,000+ Public Comments.

As noted above, nowhere in the FEIS documents covering 74 files and 26,500 pages is there an attempt at analysis, tabulation, or quantifying of the contents of the 5,000+ public comments.

The lack of tabulation and analysis is a marked change from the Agencies' treatment of public comments for the first three public comment periods[19] (see details of previous comment treatment, as described in our DEIS comments at 173-178[20] and DontWiden270.org's DEIS comments, FEIS App. T.2.A at 75-82).

The Agencies, for the Project's first three comment periods, differentiated between the number of discrete submissions and the number of separate points made within the submissions. The cumulative totals for the three periods: 3,937 individual submissions containing 16,129 points. The FEIS, in contrast, tallies only the number of submissions, with no numerical indication of the scope or complexity of their contents.

In the DEIS, the Agencies published a tally (albeit based on flawed label assignments and other biases) of the numbers of comments reflecting support or opposition to the Project during the previous comment periods. After observing the Agencies' biased processes for tallying comments, advocacy organizations developed a compensatory strategy. We suggested that commenters make their opposition clear by beginning each DEIS and SDEIS comment submission with a version of, "I oppose the toll lane plan and support the no-build option."

Given such clear, consistent messages, the Agencies could easily have published an FEIS tally of submissions expressing opposition. Instead, the Agencies got around our "fix" by tallying *none* of the opinions expressed in the submissions. This effectively removed public opinion from the FEIS except on a submission-by-submission basis, repeated 5,000+ times.

---

[19] The "first three comment periods" referenced and incorporated in MDOT's DEIS and SDEIS were originally detailed in MDOT's Scoping Report (June 2018); the Alternatives Public Workshops Summary (January 2019); and the Summary of Public and Stakeholder Engagement for the Recommended Alternatives Retained for Detailed Study (September 2019).

[20] Sierra Club, et al., Comments on I-495 and I-270 Managed Lanes Study Draft Environmental Impact Statement/Draft Section 4(f) Evaluation and Joint Federal/State Application (JPA) (Nov. 6, 2020) (hereinafter "DEIS comments"), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/2020-11-09-Comments%20on%20DEIS%2C%20I%204%28f%29%2C%20and%20JPA%20%281%29%20%281%29.pdf.

9

In reply to comments that started with, "I oppose the toll lane plan and support the no-build option," the Agencies ignored the opinion and "replied" with an unasked-for explanation of what the no-build option is. *See, e.g.*, FEIS App'x. T.2.A Vol. 1 at CO-76.

> **4.    The Agencies Give Nonsensical, False, and Inconsistent Responses to Nearly Identical Comments from the Sierra Club and DontWiden270.org Regarding the Agencies' Previous, Biased Treatment of Public Comments.**

The FEIS gives nonsensical, false, and inconsistent responses to nearly identical comments from the Sierra Club and DontWiden270.org regarding the Agencies' previous, biased treatment of public comments.[21]

From the Agencies' response to the Sierra Club:

> The letter states incorrectly that the lead agencies improperly summarized or 'miscounted' the public input on these preliminary NEPA documents. The lead agencies reviewed all comments received and properly summarized the content of those comments during the preliminary scoping stages of the NEPA review in order to inform production of the DEIS."

FEIS App'x T.2.A. Vol. 3 at CO-538. The Agencies provide no evidence or documentation to support their response.

In contrast, the Agencies' response to DontWiden270.org does *not* dispute or respond to evidence of MDOT's previous biased treatment of opposition comments, simply accepting, for instance, this documented example: MDOT established a policy to label a comment as being in opposition to the Project only if the submitter used exactly the right words. No comparable policy was established for pro-Project comments. *See* Sierra Club DEIS Comments at 166.

The Agencies' response to the Sierra Club, but not to DontWiden270.org, says, "Once the EIS documents were made available for formal comment periods, MDOT SHA reprinted and made available all comments on the DEIS and SDEIS and responded to all substantive comments in the FEIS." FEIS App'x T.2.A. Vol. 3 at CO-538.

If this were true, the publication of those DEIS and SDEIS comments would have happened *before* issuance of the FEIS, since the FEIS does not allow for a "formal comment period." Where, when, and to whom were those reprints made available?

---

[21] For references to the points in this section, see responses to Dontwiden270.org's DEIS submission, FEIS App'x. T.2.A Vol. 1 at CO-76-82, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf and the responses to Sierra Club's DEIS submission. FEIS App'x. T.2.A Vol. 3 at C0-538, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-3_June-2022p.pdf.

00177775

The Agencies' response to the Sierra Club's comments says: "Support for or opposition to the project and/or the Preferred Alternative as stated in all public comment is accurately reflected in the NEPA record and available for review." *Id.*

Since the FEIS does not tabulate support or opposition, how and where are "support for or opposition to the project and/or the Preferred Alternative" accurately reflected in the NEPA record? Does the Agencies' reply assume the reviewing federal agencies are creating their own tabulations from the raw public comments?

The Agencies' response to DontWiden270.org's comment makes a different point about support and opposition: "...a comment stating support or opposition is not a yes/no vote for the project."[22]

Yet the Agencies' treatment of comments from the first three public comment periods indicates the opposite: the Agencies clearly tabulated support and opposition to the Project, albeit in a biased and misleading manner.

## II.    The Traffic Models Used in the FEIS Are Deeply Flawed.

### A.    The Traffic Modeling in the FEIS Fails to Address Critical Errors Identified by Commenters and Introduces New Errors.

In our comments on the SDEIS, we explained that the traffic modeling supporting the SDEIS had serious errors. The SDEIS's traffic model presents a simplistic traffic story that, if the preferred alternative is not constructed, corridor traffic volumes will grow significantly and delays will grow exponentially. Based on this model, the SDEIS claims that the preferred alternative will reduce congestion on the general-purpose lanes and alleviate congestion on other roads relative to traffic conditions today. But that simple story relied on flawed modeling. *See* SDEIS Comments at 18-38; *see generally id.* at 39-96.

As described more fully in the attached expert report by Norman Marshall, President of Smart Mobility, Inc., (July 2022) (hereinafter "Marshall Report"),[23] the revised traffic modeling used in the FEIS does not remedy the acknowledged errors with the previous traffic model used in the SDEIS. To the contrary, the new model results are, instead, rife with evidence that the Agencies "have failed to comply with their own Agency guidance concerning traffic modeling" such that "the output is seriously compromised as a result of these modeling errors." *See* Marshall Report at 2.

Mr. Marshall's ability to thoroughly critique the traffic model was hampered because MDOT has refused to release the underlying data and model files, in violation of NEPA's public disclosure requirements. *See* Marshall Report at 4-5; *id.* App'x A-B; *see also* Section I.A of these comments. Even so, Mr. Marshall and others identified serious deficiencies in the FEIS traffic models. The Marshall Report details several categories of errors, some of which persist from the

---

[22] FEIS App'x T.2.A Vol. 1, p. CO-80, https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[23] The Smart Mobility, Inc., Report is attached as Exhibit B.

00177776

flawed modeling from the SDEIS and some of which are new. These errors undermine the simplistic story the Agencies continue to tell that the preferred alternative is necessary to address traffic congestion and reduce travel times. Instead, the models "appear to overstate travel time savings and inadequately capture congestion, gridlock conditions, and bottlenecks," Marshall Report at 23, based on the following errors:

- Given dramatic changes in predicted speed/travel time and vehicle throughput[24] between the SDEIS and FEIS, it appears that the modelers made parameter changes after they validated the traffic model, even though "it is only possible to have confidence in traffic microsimulation model outputs if the model is well calibrated to real-world base year data and [] these validated parameters are maintained in all alternatives analyses." As explained further in the Marshall Report, changing model parameters can have dramatic impacts on speed/travel time and throughput metrics. Marshall Report at 5-8.

- There are unexplained differences between the traffic "count" data in the FEIS and DEIS. The better model fit in the FEIS "appears to be achieved by changing the data rather than by changing the simulated volumes." But, changing the data inputs "at this point in the process after the calibration step [needs] to be disclosed and justified." That justification is not provided in the FEIS. It is possible that the FEIS modelers may be "fitting one model to another model rather than to actual data," which MDOT guidance strongly cautions against doing. *Id.* at 8-10.

- Even though input demand and the highway networks are described as "almost identical" in the SDEIS and FEIS, the FEIS shows much higher throughput under the 2045 no build alternative and also unexplained improvements in performance of the preferred alternative over the no build alternative. The only plausible explanations is that the model parameters have been changed since the model validation. If that is correct "the [p]referred alternative modeling is invalid." *Id.* at 10-15.

- To achieve reliable results from a traffic model, a modeler must reach convergence by running multiple simulations to receive comparable results. The FEIS states that only five simulations were run, the minimum required by MDOT. But, "[i]n heavily congested simulations, it generally is necessary to average more than 5 simulations. The report does not demonstrate that 5 simulations is sufficient for convergence." Again, without the underlying traffic files it is impossible to verify if the model was run enough times to achieve convergence. *Id.* at 15-16.

---

[24] Throughput is defined as "the number of vehicles that pass by a given point in the roadway network in a set amount of time." SDEIS at 3-13.

00177777

- As in the SDEIS, the FEIS traffic modeling invalidly shows future throughput to be much lower than existing throughput. This error was not addressed in the FEIS responses to comments. *Id.* at 17-18.

- As in the SDEIS, the FEIS continues to falsely insist that there is some increasing "demand" that exists independently from actual traffic volumes. Inputting unrealistic "demand" into the traffic model causes gridlock in the model and produces unrealistically low throughput. *Id.* at 18-20.

- Unlike the SDEIS, the FEIS adds a third model to its sequenced modeling approach, but this newly introduced model suffers from the same inherent problems as the other models. *Id.* at 20-22.

As we explained in our SDEIS comments, *see* SDEIS Comments at 19-20, rather than relying on flawed models, the Agencies should examine empirical data from Virginia and Maryland to understand the reasonably foreseeable impacts of constructing managed lanes on I-495 and I-270, which include the following:

1) Expanding I-495 and I-270 will shift traffic from the shoulder hours into the peak hours and create and/or exacerbate bottlenecks. As bottlenecks are most likely at the terminus of the managed lanes, phasing is critically important as well as the final extent of the Project.

2) An improvement in general-purpose lane speed is unlikely because constructing the managed lanes will shift traffic from the shoulder hours into the peak hours, and the general-purpose lanes will be just as congested during the peak hours as they would have been otherwise. The foundational premise of this Project is that extreme congestion in the general-purpose lanes is needed to justify the high tolls that will be required to fund the preferred alternative.

3) Constructing the I-495 and I-270 managed lanes is likely to make arterial congestion worse. No trip begins or ends on a limited access highway, and traffic does not magically switch between limited access highways and arterials despite what is presented in the SDEIS. Any shifts between these roadway classes causes traffic increases on some arterials and traffic decreases on others. As managed lanes concentrate traffic in the peak hour, arterial roads at I-495 and I-270 interchanges will be severely impacted, and these impacts are likely to outweigh the congestion benefits of traffic diversion from other arterials. The SDEIS models are incapable of calculating these tradeoffs.

4) If the managed lanes are constructed, it is likely that there will be significant traffic growth (induced travel) and induced land use impacts.

5) Managed lane proponents stress "choice." In fact, the choice is between two bad options: extreme congestion vs. extremely high tolls. Only about 1/6 of the daily traffic is carried by the Virginia I-495 Express Lanes despite the Express Lanes

13

having 1/3 of the roadway capacity. This is an inefficient use of infrastructure. The other 5/6 of traffic is carried by the general-purpose lanes. The toll lanes are "chosen" primarily by high-income travelers and/or travelers who are having the tolls reimbursed. This elite group will remain small because increases in demand by other users will prompt the tolls to increase further, becoming even less affordable.

6) The managed lanes will benefit only the few who are able to outbid the majority of travelers. There will be no benefits for non-users of the toll lanes. Non-users of the toll lanes (most travelers) will face continued high congestion in the general-purpose lanes and increased congestion on arterial roadways accessing I-495 and I-270 interchanges. Nevertheless, a portion of their taxes likely will go toward subsidizing the private toll lanes as has occurred in Virginia.

7) The MDTA toll-setting exercise was theater to mollify a skeptical public. The rates are set so high that the private operator will be able to maximize revenue through algorithms that cynically have been labeled "jam and harvest." These algorithms intentionally increase congestion in the general-purpose lanes prior to traffic peaking to justify charging higher tolls during the traffic peak. It's the public that gets "jammed" as their money gets "harvested."

The flawed traffic models used in the FEIS, like those in the SDEIS, continue to overestimate future congestion to justify the preferred alternative. The proposed managed lanes in Maryland will make congestion worse for most peak period drivers and push drivers to choose between extreme congestion and extremely high tolls that are set to make the lanes profitable.

As a result of these flawed models, the evaluation of numerous impacts that rely on traffic modeling, including air quality and environmental justice, is likewise flawed, and the consideration of reasonable, prudent, and feasible alternatives under NEPA and Section 4(f) is tainted. As one court observed, "In the area of the need for the subject [highway] segment, . . . predictions of traffic volumes in various target years of the several alternative transportation systems studied *are crucial*. Errors in traffic volume projections most likely would result in errors in conclusions based on traffic volume projections." *Movement Against Destruction v. Trainor*, 400 F. Supp. 533, 548 (D. Md. 1975) (emphasis added). *See also* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA."). Accordingly, a new draft NEPA document must be issued based on a revised and corrected traffic model.

**B.    The U.S. DOT Must Re-Examine the Traffic Modeling in the FEIS To Ensure Its Integrity and the Agencies Must Address Possible Inconsistencies Between the FEIS's Traffic Model and the Traffic Modelling Used to Support Revenue Models for the Project.**

**1.    MTOC Has Identified Inconsistencies in the Traffic Model that Warrant an Investigation into the Integrity of the Model.**

After the FEIS was released, Dr. Benjamin Ross, President of Maryland Transit Opportunities Coalition ("MTOC"), asked U.S. DOT Deputy Secretary Polly Trottenberg

14

to examine evidence of possible scientific fraud in the FEIS traffic model. We incorporate by reference MTOC's letter to U.S. DOT[25] and additional information revealed in the subsequent articles.[26]

Dr. Ross found that "[t]he numbers [from the traffic model] simply do not look like what a computer model would produce."[27] Further, the FEIS modeling for the 2045 no build alternative appears inconsistent "with correction of errors in model inputs, coding, or numerical methods, but would be consistent with arbitrary adjustment of intermediate or final outputs."[28]

In MTOC's letter, Ross explains that the FEIS's traffic model predicted that certain evening rush-hour travel times for the 2045 no build alternative would be less than predicted by the SDEIS models, even though the traffic counts in many spots are the same in both models. For example:

> the predicted evening rush-hour travel time from Connecticut Avenue to I-95 on the Beltway Inner Loop is 15 minutes faster in the FEIS than in the SDEIS. The travel time from Rock Spring Park to I-95 is half an hour faster. Yet, in the two reports, the number of vehicles exiting the Inner Loop onto I-95 is exactly identical in each of the four pm peak hours, 3:00 to 4:00, 4:00 to 5:00, 5:00 to 6:00, and 6:00 to 7:00.[29]

Based on these predicted results, the FEIS model outputs do not appear to be consistent with traffic modeling principles that, as commuting times decrease on a particular route, vehicles will switch from other routes to save time:

---

[25] Letter from MTOC to Deputy Sec'y Polly Trottenberg, USDOT (July 11, 2022) (hereinafter "MTOC Letter"), *available at* https://transitformaryland.org/sites/default/files/scientificintegrityletter.pdf, and attached as Exhibit D.

[26] Bruce DePuyt, Toll Lanes Critic Accuses MDOT of "Scientific Fraud" in Key Report, Maryland Matters (July 12, 2022), *available at* https://www.marylandmatters.org/2022/07/12/toll-lanes-critic-accuses-mdot-of-scientific-fraud-in-key-report/; Katherine Shaver, Maryland Toll Lane Critics Cite 'Possible Scientific Fraud' in Traffic Study, Washington Post (July 12, 2022), *available at* https://www.washingtonpost.com/transportation/2022/07/12/maryland-toll-lanes-traffic-study/; Andrew Gelman, Don't Go Back to Rockville: Possible Scientific Fraud in the Traffic Model for a Highway Project?, Statistical Modeling, Causal Inference, and Social Science Blog (July 12, 2022), *available at* https://statmodeling.stat.columbia.edu/2022/07/12/dont-go-back-to-rockville-possible-scientific-fraud-in-the-traffic-model-for-a-highway-project/; Alex Daugherty, Weekly Transportation post, Politico (July 12, 2022).

[27] Shaver, Maryland Toll Lane Critics Cite 'Possible Scientific Fraud' in Traffic Study, Washington Post.

[28] *See* MTOC Letter.

[29] Letter from MTOC to Deputy Sec'y Polly Trottenberg, at 2.

00177780

With such large differences between the two models in predicted travel time, the [model] algorithm must assign some trips that took other routes in the SDEIS model to the eastbound Beltway [] in the FEIS model… and it is next to impossible that the changes would exactly cancel out in each of the four hours [so that the traffic volumes between the FEIS and SEIS are exactly identical].[30]

In his letter, Dr. Ross identifies FEIS traffic model outputs that appear inconsistent with traffic model runs but "could … arise from ad hoc alteration of model outputs for the purposes of generating a desired conclusion."[31]

Based on these potential issues with the FEIS's traffic model, Dr. Ross asks U.S. DOT to complete an independent examination of the Record of Decision for the I-495/I-270 Managed Lane Study to ensure the veracity of the traffic modeling data or, at a minimum, conduct a peer review of the modeling report.

After the new traffic model was released as part of the FEIS, Maryland Sierra Club requested that MDOT provide the underlying data files associated with the traffic model. As explained in the comments of Norm Marshall, these underlying data files were necessary in order to fully assess the accuracy of this model. Not only did MDOT refuse to supply these underlying data files in response to Sierra Club's timely request, MDOT subsequently asserts that these files may be provided only upon payment of over $21,000, and may not be provided even then, thus ensuring that the accuracy of this traffic model will not be questioned. MDOT's refusal to disclose this underlying data, in clear violation of NEPA, strongly suggests that MDOT is trying to hide something and that Mr. Ross's concerns about fraud are well-founded. We join this request for U.S. DOT to conduct a thorough examination of the traffic model. Failure to do so violates NEPA, which requires that the conclusions reached in environmental documents be supported by accurate data. *See* 40 C.F.R. § 1500.1(b) ("Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA.").

**2.      The FEIS Traffic Model Appears to be Inconsistent with the Traffic Model Used To Predict Revenue.**

The FEIS used different traffic models to predict environmental impacts and to predict toll revenue. According to the FEIS, FEIS at 10-2, the environmental impact traffic model was done by RK&K. The March 12, 2021, Preliminary Toll Rate Due Diligence Report, submitted to the Maryland Transportation Authority ("MDTA") by CDM Smith, states on page 3 that the model used for traffic and revenue estimates "was originally based on the Metropolitan Washington Council of Governments (MWCOG) regional travel demand model but with updates and enhancements incorporated by CDM Smith." It also states on page 2 that "[t]he developer [MDOT's partner in the Public-Private Partnership] will perform their own T&R [Traffic and Revenue] studies to support project financing." Because the Project may be funded using

---

[30] *Id.* Ex. 1 at 2.
[31] *Id.* Ex. 1 at 3.

00177781

Transportation Infrastructure Finance and Innovation Act funding, this model, like the FEIS model, will be submitted to U.S. DOT.

The FEIS fails to acknowledge or discuss an apparent inconsistency between its traffic model and the traffic models used to predict revenue. Using one traffic model to predict environmental impacts and an inconsistent traffic model to predict revenue is unacceptable. It is as dishonest as keeping two sets of financial records and showing numbers to lenders that are inconsistent with the numbers shown to tax collectors. Both the environmental impact traffic model and MDTA's revenue traffic model were used to project 2045 traffic conditions for the preferred alternative. However, the Preliminary Toll Rate Due Diligence Report that was made public by MDTA includes only 2025 numbers, and only a very limited number of those. Thus, we are not able to directly compare results of the two models. No results whatsoever of the developer's traffic model have been publicly released, so the public is unable to comment on any possible inconsistencies between that model and the FEIS model.

Nonetheless, the very sparse information in the Preliminary Toll Rate Due Diligence Report suggests a possible inconsistency between its model and the FEIS model. Table 7 of the toll rate report predicts that in 2025, average traffic in the two-lane tollway reaches the soft cap threshold (variously given in MDOT documents as 3200 or 3300 cars per hour) only in one roadway segment: northbound immediately north of River Road (MD 190). That segment forks between I-270 and the Beltway; the threshold is exceeded on the I-270 fork from 4:00 to 7:00 pm and on the Beltway fork between 6:00 and 7:00 pm. In the northbound segment immediately south of Montrose Road, it predicts that the soft cap will be hit frequently despite falling short of it under average conditions.

The FEIS forecast for 2045, twenty years later, shows the toll lane traffic volume exceeding 3300 cars per hour only in the northbound segment between River Road and the I-270 fork, between 3:00 and 6:00 pm. It predicts toll lane traffic volumes between 3200 and 3300 cars per hour only in one other segment, the segment immediately south of Montrose Road.

The forecasts in the Preliminary Toll Rate Due Diligence Report assume a steadily increasing demand for automobile travel due to population and job growth, and a more rapidly growing demand for toll lane travel due to increasing income levels. The growth in travel demand should be reflected in rising traffic volumes and increasing toll rates. Thus, one would expect the report to predict tolls reaching the soft cap more frequently in 2045 than in 2025. However, the FEIS traffic model does not predict traffic volumes sufficient to activate the soft cap. The FEIS failed to grapple with this issue and explain or correct the inconsistencies between the two models.

The reliance on inaccurate data—even in the face of explicit warnings about its inaccuracies—tainted the required consideration of alternatives and therefore violates NEPA.

17

00177782

**C.    There Are Serious Problems with the Current FEIS that Indicate the Traffic Models and How They Are Applied Should Be Reviewed Independently Before Final Decisions Are Made.**

Table 1 shows a comparison of the SDEIS and FEIS PM trip travel times. The difference between the no build ("NB") and general purpose ("GP") travel times both increase and decrease, but all GP and NB travel times in the FEIS are reduced. GP lanes are the non-toll lane part of the toll road.

Table 1. Comparison of FEIS to SDEIS Numbers

| PM Trips | SDEIS | | | FEIS | | |
|---|---|---|---|---|---|---|
| | NB | GP | Difference | NB | GP | Difference |
| GW Parkway to I-370 | 42 | 52.1 | 10.1 | 27.9 | 36.8 | 8.9 |
| Clara Barton to I-370 | 37.3 | 48.6 | 11.3 | 25.1 | 35.8 | 10.7 |
| River Road to I-370 | 24.4 | 30.8 | 6.4 | 17 | 26.6 | 9.6 |

Table 2 shows the difference projected between the FEIS and the SDEIS projected travel times for identical GP trips. The trips are the PM trips from the George Washington (GW) Parkway, Clara Barton Parkway, and River Road to the end of the toll lanes on I-270 at I-370.

Table 2. Travel Time Different Between SDEIS and FEIS for GP Lanes - PM

| | SDEIS | FEIS | Difference | % Reduction |
|---|---|---|---|---|
| GW Parkway to I-370 | 52.1 | 36.8 | 15.3 | 30 |
| Clara Barton to I-370 | 48.6 | 35.8 | 12.8 | 26 |
| River Road to I-370 | 30.8 | 26.6 | 4.2 | 15 |

What Table 2 shows is that there is a substantial reduction of travel times for the FEIS compared to the SDEIS. We are talking about a 30 to 15% reduction from 15 to 4 minutes. The result of these changes is to provide MDOT with the ability to claim higher average speeds for the general purpose (GP) part of the toll lanes in the newest analysis, despite the fact that the MDOT's own analysis projects on average a 10-minute advantage (faster trips) from the GW, Clara Barton, and River Road PM trips to I-370 for the no build alternative.

In fact, when you examine the key trips from River Road along the Beltway to Old Georgetown Road exit or to the Democracy exit on the I-270 West Spur, the comparative slowdown between trips in the GP lanes vs. the No Build has grown enormously – 137% (Table 3) for the Beltway trip and 33% (Table 4) for the I-270 West Spur trip.

Table 3. Trip times from River Road to Old Georgetown Road – PM

| SDEIS | | FEIS | | % Difference |
|---|---|---|---|---|
| NB | GP | NB | GP | |

00177783

| 37.3 | 41.9 | 18.3 | 29 | |
| Difference GP-NB | 4.6 | | 10.9 | 137% |

Table 4. Trip times from River Road to Democracy - PM

| SDEIS | | FEIS | | % Difference |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 10.4 | 16.7 | 4.9 | 13.3 | |
| Difference GP-NB | 6.3 | | 8.4 | 33% |

While there a clear advantage for the no build in the PM trips, reducing the travel times of the GP portion of the toll road minimizes the devastating effects of the PM Beltway Chokepoint by giving the appearance that the speeds will be acceptable.

Figure 1. Map of project area with labeled interchanges and chokepoint



Maryland Department of Transportation State Highway Administration I-495 & I-270 P3 Office map.
Interchanges and chokepoint labeled by author.

Table 5 and 6 illustrate another inexplicable change between the SDEIS and FEIS. For trips from Connecticut Ave to the GW Parkway (Table 5) and Connecticut to River Road (Table 6) there is a 470% and 656% increase in the projected travel time advantage for the FEIS versus

19

00177784

the SDEIS for GP lanes over the no build lanes in the PM travel time. The Connecticut to GW Parkway and Connecticut to River Road No Build travel time changes between the SDEIS and the FEIS are 240% and 295%. It is puzzling that such a mismatch could occur and not explained.

Table 5. Trip from Connecticut to GWP - PM Minutes

| SDEIS | | FEIS | | Increase Time |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 16.4 | 10.1 | 39.4 | 9.8 | |
| Difference GP-NB | 6.3 | | 29.6 | 470% |

Table 5a. % Change Between SDEIS and FEIS for Connecticut to GWP - PM Minutes

| NB-SDEIS | NB -FEIS | | % Difference | |
|---|---|---|---|---|
| 16.4 | 39.3 | | 240% | |

Table 6. Trip from Connecticut to River Road - PM minutes

| SDEIS | | FEIS | | Increase Time |
|---|---|---|---|---|
| NB | GP | NB | GP | |
| 10.9 | 7 | 32.2 | 6.6 | |
| Difference GP-NB | 3.9 | | 25.6 | 656% |

6a. % Change Between SDEIS and FEIS from Connecticut to River Road - PM minutes

| NB-SDEIS | NB-FEIS | | % Difference | |
|---|---|---|---|---|
| 10.9 | 32.2 | | 295% | |

As explained more fully in the attached report, taken together these types of changes that clearly favor the Agencies' desired outcome require detailed and independent analysis that cannot be produced in 30 days for 26,000 pages with limited resources of outside groups.[32] Changes of this magnitude should not happen after two rounds of analysis before the FEIS, and they certainly should not completely favor MDOT's desired outcome.

### III.    The FEIS Fails To Address Impacts to Public Health.

The FEIS fails to disclosure serious public health risks and impacts and suffers from deficiencies in its analysis of the public health impacts of the evaluated alternatives.  Throughout the NEPA process for this Project, we have requested that the Agencies conduct a full analysis of

---

[32] *See* Katz Report, attached as Exhibit H.

00177785

public health impacts, including, for example, an analysis of localized air quality impacts or health impacts from traffic safety issues. The Agencies have declined to do so.

Based on their close review of the FEIS and its appendices, several health experts—including a public health expert, air quality expert, traffic safety and crash analysis expert, and an epidemiologist—have provided letters and reports explaining where the FEIS has failed to disclose or analyze serious public health impacts of the Project..

Roselie Bright, Sc.D., and Ronald Bialek, MPP, explain that the FEIS suffers from a deficient analysis of impacts including a failure to address traffic-related injuries and deaths from an increase in vehicle miles traveled, adverse health impacts and deaths from increased mobile source air toxics and other sources of air pollution, and adverse health impacts from construction- and traffic-related noise. As Bright notes, the FEIS fails to acknowledge or discuss the links between, for example, increased air pollution from traffic and high rates of asthma or heart disease.[33] As Bialek highlights, these health impacts are likely to be disproportionately higher in EJ populations, given historic inequities. [34]

The report by ZAMURS AND ASSOCIATES, LLC, explains that the FEIS's air quality discussion lacks a discussion of the preferred alternative's impacts on criteria pollutants and other pollutant emissions and also fails to address air quality concerns in environmental justice communities, despite previous comments identifying these missing analyses. [35] Further, the FEIS fails to fully evaluate the effects of bottlenecks that will be created under the preferred alternative and, importantly, the air quality impacts from the bottlenecks that may concentrate around the end points of the preferred alternative, in areas where EJ populations live. *See* ZAMURS AND ASSOCIATES Report at 5-6.

Further, as discussed below, Byron Bloch, a longtime expert in traffic safety, discusses failures to address the public health impacts of traffic safety issues from the preferred alternative and from respirable silica dust caused by highway construction.[36]

Impacts to public health are an important part of any "hard look" analysis required by NEPA. Many of the proposed actions under the preferred alternative will cause significant, adverse public health impacts, whether directly, indirectly, or cumulatively. For all the reasons explained in the experts' letters and reports as well as those explained in our prior comments, this FEIS fails to take that hard look. As a result, the preferred alternative is likely to cause significant, adverse health impacts, unexamined in the FEIS.

---

[33] *See* Letter of Roselie Bright to Sierra Club, attached as Exhibit E.
[34] *See* Letter from Ronald Bialek to Sierra Club, attached as Exhibit F.
[35] *See* ZAMURS AND ASSOCIATES, LLC Report, attached as Exhibit G.
[36] *See* Bloch Report, attached as Exhibit I.

00177786

A.    **Respirable Crystalline Silica Construction Dust Remains a Major Unaddressed Public Health Hazard of this Project that the Agencies Are Ignoring.**

MDOT and FHWA have failed to disclose or address critical health risks raised by safety experts regarding large volumes of toxic crystalline silica dust that will be released as the Project carries out demolitions of soundwalls, bridges, and highways to reconstruct and enlarge them for this Project. Their disregard and dismissal of this health risk flies in the face of recent, more stringent U.S. Occupational Safety and Health Administration ("OSHA") regulations for silica dust and known risks explored in articles with titles like, "Highway Repair: A New Silicosis Threat."[37]

OSHA explains that "[r]espirable crystalline silica . . . is created when cutting, sawing, grinding, drilling, and crushing stone, rock, concrete, brick, block, and mortar."

Research has shown silica dust to be a known carcinogen and one of the most harmful components of particulate matter, which is a mixture of small airborne particles of organic chemicals, metals, minerals and soil.

The Agencies do not address any of the construction-related risks of silica dust. The FEIS instead minimizes all construction-related air pollution: "Because the project's construction duration is not anticipated to exceed six years in any single location, most air emissions associated with construction are considered temporary in nature."[38]

That statement raises even more profound questions and concerns. Construction is not anticipated to exceed six years in any single location. Therefore, they consider it temporary. Six years in a single location is the entire elementary school education of a student at Carderock Springs Elementary School, which is already badly affected by its proximity to I-495. Six years is one less year than all of middle and high school, and surely will not provide comfort to the staff, students, and parents of students at Julius West Middle School, already adversely impacted by proximity to I-270. It is doubtful that another vulnerable population, the seniors at Rockville Senior Center, feel that six years is temporary.

The issue with air pollution from highway construction cannot be swept under the rug by a generic reference to "most emissions." A major issue facing all populations living, working, and going to school along the proposed construction route is the respirable crystalline silica dust. As one website correctly observes, "There are no regulations for bystanders or enforced protections for surrounding civilians. Unfortunately, the nature of respirable dust particles can put bystanders at risk of inhalation exposure far beyond the confines of the construction site."[39]

---

[37] David J. Valiante, et al, Highway Repair: A New Silicosis Threat, Am. J. Public Health 94(5): 876-880 (May 2004), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1448352/.

[38] FEIS at 9-50.

[39] How Far Can Respirable Dust Actually Travel? Sep 24, 2019, available at https://www.nosilicadust.com/how-far-can-respirable-dust-actually-travel/.

00177787

Toxic crystalline silica dust is a known carcinogen, it is very light and can drift hundreds of feet and even miles, and it causes multiple lung and breathing ailments and even death. Bryon Bloch, a longtime expert in traffic safety, states that the Project's FEIS is "evasive and fraught with omissions on such critical areas as: The generation of toxic silica construction dust that will assuredly cause asthma, silicosis, and lung cancer to many residents."[40]

He continues:

It is outrageous that this FEIS does NOT adequately address concerns for the toxic and carcinogenic crystalline silica construction dust that will be generated daily during at least the six years of road demolition and re- construction... including the multiple bridges and soundwalls. The FEIS ignores any concerns that thousands of our children through seniors will be sickened with asthma, silicosis, COPD, and lung cancer. In their response, MDOT simply refers to "fugitive dust" and then mentions that they "may" use some measures to minimize or mitigate.[41]

Contrast this evasive smoke-and-mirrors response with the evidence presented by the National Cancer Institute about silica construction dust being toxic and carcinogenic, and by the American Public Health Association about road re-construction projects causing silicosis. Yes, there are OSHA requirements to help protect the on-site workers from breathing respirable silica dust, but what about the nearby citizens and neighborhoods and schools? One of the MDOT measures is that they *"may use"* water trucks... but that means a fleet of daily tanker trucks and spraying huge amounts of water to hopefully capture enough of the silica dust, etc., and then how and where is it safely dispersed (without adversely affecting our public water supply ala Flint, Michigan)? Mitigation techniques are only mentioned in broad brush terms, and that they *"may"* be used... and that these measures are only partially effective at best.

For these reasons and those Mr. Bloch presents more fully in his report, the Agencies' failure to disclose and meaningfully grapple with the impacts of silica dust in their FEIS denies the public and decisionmakers the needed understanding of this Project's health impacts for populations living, working, and going to school near the highways.

### B.    The FEIS Fails To Address the Health Impacts of Traffic Safety Issues from the Preferred Alternative.

The FEIS fails to address how the preferred alternative road design will lead to more vehicle crashes, including the lethal truck-vs.-car crashes. It also fails to address the safety impacts

---

[40] *See* Bloch Report, attached as Exhibit I.
[41] Full quote in FEIS at 5-181 "To manage fugitive dust emissions during construction, the contractor may use some or all of the following dust control measures, to minimize and mitigate, to the greatest extent practicable, impacts to air quality:"

00177788

of the severe bottleneck the Project creates where seven lanes will funnel down to two north of Gaithersburg.

Traffic collisions on the widened highways are likely to increase under the preferred alternative. The FEIS does not, however, fully evaluate these impacts. As the FEIS explains, "safety was not one of the specific elements identified in the Study's Purpose and Need." FEIS at 60.

If the preferred alternative is built, there will be seven northbound and seven southbound lanes on I-270, with two central toll lanes. This proposed road design is likely to create multiple safety problem. Vehicles will be required to shift to and from the central toll lanes to the outer lanes to exit. According to Bryon Bloch, a longtime expert in traffic safety, this configuration "will lead to many severe collisions."[42]

Further, the road configuration proposed under the preferred alternative will cause more frequent truck versus car crashes. For example, the proposed design does not address the need for safety shoulder or break-down lanes. FHWA recommends at least 12-foot shoulders adjacent to the outer travel lanes on roads, like I-270, with heavy truck traffic. Instead, the road designs for the preferred alternative:

> look like an artist's concept, and [do] not include any technical details to describe such necessary features as entry and exit ramps, how the traffic will enter and exit the toll lanes, how the traffic on the central toll lanes will transition to the exits, and other details.[43]

Shoulders less than 12 feet adjacent to outer travel lanes carry safety risks. The FEIS talks about "typical sections" of highway but is not clear about where and how frequently a 12-foot shoulder for the general purpose lanes will be maintained. For example, it was disclosed in the final 4(f) evaluation that next to the Morningstar Moses Cemetery:

> The width of the right shoulder is reduced from 12 feet to 6 feet wide (measured between the edge of travel lane and face of concrete barrier) for a total length of approximately 400 feet including tapers. The total length of the narrow right shoulder excluding the tapers is approximately 235 feet.[44]

This FEIS does not disclose how the risk is managed between toll lanes and general purpose lanes and whether when the general purpose lane shoulder is less than 12 feet, the toll lane shoulder is also proportionally narrower or if the general purpose lanes bear the entirety of the safety risks associated with a narrower shoulder adjacent to the outer lane.

In addition, Mr. Bloch opines, the preferred alternative will exacerbate the traffic backup bottlenecks as the seven lanes heading north on I-270 will funnel to two lanes just north of

---

[42] *See* Report of Byron Bloch at 1, attached as Exhibit I.

[43] *Id.* at 4.

[44] FEIS App'x G Final 4(f) Evaluation at 65, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/11_MLS_FEIS_AppG_Final-Section-4f-Evaluation_-June-2022p.pdf

Gaithersburg. There are already bottlenecks in the Gaithersburg area from a less severe funneling from five lanes to two. As addressed more fully elsewhere in this Section, bottlenecks cause localized air pollution. Gaithersburg hosts several EJ populations who should not be asked to bear this additional environmental burden.

Based on his review of the FEIS, Mr. Bloch concludes:

The FEIS fails to address how the Alternative 9 road design will lead to more vehicle crashes, including the lethal truck-vs.-car crashes (which I have analyzed for many years as a national auto safety expert analyzing many such actual collision accidents). The lane shifting and cross-overs to and from the toll lanes to entry and exit locations will exacerbate such collisions with severe to fatal consequences for the occupants of passenger vehicles.

The FEIS should have, but did not, thoroughly evaluate these safety issues and corresponding impacts to public health while analyzing the effects of the alternatives. Instead, it includes a proposed alternative that is likely to cause significant health impacts from unsafe road conditions.

## IV. The FEIS's Discussion and Evaluation of Plummers Island, Certain NPS Lands, the Potomac River, and Impacts to the Northern Lon-Eared Bats and Other Bats Is Incomplete and Contrary to Applicable Legal Requirements.

### A. Throughout the Environmental Review Processes, the Agencies Have Failed to Consider the Full Scope of Impacts to Plummers Island.

Plummers Island is a unique natural research area that hosts many rare plant species while at the same time being close to a heavily populated urban area. It is the site of important, long-term scientific studies conducted by the Washington Biologists' Field Club ("WBFC" or "Club"), a non-profit organization comprised of influential and accomplished scientists and charged by the National Park Service with the care and maintenance of the Island. The Island also serves as the meeting place for the Club's members. WBFC has documented the rich ecosystems and biodiversity on Plummers Island through over 120 years of research. Plummers Island is entitled to protection under Section 4(f), both as part of the C & O Canal Historical Park and as a significant historic resource that is individually eligible for listing in the National Register of Historic Places as the Washington Biologists' Field Club on Plummers Island.

In the preferred alternative, the Agencies plan to take part of Plummers Island, place piers for the highway on the Island, undertake construction of the Project from the Island, destroy important research plots of rare plant species and habitat, and overshadow the Island and its significant research areas by as much as 30 feet with noisy new bridge lanes. All of these impacts constitute a use of Plummers Island that must be evaluated under Section 4(f).

WBFC was a consulting party in the Agencies' Section 106 process, but in spite of WBFC's attempts to protect the Island through its consulting role, the Agencies have failed to do so. Nonetheless, the Agencies appropriately recognized the Island's historic significant and have

00177790

agreed to nominate Plummers Island to the National Register of Historic Places. Yet, the Agencies have failed to protect the whole of the property, including the riparian areas outside the ordinary high water mark, or evaluate feasible and prudent alternatives that would avoid or minimize harm to the protected features of Plummers Island.

Under the binding 1959 agreement between WBFC and the National Park Service,[45] the parties memorialized their intent to "preserve this natural wild area as a sanctuary and scientific research preserve," and WBFC gave the Island to the federal government, who agreed to ensure that any improvements on the island "shall not be inconsistent with the uses to which the island has been dedicated by the [WBFC]" in exchange for WBFC's continued maintenance and research on the Island as a wild natural area, so long as WBFC existed and complied with certain obligations. WBFC's extensive studies of the Island make it a rare and precious part of the cultural and scientific natural heritage of the National Park system.

As we now discuss, the failure to acknowledge the full scope of the impact of the Project on Plummers Island, including the long-term research and sensitive research sites that will be destroyed by the Project, and the failure to evaluate feasible and prudent alternatives that would avoid or minimize harm to the protected features of Plummers Island, violates Section 4(f).

**1. The Agencies Violated Section 4(f) of the Transportation Act by Failing To Mitigate all Proposed Impacts to the Island.**

The Agencies' failures to avoid or minimize impacts to Plummers Island violate Section 4(f) of the Department of Transportation Act. The Act bars the FHWA from approving any transportation project that "requires the use of . . . any land from an historic site of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such . . . historic site resulting from such use." 23 U.S.C. § 138(a); 49 U.S.C. § 303(c). *See* SDEIS Comments at 136. FHWA determinations under Section 4(f) must be made in the ROD and cannot lawfully be deferred. 23 C.F.R. § 774.7(e)(3). *See generally* Sierra Club, Section 106 Comment Letter (Apr. 12, 2021).

The Agencies have now missed their opportunity to adopt an alternative to using Plummers Island as part of the Project or to adopt mitigation in compliance with Section 4(f). Understanding that the Agencies were unlikely to select an alternative that avoided the Island entirely, WBFC proposed mitigation efforts on many different topics in the Section 106 process. *See supra*. The Agencies rejected some of those proposals. They also failed to treat effects to wetlands and waterways as Section 4(f) issues. Now the FHWA has run out of time to formally agree to any meaningful mitigation to comply with its Section 4(f) responsibilities in the ROD because they deferred a final determination on Section 106 mitigation until the execution of the programmatic agreement after the NEPA process. The FEIS does not propose to include reasonable alternatives

---

[45] *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement, App'x A (Feb. 3, 2022) (attaching 1959 Agreement between WBFC and NPS).

00177791

that would avoid or mitigate harm to the Island in the preferred alternative, suggesting that it is very unlikely that the full mitigation required by Section 4(f) will be approved in the ROD.

The preferred alternative will cause irreparable harm to Plummers Island. Environmental damage to Plummers Island cannot be fixed by any form of post-hoc mitigation, as is apparently contemplated by the programmatic agreement. Plummers Island is a research site that hosts a multigenerational study of long-term ecological processes. Destruction of, or serious damage to, the habitat stops the ecological processes whose progress WBFC has been studying for over a century and ends the long-term study. The Agencies' proposed "comprehensive ecological restoration plan" on NPS land to address impacts from the preferred alternative, FEIS at 5-110, is not a solution.[46] Instead, it disrupts long-term research begun in 1901 and forces the WBFC to start a new study from scratch. The deferral of consideration of these long-term impacts violates Section 4(f). *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir. 1999) (because the historic properties protected by Section 106 and Section 4(f) are similarly defined, "it follows that the [Federal Highway Administration] must complete its Section 106 determinations before it can comply with section 4(f)").

## 2. Areas Within the Riparian Zones of the Island Must be Considered When Evaluating Impacts to the Island.

In the FEIS and the Section 106 process, the Agencies improperly ignored impacts to Plummers Island beyond the Island's ordinary high water mark. For over 120 years, as part of its overall research, WBFC has studied the wider, riparian margins of Plummers Island. This ecosystem-wide approach to the Island is part of the legacy of WBFC on Plummers Island. However, MDOT continues to say the Island ends at the ordinary high water mark because it failed to recognize the character-defining features of the historic property that justify a different boundary. The Agencies also arbitrarily declined to treat Plummers Island as a separate historic site of national significance worthy of special protections within the larger Chesapeake & Ohio Canal National Historical Park, despite the clear determination of eligibility for the WBFC at Plummers Island made by the Maryland Historical Trust during the course of the Section 106 process.[47]

The FHWA's failure to recognize this use of WBFC at Plummer's Island for purposes of Section 4(f) is contrary to the historic record and inconsistent with the purpose of the proposed designation of Plummers Island on the National Register of Historic Places. Because of the legacy of the WBFC and its research, the federal government determined Plummers Island to be eligible for the Maryland Historical Trust and the National Register of Historical Places, and historic designation requires protecting the Island as a whole.

---

[46] At a minimum, however, as required by the Section 106 process, MDOT and NPS should consult with WBFC before and during any proceeding "restorations."

[47] *See* Maryland Historical Trust, Determination of Eligibility Form for Washington Biologists' Field Club on Plummers Island (Aug. 20, 2021), attached as Exhibit J.

00177792

**3.  WBFC Was not Properly Included in the Planning Process and the Agencies Improperly Rejected its Recommendations To Minimize Impacts to Plummers Island.**

WBFC, despite its historic relationship with Plummers Island, was not originally included in the National Historic Preservation Act Section 106 process. Once WBFC was included as a consulting party to the Section 106 process, the Agencies met with WBFC and agreed to a five-year study of impacts from the Project with photographic documentation. Despite the fact that WBFC at Plummers Island will be used and its research sites will be irreparably damaged the by the Project, the Agencies have not agreed to WBFC's mitigation requests, including proposals for long-term monitoring of invasive species and the effects of the shadow from the bridge or WBFC's request for NPS funding for research using NPS standard plots emplaced and followed for 20 years to capture impacts more fully.[48] WBFC's suggestions were either ignored or dispensed with on engineering and cost grounds. For example, under the preferred alternative, the Agencies plan to build a shared use path on the bridge in a manner that would overhang Plummers Island, despite WBFC's objections and suggestions of where else to place it.

Moreover, WBFC was not given notice of MDOT's field visits to Plummers Island so that WBFC could oversee the work to avoid damage to certain plots and rare species. MDOT's contracted crews have already hacked down seven fringe trees (NPS was notified and fined the company, but that doesn't change the fact that the trees had already been cut down). MDOT has failed to respect WBFC's role on the Island throughout the planning process and provide appropriate advance notice for disturbances to Plummers Island.

WBFC should have been included in the Section 106 process from the beginning, and its reasonable mitigation requests should have been honored. Instead, the Agencies have pushed forward with a plan that will contravene WBFC's goals and permanently damage this important resource.  More importantly, in doing so, the FHWA has violated its responsibilities under Section 4(f) to avoid or minimize harm to WBFC at Plummers Island as a stand-alone Section 4(f)-protected historic site.

**4.  Mitigation for Impacts to Plummers Island Should Have Been Evaluated in the NEPA Process from the Beginning Instead of Being Channeled into a Section 106 Process that Will Conclude after the Comment Period Is over and the ROD Is Signed.**

The Agencies' failures to fully consider impacts to Plummers Island as part of the NEPA and Section 4(f) reviews is an artifact of their decision to address impacts to the Island in a Section

---

[48] Proposed mitigation included the following: Nomination of WBFC on Plummers Island to the National Register of Historical Places; bike & pedestrian lane emplacement; flooding potential; pier and caisson emplacements; ALB construction platforms; channel impacts from construction and vegetation removal; researching disturbance; invasive species; abatement of toxic runoff; abatement of noise pollution; vistas; expanded online content; financial support for inventories of understudied groups on the island; access during construction; and long-term research. *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement at 14-18 (Feb. 3, 2022).

00177793

106 programmatic agreement that will not be executed until after the NEPA and Section 4(f) processes have concluded. The decision to rely on a programmatic agreement for Plummers Island was in error. Section 106 regulations provide that a programmatic agreement is appropriate in certain limited situations, including "[w]hen effects on historic properties cannot be fully determined prior to approval of an undertaking." 36 C.F.R. §800.14(b)(1)(iii). Here, however, there was no reason to defer all identification of historic properties within the area of potential effects or the assessment of adverse effects and any measures to avoid and mitigate. WFBC and other commenters provided fulsome comments about possible adverse effects to the Island and numerous suggestions for proposed mitigation.

Because of the decision to proceed with a programmatic agreement, the Agencies claimed that they could not fully consider impacts to Plummers Island in the NEPA and Section 4(f) processes and declined to consider reasonable alternatives to avoid impacts (such as project scope, number of new lanes, and road alignment). But delaying consideration of the impacts to the site during alternative selection under NEPA and Section 4(f) undermined discussion of potential mitigation measures for any adverse effects. *See* Sierra Club Section 106 Comments of October 8, 2021.[49]

For example, in the FEIS, the Agencies essentially state that disrupting the continuity of WBFC's research is unavoidable, by ignoring reasonable alternatives that avoid impacts to Plummers Island. The no build option was dismissed without sufficient consideration. In addition, the ALB Strike Team considered a construction approach with a "west shift" of the LOD to entirely avoid impacts to Plummers Island, FEIS at 5-28, and determined it a viable option. The FEIS does not sufficiently explain why this west shift was rejected, particularly because "[a]n additional goal of the ALB Strike Team was to develop and evaluate alternatives for the avoidance and minimization of [impacts to] Plummers Island as it is a recognized ecologically sensitive and an NRHP-eligible historic property in addition to being part of the larger Chesapeake and Ohio Canal National Historical Park." FEIS at 5-28.

Damage to the Island was not inevitable. Allowing construction of the Project to impact the Island demonstrates the Agencies' error in failing to explore reasonable, prudent, and feasible alternatives under NEPA and directly violates the FHWA's substantive obligations under Section 4(f)

### 5. The Agencies Violated NEPA by Failing To Fully Account for Toxic Runoff, Water Quality Impacts, and Other Likely Impacts to the Island.

Despite WBFC's and other comments explaining the likely impacts of the Project on Plummers Island, the FEIS does not provide NEPA's required "hard look" with respect to the Island.

---

[49] Sierra Club Maryland Chapter Section 106 Comments on the I-495 & I-270 MLS (Oct. 8, 2021), *available at* https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u18365/MDSierraClub-Section106Comments-10-08-2021.pdf.

00177794

First, by limiting their consideration to areas landward of the ordinary high water mark on the Island, the Agencies claim that the preferred alternative will impact less of the Island than would have been indicated if those areas had been properly included.[50] The area that was considered is partly under the expanded ALB and the extended shadow will shade it out. Additional rare communities within the area of potential effects and bordering on the LOD include the Potomac River Bedrock Terrace Hardpan Forest; Floodplain Terrace Forest (with wetland bedrock pools); and the Central Appalachian / Piedmont Basic Mesic Forest with many sensitive species that are restricted to these habitats on the Island, including several that are rare. Plants cannot move out of the way and natural habitat is already being lost throughout the region. The rocky headland of the Island preserves a bit of the Potomac Gorge Riverside Outcrop Barren plant community (globally and state rare) and possibly the easternmost extent of this vegetation unit in the Gorge.[51]

Second, the FEIS includes incomplete maps of the Island, which adds to the Agencies' failure to consider the full extent of the impacts from the preferred alternative. In previous MDOT slides, the positions of piers from the post-construction ALB appears to be wider and overhang Plummers Island more than illustrated in the FEIS. The Agencies have not explained this discrepancy between MDOT's slides and information in the FEIS. WBFC remains concerned that the FEIS understates anticipated impacts to Plummers Island. Further, the destruction and disturbance of Chesapeake & Ohio Canal National Historical Parklands and riparian and pond wetlands is not likely to be contained within the LOD. In addition, in the maps of Plummers Island, the FEIS fails to completely catalogue the Island's water resources. For example, the Agencies did not fully map the frog water pools in the area of potential effects. There is a pool northwest of the mapped pools not drawn on the map. And there is further pooling northeast of the mapped pools that should be mapped as wetlands. The Agencies cannot fully evaluate impacts to the Island if they cannot even accurately describe its current state.

Third, the FEIS fails to consider toxic runoff onto the Island or reasonable mitigation to address it. Most bridges studied for toxic runoff rise up from the surrounding lead-in roads (convex). The ALB is concave, draining as much as a half mile in either direction from Maryland and Virginia lead-in highways. The low point in the curve is between the bend in Plummers Channel and the adjacent mainland. Currently drainage runs onto the NPS mainland, the channel, and the land edge under the bridge on both sides. The expanded I-495 and ALB would substantially increase surface runoff from the ALB, including toxic pollutants onto NPS land and into Plummers Channel. In addition, the lowest point on the ALB drains through scuppers and culverts onto NPS land, cutting an erosional gully and then draining into Plummers channel. *See* WBFC Comments on Section 106 at 16.T (Feb. 3, 2022). The Potomac River water may show little increase in pollutants due to its disproportionately large volumes. In contrast, Plummers Channel does not flow much of the time, and runoff accumulates in the water there until the surface flow threshold

---

[50] WBFC emphasized this point in its virtual and written SDEIS comments in 2021. WBFC's prior comments on the Section 106 process and comments on the DEIS and SDEIS are available at https://wbfc.science/plummers-island-threatened/.

[51] *See* WBFC, Section 106 Comments on the MLS Programmatic Agreement, App'x C map B (Feb. 3, 2022), attached as Exhibit M.

significantly breaches the channel head (level at or above 4.3 ft at Littlefalls Gauging Station). Between 3.4 and 4.2 ft Plummers Channel currently back fills from the bottom. Below 3.5 ft it is mostly stagnant.[52] Yet, the FEIS fails to discuss drainage directly onto Plummers Island or into Plummers Channel.[53] The Agencies plan to address ALB storm water management by relying on compensatory sites. FEIS at 3-20. Sierra Club criticized this approach in its SDEIS comments, *see* SDEIS Comments at 97-101, and continues to object to it. By relying on compensatory stormwater management, the FEIS seems to say that nothing can be done about contaminated runoff.[54] The Agencies also state that meeting stormwater quantity management goals on the shorelines adjacent to the ALB is infeasible. *See* FEIS at 3-18. The FEIS demonstrates that the Agencies are still planning an unlawful game of "wait-and-see" when it comes to how stormwater will affect this precious resource.

Fourth, the Agencies have failed to properly survey and analyze the occurrences of rare, threatened, and endangered species on Plummers Island and in the vicinity. As Dr. Browne explains more fully in her attached letter, the Agencies failed to properly survey for certain rare species on the Island and in the vicinity, including bats.[55] For example, they only performed bat surveys for two nights per site, even though bats frequently change roosts in the summer, so surveys should be performed for multiple nights to address presence or absence. Without mist netting and acoustic monitoring, more surveying is needed to determine the presence of threatened and endangered species on Plummers Island and in the vicinity of the American Legion Bridge on both sides of the Potomac River.

Fifth, the FEIS asserts that certain permanent impacts to Plummers Island will be temporary. The FEIS states that impacts to Plummers Island will be "permanent use for three, discrete, approximately 10-foot diameter pier foundations and temporary, construction activities," affecting "approximately 0.28 acres of impacts to the island, of which less than 0.1 acres would be permanent impact and 0.27 acres would be temporary impact." FEIS at 5-29. The FEIS notes, "[t]emporary construction activities may include efforts such as excavation, access for demolition of existing bridge foundation and piers adjacent to the island, and slope protection. Access to the existing and proposed piers is required for these activities." *Id.* These "temporary" construction activities have permanent effects. Armoring embankments, cutting down trees, destroying vegetation in the LOD, and creating a dead zone under the bridge and an extended shadow over the Island will irreparably damage the Island.

---

[52] The measures above are based on WBFC member Robert J. Soreng's estimates from having crossed to the Island many times. Dr. Soreng notes that even with the recent big rains the river level has been well below 4.3 ft.

[53] Plummers Channel is identified in the DEIS and SDEIS as "Rock Run Culvert," although it is neither Rock Run nor a culvert, and in the FEIS as a Potomac River "oxbow," although it is now officially named Plummers Channel by the USGS Board of Geographic Names.

[54] MDOT did not respond to comments about runoff from spills onto the Island from accidents. Several recent accidents have caused spills.

[55] *See* Letter from Shannon P. Brown, PhD to Sierra Club Maryland Chapter (July 18, 2022), attached as Exhibit K.

00177796

Even the FEIS recognizes that the "temporary" construction impacts may cause permanent damage to certain important plant species that are being studied on Plummers Island:[56]

> Some impacts to RTE [or rare, threatened, and endangered] plants will occur on Plummers Island, though most will occur in areas that will be temporarily disturbed during construction of the new ALB. RTE plants potentially affected within the areas of temporary disturbance on Plummers Island include thousands of horse-tail crown grass plants, about a dozen pale dock plants, 30-50 halberd-leaf rose-mallow plants, and 10-50 Rand's goldenrod plants. All of these plants occur either along the Plummers Island shoreline of the oxbow of the Potomac River or along the Plummers Island shoreline of the Potomac River. As noted above, because of the duration of construction of the new ALB and potential shading effects from the expanded ALB, the plant impacts are likely more permanent than temporary, even though they occur outside of the permanent footprint of the bridge. The RTE plant impacts resulting from the bridge pier footprint on Plummers Island would be to a few dozen horse-tail crown grass plants along the edge of the oxbow of the Potomac River.

FEIS at 5-127. The FEIS does not, however, acknowledge that many other "temporary" impacts are permanent disruptions to the integrity of the Island. Plummers Island is currently managed for scientific research to study long-term trends with no disturbance. The preferred alternative is antithetical to that purpose and the FEIS fails to acknowledge the full impacts to Plummers Island and to WBFC's mission. These acknowledged impacts also increase the severity of the use of Plummers Island under Section 4(f), and the FHWA's violation of its substantive obligation under Section 4(f) to consider prudent and feasible alternatives that would avoid or minimize harm to the important research sites that will be destroyed by the Project.

**6. The Agencies also Do Not Address Concerns to Plummers Island from Flooding.**

The FEIS fails to accurately describe the likely impacts of the preferred alternative due to the risks of catastrophic flooding to the Island. As noted above, the Agencies improperly limited consideration of impacts to Plummers Island to those that occur within the Island's ordinary high-water mark.

The FEIS's evaluation of construction and long-term impacts to the Island from flooding is also inadequate. In the FEIS, the Agencies state that hydrologic analysis will not be completed until final design, but without full hydrologic analysis the FEIS is incomplete. *See* FEIS 5-84 (explaining that a general assessment of hydrologic effects for the Project will be completed "once final limits of cut and fill are determined the final phase of engineering design"). Flow in the

---

[56] The FEIS explains "the proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the Island, a character-defining feature of the WFBC, resulting in diminishment of property's integrity of setting." FEIS at 9-33. It does not, however, fully describe the impacts from the Project or attempt to avoid or fully mitigate them, as discussed *supra*.

32

00177797

channel will be affected simply by removing the old piers at the river's edge, let alone by flooding adding to this impact, but the FEIS does not address these impacts.

The flooding issues from planned caisson and pier emplacements (creating perfect conditions for logjams) and leveling or trimming the rock ridge that constrains the channel overflow from flooding the island are major and reasonably foreseeable adverse issues that require prompt attention and avoidance, minimization, or mitigation and were not fully addressed in the FEIS.

Similarly, the Agencies indicate that the construction process will be designed to address 100-year floods, but those floods now come more frequently than historic 100-year floods. The FEIS must acknowledge that the data it is using to evaluate construction impacts is outdated and understates the risks to the Island. Given the increasing frequency of more extreme rains, there is a potential for catastrophic flooding at the ALB in Mather Gorge narrows.

In sum, throughout this process, the Agencies have continued to undervalue both Plummers Island and WBFC's important role in protecting it. As a result, they have recommended an alternative that will, among other things, permanently impact RTE plants, destroy WBFC long-term research, denude, overshadow, and armor the upper end of the Island, and increase the risk that stormwater runoff or catastrophic flooding will cause large-scale damage to the Island. The Agencies still lack smart-growth-forward thinking to address climate change, and instead of coming up with smart-growth solutions they plan to permanently damage the irreplaceable natural resource that Plummers Island represents.

**B. The FEIS Fails to Address Several Outstanding Issues Pertaining to National Park Service Land Around the American Legion Bridge, Including on Both the Maryland and Virginia Sides of the Potomac River.**

**1. There Is No Stormwater Management Planned for the American Legion Bridge, Which May Run Afoul of Clean Water Act Requirements.**

With no plan for stormwater treatment on the ALB, water will drain directly from the Bridge into the Potomac River. While original plans included stormwater management on National Park Service ("NPS") properties to address runoff from the Bridge, this control measure has been eliminated because, the Agencies claim, the NPS will not allow stormwater management facilities on their properties except in narrow circumstances not applicable here. *See* FEIS at 3-18.[57]

However, according to the FEIS at ES-10, Maryland Water Quality Standards, and likely Virginia Water Quality Standards as well, require onsite treatment of all new impervious areas and

---

[57] The Agencies must clearly explain why stormwater management to address Bridge runoff is not appropriate on Plummers Island because it is not clear that restriction applies given that Plummers Island is NPS-owned land.

00177798

for stormwater to leave a site in equal or better condition that it arrived. That requirement applies to most if not all of the ALB, yet nothing is being done to comply with it.

Observers of the Project involved in the Section 106 process have suggested that several of the scuppers on the American Legion Bridge will drain directly onto Plummers Island (National Park Service property), which would seem counter to the Agency's interpretation of NPS's policy regarding stormwater management on their property. This proposed stormwater drainage exacerbates the harm to this Section 4(f)-protected property discussed above.

Even beyond the legal requirements, it is highly concerning that no stormwater management is planned for an area that is concave and receives stormwater from large amounts of impervious surface in both Maryland and Virginia. Moreover, that stormwater flows directly into the Potomac River, a source of drinking water for 6 million people.

The Potomac River Keeper Network states:

The Potomac River provides clean, safe drinking water to almost 6 million people within the river basin. Close to 100 million gallons of water are taken from the river and transported to homes, schools, restaurants, hospitals, and dozens of other businesses and amenities daily. This water is used for drinking, cooking, cleaning, showering, and removing waste.[58]

According to the Potomac River Basin Drinking Water Source Protection Partnership,[59] pollution in the Potomac River from de-icing materials, hazardous spills, and stormwater are challenges to providing a reliable and safe supply of drinking water. Those challenges will significantly increase if the Agencies proceed with the preferred alternative of widen I-495 and the ALB by adding toll lanes without addressing increased stormwater runoff or spills into the Potomac. The FEIS should have addressed these stormwater issues given their extensive health and safety ramifications. No project should be cleared to move forward with such poor planning.

> **2.** **Over 1,000 Trees Will Be Removed from National Park Service Land, Which Remains an Unacceptable Number from the Perspectives of the National Park Conservation Association, National Capital Planning Commission, and Most Likely the National Park Service As Well.**

According to the FEIS, in July 2021, the National Park Service objected to the removal of 858 trees on NPS property, including along the C&O Canal. FEIS App'x S at 14. Under the preferred alternative, 815 trees will be removed from the C&O Canal, 270 removed along the Clara

---

[58] Potomac River Keeper Network, https://www.potomacriverkeepernetwork.org/imagine-a-day-without-water-october-21st/#:~:text=The%20Potomac%20River%20provides%20clean,people%20within%20the%20river%20basin.

[59] Potomac River Basin Drinking Water Source Protection Partnership, *available at* https://www.potomacdwspp.org/about-us/.

00177799

Barton Parkway, and 76 from the George Washington Memorial Parkway, resulting in a total of 1,161 trees to be removed on NPS property. *Id.* at Tbl. 5-9. This is an unacceptable level of impact for which no apparent mitigation has been proposed. Given that these resources are protected under Section 4(f), the FHWA is obligated to consider whether there are prudent and feasible alternatives that would avoid or minimize the harm resulting from the destruction of so many trees.

3.    **Further Investigation Is Required into Whether it Is Legal Without Congress's Review and Approval to De-Federalize Capper Crampton Lands and Transfer Them to the States for Transportation Use.**

A November 19, 2021, letter from the National Capital Planning Commission to MDOT SHA[60] stated:

> Regarding the two federal parkway lands, NPS has advised NCPC of its intent to "transfer" project-related George Washington Memorial Parkway land to the State of Virginia and project-related Clara Barton Parkway and Chesapeake & Ohio National Historic Park land to the State of Maryland. These resulting changes would negate NCPC's Capper-Crampton jurisdiction over Clara Barton Parkway land and our Planning Act jurisdiction over George Washington Memorial Parkway and C&O Canal National Historic Park lands. Given these facts, NCPC has no formal review authority over any aspect of the Alternative 9 - Phase I South Alternative; however, please note that NCPC would still be legally obligated to comply with the CCA requirements and 1941 and 1951 Agreements until such time the land transfers are complete. This includes ensuring that M-NCPPC consents to the transfers and obtains compensation for its contribution to the land purchase.

Yet, two years earlier, there were concerns about the legality and optics of taking this course of action. Meeting notes obtained by FOIA state:

> There was a discussion on de-federalizing CC lands. NCPC was not sure if that is allowed but were concerned with optics and risks associated with it even if it [sic] allowed. NCPC talked about [sic] 1963 perpetual easement agreement between the State and M-NCPPC due to the widening and construction of the Capital Beltway."[61]

---

[60] November 19, 2021, Letter to MDOT SHA's Jeffrey T. Folden from Marcel Acosta, Executive Director of National Capital Planning Commission, Re: I-495/270 Managed Lanes Study Draft Supplemental Environmental Impact Statement Comments.

[61] Meeting notes from Federal Highway Administration (FHWA) and National Capital Planning Commission (NCPC) Meeting, Location: NCPC Headquarters, November 1, 2019, attached as Exhibit L.

00177800

In another bullet, the meeting notes stated: "NCPC informed FHWA that NPS reached out to them to let them know about the 1941 agreement on George Washington (GW) Parkway which stipulates NCPC's role."

The Agencies must justify these proposed land transfers, including identifying the "risks" noted by NCPC, explaining the decision-making process, and describing why the transfers are consistent with the applicable law, including all relevant agreements.

### C. The FEIS Does Not Adequately Identify and Analyze Impacts to the Potomac River.

#### 1. Information Is Lacking and Still Needed Regarding Recreational Use of the Potomac River During Construction.

The Potomac River flows under the American Legion Bridge (ALB), which will be replaced under the preferred alternative. Recreational users of the Potomac River are deeply concerned about the impact of construction of the new bridge on the River. .

The Canoe Cruisers Association, one of these concerned groups, submitted comments on the EIS documents, FEIS App'x T.2.B. Vol. 1 at CO-566 – CO-569, and summarized their concerns in an opinion piece in Maryland's *Bay Journal*:

> It is anticipated that the construction of the [American Legion] bridge will take five years and double the size of the current one. This will inevitably harm natural and recreational experiences and the river itself. Increased noise, restriction of the channel with barges, riprap and heavy equipment are certainties, and intermittent closures of the river to recreational boating are very likely. . . . The Potomac River is nationally recognized as an important historic, scenic and recreational waterway . . . . Two of the 11 nationally designated scenic land and water trails in the U.S. run under the American Legion Bridge: The Park Service's Potomac Heritage National Scenic Trail [and the] Captain John Smith Chesapeake National Historic Trail. . . . MDOT's environmental documentation fails to even mention the impact of bridge construction on these monumental historic and recreational sites. . . . .The department must describe how it can and will avoid adverse impacts. [62]

In their comments and article, the Canoe Cruisers Association raised concerns about boating access, safety, and environmental impacts to the Potomac River during construction of the new ALB. Unfortunately, the boating concerns raised by Canoe Cruisers Association have been generally dismissed.

---

[62] David Cottingham, Maryland Silent on Recreational Impacts of Potomac Bridge Project, Bay Journal (Apr. 13, 2022), *available at* https://www.bayjournal.com/opinion/forum/maryland-silent-on-recreational-impacts-of-potomac-bridge-project/article_40e00ae8-af71-11ec-9558-b35466700206.html.

00177801

For example, the Maryland Historic Preservation Office concluded that the Potomac River under the ALB is not an historic resource covered by the National Historic Preservation Act. Even though the National Park Service has designated the Potomac beneath the ALB as part of the Potomac Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, NPS did not echo the Canoe Cruisers Association's concern about adverse impacts to those waterway trails in its comments during the EIS or historic preservation reviews.

In their response to comments on the FEIS, the Agencies stated that, during construction, no dikes or large stones will be placed in the Potomac except around the new piers supporting the ALB. Further, they expect to construct the new bridge using "trestles" for the heavy equipment:

> During construction, it is anticipated that causeways, trestles and barges will be utilized to access the ALB corridor for demolition and construction. It is not anticipated that rocks will be placed across the Potomac due to it's [sic] depth and that off the banks, the contractor will utilize steel trestles supported on temporary pilings that will be removed at the completion of construction as well as barges to obtain access. During the heavy construction operations, it is anticipated that *water users will have temporary disembarkment and rentry [sic] requirements to detour around the construction* (emphasis added). These are anticipated to be intermittent during construction. Permanent riprap for scour protection is anticipated to be placed around the pier footings but not across the entire channel between piers.

FEIS App'x T.2.B.Vol.1 at CO-567. Construction is expected to take up to 5 years and the proposed construction zone across the Potomac is about 600 feet long. The Agencies provide no information about where the "disembarkment and re-entry" points will be and no details on how frequently these "intermittent" disruptions will occur.

The Agencies further conclude that, "[w]hile the Potomac River has a recreational use, it is not a park as defined under Section 4(f) or the US Department of Transportation (USDOT) Act of 1996 as amended. Construction of the new ALB should *not prohibit the navigability* of the main channel of the Potomac River and construction will be limited to the shorelines." FEIS App'x T.2.A.Vol.1 at CO-568 (emphasis added).

Construction will certainly *interfere with or impede the navigability* of the Potomac for several years, even though it may not "prohibit" it, except intermittently.

More still needs to be disclosed to the recreational users of the Potomac and the public about how the Potomac will be impacted by the proposed demolition of the current American Legion Bridge and by its rebuilding and approximate doubling in size.

00177802

**2.    The Agencies Should Have Considered Whether the Potomac River Is a Section 4(f) Resource Due to its Inclusion Within the C & O Canal Historical Park.**

The Agencies should have considered whether the Potomac River is a Section 4(f) recreational resource due to its location within the C & O Canal National Historical Park, the fact that it is part of the Potomac Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, and possibly due to its designation as a state wild and scenic river.

FHWA's Section 4(f) policy paper states:

Those portions of publicly owned rivers, which are designated as recreational trails are subject to the requirements of Section 4(f). Of course, Section 4(f) would also apply to lakes and rivers, or portions thereof, which are contained within the boundaries of a park, recreation area, refuge, or historic site to which Section 4(f) otherwise applies.[63]

Based on these criteria, the Potomac River should qualify as a Section 4(f) recreational resource. The River passes through the 4(f)-protected C & O Canal National Historical Park, passes around the 4(f)-protected resource Plummers Island within the C & O National Historical Park, and is part of the Potomac River Heritage Trail and the Captain John Smith Chesapeake Bay National Historic Trail, both of which are recreational resources.

Additionally, the Potomac River is designated by the state of Maryland as a "scenic waterway" under the state Department of Natural Resources' Scenic and Wild Rivers System, which underscores its importance as a recreational resource within Maryland. Given this designation, the FHWA should have consulted the state's Wild Rivers Advisory Council as it weighed whether the state's management plan designates the river as a "significant park, recreation area, or wildlife and waterfowl refuge" and is therefore protected under Section 4(f).

**D.    The FEIS's Analysis of Impacts to the Northern Long-Eared Bat and Other Bats Is Inadequate and Even More Outdated than Before, Given Recent Regulatory Developments and New Revelations About the Scope of Construction.**

Throughout the NEPA process, we have emphasized that the Agencies' analysis of potential impacts to the Northern Long-Eared Bat relies on an outdated, 2016 Endangered Species Act ("ESA") Section 4(d) Rule, *see, e.g.*, SDEIS Comments at 118, and fails to sufficiently analyze the threat to bats, *see* DEIS comments at 74. We incorporate by reference the points we made in those comments in their entirety and note that the Agencies never responded to them in the FEIS.

The Agencies' assessment is now even more outdated in light of the U.S. Fish and Wildlife Service's proposed classification of the Northern Long-Eared Bat as endangered and the fact that, with construction extending into Virginia, even more bats, and potentially more bat species, will be impacted. These impacts were not properly evaluated by the Agencies' bat surveys.

---

[63] Section 4(f) Policy Paper, Question 21A, *available at* https://www.environment.fhwa.dot.gov/legislation/section4f/4fpolicy.aspx#addex21.

38

00177803

1.      **The FEIS Fails To Consider a Court Decision Invalidating the Fish and Wildlife Service's Listing for the Northern Long-Eared Bat as Threatened and the Agency's New Proposal To List it as Endangered.**

As we noted in our SDEIS comments, the U.S. District Court for the District of Columbia held that the designation of the Northern Long-Eared Bat as threatened, rather than endangered, was arbitrary and capricious. That opinion was issued before the DEIS was released for comment, *Center for Biological Diversity v. Everson*, 435 F. Supp. 3d 69 (D.D.C. 2020), giving the Agencies ample time to consider and address its effects. The FEIS does not, however, even acknowledge this decision. Instead, like the SDEIS and DEIS, the FEIS states—without caveat—that the Project is "covered" by the Programmatic Biological Opinion on the 4(d) Rule for the bat. FEIS at 5-126; FEIS App'x M, Sub-App'x N at 176-77; see also FEIS at 9-53; FEIS App'x M at 134 (explaining that the ESA consultation process has been "completed"); see also FEIS App'x M, Sub-App'x N at 84-85.

Correspondence from the Fish and Wildlife Service indicates that the decision to rely on the 4(d) Rule was made in 2019, before the D.C. District Court determined that the reasoning for the threatened status was arbitrary and capricious. FEIS App'x M, Sub-App'x N at 37. This letter also indicates that, in 2019, the Fish and Wildlife Service understood that a change in the Northern Long-Eared Bat's status would limit the Project's flexibility and even indicated a willingness to consider exemptions from the ESA's prohibition on "taking" endangered species, including potentially "exempt[ing] taking associated with tree removal during the active season, but outside of the pup season, in known occupied habitat." FEIS App'x M, Sub-App'x N at 37. MDOT SHA and FHWA were also aware of the impacts of a change in the ESA listing status: in a letter to MDOT, the Fish and Wildlife Service wrote that, because the Indiana Bat, a species found near the corridor study boundary, was endangered, there was "not as much flexibility" as there was when constructing around the Northern Long-Eared Bat's habitat when that bat species was listed as only threatened. FEIS App'x M, Sub-App'x P at 35. Further, the Agencies knew early on that forest clearing "may affect" the Northern Long-Eared Bat. FEIS App'x M, Sub-App'x P at 33. Despite that knowledge, the Agencies have not changed or even discussed possible changes to the Project in response to the changing status of the Northern Long-Eared Bat.

Importantly, the FEIS does not consider the Fish and Wildlife Service's recent proposal to list the Northern Long-Eared Bat as an endangered species under the ESA which, if finalized, will nullify the 2016 4(d) Rule. U.S. Fish and Wildlife Service, Proposed Listing, 87 Fed. Reg. 16442 (Mar. 23, 2022). None of the Agencies' correspondence even acknowledges this proposal or its implications and the Agencies have failed to undertake any conferencing procedures to address how the Project will be modified if the bat is ultimately listed as endangered.[64]

---

[64] On July 5, a federal district court in California vacated several ESA rules issued in 2019, returning the ESA consultation process to the regulatory regime that governed before 2019. The Agencies should ensure that its consultation is consistent with that applicable law and acknowledge that any consultation conducted under the now-vacated rules is invalid.

00177804

The Agencies must conduct a proper ESA Section 7 consultation and NEPA process that addresses the Northern Long-Eared Bat's likely change in status.

> **2.     Because of Newly Disclosed Construction in Virginia, There Are More Species that Will Be Affected and Impacts to These Species Should Have Been Assessed Throughout the Process, Rather than Included Only in the FEIS.**

Under the proposed alternative, construction will take place in Fairfax County, Virginia. Virginia constituents were not informed of this proposed construction until the FEIS was released in June 2022.[65] Among other things, in the FEIS, the public learned that the Virginia Department of Wildlife Resources specifically identified Virginia's state-endangered Little Brown Bat and state-endangered Tri-colored Bat as species that could be impacted. FEIS App'x M, Sub-App'x N at 131. The Agencies have determined that there are 14.4 acres of suitable bat habitat and 18.2 acres of somewhat suitable bat habitat, FEIS App'x M at 118, and that there is a "high likelihood" that construction will impact these species. FEIS at 5-126.  These impacts should have been discussed in the DEIS and SDEIS rather than sprung on Virginians in the FEIS, especially since Virginia's state government flagged these species as among those that could be impacted before the SDEIS was issued, FEIS App'x M, Sub-App'x N at 131, yet these additional species impacts were not discussed in the SDEIS, leaving the public without a sufficient opportunity to comment on them.

> **3.     Surveys of Northern Long-Eared Bat Habitat Continue To Be Inadequate, and the FEIS Fails To Address this Inadequacy.**

To determine the impacts of the Project on the Northern Long-Eared Bat, the Agencies conducted surveys and sought to identify "known" maternity roost trees and hibernacula. These surveys were incomplete, however, for reasons outlined in our SDEIS comments, see SDEIS Comments at 118, meaning that the EIS process did not consider the full range of the bats' potential habitat. [66]

The Agencies have acknowledged possible impacts to Northern Long-Eared Bat and the potential of the preferred alternative to cause adverse impacts to bat habitat. SDEIS Comment at

---

[65] Bruce DePuyt, *MDOT's Plan to Build Toll Lanes in Fairfax is an Unwelcome Surprise to Some Virginians*, Maryland Matters (Jun. 16, 2022), https://www.marylandmatters.org/2022/06/16/mdots-plan-to-build-toll-lanes-in-fairfax-is-an-unwelcome-surprise-to-some-virginians/.

[66] The Fish and Wildlife Service recently recognized that its determination of a species' habitat must not be artificially constrained. It therefore rescinded a 2020 regulatory definition of "habitat," in the definition of "critical habitat," as too restrictive because it did not include areas that "'currently or periodically' contain something deemed a necessary 'resource of condition'" or which could serve in that manner "after restoration activities or other changes occur." U.S. Fish & Wildlife Service, Endangered and Threatened Wildlife and Plants; Regulations for Listing Endangered and Threatened Species and Designating Critical Habitat, 87 Fed. Reg. 37757, 37758 (June 24, 2022).

00177805

118. For bridges in particular, the Agencies have now determined that the project area has several areas that "support or could support roosting bats," including the Northern Long-Eared Bat: the American Legion Bridge, Clara Barton Parkway Eastbound bridge (which was *not surveyed*), the McArthur Boulevard/Clara Barton Parkway Westbound bridge, and Seven Locks Road Bridge. FEIS App'x M at 117.

Yet, nowhere does the 26,500-page FEIS respond to our concerns with the incomplete bat surveys. FEIS App'x T at 826-31 (FEIS response to comments). Because the habitat surveys were inadequate, the FEIS's assertion that there are no Northern Long-Eared Bats within the LOD, FEIS App'x M at 118, is inadequate for the same reasons that assertion fell short in the SDEIS. *See* SDEIS Comments at 118-19.

The Agencies' failure to consider and address new information, in this case regarding the likely endangered status of the Northern Long-Eared Bat; failure to consider impacts to Virginia bats; and reliance on incomplete habitat studies all resulted in a deficient analysis, in violation of NEPA and the ESA. 40 C.F.R. §§ 1500.1(b); 1502.1. The FEIS also should have analyzed reasonably foreseeable future actions like the likely listing of the Northern Long-Eared Bat as endangered, but it did not, in violation of NEPA regulations. 40 C.F.R. §§ 1508.7, 1508.25.

## V.    The FEIS Fails to Meet the Agencies' Environmental Justice Obligations Despite Numerous Commenters' Efforts in Identifying Deficiencies in the Agencies' Analysis.

### A.    Delaying the EJ Analysis Until the FEIS Precluded Meaningful Public Review Including, Most Importantly, Review and Comment by EJ Populations.

As we explained in our previous comments, by delaying an analysis of EJ impacts until the FEIS, the Agencies prevented full and fair participation by all potentially affected communities. *See* SDEIS Comments at 122-23. These procedural missteps violate NEPA, Title VI, Executive Order 12,898, USDOT Order 5610.2(a), and FHWA Order 6640.23A, among others. USDOT Order 5610.2(a) in particular requires the Department of Transportation to "fully consider[] environmental justice principles throughout planning and decision-making processes." Waiting until the FEIS to disclose key analyses violates this order and fundamental environmental justice principles. As the Maryland-National Capital Park and Planning Commission wrote, waiting to analyze certain EJ issues in the FEIS:

> is far from a best practice since it obstructs public comment and community input. Waiting until after the selection of a preferred alternative to evaluate impacts to minority communities means that disproportionate impacts will not be considered in the formulation of the preferred alternative and thus do not receive the attention NEPA and Title VI of the Civil Rights Act of 1964 [] demand from the Lead Agencies.

M-NCPPC Comments on the SDEIS at 7 (Nov. 30, 2021). Similarly, by waiting until the FEIS to disclose these impacts and present the proposed mitigation for the preferred alternative, the Agencies impair the ability of the public—and EJ populations—to have meaningful input into ways to reduce impacts to EJ communities from the preferred alternative.

00177806

**B.** **Cumulative Impacts to the African American Morningstar Moses Hall and Cemetery Site Have Been Disregarded and Dismissed by the Agencies, Unlawfully Preventing an "Adverse Effects" Determination for a Nationally-Recognized 4(f) Protected Resource.**

Friends of Moses Hall, the National Trust for Historic Preservation, Cabin John Citizens Association, Maryland-National Capital Park and Planning Commission, and Sierra Club Maryland Chapter have long raised the issue of cumulative effects and environmental injustice from the Project in relation to the cemetery and hall site of the Morningstar Tabernacle No. 88 of the Ancient United Order of Sons & Daughters, Brothers & Sisters of Moses in Cabin John, Maryland. These organizations, Section 106 consulting parties or signatories, have offered comments about Morningstar Moses Cemetery and Hall on the NEPA documents and in comment letters to MDOT SHA, FHWA, and other agencies as part of the Section 106 process. Their NEPA and Section 106 comments and all Section 106 agency communications are incorporated by reference in these comments.

The Morningstar Tabernacle No. 88 site abuts Interstate 495 in Cabin John, Maryland, because, as the FEIS recognizes:

> Highways, such as the Southeast-Southwest Freeway (I-695) in D.C. and I-495 through the former Gibson Grove community in Cabin John, were frequently routed through low- income, majority-minority neighborhoods, disproportionately displacing black and African American residents in particular, further concentrating poverty and exposing remaining residents to the environmental and public health effects associated with traffic proximity.
> The historic Gibson Grove A.M.E. Zion Church was physically split from the Morningstar Tabernacle No. 88 Moses Hall and Cemetery by construction of I-495 in Cabin John in the 1960s. Gibson Grove was a settlement founded and developed by formerly enslaved families, and the Church, Hall, and Cemetery are important features of this historic settlement. (See https://www.friendsofmoseshall.org/history.)

FEIS at 5-135-5-136. The Morningstar Tabernacle No. 88 is a National Register-eligible historic site located in what was a thriving African American community before it was split apart by the construction of the Beltway, which caused the decline of the community. Descendants of this once thriving community still live down the road and in the area. They, with community members and advocates, visit multiple times a year to provide upkeep for the cemetery site they regard as sacred and hallowed. Right next to this cemetery, I-495 was built in the 1960s, widened in the 1990s for increased traffic, and a subdivision was also built around the edges of the cemetery. Now the highway will be widened with four more lanes. Despite this, the Agencies maintain that cumulative impacts to the site do not have to be considered because the harms of the original highway construction occurred prior to the enactment of the National Environmental Policy Act (1970) and the National Historic Preservation Act (1966).

00177807

According to 32 C.F.R. § 651.16 (cumulative impacts), "(a) NEPA analyses must assess cumulative effects, which are the impact on the environment resulting from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."

All aspects of this definition apply to the Morningstar site. The past impacts are listed above, the current impact is four proposed new lanes of highway to be added right next to it, and the future impacts are the rest of the phases of this toll lane project, which will result in the highway becoming saturated with more and more car and tractor trailer traffic and resulting noise, dust, and air pollution with each new toll lane expansion in the overall plan. MDOT SHA's March 31, 2022, Section 106 letter explains the future impacts:

> The [I-495 & I-270 Managed Lanes Study] is the first element of the broader Op Lanes Maryland program which considers improvements along the entire length of I-495 (Capital Beltway) in Maryland, connecting into Virginia's portion of I-495, as well as the entire length of I-270 (Dwight D. Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland.[67]

The cumulative impacts to this site are clearly an adverse effect to Moses Hall that should have been acknowledged for this important Section 4(f)-protected historic resource. Morningstar Tabernacle No. 88 Moses Cemetery and Hall was named by the National Trust for Historic Preservation as one of America's "11 Most Endangered Historic Places" in 2021. Failure to acknowledge this adverse effect has deprived Moses Hall of the protections that it is entitled to under Section 4(f) that would have allowed it to have a say in determining the mitigation measures for the adverse, cumulative impacts still accumulating to it from this highway expansion and reasonably foreseeable future actions.

The cumulative impacts on Moses Hall from past actions are undeniable and have been fully acknowledged by the Agencies. In a *Washington Post* article entitled "Maryland will avoid Moses Morningstar Cemetery when widening Beltway," Julie Schablitsky, the Chief, Cultural Resources Section and Chief Archaeologist at MDOT, is quoted as follows:

> "We own the faults of the Maryland Roads Commission impacting this community 60 years ago," Schablitsky said during a recent visit to the cemetery. "It's our responsibility now to repair that damage and come in and do the right thing."[68]

---

[67] Section 106 Letter from Steve Archer to Elizabeth Hughes and Julie Langan, March 31, 2022 at 1. Notably, the FEIS itself never mentions this fact, that this is just one small part of a larger plan for putting toll lanes along the entire Beltway and beyond. Similarly, the FEIS does not consider cumulative impacts of the clearly reasonably foreseeable much larger overall toll lane expansion plan.

[68] Katherine Shaver, African American Gravesites Detected Near the Capital Beltway Will Be Spared in Road-Widening Plans, The Washington Post (Sept. 9, 2021). https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/.

00177808

MDOT's public position took a sharp turn on January 4, 2022, when the Agencies asserted, "[b]ecause the 1960s impacts [of the original Beltway construction) occurred prior to laws that required consideration of effects, . . . . there is not an adverse effect to the historic property based on 'cumulative' impacts."[69]

This conclusion is wrong as a matter of law. There is absolutely no support in the Section 106 regulations for this arbitrary cut-off date for consideration of cumulative impacts. On the contrary, they unconditionally state that: "[a]dverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative." 36 C.F.R. § 800.5(a)(1). Nor is there any authority for this arbitrary cut-off date in the Council on Environmental Quality's cumulative impact regulations or in related regulatory guidance on cumulative impact analyses.

Furthermore, not only were those past cumulative impacts significant, they had a significant disproportionate impact on an environmental justice community and its most central community feature, the benevolent society hall and cemetery that bonded the community. As even the Agencies appear to acknowledge, a grave injustice was done when the Beltway was constructed. The imperative to consider past wrongs to environmental justice communities is confirmed by Executive Order 13990  (Jan. 20, 2021),[70] which applies to projects such as this one, that would utilize federal funding. The Executive Order cites the nation's commitment to "conserve our national treasures and monuments, places that secure our national memory. *Where the Federal Government has failed to meet that commitment in the past, it must advance environmental justice*." (emphasis added). The Agencies' acknowledgement of this past wrong but refusal to consider these past impacts in the FEIS clearly violates NEPA and has the effect of depriving these historic resources of the protections to which they are entitled under Section 4(f). In other words, rather than remediate these past wrongs, the Agencies have doubled-down on them and compounded the harm.

While the FEIS acknowledges the past harm resulting from the Beltway's original construction, MDOT's January 4, 2022, letter asserted, without any substantiation, that no impacts to the cemetery occurred from the 1992 Beltway widening. That position is not credible. Basic math indicates that when a highway is widened, it increases throughput (which translates to more noise, dust, and pollution) and impervious surface, causing greater stormwater runoff, to which this site is particularly vulnerable by the state's own admission.

---

[69] MDOT SHA Section 106 letter from Julie M. Schablitsky to Elizabeth Hughes and Julie Langan dated Jan. 4, 2022 at 3.
[70] Exec. Order 13990, 86 C.F.R 7037 (Jan. 20, 2021), https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-protecting-public-health-and-environment-and-restoring-science-to-tackle-climate-crisis/

00177809

The response from consulting parties to the Agencies' flawed argument that they could apply a cutoff date to their analysis of cumulative effects was swift and scathing. The National Trust for Historic Preservation, Friends of Moses Hall, Sierra Club and other consulting parties raised legal objections to the Agencies' arbitrary and incorrect argument that no cumulative effects prior to 1966 and 1970 could be considered.

Still set on avoiding an adverse effects determination, the Agencies deflected and reframed the argument to focus on direct impacts to burials, claiming that an adverse effects determination depends on whether there are direct impacts to burials. And instead of taking a closer look to determine if there were grave shafts beyond the area surveyed, they asked for the determination of effect to be deferred until after the Project's Record of Decision.

The reframing went thus:

In [Maryland Historical Trust's ("MHT")] letter of February 4, 2022, the rationale for not concurring with the specific effect finding for Morningstar Cemetery was due to potential for additional burials outside the defined boundaries of the property that may exist or be impacted.

MDOT SHA and FHWA note that based on the specific issues raised by MHT, in the absence of other project changes not anticipated at this time, the potential for adverse effects is narrowly limited to the issue of the possibility of extant, unverified burials outside the defined boundary of the property that cannot be further avoided. FHWA finds that the issues related to atmospheric, audible, visual, and cumulative effects to the property, have been addressed. No diminishment of location, design, setting, materials, workmanship, feeling or association has been found in these areas, and there has been no specific disagreement expressed by MHT on these assessments.[71]

In this statement, not only do they deny any adverse effects, they misrepresent the comment of MHT[72] to justify their commitment to a position of "no adverse effect."

Despite the Agencies firmly maintained commitment to that unsupported legal argument, the Agencies themselves provide information within the FEIS that undercuts the argument. MDOT acknowledges cumulative adverse effects to the property. Examples include (emphasis added):

---

[71] Section 106 Letter from Steve Archer to Elizabeth Hughes and Julie Langan, March 31, 2022.

[72] The MHT February 4, 2022 letter states regarding the Morningstar site that:

"Given the sensitivity of the resource, the potential for the presence of additional burials that may be impacted, and the overwhelming expression of concern for this resource expressed by multiple consulting parties, it is our opinion that the finding of adverse effect remains valid for this historic property."

00177810

"*Understanding that the Beltway was constructed adjacent to these sensitive resources*, MDOT SHA has committed to construct the following pedestrian connections between the Gibson Grove A.M.E. Zion Church and the Morningtar[sic] Tabernalce[sic] No. 88 Moses Hall Cemetery to restore the historic connection along Sevel[sic] Locks Road: . . ."[73]

Commitment to "Constructing a new sidewalk along the west side of Seven Lock Road under I-495 to *reestablish the historic connection* between Gibson Grove Church and the Moses Hall Cemetery."[74]

Commitment to "*Gifting land owned by MDOT SHA with potential graves* back to Trustees of Moses Hall Cemetery."[75]

EJ mapping data provided by USEPA and University of Maryland (UMD) indicates that the concentration of communities with the greatest levels of EJ concern are *located along the study corridors.* Today's concentration of *communities with the greatest levels of EJ concern along the highway is directly related to the history of highway construction* before national environmental policy.

Today's *racially and economically segregated conditions* in urban and metropolitan areas can be *traced directly to decades of neighborhood destruction and residential displacements caused by highway projects plus housing policy and other racially marginalizing actions* undertaken by local, state, and the federal government *throughout the 20th century.*[76]

But then, remarkably, the FEIS fails to acknowledge that these impacts will be adverse. The FEIS sums up the Agencies' position:

Based on the current historic boundary, the Preferred Alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the Preferred Alternative. No diminishment of location,

---

[73] FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[74] FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[75] This statement provides an acknowledgment of having taken cemetery land in 1962. That taking causes cumulative impacts to the community in the present day. FEIS App'x T.2.A.Vol.1 at CO-119 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/64_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.A_Volume-1_June-2022p-9.pdf.

[76] FEIS at 5-135.

00177811

design, setting, materials, workmanship, feeling or association has been found in these areas.[77]

Cumulative impacts from past Beltway construction are indisputably adverse; this site has been subject to longstanding, historic race-based discrimination in transportation planning in the state. The conclusion that there will be no use of Moses Hall for purposes of Section 4(f) is premature given that the serious legal issues regarding cumulative effects have been ignored.

The Agencies' wrongful dismissal and disregard of cumulative effects and other adverse effects to this site, as described above, is exacerbated by their deferral of the determination of impacts for the site through their decision to proceed with a Section 106 Programmatic Agreement.[78]

After walking back their initial determination of adverse effects and then making a contested determination of no adverse effect, the Agencies are postponing effects determination for the Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland. This approach violates FHWA's obligations to avoid and minimize harm to these historic resources under Section 4(f). *See Corridor H Alternatives, Inc. v. Slater*, 166 F.3d 368, 371 (D.C. Cir. 1999) (Because the historic properties protected by Section 106 and Section 4(f) are similarly defined, "it follows that the [Federal Highway Administration] must complete its Section 106 determinations before it can comply with section 4(f)").

The contentious issue surrounding the adverse effect determination for Morningstar Tabernacle No. 88 site cannot be deferred. In a letter to Dr. Julie M. Schablitsky of MDOT, the MHT clearly stated on February 4, 2022, that: "it is our opinion that the finding of adverse effect remains valid for this historic property."

Sierra Club objects to MDOT's deferral of the adverse effect determination for several additional specific reasons:

1. MDOT's new proposed plan to defer a determination of adverse effect for Morningstar Tabernacle No. 88 site until after issuance of the Record of Decision will foreclose major options for alternatives and mitigation.

2. Adverse effects can be determined now since, *inter alia*, there are over two dozen probable or possible grave shafts in the right-of-way abutting the land where the highway will be widened and heavy construction equipment will be used. The probable and possible grave shafts conform to the same patterns observed in the rest of the cemetery.

---

[77] Appendix T.2.B. Vol. 2 at CO-831.

[78] See more detail on this in Sierra Club's April 14, 2022 Section 106 comment letter, available at: https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-Section106Comments-14April2022final.pdf.

3.  These effects, when added to the noise, vibration, and other proximity impacts of the Project and the cumulative impacts from past Beltway construction, are indisputably adverse and will substantially interfere with the use and enjoyment of this site; hence, even assuming some degree of post-ROD mitigation, there is no basis for arguing that there will be no adverse cumulative effects to this important historical site, which has been subject to longstanding, historic race-based discrimination in transportation planning in this state.

4.  The FHWA's obligations to avoid or minimize harm to this site under Section 4(f) is clear, and the FHWA's failure to recognize the full scope of the significant use and harm to the site violates Section 4(f).

In summary, while the full extent of the adverse effect can be addressed as part of the programmatic agreement, the adverse effect determination must be made now. The Agencies' failure to consider the cumulative impacts associated with discriminatory and destructive past actions perpetuates and exacerbates a gross injustice, and violates both NEPA and Section 4(f).

48

00177813

2. **Possible and Probable Burials in the State Right of Way Adjoining the Morningstar Cemetery and Hall Site Are at Risk from the Project and Have Not Been Sufficiently Investigated to Instill Confidence in the Cemetery Boundaries Determined by the Agencies.**

Next to what is known as the "current historic boundary" of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery are potential burials extending into the state highway right of way. No ground-penetrating radar was done around the currently known area of graves to determine how much further they extend. MDOT SHA and FHWA were unable to gain concurrence from Maryland Historical Trust for a "no adverse effects determination" in large part due to these potential graves, and thus the Agencies requested that the effects determination be deferred, depriving the Friends of Moses Hall and other descendants and supporters from a Section 4(f) adverse effects determination during the decision-making window that would have allowed the site to have further avoidance and mitigation measures.

MDOT SHA owns land from the original Beltway construction with potential graves. The graves in a parcel of MDOT right of way are not just potential but, based on ground-penetrating radar, are "possible" and "probable" and number several dozen. This indicates that the "current historic boundary" that MDOT SHA uses today is inaccurate and smaller than the true historic boundary of the cemetery.

The Agencies have claimed that there is no adverse effect to the Morningstar cemetery based on their "current historic boundary," even in the face of evidence that this boundary is likely not the site's accurate historic boundary. Of interest in this regard, a Maryland Public Information Act request for documents from the time of the original construction of the Beltway revealed a state payout to a McGuire Funeral Services, Inc. for a burial site located in the true historic boundary (but outside of MDOT's "current historic boundary").[79] *See* figure at right. The most likely reason for this payout was for reburials from the cemetery due to

**State Rds Comm vs. Andrew Mickens and Jones' heirs**



---

[79] See scan of original receipt in Report of Findings from Historical I-495 Right-of-Way Records Research prepared by Friends of Moses Hall, February 2022, at Attachment 1 *available at* https://static1.squarespace.com/static/600c2298f983552f0a55148b/t/61fe8ed7e0e2b44d94c5861c/1644072672567/FMH+-+ROW+RESEARCH+REPORT+-+FINAL.pdf.

00177814

Beltway construction.

Further reinforcing the issues with the boundary of the cemetery are the ground-penetrating radar data reported on by the Washington Post. Says the article: "The outer edges of the construction site will be about five feet from the closest area where radar found a possible burial, a project spokesman said. Previous plans had showed the Beltway expanding into the grassy area and about one-fifth of the 1.5-acre cemetery."[80]

In the same article, Illinois archaeologist Tim Horsley, who undertook the ground penetrating radar, expressed that "most of the anomalies appeared in adjacent rows. The total of 377 probable or possible burials in the cemetery is probably artificially low, he wrote, because his equipment couldn't reach the entire cemetery."[81]

Given this likely location of burials, a five-foot buffer from the edge of where graves were found in a ground-penetrating radar study that failed to reach the entire cemetery is insufficient to ensure that additional graves will not be disturbed.
The FEIS states:

- Through additional investigation and survey including ground penetrating radar (GPR), MDOT SHA identified potential unmarked graves within state-owned right-of-way adjacent to I-495.[82]

- MDOT SHA acknowledges there is some potential for human remains associated with historic properties to be present adjacent to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery . . . , which are not currently accessible for the types of thorough archaeological investigation necessary to definitively identify interments.[83]

Yet the Agencies still maintain:

1. Based on the current historic boundary, the preferred alternative will avoid direct impacts to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Additionally, no atmospheric, audible, or visual effects to the property have been identified from the preferred alternative. No diminishment of location,

---

[80] Katherine Shaver, African American Gravesites Detected Near the Capital Beltway Will Be Spared in Road-Widening Plans, The Washington Post (Sept. 9, 2021), *available at* https://www.washingtonpost.com/transportation/2021/09/09/maryland-beltway-moses-morningstar-cemetery/.
[81] *Id.*
[82] FEIS T.2.A. Vol. 2 -at CO-326.
[83] *Id.* at CO-244.

00177815

design, setting, materials, workmanship, feeling or association has been found in these areas.[84]

2. The Project will be governed by a programmatic agreement, including a treatment plan that specifies the methods, limits and consultation procedures for further investigation of areas with the potential for additional burials outside of the current historic boundary, no specific determination of effects to the Morningstar Tabernacle No. 88 Moses Hall and Cemetery will be made at this time, and will be made following completion of the additional investigations specified in the programmatic agreement and treatment plan.[85]

Given the implicit acknowledgement that subsequent studies under the programmatic agreement may reveal adverse effects on Moses Hall and Cemetery, the following conclusions in the FEIS are both unsubstantiated and premature:

"[T]here are no indirect or cumulative adverse effects to historic properties specifically caused by the undertaking."[86]

"The Preferred Alternative avoids ground disturbance of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery."[87]

"MDOT SHA has completed extensive . . . archaeological research that thoroughly documents the Morningstar Tabernacle No. 88 Moses Hall Cemetery and its significant features . . ."[88]

"[T]he lead agencies have far exceeded the obligation to consider and address potential project EJ concerns."[89]

For further information in support of these points, please see relevant additional information and arguments in Sierra Club Section 106 comments dated February 3, 2022, and

---

[84] Appendix T.2.B. Vol. 2 at CO-831, *available at* https://oplanesmd.com/wp-content/uploads/2022/06/68_MLS_FEIS_App-T-DEIS-SDEIS-CR_T.2.B_Volume-2_June-2022p.pdf.

[85] *Id.*

[86] FEIS App'x I: CRTR Volume 1: Cultural Resources Tech Report at 21 *available at* https://oplanesmd.com/wp-content/uploads/2022/06/13_MLS_FEIS_App-I_CR_Vol-1_Cover-Report_June-2022_REDACTED.pdf

[87] FEIS T.2.A.vol2 -at CO-244.

[88] FEIS T.2.A.vol2 -at CO-245.

[89] FEIS App'x T.2.B.Vol.2 at CO-829.

00177816

April 14, 2022.[90] We incorporate by reference the FEIS comment letter of Friends of Moses Hall dated July 15, 2022.[91]

> **C.    In Violation of Title VI, the Agencies Failed to Provide Meaningful Opportunities for Review and Comment on Agency Plans by Non-English Speaking Populations by Directing Limited English Proficiency Commenters to an Inaccurate SDEIS Executive Summary.**

As we explained in our comments on the SDEIS, for weeks, the executive summary of the SDEIS incorrectly downplayed some of the environmental impacts of the preferred alternative. *See* SDEIS Comments at 17-18. The Agencies belatedly corrected these errors in the English version on November 20, 2021, less than three weeks before comment deadline (although many commenters had downloaded the SDEIS already, had already completed their review, and even had already submitted their comments). But the Agencies did not change the SDEIS Executive Summaries in Amharic, Chinese, French, Korean, and Spanish, leaving non-English speakers with inaccurate environmental impacts to review and comment on until November 17, 2021, fewer than 13 days before the comment period closed, when they revised those summaries without public notice.[92] This omission violated Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Executive Order 13166, "Improving Access to Services with Persons with Limited English Proficiency," 65 Fed. Reg. 50,121 (Aug. 16, 2000), which require that project sponsors be certain that Limited English Proficiency populations have meaningful access to review and comment on agency plans.

In the FEIS, the Agencies summarized their outreach to communities with limited English proficiency and explained that "translated versions of the SDEIS Executive Summary were posted to the project website," SDEIS at 5-149, without noting the errors in that summary. In their response to comments in the FEIS, the Agencies downplay the SDEIS errors as "minor" and do not mention the delay in addressing errors in the non-English versions:

---

[90] Available at the following links respectively:
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce/maryland-chapter/MDSierraClub-Section106Comments-3Feb2022.pdf;
https://www.sierraclub.org/sites/www.sierraclub.org/files/sce-authors/u25361/MDSierraClub-Section106Comments-14April2022final.pdf.

[91] *See* FEIS comment letter of Friends of Moses Hall (July 15, 2022).

[92] Some time on or after November 17, 2021, fewer than 13 days from the public comment deadline, MDOT and/or FHWA silently posted new Amharic, Chinese, French, Korean, and Spanish Executive Summaries that corrected the inaccuracies. Members of the public who relied on those translated versions and somehow became aware of the corrections therefore had a very limited time in which to comment. *Compare* https://web.archive.org/web/20211117153534/https://oplanesmd.com/sdeis (capture of SDEIS website from 3:35 PM on November 17 with links to old and incorrect Executive Summaries), *with* https://oplanesmd.com/sdeis/ (current SDEIS website with links to new Executive Summaries that include "FINAL_UPDATED-11_16_2021" in file name titles).

00177817

MDOT SHA promptly corrected a minor error in the environmental impacts summary chart, Table ES-1 of the SDEIS, upon notification by the Sierra Club Maryland Chapter. The document was updated on the project website and a replacement chart was provided at all locations where the document was publicly accessible. ... The minor error in the summary chart, Table ES-1 of the SDEIS does not require withdrawal and republication of the SDEIS.

Further, the Agencies undermined their own outreach efforts to populations with limited English proficiency populations because the flyers distributed at groceries and notices in newspapers targeting non-English populations, *see* FEIS at 5-147-5-149, unfortunately directed people to the online versions of the SDEIS at OpLanesMD.com/SDEIS, and the SDEIS had errors for most of the comment period. This failure to correct the website for weeks more for non-English speakers violates the Agencies' Title VI obligations.

### D.    The Agencies' EJ Analysis Suffers from Serious Deficiencies by Failing to Analyze Cumulative Impacts to EJ Populations.

In the FEIS, the Agencies have finally produced a determination of whether the preferred alternative has disproportionately high and adverse effects to environmental justice populations. The conclusion that the preferred alternative will not have disproportionate adverse effects on EJ populations is wrong and the analysis suffers from serious deficiencies.

For example, the Agencies do not apply the appropriate definition of "adverse effects" as that term is used in the relevant USDOT EJ orders. "Adverse effects" is defined in USDOT Order 5610.2(a) as requiring a cumulative analysis of a list of possible effects on EJ populations:

> the totality of significant *individual or cumulative* human health or environmental effects, including interrelated social and economic effects, which may include, but are not limited to: bodily impairment, infirmity, illness or death; air, noise, and water pollution and soil contamination; destruction or disruption of man-made or natural resources; destruction or diminution of aesthetic values; destruction or disruption of community cohesion or a community's economic vitality; destruction or disruption of the availability of public and private facilities and services; vibration; adverse employment effects; displacement of persons, businesses, farms, or nonprofit organizations; increased traffic congestion, isolation, exclusion or separation of minority or low-income individuals within a given community or from the broader community; and the denial of, reduction in, or significant delay in the receipt of, benefits of DOT programs, policies, or activities.

USDOT Order 5610.2(a), App'x. A.

This Order requires the Agencies to analyze the "totality of individual or cumulative" effects. NEPA also requires a cumulative analysis of impacts to EJ populations. Rather than evaluating the effects cumulatively, however, in the FEIS, the Agencies evaluate each environmental stressor to EJ populations (i.e., noise, displacement, air quality, etc.) in isolation and conclude that, because the impacts from individual environmental stressors do not disproportionately impact EJ populations compared to non-EJ populations, there is no overall

00177818

disproportionate impact. *See* FEIS at 5-155-5-160. For example, as to hazardous materials sites of concern, the FEIS tallies the number of affected communities with hazardous materials sites for EJ versus non-EJ populations:

> EJ populations contain 27 low, 4 moderate, and 2 high risk sites of hazardous materials sites of concern, while non-EJ populations contain 37 low, 56 moderate, and 9 high risk sites of hazardous materials sites of concern. … As such hazardous material concerns would not be higher or more adverse to EJ populations under the Preferred Alternative.

FEIS at 5-157. The analysis does not address cumulative adverse effects to EJ populations by *aggregating* all impacts to each EJ population, *i.e.*, it does not examine whether each EJ and non-EJ population is affected by additional noise, hazardous waste impacts, and water pollution from the preferred alternative. The Agencies thus failed to evaluate whether, once cumulative impacts are considered, EJ populations are disproportionately affected as compared to non-EJ populations.

As EPA stated in its comments on the DEIS, a proper EJ analysis requires looking at multiple impacts at the same time:

> In a preliminary review, the [EJSCREEN, EJ mapping-and-screening] tool demonstrates that the MLS alternative peripheries may now face various disproportionate environmental challenges in the context of EJ, including concerns with air toxics and hazardous waste (involving treatment storage disposal facilities and large quantity generators).

EPA, Technical Comments on I-495 & I-270 MLS, DEIS (Nov. 9, 2020), FEIS App'x T.1.A Vol 1 at AG-39.

In addition, the Agencies' analysis in the FEIS does not thoroughly evaluate the historical and existing environmental burdens borne by EJ populations together with the predicted impacts from the preferred alternative. EJ populations have already experienced high levels of air pollution as well as other harmful environmental stressors and a proper analysis must account for EJ populations' resulting increased susceptibility to environmental impacts. The EPA highlighted this point when reviewing the EJ analysis in the SDEIS:

> Table 4-45 indicates that block groups which the project characterizes as EJ and Non-EJ may face similar environmental consequences from certain hazards (e.g. air pollution). EPA notes that certain populations (e.g., low-income and/or people of color populations) may face elevated susceptibility of impacts that may affect other populations less severely. Thus the EPA encourages the project to address the potential for adverse impacts in areas of potential EJ concern even if less vulnerable areas may face similar conditions.

EPA, Technical Comments on I-495 & I-270 MLS, SDEIS (Nov. 30, 2021).

Most importantly, the FEIS completely ignores the egregious cumulative impacts resulting from past actions by MDOT, namely the original construction of the beltway in the 1960s that intentionally targeted and discriminated against EJ populations. *See* discussion above. As this

00177819

discussion points out, this arbitrary cut-off date for considering cumulative impacts of past action lacks any support in the law or agency guidance. *Id.* The Agencies' environmental justice analysis subverts the requirements of NEPA and USDOT Order 5610.2(a) which require a holistic analysis of cumulative impacts to populations. The Agencies' EJ analysis is therefore invalid and unlawful.

### E.    The FEIS Fails to Take a "Hard Look" at Air Quality Impacts to EJ Populations.

In its brief discussion of environmental justice, the SDEIS made several conclusory statements regarding potential air quality impacts that were insufficient to discharge the Agencies' duty to take a hard look at environmental justice issues as required under NEPA. *See* SDEIS Comments at 123-24. The FEIS echoes conclusory statements from the SDEIS that "the Preferred Alternative is not predicted to increase emission burdens for Mobile Source Air Toxics." SDEIS at 4-102; *see* FEIS at 9-46 & 9-56 (explaining that, under the preferred alternative, MSAT emissions are expected to "significantly decline in the Opening (2025) and Design (2040) years when compared to base conditions (2016)"). The environmental review documents provide no explanation or support for these assertions, however, which are called into question by the fact that the DEIS showed substantial increases ranging from 4.1% to 13.3% in emissions of MSAT directly attributable to the build alternatives it evaluated. Likewise, the FEIS tables showing the MSAT data appear to show that projected MSATs are *lower* under the No Build alternative. FEIS App'x. K, Tbl. 3-1.

Throughout the comment process, we have asked for a local-level analysis of air emissions to determine the impacts of construction and operation of the preferred alternative on EJ populations, which are more susceptible to health impacts of air pollution. The FEIS still does not include a proper analysis of local-level air emissions. *See supra* Section III. As in the DEIS and SDEIS, the FEIS states that, because no conformity analysis was required, the Agencies have declined to study local-level air impacts. The full indirect and cumulative effects of the preferred alternative remain unknown without this analysis.

Furthermore, even though the Agencies could not support the following statement with data, the SDEIS stated:

> Air quality impacts associated with construction would not differ between EJ block groups and non-EJ block groups. To minimize the amount of emissions generated, efforts would be made during construction to limit traffic disruptions, especially during peak travel hours.

SDEIS at 4-103.

In contrast, the FEIS states that EJ populations "[m]ay experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores." FEIS at 5-155. While we appreciate this revision, given that, like the SDEIS, the FEIS disclaims having performed any construction air quality assessment, *see* FEIS at 5-154, or a health assessment, the Agencies have not fulfilled their obligations to evaluate air quality impacts to EJ populations. As described in the attached comments of Roselie Bright, Sc.D. and Ronald Bialek, MPP, the FEIS suffers from a deficient analysis of impacts to public health

00177820

and has failed to address dozens of studies and journal articles finding causal links between, for example, increased air pollution from traffic and high rates of asthma or heart disease. As Bialek highlights, these health impacts are likely to be disproportionately higher in EJ populations, given historic inequities.

Likewise, the FEIS fails to fully evaluate the effects of bottlenecks that will be created under the preferred alternative and, importantly, the air quality impacts from the bottlenecks that may concentrate around the end points of the preferred alternative, in areas where EJ populations live. *See* ZAMURS AND ASSOCIATES Report at 5-6; *see also* SDEIS Comments at 124-25. As also noted in the attached report by Norm Marshall, the serious flaws in the traffic model affect the assessment of air quality impacts in general, and therefore the evaluation of air quality impacts on EJ populations is also flawed. As discussed below, these air quality impacts result in significant public health impacts across the board that were also ignored in the FEIS, and these public health impacts will disproportionately affect EJ populations, particularly children.

In short, the Agencies have failed to appropriately describe and, as a consequence, mitigate the disproportionate air quality impacts on minority and low-income communities, despite their obligation to do so—and to make the information available to the public for review and comment—under NEPA, USDOT Order 5610.2(a), and USDOT order 6640.23A, before moving forward with the preferred alternative.

## F.    The FEIS Fails to Quantify Impacts to the Gaithersburg EJ Area.

In the FEIS, the Agencies finally recognize that several census blocks in the Gaithersburg area have EJ populations and impacts to those areas should be fully evaluated. However, even with the Agencies' new analysis, they have failed to acknowledge real air quality and other health impacts from the preferred alternative, impacts that will disproportionately affect EJ populations, including those in the Gaithersburg area.

In our comments on the SDEIS, we listed different health assessments and air quality and other environmental impact analyses that the Agencies should have performed to accurately and quantitatively describe the potential impacts of the Project on the environmental concerns most negatively affecting the Gaithersburg community, as shown by EPA's EJSCREEN tool. SDEIS Comments at 113-14. These analyses and health risk assessments were not performed. In their expert report, ZAMURS AND ASSOCIATES, LLC explain that the "the pollutants that cause the greater health impacts, $PM_{2.5}$, $PM_{10}$ and $NO_2$ remain unexamined and unconsidered, despite the legal obligation to assess these pollutants under NEPA." ZAMURS AND ASSOCIATES Report at 3. Thus, the true impacts to the EJ populations in the Gaithersburg community remain unquantified in the FEIS.

## G.    The EJ Analysis Ignores Impacts to EJ Populations East of the I-270 Spur.

In our SDEIS comments, we explained that the Agencies were improperly segmenting the Project by limiting their environmental review to exclude the significant environmental impacts anticipated from later phases of the Project to expand I-495 east of the I-270 spur and the northern portions of I-270. *See* SDEIS Comments at 12 (comparing proposed environmental impacts).

00177821

Based on public statements by Project proponents, the Agencies will ultimately seek approval for lane widening and toll lanes on I-495 from the American Legion Bridge to the Woodrow Wilson Bridge in Virginia and the northern portions of I-270, exactly as originally proposed. *See* SDEIS Comments at 8-17.

This improper segmentation of the Project also affects the Agencies' EJ analysis. The Agencies cannot avoid their obligations to evaluate impacts to EJ populations throughout the area, including in majority-minority Prince Georges County, that will be impacted by the later phases of the Project. A proper EJ analysis requires an evaluation from the American Legion Bridge to the Woodrow Wilson Bridge in Virginia—the scope of the Project initially proposed.

By deferring a full EJ analysis until after the first phase of the Project is approved, the Agencies are attempting to bias approval of the Project by making the highway expansion east of the I-270 spur seem inevitable and essentially "shoving under the rug" the likely significant impacts to EJ populations anticipated in later phases of the Project. We remain concerned that the Agencies will also attempt to streamline the environmental review process for that next phase by relying on the (inadequate) analyses performed for the first phase of the Project and even further curtailing the public comment process, thus reducing opportunities for the community to engage in review of the Project.

## H.    The FEIS Fails to Fully Assess Construction and Post-Construction Impacts to the Julius West Middle School and Other Sensitive Sites Next to the Highway.

As described in Section IV of these comments and in the attached expert comment letter by Rosalie Bright, the generation of silica dust during road construction is a significant health hazard that the FEIS fails to adequately discuss. As the 1-270 and I-495 road and bridge construction takes place, there will be continuous generation of harmful silica dust, and precautions (i.e., staying indoors, keeping all windows closed, and wearing facemasks to go outside) may be needed to protect sensitive populations at schools (Julius West Middle School, Farmland Elementary, Carderock Springs Elementary, and Walter Johnson High) and other sites close to the highways.

In general, the FEIS fails to adequately identify, describe, and quantify the health impacts to these sensitive populations that will be impacted by silica dust under the preferred alternative.

## I.    The FEIS Fails to Consider Impacts to Environmental Justice Communities from New Bottlenecks and Increased Traffic Created by the Preferred Alternative

As explained in our previous comments, the SDEIS recognizes that the preferred alternative would create bottlenecks outside the preferred alternative limits, SDEIS at ES-12, 2-6, but the SDEIS does not accurately analyze these bottlenecks nor the arterial congestion that the preferred alternative would cause at the terminus of the managed lanes. These bottlenecks and additional congestion will create additional air quality impacts in the areas where they occur and cause travel delays for EJ populations living beyond the ends of Project development and, as noted

00177822

below, for EJ populations who must continue to use the general purpose lanes due to the unaffordability of tolls in the managed lanes.

Travel delays cause disproportionate impacts to EJ populations who face long commutes and inflexible work environments where late arrivals can mean dismissal. By failing to acknowledge these real impacts of bottlenecks, the FEIS fails to sufficiently evaluate impacts to EJ populations.

### J.    The FEIS Does Not Adequately Address the Environmental Justice Impacts of Adding Toll Lanes

The SDEIS did not provide a full picture of the costs of toll lanes on EJ communities. As we noted in our SDEIS comments, an analysis of the dynamic toll pricing revealed that driving in toll lanes could cost up to $50 per passenger car in 2021 dollars, for certain routes. *See* SDEIS Comments at 86-87; 126-27. These high tolls are exclusive, inequitable, and discriminatory. Toll lanes will not be accessible to working families. Lower income environmental justice populations who cannot afford the toll lanes will disproportionately rely on the free general-purpose lanes. In addition, as discussed above, the Agencies' traffic models are still flawed and still fail to acknowledge the new and worsened bottlenecks around the end points of the toll lanes that will disproportionately harm EJ populations living beyond the limits of the proposed new toll lanes.

Yet, the FEIS retains misguided statements from the SDEIS that fail to address the regressive impacts of predicted high tolls and overstate the purported benefits of eliminating peak-commuting-time HOV lines in favor of HOV 3+ lanes. *See* SDEIS Comments at 126-128. The FEIS even echoes the claim from the SDEIS that "populations in both EJ block groups and non-EJ block groups would have the opportunity to experience the[] operational benefits," from the toll lanes and HOV3+ lanes in the preferred alternative. SDEIS at 4-102 & 4-104; *see, e.g.*, FEIS at 5-162 (describing the HOV 3+ lanes as part of "affordable multimodal travel options").

These statements mischaracterize the likely impacts of the preferred alternative on EJ populations. As we have explained, the predicted benefits of the preferred alternative in reducing traffic times overall are overstated. Further, the aforementioned "benefits" will not reach EJ populations, who will be will be priced out of the toll lanes and required to rely on limited general purpose travel lanes. As the M-NCPPC explained, "[t]o simply conclude that everyone is benefiting with travel time savings when the project design does not provide equitable access to the managed lanes creates another layer of inequity." M-NCPPC Briefing and Discussion for July 15, 2020, Full Commission Meeting I-495 & I-270 Managed Lanes Study – DEIS Comments at 8 (June 8, 2020).

Further, the general purpose lanes as configured after building toll lanes will become less safe relative to today due to: additional traffic and congestion; new and worsened bottlenecks with end merge-point congestion; loss of the inside shoulder lane; a higher concentration of 18-wheelers that are kept off the toll lanes by unaffordable tolls and whose numbers are increasing following the COVID-19 pandemic; removal of an existing non-tolled lane in each direction of I-270, squeezing more traffic into fewer general purpose lanes; inferior maintenance of the free lanes compared to the toll lanes and poorer safety during emergencies and slower access to emergency

00177823

response owing to space constraints and loss of the inside shoulder lane. *See* SDEIS Comments at 71-85; *see also supra* Section II.

Although the Agencies have now proposed mitigation related to the toll lanes, the mitigation is not focused on making toll lanes more affordable for low income and EJ populations or making the general-purpose lanes safer, but rather focused on transit fare subsidies and toll-free buses, FEIS at 5-163-164, actions that do not remove the inequity of the two-tier system that would be created by the toll lanes.

That the preferred alternative is inequitable is not surprising. Transurban is on record saying its goal in our region is to "maximize the tolls" and admitted that: "[a]n increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, . . . and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll roads and therefore reduce our earnings."[93]

That the Agencies have failed to grapple with the inequities of the preferred alternative in their FEIS is, however, disappointing and, more importantly, violates NEPA and Title VI.

## VI.    The FEIS Fails To Disclose the Socioeconomic and Societal Impacts of Private Concessionaire Contracts and Their Influence on Future Land Use Policies.

Legal expert Ellen Dannin (2011) describes how infrastructure privatization of the type being proposed for the I-495 and I-270 project impacts socioeconomics and society,[94] even impacting future legislation and land use policies.

> Provisions commonly found in infrastructure privatization contracts make the public the guarantor of private contractors' expected revenues. Indeed, were it not for provisions that protect contractors from diminution of their expected returns, the contracts would be far shorter and much less complex. An effect of those contract provisions is to give private contractors a quasi-governmental status with power over new laws, judicial decisions, propositions voted on by the public, and other government actions that a contractor claims will affect toll roads and revenues. Giving private contractors such a role may well violate the non-delegation doctrine that bars private entities from exercising power that is inherently governmental.[95]

---

[93] Transurban Prospectus at 13 (Sept. 16, 2020), https://links.sgx.com/FileOpen/Transurban%20Finance%20Company%20Pty%20Ltd_Secured%20Euro%20MTN%20Programme%20OC.ashx?App=Prospectus&FileID=46449.

[94] See more on societal impacts in "5 questions for Donald Cohen of In the Public Interest," The New Common Sense newsletter from the Hewlett Foundation's Economy and Society Initiative (April 7, 2022), *available* at https://hewlett.org/5-questions-for-donald-cohen-of-in-the-public-interest/.

[95] Dannin, 2011. Crumbling Infrastructure, Crumbling Democracy: Infrastructure Privatization Contracts and Their Effects on State and Local Governance

00177824

These impacts result from provisions commonly found in infrastructure contracts, including compensation events, noncompetition provisions, and the contractor's right to object to and receive compensation for legislative, administrative, and judicial decisions.

"The operation of these provisions gives private contractors power over decisions that affect the public interest and are normally made by public officials and subject to oversight, disclosure, and accountability—none of which apply to private contractors."[96]

Such provisions are fundamental to the I-495 and I-270 project and written into the term sheet.[97] The project's 20 compensation events wherein the state monetarily compensates the developer include: "Discriminatory Change in Law," and "construction or expansion of a Competing Facility." These funds come from taxpayers. This has all been described in earlier comments.[98]

The P3 process ensures and protects that the developer's private interest in avoiding any competing facilities near its toll lanes, regardless of what would serve the public interest . As a September 2020 Transurban prospectus explains,

An increase in the number or improvement in quality of alternative roads, public transportation or mass transit options, ... and their relative convenience, affordability and efficiency, could reduce traffic volumes on our toll  roads and therefore reduce our earnings.[99]

Greater mobility and transportation options that are good for Marylanders and for addressing the climate crisis are not in the developer or their shareholder's interest.

Maryland taxpayer funds are even required to compensate the developer for "physical damage to the Work caused by other MDOT capital works projects [or VDOT capital works projects] in the immediate vicinity of the Section (excluding work undertaken by a Section Developer Related Entity)." So Maryland taxpayers pay the developer Transurban if VDOT capital works projects damage the toll lanes.

The term sheet clarifies in relation to compensation and relief events:

---

[96] Ellen Dannin, *Crumbling Infrastructure, Crumbling Democracy: Infrastructure Privatization Contracts and Their Effects on State and Local Governance*, 6 *NW. J. L. & SOC. POL'Y* 47 (2011)., https://elibrary.law.psu.edu/fac_works/10/

[97] Term sheet. Compensation Events. Relief Events at 13-17. https://www.oplanesmd.com/wp-content/uploads/2021/06/Phase-1-P3-Agreement-Exhibit-8-%E2%80%93-Section-P3-Agreement-Term-Sheet.pdf

[98] See Sierra Club et al. SDEIS comments.

[99] Transurban Prospectus, September 16, 2020, page 13, publicly available on the website of the Singapore Stock Exchange.

00177825

To the extent a Compensation Event or a Relief Event directly causes an adverse cost or schedule impact on the Section Developer, the Section Developer may claim an extension to applicable deadlines for performance or relief from compliance with its obligations. Notice of such claim must be provided within 30 days after the date the Section Developer first became aware (or should reasonably have become aware) that the relevant Compensation Event or Relief Event had occurred.

If such adverse impact is caused by a Compensation Event, the Section Developer may also claim compensation which places the Section Developer in a "no better/no worse" position, as compared to immediately prior to the occurrence of the Compensation Event.

The developer is protected from risks, it is the state that is taking the risk from 30 compensation and relief events.

The Dannin article says that study of a proposed toll highway made clear that "the 'free' money comes at the very high cost of eliminated highway capacity, increased congestion and degradation of highway safety."

[D]egraded roadway conditions and increased traffic congestion are] an essential part of the JPPHA's plan. Without these failing conditions, little traffic would be induced to use the expensive Jefferson Parkway. . . . By starving SH 93 and Arvada roadways of needed improvements, JPPHA would ensure congestion and push some traffic to its road. However, what is good for a road is not good for drivers. The goal of state highway access should be to promote mobility, not to impair mobility to promote the ability to toll a road. . . . . (Dannin, 2011)

In this case, degraded roadway conditions will occur from the majority of the heavy truck traffic concentrated in the general-purpose lanes degrading the infrastructure more quickly. Roadway conditions will also worsen due to removal of the left lane shoulder from the general-purpose lanes and likely more accidents. Increased congestion will occur during rush hour due to developer toll algorithms, because of new bottlenecks created at the ends of the toll lanes, and because of I-270 having two of its existing lanes converted to toll lanes (reducing publicly available road and squeezing more traffic into fewer general-purpose lanes).

To avoid being taken advantage of and protect the public interest in an infrastructure privatization deal, six principles[100] are recommended, none of which appear to have been prioritized for this project.

1. protecting the public welfare;
2. ensuring value for money;
3. taking all contingencies into account
4. establishing principles to justify the inclusion of each contract term;
5. demonstrating the superiority of privatization over public provision; and

---

[100] Dannin, 2011, p. 82.

00177826

6.  establishing a process that ensures all relevant information is presented and properly evaluated.[101]

Egregiously, alternatives other than toll lanes were not seriously considered and no value for money analysis was done.

Negative financial and societal impacts have not been adequately reflected in discussions and debate for at least two reasons. First, the state treasurer was not able to have the necessary – support to review the Phase P3 agreement contract[102] to understand its costs and risks. Second, the far-reaching negative impacts are inconvenient and not a desired part of the state or developer's narrative that toll roads will happen "at no net cost"[103] to the taxpayer. Far from no-net-cost, the private toll roads will subordinate the interests of taxpayers and the public to the private toll operator's interest in maximizing toll revenue.  By failing to disclose the foreseeable negative impacts of an intended largescale privatization of state infrastructure, the FEIS tainted the consideration of alternatives for not only this project but future projects.[104]

## VII.    Conclusion

Despite a review process where thousands of public commenters, elected officials, and state and federal agencies have tried to steer the Agencies onto the path of equity, justice, climate resilience, and smart growth, the preferred alternative as proposed in the FEIS will have significant, irreversible negative impacts on Maryland, its air, water, land, climate, residents and communities, historic resources, ecosystems, flora, and fauna.

As in the SDEIS and DEIS, these impacts are either ignored or underestimated in the FEIS, contrary to the Agencies' legal requirements. The limited benefits of the preferred alternative, meanwhile, are routinely overstated in the FEIS, and in some cases, like the traffic models, appear to be the result of improper manipulation rather than data and science.

When considering the cost of widening the American Legion Bridge and both the Maryland and Virginia I-495 projects, there is virtually no benefit provided to the traveling public except for

---

[101] Dannin, 2011.

[102] John Tulkin and Klaus Philipsen, August 9, 2021, available at https://www.baltimoresun.com/opinion/op-ed/bs-ed-op-0810-hogan-toll-lanes-20210809-qtety5ezcncdrkt4ewaqpuaz4q-story.html

[103] Katherine Shaver, Washington Post, July 1 2022.

[104] More on these issues can be read here: "Meta-monopoly," MacroBusiness, June 9, 2022, *available at* https://web.archive.org/web/20220611204818/https://www.macrobusiness.com.au/2022/06/meta-monopoly-transurban-gouges-subsidies-from-taxpayers/; Gary Hodge, Opinion: Plans to Privatize Maryland's Highways with Toll Lanes are Not in the Public Interest - Maryland Matters, July 14, 2022, available at https://www.marylandmatters.org/2022/07/14/opinion-plans-to-privatize-marylands-highways-with-toll-lanes-are-not-in-the-public-interest/; Transurban, APA Group 'ripe for takeout' in shrinking public market

00177827

marginal benefits for toll payers that evaporate when they too will be faced with heavy traffic congestion at the termini of the toll lanes. Virginia's toll lanes, now constructed, demonstrate the likely impacts of the Project on traffic patterns and congestion. As we have noted throughout this process, the tradeoffs and harms to the environment, climate, taxpayers, Section 4(f)-protected properties, and communities at large far outweigh the Project's benefits.

This $3-to-$7 billion-dollar first phase of a Project that will not relieve congestion and will worsen bottlenecks does not fulfill its purpose and need. If the Project is to go forward, it should be rethought entirely, constructed as a public project with public money, and scaled to the needs and constraints of the affected region of Maryland. It must avoid impacts to irreplaceable resources like Plummers Island and Morningstar Tabernacle No. 88 Hall and Cemetery in the historic Black community of Gibson Grove in Cabin John, Maryland, rather than cut a path with rippling impacts that signals disrespect to the communities that cherish them.

The Agencies must pause this process by withdrawing the FEIS and analyzing less costly multimodal options to improve mobility in the region that do not cause such significant harm to human health and the environment. The Agencies must also provide the public with a meaningful opportunity to review and comment on these options prior to undertaking a new FEIS.

At a minimum, the Agencies must not move forward with the preferred alternative or any of the fundamentally flawed build alternatives without considering additional new alternatives, the many analyses that have been ignored or improperly deferred, and a new review process that addresses the failures identified in these comments and prior comments.

00177828

## EXHIBIT LIST

Exhibit A     Compiled Letters Regarding Extension of Comment Period

Exhibit B     Smart Mobility, Inc., Review of Maryland I-495 & I-270 Managed Lanes Final
              Environmental Impact Statement and Final Section 4(f) Evaluation, July 2022

Exhibit C     Andrew Gallant Comment and Jeffrey T. Folden Response, July 2022

Exhibit D     Benjamin Ross, Maryland Transit Opportunities Coalition, July 11, 2022 Letter to
              Deputy Sec. Polly Trottenberg  Mentioned on pg. 12 of Master Copy

Exhibit E     Roselie Ann Bright, Comments on FEIS Regarding Lack of Analysis of Health
              Impacts, July 14, 2022

Exhibit F     Ron Bialek, Letter to MD Sierra Club Reviewing and Commenting on I-495 & I-
              270 MS FEIS, July 16, 2022

Exhibit G     ZAMURS AND ASSOCIATES, LLC, Review and Comment I-495 and I-270
              Managed Lanes Study Final Environmental Impact Study and Final Section 4(f)
              Evaluation, June 2022

Exhibit H     Arthur Katz Comments on FEIS Traffic Concerns, July 2022

Exhibit I     Byron Bloch Comments on FEIS Safety Concerns, July 2022

Exhibit J     WBFC Determination of Eligibility, August 20, 2021

Exhibit K     Shannon Browne Letter to MD Sierra Club on FEIS, July 18, 2022

Exhibit L     Federal Highway Administration (FHWA) and National Capital Planning
              Commission (NCPC) Meeting Notes, November 1, 2019

Exhibit M     Washington Biologists' Field Club (WBFC) Comments on MLS-106, February 3,
              2022

00177829



**OP·LANES™** MARYLAND | Options & Opportunities for All

1 in = 450 feet

0  115  230  460 Feet

Potomac River

Maryland
Virginia

Potomac River

I-495

24-28 ft in
solid blue

20-24 ft along
dashed line outside
NEXT work

Live Oak Dr

Ramp prior to 495
20-29 ft

I-495

George Washington Memorial Pkwy

Balls Hill Rd

**Legend**

Proposed General Purpose Lanes
Proposed General Purpose Lanes VDOT 495 NEXT Project
Proposed Managed Lanes
Proposed Managed Lanes VDOT 495 NEXT Project
Proposed New or Reconstructed Bridge
Proposed New or Reconstructed Bridge VDOT 495 NEXT Project

Proposed Shared Use Path
Proposed Shared Use Path VDOT 495 NEXT Project
Existing Noise Barrier
Proposed Noise Barrier
Proposed Noise Barrier VDOT 495 NEXT Project
Project Limit of Disturbance
Existing Right-of-Way

00177868

Message

| | |
|---|---|
| **From**: | Hill, Rodney [rhill@wrallp.com] |
| **Sent**: | 7/22/2022 11:49:21 AM |
| **To**: | Walter Miller (Consultant) [WMiller3.consultant@mdot.maryland.gov]; Don MacLean [donald.maclean@wsp.com]; Bryan Townsend (Consultant) [BTownsend3.consultant@mdot.maryland.gov] |
| **CC**: | Hill, Rodney [rhill@wrallp.com] |
| **Subject**: | RE: Complementary Responses to Questions and Comments - Live Oak Drive Meeting |

To all,

I just spoke with Matt about the MCA questions. He just got updated graphics from VDOT that he will be emailing to us that do add our roadway onto the profiles so no effort is needed there. Looking at them with him, it is clear that VDOT's project will be getting a lot more push back from the Virginia residents than the MDOT portion. Matt is also going to pull together the draft responses for the questions that he can and then send them to the MDOT team for comment but these will likely be minimal since VDOT's responses to these are really needed first to evaluate how we should respond and we have not seen those yet.

Rod

Rod Hill, P.E.
**Whitman, Requardt & Associates, LLP**
(Direct) 434.300.2367
(Cell) 717.818.6411
rhill@wrallp.com
www.wrallp.com

---

**From:** Stacy Talmadge (Consultant) <STalmadge.consultant@mdot.maryland.gov>
**Sent:** Tuesday, July 19, 2022 12:39 PM
**To:** Harrell, Matthew T. <Matthew.Harrell@wsp.com>
**Cc:** Karen Kahl <kkahl@rkk.com>; Bauer, Kenneth <kbauer@wrallp.com>; Walter Miller (Consultant) <WMiller3.consultant@mdot.maryland.gov>; Hill, Rodney <rhill@wrallp.com>; Bryan Townsend (Consultant) <BTownsend3.consultant@mdot.maryland.gov>
**Subject:** FW: Complementary Responses to Questions and Comments - Live Oak Drive Meeting

Matt,

I don't know that anyone has formally started pulling together the responses to the McLean Citizen's Association meeting and other emails that were received (in response to your email from this morning).

If someone from the GEC could draft the letter response using information we've already pulled together (see Ken's email below), that would be very helpful. Our team stretched pretty thin this week due to FEIS comments / responses and vacations.

Your assistance is much appreciated.

Thank you!

**Stacy Talmadge**
Environmental Program Support
I-495 & I-270 P3 Office

**Office** 410-637-3349 **Mobile** 443-414-7723
**Email** STalmadge@mdot.maryland.gov

**Office Address** 601 N. Calvert Street | Baltimore, MD 21202
**Mailing Address** 707 North Calvert Street,
P-601 | Baltimore MD 21202

---

**From:** Bauer, Kenneth <kbauer@wrallp.com>
**Sent:** Wednesday, June 29, 2022 8:37 AM
**To:** Walter Miller (Consultant) <WMiller3.consultant@mdot.maryland.gov>; Caryn Brookman (Consultant)
<CBrookman.consultant@mdot.maryland.gov>; Stacy Talmadge (Consultant)
<STalmadge.consultant@mdot.maryland.gov>; Bryan Townsend (Consultant)
<BTownsend3.consultant@mdot.maryland.gov>; Carlos Brown <carlos.brown@wsp.com>; Guinther, James
<jguinther@wrallp.com>
**Cc:** Matt Harrell <matthew.harrell@wsp.com>; Don MacLean <donald.maclean@wsp.com>; Hill, Rodney
<rhill@wrallp.com>; Woodhouse, Andrew <Andrew.Woodhouse@wsp.com>; kkahl <kkahl@rkk.com>; Linda Strozyk
DeVuono <LDeVuono@mdot.maryland.gov>; Shawn Eum <SEum@mdot.maryland.gov>; Lynch, Katie
<klynch@wrallp.com>; Minor, William <wminor@wrallp.com>
**Subject:** RE: Complementary Responses to Questions and Comments - Live Oak Drive Meeting

Walt,
The answer to question 2 regarding matching materials of the adjacent noise barrier is below, copied from the response to questions presented at the June 6 meeting.

For question 1 regarding early sound wall construction, there is currently nothing in the technical provisions requiring early noise barrier construction for barriers on new alignment. For the Live Oak area, the MDOT noise barrier currently planned is on, or behind a tall cut wall. Due to the complexity of the construction in this area, early noise barrier construction would be difficult or impossible. We can start looking at this issue to see if early construction is possible, and if so, how it could be done. I'll forward that info along and we can assess the feasibility of a commitment to construct noise barriers early in the process.

Thanks, Ken

---

**From:** Walter Miller (Consultant) <WMiller3.consultant@mdot.maryland.gov>
**Sent:** Wednesday, June 29, 2022 7:55 AM
**To:** Caryn Brookman (Consultant) <CBrookman.consultant@mdot.maryland.gov>; Stacy Talmadge (Consultant)
<STalmadge.consultant@mdot.maryland.gov>; Bryan Townsend (Consultant)
<BTownsend3.consultant@mdot.maryland.gov>; Carlos Brown <carlos.brown@wsp.com>; Bauer, Kenneth
<kbauer@wrallp.com>; Guinther, James <jguinther@wrallp.com>
**Cc:** Matt Harrell <matthew.harrell@wsp.com>; Don MacLean <donald.maclean@wsp.com>; Hill, Rodney
<rhill@wrallp.com>; Woodhouse, Andrew <Andrew.Woodhouse@wsp.com>; kkahl <kkahl@rkk.com>; Linda Strozyk
DeVuono <LDeVuono@mdot.maryland.gov>; Shawn Eum <SEum@mdot.maryland.gov>
**Subject:** Fw: Complementary Responses to Questions and Comments - Live Oak Drive Meeting

All:

See below. Several more questions from VDOT. Although technical/contractual in nature, I believe we should respond in a similar manner as other responses in our court with VDOT related to community concerns.

Thanks,
Walt

---

**From:** Nomani, Ali <ali.nomani@vdot.virginia.gov>
**Sent:** Tuesday, June 28, 2022 6:41 PM
**To:** Walter Miller (Consultant) <WMiller3.consultant@mdot.maryland.gov>; Woodhouse, Andrew (USA) <Andrew.Woodhouse@wsp.com>; Harrell, Matthew T. <Matthew.Harrell@wsp.com>
**Subject:** Complementary Responses to Questions and Comments - Live Oak Drive Meeting

Walt and Andrew,

Can MDOT please provide answers to the following questions raised by citizens during the Live Oak Drive Meeting held on May 26, 2022.

1.   Can the Maryland Team plan to construct the Live Oak sound wall early in the Maryland construction project to help protect the Live Oak community from the noise produced by both construction and ongoing traffic?

2.   Can the Maryland Team match the aesthetic characteristics of the sound wall that VDOT is constructing along Live Oak Drive in conjunction with the I-495 NEXT project?

   *Noise barriers required by the MLS in Virginia will match the materials and architectural finishes of adjacent noise barriers, in this case the adjacent noise barrier is to be constructed by Project NEXT.*

I would appreciate a quick turnaround on this one. Thanks.



**Ali Nomani, PE**

*Engineering Manager Design-Build Megaprojects*
Virginia Department of Transportation
Office: 703-691-6740, Cell:703-537-6630
ali.nomani@vdot.virginia.gov

The information supplied in this message may be privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient of this message, the sender does not intend delivery to you to waive any privilege or right pertaining to this message. You have no right to retain, disseminate, copy or disclose the material contained herein. If you have received this message in error, please immediately notify the sender by return e-mail, and delete the errant message. Thank you.

Whitman, Requardt & Associates, LLP (WRA) is an equal opportunity employer that values and fosters diversity at all levels. WRA does not discriminate in employment on the basis of race, color, religion, sex (including pregnancy), national origin, political affiliation, sexual orientation, gender identity, marital status, disability, genetic information, age, parental status, military and veteran status, and any other characteristic protected by applicable law. Consistent with the requirements of Title VI of the Civil Rights Act of 1964, as amended and other nondiscrimination laws and authorities, we also note that WRA does not discriminate in its selection or retention of subcontractors on the grounds of race, color, or national origin. WRA will ensure that individuals and minority business enterprises will be afforded full opportunity to submit proposals and not be discriminated against on the grounds of race, color, or national origin in consideration for an award.

WRA_Disclaimer_v20210609



## COMMONWEALTH of VIRGINIA
**DEPARTMENT OF TRANSPORTATION**
4975 Alliance Drive
Fairfax, Virginia 22030

Stephen C. Brich, P.E.
Commissioner

July 29, 2022

The Honorable John W. Foust
Dranesville District
Fairfax County Board of Supervisors
McLean Governmental Center
1437 Balls Hill Road
McLean VA  22101

The Honorable Senator Barbara Favola
District 31
Senate of Virginia
2319 18th Street North
Arlington, VA 22201-3506

The Honorable Delegate Kathleen Murphy
District 34
Virginia House of Delegates
P.O. Box 146
McLean, VA 22101

**SUBJECT:    I-495 Express Lanes Northern Extension (Project NEXT)**
State Project Number: 0495-029-419, P101
UPC Number: 116754
**Responses to Questions from Supervisor Foust, Senator Favola and Delegate
Murphy dated June 8, 2022**

Dear Supervisor Foust, Senator Favola and Delegate Murphy:

The Virginia Department of Transportation (VDOT) would like to thank you for your attendance
at the June 6th and 7th Public Information Meetings.  VDOT appreciates your questions and
offers the following responses.  In addition to these responses, The Maryland Department of
Transportation State Highway Administration (MDOT) will be responding separately to
questions specific to the I-495 & I-270 Managed Lanes Study (MLS).

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 2 of 18

For the purposes of the responses, please reference the George Washington Memorial Parkway & I-495 Interchange (GWMP) graphic:

*Figure 1: Proposed GWMP associated with Virginia's I-495 NEXT project.*



Figure 1 clarifies the design elements associated with the I-495 NEXT project. These elements, shaded in purple, include a realignment and construction of 2 existing at-grade ramps (Ramp 1 and Ramp 5), and the construction of 2 new ramps which will provide connections to and from the GWMP and the I-495 NEXT Express Lanes (Ramp 2 and Ramp 3). A new fifth ramp (Ramp 4) is being studied by MDOT under the MLS that will connect the southbound Express Lane to eastbound George Washington Memorial Parkway.

1. Exactly how high are the five flyover lanes that are proposed for near Live Oak Drive?

   ***Response:***
   *Figure 2 shows ground elevations as well as proposed elevations based upon the preliminary design as of May 25th, 2022. Attachment 1 shows several lines-of-sight of the proposed improvements from different perspectives around the GWMP interchange.*

   *Below is a description of each of the proposed ramps:*

   a. *Ramp 1 is from westbound GWMP to the southbound I-495 general purpose lanes. This ramp exists today and is being reconstructed as part of the I-495 NEXT project after which MDOT will perform work to tie into the new GWMP bridge over I-495. The range in elevation for the portions of the ramp associated with the I-495 NEXT project is anticipated to be from 217' to 245'.*
   b. *Ramp 2 is from the westbound GWMP to southbound I-495 Express Lanes. This is a new ramp being constructed as part of the I-495 NEXT project and includes a bridge over the southbound I-495 general purpose lanes. The range in elevation of the ramp is anticipated to be from 221' to 271'.*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 3 of 18

    c.  *Ramp 3 is from the northbound I-495 Express Lanes to the eastbound GWMP. This is a new ramp that will be constructed as part of the I-495 NEXT project and includes a bridge over the southbound I-495 general purpose lanes. The range in elevation of the ramp is anticipated to be from 220' to 269'.*

    d.  *Ramp 4 is from the southbound I-495 high-occupancy toll (HOT) lanes to the eastbound GWMP. This is a new ramp being constructed as part of the MLS and includes a bridge over the southbound I-495 general purpose lanes. MDOT will provide information on this ramp.*

    e.  *Ramp 5 is from the southbound I-495 general purpose lanes to the eastbound GWMP. This ramp is existing today and will be reconstructed as part of the I-495 NEXT project after which MDOT will perform work to tie into I-495 and the new GWMP bridge over I-495. The range in elevation for the portions of the ramp associated with the I-495 NEXT project is anticipated to be from 195' to 228'.*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 4 of 18

*Figure 2: Elevations for proposed GWMP associated with the I-495NEXT project*



Notes:
1) Elevations of existing conditions are based on survey information except for elevations at 720 Live Oak Drive and 708 Live Oak Drive, which are based on Google Earth Terrain data due to being outside of the project survey area.
2) Elevations have a margin of error of approximately 1-foot due to file conversion of land survey information overlaid on aerial imagery.
3) Elevations shown on the proposed design elements are from roadway surface based on Design Plans shared at May and June 2022 Public Information Meetings.

00178601

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 5 of 18

2. Will the extended toll lanes be the same height as the existing highway, or will they be higher?

   *Response:*
   *The mainline of the Express Lanes associated with the I-495 NEXT project will be built at the same general elevation as the Beltway is today.*

3. Exactly how high are the visual and sound barriers that are proposed to shield Live Oak Drive from the flyover lanes and the extended toll lanes?

   *Response:*
   *The I-495 NEXT Preliminary Noise Analysis showed noise barriers to be reasonable and feasible along Live Oak Drive up to Rivercrest Drive (see Attachment 2 to this letter). The following response is related to the proposed noise barriers associated with the I-495 NEXT project. The Preliminary Noise Analysis (Environmental Assessment Preliminary Noise Technical Report, pages 56 – 57) indicates that the height of the proposed noise barriers (Barrier 10 and 10 [ext]) range from 8 feet to 26 feet. These heights may change based on the Final Noise Analysis, but will not be any less than the heights that currently exists today. Final Noise Analysis efforts are currently in progress and are not publicly available at this time. This information is being developed according to the Federal Highway Administration (FHWA) regulations and to VDOT's Statewide Noise Policy. It will take into account current design plans, and will be shared once the analysis is completed and reviewed/approved by the FHWA for public availability. Residences that are impacted and/or benefitted will be provided the opportunity to vote on whether or not they want the proposed noise barriers to move forward to construction.*

   *MDOT will provide sound barrier heights specific to the MLS.*

   a. Where VDOT proposes to replace the existing barriers, will the replacement barriers be sound barriers or merely visual barriers?

      *Response:*
      *The surface of the proposed noise barriers will be designed to partially absorb highway noise, and are meant to serve as noise barriers. Although they may additionally serve as visual barriers, their main purpose is noise abatement.*

   b. Where VDOT proposes to replace the existing barriers, will the barriers be the same height as the existing barriers or will they be higher?

      *Response:*
      *The height of the noise barriers will be determined by the Final Noise Analysis. However, based on VDOT policy and guidance, the replacement barriers will be the same height as the existing wall or higher.*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 6 of 18

    c.  Where VDOT proposes to replace the existing barriers, will the barriers be high enough to shield both the sound and the visual impacts from the highway expansion?

*Response:*
*Based on the methodologies prescribed by VDOT Guidelines, the Final Noise Analysis will determine the height of the noise barriers to mitigate noise impacts in accordance with FHWA regulations. It is anticipated that the noise barriers along Live Oak Drive will offer a visual barrier of the proposed ramps associated with the I-495 NEXT project from several perspectives from Live Oak Drive and adjacent residences. Please refer to Attachment 2 to see representative lines-of-sight based on the Preliminary Noise Analysis.*

    d.  Please provide details on the materials proposed for the barriers shielding Live Oak Drive.

        i.  For example, will VDOT use "Whisper Walls" or will some other type of wall be used?

*Response:*
*The type of barriers that are anticipated to be constructed at Live Oak are pre-cast concrete with drystack finish on the exterior of the wall. The photo below is a general example of what the noise barrier surface will look like.*

*Figure* 3: Noise Barrier Example for the I-495 NEXT project



       ii.  Exactly how much sound protection will these barriers provide?
          1.  Please provide the response both in terms of percentage reduction in sound impacts and in actual decibels with and without the barriers.

00178603

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 7 of 18

2. Please include in the response impacts for the MDOT and the VDOT portions of the project, both separately and combined.

*Response:*
*The Preliminary Noise Analysis for the I-495 NEXT project is based on 2045 predicted noise levels associated with predicted traffic modeling for that design year, which assumes predicted traffic data as result of the implementation of the MDOT MLS. The Preliminary Noise Analysis for Live Oak Drive is associated with two (2) Common Noise Environments (CNE) named CNE C and CNE E. The amount of noise reduction varies for each noise receptor within each CNE. Based on the information found in the Appendix M and Appendix N of the Preliminary Noise Analysis, predicted sound levels within the CNE's associated with Live Oak Drive is shown to have a range of 50-78 dBA without the barrier in place and with the barrier is shown to have a range of 49-65 dBA with a range of predicted reduction from 1-16dBA. For more information regarding Preliminary Noise Analysis associated with Live Oak Drive, please refer to Page 35, 36, 55-57 as well as Appendix A – Page 1 & 2, Appendix M, Page 1 & Appendix N, Pages 3-5 in the May 2020 I-495 NEXT Preliminary Noise Analysis Report.*

*MDOT will provide a response specific to MLS elements.*

4. When, exactly (month and year), was VDOT first informed that MDOT would be building five flyover lanes near Live Oak Drive?

*Response:*
*The VDOT planning studies have been public and have considered the input of MDOT and the public. The analysis conducted as part of the National Environmental Policy Act (NEPA) process is iterative in order to consider public and agency feedback and analysis of new information. The current modified interchange reflects the incorporation of this information.*

*The May 20, 2019, Public Information Meeting provided a display board for the Design Year 2045 which showed the locations of Ramps 1, 2, 4 & 5 generally as they are currently planned to be constructed. VDOT showed a modified Ramp 3 location within the established approved Limits of Disturbance on September 28, 2021, and on September 29, 2021, that was the result of coordination efforts with MDOT as well as in response to public comments.*

a. Please explain what specific measures were taken, and when, to inform the affected communities that MDOT would be building five flyover lanes near Live Oak Drive.

*Response:*
*VDOT invited MDOT to participate in the I-495 NEXT EA public engagement process by attending its Public Information Meetings (June 11, 2018; May 20, 2019; September 28 & 30, 2020; November 18, 2020; September 29, 2021; and June 6 & 7, 2022), a Public*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 8 of 18

> *Hearing (October 5 & 8, 2020), and a presentation to the Fairfax County Board of Supervisors Transportation Committee (September 28, 2021); all of which MDOT attended to present the status of their proposed project action and to address any questions.*

5. Please identify exactly where in the public documentation VDOT explains to the public that MDOT will be building five flyover ramps (and taking other actions) in Virginia.  Please also identify specifically when (month and year) that documentation was made available to the public.

*Response:*
*See response to Question 1 for ramp description and construction responsibility.*

*VDOT hosted a Public Information Meeting on May 20th, 2019.  During this meeting, VDOT presented proposed interchange options under consideration and also presented exhibits depicting the proposed conceptual plans for the Interim Year (2025) and Design Year (2045).  The Design Year exhibits depict an early concept of the improvements that were being studied at the GWMP interchange.  This exhibit was posted on the I-495 NEXT website in May 2019:*
*http://www.495northernextension.org/documents/pim052019/pim052019_07designyeardraft.pdf*

*The I-495 NEXT Revised Environmental Assessment (EA) published in May 2021 shows the adjustment to the GWMP interchange related to the ramp configuration, in Exhibit 2-1e. in Chapter 2 of the main EA document on page 2-22, which also depicts a preliminary concept of ramp modifications proposed by the MLS project.  This document was posted to the project website for I-495 NEXT in May 2021:*
*http://www.495northernextension.org/documents/studies/070121/i-495_next_revised_ea_-_may_2021.pdf*

*VDOT and MDOT hosted a Public Information Meeting on September 29, 2021, to provide status updates for both projects.  During this meeting, VDOT presented the modified GWMP interchange.  Information and documents related to the meeting content – including the updated configuration of the GWMP interchange, were posted on the project website on the day of the meeting:*
*https://495northernextension.org/public_meetings/092921_vpim.asp*

*The presentation slides and associated graphics presented at the September 2021 Public Information Meeting, which show improvements under study by MDOT, were posted on VDOT's I-495NEXT Project website on the day of the meeting:*
*https://495northernextension.org/documents/pim092021/2021-09-29_495_next_pim_presentation_final.pdf*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 9 of 18

*The limits associated with VDOT's I-495 NEXT project at the George Washington Memorial Parkway, including the change in ramp alignment for the northbound Express Lanes exit ramp (Ramp 3 in Figure 1), are shown on Slide 12. MDOT's study showed approximate limits and assumed construction responsibilities in Virginia are shown on the graphics dated August 18, 2021, as shown in slides 23, 25, and 26. Specific responsibilities with respect to necessary tie-in work are dependent upon the timing of implementation of each of the projects.*

6. What specific actions did MDOT take to inform the affected Virginia communities that it would be taking actions with Significant Environmental Impacts in those Virginia communities?
   a. What specific actions did MDOT take to ensure that affected Virginia communities received notice that its Draft Environmental Impact Statement was available for public review and comment?*
   b. What specific actions did MDOT take to ensure that affected Virginia communities received notice that it would be holding public hearings on its Draft Environmental Impact Statement?*

   ***Response:***
   *MDOT will provide a response to this question.*

7. What specific measures did VDOT take to inform the affected Virginia communities that MDOT would be taking actions with Significant Environmental Impacts in those Virginia communities?

   ***Response:***
   *See response to 3A.*

   a. What specific actions did VDOT take to ensure that affected Virginia communities received notice that MDOT's Draft Environmental Impact Statement was available for public review and comment, and that that document would discuss specific and significant impacts in Virginia?

   ***Response:***
   *MDOT MLS is its own study with its own logical termini and independent utility. MDOT will provide additional information pertaining to its public engagement process associated with its project.*

   b. What specific actions did VDOT take to ensure that affected Virginia communities received notice that MDOT would be holding public hearings on its Draft Environmental Impact Statement, and that MDOT construction would have specific and significant impacts in Virginia?

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 10 of 18

*Response:*
*The I-495 NEXT project website has links to the MDOT website. VDOT invited MDOT to attend our Public Information Meetings where they informed the public about their upcoming document availability and the SEIS Public Hearing held November 1, 2021 (See September 28, 2021 presentation to the Fairfax County Board of Supervisors Transportation Committee as well VDOT's Public Information Meeting presentation on September 29, 2021.)*

8. Please explain VDOT's rationale for not discussing in its Environmental Assessment, as a "connected action," the MDOT construction that will occur in Virginia. For reference, "connected actions" are "closely related and therefore should be discussed in the same impact statement. Actions are connected if they…are interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1) (emphasis added).

*Response:*
*Section 1.1 of the approved Revised Environmental Assessment (EA), published in May 2021, describes the I-495 NEXT project limits and how the project has independent utility and therefore would not be categorized as having a "connected action" with any proposed adjacent future improvement. As lead federal agency, FHWA has reviewed and concurred with the logical termini and independent utility determination for the I-495 NEXT project. The VDOT I-495 NEXT project has established the logical termini to be the George Washington Memorial Parkway and Dulles Toll Road (Route 267). This selection of logical termini was based on the determination that the proposed improvements address the purpose and need of the I-495 NEXT project. The MDOT MLS has established its southern logical termini to be the George Washington Memorial Parkway. Each project has independent utility since they each provide a usable facility and would be a reasonable expenditure of funds even if no additional transportation improvements in the area are made. Additionally, each project has its own respective purpose and need. Therefore, while the projects are geographically adjacent, they are unique and independent projects with proposed improvements to address their respective purpose and need that could function regardless of the other.*

9. Please explain VDOT's rationale for not discussing in its Environmental Assessment, as a "cumulative action," the MDOT construction that will occur in Virginia. For reference, "cumulative actions" are "cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(2)(emphasis added).

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 11 of 18

*Response:*

*The previous question above describes where the approved Revised Environmental Assessment (EA) describes the project limits, established logical termini and how the project has independent utility and therefore would not be categorized as having a "cumulative action" with any proposed adjacent future improvement.*

*As a separate project with its own logical termini and independent utility, the proposed MDOT project does not contribute to the direct impacts analyzed in FHWA/VDOT's EA. Instead, the proposed MDOT project is considered a reasonably foreseeable project within the vicinity that could contribute to cumulative impacts. Table 5-1 of the Indirect and Cumulative Effects (ICE) Technical Report lists the proposed MDOT project as a reasonably foreseeable future project. Section 3.0 of the ICE Technical Report explains how the potential impacts from the proposed MDOT project were analyzed in the FHWA/VDOT EA and incorporated into the FHWA Finding of No Significant Impact (FONSI) for the Virginia project. The FONSI can be found on the I-495 NEXT website:* *https://www.495northernextension.org/documents/studies/070121/fhwa_finding_of_no_signif icant_impact.pdf.*

10. Please explain VDOT's rationale for not discussing in its Environmental Assessment, as "cumulative effects," the environmental impacts of the MDOT construction that will occur in Virginia. For reference, cumulative effects" are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.l(g) (emphasis added).

*Response:*

*Cumulative effects are summarized at the end of Chapter 3 of the May 2021 Revised Environmental Assessment (EA), and cumulative effects specific to construction are discussed in Section 5.3.2 – Present and Reasonably Foreseeable Future Actions of the May 2021 Revised Indirect and Cumulative Effects (ICE) Technical Report posted on the project website. MDOT's project – and relevant information available at the time of publication -- is specifically referenced in Table 5-1 on page 60 of the report. Section 3.0 of the ICE Technical Report explains how the potential impacts from the proposed MDOT project were analyzed in the FHWA/VDOT EA and incorporated into the FHWA FONSI for the Virginia project.*

*Indirect & Cumulative Effects Tech Report Final (Revised May 2021):*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 12 of 18

*https://www.495northernextension.org/documents/studies/070121/revised_indirect_cumulati ve_effects_tech_report_-_may_2021.pdf*

11. Please explain the rationale for VDOT and MDOT not preparing a single, integrated Environmental Impact Statement (EIS), given that the regulations clearly mandate a single EIS for "connected" and "cumulative" actions.

    ***Response:***

    *While FHWA is the lead federal agency for both projects in question, there are two independent project proponents (VDOT and MDOT) who have brought their respective proposals to the FHWA Division office assigned to their state. As lead federal agency, FHWA has concurred on the selected logical termini and independent utility of each project. As explained in the response for Question 9, each project has established logical termini, independent utility and respective purposed and need. Therefore, as stated above, it is important to reiterate in the response for this question that while the projects are geographically adjacent, they are unique and independent projects with proposed improvements to address their respective purpose and need that could function regardless of the other.*

12. Please explain why VDOT and MDOT believe that separately analyzing clearly connected and cumulative actions does not constitute unlawful "segmentation" under the National Environmental Policy Act (NEPA). For reference, unlawful segmentation occurs when agency artificially divides a major federal action into smaller components to avoid application of NEPA to some of its segments. See, e.g., Coalition on Sensible Transportation, Inc. v. Dole, 826 F.2d 60, 68 (D.C. Cir. 1987) ("Agencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components.").

    ***Response:***

    *Unlawful segmentation is not applicable because each project has independent utility. Each project provides a usable facility delivered by utilizing a reasonable expenditure of funds even if no additional transportation improvements in the area are made, which defines how they are unique and independent projects that could function regardless of the other while being geographically adjacent to each other.*

13. Please explain the basis for your belief that Virginia residents should have been on notice that the "Significant Environmental Impacts" to the Northern Virginia community would be undertaken by MDOT and thus would be addressed only in MDOT's Draft Environmental Impact Statement, and neither identified nor discussed in VDOT's Environmental Assessment.

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 13 of 18

*Response:*

*Please see responses to Questions 4, 5 and 7 regarding the I-495 NEXT public outreach.*

*MDOT will provide a response regarding their public engagement process for the MLS.*

14. We understand from the meeting on June 6, 2022, that VDOT and Transurban have reached financial close on the 495-NEXT expansion project.  We also understand that VDOT has not yet completed its noise analyses as well as various other environmental impact studies.  Please explain how financial close does not constitute an illegal "irretrievable commitment of resources" under NEPA.  For reference, NEPA analyses must be prepared at the "feasibility analysis (go-no go) stage." Andrus v. Sierra Club, 442 U.S. 347, 351 n. 3 (1979). As such, NEPA requires that the environmental analyses be conducted and completed "before any irreversible and irretrievable commitment of resources" occurs.  Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir, 2000); see also Native Ecosystems Council v. Dombeck, 304 F. 3d 886 (9th Cir. 2002).

*Response:*

*Financial close for the I-495 NEXT project was reached on March 1, 2022, after the FHWA issued a Finding of No Significant Impact (FONSI) to complete the NEPA process.  NEPA was concluded on June 29, 2021.  During a meeting between FHWA and VDOT on September 2, 2021, FHWA stated that the minor changes to the ramps are within the limits of disturbance that was evaluated in the Environmental Assessment and FONSI.  As the project advances and the design is more detailed, the detailed design and associated final studies, such as the Final Noise Analysis, are reviewed and confirmed to ensure they are consistent with FHWA's NEPA decision.*

15. Please explain VDOT's legal rationale for not addressing the noise impacts of both its portion of the project and MDOT's five flyover ramps, including why failure to do so does not violate NEPA's prescriptions regarding connected actions, cumulative actions, cumulative impacts and unlawful segmentation.
    a. Does VDOT's Analysis of Noise Abatement include the noise impacts from the five flyover ramps being constructed by VDOT?
    b. Does VDOT's estimate of a 10 decibel increase in traffic noise in the Live Oak Drive neighborhood include the noise impacts of the flyover ramps or exclude those impacts?
    c. If VDOT's estimate of a 10 decibel increase in traffic noise in the Live Oak Drive neighborhood excludes the noise impacts of the flyover ramps, please explain how the MDOT and VDOT projects together meet the US Department of Transportation's requirements for noise levels in residential neighborhoods.  See 23 C.F.R. §§ 772.11(c), 772.13 and Table 1 to Part 772.

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 14 of 18

*Response:*
*The Preliminary Noise Analysis (PNA) was done based on the configuration shown at the Public Hearing on November 18, 2020. The analysis utilized projected traffic in 2045, which included projected traffic conditions as result of the MDOT project since it was included in the Constrained Long Range Plan (CLRP). The Final Noise Analysis will take into consideration the projected 2045 traffic conditions and configuration of the ramps included in both projects.*

16. Where in the public record can we find the following analyses:

   a. Alternatives assessment for the expanded project scope?

      i. What other options were considered besides the new, expanded and elevated flyover ramps, and were those options discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

      *Response:*
      *The initial option for the GWMP and potential ramps under study by MDOT were first shown to the public in the I-495 NEXT Public Information Meeting on May 20, 2019. The proposed improvements under study by MDOT were shown on the display boards dated May 2019, as shown on Board #5 here:*
      *http://www.495northernextension.org/documents/pim052019/pim052019_07designyeardraft.pdf*

      *MDOT will provide a response.*

      ii. On what basis did VDOT and MDOT conclude that these massive new ramps are the least environmentally-impactful alternative, and was that rationale discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

      *Response:*
      *The preferred alternative/selected action is one that best meets the purpose and need while balancing cost and impact. FHWA has concurred with the I-495 NEXT preferred alternative based on these criteria.*

      *MDOT will provide a response.*

   b. Assessment of mitigation measures to address the impacts on the Live Oak Drive community and Scotts Run Nature Preserve that will result from the expanded project scope?

    i.    What specific mitigation measures were considered, and were those measures discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

    ii.   On what basis were those mitigation measures rejected and was that rationale discussed in the Environmental Assessment prepared by VDOT or only in the documents prepared by MDOT?

**Response:**

*Mitigation measures for the project were identified in the Environmental Assessment and FONSI. Design options currently being constructed are within the limits of disturbance as identified in the NEPA document. As we work to finalize the design, mitigation measures for impacts as result of the project will be reviewed and approved to ensure they are consistent with the EA and FONSI.*

*MDOT will provide a response regarding their proposed mitigation for any impacts to regulated resources within Virginia.*

c.   Noise impacts that will result from the new project scope, including:

    i.    Traffic noise predictions in conformance with the FHWA Traffic Noise Model (TNM), as required under 23 C.F.R. §§772.9 and 772.111?

    ii.   Analysis of Noise Abatement for Live Oak Drive, as required under 23 C.F.R. § 772.3?

**Response:**

*See response to Question 3.*

*MDOT will provide a response regarding the MLS noise analysis.*

d.   Light pollution impacts on the Live Oak Drive community that will result from the new project scope?

**Response:**

*Roadway lighting will be designed to minimize lighting impacts to surrounding communities.*

*MDOT will provide a response regarding the light pollution for the MLS.*

e.   Air dispersion modeling analysis that assesses both the criteria and the hazardous air pollutant emission impacts from the new project scope?

**Response:**

*An air quality study was completed in February 2021 and published in May 2021 as part of the I-495 NEXT Environmental Assessment documentation, following all federal air quality requirements, and found that the project would not cause or contribute to a violation of any air quality standard. The air study included a dispersion modeling*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 16 of 18

*analysis for carbon monoxide (CO) and found that peak CO concentrations from the project would remain well below the Environmental Protection Agency's CO standards in all locations. A dispersion modeling analysis was not required for any other criteria or hazardous air pollutants. The air study can be viewed on the Project website:*
*http://www.495northernextension.org/documents/studies/070121/revised_air_quality_tech_report_-_may_2021.pdf*
*http://www.495northernextension.org/documents/studies/070121/revised_air_quality_tech_report_appendices_-_may_2021.pdf*

*Shifting of the northbound I-495 NEXT Express Lanes exit ramp from the inside of the Beltway to the outside of the Beltway would not substantially impact on the findings of the Air Impact Analysis Study.*

*MDOT will provide a response regarding the air analysis for the MLS.*

f.  Visibility and noise impacts on Scotts Run Nature Preserve that will result from the new project scope?

***Response:***

*Impacts to Scotts Run Preserve were covered under the I-495 NEXT Revised Environmental Assessment and supporting technical studies. A final design noise analysis is currently under development that will evaluate noise impacts associated with the final design for the entire project corridor, which will include Scotts Run Nature Preserve.*

*MDOT will provide a response regarding the visual and noise impacts analysis for the MLS.*

g.  Impacts on water quality from the increased traffic that will result from the new project scope?
h.  Wetlands impacts that will result from the new project scope?
i.  Biological resources impacts that will result from the new project scope?

***Response:***

*Based on the impact analyses performed for natural resources – including water quality, wetlands, and biological resources – for the original project footprint and documented in the May 2021 Revised Environmental Assessment (EA), the impacts within the Limits of Disturbance (LOD) were established and quantified. Ramp 3 is located within the previously established LOD and approved in the 2021 EA. More details on the impact to natural resources can be found in the Revised May 2021 Natural Resources Technical Report and Appendices on the project website:*

*https://www.495northernextension.org/documents/pim032020/i-495_next_7_natural_resources_tech_report_final.pdf*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 17 of 18

*https://www.495northernextension.org/documents/pim032020/i-495_next_7a_natural_resources_tech_report_appendices_final.pdf*

*MDOT will provide a response regarding the natural resources analysis associated with the MLS.*

j.  In light of the documented health impacts to communities near major traffic sites, air quality impacts on the Live Oak Drive community that will result from the new project scope?

    ***Response:***

    *As part of the I-495 NEXT Environmental Assessment, an air quality study was completed in February 2021 and published in May 2021 as part of the environmental documentation, following all federal air quality requirements and found that the project would not cause or contribute to a violation of any air quality standard. The air quality study can be viewed on the I-495 NEXT project website, as referenced above in the response to question 16.e.*

    *MDOT will provide a response regarding the air analysis associated with their Final Environmental Impact Statement.*

k.  Calculated climate change impacts resulting from increased traffic resulting from the new project scope? (We assume that, in accordance with federal regulations and guidance, VDOT used the most current Social Cost of Carbon to calculate the monetary climate change impacts from the new project scope. What was the result of that analysis?)

    ***Response:***

    *There are currently no explicit federal requirements pertaining to transportation project-related greenhouse gas (GHG) emissions, although a qualitative GHG assessment was completed as part of the I-495 NEXT Environmental Assessment air quality study to help support an informed decision. The analysis found that the project would reduce vehicle miles traveled (VMT) in the 2045 Build scenario compared to the 2045 No-Build scenario. The lower VMT anticipated in the 2045 Build scenario compared to No-Build scenario is attributed to a number of factors. The Express Lanes will directly encourage carpooling, improve I-495 bus operations, and indirectly help to fund transit and active transportation alternatives in the corridor, and these are all anticipated to reduce VMT and GHG emissions. The I-495 NEXT project is also anticipated to shift demand in Virginia from parallel arterial facilities to the freeway network, which would result in more direct (shorter-distance) trips being taken.*

    *MDOT will provide a response regarding climate change analysis associated with the MLS.*

Supervisor Foust, Senator Favola and Delegate Murphy
July 29, 2022
Page 18 of 18

If you have any questions or need additional information, please do not hesitate to contact Abi Lerner at (703) 414-9299 – Abraham.Lerner@vdot.virignia.gov or me at (703) 259-1995 or by email at Susan.Shaw@vdot.virginia.gov.

Sincerely,

Susan N. Shaw

Susan Shaw, P.E.
VDOT MegeProjects
Northern Virginia District

cc:

       Tom Biesiadny. FCDOT
       Martha Coello, FCDOT
       John Simkins, FHWA
       Jitesh Parikh, FHWA
       Gregory Murrill,  FHWA
       Jeff Folden, MDOT
       Caryn Brookman,  MDOT

Attachments

- Attachment 1: Lines-of-Sight for Proposed Ramps at George Washington Memorial Parkway Ramp Exhibit
- Attachment 2: Preliminary Noise Analysis Noise Barrier Location Along Live Oak Drive

Attachment 1

Line of Sight for Proposed Ramps at George Washington Memorial Parkway Ramp Exhibit

00178616

# 495 Express Lanes Northern Extension Project
## June 2022 Public Update Meeting Design - Cross Section View Map
### Project NEXT
### July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

*Note: The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder.*



00178617



# 495 Express Lanes Northern Extension Project
## June 2022 Public Update Meeting Design - Cross Section View Map
## Project NEXT and I-495/I-270 Managed Lanes Study
### July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

*Note: The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.*



# 495 Express Lanes Northern Extension Project
June 2022 Public Update Meeting Design - Cross Section Views
Project NEXT and I-495/I-270 Managed Lanes Study
July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

SCALE
0    40    80

**Notes:**
1. The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.
2. Existing house and tree heights, elevations, and depictions are approximate.

Cross Section View 1

## Project NEXT

720 Live Oak Drive

7048 Arbor Lane
7040 Arbor Lane
7036 Arbor Lane
7032 Arbor Lane

House — Live Oak Drive — GWMP Ramp G21 — Southbound I-495 Express and General Purpose Lanes — GWMP Ramp E21 — GWMP Ramp E22 — Northbound I-495 Express and General Purpose Lanes — Future Shared Use Path — House

## Project NEXT and I-495/I-270 Managed Lanes Study (Maryland Project)

720 Live Oak Drive

7048 Arbor Lane
7040 Arbor Lane
7036 Arbor Lane
7032 Arbor Lane

House — Private Drive — Live Oak Drive — GWMP Ramp G21 — Southbound I-495 Express and General Purpose Lanes — GWMP Ramp E21 — GWMP Ramp E22 — Northbound I-495 Express and General Purpose Lanes — Shared Use Path — House

00178619



# 495 Express Lanes Northern Extension Project
June 2022 Public Update Meeting Design - Cross Section Views
Project NEXT and I-495/I-270 Managed Lanes Study
July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

**Notes:**
1. The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.
2. Existing house and tree heights, elevations, and depictions are approximate.

Cross Section View 2

## Project NEXT

## Project NEXT and I-495/I-270 Managed Lanes Study (Maryland Project)

00178620



# 495 Express Lanes Northern Extension Project

June 2022 Public Update Meeting Design - Cross Section Views
Project NEXT and I-495/I-270 Managed Lanes Study
July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

**Notes:**
1. The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.
2. Existing house and tree heights, elevations, and depictions are approximate.

**Cross Section View 3**

## Project NEXT

710 Live Oak Drive

House — Live Oak Drive — GWMP Ramp G21 — GWMP Ramp E21 — GWMP Ramp E22 — Southbound I-495 Express and General Purpose Lanes — Northbound I-495 Express and General Purpose Lanes — Future Shared Use Path

## Project NEXT and I-495/I-270 Managed Lanes Study (Maryland Project)

710 Live Oak Drive

House — Live Oak Drive — GWMP Ramp G21 — Maryland Ramp — GWMP Ramp E21 — GWMP Ramp E22 — Southbound I-495 Express and General Purpose Lanes — Northbound I-495 Express and General Purpose Lanes — Shared Use Path

00178621



# 495 Express Lanes Northern Extension Project
June 2022 Public Update Meeting Design - Cross Section Views
Project NEXT and I-495/I-270 Managed Lanes Study
July 21, 2022

These Plans are Unfinished and Unapproved and are not to be
used for any type of construction or the Acquisition of Right of Way.

**Notes:**
1. The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.
2. Existing house and tree heights, elevations, and depictions are approximate.

**Cross Section View  4**

## Project NEXT

## Project NEXT and I-495/I-270 Managed Lanes Study (Maryland Project)

00178622



# 495 Express Lanes Northern Extension Project
June 2022 Public Update Meeting Design - Cross Section Views
Project NEXT and I-495/I-270 Managed Lanes Study
July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

**Notes:**
1. The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.
2. Existing house and tree heights, elevations, and depictions are approximate.

**Cross Section View 5**

### Project NEXT

Storm Water Management Basin

654 Live Oak Drive

6926 Butternut Court

6928 Butternut Court

House · Live Oak Drive · GWMP Ramp G21 · GWMP Ramp E21 · GWMP Ramp E22 · GWMP Ramp G22 · GWMP Ramp G33 · Southbound I-495 Express and General Purpose Lanes · Northbound I-495 General Purpose Lanes

### Project NEXT and I-495/I-270 Managed Lanes Study (Maryland Project)

Storm Water Management Basin

654 Live Oak Drive

6926 Butternut Court

6928 Butternut Court

House · Live Oak Drive · GWMP Ramp G21 · GWMP Ramp E21 · GWMP Ramp E22 · GWMP Ramp G22 · GWMP Ramp G22 · Maryland Ramp · Southbound I-495 General Purpose Lanes · Southbound 495 Express Lanes · Northbound I-495 Express and General Purpose Lanes · Shared Use Path

SCALE
0   40   80

00178623



# 495 Express Lanes Northern Extension Project
## June 2022 Public Update Meeting Design - Cross Section Views
### Project NEXT and I-495/I-270 Managed Lanes Study
### July 21, 2022

These Plans are Unfinished and Unapproved and are not to be used for any type of construction or the Acquisition of Right of Way.

SCALE
0    40    80

**Notes:**
1. The concept shown is preliminary and subject to change as the design is further developed by the Design-Builder for each Project.
2. Existing house and tree heights, elevations, and depictions are approximate.

## Cross Section View  6

### Project NEXT

650 Live Oak Drive

Storm Water Management Basin

### Project NEXT and I-495/I-270 Managed Lanes Study (Maryland Project)

650 Live Oak Drive

Storm Water Management Basin

00178624

Attachment 2

Preliminary Noise Analysis Noise Barrier Location Along Live Oak Drive

00178625





Based on the Preliminary Noise Analysis, the VDOT project will provide a continuous noise wall adjacent to Live Oak Drive terminating at Rivercrest Drive as shown in these exhibits