
| Comment No. | Commenting Agency | Page and Section | Comment | Response |
|---|---|---|---|---|
| | | | **DEIS** | |
| 1 | FHWA | General | In the future, please provide line numbers in draft documents for ease of commenting via a comment matrix. | Comment noted |
| 2 | FHWA | General | In the future, use Excel Spread Sheet as it makes easier to combine and sort comments by page numbers and section numbers etc. | Comment noted |
| 3 | FHWA | General | Note: any comments made in the body of the document also apply to the corresponding technical reports in the appendices, and vice versa. FHWA expects the information contained within the DEIS is also consistent with the information provided in the appendices. | Comment noted |
| 4 | FHWA | General | When referencing an appendix for citation, include page number(s) also (e.g. Appendix F, page 5 or page 5-12).  In the final electronic version that will be placed on the MLS website, consider including hyperlinks to appendices and page numbers. | Throughout the document, page numbers will be added to references throughout once the technical reports are finalized prior to publication. |
| 5 | FHWA | General | The document is generally well-written and organized; however, there is an over-reliance on incorporating by reference to cut down the page numbers. While it is admirable SHA is following the spirit of the new page limits guidance, the body of the document needs to contain sufficient information to meet all applicable requirements and address the potential impacts of a proposed action. Extraneous background data can be moved to the appendices, but details regarding potential impacts and mitigation must be included in the body of the document.<br><br>The level of detail in Chapter 4 should be commensurate with the degree of impact. Some sections are disproportionately longer than others and could be pared down (i.e. Section 4.8 has little detail provided in 4.5 pages when adverse impacts are anticipated; whereas some of the natural resource sections have 10 pages and minimal impacts). | Throughout the document additional details from the technical reports have been incorporated, especially in Chapter 4. |
| 6 | FHWA | General | The body of the document would greatly benefit from additional tables and figures to supplement the narrative and better describe impacts. All maps in the document need a north arrow and scale. | Throughout the document additional figures and tables have been incorporated, especially in Chapters 2 and 4. All maps include a north arrow. Maps where figure is draw to scale includes a scale. |
| 7 | FHWA | General | FHWA has previously commented that the "representative proposed action" using the largest LOD (Alternative 10) is unacceptable for a comparison of alternatives as required by 40 CFR 1502.14. The alternatives "should present the environmental impacts of the proposal and the **alternatives in comparative form**, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." §1502.14(b) states agencies shall **devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits**.<br><br>A comparison of **each** of the alternatives, including the No Build, must be included in Administrative Draft #2 in order to receive prior concurrence from FHWA HQ. | In Chapter 4,  the cultural resource and hazardous materials sections have been updated to reflect a comparison of effect between the Build Alternatives. |
| 8 | FHWA | General | Anywhere Alternative 5 is mentioned in the document, there should be a footnote or explanation that Alternative 5 is not considered a reasonable alternative but has been retained in the DEIS for comparison purposes only. Reviewers not intimately involved in the project history found the explanation and discussion of Alternative 5 very confusing. Additionally, any time Alternative 5 is in a table comparing alternatives – the column for Alternative 5 should either be grayed out or footnoted with the proper explanation. | References to Alternative 5 in the text and tables has been consistently applied.  The tables shows the column of Alternative 5 grayed out and a footnote has been added. |

| 9 | FHWA | General | "DEIS assumes total impacts; temporary and permanent impacts will be differentiated in the FEIS." – Let's discuss. What is SHA's rationale for this approach?  Suggest having a separate section on construction impacts, or separate subsection within each environmental consequence section with a clear heading for construction impacts. As the document is written now, the few construction impacts mentioned are buried within sections. | In the DEIS the impacts are presented as permanent only.  Permanent and temporary impacts will be identified in the FEIS.  At this stage of the Study, MDOT SHA is balancing a reasonable and permittable level of environmental impacts while still allowing for flexibility in final design for the P3 designers.  A separate construction section was added at the end of chapter 4 but is still mentioned in each resource. |
| 10 | FHWA | Page vi Section TOC | Per 40 CFR 1502.10, there should be a list of agencies, organizations, and persons to whom copies of the EIS are sent. | Distribution List included in Chapter 9. |
| 11 | FHWA | Page xi Section Acronyms | ADA = Americans with Disabilities Act (add s) | Corrected |
| 12 | FHWA | Page xiv Section Acronyms | OWJ = Official(s) with Jurisdiction (change owners to official(s)) | Corrected |
| 13 | FHWA | Page vii Section TOC | Please delete names of preparers and other items in the chapter under 8 | Corrected |
| 14 | FHWA | Page ES-1 Section ES | The term "lane drops" is not something the lay person would understand. Either define it or use a different term. | No change, this is a term we |
| 15 | FHWA | Page ES-1 Section ES | Headings have words like is, to, and the capitalized. Recommend using correct title case | Corrected |
| 16 | FHWA | Page ES-2 Section ES | What Is The Draft Environmental Impact Statement? The first sentence provides an ambiguous definition of a DEIS. The current phrasing is misleading and incomplete. Recommend deleting or rewriting it.  Explain why a preferred alternative is not identified in this document or mention that it will be identified in the FEIS.  The Draft Environmental Impact Statement (DEIS) will provide a detailed description of the project purpose and need, reasonable alternatives, the affected environment, and presents analysis of the anticipated beneficial and adverse environmental effects of the alternatives.  Discuss that the DEIS will detail Alternatives Retained for Detailed Study (ARDS) but will not however, provide the preferred alternative.  Discuss that the preferred alternative will be identified within the Final EIS with applicable documentation justifying the selection. | Revised text as provided in the 2nd paragraph of the comment |
| 17 | FHWA | Page ES-2 Section ES Insert | Appendix D - Community Effects Assessment/Environmental Justice Technical Report - As previously commented, these should be two (2) separate technical reports.  Consider having an appendix for agency correspondence. Or be more descriptive in your reference to particular tech report appendices that may already contain agency correspondence. | Based on previous comments and discussions with FHWA, we were told to keep together and revise the title.  A separate Title VI analysis that the Office of Civil Rights as suggested will be completed on the Preferred Alternative prior to the FEIS.  References to agency coordination letter is the appendices has been added |
| 18 | FHWA | Page ES-2 Section ES DEIS | The No Build should be mentioned here to be consistent with Chapter 2. | Added |
| 19 | FHWA | Page ES-3 Section ES | Sentence begins with "two additional goals" …. there is no previous mention of project goals. Goals and Needs are not the same thing for environmental analysis/review. Please revise. Suggest rephrasing as "In addition, there were two goals identified for the Study…." | The term goals has been used in the concurred upon Purpose and Need; no change. |
| 20 | FHWA | Page ES-3 Section ES | 1st paragraph, 2nd sentence - A qualitative assessment of these criteria was made using readily available information.  Describe what is "readily available" information?  More description/discussion is needed. | A reference to Chapter 2, Section 2.2 where this is described was added. |
| 21 | FHWA | Page ES-4 Section ES | Delete the word incrementally. | Removed |
| 22 | FHWA | Page ES-4 Section ES | Preliminary Alts Considered - Add text to last sentence to read "The Preliminary Range of Alternatives, described in Section 2.4 of the Draft EIS, included:"  Define "contraflow" – this is not something a layperson would understand. | Added |

| 23 | FHWA | Page ES-5 Section ES | Suggest adding a footnote to Table ES-1 describing that Alternative 5 is provided for comparison purpose only at the request of cooperating agencies. To someone not intimately familiar with the project history, the table seems inconsistent with what is written in Chapter 2.<br><br>Section 2.5.2 specifically says "further consideration of alternative 5." So, clearly it is still under consideration – though ES-5 title says, "Why Was Alternative 5 Dropped From Further Consideration"? | A footnote related to Alternative 5 has been added to all tables in the DEIS. Consistent language on Alternative 5 was also added throughout. |
| 24 | FHWA | Page ES-5 Section ES | There is a mention of cooperating agencies here, but nowhere in the summary is there a discussion of who cooperating agencies are. This should be in the summary. | A section was added on cooperating agencies |
| 25 | FHWA | Page ES-6 Section ES | Add "n" in Alternative 9 Modified in heading. I am assuming the second paragraph will be revised before publication of the DEIS? Please confirm. | Corrected and updated |
| 26 | FHWA | Page – ES6 Section – ES | Second paragraph under What Is Alterative 9 Modified?<br>Sentence "An initial evaluation of this alternative using readily available information was completed by MDOT SHA and revealed significant concern over its ability to meet the stated Purpose and Need." As I understand, analysis of Alternative 9M is underway and will be completed and presented in the final DEIS. This sentence will have to be updated for final DEIS.<br>Sentence starting with "Nonetheless."<br>This sentence is in future tense. Evaluation of Alternative 9M will be completed and included in the DEIS. Therefore, the sentence needs to be rewritten with proper tense and summary of the evaluation. | Section has been updated |
| 27 | FHWA | Page ES-7 Section Tolling | Please consider adding '*finance*' the following sentence: "*Developer would design, build, finance, operate, and maintain the managed lanes for a period of time using the toll revenue.*" | Added |
| 28 | FHWA | Page ES-7 Section Transit | Please consider including a brief summary of the Managed Lanes Transit Work Group accomplishments to date. | This is included in Chapter 2, Section 2.7.6. Reference added here |
| 29 | FHWA | Page ES-7 Section ALB | Please consider indicating that for all build alternatives the bridge will be replaced wide enough to include managed lanes rather than indicating "…*all Build Alternatives include the replacement (not widening) of the American Legion Bridge*" to avoid confusion. | Text has been revised to clarify |
| 30 | FHWA | Page ES-8 Section: ES | What will the toll rates be? paragraph.   Inform that 2025 is anticipated opening year (shoud a build alternative is selected) and present rates in anticipated opening year, in 2025$. | Sentence was modified to state that 2025 is estimated opening year.  Average toll rates were updated from 2017 to 2020 dollars.  Future/2025 dollars are not typically used because we do not know what the inflation will be.  We use current or past dollars because they are based on the state of the economy as we know it.  Trying to express toll rates in inflated dollars is not accurate, so they are reported in real dollars without embedding assumptions about the future inflation and potentially misrepresent something.  Additionally, by identifying the real $ year, we provide a basis for comparison – we should not compare inflated dollars to each other if they are from different studies because there could be different inflation assumptions. |
| 31 | FHWA | Page ES8 Section: ES | Last sentence of What will the toll rates be?  Ultimately, the toll rate ranges will be set by the MDTA Board after public review and comment, but it is not **anticipated** that the environmental and **community** impacts would be **substantially different** once this toll rate range is approved.<br><br>Is this statement supported by any analysis in DEIS?  If so, please provide reference (appendix, page no etc.) | See response to comment #84. |
| 32 | FHWA | Page ES-8 Section ES | What Traffic Analysis was Performed for the Study?<br>Add a sentence or two to explain the use of WASCOG TDM 2040 and sensitivity analysis with 2045 TDM that will be performed on PA? | No change in Executive Summary; it seems out of context for the question being answered.  The 2045 Sensitivity Analysis is covered in Chapter 3, page 3-3. |
| 33 | FHWA | Page ES-10 Section ES | The "f" in 4(f) should be lowercase, not capitalized. | Corrected |
| 34 | FHWA | Page ES-11 Section ES | Remove "experience"; FHWA already commented this on the preliminary draft to be declarative and use the word "have". | Revised |
| 35 | FHWA | Page ES11 Section ES | What are the next steps for the study?  - It does not talk about public hearings/joint public hearings. | Added reference to the 4 public hearings ron |

00189814



Case 8:22-cv-02597-DKC    Document 68-1    Filed 10/30/23    Page 4 of 49    MLS Administrative Draft – DEIS Agency Comments
Errata Sheet

| 36 | FHWA | Page ES-11 Section Next Steps | Last sentence, The FEIS will also include additional and updated information not refined or quantified in the DEIS (e.g. detailed SWM analysis, long term effects, total impacts, permanent vs temporary impacts, etc.). | Added |
|---|---|---|---|---|
| 37 | FHWA | Page ES-12 Section ES | Table ES-2 – Alternative 5 should be grayed out. At minimum, there should be an asterisk/note indicating that Alternative 5 is not a reasonable alternative and is shown for comparison purposes only. This needs to be clear throughout the entirety of the document (including appendices). | Column grayed out and consistent footnote added to all tables |
| 38 | FHWA | Page ES-12 Section Table ES-2 | This table show impacts were further reduced from what is shown in Appendix A. At least include a note indicating the difference and the origin of these reductions. | The numbers in Appendix A were a moment in time (June 2019) which is explained now in Appendix B as well as a copy of this same table from the Executive Summary is included. No changes made in Executive Summary. |
| 39 | FHWA | Page 1-1 Section 1.1 | Please add '*US 50*' as part of the interregional connections with I-495 in the following sentence: "*I-495 is the only circumferential route in the regionmon that provides interregional connections to many radial routes in the National Capital Region, such as I-270, US 29 (Colesville Road), I-95, US 50 and MD 295/Baltimore-Washington Parkway (Figure 1-1).*" | Text revised accordingly |
| 40 | FHWA | Page 1-2 Section 1.2 | States "The Study purpose and needs were developed through a comprehensive process that included the examination of past studies, a review of existing regional plans, and an analysis of the environmental and socioeconomic conditions of the region."<br><br>Include P&N Statement in appendices? | The full Purpose and Need Statement has been appended to the revised DEIS as Appendix A. |
| 41 | FHWA | Page 1-3 Section 1.4 | Figure 1-1 – make sure figure is within page margin. Maps should also have north arrow and scale bar. | Figure updated |
| 42 | FHWA | Page 1-4 Section 1.4 | Delete first sentence (same sentence repeated twice). | Sentence deleted |
| 43 | FHWA | Page 1-4 Section 1.2 | It says "Nearly 260,000 vehicles commute daily from Maryland into DC…"<br><br>P&N Statement (April 12, 2018 on page 8, it says 240,000 vehicles. Is this because the P&N Statement refers to 2016 Mobility report and the DEIS is referring to 2018 Mobility report? | Yes, the Purpose and Need Statement was finalized in November 2018 and was based on the 2016 Mobility Report.  The DEIS Purpose and Need Chapter was updated with the latest numbers from the 2018 Mobility Report.  A note was added to the Chapter and new Appendix A noting this difference has been added. |
| 44 | FHWA | Page 1-2-1-4 Section 1.4 | This section does not have any supporting evidence re: long-term traffic growth. Reference future population and employment projections. Additionally, be specific about the results of the previous studies and what conclusions influenced this current study. As of now, the studies are simply listed but do not build the case of how congestion is a problem that needs to be solved. [this should already be documented in the P&N paper] | Information from the full Purpose and Need Statement has been added to the Section 1.4 of the Chapter to support the conclusions stated. |
| 45 | FHWA | Page 1-4 & 1-5 Section 1.5 | Table and text do not match. Table only shows 14 of the 15 congested segments.  The 2018 SHA Mobility Report shows 15 Most congested segments in AM peak and 15 Most Congested Segments in PM peak.  Of those 30 segments on 14 are within the Study Limits and they were included here. We suggest adding a note clarifying this misunderstanding. | The text was clarified to show the distinction between AM and PM peak congested segments. |
| 46 | FHWA | Page 1-5 Section Table 1-1 & Table 1-2 | Please ensure there is consistency with similar table on the Traffic Analysis Technical Report [page 39] for the 'Projected 2040 TTI' and 'Forecasted % Increase' columns.  Please advise which report has the correct data. | The traffic numbers were verified between the Technical Report and Chapter 1 and the most up to date numbers have been revised in the Chapter file. |
| 47 | FHWA | Page Section Chapter 1 | In general, the P&N section is weak and makes sweeping statements without the evidence/data to support. The way it reads now is why managed lanes are beneficial but does not provide supporting data to clearly describe the needs or build the case for the transportation problem being solved. The P&N chapter is oversimplified in an effort to reduce page numbers but should draw on more data from the P&N paper that has already been developed OR include P&N paper as an appendix and incorporate by reference. | The Purpose and Need Chapter has been revised and the full Purpose and Need Statement has been added as new Appendix A to the DEIS. |
| 48 | FHWA | Page 1-6-1-7 Section 1.8 | Are commuting employees part of goods and services? Wouldn't commuting employees be more relevant under accommodating existing and long-term traffic growth? | MDOT SHA had consistently been presenting commuting employees as part of the discussion of movement of goods and services in the concurred upon purpose and need statement. |
| 49 | FHWA | Page 1-7 Section 1.8 | Third paragraph, 2nd sentence remove word "residents" | Deleted as noted |


| 50 | FHWA | Page 1-7 Section 1.9.1 | Add "to address roadway congestion" after need in the 3rd line of the second paragraph. "…of the magnitude which are needed to address roadway congestion and enhance trip reliability in these study corridors…" | Revised |
|----|------|------------------------|---|---|
| 51 | FHWA | Page 1-7 Section 1.9.1 | It says, "The Transportation Trust Fund is primarily comprised of revenue from the gas tax and motor vehicle registration and titling fees."  What about Federal funds?  Otherwise state explicitly that you are referring to Maryland Transportation Trust Funds. | This sentence was specific to Maryland state funding and has been revised accordingly. |
| 52 | FHWA | Page 1-8 Section 1.9.1 | Last sentence, please consider adding '*finance*' the following sentence: "*For large-scale improvements such as those considered in this Study, MDOT SHA will seek to use innovative financing methods such as a P3 in order to design, construct, **finance**, operate, and maintain the proposed infrastructure improvements.*" | Revised |
| 53 | FHWA | Page 1-8 Section 1.9.2 | It says, "Commitments in the ROD will also be included in any contract documents **regardless of project delivery method**, including a P3."

What other delivery methods are being considered? | A public-private partnership is the only delivery method being considered. |
| 54 | FHWA | Page 1-8 Section 1.9.2 | Replace comma after highly constrained with a period (first sentence). | Revised |
| 55 | FHWA | Page 2-2 Section 2.1 | Provide a reason for retaining no build – e.g. The No Build Alternative does not meet the Study's Purpose and Need, but was retained for comparison with the other alternatives, in accordance with the CEQ regulations implementing NEPA. | Comment addressed. Language has been added. |
| 56 | FHWA | Page 2-2 Section 2.1 | Sentence "Alternative 9M will be evaluated to the same level of detail as the Screened Alternatives to determine if it meets the Purpose and Need of the Study and thus be considered a reasonable alternative to be carried forward for detailed study in the DEIS:"

This sentence will need to be edited/rewritten for final DEIS based on the results of Alternative 9M. | Text has been revised to provide full results of Alternative 9M. |
| 57 | FHWA | Page 2-2 Section 2.2 | The "*high, medium, low*" or "*yes and no*" approach was further defined for some of the criterion in this section but not all. Please define for all as indicated here: "*The screening of the Preliminary Range of Alternatives included an evaluation based on 15 criteria, under six major elements related to the Study's Purpose and Need using a "high, medium, low" or "yes and no" approach, which is further defined for **each** criterion in this section.*" | Comment addressed. The metrics and refinement of the screening criteria for each of the six major elements has been further defined. |
| 58 | FHWA | Page 2-9 Section 2.5 | It says "Also, under the HOT Alternatives (5, 9, 13C), HOVs would be permitted to use these lanes for a reduced toll or no toll."

In order to be transparent, the DEIS needs to disclose which operating rule we are considering (reduced or no tolls). | MDOT SHA is still evaluating if the HOVs using the HOT lane will be tolled at a reduced rate or not have a toll.  Language was added to state that this decision has not been made for this Study yet. |
| 59 | FHWA | Page 2-3 Sections 2.2.1 – 2.2.6 | The word criteria (plural) is used where the word criterion (singular) should be used throughout these sections. Correct for word agreement. | Comment addressed. Corrected for word agreement. |
| 60 | FHWA | Page 2-6 Section 2.3 | I think this regional transportation planning section is better suited for the purpose & need of the project | A section regarding Regional Transportation Planning is included in the full Purpose & Need statement which has been appended to the DEIS as Appendix A. The Regional Transportation Planning section is included in Chapter 2 because whether an alternative was consistent with the Visualize2045 Plan was considered in the initial screening process. |
| 61 | FHWA | Page 2-16 Section 2.5.2 | Please consider using the latest Table to compared Alternative 5 with the other Screened Alternatives. Table 2-1 is based on June 2019 information for MD 200 comparison only and not on the latest information like Table ES-2. | Table 2-3 has been added in Section 2.6.7 and includes the most recent comparison of effects and includes Alternatives 5 for comparison with the Build Alternatives, including Alternative 9M. |
| 62 | FHWA | Page 2-16 Section 2.5.2 | The following sentence does not make sense, "*The ability to minimize or mitigate impacts and permit Alternative 5 would be similar to other Screened Alternatives.*" | Comment addressed. Language has been added to clarify that the environmental impacts of Alternative 5 are similar to the impacts of the Screened Alternatives. |
| 63 | FHWA | Page 2-16 Section 2.5.3 | Change Rock Creek Park to Rock Creek Regional Park. Rock Creek Park is an NPS park that is contiguous with the regional park, but only in DC, and the regional park is not NPS. | Comment addressed. Rock Creek Park has been changed to Rock Creek Regional Park. |
| 64 | FHWA | Page 2-18 Section Table 2-1 | Please consider moving this table to page 2-21 when it is referenced and used for comparison purposes under MD 200 alternative environmental impacts. | Table 2-1 has been moved to page 2-21 in Section 2.5.3 Consideration of the MD 200 Diversion Alternative. |



| 65 | FHWA | Page 2-21 Section 2.5.3 | Remove italics (other alternatives dismissed are not described as emphatically). | Comment addressed. Italics have been removed. |
|---|---|---|---|---|
| 66 | FHWA | Page 2-23 Section 2.6.1 | First sentence – change 2040 to 2045 (Visualize 2045) | Comment addressed. Visualize 2040 was changed to Visualize 2045. |
| 67 | FHWA | Page 2-22 Section 2.6 | Suggestion: somewhere in Section 2.6 or elsewhere in the alternatives chapter, it would be helpful to have a call-out box for the definitions of ETL, HOT, and HOV for quick reference. | Comment addressed. Text box defining HOT, ETL, HOV and reversible lane operational strategies has been added to Section 2.5. |
| 68 | FHWA | Page 2-26 Section 2.7.1 | Re: American Legion Bridge - the DEIS states the American Legion Bridge will be replaced, and not widened, in its existing location. However, all alternatives add 2 additional lanes (bringing it to 6 in each direction). The current ALB is 5 lanes in each direction. How are you going to account for 2 additional lanes and new pedestrian and bicycle access if you are not going to widen it? This needs to be explained. Also, clarify (in call-out box) if replacement means full replacement. A typical section or rendering of the bridge would also be helpful.<br><br>Additionally, the "Capital Beltway Accord" between VA & MD Governors calls for ALB replacement stating "the project will replace the existing lanes in each direction across the Potomac River and add two new Express Lanes in each direction for approximately three miles between the George Washington Memorial Parkway in Virginia to the vicinity of River Road in Maryland. New bicycle and pedestrian access will connect trails on both sides of the Potomac River. The project is being designed predominantly within the footprint of the existing bridge and right-of-way to minimize impact to travelers, the environment, and surrounding communities." [ HYPERLINK "https://www.governor.virginia.gov/newsroom/all-releases/2019/november/headline-849278-en.html%20   " ]<br>Consider mentioning the Capital Beltway Accord in the document. | Comment addressed. The language in the text box has been modified to clarify that the ALB will be replaced with a new, wider bridge. A typical section of the bridge has not been included because it was not provided at any other specific location.<br><br>A reference to the Capital Beltway Accord has been added to Section 2.7.1 and is also mentioned in Section 2.7.7 (Ped and Bike Considerations). |
| 69 | FHWA | Page 2-28/29 Section 2.7.2 | There are more than 27 managed lane access points listed in Table 2-3. Clarify this discrepancy. | Comment addressed. The reference to the table in Section 2.7.2 was modified to clarify that Table 2-3 identifies more than the managed lane access locations and includes proposed interchange modification locations (e.g., reconfigured general purpose ramps to accommodate widened mainline). A map showing managed lanes access points has been added to this Section. |
| 70 | FHWA | Page 2-28 Section 2.7.2 | Should Note 15 be revised to "The proposed managed lane access points are based on preliminary traffic, and revenue analyses and **agencies' input**. The locations may change **based on public and agencies' comments on DEIS** and as more detailed analyses are completed, and the Interstate Access Point Approval request is reviewed by FHWA? " | Footnote has been revised. |
| 71 | FHWA | Page 2-28 Section 2.7.2 | Footnote #16 states "This location was not included in the initial identification of proposed managed lane access points and therefore was not included in the traffic, noise, and air quality analyses for the DEIS." There are 9 interchanges that were not accounted for. Will the traffic, noise and air quality analyses be updated for the FEIS?   Note may need to be amended.<br><br>Regarding Footnote 16: will that area be analyzed for noise in time for the FEIS, or will it be pending Final Design decisions and information? On Page 4-36 (and ES.2 of the Noise Technical Analysis Report) it states that the access points will be rechecked for the FEIS – but does that include the access point(s) that have not yet been evaluated at all? | Yes, the traffic, noise, and air quality analyses will be updated for the FEIS to include the latest managed lane access points. This sentence has been added to the footnotes for Table 2-3. |
| 72 | FHWA | Page 2-28 Section 2.7.2 | "There is the potential that multiple developers could ultimately operate different phases within the limits of the overall Study. If so, exchange ramps between the phase limits may be needed to accommodate different operational approaches within each phase."<br>Comment 1:  How is MDOT addressing in this document the potential of multiple developers operating different phases within the limits of the study? As this could create additional impacts (i.e. future traffic volumes and operations, requiring additional simulation and analysis).<br>Comment 2: When will this analysis be done and will it affect current proposed impacts and proposed mitigation? | The DEIS will include a general discussion of construction phasing based on readily available information, including identification of Phase 1 which is the only phase known at this time.  While the need for phasing has been demonstrated, the details of phasing (termini, order, timing, etc.) for the entire P3 Program are not known.  The FEIS will include any additional details that were not know at the time of the DEIS.<br>If additional footprint impacts are created due to exchange ramps between phases, they would be addressed as part of a reevaluation. If additional impacts are created relative to traffic volume and operation, they would be addressed as part of the IAPA. |
| 73 | FHWA | Page 2-29 Section Table 2-3 | Please add the following superscript to: "I-495/MD 214 Interchange[16]" and "I-270 Y-Split Interchange[16]" | Comment addressed. Cross-reference to footnote has been added for I-495/MD 214 interchange. Description of I-270 Y-split interchange has been modified. |


| 74 | FHWA | Page 2-30 Section 2.7.3a | Make clear the Stormwater Management Act of 2007 is a state law, not federal. | Comment addressed. Clarified that Stormwater Management Act is Maryland policy. |
|---|---|---|---|---|
| 75 | FHWA | Page 2-33 Section 2.7.5 | Include in this section conditions imposed by BPW related to 10% of net revenue going to both counties for transit purpose beginning day 1. This helps multimodal part of the purpose statement. | Section changed to 2.7.6 and it was separated into 3 headings to further clarify the transit-related elements that the Study is addressing: Enhanced Transit Mobility and Connectivity, Transit Work Group, and Maryland Board of Public Works Requirements.<br><br>Note that the 10% net revenue language was modified in the January 2020 BPW meeting and the new requirement language was included in the DEIS. |
| 76 | FHWA | Page 2-35 Section 2.7.7 | General comments on Tolling:<br>1) It kind of comes across as suggesting that ETL and HOT could be used interchangeably. I'm not sure if that was the intent or not? Anyways, it really should read that areas that have HOV now, will maintain that HOV component with conversion to HOT lanes in the future.<br>2) We did have a discussion with MDOT, and there is a scenario where under HOT operation you can have a discount for certain HOV occupancies. For example, if the HOT operation has a HOT operation with a 3+ requirement for free usage, you could also have a HOV 2 class that would be charged a toll, but at a discount. That is allowed, it's just not used often, since it requires a more complex toll collection and enforcement component. However, if that can be accomplished, it would do a good job of maintaining the benefits of carpooling for congestion relief and air quality benefits.<br>3) While I don't expect the toll rates to be determined at an early stage, it does seem that they are lacking a defined process on how to get there. The operating rules for charging tolls for congestion mitigation and transit improvement can be considerably different than charging tolls for revenue generation. And moving forward with a P3 requires a very detailed concept of operations to accomplish the desired outcome.<br>4) I-495 integration with VA is very important. It not only will involve multi-state collaboration, but potentially two Private operators that will need to have an incentive to cooperate within predetermined operating rules.<br>Note: Read above comments in conjunction with other tolling comments. | 1) Minor changes were made to the language in this section to further clarify when HOV lanes will remain and when they will be converted to HOT lanes.<br>2) Thank you for the comment. MDOT SHA is still evaluating if the HOVs using the HOT lane will be tolled at a reduced rate or not have a toll.<br>3) Section 2.7.7.a. describes how the toll rate ranges will be set through a public process. The toll and operational parameters will also be defined through the toll rate range setting process. The results of the Toll Rate Range Hearing process will be included in the FEIS.<br>4) MDOT SHA is coordinating with VDOT on a monthly basis to discuss geometric and operational considerations to ensure the two systems work seamlessly together. |
| 77 | FHWA | Page 2-36 Section 2-7-7 | States "Similarly, Title 23, Section 166 also grants statutory authority for states to either convert existing, or construct new, HOV lanes and implement tolling under a HOT Lane approach. In HOT lanes, vehicles that meet the state-defined minimum threshold for occupants qualify as HOVs and would travel in the HOT lanes for a reduced toll or no toll."<br><br>States "Under this provision, the Build Alternatives that include HOT lanes (Alternatives 9 and 13B) would fall within the parameters that would allow implementation of tolls along I-495 and I-270."<br><br>23 USC 166 grants authority stated above for the I-495 portion within the study limits. However, on I-270 Secretary's approval under VPPP is needed to charge reduced toll to vehicles that meet the state-defined minimum threshold for occupant requirement on the existing HOV lane. Otherwise, the existing HOV lane on I-270 will remain free. Please refer to Mr. Murrill's August 17, 2018 letter to Mr. Slater.<br><br>In order to be transparent, the DEIS needs to disclose which operating rule we are considering (reduced or no tolls). MDOT SHA should have made assumptions regarding this in conducting traffic and financial viability and should have this information now. If not ready to make a disclosure, then disclose two options with their respective impacts (include a qualitative discussion on these).<br><br>When using HOT lanes (assuming they meet the occupancy number), drivers automatically think they will have a free pass. It is important to disclose in DEIS if all analysis increase HOV 2 to HOV x+ or disclose what is under consideration (HOV 3, 4). | Language was added to explain that MDOT SHA has not made decision on whether HOVs would be free or have a reduced toll in the HOT scenario. It was also clarified that Title 23, Section 166 only applies if the HOT lanes do not include a toll for the HOV vehicles. |

00189818



| 78 | FHWA | Page 2-36 Section 2-7-7 | States "The statute authorizing HOV/HOT conversions requires that certain performance metrics are met such as maintenance of a minimum average travel speed of 45 miles per hour in those lanes consistent with MDOT's goal of improving the flow of traffic through the corridor. Under this provision, the Build Alternatives that include HOT lanes **(Alternatives 9 and 13B)** would fall within the parameters that would allow implementation of tolls along I-495 and I-270."  MDOT could not convert a HOV lane to a HOT ML and charge reduced toll to HOVs under Section 166. That would require VPPP. | The preceding sentence and this sentence were modified to more clearly explain when we are talking about generally accepted definitions as compared to MDOT and Managed Lanes Study definitions. Language was also included to clarify that this statute only applies if the HOT lanes do not include a toll for the HOV vehicles. |
|---|---|---|---|---|
| 79 | FHWA | Page 2-36 Section 2.7.7 | FHWA has already commented re: "Lexus lanes." Remove the Lexus lanes discussion as it adds nothing to the substance of the DEIS. If keeping, provide citations to the studies and research being referenced. | Revised. Text box about Lexus Lanes has been removed. |
| 80 | FHWA | Page 2-36 Section 2.7.7a | How will SHA identify a toll rate range without conducting a traffic and revenue study in order to ensure that congestion will be managed? In previous meetings, FHWA Operations made it clear as part of the process a traffic and revenue study is required. Re: "toll rate range setting process" – This should say that toll rates will be established based on the results of a traffic and revenue study. Does SHA intend to rely on the TPB model study to count as a T&R study? A board picking the toll rates does not indicate the basis for picking the price range.  Re: "it is anticipated the toll rate range would be broad enough to suffice for many years." Based on? There needs to be analysis to support this conclusion.  Re: "if the toll rate range needs to be modified…." People will be stuck in traffic on a new facility while the board asks the public to raise the tolls. This won't work. | MDOT SHA and MDTA will complete a traffic and revenue study to develop the recommended range of toll rates. This language was added to Section 2.7.7a  Extensive modeling and analysis of toll rate ranges for the I-495 and I-270 project and reviews of toll rate setting policies on priced managed lane projects around the country are currently being conducted. The modeling, analysis, and reviews are considering opening year rates for both potential real and inflationary growth in toll rates in the future. The results of these efforts will determine the proposed toll rate range for the project that will be presented to MDTA for consideration by their board.  The toll rate range will be based on maintaining a 45-mph threshold for a range of operations, not just a given instance. Additionally, it is not anticipated that the toll lanes would work one week and then operate in gridlock the next week (exclusive of a major incident). The increase in traffic would occur gradually allowing adequate time for the developer, MDOT SHA, and MDTA to evaluate the need to raise the toll rate range and then to hold hearings to address it. |
| 81 | FHWA | Page 2-37 Section 2.7.7a | Is there a maximum toll rate or is it uncapped? This needs to be clearly stated. | It is implied that a toll rate range would include an upper and a lower boundary for the toll rate; however, we have added a statement to clarify that the range would include an upper limit. |
| 82 | FHWA | Page 2-37 Section 2.7.7a | Re: "it is not intended that the FEIS/ROD would stipulate…." This is a problem. In order for FHWA to approve a ROD, the toll rates will need to have been disclosed. If not, it needs to be clearly stated that a re-evaluation of the ROD and possible supplemental DEIS/FEIS will need to be developed upon issuance of the rates through the COMAR process. Maryland's legal requirements do not supersede Federal NEPA requirements. Toll rates and policies will need to follow Maryland legal requirements and disclosed / evaluated through the NEPA process. | For disclosure to the public, Section 2.7.7a includes the average toll rate per mile for each alternative. These toll rates were developed for planning purposes to evaluate the financial viability of the alternatives. It also explains how the final toll rate range will be set through a public process. It is anticipated that the toll rate range hearing process will be later in 2020 and the results will be included in the FEIS. Regardless, there are nationwide examples that set precedent where managed lanes NEPA documents did not include final toll rates or planning toll rates. |
| 83 | FHWA | Page 2-37 Section 2.7.7a | Re: "these average daily toll rates were calculated by dividing the total passenger car ETC revenue…" Are trucks allowed on the facility? | The current thinking at the time of DEIS publication is that trucks would be allowed to use the managed lanes. Sentence has been added to clarify how they were included. |
| 84 | FHWA | Page 2-37 Section 2.7.7a | Re: "it is not anticipated that the environmental and community impacts would be substantially difference once this toll rate range is approved." Why? A discussion/analysis is needed to support this conclusion. | Text added to DEIS to explain that the process for estimating potential planning-level toll rates is similar to the modeling process to support analysis of toll rate ranges that will be presented to MDTA for consideration by their board. |
| 85 | FHWA | Page 2-37 Section2.7.7a | States "For planning purposes only and to meet these goals, this Study determined the 2025 average weekday toll rates per mile **(in 2017 $)** per alternative for all time periods for **passenger cars** paying the electronic toll collection (ETC) class and payment type."  Provide rates in opening year $. | See response to comment #30. |
| 86 | FHWA | Page 2-38 Section 2.7.7b | Re: Virginia Express Lanes - I assume they are leaving it to the P3 to figure out how to address the conflicting toll charge process. In VA HOVs are free and this proposal would charge HOVs. MDOT should be required to describe the intention for addressing this inconsistency. MDOT will cap the toll, I don't think VA capped the upper limit of the toll rate on 495. | MDOT and VDOT are continuing to define the operating rules relative to HOVs, trucks, and buses, and refine the connections between the two proposed systems. To clarify this in the DEIS, a sentence was added to this paragraph to explain that exchange ramps will be provided to allow vehicles to get into or out of the managed lanes near the state line. |



Case 8:22-cv-02597-DKC    Document 68-1    Filed 10/30/23    Page 9 of 49    **MLS Administrative Draft – DEIS Agency Comments**
Errata Sheet

| 87 | FHWA | Page 2-39 Section 2.8 | All bullets: Indicate if the amount of payment to the state is annual over the life of concession or a lump sum upon signing the agreement. The same comment applies to "payment by the state". Bullets 4 and 5: Language for these bullets is different from first 3 bullets. It is unclear why? | Typically, if a state subsidy is required, it would be paid at the beginning of the contact with the developer and if there is positive net funding, then the concession payment could be made at the beginning of the contract or as revenue sharing payments to the State of Maryland during the operation of the facility. Language added. Language in bullets 4 and 5 were modified to be more consistent with bullets 1-3; however, these 2 alternatives are less likely to be financially self-sufficient, so text needed to be somewhat different. |
|---|---|---|---|---|
| 88 | FHWA | Page 2-39 Section 2.9 | Section 2.9 discusses the benefits of managed lanes...this discussion should be under the environmental consequences/impact sections. Also, where are the results of this analysis contained? Please specify appendix reference for text in this section. | Text has been deleted as it is more relevant when the Preferred Alternative was going to be in the DEIS. |
| 89 | FHWA | Page 2-40 Section 2.9 | Re: call-out box who benefits from managed lanes? – first paragraph, last sentence – change "improved safety" to "improved trip reliability." | Comment addressed. Section 2.9 and the discussion of the benefits of managed lanes has been removed from Chapter 2. This sentence has been moved to the second paragraph in the text box "What are Managed Lanes?" in Section 2.4. |
| 90 | FHWA | Page 3-1/ES-8 Section 3.1.1 | "MDOT SHA used the MWCOG model Version 2.3.71, the latest model version available when the traffic modeling was initiated." Additional information should be included to clarify that "Version 2.3.70 (November 2017) of this model was used as it was the most recently adopted model at the time the modeling for the MLS was initiated" per the Traffic Analysis Technical Report. Furthermore, "In late June 2018, the travel forecasting process was changed to the MWCOG Version 2.3.71 Travel Demand Model." "The version 2.3.71 travel demand model is therefore not an official model used in air quality conformity analysis, but is a model specifically developed for modeling of this Study's alternatives." | Clarifying text has been added. |
| 91 | FHWA | Page 3-2 Section 3.1.3 | When will the sensitivity analysis comparing the 2040 forecasts to the 2045 forecasts be available for review? | The draft sensitivity analysis memo was sent to FHWA on December 20, 2019 for review. FHWA's review was ongoing as of January 10, 2020 – the date the first draft of the DEIS was sent to the agencies. The project team received comments from FHWA on January 21, 2020. The project team has addressed these comments and the sensitivity analysis memo will be included in the next submittal (March 26, 2020) as Appendix J of the Traffic Technical Report. |
| 92 | FHWA | Page 3-5 Section 3.1.3 | States "Toll policies and toll rate ranges for the proposed managed lanes have not yet been determined, but they will be defined **following Maryland's legal requirements** and include public hearings as described in Chapter 2, Section 2.8.7, page 2-36." Maryland's legal requirements do not supersede Federal NEPA requirements. Toll rates and policies will need to follow Maryland legal requirements and disclosed / evaluated through the NEPA process. | MDOT SHA understands that the toll information must be disclosed. Section 2.7.7 describes how the final toll rate ranges will be set through a public process and what the average daily toll rates were for planning purposes of this DEIS. Additionally, the toll and operational parameters will also be defined through the toll rate range setting process. The results of the Toll Rate Range Hearing process will be included in the FEIS. |
| 93 | FHWA | Page 3-5 Section 3.1.3 | Toll rate shown on page 2-7 ranges from $0.61 to $0.91 per lane mile whereas the one on this page shows range of $0.20 to $1.36 per mile. Would an average reader understand the difference between this rate range and what is presented in Section a? Rates on page 2-7 is in 2017$ and one on this page are in 2016$. consistency needed. All rates should be in the opening year $. | The two sets of toll rate information are provided for transparency, along with an explanation of where both sets of numbers came from. The rates shown on page 3-5 came from the MWCOG travel demand model and were provided directly to MDOT SHA as noted in the document text "As documented by TPB, the toll rates produced as part of this MWCOG modeling process were developed by TPB staff. MDOT SHA did not perform this step for traffic forecasting and traffic analysis purposes, because the estimated toll values for future-year networks were provided as part of the model transmittal package." Additionally, these rates cannot be shown in opening year because the rates were from 2016 and used in the MWCOG 2016 model. It would not be appropriate to make projections about what they would be in 2025. The rates shown on page 2-7 were developed to evaluate the financial viability of the alternatives as noted in text "...it is appropriate for the purposes of this Study to make assumptions about potential toll rates to moderate the traffic and evaluate the financial viability of the Build Alternatives." Regarding opening year toll rates, see response to comment #30. |
| 94 | FHWA | Page 3-5 Section Table 3-1 | Please clarify if the existing ADTs (2017) shown on the table include both directions (similar to Figure 2-10 & 2-11 from Traffic Analysis Technical Report). | Clarifying text has been added. |
| 95 | FHWA | Page 3-5 to 3-10 Section Tables | By reducing the table's data to weighted average/averages we are eliminating the different variations that are occurring along the entire corridor and certainly is not representative of the dynamic conditions that exist throughout I-495 and I-270. Please use similar tables as the ones used on the ARDS. | The detailed tables, similar to the ones in the ARDS document, have been added to Chapter 3. |



| 96 | FHWA | Page 3-6 Section 3.2 | Last paragraph of this section, please update top three most unreliable segments in MD based on the 2018 Maryland State Highway Mobility Report. "*I-495 Outer Loop at MD 650, I-495 Outer Loop from MD 650 to MD 193, and I-495 Outer Loop from ~~I-95 to the Prince George's County Line~~ MD 193 to US 29. Additionally, the most unreliable segment in Maryland during the PM peak period is also within the Study limits: ~~I-270 Southbound from the I-270 Split to Democracy Boulevard~~ I-495 Inner Loop at Cabin John Parkway.*" | The information provided is accurate based on the 2018 Maryland State Highway Mobility Report. The locations listed are the top three segments based on the parameter of PTI (planning time index), which is used to quantify reliability. The comment appears to reference the top three segments based on a different parameter, TTI (travel time index). |
| 97 | FHWA | Page 3-7 Section 3.3.1 | Table 3-3. Provide data separately for I-495 and I-270. Adjust the text accordingly. You may include weighted average speeds. | Tables have been added to show corridor speeds for I-270 and I-495 separately. |
| 98 | FHWA | Page 3-7 Section 3.3 | What about the Build ADT? Table 3-2 shows only the No Build. Also, why use annual growth rate in Table 3-2? Less than 1 percent growth annually doesn't seem like that big of a deal. Percent change between 2017 and 2040 seems to tell a better story. | Table 3-2 has been modified to include percent change from 2017 to 2040. Table 3-3 has been added to show Build ADTs. |
| 99 | FHWA | Page 4-1 Section 4 | "In the Section 106 and Hazardous Materials evaluations the widest proposed LODs for I-495 (Alternative 10) and I-270 (Alternative 13C) were used as a conservative assessment of potential effects." – NEPA requires a comparison of impacts for all alternatives. Even if the worst-case scenario is used, impacts still need to be quantified for each alternative to offer a fair comparison (see general comment in the beginning). | In the case of Hazardous Materials, the analysis has been updated to reflect the difference between Build Alternatives. However, the use of the widest LODs is still applicable as this was used to establish the ¼ mile investigation area.  The DEIS reflects a comparison of effects for the historic properties between the Build Alternatives. |
| 100 | FHWA | Page 4-1 Section 4 | Use NEPA terminology per 40 CFR Part 1502 in the introduction section and section headers in Chapter 4. Existing conditions = affected environment, consequences = environmental consequences | Revised "environmental consequences" is used throughout. The term Existing Conditions was retained as this is a more reader-friendly term that MDOT SHA uses. |
| 101 | FHWA | Page  4-2 Section  4.1.1 | It would be helpful to include summary information on methodology from chapter 2 of CEA/EJ technical report. | Text added on delineation and data sources from CEA Environmental Justice Technical Report |
| 102 | FHWA | Page 4-5; 4-6 Section 4.1.3 | Either remove discussion of ROW or property acquisition in the land use section [and demographics, communities, etc.], or refer the reader to Section 4.6 for more information regarding this topic (since that is where the mitigation measures for ROW and property acquisition are found). | Added references to Section 4.5: Property Acquisitions and Relocations throughout the chapter. |
| 103 | FHWA | Page 4-6 Section Table 4-1 | Verify % for Residential land use for alternative 5 and alternatives 8 and 9. Both says 0.4%. Text states that Alternative 5 has the least impact to land use but according to table so does Alternative 8, 9, 13B and 13C. | No change— in terms of absolute numbers in the tables. Per a comment from the USACE, Alt. 5 is no longer discussed in the text; it is only presented in the comparison of impacts tables. |
| 104 | FHWA | Page 4-8 Section 4.2.3 | The second paragraph says that it is anticipated that the build alternatives would not result in adverse impacts, but then identifies some (arguably) small impacts. There is a logical disconnect between no adverse and no impact, as to where adverse could be more clearly defined. | Deleted the first sentence to remove confusion |
| 105 | FHWA | Page 4-9 Section 4.3.1 | The section relies on the CEA analysis area. In App D, the document clarifies that the analysis area includes census block grounds located within .25 miles to either side of the study corridor. It is not clear to me why the study area was selected in this way. Considering how important the analysis area is to essentially every section, I recommend explaining and justifying the choices more robustly. | CEA EJ Technical Report already includes footnote, "Based on preliminary evaluation, 0.25-mile to either side of the study corridors was established as a resource inventory boundary that would reasonably include areas that would potentially be subject to direct impacts from the Build Alternatives." Added this text to Ch. 4 definition of CEA Analysis Area. |
| 106 | FHWA | Page 4-9 Section 4.3.2 A | Please include summary of Community Effects Assessment here. More detail is needed. | Added Table 4-2 with CEA Analysis Area Community Profile highlights (including acreage of property acquisitions, number of full property acquisitions, noise abatement, and page number references to Community Profiles) |
| 107 | FHWA | Page 4-9 Section 4.3.2 | Beyond property relocations, community facilities impacted, and changes to land use for each of the communities – this section needs to consider changes to community cohesion. These changes may be beneficial or adverse, and may include splitting neighborhoods, isolating a portion of a neighborhood or an ethnic group, generating new development, changing property values, or separating residents from community facilities, etc. Another consideration is changes in travel patterns and accessibility (e.g. vehicular, commuter, bicycle, or pedestrian). Recommend pulling from community cohesion discussion in the EJ table on pg. 4-18 to this section. | Included text on community cohesion in new mitigation subsection. Additional information on bicycle/pedestrian networks is provided in Chapter 2, Section 7.7 |
| 108 | FHWA | Page 4-11 Section 4.3.2 | The Montgomery County Detention Center seems better suited under "Other" rather than categorized as an emergency facility. Are there any retirement communities in the analysis area? If so, they should also be noted in this section. | No change— will address in FEIS |
| 109 | FHWA | Page 4-11 Section 4.3.3 | No Build does not necessarily mean no consequences. | No change— existing text in Chapter 4.4.3A acknowledges that consequences could arise from the No Build |

00189821

MLS Administrative Draft – DEIS Agency Comments
Errata Sheet

| 110 | FHWA | Page 4-11 Section 4.3.3 | Reference reader to visual impact section with mitigation re: visual impact related to construction. Also reference reader to property acquisition section because as written, you are saying there are impacts to these community facilities but offer no mitigation. It is important that the reader knows these community facility impacts are being mitigated. Perhaps have a section on mitigation that references the reader to the particular section?<br><br>Additionally, simply stating there are 12 of 207 places of worship being affected by Alternative 5 is not helpful in understanding exactly where the impacts are. Each facility being impacted should be listed in a table, impacts quantified (i.e. 20 acres), and the impacts listed by each alternative. Details need to be provided so the public can understand how the project is going to affect major community facilities such as schools, hospitals/medical centers, police stations, etc. The section as currently written is oversimplified and provides little detail on impacts. | Added mitigation section with references to Property Acquisition, Visual and Aesthetic Resources, and Noise sections; also added reference to new Table 4-4, which provides detail on property impacts at a smaller scale (study corridor segment) |
| 111 | FHWA | Page 4-13 Section 4.4 | This section does not follow the formatting/organization of others (i.e. no subsections for intro and methodology, existing conditions, environmental consequences, and mitigation). Additionally, the properties being affected need to be named, impacts quantified, described by each alternative, and identify appropriate mitigation. | This section has been updated to reflect the consistent format.  However the details on the impacts to park properties is included in Chapter 5 and the Draft Section 4(f) document. |
| 112 | FHWA | Page 4-13 Section 4.4 | Summary should include reference to National Capital Planning Commission (NCPC) and state how many properties are affected under the Capper Cramton Act and the process for approval under the statute. And same for NPS/ section 6(f) LWCF. | This is discussed in detail in the Draft Section 4(f) document and will be included in Chapter 5 of the DEIS. |
| 113 | FHWA | Page 4-13 Section 4.5 | Recommend moving the EJ section towards the end of the environmental consequences chapter since some of the resource impacts that are discussed in the EJ section are introduced here prior to the relevant sections (i.e. air quality, noise, hazmat, etc.). Sequentially it makes more sense to discuss EJ at the end after all the resource impacts are introduced (i.e. before or after ICE section). | Moved to new Section 4.21 |
| 114 | FHWA | Page 4-13 Section 4.5.1 | Use language of lead agency....<br><br>Environmental justice at FHWA means identifying and addressing disproportionately high and adverse effects of the agency's programs, policies, and activities on minority populations and low-income populations to achieve an equitable distribution of benefits and burdens. This includes the full and fair participation by all potentially affected communities in the transportation decision-making process. | EJ section "Assessment of Potential for 'Disproportionately High and Adverse Effects' on Areas of EJ Concern" revised to state that the determination would be made for the Preferred Alternative in the FEIS. FEIS will use FHWA instead of EPA language. |
| 115 | FHWA | Page 4-13 Section 4.5.1 | The DEIS defines EJ and alludes to a cite but does not provide it. Similarly, the text alludes to EPA, FHWA, and DOT EJ policies subsequent to EO 12898. Add appropriate citations or explanations. | Regulatory context and references added |
| 116 | FHWA | Page 4-13 Section 4.5.1 | The explanation of EO 12898 is essentially correct but should be more precise. Rather than ensuring federal programs do not result in disproportionately high and adverse environmental or health impacts to minority and low-income populations, the order directs agencies to identify and address, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations. | Replaced with EJ Introduction text from CEAEJ Technical Report, which is clearer; differentiated subsections by Introduction and Methodology |
| 117 | FHWA | Page 4-14 Section 4.5.1 | The strategies developed under Executive Order 12898 ~~and subsequent EPA~~, US Department of Transportation (USDOT), and FHWA policies [remove strikeout] | Accepted deletion in both Chapter 4 and CEAEJ Technical Report |
| 118 | FHWA | Page 4-14 Section 4.5.1 | 2nd paragraph - Discuss Title VI in terms of previous impacts and potential impacts to current populations that are defined by the Title VI law. Address concerns in terms of doing no additional harm to the communities. | Added statement in both Chapter 4 and CEAEJ Technical Report on Title VI Compliance to be addressed for the Preferred Alternative in the FEIS |
| 119 | FHWA | Page 4-14 Section 4.5.1 | "For purpose of this analysis a minority individual is defined..." Definitions should be derived from regulation or guidance, not for the purpose of this analysis. Remove "for the purpose of this analysis a"<br><br>4th paragraph - Do not use threshold statistics for EJ.  If one of the above described situations for Minority and/or Low-Income are present, an EJ analysis must be performed. The comparison area should be clearly defined and described in the EJ methodology. | Deleted "for the purposes of this analysis" in both Ch. 4 and CEA EJ Technical Report; pulled in text from CEA EJ Tech Report explaining why 50% was used |

00189822

| 120 | FHWA | Page 4-14 Section 4.5.1 | The document identifies that guidelines for identifying low-income populations explain that it may be appropriate for agencies to select a threshold for identifying low income populations that exceed the poverty level, and then provides the following information in parentheses (EJ IWG 2016). Please provide a more detailed citation and reason for using. Unable to find this information in the EJ IWG framework for collaboration from March 2016. | Pulled in text from CEA EJ Technical Report identifying IWG EJ and summarizing methodology |
|---|---|---|---|---|
| 121 | FHWA | Page 4-14 Section 4.5.1 | The document identifies that federal regulations prohibit disparate impact discrimination, but do not cite the regulations. Add cite to 28 C.F.R. § 42.104(b)(2) | Added statement in both Chapter 4 and CEAEJ TR on Title VI Compliance, including a reference to 28 C.F.R. § 42.104(b)(2), to be addressed for the Preferred Alternative in the FEIS |
| 122 | FHWA | Page 4-14 Section 4.5.1 | Please identify where definitions come from, such as the definitions of Minority Individual and Minority Populations. | Added text from CEA EJ Tech Report |
| 123 | FHWA | Page 4-15 Section 4.5.1 | How was the median household income of $63,150 determined? | Added text from CEA EJ Tech Report summarizing methodology |
| 124 | FHWA | Page 4-15 Section 4.5.1 | Please check numbers: 111 vs 112 block groups, 31 vs 32, 76 vs 79 with numbers in CEA/EJ technical report. | No change— the 112 number refers to total Montgomery County block groups |
| 125 | FHWA | Page 4-15 Section 4.5.2 | General EJ comment. Remove the phrasing EJ areas of concern. Identify as EJ populations or communities as applicable. Use EJ analysis as defined in EJ Guidance Letter 2011. | Changed to "EJ populations" throughout |
| 126 | FHWA | Page 4-15 Section 4.5.3 | The document concludes that the impacts of the build alternatives would be experienced uniformly in both areas of EJ concerns and other areas. It is not clear how the DEIS arrives at this conclusion, or how much analysis of the different impacts of each alternative was conducted. For example, APP D table 4-4 indicates that in alternatives 8 and 9, 209 acres in areas of EJ concern would be converted vs 164 in non-areas of EJ concern. Then, in APP D section 4.5, the document identifies that more land use conversion to transportation ROW would occur under the alternatives in the areas of EJ concern vs non-EJ concern but claims that since the percentage difference is no higher than 13 between EJ concern areas and non-concern areas, the property acquisitions would not be considered disproportionate. Please justify this answer. | EJ section was revised to state that adverse effects would occur to EJ populations, but a mitigation discussion and the determination of disproportionately high and adverse effects would be made for the Preferred Alternative in the FEIS.

Also revised text to state: "The types of impacts of the Build Alternatives to environmental resources and the benefits of reduced congestion on GP lanes are expected to be similar in both EJ populations and non-EJ populations throughout the CEA Analysis Area." |
| 127 | FHWA | Page 4-17 Section 4.5.3 | Table 4-2 sometimes identifies impacts from alternatives, and other times does not. Please identify impacts or explain in the text why the table does not provide impacts from alternatives. | References to additional information have been added to all resources in impact table, including where resource impacts are discussed broadly |
| 128 | FHWA | Page 4-18 Section 4.5.3 | Table 4-2 – Community Cohesion, this description seems contradictory. Sounds like adverse effects. | Deleted sentence, "The Build Alternatives would not change the sense of cohesion or interactions between persons or groups within impacted EJ and non EJ areas" |
| 129 | FHWA | Page 4-19 Section 4.5.3 | Table 4-2 – Tolling, Rephrase to - no anticipated adverse or disproportionately high and adverse impacts to the EJ community from tolls. This statement does not appear to have supporting data/documentation. | Sentence removed; the tolls and effects to the tolls on EJ or no EJ populations |
| 130 | FHWA | Page 4-19 Section 4.5.4 | EJ outreach/public involvement should be in its own section, not under mitigation. Change "Providing full and fair access to for meaningful public involvement" | Added separate sub-section for Mitigation |
| 131 | FHWA | Page 4-19 Section 4.5.4 | The use of the term multi-lingual is misleading. It should be bi-lingual. The description of what was offered in other languages in chapter 7 doesn't really meet the test of a multi-lingual outreach. There were flyers that said people could get material in other languages if they requested them, but they were not actually provided. | Made the following deletions in both Ch. 4 and CEA EJ Tech Report: "Multi-lingual outreach and meeting materials for the Public Open Houses/Workshops were made available or provided by request." |
| 132 | FHWA | Page 4-19 Section 4.5.4 | What is trying to be conveyed here? Explain why specific mitigation for EJ populations is not required. Mitigation for EJ populations is required if having an adverse impact. | EJ section revised to state that adverse effects would occur to EJ populations, but a mitigation discussion and the determination of disproportionately high and adverse effects would be made for the Preferred Alternative in the FEIS |
| 133 | FHWA | Page 4-20 Section 4.5.5 | This statement is difficult to make if the Preferred Alternative has not yet been selected [any adverse impacts would be mitigated to the greatest extent practicable]. | EJ section revised to state that adverse effects would occur to EJ populations, but a mitigation discussion and the determination of disproportionately high and adverse effects would be made for the Preferred Alternative in the FEIS |
| 134 | FHWA | Section 4-20 Section 4.5.5 | "both areas of EJ area concern and non-areas of EJ concern" should be changed to "within the project area" in the EJ section. | "Areas of EJ concern" and "non-areas of EJ concern" changed to "EJ populations" and "non-EJ populations" throughout. Existing conditions and environmental consequences for all socioeconomic characteristics are identified for the CEA Analysis Area, as stated in the beginning of Chapter 4. |
| 135 | FHWA | Page 4-21 Section 4.6.1 | Remove second paragraph (repetitive of what is described in the mitigation section). | Done |



Case 8:22-cv-02597-DKC    Document 68-1    Filed 10/30/23    Page 13 of 49    **MLS Administrative Draft – DEIS Agency Comments**
Errata Sheet

| 136 | FHWA | Page 4-21 Section 4.6.2 | Delete "closed to" in the sentence "The I-495 median width varies…" | Done |
|---|---|---|---|---|
| 137 | FHWA | Page 4-22 Section 4.6.3 | This section lacks any detail on where ROW impacts are located within the study area, who the property owners are, and the quantified impacts of these properties. A figure and table would greatly enhance this section to allow the reader a full and informed understanding of the impacts of the proposed action. | Added a new table, "Full and Partial Property Acquisition by Study Corridor Segment" plus short discussion of the segments containing the most acreage of property impacts |
| 138 | FHWA | Page 4-22 Section 4.6.3 | Table states 284.9 acres but text states 285.5 acres. | Corrected text to 284.9 in both Ch. 4 and CEA EJ Tech Report |
| 139 | FHWA | Page 4-22 Section 4.6.4 | Discuss minimization measures already taken to reduce property impacts, don't punt it to future design phases of the study. | Text revised |
| 140 | FHWA | Page 4-23 Section 4.7 | Suggest completing the VIA Questionnaire and including as a reference to the DEIS in an appendix. This will justify not completing a VIA. | The VIA will be completed on the Preferred Alternative and the results will be documented in the FEIS. |
| 141 | FHWA | Page 4-23 Section 4.7.1 | Rephrase last sentence of first paragraph. Do not use "in line with"; in accordance with, pursuant to, etc.

The guidelines were published January 2015 not September 2013. | Revised |
| 142 | FHWA | Page 4-23 Section 4.7.1 | Local planning documents were reviewed, how was this information used? | Removed |
| 143 | FHWA | Page 4-23 Section 4.7.2 | At minimum, there should be photographs of the existing conditions. Ideally, renderings for the environmental consequences section would greatly enhance the reader's understanding of the visual impacts. | Existing photos from I-495 and I-270 have been added. Renderings will be prepared of the Preferred Alternative and included in the FEIS. |
| 144 | FHWA | Page 4-23 Section 4.7.2 | Areas of deciduous trees, of varying density, provide a screen between I-495 and adjacent development in some areas. Since deciduous, is there a screen during winter months? | The views will vary throughout the corridors. If there is an existing noise wall views would be blocked year round. |
| 145 | FHWA | Page 4-23 Section 4.7.2 | Any 4(f), 6(f) or NRHP eligible properties in area of visual effects? | Yes and views from the park properties is the main concern we have heard from the cooperating agencies. MDOT SHA has committed to preparing renderings to and from selected park properties of the Preferred Alternative in the FEIS. |
| 146 | FHWA | Page 4-23 Section 4.7.2 | Include if there was any public interest on visual impacts during scoping meetings or community meetings. | Few comments specific to visual impacts have been received. However they could be assumed with comments expressed about tree loss and property impacts. |
| 147 | FHWA | Page 4-23 Section 4.7.2 | Key views would be helpful to demonstrate that the Build Alternatives would be consistent with the existing viewsheds. Include one key view for each viewshed for an accurate analysis, two are preferred—one view of the road as seen by a representative neighbor, and one view from the road as seen by a representative traveler. | Existing photos from I-495 and I-270 have been added. Renderings will be prepared of the Preferred Alternative and included in the FEIS. |
| 148 | FHWA | Page 4-25 Section 4.7.3 | "In summary, impacts to visual resources would be detectable but localized." What does this mean? Where are these impacts and who are they to? Need more information here. Just saying there are "detectable" impacts is not enough. | Text has been revised to clarify |
| 149 | FHWA | Page 4-25 Section 4.7.3 | What about impacts during construction? | Text includes a discussion on visual impacts during construction. |
| 150 | FHWA | Page 4-25 Section 4.7.4 | Could aesthetic treatments be used on retaining walls and noise barriers to reduce the appearance of the wall surface by blending better with the surroundings? | Aesthetic treatments on retaining walls and noise barriers is a mitigation treatment that could be considered in final design. |
| 151 | FHWA | General Section 4.8 | The Volumes in Appendix F do not contain original letters / documentation in enough detail as to the specific refences in Section 4.8 for all steps in the section 106 process, specifically the outstanding eligibility determinations and effect findings. | These documents are draft and represent a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the DEIS. The appendices with consultation correspondence will be updated for the FEIS. |
| 152 | FHWA | Page 4-26 Section 4.8.1 A | Reference the consultation correspondence in Volume 1 of the Cultural Resources Tech Report. Who are the consulting parties? What topics were discussed at the consulting parties' meetings to-date? Please list out whom the current Section 106 consulting parties are, which Tribes were contacted, etc. these can all be in appendices or subsequent volumes but show the data tables. There are no tables synthesizing the data. | A summary with more detailed information of this information will be included in the FEIS. |
| 153 | FHWA | Page 4-27 Section 4.8.2 | Text states "MDOT SHA has completed eligibility evaluations of above-ground resources in the APE per the methodology described in the Gap Analysis; there are no eligibility findings where SHPO concurrence has not been obtained". This contradicts what is presented in Appendix F, specifically in Volume 1 as stated in the below comments on Volume 1 that declares identification, eligibility, and assessment of effects are not complete. | Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the draft EIS. |

00189824

| 154 | FHWA | Page 4-27<br>Sections 4.8.2 A&B | These sections are weak and only reference what is in Appendix F, there needs to be at least some tables here to show the quantities of known, newly identified, and impacted resources, both above and below ground. The numbers are too complicated to read through without tables. | MDOT SHA will incorporate summary tables as space permits in the FEIS to simplify the presentation of information. |
|---|---|---|---|---|
| 155 | FHWA | Page 4-27<br>Section 4.8.2B | The paragraph below is almost impossible to understand how many Archaeological sites are there and how many will have an adverse effect. This paragraph does not match what is stated in Volume 1.<br><br>"Ten newly identified archaeological resources were identified in Maryland; seven are recommended not eligible for the NRHP and would require no further investigation. A Phase II evaluation (archaeological investigation to determine NRHP eligibility) was completed for two of the newly discovered sites in Maryland within the C&O Canal National Historical Park, and they were determined NRHP-eligible. One additional site in Maryland within Cabin John Park has been recommended for Phase II evaluation, and this work has not yet been completed. Additional intensive archaeological testing was conducted on a number of sites (**how many?**) in Virginia that lacked formal agency determination and concurrence on NRHP eligibility **this is a procedural problem and per Volume 1 you need to get agency determination and concurrence on eligibility to assess effects or declare this differently in the DEIS if it will be addressed in the PA at a later date**. MDOT SHA's field investigations identified five related resources contributing to a NRHP-eligible archaeological district within the GWMP; the district is proposed for treatment in the PA. | This is complex due to the shift from an initial survey area to a defined LOD, and numerous "archivally" recorded sites or documentary references "quad files" in SHPO database that were not field verified. We will be able to define sites within LOD, eligibility and effects but the "total" number depends the counting methodology.<br><br>No change requested from FHWA following discussion; explanation requires too much detail for the lay reader. MDOT SHA will look at language in FEIS to see if it can be clarified without excessive elaboration. |
| 156 | FHWA | Page 4-27<br>Section 4.8.2B | Evidence of SHPO concurrence? Include a table of the identified historic resources. Simply stating there are 51 properties offers no context to where these properties are located or whether they are listed, eligible for listing, National Landmark, etc., or who the property owners are. The purpose of a DEIS is to disclose information for decision-makers, but there is not sufficient information in this section to even have a basic understanding of what historic properties are in the APE, where they are located, and what the impacts are to each property. | MDOT SHA agrees a key map of historic properties would be beneficial in the FEIS. Clarified that the "property owners" is intended to demonstrate those historic properties that are also parks (i.e., NPS and M-NCPPC properties), not individual property owners. Will include in FEIS. |
| 157 | FHWA | Page 4-28<br>Section 4.8.3A | What are the effects to these properties? Impacts must be disclosed, not simply stating there will be an adverse effect. Did the SHPOs concur to these effect determinations? Basic project details need to be included in the body of the document and should not require the reader to dig in an appendix. Why can't effects be determined for 7 historic properties? This is problematic.<br><br>Does Table 4-4 include archaeological resources? This needs to be clear in the title, otherwise the note regarding eligibility pending conflicts with 4.8.2a that states there are no eligibility findings where SHPO concurrence has not been obtained. | Since the January draft was completed, MHT concurred with the eligibility and effects determination as well as the need for further Phase I and II archaeological investigation in the specified areas to which access was denied (March 12, 2020). This is reflected in the text.<br><br>Detailed descriptions of impacts are in technical report. For Washington Aqueduct, MDOT SHA will make a NEPA/ROD commitment to avoid ground disturbance and call that property "no adverse" based on the commitment to avoid. |
| 158 | FHWA | Page 4-28<br>Section 4.8.3A | Table 4.4 is incomplete and needs to be complete to allow the Section 106 process and 4(f) analyses to conclude. See comments below specific to Appendix F Volume 1 that relate to Table 4.4. | The table is "incomplete" because periods of significance or eligibility criteria were not documented in prior eligibility determinations or national register listings (properties evaluated prior to the MLS project). FHWA recommends that as a mitigation commitment, MDOT SHA will establish the period of significance and or eligibility criteria for properties where they have not been documented. |
| 159 | FHWA | Page 4-28<br>Section 4.8.3A | Last paragraph - This statement precludes your ability to conclude the Section 106 process in a Project level PA, and the 4(f) analysis. | The Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the DEIS. Since the January draft, MHT concurred with the eligibility and effects determination as well as the need for further Phase I and II archaeological investigation in the specified areas to which access was denied (March 12, 2020). Text has been revised. |
| 160 | FHWA | Page 4-29<br>Section 4.8.3 | "Table 4-3" should be Table 4-4. | Corrected |



| 161 | FHWA | Page 4-29 Section 4.8.3A | Top of page - This statement needs direct references and concurrence letters from the SHPOs before it can be taken at face value, no references or documentation was found in Appendix F. Text states "34 eligible or listed properties within the APE, none would be adversely affected by the project". These properties would either experience slight alteration of the characteristic that qualify them for inclusion in the NRHP, but there would be no diminishment of these characteristics, or there would be no appreciable alteration of the properties at all. | The Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the DEIS. |
| 162 | FHWA | Page 4-29 Section 4.8.3B | Archaeological Resources, needs table to flush this out as well as defined references with concurrence letters from MD and VA SHPO offices. | The Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the DEIS. |
| 163 | FHWA | Page 4-29 Section 4.8.4 | Even though a project level PA is the appropriate vehicle / mechanism to conclude the Section 106 process at a later date in time when more information is known, in the DEIS we need to have a more complete Section 106 analysis to be able to get to a Draft Section 106 PA. | The Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the DEIS. |
| 164 | FHWA | Page 4-29 Section 4.8.4 | <mark>Mitigation section, along with the rest of the section, is too vague. Provide details and specific mitigation measures and evidence of coordination.</mark> | This will be resolved through the development of the Project Section 106 PA, and stipulations of the PA will be incorporated into the FEIS. |
| 165 | FHWA | Page 4-30 Section 4.9.1 | The document says that the Study is located in a region that is in attainment for CO, and thus project level conformity does not apply. This does not address maintenance. It should identify that the maintenance plan timeframe has expired, and therefore there are no additional conformity requirements, rather than stating that the region is in attainment and therefore conformity does not apply. | Reworded the sentence on page 4-31 but this detailed maintenance information is detailed on page 4-33 under Existing Conditions |
| 166 | FHWA | Page 4-30 Section 4.9.1 | Is the current Transportation Conformity Determination based on the 2040 or 2045 Visualize Long-Range plan? | 2045 |
| 167 | FHWA | Page 4-31 Section 4.9.1 | Text states "NEPA guidance for air quality analyses for transportation projects **may** be found on the FHWA website for planning and the environment." Replace with "is". | Revised |
| 168 | FHWA | Page 4-33 Section 4.9.2 | The last part of the sentence at the top of the page ". . . except for the exceedance of the 8-hour ozone standard recorded at all the monitor locations." doesn't make sense. | Clarified sentence |
| 169 | FHWA | Page 4-33 Section 4.9.2 | <mark>The analysis claims that MSATs show overall long-term emissions trending downward due to technologic improvements, defined as more stringent vehicle emission and fuel quality standards couples with ongoing fleet turnover. Technical support/references should be added for this assertion. Also, we are expecting additional regulatory changes from EPA/NHTSA this year that should be monitored for possible impacts on the analysis.</mark> | We will monitor possible EPA regulations. The text has been revised to include references in footnotes. |
| 170 | FHWA | Page 4-33 Section 4.9.3 | Text states "…as a result, this analysis does not reflect a comparison between Build Alternatives". Do you have any data from technical report to support this statement? | Added clarifying information from the technical report |
| 171 | FHWA | Page 4-33 Section 4.9.3 | "Information is currently incomplete or unavailable to credibly predict the study-specific health impacts due to changes in MSAT emissions associated with each of the alternatives." Properly cite this quote/paraphrase from Appendix C of FHWA Interim Guidance on MSAT for NEPA or remove the sentence all together. | Reference added in a footnote |
| 172 | FHWA | Page 4-33 Section 4.9.3 | <mark>It is unclear whether the study analyzed PM and O3. While this may not be required, the DEIS should fully explain why we analyzed what we analyzed.</mark> | Text has been added from the technical report |
| 173 | FHWA | Page 4-33 Section 4.9.3 | <mark>In the consequences section, the document says the no build alternative would not result in the reduction of VMT. While this is true overall compared to current VMT, it is incorrect compared to the projected VMT from any of the build alternatives. Thus, it is a confusing sentence needing clarification.</mark> | Sentence revised to clarify |
| 174 | FHWA | Page 4-33 Section 4.9.3 | Analysis focusing on worst case interchanges is confusing. Additional information, perhaps presented graphically, would help. | Added clarifying information form the technical report |
| 175 | FHWA | Page 4-34 Section 4.9.3 | On very top of the page, at the end of the sentence ". . . regardless of the alternative selected." or somewhere in this section they should refer to (and source) the FHWA Interim MSAT Guidance and the Appendix C Incomplete/Unavailable Information section. | Revised |
| 176 | FHWA | Page 4-34 Section 4.9.3 | <mark>Call out box, "Can Managed Lanes Help Reduce Greenhouse Gases?" should be deleted as it is not relevant to the analysis. It gives the impression that new managed lanes proposed in this study would decrease GHG emissions, whereas the analysis in Appendix H shows that all build/managed lane alternatives would have higher GHG emissions than the no-build alternative in the design year.</mark> | Text box deleted |



| 177 | FHWA | Page 4-34 Section 4.9.3 | "Regional accessibility will be increased through providing additional lanes so that motorists can more easily pass slow-moving vehicles." Is this statement relevant to the proposed project since the additional lanes would be separated? | Statement is true but sentence not relevant. |
|---|---|---|---|---|
| 178 | FHWA | Page 4-34 Section 4.9.3 | "While VMT is expected to increase under the Build Alternatives, the increase is below the projected national rate." There is still an impact, even if it's below the projected national rate. | Comment noted |
| 179 | FHWA | Page 4-34 Section 4.9.3 | "A major factor in mitigating this increase in VMT and associated GHG emissions is more stringent fuel economy standards." The fuel economy standards will mitigate the GHG emissions, but not the VMT. Recommend rewording to something like: "A major factor in mitigating the GHG emissions associated with this increase in VMT is more stringent fuel economy standards." | Revised |
| 180 | FHWA | Page 4-34 Section 4.9.3 | "Thus, the study area would see a net reduction in GHG emissions under any of the Build Alternatives, even though VMT increases relative to the No Build Alternative and 2015 levels." This statement is true, but it would be more transparent to also note that all of the build alternatives are projected to have higher CO2 emissions than the no-build alternative, per the analysis that was documented in the Air Quality Technical Appendix. Taken as a whole, the discussion on GHG emissions in the DEIS seems to give the incorrect impression that the build alternatives would reduce GHG emissions rather than increase them relative to the no-build. | Added discussion of actual GHG results in the consequences section. |
| 181 | FHWA | Page 4-35 Section 4.10.1 | Footnote 25 – use proper CFR citation. | Updated |
| 182 | FHWA | Page 4-36 Section 4.10.1 | 2019 MDOT SHA Highway Noise Policy has not been approved yet. Was the noise analysis originally using 2011 MDOT SHA Noise Policy? | New policy has received verbal approval from FHWA as of February 20, 2020. Formal approval is expected shortly (and definitely prior to the FEIS), so it was decided to include the policy changes in the preliminary DEIS document to avoid inconsistencies between the DEIS and FEIS noise results. |
| 183 | FHWA | Page 4-36 Section 4.10.2 | The Existing Conditions summary in the DEIS (Pg. 4-36, Section 4.10.2), and in the Conceptual Mitigation Plan (Pg. 22, Regulatory Basis and Methodology) does not match the totals for NSAs or impacts as reported in the Noise Technical Analysis Report (Pg. ES.2), Conceptual Mitigation Plan (Pg. 22, Proposed Impacts of the Build Alternatives), or the DEIS' Section 4.10.3. Follow up: Why/How were the number of NSAs changed from the last Draft of the Noise Tech Report to the DEIS? | Totals in Executive Summary of Tech Report are correct, DEIS section revised to reflect the corrected numbers. Re: the number of NSAs, this change was due to the realization that some NSAs were being double-counted between I-495 and the I-270 spurs. |
| 184 | FHWA | Page 4-37 Section 4.10.3 | A table with the noise analysis results/impacts would be helpful. | A table showing results is included as part of the Noise Technical Report in Appendix J. |
| 185 | FHWA | Page 4-38 Section 4.10.4 | Are Table 4-5 and the paragraph immediately following, your Statement of Likelihood? Or will there be a more detailed Statement in the FEIS? | These numbers reflect the preliminary analysis and the new policy. |
| 186 | FHWA | Page 4-38 Section 4.10.4 | The final design noise analysis will be done during final design. Will this analysis be done by MDOT SHA or the P3? | The final design noise analysis will be completed by the developer and approved by the GEC and MDOT SHA. |
| 187 | FHWA | Page 4-39 Section 4.11 | The HAZMAT analysis should address the impacts from the different alternatives. It appears to be we studied a worst-case scenario, rather than alternative by alternative. | The HAZMAT analysis has been revised to show a comparison between the Build Alternatives. |
| 188 | FHWA | Page 4-41 Section 4.12.1 | The FPPA legal citation should be 7 U.S.C. 4201 et seq, and its implementing regulations at 7 CFR 658. | Revised as noted. |
| 189 | FHWA | Page 4-41 Section 4.12.1 | The DEIS states that the Farmland Protection Policy Act aims to prevent federal programs from converting farmland to non-agricultural land. The text of the law uses the term "minimize," rather than prevent. The DEIS misstates the law in a manner that makes it seem more stringent than it actually is. This is not a significant issue but recommend matching the law. | Revised wording to "minimize." |
| 190 | FHWA | Page 4-42 Section 4.12 | The section in the DEIS does not analyze impacts from alternatives in a systematic and comparative way. The technical report includes a chart analyzing impact to soils by alternative. Recommend adding more detail about the comparative impact into the DEIS. | Soil impact tables have been added to this section with additional text. |
| 191 | FHWA | Page 4-43 Section 4.13.1 | The citation to 42 USC 300j-13 (Source water quality assessment) does not correspond to the text well. The cite relates to the same subject matter but does not directly encourage communities to use guidance or pass regulations. It does require certain states to carry out source water assessment programs. | Adjusted citation location to better match text and added an additional citation for discussing communities. |
| 192 | FHWA | Page 4-43 Section 4.13.1 | It is true that the "SWDA does not mandate source water protection," but the SWDA does mandate source water quality assessments at 42 USC 300j-13. | Revised language to clarify. |

00189827

| 193 | FHWA | Page 4-44 Section 4.13.2 | On statement that MDE does not release the exact locations of groundwater wells for security reasons making it impossible to determine the location of most wells: Given that MDE is a sister agency of MDOT, is it credible to say that no further information can be obtained? Relevant info could include, e.g., proximity of wells to the study boundary, depth of wells (affecting probability that contamination could occur as shallow wells are more susceptible to contamination). | Numerous attempts were made to get more accurate well location information from MDE. They were responsive but said the location data is what they have available and they do not have anything more accurate or a way to determine where the wells actually are. Many wells are listed as occurring in the study area, but the data shows them mapped in adjacent counties or states or located in places that are clearly inaccurate or outdated (in paved areas or waterbodies). The study area and adjacent areas are served by public water supply and therefore drinking water supplies are not at risk. If FHWA prefers, we could remove the information regarding wells if it is perceived as more confusing than helpful. |
|---|---|---|---|---|
| 194 | FHWA | Page 4-44 Section 4.13.3 | On statement that groundwater wells in the relevant area that are still in use "are expected to be largely for commercial and industrial usage, and not for drinking water." Needs support and elaboration. | The entire study area is served by public water supply and therefore drinking water supplies are not at risk. See response above (# 193) and text from Section 4.13.2: "WSSC provides all drinking water within the corridor study boundary. Similarly, in Virginia, the Fairfax County Water Authority serves the areas immediately surrounding the corridor study boundary and receives its water from the Potomac River via the Washington Aqueduct (Fairfax Water, 2018). Less than 20 percent of the population in Fairfax County is served by private wells (VDH, 2019). Groundwater wells within the corridor study boundary that are still in use are generally for commercial and industrial usage, and not used as drinking water." |
| 195 | FHWA | Page 4-44 Section 4.13.3 | On statement that the Build Alternatives are not expected to have adverse effects on drinking water: consider comment above about private wells | See comment responses 193 and 194, above. |
| 196 | FHWA | Page 4-44 Section 4.13.3 | 4.13.4 explains that the build alternatives will use the latest SWM BMPs design (i.e. permanent stormwater facilities remaining post-construction). If these facilities improve existing conditions re: stormwater runoff and water quality, is it accurate to say that the no build alternative would have no impact on groundwater quality? Is it possible that long-term groundwater quality would further degrade under the no-build if SWM facilities are not upgraded? Alternatively, would increase runoff under the build alternatives off-set any benefits of SWM upgrades? | The Stormwater Act of 2007 requires treatment of at least 50% of existing pavement, meaning that the Build Alternatives could result in improved groundwater quality due to increased stormwater treatment. It is not anticipated that the long-term groundwater quality would degrade under the No Build Alternative due to maintenance requirements on existing stormwater facilities. In addition, runoff should not increase under the Build Alternatives due to quantity stormwater requirements. |
| 197 | FHWA | Page 4-45 Section 4.13.4 | On statement that SWM PMPs will maintain "local groundwater quantities." What does this mean? "While continuing to allow for local groundwater recharge after stormwater passes through BMPs?" Or are quantities supposed to be quality? | The statement was revised for clarity to "…while also maintaining local groundwater quantities through recharge." |
| 198 | FHWA | Page 4-45 Section 4.14.2 | What are Maryland 12-digit watersheds? Use laymen's terms or describe what a 12-digit watershed is. | Text has been revised to indicate that Maryland 12-digit watersheds are defined by MDNR (referred to as "MDNR 12-digit watersheds") and a definition was provided. |
| 199 | FHWA | Page 4-46 Section 4.14.3 | The specific impacts to the streams (second paragraph) need to be disclosed in the body of the report. Similarly, avoidance and minimization measures should be described in the body of the report and not simply refer the reader to an appendix. | Text was revised to include a paragraph between "Since the project would improve…" and "Regulatory agencies…" that summarizes the Avoidance and Minimization process. Specific details of impacts are included in the *Avoidance, Minimization, and Impacts Report*.

Removed the data/results related to jurisdictional features and renamed section "Watersheds and Surface Water Quality." The waterways referenced in Section 4.14 (previously 4.15) are the jurisdictional waterways within the corridor study boundary, while the streams discussed in Section 4.15 (previously 4.14) may or may not be jurisdictional and are discussing major streams/rivers within watersheds that may or may not be entirely within the corridor study boundary. Sections 4.14 and 4.15 of the text have been rewritten to better reflect this intention. |
| 200 | FHWA | Page 4-46 Section 4.14.3 | 4.13.4 explains that the build alternatives will use the latest SWM BMPs design (i.e. permanent stormwater facilities remaining post-construction). If these facilities improve existing conditions re: stormwater runoff and water quality, is it accurate to say that the no build alternative would have no impact on surface water quality? Is it possible that long-term surface water quality would further degrade under the no-build if SWM facilities are not upgraded? Alternatively, would increased runoff under the build alternatives off-set any benefits of SWM upgrades? | Repeat of comment #196, refer to that response |

Errata Sheet

| | | | | |
|---|---|---|---|---|
| 201 | FHWA | Page 4-47 Section 4.14.3 | Table 4-7: What does "POW" stand for?  Palustrine Open Water Wetlands?  If so, consider clarifying, as the term is not defined in the table or document.  Also: does this imply that no forested (PFO), scrub-shrub (PSS), or emergent (PEM) wetlands are impacted? | POW stands for Palustrine Open Water - Nontidal system that is permanently flooded and largely lacks rooted vegetation above the water's surface. This definition has been added to the note at the bottom of Table 4.7.  This is technically a waterway, not a wetland, so it has been included in the waterway table.  Table 4-7 was moved from the Watersheds and Surface Water Quality Section (now Section 4.15) to the "Waters of the US and Waters of the State, Including Wetlands" Section (now Section 4.14) of the DEIS. A wetland impact table by classification (PEM, PFO, PSS) was added. |
| 202 | FHWA | Page 48 Section 4.15 | The distinction between Surface waters (Section 4.14) and Jurisdictional waters and wetlands (Section 4.15) is not clear.  Also, 4.15 does not appear to be limited to wetlands: it also addresses non-tidal surface waters. | Section 4.14 now references all jurisdictional nontidal waters (Waters of the US and Waters of the State, including Wetlands).  Section 4.15 is a discussion of surface waters within the context of their watersheds and the water quality within these surface waters, and has been retitled to "Watersheds and Surface Water Quality." |
| 203 | FHWA | Page 4-48 Section 4.15.1 | Mentions efforts to reduce impacts to WOTUS but does not mention "waters of the State" (WOTS) in Maryland.  See Titles 4, sub. 1 and 4, and Title 9, sub. 3 of the Env. Article, Annotated Code of Maryland.  The jurisdictional limits of WOTS are broader than WOTUS jurisdictional limits.  The same is true for state wetlands (which include isolated wetlands exempt from federal regulation).  See Title 5 (addressing non-tidal wetlands) and Title 16 (addressing tidal wetlands) of the Maryland Environment Article. | Revised as noted. |
| 204 | FHWA | Page 4-48 Section 4.15.1 | Add appropriate reference(s) to Appendix N, the Section 404(b)(1) evaluation. | Revised as noted. |
| 205 | FHWA | Page 4-48 Section 4.15.1 | Should address Section 402 of the Clean Water Act (33 USC 1342).  State and Federal NPDES permits will also be required for stormwater discharges to WOTUS and WOTS (e.g., construction stormwater general permits). | Revised as noted: Section 402 of the CWA governs water quality through the regulation of discharged pollutants. A permit issued under the National Pollutant Discharge and Elimination System (NPDES) will be required for construction-related stormwater discharges within the corridor study boundary. Information regarding E&S and SWM is included in the *Documentation of MDOT SHA's Stormwater Management Assumptions - February 2020*. |
| 206 | FHWA | Page 4-48 Section 4.15.1 | Reference to "current guidance" is likely outdated.  EPA has not yet issued guidance on the "Navigable Waters Protection Rule" issued January 23, 2020.  The final rule becomes effective 60 days from publication in the Federal Register.  The summary of jurisdictional waters remains largely consistent with the new rule, but the sentence should likely be redrafted to expressly acknowledge the new regulatory definition. | Revised to reference Clean Water Rule (December 2019) and definition for wetlands and waterways used in the CWR based on a meeting with FHWA and USACE on 2/28/2020. |
| 207 | FHWA | Page 4-48 Section 4.15.1 | Note that the Maryland Nontidal Wetlands Protection Act is a statute, not a regulation under COMAR.  The COMAR regs implement the statute.  Maryland wetland statutes are under Title 5 of the Maryland Environment Article (for non-tidal wetlands).  See Title 5, sub. 5 and 9. (Tidally-influence wetlands are addressed under Title 16). | Revised in text as noted. |
| 208 | FHWA | Page 4-48 Section 4.15.1 | Reference should be added to Maryland's Critical Area Commission and criteria for development in the critical area.  Development is restricted in the "critical area."  See COMAR 27.01.01.  See also Md. Code Ann., Nat. Res. § 8-1807.  The Critical Area includes all land within 1,000 feet of Maryland's tidal waters and tidal wetlands. It also includes the waters of the Chesapeake Bay, the Atlantic Coastal Bays, their tidal tributaries, and the lands underneath these tidal areas. | Not applicable. This project is not within the Critical Area and does not include any tidal waters/wetlands. |
| 209 | FHWA | Page 4-49 Section 4.15.1 | Note that some discussion of stormwater management is provided in Section 2.7.3 on pages 2-30 through 2-32.  But post-construction stormwater management (SWM) is not equivalent to erosion and sediment (E&S) control during the construction phase or to NPDES discharge permitting (Section 402) during construction.  SWM pertains to the permanent stormwater management facilities left in place post-construction.  Discussion of environmental impacts / effects on jurisdictional waters (WOTS and WOTUS) should include both: (i) discharges of sediment and pollutants during construction; and (ii) permanent effects on water quality post-construction through the lens of SWM and environmental site design (ESD).  These effects are currently missing from the discussion of impacts on jurisdictional waters in Section 4.15. | Statement added to section: "Note that the project will require strict adherence to E&S requirements during construction." |

00189829

| 210 | FHWA | Page 4-49 Section 4.15.1 | Note that some discussion of erosion and sediment (E&S) control is provided in Section 4.12 on pages 4-41 through 4-43. But the focus of Section 4.12 is on impacts to soils and geology, not on impacts to water quality (and potentially aquatic life) through runoff of soils into jurisdictional waters. These are separate issues. Discussion of environmental impacts / effects of E&S runoff and sediment pollution on jurisdictional waters (WOTS and WOTUS) should be provided in Section 4.15. | Statement added to Section 4.15: "Note that the project will require strict adherence to E&S requirements during construction." |
| 211 | FHWA | Page 4-49 Section 4.15.1 | Should address erosion and sediment (E&S) control and its impacts on jurisdictional waters under the following state laws: Title 4, sub. 1 and 4, of the MD Environment Article addresses E&S control and sediment pollution. See, e.g., 4-105(a)(3), 4-106, and 4-413. Soil Conservation Districts in Maryland issue E&S control plans for all construction on over 5000 sq. feet of land. In addition, Title 9, sub. 3, of the MD Environment Article addresses water pollution control more broadly. See, e.g., 9-322 and 9-323: Maryland issues joint State and Federal discharge permits for discharges to both Waters of the State (WOTS) and WOTUS. See, e.g., 9-324 EN Art. | This detail regarding SWM is not appropriate in the discussion of wetland and waterway permits in Section 4.12.1. References to applicable SWM permits were added in Section 2.7.3. |
| 212 | FHWA | Page 4-49 Section 4.15.1 | The paragraph on the jurisdictional waters in Maryland could be structured better. The discussion of waterways should likely be its own paragraph (instead of blending it into the discussion of wetlands, which are treated separately under Maryland law, at least definitionally). The jurisdictional limits of Waters of the State (WOTS) in Maryland are broader than WOTUS jurisdictional limits. Passing reference is made at the end of the paragraph to the COMAR definition of WOTS, but see also Titles 4, sub. 1 and 4, and Title 9, sub. 3 of the Env. Article, Annotated Code of Maryland for statutory definitions (which do not rely on the new EPA WOTUS Step 2 Rule). | Revised as noted and for consistency with NRTR. |
| 213 | FHWA | Page 4-50 Section 4.15.2 | Build Alternatives are mentioned in the DEIS but in the technical reports they are called "Screened Alternatives." Please make sure you have consistent text in the documents. | Technical reports are based on Screened Alternatives and should not be called "Build Alternatives" in the technical reports. The DEIS was prepared after the technical reports and the alternatives referred to in the DEIS are the Build Alternatives. |
| 214 | FHWA | Page 4-50 Section 4.15.3 | Regarding the Potomac River crossing, there is a conclusory statement that no permit is needed under Section 10 of the Rivers and Harbors Act. Add explanation. | Revised as noted. |
| 215 | FHWA | Page 4-50 Section 4.15.3 | 4.13.4 explains that the build alternatives will use the latest SWM BMPs design (i.e. permanent stormwater facilities remaining post-construction). If these facilities improve existing conditions re: stormwater runoff and water quality, is it accurate to say that the no build alternative would have no impact on water quality? Is it possible that long-term water quality would further degrade under the no-build if SWM facilities are not upgraded? Alternatively, would increase runoff under the build alternatives off-set any benefits of SWM upgrades? | Repeat of other comment. The Stormwater Act of 2007 requires treatment of at least 50% of existing pavement, meaning that the Build Alternatives could result in improved groundwater quality due to increase stormwater treatment. It is not anticipated that the long-term groundwater quality will degrade under the No Build Alternative due to maintenance requirements on existing stormwater facilities. In addition, runoff would not increase under the Build Alternatives due to quantity stormwater requirements. |
| 216 | FHWA | Page 4-50 Section 4.15.3 | Add discussion of impacts related to sediment and pollutant discharges, stormwater runoff, etc., and associated permitting schemes (Section 402 / NPDES construction permit, E&S control plans, etc.). Referenced in 4.14, but discussion may also be warranted here (for discharges to jurisdictional waters). | Additional information regarding SWM is included in the *Documentation of MDOT SHA's Stormwater Management Assumptions - February 2020* and references to applicable SWM permits were added in Section 2.7.3. |
| 217 | FHWA | Page 4-52 Section 4.15.4 | Will the RFP on private lands be handled by MDOT SHA or the P3? | MDOT SHA and the P3 will be responsible for different parts of the RFP. MDOT SHA remains responsible for providing mitigation, however, they intend to transfer fiscal responsibility to the P3. |
| 218 | FHWA | Page 4-52 Section 4.15.4 | Add discussion of minimization and mitigation efforts related to sediment and pollutant discharges, stormwater runoff, etc., and associated permitting schemes (Section 402 / NPDES construction permit, E&S control plans, etc.). Referenced in 4.14, but discussion may also be warranted here (for discharges to jurisdictional waters). | Statement added to section: "Note that the project will require strict adherence to E&S requirements during construction."<br><br>The following paragraph was added to section 4.12.4.<br><br>"Water quality would be protected by implementing stringent erosion and sediment control plans with BMPs appropriate to protect water quality during construction activities. Post-construction SWM and compliance with Total Maximum Daily Loads (TMDLs) will be accounted for in the stormwater design and water quality monitoring to comply with required permits. Other measures may also be considered in particularly sensitive watersheds after further coordination with MDE, such as redundant sediment and erosion control measures in especially sensitive watersheds or providing on-site environmental monitors during construction to provide extra assurance that sediment and erosion control measures are fully implemented and functioning as designed." |
| 219 | FHWA | Page 4-52 Section 4.15.4B | Describe the potential mitigation identified. There is an over-reliance on referring the reader to an appendix to find pertinent details for decision-makers. | Revised with summary of information provided in Draft CMP. |

| 220 | FHWA | Page 4-52 Section 4.16.1 | Consider noting that floodplains also constitute jurisdictional waters ("Waters of the State" / WOTS) in Maryland. | Revised as noted. |
|---|---|---|---|---|
| 221 | FHWA | Page 4-52 Section 4.16.2 | Add reference to 23 CFR § 650.113 - Only practicable alternative finding by FHWA? | Added reference to this statute. |
| 222 | FHWA | Page 4-53/54 Section 4.16.3 | Do the first two paragraphs in this section provide information on the environmental consequences of the proposed action? Seems better suited for an intro section than environmental consequences. | Revised as noted. Introductory information moved to appropriate section and out of environmental consequences. |
| 223 | FHWA | Page 4-54 Section 4.16.4 | Analysis is thin, only referencing H&H studies to be performed in the future.  Should discussion be provided of FEMA no-rise certification, CLOMR/LOMR process, the NFIP, etc.?  And how those laws / regulations will apply and be complied with here?  Potentially affected property owners could object to the vagueness of the current analysis (as not taking a "hard look" at potential flooding impacts.  Explaining more about the FEMA requirements (that will be conditions of performing the work) could help to allay some of those concerns. | Additional information regarding the applicable floodplain requirements was added to Section 4.15.1. |
| 224 | FHWA | Page 4-55 Section 4.17.1 | MDOT SHA's 2006 Capital Beltway Study data was used. Did you do any more current field investigations to verify this data for the I-495 portion of the project? Was a gap analysis done to bring information more current? | No further field investigations or gap analysis was done. The table and more detailed information regarding forest stands was removed from the text because this information could be misunderstood as having been completed for this project rather than the 2006 study. |
| 225 | FHWA | Page 4-56 Section 4.17.2 | Why was forest data not collected for the Virginia portion of the corridor study boundary? | No existing forest data was available for Fairfax County other than the canopy cover and additional forest stand analysis was not completed for the MLS. The table and more detailed information regarding forest stands was removed from the text because this information could be misunderstood as having been completed for this project rather than the 2006 study. |
| 226 | FHWA | Page 4-57 Section 4.17.4 | Who owns, maintains and monitors these forest mitigation banks that MDOT SHA will purchase credits for? | The forest mitigation bank information is to be determined. Currently, the mitigation bank sources are a mix of MDOT SHA owned banks as well as privately owned banks. |
| 227 | FHWA | Page 4-59 Section 4.18.4 | This section should focus on terrestrial wildlife and not habitats. The section cites efforts to avoid and minimize forest impacts and references a discussion in Section 4.17, Vegetation and Terrestrial Habitat. It also discusses pollutant runoff into surrounding wildlife habitat. This section should discuss potential mitigation for terrestrial wildlife, not vegetation or pollutant runoff. Frame it in the context of wildlife. There is discussion of increased road kill in 4.18.3 Consequences, but no mention of possible mitigation measures to reduce roadkill (fencing, crossing structures at water crossings, etc.) | Section has been revised to focus on wildlife and not habitats. |
| 228 | FHWA | Page 4-61 Section 4.19.3 | 4.13.4 explains that the build alternatives will use the latest SWM BMPs design (i.e. permanent stormwater facilities remaining post-construction).  If these facilities improve existing conditions re: stormwater runoff and water quality, is it accurate to say that the no build alternative would have no impact on aquatic biota?  Is it possible that aquatic biota would be further harmed under the no-build if SWM facilities are not upgraded?  Alternatively, would increased runoff under the build alternatives off-set any benefits of SWM upgrades? | The Stormwater Act of 2007 requires treatment of at least 50% of existing pavement, meaning that the Build Alternatives could result in improved aquatic biota due to increase stormwater treatment.  Long-term harm to aquatic biota is not anticipated under the No Build Alternative due to maintenance requirements on existing stormwater facilities.  In addition, runoff should not increase under the Build Alternatives due to quantity stormwater requirements. |
| 229 | FHWA | Page 4-61 Section 4.19.3 | Suggest including Table 2.9-60 from technical report or describe difference between the different alternatives in impervious surface waters. | Added table. |
| 230 | FHWA | Page 4-62 Section 4.19.3 | Minimization activities should mention the likelihood of applicable time of year restrictions | Likely applicable time of year restrictions were added to Section 4.19.4. |
| 231 | FHWA | Page 4-62 Section 4.20.1 | The Citation for Section 7 of the ESA is incorrect.  The correct citation is 16 U.S.C. Section 1536, not "35."  Alternatively, a citation for the ESA could be 16 U.S.C. Sections 1531-1544.  Additional explanation of Section 7 could also be useful: Section 7 (16 U.S.C. § 1536) establishes substantive requirements for Federal agencies to insure, in consultation with the United States Fish and Wildlife Service (USFWS) and/or National Marine Fisheries Service (NMFS), any action authorized, funded, or carried out is not likely to jeopardize the continued existence of any endangered or threatened species or destroy or adversely modify designated critical habitat.  Procedural requirements for Section 7 consultations were established by regulation (50 CFR part 402).  The NMFS (under NOAA) administers the ESA for most marine and anadromous species and the USFWS administers the ESA for all other species. FHWA requests a meeting with MDOT SHA in February 2020 to discuss issues regarding the Endangered Species Act. | Text revised to reflect the correct Section 7 and 2/21/2020 meeting information. |
| 232 | FHWA | Page 4-62 Section 4.20.1 | Explaining Section 9 of the ESA could also be useful and relevant.  Section 9 of the ESA (16 U.S.C. § 1538) prohibits any action that causes a "take" of species listed as endangered or threatened. | Revised text to include reference to Section 9 of the ESA. |

00189831

| 233 | FHWA | Page 4-62 Section 4.20.1 | Text states that the Maryland ESCA applies to "animals" only. What is "animal" intended to mean in this context? Mammals? Or something else? A citation should be provided for this statement. The statute itself includes "wildlife or plants" in its definition of endangered species. Md. Code Ann., Nat. Res. § 10-2A-01. Colloquially, wildlife can include non-mammals. Is the reference to COMAR 08.03.08.15 (Protected Nongame Mammals)? That regulation protects 10 species of nongame mammals. | "Animals" only pertains to "In Need of Conservation" category. Changed "animals" to "wildlife" in the other instances of "animals." |
|---|---|---|---|---|
| 234 | FHWA | Page 4-62 Section 4.20.1 | The citation to the Maryland Nongame Endangered Species Conservation Act is poorly formatted. It should be: Md. Code Ann., Nat. Res. § 10-2A-01 through 09 | Revised as noted. |
| 235 | FHWA | Page 4-62 Section 4.20.1A | Recommend replacing existing reference in paragraph 1 with "…[NMFS] is responsible for administering section 7 of the ESA for endangered and threatened marine and anadromous species and their critical habitats." | Revised as noted. |
| 236 | FHWA | Page 4-62 Section 4.20.1A | The last sentence of paragraph 1 is imprecise and should be revised to reflect that the FWCA requires consultation with NMFS to address impacts to fish and aquatic resources under their jurisdiction, and the MSFCMA requires consultation to address effects to fish and EFH identified under the MSFCMA. | Revised as noted. |
| 237 | FHWA | Page 4-62 Section 4.20.1A | The DEIS does not mention bald eagle. Coordination is needed with the USFWS on bald eagles under the Bald Eagle and Golden Eagle Protection Act. The presence of any known bald eagles in the study area should be noted. | Revised text to include information regarding the Bald Eagle and Golden Eagle Protection Act and to indicate that we are coordinating with USFWS to determine whether any bald eagle nests occur within the study corridor boundary. |
| 238 | FHWA | Page 4-63 Section 4.20.1B | The yellow lance (*Elliptio lanceolata*) is mentioned following the northern long-eared bat as a federally listed threatened species that is potentially present. But no analysis or discussion is provided regarding whether it is actually present in the study area or how impacts on the species would be mitigated, etc. Why is it never mentioned again? Was the intention to say that the Indiana Bat (*Myotis sodalis*) was the second species? The second species discussed throughout the rest of the section is the "IB," which I assume is the Indiana Bat. But if the yellow lance is also potentially present, analysis should be provided. | Revised in text to include pertinent information regarding yellow lance and IB. The yellow lance was included in the official species list initially, but was removed from the species list in October 2019, because it was presumed to be extirpated in the study area. IB was defined as Indiana Bat in the text. Additional information regarding federally-listed species was included in this section. |
| 239 | FHWA | Page 4-63 Section 4.20.1B | The yellow lance appears to be presumed extirpated in the study area, as explained by USFWS in a 2018 Final Rule regarding the species. This should be explained in the DEIS. | This clarification regarding the yellow lance has been added to the DEIS. |

| | | | | |
|---|---|---|---|---|
| 240 | FHWA | Page 4-63 Section 4.20.1B | • On January 28, 2020, a U.S. district court in D.C. held that USFWS's decision to list the northern long-eared bat (NLEB) as "threatened" rather than "endangered" was arbitrary and capricious. The court remanded the listing decision to USFWS for a new determination on the species' status. See Center for Biological Diversity, et al. v. Everson, et al., and Defenders of Wildlife et al. v. Everson, et al. The court did not vacate the threatened listing, and thus left the status quo in effect for now. If the USFWS determines on the basis of the best available scientific data that the NLEB should now be listed as endangered, then the USFWS's programmatic biological opinion on the 4(d) rule would no longer be available. A motion remains pending before the district court regarding the current 4(d) rule (that exempts most incidental take from the Section 9 take prohibition). If the court vacates the 4(d) rule, this would also protect the NLEB as if it were endangered. Options going forward on this project include:<br>1. Use the USFWS's programmatic biological opinion on the 4(d) rule. If this opinion ceases to be available, project delays could result based on finding a new path forward under the below options. Thus, we do not recommend this option.<br>2. Use the FHWA/FTA/FRA Section 7 programmatic biological opinion for the Indiana and Northern long-eared bat, *but only if* the project fits the programmatic scope of that opinion (which includes a limitation of 20 acres of relevant impacts). If the NLEB status is changed to Endangered and/or the NLEB 4(d) Rule is vacated, this opinion would likely only require minor changes. FHWA is working with USFWS on a potential change now. With those changes, the project's consultation should stand. But this project may exceed the programmatic scope of that opinion.<br>Conduct a "standard" Section 7 consultation on the project with USFWS. Under this option, FHWA and the project team would coordinate with USFWS to determine if NLEB surveys are prudent and what potential mitigative measures would be incorporated into the project. USFWS may just request the same type of mitigative measures that are required in the 4(d) Rule. We recommend this option as presenting the least risk to project delivery. The consultation is likely to stand or require only administrative change if the NLEB listing and/or the 4(d) Rule changes. | We are currently coordinating with USFWS. We will have a contingency plan for if the programmatic biological opinion is overturned. |
| 241 | FHWA | Page 4-63 Section 4.20.1B | The formatting for the citations to the Virginia endangered species law should also be corrected. The dashes appear unusual. | Revised as noted. |
| 242 | FHWA | Page 4-63 Section 4.20.1B | The acronym NLEB is used but not defined. It appears to refer to the northern long-eared bat, which is mentioned earlier on the page. | Revised as noted. |
| 243 | FHWA | Page 4-63 Section 4.20.1B | Capitalize the "I" in the IPaC acronym. | Revised as noted. |
| 244 | FHWA | Page 4-63 Section 4.20.1B | For the purposes of section 7 consultation, the IPaC species list should be derived from an estimated "action area" as defined in 50 CFR 402.02. It should not be a "user-defined study area boundary." Furthermore, what IPaC provides, if used correctly, is an "official species list" and not an "IPaC." | Revised language in Section 4.20.1B to reflect comment, i.e., changed "user defined study area boundary" to "estimated action area," and changed pertinent "IPaC" references to "official species list." |
| 245 | FHWA | Page 4-63 Section 4.20.1B | "The USFWS recommended conducting surveys to determine if IB are utilizing summer habitat within the corridor study boundary." What is IB? I'm assuming Indiana bat, but this is not spelled out. | Revised as noted (added definition of "IB"). |
| 246 | FHWA | Page 4-63 Section 4.20.1B | Indiana Bats (IB) do not appear to be present in the study area. What is the basis for the extended discussion of IBs? | USFWS indicated that they wanted surveys conducted even though they were not included on the official species list. Text was revised to include this information. |
| 247 | FHWA | Page 4-63 Section 4.20.1B | This section could be pared down some. It overlaps with the existing conditions. | This section needed to be expanded to include requested information regarding Indiana Bat consultations and proposed surveys. However, details regarding Maryland state-listed plant surveys and results were moved out of the introductory/regulatory section and into the Existing Conditions. |

| 248 | FHWA | Page 4-69 Section 4.21 | If not covered in Section 4.15, reference should probably be made here to Maryland's Critical Area Commission and criteria for development in the critical area.  Development is restricted in the "critical area."  See COMAR 27.01.01.  See also Md. Code Ann., Nat. Res. § 8-1807.  The Critical Area includes all land within 1,000 feet of Maryland's tidal waters and tidal wetlands. It also includes the waters of the Chesapeake Bay, the Atlantic Coastal Bays, their tidal tributaries, and the lands underneath these tidal areas. | Not applicable. The Maryland Critical Area does not overlap with the project area and there are no tidal wetlands or waterways within the corridor study boundary. |
|---|---|---|---|---|
| 249 | FHWA | Page 4-71 Section 4.21.4 | Impacts have been identified; what is the corresponding mitigation? Provide details. | Text revised |
| 250 | FHWA | Page 4-71 Section 4.22.1 | Delete "the guidelines established by" in front of NEPA and replace with "in accordance with." NEPA and its implementing regs are laws not guidelines. | Revised |
| 251 | FHWA | Page 4-71 Section 4.22.1 | The methodology for the ICE analysis is disproportionately longer than any other of the methodology sections—suggest being more concise here. | Per MDOT SHA legal counsel's review, this section was expanded in the Administrative Draft, as well as other comments from FHWA review were to include more details from the technical reports, therefore no changes were made to this section. |
| 252 | FHWA | Page 4-71 Section 4.22.1 | Add s to include – "The ICE Analysis methodology includes the following four general steps." Step 1 – Increase in traffic usually results in noise impacts. Why is that not listed? | Revised per first part of comment.

Noise was not considered in the ICE.  There is not a generally accepted methodology for analyzing indirect and cumulative effects related to noise, and it is not standard practice for MDOT SHA to consider noise in the ICE. |
| 253 | FHWA | Page 4-77 Section 4.22.2 C | Replace "I-720" with I-270. | Revised |
| 254 | FHWA | Page 4-78 to 4-80 Section 4.22.2C | Figures 4-6 and 4-7 show projected population and employment for the study area, presumably for a plan scenario that assumes improvements in the I-270 and I-495 corridors. Table 4-19 discusses qualitative high-level impacts summarized from the ICE Technical Report (referenced in the traffic section of the DEIS?). Would the differences in future travel demand, traffic and congestion be significant for the No Build, particularly if there is less growth in Frederick County?

The current documents note the current mobility need and high degree of buildout. The qualitative discussion is good, but the discussion of no significant impact from induced development relative to the existing needs could use further amplification in the DEIS in addition to the discussion on pp 48-50 in the ICE Technical Report.

More analysis and discussion of the No Build is needed throughout the entire document. Each resource area states the No Build Alternative would not result in any study-related construction and therefore there would be no impacts; but this is not entirely true. The No Build does not necessarily mean there are no environmental consequences. | As part of the "Existing Conditions" (4.22.1) information, Tables 4-6 and 4-7 show the currently projected change in employment under the No Build Scenario. This section is intended to provide the background information necessary to consider potential ICE (presented in "Consequences, 4.22.3), not to convey the outcomes of a build alternative. The qualitative analysis summarized in Table 4-19 reflects the indirect effects that would be expected to occur as a result of the Build Alternatives, which could include growth and development not accounted for in the current estimates (4-6 and 4-7). It is not possible to accurately quantify how population an employment would change as a result of a Build Alternative, so our analysis relies on qualitative discussion of the potential changes. The growth predicted in Frederick County (Tables 4-6 and 4-7) is predicted to occur regardless of whether a Build Alternative is implemented.

Added a paragraph to the DEIS and the Tech Report to acknowledge the potential socioeconomic indirect effects of worsening traffic congestion under the No Build.  Beyond that, the analysis does not indicate any reasonably foreseeable ICE to other resources (cultural, natural, air). |
| 255 | FHWA | Page 4-82 Section 4.22.3B | Replace "Screened Alternatives" with Build Alternatives | Revised |
| 256 | FHWA | Page 4-83 Section 4.22.3B | Noise impacts were identified for this project; therefore, a discussion on cumulative effects should be considered. | Noise was not considered in the ICE.  There is not a generally accepted methodology for analyzing indirect and cumulative effects related to noise, and it is not standard practice for MDOT SHA to consider noise in the ICE. |
| 257 | FHWA | Page 4-83 Section 4.23 | The section identifies impacts on commitment of resources in a relatively general way by citing to previous discussions. However, it does not systematically analyze the different alternatives to compare how they differ regarding commitment of resources. A summary of that type would be helpful. | The text has been revised to include a discussion of No Build and Build Alternatives. |
| 258 | FHWA | Page 4-85 Section 4.23.2 B | Text states "Despite an anticipated increase in vehicle operating costs and toll payments under the Build Alternatives, these costs would be outweighed by benefits to both business and personal users in terms of travel time and reliability." Please provide data/analysis to support this conclusion. | This text has been removed.  It was based on the economic analysis of the Build Alternatives previously presented in Chapter 2.  However, based on other comments from FHWA this discussion in Chapter 2 has been removed and will be used in the FEIS for the rationale for the Preferred Alternative. |

| 259 | FHWA | Page 5-2 Section 5.3 | "…experience an impact from the Build Alternatives within the Proposed Action…" within the Proposed Action does not make sense. As a result of the proposed action is more appropriate; though up until this chapter "proposed action" has not been used except for the ICE section. Be consistent throughout the entirety of the document. | Text in DEIS Chapter 5 and Appendix E revised to clarify Proposed Action for the Section 4(f) Evaluation. |
| --- | --- | --- | --- | --- |
| 260 | FHWA | Page 5-2 Section 5.3 | Table 5-3 should be Table 2-7. | Comment noted. The information in Table 5-3 condenses information from two tables in Appendix E. |
| 261 | FHWA | Page 5-4, 5-5, 5-6 Section figures 5-1 through 5-3 | In these figures on right side (number and description of properties), indicate properties with no use, individually evaluated, de-minimis use and properties with exception in in different colors. | This revision will be addressed in the Final 4(f) Evaluation once the types of Section 4(f) approvals have been reviewed and commented on by the OWJ and commented on by the public. At this time, the information is detailed in Tables 5.1 to 5.3 which identify the use classification of Section 4(f) properties, individually evaluated Section 4(f) properties, and anticipated de minimis findings. |
| 262 | FHWA | Page 5-9 Section 5.3 | <mark>De minimis impact determinations cannot be made yet because there is not sufficient supporting documentation to demonstrate that the impacts, after avoidance, minimization, mitigation, or enhancement measures are taken into account, are de minimis as defined in §774.17; and that the coordination required in §774.5(b) has been completed.</mark> | On March 12, 2020, MDOT SHA received concurrence on all Section 106 findings. MHT also provided a signature acknowledging FHWA's intent to apply a finding of de minimis impact to all properties where it was requested. With regard to de minimis impacts to public park properties, MDOT SHA has met with the City of Rockville to discuss potential de minimis impacts to park properties for which they are an official with jurisdiction. MDOT SHA has additionally conducted extensive coordination with M-NCPPC Montgomery County and M-NCPPC Prince George's County and informed those agencies of FHWA's intent to apply de minimis impacts at certain park properties. Coordination with those agencies is ongoing to discuss avoidance, minimization, mitigation and enhancement measures. Coordination with additional local agency officials with jurisdiction over public parks is ongoing. The public will have an opportunity to comment on proposed de minimis impact findings concurrent with their review of the DEIS and Draft 4(f) evaluation. Full documentation of the coordination process required by 774.5(b) will be included in the Final 4(f) Evaluation. |
| 263 | FHWA | Page 5-10 Section 5.4 | <mark>Describe the "would cause other severe problems that outweigh the importance of protecting Section 4(f) properties…" in the description of the first 2 bullets.</mark> | Revised. These sections have been enhanced with additional detail from the Draft 4(f). For the first bullet – the No Build Alternative – the text added to support the designation of "other severe problems" was highlighted. For the second bullet – Increased Bus Transit – the additional text in support of "other severe problems" has been added via track changes. |
| 264 | FHWA | Page 5-12 Section 5.5 | OWJ = Official(s) with Jurisdiction, not owners. Revise throughout this section and in the Draft Evaluation in the appendix. Additionally, "Mitigation will be developed" instead of would. | Revised as noted.

Also changed to mitigation "will" as directed. |
| 265 | FHWA | Page 5-15 Section table 5.4 | Under discussion topic for NPS it says, "Cooperating agency invitation and acceptance…" Wouldn't the same apply to M-NCPPC Montgomery County and Prince George's Counties? | Revised Table 5.4. |
| 266 | FHWA | Page 5-15 Section 5.7 | Table 5-4 – M-NCPCC is a cooperating agency and should be noted as such since the other cooperating/participating agencies are identified as such. | Revised Table 5.4 to identify M-NCPPC as a cooperating agency. |
| 267 | FHWA | Page 6-1 Section 6.1 | The quoted language "to the maximum extent practicable and permitted by law" does not appear in the EO in the form quoted. | Text removed |
| 268 | FHWA | Page 6-1 Section 6.1 | Revise to read "to complete National Environmental Policy Act (NEPA) reviews <mark>within an agency average</mark> of two years of the publication of the Notice of Intent (NOI)." | Revised as noted |
| 269 | FHWA | Page 6-1 Section 6.1 | The final sentence in 6.1 is awkwardly worded. E.g. the final two listed items do not grammatically flow with the beginning of the sentence. For readability, the sentence should probably be broken up or redrafted. | Revised text to be clearer |
| 270 | FHWA | Page 6-1 Section 6.2 | Revise to read "The following are the Federal Cooperating Agencies with authorization <mark>decision</mark> responsibilities" | Revised as noted |
| 271 | FHWA | Page 6-2 Section 6.2 | Footnote 3 should read NCPC is not subject to the One Federal Decision <mark>Memorandum of Understanding (MOU)</mark> but has agreed to the "spirit" of the Executive Order 13807 | Revised as noted |
| 272 | FHWA | Page 6-2 Section 6.3 | States "Written concurrence was received on the Purpose and Need on May 16, 2018 and on the ARDS on June 5, 2019 and Revised ARDS on October 16, 2019." Is this statement accurate? | Yes, we sought re-concurrence a second time on the revised list of ARDS. No change made in text. |
| 273 | FHWA | Page 6-3 Section 6.4.1 | The NPS action would be taken in <mark>response</mark> to FHWA's proposed project, considering the potential impacts to the following NPS park properties | Revised as noted |



| 274 | FHWA | Page 6-3 Section 6.4.1 | States "The authorization by NPS is needed because the **applicant (FHWA)** has requested a transfer of use of properties and submitted preliminary plans to construct new managed lane facilities along I-495 and I-270." MDOT SHA is the applicant, please revise. When was this request done? | This land transfer process will be coordinated between FHWA and NPS once a ROD is signed and will be done in compliance with 23 U.S.C. 107(d) and NPS DO #87D: Non-NPS Roads. Chapter 6 has been revised to correct the language related to the land transfer process. |
| 275 | FHWA | Page 6-3 Section 6.4.1 | Table 6-1 – for the potential impacts from ARDS, is that the alternative with the most impacts? Ideally this should be the preferred alt impacts. | In the case of NPS lands adjacent to I-495, the impacts for the ARDS are the same along all the alternatives. The column heading in the table has been revised to state Alternatives 8, 9, 10, 13B, and 13C. |
| 276 | FHWA | Page 6-4 Section 6.4.2 | Suggest mentioning that USACE is not authorized to issue a combined FEIS/ROD and is thus exempt from the single ROD requirement of EO 13807. | No longer applicable. No change |
| 277 | FHWA | Page 7-2 Section 7.2 | Suggest describing some common themes from the comments received from public workshops. | Updated |
| 278 | FHWA | Page 7-2 Section 7.2.2 | Remove "race/ethnicity" in the first sentence (To ensure public engagement of minority ~~race/ethnicity~~ populations, low-income populations, and other underserved populations…) | Updated |
| 279 | FHWA | Page 7-3 Section 7.3.1 | "The list of two Lead, eight Cooperating, 18 Participating, and seven Notified agencies is provided in Table 7-1." This is the first time the document speaks to there being 2 leads, 8 cooperating, and 18 participating. Section 6.1 references to the cooperating and participating but does not give a comprehensive table like 7-1. Chapter 6 also says FHWA is the lead Federal agency – so not clear that MDOT is a lead project sponsor. This needs to be clarified and the cooperating agencies should be listed much early on in the document, preferably the summary, so there is context for when there are references to cooperating agencies. | Updated Ch. 7 and Exec. Summary. Exec. Summary already describes 2 leads on page ES-2 in, "Who is Leading the Study?" FHWA as the Lead Fed. Agency and MDOT SHA as the Local Project Sponsor. Added the following section underneath this section, "Who are the Cooperating, Participating, and Notified Agencies?" Added a copy of Table 7-1 in this new section. |
| 280 | FHWA | Page 7-8 Section 7.4 | Incorporation of public and agency input should include how input was accessed and included. General PI comment – were there separate meetings for EJ communities? What was the public involvement plan? If EJ meetings were combined, was location accessible to all in the community or were they held in separate locations? | Updated MDOT SHA participated in combined and separate meetings with EJ communities. E.g., MDOT SHA had several Public Workshops, Community Association Meetings, and pop-up events in Community Effects Assessment Analysis Area Communities that contain one or more previously identified areas of Environmental Justice concern. MDOT SHA also participated in two community meetings with the City of Glenarden. |
| 281 | FHWA | Page 7-9 Section 7.4 | Also include Alternative 5 and Alternative 9 Modified in response to agency comments. SHA has done a great deal of coordination with M-NCPPC, NPS, etc. to minimize impacts, so this should also be noted here. | Updated |
| 282 | FHWA | Page 8-1 Section 8 | Needs to be edited for consistency abbreviations like env vs environmental – spell out all words. | Updated |
| 283 | FHWA | Page 8-1 Section 8 | Delete "of" after degree to be consistent with all the other preparers. | Updated |
| 284 | FHWA | Page 9-1 Section References | This needs to be a comprehensive list of references cited throughout the body of the document. For example, the reference to Jones et al., 2000 in Section 4.18 is not listed here. | Updated References chapter (was Chapter 9, is now Chapter 10). |
|  | **Appendix B - Traffic** | | | |
| 285 | FHWA | Appendix B – Traffic Tech Report | Needs a table of contents and clear delineation of reference materials. | Table of Contents and references are provided. |
| 286 | FHWA | Page 1 Section 1.2 | Consider stating the beginning and ending study limits for I-270 and I-495. | Already described. Unclear on what comment is asking. |
| 287 | FHWA | Page 4 Section 1.4. A | Update completion date for ICM similar to DEIS [page 2-23]. | Revised |
| 288 | FHWA | Page 5 Section 1.4. B | Remove last sentence referencing Alternative 8 as it does not belong under Alternative 5. | Revised |
| 289 | FHWA | Page 8 Section 2.1 A | Consider break up the 2nd sentence. It is long with many commas and difficult for reader to keep up with the references. | Updated. This sentence has been reformatted as a bulleted list. |
| 290 | FHWA | Page 21 Section 2.7 | Consider providing more details on the volume balancing methodology and steps which they were completed. | Updated. Additional information has been added to the volume balancing methodology. |
| 291 | FHWA | Page 36 Section 2.9 | Update information inside Key Points box (last two bullets) to reflect the same information included as part of 2018 SHA Mobility Report. | Updated |

00189836

| 292 | FHWA | Page 39<br>Section Table 2-5 & 2-6 | Ensure there is consistency with similar tables [Table 1-1 & 1-2] on the DEIS [page 1-5] for the *'Projected 2040 TTI'* and *'Forecasted % Increase'* columns.  Please advise which report has the correct data. | DEIS Chapter 1 was revised to match what is shown in the Traffic Technical Report. |
| 293 | FHWA | Page 40<br>Section 2.11 B | Remove duplicate sentence: *"The MWCOG Model utilizes a four-step trip-based model framework with feedback between traffic assignment and distribution."* | Updated |
| 294 | FHWA | Page 52 and Appendix D<br>Section 2.12 | VISSIM Calibration – The calibrated results exceed the 10% volume difference as well as the GEH threshold.  Is the model considered calibrated? Discussion is needed to clarify calibrations results and justify the method of the calibrations. | Updated. This section was expanded to provide additional discussion on the calibration results and conclusions (the model is considered calibrated). |
| 295 | FHWA | Page 52<br>Section 2.12 B | This section stated that the calibration followed MDOT SHA's VISSIM Modeling Guidance (August 2017).  Given the complexity and size of this modeling effort, was there any deviation from the guidance?  If so, please document them in the report. | Updated.  This section was expanded to include a discussion of the calibration considerations that were given for this study (i.e., considerations due to the complexity and size of this modeling effort as well as the reliability and volatility of the study corridors). |
| 296 | FHWA | Page 66<br>Section 3.3 & 3.4 | Table 3-4 displays the percentage of vehicle demand met for locations on I-270 and I-495 for 2017. The document does not provide a description of this measure or its relevance. It may be confusing because the table is all green and the corresponding existing conditions maps, figures 3-9 & 3-10 have significant amounts of red, orange and yellow that represent the Levels of Service. Without any discussion of the percentage of vehicle demand met measure appears to contradict the existing conditions represented in figures 3-9 & 3-10 and table 2017. | Updated. Color-coding was revised to better reflect the operations of the segments. |
| 297 | FHWA | Page 77, Appendix C<br>Section Memo- Summary of Findings for Traffic Relief Plan Study based on the Regional Travel Demand Modeling Process | - Alternatives 2 to 4 in this memo are different from the report. For example, Alternative 2 is the memo consist of 2 managed ETL on I-495 and I-270 as well as the connection to the VA HOT lanes through the American Legion Bridge. The closest alternative to this in the report is Alternative 10, which consists of 2 managed ETL on I-495 and I-270 as well one HOV lane on I-270.  It is close but does not match 100%.   Please clarify how are the MWCOG alternatives being used for the analyses of the alternatives listed in the report.  The report should indicate which MWCOG alternative is used as the basis for which of the report alternative.<br>- For the toll rate prediction, since the alternatives are different from the report, are these toll rates applicable? If so, please clarify. | Section 4.2 and Appendix C discusses the initial screening of alternatives, which includes the original Alternatives 2-4. Section 4.3 discusses the travel demand modeling that followed the initial screening (which includes the alternatives in this report).<br><br>These toll rates were used solely for the purposes of the MWCOG analyses to maintain a minimum average operating speed of 45 mph in the managed lanes. Toll rates have not been finalized; however, the rates assumed in these models can be considered reasonable for this planning effort. |
| 298 | FHWA | Page Appendix C<br>Section | Appendix C (from Traffic Technical Report) pdf bookmark is not working. | Corrected. Bookmark has been fixed |
| 299 | FHWA | Page 81<br>Section 4.4 D | It stated that "Along I-270, AM growth was 97 percent of the ADT…".  Does this mean that 97% of the growth (traffic volume) in ADT is expected to be in AM peak? Or does it mean that AM peak volume is projected to grow by 97%. | AM volumes are expected to grow at 97% of the ADT growth rate.  The text has been reworded for clarity. |
| 300 | FHWA | Page 93<br>Section 5.2 | Please extend 'Key Points Box' as the word 'lanes' was cut off. | Corrected. Key Points box has been fixed. |
| 301 | FHWA | Page 95<br>Section Figure 5-14 | The graph used is the exact same one as Figure 5-13. Please update with correct one. | Corrected. Figure 5-14 has been updated with the correct graph. |
| 302 | FHWA | Page: 109<br>Section | Tables 5-13 & 14 also display the percentage of vehicle demand met for locations on I-270 and I-495 for 2025 and 2040 respectively. Same comment as above where the colors displayed in tables 5-13 & 14 not appearing consistent with figures 5-39 & 40 and the 2040 column in table 5-21. | Updated. Color-coding was revised to better reflect the operations of the segments. |
| 303 | FHWA | Page 118<br>Section 5.3 | The following statement is not accurate per table 5-17, *"Alternative 8 did not provide any vehicle throughput benefit on I-495 at MD 5 during the PM peak period, though it did increase person throughput."* Alternative 8 provides 20% vehicle throughput benefit on I-495 at MD 5 during the PM peak period. | Corrected (this sentence has been removed). |
| 304 | FHWA | Page Appendix E<br>Section | Please provide legend for the speed map similar to what is the report.  It is assumed the 45mph is the green. | Appendix E has been updated accordingly. |



| 305 | FHWA | Page General Section | When will appendix J be available for review? | The draft sensitivity analysis memo was sent to FHWA on December 20, 2019 for review. FHWA's review was ongoing as of January 10, 2020 – the date the first draft of the DEIS was sent to the agencies. The project team received comments from FHWA on January 21, 2020. The project team has addressed these comments and the sensitivity analysis memo will be included in the March 2020 submittal as Appendix J of the Traffic Technical Report. |
|---|---|---|---|---|
| | | | **Appendix D – Community Effect Assessments/Environmental Justice** | |
| 306 | FHWA | Page 10 Section 2.1 | The last ACS data is from 2012-2016. Check for updates including the 2018 releases. Adverse effects need to be fully considered per 23 USC 109(h). | No change— demographic data to be updated in FEIS for final EJ analysis and Title VI analysis |
| 307 | FHWA | Page 14 Section 2.3 | In the 2nd paragraph, 2nd sentence, there is reference to the "Build Alternatives". However, they're referred to as "Screened Alternatives" in other documents (i.e. Natural Resources). Recommend consistency. | Changed to "Screened Alternatives" throughout |
| 308 | FHWA | Page 14 Section Table 2-2 | Consider whether it would be beneficial to include how much ROW is required for each alternative beyond existing | No change— this level of detail may be provided in the FEIS rather than the DEIS |
| 309 | FHWA | Page 16 Section 3.1.1 | In the last bullet ("Transportation"), include bicycle and pedestrian facilities, as appropriate. | Revised |
| 310 | FHWA | Page 28 Section 3.1.2 B | In the 1st sentence, revise to "…in the conversion of existing land use to right-of-way…" | Revised |
| 311 | FHWA | Page 29 Section 3.1.2 B | In the 3rd full paragraph, 1st sentence, revise to "With the exception of 29 to 38 full property acquisitions (depending on the build alternative), the land use conversions…" | Revised |
| 312 | FHWA | Page 30 Section 3.1.2 B | In the 3rd full paragraph, only sentence, any concern with 'predetermination' with this statement? Deserving of additional information/clarification? | Sentence deleted |
| 313 | FHWA | Page 30 Section 3.1.2 B | In the 4th full paragraph, the sentence is oddly written… revisit and revise, as appropriate. | No change, it was unclear what text the comment was referring too |
| 314 | FHWA | Page 34 Section 3.2.1 D | Update income data for CEA Analysis area if available. | No change— demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 315 | FHWA | Page 34 Section 3.2.1 E | Is this the most recent data to determine race and ethnicity characteristics? | No change— demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 316 | FHWA | Page 35 Section 3.2.2 E | The last sentence of the last paragraph is incoherent due to missing words. What is negligible? | Deleted typos |
| 317 | FHWA | Page 36 Section 3.2.2 B | In the 1st paragraph, last sentence, recommend revising to "Additionally, the number of residents that would be relocated (less than 40) would be a small proportion…" | Revised text (however, omitted "less than 40" because the number of relocated residents, while low, is not known) |
| 318 | FHWA | Page 36 Section 3.2.2 B | 2nd paragraph, 2nd sentence: There is some research that indicates local business owners prefer increased traffic on local roadways, even if congested, to increase visibility and therefore the chances passersby pay a visit. Consider whether this is a valid concern in the project areas/communities and address accordingly. | No change— recommend keeping as-is |
| 319 | FHWA | Page 36 Section 3.3.1 A | Here, 2018 Census Data is used re: persons employed by the Armed Forces, but older Census data is used in most other areas. Why? | No change— demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 320 | FHWA | Page 37 Section 3.3.1 A | In comparing the effects of the Build Alternative in 3.2.2 B where it is stated that the 2010 through 2030 regional population growth will expand it is not clear whether it should be inferred that the growth rate in the CEA Analysis area discussed in 3.2.2 E, page 35, will increase, remain constant or decrease. | No change - wording seems appropriate |
| 321 | FHWA | Page 47 Section 3.3.2 B | In the last paragraph briefly state the location of the proposed relocation of the 4 businesses and the 24-35 residences. | Added CEA Analysis Area community locations |
| 322 | FHWA | Page 49 Section 3.4.1 | In the last paragraph, what year was the bulleted data sources relied upon to determine low income subsidized housing within the CEA Analysis area? | No change— added references and dates at the end of the TR |
| 323 | FHWA | Page 50 Section 3.4.2 | Briefly state the locations of the impacted properties based on Alternatives 5, 8, 9, 10, 13B, and 13C. This makes it easier for the reader to grasp the information. | Added CEA Analysis Area community residential locations |
| 324 | FHWA | Page 50 Section 3.4.2 B | 3rd paragraph, 2nd sentence re: 8,137 vacant units: Has there been a Conceptual Stage Survey (even if preliminary) to verify actual # of available residences? If so, recommend including statement noting this. | No change— a Conceptual Stage Survey is outside the scope of research at this point in the Study |

| 325 | FHWA | Page 57 Section 3.5.2 B | In the first paragraph, state how the specific populations will be impacted by the ROW acquisition properties adjacent to I-495 and I-270 roadway alignment. Make sure that the information is not completely buried in the Appendix. | Added table/references to table with CEA Analysis Area Community Profile highlights (including acreage of property acquisitions, number of full property acquisitions, noise abatement, and page number references to Community Profiles) |
|---|---|---|---|---|
| 326 | FHWA | Page 57 Section 3.5.2 B | In the 2nd paragraph, 2nd sentence there is reference to "added ramps…" In the 1st paragraph there is no mention of additional ramps as part of "construction of a Build Alternative." Recommend clarifying whether the Build Alternatives would include new/additional ramps. | Added "direct access at-grade auxiliary lanes or ramps" to the list of Build Alternative construction elements and changed throughout and in DEIS Ch. 4 |
| 327 | FHWA | Page 58 Section Table 3-9 | Recommend including a footnote or other reference that the impacts to the properties listed in the table are partial acquisitions. | Added table footnote: "*All community facility property impacts are partial acquisitions. No community facilities would be relocated under any Screened Alternative." |
| 328 | FHWA | Page 61-62 Section 3.6.2 | In the last paragraph of page 61 and the first paragraph of page 62- for each bullet point, in parenthesis, make a reference to the Tables of Figures where populations may be determined, i.e., information to determine demographics, ethnicity, income. | No change— keep as-is; there is no clear reference for demographics by alternative |
| 329 | FHWA | Page 64 Section 4.1.1 | Please refer to the USDOT Standard Title VI/Non-Discrimination Assurances signed by the Secretary of MDOT and SHA's Administrator. The USDOT Standard Title VI/Non-Discrimination Assurances is the official assurance statement signed by heads of State transportation agencies. The Implementation Plan is a description of how the agency intends to implement the Title VI requirements. | Added statement on Title VI Compliance, including Non-Discrimination Assurance |
| 330 | FHWA | Page 66 Section 4.1.2 B | Data to determine low income populations is dated 2012-2016, Is this the most current data available. | Demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 331 | FHWA | Page 67 Section 4.1.2 B | Are the HHS 2016 Poverty Guidelines the most current HHS guidelines available? | Demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 332 | FHWA | Page 67 Section 4.1.2 B | Is the HUD 2016 FMR/Income Limits shown in Table 4-1 the most current data available? | Demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 333 | FHWA | Page 67 Section 4.1.2 B | The 2nd full paragraph, last 2 sentences identifies how low-income populations/block groups are determined. Is this methodology based on past similar analyses? EPA receptive to this this methodology? | EPA confirmed EJ methodology is satisfactory in latest review |
| 334 | FHWA | Page 68 Section 4.1.2 D | The reference to Section 2.4 should read Section 4.2.4. | Corrected |
| 335 | FHWA | Page 68 Section 4.2.1 | The reference to Section 1.2.A should read Section 4.2.1 A. | Corrected |
| 336 | FHWA | Page 69 Section Table 4.2 | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change— already in landscape and font size is 11 throughout Table |
| 337 | FHWA | Page 70 Section No title with table | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change— already in landscape and font size is 11 throughout Table |
| 338 | FHWA | Page 71 Section No title with table | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change— already in landscape and font size is 11 throughout Table |
| 339 | FHWA | Page 72 Section No title with table | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change— already in landscape and font size is 11 throughout Table |
| 340 | FHWA | Page 73 Section No title with table | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change— already in landscape and font size is 11 throughout Table |
| 341 | FHWA | Page 74 Section No title with table | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change — already in landscape and font size is 11 throughout Table |
| 342 | FHWA | Page 75 Section No title with table | Enlarge the numbers so that they can be read easily. Consider using landscape format. | No change — already in landscape and font size is 11 throughout Table |
| 343 | FHWA | Page 82 Section 4.2.3 A | Is there updated information for limited English-Speaking households? | Demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |

**MLS Administrative Draft – DEIS Agency Comments**
Errata Sheet

| 344 | FHWA | Page 82 Section 4.2.3 B | Use updated annual information from the Virginia Department of Education for free and reduced-price lunch programs. | Demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
|---|---|---|---|---|
| 345 | FHWA | Page 82 Section 4.2.3 B | Use updated annual information from the Maryland state Department of Education for free and reduced-price lunch programs. | Demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 346 | FHWA | Page 83 Section 4.2.3 C | To support outreach efforts data is being used from 2010 that is designed to identify places of worship within CEA Analysis Area Communities that contain minority or low-income populations. Updated information should be used. | MDOT SHA is utilizing the latest accessible data |
| 347 | FHWA | Page 84 Section 4.2.3 D | When was the HUD Multifamily Assistance & Section 8 Data base accessed to obtain the information in this section? | The database was accessed and current as of June 2018, when the data for the Tech Report was collected. |
| 348 | FHWA | Page 85 Section 4.2.3 E | Is there updated data concerning Food Stamps/SNAP Benefits? | No change— demographic data will be updated for FEIS EJ analysis and Title VI analysis on Preferred Alternative |
| 349 | FHWA | Page 86 Section 4.2.4 | Indicate here where they reader may go to determine how the following issues will be addressed in this document: 1) 32 out of 112 total block groups in Montgomery County were identified as areas of EJ concerns; and 2) 79 out of 82 block groups in Prince George's County were identified as areas of EJ concerns. | Revised |
| 350 | FHWA | Page 89 Section 4.3.1 | Include all dates for Public Outreach efforts. | Added reference to Spring 2018, Summer 2018, and Spring 2019 for the advertisement campaigns; added "including outreach dates" to statement on additional detail available in Public Involvement Tech Report. |
| 351 | FHWA | Page 89 Section 4.3.2 | Include all dates for avenues addressing the low turn-out rates in Prince George's County for Public Outreach efforts. | Revised |
| 352 | FHWA | Page 93 Section 4.4 | Indicate here where the reader can locate all data, tables, figures, chart that pertain to Environmental Justice Analysis Results. | Information is provided throughout section |
| 353 | FHWA | Page 94 Section 4.4.2 | First paragraph- Briefly describe a breakdown as to where the Alternatives impact specific communities. It is indicated that 7or 8 residences (depending on the Alternative selected) in Silver Spring would be impacted. However, are the remaining 26 or 27 residences to be relocated in Prince George's County? If so, state this here. Do not bury this information in the Appendix. | Provided additional information on ROW and property impacts for the reader based on areas between interchanges.  Detailed property impacts will be developed as the Study progresses. |
| 354 | FHWA | Page 94 Section 4.4.2 A | Include the date of the referenced Air Quality Technical Report. | All Technical Reports are dated March 2020 and will be published in both the DEIS and the FEIS |
| 355 | FHWA | Page 94 Section 4.4.2 A | In the 7th sentence, what is being referred to by "increasing travel choice"? Is this focused on the mainline, local network, both? | Mainline (as referenced in Purpose and Need) |
| 356 | FHWA | Page 94 Section 4.4.2 B | Regarding Air Quality, any consideration given to mobile point source emissions and/or AQ benefits from the Build Alternatives? In other words, as opposed to the regional context, was any analysis conducted to determine whether there will be reduced EJ population exposure to actual tailpipe emissions? | MSAT emissions were analyzed for the Screened Alternatives end-to-end and were not reviewed at specific geographic areas or EJ population as the impacts would affect EJ population and non-EJ populations alike.  The details on the MSAT analysis are included in the Air Quality Technical Report. |
| 357 | FHWA | Page 95 Section 4.4.2 C | The 1st paragraph, 2nd sentence notes that existing noise barriers would be replaced. Would the barriers be optimized as part of the noise analysis, as well? Replaced in kind? | Several noise barrier scenarios have been analyzed for this Study: existing noise barriers that would remain in place; existing noise barriers that will be displaced by construction and would be replaced by a reconstructed barrier on a new alignment; existing noise barriers that would be reconstructed and extended; and new barrier construction. |
| 358 | FHWA | Page 95 Section 4.4.2 C | Additional consideration: Note that EJ communities will not be excluded from the FD noise public involvement process (or something similar). | The noise barrier public involvement process will occur in final design and include both EJ and nonEJ communities. |
| 359 | FHWA | Page 95 Section 4.4.2 C | Include the date of the referenced Noise Technical Report. | All Technical Reports are dated March 2020 and will be published in both the DEIS and the FEIS |
| 360 | FHWA | Page 96 Section 4.4.2 E | Include the date for the Hazardous Materials Technical Report. | All Technical Reports are dated March 2020 and will be published in both the DEIS and the FEIS |
| 361 | FHWA | Page 96 Section 4.4.2 F | Include the date for the Natural Resources Technical Report. | All Technical Reports are dated March 2020 and will be published in both the DEIS and the FEIS |
| 362 | FHWA | Page 97 Section 4.4.2 J | Consider noting whether vacant housing is available within the same EJ communities where they are being displaced. | Based on available data this conclusion cannot be made. |

| 363 | FHWA | Page 99<br>Section 4.5 | Recommend including a statement that EJ communities will be provided the same opportunities to participate in public involvement as non-EJ communities. | Yes and implied throughout |
|---|---|---|---|---|
| 364 | FHWA | Page 100<br>Section 4.5 | 1st paragraph, 2nd sentence: Revise "applicable" to "practicable" or similar. | Revised |
| 365 | FHWA | Page 101<br>Section 5 | A brief summary paragraph of the significance and results of the Community Profiles and Effects should be stated here so the reader may comprehend the significance even if the numerical information may be contained in Appendix C. | Added table with CEA Analysis Area Community Profile highlights (including acreage of property acquisitions, number of full property acquisitions, noise abatement, and page number references to Community Profiles) |
| | | **Appendix E – Draft Section 4(f)** | | |
| 366 | FHWA | General | When citing the United States Code use periods, e.g., 54 U.S.C. 306108 | This has been revised and addressed throughout. |
| 367 | FHWA | General | For those historic properties where we directly abut the LOD or are inside the LOD in any amount, the FPO should review the DOE and boundaries and the affects findings before we publish the DEIS in order to minimize litigation risk. There may be a couple properties where we should challenge the DOE and/or boundaries and the time to do that is now. | Discussed in the meeting with FHWA, in Maryland sliver takes of non-contributing elements are commonly found to be no adverse effect. MHT concurred on 3/12/2020 with Section 106 effects determinations and acknowledged de minimis impacts where relevant. |
| 368 | FHWA | Page 2<br>Section Cultural<br>Resources Vol 2<br>Appendix B | The archeological survey does not include Virginia | Not applicable to 4f document |
| 369 | FHWA | Page 4<br>Section 1.2.1 | ACHP Paragraph -- clarify penultimate sentence | Discussed at FHWA meeting on 2/24/2020. 4(f) and Section 106 regulations conflict. FHWA was informed of our approach and the FHWA Federal Preservation Officer agreed. Language with specific references to 36 CFR 800 and 23 CFR 774 has been added. |
| 370 | FHWA | Page 6<br>Section 1st Full<br>paragraph | says there will be a constructive use analysis and indicates we will include every property "possibly adversely effected" under section 106. That is not the correct standard. See 23 CFR 774.15(b) & (c). Negative constructive use findings can minimize litigation risk and may be desirable so let's discuss. | In response to this comment, MDOT SHA has removed the word "possibly" from this sentence. The intent of this language is to refer to 23 CFR 774.15(f)(1), so that any properties that result in a Section 106 finding of adverse effect but do not experience a permanent incorporation would receive a constructive use analysis. However, MHT concurred on 3/12/2020 with the Section 106 effects and there are no historic properties that fall into this category. |
| 371 | FHWA | Page 7<br>Section 1.2.3 | add cite to the "feasible and prudent avoidance alternative" definition in 23 CFR 774.17 | Citation added |
| 372 | FHWA | Page 7<br>Section 1.2.4 | add cite to the "all possible planning definition in 23 CFR 774.17 | Citation added |
| 373 | FHWA | Page 7<br>Section 1.2.5 | fix cite to least overall harm - correct cite is 23 CFR 774.3(c)(1) | Citation corrected |
| 374 | FHWA | Page 10<br>Section 1.2.6 | #'s 3 and 4 -- cite to legal authority for exception | Citations added |
| 375 | FHWA | Page 10<br>Section 1.2.8 A | it would help the reader if we could list the parks in the study area to which Capper-Cramton applies | Table added listing the parks |
| 376 | FHWA | Page 11<br>Section 1.2.8 B | The heading of this section, rather than just "section 6(f)" should include the name of the LWCF statute so as to reduce confusion with "section 4(f)" | Revised |
| 377 | FHWA | Page 11<br>Section 1.2.8 B | It would help the reader if we could list the parks in the study area to which Section 6(f) applies | Added |
| 378 | FHWA | Page 11<br>Section 1.2.8 B | add a citation to the 6(f) regulations - 36 CFR Part 59 | Revised |
| 379 | FHWA | Page 10-12<br>Section 1.2.8 A B C | if Capper-Crampton/Section 6(f)/Section 106 are addressed in the DEIS add a cross-reference | Capper-Cramton and Section 6(f) are covered in the Section 4(f) document. A reference to the Cultural Resources Technical Report was added. |
| 380 | FHWA | Page 12<br>Section 1.2.8 D | add sentence to the end explaining who/how/when the demonstration will happen. Because it can be read as drafted this is a federal responsibility under 4(f) and it is not. | Highlighted language has been added at the end of this paragraph (now on Page 13) to detail how the state-regulated process will be coordinated and documented. |
| 381 | FHWA | Page 12<br>Section 1.3.1 | The purpose and need (P&N) should not be treated as a subsection of the proposed action. The P&N must be a standalone section. | The purpose and need section has been separated out as a dedicated section. |
| 382 | FHWA | Page 13<br>Section 1.3.2 | last sentence says "the five build alternatives are described in detail in the DEIS and summarized below" - As the DEIS is 300 pages, it would help the reader to know the section number within the DEIS, or at least the chapter, that is being referred to. | A citation has been added to direct readers to the relevant part of the DEIS – Chapter 2, Section 2.6. |

00189841

| 383 | FHWA | Page 14 Section 1.3.2 A - E | add a citation to the visual depiction of each alternative | Revised References have been added to Section 2.6 of the DEIS for a more complete description of the Alternatives. References to figures of the typical sections for each of the alternatives (in the 4(f)) have also been added. |
|---|---|---|---|---|
| 384 | FHWA | Page 18-22 Section Figure 2-3 | It would help readers if we indicate properties with no use, individually evaluated, de-minimis use and properties with exception in in different colors in figure 2-3 on right side (number and description of properties). | This revision will be addressed in the Final 4(f) Evaluation once the types of Section 4(f) approvals have been reviewed and commented on by the OWJ and commented on by the public. At this time, the information is detailed in Tables 2-1 through 2-3. |
| 385 | FHWA | Page 26 Section 2 | Add a column to Table 2-2 for type of exception | Column added |
| 386 | FHWA | Page 28 Section 2.1.1 | Would it help readers if we indicate referenced Section 4(f) property number from Figure 2-1? e.g. 2.1.1 George Washington Memorial Parkway (2). If so, include it through out Section 2.1 and 2.2 | References have been added to figures for each of the Section 4(f) properties. This way readers are referred to more specific maps than the general overview map. |
| 387 | FHWA | Page 30 Section 2.1.2 | There is a PA being developed now, there will be separate MOAs with the different NPS units for those parks having an adverse effect and who will be responsible for the mitigation? | FHWA and NPS have discussed one MOA to cover the mitigation and other commitments from the Study. |
| 388 | FHWA | Page 32 Section 2.1.3 | Please check 5.5 miles in Table 2-1 vs 6.8 miles in text. | Corrected incorrect value (6.8 miles changed to 5.5 miles). The exact size and boundary of Clara Barton Parkway is subject to continuing coordination among FHWA, MDOT SHA, and NPS and will be finalized in the Final Section 4(f) evaluation. |
| 389 | FHWA | Page 32 Section 2.1.3 | "The revocable permit reduces the use of Section 4(f) parkland to 0.1 acres". How many acres is the revocable permit? Does NPS agree with this reduction? | Subsequent discussions between FHWA and NPS have occurred and NPS' disagreement with land within existing easements has not been resolved. Per FHWA direction, MDOT SHA is proceeding under the assumptions made to determine impacts as displayed in the January 2020 Administrative Draft DEIS No. 1. Coordination between NPS and FHWA will continue regarding ROW near NPS properties. |
| 390 | FHWA | Page 37 Section 2.1.4 | Please check 37.8 acres in Table 2-1 vs 18 acres in text. | The original number 37.8 acres was reported erroneously. This was the area of the portion of the park within the Corridor Study Boundary. MDOT SHA checked with M-NCPPC Montgomery County and determined the correct side of the park unit is 105.0 acres. |
| 391 | FHWA | Page 37 Section 2.1.4 | When will this *de minimus* determination be made? | Prior to the FEIS following the required public comment period on intent to make *de minimis* findings. |
| 392 | FHWA | Page 38, 42 Section 2.1.5 | "Fig. 2-7 shows that widening of the roadway will bring it significantly closer to one of the golf courses putting green, was a noise analysis conducted for this specific location of the golf course?" | New language addressing change in noise at the golf course has been added. Noise was modeled but the location does not qualify for noise mitigation. |
| 393 | FHWA | Page 44 Section 2.1.7 | Please check 1.9 acres in Table 2-1 vs 34.8 miles in text. | Revised to 34.7 acres in Table 2-1 and in the text per the MIHP form. |
| 394 | FHWA | Page 45-46 Section 2.1.8 | Does the widening towards the inner loop side violate the covenant? If so, how will this be handled? | Using "covenant" was a poor choice of words. The actual ROW agreement between MDOT SHA and M-NCPPC is a perpetual easement, a term which is used earlier in the same sentence. The agreement was altered in the 1982 when the capacity of the highway exceeded 6 lanes. Language in the document has been updated to reflect the need for a new ROW agreement between the agencies. |
| 395 | FHWA | Page 47 Section 2.1.9 | Was part or all of 0.4 acre of impacted resource bought with CC funds? If so, include NCPC in Official with Jurisdiction. If not, a statement reflecting this should be made. | The information MDOT SHA has on which tax parcels were acquired or improved with CCA funds was provided by M-NCPPC on 11/4/2019. Detailed review of the spreadsheet shows that contrary to what was written in the Draft 4(f) Evaluation, M-NCPPC did not provide information about whether the parcel, which comprises Locust Hill Neighborhood Park, was acquired with CCA funds or the park was expanded with the use of LWCF Act funds. Prior to construction of I-495, however, the parcel comprising Locust Hill Park was originally part of Rock Creek Park, portions of which were acquired with CCA funds. At this time, MDOT SHA has no additional information about whether Locust Hill NP was acquired with CCA funds (or expanded with LWCF Act funds), so the references to CCA and LWCF Act have been removed from the 4(f) Evaluation. Coordination with M-NCPPC is ongoing. If additional information is provided, it will be included in the Final Section 4(f) Evaluation.

NCPC does not own or administer the properties in question and are not empowered to represent the agency on matters related to the park based on the Administrative Agreement between M-NCPPC and NCPC. That agreement clearly states that title to the land purchased with Capper Cramton funding vests with the State. |

| 396 | FHWA | Page 53 Section 2.1.11 B | Is NPS official with Jurisdiction for this property?  On page 53, it says coordination will be done with NPS. | A search of the sections associated with National Park Seminary could not find a reference to NPS as an OWJ for the property.  MDOT SHA can confirm the Section 4(f) property is an historic site. Section 106 resulted in an adverse effect finding. As such, the officials with jurisdiction over National Park Seminary are ACHP and MHT. |
|---|---|---|---|---|
| 397 | FHWA | Page 63 Section 2.1.17 | What are the impacts of locating a storm water management facility on the recreational activities on the golf course? | Language revised to identify location of SWM facility and that it will not affect game play. |
| 398 | FHWA | Page 79 Section 2.1.23 B | Was part or all of 3.2 acre of impacted resource bought with CC funds? If so, include NCPC in Official with Jurisdiction. If not, a statement reflecting this should be made. | Sufficient records detailing which particular parcels were acquired or improved with CCA funds have not yet been located by M-NCPPC, NCPC or provided to MDOT SHA.  NCPC does not own or administer the properties in question and are not empowered to represent the agency on matters related to the park based on the Administrative Agreement between M-NCPPC and NCPC. That agreement clearly states that title to the land purchased with Capper Cramton funding vests with the State. |
| 399 | FHWA | Page 100 Section 2.1.34 | If Section 106 effects cannot be fully determined now and you are assuming the Proposed Action would result in an adverse effect, is there an opportunity later during design and construction to make this determination and how would this effect the mitigation being proposed? | Discussed in the 2/24/2020 meeting with FHWA. Since that time, MHT concurred on an adverse effect via letter dated March 12, 2020. The effect determination for a few properties remains unknown and will be revisited as design progresses. For the Draft Section 4(f) Evaluation, an adverse effect was assumed, and those properties were individually evaluated.  If the effect determination for these few properties remains unresolved, language will be stipulated in the PA for further evaluation during design and mitigation developed as applicable. |
| 400 | FHWA | Page 101 Section 2.1.35 B | Section 4(f) use of Alternative 5 is presented.  Please indicate that alternative 5 does not meet P&N and Is not part of the build alternatives. I am assuming that Section 4(f) use by other build alternatives for Glenarden Historic District is 0.8 acres. | Reference to Alternative 5 was deleted. |
| 401 | FHWA | Page 107 Section 2.1.40 | What are the impacts of locating a storm water management facility on the recreational activities on the golf course? | Douglas E. Patterson Park does not include a golf course. |
| 402 | FHWA | Page 109 Section 2.1.43 | will expansion limit the potential extension of the trail? | Language revised to indicate extension would not be affected |
| 403 | FHWA | Page 136 Section 2.2.11 | What are the potential impacts of locating storm water management facilities adjacent to recreational properties? | The language at the end of the paragraph explains the proposed relocation of the walking path. Language added to indicate the OWJ's preliminary agreement to the location of the facility |
| 404 | FHWA | Page 137 Section 2.2.12 | add "; and in consideration of public comments" since the resource is also a public park. | Text added |
| 405 | FHWA | Page 140 Section 2.2.15 B | Please verify reference to Figure 2-37. Should the reference be to Figure 2-38? | Reference revised to Figure 2-38. |
| 406 | FHWA | Page 141-142 Section 2.3 | Table 2-6 type of exception listed for items 2 and 4 is inconsistent with designation in subsequent paragraphs respectively. | Revised. The final rule adopted in 2018 added 774.13(a)(2)(ii). |
| 407 | FHWA | Page 141 Section 2.3.1 | will continuity of trail be impacted? | Text regarding potential impact to the trail added. |
| 408 | FHWA | Page 141 Section 2.3.1 | clarify what/when/how we will determine that the trolley trail is excepted (re it says "this action may qualify as an exception") | Text revised to indicate the action qualifies as an exception. |
| 409 | FHWA | Page 141 Section 2.3.2 | FHWA needs to see the concurrence in no adverse effect for B&O railroad. | MHT concurred with MDOT SHA's determination of no adverse effect on 3/12/2020.  Language to this effect has been added to this section.  The correspondence is included as part of the coordination in Appendix A. |
| 410 | FHWA | Page 142 Section 2.3.3 | What are the potential impacts of locating storm water management facilities adjacent to recreational properties? | The text has been revised to note the SWM facility would not disrupt the operation of the trail |
| 411 | FHWA | Page 143 Section 2.3.4 | FHWA needs to see the concurrence in no adverse effect for Baltimore & Potomac railroad. | MHT concurred with MDOT SHA's determination of no adverse effect on 3/12/2020.  Language to this effect has been added to this section.  The correspondence is included as part of the coordination in Appendix A. |

| 412 | FHWA | Page 143 Section 2.4 | I believe I read somewhere in the DEIS that ACHP is participating in the 106 consultation for the project. If they are, then list ACHP among the OWJ for all of the historic properties in table 2-7 as well as in the corresponding write up for each historic property. | Discussed at FHWA meeting on 2/24/2020. Section 4(f) and Section 106 regulations conflict where *de minimis* comes into play. FHWA was informed of MDOT SHA's approach and the FHWA Federal Preservation Officer agreed. Language with specific references to 36 CFR 800 (for Section 106) and 23 CFR 774 (for Section 4(f)) has been added. ACHP is identified as an official with jurisdiction for historic sites when there is an adverse effect. Because there is no disagreement between MDOT SHA and MHT on no adverse effect findings, ACHP has no role in acknowledging *de minimis* in those scenarios and is copied on that correspondence for informational purposes only. |
|-----|------|------|------|------|
| 413 | FHWA | Page 143 Section 2.4 | A large number of the historic properties for which we propose *de minimis* impact determinations have sliver takes. FHWA legal needs to see the OWJ concurrence in no adverse effect for those properties. It is not reasonable to assume we can get concurrence in no adverse effect from the SHPO with a physical take of any size. | This is common in Maryland and our identification of contributing vs. noncontributing elements on these properties is clear/supported.

Additionally, on 3/12/2020 MHT concurred with MDOT SHA's determination of no adverse effect and acknowledged FHWA's intent to apply *de minimis* at all historic sites where it would apply. |
| 414 | FHWA | Page 144 Section 2.5 | The Ancient United Order of Brothers and Sisters Sons and Daughters of Moses Lodge/Tabernacle and Cemetery sites warrant expedited archeology and consultation regarding their eligibility; boundaries if eligible; and possible connection to Gibson Grove which may have been severed by the Beltway construction; and the potential for the site(s) to have value for preservation in place, if determined eligible. I think there is litigation risk in delaying the work on these sites which may be important for local African American history and are likely to be of public interest due to the reported public interest of the treatment of site with a similar name in Bethesda (by a non-highway development). | The two cemeteries within the LODs of the Build Alternatives, the Moses Lodge Cemetery and the Montgomery County Poor Farm Cemetery, will be subject to additional delineation, evaluation and treatment under the PA, and consultation with the consulting parties and any identified descendants.

As it stands, evaluation options for unmarked burials are very limited and inconclusive in the Moses Lodge Cemetery, without mechanical stripping of large areas.

MDOT SHA will continue to work to minimize impacts and coordinate with affected communities on treatment of human remains that may exist regardless of NRHP eligibility.

MDOT SHA is closely coordinating with consulting parties on cemetery resources (First Agape AME Zion Church who owns Gibson Grove and other parties). Upon further investigations, if these cemeteries are found to have integrity and also meet the criteria for the NRHP, MDOT SHA will make eligibility determinations and conduct additional Section 106 review, evaluation, and treatment as part of the PA. Text has been added to this section detailing the ongoing Section 106 efforts. |
| 415 | FHWA | Page 144 Section 2.5.1 | Provide legal cite supporting claim in the final sentence regarding lack of 4(f) protection. | Citation revised: (23 CFR 774.13(b)(1)) |
| 416 | FHWA | Page 148 Section 3.1.1 | correct typo "per fay in 2018" should be "per day" | Typo corrected |
| 417 | FHWA | Page 149 Section 3.1.2 | Where is the 2017 TBP study in the DEIS tech reports/appendices or where could a reader review it? Can we calculate what the bus fare would have to be for this expanded bus system to break even? | MDOT SHA has added a footnote containing a reference to the location of the 2017 TBP study.

The current text mentions additional analysis would be required. To that end, MDOT SHA will investigate further to determine if it is possible to calculate what a bus fare would have to be for an expanded bus system to break even. If it is possible to determine, this would be addressed in the Final Section 4(f) evaluation. Regardless of the financial outcome, the alternative remains unable to address the Study's purpose and need based on traffic. |
| 418 | FHWA | Page 149 Section 3.1.2 | Clarify final sentence in final paragraph, what sever problems is this referring to? | The text has been reorganized and clarified to identify the severe problems to which is being referred. |
| 419 | FHWA | Page 150 Section 3.1.3 | Clarify why TSM/TDM is not a prudent alternative. Reference the "not prudent" factor(s) that it implicates. | Language has been revised to identify prudent factors 1 and 2. |

00189844

| | | | | |
|---|---|---|---|---|
| 420 | FHWA | Page 151 Section 3.1.4 | DEIS on Page 5-11, Section 5.4 says cost of Section 4(f) Avoidance Alternative is $20 B whereas Draft Section 4(f) Evaluation in Section 3.1.4 has a cost of $25B. Does MDOT SHA have back up for all Section 4(f) avoidance alternatives costs? | The discrepancy in the cost pointed out by FHWA ($20B vs $25B) has been corrected in the DEIS chapter (5.6) and the 4(f) evaluation (Section 3.1.4-3.1.6). Avoidance Alt 1 is 50 miles/$25 billion Avoidance Alt 2 is 40 miles/$20 billion Avoidance Alt 3 is $18 billion

The cost estimate of new road on new alignment at this portion of the county is approximately $500 million per mile. This cost estimate, as well as those for the other avoidance alternatives and the least overall harm alternatives is part of the files maintained in the administrative record. |
| 421 | FHWA | Page 151-156 Section 3.1.4, 3.1.5, 3.1.6 | Include the cost of the proposed action when discussing cost of extraordinary magnitude for comparison. | The range of cost estimates for the Proposed Action is now included in Sections 3.1.4 through 3.1.6. |
| 422 | FHWA | Page 153 Section Figure 3-2 | Fix title of the graphic. It is showing the total avoidance build alts that were considered, not "Alignment shifts analysis" | The title of the graphic has been revised to be "Alignment of Section 4(f) Avoidance Alternatives" |
| 423 | FHWA | Page 156 Section 3.2 | First paragraph seems redundant, since this information is already included in section 3.1 intro paragraph, recommend deleting. | Revised |
| 424 | FHWA | Page 156 Section 3.2 | The avoidance analysis summary should note that in addition to trying to devise a total avoidance alternative, we also looked at whether we could avoid each 4(f)-property used and that those options are in section 5.1. | Text revised and reference to Section 5.1 added. |
| 425 | FHWA | Page 157 Section 4 | I am concerned about the progress of the Section 106 consultation which is a critical path item. Paragraph 3 says MDOT is in the process of drafting a PA to resolve adverse effects. But the adverse effects can't be resolved because we have not even identified them yet. From what I can tell, we aren't quite at the completion of the identification of all historic properties yet. The identification of adverse effects to each property must be a massive effort because there are so many historic properties. The leadership of this project must prioritize the section 106 consultation because we cannot complete section 4(f) until section 106 is concluded. | Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the draft EIS. Status of Section 106 review was discussed in detail with FHWA.

MDOT SHA has completed identification of historic properties in the APE with exception of a few archaeological sites. A methodology for dealing with archaeological sites will be included within the PA. MHT concurred on all eligibility and effect determinations via letter dated March 12, 2020. |
| 426 | FHWA | Page 158 Section 4.1 | Has this 30-foot offset to the proposed LOD been agreed to by the agencies? | The LOD was established by MDOT SHA to identify costs and environmental impacts while ensuring constructability. Development of the LOD including offsets was coordinated with the resource and regulatory agencies during the study. |
| 427 | FHWA | Page 157 - 159 Section 4 | For this project the planning to minimize harm is going to need some sort of plan to periodically continue the coordination with OWJ through the design phase of the project. Because of the many properties that are right up on the LOD. | Language added to Introduction of Section 4. |
| 428 | FHWA | Page 164 - 196 Section 5.1.1 - 5.1.18 | Location Specific Alignment Shift, General Comment: Include figure number(s) in text under "A Description" for all location specific alignment shifts so readers know which figure number(s) to go to. | Revised.  No figure shows LS-5, LS-6, LS-7, LS-12, LS-14, LS-18.

The description text of all Least Overall Harm Alternatives has been revised to include references to the figures in which the alignments are visually represented. |
| 429 | FHWA | Page 164 Section 5.1.1 | Clarify why this is not a reasonable public expenditure. Is it solely based on cost? If so, then reference least overall harm factor 7. | A reference to LOH factor 7 is now included.  References to "reasonable public expenditure" have been deleted. |
| 430 | FHWA | Page 164 Section 5.1.1 | add a table for LS-1 showing the avoided properties (like we do for LS-3 in table 5-3) | Table added. |
| 431 | FHWA | Page 165 Section 5.1.2 | add a table for LS-2 showing the avoided properties (like we do for LS-3 in table 5-3) | Table added. |
| 432 | FHWA | Page 168 Section 5.1.1 | Clarify statement in first sentence of first paragraph, statement is unclear and seems inconsistent with the subsequent sentence. | The existing bridge is located within these Section 4(f) properties. However, MDOT SHA does not own the land on which the bridge is located. The wider bridge would require additional lands from these properties. |
| 433 | FHWA | Page 170 Section 5.1.3 | Include the cost of the proposed action when discussing substantial difference in cost. | Estimated cost added. |
| 434 | FHWA | Page 175 Section 5.1.4 | Include the cost of the proposed action when discussing substantial difference in cost. Clarify which least overall harm factor(s) this alignment shift fails which results in the conclusion that it is not a reasonable public expenditure. | Estimated cost added. Reference to LOH Criteria 6 and 7 added. References to "reasonable public expenditure" have been deleted. |

| 435 | FHWA | Page 175 Section 5.1.4 B | Alignment Shift LS-4 would also bisect Rock Creek SVP, Unit 3. It may be worth noting. | The text has been revised to add the word "bisect." |
|---|---|---|---|---|
| 436 | FHWA | Page 176 Section 5.1.5 | LS-5 needs a map | Alternative LS-5 is mapped on Figure 5-2. A reference has been added. |
| 437 | FHWA | Page 177 Section 5.1.6 | LS-6 needs more info; not clear what the alternative is and how it differs from LS-5, also needs a map | Additional information added and LS-6 mapped on Figure 5-2. |
| 438 | FHWA | Page 177 - 178 Section 5.1.7 | LS-7 needs a map | Alternative LS-7 is mapped on Figure 5-3. A reference has been added to the text. |
| 439 | FHWA | Page 173 & 180 Section 5.1.9 | Fig-5-3 needs to be a more zoomed in scale in order to understand the LS-9 option. Also, the map depicts zero use of northwest branch SVP which contradicts the text. | Upon previous direction from FHWA, MDOT SHA has made the scale of all maps consistent. The maps are currently designated as "not to scale" and depicting the centerline of the proposed action. Owing to the length of the corridor, and number of resources, it is difficult to display the LOD of the proposed alternative and the least overall harm alternatives – the LOD of which varies. When an avoidance alternative includes bridging on alignment– such as for LS-9 and LS -14, it is challenging to differentiate between the Proposed Action and the least overall harm alternative.

MDOT SHA will investigate revising the mapping of the alignment shift alternatives in the Final Section 4(f) Evaluation. |
| 440 | FHWA | Page 173 & 180 Section 5.1.9 | the analysis of LS-9 needs more depth. Wouldn't a longer bridge have some significant ecological benefits beyond just 4(f)? | Text has been revised to address FHWA's comment. |
| 441 | FHWA | Page 179, 180 Section 5.1.8 A and 5.1.9 A | Referenced Sections 2.1.22, 2.1.23 and 2.1.24 do not match with descriptions of Section 4(f) Avoided Properties. Please check references for all sections. | References have been updated |
| 442 | FHWA | Page 180 Section 5.1.9 B | Section 2.1.23 indicates that the proposed action would result in a Section 4(f) use of 3.2 acres. Would Alignment Shift LS-9 mitigate all 3.2 acres or part of it. Whatever the case is, please indicate it in Section B Analysis. | The goal of the exercise is to develop location specific avoidance alternatives. This alignment shift is focused on avoiding any use of NW Branch SVP. The first sentence in Section B acknowledges the property is avoided. Language has been revised to add clarity.

In the introduction to Section 5.1 notes that alignment shifts are designed to avoid the Section 4(f) properties anticipated to experience a greater than de minimis impact. |
| 443 | FHWA | Page 181 & 183 Section 5.1.10 | figure 5-4 does not match the text. The text reads as if the BARC boundary should extend into some or all of the yellow easement area. | Upon previous direction from FHWA, MDOT SHA has made the scale of all maps consistent. The maps are currently designated as "not to scale" and depict the centerline of the proposed action. Owing to the length of the corridor, and number of resources, it is difficult to display the LOD of the proposed alternative and the least overall harm alternatives – the LOD of which varies. Specific to Alignment Shift LS-10, the alignment of the centerline of the highway is shifted to the north along with the LOD so that impacts to Cherry Hill Road Park would be avoided.

MDOT SHA will investigate revising the mapping of the alignment shift alternatives in the Final Section 4(f) Evaluation. More discussion added: A tunnel alignment closer to the existing alignment would require adjusting the location of general purpose and/or managed lanes that could impact Greenbelt Park or BW Parkway. The avoidance alternative completely avoids Section 4(f) use of those two properties. |
| 444 | FHWA | Page 183 Section 5.1.10 B | Indicate acres of impacts to Cherry Hill Road Park from the proposed action. | Revised |

| 445 | FHWA | Page 184 & 186 Section 5.1.11 | the text and the figure do not entirely match. E.g., no use of Buddy Attick Park is depicted but the text says there is a use. It also is not clear why the tunnel swings so far south which would seem to increase the cost? | Upon previous direction from FHWA, MDOT SHA has made the scale of all maps consistent. The maps are currently designated as "not to scale" and depicting the centerline of the proposed action. Owing to the length of the corridor, and number of resources, it is difficult to display the LOD of the proposed alternative and the least overall harm alternatives – the LOD of which varies. When an avoidance alternative includes bridging on alignment – such as for LS-9 and LS -14, it is challenging to differentiate between the Proposed Action and the least overall harm alternative.

MDOT SHA will investigate revising the mapping of the alignment shift alternatives in the Final Section 4(f) Evaluation. More discussion added: A tunnel alignment closer to the existing alignment would require adjusting the location of general purpose and/or managed lanes that could impact Greenbelt Park or BW Parkway.  The avoidance alternative completely avoids Section 4(f) use of those two properties. |
| 446 | FHWA | Page 187 Section 5.1.11B | Analysis only speak about potential negative impact on the financial viability of the shift alignment. A discussion on if Alignment Shift LS-11 meets P&N would be helpful. | The analytical focus of each alignment shift alternative was to emphasize the specific factor(s) that would disqualify the alignment as a least harm alternative.  However, MDOT SHA has added a discussion of each of the LOH criteria in the alignment shift alternatives. |
| 447 | FHWA | Page 187 & 188 Section 5.1.12 | the map does not show a use of Carsondale by the proposed action | Upon previous direction from FHWA, MDOT SHA has made the scale of all maps consistent.  The maps are currently designated as "not to scale" and depicting the centerline of the proposed action.  Owing to the length of the corridor, and number of resources, it is difficult to display the LOD of the proposed alternative and the least overall harm alternatives – the LOD of which varies. When an avoidance alternative includes bridging on alignment – such as for LS-9 and LS -14, it is challenging to differentiate between the Proposed Action and the least overall harm alternative. |
| 448 | FHWA | Page 188 & 192 Section 5.1.13 | add Ardmore Neighborhood park to the map so that the map depicts what the text says | Ardmore Neighborhood Park added to the map. |
| 449 | FHWA | Page 192 Section 5.1.13 B | Please verify Table reference.  Last paragraph refers to Alignment Shift LS-5. | Reference revised |
| 450 | FHWA | Page 193 Section 5.1.15 | fix cross reference for Andrews Manor Park - it is section 2.1.41 (not 2.1.45) | Text revised |
| 451 | FHWA | Page 194 Section 5.1.16 B | Please verify Table reference.  Last paragraph refers to Alignment Shift LS-5. | Text revised |
| 452 | FHWA | Page 198 Section 5.2.1 | add better cross references, assuming it is discussed with more depth somewhere, related to Alt 5 not meeting the P&N | Analysis of Alternative 5 has been enhanced and a reference to DEIS Appendix B (Alternatives Technical Report) has been added. |
| 453 | FHWA | Page 177-198 Section | For LS-5, 7, 8, 9, 10, 11, 13, 15, 16, 17; Clarify which least overall harm factor(s) this alignment shift fails which results in the conclusion that it is not a reasonable public expenditure. | MDOT SHA has added a discussion of each of the LOH criteria in the alignment shift alternatives. Additionally, specific references to "reasonable public expenditure" have been removed." |
| 454 | FHWA | Page 199 Section 5.2.1 | "Modify paragraph 2 under the analysis section by:<br> - clarify what is meant by ""payment by the state""<br> - provide details of anticipated revenue of other Build Alternatives<br> - move the last sentence so that "I" comes before the statement regarding the financial viability statement " | The text has been revised to address these comments. |
| 455 | FHWA | Page 199 Section 5.2.1 A and B | Under Section B it states "When compared to build alternatives within the Proposed Action, Alternative 5 would result in approximately 3.8 acres fewer impacts to the ten Section 4(f) properties listed in Table 5-18."  Should the table include comparison with all build alternatives instead of only for Alternative 9?  If not, should reasoning for not comparing with other build alternatives be outlined? | Text has been revised to show comparison to Alternative 9 |
| 456 | FHWA | Page 199 Section 5.2.1 B | It refers to Table 5-18 but the table number on page 199 is 5-17. Please do a quality check throughout the documents for references to section numbers, table numbers, figure numbers etc. | The table and figure numbers have been quality checked. There will be a final QA/QC check before publication. |
| 457 | FHWA | Page 199 Section 5.2 | Need to discuss Including elevated highway either in Section 5.2, Other Minimization Alternatives Considered or under Section 5.1 Location Specific Alignment Shifts (e.g. on only top side of the beltway). | The elevated highway alternative was dropped during preliminary screening because it would not meet purpose and need.  Analysis of the elevated highway alternative as well as other potential minimization alternatives that were determined not to meet purpose and need can be found in the Alternatives Screening Paper. |
| 458 | FHWA | Page 200 Section 5.2.2 | Clarify the diversion alternative by adding a map. | Figure added for MD 200 Diversion Alternative |

| 459 | FHWA | Page 201 Section 5.2.2 | Must provide data; can't just say the Diversion alt avoids twelve 4(f) props and four of the props are Capper-Crampton (I don't see the relevance of Capper-Crampton by the way). At least list the names of the 12 avoided properties and what the use is that is avoided with the Diversion Alt. | Added requested detail.  CCA is mentioned to inform agency partners of the avoidance. |
|-----|------|------------------------|---------------------------------------------------------------------------------------------|------------------------------------------------------------------------------------------|
| 460 | FHWA | Page 201 Section 5.2.2 | Can we provide an example or two using major traffic generators/origins-destinations? Such as someone traveling from U Md in College Park to the technology corridor in Tysons Corner would have to drive 40? miles out of the way to take the MD 200 Diversion Alternative.  Or a truck traveling from the Port of Baltimore to deliver goods to Bethesda. | We have OD data for MD 200 for travelers on I-495/I-95 and I-270. This would be easy to add.<br>•Diversion route for traffic coming from I-95 southbound, destined for the American Legion Bridge would take MD 200 to I-270 South and head down the west side of I-495. This diversion route, using MD 200 in lieu of I-495, would be approximately **10 miles longer**.<br>•Diversion route for traffic coming from Prince George's County on I495/I-95, destined for the American Legion Bridge would take I-95 North to MD 200, travel west to I-270 and then south on I-270 to I-495. This diversion route would be approximately **19 miles longer**. |
| 461 | FHWA | Page 201 Section 5.2.2 | Explain what is meant by "adequate spare capacity" and the significance of design year 2040. | Added greater detail about traffic. |
| 462 | FHWA | Page 201 Section 5.2.2 | The analysis concludes Diversion alt does not meet P&N. There is not enough support. Add a reference to the technical report or study that we are summarizing here. Also, add cite to 23 CFR 774.17 definition of "feasible and prudent avoidance alternative" and then use the reg text to make the determination. | Added detail.  The MD 200 Diversion Alternative is not a feasible and prudent avoidance alternative because 4(f) properties would still experience a use elsewhere on the project.  Rather it is a least overall harm alternative and these criteria are referenced |
| 463 | FHWA | Page 201-202 Section 5.2.3 | Clarify Alternative 9M by adding a map. | Alternative 9M moved to Section 5.3.  Reference Alt 9M mapping in Appendix D of the DEIS. |
| 464 | FHWA | Page 202 Section 5.2.3 B | paragraph 1: I am unable to discern exactly what the 4(f) use is under Alternative 9M. It is not enough to say "impacts to Section 4(f) properties would be reduced" | Alternative 9M moved to Section 5.3 and the discussion has been enhanced.  Text revised. |
| 465 | FHWA | Page 202 Section 5.2.3 B | The analysis concludes alt 9M does not meet P&N. There is not enough support. Add a reference to the technical report or study that we are summarizing here. Also, add cite to 23 CFR 774.17 definition of "feasible and prudent avoidance alternative" and then use the reg text to make the determination. | Alternative 9M moved to Section 5.3.  This alternative is now analyzed as a full build alternative. |
| 466 | FHWA | Page 203 Section 5.3 | Can we add a sentence stating: that of the build alts, 8, 9, 13B would have an identical use of 4(f) properties; alt 13C has slightly more and Alt 10 the most but still only a modest increase, so that the reader doesn't have to go back and hunt through section 1.3.2 for the info. | The information you are requesting is included in the description of each of the alternatives.  A table was also added to the introduction of Section 5.3 with the requested information. |
| 467 | FHWA | Page 203 Section 5.3.1 | net payment annually? See similar comment for DEIS. | Discussion revised. |
| 468 | FHWA | Page 205 Section 5.3.3 A | We would like to discuss the DOE and boundary determinations for the historic properties in table 5-18 with FHWA's FPO and Md SHA's historian | Discussed during FHWA DEIS Working Session and separately between FPO and MDOT SHA Cultural Resources Team Leader and as noted sliver takes of non-contributing elements are common no adverse findings in Maryland.  MHT concurred with MDOT SHA's effect determinations on 3/12/2020 including acknowledging FHWA's intent to make a de minimis finding.  MDOT SHA will revisit based on SHPO comments if there is a disagreement. |
| 469 | FHWA | Page 205 Section 5.3.3 | table 5-18 column heading should say section 4(f) impact from Alts 8, 9, 13B not just "Alternative 9" | Revised to Build Alternatives |
| 470 | FHWA | Page 208 Section 5.3.5 | table 5-20 column heading should say section 4(f) impact from Alts 8, 9, 13B not just "Alternative 9" | Revised accordingly |
| 471 | FHWA | Page 213 Section 6 | Do NCPC and M-NCPPC have jurisdiction over the elements of projects that need to be mentioned in this section? | NCPC does not own or administer the properties in question and are not empowered to represent the agency on matters related to the park based on the Administrative Agreement between M-NCPPC and NCPC. That agreement clearly states that title to the land purchased with Capper Cramton funding vests with the State. |


| 472 | FHWA | Page 214 Section 5.4 | "the ability to mitigate adverse impacts" why do we have a greater ability to mitigate for the ones coded green and red? Aren't the uses still sliver takes for which we would provide the same types of mitigation with the same effectiveness as the other alts? | Double checked the color-coding system and everything seems to use correct colors and correct language.  The area of impacts differs among the alternatives, but 4(f) mitigation is not directly related to the area of the impacts.  For example, there are instances where an alternative may result in a small area of impacts to a particularly significant portion of a Section 4(f) property.  Conversely, it would be possible to impact a large swath of Section 4(f) property that does not contain recreational features or result in a use of a historically significant part of a property.  This analysis is presented in the body of the document.  The table represents an overview and summary of the earlier analysis. |
|---|---|---|---|---|
| 473 | FHWA | Page 214 Section 5.4 | The "relative significance of each section 4(f) property" should not be a comparison of the NUMBER of 4(f) properties. Rather, compare the trade-offs. e.g., if one alt uses prop x and another avoids prop x but uses prop y - then we would compare the relative significance of prop x versus prop y under this factor. Is one property more important than the other and how so? For the alts coded red and green which properties exactly are considered more and less significant? | Except for Alternative 9M, there is no difference to the anticipated type of use of Section 4(f) properties among the Build Alternatives.  This analysis is presented in the body of the document.  The table presents an overview and summary of the earlier analysis. |
| 474 | FHWA | Page 215 Section 6.3 | Add de minimis impact determinations to coordination discussion | MHT concurred with MDOT SHA's effect determinations on 3/12/2020 including acknowledging FHWA's intent to make a *de minimis* finding. |
| 475 | FHWA | Page 216 Section 6.4 | Should we include coordination with NCPC in this section on "Coordination with Other Agencies"? | NCPC does not own or administer the properties in question and are not empowered to represent the agency on matters related to the park based on the Administrative Agreement between M-NCPPC and NCPC. That agreement clearly states that title to the land purchased with Capper Cramton funding vests with the State. |
| 476 | FHWA | Page 216 Section 6.5 | The public must have an opportunity to comment on the proposed de minimis impact determinations also. (technically only for parks as for historic it happens through 106). Clarify in the text that is happening concurrently with the DEIS and draft 4F evaluation review period. | Text Revised. |
| 477 | FHWA | Page 217 Section 6.6 | If we do not get the concurrences needed for de minimis impacts what is the plan? | MHT concurred with MDOT SHA's effect determinations on 3/12/2020 including acknowledging FHWA's intent to make a *de minimis* finding. |
| 478 | FHWA | Page 219-228 Section Appendix A | FHWA counsel needs access to the files listed in the 4(f)-correspondence table. Also, the files need to be provided. It can be a technical report cited in the appendix. | These files will be organized and included as part of Appendix B prior to publication of the Draft Section 4(f) Evaluation. |
| 479 | FHWA | Page 225 Section Appendix A | appears to be missing correspondence to and from ACHP | These files will be organized and included as part of Appendix B prior to publication of the Draft Section 4(f) Evaluation. |
| 480 | FHWA | Page 226-227 Section Appendix A | appears to be missing transmittal of proposed affects determinations to the MHT | These files will be organized and included as part of Appendix B prior to publication of the Draft Section 4(f) Evaluation. |
| 481 | FHWA | Page 227 Section Appendix A | appears to be missing concurrence from VA DHR in the APE and the DOEs in Virginia. | These files will be organized and included as part of Appendix B prior to publication of the Draft Section 4(f) Evaluation. |
| 482 | FHWA | Page 219 - 228 Section Appendix A | appears to be missing correspondence to and from the five local agencies/OWJ listed on page 214. | These files will be organized and included as part of Appendix B prior to publication of the Draft Section 4(f) Evaluation. |
| **Appendix F – Cultural Resources** | | | | |
| 483 | FHWA | General Appendix F – Cultural Resources Tech Report Vol. 1 | How can we conclude our 4(f) least overall harm analysis if we have not determined the Section 106 effect determinations? | Discussed and will update in FEIS. Several properties in "cannot be determined" Section 106 effect group have no 4f use.  3 properties do: Capitol View Park Historic District, Carsondale Historic District and Suitland Parkway.  Washington Aqueduct is not identified as an use but is within LOD. FHWA recommends a ROD commitment to avoid ground disturbance at Washington Aqueduct and find no adverse to that property.  MDOT SHA will continue consultation to try and better define effects for the remaining properties. |
| 484 | FHWA | General Appendix F – Cultural Resources Tech Report Vol. 1 | For Archaeological resources, I'm ok punting on completing that under a phased identification PA, but having incomplete identification and effect determinations for above ground resources under Section 106 compliance, does not allow us the ability to use "reasonable assurance" under 4(f) and we will not be able to complete 4(f) compliance and that is something we cannot complete at a later date due to a lack of legal sufficiency. | Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the draft EIS. |



| 485 | FHWA | Page 2 Appendix F – Cultural Resources Tech Report Vol. 1 | You state: "Accordingly, this report documents the identification and evaluation efforts to date, but additional efforts and consultation are expected to occur under the anticipated PA terms being developed in consultation with participating consulting parties"<br><br>I don't understand this statement, it is too vague and does not give FHWA any confidence in being able to be far enough along in the Section 106 compliance to be able to conclude the 4(f) analysis. Are you 20%, 50% done, is there a list that can be defined on what still needs to be done, and a schedule to complete that at least to be able to conclude our 4(f) analysis by the ROD, knowing for Archaeology we can punt down a project level PA. | The PA would provide for continued consultation on APE changes or eligibility/effects determinations that result from that, and/or phased identification and effect findings that cannot be made now. For the current APE, all architectural resources have eligibility and effect findings (with 7 identified as cannot be determined due to lack of design information). MDOT SHA will clarify this language in FEIS to note what is subject to continued consultation as part of the PA, once the PA development has advanced. |
| 486 | FHWA | Page 12 Cultural Resources Tech Report Vol. 1 | It states: "Project hearings are planned in the Spring of 2020, and other public pop-up events are ongoing".<br><br>When is the hearing this spring and what are "pop-up" events? Please define this term. | In FEIS have a table documenting events where 106 outreach occurs alongside NEPA. Will define the term "pop-up" in FEIS. |
| 487 | FHWA | Page 15 Cultural Resources Tech Report Vol. 1 | You state there are not eligibility findings where SHPO concurrence has not been obtained, but later in the document and before you this you state you still have unresolved above ground resources from both an eligibility and effects standpoint? Be consistent. | Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the draft EIS. |
| 488 | FHWA | Page 18 Cultural Resources Tech Report Vol. 1 | You state: "Effects cannot be fully determined on seven architectural historic properties and those properties will be subject to stipulations of the PA to avoid, minimize, or mitigate adverse effects as design advances.<br><br>This is a problem for both Section 106 compliance and 4(f) compliance as we will not be able to complete our least overall harm analysis and the overall 4(f) compliance unless effects are known, we can do that for Archaeology only if we have reasonable assurance that the archaeological sites are not important for "preservation in place".<br><br>We need to discuss all 7 properties about "why" we can't determine effects now. | Discussed as per above comment. |
| 489 | FHWA | Page 18 Cultural Resources Tech Report Vol. 1 | Table 3-1 has an Error message in it and needs to be fixed. | This is not an error message. The NR listing does not specify under which criteria the property is eligible. FHWA recommends that as a mitigation commitment, MDOT SHA will establish the period of significance and or eligibility criteria for properties where they have not been documented. |
| 490 | FHWA | Page 19 Cultural Resources Tech Report Vol. 1 | Table 3-1 - NRHP Criteria for M: 36-1 is "unspecified" this is a problem and needs to be defined, how do we know if we have an adverse effect on a resource that does not have an eligibility determination, this is a Section 106 procedural issue that I'm not sure we can put in the PA, and may need to address this now. | See response to #489 |
| 491 | FHWA | Page 19 Cultural Resources Tech Report Vol. 1 | Table 3-1 - Period of Significance for M: 32-15 is "unspecified" this is a problem and needs to be defined, how do we know eligibility and effect if we don't have a defined period of significance which will relate to potential mitigation. | Similarly, this was a prior determination not conducted for this study which was concurred upon by the SHPO without a specified period of significance. As noted, FHWA recommends a mitigation commitment to establish a period of significance. |
| 492 | FHWA | Page 19 Cultural Resources Tech Report Vol. 1 | Table 3-1 - MIHP and DHR [18MO749, 18MO751, (N/A)] – these all state eligibility concurrence pending, which is a problem as you state the NRHP Criteria, but without concurrence we can't move to an effect finding, this needs to be fixed or clarified and the NHRP Criteria should be left blank and this put into the PA | Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the draft EIS. |
| 493 | FHWA | Page 19 - 25 Cultural Resources Tech Report Vol. 1 | Section A – J: For all the Adversely Effected Historic Properties (A-J) each write up needs to clearly define the Direct, Indirect, and Cumulative Effects, I recommend you put in each write up a statement on each one, as it is unclear which effects are direct, vs indirect, vs cumulative. We will need this level of detail to be able to determine compensatory mitigation which will vary depending on the nature of the impact being either direct, indirect, or cumulative. | MDOT SHA is using terms of "atmospheric, visible, audible" to describe what have been traditionally known as "indirect" effects based on unresolved DC Circuit Court/ACHP interpretations, although we do not formally "accept" or reference that guidance. We will expand this discussion for the FEIS.<br>Discussed with FHWA that cumulative effects will be largely redundant to discuss on a property-by-property basis, so these properties may refer to a general description of cumulative effects. |

00189850

**MLS Administrative Draft – DEIS Agency Comments**
Errata Sheet

| 494 | FHWA | Page 20 - 25 Cultural Resources Tech Report Vol. 1 | For Adversely effected properties C, D, E, I, J, - I'm not there yet, and we need to talk about the fact that temporary construction impacts do not automatically equal an adverse effect, each of these need to be flushed out to determine the nature of the temporary impacts vs permanent impacts to determine the effect and this goes back to the previous comment of defining direct, indirect, and cumulative effects for each historic property. This is also an issue for 4(f) compliance knowing we have to look at all these in the 4(f) analysis. | No adverse effect calls were made solely on the basis of temporary construction impacts. LOD does not distinguish at this point between temporary and permanent impacts, other than Greenbelt Park, all AEs have direct physical "take" within contributing features. Greenbelt Park has highway on either side and would experience visual effect from new interchange. Will ensure this is explicitly clear in FEIS that there are no adverse calls solely for temporary construction effects. |
|---|---|---|---|---|
| 495 | FHWA | Page 22 Cultural Resources Tech Report Vol. 1 | Section E - The NPS has made a "preliminary" determination of eligibility – this will not work and is not a Section 106 term in that we must have an eligibility determination before we can assess effects and know if they are adverse and if they are that will inform our mitigation, without an eligibility determination we cannot move to the next step in Section 106 compliance. | MDOT SHA believed this property was not eligible and coordinated with NPS on our finding. NPS elected to make their own "preliminary" determination and SHPO acknowledged the property is "eligible for the purposes of Section 106", and we are deferring on that finding. MDOT SHA will clearly reference in FEIS. |
| 496 | FHWA | Page 23 Cultural Resources Tech Report Vol. 1 | Section F - This direct impact is an issue for our 4(f) compliance and will need a lot more work in the least overall harm analysis and avoidance of an independent 4(f) for the direct take of land / contributing elements to this historic property etc. | Agreed on this comment (Indian Spring Club estates impact to pool). This coordination with the YMCA is ongoing. |
| 497 | FHWA | Page 24 Cultural Resources Tech Report Vol. 1 | Section H - There is no eligibility criteria for this historic property thus we cannot move past the identification phase in the Section 106 process, as we will not be able to determine effect to which criteria and what mitigation is compensatory. | This was a prior determination not conducted for this study which was concurred upon by the SHPO without a specified eligibility criteria. As noted, FHWA recommends a mitigation commitment to establish eligibility criteria. |
| 498 | FHWA | Page 25-26 Cultural Resources Tech Report Vol. 1 | Section K - As previously stated section K is incomplete due to no eligibility determinations and thus is only preliminary at this point and either needs to be completed or put into the PA, if we don't have concurrence on eligibility, we can't talk about effects | Draft represents a moment in time, with some eligibility and effects findings out for Section 106 review during FHWA's review of the draft EIS. |
| 499 | FHWA | Page 26 Cultural Resources Tech Report Vol. 1 | This last paragraph in K above 3.1.2 is weak and needs a much more in-depth discussion / write up with maps etc. in Volume I, not referenced in Volume 4. I need to see these areas in Vol. 1, with write ups about each area including acreage etc. This needs to be its own section in Vol. 1 and flushed out. | MDOT SHA will expand and provide mapping in the FEIS. |
| 500 | FHWA | Page 33 Cultural Resources Tech Report Vol. 1 | Section 3.1.4- It states you will notify DOI about NHL's, but it does not state if you have done this yet and the response, we need documentation of this consultation and if they will participate. In addition, for the Washington Aqueduct we can't just punt on this to the PA due to the NHL status that is a big deal and we need to clear this up now due to the 4(f) implications that will force us to avoid / minimize effects, etc. we need concurrence from the official with jurisdiction now and not after NEPA in the PA due to the risk of both Section 106 and 4(f). | This action item is with FHWA MD Division office. FHWA HQ will follow up with Division office. |
| 501 | FHWA | Page 33 Cultural Resources Tech Report Vol. 1 | Section 3.1.5 - This should not be its own section but needs to be incorporated in 3.1.2 as most of these properties have both direct and indirect effects and some also may have cumulative effects. | We will expand this discussion for FEIS. Discussed that cumulative effects will be largely redundant to discuss on a property-by-property basis, so these properties may refer to a general description of cumulative effects. |
| 502 | FHWA | Page 36 Cultural Resources Tech Report Vol. 1 | Bottom of 1st paragraph - There is a risk problem with how the write up is stated for the potential cemetery impacts, we have time and need to get out there potentially for some geophysical work to know more about potential burials, independent of direct impacts we may not have enough design to know yet, that being said this will be a 4(f)-problem due to burials "potentially" rising to the level of warranting preservation in place. (I'm thinking about Moses Lodge Cemetery) | Evaluation options for unmarked burials are very limited and inconclusive at this area, without mechanical stripping of large areas. MDOT SHA is closely coordinating with consulting parties on cemetery resources. MDOT SHA continues coordination with First Agape AME Zion Church who owns Gibson Grove and other parties. We continue to track this as a project risk. Discussed with FHWA on including explicit commitments in ROD, RFP, and 106 PA that design should be prioritized in cemetery areas and that no ground disturbance would be allowed to occur by developer until required investigations and/or any cemetery treatment occurs. |
| **Appendix G – Draft Section 106 Programmatic Agreement** | | | | |
| 503 | FHWA | Programmatic Agreement | The Programmatic Agreement is mostly a template with place holders and contains few details about the project. For example, instead of having a definition of the undertaking, it says "Defining the Undertaking." The PA should a list of all National Register eligible resources known within the APE, the project effect on each particular property, and proposed mitigation. | The PA draft provided was one shared with consulting parties in 2019 and represents a moment in time. This architectural resource has now been evaluated and found not eligible (Martin-Marietta HQ). |
| 504 | FHWA | Programmatic Agreement, page 3 | The PA states that that there is an inaccessible/unevaluated architectural resource. This could be problematic for the Section 4(f) evaluation. However, the draft PA is dated June 2019 and the DEIS, which is dated January 2020, says that all architectural resources have been evaluated. Please make sure the PA is updated with this information. | The PA draft provided was one shared with consulting parties in 2019 and represents a moment in time. This architectural resource has now been evaluated and found not eligible (Martin-Marietta HQ). |
| 505 | FHWA | Programmatic Agreement | The PA does not have page numbers. | The PA outline was shared with consulting parties in June 2019. MDOT SHA prefers not to alter this document to something Section 106 consulting parties have not previously seen. |

00189851


| 506 | FHWA | Programmatic Agreement, page 2-3 | The archaeological treatment plan should address confidentially, per 36CFR§800.11(c). | MDOT SHA agrees. |
|---|---|---|---|---|
| | | | **Appendix H – Air Quality** | |
| 507 | FHWA | Page 1 Section 1 | The Introduction, Overview, Study Corridors, Study Purpose and Need, and Alternatives Evaluated are written as though this were the EIS proper, not the Technical Report.  While this appears to be well written, a lot of text is extraneous to the intent of the Air Quality Analysis Report.  Please review the AASHTO Practitioners Handbook #18, Addressing Air Quality Issues in the NEPA Process for Highway Projects for clarifications. | This introduction is standard for all MLS technical reports and provides the study context for the technical analysis that follows. |
| 508 | FHWA | General | An Air Quality Technical Report should contain the following:<br>Discussion of methodology used for the air quality analysis<br>Description of the sources of Traffic Data (Traffic data provided – unable to find where the sources are described)<br>Summary of modeling inputs (table provided but summary needs to be included)<br>Dispersion modeling details, including inputs and results<br>Background concentration data<br>Details of emissions calculations for any retrained road dust, other emissions, or nearby sources that were included in the analysis<br>Emissions tables supporting the graphics used in the EIS<br>Analysis of any needed mitigation measures and associated written commitments<br>Specifics of interagency consultation process (not found and needs to be included) | Methodology described.<br>Mentioned in 3.2.1.  Traffic data used in this analysis was consistent with the Traffic Analysis Technical Report developed specifically for the Project.  The data developed and used in the air quality analysis is included as Appendix A.<br><br>Mentioned in Section 3.2.2 Methodology<br>Mentioned in Section 3.2.2<br>Mentioned on page 52<br>Only CO modeled since it is the surrogate for transportation impacts, PM not modeled.<br><br>See section 3.2.3 for CO impacts, Section 3.4.3 for MSATs, and 3.5.1 for GHGs<br>Mitigation and commitments mentioned in the conclusions and at the end of each pollutant section<br>Included mention of the August 2018 modeling protocol submitted to MDOT and FHWA outlining methods and assumptions. |
| 509 | FHWA | Page 8 Section 2 | The Existing Conditions – As noted above, this title is typically for an EIS and can be confusing for anyone expecting to read an Air Quality Analysis Report.<br>If an Air Quality analysis is determined to be applicable to the project, the methodology used must be described or referenced in sufficient detail to support the documentation in the EIS.  A simple table might be effective.  For example; on page 9, the 3 levels of analysis for MSAT are identified but it is not documented which were applicable for each alternative and what the methodology was for each level of analysis.  I did find the MSAT information in the conclusion. | Text added for CO, MSATs and GHGs to Section 2. |
| 510 | FHWA | Page 9 Section 2.1.2 A | Draft described "unclassifiable and unclassifiable/attainment" as meaning "insufficient data is available for determination, so area is treated as in compliance." This statement is a bit broad.<br>"Unclassifiable/attainment" and "unclassifiable" are not the same, and definitions can vary by pollutant. For example, the following ozone related explanation can be found in EPA's designations for the 2015 Ozone NAAQS, 82 FR 54232 (November 16, 2017). "When the EPA promulgates a new or revised NAAQS, the EPA is required to designate areas as Nonattainment, Attainment, or Unclassifiable, pursuant to section 107(d)(1) of the CAA. Section 107(d)(1)(A)(i) of the CAA defines a Nonattainment area as, ''any area that does not meet (or that contributes to ambient air quality in a nearby area that does not meet) the national primary or secondary ambient air quality standard for the pollutant.'' If an area meets either prong of this definition, then the EPA is obligated to designate the area as ''Nonattainment.'' CAA section 107(d)(1)(A)(ii) defines an Attainment area as any area that does not meet the definition of Nonattainment and that meets the NAAQS. CAA section 107(d)(1)(A)(iii) provides that any area that the EPA cannot designate on the basis of available information as meeting or not meeting the standards should be designated as ''Unclassifiable.'' Historically for ozone, the EPA designates most areas that do not meet the definition of Nonattainment as ''Unclassifiable/ Attainment.'' In a few instances, based on circumstances where some monitoring data are available but is not sufficient for a determination that an area is or is not attaining the NAAQS, the EPA has designated an area as ''Unclassifiable.'' I recommend not saying that the area is "treated as in compliance" when referring to unclassifiable. | Changed definitions in Section 2, page 11. |

| 511 | FHWA | Page 22 Section 3 | Does Maryland DOT have an Environmental Procedures manual that mentions CO analysis? Does it include any screening procedures? | No |
|---|---|---|---|---|
| 512 | FHWA | Page 22 Section 3 | Environmental Consequences – In the Carbon Monoxide Analysis section, the third sentence references the methodologies and assumption applied but a brief description of the methodologies is not included or referenced other that the statement that they are consistent with guidance. | Text added to clarify language, methodologies are referenced for EPA and FHWA. |
| 513 | FHWA | Page 22 Section 3 | Environmental Consequences – Here or early in the document, briefly yet clearly state which Air Quality analysis are applicable to the project and which are not. For each Air Quality analysis, the applicability or non-applicability of that analysis to the project should be briefly and carefully described. If an Air Quality analysis is determined to be applicable to the project, the methodology used must be described or referenced in sufficient detail to support the documentation in the EIS. A simple table might be effective. | Added applicability and rationale for CO, MSATs, and GHGs. See response to Comment 509. |
| 514 | FHWA | Page 42 Section 3.2.2 C | Draft states "the methodologies and assumptions used for the MOVES modeling are consistent with FHWA and EPA guidance." It should cite what the guidance in question are. | Text added on FHWA and EPA guidance was referenced in the report. |
| 515 | FHWA | Page 42 Section 3.2.2 C | MOVES Emission Rates, first paragraph - Please cite the guidance you are referring to for "FHWA and EPA Guidance" | References added |
| 516 | FHWA | Page 43 Section 3.2.2 C | Table 3-25, Geographic Bounds – Does Fairfax Co, VA need to be included here since it is part of the study area? | Text added to clarify affected intersections/interchanges for CO analysis all are located in MD. |
| 517 | FHWA | Page 75 Section 3.2.3 | Dispersion Modeling Scenarios, first paragraph - Worst-case traffic volumes (set at the theoretical per lane maximum 2,200 vehicles per hour per lane (vphpl)1 were assumed for the CO analyses at the worst-case interchanges and intersections. – comment - This seems like an overly conservative assumption that could be dialed back by using traffic forecasts. | Yes it is and discussed in the overall approach, see comment 520. |
| 518 | FHWA | Page 75 Section 3.2.3 | Dispersion Modeling, last paragraph - Does Fairfax Co, VA need to be included here since it is part of the study area? | Text added to clarify the affected area, see comment 516. |
| 519 | FHWA | Page 75 Section 3.2.3 | Table 2-3 includes values from other monitors in the region (in DC and VA) that someone might argue to use for background concentrations. What do we know about the appropriateness of the sites in Table 2-3 to use as background concentrations? | See previous responses above. |
| 520 | FHWA | Page 75 Section 3.2.3 | It appears the following sentences were added to address a previous comment that the microscale CO analysis should make a comparison between alternatives: "As documented in Section 3.2, this analysis conservatively assumed worst-case conditions, overestimating the emissions results for each alternative. There is no comparison between alternatives."<br><br>I have doubts on whether the microscale CO analysis should even be done for this project since you could probably judge the project impacts to be well below the NAAQS; however, if you are going to do the micro-scale CO analysis you should follow the Air Quality Impacts section of the 1987 Technical Advisory that says, "a comparison should be made between alternatives." The point of NEPA is to provide information about the environmental impacts of project alternatives to decision makers and the public. | Worst-case analysis was conducted as an efficient method to evaluate all alternatives and still demonstrate compliance with NAAQS for NEPA purposes. This method has been used in other DOTs and FHWA regions (i.e., Virginia) for numerous large projects. Added some additional language to address the screening approach. |
| 521 | FHWA | Page 79 Section 3.3 | The area is attainment for both CO and PM2.5. You need to explain why an extensive CO analysis was done but not for PM2.5 since transportation conformity does not apply to either of them. | Refer to the response to Comment 513. CO was used as a proxy for transportation emissions and evaluated for transparency. PM$_{2.5}$ was not. |
| 522 | FHWA | Page 83 Section 3.4.2 | At the very top of the page, Appendix D of the FHWA Interim MSAT Guidance should be cited. | Reference to the MSAT guidance in the MSAT modeling methodology section was added. |
| 523 | FHWA | Page 83 Section | On this page and elsewhere through the document the word 'Error!' or Error! Reference source not found.' is located at random. Please check and correct as appropriate. | The error does not show up in our files but table number linking will be verified in the revised final version. |



| 524 | FHWA | Page 83 Section 3.4.2 | It says FHWA reviewed the network and said it was OK. This statement needs to be removed.<br><br>Furthermore, my comment on the Air Quality Tech Report from this past fall (09/19) "Please be more specific about which methodology was used and where. The Figures 3-29 to 3-40 need revision for clarity. For example, remove the blue 'other network links.'" was not addressed. Explain what approach SHA used and then if possible, take another look at what you're calling the "FHWA network" and refine it to reflect what your chosen approach indicates.<br><br>Change the name to "affected network" (not "FHWA network" as the legend in Figures 3-28 to 3-39 indicate). | Sentence removed.<br><br>The methodology is described on page 83-84 using the FHWA criterion.  The links that met the criterion were used as the Affected Network for Each Alternative and highlighted in the Figures.<br><br>Figures have been revised. |
| 525 | FHWA | Page 84 Section 3.4.2 | Figures 3-28 through 3-39, while more clear than the draft versions, still show extraordinarily large affected networks were considered. While I realize this is a large project covering many counties, I don't think the explanation for why they went with such a large network is adequate. | The links used in the affected network were based on the FHWA criterion described on Page 84. |
| 526 | FHWA | Page 108 Section 3.4.4 | Source 29 the citation could be more specific. I recommend keeping what they have now and adding Appendix C or something so folks don't have to look through the whole guidance. The first referenced source to the Interim Guidance is on page 8. I recommend considering sourcing the Interim Guidance the first time it is referenced and as needed from there. | Updated to reference Appendix C. |
| 527 | FHWA | Page 111 Section 3.5 | Re: Statements about managed lanes optimizing traffic flow and providing GHG emissions advantages compared to general purpose lanes. If not related to this project, the argument is baseless. All build alternatives (with the exception of Alt 5 in the opening year) are projected to increase tailpipe GHG emissions compared to the no-build alternative, per Table 3-37. | Removed detailed discussion of how TRP fits with the goals TCI and left a general discussion of MD policies and plans. |
| 528 | FHWA | Page 112 Section 3.5 | Re: Statement that the State has allowed EVs to use HOV lanes regardless of number of passengers. Is this the intention for the managed lanes under this proposal? | Text deleted |
| 529 | FHWA | Page 113 Section 3.5.1 | Text states "Study area (based on FHWA criteria)." Please elaborate that the study area is based on FHWA *air toxics analysis* criteria. | Text clarified with mobile source air toxics. |
| 530 | FHWA | Page 122 Section 3.5.1 | The document cites national VMT and vehicle energy efficiency information from the 2015 and 2014 (respectively) EIA Energy Outlook Reports. The 2020 EIA report is now available. Does the information in the updated EIA report affect the cited information? | The section has been updated to reflect the information included in the 2020 report.  Citations have also been updated as needed. |
| 531 | FHWA | Page 123 Section 3.5.2 | The GHG Conclusions section would be more informative if it summarized findings of the quantitative GHG emissions analysis: That tailpipe emissions on the affected transportation network for all modeled alternatives are projected to be lower in the opening and design years compared to base year conditions. And that all build alternatives -with the exception of Alt 5 in the opening year- are projected to increase annual tailpipe GHG emissions compared to the no-build alternative. | Edits made and text removed. |
| 532 | FHWA | Page 124 Section 3.6 | Last sentence should be characterized as a mitigation or minimization commitment that will be incorporated into the bid/contract. | Sentence added |
| 533 | FHWA | Page 126 Section 4 | The last sentence references mitigation outlined in Section 3.8.  Section 3.8 is not included in the document.  Please correct by either including a Section 3.8 or referencing the correct section.  I was unable to find it. | Corrected to 3.6 |
| 534 | FHWA | Page 127 Section 5 | For MSATs, since the project was best characterized with "High Potential MSAT Effects" this requires coordination with FHWA HEP Environment and Office of Project Development and Environmental Review. Please include documentation of or reference coordination. | Addressed in Section under protocol review by FHWA and added sentence regarding protocol sent to MDOT and FHWA. |
| 535 | FHWA | Page 129 Section 5 | "Proposed project on mobile source emissions, when added to the emissions from other past, present, and reasonably foreseeable future actions, is in conformance with the SIP and will not cause or contribute to a new violation, increase the frequency or severity of any violation, or delay timely attainment of the NAAQS established by EPA".  Not sure how this comment can be made when a preferred alternative has not been analyzed and is not part of a conforming TIP and plan. | CO analysis using conservative assumptions demonstrates compliance with NAAQS for all Alternatives.  Project emissions included in the and NCRTPB's Air Quality Conformity Analysis which conforms with the SIP as stated. |

**Appendix I - Noise**


| 536 | FHWA | Page ES.2 Section ES.2 | Last para, 2nd sent. Why does it state that substantial increases "are not presented" for this study? If substantial increases occurred, regulations require that they be considered. Was the text trying to say there were no substantial increases? Then just state that. Otherwise, they must be considered if they exist, so remove this sentence (and review throughout for substantial increases). | Statement changed to state that substantial increases are not expected due to the nature of the study. |
|---|---|---|---|---|
| 537 | FHWA | Page ES.3 Section ES.2 | Top para. 2011 noise policy says 5 dBA reduction at 50% of impacted receptors, not 70%. Cite the date of the policy being used. Verify which policy is being used as well. If the 2019 policy is not approved, this approach and documents/decisions will have to be revised. Also, if the 2019 policy was never approved, and is approved in 2020, it will become the 2020 policy and references will have to be updated throughout. | Beginning of paragraph references the 2020 MDOT SHA Highway Noise Analysis Planning and Engineering Guidelines, and the 70% matches the new policy. |
| 538 | FHWA | Page ES-3 Section ES.2 | At the top of the page there is a summary of what constitutes Reasonableness. Per the latest Draft Policy, I have seen, the design goal should also mention that it is 3+ receptors or 50%; right now, this Tech Report only discusses the 50%. | Revised per comment. |
| 539 | FHWA | Page ES.4 | Revise summary for 5-06 and 5-07. It states here that they were determined feasible and reasonable, but per page 174, they are both not feasible. Based on text on page 199 it seems 5-31 should be counted in the category of "replace existing", not "new feasible and reasonable". Verify conclusion for 5-32 per page 215. Add sentence to discuss the 2 areas that require further analysis in FEIS or Final Design. | ES summary updated. 506 and 5-07 are not feasible, 5-31 is an existing barrier being replaced, the barrier at 5-32 does not meet criteria for either option. |
| 540 | FHWA | Page 11 Section | Para below table 1.2. Please verify the version of the noise policy being used and revise as appropriate. | New policy has received verbal approval from FHWA as of February 20, 2020. Formal approval is expected shortly (and definitely prior to the FEIS). Date has been changed to 2020. |
| 541 | FHWA | Page 14 Section 1.6 | Text states that of the 92 NSAs, 80 are primarily Category B and 12 are Category C, with some incidences of Categories D and E found within these other NSAs. Which are the 12 NSAs that are primarily Category C sites? | The NSAs are depicted on the project mapping and this summary is meant to just give a general overview of the types of land use within the project. The NSAs that are primarily Category C are: 4-01, 3-05, 4-02, 4-03, 2-12, 4-04, 2-14, 1-35, 1-15, 1-18, 1-22, 1-24. |
| 542 | FHWA | Page 30-45 Section 2.3.1A | This section seems to contain a lot more information and details about the land uses, whether they qualify for evaluation, and the noise measurement validation process than the previous section about I-495. No change requested but recommend reviewing these areas for consistency for the FEIS phase. | The information depicted in each section of this report have been compiled from different sources, there will be effort for the FEIS document to maintain better consistency throughout the document. |
| 543 | FHWA | Page 46 Section 2.3.3 | For M-232 and M-336 that had an equipment malfunction, why wasn't this redone with operational equipment? I understand the study was previously done. Couldn't these 2 have been fixed/redone if they were critical? Revise to provide an explanation. | These two receptors are not critical; including it after the statement summarizing the critical receptors makes this misleading. Reworked this section to clarify. |
| 544 | FHWA | Page 46 Section 2.3.3 | M-104 last sentence. I'm not clear on what this means. Is it saying that while the noise meter says it is louder than the model, the human ear would not agree/perceive that same loudness that the meter reads? It seems the meter would match the human ear's perception, and as such, the model would not be predicting valid results. | The paragraph is explaining why the measurement could be so much louder than the modeled level, which is due to noise reflecting off the bottom of the high tree canopy which is something that cannot be modeled in TNM. The word "perceived" has been changed to "measured". |
| 545 | FHWA | Page 48 Section 2.3.3 | Same as 544, changed the word "perceived" | Same as 544, changed the word "perceived". |
| 546 | FHWA | Page 49 Section 2.4.2 | It's ok to reference Appendix C tables, but the text here should state whether or not the model was validated (which per Table C-3, it appears it does, so state that). See comments on sections 2.5.2 and 2.6.2 to provide consistent level of detail and analysis. | Statement added to summarize that all receptors within this segment validate. |
| 547 | FHWA | Page 50 Section 2.5.2 | Discuss what was done (or not done) and why for the receptor that didn't validate, especially considering it is off by 12 dBA. This effort is described in detail for other segments, but not here. It appears that it is well below the NAC and therefore not critical. Is that the case? Discuss. | Added discussion of R1-23-12. |
| 548 | FHWA | Page 51 Section 2.6.2 | The level of detail provided for noise monitoring is much more detailed here than any other section. Recommend providing a consistent level of detail throughout. | The information depicted in each section of this report have been compiled from different sources, there will be effort for the FEIS document to maintain better consistency throughout the document. |
| 549 | FHWA | Page 54 Section 3.1 | Why not include the criteria of substantial increase? Is there no possibility that adding 2 lanes could cause that? I am not familiar with any rule that says you can exclude that possibility. | Added a statement that due to the high background noise levels and widening of an existing road, substantial increases would not be expected. |
| 550 | FHWA | Page 55 Section 3.3B | See comment for page 54 section 3.1. How can you be sure that there is no location that doesn't exceed/approach the NAC that wouldn't have a substantial increase unless you looked? The data is already available in TNM, so why not check? If all approached/exceeded then you wouldn't have to check, but otherwise it seems you would. | TNM does not automatically calculate this. The existing noise levels column is information that you have to manually enter, all TNM does is automatically calculate the increase over existing when it calculates a predicted noise level. To get this data to enter you either have to take a field measurement at each receptor or create another full set of TNM runs with existing traffic data to calculate them so it is like analyzing an additional full alternative. |


| 551 | FHWA | Page 55 Section 3.3B | Specific reference is made to 75 dBA, which is not the level to approach/exceed the NAC.  Please either state somewhere what the importance of 75 dBA is to the discussion or eliminate this and simply say how many approach/exceed.  Since the reasonableness criteria is not introduced until the next section, I feel it is not necessary here and only causes confusion. | MDOT SHA policy allows for an increase in the square footage of barrier per benefit evaluation threshold if noise levels are above 75 dBA.  This is explained in table 4.1 in section 4.2.5. |
| --- | --- | --- | --- | --- |
| 552 | FHWA | Page 64 Section 4.5.1 (B) and (C) | Why were the barriers in Phase 2 and Phase 3 designated separately if the analysis for them will be the same? | The existing barriers along 495 were built in two general phases, barriers analyzed and designed prior to 1995 (built in 1982-1998), and then another initiative came through and built additional barriers in the early 2000s.  Both phases of barriers are to be handled the same by the MLS project since they are both still existing barrier to this project, but the phase 2 and 3 designations were used just to distinguish at what phase of the roadway's life cycle the barriers were constructed. |
| 553 | FHWA | Page 66 Table 4-2 | Why are R1-01-01 and R1-01-02 not highlighted blue for Alt 5 and Alts/ 8/9/10/13B/13C when they provide 7 and 10/11 dBA reductions respectively.  I only see 5 impacted and benefited residences for both options, not 8 and 13 as shown in the table.  I assume each receptor may count as more than one residence.  Add a column to reflect that so the reader can make sense of the math provided here.  Same for all tables. | The blue shading is meant to highlight the benefits at critical receptors, which are the first row receptors where the worst-case noise impacts occur.  In many cases the barriers were able to provide 7 dBA insertion losses at second row receptors and other locations where lower impacts were identified.  See #554 regarding the benefit totals. |
| 554 | FHWA | Page 65 Section 4.5.2 and 4.5.3 A | It states that the majority of impacted residences receive at least a 7-dBA reduction.  Based on the table there is no way for the reader to determine this. | The benefits were calculated graphically by interpolating between results at receptors and marking individual residences on a map.  This data is available it just may take a while to compile the data and present it.  Our exhibits are already very cluttered so we did not want to add more information there, and due to the interpolation the results may be difficult to depict by assigning dwelling units to the tables.  This will be addressed for the FEIS submission. |
| 555 | FHWA | Section 4. Page 66 Overall and Tables | I cannot determine how many residences are benefited or impacted because the number of residences per receptor are not provided in the tables.  I also cannot determine whether design goals are met from this data.  This should be included in the table.  An example can be provided if requested/desired.  No review was done for this concept/data throughout the report as it cannot be verified (not even through other appendix data which is a problem). | Same as #554. |
| 556 | FHWA | Page 94 Section 4.5.17 | Text says barrier for NSA 1-12 is not reasonable.  Yet table shows only approx. 500 sf/br.  So why is it not reasonable?  Add text to explain that a barrier does exist in part of this location already. | The barrier extension on its own for NSA 1-12 does not meet reasonableness criteria, but when combined with the results from the existing barrier that is being extended the overall system meets criteria.  Text has been revised to clarify this. |
| 557 | FHWA | Page 100 Section 4.5.21 | The text states that a 7-dBA reduction could not be reached by extending the existing wall to cover NSA 1-36, yet no table is provided with documentation.  Please include a table. | The tables for this section were accidentally placed within the 4.5.22 barrier system MD-22 section, but have been moved back where they belong. |
| 558 | FHWA | Page 100 Section 4.5.21A | This section's title includes an 'NSA 1-36' but such an NSA is not discussed the text for barrier MD-21. | The last sentence of the first paragraph in this section states that an extension to protect NSA 1-36 was considered, but did not meet criteria. |
| 559 | FHWA | Page various Section 4.5 | Consistency – for some NSAs it states in the text what the square footage requirement is, and some it does not.  Please add that information to all NSAs. | Same as #542. |
| 560 | FHWA | Page 156 and 158 Section 4.5.52 and .53 | Typo – references NSA 2-30, but should say 2-31 and 2-32 respectively in both sections. | Typos corrected. |
| 561 | FHWA | Page 158 Section 4.5.54 | The barrier for areas south of MD214 – it appears that the only receptor for this area is R1-26-01.  If that is correct, then it doesn't meet warrants to consider a wall.  Either edit, or better spell out which receptors match which section.  And if that section meets warrants, then did you consider something closer to the houses that would require ROW acquisition?  That should be discussed.  Please revise as appropriate. | The Structure shown on the aerial image just south of MD 214 has been demolished and new townhomes have been constructed in their place.  Receptors 2-26-19 through 2-26-24 in the table represent these new townhomes.  These receptors need to be added to the exhibit along with maybe a note about the new townhomes.  Will be addressed for FEIS submission. |
| 562 | FHWA | Page - various Section 4.6.1 – 4.6.10 | Review and provide better consistency in the level of detail provided throughout the report.  I prefer the detail provided here as it does not require the reader to count everything up in the table themselves to try to come up with the numbers, although again, it is still necessary to provide the number of residences at each receptor in order to follow/verify the math at the bottom. | Same as comments 548 and 554. |



| 563 | FHWA | Page 173 Section 4.6.2A | Unclear how these barriers were designed such that they can benefit many non-impacted receptors, but only 2 impacted receptors. Given that it is an area of either non-sensitive, commercial, or recreational series of land uses – how were the receptors placed? | This area represents a walking path and various outdoor seating areas within the Washingtonian Rio shopping center. The path loops around a lake and there are several rows of receptors and all of the benefits were calculated using equivalent residential unit calculations. Some areas that counted for a significant number of equivalent residences were located just outside the area that was impacted, but since they were located behind the impacted path they were benefited by the proposed barrier. Some of the columns in the table had not been updated per the final barrier design and this has been revised. |
|---|---|---|---|---|
| 564 | FHWA | Page 183 Section 4.6.8A | Please add why/how they don't meet the design goal (meaning X% reach it which is less than the 50% required). | Added a statement that the barrier does not meet reasonableness due to not achieving the design goal of 7 dB(A) for at least 50% of the impacted residences. |
| 565 | FHWA | Page 183 Section 4.6.8A | This section opens by stating that barriers were designed in the model to achieve the 7dB required reduction; but in the last paragraph on this page it concludes by stating that none of the barriers could achieve the 7-dB reduction. The conclusion is confusing, given the statements made in the previous paragraphs. When this is reanalyzed for the FEIS, to include the berm, please ensure the summaries support the final conclusion. | The wording has been adjusted for barrier systems 270-1 through 270-6. |
| 566 | FHWA | Mapping Section | I tried to find Map 60, but the NTR Mapping file does not include it. Please check mapping file, it seems to only have 64 pages and is missing several pages. | Map included in next draft. The sheets are laid out in this order: Sheets 1-52 495 in MD, 53-59 I-270, 60-64 I-270 spurs, 65-71 I-270, 72-76 I-270 spurs, 77-78 I-95, 79-80 495 in VA. |
| 567 | FHWA | Page 199 Section 4.6.11 (A) and (B) | It is not clear in this section why this NSA was broken into subsections, or whether the existing barrier is being partially or totally relocated; nor why the replacement only focuses on two sub-areas within the larger NSA. Will the developer-built barrier be impacted, or will the recently built 2002 noise barriers be impacted | Reformatted section to describe the areas geographically and changed headings to refer to NSAs similar to other sections. |
| 568 | FHWA | Page 199 Table 4-181 | Check title. Refers to NSA 136 and 201 which should say NSA 5-31 (areas 136 and 201 although I don't know what th4ose areas mean, and I cannot check the mapping since it is not in the file (see previous comment on mapping). | Fixed typo in table title. |
| 569 | FHWA | Page 200 Section 4.6.11B | Text shows that NSA 5-31 has more than one barrier in it. There is no conclusion on this piece of barrier that has been analyzed. Add a conclusion, and as per comment above, make it more clear what the areas mean, and how the analysis was done and make sure table titles are clear with the text as to what is being stated here. | Barrier system 270-7, A should reference NSA 5-30, and 270-7, B should reference NSA 5-31, conclusion has been added to 5-31. |
| 570 | FHWA | Page 201 Section 4.6.12 | Section I-270 Barrier Analyses - It is not clear in this section why several NSAs were broken into so many subsections, instead of multiple NSAs, for impact and abatement analysis. Why was this area evaluated differently than the 'MD'-series barriers? | Reformatted section to describe the areas geographically and changed headings to refer to NSAs similar to other sections. |
| 571 | FHWA | Page 213 Section 4.6.13C | It is unclear whether the existing barrier will remain or be rebuilt, or just removed. Earlier (introductory) text seemed to indicate existing walls would not be removed entirely. However, the text here implies it might be. Be sure text is consistent and be clear in all sections as to the intent. | Portions of the wall will remain, while other will require to be reconstructed, text revised to indicate this. |
| 572 | FHWA | Page 224 Section 4.8.1 | Text says the majority get 7dBA reduction on page 224, but page 225 says IS reasonable because the majority DO NOT. Revise per correct information and adjust ES as necessary as well. | Typo corrected. |
| 573 | FHWA | Page 225 Section 4.8.1A | The conclusion in this section states that 'A noise barrier is considered feasible and is considered reasonable due to not meeting insertion loss design goals for NSA BW-N'.<br><br>I think that should say '[…] is not considered reasonable […]' based on the data in Table 4-199. | The results have been doublechecked for this barrier and it does not meet criteria, so the text has been revised accordingly. |
| 574 | FHWA | Page 229 Section 4.9.2 | ==Discuss whether you can build a wall on the top of the hill in front of the houses (purchasing ROW).== | This barrier will be reevaluated using information provided from VDOT prior to the FEIS. |
| 575 | FHWA | Page 234 Section 5.1 | In the second paragraph, please be clear that these areas will not be eligible for future Federal-aid participation for Type II projects. | Text revised. |
| 576 | FHWA | Page 235 Section 5.2 | Since this is such a large project, does MD plan to recommend any particular physical mitigation measures to the contractor, or include any in the Final Design plans? | Construction sequencing will be addressed during the final design phase. |
| 577 | FHWA | Page – general Section | ==The analysis for NSA 5-30 is missing in the detailed text.== | Barrier system 270-7, A should reference NSA 5-30, and 270-7, B should reference NSA 5-31, NSA 5-30 label has been added to the spurs mapping. |
| 578 | FHWA | Page 235 Section 5.2 | Will the RCNM be used for this project? Text states that it is not required. Either state that it will be used, will be provided for use in final design, or don't mention this at all. | Removed text discussing use of the model since it is not a requirement. |

**Appendix K – Natural Resources**

00189857

| 579 | FHWA | Page 15 Section 2.2 | In the 1st full paragraph, 4th sentence, what is "EPA-projected reductions" referring to? Consider clarifying. | The reductions refer to emissions. The project level air quality analysis shows that worst-case CO emissions for the design year would be well below the CO NAAQS, MSAT emissions would remain the same or slightly decrease from no build to build conditions in 2040 and GHG emissions are shown to increase slightly from the no build to build conditions in 2040. MSAT and GHG emissions do decrease significantly overall from existing conditions to 2040 and that is owing to improved fuels and vehicle technologies that would be implemented in the future. See Appendix I: Air Quality Technical Report for further detail. |
| --- | --- | --- | --- | --- |
| 580 | FHWA | Page 17 Section 2.3.1 A | In the 2nd paragraph, 1st sentence, there is reference to Appendix D, Map 5. However, the maps in Appendix D are not labeled by number. Recommend doing so. | Thanks for pointing this out – this should have been referenced as "Overview Map." Text was revised. |
| 581 | FHWA | Page 18 Section 2.3.1 B | In the second bulleted list (functions and values), "wildlife habitat" is listed twice. | Revised as noted. |
| 582 | FHWA | Page 19 Section 2.3.1 B | In the 3rd full paragraph, 3rd sentence, what is the project implications from the statement that MDE does not consider ephemeral ditches "jurisdictional", while the USACE does? Would this benefit from additional information? | The text states that MDE does not regulate ephemeral **channels**, while USACE does. We are simply pointing out differences in regulatory authority. |
| 583 | FHWA | Page 20 Section 2.3.2 | In the bulleted list, "wildlife habitat" is listed twice. | Revised as noted. |
| 584 | FHWA | Page 31 Section 2.3.4 | Replace "Screened Alternative" with Build Alternative. Please make this change throughout the document. | "Screened Alternatives" is the correct terminology for Technical Reports. The term "Build Alternatives" is used in the DEIS, Draft CMP, and AMR. |
| 585 | FHWA | Page 32-35 Section 2.3.4 B | For the various roadside designs, is this a good location to address some of the maintenance issues or other considerations for each? For example, utilizing underground vaults would introduce additional maintenance responsibilities. | Detail regarding stormwater management will be included in the *Documentation of MDOT SHA's Stormwater Management Assumptions - February 2020* |
| 586 | FHWA | Page 37 Section 2.3.4C | When will draft 2015 MDOT SHA Site Selection Process document be finalized? | It is unclear whether MDOT SHA intends to finalize this document, but this was the latest guidance available at the time of mitigation site surveys. |
| 587 | FHWA | Page 37 Section 2.3.4 C | 1st and 2nd full paragraphs: Is there a documented list of wetland mitigation sites, with scores and rankings, available and able to be tracked? Further, have the potential stream mitigation sites been scored and ranked? The text seems to indicate this is not yet underway. | Yes, both the potential wetland and stream mitigation sites were ranked/scored and the Draft CMP details this process. The NRTR was revised to reference all ranking/scoring to past tense. |
| 588 | FHWA | Page 79 Section 2.4.3 B | The last sentence refers to designing the bridges over the scenic rivers "to protect the scenic value of the resource." Recommend noting when this will be worked out and with whom will coordination take place. | MDNR commented on this section as well and instructed MDOT SHA to add: "MDNR will assist the project team with coordination for Maryland Scenic and Wild Rivers; ALB reconstruction design and impacts will be a part of this coordination." |
| 589 | FHWA | Page 80 Section 2.4.3 C | 3rd paragraph: Is the reduction and/or treatment of organic pollutants (dioxins and PCBs) addressed? Recommend doing so, if not. However, disregard comment if it's addressed within document (may have missed it). | Text was revised to note that SWM measures taken to reduce erosion and sediment transport will also reduce the transport of toxic contaminants that are sediment-bound or possess sediment-like qualities (e.g, PCBs, dioxins, trace metals). |
| 590 | FHWA | Page 95 Section 2.7.1 | 4th Paragraph/8th Sentence: Recommend beginning new paragraph here "Data from the 2006…" | Good suggestion. Revised. |
| 591 | FHWA | Page 96 Section 2.7.2 | In the 2nd paragraph, Last sentence, consider adding how it was determined that the land cover and vegetative communities are generally the same as 2006 data. Could be something as simple as GIS/aerial review and/or windshield surveys. | Revised to include windshield survey and aerial review. |
| 592 | FHWA | Page 98 Section 2.7.2 | Why was forest data not collected for Virginia portion of the corridor study boundary? | No previous forest inventories were available and no new forest data was collected in the field for this project. |
| 593 | FHWA | Page 105 Section 2.7.3 | In the 2nd sentence under Environmental Effects, recommend adding "noise barriers" to the list of activities that may result in removal/disturbance. | Revised to include reference to noise barriers. |
| 594 | FHWA | Page 108 Section 2.8.1 | The 2nd paragraph concludes with a reference to the DOI Solicitor's Memo… with this opinion, what is the approach the project team will be taking re: the MBTA? | This paragraph does not relate to our approach but presents the pertinent regulations. Sections 2.8.3 and 2.8.4 explains effects and approaches to minimizing/avoiding impacts. |
| 595 | FHWA | Page 111-112 Section 2.8.4 | In addition to options such as fencing and landscaping, any consideration given to investigating potential wildlife underpasses(es) to minimize vehicle collisions and to minimize the highways' impacts to habitat connectivity? | Since the design is preliminary, the design has not yet determined whether other potential minimization measures are necessary. |

| 596 | FHWA | Page 148 Section 2.9.3 | In the final paragraph of the section, it appears that one of the points of the discussion is that the potential impacts from increased impervious surface are relative, keeping in mind that those watersheds that already exceed the 15% threshold are considered 'impacted' and therefore the additional impacts from the Screened Alts would not be overly concerning when compared to those watersheds below 15%. If this is the case, consider how this can be clarified. | Yes, this paragraph is generally making the point that an increase in impervious surface in a degraded watershed with 32% existing impervious would result in less of a change to aquatic communities relative to a less degraded watershed (or a watershed closer to the 15% threshold). The text has been revised for clarity. |
| --- | --- | --- | --- | --- |
| 597 | FHWA | Page 149 Section Table 2.9-60 | Any benefit from updating the table to indicate the percent additional impervious? | There is no benefit to presenting the information as percentages. |
| 598 | FHWA | Page 152 Section 2.10.1 | Regarding the NLEB, how does the project team intend to proceed considering the recent court decision on listing the species as 'threatened'? Recommend noting the decision and addressing next steps. | Coordination is ongoing with USFWS. We will revise based on any further coordination if necessary. |
| 599 | FHWA | Page 160 Section 2.10.4 | 1st paragraph/Last 2 sentences: Is there citable research that supports the statement that bats "would likely seek other suitable roosting sites…"? It stands to reason but supporting data would help. In the last sentence, in reference to the "large stands of suitable forest habitat", to what extent will this habitat be impacted by the project? | No scholarly articles could be found to support this statement; however, this is generally the case with other mammals and birds that move out of active construction zones due noise and increased activity.

Regarding the potential impact to forest near where bat guano was found, the sentence was slightly modified to indicate that the large forest areas extend well beyond the limits of project disturbance and could provide alternate roosting opportunities. |
| | | **Appendix O – Indirect and Cumulative Effects** | | |
| 600 | FHWA | Page 10 Table 2-1 and Section 2.2.2A | Text in 2.2.2A for watersheds does not match the table completely. Table includes forests, but text does not mention forests. Text mentions hazardous materials, but hazardous materials are not included in the table. Be sure they are consistent. | Revised for consistency |
| 601 | FHWA | Page 22 Section 2.2.4C and Table 2-4 | Resources discussed in the text in 2.2.4.C (natural resources) do not match what is shown in Table 2-4. Some are missing in the table. Please revise for consistency to include all resources that were analyzed. | Revised to include air quality in the text document |
| 602 | FHWA | Page 23 Section 3.1.1A. a | Has Montgomery County's General Plan update been finalized? Update the reference to "current progress as of May 2019" to something in January/February 2020 and update any references and text as appropriate if the new plan is finalized. | Revised with most recent information available |
| 603 | FHWA | Page 39 Section 3.1.2 | Last para – typo – I-720 should read I-270 | Corrected |
| 604 | FHWA | Page 44 Section 3.1.3A | Move the paragraph about the Amazon National Landing HQ up before the para that states that none of the future development is dependent upon this project. Having it after that statement implies it might be dependent, which I don't believe is the case, is it? | Moved |
| 605 | FHWA | Page 52 Section 3.2.1B | References to Section 4(f) should be to the USDOT Act of 1966. LWCF stands for the Land and Water Conservation Fund, not the Land and Wildlife Conservation Fund. | Revised |
| 606 | FHWA | Page 53 Section 3.2.1B | Add a statement about parkland mitigation you are incorporating. Is there mitigation for parkland being acquired in more urban areas to help offset the impact? | Coordination is ongoing with OWJ regarding public parks mitigation; specific mitigation such as parkland acquisition has not been determined yet. |
| 607 | FHWA | Page 53 Section 3.2.2 | Intro says that an effect determination is pending. Update this, later text indicates an Adverse Effect finding has been made. | Adverse effect finding was just made and has been updated |
| 608 | FHWA | Page 54 Section 3.2.2B | 1st full para, last sentence. Change this sentence to remove reference to cumulative effects. Since cumulative impacts include the direct impacts of this project, it is not technically correct to state that there are no cumulative adverse effects specifically caused by the undertaking. | Revised to remove "cumulative" from that sentence. |
| 609 | FHWA | Page 59 Section 3.2.3B. a | Last para of this section – all direct and indirect impacts would require wetland replacement, would they not? Will any replacement occur in the study area or ICE area? That should be noted as offsetting some of these impacts. It is mentioned below in cumulative, but not here where direct impacts are also mentioned. | Added mention of permitting and mitigation, similar to mention below in Cumulative. |
| 610 | FHWA | Page 65 Section 3.2.3F | Last statement of the intro states that there are no anticipated effects to RTE species. However, in the cumulative section below, it states that the project will impact T&E habitat. These 2 statements are contradictory. Revise text to clarify. | Revised to distinguish that though there would be habitat potentially impacted, there are no known federal or state-listed species present within the corridor study boundary. |

00189859

| 611 | FHWA | Page 66 Section 3.2.3F | Discuss what the habitat impacts for RTE are here, and what mitigation is being pursued (if known).  Text states that the screened alts would require major incremental impacts to habitat.  How much bat habitat is being cleared for instance? | Added additional reference to this information in the NR tech report. Mitigation is not fully determined yet. The intent here is not to go into great detail about direct impacts, but rather to discuss the incremental impacts in the context of other past, present and future actions. It is considered major because there have been numerous many other impacts to wildlife habitat in general. |
|---|---|---|---|---|
| 612 | FHWA | Page 68 Section 3.3 | 1st para – this para seems out of place.  Move up before the last para on page 69 which seems to be concluding that indirect impacts from development would be minimal. | Moved paragraph |
| 613 | FHWA | Page 68 Section 3.3 | 2nd para – while there is potential for indirect impacts to water quality etc. as noted, E&S controls and permitting requirements would minimize increases in sediment and runoff.  This should be mentioned.  The para earlier notes that added development is not really occurring substantially as a result of this project.  Therefore, the primary indirect impact to waters from sediment is from this project which will be controlled by permits (as will developments).  Highlight that fact here. | Added reference to E&S controls and permitting requirements as minimization for water quality. |