

I-495 & I-270 Managed Lanes Study

# Cultural Resources Treatment Plan
## FOR THE MORNINGSTAR CEMETERY AND MONTGOMERY COUNTY POOR FARM CEMETERY
### FOR THE I-495/I-270 MANAGED LANES STUDY, MONTGOMERY COUNTY, MARYLAND

## March 2022

**Maryland Department of Transportation State Highway Administration**

**Prepared by:**



**For**







00198490

**DRAFT**

# CULTURAL RESOURCES TREATMENT PLAN FOR THE MORNINGSTAR CEMETERY AND MONTGOMERY COUNTY POOR FARM CEMETERY FOR THE I-495/I-270 MANAGED LANES STUDY, MONTGOMERY COUNTY, MARYLAND

**Project No. AW073A13**

Submitted to:

MARYLAND DEPARTMENT OF TRANSPORTATION'S
STATE HIGHWAY ADMINISTRATION
707 North Calvert Street
Baltimore, Maryland 21202

Submitted by:

TRC ENVIRONMENTAL CORPORATION
50101 Governors Drive, Suite 250
Chapel Hill, North Carolina 27517

Heather Millis, Principal Investigator

Authored by Heather Millis

March 31, 2022

00198491

# ACKNOWLEDGMENTS

The author would like to acknowledge the assistance of a number of individuals. In particular, I would like to thank Richard Ervin and Steve Archer of the Maryland Department of Transportation's State Highway Administration (MDOT SHA) for providing information, support, and advice as well as for assistance in writing this plan. Dale Shelton and Heather Quinn, Geologists at the Maryland Geological Survey; Adrienne Craver, Administrative Specialist at the Office of the Montgomery County Executive; Sarah Hedlund, Archivist at Montgomery History; Brian Crane, Archaeologist with the Montgomery County Historic Preservation Commission; James Watson, Director of Digital Acquisition, Processing and Publication at the Maryland State Archives; Rachel Frazier, Search Room Coordinator at the Maryland State Archives; and Cat Warren at North Carolina State University are also greatly appreciated for providing research materials and advice. It should also be acknowledged that context included in this plan was extracted from a number of Managed Lanes Study (MLS, Project) Project sources contained within the Project cultural resources compliance reports written and compiled by others with Rummel, Klepper, and Kahl, LLP; Applied Archaeology and Historic Associates, Inc.; and A.D. Marble (Arnold et al. 2021; Falchetta et al. 2021; Hutchins-Keim et al. 2018), as well as the MLS Project Programmatic Agreement and research summaries written by Richard Ervin of the MDOT SHA.

Several individuals at TRC helped to complete this Project. Heather Millis conducted background research and authored the plan. The graphics were created by Matt Paré, and Paul Webb provided an internal review of the plan.

00198492

# CONTENTS

ACKNOWLEDGMENTS ........................................................................................................ i
LIST OF FIGURES AND TABLES ..................................................................................... iv
LIST OF ACRONYMS AND ABBREVIATIONS ............................................................. v

1. INTRODUCTION ............................................................................................................ 1
    Project Description ........................................................................................................ 1
    Regulatory Framework .................................................................................................. 1
        Section 106 of the National Historic Preservation Act ........................................... 1
        Maryland and Virginia Cemetery Laws and Statutes ............................................. 1
    Section 106 of the NHPA Project Implementation ....................................................... 2
        Previously Conducted Research .............................................................................. 2
        Treatment Plan Development .................................................................................. 3
    Document Organization ................................................................................................ 3

2. MORNINGSTAR CEMETERY ...................................................................................... 4
    Site Treatment Plan Research Methods ......................................................................... 4
        Previously Conducted Research .............................................................................. 4
        Additional Research ................................................................................................ 5
        Defining Areas that Require Archaeological Investigation ..................................... 5
    Environmental Context ................................................................................................. 6
        Location, Topography, and Soils ............................................................................ 6
        Land Use History and Current Conditions .............................................................. 6
    Cultural Context ............................................................................................................ 8
        Moses Hall .............................................................................................................. 8
        Gibson Grove Community ....................................................................................... 8
    Treatment Goals ............................................................................................................ 9
        Consultation with Local and Regional Experts ...................................................... 9
        Additional Remote Sensing Survey ........................................................................ 9
    Treatment Methods ....................................................................................................... 9
        Early Coordination and Permitting ......................................................................... 10
            Consultation with Local and Regional Experts ................................................. 10
            Permits ............................................................................................................... 10
        Archaeological Fieldwork ....................................................................................... 10
            Additional Remote Sensing Survey ................................................................... 10
            Machine and Hand Stripping of the LOD ........................................................... 10
            Identification and Treatment of Human Remains or Funerary Objects ............... 11
        Reporting ................................................................................................................ 11
        Summary of Expected Steps of Coordination and Fieldwork ................................. 12

3. MONTGOMERY COUNTY POOR FARM CEMETERY ............................................. 16
    Site Treatment Plan Research Methods ......................................................................... 16
        Previously Conducted Research .............................................................................. 16
        Additional Research ................................................................................................ 18
        Defining Areas that Require Archaeological Investigation ..................................... 18
    Environmental Context ................................................................................................. 18
        Location, Topography, and Soils ............................................................................ 18
        Land Use History and Current Conditions .............................................................. 19
    Cultural Context ............................................................................................................ 21
        Late Eighteenth Century through Nineteenth Century ............................................ 21
        Twentieth Century .................................................................................................. 23

00198493

Treatment Goals ............................................................................................................... 28
    Consultation with Local and Regional Experts ................................................ 28
    Identification of Potential Interments within the LOD ..................................... 28
Treatment Methods ......................................................................................................... 28
    Early Coordination and Permitting .................................................................. 28
        Defining the Limits of Field Investigation ................................................ 28
        Permits .......................................................................................................... 29
    Initial Field Investigations ................................................................................ 29
        Identification of Potential Interments within the LOD ............................... 29
    Additional Noninvasive Survey ........................................................................ 30
    Machine and Hand Stripping of the LOD .......................................................... 30
        Full Stripping Areas ..................................................................................... 30
        Sample Stripping Areas ................................................................................ 31
        Re-Interment ................................................................................................ 31
    Evaluation of NRHP Eligibility ....................................................................... 32
Consultation Plan ........................................................................................................... 32

4. GENERAL PROCEDURES ........................................................................................ 40
Professional Qualifications of Project Personnel ............................................................ 40
Respectful Treatment of Human Remains ..................................................................... 40
Burial Protective Measures ............................................................................................. 41
Changes to the LOD Affecting Either Cemetery ............................................................ 41
Identification of Areas Requiring Archaeological Monitoring During Construction ................... 41
Monitoring Plan ............................................................................................................. 41

5. REPORTING .............................................................................................................. 43
Cultural Resources Report ............................................................................................. 43

6. REFERENCES ............................................................................................................ 44

APPENDIX 1:  INADVERTENT DISCOVERY PLAN

iii

00198494

# FIGURES

2.1.  Location of Morningstar Cemetery .............................................................. 13
2.2.  Morningstar Cemetery and the MLS Project LOD ....................................... 14
2.3.  Morningstar Cemetery Treatment Plan ........................................................ 15
3.1.  Location of Montgomery County Poor Farm Cemetery and Nearby Survey Areas ...................... 33
3.2.  Montgomery County Poor Farm Cemetery and Nearby Survey Areas and the MLS Project LOD 34
3.3.  Location of 1987 Excavation Trenches and Burials in Relation to Site 18MO266 and the MLS Project LOD .................................................................. 35
3.4.  Portion of 1923 USGS Map Showing Montgomery County Poor Farm Cemetery and the MLS Project LOD .................................................................. 36
3.5.  Portion of 1957 Aerial Photograph Showing Montgomery County Poor Farm Cemetery and the MLS Project LOD .................................................................. 37
3.6.  Memorial Marker for Montgomery County Poor Farm Cemetery Re-Interments in Parklawn Cemetery ............................................................................ 38
3.7.  Montgomery County Poor Farm Cemetery Investigation Stripping Areas .................................... 39

# TABLES

3.1.  Summary of Federal Census Data for Montgomery County Poor Farm ......................................... 22

00198495

# LIST OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| AAHA | Applied Archaeology and History Associates, Inc. |
| ACHP | Advisory Council on Historic Preservation |
| APE | Area of Potential Effects |
| ARPA | Archaeological Resources Protection Act |
| CFR | Code of Federal Regulations |
| CSB | Corridor Study Boundary |
| C&O | Cumberland and Ohio |
| DHR | Virginia Department of Historic Resources |
| FHWA | Federal Highway Administration |
| FR | Federal Register |
| GIS | Geographic Information System |
| GPR | Ground Penetrating Radar |
| GPS | Global Positioning System |
| I-270 | Interstate 270 |
| I-495 | Interstate 495 |
| JPPM | Jefferson Patterson Park and Museum |
| LiDAR | Light Detection and Ranging |
| MLS | Managed Lanes Study |
| MAC Lab | Maryland Archaeological Conservation Laboratory |
| MDOT | Maryland Department of Transportation |
| MGS | Maryland Geological Survey |
| MHT | Maryland Historical Trust |
| MIHP | Maryland Inventory of Historic Properties |
| M-NCPPC | Maryland National Capital Parks and Planning Commission |
| MSA | Maryland State Archives |
| MOA | Memorandum of Agreement |
| MCHPC | Montgomery County Historic Preservation Commission |
| NAGPRA | Native American Graves Protection and Repatriation Act |
| NHPA | National Historic Preservation Act |
| PA | Programmatic Agreement |
| RK&K | Rummel, Klepper & Kahl, LLP |
| ROW | Right-of-Way |
| SHA | State Highway Administration |
| SHPO | State Historic Preservation Officer |
| SOI | Secretary of the Interior |
| SWM | Stormwater Management |
| TRC | TRC Environmental Corporation |
| USACE | U.S. Army Corps of Engineers |
| UTM | Universal Transverse Mercator |
| WPA | Works Progress Administration |

00198496

# 1.  INTRODUCTION

**PROJECT DESCRIPTION**

The Managed Lanes Study (MLS, Project) involves the construction of Priced Managed Lanes to address congestion along Interstates 495 and 270, the two most heavily traveled freeways in the National Capital Region. It is the first element of the broader Op Lanes Maryland (Traffic Relief Program), which considers improvements along the entire length of I-495 (Capital Beltway) in Maryland, connecting into Virginia's portion of I-495, as well as the entire length of I-270 (Dwight D. Eisenhower Memorial Highway) up to I-70 in Frederick County, Maryland. The Maryland Department of Transportation State Highway Administration (MDOT SHA), with the approval of the U.S. Department of Transportation, Federal Highway Administration (FHWA), intends to deliver the Project as a Public-Private Partnership using the services of a private sector developer. The I-495 and I-270 Managed Lanes Study Project, a portion of the Program, will be implemented in Phases that are not yet fully defined, but the MDOT SHA has identified the Preferred Alternative (Alternative 9 Phase I South) for the MLS Project, beginning in Fairfax County, Virginia, and extending north to approximately I-370, and east along the separated portions of the I-495 "spurs" to approximately Maryland Route 187.

**REGULATORY FRAMEWORK**

### Section 106 of the National Historic Preservation Act

As the lead federal agency, the FHWA has determined that the I-495 & I-270 MLS Project, administered by the MDOT SHA, is an undertaking as defined in 36 Code of Federal Regulations (CFR) §800.16(y), and thus is subject to review under Section 106 of the National Historic Preservation Act (NHPA), 54 U.S.C. § 306108 and codified in its implementing regulations, *Protection of Historic Properties* (36 CFR Part 800), as amended (August 5, 2004). The FHWA has determined that historic properties will be adversely affected by the undertaking, and as described in 36 CFR Part 800.14(b), a Programmatic Agreement (PA) was developed to govern the implementation of the undertaking and the resolution of adverse effects associated with this complex Project. Although the FHWA is the lead federal agency and is responsible for ensuring that the terms of the Project PA are carried out, the MDOT SHA is a delegated authority under the Project PA to continue defined aspects of consultation, Project compliance review, and mitigation implementation. The MDOT SHA will be primarily responsible for implementation of the Project PA, and actions resulting from the Project PA stipulations, except where otherwise specified in the Project PA. This cemetery and human remains treatment plan is a commitment of the Project PA and was developed to fulfill the commitment.

### Maryland and Virginia Cemetery Laws and Statutes

Human burial sites are protected in Maryland by Article 27, §§ 265 and 267 of the Annotated Code of Maryland; and in Virginia by §§ 10.1-2305, 18.2-126, 18.2-127, and 57-36 of the Code of Virginia. If human remains are encountered at any time during the performance of work associated with the execution of this treatment plan, they will be respectfully treated in accordance with appropriate federal, state, and county statutes and guidelines.

1

**SECTION 106 OF THE NHPA PROJECT IMPLEMENTATION**

**Previously Conducted Research**

The FHWA and the MDOT SHA have prepared an Environmental Impact Statement (EIS) under the National Environmental Policy Act (NEPA) for the I-495 & I-270 MLS Project. In support of the EIS, MDOT SHA commissioned the *Archaeological and Historic Architectural Gap Analysis and Assessment* to assess the potential for archaeological and historic architectural resources to be affected by the I-495 & I-270 MLS Project in Maryland (Hutchins-Keim et al. 2018). The APE is defined as the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties (36 CFR Part 800.16(d)) and considers potential visual, audible, atmospheric, and physical effects to the historic properties. As the precise limits of disturbance for the Project had not been finalized at that time, the FHWA and the MDOT SHA developed a Corridor Study Boundary (CSB), encompassing all areas in which improvements may occur. The CSB extended 300 feet from the centerline on either side of I-495 & I-270 within the study limits, expanding farther at certain interchanges. The CSB was the area where direct effects to historic properties were studied and served as the archaeology survey area. The limits of disturbance (LOD) for the Preferred Alternative now define the portion of the APE where archaeological impacts may occur.

The gap analysis and assessment of the CSB identified previously recorded cultural resources and previously conducted cultural resources studies within the CSB, presented conclusions regarding the archaeological potential within unsurveyed portions of the CSB, and made recommendations for further studies necessary for Project compliance with Section 106. Areas that had been subjected to Phase I archaeological survey that met current MHT standards were eliminated from further analysis. The remaining areas were evaluated for their prehistoric and historic archaeological potential within a GIS-based spatial assessment using seven categories: level of disturbance, parcel width, topographic relief, soil drainage, distance to water resources, distance to recorded archaeological sites, and distance to documented historic structures. Recommendations for additional archaeological survey were made based on the archaeological potential for each area. As part of this analysis, it was recommended that additional investigation or evaluation be conducted for the Montgomery County Poor Farm Cemetery (18MO266) and the Morningstar Cemetery.

Phase I archaeological survey was subsequently conducted by Applied Archaeology and History Associates, Inc. on behalf of Rummel, Klepper & Kahl, LLP (RK&K) under contract to the MDOT SHA (Arnold et al. 2021). Further refinement of the Project limits of disturbance (LOD) for the various alternatives allowing greater design detail than the CSB were made subsequent to that study, although the Phase I survey largely conformed to the previously delineated CSB boundary. However, the evaluation of effects of the undertaking on archaeological resources employed the LOD for the widest Alternative (Number 10) for the I-495 & I-270 MLS Project to allow a conservative assessment of potential impacts.

Sixty-five individual areas for Phase I survey were identified within the archaeology survey area (including several stormwater management locations and two remote sensing areas near the Poor Farm cemetery). Forty-two of the sixty-five survey areas were fully surveyed following MHT standards and eight areas with evidence suggesting the possibility of disturbance were partially surveyed to determine the need for further work; the remainder were not surveyed due to lack of permission for access. Based on the results of that survey, further archaeological investigations were recommended for a number of Survey Areas located in proximity to the Poor Farm Cemetery, along with other surveys areas considered likely to contain significant archaeological resources.

During MLS Project work, the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (Morningstar Cemetery) was determined eligible for the NRHP. Subsequent studies provided additional details regarding

2

00198498

this resource and indicated features that may represent potential graves within the MDOT SHA Right-of-Way (ROW). The MDOT SHA developed an alternative in this area that provides complete avoidance of the Morningstar Cemetery property along with a buffer from the area that may contain potential graves. This additional information was provided to the MHT for review. This document presents proposed methods for accomplishing the additional cultural resource work related to the Montgomery County Poor Farm and Morningstar cemeteries. Survey, Phase II testing, and Phase III data recovery investigations required for the remaining unsurveyed areas and for subsequently identified archaeological sites are outlined in a separate Archaeology Treatment Plan.

### Treatment Plan Development

As stipulated in the Project PA, the MDOT SHA has developed this Cemetery Treatment Plan and the Archaeology Site treatment Plan for the affected historic properties to establish procedures for identifying and completing additional studies that will accommodate the MLS Project LOD and guidelines for any future Project design modifications. The MDOT SHA's goal is to use comprehensive but flexible plans that address the current Project LOD but that can be easily revised and updated in response to Project design advancement. If areas proposed for study in the plan are avoided by revising the Project LOD or other actions, the MDOT SHA will document the revision, including updating effect determinations and seeking SHPO concurrence and consulting with other consulting parties where required, per the Project PA.

## DOCUMENT ORGANIZATION

The following chapters detail the treatment plans for the two cemeteries. Chapters 2 and 3 present the methods used to develop this treatment plan, brief summaries of the environmental setting and cultural context, the proposed research design, and the proposed research methods for each cemetery. More detailed descriptions of the environmental setting and cultural context for each are available in the comprehensive Project reports (Arnold et al. 2021; Falchetta et al. 2021; Hutchins-Keim et al. 2018). Chapters 4 and 5 provide information regarding general procedures and the reporting plan, and Chapter 6 contains a list of references cited in the text.

00198499

# 2. MORNINGSTAR CEMETERY

## SITE TREATMENT PLAN RESEARCH METHODS

### Previously Conducted Research

Prior investigations of the Morningstar Tabernacle No. 88 Moses Hall and Cemetery, M:35-212, have involved extensive and intensive documentary research and archaeological mapping and geophysical noninvasive testing (Arnold et al. 2021; Falchetta et al. 2021; Jones 2010). No subsurface archaeological investigations have been undertaken at the Morningstar Cemetery for the MLS Project.

Archaeological research conducted for the MLS Project Phase I survey involved a pedestrian survey to assess whether undocumented graves might exist within the LOD (at that time the CSB) (Arnold et al. 2021). The survey identified a series of headstones, footstones, and possible grave depressions at the southern end of the parcel containing the Morningstar Cemetery, close to the residential lots along Cypress Grove Lane, but no visible evidence of the cemetery within 50 feet (ft) south of the existing MDOT SHA ROW. It was considered unlikely that additional graves extend farther north into the existing ROW, because Moses Hall once occupied the northern portion of the cemetery parcel, although the possibility could not be discounted. Fieldstone, clay chimney parts, and other building debris, likely representing the remains of Moses Hall, were observed in this portion of the property, suggesting to the researchers that the cemetery did not extend into this area.

Additional archaeological investigation of the cemetery was conducted for the MLS Project between March 2020 and May 2021. That study involved extensive background research, systematic surface inspection and detailed mapping, and removal of vegetation within the cemetery area that was monitored by an archaeologist (Falchetta et al. 2021). The surface inspection identified 109 features (depression, grave marker, stone, or other objects) within the cemetery, including 72 features that represent 66 graves and 37 additional features that could not be confidently associated with a specific grave but were considered likely to be grave related (Falchetta et al. 2021). A majority of the features consist of depressions and unmarked fieldstone markers, but 10 of the grave markers are inscribed, eight of these with dates. Based on historic documents, the earliest interment dates to 1894. In general, graves were found to be oriented in rows along a north-south axis, with the individual interments facing east. The primary area of the cemetery is located in the southwestern portion of the parcel, although at least one row of depressions is located in the northwest corner, and at least one depression was identified within the MDOT SHA ROW. In addition to the cemetery, the foundation of Moses Hall, the Lodge associated with the Gibson Grove chapter of the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses (also referred to as the Order or Moses, see below), and architectural and domestic artifacts likely associated with that structure are located in the north-central portion of the property (Falchetta et al. 2021).

MDOT SHA followed the surface mapping and historical research with a high-resolution ground-penetrating radar (GPR) survey conducted in July 2021 (Falchetta et al. 2021). The GPR survey covered an area containing 0.59 acres, extending west and south to the current property fence, although according to the report "GPR data could not be collected in some areas due to dense clumps of invasive bamboo stems, hay bales, demolition debris associated with the former lodge building, as well as areas of dense vegetation and a fallen tree" and the survey was limited to the east "by undergrowth, the fence, the artificial berm, and the remains of the lodge." A triangular area was surveyed within the MDOT SHA ROW to the north of the current property fence between the cemetery and I-495, extending west just beyond the fence corner to the south and bounded to the north by the break of slope down to the road. That survey identified 189 features interpreted as probable graves and 188 features interpreted as possible graves, most of which are arranged in rows. It was considered likely that additional graves are present in the cemetery, particularly in the areas

4

that could not be investigated. The study identified 14 subsurface anomalies interpreted as possible graves within the MDOT SHA ROW to the north of the enclosed cemetery; an additional 20 anomalies in this area were thought more likely to be related to natural soil variations (Falchetta et al. 2021). Although the GPR reflections in this area are weaker than other parts of the survey area, as a result of this study, the area of possible burial features within the MDOT SHA ROW has been included within the NRHP eligible boundary of the property. Based on the results of that study, the MDOT SHA developed an alternative design and LOD configuration that eliminates all Project impacts within the revised property boundary and avoids associated potential burial features within the MDOT SHA ROW adjacent to the cemetery boundary. No property is needed from the cemetery for either temporary construction or permanent acquisition. The area of possible burial features within the MDOT SHA ROW was included within the NRHP eligible boundary of the property via an update to the MHT in 2022.

In addition to the archaeological investigations, an MHT Determination of Eligibility (DOE) form was completed for the Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212) by the MDOT SHA. The historic property boundary includes three property parcels, to which was added the portion of the MDOT SHA ROW containing possible burials found during the July 2021 GPR study in an updated DOE form submitted to the MHT in January 2022. The property was determined eligible for the NRHP under Criteria A and C, taking into account Criteria Consideration D (cemeteries), with a period of significance from 1887–1973. The MHT concurred with this eligibility determination on September 4, 2020, and the January 2022 updated DOE form added and corrected information but did not change the eligibility determination.

### Additional Research

Research conducted during the development of the site treatment plan for this resource involved the review of previous research associated with the cemetery and associated resources and the acquisition of additional research materials.

### Defining Areas that Require Archaeological Investigation

The proposed LOD has been substantially redesigned to avoid impacts to this resource, and with the current design plans, no impact will occur to the Morningstar Cemetery property and an approximately 65 ft buffer to the west from the area that may contain potential graves (Figures 2.1 and 2.2). As part of the Preferred Alternative, the MDOT SHA will construct a noise barrier along the shoulder of I-495 along the length of the cemetery.

The most recent archaeological investigation involving a high resolution GPR survey informed a revised boundary for the Morningstar Cemetery that includes all areas where features that may represent potential graves were identified. Although it is possible that additional graves are located to the west of the established cemetery boundary on the adjacent property and possibly to the east of the GPR survey area within the Morningstar Cemetery property, those areas will not be impacted by the Project. The area to the north of the cemetery boundary established by the GPR study is within the roadway prism of I-495 and is extensively disturbed from construction of the interstate circa 1961. This portion of the interstate comprises a cut section with an embankment dating from circa 1960 consisting of at least 4 feet of cut into native soil at the northwestern corner of the cemetery, gradually decreasing to the east.

Several consulting parties suggested that the remote sensing survey be extended. One comment suggested that the survey be extended north of the cemetery as far as the edge of paving, to include the beltway cut slope. The GPR survey conducted by Horsley Archaeological Prospecting (HAP) reported in Falchetta et al. 2021 did include a portion of the cut slope, but data collection stopped where vegetation or ground conditions prevented survey; where the depth of the cut slope suggested that any remains would be

00198501

significantly disturbed or entirely truncated by construction; or where safety concerns became an issue alongside the highway. Lane closures and vegetation clearing would allow extension of the GPR survey to the edge of paving, although examination of this additional area may not provide meaningful results. Given the weak nature of feature signals identified on the nearby high ground, it may be impossible to confidently identify potential graves in this area. More importantly, the cut slope removed up to 4 feet of soil to construct the highway, which represents the portion of the soil column where most of the detected burial features occur (that is, the upper 1.4 m or 4.5 feet of the soil column in parts of the cemetery, or in some cases within the upper 1.1 m or 3.6 feet of the soil column in the area north of the fence).

It was also asked whether it would be appropriate to extend the survey farther to the east, where the strip of apparently undisturbed land between the cemetery and the edge of paving narrows until no undisturbed terrain remains. This area was not included in the survey due to the bamboo roots, large rocks, and other debris preventing the collection of useful data (as was also true on the south side of the fence within the cemetery). This area could be cleared for survey, but given the dense bamboo root mat and narrow width of the area in question, it is unlikely that the resulting data would be useful.

Finally, the question was raised about extending the survey to the northwest of the cemetery. It would be necessary to remove some or all of this vegetation in this area to survey here. With only one possible burial detected within around 10 feet of the western extent of the 2021 survey (see Falchetta et al. 2021, Appendix G, Figures 20–21), the GPR data suggest that this marks the edge of the burial ground. However, additional coverage would help to confirm this. The MDOT SHA will conduct additional ground penetrating radar survey to extend the limits of existing coverage as far as feasible to the north, west, and east; however, the data limitations described above may prevent results from being as interpretable as prior work. Further archaeological investigation of the Morningstar Cemetery associated with the MLS Project will be limited to the LOD adjoining the cemetery (approximately one full tax parcel to the west of the cemetery property and as far east as the Moses Hall foundation).

**ENVIRONMENTAL CONTEXT**

### Location, Topography, and Soils

The Morningstar Cemetery is located about 400 ft west of Seven Locks Road and just south of I-495 in Cabin John. It was closely associated with, but not part of, the Gibson Grove AME Zion Church, which was located on neighboring property prior to the construction of I-495 through this area (Figure 2.1). The Morningstar Cemetery and former Moses Hall location are situated on a ridge nose overlooking a small tributary to Cabin John Creek, and the access path to the cemetery runs along the adjacent side slope and terraces. The area is underlain by Glenelg silt loam series soils (8–15% slopes), which are very deep, well-drained soils formed in residuum weathered from micaceous schist, and well-drained Brinklow-Blocktown channery silt loams (15–25% slopes), which are gravelly residuum weathered from low base phyllites and schists (USDA NRCS 2021).

### Land Use History and Current Conditions

Detailed land use history information for this area is presented in Falchetta et al. 2021, and only a summary is presented here. The Gibson Grove AME Zion Church and Moses Hall are depicted on early twentieth century maps, and the Moses Hall is visible within a small clearing on aerial photographs dating from 1937. The aerial images show that the area immediately surrounding the Moses Hall and Morningstar Cemetery has been forested throughout that span and has remained undeveloped. A 1962 aerial image was taken when construction of I-495 was underway in that area, and that construction involved extensive grading and filling within the prism of the interstate, although the area northwest of the cemetery (between the current cemetery boundary and the interstate road prism) may be at its original grade. The access path and the

00198502

Moses Hall are visible on some aerial images through 1964 but are obscured by vegetation in some images. A 1981 aerial image shows the Evergreen housing development to the south of the cemetery along Cypress Grove Lane, which is not visible in the 1979 aerial image.

Prior assessments of the site have not properly distinguished the relationships among the Gibson Grove AME Zion Church, the Order of Moses/Morningstar Tabernacle No. 88, and the cemetery. While numerous members of the church are interred in the cemetery, and the membership of the Lodge significantly overlapped with the church membership, the cemetery was always part of the Lodge and not owned or operated by the church. Listed incorrectly as Gibson Grove AME Church Cemetery, with an alternate name of Moses Lodge Cemetery, First Agape Church (current), on the Montgomery County Cemetery Inventory form (ID #105), this cemetery was described as neglected, overgrown, not tended, and in poor condition during a November 2004 visit for documentation in the county cemetery inventory. Further observations in that record include the identification of two graves located within a short white garden fence that is no longer present; three small, square, uninscribed concrete markers; two inscribed markers; and several unmarked grave depressions.

Jones (2010:36) described the visit she made to the cemetery in 2008 during her work on the Gibson Grove AME Zion Church property as though stepping "into a mini forest overgrown with plants, bushes, poison ivy and bamboo." She observed seven inscribed professionally shaped head stones as well as numerous unshaped and uninscribed fieldstone markers arranged in rows. One grave was enclosed by a decorative fence and marked with a small rose bush. Jones reached out to the Moses Lodge members, the Gibson Grove and the First Agape AME churches, and the local community to organize clean-up efforts in the cemetery (Jones 2010:36–39).

When the cemetery was revisited in 2018 during Montgomery Preservation, Inc.'s efforts to update the county's cemetery inventory, the cemetery was recorded as the Moses Hall Cemetery, with alternate names given incorrectly as Gibson Grove AME Church Cemetery and Moses Lodge Cemetery, and the contact information given incorrectly as Morningside Tabernacle; at that time the Morningstar Tabernacle No. 88 organization was defunct without a clear successor. The organization was reconstituted with new Trustees in 2020. The cemetery condition was considered fair, and it was thought to be untended, with depressions and random field stones observed throughout as well as periwinkle groundcover (Wallace 2018a). It was noted that access was by way of a long dirt path along the edge of but outside the MDOT SHA ROW, with a steep embankment along part of the path. Wallace also noted that bamboo was severely encroaching on the cemetery and the site of the former Moses Hall and there were piles of debris, bricks, glass bottles, cans, and rusted metal throughout the site, but that portions of brick paths and the concrete foundation of the former Moses Hall were evident.

In March 2020 when the site was examined in preparation for the work conducted for Falchetta et al. 2021, dense bamboo covered the northern portion of the archaeology survey area extending into the MDOT SHA ROW, large piles of bamboo and other vegetation that had been cut by a community clean up group obscured surface features in some areas, and most of the cemetery had a ground cover of fallen leaves. Still, portions of the stone and concrete block foundation associated with Moses Hall could be discerned within the area covered by dense bamboo. The access path running west from Seven Locks Road to the northeastern portion of the archaeology survey area within the panhandle-shaped portion of the parcel had been extended to the area south of the Moses Hall foundation. The central portion of the path runs along a gully and was constructed on top of fill piles; railroad tie steps placed along that portion of the path by Boy Scouts working on an Eagle Scout project in 2008 were still in place.

To facilitate the MLS archaeological studies on the Morningstar Cemetery and Moses Hall property, and at the request of the Friends of Moses Hall, the MDOT SHA removed the invasive bamboo from the property. The MDOT SHA maintenance crews also stabilized the soil, diverted stormwater by planting grass seed,

00198503

laying soil matting, and placing straw bales, installed a metal gate at the entrance to the cemetery on Seven Locks Road to discourage trespassing, and removed litter from the cemetery. The MDOT SHA worked closely with the Friends of Moses Hall to coordinate all of this work.

## CULTURAL CONTEXT

### Moses Hall

Very detailed historical data regarding the Morningstar Cemetery, the Moses Hall, the Gibson Grove AME Zion Church, and the surrounding community are provided in a number of MLS Project generated materials and other sources (e.g., Falchetta et al. 2021; Jones 2010; Whitley 2021), and only a brief summary is presented in this plan. In addition to the Morningstar Cemetery, the foundation of Moses Hall, the meeting house for the Lodge associated with the local chapter (Morningstar Tabernacle No. 88) of the Ancient United Order of the Sons and Daughters, Brothers and Sisters of Moses (also referred to as the Order of Moses), is located in the north-central portion of the property. The Order was a benevolent society founded for "the maintenance and education of the orphan children of deceased members, the burial of its dead, and the care and oversight of its sick and destitute" members (Walker 1880:52, in Jones 2010:52–53). According to Whitley (2021), the Morningstar Tabernacle No. 88 meeting house (Moses Hall) and the cemetery were located on an acre of land that was conveyed in 1887 to Morningstar Tabernacle No. 88 by John Duke of Wellington Moore, the son of a Revolutionary War veteran, and the property was accessed by an eight-foot-wide right-of-way conveyed in 1887 by George and Sarilla (sometimes Cyrilla) Scott, although the Morningstar Tabernacle No. 88 may have been established as a local organization as early as 1885. Moses Hall was a two-story frame building that hosted lodge meetings and social events (Jones 2010:53). Research conducted for the MLS Project indicates that the structure was demolished sometime around 1981 but may have been damaged by fire sometime prior to that (Falchetta et al. 2021:74). The Morningstar Tabernacle No. 88 Lodge was an important source of support for many in the local African American community throughout its history, including those of the Gibson Grove AME Zion Church congregation.

The MDOT SHA determined the Morningstar Tabernacle No. 88 Lodge and Cemetery (M:35-212) eligible for the NRHP in July 2020, and the MHT concurred on September 4, 2020 (Manning 2020). The property is eligible for listing in the NRHP under Criterion A for its association with the African American community in Cabin John and under Criterion C as an example of a vernacular African American cemetery. Construction of I-495 in the early 1960s acquired a portion of the property north of the then-extant building and a road that served as the apparent northern boundary of the cemetery. Although the property has lost historic features over time, including the Moses Hall building, and has experienced invasive vegetation overgrowth, the property retains integrity of location, design, materials, feeling, and association. Character-defining features include the former road trace leading to the hall and cemetery, the hall foundation, and the identified individual markers and grave depressions and their orientation and spacing. The Friends of Moses Hall, a coalition of neighbors, descendants, archaeologists, historians, and historic preservation advocates, organized in 2020 to protect this important African American historical site. The Friends of Moses Hall report that over 85 individual interments have been identified in the Morningstar Cemetery from historical documentation, including community founder Sarah Gibson and Emma Jones, a local midwife and longtime housekeeper for Clara Barton in Glen Echo, Maryland (Whitley 2021:27–33).

### Gibson Grove Community

The Gibson Grove AME Zion Church was organized in 1889 in the Gibson Grove area of Cabin John, a community of formerly enslaved African Americans established in the mid-1880s. The church was named for Sarah Gibson, who along with her husband Robert, was one of the earliest African American landowners in this portion of Cabin John. The Gibsons had been slaves on a plantation in Virginia and had traveled

00198504

north in search of a better life. The early African American community primarily focused around the southern portion of Seven Locks Road in Cabin John was largely self-reliant, growing their own food, building their own school and homes, and running local businesses serving the community. In 1898, Sarah Gibson donated a section of her property to the community for the construction of a church. The Gibson Grove AME Zion Church was founded on that property under the direction of its first minister, Reverend Wright, and served the African American residents of Cabin John. While membership of the congregation significantly overlapped that of the Morningstar Tabernacle No. 88, the two formed separate and distinct organizations. Although many members of the church are interred in the cemetery, the cemetery was not owned or operated by the church.

## TREATMENT GOALS

No further ground disturbing investigations will be conducted within the identified cemetery boundary at this time. A series of further steps, including additional GPR and examination of the LOD to identify burials outside the understood boundary of the cemetery will be conducted to evaluate avoidance of impacts to the Morningstar Cemetery as a result of MLS Project activities.

### Consultation with Local and Regional Experts

Local and regional experts have information and insight regarding the history of the Morningstar Cemetery and those interred there. MDOT SHA has conducted extensive research and consultation on this resource, but will continue to engage with the descendant community, appropriate Section 106 consulting parties, and relevant experts to inform the field and research efforts as investigations continue. This includes consultation on this document, and progress updates and meetings as necessary or helpful before, during, and as follow-up to fieldwork. MDOT SHA will continue to accumulate new data, fill in gaps, and incorporate new information relevant to the cemetery investigation, until investigation has concluded and results are finalized.

### Additional Remote Sensing Survey

The primary goal of the archaeological investigations in the MDOT SHA right-of-way is to confirm that no interments are located within the MLS Project LOD that would be impacted by the proposed construction in this area.

## TREATMENT METHODS

To accomplish the primary goal of the additional studies in this area, this treatment plan has been developed in consultation with consulting parties to establish procedures to accomplish the following: permitting; remote sensing; machine stripping, followed by shovel stripping and hand troweling; careful delineation of any features or artifacts that are identified; and consultation regarding disposition of remains if necessary. In areas where further design avoidance is not possible, this includes the removal and re-interment of any burials that are located. Consulting parties have expressed that re-interment is generally preferred to be done within the boundary of the existing Morningstar Cemetery. If this is not possible, or if a clear family descendant is identified and wishes otherwise, re-interment would be made elsewhere in accordance with consultation. At the conclusion of investigations, if results indicate no remains or funerary objects will be impacted by proposed construction, or upon the completion of any removal and relocation of remains or funerary objects, the MDOT SHA, in consultation with the MD SHPO, will allow construction to proceed. Details regarding this process are provided below and a summary of the steps involved in the process is provided at the end of this chapter.

00198505

**Early Coordination and Permitting**

Consultation with Local and Regional Experts. The MDOT SHA and their Consultants will continue to engage with local and regional experts regarding the history of Morningstar Tabernacle No. 88 and the Morningstar Cemetery and those likely to be interred there to ensure that any new information is appropriately taken into account during fieldwork and reporting, that the communication process remains open and beneficial to all parties, and that all available information is included in the Project technical report detailing the results of fieldwork in this area. The MDOT SHA will accommodate all reasonable requests for meetings/updates regarding the work progress during its duration, which may include a pre-fieldwork briefing, post-fieldwork debrief, or other progress milestones as requested by the MD SHPO and consulting parties.

Permits. No permits are required for the archaeological investigations, however, should interments be located within the LOD and their relocation to a different cemetery be necessary, authorization for that relocation must be obtained from the state's attorney for the county. MDOT SHA will coordinate necessary maintenance of traffic and lane-closures for work adjoining I-495.

**Archaeological Fieldwork**

The archaeological fieldwork will involve additional GPR study, followed by archaeological pre-construction excavation of the LOD. If possible graves or funerary objects are identified during these investigations, the MDOT SHA will engage in a recovery and relocation effort in partnership with necessary jurisdictional entities and the descendant community and further consult on any such discoveries in relation to the boundary of the historic property and effects resulting from the Project. If all potential areas of disturbance are examined prior to construction and no indications of graves or funerary objects are identified, the MDOT SHA will submit its findings and recommendations to the MD SHPO and appropriate consulting parties for review following the procedures established in the PA and noted in this document.

Additional Remote Sensing Survey. The additional areas of GPR survey will be cleared of vegetation or debris as far as possible without risking damage to possible interments in those areas, and lane closures will be implemented as required during the field effort. GPR survey will be extended to cover the additional areas shown in Figure 2.3. The MDOT SHA will ensure that the GPR effort follows the methods of the prior study to the extent feasible to ensure comparability. The results of that study will be reported in an updated technical report or report addendum and provided to the MD SHPO and consulting parties for comment, and the MDOT SHA will also convene a meeting to review/discuss results within the time frame of a formal comment period on the written report. Following the GPR effort, the MDOT SHA will take the results into account and attempt further design modifications to avoid features in the event that probable burials indicated by GPR are within the LOD.

Machine and Hand Stripping of the LOD. Following the GPR effort, LOD will have been reduced to the maximum extent feasible while still accomplishing the purpose and need of the Project if the GPR has indicated a potential for additional burials within the LOD. At this time, substantial remaining vegetation will have been removed from the LOD in the vicinity of the Morningstar Cemetery as depicted in Figure 2.3, with a qualified archaeologist present for all ground disturbance. The area to be cleared encompasses the area between the roadway and the staked LOD. The mechanical removal of the topsoil in these areas will be accomplished with a Gradall, trackhoe, or similar vehicle with a bucket fitted with a smooth (not toothed) blade, and the soil removal will proceed, directed by the archaeologist, in a slow and careful manner and extend no deeper than the interface between topsoil and subsoil—as noted in the GPR study, "distinct soil variations associated with the grave shafts can be expected at a depth of 1 ft." The topsoil will be removed under the direction of the archaeologist, and the interface between the topsoil and subsoil will

00198506

be cleaned by shovel, trowel, or a combination thereof to evaluate any features or artifacts indicative of interments.

<u>Identification and Treatment of Human Remains or Funerary Objects</u>. Should evidence of interments, human remains, or funerary objects be identified during this work the archaeologist will immediately halt machine excavation and coordinate with the MDOT SHA and the consultant firm to staff further work appropriately. Once the area has been examined, the surface has been cleaned, and soils have been screened, the MDOT SHA may provide clearance for additional machine stripping to proceed in that vicinity to determine whether additional graves are present; however, no further excavation of grave(s) will occur until notification has occurred. The MDOT SHA will simultaneously notify the Montgomery County State's Attorney and begin coordination regarding removal. At the same time, appropriate consulting parties, including the MD SHPO, will be informed that known or suspected remains have been discovered. Following coordination with the Montgomery County State's Attorney, the soil surface will be shovel shaved, hand troweled, or a combination thereof to delineate the evidence of interments, human remains, or funerary objects. The soil removed within and around potential burial features will be screened through ¼ inch hardware mesh to recover any associated materials. Any funerary artifacts (e.g., clothing, personal items, casket hardware, but not including full caskets) found in association with discrete burials during the investigation will be analyzed and documented but will be reinterred with the associated remains to the extent possible. If potential funerary artifacts are found in fill or otherwise cannot be reasonably associated with a particular burial, those artifacts will be analyzed and documented and curated at the Maryland Archaeological Conservation Laboratory. Any burials will be recorded with a GPS unit with submeter accuracy, photographed, and plotted on a Project field map. Once documented, the remains will be removed to an appropriate and secure temporary facility pending consultation on final disposition. No analysis of any human remains recovered during the MLS Project will be conducted without the approval of descendants and the Board, and any funerary artifacts found during the investigation will be analyzed in the field and noted in the Project technical report.

Upon any identification of human remains during this effort, the MDOT SHA will begin providing daily email updates on field progress to the appropriate consulting parties for each day that work is occurring and continue for the remaining duration of fieldwork. The MDOT SHA will provide for opportunities for appropriate consulting parties to meet and/or conduct site visits during recovery efforts. In the event of human remains discovery, the MDOT SHA will also take the information into account in completion of the effect determination for the property following the procedures in the Project PA. The MDOT SHA will ensure the proper and respectful handling of any human remains and associated objects throughout the entire process and will be responsible for the issuance of any public notices required by Maryland state law related to the relocation of interments.

If no features are identified during the mechanical stripping excavations, and once all field investigations have been completed, the MDOT SHA will inform the MD SHPO and consulting parties that no further work is necessary for this area and the MDOT SHA design will proceed to final plans. No ground disturbing construction activities will begin in the area depicted in Figure 2.3 until the MDOT SHA Cultural Resources Section has completed investigations and has either verified that no remains are present or has removed any remains or funerary objects following the procedures in this document.

### Reporting

Upon completion of the fieldwork, whether or not remains are identified, the MDOT SHA will prepare a draft report documenting the investigations and provide it to the MD SHPO and consulting parties for review and comment. Upon review of comments, the MDOT SHA will finalize the report and provide copies to the MD SHPO and consulting parties. The report will meet all applicable MHT and MDOT SHA standards and guidelines.

00198507

**Summary of Expected Steps of Coordination and Fieldwork**

The MDOT SHA will explore designated areas near the Morningstar Cemetery using the following procedures:

1. Pre-field coordination, vegetation removal and permitting;
2. Additional GPR survey of the LOD within designated boundaries;
3. Review of GPR results with the MD SHPO and consulting parties, including any further Project design modifications in response to GPR results;
4. Excavation of the final LOD: This will involve machine stripping, followed by shovel stripping and hand troweling, and careful delineation of any features or artifacts that are identified. Should any graves or funerary objects be identified, following documentation, and required coordination with the Montgomery County State's Attorney, any remains will be removed from the ROW and temporarily stored in an appropriate facility. The MDOT SHA will consult with the community and/or identified descendants on the nature, condition and extent of any remains or funerary objects found. Depending on these factors, there may be opportunities for analysis or attempted identification of remains, should the community wish to pursue such options and the condition of the remains allow for analysis. Should the community wish to forego analysis and simply reinter remains, the MDOT SHA will accommodate that preference. The MDOT SHA will not conduct analysis without informed consent of the descendants and/or descendant community. The community has expressed a preference for re-interment of remains within Morningstar Cemetery, and the MDOT SHA will accommodate this to the extent practicable and permissible by law.
5. Once the LOD has been fully examined and either verified to contain no remains or funerary objects, or once such remains have been removed following the process in this document, construction may be authorized while consultation, analysis, or final disposition of remains continues.

12

00198508



Figure 2.1. Location of Morningstar Cemetery.

00198509



Figure 2.2. Morningstar Cemetery and the MLS Project LOD.

00198510



Figure 2.3. Morningstar Cemetery Treatment Plan.

00198511

## 3. MONTGOMERY COUNTY POOR FARM CEMETERY

**SITE TREATMENT PLAN RESEARCH METHODS**

### Previously Conducted Research

Michael Dwyer, historian with the M-NCPPC, documented the Montgomery County Poor Farm Site and Cemetery as Maryland Inventory of Historic Properties M:26-6 in 1975. Dwyer noted that the remains of a frame springhouse were located on a creek east of the Detention Center close to I-270 and that the cemetery had contained some visible markers a few years prior to that and was located along a dirt road that would later become Monroe Street (Dwyer 1975). A follow up note in that file states that the springhouse ruins and grave markers were no longer extant by sometime in the 1980s.

Archaeological site 18MO266, the Montgomery County Poor Farm Cemetery, was recorded in 1984 by Dennis Curry during a Phase I survey of Ritchie Parkway (now Wootton Parkway) from MD Route 355 to Seven Locks Road conducted by the Maryland Geological Survey (MGS) (Figure 3.1). Curry (1984) found an estimated 75–100 grave depressions oriented east-west, including one apparent recent grave, five or six metal grave markers that mostly appeared to have been displaced, and a road trace running north-south that bisected the cemetery.

NPS was asked to oversee archaeological investigations at the Poor Farm Cemetery because of a proposed land sale by Montgomery County and the construction of a county road now designated Wootton Parkway. The NPS involved other Maryland archaeologists in what became a salvage effort. Bruce Bevan with Geosight conducted GPR and magnetometer surveys at the Poor Farm Cemetery in the Spring of 1986 for the planned NPS fieldwork (Bevan 1986). A substantial amount of debris and vegetation covered the site area, and an attempt was made in the Spring of 1986 to clean the site using heavy machinery during a period of sustained rain. Unfortunately, this work was not supervised and resulted in destruction of grave depressions and widespread mixing of modern metallic trash into the topsoil (Rhodes 1987:2). Overall, Bevan found that soil resistivity and signal transmission were good and there was only a slight amount of radio interference. A total of 460 subsurface anomalies were detected by the GPR survey, although only about 42 of these were considered to have a high potential for indicating the location of graves and these were located in the north-central portion of that study area. Some of the other anomalies were thought to possibly represent grave locations, but most were considered to be indications of near surface metal, boulders, and natural variations in soils. Bevan reported that prior to his survey, the locations of about 75 depressions thought to represent grave locations had been marked with red flagging by NPS Archaeologist Paul Inashima, but the area had become so overgrown that these were no longer identifiable. The magnetometer survey showed that there is considerable buried metal across the area.

The following summer, NPS Archaeologist Diane Rhodes conducted extensive and intensive background research regarding the Poor Farm Cemetery in preparation for the archaeological fieldwork investigating the areas identified as potential grave locations by the geophysical study. During a site visit prior to the fieldwork and attended by archaeologists (Tyler Bastian, Dennis Curry, Doug Comer, Richard Hughes, Paul Inashima, and Beth Acuff) and George Snowden of Snowden's Funeral Home, it was discovered that areas where rows of depressions were evident prior to the heavy machinery clearing in preparation for Bevan's fieldwork were not areas where Snowden had placed burials. Instead, he indicated an area near the southwestern corner of the mapped site location that was overgrown and covered with trash and had not been closely examined during Curry's fieldwork in 1983 (MCHPC n.d.). The archaeological fieldwork that followed included volunteers from the MHT, MGS, NPS, Maryland Archaeological Society, and local CRM firms, as well as equipment and operators provided by the county, all working as quickly as possible for just the couple of weeks afforded by the Project schedule and budget. In just the year since Bevan's

00198512

study, the vegetation had already reclaimed much of the area, and his markers proved "extremely difficult" to locate (Rhodes 1987:3). Some areas were probed, and additional potential grave areas were identified. Trenches were then excavated at varying intervals across the target areas, oriented at a 45 degree angle off true north, with most excavated by heavy machinery, but some by hand (Figure 3.2). Four relatively shallow (2.5 ft below surface) graves were encountered in Trench 2N in a newly identified area north of the farm road (in what is now the location of the Tower Building and the grassy lawn on the north side of Wootton Parkway), and three of these were excavated by the archaeologists, but one was left for the undertaker to remove. It was noted that these were oriented counter to the typical Euro-American orientation—placed with their heads on the east end of the grave and their feet on the west end. Thirteen additional shallow graves were located to the west of this area (Trench 3N), all oriented in a traditional manner. Local informants, surface indications, and Bevan's study had indicated another grave location 40 ft west of that location, and a number of more recent (post-1940s) graves were found in that area (Trench 6N) and left for the undertaker to remove. More recent graves were also encountered in another area (Trench 11N) and also left for the undertaker to remove. Trenches 6N and 11N probably represent the area that Snowden's Funeral Home was using for interments during the third quarter of the twentieth century. No graves were found in Trench 9N closest to I-270. Areas south of the farm road thought to contain more recent graves based on information provided by local informants were also flagged for the undertaker. In total, 15 individuals were exhumed by the archaeologists during that field session, all thought to date to sometime after 1880 or 1890 and before the 1940s (Rhodes 1987:6) and were taken to George Mason University (GMU) for study. Rhodes (1987:7) notes that due to the limited resources and wide spacing of the trenches, "doubtless numerous graves remain in the area."

Glen Wallace with Montgomery Preservation Inc. visited the area in 2018 during the efforts to update documentation for Montgomery County's cemetery inventory project. The form completed by Wallace includes a partial clipping from a 1964 newspaper article (Gilmore 1964b) that provides verbal directions to the area where graves were/had been occurring at that time. The description indicated to Wallace that this portion of the cemetery was located in a less than half acre cleared area surrounded by forest north of the access road (Martins Road) now the location of Wootton Parkway. Wallace noted that this area was largely covered by an office complex and associated parking lot, but that a portion of Martins Road remains to the north of the complex. Wallace's Martins Road may be the same as Monroe Street. He suggested the installation of an interpretive sign along Wootton Parkway discussing the Alms House and Cemetery at this location (Wallace 2018b).

The MLS Project *Archaeological and Historic Architectural Gap Analysis and Assessment*, developed in 2018, delineated at least portions of 10 survey areas located within the former Montgomery County Poor Farm property, several of which are within the boundary of or close to the Poor Farm Cemetery site (18MO266): Area S-4, Area SWM S-4, Area S-5, Area SWM S-5, Area S-6, Area SWM S-6, Area S-27, Area SWM S-27, Area RS-1, and Area RS-2 (Hutchins-Keim et al. 2018). Initial shovel testing was conducted in 2019 where access could be obtained during Phase I survey conducted for the MLS Project (Arnold et al. 2021). In total, 21 shovel tests were excavated at 50-ft (15-m) intervals along three transects in Area S-27, and 11 shovel tests were excavated at 50-ft (15-m) intervals along two transects in Area SWM S-27. No non-modern cultural material was recovered, and no surface indications of graves were observed in these areas, although it should be noted that archaeological survey in these areas was not intended to locate graves but to examine the areas for "general" archaeological sensitivity. The area southwest of the Wootton Parkway overpass of I-270, designated Area S-28, which appeared to have been extensively disturbed during the expansion of I-270 based on aerial photographs, was examined during this survey, but no shovel tests were excavated as surface conditions indicated that this area did not occupy a natural landform. The portion of the LOD to the north of Area S-28 and several remaining survey areas around the I-270 and Wootton Parkway overpass require further archaeological investigation once access can be secured. Details regarding the planned Project investigations of those areas are provided in the Archaeology Site Treatment Plan.

00198513

In November 2019, MDOT SHA archaeologists, together with a specialist with Bay Area Recovery Canines (BARC) and two trained cadaver dogs, examined portions of selected MLS Survey Areas to locate evidence of human graves within areas closest to the former Poor Farm Cemetery. Portions of the following areas were examined: Area S-5, Area S-6, Area S-27, Area RS-1, Area RS-2, and an area northeast of Survey Area RS-1 at the southwest quadrant of the intersection of Wootton Parkway and Tower Oaks Boulevard. The dogs indicated 15 individual locations where human graves may be present, and these are situated in six main areas, one each in Areas S-5, S-27, RS-1, RS-2, and SWM S-6 and in the area northeast of RS-1 (Roche 2019). The trained cadaver dogs also expressed an interest suggestive of the presence of human remains in the portion of Area S-27 within the MDOT SHA ROW between the fence and I-270, but that area could not be examined due to safety concerns.

### Additional Research

Research conducted during the development of the site treatment plan for this resource involved the review of reports generated by previous studies, the acquisition and review of additional historic materials related to the Montgomery County Poor Farm, comparative materials related to poor farms and poor farm cemeteries, and other site treatment plans, as well as consultation with Brian Crane at the Montgomery County Historic Preservation Commission regarding his research findings and archaeological methods for the continued studies in that area.

### Defining Areas that Require Archaeological Investigation

The proposed LOD in areas that could potentially contain graves associated with the Montgomery County Poor Farm primarily involves areas adjacent to the existing I-270 and Wootton Parkway, and includes the undeveloped portions of Survey Areas S-4, SWM S-4, S-5, SWM S-5, S-6, SWM S-6, S-27, SWM S-27, North of S-28, RS-1, and RS-2, and the area to the northeast of Area RS-1 (Figure 3.3). With the exception of the northern portion of Survey Area S-4, all of these areas are located within the former boundary of the Montgomery County Poor Farm property, although the area most likely to contain graves is confined to the four quadrants of the I-270 and Wootton Parkway overpass: east of I-70 extending to Tower Oaks Boulevard up to 440 feet south and 240 feet north of Wootton Parkway; and 300 feet west of I-270 extending up to 120 feet south and 500 feet north of Wootton Parkway.

## ENVIRONMENTAL CONTEXT

### Location, Topography, and Soils

Site 18MO266, as recorded with MHT, encompasses 2.92 acres but the larger area where it is believed that interments may be present encompasses about 17 acres; the former Montgomery County Poor Farm property covered about 200 acres at its largest extent. This 200-acre area, located in the area surrounding I-270 between south of Wootton Parkway and south of MD 189 (Falls Road), contains terraces, side slopes, and a hilltop between Bogley Branch and Cabin John Creek and several of their tributaries. Some of the landforms have been substantially altered for the construction and widening of the interstate, Wootton Parkway, government installations, and commercial buildings. USDA NRCS (2021) mapped soils in this area consist of Glenelg silt loam series soils (3–15% slopes), which are very deep, well-drained soils formed in residuum weathered from micaceous schist.

Bevan (1986) describes the soils in the area he investigated as "rather puzzling" as the topsoil displayed evidence of low permeability with water filled depressions more than a week after a heavy rainfall. The surface was hard and cemented, and the radar profile showed sandy or rocky soils at a depth of about 2 ft. These attributes are not typical of Glenelg series soils and appear to reflect widespread disturbance. Curry (1984) noted that the eastern part of the site had been graded prior to his work, and additional grading was

00198514

performed in the Spring of 1986 in an unfortunate attempt to clean metallic trash from the site surface (Rhodes 1987:2). Of particular relevance to further attempts in the identification and, if necessary, removal of interments in this cemetery is Rhodes' (1987) observation that many of the graves encountered during the 1987 trenching were buried in fairly shallow graves (2.5 ft below surface) thus not extending deeply into the subsoil or deep enough into the subsoil to leave a mottled fill-like appearance just below the A horizon (the thickness of the A horizon appears to vary but a range is not given by Rhodes), which is typically a very reliable means of identifying grave shafts after the careful removal of the topsoil by heavy machinery. Rhodes also notes, as did Bevan, that soils in this area are extremely complex, with areas of sand, silt, clay, gravels, and large rocks (as well as large metal objects, other debris, and dense vegetation) all mixed in varying stratigraphic configurations, likely reflecting naturally occurring variations in soil density and composition as well as a great deal of subsequent disturbance. Rhodes notes that considering the acidic soils and the poor condition of the coffins and skeletal material of the less than 100-year-old burials they excavated, there may be little left of any older burials. As Doug Comer, an Archaeologist with the NPS's Applied Archaeology Center who was involved in the early stages of the project, noted in a 1986 interview with Pat Royse with the Montgomery Journal, he did not expect to find many artifacts given the socioeconomic status of those interred there and he anticipated that at least some of the individuals would have been interred in shrouds rather than coffins, which would substantially affect preservation (Royse 1986). Field notes taken by Doug Comer for the burials he excavated include the following, "preservation is very poor…can see grave shafts, but not clear…caskets are clear but little bone" (MCHPC n.d.:93). It is not clear in which areas Comer was working, but other investigators found much better-preserved remains in some sections of the cemetery. In a letter report submitted to the NPS Rhodes notes that "Most of the fifteen burials excavated archaeologically were intact, or nearly so" and that "far more grave goods and differential burial patterns were found than expected" (MCHPC n.d.:81–83). Within the area of the ca. 1880 to 1890 graves (Trenches 2N and 3N), the sides of at least some of the wooden caskets were largely intact (although the tops had collapsed due to the weight of the overlying soil). Skeletal elements, including well preserved skulls, were recovered. A well-preserved but misshapen hat was found within one of the graves, and an extra pair of trousers was found, neatly folded over the legs of one burial (Ervin, personal communication). The recollections of former local history teacher and archaeologist Robert Hines who participated in the 1987 investigation also indicate that different areas showed different states of preservation "we…recorded only what appeared to be coffin nails in the wall of the trench. Our group did not find human remains but others later did" (MCHPC 2018).

Archaeological survey of Areas S-27 and SWM S-27 found that soils in these areas generally conformed to the mapped soil type (Glenelg silt loam), with the exception of some areas in the northern portion near an existing SWM pond, areas adjacent to the Montgomery County General Services and Montgomery County Detention Center complex, and along the I-270 corridor (Arnold et al. 2021). Stratigraphy in the apparently intact areas generally consisted of an O horizon (0–0.2 ft) of dark grayish brown (10YR 4/2) to very dark brown (10YR 2/2) silt loam; an A horizon (0.2–1.2 ft) of brown (10YR 4/3) to dark yellowish brown (10YR 4/6) silt loam; and a B horizon (1.2–1.6 ft) of strong brown (7.5YR 5/8) silty clay. In some areas, an E horizon of brown (7.5YR 4/4) or strong brown (7.5YR 4/6) silty clay loam was observed between the A and Bt horizons.

### Land Use History and Current Conditions

When Dennis Curry conducted fieldwork on site 18MO266 in 1983, he mapped the cemetery on "an overgrown wooded knoll" with modern trash littering the surface. He noted that the eastern edge of the cemetery had apparently been bulldozed or graded, and he believed that was likely an attempt to remove trash from that area. He observed about 75–100 depressions that appeared to be graves, including one mounded, recent grave, as well as a handful of metal grave markers that appeared to have been displaced. When Bevan conducted fieldwork on the site in 1987, he noted that about 50–75 grave depressions had been previously marked, but those areas had already been reclaimed by vegetation by the time he began his

00198515

fieldwork. He also observed some metal markers that were clearly displaced. Although large amounts of understory vegetation and metallic trash were cleared to facilitate Bevan's survey, by the time Rhodes began fieldwork on the site just a year later, undergrowth had again largely reclaimed the area. Bevan noted that a lack of development in the area had resulted in only a "very slight amount of radio interference," however, most of the area investigated by Bevan and Rhodes is now covered by an office complex and several associated parking lots, and the area in general is vastly more developed than it was in 1986–1987.

Prior to the construction of Wootton Parkway, this isolated area was widely used for dumping. In addition to the dense vegetation, all of the researchers who have worked in the area also have noted the widespread and dense amount of debris, including medical supplies such as hypodermic needles and medicine bottles, miscellaneous pieces of iron, large metal objects, aluminum siding, broken bottles, bed springs, construction materials, a golf cart, and household goods and appliances.

Historic maps and aerial photographs provide some details regarding the property containing the Montgomery County Poor Farm and the portions of the LOD within that former property. The 1890 Naeff real estate map shows the ca. 200-acre Montgomery County Poor Farm, southwest of Rockville and containing two structures, one on the west side of Seven Locks Road and one to the east within the center of the property accessed by an unimproved drive. Later evidence shows that the latter was the location of the Montgomery County Poor Farm House itself. No forested areas are depicted within the property on this map, although the accuracy of the map is not certain. Those structures are also depicted on the 1908 and 1923 Rockville USGS maps, and the 1923 map shows that the driveway extended east past the Montgomery County Poor Farm House, then south past a large barn on the property, then finally east crossing Monroe Street to the area of the twentieth century cemetery (Figure 3.4). The 1944 Rockville USGS map shows most of the property under cultivation, with the only forested areas located in the northeastern portion of the property along Cabin John Creek, an unnamed tributary of that drainage, and a portion of the ridge nose overlooking Cabin John Creek (the area just west of the cemetery near the current intersection of Wootton Parkway and Tower Oaks Boulevard). A 1957 aerial photograph shows the Montgomery County Poor Farm House, at least one large and five small outbuildings, a network of farm roads, and the I-270 corridor under construction (Figure 3.5). With the exception of a few large trees near the structures and the same forested area shown on the 1944 USGS map, the entire property seems to have been in use for agricultural purposes. A 1963 aerial photograph shows I-270 constructed and in use as well as the county detention center located where the Montgomery County Poor Farm House formerly stood and county government offices to the south of the detention center. Vegetation and land use to the east of I-270 appear largely unchanged in aerial images dating through the 1970s, except that by 1979 it is evident that some former agricultural areas were becoming forested. Plat maps of this area dating from 1975, 1990, and 2000 do not contain any notes regarding the cemetery or graves. However, in 1953 MDOT SHA survey crews had noted the "Stadia Location of Potters Field" within a small clearing near Monroe Street, and indicated that they observed metal nameplates placed by W.R. Pumphrey & Sons and Robert L. Snowden, with the latest interment dating to February 1953 (Ervin 2020). A 1988 aerial image shows that almost all of the area within the former Montgomery County Poor Farm property west of I-270 was well developed by that time, although the area to the east was still undeveloped and almost completely forested. By 2002, the Tower Building office complex and associated parking lots and access roads (Wootton Parkway and Tower Oaks Boulevard) as well as a small housing development were constructed to the east of I-270 within the former Montgomery County Poor Farm property boundary. Between August 2006 and February 2007, an additional office complex was constructed south of Wootton Parkway and east of Tower Oaks Boulevard. The other surrounding areas within the former Montgomery County Poor Farm property on the east side of I-270 have remained undeveloped.

Currently, Areas S-4 and SWM S-4 are located on a level, wooded terrace in an undeveloped area on the east side of I-270 just south of the I-270/MD 189 interchange. Areas S-5 and SWM S-5 are located on a terrace above Cabin John Creek along the east side of I-270 just north of Wootton Parkway. The central

00198516

approximately one-third of Area S-5 is located within a parking lot and landscaped lawn associated with the Tower Building office complex, and the northern and southern portions of that area and all of Area SWM S-5 are covered by a mature forest with moderate to dense undergrowth. Areas S-6, SWM S-6, and RS-1 are located on a wooded terrace along the east side of I-270 south of the Wootton Parkway. Areas S-27 and SWM S-27 are located on a wooded ridge northwest of the intersection of Wootton Parkway and I-270 and directly east of the Montgomery County General Services complex and parking lot. During the archaeological survey for the MLS Project, Area S-27 was found to be wooded with sections of impassable undergrowth, and to contain "extensive modern surface deposits of trash, construction materials, and household goods" (Arnold et al. 2021). Area RS-2 is located in the northwest quadrant of the intersection of Wootton Parkway and Tower Oaks Boulevard. Area RS-2 contains terrace, side slope, and floodplain settings along Cabin John Creek and is covered by a mature forest with moderate to dense undergrowth. An area to the north of Area S-28 is located in the southwest quadrant of the intersection of I-270 and Wootton Parkway and extends west along the south side of Wootton Parkway to Seven Locks Road. It is situated on upper terrace and side slope settings between Cabin John Creek and Bogley Branch and is covered by a mature forest with moderately dense undergrowth.

## CULTURAL CONTEXT

### Late Eighteenth Century through Nineteenth Century

The Maryland General Assembly passed an act in 1787 for the relief of the poor in Montgomery and Harford counties, appointing seven men as Trustees of the Poor and requiring that an alms-house (for the lodging of the poor) and work-house (for the lodging of "such vagrants, beggars, vagabonds and offenders as may be committed") be constructed in Montgomery County on an up to 50 acre parcel of land that was convenient to the courthouse (Andersen 1998). The Trustees of the Poor acquired a 50-acre property in 1789 for the county almshouse from Thomas Wilson of Annapolis. Four additional property acquisitions were made at various times over the next 114 years, and by 1903 the Montgomery County Poor Farm property contained close to 150 acres, although various acreage amounts are given in various sources over the years (Andersen 1998). In those early years, all of those taking refuge in the Montgomery County Poor Farm House, also referred to as the county almshouse, who typically referred to as inmates, were required to wear a red or blue badge with "PM" on the shoulder of the right sleeve of their outermost garment, with the "P" standing for Poor and the "M" standing for Montgomery, signaling to all their indigent status (Andersen 1998).

Federal census data provide some information regarding the individuals living in the Montgomery County Poor Farm House, including the overseer/keeper and his family and the inmates, although the level of detail recorded varies (Table 3.1). The 1840 census lists 17 residents in the Montgomery County Poor Farm House—two children under 10, eight adult males, six adult females, all white, and one black adult female. The 1850 census lists the residents as James A. Shaw, the keeper, Mary Shaw, his wife, and Catherine Ratcliff, a servant, with white inmates including John Yates, 87 and blind; Peter Creamer, 71 and blind; Thomas Carroll, 64 and blind; Ann Elms, 98; Rebecca Magruder, 70; Mary Ward, 55; Mary Hodge, 70; Sally Davis, 70 and insane; Ann [last name illegible], 18 and dumb. Two "mulatto" residents listed are Harry Fowler, 70; and Walter Hoage, 22; and one black inmate is listed, Raney Bowen, 89 and blind. The 1860 census lists Cephus Hardy, the manager, his wife Sarah, and their two small children Clara and Maria, with white inmates including John Reese, 90, with the occupation of "Baptist Preacher;" William Clarckson, 86; William Becraft, 63; Mary Hoages, 70; Elizabeth Gingle, 65; L. Ibers, 63; Rhoda Browning, 58; and black inmates including Leroy Gray, 66; Walker Hodges, 30; Sarah Culace, 16; Ann Culase, 35 and dumb; Caroline Chase, 32, house servant; Martha, 4; and Mary, 1. The 1870 federal census lists Isaac Rabbitt, the keeper, his wife Maria, their five young children, James Smith, a farm laborer, and Eliza Martin, a servant, with white inmates including Thomas Trundle, 75; William Soper, 65; Brooke Stabler, 56; Chap Buriss, 65; John Braddock, 55; John Ruth, 30; Margaret Burris, 36; and Martha Burris, 7; and black inmates

00198517

including Charles Myers, 75; Samuel Ackard, 45; [first name illegible] Walker, 20; Charity Andersen, 22; Betsy Moinan, 30; Walt Hodge, 38; Ann Parfard, 50; Joseph Wotten, 80; and Ella Greenfield, 12. At least one Poor Farm resident was "sentenced" to live there after killing her husband in 1862 and found guilty but also insane. The November 15, 1862 article in *The Baltimore Sun* states that the judge sent her to the "almshouse" until "she shall have recovered her reason." According to the April 7, 1899 issue of *The News*, Mollie Mahew was also sentenced to live in the Montgomery County Poor Farm House for insanity but was moved to another facility a few days later.

**Table 3.1. Summary of Federal Census Data for Montgomery County Poor Farm.**

| Census Year | Children under 10 | Adult White Male | Adult White Female | Adult Black Male | Adult Black Female | Keeper |
|---|---|---|---|---|---|---|
| 1840 | 2 | 8 | 6 | 0 | 1 | Unidentified |
| 1850 | | 4 | 8 | 3 | | James A. Shaw |
| 1860 | 4 | 4 | 5 | 2 | 3 | Cephus Hardy |
| 1870 | 5 | 8 | 4 | 5 | 4 | Isaac Rabbitt |
| 1880 | | | | | | John Connell |
| 1900 | | 10 | 4 | 8 | 4 | Leonard Ricketts |

The 1877 report detailing the findings of an inspection of the state's public facilities commissioned by the governor of Maryland revealed very poor conditions at the Montgomery County Poor Farm House (Chancellor 1877). The report states that the house was not large enough for its purpose, the first floor rooms housing the superintendent and his family and the second floor housing white inmates were large, clean, well heated, and comfortable, but the basement level housing the colored inmates was divided into small rooms that were overcrowded, dirty, and offensive, with unrelated men and women in the same room, some of whom were confined to bed due to sickness, and others who were insane and/or paralyzed. Several inmates slept on the floor of the kitchen, as did unexpected temporary guests requesting accommodations. There were 26 inmates at that time.

In an 1879 report from the county Trustees of the Poor published in the *Montgomery County Sentinel*, the poorhouse had 35 beds, the capacity for 60 inmates, and an average population of 40 residents (Andersen 1998). Andersen (1998) notes that "one of the interesting features of the 1880 and 1900 census records was that there were young children at the alms-house who could not be associated with adults." The 1880 census lists 47 residents, including John Connell, the keeper, his wife, and their five children. The 1900 census lists Leonard Ricketts, the keeper, and 26 inmates—10 white males, four white females, eight colored males, and four colored females.

The inspection reports filed by the Lunacy Commission in the late nineteenth through early twentieth centuries provide some details regarding the Montgomery County Poor Farm House and its residents, although these are often contradictory from year to year and may reflect differences in how the inspections were conducted or arranged (with or without prior warning). Conditions also varied greatly depending on available finances, the age and condition of the institution in a given county, and the diligence and compassion of the superintendent of the institution in question (Chancellor 1877). The report filed in 1887 stated that the inspection found the facility "in good repair and its inmates comfortable" (Bayly 1887). The report filed in 1893 noted that improvements had been made over the last year, including cleaning in the interior, the addition of amenities to the sleeping apartments, the reconstruction of the old part of the building, the addition of two bathrooms, and the addition of a "first-class heating apparatus" (Morris et al. 1893). An 1895 report, however, found that the condition had not improved much since the 1877 Chancellor inspection (Maryland Medical Journal 1895:395). The 1898 report by the Lunacy Commission of Maryland found that the inmates were humanely treated, none was deprived of their liberty or in any seclusion, and that a number of them were working on the farm and in the house. A turn of the twentieth century

00198518

*Washington Star* article referenced by Elizabeth Wiener in her 1977 article on the Montgomery County Poor Farm Cemetery in the *Montgomery County Sentinel* described "appalling insanitary conditions" at the almshouse.

Historic documents, primarily newspaper articles, provide some information regarding those buried in the Montgomery County Poor Farm Cemetery in the nineteenth century. Perhaps the most well-known of these are two of the three documented victims of lynching in the county—John Diggs-Dorsey and Sidney Randolph. Numerous articles and historical accounts describe the events leading up to and following these tragedies (e.g., Crane 2021; Hedlund 2020; Meyer 2018; Toomey 2006). Sidney Randolph was accused of killing seven-year old Sadie Buxton, a white girl, and wounding her 16-year old sister and parents in May 1896. Randolph was arrested but maintained his innocence, and all evidence certainly supports his innocence. John Diggs-Dorsey was accused of assaulting Mary Tschiffely, the wife of his boss, in July 1880. Although the particulars of their incidents are different, both men were taken from the jail before they could be tried in a court and lynched by angry mobs, none of whom was ever officially identified or suffered any consequences for their crime. Diggs-Dorsey was lynched on July 26, 1880, and Randolph was lynched on July 4, 1896, and both were buried in the Montgomery County Poor Farm Cemetery. The Montgomery County Lynching Memorial Project, along with the Montgomery County Remembrance and Reconciliation Commission, held a Remembrance Weekend as well as a Pilgrimage Walk and Soil Collection Ceremony on September 26, 2021 to memorialize Mr. John Diggs-Dorsey and Mr. Sidney Randolph. The *It Happened in Rockville* exhibit was also developed to memorialize and honor these two men as part of a larger initiative to educate and engage the community in acknowledging the history and legacy of lynching and racial terrorism in Montgomery County, Maryland.

Armistead Humphrey Taylor, who was tried, convicted, and hanged for the 1899 murder of Dora and Louis Rosenstein, shopkeepers in Slidell, was also buried in the Montgomery County Poor Farm Cemetery (https://www.findagrave.com/memorial/57504952/armistead-humphrey-taylor). A notice in the February 11, 1874 edition of the Evening Star describes the fate of Rachel Taylor who had recently taken refuge in the Montgomery County Poor Farm House for the winter but who had left during a period of warm weather and was found dead near Barnesville. The account does not provide the location of her final resting place, but given the circumstances, it was very likely the Montgomery County Poor Farm Cemetery.

### Twentieth Century

Few documents have been located that provide information regarding those buried in the Montgomery County Poor Farm Cemetery during the twentieth century. A 1939 Works Progress Administration (WPA) survey of the records available for the county provides some details regarding what they found during that research. When the Montgomery County Poor Farm was founded, it was with the requirement that the overseer keep a "fair and regular list of all poor, and of all beggars, vagrants, vagabonds, and offenders" who have been committed to his care. The WPA study found records dating only from 1905, and the current record was kept in the overseer's home (WPA 1939). The records they found related to the Montgomery County Poor Farm House "in the care of the county commissioners and the supervisor of county aid" included the handwritten record (beginning in 1905) of the inmates by name age, sex, color, date admitted, date of removal or death, names and addresses of relative, and notes, which was arranged alphabetically by name of inmates and contained 320 pages; a box of receipts for expenses for the Montgomery County Poor Farm dating from 1922 to 1932; eight bundles of receipts for expenditures for food, salaries, and materials, annual reports, sales of produce records, number of inmate records from the Trustees of the Poor dating from 1895 to 1900; a 50-page volume containing carbon copies of the permits to embalm paupers dating from 1934, with the permit number, the date, the name of the undertaker, the decedent, the reasons for embalming, authorization, cost, and signature of the supervisor; and two volumes (50 pages total) of carbon copies of permits to bury paupers dating from 1935, with the permit number, date, name of undertaker, decedent, age, sex, color, cost, and signature of supervisor. The report generated by the WPA survey does

23

not provide the details contained within those records, and they have not been located during MLS Project research. It is possible that these were some of the estimated 95% of the records that were discarded when the county began an inventory of old county records in 1985 in preparation for archival storage of the materials that were considered to have historical value (Katches 1985). Rhodes (1987:3), who started conducting research around that same time, clearly had access to at least some of those records as she reports that the county spent from $200 to $400 per year between 1899 and 1920 on expenses for coffins for the burial of paupers.

The Department of Commerce Bureau of the Census conducted surveys of paupers in almshouses, and two from the early twentieth century are available online. The census data collected from the end of 1903 through early 1905 indicates that 22 inmates resided in the Montgomery County Poor Farm House on December 31, 1903, 15 were admitted and nine left in 1904, and on January 1, 1905, the home contained 19 inmates (DCBC 1906). According to the 1910 census, 23 inmates resided in the Montgomery County Poor Farm House (15 males, 8 females) and six deaths had occurred there that year (DCBC 1914). Newspaper articles also provide some information regarding those interred in the Montgomery County Poor Farm Cemetery in the twentieth century. The March 30, 1901 issue of *The Baltimore Sun* notes that Amos Wilcoxen, age 88, died at the Montgomery County Poor Farm House, and presumably was buried in the cemetery on that property, although that information is not given. Annie Thomas, a 35-year-old African American woman living in the Montgomery County Poor Farm House who died there due to injuries sustained by a fireplace accident, as reported in the November 29, 1909 *Evening Star* article, was likely buried in the Montgomery County Poor Farm Cemetery, although it is not specifically stated in the article. It is also likely that 70-year-old George Peters, a resident of the Montgomery County Poor Farm House who had been taken to Ritchie Hospital to be fitted for artificial legs but died there, as reported in a December 1, 1948 article in *The Daily Mail*, was buried in the Montgomery County Poor Farm Cemetery.

Improvements made to the Montgomery County Poor Farm in 1901 included painting the home and placing a new plank fence around the front yard area. A county grand jury inspecting the property in March of that year found 27 inmates and a facility that was "most gratifying" and in "most excellent condition" as reported in a March 27, 1901 article in *The Evening Times*. That fence is presumably the one shown in a photograph taken of the overseer and family in front of the home depicted in the 1909 Lunacy Commission report. Schoeberlein (2006:109) believes this photo was included with the intent to provoke a reform movement as it was captioned with a suggestion that one of the inmates also shown in the picture was capable of causing harm to others. According to a July 20, 1903 article in *The Baltimore Sun*, the president of the Maryland Prisoners' Aid Association, accompanied by a minister, had just returned from a tour of the prisons and almshouses in Montgomery and Kent counties, finding the Montgomery County Poor Farm House to be in very good sanitary condition, housing 25 inmates (16 males and 9 females) and well cared for by the current supervisor. The same two gentlemen toured the same facilities the following year and reported in the September 5, 1904 edition of *The Baltimore Sun* that the conditions in the Montgomery County Poor Farm House were as good as could be expected for such an old building and for the small amount of funds allocated by the county.

A December 8, 1907 *Evening Star* article describes the findings of a Grand Jury investigation of the Montgomery County Poor Farm House, which included a rotting porch, cracked walls, a sagging roof, and a very unsanitary situation with regard to the bathroom facilities, although the reporter apparently visited the house himself and found only one room (housing two older men who refused to bathe) objectionable and the remainder clean and in the very best condition. In a December 2, 1908 article in *The Washington Times*, the Montgomery County Poor Farm doctor, Edward (also given as Edwin in same article) Anderson, and the supervisor respond to allegations regarding poor conditions, most of which seem to be associated with the possibility that black and white inmates were housed in the same rooms. An article in the November 18, 1909 issue of *The Baltimore Sun* (also reported in the *Washington Post* on that day) makes it clear that the "appalling conditions" of concern at that time are related to the fact that men and women unrelated to

24

each other in any way were housed in the same rooms, and not related to the conditions of the facility. The 1910 Lunacy Commission report found only two almshouses in the state to be in a poor condition, one of those was the one in Montgomery County (Schoeberlein 2006). A 1912 inspection conducted by the Presbyterian Church found miserable conditions and found that the inmates were too physically or mentally disabled to work on the farm (Shapiro 1983). The Lunacy Commission inspection conducted in 1913 found the Montgomery County Poor Farm buildings "overrun with vermin and very insanitary in every way" (Young et al. 1915). An investigation conducted in 1921 found that the structures were in poor condition, the inmates were not well cared for, and the housing situation was unsanitary (The Washington Post 1921). The facility housed 13 inmates at that time. The following year, the property was transferred from the Trustees of the Poor to the county for management.

Regardless of the actual conditions in the home, according to an *Evening Star* June 10, 1904 article, the annual meetings of the trustees of the Montgomery County Poor Farm and the county commissioners were held at the facility at least some years and involved some business, but were primarily a day devoted to "having a good time" and included guests, with all enjoying a "fine dinner served by overseer Lee Ricketts." A December 23, 1922 *Evening Star* article makes it clear that at least some of the superintendents of the Montgomery County Poor Farm feared they may be held responsible for some of the poor conditions. Dr. Linthicum, the supervisor of the facility at that time, apparently received a package of chocolates postmarked from Washington, D.C. with no return address, which he sent to the county chemist to make sure it was not poisoned.

On March 5, 1924, the General Assembly of Maryland approved a new section of Article 16 of the Code of Maryland that took effect on June 1, 1924, requiring each county almshouse in the state to be referred to as the "county home." At that time, it was reported that the Montgomery County Poor Farm had 120 of its 132 acres under cultivation (Andersen 1998). The January 19, 1931 issue of *The Daily Mail* reports that a state commission investigating almshouses found the one in Montgomery County to be a fire hazard, but otherwise the sanitation condition was moderately good.

A report by the State Department of Welfare in December 1939 gave data for 22 inmates who were in the Montgomery County Home. Andersen reports that there had been 21 inmates in 1938, 27 in 1937, and 26 in 1936. A 1940 General Assembly Legislative Council Research Division report on almshouses in Maryland states that the Montgomery County Poor Farm personnel included a superintendent, matron, cook, two farm laborers, and a wash woman. The farm was comprised of 130 acres, all but 10 acres of which were under cultivation. The residence was a two to three story brick building that was in good condition and housed 22 inmates. Oher structures included a barn, a stable, a hog shed, a dairy, a feed storage house, a hen house, a brooder house, a meat house, a corn crib, and a garage.

In 1941, the Brookings Institute conducted a survey of the Montgomery County Home at the request of the county commissioners. That study reported that the county home is an outmoded institution in general, and although this particular home adequately provided for the small number (20 to 25) of inmates in an economical and efficient manner, a better solution would be the establishment of a nursing home that could better provide the medical care that was needed. The county commissioners ordered another study on the Montgomery County Home in 1948 and made plans to locate other housing for the nine inmates who were there at that time as the house was considered a fire hazard (Andersen 1998). The county commissioners initially planned to continue the operation of the farm, although they abandoned that plan when the details of the state's plans for what became I-270, which bisected the property, were announced (Andersen 1998).

An interview was conducted for a student oral history project in 1975 with Dr. Gilbert Hartley who had made regular calls on the Montgomery County Poor Farm beginning in the 1920s (Belliveau and Banfield 1975). Dr. Hartley described the facility during his period of service as "splendid, lovely condition, perfect…nice…and clean" with the inmates clothed, well fed, not confined, and apparently satisfied with

25

conditions. He described the property as a "regular farm" with a dairy and barns, and said they raised chickens, ducks, turkeys, pigs, and cattle and grew and made their own food. Dr. Hartley said that with the exception of one man who was paralyzed, residents during that time were ambulatory, helped out on the farm and in the kitchen, and there were typically about 18 inmates during that period, primarily elderly white males. Kuckkahn (1996) reports that during planting and harvesting or other busy times, prisoners from the county jail also worked on the farm. A December 21, 1910 note in *The Baltimore Sun* reports that the superintendent of the Montgomery County Poor Farm at that time had recently butchered 14 fat hogs raised on that farm.

R.W. Farmer, the Poor House Commissioner in the 1930s, recounted one of his earliest memories of the Montgomery County Poor Farm, stating that when he was a hardware salesman he went to the farm to sell fencing to the overseer, and found the overseer digging a grave. He said that "This 'potters field' is still used by the county for the increasingly infrequent burials of those who died here without money, family or friends to pay for a plot in a private cemetery, and is now the only reminder of the alms-house and work-house that stood there long ago." (Andersen 1998).

With the creation of welfare programs beginning in the 1930s, the National Housing Act of 1937, post-World War II housing credit offered to veterans, and the establishment of nursing homes for the care of the sick and infirm, the county homes/almshouses were no longer necessary or considered the best solution for housing the poor and infirm (Kuckkahn 1996). The Montgomery County Poor Farm House was closed around 1950, and it and the surrounding buildings were razed in 1959 for construction of the Montgomery County Detention Center, maintenance buildings, and police station.

During construction of I-270 in the late 1950s, an unknown but reportedly large number of interments were relocated by Snowden's Funeral Home (Ervin 2020:13). These graves may have included earlier (late eighteenth and early to mid-nineteenth century) interments than the earliest found by archaeologists (Rhodes 1987:3, 5). Research conducted by Ervin located 1953 notes recorded by surveyors working in the area indicating the "Stadia Location of Potters Field" and noting that they did not observe headstones in the area but found metal nameplates placed by W.R. Pumphrey & Sons and Robert L. Snowden, with the latest interment dating to February 1953. The survey crew found at least 50 graves and noted that the location was in a clearing at the edge of the woods next to an agricultural field accessed by a dirt road off Monroe Street, as well as the fact that additional area was being cleared there, presumably for additional graves. The clearing is readily visible on aerial imagery from the second and third quarters of the twentieth century.

In 1964, local resident David J. King provided a description of the cemetery and the burial process at that time. According to King, the graves were excavated by prisoners, burials were placed by the funeral home representative, and the graves were filled in by the prisoners (Gilmore 1964a, 1964b). King's directions to the cemetery indicate that it was likely the same dirt road off of Monroe Street identified by the surveyors in 1953. He described the burial location as a square clearing in the middle of the woody area (Gilmore 1964b). Similar information is posted on a historical blogsite that also includes a reply with additional information (https://reedbrothersdodgehistory.wordpress.com/2018/06/27/montgomery-county-maryland-almshouse-aka-poor-farm/). The January 2020 response from a former local resident mentions seeing freshly excavated graves in the wooded area behind Dogwood Park where he played as a child in the mid-1960s.

On 19 June 1981, Robert Snowden, a local undertaker, reinterred an unknown number of individuals on the Montgomery County Poor Farm property that had been removed from an unmarked cemetery for the proposed Oaks Landfill (Curry 1984:10; Shapiro 1983). The remains were found in unmarked graves on the "old Riggs farm," and were examined by the Smithsonian Institution. They could not be identified although they are thought to be the remains of Riggs family slaves. Shapiro states that the remains were buried in a wooden box by Mr. Snowden just "off the stony, furrowed path that continues from the end of

26

Monroe Street in south Rockville…Through the brambly woods, and past a junked refrigerator" and were marked by a metal stake with a tiny sign that read "Unknown remains of Riggs Farm." She also notes that "Beyond the Riggs grave, stakes mark the overgrown graves of two others buried unceremoniously by the county many years ago."

A March 17, 1983 article in the *Montgomery County Sentinel* provides additional information regarding the Montgomery County Poor Farm Cemetery (Shapiro 1983). The article states that Viola Schaefer was buried in an unmarked grave on March 8, 1983 within the former Montgomery County Poor Farm property that was being considered for development. The article contains a quote from Robert Snowden who states "For as long as I can recall....since I was a youngster, people have always been buried in that area" and adds that once or twice a year Mr. Snowden is paid by the county to bury individuals who cannot afford the cost of burial elsewhere; the article reiterates that most of the graves are unmarked.

Harvey Henderson of Pumphrey's Funeral Home was interviewed in 1984 by Dona de Zube for an article in the *Montgomery County Sentinel* regarding the county's grave removal plans prior to the anticipated sale of the property for development (de Zube 1984). Mr. Henderson stated that "all of the people his firm had buried over his 30 years on the job had been laid to rest in pine boxes" (de Zube 1984). A year later, Keith Girard wrote an article in the *Washington Post* mentioning Viola Schaefer's grave site (Girard 1985). George Snowden was interviewed for this article and when asked how many graves could be located on the property, he stated "If I said 500 people I'd be in the ballpark" …"Back during the World War II era, we would go out there quite frequently." During research for the 1983 to 1984 study, Curry was told by George Snowden that the funeral home had moved an unknown number of burials from that area during the construction of I-270. The archaeologists conducting research and fieldwork on the cemetery in 1987 were also told by Snowden that the MDOT had hired his father to relocate graves found during construction of I-270, although he could not provide details regarding those burials and attempts to locate further documentation regarding them were not successful. George Snowden also mentioned to archaeologists who were preparing for the 1987 fieldwork that when the access road was impassable "burials were sometimes made wherever convenient" (MCHPC n.d.).

During the 1987 fieldwork supervised by Rhodes, 15 burials were exhumed by the archaeologists and sent to the GMU physical anthropology lab for study. No report detailing any such study seems to have been written, and the location of those remains could not be documented, although it is probable that those remains were ultimately reinterred. At least some initial processing was conducted, and it seems that the remains were still at GMU as late as 1999 based on email correspondence in the MCHPC files for this cemetery. In a chronology of the cemetery compiled by Montgomery County historian Eileen McGuckian in the MCHPC (2018) files for this cemetery, she notes "Sept-Nov 1987 – Snowden moved c100 graves to Parklawn Cemetery, where buried in wooden particleboard caskets + polypropylene boxes "vaults"; marked with memorial stone—*check Block 18 on a hill, near veterans' memorial, for small, generic bronze marker.*" This notation is in sequence between the summer 1987 archaeological investigations and the 1987 transfer of "Some 13" remains to GMU for study.

During construction of the office tower at 1101 Wootton Parkway in 2000, an additional 38 graves dating to the 1940s and 1950s were also located and reinterred at Parklawn (Bathen 2000; Meyer 2018). The Montgomery County Cemeteries Project (Montgomery Planning 2007) indicates that "38 bodies were exhumed and relocated to Parklawn (Section 18) Rockville" (see also Bathen 2000). According to Meyer (2018), "a cemetery employee said they were re-interred in Section 18 with 'no markers, no nothing'."; however, according to a May 10, 2000 article in the *Montgomery Journal*, the remains were exhumed by Snowden Funeral Home employees over a three day period and interred in Parklawn Memorial Park with a bronze marker that reads "THIS IS THE FINAL RESTING PLACE OF THOSE UNIDENTIFIED PERSONS, FORMERLY INTERRED AT THE MONTGOMERY COUNTY ALMS HOUSE CEMETERY"; the article includes a picture of the marker (Figure 3.6) (Smith 2000). This article also states

27

00198523

that "So far 112 bodies have been reinterred at Parklawn Memorial Park from what was once a Pauper's grave" noting that these 38 individuals were placed "beside the remains of about 60 people found in the late 1980s" (Smith 2000). The May 3, 2000 article by Bathen states "This time it was 38. Last time it was 60 or 70." The county had stipulated that they would pay for the relocation of any further graves found on that property when they sold the land to the developer in 1986. The county believed that it had made a sufficient effort to locate graves on the property prior to the sale and that further investigation would not be cost effective.

From the various reports, it can be estimated that about 112 interments were found and relocated between 1987 and 2000, although it is possible that other interments were relocated, but never publicly reported, during the period that the county was preparing the land for sale to private ownership. Map analysis conducted by Richard Ervin of the MDOT SHA suggests that the most likely location for the Montgomery County Poor Farm burials found during the interstation construction would have been on the ridgetop under or near the former alignment of Monroe Street, which is now under the northbound lanes of I-270 north and south of Wootton Parkway. It is also possible, although less likely, that those burials were located in areas now under the westernmost lanes of I-270 (Ervin 2020).

## TREATMENT GOALS

### Consultation with Local and Regional Experts

Local and regional experts or others may have additional information regarding the history of the Montgomery County Poor Farm and those likely to be interred in the cemetery on this property, or other information that may assist with the successful identification of any interments located within or in close proximity to the LOD. The goal of this consultation will be to accumulate new data rather than redundant data, and to attempt identification of any descendants or communities that may have historical or family connections with the Montgomery County Poor Farm Cemetery, so that their views and input may be taken into consideration as the Project work proceeds.

### Identification of Potential Interments within the LOD

The Montgomery County Poor Farm was established in 1789 and the associated cemetery was in use from the late eighteenth century through the early 1980s. It is not clear how many individuals were buried in the cemetery over those centuries; historic records suggest a potential number in the thousands, but an estimate of 500 may be more likely. Previous location efforts have not identified interments from the earliest period of use, however, and it is possible that the eighteenth and early nineteenth century portions of the cemetery are located in areas adjacent to the current I-270 corridor. The primary goal of this study is the identification of interments within the MLS Project LOD so that they can be carefully and respectfully relocated prior to any construction in this area. A variety of research materials provide information regarding the potential for these interments within the LOD and a variety of field techniques will be employed to accomplish this goal.

## TREATMENT METHODS

### Early Coordination and Permitting

<u>Defining the Limits of Field Investigation</u>. Areas most likely to contain graves associated with the Montgomery County Poor Farm include areas adjacent to I-270 and Wootton Parkway in the northwest, northeast, southwest, and southeast quadrants of this overpass and in the area just southwest of the Wootton Parkway and Tower Oaks Boulevard intersection. Field investigations will be confined to the Alternate 9 Phase I South LOD (Preferred Alternative) to ensure that all areas that may be impacted by the Project will

00198524

be examined. The MDOT SHA will continue to ensure that LOD is minimized to the extent practicable, but also if needed, that any additional areas that are included in the MLS LOD as a result of design refinement are considered for potential treatment under this plan.

Permits. No permits are required for the archaeological investigations.

## Initial Field Investigations

Identification of Potential Interments within the LOD. Areas S-4 and SWM S-4 are within the historical boundary of the Montgomery County Poor Farm property, however, they are well removed from the known cemetery area, and the potential for graves in those areas is low relative to other areas of the former Montgomery County Poor Farm. The undeveloped portions of Areas S-5 and SWM S-5 can be considered to have a lower potential relative to other areas for containing graves, particularly the southern portion of Area S-5. All of Area SWM S-6 and the northern portions of Areas S-6 and RS-1 are just on the other side of Wootton Parkway from the mapped boundary of site 18MO266 and previous investigations show that these portions of these areas in particular have a high potential for containing graves. The undeveloped and undisturbed portions of Areas S-27 and SWM S-27 have a moderate potential for containing graves. The Area North of S-28, situated along Wootton Parkway and I-270 in the southwest quadrant of the overpass, is also considered to have a high potential for containing interments. A small portion of the southwestern part of Area RS-2 is within the mapped boundary of site 18MO266 and this area in particular has a moderate to high potential for containing graves. In addition, the area to the northeast of Area RS-1 has a high potential for containing graves.

The MDOT SHA is working with the Project's Developer to determine potential reductions in LOD from the FEIS LOD that would still meet the engineering needs of the Project. Should further reductions in the LOD in the Montgomery County Poor Farm vicinity be possible, the MDOT SHA will apply the methods in this document within the reduced LOD where disturbance will occur.

Initially, standard Phase I archaeological survey will be conducted across the entire LOD in the areas that could not be investigated by shovel testing (all of the defined survey areas except Areas S-27 and SWM S-27) during execution of the Archaeology Site Treatment Plan to ensure that these areas have been examined for the presence of archaeological resources unrelated to interments and to gather additional data regarding soils, vegetation cover, topography, and disturbance in those areas.  For Phase I survey within the Poor Farm investigation area, MDOT SHA will provide MHT and appropriate consulting parties an executive summary of the Phase I work upon completion if no potential NRHP-eligible resources are identified. Should potentially NRHP-eligible archaeological resources unrelated to interments be identified within the Poor Farm investigation area, MDOT SHA will consult with MHT and appropriate consulting parties in accordance with the PA and archaeological treatment plan.  The cemetery investigation efforts will proceed outside any potentially eligible NRHP resource and a reasonable buffer while consultation continues.

As previous investigations have shown, the traditional less intensive and less costly techniques (e.g., probing with a steel tipped rod at regular close intervals, close interval surface inspection looking for stone or other markers, grave shaped depressions, or typical cemetery vegetation such as periwinkle) will not be effective in the identification of interments in this area. The archaeology survey area presents challenges related to both environmental characteristics (surface and near surface obstacles, topography, vegetation, soil type, moisture content/permeability, and non-modern and modern disturbances) and cultural characteristics (long term use, standard practice of not using markers or permanent markers, disorganized manner of interment placement, lack of records). Following the standard Phase I archaeological investigation of the LOD as outlined in the Archaeology Site Treatment Plan, efforts will then be focused on providing additional data to help direct the substantial fieldwork effort anticipated

00198525

## Additional Noninvasive Survey

GPR would not be cost-effective for the large area under consideration with the Montgomery County Poor Farm. All areas of the LOD will need to be physically investigated through excavation, and GPR results, either positive or negative, will not alter the need for excavation. Other methods such as magnetometer or resistivity surveys are not appropriate due to the field conditions and nature of the "targets" of burials.

Historical information as summarized above tends to place the last known "core" of the cemetery as it existed prior to construction of I-270, north of Wootton Parkway near the Tower property. To refine and augment the historical information, the MDOT SHA will begin with a close-interval LiDAR survey of the investigation area, most likely accomplished with drone-mounted units. LiDAR records surface contours at a very high resolution and can reveal subtle differences in elevation that indicate grave depressions. This technique can be particularly useful in areas of dense vegetation where other standard techniques are not effective, although it does not give any direct indication of subsurface features (WSP and NSA 2018). To the extent possible with available resources, data will be collected in close intervals (50 centimeters) to ensure the capture of any potential anomalies within the study area. In this circumstance, LiDAR provides cost-effective coverage of a large area in a minimal amount of time when compared with other methods. LiDAR can identify subtle depressions or other landscape features that may not be apparent from surface investigation.

If available, the MDOT SHA will also attempt to schedule a second survey of the investigation area using trained canines to augment the earlier survey, under different field conditions. The use of specially trained cadaver dogs in the location of human remains on archaeological sites is receiving growing attention and acceptance (Glavaš and Pintar 2019; Minogue 2020; Warren 2020). The limited study conducted for this Project in 2019 suggested some specific areas that should be further investigated, and an additional survey using canines may assist in identifying core areas to begin field investigation and/or areas where additional caution during fieldwork may be warranted.

Previous studies have shown that at least some interments in this cemetery were placed in relatively shallow graves (2.5 ft below surface) and the combined non-invasive techniques will assist in providing a preliminary map of higher probability areas that will guide the field work for the final stage of the investigation.

## Machine and Hand Stripping of the LOD

Ultimately, the final stage of this investigation will involve stripping the topsoil by heavy machinery across the LOD within the undeveloped portions of Survey Areas S-4 SWM S-4, S-5, SWM S-5, S-6, SWM S-6, S-27, SWM S-27, North of S-28, RS-1, and RS-2 to identify any interments within those areas that may be impacted by the Project. The Survey Areas were defined prior to having an engineered LOD and in some cases extend outside the LOD for the preferred alternative; stripping will only occur within LOD as defined at the time of investigation. The mechanical removal of the topsoil in these areas will be performed with a Gradall, trackhoe, or similar vehicle with a bucket fitted with a smooth blade to reduce potential damage. The topsoil removal will be performed under the supervision of a qualified archaeologist, and the soil removal will proceed in a slow and careful manner and extend no deeper than the interface between topsoil and subsoil.

Full Stripping Areas. The MDOT SHA will begin excavation investigations from the general known 1957 location of the cemetery, taking into account results of the LiDAR and/or additional canine survey to focus on the highest potential areas where interments might be located, and proceed outward from this core area. The MDOT SHA will begin with 100% stripping of undisturbed landforms in these high probability locations (Figure 3.7). Within the LOD, areas of extensive fill and low-lying areas with high water table

00198526

that would not be suitable for human burials are present. The MDOT SHA archaeologists will use professional discretion and judgement in how such areas are sampled as they may not be suitable for the type of topsoil stripping planned for the level, undisturbed areas as described above.

The interface between the topsoil and subsoil will be cleaned by shovel, trowel, or a combination thereof to determine the presence or absence of features or artifacts indicative of interments. Soil removal will then continue to the depth below which any potential graves might be situated; as warranted, grading will again be halted to allow the soils surface to be cleaned and inspected. Prior investigations suggest that graves may be encountered at a depth of 2.5 feet below the ground surface, and that grave features may not be distinctly visible at the base of the topsoil. If any evidence of human remains or funerary objects is observed during this process, the topsoil removed from that area will be screened through ¼ inch hardware mesh. If evidence of a human burial is encountered *in situ* within the MLS Project LOD during any stage of the fieldwork, the burial will be exposed and cleaned; recorded with a GPS unit with submeter accuracy; photographed, drawn and recorded; plotted on the Project field map; and flagged for subsequent removal (see below). If it is determined that the burial is located outside the LOD (or if design plans can be revised to eliminate the area from the LOD), the burial will be recorded with a GPS unit with submeter accuracy, photographed, and plotted on the Project field map, but will be left *in situ*.

Sample Stripping Areas. As investigation proceeds, either into lower-potential areas away from the historically known locations of interment or if interments have been identified and investigation proceeds outward and no further interments are found, the MDOT SHA may proceed to an alternate method of investigation by excavating diagonal backhoe trenches at a 20–25 foot spacing interval, with trenches oriented either northwest-southeast or northeast-southwest within the LOD (Figure 3.7). With typical historic period burials being oriented east-west, this method provides robust coverage of the investigation area but is less time and labor intensive than 100% stripping. Should interments be found using this method, the treatment procedures above would be followed, and the area around interments would be 100% stripped of topsoil until no further remains or interments were identified.

Re-Interment. Preservation in place is not feasible for any interments located within the MLS Project LOD. Should the relocation of human remains within the LOD be necessary, the MDOT SHA will consult with the MD SHPO, the Montgomery County State's Attorney, descendants (if they can be determined), and other parties as appropriate regarding the plans for the relocation of any human remains associated with this Project. Maryland state law requires authorization from the Montgomery County State's Attorney for the removal of human remains from a site. In the past, remains from the Montgomery County Poor Farm cemetery have been reinterred in Block 18 of Parklawn Cemetery in Montgomery County. Ideally, any individuals relocated from this cemetery can be placed at Parklawn Cemetery, although those arrangements will be made by the MDOT SHA in consultation with MLS Project consulting parties at the appropriate time. The MDOT SHA will be responsible for the issuance of any public notices related to the relocation of any interments associated with the MLS Project that may be required by Maryland state law, and will also ensure the proper and respectful handling of any human remains and associated objects during the re-interment process. Given the nature of this cemetery and the lack of gravestones, it is not likely that remains will be individually identifiable and that direct descendants could be identified, although MDOT SHA will continue to seek consultation from parties who may have family or community ties to the cemetery in general.

The disinterment and relocation of any human remains that may be required for this Project will be performed by archaeologists and physical anthropologists under the direction of the MDOT SHA. Any funerary artifacts (e.g., clothing, personal items, casket hardware, but not including full caskets or large pieces of caskets) found in association with discrete burials during the investigation will be analyzed and discussed in the Project technical report, along with the results of any physical anthropology studies conducted on human remains, and reinterred with the associated remains to the extent feasible. It may not

00198527

be practicable to remove or reinter larger items, such as casket fragments. If potential funerary artifacts are found in fill or cannot be reasonably associated with a particular burial, those artifacts will be analyzed and discussed in the Project technical report and curated at the Maryland Archaeological Conservation Laboratory.

### Evaluation of NRHP Eligibility

The NRHP employs a fairly rigorous policy regarding the listing of cemeteries. Ordinarily cemeteries are not considered eligible for the NRHP unless the site in question derives its primary significance from the graves of persons of particular transcendent importance, from age, from distinctive design features, or from association with historic events or contains the grave of a historical figure of outstanding importance if there is no other appropriate site or building directly associated with his or her productive life. Curry (1984) noted that this cemetery may be eligible for its potential research value (under Criterion D) since an examination of the physical remains of those interred could provide data regarding changes over time in demographics, pathology, racial or sexual segregation within the cemetery, and burial practices. Tyler Bastian, the State Archaeologist at that time, agreed with that assessment in a November 16, 1984 letter to the mayor of Rockville, as did the State Historic Preservation Officer at that time, J. Rodney Little, in a November 26, 1984 letter to the mayor of Rockville (MCHPC n.d.). However, since that time the late nineteenth century portion of the cemetery was excavated without analysis, and about 100 other graves were removed without archaeological involvement. Together with the removal of graves from under I-270 in the late 1950s, the integrity of the Montgomery County Poor Farm population of human remains, should they exist within the LOD, has been severely compromised. Eligibility of any archaeological remains under Criterion D would be unlikely under these circumstances. The identification of a population of well-preserved older remains (pre-late 19th century), unusual pathologies, or evidence of burial practices that do not seem to clearly accord with the historical record may be considered a special circumstance that would warrant physical scientific studies to evaluate NRHP potential under Criterion D. Should such remains be encountered, the MDOT SHA will consult with the MD SHPO and other consulting parties to consider physical anthropological studies of those remains prior to their re-interment. There are also some special circumstances that should be taken into consideration during the NRHP evaluation of this cemetery, particularly the association with Sidney Randolph and John Diggs-Dorsey. Although memorial services conducted within the county thus far have focused on the locations where these two men were lynched and on the route they were taken from the jail to the location where they were lynched, the Montgomery County Poor Farm Cemetery still retains an intrinsic connection to these men; in the unlikely event that any remains can be clearly associated with important individuals, or patterns associated with history, the MDOT SHA will also consider NRHP eligibility under the other Criteria of A and B. No evidence suggests that the Montgomery County Poor Farm Cemetery has potential for consideration under Criterion C.

### CONSULTATION PLAN

The MDOT SHA will continue to seek input from consulting parties and identify descendants or other interested communities with a demonstrated interest in the Montgomery County Poor Farm prior to and during fieldwork, incorporating additional information or accommodating consulting party preferences to the extent practicable. As appropriate, the MDOT SHA will provide consulting parties a pre-fieldwork meeting opportunity, a timely meeting if remains are identified, and a post-fieldwork debrief if there is interest in these meetings. Upon completion of fieldwork and any analysis necessary, the MDOT SHA will prepare a draft and final report documenting the investigations at Montgomery County Poor Farm. If no interments are identified, or upon completion of removal and relocation of any identified interments from the entirety of the LOD, the MDOT SHA will notify the MD SHPO and consulting parties that no further work is necessary in this area and the MDOT SHA design will proceed to final plans.

00198528



Figure 3.1. Location of Montgomery County Poor Farm Cemetery and Nearby Survey Areas.

00198529



Figure 3.2. Location of 1987 Excavation Trenches and Burials in Relation to Site 18MO266 and the MLS Project LOD.

34

00198530



Figure 3.3. Montgomery County Poor Farm Cemetery and Nearby Survey Areas and the MLS Project LOD.

35

00198531



Figure 3.4. Portion of 1923 Rockville USGS Map Showing Montgomery County Poor Farm Cemetery and MLS Project LOD.

00198532



Figure 3.5. Portion of 1957 Aerial Photograph Showing Montgomery County Poor Farm Cemetery and MLS Project LOD. (Note the clearing in the woods where interments were made during the second and third quarters of the twentieth century. Monroe Street, running southwest to northeast, was bisected by the interstate, and the unimproved road to the cemetery clearing, which is cited by several twentieth century sources, is clearly visible.)

37

00198533



Figure 3.6. Memorial Marker for Montgomery County Poor Farm Cemetery Re-Interments in Parklawn Cemetery (from Smith 2000).



38

00198534



Figure 3.7. Montgomery County Poor Farm Cemetery Investigation Stripping Areas.

00198535

# 4. GENERAL PROCEDURES

**PROFESSIONAL QUALIFICATIONS OF PROJECT PERSONNEL**

The MDOT SHA employs Secretary of Interior qualified professionals in the fields of archaeology, architectural history, physical/biological anthropology, and history (48 Federal Register 44738–44739; 36 CFR 61) who will oversee implementation of stipulations in the Project PA related to Section 106 of the NHPA and this site treatment plan. Fieldwork conducted during the execution of this treatment plan will employ the services of a physical anthropologist who can identify any potential human remains uncovered during the investigations.

All Project work will comply and be consistent with all pertinent federal and state regulations, including, but not limited to, Section 106 of the *National Historic Preservation Act* and its implementing regulations (36 CFR Part 800, *Protection of Historic Properties*), as amended; the *National Environmental Policy Act* of 1969; the Secretary of the Interior's *Standards and Guidelines for Archaeology and Historic Preservation* (1983); the ACHP's *Treatment of Archaeological Properties* and *Policy Statement Regarding Treatment of Burial Sites, Human Remains and Funerary Objects* (2007); the National Register of Historic Places Bulletin 15, *How to Apply the National Register Criteria for Evaluation* (NPS revised 1997) and other National Register Bulletins as applicable; the MDOT SHA's 2017 *Archaeology Guidelines for Consultants* and the 1986 *Specifications for Consulting Engineers Services Manual, Section IV*; the MHT's *Standards and Guidelines for Archaeological Investigations in Maryland* (Shaffer and Cole 1994) and *Technical Update No. 1 of the Standards and Guidelines for Archeological Investigations in Maryland: Collections and Conservation Standards* (Morehouse et al. 2022); the Maryland Historical Trust Act of 1985, as amended (State Finance and Procurement Article 5A-325 and 5A-326 of the Annotated Code of Maryland). Any subsequent standards, revisions of standards, or applicable guidance issued by the Secretary of Interior, the ACHP, or the MD SHPO will be incorporated as then in force for the performance of work carried out under the Project PA and this site treatment plan.

It should be noted that the *Archaeological Resources Protection Act* (ARPA) and the *Native American Graves Protection and Repatriation Act* (NAGPRA) would only be relevant for Federal property, which is not applicable to the work conducted under this plan. Also, while the two cemeteries are within Maryland, the entire Project has elements in Virginia, and in the event of unexpected human remains discovery in Virginia, the Project Inadvertent Discoveries Plan (IDP) contains provisions and requirements specific to Virginia.

**RESPECTFUL TREATMENT OF HUMAN REMAINS**

The MDOT SHA recognizes that, despite the extensive archaeological field investigations that will have been conducted prior to MLS Project construction, it is possible that human remains or funerary objects could be discovered during construction. The MDOT SHA is committed to protecting and preserving any human remains or funerary objects that may be identified in accordance with state and federal regulations. An Inadvertent Discoveries Plan (IDP) was developed on behalf of the MDOT SHA and in consultation with the FHWA, Virginia and Maryland SHPOs, the NPS, the ACHP, and other MLS Project consulting parties should any such remains be discovered. This IDP summarizes the requirements MDOT SHA and its archaeological consultants will follow to address the discovery of human remains or funerary objects during construction activities associated with the MLS Project anywhere outside of the identified investigation areas of the Morningstar Cemetery and the Montgomery County Poor Farm. Human remains or funerary objects discovered on NPS property and/or within Virginia have different and additional requirements as noted in the Project PA and IDP.

40

00198536

The MDOT SHA archaeologists and archaeological consultants will treat any human remains encountered during the Project in a manner guided by the relevant federal and state laws and guidelines. In addition, human remains will be treated with the utmost dignity and respect at all times. Human remains and/or associated artifacts (including grave markers, casket/coffin materials, or funerary objects) will be left in place where possible and not disturbed unless necessary, and no personal or media photographs will be allowed of human remains other than what is needed for technical documentation, and consultant Project personnel will be restricted from posting or disclosing information or photographs on social media or other venues. The MDOT SHA and FHWA will be the only authorized sources to disseminate information to consulting parties or media. No skeletal remains or materials associated with the remains will be collected or removed until appropriate consultation has taken place. All personnel involved with the discovery will maintain confidentiality concerning the remains, and any press contacts will be referred to the MDOT SHA.

## BURIAL PROTECTIVE MEASURES

During field investigations, the MDOT SHA will ensure protection of each cemetery during active investigation. This will include protection of remains or excavation areas for weather as necessary, and security and privacy measures (such as screening fencing or off-hours security staffing) appropriate to the specific situation, with the goal of preventing unnecessary damage to human remains and limiting inappropriate public access if and when such remains are exposed.

## CHANGES TO THE LOD AFFECTING EITHER CEMETERY

Additional areas could be included in the MLS LOD as a result of design refinement. The MLS Project PA stipulates how any such design changes will be coordinated with the SHPOs, Tribes, local governments and other consulting parties.

## IDENTIFICATION OF AREAS REQUIRING ARCHAEOLOGICAL MONITORING DURING CONSTRUCTION

The Ball Family Cemetery may be located close to or under the paving of I-270, near archaeological site 18MO191, which may represent the Ball homestead (Arnold et al. 2021:216–217). Archaeological monitoring will be required during all ground disturbing activities between Stations 3.47 to 3.59 along I-270 south of Montrose Road.

MDOT SHA may identify additional areas requiring archaeological monitoring during construction to allow the identification of archaeological deposits in areas where previous studies indicate areas of high archaeological potential that are not feasible to examine by traditional survey means. Such areas could potentially include portions of the several cemetery areas described above, or areas that are deeply buried beneath fill or pavement that must be removed prior to archaeological hand excavations. Such areas may also require archaeological monitoring during the fill removal process. Once these areas have been identified, reviewed, and mapped by the MDOT SHA, their locations will be immediately communicated with the Phase 1 Developer, and archaeological monitoring will be scheduled concurrent with any ground disturbing activities in the designated area(s) following the archaeological monitoring plan below.

## MONITORING PLAN

The archaeological monitor will be present for all ground-disturbing activity in areas requiring monitoring during MLS Project construction. If excavations of potentially sensitive sediments occur simultaneously in more than one location, an archaeological monitor will be present at each location. The archaeological monitor will work in close coordination with the on-site construction engineer and construction personnel and have the authority to pause the excavation work as necessary in order to examine soil deposits and

41

potential cultural features or deposits and implement the IDP. The archaeological monitor will visually inspect subsurface exposures, profile walls, and backfill piles for archaeological deposits from a vantage point that allows a clear view of that ground disturbance. The archaeological monitor will take photographs, collect location information with a GPS unit, and document sedimentary composition, stratigraphy, inclusions, and any other pertinent data. Archaeological monitors working near heavy equipment will be outfitted with appropriate personal protective equipment (e.g., safety glasses, hard hat, and gloves), will obey all safety requirements, and will undergo any necessary safety training. In the event that potentially significant cultural deposits or human remains are identified, the archaeological monitor will follow procedures provided in the MLS Project IDP (Appendix). In the absence of any significant finds, the archaeological monitor will provide the MDOT SHA with a daily summary of the construction activities, monitoring locations, condition of the sediments and any cultural finds, and additional pertinent information. In accordance with the IDP, should archaeological monitoring identify either archaeological human remains or potentially NRHP-eligible archaeological deposits, MDOT SHA will consult per the Project IDP.



00198538

# 5. REPORTING

**CULTURAL RESOURCES REPORT**

MDOT SHA will provide reports as identified in this document to the consulting parties as appropriate. These are expected to include: 1. Additional GPR study of LOD near Morningstar Cemetery; 2. Draft and Final Reports of Excavation Investigations near Morningstar Cemetery; and 3. Draft and Final Reports documenting Excavation Investigations for Montgomery County Poor Farm. The full comprehensive details regarding the methods and results of further studies conducted for the MLS Project will be reported in additional Project report volumes. All reporting will conform to MHT and MDOT SHA standards and guidelines.



00198539

# 6. REFERENCES

Andersen, Patricia Abelard
    1998    The Almshouse, Later Called the "County Home," 1789–1948, A History of Poor Relief in
        Montgomery County. *The Montgomery County Story* 42(2):25–36.

Arnold, W. Brett, Jason L. Tyler, Jessica Brannock, Alexandra Glass, Alexander Keim, and Jason
    Shellenhamer
    2021    *Phase I Archaeological Investigation for the I-495 & I-270 Managed Lanes Study,*
        *Montgomery and Prince George's County, Maryland and Fairfax County, Virginia.* (MLS
        Cultural Resources Technical Report Volume 4). Report Prepared for the Maryland Department
        of Transportation State Highway Administration by Applied Archaeology and Historic
        Associates, Inc., Annapolis, Maryland.

Bathen, Effie
    2000    More Remains Found on Site of Rockville Development. *Gazette Regional News*, Wednesday
        May 3, 2000, page A-33.

Bayly, Alex H., John Morris, Charles Chancellor, Thomas Latimer, Charles Roberts, and William Lee
    1887    *Second Report of the Lunacy Commission, to His Excellency the Governor of Maryland.* The
        Sun Book and Job Printing Office, Baltimore, Maryland.

Belliveau, Carol, and Kassy Banfield
    1975    Montgomery County Historical Society Oral History Program: Interview with Dr. Gilbert V.
        Hartley, Montgomery County Home (Almshouse) taken November 5, 1975. On file, Montgomery
        History, Rockville.

Bevan, Bruce
    1986    *A Radar Survey at the Poor Farm Cemetery.* Report prepared for Applied Archaeology
        Center National Park Service by Geosight.

Chancellor, C.W.
    1877    Report on the Public Charities, Reformatories, Prisons and Almshouses of the State of
        Maryland. Baughman Brothers, Frederick, Maryland. Electronic document,
        https://www.loc.gov/item/09008725/.

Crane, Brian
    2021    The Poor Farm Cemetery: A Dark and Overlooked Part of Our Past. Blog available at
        https://montgomeryplanning.org/blog-design/2021/03/the-poor-farm-cemetery-a-dark-and-
        overlooked-part-of-our-past/.

Curry, Dennis
    1984    *Archeological Reconnaissance of Ritchie Parkway from Maryland Route 355 to Seven Locks*
        *Road, Montgomery County, Maryland.* Report Prepared for the Maryland State Highway
        Administration.

Department of Commerce Bureau of the Census (DCBC)
    1906    Paupers in Almshouses 1904. U.S. of America, Department of Commerce, Special Reports.
        U.S. Government Printing Office, Washington, D.C.
    1914    Paupers in Almshouses 1910. U.S. of America, Department of Commerce, Bulletin 120. U.S.
        Government Printing Office, Washington, D.C.

de Zube, Dona
    1984    Potter's Field Going: County to Sell Land to Builder, May Hit Snag. *Montgomery County*
        *Sentinel*, November 30, 1984.

Dwyer, Michael F.
    1975b  Maryland Historical Trust Worksheet Nomination Form for the National Register of Historic
        Places, National Park Service: Poor Farm Site and Cemetery (M:26-6). On file, MHT,
        Crownsville.

00198540

Ervin, Richard
    2020    The Ball Family Farmstead and Cemetery. On file, Maryland Department of Transportation State Highway Administration, Baltimore, Maryland.

Falchetta, Jennifer, Patricia Slovinac, Katherine McCarthy Watts, Frank Mikolic, and Russell Stevenson
    2021    *Documentation and Archaeological Monitoring for the I-495&I-270 Managed Lanes Study Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212) Montgomery County, Maryland.* (MLS Cultural Resources Technical Report Volume 9). Report Prepared for the Maryland Department of Transportation State Highway Administration by A.D. Marble.

Gilmore, Sue
    1964a    Burying the Unclaimed Can Be Thorny Problem. *Montgomery County Sentinel*, November 25, 1964 (?).
    1964b    Our Potter's Field Is Sadly Neglected. *Montgomery County Sentinel*, November 25, 1964.

Girard, Keith F.
    1985    Montgomery Graveyard Sale is Questioned. *Washington Post*, June 30, 1985.

Glavaš, Vedrana, and Andrea Pintar
    2019    Human Remains Detection Dogs as a New Prospecting Method in Archaeology. *Journal of Archaeological Method and Theory* 26:1106–1124.

Hedlund, Sarah
    2020    At the Hands of Parties Unknown: The 1880 Lynchings in Montgomery County, Maryland. Electronic document, https://montgomeryhistory.org/wp-content/uploads/2020/07/WEB_Montgomery-Story_Summer-2020.pdf

Hutchins-Keim, Karen, Christeen Taniguchi, Jacob Bensen, Richard Ervin, and Matt Manning
    2018    *Archaeological and Historic Architectural Gap Analysis and Assessment.* (MLS Cultural Resources Technical Report Volume 2). Report prepared for the Maryland Department of Transportation State Highway Administration by Rummel, Klepper & Kahl, LLP, Baltimore, Maryland.

Jones, Alexandra
    2010    Gibson Grove A.M.E. Zion Church Gone But Not Forgotten: The Archaeology of an African American Church. PhD dissertation submitted to the Department of Anthropology, the University of California at Berkeley.

Katches, Mark
    1985    Archives to Preserve a County's Past. *The Washington Post*, Thursday August 8, 1985, p. Md 9.

Kuckkahn, Joan Lutz
    1996    Housing the Poor in Rockville, Maryland, a History, with Comparisons to Towson, Maryland. Paper submitted to the University of Maryland School of Law.

Manning, Matt
    2020    Maryland Historical Trust Determination of Eligibility Form: Morningstar Tabernacle No. 88 Moses Hall and Cemetery (M:35-212). On file, MHT, Crownsville.

Maryland Medical Journal
    1895    The New Insane Asylum. *Maryland Medical Journal*, August 24, 1895, Volume XXXIII, No. 19, Baltimore, Maryland.

Meyer, Eugene L.
    2018    Once Upon a Time in Montgomery County. *Bethesda Magazine*. February 1, 2018.

Minogue, Kristen
    2020    The Hunt for Historic Graves. Posted on August 28, 2020 on the Smithsonian Environmental Research Center Blog.

Montgomery County Historic Preservation Commission (MCHPC)
    2018    Notes and Emails, Poor Farm Cemetery (#196). On file, MCHPC, Rockville.
    n.d.    Correspondence Files for Poor Farm Cemetery (#196). On file, MCHPC, Rockville.

00198541

Montgomery Planning
    2007    Montgomery County Poor Farm Cemetery (ID 196). Electronic document,
        (http://www.montgomeryplanning.org/historic/education/documents/cemeteries176-200.pdf).
Morehouse, Rebecca, Sara Rivers Cofield, and Nichole Doub
    2022    *Technical Update No. 1 of the Standards and Guidelines for Archaeological Investigations in Maryland: Collections and Conservation Standards*. Maryland Archaeological Conservation Laboratory, Maryland Historical Trust and Jefferson Patterson Park and Museum, St. Leonard, Maryland.
Morris, John, Samuel Chew, Thomas Latimer, R.W. Dashiell, John Poe, and William Lee
    1893    *Eighth Report of the Lunacy Commission, to His Excellency the Governor of Maryland*. The Sun Book and Job Printing Office, Baltimore, Maryland.
Naeff, Fava & Company
    1890    Real Estate Map of the Metropolitan Branch of the Baltimore and Ohio Railroad Company between Washington, D.C., and Rockville, Md., and Adjacent Land Holdings: from Latest Official Authorities & Actual Surveys. Electronic document, https://www.loc.gov/item/91680470/, accessed November 2021.
Rhodes, Diane
    1987    *Archeological Investigations at the Poor Farm Cemetery Montgomery County, Maryland*. National Park Service Denver Service Center Applied Archeology Center Rockville, Maryland.
Roche, Heather
    2019    Bay Area Canines Mission Report for I-270 Widening Project. On file, MDOT SHA.
Royse, Pat
    1986    County Prepares to Search for Graves at Poor Farm. *Montgomery Journal*, February 26, 1986.
Schoeberlein, Robert William
    2006    Mental Illness in Maryland: Public Perception, Discourse, and Treatment, from the Colonial Period to 1964. PhD dissertation, submitted to submitted to the Faculty of the Graduate School of the University of Maryland, College Park.
Shaffer, Gary D., and Elizabeth J. Cole
    1994    *Standards and Guidelines for Archeological Investigations in Maryland*. Guidelines prepared by the Office of Archeology and Office of Preservation Services, Maryland Historical Trust. Maryland Historical Trust Technical Report No. 2.
Shapiro, Stephanie
    1983    County's Paupers Still Buried in Potter's Field. *Montgomery County Sentinel*, March 17, 1983, p. A1.
Smith, Kelly
    2000    Bodies Count at Rockville Site. *Montgomery Journal*, May 10, 2000, p. A1.
Toomey, Jack
    2006    The Lynching of Sidney Randolph. *The Monocacy Monocle*. June 30, 2006, p. 5.
United States Department of Agriculture Natural Resources Conservation Service (USDA NRCS)
    2021    Web Soil Survey. Electronic document, websoilsurvey.sc.egov.usda.gov/App/WebSoilSurvey.aspx. Accessed November 2021.
United States Geological Survey (USGS)
    1908    Rockville, Maryland, 7.5 minute series quadrangle map. U.S. Geological Survey, Washington, D.C.
    1923    Rockville, Maryland, 7.5 minute series quadrangle map. U.S. Geological Survey, Washington, D.C.
    1944    Rockville, Maryland, 7.5 minute series quadrangle map. U.S. Geological Survey, Washington, D.C.

00198542

Wallace, Glen
    2018a   Moses Hall Cemetery. Montgomery County Cemetery Inventory Revisited Burial Site
        Information Form, on file, MCHPC.
    2018b   Poor Farm Cemetery. Montgomery County Cemetery Inventory Revisited Burial Site
        Information Form, on file, MCHPC.
Warren, Cat
    2020    When Cadaver Dogs Pick Up a Scent, Archaeologists Find Where to Dig. *New York Times*,
        May 19, 2020.
The Washington Post
    1921    Finds Almshouse a "Disgrace," Grand Jury at Rockville in Drastic Report Calls for
        Improvements. 24 March 1921, Page 9.
Whitley, Paige
    2021    The History of the Gibson Grove Community and the Gibson Grove AMEZ Church, Cabin
        John School and Morningstar Tabernacle No. 88 Moses Hall and Cemetery. Prepared for the
        Friends of Moses Hall.
Wiener, Elizabeth
    1977    County to Sell Land with Paupers' Graves. *Montgomery County Sentinel*, June 30, 1977.
Works Progress Administration (WPA)
    1939    Inventory of the County and Town Archives of Maryland No. 15 Montgomery County
        (Rockville). Prepared by the Historical Records Survey, Division of Women's and Professional
        Projects, Works Progress Administration.
WSP, Inc., and New South Associates, Inc. (WSP and NSA)
    2018    Practical Guide for Developing Effective Scopes of Work for the Geophysical Investigation
        of Cemeteries. Prepared for the American Association of State Highway and Transportation
        Officials (AASHTO) Standing Committee on the Environment, Washington, D.C.
Young, Hugh Hampton, Henry M. Hurd, Henry J. Berkley, George H. Hocking, Edgar Allan Poe, and
        Arthur P. Herring
    1915    *Biennial Report of the Lunacy Commission to His Excellency the Governor of Maryland*. The
        Lord Baltimore Press, Baltimore, Maryland.

00198543