IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARYLAND CHAPTER OF THE SIERRA  :
CLUB, part of Sierra Club, Inc.,
et al.                          :

     v.                         :   Civil Action No. DKC 22-2597

                           :

FEDERAL HIGHWAY ADMINISTRATION,
et al.                          :

**MEMORANDUM OPINION**

These consolidated cases present challenges to the administrative decisions approving plans to replace the American Legion Bridge and widen and add toll lanes to Routes I-495 and I-270.  Presently pending and ready for resolution are a joint motion for summary judgment filed by Plaintiffs the Maryland Chapter of the Sierra Club (the "Maryland Chapter"), Friends of Moses Hall ("Moses Hall"), National Trust for Historic Preservation ("National Trust"), National Resources Defense Council, Inc. ("NRDC") (collectively, "Non-Profit Plaintiffs"), and the Northern Virginia Citizens Association ("NVCA"), (ECF No. 46); a cross-motion for summary judgment filed by Defendants the Federal Highway Administration ("FHA"), Stephanie Pollack, in her official capacity as Acting Administrator of the FHA, Gregory Murrill, in his official capacity as Maryland Division Administrator of the FHA (collectively, "Federal Defendants"), (ECF No. 47); and a cross-motion for summary judgment filed by Defendants the Maryland

1

Department of Transportation ("MDOT") and James F. Ports, Jr., in his official capacity as Secretary of MDOT (collectively, "State Defendants"), (ECF No. 48).  The issues have been briefed, and the court now rules, no hearing being deemed necessary.  Local Rule 105.6.  For the following reasons, Plaintiffs' motion for summary judgment will be denied and Defendants' cross-motions for summary judgment will be granted.

## I.   Background

### A. Factual Background[1]

In response to extreme congestion on I-495 and I-270, the two most heavily traveled freeways in Maryland, FHA and MDOT (collectively, the "Agencies") initiated the "I-495 & I-270 Managed Lanes Study" (the "Study") in early 2018 by publishing a Notice of Intent to develop an Environmental Impact Statement ("EIS") evaluating ways to mitigate traffic congestion in I-270 and I-495.  (AR 242; AR 267; AR 35732; AR 55593-94 (Notice of Intent)).  The Study considered alternatives to address congestion within a 48-mile corridor spanning from "I-495 from south of the George Washington Memorial Parkway in Fairfax County, Virginia, including improvements to the American Legion Bridge [("ALB")] over the Potomac River, to west of MD 5 and along I-270 from I-

---

[1] The following facts are drawn from the administrative record.  Citations to "AR" refer to the administrative record. (ECF Nos. 56-69).

495 to north of I-370, including the East and West I-270 spurs" in Montgomery and Prince George's Counties.   (AR 35732; AR 4).   The Agencies coordinated with the Virginia Department of Transportation ("VDOT"), whose I-495 Express Lanes North Extension project ("I-495 NEXT") proposes building toll lanes along I-495 in Virginia that would tie in with the Agencies' preferred alternative at the George Washington Memorial Parkway ("GWMP") interchange. (*See* AR 163467; AR 189242-43).

On July 10, 2020, the Agencies published a Draft Environmental Impact Statement ("DEIS").   (AR 242).   The DEIS screened fifteen preliminary alternatives, ultimately retaining six "Build" alternatives and a "No Build" alternative for further study. (*Id.; see also* AR 35768-70).   The DEIS proposed building nested ramps instead of flyover ramps at the GWMP interchange.   (AR 36029). The DEIS also considered impacts to historic properties, (AR 35892), air quality, (AR 35895), and environmental justice ("EJ") communities, (AR 35957).   The DEIS was available for public comment for 123 days.   (AR 242).

After reviewing public comments on the DEIS, the Agencies selected their preferred alternative (the "Preferred Alternative").   (AR 27377).   On October 1, 2021, the Agencies published a Supplemental DEIS ("SDEIS"), whose focus was limited to presenting new information related to the Preferred Alternative.   (AR 242; AR 27360).   The SDEIS included information

on how the Preferred Alternative was selected, traffic modeling conducted by MDOT, anticipated impacts on the environment and historic properties, and mitigation tactics.   (*See* AR 242; AR 27364-65; AR 27410-11).   Apart from the changes attendant to the selection of the Preferred Alternation, the SDEIS incorporated the same improvements proposed in the DEIS-including those with respect to the GWMP interchange.   (*See* AR 27827).   The SDEIS was available for public comment for 75 days.   (AR 242).

On June 17, 2022, the Agencies published a Final Environmental Impact Statement ("FEIS").   The FEIS presented the Agencies' response to public comments received on the DEIS and SDEIS.   (AR 243).   The Agencies' response noted that MDOT's traffic modeling was manually adjusted post-SDEIS because it previously reflected traffic volumes around the Greenbelt Metro Station that well exceeded roadway capacity.   (AR 132).   The FEIS also included final environmental analyses, a "Final Section 4(f) Evaluation," as well as mitigation commitments for unavoidable impacts.   (AR 243).   The FEIS stated that the design at the GWMP interchange had been modified to align with proposed improvements in I-495 NEXT.   (*Id.*).

After the end of the FEIS's 30-day availability period, the Agencies announced their approval of the Record of Decision ("ROD") on August 25, 2022.   (AR 57).

## 1. The Preferred Alternative

The Preferred Alternative proposes

> a two-lane, [high occupancy toll] [("HOT")]
> managed lanes network on I-495 and I-
> 270 . . . On I-495, the Preferred Alternative
> consists of adding two, new HOT managed lanes
> in each direction from south of the [GWMP] to
> west of MD 187.   On I-270, the Preferred
> Alternative consists of converting the one
> existing [high occupancy vehicle] lane in each
> direction to a HOT managed lane and adding one
> new HOT managed lane in each direction on I-
> 270 from I-495 to north of I-370 and on the I-
> 270 east and west spurs.

(AR 248).   The Preferred Alternative is located in Montgomery
County and Fairfax County.   (*See* AR 4-5).   The Preferred
Alternative also proposes replacing the ALB.   (*Id.*).   The Agencies
concluded that there was no feasible and prudent alternative to
using land from properties protected by Section 4(f) of the
Department of Transportation Act ("Section 4(f)"), 49 U.S.C. §
303(c), and the Preferred Alternative poses the least overall harm
compared to other alternatives considered in the DEIS.   (AR 255).
While the Preferred Alternative uses land from the Washington
Biologists' Field Club (the "Field Club") on Plummers Island, it
would avoid using any land from the Morningstar Tabernacle No. 88
Moses Hall and Cemetery ("Morningstar Moses Cemetery").[2]   (*See* AR
539; AR 544).

---

[2] The Field Club on Plummers Island and the Morningstar Moses
Cemetery are both protected by Section 4(f), 49 U.S.C. § 303(c),
and Section 106 of the National Historic Preservation Act ("Section

The Field Club is a twentieth century naturalist club located on Plummers Island that conducts long-term scientific studies and serves as a gathering place for its membership of influential and accomplished scientists.  (AR 403).  The natural landscape of Plummers Island is a character-defining feature of the Field Club.  (*Id.*).  The Morningstar Moses Cemetery is an African-American burial ground established more than a century ago.  (*See* AR 13938; AR 13952-54).  The exact number of burials in the Morningstar Moses Cemetery, many of which are unmarked, remains unknown.  (AR 13966; AR 13976; AR 14228; AR 161430).  In order to determine whether the Preferred Alternative would use land from the Morningstar Moses Cemetery, MDOT engaged experts to define the Morningstar Moses Cemetery's historic boundaries through historical research, fieldwork, and ground-penetrating radar ("GPR") surveys.  (AR 13913; AR 13915).  Some areas within the Preferred Alternative's limits of disturbance[3] ("LOD") remain uninvestigated, (AR 161430), the reasons for which include the fact that the Morningstar Moses

---

106"), 54 U.S.C. § 306108.  (*See* AR 539; AR 544; AR 398).  The parties refer to the Field Club and Plummers Island interchangeably as a Section 4(f) property.  Plummers Island is located within the Chesapeake and Ohio Canal National Historical Park, (AR 17690), which is also a Section 4(f) property, (AR 539).

[3] "The limits of disturbance . . . are the proposed boundary within which all construction, staging, materials storage, grading, clearing, erosion and sediment control, landscaping, drainage, stormwater management, noise barrier replacement/construction, and related activities would occur." (AR 247 n.1).

Cemetery's channery soils and shallow bedrock can undermine the quality of GPR survey data, (AR 13916).  Consequently, the Agencies deferred the final evaluation of the Preferred Alternative's effects on the Morningstar Moses Cemetery-as required by Section 106 of the National Historic Preservation Act ("Section 106"), 54 U.S.C. § 306108-via a May 17, 2022 programmatic agreement ("PA") providing consultation and mitigation procedures for burials identified within the Preferred Alternative's LOD but outside of the Morningstar Moses Cemetery's historic boundary prior to final design and construction.  (AR 94; AR 395-96).

Post-DEIS, the Agencies investigated three potential roadway alignments to accommodate replacement of the ALB while limiting impact to its neighboring Section 4(f) properties, such as Plummers Island:  a new structure can be constructed on a minimally offset alignment to the east of the existing ALB (the "east shift alignment"), on a minimally offset alignment to the west of the existing ALB (the "west shift alignment"), or on the existing alignment (the "on-center alignment").  (AR 17690-92).  MDOT convened an "ALB Strike Team" to develop and evaluate ALB replacement alternatives with the goal of avoiding impacts to Section 4(f) land.  (AR 17698; AR 198357).  The "ALB Strike Team" deemed the west shift and on-center alignments viable options. (AR 17698).  Ultimately, the Agencies chose the on-center alignment for the Preferred Alternative.  (*See* AR 17692).

7

**B. Procedural Background**

On October 11, 2022, Non-Profit Plaintiffs filed a complaint against Defendants asserting violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, Section 4(f), 49 U.S.C. § 303(c), and Section 106 of the National Historic Preservation Act ("Section 106"), 54 U.S.C. § 306108. (ECF No. 1).  On December 23, 2022, NVCA filed a complaint against Defendants asserting a violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, et seq.  (Originally Case No. DKC 22-3336, now ECF No. 36).  The cases were consolidated on February 28, 2023. (ECF No. 35).  On June 16, 2023, Plaintiffs filed a joint motion for summary judgment seeking vacatur of the FEIS, Final Section 4(f) Evaluation, and ROD.  (ECF No. 46).  On August 7, 2023, Federal Defendants filed a cross-motion for summary judgment, opposition to Plaintiffs' joint motion for summary judgment, and request for hearing.  (ECF No. 47).  On the same day, State Defendants filed a cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment.  (ECF No. 48).  On September 5, 2023, Plaintiffs filed a joint reply in support of their motion for summary judgment and opposition to Defendants' cross-motions for summary judgment.  (ECF No. 49).  On October 4, 2023, Federal Defendants and State Defendants replied

respectively in support of their cross-motion for summary judgment. (ECF Nos. 50, 51).

## II.  Standard of Review

Claims brought under NEPA, Section 4(f), and Section 106 are subject to judicial review under the APA, 5 U.S.C. § 706 *et seq.* These statutes do not provide an independent cause of action, and thus "fall[] under the aegis of the APA." *Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F.Supp.2d 642, 659 (D.Md. 2007) (citing *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 882 (1990)). "Reviews of agency action in the district courts must be processed *as appeals*." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994) (emphasis in original). "[M]otions for summary judgment are conceptually incompatible with the very nature and purpose of an appeal." *Id.; see also Jarita Mesa Livestock Grazing Ass'n v. U.S. Forest Serv.*, 305 F.R.D. 256, 281 (D.N.M. 2015). "Accordingly, district courts reviewing agency action do not determine whether a 'genuine dispute as to any material fact' exists, Fed.R.Civ.P. 56, and instead 'engage in a substantive review of the record to determine if the agency considered relevant factors or articulated a reasoned basis for its conclusions[.]'" *New Mexico Health Connections v. United States*, 312 F.Supp.3d 1164, 1171 (D.N.M. 2018) (quoting *Olenhouse*, 42 F.3d at 1580). "The entire case is a question of law," and the "complaint, properly

read, actually presents no factual allegations, but rather only arguments about the legal conclusion[s] to be drawn about the agency action." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C.Cir. 1993). Therefore, the question is not whether the plaintiff has "raised genuine issues of material fact," but whether, "based on the agency record[,] . . . the agency acted arbitrarily or capriciously." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C.Cir. 2009).

The "focal point for judicial review" of agency action "should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *see also Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004). The reviewing court "should have before it neither more nor less information than did the agency when it made its decision." *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C.Cir. 1984); *see also Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C.Cir. 1989) ("[I]n order to allow for meaningful judicial review, the agency must produce the administrative record that delineates the path by which it reached its decision.").

"'[A]rbitrary and capricious' review focuses on the reasonableness of the agency's decisionmaking processes." *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1105 (D.C.Cir. 2009).

> "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).  An agency can satisfy that requirement by providing an explanation with enough clarity that its "path may reasonably be discerned."  *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  So long as the agency "provide[s] an explanation of its decision that includes a rational connection between the facts found and the choice made," we will uphold its decision. *Ohio Valley Env't Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  "But where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."  *Encino Motorcars*, 579 U.S. at 221 (citing *State Farm*, 463 U.S. at 42–43).

*Jimenez-Cedillo v. Sessions*, 885 F.3d 292, 297–98 (4th Cir. 2018). When reviewing the agency's explanation, the reviewing court "must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *State Farm*, 463 U.S. at 43 (quoting *Bowman*, 419 U.S. at 285).

> [A]n agency decision is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [offers an explanation for its decision that] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

*Sierra Club v. Dep't of the Interior*, 899 F.3d 260, 293 (4th Cir. 2018) (quoting *State Farm*, 463 U.S. at 43).

An agency also violates the APA if it fails to respond to "significant points" and consider "all relevant factors" raised by the public comments. *Home Box Off., Inc. v. FCC*, 567 F.2d 9, 35–36 (D.C.Cir. 1977). "An agency is not obliged to respond to every comment, only those that can be thought to challenge a fundamental premise." *MCI WorldCom, Inc. v. FCC*, 209 F.3d 760, 765 (D.C.Cir. 2000) (citing *Grand Canyon Air Tour Coalition v. FAA*, 154 F.3d 455, 468 (D.C.Cir. 1998) (emphasis added) ("An agency must . . . demonstrate the rationality of its decisionmaking process by responding to those comments that are relevant *and significant*.")).

Review under the arbitrary and capricious standard is deferential and narrow. "[A] court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Nonetheless, the arbitrary and capricious standard "is not meant to reduce judicial review to a 'rubber-stamp' of agency action." *Ohio Valley*, 556 F.3d at 192. The reviewing court must "engage in a 'searching and careful' inquiry of the record." *Id.* (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## III. Analysis

### A. Standing

In their motion for summary judgment, Plaintiffs assert that they have established standing. (ECF No. 46-1, at 30-31). In their cross-motions for summary judgment, Defendants solely contest NVCA's standing. (ECF Nos. 47-1, at 31-34; 48-1, at 42-43). Standing is an element of jurisdiction and will be discussed in relation to each Plaintiff even without Defendants' challenge.

As organizations "bring[ing] this suit on behalf of their members[,]" (ECF No. 46-1, at 30), Plaintiffs have standing if at least one of their members has standing, *see Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009) ("[O]rganizations can assert the standing of their members."). Plaintiffs must identify at least one member who "present[s] an injury that is concrete, particularized, and actual or imminent; fairly traceable to [Defendants'] challenged behavior; and likely to be redressed by a favorable ruling." *Dep't of Com. v. New York*, 139 S.Ct. 2551, 2565 (2019) (quoting *Davis v. Federal Election Comm'n*, 554 U.S. 724, 733 (2008)).

"Standing is determined as of the date a plaintiff files suit." *Equal Rts. Ctr. v. Equity Residential*, 798 F.Supp.2d 707, 719 (D.Md. 2011) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 570 n.5 (1992)).

> [E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. . . . In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed.R[.]Civ.[P]. 56(e), which for purposes of the summary judgment motion will be taken to be true.

*Lujan*, 504 U.S. at 561.

Here, a Maryland Chapter member and an NRDC member assert harm from the noise and pollution attendant to the Preferred Alternative's anticipated increase in traffic, (*see* ECF Nos. 46-10 ¶¶ 8-9; 46-4 ¶¶ 3-6); a Moses Hall member asserts harm from the Preferred Alternative's taking of land from the Morningstar Moses Cemetery and Hall and potential disturbance of graves, (*see* ECF No. 46-2 ¶ 14); and a National Trust member and Plummers Island researcher asserts harm from the construction of the ALB that would damage Plummers Island's natural setting, (*see* ECF No. 46-6 ¶¶ 9-16). As Plaintiffs state, "[t]he harms to these members' interests [as alleged in their affidavits] constitute injuries-in-fact[]" that are "traceable to the Agencies' approval of the [Preferred Alternative] and redressable by the relief Plaintiffs seek—vacatur of the FEIS, Final Section 4(f) Evaluation, and ROD." (ECF No. 46-1, at 31) (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Sierra Club*, 899

F.3d at 283-85).   Thus, Non-Profit Plaintiffs have met all three standing requirements.

NVCA, however, lacks standing.   NVCA alleges that Defendants violated NEPA by approving the Preferred Alternative when "[t]he FEIS disclosed the planned construction by MDOT of new ramps in [the GWMP interchange]"-all of which were not discussed in the DEIS and SDEIS-without "tak[ing] a hard look at the visual, noise, water quality, and air quality impacts associated with moving these ramps closer to Live Oak Drive." (ECF No. 36 ¶¶ 45-46).   Defendants argue that NVCA does not have standing because NVCA's alleged injuries are traceable to I-495 NEXT rather than the Preferred Alternative.   (ECF Nos. 47-1, at 31-33; 48-1, at 42-43).   Federal Defendants also contend that NVCA's alleged injuries are not redressable.   (ECF No. 47-1, at 33-34).   Plaintiffs respond that NVCA's injuries are both traceable to the Preferred Alternative and redressable by vacatur of the FEIS and ROD until the Agencies prepare a supplemental EIS.   (ECF No. 49, at 33-36).

In support of their contention that NVCA has standing, Plaintiffs rely on a declaration by Debra Butler ("Ms. Butler"), NVCA's President, stating that the "additional changes belatedly proposed in the [FEIS in June 2022], . . . will result in a significant impact on the Live Oak Drive community[.]" (ECF Nos. 49, at 33-34) (quoting ECF No. 46-3 ¶ 10).   Ms. Butler, however, concedes that that belated changes proposed in the FEIS were made

by VDOT as part of I-495 NEXT.  (*See* ECF No. 46-3 ¶¶ 5-6 (emphasis added) ("[I]n June 2022, *VDOT unveiled a radically changed design at the GWMP cloverleaf interchange . . .* add[ing] and rais[ing] the flyover ramps . . . [t]he [FEIS] . . . disclosed the new flyovers at essentially the same time[.]"); *see also id.* ¶ 3 (emphasis added) ("The direct and cumulative impacts of [the Preferred Alternative] along with the *belated design changes to the GWMP/I-495 interchange made by the . . . I-495 NEXT project* will be born[e] most directly by the Live Oak Drive community.")). Although Ms. Butler does not specify which flyover ramps NVCA is contesting, the fact that the belatedly proposed flyover ramps serving as the source of NVCA's alleged injury are part of I-495 NEXT rather than the Preferred Alternative is further supported by the administrative record.  While the FEIS indeed states that the Preferred Alternative "would include . . . new flyover ramps providing direct access to the [toll] lanes from George Washington Memorial Parkway[,]" (AR 5717), of the three proposed ramps ("Ramp 2, Ramp 3, and Ramp 4") to be newly constructed at the GWMP interchange, only one ramp is under the purview of the Preferred Alternative ("Ramp 4"), (*see* AR 178599-600).  Ramp 4, unlike the belatedly proposed Ramp 2 and Ramp 3, was already contemplated in the 2021 SDEIS and was not introduced for the first time in the 2022 FEIS.  (*Compare* AR 178599 (depicting Ramp 4 amongst other ramps at the GWMP interchange associated with I-495 NEXT), *with* AR

16

32153-54 (mapping the contemplated ramps, including Ramp 4 but excluding Ramp 2 and Ramp 3, at the GWMP interchange in the 2021 SDEIS), *and* AR 5098-99 (mapping the contemplated ramps, including Ramp 2, Ramp 3, and Ramp 4, at the GWMP interchange in the 2022 FEIS)).

Plaintiffs insist that "MDOT has responsibility for significant portions of the project in Virginia beyond Ramp []4, including sound walls, construction of multiple new 'flyover' ramps, and a bridge reconstruction." (*Id.*) (citing AR 5098-99). Plaintiffs mischaracterize the extent of MDOT's construction responsibilities. Apart from building Ramp 4, MDOT is only responsible for "perform[ing] work to *tie* [two VDOT-constructed flyover ramps] *into* I-495 and the new GWMP bridge over I-495." (AR 178599-600) (emphasis added). The only bridge at the GWMP interchange that MDOT is responsible for building is part of Ramp 4. (*Id.*) ("[Ramp 4] . . . includes a bridge over the southbound I-495 general purpose lanes."). The SDEIS shows that MDOT had contemplated building sound walls along Live Oak Drive, much of which was replaced in the FEIS by a new sound wall associated with I-495 NEXT. (*Compare* AR 3254 (mapping MDOT's proposed sound walls via orange dashed lines in the 2021 SDEIS), *with* AR 5099 (mapping MDOT's proposed sound walls via significantly shortened orange dashed lines in the 2022 FEIS, much of which are replaced by new blue dashed lines representing I-495 NEXT's sound walls)). More

17

importantly, Plaintiffs fail to show how the design elements at the GWMP interchange that are part of the Preferred Alternative are *belatedly proposed* in the FEIS along with Ramp 2 and Ramp 3. Because NVCA's alleged injury is not traceable to the Preferred Alternative, NVCA lacks standing and it is unnecessary to address the issue of whether NVCA's alleged injury is redressable.[4]

## B. NEPA[5]

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). One "action-forcing" procedure established by NEPA to ensure that "agencies take a '"hard look" at environmental consequences,'" *id.* at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)), is the requirement that agencies prepare an environmental impact statement ("EIS") before "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. 4332(2)(C). An EIS (1) "ensures that the

---

[4] Because NVCA lacks standing, it is also unnecessary to address NVCA's arguments that the Agencies failed to take a hard look at impacts from belated changes to the GWMP interchange design. (ECF No. 46-1, at 54-58).

[5] Amendments to NEPA regulations in 2020 apply to "any NEPA process begun after September 14, 2020." 40 C.F.R. § 1506.13. Here, the NEPA process began in 2018. (*See* AR 55593). Therefore, the court cites to the NEPA regulations then in force, that is, those codified in the 2019 edition of the Code of Federal Regulations. In this section, citations to "C.F.R." refer to that edition of the regulations.

agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts;" (2) "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision[;]" and (3) "insures the integrity of the administrative process." *Audubon*, 524 F.Supp.2d at 662 (first quoting *Robertson*, 490 U.S. at 349; then quoting *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004); and then quoting *Sierra Club v. Morton*, 510 F.2d 813, 820 (5th Cir. 1975)). NEPA's procedural requirement "does not mandate particular results, but simply prescribes the necessary process." *Id.* at 350 (citing *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–228 (1980); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558 (1978)). "[O]nce an agency has made a decision subject to NEPA's procedural requirements, the only role for a court is to insure that the agency has considered the environmental consequences[.]" *Strycker's Bay*, 444 U.S. at 227.

As explained in *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 421–22 (4th Cir. 2012),

> In reviewing an agency's efforts to comply with the NEPA, [the court's] task is to ensure that it took a "hard look" at the environmental consequences of the proposed action. *Nat'l Audubon Soc'y,* 422 F.3d at 185.

This review "requires a pragmatic judgment whether the [EIS's] form, content[,] and preparation foster both informed decision-making and informed public participation." *Save the Peaks Coal. v. U.S. Forest Serv.,* 669 F.3d 1025, 1036 (9th Cir.2012) (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,* 606 F.3d 1058, 1072 (9th Cir.2010)) (internal quotation marks omitted).   A hard look involves, at minimum, "a thorough investigation into the environmental impacts of [the] action and a candid acknowledgement of the risks that those impacts entail." *Nat'l Audubon Soc'y,* 422 F.3d at 185.   In conducting this review, we "may not 'flyspeck' [the] agency's environmental analysis, looking for any deficiency, no matter how minor."  *Id.* at 186.   Instead, we "must take a holistic view of what the agency has done to assess environmental impact" and "examine all of the various components of [the] agency's environmental analysis . . . to determine, on the whole, whether the agency has conducted the required 'hard look.'"  *Id.*

"[A]n agency takes a sufficient 'hard look' when it obtains opinions from its own experts, obtains opinions from experts outside the agency, gives careful scientific scrutiny and responds to all legitimate concerns that are raised."  *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) (citing *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  On the other hand, "[a]n EIS is deficient, and the agency action it undergirds is arbitrary and capricious, if the EIS does not contain 'sufficient discussion of the relevant issues and opposing viewpoints,' or if it does not demonstrate 'reasoned decisionmaking,'" to the point where the "deficiencies are

significant enough to undermine informed public comment and informed decisionmaking." *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C.Cir. 2017) (first quoting *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C.Cir. 2006); then quoting *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C.Cir. 2014); and then citing *Nevada*, 457 F.3d at 93).

The court may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." *Kleppe*, 427 U.S. at 410 n.21. When environmental analysis "'requires a high level of technical expertise,' [the court] must defer to 'the informed discretion of the responsible federal agencies.'" *Marsh*, 490 U.S. at 377 (citing *Kleppe*, 427 U.S. at 412). Judges as "non-scientists" may not "impose [bright-line] 'procedural requirements [not] explicitly enumerated in the pertinent statutes[]'" for the purpose of "further[ing] some vague, undefined public good." *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (first quoting *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990); then quoting *Churchill County v. Norton*, 276 F.3d 1060, 1072 (9th Cir.2001)), *overruled in part on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). The court may not "disturb the agency's judgment" if the agency has followed proper procedures and provided a "rational basis for its decision." *Id.* (citing *Hughes River*, 165 F.3d at 288).

Non-Profit Plaintiffs argue that Defendants violated NEPA because they: (1) failed to take a hard look at localized health harms from $PM_{2.5}$ emissions; (2) failed to take a hard look at the impact on environmental justice communities; and (3) failed to disclose data from and explain their traffic modeling. (ECF No. 46-1).

### 1. $PM_{2.5}$ Emissions

The Clean Air Act ("CAA"), 42 U.S.C. §§ 7401 *et seq.*, requires the Environmental Protection Agency ("EPA") to establish national ambient air quality standards ("NAAQS") for certain air pollutants, 42 U.S.C. § 7409, which are adopted by states at the regional level, *see* 42 U.S.C. § 7410(a)(1). The EPA has established NAAQS for pollutants such as carbon monoxide ("CO"), ozone, and fine particulate matter ("$PM_{2.5}$"). The EPA is responsible for designating areas that satisfy ("attainment areas") and fail to satisfy ("nonattainment areas") NAAQS. 42 U.S.C. § 7407(d)(1). Agencies proposing transportation projects in nonattainment areas may be required to prepare a "hot-spot" analysis-in other words, a localized analysis of air pollutants. *See* 40 C.F.R. §§ 93.101, 93.116. The CAA's conformity requirements forbid the FHA from approving a transportation project in a nonattainment area unless it conforms to an approved State Implementation Plan limiting the maximum amount of pollution allowed from motor vehicle emissions. *See* 40 C.F.R. § 93.101; 42

U.S.C. § 7506(c)(1), (5).  The parties do not dispute that Montgomery and Fairfax counties are attainment areas for $PM_{2.5}$. (ECF Nos. 46-1, at 33; 51, at 16).

The FEIS concluded that because Montgomery and Fairfax counties "[are] in an attainment area for $PM_{2.5}$ . . . [the CAA's] conformity requirements pertaining to $PM_{2.5}$ do not apply for this project and no further analysis of $PM_{2.5}$ was required."  (AR 408). Non-Profit Plaintiffs argue that the Agencies' refusal to conduct a localized analysis of $PM_{2.5}$ emissions-instead relying on regional $PM_{2.5}$ NAAQS compliance-violated NEPA's hard look requirement.  (ECF No. 46-1, at 35).  According to Non-Profit Plaintiffs, "regional [$PM_{2.5}$] NAAQS compliance [is not] a proxy for local $PM_{2.5}$ impacts[,]" especially given that current $PM_{2.5}$ NAAQS are not set at levels that prevent serious health harms."[6]  (ECF No. 46-1, at 36-37). Defendants respond that the Agencies justifiably relied on $PM_{2.5}$ NAAQS compliance.  (ECF Nos. 47-1, at 37; 48-1, at 32-33). Moreover, Defendants argue that the Agencies conducted the

---

[6] Non-Profit Plaintiffs also contend that a 2015 study shows that "$PM_{2.5}$ levels were 'consistently higher' at the study's air monitor near the Capital Beltway than at the NAAQS-compliance monitors miles from the highway[,]" (ECF No. 46-1, at 37) (citing AR 193538-39, 193545), and "[t]he Agencies' failure to account for this 'real-world data' alone violated NEPA[,]" (ECF No. 49, at 15 n.5).  As Federal Defendants argue, Non-Profit Plaintiffs' assertion is misleading.  (ECF No. 50, at 14).  The 2015 study is irrelevant because it examines data collected in Largo, Maryland-not along the Preferred Alternative's path.  (*See* AR 193537).

requisite hard look at air quality impacts by ensuring that the regions covered by the Preferred Alternative complied with CO and ozone NAAQS in addition to considering short-term localized increase in $PM_{2.5}$ emissions during construction. (ECF Nos. 47-1, at 35-6; 48-1, at 31).

Non-Profit Plaintiffs' allegations of a procedural deficiency in the Agencies' air quality analysis belie the fact that Non-Profit Plaintiffs actually contest the *scientific merit* of the Agencies' reliance on regional NAAQS standards as a sufficient measure of $PM_{2.5}$ emissions impacts. Non-Profit Plaintiffs do not dispute that the CAA's conformity requirements are no obstacle to the Agencies' approval of the Preferred Alternative. (ECF No. 46-1, at 39-40) ("[T]he Clean Air Act wouldn't *forbid* the project's approval."). Neither is there a procedural requirement that an agency must conduct a localized air quality analysis in an attainment area. (*See* ECF No. 50, at 15 (first citing 42 U.S.C. § 7506(c)(1), (5); and then citing 71 Fed. Reg. 12,468) (stating that "[u]nder the Clean Air Act, localized 'hot-spot' analyses for $PM_{2.5}$ are only required for projects in areas that are currently in nonattainment for the $PM_{2.5}$ NAAQS[,]" of which "only projects that are 'considered to have the potential to impact the air quality standards (i.e., "projects of air quality concern")' are required to do the localized analysis."); *see also* ECF No. 51, at 17). Defendants contend that regional $PM_{2.5}$ NAAQS are sufficient to

24

protect the public health with an "adequate margin of safety." (ECF Nos. 47-1, at 37 (citing 88 Fed. Reg. 5558, 5564 (Jan. 27, 2023); 42 U.S.C. § 7409(b)(1)); 48-1, at 33).  Accordingly, the court defers to the Agencies' methodological discretion in using regional NAAQS to evaluate the Toll Lane Project's $PM_{2.5}$ emissions impacts.  *See, e.g., Sierra Club v. Fed. Highway Admin.*, 715 F.Supp.2d 721, 741 (S.D.Tex. 2010) (holding that "[t]he [defendant agencies'] decision to consider air pollution issues through the same [NAAQS] framework used by the EPA to enforce the Clean Air Act cannot be considered arbitrary or capricious[,]" and the defendant agencies "have not failed to consider the [proposed] highway's effects on local levels of particulate matter" because "the FEIS specifically addresses the issue of particulate matter under the NAAQS framework"), *aff'd*, 435 F. App'x 368 (5th Cir. 2011).

Non-Profit Plaintiffs' reliance on *Friends of Buckingham v. State Air Pollution Control Bd.*, 947 F.3d 68 (4th Cir. 2020), fares no better.  In *Friends of Buckingham*, the United States Court of Appeals for the Fourth Circuit held that, pursuant to Virginia law requiring the defendant state agency to consider "character and degree of injury to . . . health," and "suitability of the activity to the area[,]" the defendant arbitrarily and capriciously

dismissed environmental justice[7] ("EJ") concerns about its decision to build a compressor station by relying on NAAQS "not tailored to [a] specific EJ community." *Id.* at 90.   The Fourth Circuit reasoned that "[e]ven if all pollutants within the county [comply with NAAQS], the [defendant] failed to grapple with the likelihood that those living closest to the Compressor Station-an overwhelmingly minority [EJ] population . . . -will be affected more than those living in other parts of the same county." *Id.* at 87, 91-92 (quoting Va. Code Ann. § 10.1-1307(E)).   Non-Profit Plaintiffs argue that, like in *Friends of Buckingham*, "the Agencies relied on NAAQS compliance to justify their decision not to assess localized health impacts from the project's $PM_{2.5}$ emissions." (ECF No. 46-1, at 39; *see also* ECF No. 49, at 17-18).   Non-Profit Plaintiffs acknowledge that *Friends of Buckingham* does not involve NEPA but contend that the distinction between NEPA and Va. Code Ann. § 10.1-1307(E) are "illusory."   (ECF No. 49, at 17).   As Federal Defendants argue, "the case law is nearly unanimous that federal agencies may rely on NAAQS compliance to conclude that human health will not be seriously affected by a transportation project."   (ECF No. 47-1, at 36) (citing *Sierra Club v. Fed.*

---

[7] "The purpose of an environmental justice analysis is to determine whether a project will have a disproportionately adverse effect on minority and low income populations." *Id.* at 87 (quoting *Mid States Coal. for Progress v. Surface Transp. Bd.*, 345 F.3d 520, 541 (8th Cir. 2003)).

*Highway Admin.*, No. 17-CV-1661-WJM-MEH, 2018 WL 1610304, at *7 (D.Colo. Apr. 3, 2018) (collecting cases)) (incorporating *Barnes v. FAA*, 865 F.3d 1266, 1273 (9th Cir. 2017); *Coal. for Advancement of Reg'l Transp. v. Fed. Highway Admin.*, 959 F.Supp.2d 982, 1012-13 (W.D.Ky. 2013), *aff'd*, 576 Fed.Appx. 477 (6th Cir. 2014); *Sierra Club v. Fed. Highway Admin.*, 715 F.Supp.2d at 741, *aff'd*, 435 Fed.Appx. 368; *Sierra Club v. U.S. Dep't of Transp.*, 310 F.Supp.2d 1168, 1202 (D.Nev. 2004); *Border Power Plant Working Grp. v. Dep't of Energy*, 260 F.Supp.2d 997, 1020-21 (S.D.Cal. 2003)).  Non-Profit Plaintiffs counter that the "nearly unanimous" cases Federal Defendants rely on are factually distinguishable because most involve agencies that "modeled the project's emissions, added them to ambient pollution levels, and found the cumulative levels [would not] exceed the NAAQS."  (ECF No. 49, at 16).  Non-Profit Plaintiffs, however, miss the point-the "nearly unanimous" cases affirm that NAAQS compliance does not necessitate further study.  Given the clear analysis provided by other districts, the court will not import the Fourth Circuit's interpretation of Virginia law into NEPA's requirements.

The administrative record does not otherwise show that the Agencies have failed to conduct a hard look analysis.  The DEIS describes the sources and attendant health risks of various pollutants that have established NAAQS, (*see* AR44929-30) (noting, in relevant part, the fact that particulate matter originates from

27

vehicles and can cause illnesses such as asthma and bronchitis), in addition to providing $PM_{2.5}$ emissions monitoring data, (*see* AR 44935).  The DEIS also describes a potential short-term localized increase in $PM_{2.5}$ emissions, among other pollutants, as well as proposed mitigation measures such as using water trucks, covering trucks, and regularly sweeping paved areas.  (AR 45037-38).  Pursuant to a 1987 FHA guidance suggesting that CO emissions is a proxy for transportation emissions, (AR 656) (citing FHA Tech. Advisory T 6640.8A), the Agencies conducted localized CO emissions analysis for the worst-case traffic scenarios at various interchange and intersection locations along the Build and No Build alternatives (the "CO Proxy Analysis"), (AR 44993-94), and determined that all predicted peak CO concentrations do not exceed the CO NAAQS, (AR 44992).  Based on the Metropolitan Washington Council of Governments' Transportation Planning Board regional assessment of projected conformity to the ozone NAAQS standards (the "Conformity Analysis"), (see AR 131349-58) (explaining that the Conformity Analysis is limited to ozone emissions), which included the Preferred Alternative, the Agencies state that "it is not anticipated that the Preferred Alternative . . . would cause new air quality violations, worsen existing conditions, or delay timely attainment of the relevant NAAQS."  (AR 408; *see also* AR 33, 39-40, 520).

Non-Profit Plaintiffs contest the Agencies' reliance on the 1987 FHA guidance on the basis that it does not mention $PM_{2.5}$. (ECF Nos. 46-1, at 40; 49, at 20). In addition, Non-Profit Plaintiffs contend that CO is not a proxy for $PM_{2.5}$ because they have dissimilar origins and health impacts and are subject to different measurement standards. (ECF No. 49, at 18-19). Non-Profit Plaintiffs also argue that the Conformity Analysis is irrelevant because it did not examine $PM_{2.5}$ emissions. (*Id.* at 18). Given that Non-Profit Plaintiffs' arguments again hinge upon their disagreement with the *scientific merit* of using CO as a proxy for $PM_{2.5}$ and projected ozone NAAQS conformity as an adequate substitute for $PM_{2.5}$ emissions analysis, the court defers to the Agencies' expertise.

The Agencies have thoroughly investigated the impacts of the Toll Lane Project's $PM_{2.5}$ emissions, supported their conclusions with scientific evidence, and rationally explained the conclusions from their chosen methodologies. Thus, the Agencies have sufficiently conducted a hard look analysis with respect to the Toll Lane Project's $PM_{2.5}$ emissions.

**2. Environmental Justice Communities**

Executive Order 12898 ("E.O. 12898") directs federal agencies to consider EJ issues in their NEPA reviews-namely, by "identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects" on low-income communities or communities of color ("EJ communities"). Exec.

Order No. 12,898, 3 C.F.R. § 859 (1995), *reprinted as amended in* 42 U.S.C. § 4321 (1998).   E.O. 12898 does not create a private right of action but the court may evaluate the Agencies' consideration of EJ issues under the APA's "arbitrary and capricious" standard.   *See, e.g.*, *Cmtys. Against Runway Expansion, Inc. (CARE) v. FAA*, 355 F.3d 678, 688 (D.C.Cir. 2004).   Agencies must also evaluate cumulative impacts on EJ communities, 40 C.F.R. §§ 1502.16(a)-(b), 1508.27(b)(7); FHA Order 6640.23A; United States Department of Transportation Order 5610.2C-"the impact[s] on the environment which result[ ] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]"   40 C.F.R. § 1508.7.   As long as the Agencies consider EJ impacts in their decisionmaking, they are "not required to select an alternative with the least environmental justice impact."   *Latin Americans for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 476 (6th Cir. 2014). "Nonetheless, courts may overturn a NEPA approval where a 'bare-bones' environmental justice analysis, concluding the community would not be disproportionately harmed, violates NEPA's 'hard look' requirement."   *NAACP Erie Unit 2262 v. Fed. Highway Admin.*, 648 F.Supp.3d 576, 591 (W.D.Pa. 2022) (quoting *Standing Rock Sioux*

*Tribe v. U.S. Army Corps. of Eng'rs*, 255 F.Supp.3d 101, 140 (D.D.C. 2017)).

Non-Profit Plaintiffs argue that the Agencies failed to take a hard look at (1) evidence that the Preferred Alternative would disproportionately increase air pollution in EJ communities; and (2) the Preferred Alternative's cumulative harms to EJ communities. (ECF No. 46-1, at 42-48). Defendants counter that the administrative record indicates otherwise. (ECF Nos. 47-1, at 41-46; 48-1, at 37-41; 50, at 16-23; 51, at 22).

First, Non-Profit Plaintiffs contend that the FEIS erroneously ignores record evidence in concluding that "the [Preferred Alternative's] air pollution would not disproportionately harm environmental justice communities because 'traffic-related air pollution . . . would be distributed along' the [Preferred Alternative's] corridor." (ECF No. 46-1, at 42) (citing AR 496). Specifically, Non-Profit Plaintiffs assert that the Preferred Alternative "would shift the current traffic bottleneck at the American Legion Bridge, where there are no nearby [EJ] communities, to the toll lanes' endpoints [at the I-270 and I-370 interchange in Gaithersburg as well as the I-270 spurs near the endpoints of the I-495 Inner Loop toll lanes in North Bethesda], where [EJ] communities are clustered[]"-thus disproportionately increasing congestion, and consequently air

31

pollution, in EJ communities.  (*Id.* at 42-44) (citing AR 177668-69; AR 154637; AR 479).

Non-Profit Plaintiffs mischaracterize the administrative record.  The FEIS contains a Final Community Effects Assessment & EJ Analysis Technical Report, (AR 5136-261), which evaluates traffic and air quality impacts on EJ communities, (AR 5230-35). The Agencies identified sixteen EJ communities along the Preferred Alternative, (*see* AR 5206) (mapping the locations of sixteen EJ communities along the Preferred Alternative, all of which are concentrated around two endpoints), and modeled traffic impacts on drivers in segments of the Preferred Alternative adjacent to EJ communities, (*see* AR 5230-31; *see also* AR 702-1501 (traffic analysis technical report)).  The Agencies determined that mitigation was not necessary to alleviate traffic effects on EJ communities because

> [d]rivers would experience uncongested conditions in the . . . peak hours along all of I-495 and I-270 in the study corridors. Should use of the HOT lanes not be a feasible economic choice for drivers from EJ populations, all existing [general purpose] lanes would . . . also experience traffic improvements under the Preferred Alternative[.]

(AR 5231-32).  Indeed, the Agencies' traffic model projects decreases in vehicle speeds in some segments near Gaithersburg and North Bethesda.  (ECF No. 49, at 23 n.13) (citing AR 1719; AR 1708).  Non-Profit Plaintiffs, however, concede that "the

Agencies' model forecasts faster travel speeds systemwide and significant congestion relief north of the American Legion Bridge[.]" (*Id.*) (citing AR 328, 1708). Neither do the Agencies overlook congestion issues that would persist after the Preferred Alternative's implementation. The Agencies acknowledge that "[c]ongestion would still be present during the PM peak period on I-270 northbound and the I-495 inner loop in the design year of 2045 due to downstream bottlenecks outside of the Preferred Alternative limits, but it would not get worse due to implementing that Preferred Alternative." (AR 259). On the other hand, under the "No Build" alternative, the Agencies assert that "[i]ncreased traffic congestion . . . would contribute to increased overflow congestion on the local road network[,] . . . result[ing] in increased response times for emergency services and increased travel times to community facilities[.]" (AR 5227).

In addition, the Agencies considered analyses of three different air pollutants. The Agencies undertook a quantitative assessment of projected mobile source air toxics ("MSAT") emissions[8] and determined that although "MSAT pollutant emissions are expected to increase slightly for the Preferred Alternative

---

[8] MSATs are EPA-identified compounds largely originating from mobile sources and are among national and regional-scale cancer drivers. MSATs consist of: acetaldehyde; acrolein; benzene; 1, 3-butadiene; diesel particulate matter and diesel exhaust organic gases; ethylbenzene; formaldehyde; naphthalene; and polycyclic organic matter. (AR 5233).

when compared to the No Build condition . . . [a]ll MSAT pollutant emissions are expected to significantly decline . . . when compared to existing conditions." (AR 5233). The FEIS cites to the Conformity Analysis, which projected long-term conformity with ozone NAAQS. (AR 408, 5233; *see also* AR 33, 39-40, 520). The Agencies' CO Proxy Analysis "demonstrate[s] that the worst-case interchanges and intersections for each Build and the No Build Alternative . . . would not cause or contribute to a violation of the CO NAAQS[.]" (AR 5233).

Non-Profit Plaintiffs argue that the Agencies' MSAT analysis is deficient because it "predicted total [MSAT] emissions for the entire[ty] [of the Preferred Alternative] rather than for specific locations along the [Preferred Alternative.]" (ECF No. 49, at 24 n.15) (citing AR 14339-40). As explained in the FEIS, "due to industry-wide limitations in tools/techniques for measuring project-specific health outcomes, detailed [MSAT] effects on public health cannot be projected for any specific location along the [Preferred Alternative]." (AR 5233) (footnote omitted). Moreover, although Non-Profit Plaintiffs correctly contend that the CO Proxy Analysis predicts that building the Preferred Alternative will increase CO levels near Gaithersburg and North Bethesda, (ECF No. 49, at 25) (citing AR 44993 (showing higher projected CO emissions for the I-270 and I-370 interchange as well as the I-495 and I-270 spur interchange for the Build versus No

Build scenario)), the CO Proxy Analysis's projections exceed neither the CO NAAQS, (AR 44992), nor the existing CO levels from 2016, (AR 44993) (showing that existing CO levels from 2016 are higher than projected CO levels for the Build scenario).[9]  Non-Profit Plaintiffs maintain that the CO Proxy Analysis was not designed to evaluate whether EJ communities would suffer disproportionate harm from the Preferred Alternative's traffic-related air pollution because it merely focuses on whether worst-case traffic scenarios would result in CO NAAQS violations.  (ECF No. 49, at 24).   Non-Profit Plaintiffs, however, raise a distinction without a difference.  The Agencies used CO NAAQS as the baseline for determining that the Preferred Alternative would not result in significant-in other words, *disproportionate*-air pollution impacts on *any* community, even if there is some variation in pollution distribution.   No further analysis is necessary as the court defers to the Agencies' methodological choice.[10]

---

[9] Defendants argue that the administrative record reflects that the traffic-related air pollution impacts will be "equally" distributed along the Preferred Alternative's corridor.  (ECF Nos. 47-1, at 12; 48-1, at 40).   The CO Proxy Analysis, however, predicts different levels of CO emissions across various interchanges and intersections along the Preferred Alternative. (AR 44993-94).

[10] In addition, Non-Profit Plaintiffs argue that the CO Analysis's "focus on one-hour, worst-case emissions renders [it] useless for understanding the longer-term (daily and annual) $PM_{2.5}$ levels that would drive the project's contributions to asthma, heart attacks, and early deaths in nearby communities."  (ECF No. 49, at 24 n.14) (citing AR 196544-55; 40 C.F.R. § 50.18).  The

Furthermore, the Agencies are not required to show that the Preferred Alternative has the *least* amount of adverse impact on EJ communities.

Second, Non-Profit Plaintiffs maintain that the Agencies' focus on "incremental effects," to the exclusion of "pre-existing pollution burdens and health vulnerabilities[,]" constitutes a failure to take a hard look at cumulative impacts in EJ communities. (ECF No. 46-1, at 46). Rather, Non-Profit Plaintiffs contend that Defendants should have projected cumulative levels of air pollution, identified pre-existing pollution burdens, and explained with specificity how EJ communities' heightened sensitivities to air pollution might amplify experienced environmental impacts. (ECF Nos. 46-1, at 46, 48; 49, at 26-27). Defendants counter that Non-Profit Plaintiffs overlook the fact that the Agencies incorporated preexisting pollution burdens in their methodology for identifying EJ populations and evaluated cumulative air quality effects in the CO Proxy Analysis. (ECF Nos. 47-1, at 44 (citing AR 5207-08, 5232-34, 5350); 48-1, at 39 (citing AR 5207-08)).

Contrary to Non-Profit Plaintiffs' contention that the Agencies performed "no . . . quantitative or qualitative

---

court again defers to the Agencies' expertise in designing the appropriate methodology for analyzing the health impact of CO emissions.

analysis[,]" (ECF No. 46-1, at 47), the Agencies' CO Proxy Analysis determined that there were no "exceedances of the CO NAAQS . . . for the opening and design years *when the results of the modeling are added to monitored background [CO] levels* at each of the worst-case intersections/interchanges evaluated[.]"  (AR 5233, 14331, 44946) (emphasis added).  Thus, with respect to its evaluation of projected CO emissions, the Agencies have also considered existing CO emissions burdens-rendering the CO Proxy Analysis a *cumulative* analysis.  The Agencies also identified sixteen EJ communities via two EJ screening and mapping tools that, by design, account for pre-existing pollution burdens:  one hosted by the EPA ("EPA EJSCREEN"), and the other developed by the Community Engagement, Environmental Justice, and Health Laboratory at the University of Maryland School of Public Health ("MD EJSCREEN").  (AR 5207-08). EPA EJSCREEN produces an "EJ Index" score for a specific geography using twelve environmental and demographic characteristics ("Environmental Indicators"), including $PM_{2.5}$ levels, ozone levels, air toxics cancer risk, and traffic proximity.  (*Id.*).  EPA EJSCREEN data showed that seven EJ communities in Gaithersburg are at or above the fiftieth percentile in Maryland for all twelve Environmental Indicators, whereas two EJ communities in Potomac are at or above the fiftieth percentile in Maryland for eleven Environmental Indicators.  (AR 5208).  MD EJSCREEN operates similarly to EPA EJSCREEN by generating a score combining values

representing a certain tract's pollution burden and EJ population. (AR 5208; *see also* AR 5210 (mapping various studied tracts along the Preferred Alternative with corresponding MD EJSCREEN EJ Index scores)).  Based on MD EJSCREEN results, the Agencies concluded that Gaithersburg, Rockville, North Bethesda, Bethesda, and Potomac have some of the highest scores.  (AR 5209).  The Agencies note that "EJ population who live in areas with high [EPA EJSCREEN] and MD EJSCREEN EJ Index scores . . . may experience air quality and/or public health impacts from construction activities and highway operations more acutely than populations with lower EJ Index scores."  (AR 496).

Non-Profit Plaintiffs argue that such a "'conclusory' acknowledgment of possible cumulative effects falls short of NEPA's hard look requirement."  (ECF No. 46-1, at 47) (citing *N. Carolina Wildlife Fed'n v. N. Carolina Dep't of Transp.*, 677 F.3d 596, 602 (4th Cir. 2012)).  Non-Profit Plaintiffs contend that *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016 (10th Cir. 2023), "confirms, rather than excuses, the insufficiency of the Agencies' analysis."  (ECF No. 49, at 28).  Non-Profit Plaintiffs' reliance on *Diné Citizens* fares no better, as the Agencies' Proxy Analysis is consistent with the ozone emissions evaluation undertaken in *Diné Citizens*.  In *Diné Citizens*, one of the defendant agencies determined that the ozone emissions for all anticipated oil wells to be built did not exceed ozone NAAQS.  *Id.*

at 1046.  The *Diné Citizens* court held that "[c]omparison to standards set by administrative bodies to determine whether healthy levels of pollutants would be exceeded constitutes a hard look at the health impacts of [drilling oil wells]."  *Id.* Furthermore, by "conced[ing] there were health impacts of ozone pollutants, especially for sensitive groups[,]" the defendant agency did not ignore health impacts.  *Id.* Similarly, the CO Proxy Analysis compared projected cumulative CO emissions from the Preferred Alternative to the NAAQS, and acknowledged that EJ communities with a higher EJ Index score would suffer greater health impacts.  Accordingly, the Agencies conducted a hard look at pre-existing and projected traffic and pollution impacts on EJ communities.

### 3. Traffic Modeling

Non-Profit Plaintiffs contend that the Agencies violated NEPA by failing to respond adequately to comments regarding MDOT's traffic modeling, in addition to withholding traffic modeling files.  (ECF No. 46-1, at 49-54).

### a. The Agencies' Responses to Comments

Non-Profit Plaintiffs challenge the Agencies' responses to comments in two respects: (1) the Agencies failed to respond to criticism from Norman Marshall[11] ("Mr. Marshall") that MDOT's

---

[11] Norman Marshall is a traffic modeling expert and the President of Smart Mobility, Inc.  (AR 178647-48).

modeling relied on "unrealistically high traffic volumes" exceeding roadway capacity as well as "implausible levels of gridlock[,]" which resulted in "inflated estimates of the congestion relief that toll lanes could offer[,]" (ECF No. 46-1, at 49-52) (citing AR 137028-34; AR 137040-46; AR 158586; AR 158590-93; AR 158600-01; AR 178663-67; AR 178669); and (2) the Agencies' explanation of MDOT's manual alterations to its traffic modeling results post-SDEIS neither acknowledged that it addressed one instance of the precise issue raised by Mr. Marshall nor provided enough information to enable the public to conduct an independent evaluation, (id. at 52). Defendants counter that the administrative record reflects that the Agencies sufficiently responded to Mr. Marshall's comments and explained MDOT's altered traffic modeling results. (ECF Nos. 47-1, at 47-50; 48-1, at 26-28).

While an agency preparing a FEIS must respond to responsible opposing views expressed by commenters, see 40 C.F.R. § 1502.9(b), the agency has the discretion to choose the way it responds, such as by making factual corrections, supplementing or modifying its analyses, and explaining why certain comments do not warrant further response, 40 C.F.R. § 1503.4. An agency's obligation to respond to comments is "not 'particularly demanding.'" Ass'n of Private Sector Colls. & Univs. v. Duncan, 681 F.3d 427, 441-42 (D.C.Cir. 2012) (quoting Pub. Citizen, Inc. v. FAA, 988 F.2d 186,

197 (D.C.Cir. 1993)).  An agency's response to public comments need only "enable us to see what major issues of policy were ventilated . . . and why the agency reacted to them as it did." *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 338 (D.C.Cir. 1968).  "[A]n agency need not respond to every single scientific study or comment[,]" *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 668 (9th Cir. 2009) (citing *McNair*, 537 F.3d at 1001-02), or engage in a "point-by-point type of counter-argument to experts[,]" *Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012).  Neither is an agency obligated to "conduct new studies in response to issues raised in the comments," or "resolve conflicts raised by opposing viewpoints." *State of Cal. v. Block*, 690 F.2d 753, 773 (9th Cir. 1982).  An agency must, however, provide a "good faith, reasoned analysis" in response to responsible opposing viewpoints. *Id.* (quoting *Silva v. Lynn*, 482 F.2d 1282, 1285 (1st Cir. 1973)).  Even somewhat cursory responses that are nevertheless reasoned are sufficient to satisfy NEPA. *See Sierra Club v. U.S. Dep't of Transp.*, 310 F.Supp.2d at 1194-95 (holding that a brief explanation, even if "not a model of agency responsiveness[]" to public comment, complies with NEPA); *Committee for Nuclear Responsibility, Inc. v. Seaborg*, 463 F.2d 783, 787 (D.C.Cir. 1971) ("The agency need not set forth at full length views with which it disagrees, all that is required is a

meaningful reference that identifies the problem at hand for the responsible official.").

First, the Agencies directly responded to Mr. Marshall's criticisms toward the traffic volumes in MDOT's modeling:

> The [A]gencies remain confident in the state-of-the-art traffic impacts methodology employed for the [Preferred Alternative]. . . . [Mr. Marshall's] comment extrapolates that [MDOT's model] should have assumed <u>zero</u> growth for the No Build Alternative as a result of likely gridlock conditions. This is an unreasonable assumption in light of clear projected increases in regional population and employment that can certainly increase demand for mobility, even if congestion conditions worsen under the No Build scenario.

(AR 23037) (emphasis in original).  The Agencies also cite to portions of the FEIS and DEIS regarding MDOT's traffic modeling, the substance of which is reiterated in their response.  (*See* AR 23038 (responding to Mr. Marshall's comments about overcapacity in MDOT's traffic model by citing to FEIS Chapter 9.3.4(B) and DEIS Appendix C); AR 636 (stating that FEIS Chapter 9.3.4(B) incorporates FEIS Chapter 4's discussion on assumptions used in MDOT's traffic modeling); AR 325 (explaining in FEIS Chapter 4 that "[t]raffic volumes throughout the study corridors are projected to continue to grow over the next 20 to 25 years due to expected increases in population and employment in the Washington, DC metropolitan region[,]" which are further described in FEIS Chapter 1); AR 268 (quantifying in FEIS Chapter 1 the forecasted

percentage increases in regional population and employment growth from 2020 to 2045); AR 36714-17 (forecasting in DEIS Appendix C that in 2040, the No Build Alternative will experience an over 500% increase in vehicles that are unable to enter I-495 and I-270 due to queues extending outside the network)).

Non-Profit Plaintiffs argue that the Agencies failed to offer a reasoned response and instead "mischaracterized" Mr. Marshall's comments "without addressing the litany of evidence [Mr. Marshall] offered documenting how MDOT had overestimated traffic volumes." (ECF No. 49, at 30; *see also* 46-1, at 50).  In support, Non-Profit Plaintiffs merely recite scientific criticisms of MDOT's traffic model, including those provided by Mr. Marshall (*see* ECF Nos. 46-1, at 50 (citing AR 138, 158588-89); 49, at 30 (citing AR 138-39; AR 158583-625)-all of which demonstrate that Non-Profit Plaintiffs' disagreement with the Agencies' response ultimately lies with the methodological merit of MDOT's traffic modeling. While Non-Profit Plaintiffs seek a more extensive discussion from the Agencies in response to Mr. Marshall's comments, the Agencies are not obligated to address every piece of evidence offered by Mr. Marshall, *see Earth Island*, 697 F.3d at 1021, or resolve conflicts in scientific opinion, *see Block*, 690 F.2d at 773. Because the Agencies identified the overcapacity issue raised in Mr. Marshall's comments and rationally justified why it does not warrant further response, no additional explanation is necessary

under NEPA.  Nor will the court question the Agencies' expertise with regard to their chosen traffic modeling methodology.

Second, the Agencies adequately explained MDOT's manual alterations to its modeling results in multiple instances.  In response to the Maryland Chapter's criticism that MDOT's alterations to its modeling results introduced "new, serious flaws[,]" the Agencies answer:

> These comments are not based in fact and appear to be based on a misunderstanding of how data was updated and refined between publication of the SDEIS and publication of the FEIS . . . Any changes to the traffic forecast results in the FEIS properly reflect appropriate and relatively minor updates to modeling inputs based on information available to MDOT . . . following completion of the SDEIS.

(AR 171).   In response to the Maryland Transit Opportunities Coalition's assertion that "the FEIS offers no explanation of what was wrong with the SDEIS model or how the errors were corrected[,]" the Agencies answer:

> The changes [in MDOT's traffic modeling] that caused some of the detailed results to differ between the SDEIS and FEIS are the consequence of several different factors, which are generally performed in the ordinary course of NEPA reviews by technical traffic forecasting professionals . . . These factors include: (1) responding to public comments/questions; (2) updating modeling based on refinements to the alternatives analysis and/or identification of the [P]referred [A]lternative; (3) reviewing or "validating" previous modeling results prior to publication of [a] FEIS. . . . In the SDEIS model, the traffic

volumes in the Greenbelt area were showing significantly higher growth between existing and future compared to the [Metropolitan Washington Council of Governments] [(")]MWCOG[")] model trends[12]. . . . [I]t resulted in forecasted volumes that well exceeded the capacity of the roadway. Therefore, in the FEIS, both the no build and build forecasts in the Greenbelt Metro Station area were reduced to better align with MWCOG model trends along both the interstate and the crossroads.

(AR 130, 132). The Agencies compared quantified results presented in the SDEIS and FEIS for six key metrics and concluded that "the results presented in the FEIS for all key metrics were **either the same as reported in the SDEIS or very similar**." (AR 131). In response to concerns raised by the United States Department of Transportation's Volpe Center that it could not "assess [the] plausibility or validity[]" of MDOT's altered traffic modeling because the Agencies did not provide "a detailed explanation of the adjustments to projected future travel demands that were made between the SDEIS and the FEIS[,]" the Agencies answer:

> Upon review of the SDEIS models following the comment period, it was determined that the Greenbelt forecast projections were not consistent with MWCOG model trends and therefore needed to be adjusted. The volumes serving the background development at the Greenbelt Metro interchange were reduced

---

[12] MDOT and other transportation agencies typically use the MWCOG Travel Demand Model to evaluate projects in the Washington, D.C. area. (AR 27410). MWCOG is an independent non-profit association consisting of area leaders who address regional issues affecting the District of Columbia, suburban Maryland, and northern Virginia. (AR 6).

> accordingly for both the [N]o [B]uild and [B]uild condition during development of the FEIS.
>
> These changes did not affect the project[ed] traffic demand for vehicles traveling from the eastbound [Capital] Beltway to I-95 . . . However, it did affect the travel times for trips between Connecticut Avenue and Rockledge Drive eastbound to I-95 . . . While both the No Build and Build travel times reduced in the FEIS, the net difference between [the] [N]o [B]uild and [B]uild [alternatives] remained approximately the same and therefore this change did not fundamentally alter the overall benefits of the Preferred Alternative reported originally in [the] SDEIS[.]

(AR 140). Given that the Agencies described the key metrics in the MDOT model that were manually altered, the negligible effect of the changes, and the reasons for such changes, the administrative record does not support Non-Profit Plaintiffs' assertion that "[t]he Agencies withheld 'relevant information' about their assessment of the project's benefits," such that the public is precluded from "play[ing] a role in the decisionmaking process." (ECF No. 46-1, at 52) (quoting *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 446 (4th Cir. 1996)).

Non-Profit Plaintiffs contend that "MDOT's selective manual adjustments [to its traffic modeling] were inconsistent with its summary dismissal of [Mr.] Marshall's comments[]" because MDOT did not "explain why it was reasonable to address the problem of unrealistically high traffic volumes for only one road segment when [Mr.] Marshall showed that this problem pervades the model."

(*Id.*) (citing AR 137033 (depicting in Mr. Marshall's comment various road segments whose predicted traffic volumes exceed roadway capacity)).  Non-Profit Plaintiffs disregard the fact that the Agencies already responded to Mr. Marshall in the FEIS, (*see* AR 23037) (dismissing Mr. Marshall's criticism regarding overcapacity in MDOT's model on the basis that he unreasonably assumes zero growth in traffic volume for the No Build alternative), and reasonably explained that MDOT manually altered its traffic model to match MWCOG model trends better, (*see* AR 132, 140).  Non-Profit Plaintiffs' argument that the Agencies failed to acknowledge Mr. Marshall's criticism simply masks their disagreement with MDOT's conclusion that overcapacity only existed in the Greenbelt portion of its traffic model.  Again, the court defers to the Agencies' scientific expertise in determining the existence and scope of flaws in its traffic modeling.

### b. Traffic Modeling Files

Non-Profit Plaintiffs argue that the Agencies' refusal to make public the modeling files underlying MDOT's traffic analysis violates NEPA.  (ECF No. 46-1, at 53).  Specifically, Non-Profit Plaintiffs challenge MDOT's imposition of costs each time the Maryland Chapter requested the modeling files.  (*Id.*).  First, MDOT provided an estimated cost of $6,294.51 in response to the Maryland Chapter's 2020 request for modeling files used in the DEIS.  (*Id.*) (citing AR 135999-6000).  Second, MDOT provided an

estimated cost of $21,796 in response to the Maryland Chapter's 2022 request for modeling files used in the FEIS. (*Id.*) (citing AR 189589). Non-Profit Plaintiffs also contest FHA's response to the Maryland Chapter's modeling files request-FHA stated that it could not provide MDOT's modeling files because it did not review them. (*Id.*) (citing AR 136264; AR 136152).

NEPA's EIS requirement ensures that agencies will make environmental information available to public officials and citizens before decisions are made and actions are taken, such that "the larger audience that may also play a role in both the decisionmaking process." *Robertson*, 490 U.S. at 349 (interpreting 42 U.S.C. § 4332(C)). An agency "shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the [EIS]." 40 C.F.R. § 1502.24. An agency may not incorporate by reference material that is not "reasonably available for inspection by potentially interested persons within the time allowed for comment[]" or "material based on proprietary data that is not available for review and comment." 40 C.F.R. § 1502.21. Accordingly, NEPA requires that the public receive underlying "environmental data" from which the agency's expert derives his or her opinion about the impacts of the proposed project. *Idaho Sporting Cong. v. Thomas*, 137 F.3d 1146, 1150 (9th Cir. 1998), *overruled on other grounds by McNair*, 537 F.3d 981. "NEPA [only] obligates agencies

48

to make information *reasonably* available to the public[.]" *Friends of Cap. Crescent Trail v. Fed. Transit Admin.*, 255 F.Supp.3d 60, 67 (D.D.C.) (emphasis in original), *aff'd*, 877 F.3d 1051 (D.C.Cir. 2017).

The opinion of the United States District Court for the District of Columbia in *Crescent Trail*, 255 F.Supp.3d 60, is instructive.  In *Crescent Trail*, the plaintiffs argued that the defendant agencies' release of data that would not be accessed without purchasing other software violated NEPA.  *Id.* at 67.  The district court held that by "ma[king] their ridership data available to the plaintiffs and t[elling] them how they could purchase their own license to run the proprietary software[,]" the defendant agencies sufficiently satisfied NEPA, even if the plaintiffs must incur financial costs to access the data.  *Id.* at 67.

Here, MDOT made its data available to Non-Profit Plaintiffs, albeit at a cost.  As Defendants argue, the data Non-Profit Plaintiffs requested is not wholly unavailable because it was released to the City of Rockville after it paid the cost.  (ECF No. 50, at 25) (citing ECF No. 48-1, at 29; AR 189584–85 (letter from MDOT releasing modeling data to the City of Rockville)).  Non-Profit Plaintiffs contend that "NEPA require[s] the Agencies to . . . not lock [underlying data] behind a paywall or a time-consuming appeals process." (ECF No. 49, at 32).  Non-Profit

Plaintiffs, however, ignore the increasing size of their data requests.  In 2020, the Maryland Chapter requested modeling files and spreadsheets containing traffic and speed data, (AR 135999)- all of which was vastly eclipsed by the Maryland Chapter's 2022 request for modeling files as well as "[a]ll reports, memorandum, letters, and/or emails" describing model development, among other data, (AR 175918-19).  MDOT's request for payment while conducting their own time-consuming document and data compilation is reasonable such that the requested data cannot be deemed unavailable to the public.

Moreover, FHA explained that it did not possess MDOT's modeling files because it only reviewed traffic analysis and not the underlying data.  (*See* AR 136264; AR 136152).  Non-Profit Plaintiffs cannot assert that FHA violated NEPA in failing to produce information that it does not possess.

Non-Profit Plaintiffs maintain that even if the Maryland Chapter paid MDOT, it would not cure the Agencies' NEPA violation because the Maryland Chapter would not have received the requested information in time to comment on the FEIS.  (ECF No. 49, at 32) (citing AR 51, 175918, 189586).  Non-Profit Plaintiffs, however, overlook the fact that much of the delay is the Maryland Chapter's own doing.  Although the FEIS was available for comment from June 17, 2022 through July 18, 2022, (AR 51), the Maryland Chapter did not submit its request for information until June 29, 2022, (AR

175918).  On July 1, 2022, MDOT informed the Maryland Chapter that the information request would not be fulfilled within ten business days due to the time needed to retrieve, review, and redact records.  (AR 189588).  On July 8, 2022 and July 12, 2022, MDOT and the Maryland Chapter discussed narrowing the scope of the information request to reduce costs and processing time.  (AR 189589).  Despite Non-Profit Plaintiffs' sole focus on the computer files used for MDOT's traffic modeling, (*see* ECF No. 46-1, at 53), by July 14, 2022, the Maryland Chapter had still not provided a narrowed request for information, (AR 189589).  The Maryland Chapter had ample time to request its desired modeling files successfully but failed to take proactive steps to do so.  Hence, the Maryland Chapter's failure to obtain MDOT's modeling files from the Agencies does not indicate that the Agencies violated NEPA.

### C. Section 4(f) and Section 106

Section 4(f) prohibits an agency from approving a transportation project that "requir[es] the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance" unless "there is no prudent and feasible alternative to using that land" and the agency engages in "all possible planning" to "minimize harm" to the sites.  49 U.S.C. § 303(c).  An agency must make its

Section 4(f) approval in the FEIS or ROD.  23 C.F.R. § 774.9(b).
Section 4(f) property must be identified and evaluated for
potential use "as early as practicable in the development of the
action when alternatives to the proposed action are under study."
23 C.F.R. § 774.9(a).  Section 4(f) applies to sites included in,
or eligible to be included in, the National Register of Historic
Places.  *See* 23 C.F.R. §§ 774.11(f), 774.17.  Section 106 governs
the process for identifying historic sites for the National
Register of Historic Places.  54 U.S.C. § 306108; 36 C.F.R. §
800.4.  To comply with Section 106, an agency must "make a
reasonable and good faith effort to carry out appropriate
identification efforts."  36 C.F.R. § 800.4(b)(1).  In addition,
an agency must evaluate any adverse effects on identified historic
site that would "alter, directly or indirectly, any of the
characteristics of a historic property that qualify the property
for inclusion in the National Register in a manner that would
diminish the integrity of the property's location, design,
setting, materials, workmanship, feeling, or association."  36
C.F.R. § 800.5(a).

The Maryland Chapter, Moses Hall, and National Trust
("Morningstar Plaintiffs") argue that the Agencies violated
Section 4(f) and Section 106 by approving the Preferred Alternative
without determining whether it would disturb graves in Morningstar
Moses Cemetery.  (ECF No. 46-1, at 60).  In addition, The Maryland

Chapter, National Trust, and NRDC ("Plummers Island Plaintiffs")
contend that the Agencies violated Section 4(f) by "summarily
dismissing" the west shift alignment for ALB reconstruction-which
would avoid impacting Plummers Island-without determining whether
it would cause the "least overall harm." (*Id.* at 67) (first citing
AR 14952; AR 17698; and then quoting 23 C.F.R. § 774.3(c)(1)).

### 1. Morningstar Moses Cemetery

Morningstar Plaintiffs argue that the Agencies' approval of
the Preferred Alternative is deficient because the Agencies
entered into a programmatic agreement ("PA") improperly deferring
investigation of the land outside of the Morningstar Moses
Cemetery's historic boundary but within the Preferred
Alternative's LOD for potential burials until the Preferred
Alternative's design reaches a more advanced stage. (*Id.* at 61)
(citing AR 399, 14298).  Specifically, Morningstar Plaintiffs
contend that: (1) the Agencies failed to determine whether the
Preferred Alternative would "use" Morningstar Moses Cemetery under
Section 4(f); (2) the Agencies failed to assess the Preferred
Alternative's adverse effects on the Morningstar Moses Cemetery
under Section 106; and (3) the Agencies' insistence that the
Preferred Alternative would have no cumulative effects on
Morningstar Moses Cemetery was arbitrary. (*Id.* at 60-67).

First, Morningstar Plaintiffs contend that "the Agencies did
not finish the Section 4(f) evaluation" because the Agencies did

not survey the entirety of the land within the Preferred Alternative's LOD for potential burials prior to issuing a Section 4(f) approval. (*Id.* at 61). Federal Defendants counter that "[Morningstar] Plaintiffs confuse the separate conclusions made for Section 4(f) and Section 106." (ECF No. 47-1, at 53). Defendants argue that while the Agencies had already determined that the Preferred Alternative does not "use" Morningstar Moses Cemetery in their Section 4(f) evaluation, the Agencies complied with Section 106 via a PA deferring final identification and evaluation of graves. (*Id.* at 53 (citing AR 31; AR 5637; AR 396); 48-1, at 45-48).

To comply with Section 106, an agency "may use a phased process to conduct identification and evaluation efforts[,]" and "may also defer final identification and evaluation of historic properties" if provided in a memorandum of agreement or programmatic agreement. 36 C.F.R. § 800.4(b)(2). A phased Section 106 process extending past the issuance of the ROD does not necessarily render deficient a Section 4(f) approval issued before the ROD. The opinion of the United States Court of Appeals for the Ninth Circuit in *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222 (9th Cir. 2014), is illustrative. There, the plaintiffs challenged federal and local agencies' Section 4(f) determination on the basis that the agencies did not conduct archaeological surveys to identify all undiscovered historic

burial sites along the length of the proposed transportation corridor prior to approval. *Id.* at 1233-34. The Ninth Circuit explained that considering that the archaeological surveys were likely to disturb the burial sites, "[a]ny changes to the plans would then result in repetition of the surveys and more disturbance to burial sites than would otherwise be necessary." *Id.* at 1234. Moreover, it was "appropriate and desirable" that the agencies "entered into a programmatic agreement . . . outlining the procedures for burial sites that are discovered during construction . . . and providing specific protocols for addressing burials or other archaeological resources that are discovered. *Id.* (citing 73 Fed.Reg. 13368-01, 13379-80 (2008)). The Ninth Circuit observed that, in accordance with Section 106, "[the agencies] have made a good faith and reasonable effort to identify known archaeological sites along the proposed [corridor's] route and have developed an appropriate plan for dealing with sites that may be discovered during construction." *Id.* The Ninth Circuit concluded that, given that "[b]urial sites are eligible for Section 4(f) protection only insofar as they are identified under the Section 106 process for identifying historic sites[,]" any undiscovered burial sites are not protected by Section 4(f) and do not preclude the agencies' Section 4(f) approval. *Id.*

Here, the Agencies analogously issued their Section 4(f) approval in conjunction with implementing a phased Section 106

process.   (*See* AR 31, 5637, 396).   To define the historic boundaries of the Morningstar Moses Cemetery, (*see* AR 6029) (mapping the boundaries of the Morningstar Moses Cemetery overlaid with the Preferred Alternative's LOD), MDOT engaged experts to collect information from descendants of people whose remains are buried in the cemetery, (*see* AR 6161-63) (letter from descendants summarizing concerns), to conduct field documentation of surface features potentially indicating burials, (*see* AR 13913) ("An initial pedestrian survey of the cemetery resulted in the identification of numerous surface features, including burial markers, depressions, fieldstones, and environmental features . . . that may be related to the cemetery operations, burials, or other evidence of human activities at the site during its historic use."), and to conduct a GPR survey of subsurface burial features, (*see* AR 13915-16).   MDOT then revised the design of the Preferred Alternative that "avoids any right-of-way impacts to the [Morningstar Moses Cemetery] . . . and provides a buffer to avoid performing earthwork at the nearest known GPR-indicated feature that may be a grave."  (AR 6021).   Although MDOT cleared overgrown foliage and bamboo at the Morningstar Moses Cemetery to accommodate its GPR survey better, it explained that GPR data accuracy is affected by the cemetery's channery soils and shallow bedrock, (*see* AR 14241) (mapping soil types and ground conditions at the Morningstar Moses Cemetery), such that the GPR survey may

indicate subsurface disturbances that are actually tree roots, rocks, or different soil types-all of which can only be confirmed with complete certainty through subsurface excavations, (AR 13916).  While recognizing that "potential is low for additional burials" outside the defined boundary of the Morningstar Moses Cemetery, (AR 6021), MDOT entered into a PA establishing protocol for handling the discovery of burials in areas that are not currently accessible for thorough archaeological investigation, (AR 14298).  The PA's treatment plan for burials includes, for instance, consulting with identified descendants to recover human remains as well as adjusting the Preferred Alternative's final design to avoid newly uncovered burial sites.  (AR 14299).  Like the agencies in *HonoluluTraffic.com*, MDOT made a good faith and reasonable effort to identify potential burials.  Through the PA, MDOT ensured that the Preferred Alternative's final design remained sensitive to burials yet to be discovered, thus avoiding repetitive archaeological disturbances of gravesites preceding each design change.  Accordingly, the existence of potentially undiscovered burials does not interfere with the validity of the Agencies' Section 4(f) approval.

Morningstar Plaintiffs' argument that Section 106 cannot "loosen" Section 4(f)'s requirements because the "[National Historic Preservation Act] is an entirely separate statute with its own implementing regulation promulgated by another Federal

agency[]" fares no better.  (ECF No. 46-1, at 62) (quoting 73 Fed.
Reg. 13,368, 13,386 (Mar. 12, 2008)).  Morningstar Plaintiffs
overlook the fact that Section 4(f) and Section 106 are "distinct
but *overlapping* statutes[.]"  *City of Alexandria, Va. v. Slater*,
198 F.3d 862, 971 (D.C. Cir. 1999) (emphasis added).  "[C]ompliance
with [S]ection 4(f) is predicated upon completion of the [S]ection
106 process[,]" *id.* (citing *Corridor H Alternatives, Inc. v.
Slater*, 166 F.3d 368, 371 (1999)), and Section 106's "reasonable
and good faith effort" requirement does not demand that the
Agencies identify every possible burial within the Preferred
Alternative's LOD, *see HonoluluTraffic.com*, 742 F.3d at 1234.

Second, Morningstar Plaintiffs contend that Section 106
regulations permitting a "phased approach" do not allow the
Agencies to defer assessment of the Preferred Alternative's
adverse effects on the Morningstar Moses Cemetery.  (ECF No. 46-
1, at 63-64; *see also* ECF No. 49, at 48-49).  Defendants respond
that Morningstar Plaintiffs mischaracterize Section 106
regulations, which authorize a deferred adverse effects
evaluation.  (ECF Nos. 47-1, at 56; 48-1, at 47-48; 50, at 29-30;
51, at 33).

> Where alternatives under consideration
> consist of corridors or large land areas, or
> where access to properties is restricted, the
> agency official may use a phased process to
> conduct identification and evaluation
> efforts.  The agency official may also defer
> final identification and evaluation of

> historic properties if it is specifically provided for in a memorandum of agreement executed pursuant to § 800.6, [or] a *programmatic agreement* executed pursuant to § 800.14(b)[.] . . . As specific aspects or locations of an alternative are refined or access is gained, the agency official shall proceed with the identification and evaluation of historic properties[.]

36 C.F.R. § 800.4(b)(2) (emphasis added). "Where alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted, the agency official may use a phased process in applying the criteria of adverse effect consistent with phased identification and evaluation efforts conducted pursuant to § 800.4(b)(2)." 36 C.F.R. § 800.5(a)(3). "[An] agency official may negotiate a programmatic agreement to govern . . . the resolution of adverse effects." 36 C.F.R. § 800.14(b). "Compliance with the procedures established by an approved programmatic agreement satisfies the agency's [S]ection 106 responsibilities[.]" 36 C.F.R. § 800.14(b)(2)(iii).

Morningstar Plaintiffs argue that, pursuant to 36 C.F.R. § 800.4(b)(2), the Agencies are not permitted to defer the adverse effects determination "[b]ecause the Agencies had 'refined' their Preferred Alternative and had access to the unevaluated portion of the [LOD] long before issuing the ROD[.]" (ECF No. 49, at 49). Morningstar Plaintiffs misrepresent 36 C.F.R. § 800.4(b)(2), which plainly allows final evaluations to be deferred subject to a PA. *See* 36 C.F.R. § 800.4(b)(2) ("The agency official may also defer

final identification and evaluation of historic properties if it is specifically provided for in a . . . a programmatic agreement executed pursuant to § 800.14(b)[.]"). Morningstar Plaintiffs also contend that 36 C.F.R. § 800.4(b)(2) only permits deferring the identification of historic properties and evaluation of their historic significance. (ECF No. 46-1, at 64 n.38). Morningstar Plaintiffs, however, overlook the fact that 36 C.F.R. § 800.4(b)(2) incorporates 36 C.F.R. § 800.14(b), which expressly permits adverse effects evaluations to be governed by a PA. Morningstar Plaintiffs' omission of 36 C.F.R. § 800.14(b) in their analysis similarly dooms their argument that "[t]he Agencies can defer [an adverse effects] assessment only '[w]here alternatives under consideration consist of corridors or large land areas, or where access to properties is restricted.'" (ECF No. 46-1, at 64 (quoting 36 C.F.R. § 800.5(a)(3)); *see also* ECF No. 49, at 48 (quoting 36 C.F.R. § 800.5(a)(3))). Under 36 C.F.R. § 800.14(b), the Agencies may defer the adverse effects evaluation as provided for in the PA regardless of whether the unevaluated land within the Preferred Alternative's LOD is a corridor or large land area. Therefore, the Agencies' deferred adverse effects evaluation does not violate Section 106.

Third, Morningstar Plaintiffs contend that the Agencies' determination that the Preferred Alternative would have no cumulative effects on the Morningstar Moses Cemetery was arbitrary

because it contradicts the Agencies' admission that the Preferred Alternative might disturb burials.  (ECF No. 46-1, at 65) (citing AR 399, 14298).  Additionally, Morningstar Plaintiffs maintain that the Agencies' cumulative effects analysis failed to consider air pollution, stormwater runoff, construction impacts, and prior impacts from I-495's construction in the 1960s.  (*Id.* at 64-65). Morningstar Plaintiffs' arguments are premised on the notion that the Agencies have finished their Section 106 effects determination but it remains incomplete.  (*See* ECF No. 49, at 49 n.28). Defendants respond that the Agencies deferred the final cumulative effects determination pursuant to the PA.  (ECF Nos. 50, at 30; 51, at 33).

According to 36 C.F.R. § 800.5(a)(3), an adverse effects evaluation under Section 106 includes cumulative effects.  Given that the Agencies deferred their final adverse effects determination, it follows that they deferred their final cumulative effects determination as well.  Indeed, as Morningstar Plaintiffs observe, the Agencies determined that the Preferred Alternative does not pose adverse cumulative effects on the Morningstar Moses Cemetery.  (ECF No. 46-1, at 65 (quoting AR 6023); *see also* AR 174970 (stating that "MDOT . . . has provided detailed and specific supporting information . . . regarding the evaluation of cumulative effects [on Morningstar Moses Cemetery] . . . and the factors considered[]" in response to

comments received on the PA); AR 182 (stating that the Agencies "properly evaluated the Preferred Alternative's potential for cumulative effects, including at Morningstar [Moses] Cemetery[]" in response to comments received on the FEIS)). The Agencies' *interim* cumulative effects analysis, however, does not undermine the fact that the Agencies deferred the *final* cumulative effects determination. (*See* AR 83 (PA provision deferring effects assessment); AR 396 (stating in the FEIS that the "effects [assessment] to Morningstar [Moses] Cemetery would be deferred through the PA until further investigations of the Preferred Alternative LOD are completed[]")). Because the Agencies' interim cumulative effects analysis is subject to change pending future design changes and potential burial discoveries that may expand the Morningstar Moses Cemetery's boundaries, as well as the fact that the final cumulative effects determination is deferred, the court will not find that the Agencies' arbitrarily and capriciously ignored cumulative effects to the Morningstar Moses Cemetery.

## 2. Plummers Island

Plummers Island Plaintiffs contend that, in rejecting the west shift alignment, the Agencies violated Section 4(f) in failing to analyze all the factors necessary to identify the alternative that causes the "least overall harm." (ECF No. 46-1, at 67) (quoting 23 C.F.R. § 774.3(c)(1)). Defendants respond that the Agencies need not engage in a formulistic factor-by-factor

analysis, and they complied with Section 4(f) by broadly considering the relative harm of the west shift alignment compared to the on-center alignment. (ECF Nos. 47-1, at 58-59; 50, at 31-32; 51, at 35-36; *see also* ECF No. 48-1, at 49-50).

If an agency determines that there are no "feasible and prudent" alternatives to using Section 4(f) property, the agency must select the alternative that "[c]auses the least overall harm in light of [Section 4(f)'s] preservation purpose." 23 C.F.R. § 774.3(c)-(c)(1).

> This determination involves balancing several factors, including: (1) the "ability to mitigate adverse impacts"; (2) the relative severity of the harm after mitigation; (3) the relative significance of the Section 4(f) property; (4) the "views of the official(s) with jurisdiction over each Section 4(f) property"; (5) the "degree to which each alternative meets the purpose and need for the project"; (6) "[a]fter reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f)"; and (7) "[s]ubstantial differences in costs among the alternatives."

*Defs. of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 401 (4ᵗʰ Cir. 2014) (quoting 23 C.F.R. § 774.3(c)(1)(i)-(vii)). A Section 4(f) determination does not require formal findings. *Volpe*, 401 U.S. at 417, *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99; *see also Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 65-66 (D.C.Cir. 1987) (holding that officials balancing harms from different alternatives under Section 4(f) did

not need to provide formal findings given that "[t]he record demonstrates consideration of the relevant factors"). Even if there are some "'technical deficiencies" in an agency's least overall harm analysis, "the judicial branch may not 'fly speck,' if it appears, in its review, that all factors and standards were considered." *Adler v. Lewis*, 675 F.2d 1085, 1095 (9th Cir. 1982); *accord Hickory Neighborhood Def. League v. Skinner*, 731 F.Supp. 207, 214 (W.D.N.C. 1990), *aff'd*, 910 F.2d 159 (4th Cir. 1990). Regardless of whether an agency "use[s] the 'magic' terminology," the agency satisfies Section 4(f) as long as there has been "a reasonable and thorough review[.]" *Adler*, 675 F.2d at 1095.

In the DEIS and FEIS, the Agencies have recognized the factors in 23 C.F.R. § 774.3(c)(1). (*See* AR 38757; AR 5695). The DEIS features a factor-by-factor analysis of each Build Alternative, (*see* AR 38757-883), all of which is incorporated in the FEIS alongside a factor-by-factor analysis of the Preferred Alternative ("Table 6"), (*see* AR 5696; AR 5698-700). Despite the fact that Table 6 does not discuss the west shift alignment that was considered post-DEIS, the Agencies provide a comparative Section 4(f) analysis of the west shift and on-center alignments elsewhere.[13] An April 9, 2021 report by the "ALB Strike Team" (the

---

[13] The east shift alignment is also not mentioned in Table 6, but the FEIS notes that the east shift alignment "would . . . impact Plummers Island and other [Section 4(f)] property more than would be acceptable and is not feasible." (AR 17691).

"ALB Strike Team Report") noted that although the west shift
alignment "affords both bridge construction cost and schedule
benefits . . . relative to a centerline alignment[,] . . . [t]he
potential added expense for shifting the roadway approaches and
adjacent Clara Barton parkway interchange to accommodate a
westerly shift . . . could quickly negate these cost and schedule
benefits." (AR 198378). According to the FEIS, MDOT then compared
impacts on Section 4(f) land as well as natural and cultural
resources around the ALB and "determined that the on-center
alignment would impact the least amount of total [Section 4(f)]
land; would not require re-configuration of the Clara Barton
Parkway interchange; and would not require residential
displacement, as the west shift alignment would." (AR 17702; *see
also* AR 17692 (quantifying the west shift and on-center alignments'
impacts on Section 4(f) parks, individual trees within park
boundaries, and natural resources such as Plummers Island)). The
west shift alignment, on the other hand, "would avoid impacts to
Plummers Island but would impact more [Section 4(f)-protected
park] property and would require displacement of a residential
property on the Virginia shoreline of the Potomac River."[14] (*Id.*).

---

[14] State Defendants incorrectly state that "[t]he west shift
alignment would . . . have required MDOT to take homes and affect
the Naval Surface Warfare Center Carderock Division property[.]"
(ECF No. 48-1, at 50). In the DEIS, the Agencies considered
building a replacement ALB on an entirely offset alignment to the
west of the existing structure, which was dismissed as unfeasible

The FEIS also recognized the historical significance of each impacted Section 4(f) property, including Plummers Island. (AR 401-03) ("[Plummers Island] is significant for its association with contributions to science and conservation as the site of long-term scientific studies[.]"). Moreover, the FEIS explained anticipated adverse effects and mitigation tactics for the on-center alignment:

> Impacts were minimized by strategically locating the new piers near the existing piers such that a single access method could be used for demolition of the existing [structures] and construction of the proposed structures. However, some impact is unavoidable based on construction requirements and the structural requirements for pier locations. . . . [T]he proposed construction activities at the western edge of Plummers Island will alter the natural landscape of the island, . . . resulting in diminishment of the property's integrity of setting.

(AR 403).

Plummers Island Plaintiffs contend that Defendants failed to analyze five of seven factors in 23 C.F.R. § 774.3(c) (1)-namely, the relative significance of the impacted Section 4(f) properties, the relative severity of harm after mitigation, the ability to mitigate adverse impacts of the west alignment, whether the west

---

"due to unacceptable impacts to the Naval Surface Warfare Center Carderock Division property[.]" (AR 17690). The less impactful, "minimally offset alignment to the west"-in other words, the west shift alignment-that was considered post-DEIS does not affect the Naval Surface Warfare Center Carderock Division property. (AR 17691).

shift alignment's impacts to Section 4(f) and non-Section 4(f) property could be mitigated, and differences in costs between the west shift and on-center alignments.  (ECF Nos. 46-1, at 69-70; 49, at 52-54).  As Federal Defendants argue, Plummers Island Plaintiffs urge the court to adopt "an overly formulistic reading of Section 4(f)'s requirements."  (ECF No. 47-1, at 57). Especially given the fact that Section 4(f) does not mandate formal findings, the court will not "fly speck" the Agencies' least overall harm analysis.  *Adler*, 675 F.2d at 1095.  Even in the absence of a factor-by-factor analysis, the administrative record shows that the Agencies were aware of the 23 C.F.R. § 774.3(c)(1) factors and undertook all possible planning to minimize the Preferred Alternative's harm to natural and cultural resources as well as residential communities while reducing costs.  Thus, the Agencies have reasonably complied with Section 4(f) with respect to their selection of the on-center alignment.

## IV.  Conclusion

The court concludes based on review of the administrative record and the foregoing analysis that Plaintiffs have not demonstrated that Defendants' actions were arbitrary and capricious in their decision to approve the Preferred Alternative. Nor have Plaintiffs demonstrated that Defendants have violated NEPA, Section 4(f), and Section 106.  Thus, Plaintiffs' motion for

summary judgment will be denied and Defendants' cross-motions for summary judgment will be granted.  A separate order will follow.


                                        /s/
                            _____
                            DEBORAH K. CHASANOW
                            United States District Judge